1   MAURA LARKINS
    1935 Autocross Court
2   El Cajon, CA 92019
    619 444 0065
3   Defendant pro se

```
┌─────────────────────────┐
│        FILED            │
│      NOV 1 9 2007       │
│  CLERK, U.S. DISTRICT COURT │
│ SOUTHERN DISTRICT OF CALIFORNIA │
│  BY              DEPUTY  │
└─────────────────────────┘
```

4                    UNITED STATES DISTRICT COURT
5                       Southern District of California

6   ─────────────────────────────────────────
7   STUTZ ARTIANO SHINOFF          ) USDC 07-CV _____
    & HOLTZ, APC,                  )
            Plaintiff,             )          '07 CV 2202 WQH (WMC)
8                                  )
                                   )
9            v.                    )
                                   ) **NOTICE OF REMOVAL**
10  MAURA LARKINS,                 ) FROM STATE COURT [28 USC 1441,
                                   ) 1442, 1443, 1446]
11  and DOES 1 through 100, inclusive, )
            Defendants.            )
12                                 )
                                   )
13                                 ) (Removing Case No.
                                   ) 37-2007-00076218-CU-DF-CTL)
14                                 )
    ─────────────────────────────────────────

15      1.  On October 5, 2007, an action was commenced against defendant by

16  STUTZ, ARTIANO, SHINOFF & HOLTZ, APC in SUPERIOR COURT OF

17  THE STATE OF CALIFORNIA, FOR THE COUNTY OF SAN DIEGO (Central

18  Division).

19
        2.  On October 21, 2007 service was made on defendant of a summons and
20
    complaint in the above-mentioned defamation action.
21
22      3.  On November 16, 2007 defendant filed an answer to the complaint, and

23  served it on plaintiff.

24      4.  Copies of the above-mentioned complaint, summons and answer are

25  attached to this notice.  All process, pleadings and orders in the case are attached,

26  pursuant to 28 USC 1446.  These consist of the complaint, the proof of service of

27
28
                                    1
                          ─────────────────────
                          Notice of Removal

1  the complaint, the defendant's answer, and the proof of service of defendant's

2  answer.

3       5.  Since this removing defendant is the only named defendant in this

4  action, no written consent from any other defendant is required in this removal.

5

6       6. This Notice of Removal is timely filed within thirty days of Plaintiff's

7  service on me of the aforementioned complaint on October 21, 2007.

8       7. This notices all parties that the above-entitled state court case has been

9  removed to the United States District Court in accordance with 28 USC 1441,

10  1442, 1443, 1446.

11            Basis for Removal at 28 USC 1441, 1442, 1443, 1446

12                 Federal Question Jurisdiction

13                 First Amendment Right

14

15      It appears from the plaintiff's complaint that this is a civil action that

16  arises under the First Amendment to the Constitution of the United States because

17  defendant has a right to speak publicly about matters of public interest,

18  specifically, the actions of public entities, and their employees and officers and

19  lawyers.  Defendant has spoken out about Plaintiff's successful efforts to help

20  public entities hide behind attorney confidentiality in order to cover up

21  wrongdoing.

22

23      Not coincidentally, the instant  First Amendment freedom of speech case

24  arose out of a grievous violation of defendant's First Amendment right to petition

25  for redress of grievances, when defendant was fired in May 2002 specifically for

26  filing a lawsuit at Chula Vista Elementary School District ("CVESD") in March

27

28

2002.  Plaintiff Stutz Artiano Shinoff & Holtz  ("SASH") was the law firm provided by San Diego County Office of Education Joint Powers Authority to CVESD in that case.  SASH apparently instructed CVESD to violate the law by firing plaintiff less than two months after she filed the lawsuit, then SASH pressured CVESD employees to commit perjury and abused the discovery process (see exhibits in defendant's ANSWER TO COMPLAINT, which is attached to this NOTICE).  The Superior Court of California threw out defendant's lawsuit after three years because defendant failed to file a specific motion to compel, even though the court admitted that plaintiff appeared to have abused the discovery process.   There appears to be an overwhelming bias against in pro per litigants in San Diego state courts.

The California Court of Appeal also has failed to enforce California state laws when school districts violate those laws *(Mary Anne Weegar v. Sweetwater Union High School District, James T. Carter v. Escondido Union High School District)*, and has at the same time failed to enforce the Constitution of the United States.  Instead, the Court of Appeal protects dysfunctional public entities that devote public resources to keeping individuals in power, often by channeling public money to defense lawyers such as SASH who help cover up the truth.

Defendant Maura Larkins filed an appeal in a related case in the Court of Appeal, and shortly thereafter she informed opposition counsel of her action.  The next day the California Court of Appeal called up defendant Larkins and said it would not file her case.  Larkins informed the Court of Appeal that the case had already been filed, and it would be a felony to remove the case from that file.  The

3

1   Court of Appeal conceded that defendant was in the right, but has not revealed

2   how many other in pro per litigants have been hoodwinked by such attempts to

3   undermine the justice system.

4       The United States can not continue to benefit from democracy and

5   continued economic progress without respect for the law, particularly when

6   

7   violations of law are undermining our educational system.  The nations of the

8   world send their best and brightest students to graduate schools in the United

9   States, but our own kindergarten through twelfth-grade educational system is

10  mired in inertia and failure, in part because public entity lawyers such as SASH

11  abuse the justice system and violate the law to protect individuals in power who

12  put politics first and education a distant second.

13  

14      WHEREFORE, defendant prays that the above action now pending

15  against her in the Superior Court of California, County of San Diego, be removed

16  therefrom to this Court.

17  November 19, 2007            _Maura Larkins_

    Maura Larkins, defendant in pro per

18  

19  

20  

21  

22  

23  

24  

25  

26  

27  

28  

Notice of Removal

FILED
CIVIL BUSINESS OFFICE 2
CENTRAL DIVISION

2007 OCT -5  PM 4: 42

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

1  **STUTZ ARTIANO SHINOFF & HOLTZ**
*A Professional Corporation*
2  Ray J. Artiano, Esq. (State Bar No. 88916)
Jeffrey P. Wade, Jr., Esq. (State Bar No. 196066)
3  Richard E. Romero, Esq. (State Bar No. 247056)
2488 Historic Decatur Road, Suite 200
4  San Diego, CA 92106-6113
Tel: (619) 232-3122
5  Fax: (619) 232-3264

6  Attorneys for Plaintiff, STUTZ ARTIANO SHINOFF & HOLTZ, APC

7

8  ### SUPERIOR COURT OF THE STATE OF CALIFORNIA

9  ### FOR THE COUNTY OF SAN DIEGO - CENTRAL BRANCH

10

| 11 | STUTZ ARTIANO SHINOFF & HOLTZ, APC, | Case No.  37-2007-00076218-CU-DF-CTL |
|---|---|---|
| 12 | | |
| 13 | Plaintiff, | COMPLAINT FOR DAMAGES FOR DEFAMATION AND REQUEST FOR PUNITIVE DAMAGES |
| 14 | v. | |
| 15 | MAURA LARKINS, and DOES 1-100, inclusive | |
| 16 | Defendant. | [Jury Trial Demanded] |
| 17 | | |
| 18 | | |

19        Plaintiff hereby alleges as follows:

20        1.      Plaintiff, Stutz Artiano Shinoff & Holtz, APC (hereinafter "SASH") was at all

21  times mentioned herein a professional corporation registered in California and authorized to

22  practice law in the States of California and Nevada, with offices located in Los Angeles, Orange

23  County, Temecula and San Diego, California, and Las Vegas Nevada.

24        2.      SASH is informed and believes and thereon alleges that Defendant Maura Larkins

25  was at all times mentioned herein an individual and a resident of the County of San Diego, State

26  of California, where the injury occurred.

27  ///

28

1

G:\DATA\PW\000\pl\S7018036.WPD

3.      SASH is ignorant of the true names and capacities of the defendants sued herein as Does 1 through 100, inclusive, and therefore sues these defendants by such fictitious names pursuant to Code of Civil Procedure section 474. SASH will amend this complaint to allege their true names and capacities when ascertained. SASH is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged and that SASH's injuries as herein alleged were proximately caused by the aforementioned defendants.

4.      SASH is informed and believes and on that basis alleges that at all relevant times each defendant is or was the employee, agent, partner or representative of each other defendant, was at all times acting within the course and scope of that relationship, and acted with the permission, approval, consent and/or ratification of all other defendants.

5.      Jurisdiction in this matter is proper as all parties are citizens of California and the amount in controversy exceeds the value or sum of $5,000.00.

6.      Venue in this matter is proper within the Superior Court, County of San Diego, as a substantial part of the acts and omissions giving rise to SASH's claims occurred within the County of San Diego, State of California.   The injuries and damages sustained by SASH, as more fully set forth herein, occurred in the County of San Diego, State of California.   The conduct of the defendants, and each of them, occurred and directly impacted SASH within the County of San Diego, State of California.

## GENERAL ALLEGATIONS

7.      In or about approximately December of 2006, SASH learned that Defendant Maura Larkins had created a website entitled www.mauralarkins.com, also known as the San Diego Education Report.  It is unknown when Defendant started the website.

8.      On or about March 12, 2002, Defendant filed a complaint for damages against Richard T. Werlin, Gretchen Donndelinger, Joe Ellen Hamilton, Ellen R. Smith, Linda M. Watson, Michelle Leon-Scharmach, Lynne Margaret Sallans, Libia S. Gil, and Chula Vista Elementary School District.

2

G:\DATA\PW\000\pfiS7018036.WPD

9.    SASH represented each of the named defendants, as well as the Chula Vista Elementary School District, during the course of the litigation. The matter was ultimately resolved in favor of the defendants and against Defendant Larkins on March 16, 2005. As a result of this lawsuit, Defendant Larkins was ordered to pay $3,124.68.

10.    SASH is unaware of the date that Defendant's website, www.mauralarkins.com, was created. Defendant's website, however, contains articles dated from May 18, 2006, referencing SASH.

11.    When searching the internet using the search term "stutz artiano," Defendant's website, www.mauralarkins.com/stutzartiano, is located.

12.    Defendant's website, www.mauralarkins.com, contains numerous defamatory statements regarding SASH and its attorneys, which defamatory statements were made with negligence, malice, oppression, fraud, and/or willful/knowing disregard of the truth and have harmed SASH's reputation, property, business, trade, profession, and occupation.

## I.

## FIRST CAUSE OF ACTION

### (Defamation Per Se)

13.    SASH realleges and incorporates by reference paragraphs 1-12 as though fully set forth herein.

14.    The "homepage" for www.mauralarkins.com, entitled "San Diego Education Report," contains a "link" titled "Stutz Artiano & Shinoff." Once a person "clicks" on the Stutz Artiano & Shinoff link, several articles authored by Defendant appear. The homepage also contains numerous other references to SASH and its attorneys.

15.    On the website, Defendant has a section entitled "Judges and Prosecutors are getting tired of lawyers who violate the law," wherein Defendant makes the statement that "Education Law Firms Slammed by Federal Judge: Lozano, Smith uses same practices as Stutz, Artiano, Shinoff & Holtz." Defendant's statement attempts to liken SASH to the firm of Lozano Smith and makes the factual assertion that SASH and Lozano Smith engage in the same

3

1    practices. Defendant points out that the Fresno-based Lozano Smith firm was sanctioned by a

2    federal judge for "repeated misstatements of the record, frivolous objections to plaintiff's

3    statement of facts, and repeated mischaracterizations of the law." The federal judge's published

4    decision made no reference to SASH yet Defendant, with negligence, malice, oppression, fraud,

5    and/or willful/knowing disregard of the truth, made the factual assertion that SASH engages in

6    the same practices as Lozano Smith. These statements imply to the reader that SASH engages

7    in unprofessional and unethical conduct and lacks professional competence or integrity in its

8    chosen profession.

9          16.     Within the same article, Defendant states that "Stutz, Artiano, Shinoff & Holtz

10   shares the following characteristics with the law firm in the Moser case," followed by a

11   numbered list of characteristics, the first of which is that "A culture of misrepresentation and

12   deception exists at Stutz Artiano & Shinoff [sic]." Defendant made this factual statement with

13   negligence, malice, oppression, fraud, and/or willful/knowing disregard of the truth. This

14   statement implies to the reader that SASH engages in unprofessional and unethical conduct and

15   lacks professional competence or integrity in its chosen profession.

16          17.     Defendant continues in the article by stating that "the firm [referring to SASH]

17   clearly suffers from a lack of professionalism or a lack of understanding of the law." This

18   statement states and suggests a fact, that SASH is unprofessional and lacks an understanding of

19   the law. Defendant made this factual statement with negligence, malice, oppression, fraud,

20   and/or willful/knowing disregard of the truth. This statement tells the reader that SASH engages

21   in unprofessional and unethical conduct and lacks professional competence or integrity in its

22   chosen profession.

23          18.     Defendant continues with the statement that "Many of STUTZ's filings cannot be

24   interpreted as anything other than bad-faith attempts to mislead the court, obscure the real facts,

25   and to obstruct and/or harass the plaintiff, either to wear down the plaintiff or to win a victory

26   that is clearly unjustified by either the facts or the law." Defendant made this factual assertion

27   regarding the nature of SASH's filings with negligence, malice, oppression, fraud, and/or

28

4

*A Professional Corporation*

willful/knowing disregard of the truth. This statement implies to the reader that SASH engages in unprofessional and unethical conduct and lacks professional competence or integrity in its chosen profession.

19.    Defendant next makes the statement that "While isolated errors or misstatements might be excused, given the size of the record, the sheer volume of misstatements, the only reasonable inference that can be drawn is that Daniel Shinoff, Jeffery Morris, Kelly Angell and many other Stutz lawyers intended to obstruct at every step and stand education law, as well as labor law, the Penal Code, and the constitutions of California and the United States, on their heads." Defendant made this factual statement with negligence, malice, oppression, fraud, and/or willful/knowing disregard of the truth. In making this statement, Defendant is suggesting to the reader that it is a fact that SASH and its lawyers obstruct the law and implies that SASH engages in unprofessional and unethical conduct and lacks professional competence or integrity in its chosen profession. This statement also implies that SASH has engaged in violations of the law.

20.    Collectively, the article entitled "Judges and Prosecutors are getting tired of lawyers who violate the law" takes excerpts from the *Moser v. Bret Harte Union High School District* case and replaces the name of the Lozano Smith firm or its individual attorneys with the names of SASH and its attorneys, suggesting that SASH was involved in the *Moser* case or otherwise sanctioned by the federal court. Defendant made these factual statements with negligence, malice, oppression, fraud, and/or willful/knowing disregard of the truth. In making these statement, Defendant imputes to SASH unprofessional and unethical actions and implies that SASH and its lawyers engage in unprofessional and unethical conduct and lack professional competence or integrity in their chosen profession. These statement also imply that SASH has engaged in violations of the law.

21.    In another section of Defendant's website, entitled "WHEN PUBLIC ENTITIES HIRE UNETHICAL LAWYERS," Defendant asserts that: "STUTZ works hard to make sure that LOTS of tax money goes to lawyers who:

5

*A Professional Corporation*

1        A)      prevent legitimate investigations of problems in schools; and

2        B)      make sure that tax dollars do not go to victims."

3   Defendant made these factual statement with negligence, malice, oppression, fraud, and/or

4   willful/knowing disregard of the truth.  These statements tell the reader that SASH engages in

5   unprofessional and unethical conduct and lacks professional competence or integrity in its

6   chosen profession.

7        22.    The same "article" further asserts that "Public officials who want to keep the

8   public in the dark call on Dan Shinoff and Mark Breese to keep witnesses quiet and to finesse

9   the paperwork." This statement is an assertion of fact—that public officials call Dan Shinoff when

10  they want to engage in inappropriate and unlawful conduct such as tampering with

11  witnesses—and is made with negligence, malice, oppression, fraud, and/or willful/knowing

12  disregard of the truth.  This statement tells the reader that SASH and its attorneys engage in

13  unprofessional and unethical conduct and lack professional competence or integrity in their

14  chosen profession.

15       23.    Another "article" on Defendants website is entitled "GET OUT OF JAIL FREE

16  CARD?" and states that "The lawyers provided by SDCOE Joint Powers Authority to Chula

17  Vista Elementary School District, Daniel Shinoff, Jeffery Morris, and Kelly Angell, as well as

18  Stutz partner Ray Artiano, violated California law in case after case." Defendant made this

19  factual statement with negligence, malice, oppression, fraud, and/or willful/knowing disregard

20  of the truth.  This statement tells the reader that SASH engages in unprofessional and unethical

21  conduct, lacks professional competence or integrity in its chosen profession, and engages in

22  violations of the law.

23       24     In yet another section of Defendant's website, Defendant asserts that "Daniel

24  Shinoff, Kelly Angell Minnehan, Jeffery Morris and their law firm, Stutz, Artiano, Shinoff &

25  Holtz took $100,000s of taxpayer dollars to cover up crimes at Chula Vista Elementary School

26  District."  Defendant made this factual statement with negligence, malice, oppression, fraud,

27  and/or willful/knowing disregard of the truth.  This statement tells the reader that SASH engages

28

6

*A Professional Corporation*

1    in unprofessional and unethical conduct, lacks professional competence or integrity in its chosen

2    profession, and engages in violations of the law.

3        25.    Another article on Defendant's website is entitled "Why did Gallagher suddenly

4    leave his own firm, Stutz Gallagher in 2003?" Plaintiff makes the factual assertion that Robert

5    Gallagher left SASH in December 2003 after Maura Larkins "wrote a letter to the firm in

6    December 2003 detailing obstruction of justice by Daniel Shinoff and Kelly Angell". Daniel

7    Shinoff is an owner of SASH and Kelly Angell [Minnehan] is a former associate with the firm.

8    Defendant made this factual statement with negligence, malice, oppression, fraud, and/or

9    willful/knowing disregard of the truth. This statement tells the reader that SASH and its

10    attorneys engage in unprofessional and unethical conduct, lack professional competence or

11    integrity in their chosen profession, and engage in violations of the law.

12        26.    In another article, entitled "Thirty former Mira Costa College officials agree with

13    SD Education Report," Defendant asserts that "Officials complain about channeling enormous

14    amounts of public funds to Attorney Daniel Shinoff." Defendant goes on to state that "My own

15    personal opinion is, if a public entity is doing business with Daniel Shinoff of Stutz, Artiano,

16    Shinoff & Holtz, that public entity is probably involved in dirty business." Despite being

17    phrased as an opinion, Defendant's latter statement suggests a fact, that SASH and its attorneys

18    are involved in inappropriate and illegal businesses. Defendant made these factual statements

19    with negligence, malice, oppression, fraud, and/or willful/knowing disregard of the truth. Thess

20    statements tell the reader that SASH engages in unprofessional and unethical conduct, lacks

21    professional competence or integrity in its chosen profession, and engages in violations of the

22    law.

23        27.    On her website, Defendant also states, in two different locations, that "Shinoff

24    keeps important documents locked up in his files, and presents perjured testimony." Defendant

25    made this factual statement with negligence, malice, oppression, fraud, and/or willful/knowing

26    disregard of the truth. This statement tells the reader that SASH and its attorneys engage in

27    ///

28

7

*A Professional Corporation*

G:\DATA\UPW\000\pfS7018036.WPD

Complaint for Damages for Defamation

1   unprofessional and unethical conduct, lack professional competence or integrity in their chosen

2   profession, and engage in violations of the law.

3       28.     Although not required to do so, SASH asked Defendant to cease and desist in her

4   website and publications in a letter dated August 6, 2007. Defendant did not respond but instead

5   posted the letter on her website.

6       29.     Defendant admits on her website that she is the author of the offending website.

7       30.     All of he statements outlined above were published by Defendant Maura Larkins

8   on her website, www.mauralarkins.com.

9       31.     None of the above-referenced defamatory publications by Defendant against SASH

10  are true.

11      32.     The above defamatory statements were and are reasonably understood as assertions

12  of fact and not as opinions.  Each of these false defamatory publications were negligent,

13  recklessly, intentionally, fraudulently, and oppresively published in a manner equaling malice

14  and abuse of any alleged  privilege that may or may not exist.

15      33.     Each of these publications by Defendant Larkins was made with knowledge that

16  no investigations supported the unsubstantiated and obviously false statements. The defendant

17  published these statements willingly and knowing them to be false and unsubstantiated by any

18  reasonable investigation.   These acts of publication were known by Maura Larkins to be

19  negligent to such a degree as to be reckless, if not intentional.  Not only did Defendant have no

20  reasonable basis to believe these statements, but she also had no belief in the truth of these

21  statements, and in fact knew these statements to be false.

22      34.     The above complaint of publications by defendants, and each of them, were made

23  with malice, hatred and ill will towards SASH, with a design and intent to injure SASH, SASH's

24  good name, its reputation, employment, and employability in the future.  Defendants, and each

25  of them, published these statements not with an intent to protect any interest intended to be

26  protected by any privilege but with negligence, recklessness, and/or an intent to injure SASH and

27  destroy its reputation; therefore, no privilege existed to protect any of the defendants from

28

8

*A Professional Corporation*

1   liability for any of these aforementioned publications or re-publications. The publications by

2   Defendant were made with hatred, ill will and with the intent to injure, as to entitle SASH to

3   punitive damages.

4        35.     As a proximate result of the publications and re-publications of these defamatory

5   statements by defendants, and each of them, SASH has suffered injury to its personal, business,

6   and professional reputation including suffering embarrassment, humiliation, and significant

7   economic loss in the form of lost wages and future earnings, all to SASH's economic detriment,

8   and general damages in an amount in excess of $100,000, according to proof at trial.

9        **WHEREFORE**, Plaintiff prays for judgment against Defendant as follows:

10       1.      For general and special damages according to proof at trial;

11       2.      For punitive damages according to proof at trial;

12       3.      For attorney fees and costs;

13       4.      For costs of suit herein incurred; and

14       5.      For such other and further relief as this Court may deem proper.

15   DATED: October 5, 2007                    By: _____

16                                                 Ray J. Artiano, Esq.
                                                   Jeffrey P. Wade, Jr., Esq.

17                                                 Richard Romero, Esq.
                                                   **Attorneys for Plaintiff, STUTZ ARTIANO**

18                                                 **SHINOFF & HOLTZ** *A Professional*
                                                   *Corporation*

19

20

21

22

23

24

25

26

27

28

*A Professional Corporation*

9

# SUMMONS

**SUM-100**

## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Maura Larkins, and DOES 1-100, inclusive

| FOR COURT USE ONLY |
|---|
| *(SOLO PARA USO DE LA CORTE)* |
| CIVIL BUSINESS OFFICE 2 CENTRAL DIVISION |
| 2007 OCT -5 PM 4: 42 |
| CLERK-SUPERIOR COURT SAN DIEGO COUNTY, CA |

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Stutz Artiano Shinoff & Holtz, APC

---

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.  Una carta o una llamada telefónica no lo protegen.  Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.  Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales.  Es recomendable que llame a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.  Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.  Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org); en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California
330 W. Broadway
Hall of Justice
San Diego, CA  92101

| CASE NUMBER: |
|---|
| *(Número del Caso):* 37-2007-00076218-CU-DF-CT |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Ray J. Artiano, Esq.                                    619/232-3122    619/232-3264
Stutz Artiano Shinoff & Holtz
2488 Historic Decatur Road, Suite 200
San Diego, CA  92106-6113

DATE:                                           Clerk, by _____**C. SCHAEFFER**_____, Deputy
*(Fecha)*   OCT - 5 2007              *(Secretario)*                              *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

| [SEAL] | 1. ☒ as an individual defendant. |
|---|---|
| | 2. ☐ as the person sued under the fictitious name of *(specify):* |
| | 3. ☐ on behalf of *(specify):* |
| | under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor) |
| | ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee) |
| | ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person) |
| | ☐ other *(specify):* |
| | 4. ☒ by personal delivery on *(date):* 10/21/07 |

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STUTZ, ARTIANO SHINOFF & HOLTZ, AfC, plaintiff )<br><br>vs. )<br><br>MAURA LARKINS, defendant ) | Case No. _____<br><br>**DECLARATION OF SERVICE**<br><br>Person Served:<br>Ray Artiano<br>_____<br>Date Served:<br>11/19/07<br>_____ |

I, the undersigned declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; that I served the above named person the following documents:
NOTICE OF REMOVAL
in the following manner: (check one)

1)          By personally delivering copies to the person served.

2)          By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to ther person served at the place where the copies were left.

3)          By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4)    ✗    By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at El Cajon, California on  November 19 , 20 07
Stutz, Artiano Shinoff & Holtz
2488, Historic Decatur Road, Suite 200
San Diego, CA 92106

Executed on          November 19,          , 20 07          at El Cajon, California

_____
Robert  W.  Larkins

::ODMA\PCDOCS\WORDPERFECT\14560\2 May 5, 1999 (10:01am)

POS-030

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Maura Larkins<br>1935 Autocross CT<br>El Cajon, CA 92019<br>TELEPHONE NO.: 619 444 0065  FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:  Defendant in pro per<br>ATTORNEY FOR *(Name)*: | CIVIL BUSINESS OFFICE 7<br><br>2007 NOV 16  P 4: 36<br><br>CLERK-SUPERIOR COURT |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF    San Diego

STREET ADDRESS:    330 Broadway
MAILING ADDRESS:    330 Broadway
CITY AND ZIP CODE:    San Diego, CA 92101
BRANCH NAME:    Central-Hall of Justice

PETITIONER/PLAINTIFF:    STUTZ ARTIANO SHINOFF & HOLTZ, APC

RESPONDENT/DEFENDANT:    MAURA LARKINS

| PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL | CASE NUMBER:  NOV 16 '07 PM 4:19 |
|---|---|
| | 37-2007-00076218-CU-DF-CTL |

**(Do not use this Proof of Service to show service of a Summons and Complaint.)**

1. I am over 18 years of age and **not a party to this action.** I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:
   4566 Nebo DR  Apt A
   La Mesa, CA 91941

3. On *(date)*: Nov. 16, 2007  I mailed from *(city and state)*:
   the following documents *(specify)*:

   Answer to Complaint

   ☐ The documents are listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Documents Served)* (form POS-030(D)).

4. I served the documents by enclosing them in an envelope and *(check one)*:
   a. ☑ **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.
   b. ☐ **placing** the envelope for collection and mailing following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

5. The envelope was addressed and mailed as follows:
   a. **Name** of person served:
   b. **Address** of person served:
   Ray Artiano
   Stutz Artiano Shinoff & Holtz
   2488 Historic Decatur Rd. Suite 200
   San Diego, CA 92106-6113

   ☐ The name and address of each person to whom I mailed the documents is listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Persons Served)* (POS-030(P)).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  November 16, 2007

Toni Chase                                          ▶ _Toni Chase_

| (TYPE OR PRINT NAME OF PERSON COMPLETING THIS FORM) | (SIGNATURE OF PERSON COMPLETING THIS FORM) |
|---|---|

**PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL**
**(Proof of Service)**

Code of Civil Procedure, §§ 1013, 1013a
www.courtinfo.ca.gov

1

MAURA LARKINS
1935 Autocross Court
El Cajon, CA 92019
619 444 0065

Defendant in pro per

NOV 16 '07 PM 4:19

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| STUTZ ARTIANO SHINOFF & HOLTZ, APC, <br><br> Plaintiff, <br><br> vs. <br><br> MAURA LARKINS, <br> and DOES 1 through 100, inclusive, <br> Defendants. | ) Case No. 37-2007-00076218-CU-DF-CTL <br> ) Judge:     Linda B. Quinn <br> ) Dept:      74 <br> ) <br> ) MAURA LARKINS' VERIFIED <br> ) ANSWER TO UNVERIFIED <br> ) COMPLAINT <br> ) <br> ) <br> ) <br> ) TRIAL DATE: NOT SET <br> ) CASE FILED: OCTOBER 5, 2007 <br> ) |

COMES NOW the defendant, MAURA LARKINS, for herself alone, and answers the allegations of the above-entitled complaint, affirms, denies, and alleges as follows:

This complaint constitutes malicious prosecution by a plaintiff who is a public figure and is itself guilty of egregious defamation of defendant. Plaintiff's awareness of its own guilt is made clear by its refusal to produce even one of the documents requested for its deposition. Two representatives of plaintiff, Ray Artiano and Daniel Shinoff, came to the deposition of Stutz, Artiano, Shinoff & Holtz, APC ("SASH"), but they walked out after two hours, having refused to answer questions (see Exhibit 1--rough

1
Answer

draft of November 8, 2007 deposition of SASH).  Hours later, Daniel Shinoff failed to

show up for his deposition at all, without serving an objection beforehand.  It is clear that

this lawsuit is an attempt to use malicious prosecution to stifle defendant's First

Amendment right to publish material on a website to inform the public of matters of

public concern.

## ANSWER TO paragraphs 1-12 GENERAL ALLEGATIONS

1. This answering defendant admits, on information and belief, the allegations in

paragraph 1.

2.  This answering defendant admits the allegations in paragraph 2.

3.  This answering defendant lacks information and belief to either admit or deny

the allegations in paragraph 3, and on that basis, this answering defendant states that the

allegations contain legal conclusions solely within the purview of the court and on that

basis denies the allegations.

4.  This answering defendant denies all the allegations in paragraph 4, since she

works alone, but is flattered by Stutz' apparent belief that there are 100 people who

approve of defendant's actions, and that each of these people is her employee, employer,

agent, partner or representative.  Apparently SASH thinks of defendant as some sort of

Internet mogul.

5. This answering defendant admits that she is a citizen of California. This

answering denies that the amount in controversy exceeds $5,000.00, and presents Exhibit

1, the deposition of the plaintiff taken on November 8, 2007, in which the plaintiff

admitted that it knows nothing of any financial damages it suffered.

6. This answering defendant lacks information and belief to either admit or deny the

allegations in paragraph 6, and on that basis, this answering defendant states that the allegations contain legal conclusions solely within the purview of the court and on that basis denies the allegations.

7. This answering defendant lacks information and belief to either admit or deny the allegations in paragraph 7, and on that basis, this answering defendant states that the allegations contain legal conclusions solely within the purview of the court and on that basis denies the allegations.

8. This answering defendant admits the allegations in paragraph 8.

9. This answering defendant admits that SASH represented defendants name in paragraph 8. If the allegations in paragraph 9 are intended to mean that any finding of fact regarding the causes of action was made in the case described in paragraph 8, this answering defendant denies the allegations. In fact, the lawsuit was dismissed as a result of MAURA LARKINS' failure to file a motion to compel SASH to conform to the rules of discovery when, *as the judge noted, there was evidence that SASH was abusing the discovery process.* LARKINS paid only court costs after the case was dismissed.

10. This answering defendant assumes that the allegations in paragraph 10 are probably true.

11. This answering defendant admits the allegation in paragraph 11.

12. This answering defendant denies all the allegations in paragraph 12. There are no defamatory statements on defendant's website.

## ANSWER TO FIRST CAUSE OF ACTION

14. This answering defendant admits the allegations in paragraph 14.

15. This answering defendant admits the allegations in the first three sentences in

paragraph 15, however, since the statements are true and SASH is the legal representative for many public entities, defendant's statements are protected speech under the First Amendment to the Constitution, Bill of Rights, giving citizens the right to speak publicly about government and matters of public interest. Since SASH is often in the media spotlight, it and its lawyers are public figures who act on behalf of government. In fact, SASH sometimes acts in place of the officials of those public entities (as when Dan Shinoff, not the college president, ordered the removal of Julie Hatoff from MiraCosta College). This answering defendant denies the allegations in the fourth sentence of paragraph 15, and lacks information and belief to either admit or deny the allegations in the final sentence in paragraph 15, and on that basis, this answering defendant states that the allegations contain legal conclusions solely within the purview of the court and on that basis denies the allegations.

16. This answering defendant **admits** the allegations in the first sentence in paragraph 16, however, since the statements are true and SASH is the legal representative for many public entities, defendant's statements are protected speech under the First Amendment to the Constitution, Bill of Rights, giving citizens the right to speak publicly about government and matters of public interest. Since SASH is often in the media spotlight, it and its lawyers are public figures who act on behalf of government. This answering defendant **denies** the allegation in the second sentence of paragraph 16, and **lacks** information and belief to either admit or deny the allegations in the final sentence in paragraph 16, and on that basis, this answering defendant states that the allegations contain legal conclusions solely within the purview of the court and on that basis denies the allegations.

4

Answer

17. This answering defendant **admits** the allegations in the first sentence of paragraph 17, however, since the statements are true and SASH is the legal representative for many public entities, defendant's statements are protected speech under the First Amendment to the Constitution, Bill of Rights, giving citizens the right to speak publicly about government and matters of public interest. Since SASH is often in the media spotlight, it and its lawyers are public figures who act on behalf of government. This answering defendant **denies all** the allegations in the remaining sentences of paragraph 17. The complainant has blithely changed defendant's word "or" to the word "and," resulting in false allegations.

18. This answering defendant admits the allegation in the first sentence of paragraph 18, however, since the statements are true and SASH is the legal representative for many public entities, defendant's statements are protected speech under the First Amendment to the Constitution, Bill of Rights, giving citizens the right to speak publicly about government and matters of public interest. Since SASH is often in the media spotlight, it and its lawyers are public figures who act on behalf of government. This answering defendant **denies** the allegation in the second sentence of paragraph 18, and **lacks** information and belief to either admit or deny the allegations in the final sentence in paragraph 18, and on that basis, this answering defendant states that the allegations contain legal conclusions solely within the purview of the court and on that basis denies the allegations.

19. Defendant admits the first and second sentences of paragraph 19, and denies the rest of the paragraph.

20. Paragraph 20 is a flight of fancy which no reader with good reading

comprehension would gather from reading defendant's website.  This answering

defendant denies all the allegations in paragraph 20.

21. Defendant admits the first and second sentences of paragraph 21, and

denies the rest of the paragraph.

22. Defendant admits the first and second sentences of paragraph 22, and

denies the rest of the paragraph.

23.  Defendant admits the first and second sentences of paragraph 23, and

denies the rest of the paragraph.

24. Defendant admits the first and second sentences of paragraph 24, and

denies the rest of the paragraph.

25.  Defendant denies that her website states that Robert Gallagher left his

own law firm in December 2003.  Defendants's website merely states that he left

after she sent a complaint to the firm in December 2003. Defendant learned in early

2004 that Mr. Gallagher had left, when Kelly Angell announced that fact to the

judge.  Defendant suspects that Mr. Gallagher demanded that Judge Nevitt be

informed that Gallagher was no longer associated with that case or Stutz law firm.

26.  Defendant admits the first and second sentences of paragraph 26, and

denies the rest of the paragraph.

27.  Defendant admits the first sentence of paragraph 27, and denies the rest

of the paragraph.

28.  As to first sentence, Defendant is informed and believes that Stutz was

legally required to demand a retraction within 20 days.  As to second sentence,

Defendant denies this allegation, since she responded with an immediate phone call

6

Answer

to Mr. Ray Artiano, and followed up with emails and a fax letter (Exhibit 1).

Defendant notes that it appears that Mr. Artiano has hidden facts about this case

from Mr. Romero.

29. Defendant denies the allegation in paragraph 29. Defendant is the author

of her website, but denies that the website is offending. Defendant has used her

own name as the name of the website ("mauralarkins.com), and has placed her

name all over the site, and clearly states many facts on her website, but does not

agree that any of these statements are admissions.

30. With the exception of the incorrect quote in paragraph 17, this answering

defendant admits that statements outlined were published on her website.

31. Defendant denies the allegation in Paragraph 31.

32. Defendant denies all the allegations in Paragraph 32.

33. This answering defendant denies all the allegations in paragraph 33.

34. This answering defendant denies all the allegations in paragraph 34.

35. Defendant denies the allegation in Paragraph 35. In its deposition, SASH

admitted that it knows of no financial damages to itself.

36. All allegations not specifically admitted are hereby denied.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

### (Plaintiff is a public figure)

As a separate affirmative defense to the COMPLAINT FOR DAMAGES

FOR DEFAMATION on file herein, this answering defendant is informed and

believes and thereon alleges that plaintiff waived its right to privacy to the issues in

1  question by being a public figure.  (Johnson v. Harcourt, Brace, Jovanovich, Inc.

2  (1974) 43 Cal. App. 3d 880m 892, 118 Cal. Rptr. 370).

3      SASH and all others mentioned on defendant's website became public

4  figures either by achieving such pervasive fame or notoriety that they became

5  public personages for all purposes and in all contexts, and/or by voluntarily

6  injecting themselves or by being drawn into a particular public controversy, in

7  which they became public figures for the limited issues relating to the controversy

8  (Kinsey v. Macur (1980) 107 Cal. App. 3d 265, 273, 165 Cal. Rptr. 608).

9

10     Daniel Shinoff and SASH have acted in place of public officials, and as

11  agents for public officials, usurping to a remarkable degree the functions and

12  obligations of public officials in public entities.  Shinoff not only has acted as the

13  public face of public entities, but has made decisions and presented those decisions

14  as if he himself were a public official.  .

15

16              **SECOND AFFIRMATIVE DEFENSE**

17       (Defendant's statements about a public figure were not published with malice)

18      As a separate affirmative defense to the COMPLAINT FOR DAMAGES

19  FOR DEFAMATION on file herein, this answering defendant alleges that the

20  publication complained of in plaintiff's complaint was not published by the

21  defendant either with knowledge that it was false or with reckless disregard of the

22  truth of the statements.  Because plaintiff is a public figure, defendant is protected

23  by constitutional privilege from defamation actions in which the statements were

24  not published with actual malice.

25

26              **THIRD AFFIRMATIVE DEFENSE**

27

28
                                8
                            Answer

1    <u>(Defendant did not publish statements about public official with malice)</u>

2    As a separate affirmative defense to the COMPLAINT FOR DAMAGES

3    FOR DEFAMATION on file herein, this answering defendant is informed and

4    believes and thereon alleges that the publication complained of in plaintiff's

5    complaint concerned plaintiff's official conduct as legal representative of public

6
    entities and their elected officials, acting in lieu of and on behalf of those public
7
8    entities and public officials.  The statement was not published by the defendant

9    either with knowledge that it was false or with reckless disregard of the truth of the

10    statements.  It thus is protected by constitutional privilege.

11    **FOURTH AFFIRMATIVE DEFENSE**

12    **(Truth)**

13    As a separate affirmative defense to the COMPLAINT FOR DAMAGES

14
    FOR DEFAMATION on file herein, this answering defendant is informed and
15
16    believes and thereon alleges that

17    The statements complained of in plaintiff's complaint were not false.  To the

18    contrary, they were completely truthful in that

19    1)    Lozano, Smith uses the same practices as Stutz, Artiano, Shinoff & Holtz,

20    specifically, repeated misstatements of the record, frivolous objections to plaintiff's

21    statements of facts, and repeated mischaracterizations of the law.
22
23    2)    SASH engages in unprofessional and unethical conduct and lacks

24    professional competence or integrity in its chosen profession.

25    3)    A culture of misrepresentation and deception exists at Stutz, Artiano &

26    Holtz (sic) and/or Stutz, Artiano Shinoff & Holtz.

27

28
    9
Answer

4) The firm (SASH) clearly suffers from a lack of professionalism or a lack of understanding of the law.

5) Many of STUTZ's filings cannot be interpreted as anything other than bad-faith attempts to mislead the court, obscure the real facts, and to obstruct and/or harass the plaintiff, either to wear down the plaintiff or to win a victory that is clearly unjustified by either the facts or the law.

6) While isolated errors or misstatements might be excused, given the size of the record, the sheer volume of misstatements, the only reasonable inference that can be drawn is that Daniel Shinoff, Jeffery Morris, Kelly Angell and many other Stutz lawyers intended to obstruct at every step and stand education law, as well as labor law, the Penal Code, and the constitutions of California and the United States, on their heads.

7) SASH has engaged in violations of the law.

8) Defendant has never suggested that SASH was involved in the Moser case, or that SASH has been sanctioned by a federal court. Defendant has certainly implied that SASH should be sanctioned by some court.

9) STUTZ works hard to make sure that LOTS of tax money goes to lawyers who:

    A) prevent legitimate investigations of problems in schools; and

    B) make sure that tax dollars do not go to victims.

10) Public officials who want to keep the public in the dark call on Dan Shinoff and Mark Bresee to keep witnesses quiet and to finesse the paperwork. Defendant possesses a wealth of testimony and documentation to prove this statement.

11) SASH has a habit and custom of having parents of students arrested, while, in fact, SASH itself is guilty of egregious wrongdoing that qualifies for incarceration under California law.

12) The lawyers provided by SDCOE Joint Powers Authority to Chula Vista Elementary School District, Daniel Shinoff, Jeffery Morris, and Kelly Angell, as well as Stutz partner Ray Artiano, violated California law in case after case. Defendant informed Ray Artiano of obstruction of justice by Daniel Shinoff and his assistants, and Ray Artiano worked hard to cover up that wrongdoing instead of putting an end to it. Bob Gallagher left the firm at that time, quite possibly because he could not tolerate the violations of law by lawyers in the firm.

13) Daniel Shinoff, Kelly Angell Minnehan, Jeffery Morris and their law firm, Stutz, Artiano, Shinoff & Holtz took $100,000s of taxpayer dollars to cover up crimes at Chula Vista Elementary School District.

14) Robert Gallagher left his own law firm after Defendant sent a complaint in December 2003 to the firm about obstruction of justice on the part of its lawyers. Defendant learned in early 2004 that Mr. Gallagher had left, when Kelly Angell announced that fact to the judge at a hearing in defendant's case. Defendant suspects that Mr. Gallagher wanted Judge William Nevitt to be informed that Gallagher was no longer associated with that case or Stutz law firm.

15) Defendant assumes that some of Mr. Shinoff's clients do not wish to violate contracts or laws, or do harm to others. Defendant can only assume, of course, since she does not have information about all the public entities working with Mr. Shinoff. However, judging by Mr. Shinoff's methods as observed in her own and

11

Answer

1   quite a few other cases, defendant has come to believe that Mr. Shinoff is generally

2   called in by SDCOE-JPA when there is something to hide.  Defendant can only

3   guess at the percentage of Mr. Shinoff's cases which involve dirty business by a

4   public entity, of course, since she does not know all the public entities working with

5   Mr. Shinoff, nor all the cases they are involved in. Nevertheless, defendant has

6   come to hold the personal opinion that if a public entity is doing business with

7   Daniel Shinoff of Stutz, Artiano, Shinoff & Holtz, that the laws of probability

8   would predict that, more often than not, the public entity is involved in some dirty

9   business.

10

11  16)     In its deposition on November 8, 2007, SASH claimed that it had not

12  destroyed or hidden the documents that defendant has been requesting for more

13  than five years.  Therefore, SASH itself admits that Shinoff keeps important

14  documents locked up in his files.

15

16  17)     Shinoff presented a good deal of perjured testimony in my case.  The proof

17  is in the attached depositions, which may be compared and contrasted with each

18  other, and documents in the record.

19  Truth is a complete defense to an action for defamation (Draper v. Helllman

20  Commercial Trust & Sav. Bank (1928) 203 Cal. 26, 34, 263 P. 240: Swaffield v.

21  Universal Ecsco Corp. (1969) 271 Cal. App. 2d 147, 164, 76 Cal. Rptr. 680).

22  Defendant affirmatively asserts that all statements and comments by Defendant

23  about Plaintiff were true and thus, can not be the basis for a defamation action.

24  Defendant's statements are supported by the deposition transcripts attached,

25  specifically:

26

27

28

| | | |
|---|---|---|
| 1 | Exhibit 1: | Rough draft |
| 2 | | Deposition of Stutz, Artiano Shinoff & Holtz November 8, 2007 |
| 3 | Exhibit 2 | Deposition of Commander Sam Gross, |
| 4 | | Sheriff's Department of Santa Barbara, California Nov. 17, 2004 |
| 5 | Exhibit 3: | Deposition of Virginia ("Gina") Boyd, former President of Chula |
| 6 | | |
| 7 | Vista Elem. Education Association (CVE) Mar. 22, Oct. 11, 2004 | |
| 8 | Exhibit 4: | Deposition of Margaret ("Peggie") Myers, |
| 9 | | President of Chula Vista Educators (CVE) Nov. 29, 2004 |
| 10 | Exhibit 5: | Deposition of Richard T. Werlin, Assist. Superintendent Human |
| 11 | Res., Chula Vista Elem. School Dist. (CVESD) Sept. 4, 2002 | |
| 12 | Exhibit 6: | Deposition of Gretchen Donndelinger, |
| 13 | | Principal of Castle Park Elementary, CVESD Sept. 10, 2002 |
| 14 | | |
| 15 | Exhibit 7: | Deposition of Robin Colls Donlan Nov. 4, 2004 |
| 16 | Exhibit 8: | Deposition of Maura Larkins Oct. 28, Nov. 1, Nov. 2, 2004 |
| 17 | Exhibit 9: | Deposition of Linda Mae Watson April 30, 2004 |
| 18 | Exhibit 10: | Deposition of Teresa Coffey Nov. 8, 2004 |
| 19 | Exhibit 11: | Deposition of Karen Snyder Nov. 9, 2004 |
| 20 | Exhibit 12: | Deposition of Nikki Perez  Nov. 29, 2004 |
| 21 | | |
| 22 | Exhibit 13: | Deposition of Michelle Scharmach Nov. 10, 2004 |
| 23 | Exhibit 14: | Deposition of Richard Denmon Nov. 30, 2004 |
| 24 | Exhibit 15: | Deposition of Jo Ellen Hamilton Sept. 10, 2002 |
| 25 | Exhibit 16: | Deposition of attorney Elizabeth Schulman July 16, 2004 |
| 26 | Exhibit 17: | Deposition of Maura Larkins by Stutz, Artiano, Shinoff & |
| 27 | | |
| 28 | | |

13

**Answer**

Holtz  Oct. 25, 2004 and Nov. 11, 2004

## FIFTH AFFIRMATIVE DEFENSE:

### (GOOD MOTIVE – FAIR COMMENT)

As a separate affirmative defense to the COMPLAINT FOR DAMAGES

FOR DEFAMATION on file herein, this answering defendant is informed and

believes and thereon alleges that

All statements and comments made by Defendant about Plaintiff were made

by the Defendant with good motive and were fair comments made as a private

citizen about education and politics in San Diego, along with many other matters of

public concern, exercising her right of free speech, discussing matters of public

importance, as a concerned citizen of the community.   All statements complained

of in plaintiff's complaint were made by defendant in good faith, honestly, and not

maliciously, in that defendant researched many hundreds of documents and news

reports, meticulously took notes of meetings and phone calls, and deposed over a

dozen individuals, while interviewing many more individuals, as well as having

first hand knowledge of many of the events she reported on.

## SIXTH AFFIRMATIVE DEFENSE

### (PRIVILEGE)

As a separate affirmative defense to the COMPLAINT FOR DAMAGES

FOR DEFAMATION on file herein, this answering defendant is informed and

believes and thereon alleges that the allegedly defamatory statement of which

plaintiff complains related to a matter of public concern and thus is constitutionally

protected in the absence of fault.  The defendant was not negligent in publishing the

14

statements complained of.  Therefore, defendant is protected from liability by

constitutional privilege.

The matters addressed by Defendant concerning Plaintiff concern matters

which affect the interest of the general public. These statements were made in good

faith with the proper motives of informing the public, informing elected officials, to

poor performance and of negative developments. Therefore the Defendant's

statements are protected by both qualified and conditional privilege.

### SEVENTH AFFIRMATIVE DEFENSE

### LACK OF DAMAGE CAUSED BY DEFENDANT

As a separate affirmative defense to the COMPLAINT FOR DAMAGES

FOR DEFAMATION on file herein, this answering defendant is informed and

believes and thereon alleges that no act or omission on the part of Defendant either

caused or contributed to whatever injury (if any) the Plaintiff may have sustained.

Plaintiff's own actions have caused any loss of business it might have suffered.  In

its November 8, 2007 deposition, SASH admitted that it knows of no financial

losses caused by defendant's website (Exhibit 1).  In its deposition, SASH even had

trouble remembering (or admitting) that it had claimed over $100,000 damages in

its complaint.

### EIGHTH AFFIRMATIVE DEFENSE

### (FAILURE TO MITIGATE DAMAGES)

As a separate affirmative defense to the COMPLAINT FOR DAMAGES

FOR DEFAMATION on file herein, this answering defendant is informed and

believes and thereon alleges that Plaintiff has failed to properly mitigate its

damages by ceasing its unethical and illegal behavior. For example, this lawsuit is itself an action that is likely to harm plaintiff's reputation as it is an effort to stifle discussion protected by the First Amendment to the Constitution of the United States.

WHEREFORE, defendant prays:

a. that plaintiff take nothing by way of its Complaint for Damages;

b. recover costs of suit herein incurred; and

c. such other relief as the court may deem proper.

DATED: November 16, 2007    *Maura Larkins*

Maura Larkins, defendant *in pro per*

VERIFICATION

I, Maura Larkins, am a defendant in the above-entitled action. I have read the foregoing ANSWER TO COMPLAINT FOR DAMAGES FOR DEFAMATION and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: November 16, 2007    *Maura Larkins*

Maura Larkins, defendant *in pro per*

STUTZ ARTIANO SHINOFF & HOLTZ, APC v. MAURA LARKINS
Case No. 37-2007-00076218-CU-DF-CTL

TABLE OF EXHIBITS

Exhibit 1:                    Rough draft
                              Deposition of Stutz, Artiano Shinoff & Holtz November 8, 2007

Exhibit 2                     Deposition of Commander Sam Gross,
                              Sheriff's Department of Santa Barbara, California Nov. 17, 2004

Exhibit 3:                    Deposition of Virginia ("Gina") Boyd, former President of Chula
                              Vista Elem. Education Association (CVE) Mar. 22, Oct. 11, 2004

Exhibit 4:                    Deposition of Margaret ("Peggie") Myers,
                              President of Chula Vista Educators (CVE) Nov. 29, 2004

Exhibit 5:            ı       Deposition of Richard T. Werlin, Assist. Superintendent Human
                              Resources, Chula Vista Elem. School Dist. (CVESD) Sept. 4, 2002

Exhibit 6:                    Deposition of Gretchen Donndelinger,
                              Principal of Castle Park Elementary, CVESD Sept. 10, 2002

Exhibit 7:                    Deposition of Robin Colls Donlan Nov. 4, 2004

Exhibit 8:                    Deposition of Maura Larkins Oct. 28, Nov. 1, Nov. 2, 2004

Exhibit 9:                    Deposition of Linda Mae Watson April 30, 2004

Exhibit 10:                   Deposition of Teresa Coffey Nov. 8, 2004

Exhibit 11:                   Deposition of Karen Snyder Nov. 9, 2004

Exhibit 12:                   Deposition of Nikki Perez  Nov. 29, 2004

Exhibit 13:                   Deposition of Michelle Scharmach Nov. 10, 2004

Exhibit 14:                   Deposition of Richard Denmon Nov. 30, 2004

Exhibit 15:                   Deposition of Jo Ellen Hamilton Sept. 10, 2002

Exhibit 16:                   Deposition of attorney Elizabeth Schulman July 16, 2004

Exhibit 17:                   Deposition of Maura Larkins by Stutz, Artiano, Shinoff & Holtz
                              Oct. 25, 2004 and Nov. 11, 2004

---

Table of Exhibits-Answer to Complaint

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO


STUTZ, ARTIANO, SHINOFF &
HOLTZ, APC,

       Plaintiffs,

vs.

MAURA LARKINS, and DOES 1 through
100, inclusive,

       Defendants.

_____/

CASE NO.:  37-2007-00076218-CU-DF-CTL

_____/


VIDEOTAPED DEPOSITION OF RAY ARTIANO

Taken at San Diego, California

November 8, 2007

BONNIE G. BREEN,
CSR NO. 5582

1

1

## INDEX

2

DEPOSITION OF RAY ARTIANO                    PAGE

3

November 8, 2007

4

5     EXAMINATION

6     By Ms. Larkins                    5

7

      EXHIBITS

8

      1    Deposition Notice              6

9

      2    NCTimes.com Website Article dated        34

10         10-25-2007

11    3    Page from Website San Diego Education    40
           Report, Mauralarkins.com

12

      4    Subpoena to Testify Before Grand Jury    45

13

14    INSTRUCTIONS NOT TO ANSWER

```
15      PAGE    LINE

16       20      19
         26      13
17       27      18
         28      7
18       32      17
         34      10
19       43      11
         45      12
20       53      16

21
      NOTICE OF ADJOURNMENT OF DEPOSITION
22
         PAGE    LINE
23       54      9

24

25
```

2

1            DEPOSITION OF RAY ARTIANO

2            Pursuant to Notice to take deposition on the

3       8th day of November, 2007, commencing at the hour of

4       10:19 a.m., at 1620 Fifth Avenue, Suite 770, in the City

5       of San Diego, County of San Diego, State of California,

6       before me, Bonnie G. Breen, Certified Shorthand Reporter

7       in and for the State of California, personally appeared:

8          RAY ARTIANO,

9     who, called as a witness by the Defendants, being by me

10    first duly sworn, was thereafter examined as a witness in

11    said cause.

12              APPEARANCES

13    FOR THE PLAINTIFFS:

14    STUTZ, ARTIANO, SHINOFF & HOLTZ
      BY: DANIEL SHINOFF
15    2488 Historic Decatur Road, Suite 200
      San Diego, California  92106-6113
16    (619) 232-3122

17    FOR THE DEFENDANT:

18    MAURAL LARKINS
      In Pro Per
19    1935 Autocross Court
      El Cajon, California  92019
20    (619) 444-0065

21

22    VIDEOTAPED By:

23    VIDEOTRACK/DEBORAH L. BURKE
      401 West A Street, Suite 135
24    San Diego, California 92101
      (619) 234-1990
25

                    3

1          THE VIDEOTAPE TECHNICIAN:  This is the

2    beginning of tape one of the deposition of Ray Artiano.

3    The case caption is Stutz, Artiano, Shinoff & Holtz, APC,

4    versus Larkins.  My name is Deborah L. Burke.  I'm a

5    certified legal video specialist and a Notary public for

6    the State of California, County of San Diego.  I'm a

7    partner in Video Track, located at 401 West "A" Street,

8    Suite 135, San Diego, California.  The court reporter

9    today is Bonnie Breen of San Diego Court Reporting.

10   Today's date is November 8th, 2007; and it is now 10:19

11   a.m.  This video recording is being taken at San Diego

12   Court Reporting, located at 1620 Fifth Avenue, Suite 770,

13   San Diego, California.

14        Please be aware that the video and audio

15   recording will take place at all times throughout this

16   deposition, unless all parties agree to go off the

17   record; at which time, I will announce the time that we

18   are going off the record, and the recording devices will

19   then be stopped.

20        Would counsel please introduce yourselves.

21        MR. SHINOFF:  My name is Daniel Shinoff; and

22   I'm appearing on behalf of the law firm as plaintiff in

23   this case.

24        MS. LARKINS:  My name is Maura Larkins, and I'm

25    the defendant.

4

1         THE VIDEOTAPE TECHNICIAN:  Would the court

2    reporter please swear in the deponent.

3         (Whereupon, Ray Artiano, Plaintiff herein, was

4    duly sworn by the reporter.)

5         MR. SHINOFF:  Just before we proceed with the

6    deposition, I would like the record to reflect that the

7    deposition subpoena for the person most knowledgeable

8    from the law firm was scheduled for 10:00 a.m. and that

9    the deposition did not start until 10:19, as the

10   videographer indicated; and the deposing party did not

11   arrive until 10:15.  The depo was scheduled for ten.

12   EXAMINATION BY MS. LARKINS:

13      Q.  Ready?  Okay.  So I'm asking you the questions,

14   right?  Good morning.

15      A.  Good morning.

16      Q.  How are you feeling today?

17      A.  I'm feeling fine.

18    Q.  Can you think of any reason that you wouldn't

19    be able to give your best testimony today?

20    A.  No.

21    Q.  Okay.  Uhm.  My deposition subpoena asked for

22    documents.  Did you bring documents today?

23    MR. SHINOFF:  Yes.  We did.

24    MS. LARKINS:  Okay.  Instead of handing them

25    all in a bunch, where it will be hard, I'm sure you can


5


1    figure out what they are faster than I can.  Do you have

2    the bate stamped Document Number 5?

3    MR. SHINOFF:  We have many bate stamped

4    documents in our office, and we were attempting to figure

5    out precisely what it was that you were looking for, but

6    we do have a bate stamped Document Number 5 dated April

7    26, 2001 from yourself to Mr. Worland.

8    MS. LARKINS:  Okay.  You know, I'm a little

9    confused here.  Isn't Mr. Artiano supposed to be talking?

10    MR. SHINOFF:  No, not right now.  Not right

11    now, because you asked me about documents that are being

12    produced; and so, as counsel, I'm telling you what we

13    have produced.

14         MS. LARKINS:  Okay.

15         MR. SHINOFF:  We brought a series of documents

16    bate stamped 1 through 70 -- or through 84.

17         (EXH. 1 was marked for identification.)

18    BY MS. LARKINS:

19      Q.   Okay.  I'd like to have this marked as Exhibit

20    Number 1.  It is my notice of taking deposition and

21    request for production of documents.  And here is a copy

22    for you, Mr. Artiano.  Does this document look familiar

23    to you?

24      A.   Yes, it does.

25      Q.   Okay.  Would you look at the second page.  And


                              6


1     the first paragraph, can you read the bottom sentence,

2     the last sentence in the first paragraph.

3       A.   The deposition may also be recorded through

4     such means as to provide the instant display of the

5    testimony as also authorized by CCP Section 2025(d).

6       Q.  Excuse me.  I'm sorry.  I meant the paragraph

7    that is numbered one.

8       A.  Well, the document speaks for itself.  I'm not

9    here to read, ma'am.

10       Q.  Okay.  Well, I'm going to consider you a

11    hostile witness, and this is how I'm going to do it.  I

12    will ask you if it says a certain thing.  I'm going to

13    need my copy.

14       Mr. Artiano, on page 2, line 15 of Exhibit 1,

15    do you see the sentence, "The bate stamps begin with the

16    number 1, not 01 or 001, and continue through 87"?

17       A.  Yes, I do.

18       Q.  Okay.  Do you have a document that is bate

19    stamped with a 5, not a 05 or a 005?

20       A.  Not to my knowledge.

21       MR. SHINOFF:  Nor do I.

22    BY MS. LARKINS:

23       Q.  Well, that is very interesting.  How about a

24    document that is bate stamped 06 -- 6, not 06?

25       A.  Not to my knowledge.

7

1          MR. SHINOFF:  Nor do I.

2     BY MS. LARKINS:

3          Q.  Did you bring any of the documents that are

4     specifically numbered here in paragraph 1 on page 2 of

5     this exhibit?

6          A.  Based on what we could make out from your

7     request, we had the documents gathered, which

8     Mr. Shinoff, my attorney, brought with him.

9          Q.  Well, it would appear that either intentionally

10    or unintentionally, you ignored this last sentence in

11    this first document request.  So I'm asking you, now that

12    I'm making it really clear to you that the documents I'm

13    talking about don't have any zeroes in front of the

14    single digits, did you bring any of those?

15         A.  I just answered that.

16         Q.  It's a yes or no answer.

17         A.  I just answered that.

18         Q.  Could you read back Mr. Artiano's last answer.

19            (Record read line 17 and then line 6 through

20    8.)

21    BY MS. LARKINS:

22    Q.  Okay.  Did you bring a document that is bate

23    stamped with a 9, not a 09?

24    A.  Not to my knowledge.

25    Q.  Did you bring a document that is bate stamped


8


1    09?

2        MR. SHINOFF:  Yes.

3    BY MS. LARKINS:

4    Q.  And what is that document, Mr. Artiano?

5    A.  That document is a letter dated -- actually, it

6    is undated; although, there is a Chula Vista Elementary

7    School Human Resources stamp that says June 4th, 2002.

8    It is addressed to a Dr. Gill from Maura Larkins.

9    Q.  And do you believe that the Maura Larkins who

10   wrote this letter is the person who is taking your

11   deposition right now?

12   A.  I assume so.

13   Q.  Well, why would you think that I would want a

14   copy of my own letter?

15     A.  I have no idea what's in your mind, ma'am.

16     Q.  I wanted a document that your law firm has been

17 ⋆ refusing to produce for several years.  I'm very

18   disappointed that you are still not producing it.

19     MR. SHINOFF:  We'd be happy to produce whatever

20  we have.  The problem is that you have filed multiple

21  lawsuits.  And we have -- as you do, we have multiple

22  Beacon boxes of documents; and we used our best efforts

23  to try to determine exactly what you want, and this is

24  what we brought.

25     MS. LARKINS:  Is it not true, Mr. Shinoff, that


9


1   you actually used your best efforts not to produce the

2   documents I requested?

3     MR. SHINOFF:  That's not true.  And I'm not

4   going to argue with you.

5   BY MS. LARKINS:

6     Q.  Did you bring a bate stamped document 11 that

7   was not written by me?

8     MR. SHINOFF:  We brought a bate stamped

9    document 11.

10        MS. LARKINS:  Was it written by me?

11        MR. SHINOFF:  I don't know.  It has your

12    initials by it.

13        MS. LARKINS:  Does it have my name on it?

14        MR. SHINOFF:  It has your name on it, yes.

15        MS. LARKINS:  Does it say "from Maura Larkins"?

16        MR. SHINOFF:  It does.

17        MS. LARKINS:  But you are not sure if it

18    actually is from Maura Larkins?

19        MR. SHINOFF:  Only you could authenticate

20    whether that document is from you, but it appears to be

21    from you.

22        MS. LARKINS:  Why would you produce a document

23    in this case that appears to be from me if you didn't

24    think it was from me?

25        MR. SHINOFF:  Because you asked for bate stamp

10

1    11, we produced bate stamp 11.

2       MS. LARKINS:  You wouldn't by any chance be

3    trying to perpetrate a fraud on the court by producing a

4    false document that wasn't really from me, that appeared

5    to be from me?

6       MR. SHINOFF:  I would never perpetrate a fraud

7    upon the court.  I know that you use language like that

8    without any consideration of what you are saying, but

9    bate stamp 11 is responsive to your document request, and

10    bate stamp 11 is here.  So I would suggest that you move

11    forward with your documents and stop with the casting

12    personal aspersions.  Take the deposition, please.

13    BY MS. LARKINS:

14       Q.  Uhm.  Mr. Shinoff -- Mr. Artiano, did you do a

15    search for the documents I asked for?

16       A.  I had a paralegal do a search for the documents

17    which you asked for.

18       Q.  You had a paralegal do the search?

19       A.  Yes.

20       MS. LARKINS:  Okay.  May I look through the

21    documents?

22       MR. SHINOFF:  Certainly.

23       MS. LARKINS:  I believe that the documents that

24    you have here are completely separate, a completely

25  separate group of documents from the ones I wanted.

·11

1  MR. SHINOFF:  Well, I think you need to be

2  clearer then in terms of what you want.

3  MS. LARKINS:  Mr. Shinoff, I faxed to Kelly

4  Angell the documents that you did produce.  Well,

5  actually, you didn't produce them, but Parham Rajcic

6  produced them from my administrative hearing so that she

7  could easily determine what were the missing documents.

8  Your law firm has had years to produce these

9  documents; and, apparently, they must be very harmful to

10  your case or you would have produced them.

11  MR. SHINOFF:  Well, you can entertain whatever

12  fantasy you wish to engage in; and I know that you are

13  prone to fantasies, but I respectfully disagree with your

14  characterization.

15  MS. LARKINS:  Mr. Shinoff, did you seek a

16  protective order from discovery in my case when I sued

17  Chula Vista Elementary School District?

18  MR. SHINOFF:  My deposition isn't being taken.

19          MS. LARKINS:  Oh, that is really confusing.

20     Uhm.  I have got to get more.  I've got to get you

21     talking more, Mr. Artiano.  I have got to remember that

22     it is not Mr. Shinoff's deposition being taken.

23     BY MS. LARKINS:

24          Q.  Did your law firm, Mr. Artiano, seek one or

25     more protective orders in -- when I -- in the case when

12

1     you were defending the Chula Vista Elementary School

2     District and other associated defendants?

3          A.  I have no idea.

4          Q.  Okay.  When did you first become aware of my

5     lawsuit against Chula Vista Elementary School District?

6          A.  Probably when we discovered the defamatory

7     material that you had on your website, right about that

8     time.

9          Q.  When I sued DOES for obstruction of justice,

10    and then I sought to name your firm as a DOE, your

11    secretary talked to me quite frequently about trying to

12    serve you. She would tell me that you weren't in. And I

13    remember one day in particular, she said you were in.

14    And then she called -- no, that you would be in at such

15    and such a time, and then half an hour before that, she

16    called and said that you had just left.

17          Do you have any memory of my trying to serve

18    you as a DOE as the representative of Stutz, Artiano?

19    A.  No, ma'am.

20    Q.  Do you normally have a pretty good memory?

21    A.  I have an excellent memory.

22    Q.  You have an excellent memory. Okay. I need to

23    find a document. I need to take a break. Is that okay

24    with everybody?

25          MR. SHINOFF: I want to stay on the record, but


13


1     you can look for your document.

2     BY MS. LARKINS:

3     Q.  Uhm. Okay. Fine. Okay. What I'm looking for

4     is the motion that your law firm filed. What I'm looking

5     for is the motion that your law firm filed in that case

6    where I was -- I filed a complaint for obstruction of

7    justice against DOES; and your law firm got involved in

8    that.

9        A.   Ma'am, I'm here to have my deposition taken.

10   I'm not here to listen to you make speeches.  So please,

11   if you have questions that you would like to ask me, I

12   will be happy to answer them.

13       Q.   Okay.  Let me ask you this.  Well, I will tell

14   you what, just before we go on to the motion that Kelly

15   Angell filed on behalf of Chula Vista School District,

16   apparently collecting taxpayers' money for doing it, when

17   Chula Vista School District was not a party in the case.

18       A.   Ma'am, please ask me questions.  Don't give

19   speeches.

20       Q.   Well, gee, I would have thought that you really

21   didn't like to talk, to answer questions that much, since

22   you had Mr. Artiano doing most of your answers.

23            Okay.  I do want to get and note your law

24   firm's involvement in the obstruction of justice case.

25            Let's get -- let's just finish this up and find

14

1   out if you produced any of the documents that were

2   requested.  Okay.

3          MR. SHINOFF:  We produced the documents that

4   were requested.

5          MS. LARKINS:  So far, I haven't seen a single

6   document, but let's go on to Number 2.

7          MR. SHINOFF:  There is a disconnect, obviously,

8   between what you wrote down and what you wanted to have.

9   So I believe that we did a reasonable, good faith search

10   to determine what documents were responsive to your

11   request for production.

12          MS. LARKINS:  Did you read the last line in

13   this paragraph that is numbered one?

14          MR. SHINOFF:  The paralegal was charged with

15   the responsibility for looking for the documents.  So she

16   looked through multiple documents, and that's what she

17   found.

18          MS. LARKINS:  Well, perhaps it's the

19   paralegal's fault.  Perhaps she didn't read that

20   sentence.

21          MR. SHINOFF:  She's a very fine paralegal.

22    MS. LARKINS:  Well, this a very fine sentence.

23    It is very clear.

24    THE WITNESS:  Ma'am, I'm not going to waste my

25    time here with your engaging in these types of

15

1    discussions.  Just ask questions, please.

2    MS. LARKINS:  Well, Mr. Shinoff, did you hear

3    that?

4    MR. SHINOFF:  Yes, I did.  And there are

5    provisions in the Code of Civil Procedure that prevent

6    depositions that are vexatious, that are harassing, that

7    are argumentative.  You are held to the same standard as

8    a lawyer; and so you need to ask questions.  That is what

9    the Discovery Act in the State of California is all

10    about.

11    You desire to engage in speeches.  That's not

12    what the discovery process is about.  So I respectfully

13    disagree with your approach.  Mr. Artiano is here to

14    answer questions.

15    MS. LARKINS:  Okay.  Mr. Shinoff, you are

16   required to behave, as well as an in pro per; and that

17   means that you should not be engaging in speeches, which

18   you just did.

19       MR. SHINOFF:  Because I'm commenting on your

20   behavior, because I think it is violative of the Code of

21   Civil Procedure in the State of California.

22       MS. LARKINS:  Well, that's exactly what I think

23   of your behavior.  When you go on saying things like I

24   make statements without any consideration, which you said

25   today, or saying things like I know that you are prone to


16


1   fantasy, fantasies, I think that you are stepping outside

2   of a professional behavior, and I think that you need to

3   follow the suggestions that Mr. Artiano just made.

4       MR. SHINOFF:  Is that a question?

5       MS. LARKINS:  I'm not the deponent,

6   Mr. Shinoff.

7       MR. SHINOFF:  No.  You are the person who is

8   supposed to be posing the questions.

9      MS. LARKINS:  Thank you.  Okay.  I want to --

10     apparently, you completely avoided all of this by blaming

11     it on your paralegal.  And you avoided Number 1,

12     producing any of those documents.

13            Let's look at Number 2.  Okay.  Do you have

14     documents containing information regarding the dollar

15     amounts of payments from Chula Vista -- Chula Vista

16     Elementary School District?

17     MR. SHINOFF:  No.

18     MS. LARKINS:  Oh.  Didn't you just earlier say

19     that you produced all the documents?

20     MR. SHINOFF:  I said we produced the bate

21     stamped documents, yes.

22     MS. LARKINS:  But on Number 2, you didn't

23     produce any of those?

24     MR. SHINOFF:  That's correct.

25     MS. LARKINS:  May I ask why?


17


1      MR. SHINOFF:  Well, our objection is that they

2      are proprietary in nature.

3      MS. LARKINS:  Okay.  Did you produce documents

4   supporting your claim that my website has caused

5   financial losses to your firm?

6      MR. SHINOFF:  We don't have specific documents

7   other than your website itself, and we have documents

8   from your website.

9      MS. LARKINS:  I have no information on my

10   website about financial losses to you as a result of my

11   website.

12      MR. SHINOFF:  It is our belief that your

13   website has interfered with prospective economic

14   advantage.  It's our opinion that your website is

15   slanderous, per se.

16      MS. LARKINS:  If it were false, it would be

17   slanderous, per se.  I agree with you there.  The only

18   problem is is that it's all true.

19      Do you consider -- do you consider yourself a

20   lawyer for a public entity when you work for Chula Vista

21   Elementary School District?

22      MR. SHINOFF:  I think your deposition is of

23   Mr. Artiano.

24      MS. LARKINS:  Oh, that is right.  Boy.

25   BY MS. LARKINS:

18

1     Q.  Do you feel left out, Mr. Artiano?

2     A.  I just would like to get on with the deposition

3     if you intend to take my deposition.

4     Q.  Let's try.  Let's just hope that Mr. Shinoff

5     won't be talking quite so much.

6         Okay.  Mr. Artiano, in your complaint against

7     me, you stated or your firm stated that I had cost you

8     $100,000 or more.  Do you have -- can you explain to me

9     how you came to that figure?

10    A.  To which paragraph are you referring?

11    Q.  I think it's right at the end of your

12    complaint.

13    A.  Which paragraph specifically?

14    Q.  If you let me look at that, I will find it for

15    you.

16    A.  Well, this is my copy.

17    Q.  You don't remember putting in your complaint

18    that you had losses of $100,000 or more?

19    A.  Ma'am, I just asked you to tell me which

20    paragraph you are referring to.

21    Q.  Okay.

22    A.  I'm happy to answer it.

23    Q.  Mr. Artiano, I believe that the quality of your

24    memory is important.  Could you tell me, do you remember

25    that, in the complaint that your law firm filed, and you


19


1    are representing that law firm, that you said that you

2    had $100,000 or more of financial damages?

3    MR. SHINOFF:  I'm going to object to the nature

4    of the question as being argumentative.  You can answer

5    if you can.

6    THE WITNESS:  Yes.  In paragraph 35, it is

7    alleged that as a result of your defamatory statements

8    that we have suffered economic detriment and general

9    damages in an amount in excess of $100,000.

10    BY MS. LARKINS:

11    Q.  I notice that you did have to look through that

12    complaint to find that fact.  I myself remembered it

13    without looking at the complaint.

14        A.    I told you before.  I'm not here to listen to

15    you give speeches.  Just ask me questions.

16        Q.    Okay.  Let me just say, given what just

17    happened, Mr. Artiano, would you like to revise your

18    earlier statement that you have an excellent memory?

19        MR. SHINOFF:  I'm going to object that the

20    question is argumentative.  Don't respond to that.

21    BY MS. LARKINS:

22        Q.    Okay.  Is there any particular client that you

23    have lost as a result of my website that you know of?

24        A.    I don't know at this time if there is any

25    particular client that we have lost as a result of your

20

1    defamatory statements.

2        Q.    Mr. Artiano, they are only defamatory if they

3    are false.

4        MR. SHINOFF:  Again, I'm going to object that

5    the question is argumentative as phrased; and I would

6    respectfully request that you ask a question.

7    BY MS. LARKINS:

8    Q. Okay. You say that you don't know at this

9    time. Why didn't you find out if you had lost a client

10    before you filed this suit saying that you had $100,000

11    of damages?

12    A. You want me to answer that?

13    MR. SHINOFF: Sure. Go ahead.

14    THE WITNESS: Because of the defamatory

15    statements, which you have made on your website, it has

16    come to my knowledge that there have been a number of

17    individuals who have googled the name of the website.

18    And that, in turn, has led them to your San Diego, I'm

19    not sure what, San Diego Education Report Website.

20    And I know that it has caused concern on the

21    part of at least one attorney. I'm assuming that anyone

22    who googles us, as most clients and prospective clients

23    do, they'll come across your website and know nothing at

24    all about the author of the website and whether or not

25    the statements have any truth at all.

21

1     BY MS. LARKINS:

2         Q.   If they knew more about the author of the

3     website, what would they know, that you seem to imply

4     that there is something to be known that isn't on my

5     website, I mean?

6         A.   Well, what they would know is that the

7     statements, which you have made impugning the integrity

8     and character of the firm, are false.

9             In addition, I also know that, at least, at the

10    very least, one new attorney in our firm googled our

11    website prior to making a decision as to whether or not

12    he was going to join the firm, and then had to -- had to

13    check around after he saw the materials on your website

14    to determine who this person was and why these things

15    were being said so that he could determine whether or not

16    he should join our firm.

17            I assume that there are a number of prospective

18    candidates, as well as clients that we have, that do

19    exactly the same thing, come across the same information,

20    and it causes them concern.

21        Q.   Okay.  Well, it seems to me that you have done

22    a pretty good argument for saying that my website has not

23   harmed your firm.  The only evidence you have is that

24   someone read my website and then came to your firm.

25        MR. SHINOFF:  I'm going to object that the

22

1    question is -- the statement is argumentative.  If you

2    could ask your next question, please.

3    BY MS. LARKINS:

4        Q.  Okay.  Is it your wish that people not check

5    around before they join your firm?

6        A.  Is it my wish?

7        Q.  Uh-huh.  You seem to be complaining that this

8    prospective new attorney had to check around about you,

9    your firm, before he decided to join your firm.  Is it

10   your wish that prospective attorneys not check around?

11       A.  No.  I think that anyone proposing any type of

12   relationship with a firm, whether it is a candidate or a

13   prospective client, do their due diligence.  What

14   concerns me is that people have to deal with false

15   statements, which were made on your website.

16      Q.  Well, I'd like to point out to you,

17   Mr. Artiano --

18      A.  Don't point anything out to me, ma'am.  Just

19   ask questions.

20      Q.  Okay.  Has any court of law decided that these

21   statements were false, the statements on my website were

22   false?

23      A.  Has any court of law?

24      Q.  Uh-huh.

25      A.  This lawsuit was just filed.


                              23


1       Q.  Uhm.

2       A.  There will be -- there will be a determination

3    at the conclusion of this case that the statements on

4    your website were false.

5       Q.  Is that your hope?

6       A.  No.  I know that to be the case.

7       Q.  How do you know that?

8       A.  Because I know that the statements, which you

9    have made, are false.

10     Q.  Uhm.  Okay.  Let's get back.  Uhm.

11         Mr. Artiano, do you think that someone in your

12  law firm may have destroyed evidence in my lawsuit

13  against Chula Vista Elementary School District?

14     A.  I'm certain that no one in my law firm

15  destroyed any evidence.

16     Q.  Do you think that someone may have hidden some

17  evidence?

18     A.  I'm certain that no one has hidden evidence.

19     Q.  Do you think that someone may have misplaced

20  it?

21     A.  I have absolutely no idea as to whether or not

22  anyone misplaced documents.

23     Q.  Well, wouldn't that be your best explanation

24  for why you don't have Document 05 to produce to me

25  today?

24

1         MR. SHINOFF:  We did produce Document 05.

2  BY MS. LARKINS:

3      Q.  I mean Document 5 without the zero.  Isn't that

4      the best explanation for why you don't have Documents 5,

5      6 and 9 to produce to me today?

6      A.  No.  The best explanation is that your request

7      is extremely vague; and the paralegal did her best job in

8      trying to decipher what it was that you wanted.

9      Q.  Uhm.  Poor dear.  Uhm.  I -- maybe someone

10     should have helped her out.

11          Mr. Artiano, would you, yourself, give it a

12     try, to try to find these documents here, 5, 6, 9.  And

13     then these other ones, apparently, they have the same

14     numbers as the ones that you have produced, but they are

15     from a different set.

16          MR. SHINOFF:  Well, if you could be clearer in

17     terms of the documents that you are requesting, since

18     there are multiple lawsuits that you were involved in, we

19     would be happy to provide it in response to request for

20     production of documents.

21          MS. LARKINS:  Is that your answer, too?

22          MR. SHINOFF:  I'm responding to that question

23     as counsel for Mr. Artiano, because that is not an

24     appropriate question in a deposition.  The question is

25     whether we will produce documents responsive to a request

25

1    for production.  We will of course produce documents

2    responsive to a request for production of documents.

3    BY MS. LARKINS:

4        Q.  Okay.  Mr. Artiano, are you in agreement that

5    you did not bring today documents that were bate stamped

6    with a simple 5 without a zero in front of it?

7        MR. SHINOFF:  The document speaks for itself.

8    I'm going to object.  I'm going to instruct the witness

9    not to respond.

10   BY MS. LARKINS:

11       Q.  If my statements about your law firm are false,

12   then why are you so afraid of discovery?

13       MR. SHINOFF:  Again, the objection is that the

14   question is argumentative; and it is vexatious in nature.

15   And I'm going to instruct him not to respond.

16   BY MS. LARKINS:

17       Q.  Okay.  Uhm.  Mr. Artiano, when I asked you,

18   uhm, what should people who come to my website know about

19   me that they don't know from the website, you said that

20    the statements are false; that's what they should know.

21    But that is not something about me.  What should they

22    know about me that is not on the website?

23        A.  I don't know what they could possibly learn

24    about you through the website.

25        Q.  How many -- approximately how many pages of the


                                26


1    website have you read, Mr. Artiano?

2        A.  I have no idea.  I don't think that the website

3    is actually paginated.

4        Q.  No.  But just in your head, you could count,

5    like you would know if you had read one page or a hundred

6    pages.

7        A.  I know that I have looked at the pages that we

8    have produced today.

9        Q.  Okay.  Do you know that, on the website, I talk

10    about -- I tell the story of how I was arrested?

11        A.  (Witness shook head from side to side.)

12        Q.  You didn't know that?

13    A.  I have no idea whether or not you have been

14    arrested.  It wouldn't surprise me, but I have no idea.

15    Q.  What would you expect me to be arrested for,

16    Mr. Artiano?

17    A.  I have --

18        MR. SHINOFF:  I'm going to object that the

19    question calls for speculation.  I'm going to instruct

20    him not to answer.

21    BY MS. LARKINS:

22    Q.  Well, you said it wouldn't surprise you.  You

23    said it wouldn't surprise you that I had been arrested.

24    So I was just wondering what sort of arrest you were

25    expecting to have occurred?


27


1        MR. SHINOFF:  Go ahead.  You can answer that.

2        THE WITNESS:  I have no idea.

3    BY MS. LARKINS:

4    Q.  But you just kind of, perhaps you'd like the

5    idea of me being arrested, and maybe you just created a

6    fantasy about it?

7          MR. SHINOFF: I'm going to object that the

8     question is argumentative. Don't respond to that,

9     please.

10    BY MS. LARKINS:

11        Q. Okay. Uhm. Did you know that, on my website,

12    I have a detailed explanation of my administrative

13    hearing?

14        A. Do I know?

15        Q. Yes.

16        A. I seem to recall that there was some

17    information concerning an administrative hearing.

18        Q. Okay. Do you know that, on my website, there

19    is -- I have written a lot about the school I taught at?

20        A. I don't really recall that. What I was looking

21    at were statements concerning my law firm.

22        Q. Uhm.

23        A. Whatever else you may have written about was of

24    no concern to me.

25        Q. Well, you seem to have expressed today a

28

1    concern that people know more about me than what is on my

2    website.

3        MR. SHINOFF:  That's not a question.

4        MS. LARKINS:  But we can talk about that in

5    another forum.

6        MR. SHINOFF:  Is that a threat or is that a

7    question?

8        MS. LARKINS:  You guys filed this lawsuit, not

9    me.  We don't have to talk about everything in the

10   deposition.  We can talk about it at trial, in motions,

11   in hearings, all kinds of other places.  We don't have to

12   talk about it now.

13   BY MS. LARKINS:

14       Q.  Okay.  You said that you thought that people

15   should do due diligence when they -- let me see.

16           You seem to be upset that the prospective

17   lawyer had to check around after seeing my website.  Am I

18   correct in that perception, that you were upset that he

19   had to check around?

20       A.  As you have stated it, you are incorrect, yes.

21       Q.  Could you explain to me exactly how you feel

22   about the lawyers, the prospective lawyers having to

23    check around?

24       A.   What I had said was that it's very unfortunate

25    that someone would have to investigate statements, which

29

1    you have made on your website, which are false,

2    concerning unethical behavior, comments impugning the

3    reputation and character of the law firm and individual

4    lawyers in the law firm.

5       Q.   Okay.  About how much of your law firm's work

6    is work for public entities?

7       A.   Uhm.  I'm not sure that it has ever been broken

8    down in percentages.  My best estimate would probably be

9    about 40 percent.

10       Q.   Okay.  How much of Mr. Shinoff's work is for

11    public entities?

12       A.   I don't know.

13       Q.   All right.  When Mr. Shinoff is working for a

14    public entity, do you believe that his actions become a

15    matter of public interest?

16       A.   If you are asking whether I think Mr. Shinoff

17    is a public figure, my answer is no.

18       Q.  Does Mr. Shinoff frequently speak to the press?

19       A.  You'd have to ask Mr. Shinoff that.  I

20    certainly know that he has spoken to the press, but you

21    can certainly ask.  You certainly have to ask him how

22    frequently.

23       Q.  Mr. Artiano, you seem to be very certain that

24    he's not a public figure; and, yet, you are not certain

25    whether he frequently speaks to the press.

30

1      A.  Is that a question, ma'am?

2      Q.  Well, I guess I'm just talking to myself here,

3    really.  I shouldn't be just mentioning that.  Uhm.

4    Okay.  I'm just trying to understand your position here.

5       Let me put it this way:  Does Mr. -- is

6    Mr. --

7       Do you read the newspaper?

8      A.  I read many newspapers.

9      Q.  Do you read the North County Times?

10    A.    That's not one of the newspapers that I read.

11    Q.    How about the San Diego Union?

12    A.    I read the San Diego Union.

13    Q.    Okay. Has anybody ever talked to you about

14    articles about Mr. Shinoff and other lawyers in your firm

15    that have been running in the North County Times over the

16    last, well, years, many years?

17    A.    Probably not about the articles themselves;

18    although, there may have been discussions about cases,

19    which were prompted by articles.

20    Q.    Or articles that were prompted by cases?

21    A.    I'm sorry?

22    Q.    Or do you really mean articles that were

23    prompted by cases?

24    A.    No, discussions of cases or inquiries about

25    cases, which were prompted by individuals reading the

31

1    articles.

2    Q.    A case would be prompted by -- oh, you mean a

3    discussion was prompted by someone reading the article?

4      A.  Yes.

5      Q.  Okay.  Have you been following the Mira Costa

6   scandal?

7      A.  I have not.

8     ·Q.  You have not followed the Mira Costa scandal?

9      A.  No.

10      Q.  But you did see some articles about it in the

11   Union Tribune?

12      A.  I do recall, there were some articles about it,

13   yes.

14      Q.  Is the Union Tribune more careful of your ego

15   than the North County Times?

16      A.  I have no --

17      MR. SHINOFF:  I'm going to object that the

18   question is vague and argumentative.  Don't answer that

19   question.

20      THE WITNESS:  Not to mention that I have no

21   idea what that question meant.

22   BY MS. LARKINS:

23      Q.  Does the North -- okay.  By the way, who was

24   the attorney that checked around before he joined your

25   firm?

32

1       A.  B.C. Eziolu.

2       Q.  Could you spell that?

3       A.  I believe it is spelled E-z-i-o-l-u, but I

4   could be mistaken on that.

5       Q.  Okay.  Okay.  Now, do you know of anyone other

6   than this one individual, B.C. Eziolu, who had doubts

7   about your firm as a result of my website?

8       A.  I know that I had an inquiry from one lawyer

9   about the contents of your law firm.  His name is Bob

10   Gile, G-i-l-e.

11          I know there was at least one other client,

12   whom I had known and had a relationship with for quite

13   sometime, that asked me about the website, who was this

14   person, why was she writing these things.  And I

15   certainly assume again that any prospective client in

16   doing their due diligence will try to learn what they can

17   about the law firm.

18          For instance, when we respond to a request for

19   a proposal, and our firm is being considered along with

20    many other firms, the decision-makers, maybe an

21    individual or board members of a public entity will

22    likely do their due diligence.  And even if they have no

23    reason to believe that the statements on your website are

24    true, it may still cause concern on their part.

25        Q.  Do you believe that the public has a right to

33

1    know about public entity attorneys?

2        MR. SHINOFF:  I'm going to object that the

3    question is vague and ambiguous.  If you understand the

4    question, go ahead.

5        THE WITNESS:  I'm not really sure what you are

6    asking.

7    BY MS. LARKINS:

8        Q.  Let me rephrase it.  Should the tactics of

9    public entity attorneys be protected from public view?

10        MR. SHINOFF:  I'm going to object that the

11    question is vague and ambiguous in terms of the term

12    ambiguous -- in terms of the phrase tactics; and

13    protected from public view is also vague.  And I'm going

14    to instruct him not to answer.

15          THE WITNESS:  I have no idea what you are

16    asking.

17          (EXH. 2 was marked for identification.)

18    BY MS. LARKINS:

19      Q.  Okay.  I'd like to have a document marked as

20    Exhibit 2.  Thank you for taking a look at this document,

21    Mr. Artiano.  Does this newspaper article from the North

22    County Times from August 25th, 2006 look familiar to you?

23      A.  No.

24      Q.  Okay.  Uhm.  Do you want to -- do you still

25    want to refuse to read things into the record?  Would you


34


1    rather I do it in the form of a question?

2          MR. SHINOFF:  Please do it in the form of a

3    question.

4    BY MS. LARKINS:

5      Q.  Okay.  Uhm.  In this newspaper article, would

6    you look at paragraph five, and would you tell me if I

7    read this correctly. It says: An e-mail from the Mira

8    Costa public information office Friday stated that

9    Dr. Richart, or I guess her name is Richart or something

10    like that. Let me start over.

11        "An e-mail from the Mira Costa public

12    information office Friday stated that Dr. Richart was

13    informed this morning by college attorney Daniel Shinoff

14    that the vice president of instructional services would

15    be on leave until further notice."

16        You agree that that's what it says?

17    A.  That's what it says, yes.

18    Q.  Thank you. When Mr. Shinoff is telling the

19    president of a college what to do, would you say that he

20    becomes a public figure at that time?

21        MR. SHINOFF:  I'm going to object that the

22    question is vague and argumentative.

23        THE WITNESS:  Would I say that he becomes a

24    public figure?

25    BY MS. LARKINS:

35

1     Q.  Yes.

2     A.  No.

3     Q.  Oh, I should have mentioned that it is a public

4     college.  When Mr. Shinoff instructs the president of a

5     public college of an important personnel decision, is he

6     a public figure?

7     A.  No, ma'am.

8     Q.  I'd like you to look at paragraph 10.  It says:

9     "'On the advice of our attorneys, we really can't say

10    anything beyond the memo you got from the public

11    information office,' said Fernandez."

12         Is that true?  Does that say -- paragraph 10

13    say that?

14    A.  You have read it correctly.

15    Q.  Okay.  Uhm.  Does your firm believe that

16    information about how personnel decisions are made by

17    public entities should be kept from the press?

18         MR. SHINOFF:  I'm going to object that the

19    question is vague and ambiguous and overly broad.  If you

20    understand the question.

21         THE WITNESS:  I have no idea what you are

22    asking.

23    BY MS. LARKINS:

24     Q.  Does your law firm believe that the public

25     should be kept from knowing how personnel decisions are

36

1     made by public entities?

2         A.  I don't know if I can speak for the law firm as

3     a whole; but I can tell you this, that anything having to

4     do with the attorney-client relationship and the

5     decision-making process, which involves the

6     attorney-client relationship, is privileged information;

7     and no one other than the parties have a right to know

8     about that information.

9         Q.  Do you think that your firm uses

10    attorney-client privilege to hide information from the

11    public that the public has a right to know?

12        A.  I know they don't.

13        Q.  Are you aware that Mira Costa College paid

14    approximately $3 million for an investigation conducted

15    by Mr. Shinoff?

16        A.  I have no idea about amounts paid to afford an

17    investigation, nor do I have any knowledge that

18    Mr. Shinoff conducted an investigation.

19        Q.   That was in the Union Tribune.

20        MR. SHINOFF:  It is not a question.

21        THE WITNESS:  I know.  You to have ask

22    questions.

23        MS. LARKINS:  I know.  I'm not a lawyer.  So I

24    know I might not do this right.

25        THE WITNESS:  I'm not here to have my time


                            37


1    wasted.

2    BY MS. LARKINS:

3        Q.   Someone who is not a lawyer is a waste of time,

4    is that what you are saying?

5        MR. SHINOFF:  Don't respond to the

6    argumentative nature of that question.

7        MS. LARKINS:  Okay.  Actually, you weren't

8    responding to a question there.  Move to strike

9    Mr. Artiano's last statement.

10        I need to take a break, about 10 minutes.

11          MR. SHINOFF: Okay. Very good.

12          THE VIDEOTAPE TECHNICIAN: Off the record at

13     11:18 a.m.

14          (Recess.)

15          THE VIDEOTAPE TECHNICIAN: We are back on the

16     record at 11:27 a.m.

17     BY MS. LARKINS:

18     Q.  Mr. Artiano, what members of your firm made the

19     decision to sue me for defamation?

20     A.  It wasn't a matter of what members of the firm

21     made a decision.  I made a decision, certainly, that

22     unless you did the right thing by correcting the

23     mistake --

24          Actually, I shouldn't call it a mistake.

25     Q.  No, you shouldn't.


38


1     A.  -- of the intentional misstatements you placed

2     in your website, if you had removed that, that would have

3     obviated the need for a lawsuit.  And after I gave you

4    that opportunity to do that and you refused to do that, I

5    made the decision to go ahead and file suit.

6        Q.  Did you do any investigation to find out if the

7    statements on my website were true?

8        A.  I didn't have to do any investigation, because

9    I knew that the allegations in your -- that are posted on

10    your website are not true.

11        Q.  How closely do you follow Mr. Shinoff's actions

12    in his work?

13        A.  I don't follow his work.  I have known

14    Mr. Shinoff for approximately 30 years; and I know that

15    he is an extremely ethical, diligent, excellent attorney.

16        I can also speak for myself.  In one of your

17    websites, one of your website postings, it talks about

18    Stutz' partner, Ray Artiano, violating California law in

19    case after case; and I know that not to be true.

20        Moreover, I know that you didn't have any

21    involvement with me, knew nothing about any of the cases

22    that I handled, but yet you chose to make an

23    intentionally defamatory comment.

24        Q.  I noticed that you read from a document just

25    now.  Would you be willing to put that document into the

39

1    record as Exhibit 3.

2        A.  You want to make a copy of it?

3        Q.  Yes.

4        A.  That would be fine.

5            You'll make a copy of this?

6            THE REPORTER:  Yes.

7            (EXH. 3 was marked for identification.)

8    BY MS. LARKINS:

9        Q.  Could I take a peak at that just to make sure

10   he didn't take something out of context.

11           Did you start your quote in the middle of a

12   sentence, Mr. Artiano?

13       A.  I don't know that I started a quote anywhere.

14       Q.  When you -- when you read from the document,

15   Exhibit Number 3, did you start your quote in the middle

16   of a sentence?

17       A.  As I said, I don't know that I quoted anywhere.

18   What I said was that you have claimed that Sutz' partner,

19   Ray Artiano, violated California law in case after case.

20       Q.  Okay.

21    A.   You have also claimed that Daniel Shinoff,

22    Jeffrey Morris and Kelly Angell have violated California

23    law in case after case.

24    _    Q.   When you first became aware of this

25    accusation --


40


1    A.   Which accusation?  That I violated California

2    law in case after case?

3    Q.   This -- okay.  Let's just read this sentence

4    into the record, just so we know what we are talking

5    about.  Would you like to read it?

6    A.   Sure.  I will be happy to.

7    Q.   That first paragraph there.

8    A.   "Get out of jail free card?  The lawyers

9    provided by SDCOE Joint Powers Authority to Chula Vista

10    Elementary School District, Daniel Shinoff, Jeffrey

11    Morris, and Kelly Angell, as well as Stutz' partner, Ray

12    Artiano, violated California law in case after case."

13    Q.   Thank you.  Uhm.  When you first saw that

14   charge on my website, did it occur to you to do any

15   investigation at all into Daniel Shinoff or, well, you

16   say you have known Daniel Shinoff for 30 years, and you

17   wouldn't question him.

18       But how about Kelly Angell, did you do any

19   investigating into Kelly Angel's actions?

20     A.  Of course not.

21     Q.  May I ask why?

22     A.  Because there was no need for me to do that,

23   because I would know if anybody in my law firm had

24   violated California law --

25     Q.  How would you know that?

41

1     A.  -- in case after case.  We would be notified by

2   the state bar.  We would be notified by the courts.

3     Q.  Isn't it true that the state bar does not take

4   complaints from opposing clients or attorneys?

5     A.  No, it is not true.

6     Q.  Well, that's good news.  I was under the

7   impression that they did.  Uhm.  It seems to me that you

8    filed a lawsuit without making any effort at all to find

9    out if the allegations on my website are true and that

10   you have engaged in malicious prosecution.

11        A.   Is that a question, ma'am?

12        Q.   No.  No.  I flubbed up again.

13             Did Bob Gallagher ever discuss my case with

14   you?

15        A.   No, Bob Gallagher never discussed any of your

16   cases with me.

17        Q.   When I sent a complaint to your law firm in, it

18   was either December 2003 or early 2004, how was my

19   complaint handled?

20        A.   I have no idea.  If I saw a complaint that you

21   filed or that you sent, I have no recollection of that.

22        Q.   What would have happened if you saw a

23   complaint?

24        A.   It would depend on what the complaint said.

25        Q.   Well, what if it said that Daniel Shinoff was

42

1    violating the law?

2    A.  It would depend on how specific the complaint

3    was.

4    Q.  What if it says that he was obstructing justice

5    by trying to intimidate witnesses?

6    A.  Again, it would depend on what the complaint

7    said or what the letter said.

8    Q.  If someone complained to the firm that Daniel

9    Shinoff was violating the law and the firm protected him,

10    is not the firm also guilty of his wrongdoing?

11    MR. SHINOFF:  Don't answer that question.

12    THE WITNESS:  That question is nonsensical, as

13    well.

14    BY MS. LARKINS:

15    Q.  Okay.  Let me try again.  Let's not use Dan

16    Shinoff's name.  Let's keep this hypothetical.  If a

17    lawyer in your firm violates the law in case after case

18    and someone complains to the firm about that lawyer's

19    actions, aren't you aiding and abetting the wrongdoing by

20    failing to investigate, and by not just failing to

21    investigate, but by actively attacking the complainer?

22    MR. SHINOFF:  I'm going to object that the

23    question is vague and ambiguous.  It is an incomplete

24   hypothetical, and it calls for speculation.

25   BY MS. LARKINS:

43

1   Q.  Can you answer it?

2   A.  It is incapable of being answered.

3   Q.  Well, let me try again.  If one of your lawyers

4  in your firm obstructs justice and the firm is informed

5  about it and yet continues to support that lawyer by

6  shielding him from discovery, not producing documents,

7  not producing witnesses, filing malicious lawsuits

8  against the complainer, is not that firm guilty of the

9  same wrongdoing?

10   MR. SHINOFF:  I'm going to object that the

11  question is vague and ambiguous.  It is an incomplete

12  hypothetical and calls for speculation.

13  BY MS. LARKINS:

14   Q.  You still can't?

15   A.  Again, ma'am, you have to be much more specific

16  than that.

17   MS. LARKINS:  Okay.  Uhm.  I need to take a

18   break.

19       THE VIDEOTAPE TECHNICIAN: Are we going off the

20   record?

21       MR. SHINOFF: No.

22       THE WITNESS: No.

23       MR. SHINOFF: We just took a break.

24       MS. LARKINS: Uhm, I need a -- well, I really

25   need this copied, but I suppose we could do it without

44

1   copying it.

2       (EXH. 4 was marked for identification.)

3   BY MS. LARKINS:

4     Q. Okay. Yes. I have an exhibit I would like to

5   mark as exhibit -- I have an exhibit I would like to mark

6   as Exhibit 4. I'm going to pass it to you here.

7       Exhibit 4, Mr. Artiano, does this document look

8   familiar to you? Is it humorous to you, Mr. Artiano?

9     A. I'm sorry?

10     ⌐Q. Is this a matter of humor to you? You have a

11    huge smile on your face or you did a second ago.

12        MR. SHINOFF:  Don't respond to that question.

13        MS. LARKINS:  Okay.

14        THE WITNESS:  The document is not familiar to

15    me.

16    BY MS. LARKINS:

17        Q.  When a complaint comes into your office, who

18    looks at it?  A complaint about one of your lawyers comes

19    into the Stutz office, who looks at it?

20        MR. SHINOFF:  I'm going to object that the

21    question is vague and ambiguous and overly broad.

22        THE WITNESS:  It would certainly depend upon

23    who brought the complaint.  In other words, you know, if

24    a judge was complaining about something serious, I'd

25    certainly expect to be involved.  Certainly if the state


45


1    bar brought a concern, I would expect to be involved.  In

2    all of our years of practice, that's never happened.

3        If an opposing attorney brought a complaint

4    against a lawyer, it would depend upon whether or not

5    that opposing attorney brought it directly to my

6    attention or it was brought to somebody else.  So --

7    BY MS. LARKINS:

8        Q.   Well, how about if it were addressed to the

9    firm itself?

10       A.   Just a blanket letter to the firm?

11       Q.   Yes, just to Stutz law firm.

12       A.   It would depend on where the mail was routed, I

13   suppose.

14       Q.   So it is all up to the person in the mail room?

15       A.   I would suspect that they would route it either

16   to the administrative manager --

17       Q.   Isn't that you?

18       A.   No.

19       Q.   Who is he?

20       A.   Who is she?  Right now, it is Rita Hee.

21       Q.   And how long has she --

22       A.   Or Rita.  Actually, her last name isn't Hee

23   anymore.  She's been our administrative manager probably

24   for two, two to three years.

25       Q.   And before that?

46

1    A.  Before that, a woman by the name of Diana

2  Clark, I believe.

3    Q.  And how long did she work for your firm?

4    A.  A few years.

5    Q.  Would that be three or more?

6    A.  Not necessarily.

7    Q.  What does that mean, a few?

8    A.  To the best of my recollection, about two.

9    Q.  About two.  And how about before that?

10    A.  We had the same administrative manager for

11  probably 20 years or so, and her name was Shari Randall.

12    Q.  How do you spell the Shari?

13    A.  S-h-a-r-i.

14    Q.  I'm glad I asked.  And Randall with two Ls?

15    A.  I believe so.

16    Q.  Okay.  You know, I think maybe I owe you an

17  apology, Mr. Artiano, for the big smile, because now that

18  I look at Exhibit Number 4, I see something funny.  Were

19  you smiling at the spelling of the name?

20    A.  Ma'am, I wasn't.  First of all, I wasn't

21    smiling.

22        Q.  You weren't smiling?

23        A.  And I have no idea what you are talking about.

24        Q.  Is that your testimony, that you weren't

25    smiling?


47


1        A.  Yes, ma'am.

2        Q.  Oh, that is great.  That's what the video

3    camera is for.  Did you think it was kind of humorous in

4    a way, the way that my name is spelled at the top of that

5    document?

6        A.  Frankly, I didn't notice the way your name was

7    spelled.

8        Q.  Oh, well, then we can't let you off the hook on

9    that, for the smiling.

10       A.  Is that a question?

11       Q.  No, that is a statement.

12          MR. SHINOFF:  I'm going to ask that you cease

13    with the personal comments, please.

14    BY MS. LARKINS:

15     Q.  Okay.  And do you also want me to stop saying

16   things without any consideration?

17        And, by the way, how did you know that I'm

18   prone to fantasies?

19        MR. SHINOFF:  I'm not going to respond to that

20   question.

21        MS. LARKINS:  Well, if you say something like

22   that again, I might ask you a similar question.

23        MR. SHINOFF:  Is that threat?

24        MS. LARKINS:  It is a promise.  If you make

25   disparaging personal comments such as I know that you are

48

1   prone to fantasies, I might ask you if that's what you

2   are talking about, when you ask me not to speak in a

3   certain way.

4        MR. SHINOFF:  Well, that is governed by the

5   Code of Civil Procedure.

6        MS. LARKINS:  Really?  Whether or not you can

7   sit there and say that I know you are prone to fantasies,

8    that is governed by the Code of Civil Procedure?

9         MR. SHINOFF:  The way you are asking questions

10   is governed by the Code of Civil Procedure.

11        MS. LARKINS:  But your comments are not?

12        MR. SHINOFF:  Please ask your next question.

13        MS. LARKINS:  Well, here I am, an in pro per

14   attorney, and you won't even give me answers.  I mean,

15   well, an in pro per defendant, not an in pro per

16   attorney.

17   BY MS. LARKINS:

18    Q.  Okay.  I'm sorry.  Can I look at Exhibit 1

19   again.  It is the deposition notice.  Okay.  On Number 4,

20   did you bring any documents related to your investigation

21   into whether the facts on my website might be true?

22    A.  There are no documents, because there is no

23   need to determine whether or not the statements on your

24   website were true, because I knew them to be false.

25    Q.  Oh, yeah, on this last one, I'm glad I came



                              49



1    back to this.  Did you bring any documents about your

2    policies with regard to complaints about unethical or

3    illegal behavior on the part of your attorneys?

4        A.  There are no written policies, nor have we ever

5    had any complaints about unethical or illegal behavior on

6    the part of any attorney in my firm other than from you.

7        Q.  That's very interesting that you would say

8    that.  Did Bob Gallagher leave your firm because your

9    firm was obstructing jus- -- was supporting Daniel

10   Shinoff's and Kelly Angell's obstruction of justice?

11       A.  No, that is not why Bob Gallagher left our

12   firm.

13       Q.  Why did he leave?

14       A.  You are not entitled to that information.  That

15   is protected by Mr. Gallagher's privacy rights.

16       Q.  Would you -- were you sorry to see him leave?

17       MR. SHINOFF:  I'm going to object that that is

18   irrelevant.

19       THE WITNESS:  Again, I'm not going to engage in

20   this line of questioning, because you seek to invade the

21   privacy rights of an employee of my firm, an ex-employee,

22   rather.

23   BY MS. LARKINS:

24       Q.  I'm not sure that you have a privacy right to

25    cover up obstruction of justice.


50



1     A.  If you continue making statements such as the

2     one -- such as the one that you just made, the deposition

3     will conclude rather quickly.

4     Q.  Well, that's too bad, because you are trying

5     to -- you are suing me for saying that your firm

6     obstructed justice; and yet, you claim that you have

7     never seen that Exhibit Number 4, which was part of a

8     complaint I sent to your law firm just about weeks before

9     Bob Gallagher left the firm.  I -- you are the plaintiff

10    here.  You are the one that wanted to talk about this in

11    court, about how you don't obstruct justice.

12       MR. SHINOFF:  You misunderstand the

13    allegations.

14       MS. LARKINS:  Okay.  Let's hear it.  I think

15    defamation is a heinous action; and I think people who do

16    it intentionally are heinous.  If I have said anything on

17    my website about your law firm or you as an individual,

18    Mr. Artiano, or you as an individual, Mr. Shinoff, I want

19    to apologize. I want to reimburse you for any losses

20    financially it has cost you. I want to take down the

21    website, put a big apology in its place. If all this is,

22    as Mr. Shinoff seems to be saying, a fantasy on my part,

23    please stay and explain it to me, how I'm wrong.

24        Your lawyer, Mr. Shinoff, and your other

25    lawyer, Kelly Angell, obstructed justice in an


51


1    unconscionable fashion in my case and in several other

2    cases. Intimidation seems to be a favorite tactic.

3        THE WITNESS: Please ask a question.

4    BY MS. LARKINS:

5        Q. Okay. If your law firm is so great, why did

6    Bob Gallagher leave?

7        A. I just explained to you that I would never talk

8    about an employee, who has departed the firm. I can tell

9    you this, however: It had absolutely nothing at all to

10    do with you.

11        Q. Uhm. Do you always refer to Bob Gallagher as

12    an employee of the firm or do you sometimes refer to him

13    as a founder, a partner?

14       A.  He was a founder of the firm.  He was a

15    partner, actually, a shareholder.  In law firms, we

16    generally refer to partners, however.

17       Q.  He started the firm without you, correct?

18       A.  No.

19       Q.  You were there at the very beginning?

20       A.  Yes.

21       Q.  How many lawyers were in the firm when you

22    founded it?

23       A.  Three of us.

24       Q.  Okay.  But now you refer to him as an employee?

25       A.  An ex-employee, yes.  I am an employee of the

52

1    firm, as well.

2       Q.  Do you sort of -- are you uncomfortable talking

3    about Bob Gallagher?

4       A.  In California, everybody has a constitutional

5    right to privacy. And --

6        Q.  Well, that's not what I'm talking about.

7    Really, it struck me when you referred to him as an

8    employee.  It seemed like you were trying to diminish his

9    importance.

10       MR. SHINOFF:  There is no question pending.

11       THE WITNESS:  I know.

12   BY MS. LARKINS:

13       Q.  How many lawyers do you know that have founded

14   a firm and then left it?

15       MR. SHINOFF:  I'm going to object that the

16   question is irrelevant.  Don't respond, please.

17       MS. LARKINS:  You're instructing him not to

18   answer?

19       MR. SHINOFF:  I am.  I don't see how it's

20   calculated to lead to the discovery of relevant evidence.

21       MS. LARKINS:  You know, we wouldn't even have

22   to continue with this case.  If you just gave me just a

23   little flicker of a doubt about my allegations, I'd take

24   my site down right now.  You are just acting so guilty.

25   You are acting like you are covering up.

53

1          THE WITNESS:  Are you going to continue to ask

2    questions or are you going to continue to make speeches?

3    If the latter, as I said before, we are going to end the

4    deposition.  I'm not here to listen to you make speeches.

5          MS. LARKINS:  I really am a person, who, when

6    I'm wrong, I admit it.

7          THE WITNESS:  Okay.  That's the end of this

8    deposition.

9          MR. SHINOFF:  We'll give you notice of our

10    motion for a protective order.  If we could have a copy

11    of the deposition transcript, please.

12          MS. LARKINS:  Are you going to attend your

13    deposition, Mr. Shinoff?

14          MR. SHINOFF:  No, because I'm concerned that

15    the deposition will go the same way.  And I think we need

16    guidance from the court so the court can provide guidance

17    for both parties in terms of the rules that govern the

18    deposition process.

19          MS. LARKINS:  Okay.

20          MR. SHINOFF:  I'm also going to ask that we be

21    permitted, just so that you know, that we be permitted to

22   have a camera that focuses on you, as well, because I

23   think that your behavior is also intended to intimidate,

24   vex, and annoy the witness, in particular, Mr. Artiano.

25       MS. LARKINS:  I certainly do want a camera


54


1   focused on me, because you are making false allegations,

2   and I want to be protected by the camera.  Would you

3   agree to have a camera on you, yourself, Mr. Shinoff?

4       MR. SHINOFF:  I have no problem having a camera

5   on me.  What's interesting to me --

6       THE VIDEOTAPE TECHNICIAN:  Excuse me.  Counsel,

7   I just need to find out technically how we are going off

8   the record, because everybody has to agree.  You are

9   going off to seek a protective order, go off with that

10   part of the statute?

11       MR. SHINOFF:  Yes, we are going to go off to

12   seek a protective order.

13       THE VIDEOTAPE TECHNICIAN:  So you want me to go

14   off the tape, and you want Bonnie to stop writing?

15          MR. SHINOFF:  No, I don't want the reporter to

16    stop.

17          It is curious to me that you would hold

18    yourself out as a person, who has a great honor for the

19    truth, yet you would deny that you were smirking and

20    smiling at Mr. Artiano throughout the course of your

21    questioning.

22          Are you saying that you weren't doing that,

23    because I believe you when you say that the truth is

24    something that is very important to you and that you find

25    defamation to be heinous?  So I take you at your word.


                              55


1           MS. LARKINS:  I may have smiled a few times.  I

2    really -- I don't know.  I would like to have the camera,

3    too.

4           MR. SHINOFF:  Okay.

5           MS. LARKINS:  So I know myself for sure how

6    true or false your allegations are.

7           MR. SHINOFF:  Okay.  I'm just telling you what

8    I observed.  Okay?  And I think that the camera would be

9   extremely beneficial.

10          MS. LARKINS:  I think so, too.  It will protect

11   me from any false allegations.

12          MR. SHINOFF:  Are you saying you didn't smile

13   and smirk at Mr. Artiano throughout the course of the

14   deposition?

15          MS. LARKINS:  I said that the camera will

16   protect me from any false allegations.

17          MR. SHINOFF:  Why is it that you won't answer

18   the question?

19          MS. LARKINS:  If you look at the deposition

20   transcript when it comes, you'll see that I said that I

21   may have smiled a few times.

22          MR. SHINOFF:  And how many is a few times?

23          MS. LARKINS:  I have no idea.  I wasn't paying

24   attention to my smiling.

25          MR. SHINOFF:  Thank you.


                              56



1          THE REPORTER:  We are going off the record now.

2          THE VIDEOTAPE TECHNICIAN:  Off the record at

3     12:00 p.m.

4          (Deposition adjourned at 12:00 p.m.)

5          I, the undersigned, say that I have read the

6     foregoing deposition and hereby declare under penalty of

7     perjury the foregoing is true and correct.

8          Executed this _____ day of _____, 2007,

9     at _____, _____.

10.    (City)      (State)

11

12     _____

13          DECLARANT

14

15

16

17

18

19

20

21

22

23

24

25

57

1    STATE OF CALIFORNIA          )
                                  ) ss
2    COUNTY OF SAN DIEGO          )

3

4        I, Bonnie Breen, CSR No. 5582, a Certified Shorthand

5    Reporter in and for the County of San Diego, State of

6    California, do hereby certify:

7        That prior to being examined, the witness named in

8    the forgoing deposition was by me duly sworn to testify

9    to the truth, the whole truth, and nothing but the truth.

10       That said deposition was taken before me at the time

11   and place set forth and was taken down by me in shorthand

12   and thereafter reduced to computerized transcription

13   under my direction and supervision; and I hereby certify

14   the foregoing deposition is a full, true and correct

15   transcript of my shorthand notes so taken.

16       I further certify that I am neither counsel for nor

17   related to any party to said action nor in anywise

18   interested in the outcome thereof.

19    IN WITNESS WHEREOF, I have hereunto subscribed my

20  name this _____ day of _____, 2007 at San Diego,

21  California.

22

23  _____

      BONNIE G. BREEN, CSR NO. 5582
24

25

58