IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

MAURA LARKINS,                          *

                                        *

            Plaintiff,                  *

                                        *

    vs.                                 *       Case No. GIC 781970

                                        *

RICHARD T. WERLIN, etc.,                *

et al.,                                 *

                                        *

            Defendants.                 *

                                        *

VIDEOTAPED DEPOSITION OF SAMUEL D. GROSS, JR.

Taken at San Diego, California

November 17, 2004

Claudia A. Witt, CSR

Certificate No. 10797

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

**Page 2**

I-N-D-E-X

VIDEOTAPED DEPOSITION OF SAMUEL D. GROSS, JR.
November 17, 2004

EXAMINATION                                    PAGE
By Ms. Larkins                          7
                                                73

By Mr. Hersh                            68

By Mr. Hedrick                          69
                                    72

By Ms. Angell                           71

EXHIBITS                                       PAGE
1  San Diego Regional Crime/Incident Report,    9
   21 pages

2  Declaration of Commander Sam Gross, three    9
   pages

3  Amended Declaration of Commander Sam Gross,  11
   six pages

4  California Labor Code Section 430-435, two   38
   pages

5  Typewritten excerpt with handwritten         45
   notations, one page

6  Penal Code Section 11140-11144, one page     46

7  Plaintiff's Memorandum of Points and         47
   Authorities in Support of Defendant Michael
   Carlson's Motion to Set Aside Default, two
   pages

8  Excerpt from The Star News dated 8-20-04,    48
   two pages

**Page 3**

I N D E X (Continued)

EXHIBITS                                       PAGE
9  Excerpt from San Diego Union Tribune dated   50
   8-21-04, one page

10 South County Opinion, Letter to the Editor   57
   dated 8-26-04, two pages

11 Excerpt from news article dated 9-17-04,     61
   one page

12 The Star News article, two pages            62

13 Star News excerpt, one page                  65

14 Deposition Subpoena, one page                74

**Page 4**

VIDEOTAPED DEPOSITION OF SAMUEL D. GROSS, JR.

Pursuant to Notice to Take Deposition, and on the 17th
day of November 2004, commencing at the hour of 10:19 a.m. at
319 Elm Street, Suite 100, in the City and County of San Diego,
State of California, before me, Claudia A. Witt, Certified
Shorthand Reporter in and for the State of California,
personally appeared:

SAMUEL D. GROSS, JR.,
Witness herein, who, called as a witness by the Plaintiff,
being by me first duly sworn, was thereupon examined as a
witness in said cause.

APPEARANCES

For the Plaintiff:  MAURA LARKINS
                    1935 Autocross Court
                    El Cajon, California 92019
                    (619) 444-0065
                    (In Propria Persona)

For Chula Vista     CALIFORNIA TEACHERS ASSOCIATION
Educators,     By:  MICHAEL HERSH, ESQ.
California Teachers  Post Office Box 2153
Association,        11745 East Telegraph Road
Virginia Boyd and   Santa Fe Springs, California 90670
Timothy O'Neill:    (562) 942-7979
                    (Appeared telephonically)

For Robin Donlan    STUTZ, ARTIANO, SHINOFF & HOLTZ
and Linda Watson:  By:  KELLY R. ANGELL, ESQ.
                    401 West A Street, 15th Floor
                    San Diego, California 92101
                    (619)232-3122

**Page 5**

For Michael Carlson: McCORMICK & MITCHELL
                     By:  GABRIEL G. HEDRICK, ESQ.
                     625 Broadway, Suite 1400
                     San Diego, California 92101
                     (619) 235-8444

Also present:       Gregg Eisman, Videographics

2 (Pages 2 to 5)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

---

**Page 6**

1  THE VIDEOGRAPHER: This is the video deposition of
2  Sam Gross being taken on behalf of the plaintiff in the
3  matter of Maura Larkins versus Richard T. Werlin, et cetera,
4  et al., San Diego Superior Court case No. GIC 781970. This
5  deposition's being held in the offices of San Diego Court
6  Reporting, located at 319 Elm Street, Suite 100, San Diego,
7  California. Today is Wednesday, November 17th, 2004. The
8  time is now 10:19 a.m. My name is Gregg Eisman. I'm a legal
9  video specialist with Videographics, located at 1903 30th
10  Street, San Diego, California. The certified shorthand
11  reporter is Claudia Witt of San Diego Court Reporting.
12  For the video record, would counsel please state
13  their appearances.
14  MS. LARKINS: Maura Larkins, plaintiff in pro per.
15  MS. ANGELL: Kelly Angell for Robin Donlan and
16  Linda Watson.
17  MR. HEDRICK: Gabriel Hedrick for Defendant
18  Michael Carlson.
19  MR. HERSH: Michael Hersh on behalf of the
20  California Teachers Association, Chula Vista Educators,
21  Virginia Boyd, and Timothy O'Neill.
22  THE VIDEOGRAPHER: Would the reporter please swear
23  the witness.
24  (At this point, the deponent was placed under oath
25  by the court reporter.)

**Page 7**

1  EXAMINATION BY MS. LARKINS:
2  Q. Could you state your name for the record.
3  A. My name is Samuel, middle initial "D," Gross,
4  G-r-o-s-s, Jr.
5  Q. Thank you. Are you feeling well today, Mr. Gross?
6  A. I'm fine.
7  Q. Okay. Do you feel that you -- is there any reason
8  that you might not be able to give your best testimony today?
9  A. I don't believe there's any reason I could not
10  give my best testimony.
11  Q. Okay. I'd like to just do the standard review of
12  education and employment. Could you tell me where you
13  graduated from high school?
14  A. I graduated from San Marcos High School,
15  Santa Barbara, California.
16  Q. And after that what was your first employment or
17  if you went into education after that?
18  A. I continued my education through Santa Barbara
19  Community College. I graduated with an A.A. degree from
20  there. At the same time I was also an ambulance driver and
21  attendant for then Coast Ambulance in Santa Barbara.
22  Following that I transferred to California State University
23  at Fresno where I graduated with a bachelor of science
24  degree. I was then employed by the Santa Barbara County
25  sheriff's department in July of 1971. I've been there ever

**Page 8**

1  since. Subsequent to all of that I have a master's degree in
2  public administration from Golden Gate University.
3  Q. Okay. And -- thank very much. I can tell you've
4  done this before.
5  A. Once or twice.
6  Q. And can you explain to me what exactly is your
7  position with the Santa Barbara sheriff's department now?
8  A. I am a division commander with the department in
9  charge of information services which entails our
10  communications sections, our civil processes unit, our
11  criminal records unit, as well as our information technology
12  units.
13  Q. Okay. And you're just the person I want to talk
14  to. I would like to ask that this first exhibit be labeled
15  as Exhibit 1. These are my arrest records from -- by the
16  San Diego police department.
17  I think I've already produced these to you, and
18  they're not really that interesting anyway, but you can share
19  if --
20  MS. ANGELL: Can I have a copy of the exhibit,
21  please, so I can reference it while you're questioning.
22  MS. LARKINS: Yeah, yeah.
23  MS. ANGELL: Thanks.
24  MR. HEDRICK: If you have another copy, that'd be
25  great too. If you -- that's fine. I can share with her.

**Page 9**

1  MS. LARKINS: Tell you what, could you give it
2  back to me at the end.
3  MR. HEDRICK: Sure.
4  MS. LARKINS: Yeah. Okay.
5  THE WITNESS: I can give you mine too if you like.
6  MS. LARKINS: I can give it to you right now. I
7  just want to just take a look at it.
8  MS. LARKINS: Okay. Yeah. Yeah. Okay. Great.
9  (Plaintiff's Exhibit No. 1 was marked for
10  identification.)
11  MS. LARKINS: And we'll talk more about this
12  later, but I just wanted to get it into evidence. Okay.
13  That's going to be Exhibit 1.
14  I'll tell you what, how about I let you guys
15  share, because I have this new plan for this deposition where
16  I'm going to keep one copy of each exhibit in a red folder so
17  it will be easier for me to know what my exhibits were, and
18  then this is my original copy.
19  Okay. The next exhibit I'd like to put into
20  evidence is this Declaration of Commander Sam Gross, and I'd
21  like that to be Exhibit 2. And you probably will want to
22  look at that. And let me have a copy for my red folder.
23  (Plaintiff's Exhibit No. 2 was marked for
24  identification.)
25  MR. HEDRICK: Can I look at that really quick? I

3 (Pages 6 to 9)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

Page 10

1  just want to make sure it's -- if I can -- are you going
2  to -- are you going to introduce the amended declaration, the
3  one that has exhibits attached to it?  I have a copy of it.
4  I can bring it in later.
5      MS. LARKINS:  Yeah, okay.  I guess this was the --
6      MR. HEDRICK:  There were --
7      MS. LARKINS:  -- first version.
8      MR. HEDRICK:  Right, right.  There was another
9  amended declaration --
10     MS. LARKINS:  Yeah.
11     MR. HEDRICK:  -- filed September 29th.
12     MS. LARKINS:  Okay.  I believe I do have that.
13     MS. ANGELL:  Do you have a copy of Exhibit 2 for
14  counsel to refer to?
15     MS. LARKINS:  I'm afraid I don't, but if you could
16  give it back to me at the end?  Or if you could give it back to
17  me at the end?
18     MS. ANGELL:  Uh-huh.
19     MS. LARKINS:  Thank you.
20     MS. ANGELL:  Did you bring copies of these
21  exhibits of all of them for us to look at or you didn't bring
22  copies --
23     MS. LARKINS:  I did my best.  I think I might have
24  more of some and less of others.
25     Okay.  I would like to ask that this Amended

Page 11

1  Declaration of Sam Gross be entered as Exhibit 3.  In fact,
2  you know what, I'm actually surprised I don't have more of
3  these.  Let's see.  Okay.  This is Exhibit 3, and Kelly's
4  going to give me 2.
5      MS. ANGELL:  If you can give me a copy of
6  everything that you're handing him for my reference, and when
7  you don't have enough copies for me to keep one, just let me
8  know and I'll give it back to you today.
9      MS. LARKINS:  Hold on here.  Okay.  No. 3, No. 3,
10 did I give you a No. 3?
11     THE WITNESS:  You did not give me No. 3.
12     MS. LARKINS:  Okay.  Here's a No. 3 for you.  And
13 I would like this back too.  Here's No. 3.  Okay.  And that's
14 the amended declaration.
15     (Plaintiff's Exhibit No. 3 was marked for
16  identification.)
17 BY MS. LARKINS:
18     Q.  Okay.  Mr. Gross, let's just look at Exhibit 3 for
19 now.  Did you sign the third page of this exhibit?
20     A.  Yes, that appears to be my signature.
21     Q.  And did you cause to be faxed to McCormick &
22 Mitchell this signature page?
23     A.  Yes, ma'am.
24     Q.  When you faxed this signature page to McCormick &
25 Mitchell did you also fax to them the first two pages of this

Page 12

1  amended declaration?
2      A.  I believe I did.
3      Q.  Okay.  Are the two pages that we're looking at
4  here, Pages 1 and 2 of this exhibit, do they bear the heading
5  showing that they have been faxed?
6      A.  They do not.
7      Q.  Could I give you a minute to read over those first
8  two pages, and you tell me if you believe they are the same
9  as the ones that you faxed back to McCormick & Mitchell?
10     A.  I believe those were the documents that were faxed
11 back.
12     Q.  Okay.  When a sheriff's deputy in Santa Barbara
13 County wants to access criminal records information of
14 individuals within the State of California, can you tell me
15 perhaps what is the most common method of doing that?
16     MR. HEDRICK:  Objection.  Lacks foundation.
17 BY MS. LARKINS:
18     Q.  Are you able to answer the question?
19     A.  The most common method is by using the California
20 Law Enforcement Telecommunications System through the
21 California Department of Justice requesting a criminal
22 records, a rap sheet in essence.
23     Q.  And what are the various methods of doing that as
24 far as like do you write them a letter?  Do you punch
25 something into a computer?  Do you call them up or all three?

Page 13

1      A.  Everything is done into the California Law
2  Enforcement Telecommunications System, C.L.E.T.S. for short,
3  through a computer terminal.
4      Q.  And do all the sheriff's vehicles which have
5  computers, do they have computer terminals which have access
6  to this system?
7      A.  No, they do not.
8      Q.  So if a sheriff's deputy wants to get access to
9  this information, what does he have to do?
10     A.  He has to go to one of our sheriff's stations and
11 either run the information -- request the information himself
12 or have the information requested by one of our records
13 staff.
14     Q.  Okay.  How does he request it himself?
15     A.  He can enter his proper identification into the
16 computer, into the log-in screen of the computer, and request
17 a criminal history through the appropriate commands in the
18 computer itself.
19     Q.  And if he requests that a staff member do this for
20 him, then it would be the staff member's I.D. that would be
21 entered into the computer?
22     A.  And it would be referenced to the deputy
23 requesting the request as the person actually requesting the
24 information.
25     Q.  Okay.  And then after this request has been made,

4 (Pages 10 to 13)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

---

**Page 14**

1   about how long does it take for the information to come back
2   to this computer terminal?
3       A.  Depending on the amount of traffic on the computer
4   system itself, it can be a matter of seconds, it can be a
5   matter of minutes.
6       Q.  Okay.  And if you could look at Exhibit 1, would
7   this or any -- would any part of these documents come through
8   the computer terminal if someone made a request for my arrest
9   records?
10      A.  As a generality?
11      Q.  Yes.
12      A.  The information that comes back from the State of
13  California usually includes some identifying information --
14  I'm not speaking specifically of you, but I'm --
15      Q.  Right.
16      A.  -- speaking generally of anyone who it's requested
17  of.  Comes back with identifying information about the
18  person; it comes back with information from the arresting
19  agency where a person was charged; it should come back if the
20  courts have done their job with the status of the case,
21  whether there's been a conviction, whether it was rejected by
22  the district attorney's office, whether it was dropped in the
23  interest of justice; and if there is a conviction, it should
24  come back with a conviction record including the punishment.
25      Q.  Okay.  Looking again at Exhibit 1, this is a full

---

**Page 15**

1   eight-and-a-half-by-eleven sheet of paper, but there really
2   isn't that much information on it.  Up at the top it says
3   San Diego -- well, could you tell me what the label is up at
4   the top?
5       A.  It says San Diego Regional Crime, slash, Incident
6   Report.
7       Q.  Okay.  And does it have an incident number?  I'm
8   not asking you what the incident number is, but does it have
9   an incident number?
10      A.  It says that there is an incident number there,
11  yes, with some numbers below it.
12      Q.  Would that number come across to someone who was
13  accessing information about me through this California Law
14  Enforcement Telecommunication System?
15      A.  I don't know what information San Diego Regional
16  Crime/Incident Report or whoever their holding agency is,
17  whether it's San Diego police department or whomever, what
18  number they would enter in there.  I don't know.
19      Q.  No, that's not what I'm asking you.  What I'm
20  saying is whatever number San Diego Regional Crime --
21  San Diego police department gave to this incident, would that
22  number be transferred through this C.L.E.T.S. system?
23      A.  I don't know whether or not their incident number
24  would transfer through or not.  Sometimes it's a court
25  number, and sometimes it's an arrest information number.  I

---

**Page 16**

1   don't know for San Diego.
2       Q.  Okay.  Let's assume that there was no court
3   involvement, which was the case here with my case.  Since
4   there is no court number, in that case would this incident
5   number be the one that would be transmitted?
6       A.  Well, it has an incident number --
7           MS. ANGELL:  Objection.  Calls for speculation.
8   Incomplete hypothetical.
9           THE WITNESS:  It has an incident number and it has
10  a case number.  I do not know which San Diego would have put
11  there.  They should reference it by one of those -- by a
12  reference number similar to that.
13  BY MS. LARKINS:
14      Q.  Okay.  Is it possible that both of those numbers
15  would be transmitted?
16          MR. HEDRICK:  Calls for speculation.
17          THE WITNESS:  It's possible.
18  BY MS. LARKINS:
19      Q.  Okay.  Let me -- let me refer -- let me find out a
20  little more about your experience.  Have you ever gone to
21  the -- a computer terminal with access to the C.L.E.T.S.
22  system and accessed someone's criminal records information?
23      A.  I have not personally, no.
24      Q.  Okay.  Has anyone done that on your behalf?
25      A.  Yes.

---

**Page 17**

1       Q.  And who would that be?
2       A.  It would have been one of our records staff.
3       Q.  Okay.  The records staff.  Do you recall the last
4   time one of your records staff accessed criminal records
5   information on your behalf?
6       A.  I don't recall.
7       Q.  If it had happened during the past month, would
8   you recall it?
9       A.  I would recall it.
10      Q.  Okay.  So it's been more than a month?
11      A.  I've been in an administrative assignment for
12  seven years.  I don't think I've recall -- requested any
13  criminal history in the past seven years.
14      Q.  Okay.  Jumping over to the exhibits within my
15  Exhibit 3, did you yourself cause this report to be printed
16  out?
17      A.  I did not.
18      Q.  Can you tell me who did?
19      A.  Christine Nail, the information -- information
20  technology manager of the Santa Barbara police department.
21      Q.  Of Santa Barbara --
22      A.  Santa Barbara police department.
23      Q.  And I'm sorry, I didn't catch her last name?
24      A.  Nail, N-a-i-l.
25      Q.  Okay.  Looking down at the bottom of this

---

5 (Pages 14 to 17)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

---

**Page 18**

1    Exhibit A, first page, do you see where it says "Strings:
2    'Larkins' and 'Maura'"?
3        A.  Yes, ma'am.
4        Q.  Okay.  Could you look back at Page 3 of your
5    amended declaration.  On Line 4 could you just -- actually,
6    could you read the sentence there that's labeled as Paragraph
7    10.
8        A.  "The results of the audit further indicate that no
9    information pertaining to 'Larkins' or 'Maura' was accessed
10   or attempted to be accessed by anyone during the time periods
11   indicated above, which includes the time periods indicated by
12   Maura Larkins in her complaint against Deputy Carlson."
13       Q.  Mr. Gross, in your Exhibit A I have two pages for
14   Exhibit A, and I'm having trouble seeing any difference
15   between these two pages, other than one shows that it was
16   faxed as Page 2 and the other shows that it was faxed as Page
17   3.  Is there -- do you know of there being any difference
18   between these two pages?
19       A.  There's a difference.  If you look at the third
20   line where it says "start" --
21       Q.  Uh-huh.
22       A.  -- you'll notice that one is for the calendar year
23   2001 and the other is for the year calendar 2000.
24       Q.  Okay.  Thank you.
25       A.  Uh-huh.

---

**Page 19**

1        Q.  Looking at the second page of this exhibit, do you
2    see down in the bottom where it says "Strings"?
3        A.  Referring to each of the pages, is that what
4    you're --
5        Q.  No, just the second of the two pages.
6        A.  The second of the two.  Yes, ma'am.
7        Q.  And what does it say there?
8        A.  It says Larkins in parentheses and Maura in
9    parentheses.
10       MR. HEDRICK:  I think it's quotation marks.
11       THE WITNESS:  Quotation marks, excuse me.
12   BY MS. LARKINS:
13       Q.  Okay.  Now, I'm not a real computer expert, but
14   I've done a few searches.  And in many of the searches it
15   makes a big difference whether you say "and" or "or."  Now,
16   in this search done by Christine Nail, did she search for
17   Larkins and Maura or did she search for Larkins or Maura?
18       MR. HEDRICK:  Lacks foundation.  Lacks personal
19   knowledge.
20       THE WITNESS:  I don't know which way she searched.
21   My request was to search Larkins or Maura.
22   BY MS. LARKINS:
23       Q.  Okay.  Looking down at "strings" does this let us
24   know what she searched for?
25       A.  No.  It says "and."  I don't know anything further

---

**Page 20**

1    than that.
2        Q.  Okay.  So judging from this document, it appears
3    that she searched for Larkins and Maura.  Is that not true?
4        MR. HEDRICK:  Calls for speculation.
5        THE WITNESS:  That's what it appears.
6    BY MS. LARKINS:
7        Q.  Thank you.  When you faxed this document were you
8    aware of the fact that it said "and" there instead of "or"?
9        A.  I had read the document.  I was probably aware of
10   it.
11       Q.  Did -- did that concern you and make you want to
12   do another -- ask Christine Nail to do another search using
13   the word "or"?
14       A.  No.
15       Q.  Wouldn't using the word "or" have a tendency to
16   bring up a lot more information?
17       A.  Using the word "or" could bring up any person with
18   the last -- with the name Larkins and/or a name Maura, not
19   necessarily connected together.
20       Q.  Thank you.  So is that a yes?
21       A.  I don't know how she searched.
22       Q.  No --
23       A.  I know what I asked.  I don't know how she
24   searched.
25       Q.  Okay.  If she had searched Larkins or Maura, is it

---

**Page 21**

1    not -- is your -- is it not true that almost certainly more
2    information would have come up?
3        A.  I don't know that.
4        Q.  Okay.  On your -- does your computer search engine
5    work like other search engines in that "and" and "or" mean
6    different things?
7        A.  I do not know that.
8        Q.  Okay.  Well, this is -- this is something that can
9    be further tested.  Would you be willing to in the interest
10   of justice in this case and in order to make sure that you
11   know what's going on with the employees of the Santa Barbara
12   sheriff's department in case they're breaking the law, would
13   you be willing to do a search for Larkins or Maura?
14       A.  I would be happy to.
15       Q.  Thank you.  And would you be willing to fax me the
16   results of that search?
17       A.  Of course.
18       Q.  Thank you.
19       Going back to Page 3 of your amended
20   declaration --
21       MS. ANGELL:  If I may while you're taking a drink,
22   I would just request that that also be faxed simultaneously
23   to my office, and I'll provide you with my business card
24   after the deposition today.  Thank you.
25       THE WITNESS:  Thank you.

---

6 (Pages 18 to 21)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

---

**Page 22**

1  BY MS. LARKINS:
2      Q.  Okay. Was this amended declaration prepared by
3  you or by someone else?
4      A.  It was not prepared by me. It was prepared I
5  believe by the law offices of Deborah Garvin.
6      Q.  Okay. Did you personally speak to Deborah Garvin?
7      A.  Yes, I have.
8      Q.  About -- are you being represented by Deborah
9  Garvin's law firm?
10     A.  No, ma'am, I'm not.
11     Q.  Okay.
12         MR. HEDRICK:  And just to clarify for the record,
13  Deborah Garvin is employed by McCormick & Mitchell --
14         MS. LARKINS:  Okay.
15         MR. HEDRICK:  -- not the law firm of Deborah
16  Garvin.
17         MS. LARKINS:  Correct.
18     Q.  So did you -- did you do this as a favor to
19  Michael Carlson, talking to Deborah Garvin?
20     A.  I was asked to provide information after the
21  search had been run to their offices on behalf of
22  Mr. Carlson, and I did so.
23     Q.  Okay. And it was Deborah Garvin who asked you to
24  do that?
25     A.  I don't know whether it was Deborah Garvin or

---

**Page 23**

1  Deputy Carlson himself.
2      Q.  Okay. Did you talk to Deputy Carlson about this
3  matter?
4      A.  Initially when he was first served, yes.
5      Q.  Okay. And have you talked to him since then?
6      A.  About two weeks ago just to ask him how he was
7  doing.
8      Q.  Okay. And what did he say?
9      A.  He said he was doing okay. He was weathering
10  through this.
11     Q.  Okay. On Page 3 of your amended declaration, Line
12  4, does it say Larkins and Maura or does it say Larkins or
13  Maura?
14     A.  It says "or."
15     Q.  After the discussion that we've just had, would
16  you be interested in having a second amended declaration that
17  changes this "or" to "and" in the interest of justice to make
18  sure that you are declaring correct information?
19     A.  We could do that. Wouldn't it just be easier if
20  when when the "or" came through that an amended
21  declaration was done to reflect both of them?
22     Q.  No. Actually, what I'm concerned with here is
23  that this declaration contains incorrect information.
24     A.  Okay.
25     Q.  Would you be interested in redoing this particular

---

**Page 24**

1  declaration to reflect that -- to change this word and make
2  it correct?
3      A.  Fine.
4      Q.  And would you fax that to me?
5      A.  Okay.
6      Q.  Are you at all upset with Deborah Garvin for
7  preparing a document for you to sign with false information
8  in it?
9      A.  No. It was my mistake that I didn't catch the
10  information.
11     Q.  Okay.
12         MS. ANGELL:  Mrs. Larkins, are you asking that
13  this second amended declaration be submitted to the court and
14  to you to replace this first one --
15         MS. LARKINS:  Oh, right.
16         MS. ANGELL:  -- Exhibit 3?
17         MS. LARKINS:  That was filed with the court,
18  wasn't it. Oh, my goodness.
19         MS. ANGELL:  So is that what you're asking for?
20         MS. LARKINS:  I'll tell you what, I'll leave it up
21  to you folks. If you want to -- if I were you, I would as
22  quickly as possible get this amended and have the amended
23  document filed with the court. Because I don't think the
24  court would appreciate it -- you know, waiting very long for
25  it once I've pointed out to you that this is false. Because

---

**Page 25**

1  I will -- I will point it out to the court if you don't, so I
2  just recommend that you do.
3         MS. ANGELL:  That's not a response to my question.
4  My question was --
5         MS. LARKINS:  I'm not the deponent, Ms. Angell.
6         MS. ANGELL:  The question -- I think that you've
7  asked this person to replace his prior declaration with
8  another one, and I'm trying to find out whether you're
9  stipulating to basically a switch out for a correction of
10  this typographical error or what you're asking for.
11         MS. LARKINS:  Ms. Angell, I do not think it was a
12  typographical error.
13         MS. ANGELL:  Let the record reflect that
14  Mrs. Larkins is staring me down.
15         Let the record reflect that plaintiff is again
16  staring me down.
17         MS. LARKINS:  I was just looking with curiosity at
18  Ms. Angell noticing how she's rocking sideways in her chair
19  and wearing a very, very nice jacket.
20         Okay. Let's see. Have I been taking yours?
21  Goodness. I'm going to get 2 back from you later, right?
22     Q.  Mr. Gross, I just meant that as a personal thing,
23  you know, if you wanted to fax me any amended documents. I
24  didn't mean to have it be any stipulation.
25         Okay. Mr. Gross, what training do Santa Barbara

---

7 (Pages 22 to 25)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

---

Page 26

1  deputies receive regarding citizens' rights?
2      A.  I don't understand the question.
3          MR. HEDRICK: I'm going to object too. Not
4  reasonably calculated to lead to discoverable evidence.
5          MS. ANGELL: And isn't it outside the scope of the
6  subpoena?  Is there a subpoena here?
7          THE WITNESS: Yes.
8  BY MS. LARKINS:
9      Q.  Okay. Mr. Gross, have you had your deposition
10  taken before?
11      A.  Yes, ma'am.
12      Q.  Can you tell me about how many times?
13      A.  Approximately half a dozen.
14      Q.  Okay. And are you aware that you do have the
15  option of refusing to answer a question?
16      A.  I've never refused to answer a question. Some
17  I've asked for a lot of clarification on.
18      Q.  Oh, okay.
19          Okay. I'd like to get back to that last question
20  in a little bit because I agree that is going to take some
21  clarification.
22          Mr. Gross, when a Santa Barbara sheriff's deputy
23  is sitting in his patrol car, do all of the patrol cars have
24  computer terminals in them?
25      A.  No, they do not.

---

Page 28

1      Q.  Okay. Okay. Now, we've talked about this -- do
2  you call it C.L.E.T.S.?
3      A.  C.L.E.T.S., California Law Enforcement
4  Telecommunication System.
5      Q.  Okay. Now, is this -- is driver's license
6  information available through C.L.E.T.S.?
7      A.  Yes, ma'am.
8      Q.  Is driver's license information available
9  separately from C.L.E.T.S.?
10      A.  Not in any of our terminals in Santa Barbara
11  County.
12      Q.  Okay. Do you by any chance know what the
13  situation is here in San Diego, if C.L.E.T.S. and D.M.V.
14  information are available separately?
15          MR. HEDRICK: Lacks foundation. Calls for
16  speculation.
17          THE WITNESS: And I have no knowledge.
18  BY MS. LARKINS:
19      Q.  Okay. The first time you talked to Deputy Carlson
20  did -- about how long did you spend talking to him?
21          MR. HEDRICK: Lacks foundation. Vague as to time.
22          THE WITNESS: Several minutes. He told me he was
23  being sued and asked if our county counsel would assist him
24  in this matter.
25  ///

---

Page 27

1      Q.  Do some of the patrol cars in Santa Barbara County
2  have computer terminals in them?
3      A.  Yes, they do.
4      Q.  And what sort of information can those computer
5  terminals access?
6      A.  They can access information from our dispatch
7  center in the nature of the calls that the deputies are being
8  sent upon. They can access a limited amount of information
9  regarding driver's license information as well as vehicle
10  information.
11      Q.  Okay. So --
12      A.  Are you asking also at the time when this -- when
13  this alleged action by Deputy Carlson occurred? And if
14  you're asking that, there were no computers in any of our
15  cars.
16      Q.  Okay. That's good to know. Okay. So at the
17  time -- okay. During the year 2000 there were no computers
18  in any patrol vehicles for the Santa Barbara sheriff's
19  department?
20      A.  That's correct.
21      Q.  Okay. So at that time if a deputy on patrol
22  wanted to get driver's license information, he had to get it
23  over the radio auditorily from dispatch center?
24      A.  Yes, ma'am, or go into one of the stations and use
25  one of the telecommunications terminals there.

---

Page 29

1  BY MS. LARKINS:
2      Q.  And what did you say to him?
3      A.  I said I would -- as soon as he sent me the
4  information, I would refer it to county counsel for their
5  opinion.
6      Q.  Okay. And did you do that?
7      A.  I did.
8      Q.  And what did county counsel say?
9      A.  County counsel came back with the opinion that
10  this was not something that was done in the course and scope
11  of his employment, and therefore they were not going to
12  represent him.
13      Q.  And then did you give this information to
14  Mr. Carlson?
15      A:  Yes.
16      Q.  And how did you do that, by letter? By phone?
17      A.  I believe I phoned him back.
18      Q.  Okay. So you've talked to him at least three times.
19      A.  Yes.
20      Q.  Okay. Okay. Going back to Exhibit 1 there is a
21  column on the left that's vertical. I guess all columns are
22  vertical. Can you tell me what the first word is there in
23  that column?
24      A.  It appears to be the word "crime."
25      Q.  Okay. And is there a code section and description?

---

8 (Pages 26 to 29)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

Page 30

1    A.  Yes, there is.
2    Q.  Okay.  And what is the crime that is being
3  reported here?
4    A.  Well, the words say PC, slash, 602, parentheses,
5  L, slash, trespassing, hyphen, enter, slash, occupy prop E.
6    Q.  Okay.  And if someone were to access my criminal
7  records through C.L.E.T.S., would this code section and
8  description be part of the information transmitted?
9    MR. HEDRICK:  Calls for speculation.
10  BY MS. LARKINS:
11    Q.  As in your experience.
12    A.  It's a misdemeanor code section, and I believe it
13  is reportable to the state.
14    Q.  Okay.  How familiar are you with the C.L.E.T.S.
15  system?
16    A.  I have a general working knowledge of the
17  C.L.E.T.S. system itself, not -- not the intricacies of what
18  an operator does.
19    Q.  Okay.  Is there someone in your department who
20  would have more knowledge about what sort of information is
21  transmitted through C.L.E.T.S. that I could depose?
22    A.  To C.L.E.T.S. you mean?
23    Q.  Through C.L.E.T.S.?
24    A.  Through meaning both ways or to C.L.E.T.S.?
25  What's reported to C.L.E.T.S. or -- I don't understand.

Page 31

1    Q.  Oh, thank you.  That's a good point.
2    A.  I don't understand.
3    Q.  Both of those are important, what is reported to
4  C.L.E.T.S. and what is reported by C.L.E.T.S.  Thank you for
5  pointing out the distinction.
6    Okay.  Is there someone that you could name in
7  your department who knows more about what is reported to
8  C.L.E.T.S.?
9    A.  I would suggest that if you're asking for
10  C.L.E.T.S. information that you contact someone from the
11  Department -- California Department of Justice who
12  administers C.L.E.T.S.
13    Q.  And is there someone in your department who knows
14  more than you do about what sort of information is reported
15  by C.L.E.T.S.?
16    A.  Again, I would refer you to the Department of
17  Justice.  You're asking for information on a San Diego
18  report, and I have no idea whether the criteria for
19  San Diego's going to be the same criteria that we use in
20  Santa Barbara --
21    Q.  Okay.
22    A.  -- or whether it would get entered.
23    Q.  Okay.
24    THE REPORTER:  I'm sorry, I didn't hear the end of
25  the answer.

Page 32

1    THE WITNESS:  Or whether it would get entered.
2    THE REPORTER:  Thank you.
3  BY MS. LARKINS:
4    Q.  I do appreciate your suggestion about the
5  Department of Justice, but I do want to get an answer to the
6  question.  Is there anyone in your department, the
7  department -- the sheriff's department of Santa Barbara who
8  would know more than you do?
9    A.  We submit abstracts of judgment from the courts to
10  the Department of Justice.  We don't make the entering.
11    Q.  Okay.  What I'm asking --
12    A.  California Department of Justice is the one who
13  makes entries into C.L.E.T.S.
14    Q.  Okay.  That's good.  Is there someone in your
15  department who knows more than you do about this?
16    A.  About C.L.E.T.S. itself?
17    Q.  Yes.
18    A.  Yes.
19    Q.  Who is that?
20    A.  That would be Terry Brown, our communications
21  manager.
22    Q.  Okay.  Now, are you suggesting him as an expert on
23  information reported both to C.L.E.T.S. and information
24  reported by C.L.E.T.S.?
25    A.  I would suggest if you are looking for a

Page 33

1  C.L.E.T.S. person, an authority on C.L.E.T.S. information,
2  that would be Terry Brown.
3    Q.  Okay.
4    A.  If -- let me finish.  If you're looking for an
5  authority on what is transmitted to the Department of Justice
6  that ends up in a criminal history that is transmitted out by
7  C.L.E.T.S., then it would be better either the Department of
8  Justice or the local court or jurisdiction where the incident
9  happened.
10    Q.  Okay.  Okay.  Thank you.
11    Okay.  In your experience, is the location of the
12  incident reported by C.L.E.T.S. to the requesting individual?
13    A.  No.
14    Q.  Okay.  In your experience, is the victim's name
15  reported?
16    A.  In this type of a crime?
17    Q.  Yes.
18    A.  No.
19    Q.  Do I keep taking yours?  No.
20    Okay.  So you're saying that no victim name, no
21  location, but yes the code section and description.  Would
22  the date of the incident be reported in your experience?
23    MS. ANGELL:  Vague and ambiguous.  Incomplete for
24  purposes of the record.  Do you mean would it be reported in
25  whatever report comes out of a C.L.E.T.S. inquiry?

9 (Pages 30 to 33)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

Page 34

1      MS. LARKINS: Yes.
2      THE WITNESS: And you mean the date of incident or
3  the date of arrest?
4  BY MS. LARKINS:
5      Q. Well, let's do them separately. Let's start with
6  the date of the incident?
7      A. No.
8      Q. The date of the arrest?
9      A. Yes.
10     Q. Okay. And would the time of the arrest --
11     A. No.
12     Q. -- be reported?
13     A. No.
14     Q. And you're -- okay. And at least one incident
15  number or case number would be reported; is that correct?
16     A. A reference number has to be reported, yes.
17     Q. Okay. A reference number. Okay. Would the name
18  of the reporting officer be included in the C.L.E.T.S. report?
19     A. No, it would not.
20         And let me clarify. It's not a C.L.E.T.S. -- the
21  information you're asking for right now is not a C.L.E.T.S.
22  report.
23     Q. Okay.
24     A. The information you're asking now is a report that
25  happens as the result of an arrest. And a result of an

Page 35

1  arrest goes to the State of California's Department of
2  Justice on a separate paper form that's known as an arrest
3  disposition report. From there somehow they transfer it to
4  the California criminal history portion of C.L.E.T.S.
5      MS. ANGELL: I think I'm going to have to object
6  to this line of questioning as vague and ambiguous, because I
7  thought that plaintiff was asking whether these individual
8  pieces of information such as victim name, alleged crime,
9  et cetera, would be contained in whatever report would be
10  kicked back after a C.L.E.T.S. inquiry, and I thought that
11  that was the question that was being asked. Is that what you
12  were asking?
13     MS. LARKINS: Yes.
14         I think that's what you were answering too, wasn't
15  it?
16     THE WITNESS: No. What I was answering was what
17  is reported to C.L.E.T.S.
18  BY MS. LARKINS:
19     Q. Oh.
20     A. Which was what you were asking.
21     Q. Well, obviously, if it wasn't reported to
22  C.L.E.T.S. it couldn't be reported by C.L.E.T.S., so I think
23  that pretty well covers it.
24     A. Well, it might be a little clearer for me then
25  if -- if you want to know what comes back from C.L.E.T.S. to

Page 36

1  ask what comes back from C.L.E.T.S.
2      Q. Okay. What comes back from C.L.E.T.S.?
3      A. Okay. The reference number, whatever that may be,
4  the -- and I think I've already -- I think your notes already
5  show it. What comes back from C.L.E.T.S. is identifying
6  information about the person --
7      Q. Okay.
8      A. -- a reference number, the crime type --
9      Q. Uh-huh.
10     A. -- the date of the offense --
11     Q. Uh-huh.
12     A. -- arrest, and the date of the disposition by the
13  court, and if there is a court's disposition, the court's
14  disposition.
15     Q. Okay. Perhaps I watch too much television, but I
16  had the impression that it was possible for law enforcement
17  agencies to get more information than that about past crimes
18  or past arrests. How does a law enforcement officer get more
19  detailed information about a crime or arrest?
20     MR. HEDRICK: Lacks foundation. Calls for
21  speculation.
22     MS. ANGELL: Vague and ambiguous. Incomplete
23  hypothetical. Do you mean more information than the several
24  categories he just listed that come out of the response to a
25  C.L.E.T.S. inquiry?

Page 37

1      MS. LARKINS: Yeah.
2      THE WITNESS: The most common is by a telephone
3  call --
4  BY MS. LARKINS:
5      Q. Uh-huh.
6      A. -- to our local agency.
7      Q. Uh-huh.
8      A. And that would cover -- that would cover all
9  arrests in our county.
10     Q. Uh-huh.
11     A. And that would be the extent they could go within
12  our county.
13     Q. Uh-huh.
14     A. If there's information that an officer has that's
15  outside of our county --
16     Q. Uh-huh.
17     A. -- then he/she could make a phone call or inquiry
18  or letter to the other agency --
19     Q. And then --
20     A. -- asking for information.
21     Q. And then the information could be faxed or mailed?
22     A. I don't know very few agencies that fax
23  information. The information would be mailed probably.
24     Q. Okay.
25     A. And at least in our county, a record would be kept

10 (Pages 34 to 37)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

---

Page 38

1  of where the information went to.
2      Q.  So if say some law enforcement officer in
3  San Diego called up your department and asked for information
4  about an arrest, would you make copies of your crime report
5  or incident report and mail it to them?
6      MR. HEDRICK:  Lacks foundation.  Misstates
7  testimony.  Incomplete hypothetical.
8      MS. ANGELL:  Join.
9      THE WITNESS:  It depends whether or not the
10  information is releasable to another agency.  And in that
11  case if it is releasable, then yes, that's the proper
12  procedure to go through.
13      MS. LARKINS:  I would like to ask that this
14  document be labeled Exhibit 4.  Let's see.  We have one, two,
15  three, four, and I have copies for everybody.
16      (Plaintiff's Exhibit No. 4 was marked for
17      identification.)
18  BY MS. LARKINS:
19      Q.  Mr. Gross, are you familiar with the California
20  Labor Code sections that appear on these two pages of this
21  Exhibit 4?
22      A.  I am.
23      Q.  Okay.  Was there a time in the past when law
24  enforcement agencies were more lax about releasing
25  information about arrests --

---

Page 39

1      MR. HEDRICK:  Vague -- I'm sorry.  Go ahead.
2      MS. LARKINS:  -- than they are now?
3      MR. HEDRICK:  Vague and ambiguous as to the term
4  lax.  Vague as to time.
5      THE WITNESS:  I'm sure they were.
6  BY MS. LARKINS:
7      Q.  Okay.  Are deputies in Santa Barbara County given
8  any sort of training regarding Labor Code sections -- the
9  Labor Code sections that are on these two pages?
10      MR. HEDRICK:  Lacks foundation.  Calls for
11  speculation.
12      MS. ANGELL:  Join.
13      THE WITNESS:  I know that some are because they
14  work in our human resources area, and they're very familiar
15  with some of these codes.  As for the average deputy, I do
16  not know.
17  BY MS. LARKINS:
18      Q.  So the average deputy as far as you know might
19  think it was perfectly okay to obtain and spread around
20  arrest information about citizens?
21      MR. HEDRICK:  Calls for speculation.
22      MS. ANGELL:  Join.
23      THE WITNESS:  There is a section in our policy and
24  procedures manual that forbids release of confidential
25  information.

---

Page 40

1  BY MS. LARKINS:
2      Q.  Uh-huh.  And are deputies expected to read that by
3  themselves on their own time?
4      MR. HEDRICK:  Calls for speculation.  Lacks
5  foundation.
6      THE WITNESS:  They are issued a copy and they are
7  expected to read it and be conversant with its -- with its
8  contents.
9      MS. LARKINS:  Okay.
10      MR. HEDRICK:  I'd also like to object, I'm not
11  sure if this is within the scope of the deposition subpoena
12  either, this line of questioning.
13      MS. ANGELL:  Join.
14  BY MS. LARKINS:
15      Q.  Are deputies in Santa Barbara County to your
16  knowledge given any training on how to have good
17  relationships with members of the public?
18      MR. HEDRICK:  I'm going to object on that too.
19  Lacks foundation.  Calls for speculation.  Not within the
20  scope of the deposition subpoena.
21      MS. ANGELL:  Join.
22      THE WITNESS:  They receive a certain amount of
23  what we used to call public relations within their academy
24  training, and I know that there are certain other training
25  classes that have been held within the agency that deal with

---

Page 41

1  relations with the public.
2  BY MS. LARKINS:
3      Q.  Are they given training about the Constitutional
4  rights of citizens?
5      MR. HEDRICK:  Same objection.
6      MS. ANGELL:  Join.
7      THE WITNESS:  It is part of what's happen -- their
8  training that happens in the academy to become a peace officer.
9  BY MS. LARKINS:
10      Q.  Are they ever given any reminders or -- at
11  meetings or -- are they ever given any reminders at meetings
12  regarding their obligations to respect the Constitutional
13  rights of members of the public?
14      MR. HEDRICK:  Same objections.
15      MS. ANGELL:  Add vague, ambiguous.
16      THE WITNESS:  And I don't know.  I'd have to be
17  present in one of those meetings.  I have no idea.
18  BY MS. LARKINS:
19      Q.  Okay.  Maybe we could ask Mr. Carlson that.
20      To your knowledge, has anyone other than myself
21  made a complaint or a claim that a member of San Diego --
22  strike that.  Just strike San Diego, Santa Barbara sheriff's
23  department illegally obtained or distributed criminal records
24  information?
25      MR. HEDRICK:  Lacks foundation.  Calls for

---

11 (Pages 38 to 41)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

Page 42

1  speculation. Vague as to time. Outside the scope of the
2  deposition subpoena.
3       MS. ANGELL: Join.
4       THE WITNESS: I can't answer that. I don't know.
5  BY MS. LARKINS:
6    Q. Okay. Are you saying that -- I did ask you as far
7  as you know. Now, are you refusing to answer the question or
8  are you just saying that you do not know of any such event?
9    A. I do not know. I didn't refuse to answer. I said
10 I don't know.
11   Q. What don't --
12   A. I said I can't answer that. I don't know of any.
13   Q. Okay. Okay. Since you have filed a declaration
14 and it -- to help the defense in this case obtain a summary
15 judgment against my complaint, I would like to know your
16 personal attitudes about this case.
17      MR. HEDRICK: I'm going to have to -- well, go
18 ahead and ask your question.
19 BY MS. LARKINS:
20   Q. Okay. How do you personally feel about California
21 Labor Code 432.7 as -- do you think that it should be a law
22 or do you think that it would be better if it were not a law?
23      MR. HEDRICK: Okay. I'm going to object. Not
24 reasonably calculated to lead to the discovery of admissible
25 evidence. Outside the scope of the deposition subpoena.

Page 43

1       MS. ANGELL: Vague and ambiguous adding to that
2  and join prior objections.
3       THE WITNESS: I don't believe as a --
4       MR. HERSH: I'll join the prior objections as well.
5       THE WITNESS: I don't believe as a law enforcement
6  officer I have any other choice other than to obey the law.
7  I don't have any personal feelings one way or the other about
8  432.7.
9  BY MS. LARKINS:
10   Q. But would you want to help an officer escape
11 responsibility if he had disobeyed this law?
12      MR. HEDRICK: Same objections.
13      MS. ANGELL: Join.
14      MR. HERSH: Join.
15      THE WITNESS: As I just said, I'm a -- as a law
16 enforcement officer I have to uphold the law. I don't have
17 to have an opinion as to law one way or the other. I have to
18 uphold the law.
19 BY MS. LARKINS:
20   Q. But you did submit a false declaration to help
21 Mr. Carlson in this case.
22      MR. HEDRICK: Objection. Misstates testimony.
23 Argumentative.
24      MS. ANGELL: Join. And move to strike. No
25 question pending.

Page 44

1  BY MS. LARKINS:
2    Q. What was your personal motivation for supplying a
3  declaration to help Michael Carlson in this case?
4       MR. HEDRICK: I'm going to object again. Not
5  reasonably calculated to lead to the discovery of admissible
6  evidence.
7       MS. ANGELL: Join.
8       THE WITNESS: I had no personal motive at all. I
9  was doing it on advice of my county counsel that it would
10 probably -- maybe save me from a deposition, and it didn't.
11      MS. LARKINS: Those county counsel, they can --
12 they can cause problems. In San Diego the county counsel is
13 being sued --
14      MR. HERSH: Objection. No question.
15      MS. ANGELL: Move to strike.
16      MS. LARKINS: -- by a member of the port authority
17 board who was convicted of a felony.
18      MS. ANGELL: Move to strike. No question pending.
19      MR. HEDRICK: Join.
20      MS. ANGELL: Can we have questions for this
21 witness instead of your attempt to testify, please.
22      MS. LARKINS: And although I don't particularly
23 sympathize with the guy convicted of a felony, I believe him,
24 that the county counsel gave him the bad advice.
25      MR. HEDRICK: Same objection.

Page 45

1       MS. ANGELL: Same --
2       MR. HERSH: Joined.
3       MS. ANGELL: Same objection and motion to strike.
4       THE WITNESS: If we have a little bit more, I'd
5  like to take a break. If we're almost through, I'm fine.
6       MS. LARKINS: I have more. Let's take a break.
7  Anybody object?
8       THE WITNESS: Thank you.
9       MS. ANGELL: No.
10      MR. HEDRICK: No.
11      THE VIDEOGRAPHER: We're going off the record.
12 The time is 11:27 a.m.
13      (Recess taken.)
14      THE VIDEOGRAPHER: We're going on the record. The
15 time is 11:44 a.m.
16      MS. LARKINS: Okay. I can start talking? I'd
17 like to ask that this next exhibit be labeled Exhibit 5. And
18 I apologize for the markings on it. There's some handwriting
19 and some lines on it that are not part of the original
20 document.
21      (Plaintiff's Exhibit No. 5 was marked for
22      identification.)
23 BY MS. LARKINS:
24   Q. Mr. Gross, are you familiar with the code sections
25 on this document?

12 (Pages 42 to 45)

Page 46

MS. ANGELL: Objection. Lacks foundation because I can't tell what's in this document. And you're -- and testifying.
BY MS. LARKINS:
Q. Mr. Gross, do you see the No. 13302 on this document?
A. Yes, I do.
Q. Could you take a minute and read that sentence there.
A. Yes, ma'am.
Q. Okay. Are you -- have you ever seen or heard of this code section before?
A. Which code does this come from?
Q. I believe this is the Penal Code. Does it not look familiar?
A. Well, the words are familiar, but I just -- the numbering is not familiar to me.
Q. Okay. I'm going to go ahead and set that aside for now, and I'd like to enter into evidence Exhibit 6. And -- when they're one page it's easy to make copies for everybody.
(Plaintiff's Exhibit No. 6 was marked for identification.)
BY MS. LARKINS:
Q. This document fortunately is labeled better. Are you familiar with Section 11142 of the Penal Code?

Page 47

A. Not by the number, but again the wording is familiar to me.
Q. Okay. Thank you. I'm just giving you that one so you can look it over while I staple these.
I'd like to ask that this document be labeled Exhibit 7.
(Plaintiff's Exhibit No. 7 was marked for identification.)
THE WITNESS: Excuse me for just one second
MS. LARKINS: Shall we go off record?
THE WITNESS: Please.
THE VIDEOGRAPHER: We're going off the record. The time is 11:50 a.m.
(Recess taken.)
THE VIDEOGRAPHER: We're going on the record. The time is 11:59 a.m.
BY MS. LARKINS:
Q. Mr. Gross, did Mr. Carlson tell you that his brother had mistakenly been named in this lawsuit before Mr. Carlson was named?
A. No.
Q. Did Mr. Carlson tell you that Ms. Angell's law firm worked hard to hide the existence of Michael Carlson?
A. No.
Q. Did he tell you why he didn't immediately respond

Page 48

to the summons with a denial?
MS. ANGELL: Objection. Outside the scope of the deposition subpoena.
THE WITNESS: No, he did not.
BY MS. LARKINS:
Q. Okay. Did he tell you that his brother had immediately submitted a denial in the case?
A. No, he did not.
Q. Okay. I'd like to ask that this document be entered as Exhibit 8 -- I mean, labeled as Exhibit 8.
(Plaintiff's Exhibit No. 8 was marked for identification.)
BY MS. LARKINS:
Q. Mr. Gross, did Michael Carlson tell you that the matter of transfers of teachers from Castle Park Elementary School had been covered pretty widely in the media here in San Diego?
MR. HEDRICK: Objection. Not calculated to lead to the discovery of admissible evidence. Outside the scope of the deposition subpoena.
MS. ANGELL: Join.
MR. HERSH: Join.
THE WITNESS: No, he did not.
BY MS. LARKINS:
Q. Mr. Carl -- Mr. Carlson. Mr. Gross, do you

Page 49

personally believe that Michael Carlson did not obtain or distribute criminal records information about me?
A. I have no evidence to believe that he did.
Q. So are you suspending judgment on that question?
A. I said I have no evidence to believe he did. I don't know that he did or he didn't, but I have no evidence to believe that he did.
Q. Okay. Are you absolutely certain that he did not obtain criminal records information about me?
MR. HEDRICK: Asked and answered.
MS. ANGELL: Argumentative.
THE WITNESS: I don't know.
BY MS. LARKINS:
Q. You don't know if he obtained the records?
A. No, I don't.
Q. Okay. Okay. Are you aware that Mr. Carlson's sister is a defendant in this lawsuit?
A. He told me so.
Q. Okay. And are you aware that her name is Robin Donlan?
A. No.
Q. She was actually originally sued under the name Robin Colls. So you can see on Exhibit 7 that it says Robin Colls is one of the defendants, but she got married and changed her name.

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

Page 50

1    MR. HEDRICK: No question pending.
2    MS. ANGELL: Move to strike.
3  BY MS. LARKINS:
4    Q. I'd like to ask that this document be entered as
5  Exhibit 9.
6    (Plaintiff's Exhibit No. 9 was marked for
7  identification.)
8  BY MS. LARKINS:
9    Q. Mr. Gross, are you aware that I was removed from
10  my classroom in the middle of a school year because two
11  teachers called up the district and said that they believed I
12  was going to kill them?
13    MR. HEDRICK: Objection. Outside the scope of the
14  deposition subpoena and not reasonably calculated to lead to
15  the discovery of admissible evidence. Calls for -- well,
16  that's it.
17    THE WITNESS: No.
18  BY MS. LARKINS:
19    Q. Okay. Did Michael Carlson offer you any
20  explanation other than the distribution of information from
21  my arrest records for my having been taken out of my
22  classroom in the middle of the year and being accused of
23  being about to commit mass murder?
24    MR. HEDRICK: Same objections.
25    MS. ANGELL: Join. And assumes facts not in

Page 51

1  evidence. If the -- if there could be a question posed to
2  this witness as to what he was told or what he knows instead
3  of an attempt to testify for him, I would be able to reserve
4  this type of objection.
5  BY MS. LARKINS:
6    Q. Okay. Mr. Gross, if you could look at
7  Exhibit 1 -- and these pages are numbered at the bottom.
8  Would you look at exhibit -- I mean, Page 6. In the
9  paragraph or I should say partial paragraph at the top of the
10  page, would you read that partial paragraph to yourself.
11    A. All right.
12    Q. Do you believe that someone who was told that
13  Elton's report here to the police that Larkins has a
14  psychological problem and should be on medication and owns at
15  least one handgun, do you think this information might cause
16  someone to be afraid that Larkins might shoot someone with a
17  handgun?
18    MR. HEDRICK: Calls for speculation. Lacks
19  foundation. Outside the scope of the deposition subpoena.
20  Not reasonably calculated to lead to the discovery of
21  admissible evidence.
22    MS. ANGELL: Join.
23    THE WITNESS: It's a police report, and it's one
24  section of a police report. I have not read the whole police
25  report, and I have no idea what the rest of the police report

Page 52

1  says.
2    Given that statement, it's -- it's one person's
3  opinion. It doesn't necessarily mean that's fact.
4  BY MS. LARKINS:
5    Q. I agree with you wholeheartedly. But if it were
6  reported as fact, do you think it might cause someone to be
7  afraid that I might shoot someone?
8    MS. ANGELL: Objection.
9    MR. HEDRICK: Same objections.
10    MS. ANGELL: Same objections. Calls for
11  speculation onto the state of mind of unnamed various other
12  people.
13    THE WITNESS: I have no idea what other people
14  would perceive of that -- of that statement or portions
15  thereof.
16  BY MS. LARKINS:
17    Q. If Michael Carlson came to you and told you that I
18  had a psychological problem and I should be on medication and
19  I owned at least one handgun, would you be a little bit
20  afraid of me?
21    MR. HEDRICK: Same objections.
22    MS. ANGELL: Join.
23    MR. HERSH: Joined.
24    THE WITNESS: It's a difficult question in the
25  fact that am I believing Michael Carlson as a peace officer

Page 53

1  and as a fellow peace officer going to investigate a crime or
2  investigate something or am I a private citizen is he saying
3  that to, and I don't know the answer to that.
4    MR. HEDRICK: Ms. Larkins, if I could interject.
5  I don't mean to be a pain, but the deposition subpoena states
6  that Mr. Gross is to be deposed as to whatever information he
7  may have as to access to records. The line of questioning
8  isn't aimed at that at all from what I can perceive. So if
9  we can just restrict the testimony to the topics stated in
10  the deposition subpoena.
11    MS. LARKINS: Thank you.
12    MR. HEDRICK: I have a copy of it here if you want.
13    MS. LARKINS: Oh, no thanks.
14    Q. I'm very -- I think it is meaningful that you said
15  that it would depend on whether a police officer were
16  reporting this information. Would you find the information
17  much more convincing if it were coming from a police officer
18  than if it were coming from an ordinary citizen?
19    MR. HEDRICK: Calls for speculation. Incomplete
20  hypothetical. Outside the scope of the deposition subpoena.
21  Not reasonably calculated to lead to the discovery of
22  admissible evidence.
23    MS. ANGELL: Join.
24    MR. HERSH: Joined.
25    THE WITNESS: As a fellow peace officer, I would.

14 (Pages 50 to 53)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

Page 54

1  As a private citizen, I don't know.
2  BY MS. LARKINS:
3  Q. Okay. Was this paragraph here written by a police
4  officer?
5  MR. HEDRICK: Calls for speculation.
6  MS. ANGELL: Join.
7  MR. HEDRICK: Lacks personal knowledge.
8  THE WITNESS: I have no idea who wrote this report.
9  BY MS. LARKINS:
10  Q. Okay. Would you look down on the very bottom of
11  Page 6 of Exhibit 1. Does it say "reporting officer" in that
12  box down at the bottom?
13  A. Yes, it does.
14  Q. And who is the reporting officer? Does it look to
15  you like Dawn Wolfe?
16  A. The last is definitely Wolfe, but the first is so
17  blurry.
18  Q. Yeah, the -- about a third of the "D" has been
19  obliterated. So would you assume that the report was
20  prepared by a police officer?
21  A. I don't know the agency's makeup, whether or not
22  they allow civilian employees to take crime reports or not.
23  Certain agencies do. I do not know the policy of San Diego.
24  Q. Are these civilian people that you're suspecting
25  might have made this report, are they referred to as officers?

Page 55

1  A. They could be. You don't usually change the
2  format of a report to signify that it's not an officer. You
3  usually have one report form.
4  Q. Okay. When arrests are made by law enforcement
5  officers, do you believe that it's probably because the
6  person arrested is guilty of a crime?
7  MR. HEDRICK: Calls for speculation. Lacks
8  foundation. Outside the scope of the deposition subpoena.
9  MS. ANGELL: Join. Add vague and ambiguous as to
10  law enforcement officers.
11  MR. HERSH: Joined.
12  THE WITNESS: In my own experience, when I
13  arrested a person I believed that they had committed the
14  crime I arrested them for.
15  BY MS. LARKINS:
16  Q. Do you believe that other officers are as careful
17  as you were about only arresting people who were guilty of
18  crimes?
19  MR. HEDRICK: Calls for speculation.
20  MR. HERSH: Objection. Misstates the testimony.
21  MR. HEDRICK: Calls for speculation. Outside the
22  scope of the deposition subpoena.
23  THE WITNESS: I don't know --
24  MS. ANGELL: Join.
25  THE WITNESS: I don't know whether other officers

Page 56

1  are as careful as I am.
2  BY MS. LARKINS:
3  Q. Okay. Do you believe that innocent people are
4  sometimes charged with crimes?
5  MR. HEDRICK: Lacks foundation. Calls for
6  speculation. Outside the scope of the deposition subpoena.
7  MS. ANGELL: Join. Vague and ambiguous.
8  MR. HERSH: Joined.
9  THE WITNESS: Based on what I see on television,
10  it appears that way.
11  BY MS. LARKINS:
12  Q. Okay. Are you thinking of cases where people have
13  spent decades in jail and then they're freed because of new
14  D.N.A. evidence?
15  A. Yes, I am.
16  Q. Fortunately I only spent a night in jail.
17  I consider myself not --
18  MR. HERSH: Objection. Questioning is posing no
19  question.
20  BY MS. LARKINS:
21  Q. Okay. Nine -- okay. I'd like to ask that the
22  next document be labeled as Exhibit 10.
23  By the way, if you want to go to lunch -- I think
24  this is going to take at least an hour longer. Do you want
25  to go through or --

Page 57

1  A. My preference would be to work through.
2  Q. Okay. Let's see. I think I can do this in an
3  hour. Okay. Well, I can get this off the internet again so
4  I'll give you guys this copy.
5  A. I'll just scan this one and then I can hand it off.
6  (Plaintiff's Exhibit No. 10 was marked for
7  identification.)
8  BY MS. LARKINS:
9  Q. I'd like you to look on the first page just at the
10  very bottom of the page. Do you see where someone named
11  Debbie Croshier wrote a letter to the South County Opinion,
12  Letters to the Editor?
13  MS. ANGELL: Objection. Document speaks for
14  itself. Lacks foundation.
15  MS. LARKINS: Well, I just asked him if he
16  could -- if he saw it. I was just bringing his attention to
17  the first page at the bottom.
18  MS. ANGELL: Well, I don't think that this witness
19  has any knowledge as to the authenticity of this document,
20  what it is, where it came from. You haven't asked him if
21  he's seen it before. So I don't know how he can testify as
22  to whether somebody wrote a letter to the editor or not.
23  MS. LARKINS: I'm just asking him if he sees the
24  name Debbie Croshier on this piece of paper.
25  MS. ANGELL: Oh, I'm sorry. That's not the

15 (Pages 54 to 57)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

Page 58

1  question I heard.
2      THE WITNESS: Yes, I do.
3  BY MS. LARKINS:
4      Q.  Okay.  Do you -- three lines above her name, would
5  you just read to yourself that sentence that starts with "the
6  truth" and the next sentence that starts with "until."
7      A.  All right.
8      Q.  Okay.  Do you believe that in most cases when
9  there's a question about whether or not someone has been
10  falsely accused, that the truth will come out in the end?
11      MR. HEDRICK: Calls for speculation.  Outside the
12  scope of the deposition testimony.
13      MS. ANGELL: Join.  And not reasonably calculated
14  to lead to the discovery of admissible evidence in that
15  these -- this document that you've marked as Exhibit 10
16  purports to be letters to the editor concerning the transfers
17  of a number of teachers at Castle Park Elementary School
18  during August I think of 2004.  And that is outside the scope
19  of this witness's subpoena, and it's outside the scope of
20  discovery because it's not calculated to lead to the
21  discovery of admissible evidence in this case.
22      MS. LARKINS: Well --
23      MR. HERSH: Joined on all those bases stated by
24  counsel for Mr. Carlson and Ms. Donlan.
25      MS. LARKINS: Well, I'm sure Mr. Gross doesn't

Page 59

1  want to come back again, so -- and since Mr. Gross has made a
2  declaration in an effort to end this lawsuit, he's certainly
3  involved.  And I think probably both Mr. Gross and I would
4  like to just get this finished with, and I believe that the
5  judge would allow these questions if consulted.
6      THE WITNESS: My personal belief, not as a law
7  enforcement officer, not as anyone other than myself, I
8  believe the truth does come out in the end.  Maybe not here,
9  but somewhere else.
10      MS. LARKINS: Well, I'm doing my best paying for
11  this shorthand reporter and this videographer to make sure it
12  comes out --
13      MS. ANGELL: Move to strike.  No question pending.
14      MS. LARKINS: -- in this -- in this superior court
15  case.
16      MS. ANGELL: Move to strike.  No question pending.
17      MR. HEDRICK: Join.
18      MR. HERSH: Joined.
19      MS. LARKINS: But all three of you do hope the
20  truth will come out in this case, don't you?  Oh, I guess you
21  wouldn't be making so many objections if you wanted the
22  information to come out.
23      MS. ANGELL: Move to strike.  Argumentative.
24      MR. HEDRICK: Joined.
25      MS. ANGELL: No question pending.

Page 60

1      MR. HEDRICK: Joined.
2      MR. HERSH: Joined.
3  BY MS. LARKINS:
4      Q.  Okay.  On the second page of Exhibit 10, do you
5  see about -- after the first five short paragraphs there's
6  the name Anna Weight?
7      A.  Yes, I see that name.
8      Q.  Okay.  And just above it, would you read the
9  sentence to yourself just above her name.
10      A.  Okay.
11      Q.  And then would you read the paragraph two
12  paragraphs above that where it says "the truth is."
13      A.  All right.
14      Q.  Okay.  Are you aware that persons supporting
15  Michael Carlson's sister, who was recently transferred out of
16  the school I was transferred out of, are saying in the
17  media -- are attacking the superintendent of the school
18  district in the media saying that these recent actions in
19  removing Robin Donlan and other teachers were due to a
20  personal grudge of the superintendent intended to hurt and
21  intimidate these teachers, that the superintendent has petty
22  and mean spirited behavior, and that his ego was his
23  motivation for transferring these five teachers?
24      MR. HEDRICK: Objection.  Outside the scope of the
25  deposition subpoena.  Compound.

Page 61

1      MR. HERSH: I'll join that objection.
2      MS. ANGELL: Join.
3      MS. LARKINS: Question withdrawn.
4      Well, this is getting a little boring, all these
5  news articles.  I'm not going to put them all into evidence.
6      Okay.  Let's -- I'd like to put this document into
7  evidence.  This is Exhibit 11.  I mean, I'd like to ask that
8  it be labeled as Exhibit 11.
9      (Plaintiff's Exhibit No. 11 was marked for
10  identification.)
11  BY MS. LARKINS:
12      Q.  Mr. Gross, do you think the superintendent was
13  simply trying to restore law and order to a school where
14  crimes had been committed against me and teachers had gone
15  out of control in their power over weak principals when he
16  transferred these five teachers, including Defendant Robin
17  Donlan?
18      MR. HEDRICK: Outside the scope of the deposition
19  subpoena.  Lacks foundation.  Calls for speculation.
20      MR. HERSH: Assumes facts not in evidence.
21      MS. ANGELL: Join.  Compound.  In conjunction --
22      MS. LARKINS: Question withdrawn.
23      MS. ANGELL: -- it's not reasonably calculated to
24  lead to the discovery of admissible evidence.  Mrs. Larkins,
25  it's apparent that you're attempting to either harass this

16 (Pages 58 to 61)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

Page 62

1  witness or testify for him based on your making these long,
2  compound, not comprehensible questions and then withdrawing
3  them, and I would respectfully respect that you cease and
4  desist from that practice.
5     MR. HERSH: I join in that request.
6     MR. HEDRICK: Join. And if we could just please
7  try to keep the deposition within the scope of the subpoena.
8     MS. LARKINS: Well, I'm surprised at your
9  attitude, Ms. Angell, since Chula Vista schools is paying you
10  for your work here today, and I'm -- aren't you concerned
11  about the way that the superintendent is being attacked by
12  teachers in the media?
13     MR. HERSH: Objection. Move to strike. The
14  questioning of Ms. Angell's completely inappropriate in this
15  regard, and your comments are completely inappropriate, and
16  the way you're conducting this deposition is an abuse of
17  discovery.
18     MS. ANGELL: Join.
19     MR. HEDRICK: Join.
20     MS. LARKINS: I'd like to ask that this document
21  be labeled Exhibit 12.
22     (Plaintiff's Exhibit No. 12 was marked for
23     identification.)
24  BY MS. LARKINS:
25     Q. Would you look at the second page of Exhibit 12,

Page 63

1  please, Mr. Gross, the middle column. Could you read the
2  first two paragraphs there.
3     A. All right.
4     Q. Are you at all concerned that Michael Carlson's
5  sister, who is a friend of this parent who made this
6  statement, is committing slander?
7     MR. HEDRICK: Objection. Calls for legal opinion.
8  Outside the scope of the deposition subpoena. Calls for
9  speculation.
10     MR. HERSH: Assumes facts not in evidence.
11     MS. ANGELL: Not reasonably calculated to lead to
12  the discovery of admissible evidence. And join all prior
13  objections.
14     MS. LARKINS: Question withdrawn.
15     MS. ANGELL: Again, Mrs. Larkins, I would -- I
16  would request that you please limit your questioning to items
17  noticed in your deposition subpoena and cease your apparent
18  attempt to testify for this witness and inform -- I don't
19  know why you're doing this, but inform him of things that
20  have nothing to do with what you subpoenaed him here for today.
21     MR. HEDRICK: Join.
22     MR. HERSH: Joined.
23     MS. LARKINS: I think that both of your law firms
24  have made significant efforts to involve this witness in this
25  case far beyond the involvement of a normal witness. In

Page 64

1  fact, I don't think that there is another nonparty or
2  nonlawyer in this case who has filed a declaration in this
3  case. This witness is deeply involved in this case and has a
4  personal -- well, not a close relationship but is clearly an
5  acquaintance of Michael Carlson who is trying to help him in
6  this case, and I'm certain that if not now then certainly at
7  trial the judge will approve this line of questioning.
8     MR. HEDRICK: No question pending. Move to strike.
9     MS. ANGELL: Join.
10     MR. HERSH: Join.
11     MS. LARKINS: I was trying to give an offer of
12  proof for why I think this line of questioning is appropriate.
13     MR. HERSH: You haven't explained why you think
14  it's appropriate.
15     MS. ANGELL: And are you referring to the line of
16  questioning about the teacher transfers and all these
17  newspaper articles? Is that what you're referencing?
18     MS. LARKINS: Yes. I'm referring to current
19  actions by Michael Carlson's sister who is trying to paint
20  the principal of Castle Park School and the superintendent of
21  Chula Vista School District as deceitful egomaniacs in an
22  effort to escape responsibility for her crimes.
23     MR. HEDRICK: Move to strike. No question.
24     MR. HERSH: Joined.
25     MS. ANGELL: Perhaps asking this witness if he has

Page 65

1  any knowledge of actions by Ms. Donlan might accomplish your
2  goal, if your goal is actually to question him about his
3  knowledge instead of harass him.
4     MS. LARKINS: Skip that, skip that, skip that.
5  I'd like to ask that this document be labeled Exhibit 13.
6     (Plaintiff's Exhibit No. 13 was marked for
7     identification.)
8     MS. LARKINS: The three of you were together in
9  the back room here this morning. I'm surprised that the two
10  of you didn't better inform Mr. Gross about what's happening
11  in this case since he went out of his way to file a
12  declaration to help out the defendants.
13     MS. ANGELL: Move to strike. Nonresponsive.
14  Argumentative and misstates --
15     MR. HERSH: If you want to ask questions of the
16  deponent, go ahead. Your commentary, your abusive manner of
17  questioning the motives of this witness is an abuse of
18  discovery. It's an abuse of his time and our time, and I
19  would ask that you return to asking questions within the
20  scope of the deposition notice that you served.
21     MS. LARKINS: Personally --
22     MR. HEDRICK: Joined.
23     MS. ANGELL: Joined. And in addition, the prior
24  statement of Ms. Larkins concerning this witness's motive
25  misstates his testimony. I believe his testimony was that he

17 (Pages 62 to 65)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

---

**Page 66**

1  gave a declaration on advice of counsel thinking that he
2  might be able to avoid his own deposition by providing the
3  written information.
4      MS. LARKINS: I think this witness is in large
5  part a victim of law firms who have caused him to get
6  involved in a case without giving him enough information. In
7  fact, I think he's been deceived about this case. And
8  he's -- the truth that the evidence is overwhelming against
9  Michael Carlson has been kept from him, and as a goodhearted
10  man who wanted to support a fellow employee of Santa Barbara
11  sheriff's department whom he believed to be innocent, he was
12  taken advantage of. By the way, we're running out of tape.
13      MR. HERSH: Ms. Larkins, since you seem to have so
14  much information about this, why don't we release the
15  deponent and you can simply file your own declaration. It
16  seems that would be a sufficient manner of proceeding.
17      MS. LARKINS: Usually your sense of humor is more
18  lighthearted, Michael.
19      MS. ANGELL: And in addition, if you have a bunch
20  of evidence as you said concerning Mr. Carlson, how about
21  asking this witness about his knowledge concerning that,
22  quote, evidence that you have about Mr. Carlson's alleged
23  guilt and -- because that might be relevant.
24      MR. HEDRICK: Also if I could move to strike
25  Mrs. Larkins' prior statements as no question pending.

---

**Page 67**

1      THE VIDEOGRAPHER: Did you wish to change the
2  tape, Mrs. Larkins?
3      MS. LARKINS: Oh, I'm sorry. Yes. Let's go off
4  the record. Is that agreeable to everybody to change the tape?
5      MR. HEDRICK: Yes.
6      MS. ANGELL: Yes.
7      MR. HERSH: So agreed.
8      THE VIDEOGRAPHER: This is the end of Tape 1,
9  Disk 1. We are going off the record at 12:34 p.m.
10      (Recess taken.)
11      THE VIDEOGRAPHER: Today is Wednesday, November
12  17th, 2004. The time is now 12:39 p.m. We're beginning Tape
13  2, Disk 2 of the deposition of Sam Gross. We're going on the
14  record.
15  BY MS. LARKINS:
16      Q. Okay. Mr. Gross, I just want to ask you a short
17  question about this last exhibit, Exhibit 13. Do you see in
18  the second column at the bottom there is my name right there,
19  Maura Larkins?
20      A. Yes, ma'am.
21      Q. Okay. Would you just to yourself read that short
22  letter.
23      A. All right.
24      Q. Do you agree with me that people should take
25  responsibility for their actions rather than denying them and

---

**Page 68**

1  destroying the lives and careers of others in order to hide
2  their guilt?
3      MR. HEDRICK: Objection. Outside the scope --
4      MS. LARKINS: Question withdrawn.
5  That's all my questions for this deposition.
6      MR. HERSH: I have a few questions if no one else
7  does.
8      MS. LARKINS: Okay. Go ahead.
9      MR. HERSH: Well, co-counsel, is that okay with
10  you?
11      MR. HEDRICK: Yes. I have a few questions, but
12  you can go ahead.
13      MR. HERSH: Thank you.
14
15  EXAMINATION BY MR. HERSH:
16      Q. My first question's because it's very hard to hear
17  over the phone. Is this -- is it Detective Gross?
18      A. No. My rank is commander.
19      Q. Commander? And is it Groth, G-r-o-t-h?
20      A. No. It's G-r-o-s-s, Sam, Sam.
21      Q. Okay. Commander, you mentioned earlier that you
22  were sworn to uphold the law as part of your employment with
23  Santa Barbara?
24      A. That's correct.
25      Q. And you were sworn in in your testimony earlier

---

**Page 69**

1  today here?
2      A. Yes.
3      Q. You signed a declaration under penalty of perjury
4  in this matter?
5      A. Yes, I did.
6      Q. And you signed an amended declaration under
7  penalty of perjury as well?
8      A. Yes.
9      Q. Was your declaration prepared in an attempt to
10  cover up wrongdoing by Mr. Carlson?
11      A. No, it was not.
12      Q. Was your amended declaration prepared in an
13  attempt to cover up wrongdoing by Mr. Carlson?
14      A. It was not.
15      Q. And have you responded to questions here today in
16  an attempt to cover up any wrongdoing by Mr. Carlson?
17      A. I have not.
18      MR. HERSH: Thank you. I have no further questions.
19
20  EXAMINATION BY MR. HEDRICK:
21      Q. I have a couple questions. If you could look at
22  Exhibit 3 to the amended -- your amended declaration, and if
23  you could take a look at Exhibit A. Have you seen these two
24  documents before? --
25      A. Yes, I have.

---

18 (Pages 66 to 69)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

Page 70

1  Q.  Can you tell me what they are?
2  A.  They are the audit done by the Santa Barbara
3  police department which is the holder of the C.L.E.T.S.
4  message switch for Santa Barbara County, and they have the
5  ability to go in and audit any telecommunications traffic
6  over the C.L.E.T.S. network.
7  Q.  Can you tell me why these documents were generated?
8  A.  I requested that an audit be conducted to find out
9  if Ms. Larkins was -- her name was run by any of our
10  personnel and/or our telecommunications devices within Santa
11  Barbara County.
12  Q.  Can you tell me what do these documents say to you?
13  A.  They say that in the year -- from the year -- from
14  January 1, 2000 to January 1 -- basically to 12 -- to
15  December -- through December 31st, 2001, that no record was
16  found of any message containing the words "Maura" and
17  "Larkins."
18  Q.  And you said that this document was generated
19  by -- I'm sorry, who -- who generated this document?
20  A.  Christine Nail is the information technology
21  manager for Santa Barbara police department.
22  Q.  Did you request this audit from her?
23  A.  Yes, I did.
24  Q.  What about this -- these two documents tells you
25  that no search was -- no inquiry was made into the criminal

Page 71

1  records for Maura -- or let me rephrase that.
2  You said -- you said that the -- let me phrase
3  that again.
4  What about this document tells you that no
5  inquiries were made into the criminal records of Maura and
6  Larkins?
7  A.  The bottom line -- the bottom line of the
8  message in the middle of the page says "no messages found" on
9  both pieces of paper, and to me and in my conversations with
10  Ms. Nail they were unable to find anything that referenced
11  any request for information or any information received back
12  based on the words "Maura" and "Larkins."
13  MS. ANGELL:  And the two pieces of paper you're
14  referencing are the two pieces of paper that constitute
15  Exhibit A to your amended declaration; is that correct?
16  THE WITNESS:  Yes.  They are behind a piece of
17  paper that has a handwritten "A" on it, yes.
18  MR. HEDRICK:  Thank you.  That's all the questions
19  I have.
20
21  EXAMINATION BY MS. ANGELL:
22  Q.  Commander, during the course of this deposition
23  today plaintiff marked as exhibits a number of newspaper
24  articles, according to my recollection.  Is that your
25  recollection as well?

Page 72

1  A.  Yes.
2  Q.  Before today had you ever seen copies of any of
3  those newspaper articles before?
4  A.  I have not.
5  Q.  Before today had you ever met me before?
6  A.  No, I have not.
7  Q.  Before today had you ever spoken with me before?
8  A.  No.
9  Q.  Before today had you ever spoken with any person
10  employed by the law firm of Stutz, Artiano, Shinoff & Holtz?
11  A.  No, ma'am.
12  MS. ANGELL:  Nothing further.
13
14  EXAMINATION BY MR. HEDRICK:
15  Q.  Just one more question.  Apart from these reports
16  attached as Exhibit A to your declaration on Exhibit 3, are
17  you aware based on your personal knowledge whether or not
18  Michael Carlson has ever accessed criminal records for the
19  plaintiff Maura Larkins?
20  A.  I'm not aware that he has.  I am aware that he has
21  said he has not.
22  MR. HEDRICK:  Thank you.  That's it.
23  MS. LARKINS:  Michael?
24  MR. HERSH:  I'm through.  Thank you.
25  ///

Page 73

1  EXAMINATION BY MS. LARKINS:
2  Q.  Okay.  I'd like to do a little follow-up.
3  Mr. Carlson -- Mr. Carlson.  Mr. Gross, since you have
4  testified that you did not prepare the declaration that you
5  signed, do you know for certain that Deborah Garvin was not
6  trying to prepare the declaration in a way that would hide
7  actions of her client?
8  MR. HEDRICK:  Calls for speculation.
9  MS. LARKINS:  No, I'm asking if he knows for sure.
10  THE WITNESS:  I don't know for sure.
11  BY MS. LARKINS:
12  Q.  Thank you.  Do you know for a fact Michael Carlson
13  never called up the San Diego police department and asked
14  them to send him my arrest records?
15  A.  I do not, no.
16  MS. LARKINS:  No more questions.  I will try to do
17  the stipulation.  Okay.  I'd like to stipulate that when this
18  transcript is prepared it will be sent to Mr. Gross or would
19  you like to have it sent to your county counsel or --
20  THE WITNESS:  Please send it to me.
21  MS. LARKINS:  Okay.  And do we have your address
22  where we should send it?
23  THE WITNESS:  Yes.
24  MS. LARKINS:  Okay.  Okay.  And then I suggest
25  that once you receive it that you be allowed the normal

19 (Pages 70 to 73)

Larkins v. Werlin
GIC 781970

Deposition of Samuel D. Gross, Jr.
November 17, 2004

---

Page 74

1  30 days to read it over, and you can make changes if you find
2  any -- anything that you want to change. And then within
3  that 30 days you would sign it and return it to me -- to me.
4  Okay. And if you do not sign it and return it within
5  30 days, it will be just considered to have been signed just
6  the way it was prepared by the court reporter. I'd like to
7  stipulate that a fax signature on the signature page be
8  considered equal to an original. And I will keep the
9  original, and if the original becomes lost or unavailable, a
10  certified copy will be acceptable in place of the original.
11        Does anyone have any other things that they would
12  like to add to that?
13        MR. HEDRICK: If nobody has any objections, I'd
14  like to include the deposition subpoena of Mr. Gross as part
15  of the exhibits to the deposition.
16        MS. LARKINS: Shall we number -- would you like it
17  to be numbered 14?
18        MR. HEDRICK: Sure.
19        MS. LARKINS: Or do you want it to be maybe 1 for --
20        MR. HEDRICK: 14 is fine.
21        MS. LARKINS: 14? Okay.
22        (Plaintiff's Exhibit No. 14 was marked for
23  identification.)
24        MS. ANGELL: And was it your proposed stipulation
25  that the witness inform you in writing of all changes and

---

Page 75

1  provide a copy of the signature and date of his deposition
2  transcript?
3        MS. LARKINS: Yes. Thank you.
4        MS. ANGELL: All right. And so you will then
5  provide within 24 hours of receipt or as soon as practicable
6  a copy of all changes and Commander Gross's signature and
7  date page to all counsel.
8        MS. LARKINS: Okay.
9        MS. ANGELL: Correct?
10        MS. LARKINS: Yes. I so stipulated.
11        MR. HERSH: So stipulated.
12        MR. HEDRICK: So stipulated.
13        MS. ANGELL: So stipulated.
14        THE VIDEOGRAPHER: This concludes today's
15  deposition. We're going off the record at 12:50 p.m.
16              * * * * *
17        I, SAMUEL D. GROSS, JR., swear under penalty of
18  perjury that I have read the foregoing, and that it is true
19  and correct, to the best of my knowledge and belief.
20        Signed on this      day of         , 2004,
21  at
          (City)          (State)
22
23
              SAMUEL D. GROSS, JR.
24
25

---

Page 76

1  STATE OF CALIFORNIA )
2  COUNTY OF SAN DIEGO )
3
4      I, CLAUDIA A. WITT, Certified Shorthand Reporter
5  licensed in the State of California, License No. 10797,
6  hereby certify that the deponent was by me first duly sworn
7  and the foregoing testimony was reported by me and was
8  thereafter transcribed with Computer-Aided Transcription;
9  that the foregoing is a full, complete, and true record of
10  said proceeding.
11      I further certify that I am not of counsel or
12  attorney for either or any of the parties in the foregoing
13  proceeding and caption named or in any way interested in the
14  outcome of the cause in said caption.
15      The dismantling, unsealing, or unbinding of the
16  original transcript will render the reporter's certificates
17  null and void.
18      In witness whereof, I have hereunto set my hand
19  this day: November 29, 2004
20
21  _____
    CLAUDIA A. WITT, CSR
22  Certificate No. 10797
23
24
25

---

20 (Pages 74 to 76)

**EXHIBIT 3**

Page 1

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

MAURA LARKINS,                        *
                                      *
                                      *
              Plaintiff,              *
                                      *
                                      *
       vs.                            *    Case No. GIC 781970
                                      *
RICHARD T. WERLIN, etc., et al.,      *
                                      *
              Defendants.             *
                                      *

DEPOSITION OF VIRGINIA BOYD

Taken at San Diego, California
March 22, 2004

T. A. Martin, CSR
Certificate No. 3613

COMPLIMENTARY

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

Page 2

```
1
2                    I-N-D-E-X
3       DEPOSITION OF VIRGINIA BOYD              PAGE
           March 22, 2004
4
        Examination by Ms. Larkins            5
5
6
        EXHIBITS:                       PAGE
7
          1 Deposition Preamble              4
8
          2 One-page letter, January 23, 2001    36
9
10
        INSTRUCTION NOT TO ANSWER:         LINE/PAGE
11                        2  58
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
1
2            DEPOSITION OF VIRGINIA BOYD
3
        Pursuant to Notice to Take Deposition, and on
4
   the 22nd day of March, 2003, commencing at the hour of
5
   10:00 o'clock p.m., at 319 Elm Street, Suite 100, in the
6
   City and County of San Diego, State of California, before
7
   me, T. A. Martin, Certified Shorthand Reporter in and for
8
   the State of California, personally appeared:
9
            VIRGINIA BOYD,
10
   who, called as a witness by the Plaintiff, being by me
11
   first duly sworn, was thereupon examined as a witness in
12
   said cause.
13
            APPEARANCES
14
   For the Plaintiff:  MAURA LARKINS
15           1935 Autocross Court
             El Cajon, California 92109
16             (In Propria Persona)
17   For Chula Vista    CALIFORNIA TEACHERS ASSOCIATION
     Educators, California By:  MICHAEL HERSH
18   Teachers Association, 11745 East Telegraph Road
     Virginia Boyd and    Post Office Box 2153
19   Timothy O'Neil:     Santa Fe Springs, California 90670
20   For Robin Donlan    STUTZ, ARTIANO, SHINOFF & HOLTZ
     and Linda Watson:    By:  KELLY R. ANGELL
21           401 West "A" Street, 15th Floor
             San Diego, California 92101
22
     Specially appearing   McCORMICK & MITCHELL
23   for Michael Carlson:  By:  DEBORAH K. GARVIN
             625 Broadway, Suite 1400
24           San Diego, California 92101
25   Videographer:    Gregg Eisman, Videographics
```

---

Page 4

```
1       (Exhibit P-1 marked for identification.)
2       VIDEOGRAPHER:  We're on the record.
3       This is the videotape deposition of Virginia
4  Boyd being taken on behalf of the plaintiff in the matter
5  of Maura Larkins versus Richard T. Werlin, et al., San
6  Diego Superior Court Case No. GIC 781970.
7       This deposition is being held in the offices of
8  San Diego Court Reporting, located at 319 Elm Street,
9  Suite 100, San Diego, California.  Today is Monday, March
10  22, 2004.  The time is now 10:08 a.m.
11       My name is Gregg Eisman.  I'm a Legal Video
12  Specialist with Videographics, located at 1903 30th
13  Street, San Diego, California.  The Certified Shorthand
14  Reporter is Tadzia Martin of San Diego Court Reporting.
15       For the video record would counsel please state
16  their appearances.
17       MR. HERSH:  Michael Hersh, California Teachers
18  Association.  I'm here -- I'm defending the deposition,
19  and I represent -- for the defendants -- the Chula Vista
20  Educators, the California Teachers Association, Ms. Boyd
21  and Timothy O'Neil.
22       MS. GARVIN:  I'm Deborah Garvin of the law of
23  McCormick & Mitchell.  I'm specially appearing for
24  defendant Michael Carlson.
25       MS. ANGELL:  Kelly Angell of Stutz, Artiano,
```

---

Page 5

```
1  Shinoff & Holtz, appearing for Robin Donlan and Linda
2  Watson.
3       MS. LARKINS:  And I'm Maura Larkins, plaintiff
4  in pro per.
5       VIDEOGRAPHER:  The witness may now be sworn.
6       (Whereupon the witness was duly sworn.)
7
8  EXAMINATION BY MS. LARKINS:
9       Q.  Would you please state and spell your full name
10  for the record.
11       A.  Virginia T. X. Boyd, B-o-y-d.
12       Q.  Ms. Boyd, have you had your deposition taken
13  before?
14       A.  No.
15       Q.  Have you been present when a deposition was
16  taken?
17       A.  Yes.
18       Q.  On about how many occasions?
19       A.  I'd say one.
20       Q.  One deposition?
21       A.  I believe so.
22       Q.  You were present at?
23       A.  Yes.
24       Q.  And could you tell me when that took place?
25       A.  Last year sometime, I believe.
```

---

2 (Pages 2 to 5)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

Page 6

1   Q. Who was being deposed?
2   A. Jo Ellen --
3   Q. Jo Ellen Hamilton?
4   A. Hamilton, yes.
5   Q. Were there any other depositions you attended at
6   about that same time?
7   A. I don't think so.
8   Q. Do you recall being present during the
9   deposition of Linda Watson?
10  A. No, I don't.
11  Q. Do you recall being present during the
12  deposition of Richard Denmon?
13  A. No, I don't.
14  Q. During the deposition of Jo Ellen Hamilton was
15  there any objection made to your being present?
16  A. Yes.
17  Q. What was that objection?
18  A. Your lawyer asked me to remove myself.
19  Q. Did she give a reason?
20  A. If she did, I don't remember what it was.
21  Q. Just to help refresh your memory, did she say
22  that it was because you had previously represented Maura
23  Larkins and you were now there on behalf of Jo Ellen
24  Hamilton?
25  A. She may have stated that.

Page 7

1   Q. Did you feel any conflict of interest?
2   MR. HERSH: Objection --
3   MS. LARKINS: First of all, let me have some
4   foundation for that. I'll come back later and ask about
5   that.
6   Q. Before we went on the record I asked you to read
7   what has been marked as Exhibit P-1 in a series of these
8   exhibits. P-1 is entitled "Deposition Preamble."
9   Have you taken the opportunity to read that
10  document?
11  A. Yes, I have.
12  Q. And do you understand its contents?
13  A. Yes.
14  Q. Do you have any questions about the procedure
15  and rules of taking a deposition?
16  A. No.
17  Q. Do you know of any reason why you can't give
18  your best deposition testimony here today?
19  A. No.
20  Q. What is the highest level of schooling you
21  achieved?
22  A. I have a Master's in education and an ADR from
23  Pepperdine Law Institute.
24  Q. Okay. Where did you get those -- let's see.
25  Where did you get the Master's?

Page 8

1   A. University of San Diego.
2   Q. Okay. And when did you get it?
3   A. 19 -- I believe it took me 1971 and '72. Around
4   that time.
5   Q. When did you get the degree at Pepperdine?
6   A. Oh, beginning in 19 -- I think around 1988. It
7   took me three years.
8   Q. I'm sorry. I didn't understand what degree that
9   was.
10  A. It's Alternative Dispute Resolutions. It's
11  actually a certificate to provide
12  mediation/arbitration-type services.
13  Q. And where did you do your undergraduate work?
14  A. University of Washington.
15  Q. And you got a Bachelor's degree in what year?
16  A. 1966.
17  Q. And what was your major course of study?
18  A. Spanish.
19  Q. Spanish.
20  When did you get a teaching credential?
21  A. At that same time.
22  Q. At USD with the Master's?
23  A. No. I had a teaching credential in Seattle in
24  1966.
25  Q. Oh, okay. And where did you graduate from high

Page 9

1   school?
2   A. Planchette High School in Seattle, Washington.
3   Q. What year did you graduate?
4   A. 1962.
5   Q. What was the first full-time teaching position
6   that you held?
7   A. In Seattle -- well, actually Shoreline District
8   in Seattle, Washington area.
9   Q. And what year was that?
10  A. 1967.
11  Q. And what grades did you teach?
12  A. Third.
13  Q. How long did you stay at that school?
14  A. Three years. Well, actually it was two and a
15  half because I started in January.
16  Q. And what was your next assignment?
17  A. At Palomar School in Chula Vista, California. I
18  taught a fourth grade class.
19  Q. And so that was in about '69, '70?
20  A. 1969, the fall of 1969.
21  Q. Okay. And how long did you teach at Palomar?
22  A. Until 1978.
23  Q. And where did you go in 1978?
24  A. I went to Tiffany School in the same school
25  district.

3 (Pages 6 to 9)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

Page 10

1    Q. And how long?
2    A. Until 1986, I believe.
3    Q. And what was your assignment in 1986?
4    A. Let's see. It was probably a fifth grade. Yes,
5  it was a fifth grade.
6    Q. Is that at Tiffany?
7    A. No.
8    Q. The next assignment after that?
9    A. Wait a minute. Are we talking about -- I think
10  you went to the next school after Tiffany.
11    Q. Yes. Okay. What school was that?
12    A. Castle Park.
13    Q. Castle Park.
14      You taught fifth grade and only fifth grade
15  there?
16    A. No. The last year I was at the school I taught
17  a four/five combination.
18    Q. What was that last year?
19    A. 1995.
20    Q. And what was your assignment after that?
21    A. President of Chula Vista Educators.
22    Q. Okay. When you were serving as president of
23  Chula Vista Educators, were you still an employee of
24  Chula Vista Elementary School District?
25    A. I'm an employee on leave.

Page 11

1    Q. Okay. And who is your employer when you're on
2  leave from Chula Vista Elementary School District?
3    A. According to our contract, the district remains
4  my employer.
5    Q. Do you have any other employer?
6    A. No.
7    Q. Who pays your paycheck?
8    A. The county.
9    Q. And -- county.
10      Does CTA or Chula Vista Educators give money to
11  the county on your behalf?
12    A. They give money to the school district on my
13  behalf.
14    Q. Okay. They give money to the school district.
15  And the school district money is the money that is
16  actually being paid to you then through the county?
17    A. Yes.
18      No. Actually it's CVE's money that goes to the
19  district, because I'm on their payroll and have my -- I
20  have all the benefits of someone who is in the classroom
21  full time. So I go through the county in order to have
22  my STRS and my health benefits, etcetera, but the union
23  does pay for my actual compensation through the district.
24    Q. How -- what is your -- do you consider yourself
25  to have any sort of -- what is your relationship with the

Page 12

1  union, then, financially? Do you have a name for this
2  relationship? If you're not their employee -- you're not
3  the employee of Chula Vista Educators?
4    A. No. I'm the employee on release -- full-time
5  release. According to our contract, I am an employee of
6  the school district.
7    Q. Okay. We can come back to that later.
8      Okay. Are you at present officially assigned to
9  Castle Park Elementary?
10    A. No.
11    Q. When you're -- how many years long do your terms
12  last, your terms as president?
13    A. The length of the term or how many terms?
14    Q. Well, let's start with the length of the term.
15    A. They are two-year terms.
16    Q. Okay. So your first two-year term was '95 to
17  '97?
18    A. Uh-huh.
19    Q. '97 to '99 and '99 to 2001.
20      Now, when you were ending your term in 2001, did
21  you consider that you might go back to the classroom?
22    A. Only if I was not reelected.
23    Q. And what classroom -- what school would you have
24  gone back to if you hadn't been reelected?
25    A. I would have access to Castle Park if I wanted

Page 13

1  to go back there.
2    Q. Did you inform Castle Park that you would go
3  back there if you were not elected?
4    A. Yes, I did.
5    Q. Thank you.
6      And how about in 2003 when your term was ending
7  in 2003; did you inform Castle Park that you were
8  intending to go back to Castle Park at that time if you
9  were not reelected?
10    A. Yes, I did.
11    Q. One thing I'd like to make clear for the record,
12  when I use the term "district" or "school district" or
13  "Chula Vista School District," I am referring to Chula
14  Vista Elementary School District. And when I use the
15  term "Chula Vista Educators" or the "teachers
16  association" or the "union" or "Chula Vista" -- I'm then
17  referring to Chula Vista Elementary Education
18  Association.
19      During your time at Castle Park School, did you
20  come to believe that there was a clique at the school --
21  of teachers -- a clique of teachers at the school?
22    A. Actually, there were several cliques.
23    Q. Okay. Did you feel that one clique was perhaps
24  more powerful than the others?
25    A. I would say one clique had -- took advantage of

4 (Pages 10 to 13)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

**Page 14**

1 having more access to the principal than others.
2    Q. Could you tell me who were the members of that
3 clique?
4    MR. HERSH: I'm sorry. What years are we
5 talking about?
6    MS. LARKINS: Over the entire -- whatever this
7 clique is, her -- whatever she sees this clique to be
8 over time, not at any particular time.
9    THE WITNESS: I felt that there were two people
10 who had more access or took more access to the principal,
11 and that was Jo Ellen Hamilton and Kathy -- at that
12 present time her name wasn't Bingham; it was -- I can't
13 remember. A very long name.
14    MS. LARKINS: Yes, I remember. I remember that
15 there was a different name. Okay.
16    Q. Did you consider yourself to be a member of the
17 Jo Ellen/Kathy Bingham clique?
18    A. No.
19    Q. Did you feel yourself to be a member of any
20 clique?
21    A. In elementary schools often there is a group of
22 people who are in the primary grades that coalesce, and
23 then there are people in the upper grades that coalesce.
24 I was probably the person in the upper grades who had an
25 influence on people, also because I was the union

---

**Page 15**

1 representative there.
2    Q. And during the time you were there, Richard
3 Denmon taught in the upper grades?
4    A. No, not while I was there.
5    Q. He was a primary teacher while you were there?
6    A. I don't believe Rick Denmon taught while I was
7 at Castle Park.
8    Q. Oh, okay. I'm jumping a little bit. I want to
9 jump back to this question.
10    Did you discuss your testimony for today with
11 anyone?
12    MR. HERSH: Vague and ambiguous. Objection.
13 BY MS. LARKINS:
14    Q. Other than your attorney, did you talk to anyone
15 about what you were going to say here today?
16    A. No.
17    Q. Okay. Was there a time during your employment
18 at Chula Vista Elementary School District that you came
19 to know or to know of Maura Larkins?
20    A. Yes.
21    Q. What was that time?
22    A. The first time I knew of Maura Larkins was when
23 I was called in to an early morning meeting because the
24 person was going to be put on administrative leave.
25    Q. Do you have any idea about what date that was?

---

**Page 16**

1    A. It was in February.
2    Q. Of what year?
3    A. It was 2001.
4    Q. Now, how did you come to hear about this
5 meeting?
6    A. I was either called by my executive director Tim
7 O'Neil or by Richard Werlin to be told that one of my
8 unit members would be needing representation. As I
9 recall, the meeting was called at about 7:00 o'clock in
10 the morning.
11    Q. Okay. Did you have any idea what this meeting
12 was going to be about?
13    A. No, I didn't.
14    Q. Okay. Did there come some time when you made
15 the acquaintanceship of Linda Watson?
16    A. Yes.
17    Q. When was that?
18    A. When she -- let's see. When she taught at --
19 came to Castle Park School.
20    Q. Do you know what year that was?
21    A. Let's see. She wasn't there -- I think probably
22 around 1987. I think I had taught there for a while
23 before she came on staff.
24    Q. And was she an upper-grade teacher?
25    A. I think she taught third and then went to

---

**Page 17**

1 fourth, or started at fourth and went to third. I'm not
2 sure.
3    Q. Did you ever have lunch with her at the same
4 time as she had lunch?
5    A. Sometimes. I didn't usually eat lunch in the
6 teachers lounge, so I can't -- you know, I know that
7 there were times that we shared the same lunch period.
8 Whether --
9    MS. ANGELL: I'm going to object as vague and
10 ambiguous as to time.
11    Can we get clarification on that?
12    MS. LARKINS: I'm sorry. Can you explain what
13 you're asking?
14    MS. ANGELL: Vague and ambiguous as to time.
15    MS. LARKINS: Like the year it took place?
16    MS. ANGELL: There is no aspect of time included
17 in the question, so --
18    MS. LARKINS: Okay.
19    Q. Did you ever, when you were at Castle Park, eat
20 lunch with Linda Watson?
21    A. I'm sure I did.
22    Q. Do primary teachers and upper-grade teachers
23 have lunch at different times?
24    A. Yes, they do.
25    Q. So at those times when you ate lunch with her,

---

5 (Pages 14 to 17)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

**Page 18**

1  we can assume that you must have both been upper-grade
2  teachers?
3      A. Yes.
4      Q. And did you sometimes -- did you ever while you
5  were at Castle Park go out to lunch with her to a
6  restaurant or a fast food place?
7      A. Yes.
8      MS. ANGELL: Again, vague and ambiguous as to
9  time. I think the testimony is that she's still employed
10  by the district, so I don't understand the question as to
11  time.
12  BY MS. LARKINS:
13      Q. When you were a teacher at Castle Park, did you
14  ever go out to lunch with Linda Watson to a restaurant or
15  a fast food place?
16      A. Yes.
17      Q. Since you have been president of CVE -- and by
18  CVE, I mean Chula Vista Educators -- have you ever gone
19  out to lunch with Linda Watson?
20      A. Yes.
21      Q. It's been almost nine years, I think, since --
22  that you've been CVE president. Over that period of nine
23  years, about how often would you say that you went out to
24  lunch with Linda Watson?
25      A. I'd say three or four.

---

**Page 19**

1      Wait a minute. No. I would say three. I did
2  have -- go out to lunch in a restaurant with Linda one
3  time prior to becoming president.
4      MR. HERSH: I object to the answer, because I
5  think the question was simply during the period that you
6  have been president how many times have you had lunch
7  with her.
8      THE WITNESS: Three.
9      MS. LARKINS: Okay.
10      Q. Other than a professional relationship -- wait a
11  minute. Let me ask that differently.
12      Have you ever socialized with her outside of
13  school?
14      A. I went to a -- it was either a -- I believe a
15  wedding shower at her home, and the lunches.
16      Q. Okay. Did you sometimes speak to her on the
17  phone when you were president?
18      MR. HERSH: Just so the question is clear, she
19  is still the president. Do you understand that?
20      MS. LARKINS: Yes. I'm limiting it to that
21  time.
22      THE WITNESS: I'd say maybe four or five times
23  in nine years, eight and a half years.
24  BY MS. LARKINS:
25      Q. How many of those times were between '95 and

---

**Page 20**

1  2000?
2      A. Maybe one or two.
3      MR. HERSH: I'm sorry. What -- what? How many
4  times for what?
5  BY MS. LARKINS:
6      Q. How many times did you speak to Linda Watson on
7  the phone between 1995 and 2000?
8      A. Maybe one or two.
9      Q. Okay. Would you say that the phone
10  conversations increased after -- your phone conversations
11  with Linda Watson increased after this early morning
12  meeting with the district regarding Maura Larkins?
13      A. No.
14      Q. When you say four or five phone conversations in
15  nine years, are you including conversations related to
16  your representation of Linda Watson?
17      A. Yes.
18      Q. Do you consider her a friend?
19      A. I consider her an acquaintance.
20      Q. Did Maura -- excuse me. Did Linda Watson ever
21  speak to you about Maura Larkins?
22      A. Yes.
23      Q. What did she say?
24      A. She told me about the incident in the locker
25  room at the swimming pool.

---

**Page 21**

1      Q. What did she say about that?
2      A. She said that she was very upset and afraid and
3  that she had been verbally accosted by Maura Larkins in
4  front of children.
5      Q. Under -- was this -- did she call you at this --
6  at the time she wanted to talk to you about this?
7      A. No. I called her.
8      Q. What caused you to call her?
9      A. The previous day she had been so upset by the
10  incident that she went home ill midday, and so the next
11  day I called her to check to see that she was -- check to
12  see whether she was okay.
13      MS. ANGELL: I'm going to object to this whole
14  line of questioning with regard to Linda Watson based on
15  privacy. The conversations alleged were conducted
16  apparently in relationship to representation being
17  provided by union representation and were thus
18  confidential.
19  BY MS. LARKINS:
20      Q. Okay. So you spoke to her the previous day?
21      MS. ANGELL: Same objection.
22      MS. LARKINS: Objection noted.
23      Q. You may answer the question.
24      A. The next day.
25      Q. Okay. You spoke to her on two consecutive days?

---

6 (Pages 18 to 21)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

**Page 22**

1  A. Yes. I was called to the school on the day of
2  the incident because she was very upset, and so I spoke
3  to her in person on that particular day. And I believe I
4  called her the next day to check to see if she was okay.
5  Q. Okay. Who called you to the school?
6  A. Well, it wasn't Linda. It may have been one of
7  her colleagues or it may have been the union rep.
8  Q. How soon did you come to the school?
9  A. Probably within 15 minutes.
10  MS. ANGELL: I don't understand the time frame
11  that we're talking about. Do we have a date?
12  BY MS. LARKINS:
13  Q. Can you tell us the date that this incident
14  occurred?
15  A. No.
16  Q. You have no idea; you just remember that there
17  was a day?
18  A. Yes.
19  Q. In what capacity did you come to the school on
20  that day?
21  A. As a representative for Linda or support for
22  Linda.
23  Q. Representative for Linda, support for Linda.
24  MR. HERSH: I'm going to have, I guess, an
25  objection here, because we are here, just to remind you,

---

**Page 23**

1  in a lawsuit that you have brought alleging that Ms. Boyd
2  wrongfully possessed and received arrest records
3  pertaining to Maura Larkins in September of 2000. So I'm
4  not exactly clear on how this line of questioning will
5  assist you in developing evidence concerning the
6  September 2000 event, because it seems a little bit off
7  base.
8  MS. LARKINS: Okay.
9  Q. Are you often called to give support to
10  teachers?
11  A. Yes, I am.
12  Q. What -- did you know when you were coming to the
13  school who she had a problem with?
14  A. I believe it was stated that the concern had
15  something to do with Maura Larkins.
16  Q. Okay. You went to the school to give support to
17  Linda Watson because of a problem she had with Maura
18  Larkins?
19  A. Yes.
20  Q. Okay. What happened when you got to the school?
21  A. I met with Linda Watson briefly. She was very
22  emotionally distressed; she was crying, obviously not fit
23  to go back in the classroom. So I went to her immediate
24  supervisor Gretchen Donndelinger and informed her that my
25  unit member needed to be excused for the rest of the day

---

**Page 24**

1  to go home so that she could compose herself and
2  certainly could not be in the presence of children.
3  I then met with Linda briefly while she
4  explained to me her rendition of what the event was, and
5  she later went home.
6  Q. Okay. Now, you are saying that she was not fit
7  to go in the classroom because she was crying; she was
8  not able to speak in a normal voice?
9  A. She couldn't compose herself.
10  Q. She couldn't compose herself. So you felt that
11  she simply couldn't adequately handle her
12  responsibilities in the classroom?
13  A. It would not have been a good model to put in
14  front of boys and girls.
15  Q. What did she tell you?
16  MS. ANGELL: Objection.
17  Can we take a break?
18  MR. HERSH: Sure.
19  MS. LARKINS: I agree to it too, Ms. Angell.
20  VIDEOGRAPHER: We're going off the record. The
21  time is 10:40 a.m.
22  (Recess taken.)
23  VIDEOGRAPHER: We're going on the record. The
24  time is 10:49 a.m.
25

---

**Page 25**

1  BY MS. LARKINS:
2  Q. I'd like to go back to when you -- the time you
3  first arrived at Castle Park School when you were called
4  to come and give support to Linda because of an
5  interaction she had with Maura Larkins that upset her.
6  When you first talked to Linda Watson, where
7  were you physically in the school? In the office, in her
8  room?
9  A. In the principal's office.
10  Q. In the principal's office.
11  And then after you went and talked to Gretchen
12  Donndelinger about Linda not being able to complete the
13  day --
14  MR. HERSH: Is that in evidence? Was there
15  testimony about that? Okay.
16  BY MS. LARKINS:
17  Q. -- you talked with Linda some more; is that
18  correct?
19  A. I waited with her until she was able to go home,
20  and she may have discussed further the incident.
21  MR. HERSH: I'm going to make an objection
22  again, not -- I believe all of these questions are far
23  outside the scope of discovery, but, in addition, I do
24  have concerns that statements made by individual members
25  of the union to a union representative seeking assistance

---

7 (Pages 22 to 25)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

Page 26

1  are generally privileged communications akin to an
2  attorney/client privilege. And I'm trying to give you
3  some latitude here because -- I don't know if she still
4  is -- at one point Linda Watson was a defendant in this
5  case, and -- but I -- I'm just reminding you that this
6  case is about the wrongful possession of criminal
7  records.
8      MS. LARKINS:  Thank you.
9      MS. ANGELL:  Join in the objection based on --
10 the question is not calculated to lead to the discovery
11 of admissible evidence based on the causes of action in
12 this litigation.
13 BY MS. LARKINS:
14     Q. Did Linda Watson ever express to you her fear
15 that Maura Larkins had a gun?
16     MR. HERSH:  Same objection. Outside the scope
17 of discovery.
18     THE WITNESS:  No.
19 BY MS. LARKINS:
20     Q. Did you get the impression that Linda Watson was
21 failing to share with you all her concerns?
22     A. No.
23     Q. You believed she was sharing with you all her
24 concerns --
25     A. She was --

---

Page 27

1      Q. -- about Maura Larkins?
2      A. Yes.
3      Q. And you can't recall any time when she ever
4  discussed her -- did she ever ask --
5      MR. HERSH:  Vague as to time. Can you give us
6  an indication of the time period that your question is?
7  BY MS. LARKINS:
8      Q. During any discussion you had with Linda Watson
9  about Maura Larkins, did Linda Watson ever say -- ever
10 ask whether Maura Larkins had a gun?
11     A. No.
12     Q. Did you believe Linda Watson's story on this day
13 of the incident?
14     A. Yes.
15     Q. At the time of this incident, were you
16 representing Maura Larkins?
17     A. Yes.
18     Q. Did you speak to Maura Larkins on that same day?
19     A. I believe I did.
20     Q. Did she tell you any part of her version of what
21 happened at the swimming pool?
22     A. No, I don't think so.
23     Q. So you believed Linda Watson's story without
24 hearing Maura Larkins' story?
25     A. I don't believe I heard Maura Larkins' story on

---

Page 28

1  that particular day. I think it was the next day.
2      Q. Okay. Let's jump to the next day.
3      A. Okay.
4      Q. Or -- you're not certain exactly; it might have
5  been the same day?
6      A. It may have been the same day.
7      Q. Okay. But sometime shortly after you heard
8  Linda Watson's story, you did hear Maura Larkins' story?
9      A. Yes.
10     Q. Did she have an opportunity to completely tell
11 you her entire version of what happened?
12     A. I believe she did.
13     Q. And what was her version?
14     A. Her version was that --
15     MS. ANGELL:  Objection. The question is not
16 calculated to lead to the discovery of admissible
17 evidence.
18     THE WITNESS:  I believe that she indicated that
19 she had approached Linda Watson to talk about either the
20 swimming program or a teaming situation that she wanted
21 to reinstitute, and that Linda was unwilling to have that
22 discussion with her at that point in time, and that Maura
23 did not understand why Linda did not want to have the
24 discussion. And then Linda became unwilling to talk to
25 her at all, and the conversation kind of escalated, and

---

Page 29

1  they went back to school.
2  BY MS. LARKINS:
3      Q. So you don't recall any -- let me say this. Do
4  you recall any contradictions between the story of Linda
5  Watson and the story of Maura Larkins?
6      A. Yes.
7      Q. What were the contradictions?
8      A. Linda indicated that the tone and body language
9  of Maura Larkins was threatening to her and it was also
10 occurring in front of children. Maura indicated that she
11 wanted to have a reasonable discussion about a school
12 program, and there was a situation where Linda did not
13 want to engage in conversation. I don't believe that
14 Maura understood why Linda was resistant to engaging her
15 in conversation.
16     Q. Okay. You don't believe that Maura understood.
17 Did Maura Larkins say she didn't understand?
18     A. I don't remember.
19     Q. Okay. Now, you said Linda said the tone and --
20 tone of voice and body language of Maura Larkins was
21 threatening, according to Linda. Did Maura Larkins deny
22 that?
23     A. I don't know whether she denied that it was
24 threatening. I think she may have wondered why Linda
25 thought that she was being, you know, obtuse with her. I

---

8 (Pages 26 to 29)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

**Page 30**

1  don't remember whether Maura told me that she hadn't been
2  threatening or not.
3      Q. Okay. Linda said Maura was threatening, and you
4  don't know if Maura denied that?
5      A. Linda felt threatened, and I don't think that
6  Maura can deny that Linda Watson felt threatened. I
7  think you may --
8      MR. HERSH: I just would ask the witness not
9  offer additional information or get into an argument with
10  Ms. Larkins here.
11      THE WITNESS: Okay.
12  BY MS. LARKINS:
13      Q. Okay. Did Linda say that Maura Larkins' tone of
14  voice was -- what did Linda -- how did Linda Watson
15  describe Maura Larkins' tone of voice?
16      A. She -- I think Linda Watson spent more time
17  telling me about how she felt; that she felt that she was
18  being pushed in a corner so that she couldn't get away;
19  that the body language was threatening and the tone was
20  threatening, and that she just wanted to get away from
21  the situation.
22      Q. Okay. I'm going to try to avoid talking about
23  how Linda felt, and I'm trying to find out actual facts,
24  the facts as Linda reported them to you.
25      Now, you said she felt pushed in a corner. Are

---

**Page 31**

1  you speaking literally or figuratively? Did -- was she
2  actually pushed into a corner or did she just feel pushed
3  into a corner?
4      A. I believe that she said that you were very close
5  in her physical space and she felt uncomfortable and did
6  not want to participate in the conversation and did not
7  want to have the discussion.
8      MR. HERSH: I'm going to make another objection
9  here; that this is outside the scope of discovery. And
10  I'm going to ask Ms. Larkins whether she intends to ask
11  any questions today that are designed to bring out
12  evidence that is related to the tenth cause of action
13  involving Ms. Boyd and Ms. Watson concerning the wrongful
14  possession and receipt of criminal justice information
15  concerning Ms. Larkins.
16      Because we didn't come here today to simply
17  allow you to ask questions about every interaction in
18  your professional life with Ms. Watson or Ms. Boyd. We
19  are really here because you filed a lawsuit, and it would
20  be a misuse of the discovery process for you to utilize
21  the discovery process to simply ask questions about
22  things that are of general interest to you, but would not
23  be within the scope of 2017 of the Code of Civil
24  Procedure which sets forth the scope of the discovery
25  process.

---

**Page 32**

1      And as Ms. Angell said earlier, the scope of
2  discovery is essentially matters that you need in order
3  to prosecute the underlying lawsuit in this case which
4  has to do at this point with some slander allegations and
5  possession and receipt of prison -- I mean criminal
6  justice information pertaining to you. And I would ask
7  that you begin asking questions that are relevant to this
8  lawsuit, because I would consider it a misuse of the
9  discovery process if you intend to spend additional time
10  pursuing these other matters.
11      MS. LARKINS: Thank you.
12      Q. Did Linda Watson tell that you Maura Larkins
13  physically pushed her into a corner?
14      A. I don't think she told me that, no.
15      Q. Okay. This threatening body language that
16  Ms. Watson reported, what exactly was this threatening
17  body language?
18      A. Entering her space and appearing very angry and
19  distraught and demanding that she have a conversation
20  that she did not want to engage in.
21      Q. What indications did Linda report -- actual
22  physical indications that she had that Maura Larkins was
23  angry?
24      A. She just said that she felt threatened and the
25  tone and the body language was frightening to her.

---

**Page 33**

1      Q. Did she say that Maura Larkins raised her voice?
2      A. Yes, she did.
3      Q. Okay. Raised voice.
4      And to your understanding, the problem was
5  whether or not to have a conversation?
6      A. Yes.
7      Q. Did Maura Larkins deny that she had raised her
8  voice?
9      A. I don't know whether I asked that question of
10  Maura Larkins.
11      Q. Did Maura Larkins say that Linda Watson had
12  raised her voice?
13      A. I don't -- I don't know.
14      Q. Did Maura Larkins say that Linda Watson became
15  very angry?
16      A. She may have.
17      Q. Did you believe her?
18      A. That Linda Watson was very angry?
19      Q. Yes.
20      A. I believe she was afraid.
21      MR. HERSH: I'm going to make a motion to strike
22  the answer as nonresponsive and providing a speculative
23  response to a specific question.
24      If you don't know the answer, you don't have to
25  imagine it.

9 (Pages 30 to 33)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

Page 34

1      THE WITNESS: Okay.
2      MS. LARKINS: That's a good objection. Let me
3  try this again.
4      Q. Do you remember anything that Maura Larkins
5  said?
6      A. I recall that Maura Larkins said that she wanted
7  to engage her in a conversation about teaming, resuming
8  teaming, and that Linda -- I don't know. That is my
9  recall.
10     Q. Okay. So your memory of what Linda Watson said
11 is much better than your memory of what Maura Larkins
12 said?
13     A. Yes.
14     Q. But you already had decided that you believed
15 Linda Watson before you talked to Maura Larkins?
16     MS. ANGELL: Objection. Argumentative.
17     MS. LARKINS: Okay.
18     Q. Had you decided before you talked to Maura
19 Larkins that you believed Linda Watson?
20     A. I believed Linda Watson was very upset.
21     Q. Did you believe that Maura Larkins raised her
22 voice?
23     A. I believed that Linda felt that she had raised
24 her voice.
25     Q. Did you believe that Maura Larkins had raised

---

Page 35

1  her voice?
2      A. I hadn't -- I was more concerned about my unit
3  member getting home than that particular conversation.
4      Q. Were you at all concerned about the possibility
5  that Linda Watson might be making a false accusation
6  about Maura Larkins?
7      A. No.
8      Q. I want to be very careful that I understand
9  this. You were not concerned that Linda Watson might be
10 making a false accusation about Maura Larkins?
11     A. I don't think she was making something up.
12     Q. So you were not concerned?
13     MS. ANGELL: Objection. Asked and answered.
14     MS. LARKINS: Good point. Okay. Let's leave
15 that subject of discussion for now.
16     MR. HERSH: Ms. Larkins is attempting to draw
17 you into an argumentative position. Don't respond to her
18 argumentative questions. Just try to answer to the facts
19 and don't be concerned with her tone of voice, which is
20 increasingly belligerent.
21     MS. LARKINS: Let's start with some exhibits.
22 I'm going to label this one P-2.
23     MR. HERSH: When you say you want to start with
24 these exhibits, does that mean that the last hour that we
25 have spent in this deposition was a prelude to something?

---

Page 36

1      MS. LARKINS: No. I'm just sort of taking a
2  break and I'm going to something different.
3      MR. HERSH: Okay.
4      MS. LARKINS: We will be going back to the
5  questions on that same train of thought that we had
6  before.
7      (Exhibit P-2 marked for identification.)
8  BY MS. LARKINS:
9      Q. Have you ever seen this letter before?
10     A. Yes.
11     Q. Is this a letter from Maura Larkins to her
12 principal Gretchen Donndelinger?
13     A. Yes, it is.
14     Q. Could you please read the date on the letter?
15     A. January 23rd, 2001.
16     Q. Do you know the date on which Maura Larkins was
17 first placed on administrative leave?
18     A. It was early February.
19     Q. Would the date February 12th sound about right
20 to you?
21     A. Yes, it does.
22     Q. Okay. Is the date on this letter approximately
23 20 days before Maura Larkins was placed on administrative
24 leave?
25     A. Yes.

---

Page 37

1      Q. In this letter did Maura Larkins notify her
2  principal that she was being harassed at work?
3      A. Yes.
4      Q. Would you please read the letter into the
5  record?
6      A. January the 23rd, 2001.
7      "Dr. Donndelinger: One year ago I first tried
8  to report to you a problem with inappropriate behavior
9  toward me on the part of a staff member. You dismissed
10 the matter as insignificant. I have endured in silence.
11 During the past few weeks the problem has escalated into
12 constant harassment. Please set up a meeting time to
13 discuss this problem. Sincerely, Maura Larkins."
14     Q. In this letter does Maura Larkins give the name
15 or names of the person or persons who, according to
16 her --
17     MS. ANGELL: Objection. The letter speaks for
18 itself.
19     MR. HERSH: You also haven't laid a foundation
20 as to when this witness first saw this letter or at which
21 date -- if she has actual knowledge that you provided
22 this letter to the Principal Donndelinger. If you want
23 to --
24     MS. LARKINS: Thank you.
25     Q. Approximately when did you first see this

---

10 (Pages 34 to 37)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

Page 38

1  letter?
2  A. Sometime shortly after it was written. I'm not
3  sure.
4  Q. Okay. This letter -- do you believe that this
5  letter was written by Maura Larkins and given to Dr.
6  Donndelinger?
7  A. Yes.
8  MR. HERSH: That calls for a speculative --
9  MS. LARKINS: You have a question as to whether
10  this letter is genuine?
11  MR. HERSH: I have a question as to whether she
12  knows that it's genuine, and how she obtained it, other
13  than she may be just saying you gave it to her and she
14  believed -- if you told her that she gave it to
15  Donndelinger, she may have believed you, but it's not
16  clear.
17  MS. LARKINS: Okay. This is my first
18  deposition, so I'm trying to keep everything straight.
19  Okay.
20  Now, I think we can answer that question by
21  doing some more work on that first meeting, that first
22  February 12th meeting.
23  MR. HERSH: The meeting that is several months
24  after the allegations that are at the heart of this
25  lawsuit that you're asking about?

---

Page 39

1  THE WITNESS: February 12th.
2  MS. LARKINS: February 12, 2001.
3  MR. HERSH: Right. And the lawsuit deals with
4  events in September of 2000 concerning the wrongful
5  receipt and possession of arrest information.
6  MS. LARKINS: Exactly.
7  MR. HERSH: Okay.
8  BY MS. LARKINS:
9  Q. Okay. Did you know before the February 12th
10  meeting that a teacher or teachers had expressed concern
11  that Maura Larkins might kill a teacher or teachers?
12  A. No.
13  Q. Does Richard -- at this time did you -- did
14  Richard Werlin generally have a habit and custom of
15  informing you when he was going to have a meeting with a
16  teacher?
17  A. If the teacher -- if it was of a serious nature,
18  if the person was one of my unit members, normally he
19  would alert me that a person may need assistance.
20  Q. Did Jo Ellen Hamilton call you shortly before
21  the February 12th meeting and tell you that she was
22  afraid of Maura Larkins?
23  A. No.
24  Q. Are you certain about that?
25  A. Yes, I am certain about that.

---

Page 40

1  Q. Okay. Let's go ahead and talk about this
2  meeting on February 12th. I believe you said that --
3  here it is. It was an early morning meeting; you thought
4  that either Tim -- Tim O'Neil or Richard Werlin had
5  called you.
6  Did you speak to Maura Larkins before the
7  February 12th meeting?
8  A. Briefly outside the office. That would be the
9  district office.
10  Q. In the meeting -- what do you remember that Rick
11  Werlin said in the meeting?
12  A. Rick Werlin indicated that more than one person
13  had contacted him and indicated that they feared for
14  their personal safety.
15  Q. Who was at the meeting?
16  A. Maura Larkins, Gina Boyd, Rick Werlin and
17  probably Cindy.
18  Q. Was Gretchen Donndelinger at the meeting?
19  A. No.
20  Was she? I don't think so.
21  MR. HERSH: I'm not sure who is testifying here,
22  but your job is to answer the questions to the best of
23  your recollection, and you don't need to change your
24  responses because of Ms. Larkins.
25  MS. LARKINS: I am curious, though.

---

Page 41

1  Q. Are you certain that Gretchen Donndelinger was
2  not at the meeting?
3  MS. ANGELL: Objection. Argumentative.
4  BY MS. LARKINS:
5  Q. Is your memory very clear that Gretchen
6  Donndelinger was not at meeting?
7  A. No.
8  Q. Thank you. Okay.
9  You said that more than one person had contacted
10  him and that they had said what?
11  A. Indicated that they feared for their personal
12  safety.
13  Q. Did he say that they feared for their lives?
14  A. I believe he used "personal safety," but I'm not
15  that --
16  Q. Did he give the name of any person who had made
17  this claim?
18  A. No.
19  Q. Did he take any action, any personnel action
20  against Maura Larkins at that meeting?
21  A. Yes, he did.
22  Q. What was that action?
23  A. Put her on paid administrative leave.
24  Q. Is this considered acceptable; for anonymous
25  allegations to be used to take personnel actions against

---

11 (Pages 38 to 41)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

Page 42

1    teachers?
2        MR. HERSH: Vague and ambiguous.
3    BY MS. LARKINS:
4        Q. Do you believe it was consistent with district
5    policy to take personnel action based on anonymous
6    allegations?
7        MS. ANGELL: Objection. Calls for a legal
8    conclusion.
9    BY MS. LARKINS:
10       Q. Does the district frequently take personnel
11   action against teachers -- to your knowledge, since you
12   have been president -- does it frequently take personnel
13   actions against teachers based on anonymous allegations?
14       A. At the site level.
15       MR. HERSH: I need to object that the term that
16   you're using, "personnel action," has a wide variety of
17   meanings, and it's not clear what Ms. Boyd's
18   understanding of the term is that you're asking her
19   about.
20       MS. LARKINS: Thank you.
21       Q. Does Rick Werlin, to your knowledge, frequently
22   place teachers on administrative leave on the basis of
23   anonymous allegations?
24       MR. HERSH: Lack of foundation. Objection.
25   Lack of foundation.

Page 43

1    BY MS. LARKINS:
2        Q. Are you aware -- are you -- do you -- let's see.
3    When a teacher is placed on administrative leave in the
4    Chula Vista School District -- and we can limit this to
5    the time that you have been serving as president -- are
6    you informed of the fact when teachers are placed on
7    administrative leave? Do you -- when Rick Werlin places
8    a teacher on administrative leave, does he inform the
9    president of the teachers association?
10       MS. ANGELL: Excuse me. Objection. Have any of
11   the prior questions been withdrawn? Because I have heard
12   about four questions there.
13       MS. LARKINS: I withdraw all of them since --
14   all the questions asked since Ms. Boyd spoke last.
15       Q. Can you answer my last question, or would you
16   like me to repeat it?
17       MR. HERSH: You withdrew it.
18       MS. LARKINS: Okay. I'll repeat my last
19   question.
20       Q. Does Mr. Werlin normally -- let me say this.
21   Does Mr. Werlin normally tell you when he is placing a
22   teacher on administrative leave?
23       A. Yes.
24       Q. Has it ever happened that you found out that a
25   teacher was placed on administrative leave and you had

Page 44

1    not been told?
2        A. I don't think so.
3        Q. You don't remember any such event?
4        MS. ANGELL: Objection. That's not what the
5    answer was.
6    BY MS. LARKINS:
7        Q. The answer was "I don't think so," and I'm
8    trying to clarify that answer.
9        When you say you don't think so, does that mean
10   you don't recall any such event?
11       A. A person could be put on administrative leave
12   without contacting me.
13       Q. So there might be -- so what you're saying is
14   that if there is any such case, you don't know about it?
15       A. Correct.
16       Q. Okay. How many times, to your knowledge, has
17   Richard Werlin placed teachers on administrative leave
18   due to anonymous allegations?
19       A. One.
20       Q. When Richard Werlin placed Maura Larkins on
21   administrative leave on February 12, 2001 due to
22   anonymous allegations, did you make any objection during
23   the meeting?
24       MS. ANGELL: Objection. Assumes facts not in
25   evidence; lacks foundation.

Page 45

1    BY MS. LARKINS:
2        Q. Were you at the meeting when Richard Werlin
3    placed Maura Larkins on administrative leave on February
4    12, 2001 due to anonymous allegations?
5        A. Yes.
6        MS. ANGELL: Objection. Assumes facts not in
7    evidence; lacks foundation.
8        MS. LARKINS: We'll go on.
9        Q. Did you speak during the meeting?
10       A. Yes.
11       Q. What did you say?
12       A. I objected to using anonymous complaints in that
13   our contract specifically says that anonymous complaints
14   will not be addressed by the district.
15       Q. Did you ever put your objection in writing?
16       A. I don't know.
17       Q. Okay. We can do a search for that document if
18   it exists.
19       MR. HERSH: Ms. Larkins, I'm going to caution
20   you on the record. It is not my intent to spend the day
21   here while you go through actions and conversations that
22   have nothing to do with this lawsuit. I'm giving you a
23   lot of latitude here; I'm trying to give you an
24   opportunity to put on your case and to ask questions that
25   are part of the discovery scope, but you haven't asked

12 (Pages 42 to 45)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

**Page 46**

1  one yet. And I'm just letting you know that there is a
2  certain point where my patience is going to go and I'm
3  going to suspend this hearing and seek a protective order
4  if you continue in this manner.
5      MS. LARKINS: Well, I've been waiting for that.
6      MR. HERSH: I've been trying to -- I've been
7  waiting you to ask questions that pertain to the matter
8  that brings us here.
9      MS. LARKINS: Okay.
10    Q. How important, in comparison to the other
11  problems you were working on in your position as
12  president of CVE, did you consider this problem with
13  Maura Larkins?
14    A. I felt it was a very serious problem.
15    Q. And what did you do about the problem?
16    A. We filed a grievance.
17    Q. When did you file the grievance?
18    A. It had to be within 30 days after the event.
19    Q. So it's your testimony that you filed a
20  grievance regarding February 12th?
21    A. You know what? Come to think of it, I think --
22  no, I don't think we did file a grievance about February
23  the 12th.
24    Q. Okay. About how long did that meeting last on
25  February 12th?

---

**Page 47**

1    A. Not very long. I'd say maybe half an hour to 45
2  minutes or so.
3    Q. Was Maura Larkins given any specifics at all of
4  the charges against her, like that she was charged with
5  doing anything specific?
6      MS. ANGELL: Objection. This line of
7  questioning is not calculated to lead to the discovery of
8  admissible evidence. These questions are going to causes
9  of action which have been dismissed to which demurrers
10  have been sustained without leave to amend.
11      The causes of action remaining in this lawsuit
12  are the first cause of action for conspiracy to slander
13  against Ms. Colls and Mr. Carlson, the second cause of
14  action for slander of Carlson, the third cause of action
15  for violation of Labor Code 432.7 as to Carlson, the
16  ninth cause of action for Labor Code 432.7(g) as to
17  Colls, and the tenth cause of action for violation of the
18  same Labor Code provision as to Mr. O'Neil, Ms. Watson,
19  CTA, CVEA, the educational association.
20    Accordingly, these questions are not calculated
21  to lead to the discovery of admissible evidence.
22      MS. LARKINS: Thank you.
23      MR. HERSH: And I would add they are related,
24  however, to another ongoing piece of litigation at the
25  Public Employment Relations Board where Ms. Larkins has

---

**Page 48**

1  claimed that we failed to properly represent her in a
2  variety of grievances that she believed should be
3  arbitrated.
4    And I view your questioning in this area as a
5  very conscious violation of the discovery statute in
6  order to misuse this court's proceedings to obtain
7  evidence that you believe will be useful to you in
8  another form. And I assure you that it is a very great
9  violation of the rules of discovery, and I'm just --
10  second notice.
11      MS. LARKINS: Thank you very much.
12    Q. Did you take notes at the February 12th meeting?
13    A. I'm quite sure I did.
14    Q. Do you know where those notes are?
15    A. I gave them to Michael Hersh if I had them.
16      MR. HERSH: If you had them. Thank you.
17  BY MS. LARKINS:
18    Q. Is it your habit and custom to take notes at
19  meetings when a teacher is called to the district's
20  office to speak with Mr. Werlin?
21    A. Yes.
22    Q. And do you take -- are you more careful about
23  taking notes, depending on how important the matter is?
24    A. Yes.
25    Q. So if a matter were especially important, you

---

**Page 49**

1  would be especially careful to take notes?
2    A. Yes.
3    Q. Did Maura Larkins ask what she was being accused
4  of having done at the meeting?
5    A. Yes.
6    Q. Was she told by Mr. Werlin what she was accused
7  of having done?
8    A. No.
9    Q. Did Mr. Werlin ask Maura Larkins to get a
10  fitness-for-duty letter from a doctor?
11    A. I believe he did.
12    Q. Is that legal?
13      MS. ANGELL: Objection. Calls for a legal
14  conclusion.
15  BY MS. LARKINS:
16    Q. Are you familiar -- are you quite familiar with
17  the Education Code?
18    A. Some of it.
19    Q. Are you familiar with the conditions under which
20  a school district may ask for a fitness-for-duty letter
21  from a doctor?
22    A. Some of them.
23    Q. Okay. Can a district ask for a fitness-for-duty
24  letter from a doctor on the basis of anonymous
25  allegations, according to the Education Code?

---

13 (Pages 46 to 49)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

Page 50

1    MS. ANGELL: Objection. Calls for a legal
2  conclusion.
3  BY MS. LARKINS:
4    Q. To your knowledge, does the Education Code --
5  excuse me. Strike that question.
6    Do you have a copy of the Education Code in your
7  office?
8    A. Yes.
9    Q. Do you -- have you been trained to -- have you
10  been trained to know common aspects of the Education Code
11  that arise in the course of your work as president of the
12  teachers association?
13    A. Some things.
14    Q. Have you been trained in how to deal with a
15  situation when a school district asks for a
16  fitness-for-duty letter from a doctor from a teacher -- a
17  fitness for duty -- have you been trained with how to
18  deal with a district when it asks a teacher for a
19  fitness-for-duty letter from a doctor?
20    MS. ANGELL: Objection. Vague and ambiguous.
21    MS. LARKINS: You may answer.
22    THE WITNESS: I'm trained to answer questions
23  that I know the answer to and trained to seek counsel or
24  advice from my executive director when I don't know the
25  answer.

---

Page 51

1  BY MS. LARKINS:
2    Q. Okay. Did you know the answer -- did you
3  believe that Mr. Werlin's request was within the scope --
4  was allowed by the Education Code when --
5    MS. ANGELL: Same objection.
6    MS. LARKINS: Thank you.
7    Q. Did you believe it -- that Mr. Werlin was within
8  his rights in asking for the fitness-for-duty letter?
9    A. I didn't think it was appropriate. I didn't
10  know -- whether it was in the Ed Code, I would have to
11  seek advice on that.
12    Q. Did you do any research on the matter?
13    A. After that, yes.
14    Q. What did you find?
15    A. I found that it was not appropriate for him to
16  ask for a fitness report.
17    Q. Was it legal?
18    MS. ANGELL: Objection. Calls for a legal
19  conclusion.
20    MR. HERSH: She's not an attorney.
21  BY MS. LARKINS:
22    Q. When you researched this question, did you find
23  anything in the Ed Code that forbade Mr. Werlin from
24  asking for a fitness-for-duty letter based on anonymous
25  complaints?

---

Page 52

1    MS. ANGELL: Objection. Calls for a legal
2  conclusion.
3    MS. LARKINS: Go ahead.
4    THE WITNESS: I didn't examine the Ed Code.
5  BY MS. LARKINS:
6    Q. What was your research that you did regarding
7  this matter?
8    A. Discussion with my executive director.
9    Q. Okay. What did Tim O'Neil tell you about the
10  legality of this request?
11    A. That it wasn't appropriate.
12    Q. From a legal standpoint?
13    MS. ANGELL: Objection. Calls for a legal
14  conclusion, and, objection; this line of questioning is
15  not calculated to lead to the discovery of admissible
16  evidence.
17  BY MS. LARKINS:
18    Q. I'm asking you what Tim said.
19    A. I'm sure that he -- well, I'm not sure that --
20    MS. ANGELL: Same objection.
21    THE WITNESS: My conclusion was that it was --
22  that you could not be required to present a fitness
23  report.
24    MS. LARKINS: Thank you.
25    Q. Did you give this information to Maura Larkins?

---

Page 53

1    A. I believe so.
2    Q. Did you put it in writing?
3    A. I don't know.
4    Q. Okay. Was there some discussion at this meeting
5  about Maura Larkins having emotional problems?
6    MS. ANGELL: Objection. Vague and ambiguous as
7  to time.
8  BY MS. LARKINS:
9    Q. Was there some discussion at the February 12th
10  meeting which we have been discussing that Maura
11  Larkins -- about Maura Larkins having emotional problems?
12    A. The discussion that I recall is that people were
13  afraid of Maura Larkins and that there was allegations
14  that there may be emotional problems.
15    Q. Thank you.
16    When Mr. Werlin places teachers on
17  administrative leave, does he ever discuss something
18  called due diligence?
19    MS. ANGELL: Objection. Not calculated to lead
20  to the discovery of admissible evidence.
21    THE WITNESS: I don't know.
22    MR. HERSH: Also, lack of foundation as to the
23  frequency with which Mr. Werlin puts people on leave.
24  You have asked other questions, but you didn't actually
25  ask her about that.

---

14 (Pages 50 to 53)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

Page 54

1   MS. LARKINS: Thank you.
2   Q. How often does Mr. Werlin place a teacher on
3   administrative leave?
4   A. I'm trying to think of how many times in --
5   maybe once a year.
6   Q. I believe you testified that you discussed with
7   Tim O'Neil whether or not the request for the
8   fitness-for-duty letter was appropriate. Did you discuss
9   with Tim O'Neil whether or not placing Maura Larkins on
10  administrative leave was itself appropriate?
11  A. Yes.
12  Q. What did Mr. O'Neil tell you?
13  A. The action was not considered discipline because
14  you were put on administrative leave with pay. Our
15  discussion revolved more around being able to get you
16  back -- Maura back into the classroom.
17  Q. So Tim' O'Neil felt that it was allowed by the
18  contract to place Maura Larkins on administrative leave
19  based on anonymous allegations?
20  MR. HERSH: I don't believe your question
21  accurately states the --
22  MS. Larkins: Okay. Let me withdraw that.
23  MR. HERSH: -- testimony.
24  BY MS. Larkins:
25  Q. Did Tim O'Neil say that the district was within

Page 55

1   its rights in placing Maura Larkins on administrative
2   leave based on anonymous allegations?
3   MS. ANGELL: Objection. Not calculated to lead
4   to the discovery of admissible evidence.
5   MR. HERSH: It calls for a compound -- it's a
6   compound question as well, so I'd object on that basis.
7   MS. LARKINS: Go ahead.
8   THE WITNESS: We did not consider that this was
9   a disciplinary action because it's not defined as
10  discipline when someone is sent home with pay, so --
11  BY MS. LARKINS:
12  Q. Was it legal?
13  MR. HERSH: Objection. This witness is not
14  competent to testify about something that is legal.
15  MS. LARKINS: I apologize. I keep asking that
16  same question, don't I?
17  MS. ANGELL: Join.
18  BY MS. LARKINS:
19  Q. Did Tim O'Neil say -- this really is a yes or no
20  question. Did Tim O'Neil say that the district was in
21  its rights -- was within its rights when placing Maura
22  Larkins on administrative leave on the basis of anonymous
23  allegations?
24  A. I don't believe we addressed that as far as
25  legality went.

Page 56

1   MS. LARKINS: I'm going to try to bring our
2   exhibit list kind of up to date.
3   MR. HERSH: Up to date meaning?
4   MS. LARKINS: Up to date of our discussion here.
5   We are now talking about what --
6   MR. HERSH: Is it your intent to ask any
7   question of this witness concerning September of 2000 and
8   her wrongful receipt or possession of criminal justice
9   information pertaining to you?
10  MS. ANGELL: Other than the question already
11  asked about whether or not she had ever been told by
12  anyone that the plaintiff possessed a handgun.
13  MS. LARKINS: I don't think it's appropriate for
14  us to be having this discussion.
15  MR. HERSH: I think it's appropriate to have a
16  discussion because we are here for a reason. You have a
17  legal right to depose this witness concerning matters
18  that are in the sixth amended complaint that have
19  survived the demurrer, but your questioning for the last
20  hour and a half has not been concerning the allegations
21  contained in the complaint, nor -- and I'm a very
22  open-minded person. I haven't heard one yet that would
23  lead to evidence that would support the allegations in
24  your complaint or other lawful purposes for discovery.
25  MS. LARKINS: Thank you.

Page 57

1   Q. To your recollection, what developed next after
2   Maura Larkins was placed on administrative leave? In
3   fact -- no. Let me ask this question first.
4   Did you ever -- at this February 12 meeting, did
5   Maura Larkins complain that she had been harassed?
6   A. Probably. I think so.
7   Q. Did Maura Larkins point out to Richard Werlin
8   that these charges against her, these anonymous charges
9   against her, had come 20 days after she complained about
10  being harassed?
11  A. I don't remember that.
12  Q. Were you at all concerned that Maura Larkins was
13  being harassed?
14  A. Yes.
15  Q. What did you do about that?
16  MR. HERSH: At what point in time are we talking
17  about?
18  MS. LARKINS: After February 12th.
19  Q. When Ms. Larkins was placed on administrative
20  leave due to these complaints and Maura Larkins pointed
21  out that these complaints had come right after she had
22  complained about harassment, did you investigate the
23  harassment?
24  A. Of Maura Larkins?
25  Q. Yes.

15 (Pages 54 to 57)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004

---

Page 58

1    A. No
2        MR. HERSH: I'm going to instruct the witness
3    not to answer these questions at this point. These are
4    outside the scope of permitted discovery. They are
5    designed to elicit information pertaining to a separate
6    legal matter before the Public Employment Relations Board
7    which has exclusive jurisdiction over those matters.
8        And please don't answer those questions.
9        MS. LARKINS: Well, what I need to do now is I
10   need to decide whether I want to suspend this deposition
11   or to continue it in light of your telling your client
12   not to answer these questions.
13       Would you be willing to take a break for a
14   little while I make that decision?
15       MR. HERSH: Absolutely.
16       MS. ANGELL: Sure.
17       VIDEOGRAPHER: We're going off the record. The
18   time is 11:42 a.m.
19       (Recess taken.)
20       VIDEOGRAPHER: We're going on the record. The
21   time is 11:55 a.m.
22       MS. LARKINS: I have decided to suspend the
23   deposition in order to seek a motion to compel testimony.
24   So --
25       MR. HERSH: I have a statement to make as well.

---

Page 59

1        MS. LARKINS: Okay.
2        MR. HERSH: Are you done?
3        MS. LARKINS: Yes.
4        MR. HERSH: I just would like the record to
5    reflect that the deponent and her attorney, and as far as
6    I know the other attorneys in this room, are perfectly
7    willing to allow this deposition to proceed if you're
8    asking questions that are pertinent to the case that
9    brings us here and within the scope of discovery, but you
10   have clearly attempted to misuse this proceeding to
11   obtain discovery concerning matters that have nothing to
12   do with this case; that have to do with other legal
13   actions that you have brought against the association,
14   the Chula Vista Educators Association and the California
15   Teachers Association, and I believe that is a misuse of
16   the discovery statute.
17       MS. LARKINS: Anybody else?
18       MS. ANGELL: Mrs. Larkins, do you have any
19   questions related to the receipt of a record of arrest or
20   information contained in a record of arrest which did not
21   result in conviction for this witness?
22       MS. LARKINS: That sounds like a rhetorical
23   question to me, and I've already said that I'm suspending
24   this deposition.
25       MS. ANGELL: Could you answer the question as to

---

Page 60

1    whether or not you have any questions along that line?
2    Because we can stay here and answer those questions at
3    this time.
4        MS. LARKINS: I don't think we should -- it's
5    obviously a rhetorical question and there is no point in
6    discussing it.
7        MR. HERSH: It's an accurate statement of all of
8    our positions; we are happy to remain here and allow you
9    to ask questions that are pertinent to the dispute at
10   hand and within the scope of discovery. But you have
11   indicated that you would prefer to suspend the deposition
12   and I respect that.
13       VIDEOGRAPHER: This concludes today's
14   deposition. We are going off the record. The time is
15   11:57 a.m.
16       (Discussion off the record.)
17       VIDEOGRAPHER: We're going on the record. The
18   time is 11:58 a.m.
19       MR. HERSH: Thank you. While we were off the
20   record the parties discussed how we would handle the
21   transcript of this proceeding -- and if I am not
22   accurately stating this, will someone indicate that in
23   the room.
24       My understanding is that Ms. Larkins and the
25   other attorneys present have agreed that we will ask the

---

Page 61

1    court reporter to provide us the original of the
2    transcript of this day's proceedings to me so that I can
3    have Ms. Boyd review it, and that at that time we will, I
4    believe, serve the other parties with a copy of that
5    transcript or the notice of changes, if any.
6        MS. ANGELL: In the event that the original
7    cannot be located or found or goes unsigned, a certified
8    copy of this document will stand in as evidence of the
9    testimony given here today and have the same full effect
10   as if it were a signed original.
11       MR. HERSH: That's fine with me.
12       MS. GAVIN: So stipulated.
13       MS. LARKINS: Fine with me.
14       VIDEOGRAPHER: This is the conclusion of today's
15   deposition. The time is 11:59 a.m. We're off the
16   record.
17           * * * * *

---

16 (Pages 58 to 61)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
March 22, 2004



Page 62

1       I, VIRGINIA BOYD, swear under penalty of perjury
2    that I have read the foregoing, and that it is true and
3    correct, to the best of my knowledge and belief.
4       Signed on this      day of         , 2004, at
5
6       (City)           (State)
7
8
9             VIRGINIA BOYD
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 63

1
2    STATE OF CALIFORNIA  )
                          ) ss.
3    COUNTY OF SAN DIEGO  )
4
5       I, T. A. Martin, a Certified Shorthand Reporter,
     Certificate No. 3613, do hereby certify that the witness
6    in the foregoing deposition was by me first duly sworn to
7    testify to the truth, the whole truth, and nothing but
8    the truth in the foregoing cause; that the deposition was
9    then taken before me at the time and place herein named;
10   that said deposition was reported by me in shorthand, and
11   then transcribed through computer-aided transcription
12   under my direction, and that the foregoing transcript
13   contains a true record of the testimony of said witness.
14      I do further certify that I am a disinterested
15   person and am in no way interested in the outcome of this
16   action, or connected with or related to any of the
17   parties in this action or to their respective counsel.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19   on this 7th day of April, 2004.
20
21
22   T. A. MARTIN
     Certificate No. 3613
23
24
25

17 (Pages 62 to 63)

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN DIEGO


MAURA LARKINS,                              *
                                            *
                                            *
                Plaintiff,                  *
                                            *
        vs.                                 *     Case No. GIC 781970
                                            *
RICHARD T. WERLIN, etc.,                    *
et al.,                                     *
                                            *
                Defendants.                 *
                                            *


VIDEOTAPED DEPOSITION OF VIRGINIA BOYD
Taken at San Diego, California
October 11, 2004

VOLUME II

(Pages 64 through 258, inclusive)


Claudia A. Witt, CSR                    COMPLIMENTARY
Certificate No. 10797

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 65

1                   I-N-D-E-X
2   VIDEOTAPED DEPOSITION OF VIRGINIA BOYD          PAGE
3       October 11, 2004 - Volume II
4       Examination by Ms. Larkins            70
5
6   PLAINTIFF's EXHIBITS:                   PAGE
7    3  Ms. Larkins' file on Appeal to the    70
        Public Employment Relations Board, 366
8
9    4  Handwritten notes, one page            72
10   5  Memo from Ms. Larkins to Mr. O'Neill   95
        dated 12-9-02, two pages
11
12   6  San Diego Union Tribune article dated  113
        9-2-04, two pages
13   7  Star News article, two pages           118
14   8  Letter from Mr. Werlin to Ms. Larkins  128
        dated 4-4-01, one page
15
16   9  Handwritten notes, one page            139
17  10  Summary Evaluation Report dated 4-28-00,  140
        three pages
18  11  Grievance Report Form, Level II dated  152
        5-22-01, one page
19
20  12  Grievance Report Form, Level II dated  152
        5-22-01, one page
21  13  Memo from Maura to Gina and Tim dated  159
        5-30-01, one page
22
23  14  Letter from Mr. Werlin to Ms. Boyd     168
24      dated 6-18-01, two pages
25  15  Disposition notice dated 2-7-03, one   189
        page

Page 66

1                I-N-D-E-X (Continued)
2   PLAINTIFF'S EXHIBITS               PAGE
3   16  Memo from Ms. Larkins to Ms. Boyd dated  202
        6-5-01, one page
4
5   17  Memo from Ms. Boyd to Ms. Larkins dated  203
        6-21-01, one page
6   18  Letter from Mr. O'Neill to Ms. Gil dated  207
        7-18-01, one page
7
8   19  Letter from Ms. Gil to Mr. O'Neill dated  207
        7-26-01, one page
9   20  Memo from Ms. Larkins to Ms. Boyd dated  216
        3-24-01, two pages
10
11  21  Memo from Ms. Larkins to Mr. Werlin      219
        dated 3-24-01, one page
12  22  Memo from Ms. Larkins to Ms. Boyd dated  220
        3-26-01, one page
13
14  23  Handwritten notes, two pages             220
15  24  Memo from Ms. Larkins to Ms. Boyd dated  221
        3-27-01, one page
16  25  Handwritten note dated 3-28-01, one      223
        page
17
18  26  Handwritten note dated 3-28-01, one      224
        page
19  27  San Diego Union Tribune article with     227
        handwritten notes dated 5-28-01, one page
20
21  28  Memo from Ms. Larkins to Ms. Boyd        229
        dated 6-20-01, one page
22
23  29  Memo from Ms. Larkins to Mr. O'Neill     230
        dated 6-20-01, one page
24  30  Memo from Ms. Larkins to Ms. Boyd dated  232
        6-21-01, one page
25

Page 67

1              I-N-D-E-X (Continued)
2   PLAINTIFF'S EXHIBITS                    PAGE
3   31  Memo from Ms. Larkins to Ms. Boyd dated  233
        6-5-01, one page
4
5   32  Memo from Ms. Larkins to Ms. Boyd dated  235
        8-2-01, one page
6   33  Handwritten notes, one page              238
7   34  Memo from Maura to Gina dated 8-2-01,    241
        one page
8
9
10  DEFENDANTS' EXHIBIT                     PAGE

11   A  Letter from Mr. Hersh to Ms. Larkins     71
        dated 9-8-04, two pages
12
13  INSTRUCTION NOT TO ANSWER:        LINE/PAGE
14                                    23 115
                                      18 117
15
16
17
18
19
20
21
22
23
24
25

Page 68

1   VIDEOTAPED DEPOSITION OF VIRGINIA BOYD
2                   VOLUME II
3       Pursuant to Notice to Take Deposition, and on the 11th
4   day of October, 2004, commencing at the hour of 9:58 a.m. at
5   319 Elm Street, Suite 100, in the City and County of San Diego,
6   State of California, before me, Claudia A. Witt, Certified
7   Shorthand Reporter in and for the State of California,
8   personally appeared:
9              VIRGINIA BOYD,
10  Witness herein, who, called as a witness by the Plaintiff,
11  being by me first duly sworn, was thereupon examined as a
12  witness in said cause.
13
14              APPEARANCES
15  For the Plaintiff:  MAURA LARKINS
                        1935 Autocross Court
                        El Cajon, California 92019
16                      (In Propria Persona)
17  For Chula Vista    CALIFORNIA TEACHERS ASSOCIATION
    Educators,    By:  MICHAEL HERSH, ESQ.
18  California Teachers  Post Office Box 2153
    Association,       11745 East Telegraph Road
19  Virginia Boyd and  Santa Fe Springs, California 90670
    Timothy O'Neill:   (562) 942-7979
20
21  For Robin Donlan   STUTZ, ARTIANO, SHINOFF & HOLTZ
    and Linda Watson:  By:  KELLY R. ANGELL, ESQ.
22                     401 West A Street, 15th Floor
                       San Diego, California 92101
23                     (619)232-3122
24  Also present:    Gregg Eisman, Videographics
                     Jackie Robinson, Law Clerk
25

2 (Pages 65 to 68)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

Page 69

1       THE VIDEOGRAPHER: This is the video deposition of
2   Virginia Boyd, Volume II, being taken on behalf of the
3   plaintiff in the matter of Maura Larkins versus Richard T.
4   Werlin, et cetera, et al., San Diego Superior Court case No.
5   GIC 781970. This deposition is being held in the offices of
6   San Diego Court Reporting, located at 319 Elm Street, Suite
7   100, San Diego, California. Today is Monday, October 11th,
8   2004, and the time is now 9:58 a.m. My name is Gregg Eisman.
9   I'm a legal video specialist with VideoGraphics, located at
10  1903 30th Street, San Diego, California. The certified
11  shorthand reporter is Claudia Witt of San Diego Court
12  Reporting, San Diego, California.
13      For the video record, would counsel please state
14  their appearances.
15      MS. LARKINS: I'm Maura Larkins, plaintiff in pro
16  per.
17      MR. HERSH: Michael Hersh on behalf of the
18  Association defendants and defending the deposition.
19      MS. ANGELL: Kelly Angell for Robin Donlan and
20  Linda Watson.
21      THE VIDEOGRAPHER: Would the reporter please swear
22  in the witness.
23      (At this point, the deponent was placed under oath
24      by the court reporter.)
25  ///

---

Page 70

1   EXAMINATION BY MS. LARKINS:
2       Q.  Good morning, Ms. Boyd. How are you feeling
3   today?
4       A.  Busy.
5       Q.  Do you feel that you can give your best testimony
6   today?
7       A.  Yes.
8       Q.  Okay. The first thing I'd like to do is I'd like
9   to mark as exhibit -- well, let's call this Exhibit 3 because
10  I believe there were two exhibits already entered in this
11  deposition the last time we met. So let's call it Exhibit 3,
12  and this is the appeal to the Public Employment Relations
13  Board regarding decision LA-C0-1091-E, which was my charge
14  against Chula Vista Elementary Education Association. Okay.
15      (Plaintiffs' Exhibit No. 3 was marked for
16      identification.)
17      MR. HERSH: Could I make a preliminary statement
18  here? I thought -- let me just say that because I think it's
19  a good time in light of the exhibit, there was an exchange on
20  September 8th between Ms. Larkins and myself, and I would ask
21  that we make this an exhibit, except I only have -- oh, no, I
22  have both. And essentially there was an exchange. I
23  expressed concerns about the scope of the deposition and the
24  discovery that Ms. Larkins was attempting to conduct, and
25  Ms. Larkins responded with a fax that said, "I also need to

---

Page 71

1   question Ms. Boyd regarding obstruction of justice,
2   specifically, violations of Penal Code Section 136.1," which
3   I don't have a problem with because that is part of the other
4   lawsuit that she has. And she wants to question her about
5   her illegal -- illegal receipt of records of the arrest which
6   of course is why we're here. But this is what I believe this
7   deposition is about, and Ms. Boyd is not here as a -- through
8   the compulsion of the law. She's here voluntarily to allow
9   you to ask these questions. So I just want to remind you
10  what we're here for because it has nothing to do with your
11  PERB appeal.
12      MS. LARKINS: What are we going to call this
13  exhibit?
14      MR. HERSH: You can call it 3 if you want.
15      MS. LARKINS: Well, I called this 3.
16      MR. HERSH: Oh, call it "A."
17      (Defendants' Exhibit A was marked for
18      identification.)
19  BY MS. LARKINS:
20      Q.  Okay. I became convinced that you had illegally
21  received records of my arrest as a result of events which
22  happened regarding my employment at Chula Vista Elementary
23  School District. All my evidence regarding your guilt in
24  this matter comes out of events related to my employment in
25  Chula Vista Elementary School District. I'm happy with the

---

Page 72

1   evidence that I have and I'm convinced by it, but what I
2   would really like to find out today is any alternative
3   explanation that you might have for the events that led to my
4   dismissal from Chula Vista Elementary School District apart
5   from your receipt of records of my arrest. I just want to
6   try to understand this case from the point of view of -- from
7   your point of view.
8       Okay. I'd like to enter as Exhibit 4 some notes
9   that I myself took -- I can put a little 4 on this -- in
10  1999.
11      MS. ANGELL: Excuse me. Is there a copy for me?
12      MS. LARKINS: Sure.
13      MS. ANGELL: Thanks.
14      And is there a copy for me of Exhibit 3?
15      MS. LARKINS: No, sorry. I don't have that, but I
16  have served it on you already. It's my PERB appeal which was
17  served to you quite recently, big box.
18      (Plaintiffs' Exhibit No. 4 was marked for
19      identification.)
20  BY MS. LARKINS:
21      Q.  Okay. Could you read the heading on this
22  Exhibit 4, Ms. Boyd.
23      A.  Notes taken at 3:00 o'clock to 3:30, Gretchen,
24  Maura and --
25      Q.  Maria?

---

3 (Pages 69 to 72)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 73

1    A.  And Maria --
2    Q.  Does that look like Maria?
3    A.  -- in G's office.
4    Q.  And what is the date?
5    A.  It's 5-6-99.
6    Q.  Okay.  And could you read what the note says.
7  It's just a few sentences.
8    A.  "When I found out there might be a problem with
9  Rick's credential, I thought Maura wanted to switch with
10  Stephanie.  I thought she hasn't liked the 3rd grade team.
11  (Someone else might team more with the other 3rd grade
12  teacher.)  Gina might come.  Actually Gretchen asked Rick
13  about third last week and again."
14    Q.  Okay.  The part of this document I'm most
15  interested in is this second-to-the-last sentence that says
16  "Gina might come."  Obviously, these are all quotes from
17  Gretchen, and she said that you might come to a meeting that
18  day.  Did you talk to anyone in 1999 about the 3rd grade
19  teachers at Castle Park?
20    A.  I would presume that I did.
21        MR. HERSH:  If you don't know or you don't
22  remember, that's the correct answer.
23  BY MS. LARKINS:
24    Q.  Okay.  And are you aware that one of the 3rd grade
25  teachers was Linda Watson at Castle Park?

Page 74

1    A.  Yes, I know that Linda's a 3rd grade teacher.
2    Q.  Okay.  So this document indicates that you must
3  have talked to either Gina or Linda?
4    A.  I am Gina.
5    Q.  I mean -- I mean Gretchen.  I get -- I'm sorry,
6  Gretchen or Linda.  Would you believe that is likely?
7    A.  No.
8    Q.  How do you think anybody would have got the idea
9  that you were coming to a meeting at Castle Park School?
10        MS. ANGELL:  Objection.  Calls for speculation.
11  Vague and ambiguous as to time.
12  BY MS. LARKINS:
13    Q.  Let me think.  Did you go to any meetings at
14  Castle Park School before the year 2000 -- no.  Did you go to
15  any meetings at Castle Park School when Gretchen Donndelinger
16  was the principal before the year 2000?
17    A.  Yes.
18    Q.  Did you go to several meetings with Gretchen
19  Donndelinger during that time?
20        MR. HERSH:  What is the period of time again?
21        MS. LARKINS:  Well, starting when Gretchen
22  Donndelinger became principal and then ending before the year
23  2000.
24        THE WITNESS:  I've been to several meetings with
25  Gretchen.

Page 75

1  BY MS. LARKINS:
2    Q.  Did you -- do you recall saying to me that
3  Gretchen had difficulty dealing with conflict?
4    A.  Yes, I believe I did.
5    Q.  Did Robin Donlan ask you to come to help her deal
6  with Gretchen at Castle Park?  She was Robin Colls then?
7        MS. ANGELL:  Objection.  Vague and ambiguous as to
8  time.
9        MS. LARKINS:  During the time that Gretchen was
10  principal but before the year 2000.
11        MS. ANGELL:  Objection.  Vague and ambiguous.  I
12  think the question was did Robin Donlan ask you to come.
13  Come to what, when, where?  For purposes of reading back the
14  record it's going to be hard to understand.
15  BY MS. LARKINS:
16    Q.  Okay.  Let's just try this one more time, and then
17  I'm going to ask you to answer the question.  Okay?  So even
18  when they object, try to still remember the question.
19    Q.  During the time Gretchen Donndelinger was
20  principal at Castle Park did Robin Colls, now Robin Donlan,
21  ask you to come to Castle Park to meet with Robin and
22  Gretchen regarding problems that had nothing to do with Maura
23  Larkins?
24    A.  I don't know.
25    Q.  Is it your opinion that Gretchen Donndelinger had

Page 76

1  difficulty dealing with conflict?
2    A.  Yes.
3    Q.  Can you tell me how you came to have that opinion?
4    A.  She didn't deal with conflict.  She ignored it.
5    Q.  Can you give me an example of a situation that
6  caused you to believe this?
7    A.  Yes.
8    Q.  What was that?
9    A.  Well, I was the -- well, advocating for a teacher.
10  There was a problem with a parental complaint, and rather
11  than handling it properly Gretchen tried to ignore it which
12  caused it to become bigger than it needed to.
13    Q.  Did Karen Snyder ask you to come and help deal
14  with problems at Castle Park when Gretchen was principal of
15  Castle Park, problems that had nothing to do with me?
16        MS. ANGELL:  Objection.  Not reasonably calculated
17  to lead to the discovery of admissible evidence.
18        THE WITNESS:  I have advocating for Karen, but I
19  don't know whether it was when Gretchen was there.
20  BY MS. LARKINS:
21    Q.  Okay.  Okay.  So if you had talked to Gretchen or
22  Linda Watson about me before the year 2000, do you think you
23  would remember it?
24    A.  To -- to Gretchen or Linda Watson?  I didn't talk
25  to Linda Watson.  About you, is that the question?

4 (Pages 73 to 76)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

Page 77

1  Q. If you had talked to them about me, would you
2  remember it?
3  A. I think I would.
4  Q. Okay. Do you have any memories of talking to
5  Linda Watson or Gretchen about me before February 12th, 2001,
6  the day that I was removed from my classroom?
7  A. No, I didn't have any discussions with them.
8  Q. Okay. You sound quite certain of that.
9  A. I'm very certain of that.
10  Q. Okay. Did you ever meet me before February 12th,
11  2001?
12  A. I may have in a group setting, but I hadn't in a
13  private setting as that was.
14  Q. Okay. What group setting do you think it might
15  have been?
16  A. Well, I visit all of the schools every year.
17  Q. So it could have been at the school.
18  A. Uh-huh.
19  Q. Anyplace else?
20  A. No.
21  Q. You're quite sure.
22  A. I'm quite sure.
23  Q. Okay. When you met me on February 12th, 2001,
24  what was your understanding of my problem?
25  A. My understanding is that you had been directed to

---

Page 78

1  meet at the district office with the assistant superintendent
2  of human resources.
3  Q. And what was your understanding of why I had been
4  directed to attend a meeting?
5  A. You were -- I -- you know what, I think that we
6  were there to find out why you were directed to the district
7  office.
8  Q. And what did you find out at that meeting?
9  A. At that meeting Richard -- Richard Werlin
10  expressed that more than one person had called him over the
11  weekend to say that they were concerned about their well
12  being because of Maura Larkins.
13  Q. Okay. So you understand that more than one person
14  expressed a concern. Was Mr. Werlin specific that it was two
15  teachers who called him?
16  A. I believe he did say two.
17  Q. And what did you understand that their concern was
18  based on? On what was their concern based?
19  MS. ANGELL: Objection. Calls for speculation.
20  And as to the prior characterization that it was two
21  teachers, the witness didn't testify to that. She said two
22  persons or people or employees or something. She didn't say
23  teachers.
24  BY MS. LARKINS:
25  Q. Okay. Let's do that one again. Is your

---

Page 79

1  understanding that Mr. Werlin said that two teachers had
2  called him?
3  A. I don't remember.
4  Q. Okay. Now, you said I believe he did say two.
5  Two -- what did you mean by two? Two what?
6  A. People.
7  Q. Two people. Okay. Two people had called him.
8  Okay. Now, I'm not asking you to speculate. I'm
9  asking you to recall what Mr. Werlin said. Did Mr. Werlin
10  say why these people -- these two people were concerned?
11  A. Just your behavior. They felt threatened by you.
12  Q. Did he say they feared for their lives?
13  A. I believe he did say that.
14  Q. Were you curious as to what my behavior might have
15  been that caused them to fear for their lives?
16  A. I guess.
17  MR. HERSH: If you can just -- don't guess. If
18  you just honestly state -- if you don't know, just honestly
19  state that.
20  THE WITNESS: I don't know.
21  BY MS. LARKINS:
22  Q. Okay. Were you -- did you already know what their
23  concern was based on?
24  A. No.
25  Q. And you don't know why you weren't -- and yet you

---

Page 80

1  weren't driving the curious about what could cause teachers
2  to feel that another teacher might kill them?
3  MS. ANGELL: Objection. Argumentative.
4  BY MS. LARKINS:
5  Q. Okay. Did Mr. Werlin explain why these two
6  teachers feared for their lives?
7  A. He said there would be an investigation and put --
8  placed you on leave. I believe the investigation was to find
9  out why they felt fearful.
10  Q. And what -- what were the results of his
11  investigation?
12  A. He didn't share the results of his investigation
13  with me.
14  Q. Were you curious about it, the results of his
15  investigation?
16  A. I don't know whether he ever completed it, frankly.
17  Q. Did you ask him?
18  A. No.
19  Q. Were you concerned about the safety of teachers at
20  Castle Park?
21  A. I'm concerned about the safety of all my teachers.
22  Q. How many other teachers have told you that they
23  were afraid that another teacher would kill them?
24  MS. ANGELL: Objection. Misstates the prior
25  testimony. There's no testimony that a teacher told Ms. Boyd

---

5 (Pages 77 to 80)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

Page 81

1  that they feared that a teacher would kill them.
2  BY MS. LARKINS:
3      Q.  Well, let's find out about that.
4      Did any teacher ever tell you that he or she
5  feared that I might kill him or her?
6      A.  No.
7      Q.  Okay.  Did you think there might be any truth to
8  the teachers' -- or the -- these two persons' statements that
9  I had behaved in a way that would seem to threaten their
10  lives?  Did you believe that I had actually behaved in a way
11  that threatened somebody's life?
12      MS. ANGELL:  Objection.  Can we have one question
13  at a time just because it's going to be really hard to read
14  back the record later.  There were two questions there with
15  no answer.
16  BY MS. LARKINS:
17      Q.  Okay.  Let's not read back the record.  Let me
18  just start with a new question.
19      Did you believe that I had behaved in a manner
20  that threatened the lives of others?
21      MR. HERSH:  At the February 12th, 2001 meeting are
22  we --
23      MS. LARKINS:  Yes, thank you.
24      THE WITNESS:  No, I didn't.
25  ///

---

Page 82

1  BY MS. LARKINS:
2      Q.  Did you think that these two people had lied?
3      A.  No.
4      Q.  Well, if you didn't think I had threatened them
5  and you didn't think they had lied, what did you think?
6      A.  I believed that two people had called Rick Werlin
7  and expressed that your behavior was causing them to be
8  afraid.
9      Q.  Did you believe they had reason to be afraid?
10      MS. ANGELL:  Objection.  What she believed is not
11  relevant.
12      MS. LARKINS:  I believe it's very relevant.
13      Q.  Did you believe that they had reason to be afraid?
14      A.  At that time, no.
15      Q.  At any other time did you believe they had reason
16  to be afraid?
17      A.  During the investigation?
18      Q.  At any time ever.  Did you ever believe that
19  anyone had reason to be afraid of me --
20      MR. HERSH:  Objection.
21      MS. LARKINS:  -- physically?
22      MR. HERSH:  Overly broad.  Calls for, you know, an
23  answer that has possibly nothing to do -- you need to tie it
24  in to the time frame that --
25      MS. LARKINS:  Well, Mr. Hersh, if she -- I think

---

Page 83

1  this is very relevant.  If she ever had some reason to think
2  that I would kill somebody, I think we should know about it.
3      MR. HERSH:  I don't think it's part of this case.
4      MS. LARKINS:  Okay.  Well, let's let the judge
5  decide that.
6      Q.  Have you ever had any reason to think that I might
7  kill someone?
8      MS. ANGELL:  Objection.  Calls for --
9      THE WITNESS:  My teachers were afraid of you.
10      MS. ANGELL:  Excuse me.  Let me get the objection
11  out.
12      THE WITNESS:  Okay.
13      MS. ANGELL:  Calls for expert testimony, and this
14  witness is not qualified to be an expert as to psychological
15  issues.  As -- insofar as the witness would state her own lay
16  opinion based on items that she's witnessed herself, I would
17  have no objection other than that the question is not
18  relevant and that it calls for speculation.  Sorry.
19  BY MS. LARKINS:
20      Q.  Do you want me to repeat it as well as I can or do
21  you remember?
22      A.  My concern wasn't whether I was thinking that
23  people should be afraid of you.  My concern was that my
24  people were afraid of you, and how they came to -- to have
25  that sense about them, I really don't have any purview over

---

Page 84

1  that.
2      Q.  Okay.  It seems to me that if you believed that I
3  might actually kill someone, that that would affect your
4  behavior.
5      MR. HERSH:  Argumentative.  Not a question.
6  BY MS. LARKINS:
7      Q.  Right.  I'm just kind of helping to set some
8  background so you can understand my question better.  See,
9  because of your behavior I have filed a complaint against
10  you.
11      A.  Uh-huh.
12      Q.  If there is any explanation for your behavior
13  other than the explanation I have given in my complaint, I
14  want to know about it.  I don't want to be surprised in
15  court.
16      MR. HERSH:  If I may object, when you talk about
17  her behavior, you're talking as you have in the past about a
18  three and a half year course of conduct?  Is that what you
19  want her to sit here and explain today, every determination
20  and decision that she made over three and a half years?
21      MS. LARKINS:  I want her to explain to me why she
22  helped my accusers and contributed to my being illegally
23  taken out of the classroom, why she supported the district in
24  violating the contract time and time again.  Obviously, I
25  don't have time to discuss every single thing she did over

---

6 (Pages 81 to 84)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

**Page 85**

1  the past three and a half years, but as a matter of fact,
2  even her recent behavior I believe shows evidence of guilt.
3  For example, the fact that this deposition was stopped after
4  an hour and a half the last time we met because you didn't
5  want to answer questions.
6      MR. HERSH: Okay. That's not accurate. You
7  stopped the deposition. We were happy to sit here and allow
8  you to continue asking relevant questions, but you
9  unilaterally suspended the deposition because I instructed
10  the witness not to answer. You didn't have to do that. You
11  chose to do that.
12      MS. ANGELL: I'd like to note for the record that
13  there's no question to the witness pending.
14      MS. LARKINS: Okay. You made it clear in the last
15  deposition that you did not want your client to answer
16  questions regarding the Chula Vista Educators Association and
17  the California Teachers Association, that you did not want
18  questions about my employment at Chula Vista elementary
19  schools, that you wanted to have questions about --
20  apparently about the -- about things which have nothing to do
21  with this case. You wanted --
22      MR. HERSH: You mean what you said in your
23  complaint? That's what -- that has nothing to do with the
24  case that you -- you allege that she wrongfully possessed and
25  received criminal justice information. You spent an hour and

---

**Page 86**

1  a half asking her about how she represented you in grievance
2  proceedings. You never asked one question about her alleged
3  actions that you claim without any evidence in your complaint.
4      MS. LARKINS: All my evidence rests on events at
5  Chula Vista Elementary School District. I have no knowledge
6  of anything that Gina Boyd did outside of her relationship
7  with me and other teachers at Chula Vista Elementary School
8  District. I have no case except for Gina Boyd's -- the
9  manner in which she represented me and other teachers.
10      MR. HERSH: Well, I'm going to not -- I'm
11  objecting. You know, I'll have a standing objection as I did
12  last time, and I'm going to let you ask a bunch of questions,
13  and then we're going to have lunch and go home. Because if
14  you don't have any questions that are relevant to the two
15  causes of action that you currently have going, the one
16  concerning the wrongful possession in September of 2000, and
17  you don't have any questions about February or March of 2002
18  when you claim that Doe defendants harassed you by causing a
19  federal prosecutor to issue a grand jury subpoena and serve
20  it upon you, then there's really no reason to be here.
21      MS. LARKINS: Okay. Let's do it that way then.
22      Q. Okay. Why did you allow me to be taken out of my
23  classroom on February 12th, 2001?
24      A. I didn't allow you. That was a judgment that was
25  made by the assistant superintendent of human resources, and

---

**Page 87**

1  I do not have any authority over his decisions.
2      Q. Why did you not object during that meeting?
3      A. Because he said that -- that other people felt
4  that they were in danger, because he sent you home with pay
5  and so there was no discipline -- disciplinary action taken.
6      Q. Did he ask for a fitness for duty letter from a
7  doctor?
8      MS. ANGELL: In the February 12th, 2001 meeting?
9      MS. LARKINS: In the February 12th, 2001 meeting?
10      THE WITNESS: I don't remember.
11  BY MS. LARKINS:
12      Q. Okay. We did discuss that last time, and we had
13  it pretty well established that he did.
14      A. Okay.
15      MS. ANGELL: Objection. Plaintiff's testifying.
16  BY MS. LARKINS:
17      Q. Did you have any concern that I might have been
18  falsely accused by these two people?
19      MS. ANGELL: Vague and ambiguous as to time.
20      MS. LARKINS: On February 12th, 2001.
21      THE WITNESS: That they might be what?
22  BY MS. LARKINS:
23      Q. Might have falsely accused me of having behaved in
24  a threatening manner.
25      A. Yeah, I thought they could.

---

**Page 88**

1      Q. And you believe that the district has a right to
2  take a person out of their classroom on the -- oh, were these
3  two people named by Mr. Werlin?
4      A. No.
5      Q. So these allegations were anonymous?
6      A. Yes.
7      Q. And did he say any specifics of what I was
8  having -- accused of having done?
9      A. No.
10      Q. So these were vague and anonymous allegations.
11  Basically they -- did you -- did you have the understanding
12  that perhaps they had given him more information than he gave
13  us at that meeting?
14      MS. ANGELL: Objection. Are we -- is the answer
15  going to be to the very last question that was answered or
16  the several questions before that?
17  BY MS. LARKINS:
18      Q. Let me ask a question again.
19      Did you have the feeling that on February 12th,
20  2001 when Mr. Werlin failed to give any specifics of what I
21  was accused of having done, that he actually had received
22  specifics from these two people who called on the phone but
23  just wasn't sharing them?
24      A. I don't -- I don't think he told us what they said
25  to him. He just expressed that they were fearful.

---

7 (Pages 85 to 88)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

**Page 89**

1 Q. And as far as you understood, they had not been
2 specific to him either?
3 A. I don't know.
4 Q. Does it matter to you?
5 MS. ANGELL: Objection. Relevance.
6 MR. HERSH: What do you mean by matter?
7 THE WITNESS: I don't know.
8 BY MS. LARKINS:
9 Q. Do you approve of a teacher being taken out of her
10 classroom on the basis of anonymous, vague allegations?
11 MS. ANGELL: Are you referring to paid -- being
12 placed on paid administrative leave?
13 MS. LARKINS: I'll just leave my question the way
14 it is.
15 THE WITNESS: No.
16 BY MS. LARKINS:
17 Q. Why did you not immediately file a grievance when
18 this happened?
19 A. There was no negative impact.
20 MR. HERSH: And also assumes facts not in evidence
21 that the behavior you're complaining of was a violation of
22 the contract.
23 MS. ANGELL: And the question is vague and
24 ambiguous as to taken out of the classroom.
25 MS. LARKINS: Mr. Hersh, Ms. Boyd has stated that

**Page 90**

1 she did not think it was right, and so I'm asking why didn't
2 she object?
3 MR. HERSH: You asked why she didn't file a
4 grievance, and that's why I wanted it out that a grievance
5 means a violation of the contract. So you would need to ask
6 a number of questions --
7 BY MS. LARKINS:
8 Q. Okay. Can you -- can you give me any reason that
9 would cause me to believe that you hadn't seen those arrest
10 records at that time? I can't understand why you would
11 behave like this.
12 MS. ANGELL: Objection. Where's the question?
13 BY MS. LARKINS:
14 Q. Why -- what is your explanation for having behaved
15 like this other than that you had seen arrest records?
16 A. I had not seen arrest records.
17 Q. Well, what's your explanation then?
18 A. My explanation is that you were taken from your
19 classroom pending investigation. You were put on paid
20 administrative leave. There was no violation of the
21 contract. I did express at that meeting that I was concerned
22 about the anonymous complaints and that's as far as I went.
23 Q. It's your testimony that you expressed at the
24 meeting that you were concerned about anonymous complaints?
25 A. Yes, I did.

**Page 91**

1 Q. But you took notes at that meeting, didn't you?
2 A. I believe I did.
3 Q. And we don't have the notes, do we. You haven't
4 produced the notes?
5 A. No.
6 Q. What happened to those notes?
7 A. I don't know.
8 Q. At that meeting you knew it was an important case,
9 didn't you?
10 A. Yes.
11 Q. You didn't take good care of those notes?
12 A. I don't know where the notes are, Maura.
13 Q. Did you make a special effort to take care of
14 those notes?
15 A. Apparently not.
16 Q. Did you think those notes were important?
17 A. The information contained would have been very
18 brief, that you were placed on administrative transfer due to
19 two complaints from people and that -- you know, there was
20 very little content to that meeting other than that you were
21 placed on the administrative leave and that there would be an
22 investigation.
23 Q. There was little content to that meeting? How
24 long did that meeting last?
25 A. Not very long.

**Page 92**

1 Q. Like about how many minutes?
2 A. I don't recall, but it was a brief meeting.
3 MS. ANGELL: Objection. I'd like to state for the
4 record plaintiff's behavior of making facial gestures,
5 laughing, sighing is directed at the witness as a method of
6 intimidating and being aggressive and argumentative and
7 coercing to the witness.
8 MS. LARKINS: Fortunately we have this on
9 videotape and I have some record of -- of the sound of my
10 voice. I will say, though, that I really was shocked when
11 you said it was a brief meeting, and I did have an expression
12 of surprise on my face.
13 Gretchen Donndelinger took notes of that meeting,
14 self-serving notes of course, but even she had several pages
15 of notes from that meeting, and I recall many, many things
16 being discussed at that meeting. It was not a brief meeting,
17 and that's why I was just startled. And I'm sorry that I let
18 out a little -- excuse me, excuse me, Mr. Hersh. Let me
19 finish.
20 MR. HERSH: I just don't think you're under oath.
21 I want you to be sworn in while you're giving this testimony.
22 That's all. I think it would be appropriate.
23 MS. LARKINS: Sure. Would you like that?
24 MR. HERSH: Yeah.
25 MS. LARKINS: Okay.

8 (Pages 89 to 92)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 93

1    MR. HERSH: No, I'm kidding.

2    MS. LARKINS: You are a funny guy.

3    Okay. I gasped. I gasped, and I had a look of

4  surprise on my face because it was so surprising to me that

5  you would say it was a brief meeting. And actually, I recall

6  your telling me when you and I were discussing the --

7    MR. HERSH: No question's pending.

8    MS. LARKINS: --meeting that in your notes it

9  said they feared for their lives. So I know that you did

10 still have your notes. It was about a month later in March

11 when the question was whether it was one or two people who

12 had called.

13   MR. ANGELL: I need to object to this whole line

14 of plaintiff's attempting to give testimony and again

15 intimidate the witness, coerce memories out of her, give

16 testimony. It's improper, and the flow of a deposition goes

17 question, answer, question, answer, not testimony from the

18 questioner. So if we could follow a format similar to that,

19 there would be very much fewer objections from me.

20   MS. LARKINS: Well, Ms. Angell, I felt compelled

21 to put on the record the truth about what was happening here

22 in this deposition when you made a lengthy objection to my

23 behavior which was also -- your objection was false, saying

24 that I was laughing and intimidating. You're the one that

25 forced me to explain what was really going on here.

Page 94

1  Sometimes I think that perhaps the camera should cover

2  everybody.

3    MR. HERSH: Well, luckily the court rules and the

4  California Rules of Court and the civil -- Code of Civil

5  Procedure dictate otherwise.

6    MS. LARKINS: Do you think so?

7    MR. HERSH: Yes.

8    MS. LARKINS: Luckily for lawyers?

9    MR. HERSH: I would have to wear a suit. I would

10 have to be wearing a suit then.

11   MS. LARKINS: Yeah. Yeah. Okay. I'd like to

12 take a break. Does anybody else want -- agree to that or

13 disagree or object to a break?

14   MR. HERSH: I have no objection.

15   MS. LARKINS: And the other three are silent, so

16 I'm going to take that to imply consent.

17   THE VIDEOGRAPHER: We're going off the record.

18 The time is 10:41 a.m.

19   (Recess taken.)

20   THE VIDEOGRAPHER: Going on the record. The time

21 is 10:50 a.m.

22   MS. LARKINS: Okay. I would like to introduce

23 into the record as Exhibit 5 a letter from me to Tim O'Neill

24 and a letter from Tim O'Neill to me.

25   MR. HERSH: Two separate exhibits or --

Page 95

1    MS. LARKINS: I think we can just make them one

2  exhibit.

3    MR. HERSH: It's up to you.

4    MS. LARKINS: It's about one subject.

5    (Plaintiff's Exhibit No. 5 was marked for

6  identification.)

7  BY MS. LARKINS:

8    Q. Okay. Ms. Boyd, have you ever seen this letter

9  that is dated December 9th, 2002, and it's to Tim O'Neill

10 from me?

11   A. Yes.

12   Q. Okay. Could you read it into the record, please.

13   A. December the 9th, 2002, to Tim O'Neill from Maura

14 Larkins. "Pursuant to Article 12 of the Bylaws of Chula

15 Vista Elementary Education Association (Section 12.1), I

16 request that I be given an opportunity to appear before the

17 Representative Council. The issue I wish to address is the

18 violation of my rights as a C.V.E.E.A. member by President

19 Gina Boyd. I also wish to address Ms. Boyd's violations of

20 the Code of Ethics of the Education Profession (see Article

21 1, Section 1.5).

22   "I have complained about Ms. Boyd to you in the

23 past, however, her misconduct has not only continued, it has

24 escalated. Please schedule my appearance during the first

25 meeting of the Representative Council in January 2003.

Page 96

1    "I trust Gina Boyd will be allowed the Due Process

2  procedures which she (and you) denied to me. Maura Larkins."

3    Q. I believe that we have the bylaws in this large

4  exhibit, Exhibit 3. Unfortunately these pages are not

5  numbered. I believe -- yeah, there are those little green

6  separators?

7    MR. HERSH: Uh-huh.

8    MS. LARKINS: It's in Exhibit 5, pretty close to

9  the end of Exhibit 5.

10   MR. HERSH: Uh-huh.

11 BY MS. LARKINS:

12   Q. Okay. Ms. Boyd --

13   MS. ANGELL: Exhibit 5 to what? I'm not sure what

14 you're looking at.

15   MS. LARKINS: Within Exhibit 3. Within Exhibit 3

16 there are exhibits that were part of the PERB appeal.

17   MS. ANGELL: The thing -- and that's something

18 that you didn't bring a copy of for me today?

19   MS. LARKINS: No. I'm sorry.

20   MS. ANGELL: Okay.

21 BY MS. LARKINS:

22   Q. Let me ask you this. If a C.V.E. member wants to

23 lodge a complaint against the president of C.V.E., does the

24 member have that right?

25   MS. ANGELL: Objection. Not relevant.

9 (Pages 93 to 96)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 97

1    THE WITNESS: Sure.
2  BY MS. LARKINS:
3    Q.  Okay.  Would you -- did I lodge a complaint
4  against you when I wrote this letter, this December 9th
5  letter?
6    A.  That's a complaint.
7    Q.  Is it your understanding that I have a right to --
8  that a member has a right to address the Representative
9  Council about any matter?
10    A.  No.
11    Q.  What is your understanding of a member's rights to
12  address the Representative Council?
13    MS. ANGELL:  Renew the objection.  This line of
14  questioning is not reasonably calculated to lead to the
15  discovery of admissible evidence.  This is not a case about
16  Ms. Larkins' grievances, representation, et cetera.  This
17  case is -- bears an allegation that certain people received
18  criminal records information and then a Doe -- an allegation
19  against Does that Does caused Mrs. Larkins to be in receipt
20  of a subpoena from the grand jury.
21    MR. HERSH:  And that was -- that second allegation
22  took place in February or March of 2002.  You're asking Gina
23  about a December 2002 which is even -- almost a year after
24  you were served with a subpoena.
25    MS. LARKINS:  I believe that Tim O'Neill's

Page 98

1  behavior, Ms. Boyd's behavior, their lawyers' behavior is
2  evidence of guilt and that there's been a steady effort to
3  hide the truth in this case.  And I believe that this is one
4  of the events in which an effort was made to cover up the
5  truth.
6    MR. HERSH:  Your question was asked and answered I
7  believe.
8  BY MS. LARKINS:
9    Q.  When does a person have a right to address the
10  Representative Council of C.V.E.?
11    MS. ANGELL:  Objection.  Bylaws of the document
12  speaks for itself.
13    MR. HERSH:  And the letter from -- your Exhibit 5,
14  the letter from Tim O'Neill explains why you were denied a
15  right to speak at that meeting.
16  BY MS. LARKINS:
17    Q.  Go ahead.  Answer the question.
18    A.  Repeat the question.
19    MS. LARKINS:  I would stipulate that your
20  objections are still on the record for this question, if we
21  could just go from the question to the answer.
22    Q.  When does a C.V.E. member have a right to address
23  the Representative Council?  And all the objections are still
24  in effect.
25    A.  When they're speaking to issues that are on our

Page 99

1  agenda.
2    Q.  How does an issue get to be on the agenda?
3    A.  Board members put it on.  People put it on.  It
4  depends.
5    Q.  Okay.  Can anyone besides a board member put it on?
6    A.  Yes.
7    Q.  An ordinary member has the right to put an item on
8  the agenda?
9    A.  They can request that, yes.
10    Q.  And then who decides if it will be on or not?
11    A.  Well, it depends when it is.  I mean, if it's at
12  the meeting, people frequently ask to have something placed
13  on the agenda.  That's why we approve it.  The rep council
14  then approves whether or not that agenda is moving forward.
15  That's whey they're called tentative agendas.
16    Q.  Okay.  So it is the rep council in its entirety
17  that decides if something can be on the agenda?
18    A.  If one is -- if a person places an agenda item,
19  then the rep council does have to vote to approve the agenda
20  before we go on with a meeting.
21    Q.  Okay.  And who has a right to place the
22  tentative -- who has a right to place an item on the agenda
23  tentatively?
24    MS. ANGELL:  Objection.  I just want to renew my
25  objection as to this entire line of questioning concerning

Page 100

1  placing things on the union board agenda, et cetera.  And if
2  plaintiff would like to stipulate that the objection
3  continues for this whole line of questioning, I'll refrain
4  from making it again.
5    MS. LARKINS:  It's fine with me if the objection
6  continues for every single question I ask today.
7    MR. HERSH:  Okay.  So stipulated.
8    MS. ANGELL:  That it's -- that the question is not
9  relevant?
10    MS. LARKINS:  Yes.
11    MS. ANGELL:  Okay.  So stipulated.
12    MS. LARKINS:  So stipulated.
13    Q.  Okay.  Who has a right to put an item on the
14  tentative agenda?
15    A.  Board members, the rep council as it sits.  If a
16  rep council member calls me and says this is an item that I
17  would like placed, I can put it on a tentative agenda.
18    Q.  Okay.  So an ordinary C.V.E. member does not have
19  a right to put an item on the tentative agenda?
20    A.  I guess I haven't had that to address before.  The
21  agenda is usually prepared ahead of time by me and then when
22  we present the agenda we ask the body whether they need to
23  prioritize any of the items that are on it or whether they
24  need to add items to -- for example, one of the sections is
25  information, and they might ask to have a moment to talk

10 (Pages 97 to 100)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 101

1  about something to give to the rep council.
2      Q. Okay. Then it seems clear to me that an
3  ordinary C.V.E. member does not have the right in your view
4  to place an item on the tentative agenda.
5      MS. ANGELL: Objection. The question was it seems
6  to me that you believe. The witness can't testify --
7      MS. LARKINS: Well, is that true?
8      MS. ANGELL: -- as to what plaintiff thinks.
9      MS. LARKINS: Is that correct?
10     MS. ANGELL: Objection. The witness cannot
11 testify as to what plaintiff thinks.
12     MS. LARKINS: Okay. Is that correct? Am I
13 correct?
14     MR. HERSH: What is the question?
15     THE WITNESS: What's the question?
16 BY MS. LARKINS:
17     Q. The question is -- okay. I believe that I'm
18 hearing you say that an ordinary C.V.E. member does not have
19 a right to put an item on the tentative agenda.
20     MS. ANGELL: Objection. Asked and answered.
21 BY MS. LARKINS:
22     Q. Am I correct?
23     A. No.
24     Q. Okay. Can an ordinary member put an item on the
25 tentative agenda? Does an -- let me say that again. Does an

Page 102

1  ordinary member have a right to place an item on the
2  tentative agenda?
3      A. They can request to place something on the agenda.
4      Q. Okay. So it's not a right.
5      A. I -- I've just never had this to think about
6  before. I don't -- you know, I don't know whether it's a
7  right. I don't see that it's written anywhere that anyone
8  can place something on the agenda, but it's certainly nothing
9  that I've thought about before.
10     Q. Okay. We're missing --
11     MR. HERSH: I don't see the --
12     MS. LARKINS: Oh, dear. Oh, gosh.
13     Q. Okay. So in your memory this is the only time
14 that a regular C.V.E. member asked to have something put on
15 the agenda of the board of representation?
16     MR. HERSH: Objection. You're assuming facts not
17 in evidence. Your letter specifically requests to speak to
18 the rep council pursuant to a particular article in the
19 bylaws that you don't have with you today.
20 BY MS. LARKINS:
21     Q. Has any C.V.E. member who was not a member of
22 the -- what do we call it here, the Representative Council of
23 C.V.E. ever been allowed to address the Representative
24 Council, in your knowledge?
25     MS. ANGELL: Objection. Vague and ambiguous as to

Page 103

1  time. Lacks foundation.
2  BY MS. LARKINS:
3      Q. During the time that you've been C.V.E. president,
4  has any ordinary C.V.E. member ever addressed the
5  Representative Council?
6      A. People at the rep council speak all the time, but
7  that doesn't mean that they're addressing the council.
8  They're engaging in a meeting.
9      Q. Okay. But are those people always members of the
10 Representative Council?
11     A. Depends on what you're talking about. If you're
12 talking about an action item or a vote situation, people who
13 are not members of the rep council cannot speak to those
14 issues because they can't vote.
15     Q. Do they speak to other issues?
16     A. Sure.
17     Q. So in your -- in your experience, sometimes people
18 who are not members of the Representative Council have
19 addressed the Representative Council.
20     A. Yes, we've had people who came from other
21 committees. We've had board of education candidates come to
22 address the board -- to address the council, but it's prior
23 to the beginning of the meeting.
24     Q. Okay. You mentioned board members and people from
25 other committees. Have teachers who are only -- who are

Page 104

1  merely C.V.E. members who do not sit on any committee,
2  they're not part of any board or any Representative Council,
3  have you ever had the experience during the time that you've
4  been president of C.V.E. that one of those teachers ever
5  spoke to the Representative Council?
6      A. People frequently speak to the Representative
7  Council concerning issues that are on our approved agenda.
8  People don't come into the council to just talk about
9  whatever they want to talk about.
10     Q. Okay. And by --
11     A. I mean, that -- it is approved.
12     Q. Now, you're using the word people, and I want to
13 really make clear that we're talking about ordinary teachers
14 that don't sit on any committee. Can you give me a yes or no
15 on that? Do ordinary teachers who don't sit on any
16 committee, any board, any counsel ever come in and talk to
17 the representative counsel?
18     MS. ANGELL: Vague and ambiguous. How would she
19 know whether anyone's ever done it when she wasn't there?
20     MS. LARKINS: During the time you've been
21 president.
22     MS. ANGELL: And at which meeting she's been in
23 attendance?
24     MS. LARKINS: And when you were in attendance.
25     THE WITNESS: Yes.

11 (Pages 101 to 104)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 105

1  BY MS. LARKINS:
2      Q.  Okay.  How many times has that happened?
3      A.  I have absolutely no idea.
4      Q.  Is it more like three or more like 300?
5      A.  Probably more like three.
6      Q.  Okay.  I asked to address the Representative
7  Council in December of 2002, did I not, in the second --
8  well, in the second line of the letter it -- could you read
9  the second line of the letter after the number 12.1.
10     A.  "I request that I be given an opportunity to
11 appear before the Representative Council."
12     Q.  Did I ask to appear before the Representative
13 Council?
14     A.  Yes.
15     Q.  Was I allowed to do so?
16     A.  No.
17     Q.  Why not?
18         MS. ANGELL:  Vague and ambiguous and calls for
19 speculation.
20         THE WITNESS:  Because your request did not apply
21 to your circumstances.
22 BY MS. LARKINS:
23     Q.  Who made the decision that I would not be allowed
24 to appear?
25     A.  Tim O'Neill and I.

Page 106

1      Q.  Have you ever seen this second page of Exhibit 5,
2  a letter from Tim O'Neill to me dated December 11th, 2002?
3      A.  Yes.
4      Q.  Could you please read the second paragraph.
5      A.  "I shared with Gina Boyd your request to appear
6  before the C.V.E. Representative Council in accordance with
7  Article 12.1 of the C.V.E. bylaws.  She has directed me to
8  communicate to you that your request is denied.  In that
9  Article 12.1 does not apply to your circumstances (i.e. you
10 have not been censured, suspended or expelled or removed from
11 a committee), this provision is not applicable, and therefore
12 is not a legitimate item to be placed on the Council's
13 agenda."
14     Q.  Okay.  So who exactly determined that I would not
15 be allowed to appear?
16         MS. ANGELL:  Objection.  Asked and answered.
17         THE WITNESS:  Tim and I.
18 BY MS. LARKINS:
19     Q.  Okay.  In this letter did Mr. O'Neill write "she
20 has directed me to communicate to you that your request is
21 denied"?
22         MS. ANGELL:  Objection.  Document speaks for
23 itself.  Argumentative.  Let the record reflect that
24 plaintiff is making gestures with her finger, shaking her
25 head, raising her eyebrows and sort of making eyes at the

Page 107

1  witness.  Sorry for lack of a better description.
2          MS. LARKINS:  Okay.  I'm kind of -- I'm trying to
3  encourage the witness to answer the question.
4          Please answer the question.
5          THE WITNESS:  Was it -- was the question that -- I
6  can't remember what the question is, Maura.
7  BY MS. LARKINS:
8      Q.  Does this document say "she has directed me to
9  communicate to you that your request is denied"?
10     A.  Yes, it does say that.
11     Q.  Was Mr. O'Neill trying to escape responsibility
12 for this decision by saying that you had directed him to do
13 this?
14         MS. ANGELL:  Objection.  Calls for speculation.
15         MR. HERSH:  And it's vague and ambiguous as to
16 what you mean by this.  The letter speaks for itself.
17 BY MS. LARKINS:
18     Q.  Okay.  Does this letter contradict your testimony
19 that it was you and Tim O'Neill together who made the
20 decision?
21         MS. ANGELL:  Objection.  Argumentative.
22         THE WITNESS:  I don't think so.
23 BY MS. LARKINS:
24     Q.  This letter says that you directed Mr. O'Neill
25 to --

Page 108

1          MS. ANGELL:  Objection.  Argumentative.
2  BY MS. LARKINS:
3      Q.  Does this say that you directed Mr. O'Neill to do
4  something?
5      A.  Yes.
6      Q.  But it is your testimony that he made the decision
7  with you.  Is that not correct?
8          THE WITNESS:  We --
9          MS. ANGELL:  Objection.  Asked and answered.  Let
10 the record reflect that -- for the written record because it
11 won't show it, that plaintiff's tone of voice is aggressive.
12 She's stressing syllables in her diction and repeatedly
13 asking the same question in an apparent attempt to get a
14 different answer.
15         MS. LARKINS:  Well, let the written record reflect
16 that I am very happy that we have an audiotape being made at
17 the same time, because I believe that Ms. Angell is trying to
18 create a deceptive written record.
19         I am trying to understand how it is possible for
20 Tim O'Neill to say she has directed me to communicate to you
21 that your request is denied if Tim O'Neill were equally or in
22 any way responsible for making this decision.
23     Q.  Okay.  Were you worried that your reputation would
24 be harmed if I addressed the Representative Council?
25     A.  No.

12 (Pages 105 to 108)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 109

1 Q. Did you feel that it would be an injustice, an
2 injustice would be committed if I represented -- if I
3 addressed the Representative Council?
4 A. An injustice?
5 Q. (Witness nods head.)
6 MS. ANGELL: Vague and ambiguous. Injustice to
7 whom? What are you talking about?
8 THE WITNESS: I don't know what you're talking
9 about.
10 BY MS. LARKINS:
11 Q. Did you believe that it would be morally wrong if
12 I were to address the Representative Council?
13 MR. HERSH: Any particular code of ethics that
14 you're considering here? Judeo Christian or --
15 MS. LARKINS: Gina Boyd's code of ethics.
16 I'm trying to figure out what was your reason for
17 denying my request.
18 MR. HERSH: Other than what the document itself
19 says?
20 MS. LARKINS: I do not -- I don't really see that
21 it matters. The document says is that
22 Mr. O'Neill is interpreting the bylaws to say that this part
23 of the bylaws doesn't apply. That still doesn't explain,
24 though, why you wouldn't allow someone to speak. I mean,
25 even if it had nothing to do with the bylaws, if I simply

Page 110

1 said I want to address the Representative Council to complain
2 about Gina Boyd, why wasn't I allowed to do that?
3 MS. ANGELL: Objection to that entire preamble and
4 question. It's argumentative. It's an attempt to badger the
5 witness and coerce particular testimony.
6 MS. LARKINS: I just want to know why Gina Boyd
7 denied my request to address the Representative Council.
8 MS. ANGELL: Let the record reflect that plaintiff
9 is gesticulating with her hands, emphasizing her question and
10 speech in a manner that appears to be argumentative.
11 MR. HERSH: And snickering.
12 MS. ANGELL: And covering her mouth as she laughs.
13 MS. LARKINS: Let the record show that Ms. Angell
14 has an extremely sour expression on her face. She looks like
15 she's been chewing on lemons, and she's rocking in her chair.
16 MS. ANGELL: Let the record reflect that plaintiff
17 is staring down defense counsel during that -- however long
18 that intermittent time period was in a manner similar to what
19 was done in court when the court directed her, plaintiff that
20 is, to refrain from that type of behavior.
21 MS. LARKINS: Ms. Angell, you could not possibly
22 have known how long I was looking at you unless you were
23 looking at me for the same length of time.
24 Q. Okay. Let's get back to -- I just want to know
25 your personal reason for denying me the opportunity to

Page 111

1 address the Representative Council of --
2 MS. ANGELL: Objection. Assumes facts not in
3 evidence. Assumes that there was a personal reason other
4 than the reason already given.
5 THE WITNESS: The reason is what is written here.
6 BY MS. LARKINS:
7 Q. Okay. I understand that you felt that you were
8 not obliged to let me address the Representative Council.
9 That's what this states. What I want to know is why didn't
10 you let me do it anyway?
11 A. Because the items that before -- come before the
12 council need to be legitimately placed there, and this was
13 not.
14 Q. So you have the -- so according to the bylaws of
15 C.V.E. the president can forbid anyone to come and complain
16 about her?
17 MR. HERSH: Not -- you're assuming facts not in
18 evidence. You asked about this request. She's answering
19 about this request.
20 BY MS. LARKINS:
21 Q. Did you deny my request to address the
22 Representative Council?
23 A. Yes.
24 Q. Did you have the right to deny my request?
25 A. Yes.

Page 112

1 Q. Did you do it to protect yourself?
2 A. No.
3 Q. Do you have the right to deny a teacher the
4 ability to make a complaint against you?
5 A. Meaning anywhere or are you talking about --
6 Q. In C.V.E. As C.V.E. president do you have the
7 right to deny any teacher the right to make a complaint about
8 you to the Representative Council?
9 MS. ANGELL: Vague and ambiguous as to the manner
10 of make a complaint. Are you specifying orally or in any way
11 particular?
12 MR. HERSH: And if you don't know --
13 THE WITNESS: I don't know.
14 BY MS. LARKINS:
15 Q. Do you have the right -- let me try to ask it
16 again. Do you have the right to deny a teacher the ability
17 to make an oral complaint about you to the Representative
18 Council?
19 A. I don't know. I don't think it's in our bylaws
20 anywhere, but --
21 Q. But you did deny me that right; is that correct?
22 A. I don't think that you had the right according to
23 the bylaws to make that particular complaint.
24 Q. Okay. Thank you. That was what I wanted to know.
25 Okay. I'd like to put into -- I'd like to have

13 (Pages 109 to 112)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

**Page 113**

1 marked as an exhibit, Exhibit 6, which is a two-page printout
2 of a Union Tribune article.
3     (Plaintiff's Exhibit No. 6 was marked for
4     identification.)
5 BY MS. LARKINS:
6     Q. Okay. You may not have seen this in this form
7 because this was printed out from the internet. But do you
8 recall an article in the South Edition of the Union Tribune
9 that was -- or I should say editorial that was titled
10 "Silence is not Golden in Chula Vista Elementary District"?
11     A. Yes, I've read it.
12     Q. Okay.
13     MS. ANGELL: Vague and ambiguous. This -- are you
14 talking about this particular document at this point or --
15     MS. LARKINS: Well, I just asked her if she
16 recalled an article that was titled --
17     MS. ANGELL: Okay. So we're not talking about
18 Exhibit 6?
19     MS. LARKINS: Well, as it happens Exhibit 6 is an
20 editorial published in the Union Tribune titled "Silence is
21 Not Golden in Chula Vista Elementary School District."
22     MR. HERSH: Dated September 2nd, 2004?
23     MS. LARKINS: Yes.
24     Q. Okay. This is the only article that you know of,
25 the only editorial you know of that was titled "Silence is

---

**Page 114**

1 not Golden in Chula Vista Elementary District"? Do you know
2 of another one that had the same title?
3     A. No.
4     Q. Neither do I.
5     Okay. If you would look at the second page of
6 this exhibit, the second paragraph, could you please read
7 that.
8     A. "This is the most" --
9     MS. ANGELL: Objection. This document lacks
10 foundation.
11 BY MS. LARKINS:
12     Q. You can go ahead and answer my question after the
13 lawyers make their objections.
14     A. You wanted me to read --
15     Q. The second paragraph.
16     A. "This is the most egregious and disrespectful
17 affront to district personnel I have ever seen, and I have
18 been involved with this district for over 25 years, said Boyd
19 of the teachers' organization, which has filed a grievance."
20     Do you want more?
21     Q. No. Thank you. That's perfect. I was just
22 looking at the word egregious.
23     A. Yeah, they didn't spell it right.
24     Q. I think they misspelled it.
25     MS. ANGELL: I'm going to object to the entire

---

**Page 115**

1 line of questioning concerning this document. The
2 allegations in this litigation are concerning activities
3 alleged to have occurred in September of 2000, I think maybe
4 up to 2002. This is a newspaper article -- or I'm sorry
5 editorial -- in fact, it's not established what it is or who
6 wrote it, but it's dated September 2nd, 2004.
7 BY MS. LARKINS:
8     Q. It is interesting that this does not give any
9 author. That would be interesting to know. Who did you
10 speak to when you made this statement?
11     A. I think his name is Don. I'm not --
12     Q. Okay. This most egregious and disrespectful
13 affront to district personnel that you spoke of here, can you
14 tell us what it was? What was the affront?
15     A. That they were administratively transferred
16 without cause.
17     Q. Okay. Was the contract violated in this case?
18     A. Yes.
19     Q. Can you tell me what -- what -- you know, without
20 citing numbers or anything, just what part of the contract
21 was violated?
22     A. The transfer article.
23     Q. Specifically what was -- what did they do wrong?
24     MR. HERSH: I object for more reasons than I can
25 even say here. I mean, first of all, this is currently in

---

**Page 116**

1 litigation. There's a pending grievance. The school
2 district's attorney is sitting in the room here. It's
3 totally improper for you to be asking these questions, and
4 I'm going to instruct the witness not to answer a question
5 concerning a matter that's in litigation.
6     MS. LARKINS: This case has made strange
7 bedfellows, has it not? You have -- do have a problem
8 because --
9     MR. HERSH: This is a question directed at counsel
10 or at the deponent?
11     MS. LARKINS: We have a problem in this case with
12 collusion between the district and --
13     MR. HERSH: Again, we're at a deposition. You ask
14 questions; the deponent answers. We're not here to listen to
15 you make statements on the record.
16     MS. LARKINS: You just made me listen to a
17 statement on the record.
18     MR. HERSH: I made an objection, and I instructed
19 the witness not to answer your question because -- for the
20 reasons I stated.
21     MS. LARKINS: You just made another statement for
22 me to listen to.
23     We do have a serious problem with collusion
24 between the district and the union in violating the Labor
25 Code, the Penal Code, the contract in my case.

---

14 (Pages 113 to 116)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 117

1    MS. ANGELL:  Is there a question there,
2  Mrs. Larkins?
3    MS. LARKINS:  I believe that was a statement,
4  Ms. Angell.  Is that a rhetorical question you're asking me?
5    MS. ANGELL:  No, because the purpose of a
6  deposition is for you to be able to ask questions of the
7  witness under oath, and if you're not going to ask a question
8  it's improper for you to attempt to testify on the record.
9  You've not been sworn.  It's not your deposition.  And I
10  think it will take a lot less time for you to get all the
11  information that you're looking for, at least for this
12  deposition to proceed wherever it's going to go, if we could
13  have questions to the witness, excuse me, and then allow the
14  witness to answer instead of testimony or statements from
15  you.
16    MS. LARKINS:  I think the word you're struggling
17  for is yes.  Yes, it was a rhetorical question.
18    Q.  Okay.  Were five teachers transferred out of
19  Castle Park Elementary School recently?
20    MS. ANGELL:  Objection.  The witness has
21  previously been instructed by her counsel not to respond to
22  questions concerning a matter that's pend -- currently in
23  litigation, specifically the transfer of teachers at Castle
24  Park Elementary School in or about September of 2004.
25    MR. HERSH:  If we can, if you could make some sort

Page 118

1  of showing of relevance how this is to lead to discoverable
2  evidence, how you think this is possibly related to something
3  that happened -- I'm not very got with math, but in September
4  of 2000 and --
5    MS. LARKINS:  Mr. Hersh, one of the teachers that
6  was just transferred is Robin Donlan who is a defendant in
7  this case, and Gina Boyd is working with Robin Donlan now
8  trying to get this principal of Castle Park Elementary School
9  fired.  And it's obvious to me that she's been working with
10  Robin Donlan ever since the beginning of these events.
11    MR. HERSH:  Well, you can ask questions about her
12  relationship with Robin Donlan, but I don't see how the
13  matter that you're currently questioning is covered by the
14  discovery statute because it's completely irrelevant what her
15  relationship is now with Robin.  If you want to ask her if
16  Robin gave her information in 2000 or 2001 or -- you know,
17  that's fine.
18    MS. LARKINS:  I'd like to enter into evidence --
19  sorry.  I would like marked as Exhibit 7 a two-page copy of
20  an article in the Chula Vista Star News.
21    (Plaintiff's Exhibit No. 7 was marked for
22    identification.)
23  BY MS. LARKINS:
24    Q.  And I see that it doesn't have a date on it, but I
25  can -- I can get that date later.  Ms. Boyd, does this

Page 119

1  article look familiar to you?
2    A.  Yes.
3    Q.  Okay.  You read it when it came out in the Star
4  News?
5    A.  Yes.
6    Q.  Okay.
7    MR. HERSH:  I'm sorry.  You know, you can answer
8  what you've read in the paper.
9  BY MS. LARKINS:
10    Q.  Did you read the part of this article in which two
11  people named -- one named Kim Simmons and the other named
12  Felicia Starr made statements to the Star News?
13    MR. HERSH:  I'm sorry.  I'm just marking the
14  exhibit.
15    THE WITNESS:  I'm looking for that part.
16  BY MS. LARKINS:
17    Q.  On the second page in the middle column I happen
18  to see both names.
19    A.  Okay.  What's the question?
20    Q.  Did you read the part of the article where Felicia
21  Starr and Kim Simmons made statements to the Star News?
22    A.  Yes.
23    Q.  Would you consider that the statements that these
24  two people made were negative statements about the principal
25  of Castle Park Elementary?

Page 120

1    MS. ANGELL:  Objection.
2    MR. HERSH:  Objection.
3    MS. ANGELL:  Incomplete question.  Incomplete
4  hypothetical.  It's not in the record.  I don't know what
5  you're talking about, and I believe that it relates to
6  information that counsel already instructed the witness not
7  to respond to concerning a currently pending grievance.
8  BY MS. LARKINS:
9    Q.  Okay.  What is your relationship with Felicia
10  Starr?
11    A.  I know her as a parent of children that attend
12  Castle Park School.
13    Q.  How did you come to get to know her?
14    A.  She's also assisting with a campaign for one of
15  the board of education candidates.
16    Q.  And you are also working on that campaign?
17    A.  Yes.
18    Q.  Okay.  And how -- what is your relationship with
19  Kim Simmons?
20    A.  I know that she's a parent of children at Castle
21  Park School.
22    Q.  How did you come to know her?
23    A.  Just by being at the school I've been introduced
24  to her.
25    Q.  How long have you known her?

15 (Pages 117 to 120)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 121

1    A.  I've known her by name probably since September.
2    Q.  Just last month?
3    A.  Yeah.
4    Q.  Okay.  And how long have you known Felicia?
5    A.  For probably I would -- I would say two years,
6  because she's -- about two years.
7    Q.  How many times have you met with Kim Simmons?
8    A.  You mean like had a meeting with her?
9    Q.  I'm sorry.  How many times have you talked to Kim
10  Simmons?
11    A.  Maybe two or three.
12    Q.  What is your -- do you consider her a friend?
13    A.  No.
14    Q.  Do you have a warm relationship with her?
15    A.  I have a congenial relationship with her.
16    Q.  Okay.  Did you caress her hand at the last Chula
17  Vista Elementary School District board meeting when she put
18  her hand on your shoulder?
19    A.  I don't know.
20    Q.  Okay.  Did Felicia Starr sit with you at the last
21  board meeting?
22    A.  Yes.
23    Q.  Did you talk to either Felicia Starr or Kim
24  Simmons about what they would say to the Star News before
25  they made these statements to the Star News?

Page 122

1    A.  No.
2    Q.  Do you feel good -- are you -- do you think it was
3  a good thing that they made these statements to the Star
4  News?
5    MR. HERSH:  Objection.  Irrelevant.  Not likely --
6  not reasonably calculated to lead to discoverable evidence
7  pertaining to the complaints you filed in this matter.
8    Just for the record, just as I did last time, I've
9  already told you, you know, we're leaving after lunch because
10  you're not asking questions that are within the scope of
11  discovery.  You've got another half an hour.  If you want to
12  continue asking questions about these kind of issues that
13  happened years after the events, I'm not going to stop you
14  other than to instruct the witness not to answer, you know,
15  things that are improper.  But you know, I really would urge
16  you to comply with your own September 8th letter and to ask
17  questions that pertain to the two matters that led me to
18  agree to produce the witness on this -- for this deposition.
19  BY MS. LARKINS:
20    Q.  What is your current relationship with Robin
21  Donlan?
22    A.  She's one of my unit members and she's a friend.
23    Q.  Okay.  Do you think that this article was a fair
24  article toward Ollie Matos, the principal of Castle Park
25  Elementary?

Page 123

1    MR. HERSH:  Objection, because the answer would
2  require the witness to essentially talk about the merits of
3  the grievance, and that's what I've already instructed her
4  not to discuss.
5    MS. LARKINS:  Is the grievance about Ollie Matos?
6    MR. HERSH:  Well, it's -- if you're talking about
7  the fairness, what she perceives as the fairness, it would
8  seem to me to call for -- he was the one who did the
9  transfers, was he not?  Is he not the --
10    MS. LARKINS:  Yeah, but this article isn't about
11  the transfers really.  This article is about his performance
12  as a principal which I don't think is part of the grievance.
13    MR. HERSH:  You're not asking about the grievance?
14    MS. LARKINS:  No.
15    MR. HERSH:  You're just asking about --
16    MS. LARKINS:  Yes.
17    MR. HERSH:  Oh, okay.
18    MS. LARKINS:  Yeah.  Is this a fair article about
19  Ollie Matos?
20    THE WITNESS:  Yes.
21  BY MS. LARKINS:
22    Q.  Okay.  Do you think it would have been better if
23  the article had told how many teachers were at Castle Park?
24    MR. HERSH:  Calls for speculation.
25  ///

Page 124

1  BY MS. LARKINS:
2    Q.  When -- it has a poll here that says 17 teachers
3  answered a poll, but it doesn't tell the total number of
4  teachers.  Do you think that the whole -- that the total
5  number of teachers should have been told.
6    A.  I don't have any opinion about that in either
7  direction.
8    Q.  It's sort of a math question.  I mean, wouldn't --
9  if 17 is half the number of teachers, the poll isn't worth
10  much.  If 17 is the total number of teachers, then the poll
11  is pretty -- has a lot more value, and they don't tell.
12    MS. ANGELL:  Objection.  Argumentative.  Asked and
13  answered.  Plaintiff is attempting to testify.  And I'll just
14  reflect for the record that we have a standing stipulation
15  that all of these questions are irrelevant.
16    MS. LARKINS:  Right.  As far as I'm concerned, all
17  the objections -- I would stipulate that all the objections
18  can apply to all the questions.
19    MR. HERSH:  The reason we can't do that is the
20  rules require that certain objections be made in order to --
21  really it's for your benefit so that if there is an error in
22  the way you're asking a question that can be corrected at the
23  time of the deposition, that it has to be made, and that's
24  really so the record is clear and the court can make use of
25  it down the road, so --

/16 (Pages 121 to 124)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

Page 125

1    BY MS. LARKINS:
2       Q.  Did you think that this article was unfair to the
3    ELAC parents, accusing them of trying to take over power at
4    Castle Park?
5       A.  Do I think it was unfair?
6       Q.  (Witness nods head.)
7       A.  No.
8       Q.  But no ELAC parents were interviewed or quoted in
9    the article, were they?
10      A.  I don't know.  I don't know.
11      Q.  But it would matter, wouldn't it?  If they weren't
12   it would be unfair?
13      A.  Apparently Kelley Dupuis thought it was fair, and
14   I really don't have any opinion about it.
15      Q.  Okay.  Did you think that my being taken out of my
16   classroom on February 12th, 2001 was fair?
17      A.  No, I don't.
18      Q.  Did you think my being taken out of my classroom
19   on April 20th, 2001 was fair?
20      A.  Is that the pencil incident?
21      MS. ANGELL:  Objection.  Vague and ambiguous.
22   Even the witness clearly can't understand the question or
23   what the point is.  Again, these questions are not relevant.
24      MS. LARKINS:  I'm glad you brought up the pencil
25   incident.  Could I take a quick break, and I want to look for

---

Page 126

1    something.  Is anybody else interested in a break just for a
2    couple minutes?
3       MR. HERSH:  No, but if you want to take a break,
4    it's your deposition.
5       MS. LARKINS:  Right.  If everybody wants to just
6    stay here, let me -- just give me a second.
7       Q.  Do you believe that Richard Werlin lied when he
8    described what you have just referred to as I think the --
9    what did you say?  What incident did you call it, the pencil
10   incident?  The pencils incident?
11      A.  The pencil incident.
12      Q.  Okay.  Do you believe that Mr. Werlin lied when he
13   described the pencils incident?
14      MS. ANGELL:  Objection.  Vague and ambiguous.
15      THE WITNESS:  No.
16   BY MS. LARKINS:
17      Q.  You believe he told the truth about the pencils
18   incident?
19      MS. ANGELL:  Objection.  Asked and answered.
20      MS. LARKINS:  I'm just -- I'm just so shocked.
21   I'm sorry.
22      Q.  Could you tell me what you remember of the pencils
23   incident as told to you by Mr. Werlin?
24      A.  He said that you were very angry and upset and
25   that he was trying to calm you down and that you threw a

---

Page 127

1    pencil at the ground near him.
2       Q.  Can you remember anything else?
3       A.  And that then you walked away.  I can remember
4    what you said, but I believe that that was Mr. Werlin's
5    depiction of that event.
6       Q.  Okay.  And you -- okay.  Did he say that he tried
7    to welcome me back and then I exploded for no apparent
8    reason?
9       A.  Yes, he did.
10      Q.  Okay.  Thank you.  Did C.V.E. file a grievance
11   about the pencils incident?
12      A.  No.
13      Q.  Did Mr. Werlin say that I behaved in an irrational
14   and unprofessional manner during the pencils incident?
15      A.  Yes.
16      Q.  Could I bring your attention to Exhibit 3.  There
17   are about 10, 15 pages and then it's Exhibit 1, and then the
18   very first document after Exhibit 1.
19      MR. HERSH:  You're able to find it?
20      MS. ANGELL:  I'd appreciate it if you could state
21   for the record what you're looking at since I haven't been
22   provided with a copy of the document.
23   BY MS. LARKINS:
24      Q.  Okay.  Can you tell us what we're looking at,
25   Ms. Boyd?

---

Page 128

1       A.  We're looking at a Level II grievance.
2       Q.  Okay.  And who filed -- who is here as for making
3    the grievance, the last name or the first name of the
4    grievant?
5       A.  A grievant, Jim Groth.
6       Q.  Okay.  And what does it give as his position?
7       A.  The district violated Article 38.1 of the
8    agreement when it issued a letter of reprimand to Maura
9    Larkins without just cause on April the 4th, 2001.
10      Q.  Okay.  I think -- I know I have that letter.  Here
11   it is.
12      Okay.  I'd like to put into evidence as
13   Exhibit 8 -- here's one for you, here's one for you, and
14   here's one for you.  And let me put a sticker on this.  And
15   what I mean -- I don't mean put into evidence, I mean mark as
16   an exhibit.
17      (Plaintiff's Exhibit No. 8 was marked for
18   identification.)
19   BY MS. LARKINS:
20      Q.  Okay.  Can you tell us what we're looking at here
21   on Exhibit 8?
22      A.  This?
23      Q.  Yes.
24      A.  It's a letter to Maura Larkins from Richard T.
25   Werlin.

---

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA  92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 129

1  Q.  Can you tell us the date?
2  A.  April the 4th, 2001.
3  Q.  Okay.
4      MS. ANGELL:  Objection.  Lacks foundation.
5  BY MS. LARKINS:
6  Q.  Does this letter look familiar to you?
7  A.  Yes.
8  Q.  Okay.  So you received a copy as it indicates at
9  the bottom of the letter?
10  A.  Yes.
11  Q.  Okay.  In Exhibit 7 where it says -- about halfway
12  down it says proposed remedy to grievance?
13      MS. ANGELL:  Excuse me.  Exhibit 7 is a news
14  article.
15  BY MS. LARKINS:
16  Q.  Okay.  What I mean is Exhibit 3, this document
17  that we're looking at in Exhibit 3, it's the first page of
18  Exhibit 1 which is an exhibit within Exhibit 3.  And could
19  you read the -- the proposed remedy to the grievance:
20  A.  "The district shall:  No. 1, provide written,
21  detailed rationale for why the employee was placed on
22  administrative leave on February the 8th, 2001.
23      "Provide specific written details of the behaviors
24  alleged to be irrational and unprofessional.
25      "Modify the content of the 4/4/01 memorandum by

Page 130

1  eliminating completely the second paragraph.
2      "No. 4, any other remedies mutually agreed to by
3  the parties."
4  Q.  Ms. Boyd, to your knowledge, was this grievance
5  ever filed?
6  A.  It doesn't look to me like it was because it's not
7  signed or dated.
8  Q.  Is it your understanding that C.V.E. filed a
9  grievance on my behalf?
10  A.  About -- about this incident?
11  Q.  About anything.  Did C.V.E. ever file a grievance
12  on my behalf?
13      MR. HERSH:  If you remember.
14      THE WITNESS:  I don't remember.
15  BY MS. LARKINS:
16  Q.  Okay.  Have you seen this form before, this
17  grievance form filled out like it is?
18  A.  You mean this specific one?
19  Q.  Yes.
20  A.  I don't remember.
21  Q.  Do you remember faxing me a copy of this document?
22  A.  No, I don't.
23  Q.  Okay.  In the part you just read for proposed
24  remedy to grievance, the third part, do you believe that that
25  refers to this letter that is Exhibit 8?

Page 131

1  A.  Yes.
2  Q.  So do you recall that Jim Groth and Tim O'Neill
3  discussed with me filing a grievance on my behalf?
4  A.  Was I there?
5  Q.  No, just do you recall that that -- you weren't
6  there.  But do you recall when that -- that we had a meeting?
7      MS. ANGELL:  Objection.  Vague and ambiguous.
8  BY MS. LARKINS:
9  Q.  Do you recall anything about a meeting between Jim
10  Groth, Tim O'Neill, and me to discuss C.V.E.'s filing a
11  grievance?
12      MR. HERSH:  At which she wasn't present?
13      MS. LARKINS:  Yes.
14      THE WITNESS:  I don't remember.
15  BY MS. LARKINS:
16  Q.  Okay.  Do you recall that -- a letter that
17  I wrote to my principal in January of 2001 where I said that
18  I was being harassed by teachers?
19  A.  Am I aware --
20      MS. ANGELL:  Objection.  Vague and ambiguous.  Do
21  you recall that a letter?  I don't understand that question.
22      MS. LARKINS:  Well, actually it was Exhibit P-1 in
23  this very deposition.
24      MS. ANGELL:  Could the question be read back?
25  Maybe I misunderstand it.

Page 132

1      MS. LARKINS:  Let me just repeat the question.
2  How about I just find the letter and then it's going to be a
3  lot easier to talk about.  Here it is.
4      Okay.  This letter has -- oh, no, it wasn't P-1,
5  it was P-2.  This letter has already been marked as P-2, so I
6  won't give the --
7      MS. ANGELL:  P-2 to what?
8      MS. LARKINS:  Yeah, it was marked as P-2 in
9  this -- this is my last copy so I need to keep this, in this
10  deposition, the first time we met for this deposition.
11  Q.  Does this letter look familiar to you?
12  A.  I've seen it before, yes.
13  Q.  Okay.  Oh, by the way, I wanted to ask you, you
14  believed that -- do you remember Mr. Werlin saying in the
15  pencils incident that I ran away and came back?
16  A.  Uh-huh.
17  Q.  And ran away and came back?
18  A.  Uh-huh.
19  Q.  Could you say that --
20      MR. HERSH:  Yeah, can you be audible.
21      THE WITNESS:  Oh, yes.  I'm sorry.
22  BY MS. LARKINS:
23  Q.  Yes.  Okay.  Were you concerned that I behaved
24  like a person who might be seriously emotionally ill?
25      MS. ANGELL:  Objection.  Calls for expert

18 (Pages 129 to 132)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

**Page 133**

1  testimony. Incomplete hypothetical. Vague and ambiguous.
2  BY MS. LARKINS:
3      Q.  I'm just wondering if you were a little worried
4  about it, even though you're not an expert. Were you a
5  little worried that maybe this teacher is unhinged
6  emotionally?
7      A.  I thought that you were duly upset considering
8  what you were going through.
9      Q.  So you think it's normal behavior for someone to
10  run way and come back and run away and come back?
11      A.  I don't know whether that's what you did. That
12  was his description.
13      Q.  So you don't necessarily believe that that was
14  true, his -- his allegation was true?
15      A.  I think his perceptions might not be the same as
16  others.
17      Q.  Perceptions are one thing but the truth is
18  something else. Do you think that I ran away and came back
19  and ran away and came back?
20      A.  I don't know.
21      Q.  So maybe he told me the truth; maybe he didn't?
22  Is -- do you think that -- are you not -- not confident,
23  not -- are you 100 percent confident that he told the truth?
24      MS. ANGELL:  Objection. Asked and answered.
25      THE WITNESS:  You know what, I don't know

**Page 134**

1  100 percent whether anybody tells the truth. But I mean, he
2  was describing what he perceived in.
3  BY MS. LARKINS:
4      Q.  Okay. Did I tell you that I had not done any
5  running and had only walked away once?
6      A.  Yes, you did.
7      Q.  And did you think that I was telling the truth?
8      A.  Yeah.
9      Q.  Okay.
10      MS. ANGELL:  Excuse me. For clarity in the record
11  can we stipulate that these last couple of questions relates
12  to an incident occurring on March 27, 2001?
13      MS. LARKINS:  Yes.
14      MS. ANGELL:  Thanks.
15  BY MS. LARKINS:
16      Q.  Did you believe Rick Werlin -- did you believe
17  that I yelled "I want to work. I want to work" during the
18  March 27th pencils incident?
19      A.  I don't know.
20      Q.  Okay. Do you believe that my eyes were glazed
21  during the incident?
22      A.  I don't know.
23      Q.  Do you believe that I jerked as I ran?
24      A.  I don't know.
25      MR. HERSH:  Are you asking if she believes now or

**Page 135**

1  if she believed in April of 2002?
2  BY MS. LARKINS:
3      Q.  Did you ever -- have you ever believed that I
4  jerked as -- my body jerked as I ran back and forth and back
5  and forth?
6      A.  I just -- I don't know, Maura.
7      Q.  Okay. I do forgive you for a little smile. It is
8  kind of a funny story. I actually tried it myself, to jerk
9  and run at the same time. I haven't mastered the art of
10  jerking and running at the same time.
11      MR. HERSH:  I don't even know where you're -- what
12  you're asking about. Is there something in the record that
13  I'm missing that talks about jerking and running?
14      MS. LARKINS:  No, I -- there is, but not -- not
15  right before us.
16      MS. ANGELL:  Where in the record?
17      MS. LARKINS:  We'll get to that later.
18      MR. HERSH:  Well, then I object to your questions
19  as lacking foundation.
20      MS. LARKINS:  Okay. Fine. I'm just asking her
21  what Rick Werlin said to her and what she believed or didn't
22  believe.
23      Q.  Okay. In this -- could you read this letter to
24  Dr. Donndelinger that I wrote in January 2001?
25      A.  January the 23rd, 2001, Dr. Donndelinger, one year

**Page 136**

1  ago I first tried to report to you a problem with
2  inappropriate behavior toward me on the part of a staff
3  member. You dismissed the matter as insignificant. I have
4  endured in silence. During the past few weeks the problem
5  has escalated into constant harassment. Please set up a
6  meeting time to discuss this problem. Sincerely, Maura
7  Larkins.
8      Q.  Do you recall at the February 12th, 2001 meeting
9  that I objected that I had just recently complained about
10  harassment and then all of a sudden, I guess about within a
11  period of three weeks or so, I was being taken out of my
12  classroom?
13      A.  Do I remember you objecting?
14      Q.  Yeah.
15      A.  I don't remember.
16      Q.  Okay. Do you recall me ever telling you about
17  this letter?
18      A.  Yes, I do.
19      Q.  Were you concerned that I had been harassed?
20      A.  I was concerned that you felt that you were being
21  harassed, yes.
22      Q.  Okay. To your knowledge, was any investigation
23  ever done about harassment of me at Castle Park Elementary?
24      A.  By Dr. Donndelinger?
25      Q.  By anyone.

19 (Pages 133 to 136)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 137

1    A. I don't know.
2    Q. Do you think that would have been a good idea?
3        MR. HERSH: What would have been a good idea?
4        THE WITNESS: For what?
5    BY MS. LARKINS:
6    Q. For someone to investigate the harassment of me by
7    other teachers.
8    A. Yeah. Yes.
9    Q. But to your knowledge, it was never done.
10        MS. ANGELL: Objection. Asked and answered.
11    BY MS. LARKINS:
12    Q. I'm sorry. Did you say you don't remember?
13    A. Well, I don't know what Dr. Donndelinger did.
14    Q. Right. Okay. So you don't know -- as far as you
15    know, nothing -- you don't know of any investigation.
16        MS. ANGELL: Objection. Asked and answered.
17    Argumentative.
18    BY MS. LARKINS:
19    Q. Okay. I'm trying to understand. Do you know of
20    any investigation that was done into the harassment of me by
21    teachers at Castle Park?
22        MS. ANGELL: Objection. Asked and answered.
23    Could the court reporter please read the question
24    and answer where this was answered first.
25        MS. LARKINS: Maybe we should ask it again and

Page 138

1    then we'll be sure to have it on the record.
2        MS. ANGELL: It already is in the record.
3        (Page 136, Line 22 through Page 137, Line 1 was
4        read back.)
5        MS. ANGELL: Thank you.
6    BY MS. LARKINS:
7    Q. Okay. Okay. And I believe that -- I'm just
8    thinking out loud. I believe you said that you thought it
9    would have been a good idea to have done that. Do you now
10    think it would have been a good idea to have investigated the
11    possibility that I was being harassed?
12    A. Yes.
13        MS. ANGELL: Objection. Asked and answered. Your
14    own thinking out loud just answers the question -- shows that
15    she already answered the question.
16        MS. LARKINS: Well, I make mistakes. I like to
17    make sure.
18    Q. Do you think it's possible that this entire
19    lawsuit would have been prevented if some --
20        MR. HERSH: Objection. Complete speculation.
21    This witness is not competent to figure out what would have
22    caused you to file a lawsuit.
23        MS. LARKINS: Okay. We have five minutes on the
24    tape left. This -- I'd like to submit this as I think --
25        MS. ANGELL: I think it would be No. 9.

Page 139

1        MS. LARKINS: Would it? Thank you. Exhibit 9.
2        MR. HERSH: That's the April 4th --
3        MS. LARKINS: Pardon me?
4        MR. HERSH: Oh, this is the one. This is 8.
5        (Plaintiff's Exhibit No. 9 was marked for
6        identification.)
7    BY MS. LARKINS:
8    Q. Okay. Do you recall discussion at the time that I
9    was taken out of my classroom about an anti bilingual
10    attitude at Castle Park?
11    A. Yes.
12    Q. Okay. Did you feel that there was an anti
13    bilingual attitude at Castle Park?
14        MS. ANGELL: Just reflecting for the record
15    because it's been a long time the stipulation that all of
16    these questions are not reasonably calculated to lead to the
17    discovery of admissible evidence.
18        THE WITNESS: There are some people at Castle Park
19    that do not favor bilingual programs.
20    BY MS. LARKINS:
21    Q. Okay. Do you recall my telling you that -- do you
22    recall that I was a bilingual teacher at Castle Park?
23    A. Yes.
24    Q. Do you recall my telling you that the other 3rd
25    grade teachers didn't want to team with me at Castle Park?

Page 140

1    A. Yes.
2    Q. Do you recall that the 1st grade teachers also did
3    not team with the bilingual class at 1st grade level?
4    A. I don't remember about that.
5    Q. Okay.
6        MR. HERSH: If I could just ask, is there a time
7    when you folks need to take lunch? Is that -- you're okay?
8        MS. LARKINS: Can I just get one more -- shoot.
9    I've only got two copies of this, but I'd like to introduce
10    this as Exhibit 10, and I'll give you my copy when I'm
11    finished talking about it.
12        (Plaintiff's Exhibit No. 10 was marked for
13        identification.)
14    BY MS. LARKINS:
15    Q. Would you characterize this document for us,
16    Ms. Boyd?
17        MS. ANGELL: Can I see the document, please.
18        MS. LARKINS: Here, you can have mine for a
19    minute.
20        THE WITNESS: This is a Chula Vista Elementary
21    School District, Summary Evaluation Report, Employees Form
22    E-2.
23    BY MS. LARKINS:
24    Q. And can you tell who was being evaluated in this
25    evaluation?

20 (Pages 137 to 140)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 141

1   A. Maura Larkins.
2   Q. And can you tell who prepared the evaluation?
3   A. I think it's Donndelinger, but there --
4   Q. Oh, maybe it's not clear. Okay. Can you give a
5 date for that evaluation?
6      MS. ANGELL: Do you mean the date that the
7 evaluation occurred or the date that's reflected on the
8 document or --
9      MS. LARKINS: Well, let's ask Ms. Boyd what date
10 she finds.
11      MS. ANGELL: On the document?
12      MS. LARKINS: Yes.
13      THE WITNESS: It's dated April the 28th, 2000.
14 BY MS. LARKINS:
15   Q. And that's the date that this was signed?
16   A. Yes.
17   Q. By two people?
18   A. My Maura Larkins and by I believe --
19      MS. ANGELL: Objection. Lacks foundation. How
20 could this person know when the document was signed by whom?
21      MS. LARKINS: Because she's looking at the
22 signatures.
23      MS. ANGELL: Because she's looking at the
24 signatures doesn't mean she knows when they were signed.
25      MS. LARKINS: Okay.

Page 142

1      MS. ANGELL: The people who signed them would know
2 when they were signed.
3 BY MS. LARKINS:
4   Q. Okay. Does this appear to have been -- on what
5 date does this appear to have been signed by the evaluator
6 and the evaluatee?
7   A. April the 28th, 2000.
8      MS. LARKINS: Okay. Can I just take a peek at it
9 real quick? Oh, we're out?
10      Okay. We can just end now.
11      THE VIDEOGRAPHER: This is the end of Tape 1 of
12 Disk 1. We are going off the record at 12:05 p.m.
13      (Recess taken.)
14      THE VIDEOGRAPHER: Today is Monday, October 11,
15 2004. The time is now 12:29 p.m. We are beginning Tape 2,
16 Disk 2, Volume II of the deposition of Virginia Boyd. We're
17 going on the record.
18 BY MS. LARKINS:
19   Q. We're looking at Exhibit 10, a summary evaluation
20 report of Maura Larkins by Gretchen Donndelinger. Ms. Boyd,
21 would you look at the first page, the box on the bottom where
22 it says "evaluator comments." I'm interested in the very
23 last sentence there that starts "Maura." Could you read that
24 sentence?
25   A. "Maura took a leadership role with her team this

Page 143

1 year to offer students an equitable and consistent program."
2   Q. Okay. Did you ever become aware at any time since
3 this whole situation began that there was a problem with the
4 bilingual Hispanic class teaming with the English-only
5 classes at Castle Park?
6      MS. ANGELL: Vague and ambiguous as to time.
7 Irrelevant. And because we're on a separate tape I'll
8 reflect that there's a stipulation among counsel and
9 Mrs. Larkins that every question is objected to on the basis
10 of relevance, that it is not reasonably calculated to lead to
11 the discovery of admissible evidence.
12      MS. LARKINS: That's correct.
13   Q. Did you ever become aware -- are you -- are you
14 aware now that there was a problem at Castle Park regarding
15 the bilingual class being included in the grade level teaming
16 at 3rd grade level?
17   A. In 2000?
18   Q. At any time. Are you aware that there ever was a
19 problem. Have you -- I would stop talking. Are you aware
20 that there was a problem at some time?
21   A. Yes.
22   Q. Okay. Can you tell me what you are aware of
23 regarding that?
24   A. There was a concern over certain teachers not --
25 not teaming with bilingual teachers.

Page 144

1   Q. Okay. This evaluation was written roughly a year
2 before I was taken out of my classroom, and it seems to
3 indicate that the problem had been solved. Was it your
4 understanding that the problem at 3rd grade level with the
5 teaming had been solved before these -- before February 12th,
6 2001?
7      MS. ANGELL: Objection as to plaintiff's testimony
8 before the text of the question. No objection as to the
9 question other than the standing irrelevance question --
10 objection.
11      THE WITNESS: I don't know.
12 BY MS. LARKINS:
13   Q. Okay. Is it possible that you had some
14 information at one time and that you've forgotten it or --
15 leave off the or. Is it possible that you had some
16 information at some time regarding this problem having been
17 solved and you've forgotten it?
18      MR. HERSH: Objection. Calls for speculation.
19      MS. ANGELL: Incomplete hypothetical. Vague and
20 ambiguous.
21 BY MS. LARKINS:
22   Q. Can you answer?
23   A. I can't remember what I've forgotten. I --
24   Q. Okay. Are you -- let me say it a different way.
25 Are you certain that no one ever told you anything about this

21 (Pages 141 to 144)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

Page 145

1  problem being solved?
2      A.  No, I'm not certain.
3      Q.  Okay.  I don't think I'm going to ask any more
4  about this.  Let me make sure that this exhibit is complete.
5  And anybody who wants the second or third page of this
6  exhibit may --
7      MR. HERSH:  Sure.
8      MS. LARKINS:  All I want is -- I need just one
9  page of each.
10     MR. HERSH:  We're still on the record.  I guess
11 let me -- why don't I use this opportunity to make my
12 statement which is simply that while we were on break I
13 indicated to plaintiff that I was going to allow her to
14 complete the line of questioning concerning Exhibit 10, and
15 we have done so.  And at this point I'm going to repeat what
16 I said at the beginning of the hearing, that we are here, you
17 know, to talk about the -- answer questions about the
18 allegations that you have made in your complaint.  And I feel
19 that we've given you every opportunity to do that, and you
20 have not done so.  You indicated you have no evidence I
21 understand, but you haven't asked questions of this witness
22 to elicit whether she had any knowledge of the matters
23 alleged in the complaint.  And if you have any questions I --
24 you know, can you let us know and -- you know, because I
25 don't believe it would be proper for us to come back after

---

Page 146

1  lunch for more of what we've just sat through this morning.
2      MS. LARKINS:  As I've said before, all my evidence
3  which leads me to believe that Ms. Boyd and others illegally
4  obtained evidence of my arrest comes from the actions of
5  Ms. Boyd and others related to Chula Vista Elementary School
6  District and my employment.  I think it's silly to ask
7  Ms. Boyd to simply repeat again and again what she's already
8  signed in her answer to my complaint.  She signed under
9  penalty of perjury that she did not receive these records.
10     What I really want, I don't want to be surprised
11 at trial.  If there is anything that Ms. Boyd can say that
12 offers an alternative explanation for the events at Chula
13 Vista's elementary school district, I really would like to
14 hear it.
15     MR. HERSH:  An alternative to what she's already
16 given you, an alternative to the explanations you've already
17 received for each of the determinations that the union has
18 reached?
19     MS. LARKINS:  It's all bogus.  It's all
20 ridiculous.
21     MR. HERSH:  That's your position that it's bogus,
22 but you do understand that you were given letters from the
23 union explaining why certain grievances weren't arbitrated,
24 why we didn't want to pay for your personal attorney to
25 represent you at the C.P.C. hearing.  I mean, we gave you in

---

Page 147

1  writing explanations for all of these determinations, and you
2  may think they're bogus, but really that isn't this lawsuit.
3      MS. LARKINS:  Okay.  Really there's no other
4  explanation that's going to be coming up in trial?  I don't
5  want to be surprised.  If you have some explanation for what
6  happened other than what you have written, I want to hear
7  about it.
8      MR. HERSH:  Well, I appreciate you for giving us
9  the opportunity and I hope that Ms. Boyd's questions and
10 answers have satisfied you and you'll withdraw your complaint
11 now that you've realized that everything we've, you know,
12 done has been well grounded and reasonable thought, and we
13 can all go about our lives and --
14     MS. LARKINS:  It's absurd.  It's ridiculous.  All
15 your behavior indicates guilt.
16     MR. HERSH:  Well, I appreciate it.  So I guess in
17 light of that I'm going to conclude our participation in the
18 deposition here.
19     MS. LARKINS:  You refuse to answer any more
20 questions?
21     MR. HERSH:  Do I refuse?  Yeah, I'm not going to
22 answer any more questions.
23     MS. LARKINS:  You refuse to have your client
24 answer any more questions?
25     MR. HERSH:  Oh, no.  She's -- she's just -- I'm

---

Page 148

1  going to -- if you want to do it that way, you want to make a
2  formal record, you know, that's fine.  You want to ask her
3  another question and I'll instruct her not to answer, we can
4  do that if you feel more comfortable.
5      MS. LARKINS:  I would.
6      Q.  Ms. Boyd, after I was taken out of my classroom on
7  February 12th, 2001, did you receive a number of faxes from
8  me regarding my situation?
9      A.  I don't remember.
10     Q.  Okay.  Oh, I would like to point this out.  We
11 were talking before as to whether you had ever seen the
12 grievance that -- now this is interesting.  I won't enter
13 this into -- as a separate exhibit, but I would like to
14 direct your attention to our Exhibit 3 in this deposition and
15 within Exhibit 3 there is an Exhibit 5.  The first page is
16 some notes taken by Gina Boyd, and the -- do you have -- do
17 you want to look at it?
18     MR. HERSH:  Exhibit --
19     MS. LARKINS:  It's Exhibit 5 within there.
20     MR. HERSH:  -- 5 of Exhibit 3.  Okay.  How far --
21     MS. LARKINS:  That doesn't look right.
22     MR. HERSH:  Oh, it's 6-C.  Okay.  6.  How far in?
23     MS. LARKINS:  That doesn't look right either.  Is
24 it between those?
25     MR. HERSH:  Oh, you're right.  Okay.  I'm sorry.

---

22 (Pages 145 to 148)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 149

1    MS. LARKINS: Okay. There, the first page we're
2    not going to look at. That's some notes taken by Ms. Boyd.
3    The second page is a fax that was faxed to me by Ms. Boyd,
4    and it has the -- the marks of the C.V.E. fax machine,
5    Ms. Boyd's fax machine that had at that time. So I would
6    like to -- not -- when you look at this and the page after
7    this copy of a grievance which was faxed to me with the two
8    large stripes on it, the next page is a May 30th letter.
9    Does that look at all familiar?
10   MS. ANGELL: Objection as to all the
11   characterization of what this document is. Plaintiff cannot
12   testify and has failed to lay a foundation for this document.
13   MS. LARKINS: Okay. I'm just trying to help find
14   the page.
15   MS. ANGELL: You could ask questions to the
16   witness as to whether she recognizes or knows what it is or
17   something.
18   MS. LARKINS: I think I'll let her read it first.
19   Q. Do you recognize this document, Ms. Boyd, this --
20   A. This?
21   Q. -- third page of Exhibit 5?
22   A. Yes, I recognize it.
23   Q. Is that your handwriting, the -- the printing on
24   these lines?
25   A. Yes.

Page 150

1    Q. Okay. Does this help you recall having faxed me a
2    copy of a grievance which is the -- what you faxed me is
3    Page 2?
4    A. It doesn't help me remember. I can see the fax;
5    but no, I don't remember sending it.
6    Q. Okay. This is very similar to the purported
7    grievance that we looked at earlier, is it not?
8    MS. ANGELL: Vague and ambiguous.
9    BY MS. LARKINS:
10   Q. The earlier grievance, do you recall who was --
11   whose name was given on the earlier grievance we looked at?
12   A. Jim Groth.
13   MS. ANGELL: Vague and ambiguous. What earlier
14   grievance? Can you refer to an exhibit number?
15   MS. LARKINS: You know what, it was -- it was in
16   here. It was the same exhibit but Exhibit 1 within this
17   exhibit, the first page. It was the first page of Exhibit 1
18   which is an exhibit within Exhibit 3 of this deposition.
19   MS. ANGELL: I'm sorry. Did you say Page 1 of
20   Exhibit --
21   MS. LARKINS: 1.
22   MS. ANGELL: -- 3 to your Exhibit 3?
23   MS. LARKINS: Page 1 of Exhibit 1 which is an
24   exhibit within Exhibit 3 of this deposition.
25   Q. Okay. And now we are looking at Page 2 of

Page 151

1    Exhibit 5 which is an exhibit within Exhibit 3 of this
2    deposition. Okay. So you recalled correctly that this
3    first --
4    MR. HERSH: Can I just point out, Ms. Larkins,
5    this -- this also, is this not, the same as the second page
6    of Exhibit 1 of Exhibit 3? Is this --
7    MS. LARKINS: They're different.
8    MR. HERSH: Maybe not.
9    MS. LARKINS: They're different.
10   MR. HERSH: Okay.
11   BY MS. LARKINS:
12   Q. Can you tell us, Ms. Boyd, what difference you
13   notice between the purported grievance that we looked at
14   earlier and the purported grievance that we're looking at
15   now?
16   A. I think I would need to see the other one.
17   Q. Let me show you my copy.
18   MS. ANGELL: I'd like to request that these
19   individual documents that are being pulled from the big fat
20   exhibit that I've not been given a copy of, that each of the
21   individual documents that you're talking about be referred to
22   as a separate exhibit for clarity of the record.
23   MS. LARKINS: I think that's a good idea. Okay.
24   Let's -- at least let's start with these two and give them
25   numbers. How about we go back and we'll call the first one

Page 152

1    with Jim Groth's name on it, we'll call that Exhibit 11. Can
2    we just stick that on there and we'll just get copies later.
3    MS. ANGELL: How many pages is that exhibit?
4    MS. LARKINS: One page.
5    MS. ANGELL: Okay.
6    MS. LARKINS: And then let's call this Exhibit 12.
7    And let me make a note to myself, we've got to get copies of
8    these.
9    Should we stop now and just get these copies,
10   so -- it might be a good idea, huh, or should we just let the
11   tape run, and I'll try to run and get copies? I think
12   probably we really should. Let's get -- this is going to be
13   11 and 12. Could we get -- these are so good.
14   (Plaintiff's Exhibit Nos. 11 and 12 were marked
15   for identification.)
16   THE VIDEOGRAPHER: We're going off the record.
17   The time is 12:46 p.m.
18   (Recess taken.)
19   THE VIDEOGRAPHER: We're going on the record. The
20   time is 12:57 p.m.
21   MR. HERSH: Thanks. Yeah, Ms. Larkins is allowing
22   me to make a statement. Last week, late last week I had
23   served and faxed Ms. Larkins a copy of a notice designating
24   Ms. Boyd as the representative of C.V.E. for the purpose of
25   deposition since she has been serving board members of the

23 (Pages 149 to 152)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 153

1  C.V.E. with -- with deposition subpoenas. So she responded
2  that she believed I was too late in making that designation
3  and that she was not going to essentially question the
4  witness as a representative of C.V.E., but now we're sitting
5  here and you're asking her questions about C.V.E. So it
6  seems to me that either this is a deposition about C.V.E.,
7  you're asking about official actions of C.V.E. and all of the
8  policies, you know, and this morning concerning the bylaws.
9  You're speaking to her as a C.V.E. representative, so I
10  believe that you have in fact been questioning her as the
11  designee, and so for that reason I'm going to allow you to
12  continue asking these questions, but as far as I'm concerned
13  this is your opportunity to question C.V.E. as an
14  organization as well as Ms. Boyd. And in light of that, yes,
15  I will come back after lunch and allow you to ask Ms. Boyd
16  further questions.
17      MS. LARKINS: I have not prepared any questions
18  for C.V.E. I'm questioning Ms. Boyd only as an individual,
19  and I'm relying on my right, which I won't necessarily take
20  advantage of, to question C.V.E., to depose C.V.E. I simply
21  have not prepared. This was not noticed as a C.V.E.
22  deposition. I would assume that if Ms. Boyd were answering
23  for C.V.E. she would be giving a whole lot more information
24  than she has been giving. I believe that she's just
25  answering what she as an individual remembers.

Page 154

1      MR. HERSH: You're asking her about in her
2  capacity as president of C.V.E. actions that she took,
3  knowledge of grievances that were filed by other C.V.E.
4  members that she doesn't necessarily have personal knowledge
5  of. You're asking her all kinds of questions about her
6  representational conduct with regard to you and what she said
7  and did in meetings when she wasn't acting as Gina Boyd, the
8  individual. She was acting as president of C.V.E. and your
9  union representative.
10      MS. LARKINS: Well, I would expect if she were
11  acting as the representative of C.V.E. she would have a whole
12  lot more information. I -- if and when I depose C.V.E. I
13  will include a request for documents. The -- it's ridiculous
14  that C.V.E. has not turned over the documents.
15      MR. HERSH: You have already sent out deposition
16  notices directed at people as representatives of C.V.E., and
17  I don't believe you asked for any documents in those
18  deposition subpoenas.
19      MS. LARKINS: No. I -- I subpoenaed those people
20  as individuals.
21      MR. HERSH: No, you didn't. You subpoenaed them
22  as representatives of C.V.E. That's what you checked on the
23  form.
24      MS. LARKINS: Well, maybe I should withdraw those
25  subpoenas and --

Page 155

1      MR. HERSH: That's what I would ask that you do.
2      MS. LARKINS: Okay. I will do that.
3      MS. ANGELL: Do you know which depositions are now
4  off because the subpoenas are being withdrawn?
5      MR. HERSH: Well, the ten people who were --
6      MS. ANGELL: All ten of them?
7      MR. HERSH: There were only three that you said --
8  or two that you said personally served. I don't remember if
9  it was Groth and --
10      MS. ANGELL: It was Carr.
11      MR. HERSH: -- Donna Padilla or --
12      MS. ANGELL: It was Carr and --
13      MS. LARKINS: Andy Johnston.
14      MR. HERSH: Andy Johnston.
15      MS. LARKINS: I'm not sure if I -- Carr and Andy
16  Johnston were -- it was checked as representatives.
17      MR. HERSH: Yeah, I don't know that I have them
18  with me, but let me check. I may. If that's -- I mean, this
19  is your deposition notice which also separated out the same.
20      MS. LARKINS: Yeah, but let's -- we need to look
21  at the subpoena itself that they were served with.
22      MR. HERSH: Okay. You want Andy and who else are
23  we talking about, Mimi?
24      THE REPORTER: I'm sorry, I didn't hear that.
25      MS. ANGELL: Johnston and Mimi Carr, Andy Johnston

Page 156

1  with a "T" and Mimi Carr.
2      MR. HERSH: Yeah, I don't have all of the
3  subpoenas with me, but they all were the same -- all ten
4  people, exact same form.
5      MS. LARKINS: Well, if it would make you feel
6  better to just -- to not check that they're representatives
7  and just depose them as individuals, I'd be happy to do that.
8  But let's do make sure that we see what was served on Mimi
9  Carr and Andy Johnston.
10      MR. HERSH: Sure. We can do that. I'll fax it to
11  you or ask my secretary to fax it to you later.
12      MS. LARKINS: I have it at home. I'll just --
13  I'll look at it.
14      MS. ANGELL: I'm not sure what -- is there an
15  agreement that all ten of these union depos noticed in the
16  September I think it was 13th depo notice are off then or
17  what?
18      MR. HERSH: Well, let's put it like this to give
19  Ms. Larkins the ability to go back and check. The people
20  whose subpoenas indicate that they were being subpoenaed as
21  representatives of C.V.E. on the form where it checks the box
22  individual or representative, they're --
23      MS. LARKINS: I'll tell you what. I'll withdraw
24  everything, all the board members, other than Gina Boyd --
25      MR. HERSH: Uh-huh.

24 (Pages 153 to 156)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 157

1    Means less work for you people, by the way.
2        MS. LARKINS: -- except Mimi Carr and Andy
3    Johnston, and we'll check on those two.
4        MR. HERSH: Okay.
5        MS. LARKINS: And I'll just issue a new notice in
6    which everything is made clear.
7        MS. ANGELL: So I understand, so all ten of the
8    people listed as union people on that notice with 22 people's
9    depositions, they're all taken off except for Mimi Carr and
10   Andy Johnston, and you'll let us know if those are off, if
11   those were subpoenaed as representatives of C.V.E.?
12       MS. LARKINS: Uh-huh.
13       MS. ANGELL: Then they will also be off?
14       MS. LARKINS: Uh-huh.
15       MS. ANGELL: Okay. Thank you.
16       MR. HERSH: Thank you.
17       MS. LARKINS: So where do we stand with regard to
18   our --
19       MR. HERSH: You know, I'm going to -- I think we
20   should have lunch and let these guys have lunch, and then --
21   and then Ms. Boyd is willing to come back and answer more
22   questions. But I think that you know where it's headed, you
23   know.
24       MS. LARKINS: Okay. How long should we take for
25   lunch?

Page 158

1        MR. HERSH: Is there -- I don't know what's
2    available in the neighborhood here.
3        THE VIDEOGRAPHER: We're going off the record.
4    The time is 1:05 p.m.
5        (Lunch recess taken.)
6        THE VIDEOGRAPHER: We're going on the record. The
7    time is 2:17 p.m.
8    BY MS. LARKINS:
9        Q. Okay. I think we're pretty well set up now to
10   discuss Exhibits 11 and 12. We're not talking about that
11   thing right there right yet.
12       MR. HERSH: Is that 12?
13       MS. LARKINS: We're going to talk about that in a
14   minute. No, that's -- that's probably going to be 13.
15       MR. HERSH: Okay. This is 12?
16       MS. LARKINS: Yes, and then 11 looks like this.
17       MR. HERSH: That's 10. That's okay. You can go
18   ahead and I'll --
19       MS. LARKINS: There's a copy of it right there if
20   you want to share.
21       MR. HERSH: Oh, yeah, that's mine. Or that's
22   yours.
23       MS. LARKINS: Or maybe we should let --
24       MR. HERSH: No, I have it I'm sure.
25       MS. LARKINS: I want Gina to be able to see it.

Page 159

1    Oh, here. Here's an extra.
2        Q. Okay. Ms. Boyd, if I recall correctly, you said
3    you don't remember faxing me Exhibit 12?
4        A. That's correct. --
5        Q. Okay. Do you -- is that -- you know what, I think
6    we will go ahead and make this 13 now. Let's -- oh dear, I
7    don't know if we have -- okay. This is going to be
8    Exhibit 13. It occurs in the PERB appeal right after -- it's
9    the next page after Exhibit 12. It's that paper right there.
10   Do you want to mark it 13 or did you just mark it 13? Yeah,
11   your hand is touching it.
12       MR. HERSH: This one 13?
13       MS. LARKINS: Yeah.
14       MS. ANGELL: Is there one of those for me?
15       MS. LARKINS: I'm afraid not, unless you wanted to
16   dig in there.
17       MS. ANGELL: Can I see it, please.
18       MS. LARKINS: Yeah.
19       (Plaintiff's Exhibit No. 13 was marked for
20   identification.)
21   BY MS. LARKINS:
22       Q. Okay. Do you recognize Exhibit 13?
23       A. This?
24       Q. Over here. This one.
25       A. Yes.

Page 160

1        Q. Okay. Do you recall faxing Exhibit 13 to me?
2        A. No.
3        Q. Okay. Do you believe that you probably did fax it
4    to me?
5        A. Yes.
6        Q. Okay. Maybe we need to get a -- I don't have a
7    copy of it.
8        MS. ANGELL: Hold on one second?
9    BY MS. LARKINS:
10       Q. Okay. Can you tell me who prepared the machine
11   printed part of Exhibit 13?
12       A. You.
13       Q. Right. And to whom was it addressed?
14       A. To Gina and Tim.
15       Q. And then did you write some words on it and
16   then -- in answer to my questions to you?
17       A. Yes.
18       Q. Okay. Could you read the first paragraph and then
19   the short sentence after that.
20       A. "I was pleased to learn yesterday that C.V.E. had
21   filed a grievance on my behalf last week. Thank you for the
22   copy I received today by fax. Since the grievance seems to
23   have been filed on May 22nd, the six-day time limit for the
24   meeting would expire tomorrow. I'm wondering if the super-
25   intendent's designee has set up a meeting. Would you give me

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA  92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 161

1 answers to the following questions as soon as possible?
2      "When was grievance filed? 5/22."
3      Q. Thank you. So earlier today I believe you weren't
4 certain whether C.V.E. had filed a grievance on my behalf,
5 but now that you have seen this letter do you now believe
6 that C.V.E. did file a grievance on my behalf?
7      A. I believe that C.V.E. was going to file a
8 grievance, but I don't have anything here that shows that it
9 was received by the district and moved forward.
10      Q. I have never in my life seen any such thing. But
11 this is your handwriting that says 5, slash, 22?
12      A. Uh-huh.
13      Q. In response to the question when was the grievance
14 filed?
15      A. Uh-huh.
16      Q. What made you -- do you know -- do you recall what
17 made you think that the grievance had been filed on 5-22?
18      MS. ANGELL: I'd like to renew the objection
19 because we've now taken a break that we have a stipulation
20 among counsel and Mrs. Larkins that every question posed by
21 Mrs. Larkins is objected to on the basis that it's not
22 reasonably calculated to lead to the discovery of admissible
23 evidence. And I renew that objection here as regard to this
24 line of questioning.
25      MR. HERSH: So stipulated.

Page 162

1      MS. LARKINS: So stipulated.
2      Q. Okay. Now we're doing great. We've got copies of
3 Exhibit 13 for -- okay.
4      Okay. Do you recall why you wrote 5, slash, 22 in
5 response to my question when was the grievance filed?
6      A. I just would presume that Jim told me he had filed
7 it.
8      MR. HERSH: Again, answers like I presume, it's
9 better to say exactly what you remember and don't remember.
10      THE WITNESS: I don't remember.
11 BY MS. LARKINS:
12      Q. Okay. But it's your belief that you never saw the
13 signed grievance before it was filed with the district?
14      A. I don't remember.
15      Q. Okay. Is it normal for a grievant or a teacher on
16 whose behalf C.V.E. has filed a grievance to attend a
17 grievance meeting? Is it customary?
18      A. Yes.
19      Q. Under what circumstances would a teacher not be
20 allowed to attend her own grievance meeting?
21      A. I don't know.
22      Q. To your knowledge, has a teacher ever been told by
23 C.V.E. or Tim O'Neill that they were not going to be allowed
24 to attend their grievance meeting?
25      A. Not to my knowledge.

Page 163

1      MR. HERSH: Can I just ask what you're referring
2 to by grievance meeting?
3      MS. LARKINS: I'm referring to the third paragraph
4 in Exhibit 13.
5      MR. HERSH: So a meeting that's part of the
6 grievance process?
7      MS. LARKINS: Yes.
8      Q. Okay. And when you wrote "Jim will contact you,"
9 do you recall if you had talked to Jim or if you just -- if
10 that would be the normal procedure?
11      (Phone interruption.)
12      THE WITNESS: I'm sorry.
13      MR. HERSH: Go off the record.
14      THE VIDEOGRAPHER: We're going off the record.
15 The time is 2:26 p.m.
16      (Recess taken.)
17      THE VIDEOGRAPHER: We're going on the record. The
18 time is 2:27 p.m.
19 BY MS. LARKINS:
20      Q. Okay. Why did you write "Jim will contact you" on
21 this paper?
22      A. Because I thought that Jim would contact you.
23      Q. Uh-huh. Is -- he would normally be expected to
24 contact a person if the C.V.E. had filed a grievance on that
25 person's behalf?

Page 164

1      A. Uh-huh.
2      Q. Okay.
3      A. Yes. I'm sorry.
4      Q. Can you think of any reason why he might not
5 contact a person?
6      MR. HERSH: Calls for speculation.
7 BY MS. LARKINS:
8      Q. As far as you know, that Jim always contacts the
9 person.
10      A. I don't know that.
11      Q. Okay. You seemed to be quite confident when you
12 wrote this that he would contact me.
13      A. Uh-huh.
14      Q. Why did you think that he would contact me?
15      A. Because he's the grievance chair, and he was the
16 one that was handling the grievance.
17      Q. So he should have contacted me. Is that what
18 you're saying?
19      A. Yes.
20      Q. Okay. You say you don't remember faxing
21 Exhibit 12 to me, but for the purposes of this deposition
22 let's assume that any questions I ask about Exhibit 12 are
23 assuming that it is a document which was faxed to me by you.
24 Maybe at some point in the future you can prove otherwise,
25 but let's just for the purposes of discussion assume that.

26 (Pages 161 to 164)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 165

1　This grievance in Exhibit 12, if you look down at
2　the bottom would you say that the proposed remedy to
3　grievance is the same as that in Exhibit 11?
4　A. Yes.
5　Q. And we have already established that the -- or
6　let's see.
7　Ms. Angell, I know you'll object if I ask a
8　question twice. Ms. Angell, is it your understanding that we
9　have already established that this 4, slash, 4, slash, 01
10　memorandum referred to in these two grievances is the
11　April 4th letter written to me by Rick Werlin?
12　MR. HERSH: I think she testified that she
13　believed it was.
14　MS. LARKINS: Yeah, I thought she did. Okay. Oh,
15　yes. It's Exhibit 8.
16　Q. Okay. So is it your understanding that this
17　grievance is a grievance against Richard Werlin?
18　A. Yes.
19　Q. At the time this happened did you feel that it was
20　a problem -- okay. Let's look over here on Exhibit 13, the
21　one, two, three -- the sixth paragraph. Could you read that
22　to us. It starts with the word "who."
23　A. "Who is the superintendent's designee?"
24　Q. Okay. And who was -- what did you write there as
25　an answer?

Page 166

1　A. "Rick Werlin."
2　Q. Do you recall having any qualms about the justice,
3　reasonableness of having Rick Werlin investigate a grievance
4　against himself?
5　MS. ANGELL: Objection. Incomplete hypothetical.
6　Let me just explain what the problem I'm seeing with the
7　question is.
8　MS. LARKINS: I'll take it back.
9　MS. ANGELL: Okay.
10　BY MS. LARKINS:
11　Q. Do you feel that it's a good practice for someone
12　to investigate himself?
13　A. No.
14　MS. ANGELL: I'm going to object because I don't
15　see anywhere on this grievance where it says that the
16　grievance is about Rick Werlin. So it assumes facts not in
17　evidence. And to the extent that the question was asked of
18　the deponent, I object to the extent that it calls for
19　speculation.
20　BY MS. LARKINS:
21　Q. Okay. Could you -- okay. Do you believe that it
22　was appropriate for Rick Werlin to have investigated a -- the
23　grievance against himself?
24　MS. ANGELL: Objection again. Misstates the
25　testimony. Assumes facts not in evidence.

Page 167

1　MS. LARKINS: I'll be happy to stipulate to that
2　for all the questions I'm going to ask now because I believe
3　that we have established that the grievance was regarding
4　Rick Werlin. We can do it further, but I'd be willing to
5　stipulate that objection to all my questions about this.
6　MS. ANGELL: On this grievance report?
7　MS. LARKINS: Yeah.
8　MS. ANGELL: Great.
9　MS. LARKINS: Yeah.
10　MS. ANGELL: So stipulated.
11　MR. HERSH: So stipulated.
12　MS. LARKINS: So stipulated.
13　Q. Okay. Let's see. I think I asked something about
14　was it appropriate for Rick Werlin to investigate a grievance
15　against himself?
16　A. I have -- I have no knowledge that this grievance
17　was moved forward.
18　Q. Okay. I can -- I can address that question,
19　although I share your doubts. But there are some interesting
20　documents. And I'm sorry, I don't have extra copies. I'd
21　like to put into evidence as Exhibit 14 a two-page document
22　that's in our Exhibit 3.
23　MS. ANGELL: Of which I don't have a copy. Can I
24　look at it, please?
25　MR. HERSH: Exhibit --

Page 168

1　MS. ANGELL: She says it's in Exhibit 3.
2　MS. LARKINS: It's -- part of Exhibit 3 is
3　Exhibit 2.
4　MR. HERSH: Uh-huh.
5　MS. LARKINS: And it's the very first document in
6　Exhibit 2.
7　MR. HERSH: Okay.
8　(Plaintiff's Exhibit No. 14 was marked for
9　identification.)
10　BY MS. LARKINS:
11　Q. Okay. Ms. Boyd, can you tell who prepared this
12　document?
13　A. Rick Werlin.
14　Q. Okay. And who is it -- to whom is it addressed?
15　A. Gina Boyd.
16　Q. Do you recall ever having received that document?
17　A. I don't remember, Maura, but --
18　Q. Okay. Thank you.
19　Okay. Can you read the two sentences that Rick
20　Werlin wrote to you in this document?
21　A. "Please find attached the" two -- "the Level II
22　response to Grievance 00/01-A on behalf of Maura Larkins.
23　Please feel free to contact me should you have any questions."
24　Q. Okay. If this is indeed a legitimate document, it
25　would appear from this that the grievance was moved forward,

27 (Pages 165 to 168)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 169

1 wouldn't it?
2   A.  Yes, it would.
3       MR. HERSH:  Well, which grievance?
4       MS. LARKINS:  The mystery grievance that Ms. Boyd
5 wrote to me and described as having been filed on 5, slash, 22.
6       MR. HERSH:  So you believe that whatever they
7 refer to that as 00, slash, 01-A is the same as the level --
8 the exhibit --
9       MS. LARKINS:  I have no idea.  I actually believe
10 that there was no such grievance, that this was a hoax, but I
11 have two copies that were given to me by C.V.E. of grievance
12 forms that were filled out and they're very similar.  The
13 only difference is one of them has the grievant as Jim Groth
14 and the other has the grievant as Maura Larkins, but I'm sure
15 Rick Werlin expected everyone to assume that this was the
16 grievance he was responding to, at least a grievance that
17 said these things at the bottom.
18       Okay.  And could you look at the second page of
19 Exhibit 14.
20   A.  I didn't get the second page.
21   Q.  It's --
22       MR. HERSH:  Where it -- I'm sorry.  Oh, okay.
23 BY MS. LARKINS:
24   Q.  Okay.  Could you read what Mr. Werlin wrote there.
25   A.  "District Response:  Grievance denied.  The

Page 170

1 District does not find that there was any violation of the
2 contract.  The information contained in the second paragraph
3 was a warning regarding Maura Larkins' behavior on March the
4 27th, 2001.  Additionally, even if one assumes the letter was
5 disciplinary, as defined by Article" 31 -- "38.1, just cause
6 existed for the issuance of the letter."
7       MS. ANGELL:  I'm going to object to the
8 characterization of this document -- can I see it for one
9 second, please -- as being written by Rick Werlin, because
10 there's no indication on this document who wrote it.  The
11 document's not been authenticated; and therefore, the
12 question lacks foundation and assumes facts.
13       MS. LARKINS:  Yes.  It adds to the mystery why
14 this second page isn't signed.
15   Q.  Let's look up at the top of these two pages and
16 see what we can learn from the fax information at the top.
17 Well, obviously the second time it was faxed was June 18th,
18 and it was from South County Teachers United.  But what's
19 interesting is the first time it was faxed.  It looks like it
20 was faxed from risk management, C.V.E.S.D.  And it's really
21 hard to see what's there.  I believe I can make out something
22 that's supposed to mean Monday, M-O-N maybe, and then it
23 looks like 04?
24   A.  I can't see what you're looking at.
25   Q.  Oh, I think that's a time.  Well, do you see

Page 171

1 where --
2   A.  I can't see what you're looking at.
3   Q.  Okay.
4       MS. ANGELL:  And I'm going to object to
5 plaintiff's testifying as to what -- testifying in order to
6 attempt to authenticate this document.  The process is to ask
7 the witness questions to authenticate the document, and the
8 witness has not been asked any such questions yet.  I object
9 to the testimony about when it was obviously sent, from
10 where, that kind of thing.
11 BY MS. LARKINS:
12   Q.  I would like to state for the record that I have
13 highlighted in yellow to help Ms. Boyd find the -- the data
14 that I'm talking about.
15       And you can look at your own copy, but from my
16 copy you can see what I'm talking about there.  It looks to
17 me like it says -- do you see -- do you recognize any of the
18 numbers there?  Do you see a 4 there?  It looks like
19 4:32 p.m.?
20   A.  I see 4:27 p.m.
21   Q.  Yeah, that's on the top, but below that.
22       I'll tell you what, let's forget about the time
23 and the date.  Obviously it must have been some date before
24 June 18th, and just tell me, do you see where it says
25 management C.V.E.S.D.?

Page 172

1       MS. ANGELL:  Again, I'm going to object to
2 plaintiff's attempt to testify and just request that direct
3 questions without commentary be given to the witness for
4 clarity in the record.
5 BY MS. LARKINS:
6   Q.  Do you see at the top -- at the top -- on the top
7 line here, what words can you make out?
8   A.  June the 18th, '01, 4:27 p.m., South County
9 Teachers United.
10   Q.  Right directly under South County Teachers United,
11 do you see some words?
12   A.  I see Monday 04:32, management C.V.E.S.D.
13   Q.  Thank you.
14       MS. ANGELL:  And for the record, let me reflect
15 for the record that I see the witness looking at a document
16 which I've not been given copies of that has some sort of
17 emblem on the top left and that plaintiff appeared to me to
18 be reading from a different document that doesn't have an
19 emblem.  So I don't -- I'm concerned that maybe you guys
20 weren't looking at the same piece of paper.
21       MS. LARKINS:  I had two documents in my hands, one
22 of which is the same as the document the witness is holding,
23 and the other which has the exact same information on it.  I
24 was just -- for my own interest I was looking at this other
25 one at the time.  The difference between the two documents is

28 (Pages 169 to 172)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

Page 173

1 one says Page 2 and the other says Page 3.
2      Q.   Okay. Assuming that these are legitimate
3 documents and haven't been forged or created by someone other
4 than Rick Werlin, does this indicate that this grievance
5 about which Mr. Werlin is talking on the first page is indeed
6 a grievance about the letter -- the April 4th, 2001 letter
7 from Rick Werlin to Maura Larkins?
8      A.   Yes.
9          MR. HERSH: And just for the record, if you want
10 to stipulate, I have a calendar, June 18th was a Monday, if
11 that's of any use, June 18th, 2001.
12          MS. LARKINS: I really wish we could see the date
13 in the second line, but I can't make out the date at all. I
14 agree with the witness about the time. I think she's read
15 that. But I cannot make out anything before the time.
16      Okay.
17          MS. ANGELL: Do we want a -- you want a
18 stipulation as to whether or not Monday -- June 18th was a
19 Monday or what day of the week it was?
20          MS. LARKINS: No. No, I -- it really doesn't
21 matter to me one way or the other what day of the week it
22 was. They're two separate fax -- they were faxed on two
23 completely separate days. One was faxed by management
24 C.V.E.S.D. and the other was faxed by South County Teachers
25 United.

---

Page 174

1          MS. ANGELL: I thought you just said that both the
2 documents had the same information, both pages of the same
3 exhibit. You're talking about Exhibit 14, right, which is
4 two pages?
5          MS. LARKINS: Uh-huh.
6          MS. ANGELL: You just told me that they both say
7 the same thing.
8          MS. LARKINS: They do. And each one of them shows
9 that it was faxed twice.
10          MS. ANGELL: Oh.
11 BY MS. LARKINS:
12      Q.   Okay. Do you believe that it was appropriate for
13 Rick Werlin to be making a decision about this grievance, the
14 grievance which is described here on the second page of
15 Exhibit 14?
16      A.   Yes.
17      Q.   He himself is the one who issued the letter of
18 reprimand to Maura Larkins? Did Mr. Werlin issue the letter
19 of reprimand to Maura Larkins which is discussed here in this
20 grievance?
21          MS. ANGELL: Do you mean did Richard Werlin write
22 the April 4, 2001 letter? Is that your question?
23          MS. LARKINS: Well, the grievance here refers to a
24 letter of reprimand. So whatever C.V.E. meant when it
25 grieved a letter of reprimand that was issued to Maura

---

Page 175

1 Larkins without just cause on April 4th, 2001.
2      Q.   Was it Rick Werlin who issued that letter of
3 reprimand?
4      A.   Yes.
5      Q.   And do you believe it was appropriate for him to
6 investigate whether or not the letter of reprimand was
7 merited?
8          MS. ANGELL: Objection. Asked and answered.
9 Would you like the reporter to read back the question and
10 answer?
11          MS. LARKINS: Okay. I'm not a lawyer. But the
12 way I understood it is that you could make an objection, but
13 then the witness should still answer the question?
14          MS. ANGELL: Well, it's been asked and answered,
15 so I would ask the reporter to read the question and the
16 answer, please.
17          And the reason for having the court reporter read
18 it back into the record is so that you can be assured that
19 you have already asked and -- and the question has been
20 answered. Because otherwise, if you do understand that it's
21 been asked and answered and you continue to insist on the
22 same question, that's argumentative and that's badgering the
23 witness.
24          (Page 174, Lines 12 through 16 were read back.)
25 ///

---

Page 176

1 BY MS. LARKINS:
2      Q.   Okay. At the time you answered yes to the
3 question which the court reporter just read back, did you
4 understand that the grievance was against Rick Werlin?
5      A.   Yes.
6      Q.   Okay. Does it appear as long -- you know,
7 assuming that these documents are not forgeries, that the
8 document to which Mr. Werlin refers when he says "please find
9 attached the Level II response to grievance," and then he
10 gives a number, is this second page of Exhibit 14 that I've
11 provided you with?
12          MS. ANGELL: Objection. Calls for speculation.
13 Lacks foundation.
14          MS. LARKINS: I'm asking if these two documents go
15 together, this top one and that --
16          MR. HERSH: This is Page 2, 14?
17          MS. LARKINS: Yeah.
18          MS. ANGELL: Not having a copy of that document,
19 was Ms. Boyd a recipient of it?
20          MS. LARKINS: Yes. It was written to her.
21          MS. ANGELL: Okay. So is the question does she
22 recall whether these two things came together?
23          MS. LARKINS: No. The question is as long as
24 these are legitimate documents and not forgeries, does it
25 appear that Page 2 did indeed -- was indeed attached or

---

29 (Pages 173 to 176)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 177

1  whatever the word is that Mr. Werlin uses, please find
2  attached, did he say or enclosed?
3       THE WITNESS: Uh-huh.
4  BY MS. LARKINS:
5       Q. Please find attached? Does it appear from these
6  two documents looking at them that Page 2 was indeed attached
7  to Page 1?
8       A. There is no Page 1 here.
9       Q. Okay. I'm talking about Page 1 of my exhibit.
10  There's two pages of my exhibit, and --
11       A. Oh.
12       Q. -- it is kind of funny the way --
13       A. I'm seeing a Page 2 and a Page 3.
14       Q. Right. Do you believe those two came together?
15       A. Yes.
16       Q. Okay. And not only did they come together when
17  they were faxed but that this second page is indeed the Level
18  II response to which Mr. Werlin refers in Page 1?
19       A. Yes.
20       Q. Okay.
21       A. Although it's not signed.
22       Q. Okay. So it is starting to appear -- let's see.
23  Just give me one second here. I've got some copies here that
24  were just brought in and -- actually not just brought in but
25  brought in a while ago that I haven't been able to separate

Page 178

1  out.
2       Okay. I really need to get some copies made,
3  because I want to give you this separate copy but I don't
4  want to mess up this here. Tell you what, how about if I --
5  I'm going to just stick it sideways here and then I'll get
6  you copies later of Exhibit 14. Okay.
7       Okay. Do you have a copy of this?
8       MS. ANGELL: That's 13.
9       MS. LARKINS: Because I've got more copies now.
10       MS. ANGELL: I have No. 13.
11  BY MS. LARKINS:
12       Q. Okay. Now, that was -- looking at those two pages
13  about -- that Rick Werlin wrote was an aside to what we were
14  talking about in Exhibit 13. I believe the question I had
15  asked you was regarding this second-to-last paragraph in
16  Exhibit 13. Could you read that again?
17       A. "Who is the superintendent's designee?"
18       Q. Thank you. And could you read the line underneath
19  that.
20       A. "Why is there no signature on the grievance?"
21       Q. And could you read the answer?
22       A. "This is a copy. The one given to Werlin was
23  signed by Jim Groth." Now that --
24       Q. So -- okay. Oh, that's fine. Thank you.
25       Okay. So on May 30th -- well, actually I don't

Page 179

1  know. Somewhere around May 30th, 2001, you believed -- did
2  you believe that Jim Groth had signed a grievance on my
3  behalf and filed it with the district?
4       A. Yes.
5       Q. Okay. Do you have any reason to think that a
6  grievance meeting was held regarding this grievance?
7       A. I don't know whether there -- whether one was.
8       Q. It's -- it's a mystery. Okay.
9       MR. HERSH: If I can, in your Exhibit 3 under
10  Exhibit 5 about four pages in, you've got two letters that
11  seem to relate to this. One is a June 21st letter from Gina
12  to you.
13       MS. LARKINS: Uh-huh.
14       MR. HERSH: And the other is a July 18th letter
15  from Tim O'Neill to Libia Gil in which she seems to be
16  addressing the very issue that you're asking her about.
17       MS. LARKINS: Yes. I do intend to --
18       MR. HERSH: Okay.
19       MS. LARKINS: -- continue on. Let's see. I've
20  got 12, and I'll put 13 here. And then 14 we're going to
21  make later. This is 13. Stick this up at the top.
22       MS. ANGELL: What time are we planning on going
23  until today? It's 3:00 o'clock now.
24       MS. LARKINS: Well, I have a lot to do, but I'd be
25  willing to stop and we could continue tomorrow.

Page 180

1       MR. HERSH: We'd need to discuss that, but I --
2       MS. ANGELL: I'm just asking what time are we
3  going to. Are we going to 4:00? Are we going till 5:00?
4  When are we stopping?
5       MS. LARKINS: Tell you what, if you suggest a
6  number we'll probably agree with it.
7       MS. ANGELL: Normally I wouldn't expect to go past
8  5:00.
9       MS. LARKINS: I think we'll agree that we won't go
10  past 5:00.
11       MR. HERSH: Yeah. I mean, I don't plan on coming
12  back tomorrow unless something really exciting happens
13  between now and 5:00 o'clock, but --
14       MS. ANGELL: Well, the reason I was asking is that
15  I -- you gave exhibit -- or I'm sorry. Counsel put in
16  Exhibit A which was a letter from you which states that you
17  need to question Ms. Boyd about "her illegal receipt of
18  records of my arrest," and that was a quote, and that you
19  also need to question Ms. Boyd regarding obstruction of
20  justice, specifically violations of C.P.C. Section 136.1.
21  Being cognizant that there's only two hours left and we've
22  been here since 10:00 o'clock, I haven't heard any questions
23  about those things yet and --
24       MS. LARKINS: I don't except to finish this
25  deposition today.

30 (Pages 177 to 180)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 181

1    MR. HERSH: So you don't expect to ask -- ask any
2  questions about the two things you stated that you need to
3  depose her about today?
4    MS. LARKINS: As I've said before, all my evidence
5  regarding felony obstruction of justice on the behalf of
6  unknown individuals and misdemeanor obtaining of arrest
7  records of an arrest that did not lead to a conviction or
8  even charges comes from events at Chula Vista Elementary
9  School District and the -- the -- the preposterous behavior
10  of Gina Boyd and others including the lawyers involved in
11  this case which points to an effort to cover up the truth.
12  And that's why I need to ask questions about why people were
13  investigating themselves and things like that.
14    MR. HERSH: And you're asking those questions, and
15  we're just trying to determine if you're going to ask any
16  specific questions concerning what you allege in your
17  complaint such as her knowledge or receipt -- possession of
18  this information or knowledge of anybody else processing that
19  information, her knowledge or any contact with the attorney
20  general who issued this grand jury subpoena.
21    MS. LARKINS: I'm not going to ask stupid
22  questions if that's what you're asking.
23    MR. HERSH: Well, some might think that those are
24  legitimate questions to ask at a deposition.
25    MS. LARKINS: Haven't they already been asked and

Page 182

1  answered?
2    MR. HERSH: Well, you know, it's really your
3  deposition, and -- but I'm just letting you know as I -- you
4  know, I've agreed to stay the afternoon despite my true
5  desire to be on the road, and I would consider going to the
6  end of the day today to have gone way overboard in terms of
7  giving you as much time as you need to ask questions that I
8  believe the judge would find within the scope of discovery.
9  I -- like Ms. Angell, I haven't heard any yet today.
10    I understand your theory of the case, but I don't
11  believe it's a reasonable theory, and I don't believe the
12  judge would think that the entire course of events that
13  followed, you know, February 2001, no matter what they
14  indicate or evidence that a crime was committed by my client
15  or anybody's client in September of 2000 or that no matter
16  what our intent was or what we thought about you or anything
17  else or whether we're competent or incompetent, that that is
18  evidence in a court of law that we obstructed justice in some
19  manner.
20    I understand you see it differently, but I feel
21  like you've had an opportunity today to make a record. You
22  had an opportunity for a few hours the first time we met, and
23  if this is -- you know, at this point if you're going to
24  continue beyond 5:00 o'clock, I'm just going to let you know
25  it's not my intent to return, and I will certainly advise

Page 183

1  Ms. Boyd not to return for a deposition that I believe we're
2  here voluntarily here to permit you to ask questions that you
3  said you wanted to ask.
4    MS. LARKINS: Okay. The last time you were here
5  you stayed for an hour and a half, not a few hours. This
6  deposition was originally scheduled in 2002.
7    MR. HERSH: Uh-huh.
8    MS. LARKINS: Just the fact that Ms. Boyd and the
9  lawyers and the other defendants and witnesses in this case
10  have worked so hard to avoid depositions is in itself
11  evidence of guilt, evidence of an awareness of guilt and
12  certainly an effort to hide the truth.
13    MR. HERSH: You're welcome to have your theories,
14  and you're welcome to bring them forth in the proceeding.
15  I'm just letting you know, if I were in your situation I
16  would think I have two hours. What questions should I ask
17  that I think will produce evidence that would show that your
18  course of inquiry is one that the judge would allow you to
19  pursue beyond a full day of questioning, because I don't
20  think the judge will believe that your course of inquiry is
21  within the scope of discovery. But I'm giving you the
22  opportunity to ask her the questions. I'm just letting you
23  know that that's my theory of the case.
24    MS. LARKINS: I think your guesses about what you
25  would do if you were in my shoes are pretty far off the mark.

Page 184

1  I'm afraid that you have no idea of how it feels to be in my
2  shoes, and I think that that's why you have pursued this
3  litigation in such a ridiculous way. You don't know your
4  opponent.
5    Q. Ms. Boyd, why didn't you come forward voluntarily
6  in 2002 to testify when I -- to help me with my
7  administrative hearing and my lawsuit?
8    MS. ANGELL: Objection. Seeks to invade attorney-
9  client privilege. Seeks to invade attorney work product.
10  Calls for speculation. Calls for facts not in evidence.
11    MR. HERSH: And I'm sorry. I missed the question.
12  I thought you were asking about something before the
13  litigation. You're asking her a question about why we have
14  responded to litigation the way we have?
15    MS. LARKINS: Your long speech made me think of a
16  different line of questioning. I'll get back to the first
17  one.
18    Q. But I'm wondering why you didn't voluntarily come
19  forward and testify on my behalf?
20    MR. HERSH: Okay. "A," it assumes facts not in
21  evidence because Ms. Boyd volunteered to be deposed in 2002.
22  You declined. You took the deposition off calendar. We
23  volunteered to be deposed, and you declined to pursue it and
24  you produced a letter to that effect as an exhibit to your
25  motion to compel Gina's further deposition.

31 (Pages 181 to 184)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 185

1  MS. LARKINS: Did you say that she would not
2  testify in a deposition by me regarding anything to do with
3  C.V.E. or her representation of me?
4      MR. HERSH: I don't -- I don't remember exactly
5  the wording I used, but I basically told you what objections
6  I would intend to make at any such deposition and you've
7  heard plenty of them today --
8      MS. LARKINS: Uh-huh.
9      MR. HERSH: -- but you've still been allowed to
10 proceed with the deposition.
11     MS. LARKINS: How could she possibly have
12 testified to anything if she couldn't have testified to her
13 representation of me with regard to C.V.E.?
14     MR. HERSH: I don't know. You're saying that's
15 what the letter said. I don't remember exactly what it said.
16 But she had volunteered to come forward to be deposed. Now
17 you're asking about -- as Ms. Angell pointed out, you're
18 asking about why we're doing things in this litigation, and I
19 have to say, yeah, this is all privileged information, and
20 you're not permitted to pursue those areas even in a
21 deposition.
22     MS. LARKINS: Not necessarily, Mr. Hersh. She --
23 all her decisions are not decided by you or in conjunction
24 with you. Before she --
25     MR. HERSH: It's still litigation.

Page 186

1  BY MS. LARKINS:
2      Q. Ms. Boyd, did you know -- did you have a
3  relationship with Mr. Hersh before February 12th, 2001?
4      MR. HERSH: For the record, I started working at
5  C.T.A. February 4th of 2001, so --
6      MS. LARKINS: Or two?
7      MR. HERSH: Maybe two.
8      MS. LARKINS: Yeah, I think it was two.
9      MR. HERSH: Okay.
10 BY MS. LARKINS:
11     Q. Have you paid --
12     MS. ANGELL: Mrs. Larkins, I don't think that
13 Mr. Hersh would be the only counsel. I'm a little bit
14 confused by your line of questioning, but I think your
15 question had to do with whether she volunteered to be deposed
16 in your dismissal proceeding? There was that, and then there
17 was the prior deposition when we were all here in this room
18 together. And the thing that I was just going to bring up is
19 that --
20     MS. LARKINS: I have a different question.
21     MS. ANGELL: -- there could have been any number
22 of counsel that she was -- you understand what I'm saying?
23     MS. LARKINS: Yeah, we don't need to belabor the
24 obvious.
25     MS. ANGELL: Okay.

Page 187

1  BY MS. LARKINS:
2      Q. Have you made any decisions regarding testifying
3  in a deposition on your own?
4      MS. ANGELL: Objection. Vague and ambiguous as to
5  time. Overly broad.
6      MR. HERSH: In what case?
7      MS. LARKINS: In this case.
8      MR. HERSH: Then I --
9      MS. LARKINS: Regarding me.
10     MR. HERSH: Objection. Totally privileged. I'm
11 instructing you not to answer this line of questions. It's
12 just ridiculous, absolutely ridiculous.
13     MS. LARKINS: Okay. I'm just going to think about
14 that for a second. Now any -- any discussions she had with
15 any attorney who is representing her are privileged. Any
16 decisions she made in conjunction with an attorney she -- the
17 line of thinking on that is privileged. But if her attorney
18 said I don't want you to testify and she decided hey, I want
19 the truth to be told, I am going testify to the truth --
20     MR. HERSH: What was the question that prompted my
21 objection? The question was --
22     MS. LARKINS: What I'm responding to is you're
23 saying that it's ridiculous that she could have had a thought
24 on her own about depositions that wasn't related to her
25 attorney.

Page 188

1      MR. HERSH: It's the line of questioning that's
2  ridiculous, because your suppositions are completely all over
3  the place and it makes no sense. And it's -- and it's
4  probing into litigation strategy, it's probing into, you
5  know, areas that are -- even without an attorney she's
6  probing into areas in litigation where an individual, you
7  know, is allowed to make choices and decisions that I think
8  are privileged even absent.
9  BY MS. LARKINS:
10     Q. Were you representing me during the year 2000?
11     A. Yes.
12     Q. Were you representing me during the year 2002? I
13 was dismissed on February 11th, 2003, and actually I think it
14 becomes official like 30 days later or something like that.
15 But anyway I was a member of C.V.E. during the entire year
16 2002.
17     MS. ANGELL: Objection as to plaintiff's
18 testifying. This is not plaintiff's deposition. If you want
19 to give testimony, you can be sworn.
20     MS. LARKINS: I'm trying to help her remember.
21     MS. ANGELL: That doesn't excuse your giving
22 testimony. I'm sorry, but if you can ask a question as to
23 what the witness knows, she can respond.
24 BY MS. LARKINS:
25     Q. Were you representing me in 2002?

32 (Pages 185 to 188)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

Page 189

1    MS. ANGELL: Vague and ambiguous as to time. Do
2  you mean from January 1, 2002 continuously through the end of
3  the year?
4  BY MS. LARKINS:
5    Q. At any time in 2002 were you representing me?
6    MR. HERSH: If you don't remember just --
7    THE WITNESS: I don't remember.
8  BY MS. LARKINS:
9    Q. I have a document that might help. Oh, boy. It's
10  too scribbled on. Oh, gosh. Here. I need to make copies of
11  this. Shall I just -- I'll be right back. I don't think we
12  need to. I think I can do it pretty fast.
13    MR. HERSH: Are we off the record? Oh, we just --
14    MS. LARKINS: I think this will help with our
15  current line of questioning. This will be Exhibit 14?
16    MS. ANGELL: I think we are on No. 15.
17    MS. LARKINS: 15? Okay. This will be Exhibit 15.
18    (Plaintiff's Exhibit No. 15 was marked for
19    identification.)
20  BY MS. LARKINS:
21    Q. Assuming this is a legitimate document, could you
22  read the first paragraph here?
23    A. "Disposition" --
24    MS. ANGELL: Objection. This document lacks
25  foundation. This appears to be from my own knowledge the

---

Page 190

1  last page of a different document that Ms. Boyd did not
2  create. And therefore, it lacks foundation.
3  BY MS. LARKINS:
4    Q. Okay. Go ahead.
5    MR. HERSH: You can answer.
6    THE WITNESS: "Disposition. Maura Larkins is
7  dismissed from her employment with the Chula Vista Elementary
8  School District. Her dismissal is based on her persistent
9  refusal to follow reasonable regulations authorizing the
10  Direct" -- the direct to direct -- "the Direct to direct the
11  work of its employees, on her evident unfitness for service
12  as a teacher with the Chula Vista Elementary School District,
13  and her willful refusal to perform regular assignments
14  without reasonable cause, each being a cause for dismissal
15  under the Education Code and each independently supporting
16  her dismissal from employment."
17    Q. Okay. And are there any dates on this document?
18    A. This is dated 2-7-03.
19    Q. And is it signed by anyone?
20    A. It is signed by James Ahler, Terry Olson, and
21  Barbara Abeyta.
22    Q. And in your understanding, what do you perceive
23  this document to be?
24    A. A dismissal from employment with the Chula Vista
25  Elementary School District.

---

Page 191

1    Q. Thank you.
2    MS. ANGELL: Excuse me. Can we go off the record
3  for a minute? Can I talk to you?
4    THE VIDEOGRAPHER: We're going off the record.
5  The time is 3:15 p.m.
6    (Recess taken.)
7    THE VIDEOGRAPHER: We're going on the record. The
8  time is 3:21 p.m.
9  BY MS. LARKINS:
10    Q. Okay. Assuming this is a legitimate document,
11  approximately when would you -- do you think that I was
12  dismissed from employment?
13    MR. HERSH: Assumes a legal question I believe.
14  You're asking her a question that is of I think legal
15  significance.
16    MS. LARKINS: It's very approximate, like
17  within -- just within a -- a month or two.
18    MS. ANGELL: A month or two doesn't make a
19  difference as to the issue of whether it's calling for a
20  legal conclusion, and it's -- I don't have any information
21  that this witness is an attorney.
22    MS. LARKINS: I don't think you have to be an
23  attorney to say that this decision was signed on February 7th,
24  2003.
25    MS. ANGELL: Well, then in that case, the document

---

Page 192

1  speaks for itself.
2  BY MS. LARKINS:
3    Q. Okay. Do you feel after having seen this document
4  that you have a pretty good idea of when I was dismissed from
5  employment?
6    A. Well, it says February the 7th, '03.
7    Q. Uh-huh. So somewhere around there. Okay. So --
8    MS. ANGELL: Objection. That's not the witness's
9  testimony. You just testified for her. She didn't say that.
10  And again, it calls for a legal conclusion. There's no
11  evidence that this witness understands and knows the legal
12  process for dismissing a teacher. If you'd like to lay that
13  foundation and ask her to go through the Education Code and
14  describe her legal qualifications, we can do that and have
15  this testimony on the record.
16    MS. LARKINS: Are you going to talk like that in
17  court too and like in front of a jury act like any -- any 3rd
18  grader wouldn't know what this meant.
19    MS. ANGELL: Let the record reflect plaintiff is
20  again staring me down and being argumentative with counsel.
21    MS. LARKINS: Let the record show that I looked at
22  Ms. Angell when I asked her a question, and she -- instead of
23  answering, she stared at me for a while before making her
24  comments.
25    Q. Okay. Were you happy when I was dismissed from

---

33 (Pages 189 to 192)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 193

1  employment?
2         MS. ANGELL: Objection. Assumes facts not in
3  evidence. We just discussed that this witness is not legally
4  qualified to make determinations as to when you were -
5  dismissed from employment, so how could she answer the
6  question. If you'd like to give a particular date and time,
7  if you'd like to ask about whether, you know, something --
8  you're trying to bring in -- one question into another, and I
9  have to object on that basis.
10        MS. LARKINS: I can -- I can restate.
11     Q.  Were you happy when you found out that I had been
12  dismissed from employment?
13     A.  No.
14     Q.  Were you sad?
15     A.  No.
16     Q.  Did you think it was a just decision?
17     A.  I didn't know about it at that time.
18     Q.  Well, whenever you found out that I had been
19  dismissed, did you think it was a fair decision?
20        MR. HERSH: Assumes facts not in evidence. You
21  need to find out if she's seen the decision, if she knows --
22        MS. LARKINS: Oh, I just mean the decision to be
23  dismissed, not -- not any details at all. Just was it right
24  to dismiss me from employment?
25        MS. ANGELL: Do you mean when the board gave its

Page 194

1  notice of intent to dismiss you or do you mean the hearing
2  before the Commission on Professional Competence determining
3  finally that you were dismissed or -- I mean, I don't know
4  how the witness can answer the question.
5         MS. LARKINS: Okay. Let's -- let's use Ms. Angell's
6  list of different things.
7      Q.  When you heard that the board had voted to dismiss
8  me from employment, did you think that that was a reasonable
9  action for the board to take?
10        MS. ANGELL: Objection. Assumes facts not in
11  evidence. We don't know that this witness heard any such
12  thing.
13  BY MS. LARKINS:
14     Q.  Did you ever hear -- at some time did you hear
15  that the school board of Chula Vista Elementary School
16  District had voted to dismiss me from employment?
17     A.  I don't know about their votes. I mean, it's
18  executive session. They don't report to me what their votes
19  are.
20     Q.  So as far as you know, the Chula Vista School
21  Board never voted to dismiss me from employment?
22     A.  They don't do that in public session, as far as I
23  know.
24     Q.  Did anybody tell you that they had voted to
25  dismiss me from employment?

Page 195

1      A.  I don't think I've had a discussion about voting
2  by the board.
3      Q.  Okay. Can a teacher get dismissed from employment
4  without the school board voting to dismiss them from
5  employment?
6      A.  I believe that they approve it on their agendas.
7         MS. ANGELL: And I renew my objection to this line
8  of questioning just insofar as Ms. Boyd is not legal counsel,
9  and this is calling for expert testimony concerning the legal
10  process for dismissing a certificated teacher.
11  BY MS. LARKINS:
12     Q.  As the president of Chula Vista Educators do you
13  take any interest in finding out when members of your union
14  are subject to -- are being discussed by the board for
15  dismissal from employment?
16     A.  They don't always tell me when -- I guess I would
17  care about if someone's going to be dismissed, but that
18  doesn't mean that I have firsthand knowledge of what their
19  discussions are. They are --
20     Q.  Okay. So it's possible that there have been some
21  teachers dismissed from Chula Vista school district and you
22  don't know anything about it?
23     A.  Yeah, it's possible.
24     Q.  Have you ever thought of talking to the district
25  and asking them to inform you when they're dismissing

Page 196

1  someone, one of your members from employment?
2      A.  I talk to them all the time about employment issues.
3      Q.  But wouldn't it be nice to just make an agreement
4  with them that they would tell you when they're dismissing
5  someone from employment?
6      A.  I don't believe they have to make that agreement
7  with me.
8      Q.  But you could ask.
9         MS. ANGELL: Is there a question there?
10  BY MS. LARKINS:
11     Q.  You've never asked them to let you know when one
12  of your members is being dismissed from employment?
13     A.  I've asked about non re-elections --
14     Q.  Uh-huh.
15     A.  -- as a matter of course.
16     Q.  How about dismissals?
17     A.  I haven't had that many opportunities.
18     Q.  Okay. Let's see, I'm not really that interested
19  in this or this.
20        Oh, there are a few questions that occurred to me.
21  We were -- earlier you said that Robin Donlan is your friend.
22  How long has she been your friend?
23     A.  She was my friend when I was working at Castle
24  Park School. We had very little contact after I left other
25  than my regular meetings at the school.

34 (Pages 193 to 196)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 197

1    Q.  And what do you mean by regular meetings?

2    A.  I try to visit the schools once a year, all of the

3  schools in the district.  And most of the time that meeting

4  is very well -- a lot of teachers go when I -- when I go to

5  visit because I know a lot of them.

6    Q.  So at Castle Park it's more of a friendly visit

7  than at other schools?

8    A.  No, there's other schools.

9    Q.  Where you have an equal number of friends?

10    A.  Yeah.

11    Q.  Okay.  Is Linda Watson your friend?

12    A.  She's an acquaintance.

13    Q.  Okay.  So you're closer to Robin -- are you closer

14  to Robin Donlan than you are to Linda Watson?

15    A.  No.

16    Q.  Okay.  I'm a little confused, because you

17  characterized Robin Donlan as your friend and Linda Watson as

18  your acquaintance.  Do you consider those two words to be

19  interchangeable, friend and acquaintance?

20    A.  I've had more contact with Robin, especially since

21  the last issue with them, but these aren't people I hang out

22  with.

23    Q.  Uh-huh.  Okay.  Do you feel that you were at all

24  times able to give me adequate representation regarding my

25  problems?

Page 198

1    A.  Yes.

2    Q.  Okay.  Do you consider me to be your friend?

3    A.  No.

4    Q.  Okay.  When a person who is your friend accuses a

5  member of C.V.E. who is not your friend, are you able to give

6  adequate representation to the person who is not your friend?

7    A.  Yes.

8    Q.  Okay.  Earlier you testified that you believe that

9  I had thrown a pencil or pen?

10        MR. HERSH:  I believe that's misstating the actual

11  testimony.

12        MS. LARKINS:  Okay.

13        MR. HERSH:  I believe she said that she believed

14  Mr. Werlin when he said that he perceived that -- you know,

15  she believed that he had perceived that, if I recall.

16  BY MS. LARKINS:

17    Q.  Okay.  Well, then let me ask you for the first

18  time then, do you believe that I threw a pen?

19    A.  No.

20    Q.  Okay.  Do you believe that I became very upset?

21    A.  Yes.

22    Q.  What makes you believe that?

23    A.  Because your job was in jeopardy.

24    Q.  Do you believe that the account I gave you of what

25  happened on March 27th with Mr. Werlin was factually

Page 199

1  accurate?

2    A.  I believed you when you said that you had not

3  thrown the pen, that when you turned to walk away from him

4  that it slipped from -- I think you said you were carrying a

5  clipboard or something.

6    Q.  Uh-huh.

7    A.  And that it fell when you turned.

8    Q.  Did you believe me when I said that I did not yell?

9        MS. ANGELL:  Do you mean then or now?

10        MS. LARKINS:  On March 27th.

11        MR. HERSH:  2001.

12        MS. LARKINS:  Well, let's divide it up.

13    Q.  At the time on March 27th, 2001, did you believe

14  me when I told you that I did not yell?

15    A.  Yes.

16    Q.  Did you believe me when I told you that I didn't

17  explode?

18        MS. ANGELL:  You mean on March 27th, 2001?

19        MS. LARKINS:  Yes.

20        THE WITNESS:  Yeah, I did.

21  BY MS. LARKINS:

22    Q.  Do you have any idea why Mr. Werlin would have

23  said that I exploded?

24    A.  Mr. Werlin has different perceptions than other

25  people.

Page 200

1    Q.  Did Mr. Werlin take me to a place where there were

2  no witnesses?

3    A.  I don't know.

4    Q.  To your knowledge, has any witness come forward

5  other than myself or Rick Werlin to the, quote, pencils

6  incident, unquote?

7    A.  Not to my knowledge other than --

8        MS. ANGELL:  Come forward to whom?  Anyone other

9  than her?

10        MS. LARKINS:  Well, to her knowledge, come forward

11  to anyone.

12        THE WITNESS:  Not to my knowledge.

13  BY MS. LARKINS:

14    Q.  Okay.  Around March 2001 did you say to me that it

15  was probably a setup?

16    A.  I may have.

17        MR. HERSH:  If you recall.

18        THE WITNESS:  I don't -- I don't recall.

19  BY MS. LARKINS:

20    Q.  Okay.  Do you believe that Rick Werlin exercised

21  due diligence in investigating the allegations against me in

22  February 2001?

23        MS. ANGELL:  Investigating in February 2001 or

24  investigating at any time allegations made in February 2001?

25        MS. LARKINS:  Investigating at any time

35 (Pages 197 to 200)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

Page 201

1  allegations made in February 2001.
2       THE WITNESS:  I don't know what he did.
3  BY MS. LARKINS:
4       Q.  Okay.
5       MR. HERSH:  Excuse me.  I don't want to cough into
6  the microphone.
7  BY MS. LARKINS:
8       Q.  Okay.  Did I -- okay.
9       Mr. Hersh, could you help me for a second.  I want
10 to make sure that I'm putting these things in the correct
11 order.  I think what you have over there is Exhibit 5 of
12 Exhibit 3 there?
13      MR. HERSH:  Uh-huh.
14      MS. LARKINS:  It looks to me like you are on --
15      MR. HERSH:  About three pages in.
16      MS. LARKINS:  Three pages in.  Okay.  Can I see
17 your first page that you have --
18      MR. HERSH:  This one?
19      MS. LARKINS:  No, the first one.  Just -- okay.
20 Yeah.  Okay.  I have that.  And then what comes next?
21      MS. ANGELL:  June 5, 2001.
22      MS. LARKINS:  Okay.  Some things have been taken
23 out.  Okay.  I guess some of them are over here.  Okay.  So
24 Exhibit 12 and 13, we're going to move that over there.
25 And -- okay.  And now I have copies of the next few.

---

Page 202

1       Okay.  Let's just start going through these as
2  fast as possible.  Okay.  This will be Exhibit 16, this next
3  one that Ms. Angell just held up.  And I will give Ms. Angell
4  a copy of it, and I believe that you should have a copy of
5  this?  I think you just turned it over?  Yeah.
6       MR. HERSH:  So --
7       MS. LARKINS:  So this will be 16.
8       MR. HERSH:  Excuse me.  That's the June 5th
9  letter?
10      MS. LARKINS:  Yes.  This is a June 5th letter,
11 June 5th, 2001.
12      (Plaintiff's Exhibit No. 16 was marked for
13 identification.)
14 BY MS. LARKINS:
15      Q.  Ms. Boyd, to whom was this letter written?
16      A.  To Gina Boyd.
17      Q.  And from whom?
18      A.  Maura Larkins.
19      Q.  Okay.  And it appears that it was -- it reached
20 you somehow and then you wrote on it.  Did you write on this
21 letter?
22      A.  Yes.
23      Q.  Okay.  And do you imagine that you probably faxed
24 it to me on June 5th, 2001 at 12:13 p.m.?
25      A.  Yes.

---

Page 203

1       Q.  Okay.  Could you read the two short paragraphs of
2  letter.
3       A.  "I wrote Rick Werlin on May the 6th asking for the
4  names of the two doctors I was required to visit before I
5  could come back to work.  I recall your telling me that he
6  made it clear that I had to see both of them.  I faxed him
7  again June the 1st in the evening.  He has not responded.
8       "His behavior would suggest that he knows
9  perfectly well that I am fit to teach, but doesn't want to
10 give me the opportunity to prove it.  Would you see if you
11 can get the names from him?  Thanks."
12      Q.  Okay.  And what did you write on that letter?
13      A.  "Yes, but not today."
14      Q.  Did there ever come a day when you answered my
15 question?
16      A.  I don't remember.
17      Q.  Well, actually, I think maybe Exhibit 17 will shed
18 some light on that.  And I think I have copies.
19      MR. HERSH:  Is that the June 21st?
20      MS. LARKINS:  I'm sorry, yes.  I -- then let's let
21 the next letter in the pile be Exhibit 17.
22      (Plaintiff's Exhibit No. 17 was marked for
23 identification.)
24 BY MS. LARKINS:
25      Q.  Okay.  Who wrote this letter?

---

Page 204

1       A.  Gina Boyd.
2       Q.  And to whom did you write it?
3       A.  Maura Larkins.
4       Q.  Could you read what it says?
5       A.  "I have a call into Rick but he has been out of
6  the office on an Administrative retreat for all of this week.
7       "On the two doctor issue it appears that the
8  district wants you to have a psychological exam before
9  returning to work.  They cannot require you to do this.
10 There is a very detailed and lengthy process in the Ed Code
11 that a District must use to have a teacher defined as
12 incompetent or unfit for service which involves a formal
13 hearing process and neutral parties.  In other words, you can
14 either report for work or the District can put you on
15 administrative leave with pay.  If you put yourself on sick
16 leave that is what you will have.
17      "Rick indicated that the investigation is ongoing.
18 He did not say who would be investigating the incident that
19 is being grieved.  Gina."
20      Q.  Okay.  When you're talking in this letter about
21 the Ed Code and fitness for service, what were you trying to
22 tell me?
23      A.  Just what it says in the letter.
24      Q.  Okay.  Well, I'm -- okay.  This is an effort to
25 communicate something, and were you trying to tell me that I

---

36 (Pages 201 to 204)

**Page 205**

1  did not have to be examined by two doctors?
2      MS. ANGELL: Objection. The document speaks for
3  itself.
4      MS. LARKINS: Please, let's go ahead and answer it
5  anyway.
6      THE WITNESS: It's saying they cannot require you
7  to do this.
8  BY MS. LARKINS:
9      Q. Okay. Had I already made it clear to you that I
10  wanted to be examined by the doctors in my previous letter?
11  Let me -- strike that.
12      Did you ever give me the names of the two doctors
13  that Rick Werlin wanted me to be examined by?
14      A. No.
15      Q. Why not?
16      A. Because I didn't know.
17      Q. Did you ask him for the names?
18      A. I don't remember.
19      Q. Okay. In the light of this information that you
20  yourself put here about the Education Code, was it a
21  violation of the Education Code for the district to take me
22  out of my classroom on February 12th, 2001?
23      MS. ANGELL: Objection. Calls for a legal
24  conclusion. This person is not established as an expert in
25  the law and therefore is not qualified to respond.

**Page 206**

1      MS. LARKINS: I'm only asking what she meant by
2  her writing to me about the Ed Code.
3      MS. ANGELL: No, that's not the question that you
4  asked.
5      MS. LARKINS: Well, I didn't finish my question.
6  Next time will you please wait till I've finished it.
7      MS. ANGELL: My apologies. I thought you were
8  done.
9  BY MS. LARKINS:
10      Q. Were you trying to inform me about the Ed Code
11  when you wrote this letter?
12      A. No.
13      Q. Why did you mention the Ed Code?
14      A. Because I didn't believe that they had the
15  authority to require you to have a psychological exam.
16      MR. HERSH: And if I might point out, this was
17  already the subject of questioning on the first day of the
18  deposition.
19      MS. LARKINS: We never looked at this letter.
20      MR. HERSH: I think there was another letter, the
21  one from Tim O'Neill. I'm sorry, no, that wasn't an exhibit.
22  BY MS. LARKINS:
23      Q. Okay. Let's move on. Let's call this Exhibit 18,
24  the next letter in the Exhibit 3. And I have copies.
25      MR. HERSH: That's the July 18th?

**Page 207**

1      MS. LARKINS: Yes.
2      (Plaintiff's Exhibit No. 18 was marked for
3  identification.)
4  BY MS. LARKINS:
5      Q. Okay. Do you recognize this document?
6      A. I'm trying to read it.
7      Yes, I recognize it.
8      Q. Let's talk about two exhibits together. Let's
9  look at the next document in this file and call it 19. Yeah.
10      MS. ANGELL: This is the same document.
11      MS. LARKINS: Oh, I gave you two?
12      MS. ANGELL: That's what I have for 18.
13      MS. LARKINS: Oh, that's wrong. This is 18 and
14  that's 19.
15      (Plaintiff's Exhibit No. 19 was marked for
16  identification.)
17  BY MS. LARKINS:
18      Q. Okay. Okay. Do you recognize Exhibit No. 19?
19      A. I don't know.
20      Q. Okay. Assuming that it's a legitimate document,
21  would you say that this is a response to Exhibit 18?
22      A. Yes.
23      MS. LARKINS: Okay. I say let's go ahead and
24  change the tape. Everybody in agreement to stop and go off
25  the record so we can change the tape?

**Page 208**

1      MS. ANGELL: Fine with me.
2      MR. HERSH: Sure.
3      THE VIDEOGRAPHER: This is the end of Tape 2, Disk
4  2, Volume II. We're going off the record at 3:48 p.m.
5      (Recess taken.)
6      THE VIDEOGRAPHER: Today is Monday, October 11,
7  2004. The time is now 3:53 p.m. We are beginning Tape 3,
8  Disk 3, Volume II of the deposition of Virginia Boyd. We're
9  going on the record.
10      MS. LARKINS: Okay. Did --
11      MS. ANGELL: Before we talk more about -- I
12  apologize for interrupting. Before we talk more about No. 18
13  I'll just reflect a notation and make an objection that I did
14  off the record that this document appears to be incomplete in
15  that it references an enclosure but the enclosure is not
16  attached to the document that's been presented to me as
17  Exhibit 18.
18      MS. LARKINS: I agree with Ms. Angell. She's
19  absolutely correct. And I will -- I'll make a note to myself
20  to produce the entire document to you.
21      Okay. I want to produce the July 18th, 2001
22  letter to Libia Gil from Tim.
23      Okay. Did we establish that 19 was a response to
24  18? Anybody remember or can I ask again?
25      MS. ANGELL: Well, since Mrs. Boyd was not a

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

**Page 209**

1  recipient of these documents, how would she know.
2  BY MS. LARKINS:
3      Q.  Just assuming that these are legitimate documents,
4  would you say that 19 is a response to 18?
5          MS. ANGELL:  Objection.  Calls for speculation.
6  She wasn't a recipient of these documents as far as I can
7  tell.  Lacks foundation.
8      -   MS. LARKINS:  Well, even if she had received them,
9  she would have to make some sort of judgment as to whether a
10  document was in response to another document.
11      Q.  Does it appear that 19 is a response to 18?
12      A.  Yes.
13      Q.  And I believe you said that you had seen 18
14  before?
15      A.  I believe I did see it before.
16      Q.  But I believe you said you had not seen 19 or at
17  least you don't recall having seen it?
18      A.  No, I don't recall.
19      Q.  Okay.  I'm just sitting here thinking about how to
20  do this fast.  What do you understand letter 18 to be asking?
21          Perhaps -- I have an idea.  Would you read the
22  third paragraph of Exhibit 18.
23      A.  "In the interests of justice and in order to be
24  able to objectively evaluate both the facts of the case and
25  the potential to reach an" agreement -- "an agreeable

---

**Page 210**

1  resolution to this grievance, I request that the District's
2  6/18/01 response be withdrawn and that you consider this
3  matter directly.  The Association agrees to extend the
4  pertinent timelines for the Level II response in order that
5  you may have time to fairly consider this issue."
6      Q.  Could you read the next paragraph too.
7      A.  "Alternatively, I would request the mediation of
8  this grievance as a present alternative to Level III,
9  arbitration."
10      Q.  Okay.  Would you say that when he wrote this
11  letter it appears that Mr. O'Neill was considering
12  arbitration of the grievance filed on my behalf?
13          MS. ANGELL:  Objection.  The wording of the
14  question is attempting to get around the fact that this calls
15  for speculation.  I don't know unless Mr. O'Neill told the
16  witness how this witness would know what Mr. O'Neill's intent
17  was.
18          Maybe we should ask whether Mr. O'Neill told
19  Mrs. Boyd about anything?
20  BY MS. LARKINS:
21      Q.  Okay.  Did -- let me rephrase the question.  Did
22  Mr. O'Neill bring up the idea of arbitration in this letter,
23  second-to-last paragraph?
24          MS. ANGELL:  Objection.  The document speaks for
25  itself.  I'm not sure why this witness would need to testify

---

**Page 211**

1  to stuff that is in the document, other than to just hold the
2  witness here and abuse the discovery process.
3          MS. LARKINS:  Well, Ms. Angell, you said that she
4  couldn't know anything about Mr. O'Neil's intentions about
5  arbitration, so what I'm doing in order to -- in an effort to
6  please you is to ask if the document mentions arbitration.
7  Why don't -- okay.  All your objections, let's keep them in.
8  They're all in there.  And the judge might decide that I
9  shouldn't have asked any questions about arbitration, but --
10  and he'll throw the answers out.  But for now let me just ask
11  a couple questions about arbitration.
12      Q.  Does Mr. O'Neill discuss the idea of arbitration
13  of the C.V.E. grievance filed on my behalf in this letter?
14          MS. ANGELL:  Same objection.
15          THE WITNESS:  He requested mediation as an
16  alternative to arbitration.
17  BY MS. LARKINS:
18      Q.  Would you say then that -- okay.  Let's not talk
19  any more about arbitration.  Let's go back to paragraph two.
20  Could you read paragraph two.
21      A.  "I am writing to you to voice my objection that
22  Mr. Werlin served as a superintendent's designee regarding
23  this grievance in that he is the author of the letter that is
24  the basis of the grievance.  I understand that the Assistant
25  Superintendent of Human Resource Services would normally be

---

**Page 212**

1  the choice as your designee.  However, in this case,
2  selecting him as the designee puts him in the position of
3  determining whether his own actions constitute a violation of
4  the contract.  To do so essentially guarantees that the
5  response will be subjective, rather than fair impartial and
6  objective."
7      Q.  Did you discuss this letter with Tim before he
8  wrote it?
9      A.  I don't know.
10      Q.  Were you aware -- oh, let me -- let me ask.  Back
11  in 2001 was there anytime when you felt that it was wrong for
12  Werlin to be making a -- to be determining whether his own
13  actions violated the contract?
14      A.  I don't remember.
15      Q.  Okay.  But sitting here today, would it be fair to
16  say that you disagree with the letter that Tim O'Neill
17  expresses in paragraph two of this letter?
18      A.  No.
19      Q.  Do you agree with what Mr. O'Neill is saying here?
20      A.  Yes.
21      Q.  I'm sorry.  But is it me or are you contradicting
22  something that you said earlier today when you said that you
23  thought that it was appropriate for Mr. Werlin to be deciding
24  the grievance?
25          MR. HERSH:  She testified the opposite earlier.

---

38 (Pages 209 to 212)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

Page 213

1  She said she didn't think it was appropriate. Isn't that
2  correct?
3       MS. LARKINS: Okay.
4-      MS. ANGELL: I don't recall, but if it's already
5  been asked and answered, it's already been asked and answered
6  and maybe we should not be revisiting the same thing here.
7       MS. LARKINS: But Ms. Angell, our problem is that
8  it was asked and answered in the completely opposite way.
9       MS. ANGELL: Which is why people don't get the
10 opportunity to ask and -- repeatedly ask the same question
11 because it's a chance for them to try and trap the deponent
12 into giving a different answer maybe by giving different
13 inflections or different context, which is why the asked and
14 answered objection is there.
15      MS. LARKINS: This is such --
16      MS. ANGELL: One of the reasons.
17      MS. LARKINS: This is such a big issue that I
18 don't see how it can be something that someone would just
19 accidentally trip over their own tongue about.
20      MR. HERSH: Well, let's solve it by going back and
21 finding out what -- from the court reporter what actually was
22 answered when you asked the question the first time, because
23 we can agree the question was asked. Can I ask that the --
24 can you --
25      THE REPORTER: That could take --

---

Page 214

1       MR. HERSH: You can't do a word search?
2       THE REPORTER: Not very easily.
3       MR. HERSH: Okay.
4       THE REPORTER: Sorry. That would take some time
5       MS. LARKINS: But you and I have the same memory,
6  Mr. Hersh?
7       MR. HERSH: No. I recall that her response was
8  that she didn't think it was appropriate for Werlin to
9  investigate his own grievance.
10      MS. LARKINS: Okay. Then I stand alone.
11      MR. HERSH: But the record will show.
12      MS. LARKINS: Yes, it will, won't it.
13      Q. Okay. Do you believe that this grievance should
14 have been arbitrated?
15      A. No.
16      Q. Can you tell me why?
17      A. We have certain criteria that we use for moving
18 forward on arbitrations. I don't have those memorized, but
19 this grievance did not fall in line with the criteria that we
20 use.
21      MR. HERSH: And I also object that your question
22 assumes that arbitration was available to the parties in July
23 of 2001 which would depend on a contract being in effect, and
24 I don't know that the record shows that any contract was in
25 effect at that time.

---

Page 215

1       MS. LARKINS: I'm sorry. Did you say you don't
2  know that the record shows?
3       MR. HERSH: If the record certainly doesn't show
4  that there was agreement through which arbitration could have
5  been compelled in July of 2001, I don't know. I don't
6  remember.
7       MS. ANGELL: You mean no exhibit in this
8  deposition?
9       MR. HERSH: Yeah. I don't even remember myself
10 whether there was a contract in effect, but contracts
11 generally expire June 30th, and they're not always.
12 BY MS. LARKINS:
13      Q. Ms. Boyd, to your knowledge, did C.V.E. have a
14 memorandum of understanding with the district that the
15 contract would continue to be in force after it expired?
16      MS. ANGELL: Vague and ambiguous as to time, as to
17 what contract.
18      THE WITNESS: Not that I'm aware of.
19 BY MS. LARKINS:
20      Q. Okay. And what is your understanding of
21 superintendent Libia Gil's response to Mr. O'Neil's request
22 for mediation?
23      A. Want me to read it?
24      Q. Just -- I mean, just like yes or no or --
25      A. She denies the request.

---

Page 216

1       Q. Right. Okay. Does that surprise you?
2       A. No.
3       Q. Why not?
4       A. Because she denied all requests for mediation.
5       Q. Thank you.
6       Okay. Do you know what I think I'd like to do is
7  jump to Exhibit 6 within Exhibit 3, and I think I can save
8  you the trouble of looking around for it because I have
9  copies. I'm just going to -- well, you know what, I'm not
10 going to put this one in. I would like to put this one in,
11 though.
12      Okay. I'd like to enter as Exhibit 20 a two-page
13 letter written to Gina Boyd on March 24th, 2001.
14      MS. ANGELL: You mean mark? You said enter. You
15 mean mark?
16      MS. LARKINS: That's exactly what I mean. Thank
17 you. Okay.
18      MS. ANGELL: Do you have a copy of that for me?
19      MS. LARKINS: Yes, I do.
20      MS. ANGELL: Thanks.
21      (Plaintiff's Exhibit No. 20 was marked for
22 identification.)
23      MS. LARKINS: Okay.
24      MR. HERSH: Do I have a copy?
25      MS. LARKINS: It's the second page in Exhibit 6.

39 (Pages 213 to 216)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 217

1    MR. HERSH: There are --
2    MS. LARKINS: It's the second and third page.
3    MR. HERSH: Okay. And there just happens to be
4  another March 24th letter in here with handwriting at the top.
5    MS. ANGELL: So this is the one that starts "Rick
6  Werlin called"? This is the March 24th, 2001 memo to Gina
7  Boyd from Maura Larkins starting with "Rick Werlin called"?
8  Is that what you want for Exhibit 20?
9    MS. LARKINS: Yes.
10    MS. ANGELL: Okay.
11  BY MS. LARKINS:
12    Q. Okay. Do you recognize this letter?
13    A. I've -- I've seen it before, yes.
14    Q. Did you respond to this letter?
15    A. I don't remember.
16    Q. Would you be willing to look for -- in your
17  records for any response you might have sent to this letter
18  and provide it to me?
19    A. I have none of those records.
20    Q. So you think you possibly could have responded to
21  this letter and then lost your copy?
22    A. I presented all of my copies of all documentation
23  to C.T.A. legal.
24    MS. LARKINS: Okay. Mr. Hersh, would you be
25  willing to look through the records given to you?

Page 218

1    MR. HERSH: Absolutely. But I think we already
2  did -- wasn't that part of one of your discovery requests?
3    MS. LARKINS: It was.
4    MR. HERSH: Yeah.
5    MS. LARKINS: But of course so were the notes for
6  February 12th.
7    MR. HERSH: Right, and we didn't find them.
8  BY MS. LARKINS:
9    Q. Okay. And this is interesting in that this was
10  written -- do you remember when the pencils incident
11  occurred?
12    A. It's described in the letter. I believe it was in
13  April sometime. I'm not sure. I'd have to look back.
14    Q. Does March 27th, 2001 sound right to you?
15    A. (Witness shakes head.)
16    Q. I believe it was in Exhibit 14?
17    A. Yeah, March 27th.
18    Q. Okay. Okay. So assuming this is a legitimate
19  document, would you say that this document was written before
20  the pencils incident?
21    A. Yes.
22    Q. Okay. On -- regarding the pencils incident, did
23  Mr. Werlin -- okay. At around the time of the pencils
24  incident, do you recall talking to Mr. Werlin about my case?
25    A. I don't recall.

Page 219

1    Q. Okay. You know what, I'm ready to just skip that
2  one for now and go on to the next one. I'd like to mark as
3  Exhibit 21 the next document in this folder.
4    MR. HERSH: Oh, I'm sorry.
5    Ms. Boyd would like to take a little break.
6    MS. LARKINS: Okay.
7    (Plaintiff's Exhibit No. 21 was marked for
8  identification.)
9    THE VIDEOGRAPHER: We're going off the record.
10  The time is 4:15 p.m.
11    (Recess taken.)
12    THE VIDEOGRAPHER: We're going on the record. The
13  time is 4:24 p.m.
14    MS. LARKINS: Okay. I'd like to talk about
15  Exhibit 21, and I believe I have given away all my copies.
16  Oh, wait a minute. Yeah, you just have one there between us?
17    MR. HERSH: Which one are you talking about?
18    MS. LARKINS: The one you're looking at right
19  there, that one.
20    MR. HERSH: Yeah.
21    MS. LARKINS: Okay. That will be 21.
22    MR. HERSH: I haven't marked it yet.
23    MS. LARKINS: That's Exhibit 21.
24    Q. Okay. Do you want a minute to look this over
25  before I ask you about it?

Page 220

1    Does this letter appear familiar to you?
2    A. No.
3    Q. You don't recall having received it?
4    A. No.
5    Q. Let's just go on to the next. Let's let this be
6  22.
7    (Plaintiff's Exhibit No. 22 was marked for
8  identification.)
9  BY MS. LARKINS:
10    Q. Do you recall having received this letter?
11    MR. HERSH: Sorry. Let me --
12  BY MS. LARKINS:
13    Q. Does this letter seem familiar to you?
14    A. I don't -- I don't remember receiving it.
15    Q. Okay. Did you make a decision to not communicate
16  with me during this time, March 2001?
17    A. I don't remember.
18    Q. Okay. Let's go on to the next one. This will be
19  23. I guess it's two pages. Yeah, it's two pages.
20    MR. HERSH: The first one is the shorter?
21    MS. LARKINS: Yes.
22    (Plaintiff's Exhibit No. 23 was marked for
23  identification.)
24  BY MS. LARKINS:
25    Q. Okay. Do you recall having received these two

40 (Pages 217 to 220)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

---

Page 221

1  pages?
2      Do you recall having received these two pages?
3      A. No.
4      Q. Okay. Let's go to the next page. I will call it
5  24.
6      (Plaintiff's Exhibit No. 24 was marked for
7      identification.)
8  BY MS. LARKINS:
9      Q. Do you recall having received this?
10     A. No.
11     Q. Do you have -- is there something like -- some
12  sort of a problem with -- what happens to faxes which are
13  received on your fax machine at the C.V.E. office?
14     A. Which one?
15     Q. I think it's 0129 is the -- 427-0129 I think is
16  the number?
17     A. Uh-huh.
18     Q. On that one.
19     A. What happens to them?
20     Q. Yeah. When they are received, the fax machine
21  receives the fax, then where do the papers go, the fax papers
22  go?
23     A. That machine is in my office.
24     Q. Okay. So are you the only one that has access to
25  it?

Page 222

1      A. Yes.
2      Q. So the only one that would take a fax -- fax off
3  of that machine would be you?
4      A. Unless I ask someone to take something off of it.
5      Q. Okay. Do you think that you could have received a
6  large number of faxes in 2001 and you've completely forgotten
7  about it?
8      A. No, I'd remember receiving a lot of faxes.
9      Q. Do you think that you have forgotten receiving
10  these faxes?
11     A. I don't remember receiving them. I remember
12  specifically -- I don't remember specifically receiving this.
13     Q. Okay.
14     A. Appears that I did.
15     Q. Okay.
16     A. But I don't remember. That was three years ago.
17     Q. Okay. Were you very interested in my case in
18  March of 2001?
19     A. Yes.
20     Q. Did you talk to your friend Robin about my case in
21  March of 2001?
22     A. No, I don't believe so. No.
23     Q. Did Robin ever tell you that she was afraid of me?
24     A. Robin?
25     Q. (Witness nods head.)

Page 223

1      A. Not that I recall.
2      Q. If she had told you that she feared that I might
3  kill her, you would have remembered that, wouldn't you?
4      A. Yes.
5      Q. Okay. In March 2001 were you at all concerned
6  about my students?
7      A. Yes.
8      Q. Okay. Did I already ask you if you remembered
9  seeing this one? It mentions Rosa Parks and Noa Davenport?
10     A. Yes.
11     Q. Okay. And you don't recall this one?
12     A. I don't.
13     Q. This refers -- could you -- could you read the
14  first sentence of this letter.
15     A. "I'm faxing you the front and back covers and the
16  contents of the first American book about mobbing."
17     Q. So apparently there was an attachment to this that
18  I don't have now, and I'll be sure to get that before trial.
19     Okay. And I'll -- where's that note. I'm going
20  to produce that for you too. Produce with attachment. Okay.
21  I will be sure to get that to you.
22     Okay. Let's call the next Exhibit 25. It starts
23  "the district"?
24     (Plaintiff's Exhibit No. 25 was marked for
25     identification.)

Page 224

1  BY MS. LARKINS:
2      Q. Does that strike you at all familiar?
3      A. No.
4      Q. Is it possible that you intentionally disregarded
5  my faxes in March of 2001?
6      A. No.
7      Q. You believe that you read all my faxes?
8      A. Yes.
9      Q. Do you recall writing me any letters in response?
10     A. No.
11     Q. Okay. Let's look at the next one. We'll call it
12  26.
13     (Plaintiff's Exhibit No. 26 was marked for
14     identification.)
15  BY MS. LARKINS:
16     Q. Do you recall receiving this fax?
17     A. No.
18     Q. Were you aware that I was making repeated attempts
19  to get your help during this time?
20     A. Yes.
21     Q. Why didn't you respond?
22     A. In writing?
23     Q. In any way.
24     A. I believe that I responded to you verbally.
25     Q. What do you believe that you responded in answer

---

41 (Pages 221 to 224)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 225

1  to this one where it says that -- well, could you read this
2  one. It's very short.
3      A.  March the 28th, 2001. "Gina, the contract says a
4  complaint must be investigated. Rick's refusal to do that is
5  an administrative break. It looks like he is trying to
6  conceal a crime against me - the crime of slander. He has
7  already changed his story from two to one teacher complaining
8  about me. He refused to put anything in writing to Kaiser.
9  He told me I'd be safe at Castle Park, then he himself lied
10  about me throwing pencils. Maura."
11     Q.  Okay. Did you make any attempt to get Rick Werlin
12  to investigate the complaints?
13     A.  Which complaints?
14     Q.  My complaint that I was being harassed, other
15  teachers' complaints that I had threatened them to such an
16  extent that they believed I was going to kill them?
17     A.  I believe that he indicated he was having an
18  ongoing investigation.
19     Q.  Do you recall when he changed from saying that
20  there were two teacher -- two people who called to saying
21  only one person called him on the weekend --
22     A.  No.
23     Q.  -- before?
24     A.  No.
25     Q.  Okay. But you never found out if he investigated.

Page 226

1  To this day you don't know?
2      MS. ANGELL: Objection. Asked and answered.
3  BY MS. LARKINS:
4      Q.  What did you do in response to this letter?
5      A.  I believe I talked to you on the phone.
6      Q.  Would that have been from the C.V.E. office or
7  from your home?
8      A.  One of those.
9      Q.  Would you be willing to allow the local telephone
10  service provider to provide records of these -- this period
11  to find out how many times you called me?
12     MR. HERSH: I would advise the witness not to make
13  that agreement, but it's really your life.
14  BY MS. LARKINS:
15     Q.  Do you keep any record of calls you make?
16     A.  Yes.
17     Q.  But you've lost all your records regarding calls
18  you made to me?
19     A.  I make records of people who have called me, their
20  name, their site, a description of what their concern is so
21  that I can get back to them. It's my phone log.
22     Q.  Uh-huh. And what did you do with the letters --
23  the faxes you received?
24     MS. ANGELL: Objection. Vague and ambiguous as to
25  time. You mean when they were received or ever?

Page 227

1  BY MS. LARKINS:
2      Q.  Yeah. When you received faxes from me where did
3  you put them?
4      A.  Probably in a -- in a file.
5      Q.  I don't believe I have ever asked for -- asked you
6  to produce letters that -- faxes that I sent to you. I
7  should do that.
8          Okay. Here's one that I'm going to guess you
9  might remember. I'm going to go ahead and call this one 27,
10  and I don't believe I have any copies of it except for you
11  have one in there. It's -- it's about 12 to 15 pages down.
12     MR. HERSH: From where are we now?
13     MS. LARKINS: Yeah. And it's just -- if you get
14  to this picture of Wayne Johnson, you've gone too far. It's
15  the one just before that. This is a news clipping about the
16  Salem witch trials.
17     MS. ANGELL: Can I see it, please.
18     MR. HERSH: 12 pages --
19     MS. LARKINS: There it is.
20     MR. HERSH: This one?
21     MS. LARKINS: Yeah. And that's whatever number I
22  put on there.
23     MR. HERSH: 27?
24     MS. LARKINS: Yeah. Thank you.
25     (Plaintiff's Exhibit No. 27 was marked for

Page 228

1  identification.)
2  BY MS. LARKINS:
3      Q.  Would a fax that looks different from your usual
4  fax probably stand out more in your memory, would you say? I
5  picked one that looks different. It's visually -- kind of
6  catches the attention, and the subject matter's sort of
7  compelling then.
8      A.  No, I don't remember this.
9      Q.  Okay. Okay. I'm going to make this stick out
10  because I have to get copies later. Okay. I've got these --
11  these two where it's going up there, I have to get these
12  copies. Okay.
13         Okay. I'm just going to look through here and see
14  if I can find something that's so visually compelling that
15  you'd really remember it. I know that I started trying to
16  make these things visually compelling so that you would look
17  at them.
18     MR. HERSH: I didn't know there was a rational
19  reason for your interest in faxes.
20     MS. LARKINS: As I mentioned before, you do not
21  know your opponent in this case. When you assume
22  irrationality --
23     MR. HERSH: I didn't assume irrationality. I just
24  assumed a lack of rationality.
25  ///

42 (Pages 225 to 228)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 229

1  BY MS. LARKINS:
2      Q.  Okay.  If you go through -- I think it's about
3  four -- three or four pages beyond.  No, wait a minute.  It's
4  more than that.  One, two, three, four, five, six, seven,
5  eight.  About eight pages beyond the last one.
6          MS. ANGELL:  Can I look at that while he's
7  looking.
8          MR. HERSH:  It's got --
9          MS. LARKINS:  It says hello, hello, hello, hello,
10  hello.  It's a visual --
11          MR. HERSH:  Oh.
12          MS. LARKINS:  -- wave for help.
13          MR. HERSH:  It doesn't --
14          MS. LARKINS:  Yeah.  And we'll call that -- are we
15  on 27 now?
16          MR. HERSH:  28 I think.
17          MS. ANGELL:  28.
18          MS. LARKINS:  Oh, yeah.  27 had no copy.
19          (Plaintiff's Exhibit No. 28 was marked for
20          identification.)
21  BY MS. LARKINS:
22      Q.  Ring a bell?
23      A.  No.
24      Q.  How about the next one?
25      A.  I don't see the next one.

Page 230

1      Q.  Really trying -- I was really trying hard to get
2  your attention.  I drew a big happy face and a daisy.
3          MS. ANGELL:  Can I see the document, please.
4          (Plaintiff's Exhibit No. 29 was marked for
5          identification.)
6  BY MS. LARKINS:
7      Q.  Do you remember me drawing little pictures on my
8  faxes?  Do you remember thinking gee, I wonder if she has any
9  rational reason for doing that like Mr. Hersh did?  Does it
10  seem familiar to you?
11      A.  Well, I know I've seen it before, but it's not
12  something that I've maintained in my memory bank..
13      Q.  Okay.  Well, good.  We're getting somewhere then.
14  See, it wasn't irrational to make those pictures on there.
15  Okay.  I'm ready to move on.
16          MS. ANGELL:  I haven't got an opportunity to
17  finish reading it yet, and object to plaintiff's testifying.
18          MS. LARKINS:  Sorry.  You do have all these
19  documents.  I produced them to you recently.  Okay.
20          MR. HERSH:  And I'd just point out that your
21  Exhibit 17 is a response to Exhibit 20 -- a written response.
22          MS. LARKINS:  I think it's a written response to
23  quite a few of these.
24          MR. HERSH:  Just pointing it out.
25          MS. LARKINS:  That hello, hello, hello must have

Page 231

1  worked.
2          Okay.  Okay.  If you go through about three
3  further there's a visually striking one in there?
4          MR. HERSH:  Three more?
5          MS. LARKINS:  Yeah.  And we'll call this 30.
6          MR. HERSH:  The one with the happy face at the
7  bottom?
8          MS. LARKINS:  Yeah, and the earrings.
9          MR. HERSH:  20 -- 30.
10          MS. ANGELL:  I have a question about this
11  document.  Was it -- there are two places in the first
12  paragraph and the fourth paragraph where something is blacked
13  out.  Was it faxed that way?
14          MS. LARKINS:  I don't have a copy.
15          MS. ANGELL:  Is that how it was sent, do we know,
16  in that first paragraph and the fourth paragraph?
17          MS. LARKINS:  I believe that's how it was sent.
18          MS. ANGELL:  Okay.
19          MR. HERSH:  And where you say "faxed 5:25 p.m." at
20  the top, was that part of the fax or was that added
21  afterwards?
22          MS. LARKINS:  That was added afterwards.
23          MS. ANGELL:  Do you have fax transmission sheets
24  to establish the date and time that all of these faxes
25  allegedly were sent?

Page 232

1          MS. LARKINS:  I have printouts of fax activity.
2  Every 25 faxes the machine printed out a -- an activity
3  report.
4          MS. ANGELL:  But you don't have any kind of like
5  transmission sheet that --
6          MS. LARKINS:  No.
7          MS. ANGELL:  -- normally I would attach on like a
8  proof of fax service?
9          MS. LARKINS:  Yeah.  I just bought that recently
10  when I realized that it was going to be a good investment.
11          (Plaintiff's Exhibit No. 30 was marked for
12          identification.)
13  BY MS. LARKINS:
14      Q.  Does this seem familiar to you?
15      A.  No.
16      Q.  Okay.  Okay.  Let's go about ten further.  Actually,
17  more like 12, 13 further, the one that looks like this.
18          Ms. Boyd, can you explain how there can be so many
19  letters written to you and so few responses from you --
20      A.  No.
21      Q.  -- to me?
22          Okay.  Do you remember receiving this one?
23      A.  No.
24      Q.  Okay.  Do you believe --
25          MR. HERSH:  This is an exhibit now?

43 (Pages 229 to 232)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 233

1   MS. LARKINS: Yeah.
2   MR. HERSH: 31?
3   MS. LARKINS: Let's make this 31. Yeah. Okay.
4   Apparently my -- this document has some additions that have
5   been made to it.
6   MS. ANGELL: Can I see it?
7   (Plaintiff's Exhibit No. 31 was marked for
8   identification.)
9   MS. LARKINS: Yes. You can see that I attached a
10  little yellow sticky to it which was not part of the fax.
11  The handwriting in the upper right-hand corner there about
12  the size of the average sticky is -- should not be part of
13  that document. I should have taken that sticky off before I
14  copied it.
15  MS. ANGELL: Isn't this -- is this the same thing
16  as one of the earlier exhibits that's just got added
17  commentary on the bottom?
18  MS. LARKINS: I would have to look at it. Yes.
19  Yes. Actually, I guess we should ask the witness that.
20  Q. Is this document the same as one that you -- we
21  talked about previously today? Do you recall this?
22  A. Yes.
23  Q. Seeing that earlier today? This was an earlier
24  exhibit. Do you see one difference on it?
25  A. Yes. The "did you forget about this" --

Page 234

1   Q. Uh-huh.
2   A. -- and this note. "Did you forget about this?"
3   MS. LARKINS: Okay.
4   MS. ANGELL: You mean in addition to all the
5   writing up in the right-hand corner?
6   THE WITNESS: And that, yes.
7   MS. ANGELL: And I'll represent I think that we're
8   talking about Exhibit 16 as being a similar version of this
9   document that doesn't -- you know.
10  MS. LARKINS: I'll take your word for it. You
11  wouldn't have any reason to lie.
12  Q. Yes. So I guess you really can't -- do you recall
13  receiving -- I'm sorry. Did you say that you didn't recall
14  receiving this a second time?
15  A. I said I don't remember receiving this a second
16  time.
17  Q. Okay. Okay. Then I guess I would have to be the
18  one that would testify about reminding you about this a month
19  and a half later. Okay. But we'll go ahead and leave that
20  as Exhibit 31.
21  Look for something visually compelling. Okay.
22  Here we go. Oh, no, that wasn't to you. This was when I
23  started using color. Here's one you can --
24  Okay. Now, this one I would say is about 20 pages
25  down, and it has a picture of an ear. And I picked this one

Page 235

1   because I thought it looked a little bit like you and a gavel
2   on the bottom. I'd say that's about 20 pages?
3   MR. HERSH: There's another one -- well, I don't
4   know about --
5   MS. LARKINS: No. We're skipping that one.
6   MR. HERSH: -- scales of justice.
7   MS. LARKINS: Some of those are to other people.
8   MR. HERSH: It's further on?
9   MS. LARKINS: Yeah. It's about 20 pages down and
10  it's an ear.
11  MR. HERSH: Okay.
12  MS. LARKINS: Yeah. Okay. Let's call that --
13  MR. HERSH: And do you think the ear looks like
14  Ms. Boyd or the picture of the woman in the middle of the page?
15  MS. LARKINS: The picture of the woman with the --
16  MS. ANGELL: Operator thing?
17  MS. LARKINS: The picture of the woman.
18  MR. HERSH: I'm sorry, Gina, that you had to hear
19  all that.
20  MS. LARKINS: If you could see the picture in
21  color it really looks very attractive. We'll have Kelley
22  Angell show it to you. Okay. This is 32. And here's the
23  better picture.
24  (Plaintiff's Exhibit No. 32 was marked for
25  identification.)

Page 236

1   BY MS. LARKINS:
2   Q. Does this letter strike you as familiar?
3   A. No.
4   Q. Did you become angry at me during 2001?
5   A. I don't remember.
6   Q. If you were angry at a member, would you look to
7   get -- find someone else to represent that member?
8   A. I believe we had Jim Groth representing you.
9   Q. Go ahead and answer my question.
10  A. Okay.
11  Q. If you were angry at a member, would you try to
12  find someone else to represent that member?
13  A. I guess it would depend on why I was angry at that
14  person.
15  Q. What if they were working hard to uncover a crime
16  you had committed?
17  A. Would I --
18  Q. Look for someone else to represent that member.
19  MS. ANGELL: Objection. Incomplete hypothetical.
20  Assumes facts not in evidence. Argumentative.
21  BY MS. LARKINS:
22  Q. Well, it's a situation which I allege took place.
23  And I'd like to know if you felt that a member was acting
24  against your best interest, if you would try to find them
25  somebody else to represent them?

44 (Pages 233 to 236)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 237

1    A.  It would depend on the situation.
2    Q.  Well, what if it was a very serious situation and
3  if they -- their rights were honored, it could be harmful to
4  you?
5        MS. ANGELL:  Objection.  Vague and ambiguous.
6  Incomplete hypothetical.
7  BY MS. LARKINS:
8    Q.  Can you think of any situation where you would
9  look for someone else to represent a member?
10   A.  I frequently have other people represent members
11 because I can't represent everybody.
12   Q.  Have you ever had someone from outside of C.V.E.
13 represent a C.V.E. member?
14   A.  No.
15   Q.  Did I ask you -- did I ask to have representation
16 from outside C.V.E.?  Not necessarily in this letter,
17 although let's see.
18        Actually, it is.  Could you read the middle
19 paragraph which is partly above the picture of the woman and
20 partly below.
21   A.  "Why do you want to keep your point of view secret
22 from me, when you have insisted all these months that you are
23 representing me?  Are you at last admitting that your goals
24 are different from mine?  If you are opposed to arbitration,
25 don't keep it a secret.  As my lawyer, you must reveal that

Page 238

1  to me.  Then you should call C.T.A. and tell them you do not
2  wish to represent me, and that I need a representative from
3  outside the district (so I don't have to worry about
4  conflicts of interest, such as your ties with my accusers,
5  and ties with the board of directors which you apparently
6  hope to exploit on Monday."
7    Q.  I would like to enter into exhibit -- as
8  Exhibit 33 --
9        MR. HERSH:  Can I --
10       MS. LARKINS:  These are note -- yeah.  Yes.  Oh,
11 sure.
12       MR. HERSH:  I can mark -- this is my copy?
13       MS. LARKINS:  That's your copy.
14       MR. HERSH:  Okay.
15       MS. LARKINS:  Okay.  And this is not part of the
16 PERB appeal.
17       (Plaintiff's Exhibit No. 33 was marked for
18       identification.)
19 BY MS. LARKINS:
20   Q.  Okay.  Could you read this out loud to us so we
21 can figure out what exactly this document is.
22   A.  "I said I wanted to file a grievance.  Gina said
23 there was no hurry.  Gina said, 'The process (grievance)
24 starts all over now that' you've -- 'that they've suspended
25 you again.'  I said, 'But if they pay me, it's not an

Page 239

1  administrative break, right?'  No answer.
2        "4-25-01, as your lawyer, I'm telling you it is
3  very important for you to come to this meeting today."
4    Q.  Okay.  I'm -- mostly I just want to produce this
5  document to you because this is something I'm going to want
6  to use in the trial.
7        MS. ANGELL:  So you have no questions concerning
8  that document?
9  BY MS. LARKINS:
10   Q.  Did you say to me on April 25th, 2001, "as your
11 lawyer, I'm telling you it is very important for you to come
12 to this meeting today"?
13   A.  I wouldn't say that I'm a lawyer.  I'm not a
14 lawyer.
15   Q.  Are you saying -- is your answer no?
16   A.  No.
17   Q.  Okay.  Okay.  That's 33.  Okay.  I also wanted to
18 put that in to help set up the background for this letter
19 here that we're looking at now, Exhibit 32.  After you
20 received this letter did you call C.T.A. and tell them that
21 you did not wish to represent me?
22       MR. HERSH:  Question as to -- objection.  What are
23 you talking about?  What exhibit?
24       MS. LARKINS:  Exhibit 32?
25       MS. ANGELL:  The one with the ear.

Page 240

1        MR. HERSH:  Then the objection is that Ms. Boyd is
2  not an eye, nose or ear specialist.
3        MS. LARKINS:  I think it's a plea to be heard, but
4  I wouldn't be surprised at the objection.
5        THE WITNESS:  What was the question?
6  BY MS. LARKINS:
7    Q.  When you received this did you call C.T.A. and
8  tell them that you did not wish to represented me -- to
9  represent me and that I need a representative from outside
10 the district?
11   A.  No.
12   Q.  Why not?
13   A.  Because I didn't believe that was true.
14       MS. ANGELL:  And I'm sorry.  I'm going to
15 belatedly object to the question because it assumes facts not
16 in evidence.  The testimony was that the witness does not
17 recall receiving the document with the ear on it, so --
18 BY MS. LARKINS:
19   Q.  But you do -- you are certain that you never
20 called C.T.A. and told them that you didn't want to represent
21 me?
22   A.  I am certain.
23   Q.  Okay.  Okay.  Two pages down.  Do you remember
24 this?
25       MR. HERSH:  I'm sorry.  This is 34 now, right?

45 (Pages 237 to 240)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 241

1    MS. LARKINS: Yes.
2    (Plaintiff's Exhibit No. 34 was marked for
3    identification.)
4  BY MS. LARKINS:
5    Q. Do you remember this?
6    A. Not specifically.
7    Q. Does this -- this paper containing these three
8  photographs strike you as bizarre?
9    MS. ANGELL: You mean now or --
10    MS. LARKINS: Now.
11    THE WITNESS: Yes.
12  BY MS. LARKINS:
13    Q. It's -- it's sort of shocking in a way. Would you
14  say it's shocking to some extent?
15    A. Bizarre.
16    Q. Would you say it's compelling?
17    A. Bizarre.
18    Q. Well, I didn't ask you that. I asked you would
19  you say it's compelling?
20    A. I would read it.
21    Q. Thank you. Would -- would you wonder why someone
22  had put these three strange photographs in a fax to you?
23    MS. ANGELL: Objection. Calls for speculation.
24  Incomplete hypothetical.
25    ///

Page 242

1  BY MS. LARKINS:
2    Q. Okay. I'll withdraw that.
3    I notice that you were looking at this document
4  quite a bit just now, that you just kept looking at it,
5  whereas other times you've kind of set them aside and looked
6  away. It really attracts attention, doesn't it. Or let me
7  say this. You don't know that for everybody. It attracted
8  your attention, didn't it?
9    A. Just now?
10    Q. Just now.
11    A. Yes.
12    Q. But you don't recall having received it when -- at
13  the time?
14    A. No.
15    MS. LARKINS: Okay. Let's see. Do I get -- what
16  did I do with my -- do I have a copy of that?
17    Ms. Angell, did I by any chance give you a copy
18  and then --
19    MS. ANGELL: Yes, you did.
20    MS. LARKINS: It's my -- it's our only copy for
21  that deposition.
22    Q. Okay. So when you look back on 2001 do you have
23  the impression that boy, Maura Larkins really sent me a lot
24  of faxes?
25    A. Yeah.

Page 243

1    Q. Before you saw these faxes here today, did you
2  have that impression? Would you -- if I had asked you that
3  before I showed you all these faxes, did you -- before today,
4  like yesterday did you have an impression -- did you remember
5  boy, Maura Larkins really sent me a lot of faxes back in --
6  when this whole thing was going -- started up?
7    MS. ANGELL: Wait a second. Which question is she
8  supposed to respond to?
9    You were just asked four.
10  BY MS. LARKINS:
11    Q. Before you saw these documents today of copies of
12  faxes I sent you, did you have an impression that Maura
13  Larkins sent you a lot of faxes in 2001?
14    A. Yes.
15    Q. Okay. Do you recall any of your feelings in
16  response to any of them?
17    A. Interest.
18    Q. Were you at all irritated at being communicated
19  with so often?
20    A. Not particularly.
21    Q. Slightly?
22    A. Not particularly.
23    Q. Okay. Did you feel that you had an obligation to
24  respond to the faxes?
25    A. When were they taking place?

Page 244

1    Q. Right now we're at --
2    MS. ANGELL: Do you mean collectively to every --
3  do you mean giving a response to each individual fax or do
4  you -- the question's vague.
5  BY MS. LARKINS:
6    Q. Well, other than -- than the responses that we've
7  seen here, I believe I had one entire section which was
8  devoted entirely to what I had received from C.V.E., and it
9  was a small section.
10    Okay. Do you recall sending me your notes of the
11  August -- excuse me, April 25th, 2001 meeting?
12    A. No.
13    Q. Well, you did and I appreciated that. And then I
14  think we've established that -- to my satisfaction anyway. I
15  have submitted documents proving to my satisfaction, maybe
16  not anyone else's, that you faxed me a copy of a -- of a
17  filled out grievance form that you answered some questions I
18  had written and faxed -- well, on the same --
19    MS. ANGELL: Is there a question there or are we
20  just doing dialogue?
21    MS. LARKINS: Well, you are asking how much
22  response did I expect.
23    MS. ANGELL: No. My question was because I didn't
24  understand your question and I objected that it was vague.
25  You said did she do --

46 (Pages 241 to 244)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 245

1    MS. LARKINS: What I want to do, Ms. Angell, is I
2  want to count the responses that I say that I received from
3  Ms. Boyd and ask her then if she felt any obligation to
4  communicate more than that. Okay. We have this one, two,
5  three, four, five, and I also recall --
6    Q. Okay. Did you feel any obligation to respond more
7  than five times to all the faxes that were sent to you?
8    MR. HERSH: This question assumes facts not in
9  evidence.
10    MS. LARKINS: Well, it doesn't require there to
11  have been exactly five.
12    MR. HERSH: Then you should change the way you
13  asked the question, because your question assumes there were
14  five.
15    MS. LARKINS: No, I just asked if she felt that
16  she was obliged to do more than five responses. Maybe she --
17  she could have not done any and I could still ask her did you
18  feel like you should have done more than five.
19    MR. HERSH: Okay.
20    MS. LARKINS: It works. Think about it tonight
21  when you're in the shower.
22    Q. Did you feel any obligation to respond more than
23  about five times to all these faxes?
24    A. No.
25    Q. Okay. Did you answer all the questions I asked

Page 246

1  you?
2    A. I don't know.
3    MS. ANGELL: And I'm going to object here because
4  the witness has already testified that she did give responses
5  other than the ones in writing that you've referenced. The
6  testimony was that she made oral responses to I don't know
7  which particular faxes, but that to some of the faxes she
8  made oral responses.
9    MS. LARKINS: She said she called me on -- in
10  relation to -- she -- I think she said she thought she might
11  have called me in relation to one fax, Ms. Angell.
12    Okay. I'd like to take a break. Anybody else?
13  Would you agree to that?
14    MR. HERSH: Can we have some idea of how long
15  you're planning on --
16    MS. LARKINS: Five minutes.
17    MR. HERSH: I mean, after we come back how long
18  you're planning on continuing.
19    MS. LARKINS: I have a lot, lot more to go
20  through.
21    MR. HERSH: Wow. That's a tough one, because I'm
22  pretty ready to hit the road. So I'll take a five-minute
23  break if you want and then I think we should wrap up. That's
24  my feeling.
25    MS. LARKINS: Well, at least we agree on a

Page 247

1  five-minute break.
2    THE VIDEOGRAPHER: We're going off the record.
3  The time is 5:17 p.m.
4    (Recess taken.)
5    THE VIDEOGRAPHER: We're going on the record. The
6  time is 5:29 p.m.
7    MS. LARKINS: Okay. I think Mr. Hersh wanted to
8  make a statement?
9    MR. HERSH: Sure. Just before I do I just wanted
10  to ask whether you're going to need some time on the record
11  to sort out any of these exhibits or can that be done --
12    MS. LARKINS: I think it can be done off the
13  record. I just have to make sure that everybody gets a copy
14  of all these exhibits.
15    MR. HERSH: Okay. Sure. Off the record I had an
16  exchange with Ms. Larkins, and she had indicated that she
17  would like to continue the deposition tomorrow. I am not
18  available to do that, and I have proposed as I did before
19  today's deposition that she proceed by submitting written
20  deposition questions which we would then respond to pursuant
21  to the Code of Civil Procedure, and that I believe is a
22  reasonable way of proceeding. Because I don't believe -- in
23  addition to all the irrelevancy issues, just the mechanics of
24  this process I don't think are very productive. And so I'm
25  offering on the record to -- even though we have no legal

Page 248

1  duty to answer questions here or in a written deposition at
2  this point, I am willing on the record to agree to -- for you
3  to submit written deposition questions that we would respond
4  to. And you can attach documents to your request and ask the
5  same questions that you've been asking here. And so that
6  would my proposal.
7    MS. LARKINS: Are you offering a choice?
8    MR. HERSH: Well, no, because if you don't want to
9  do the written depositions, then I would -- you know, the
10  deposition is concluded and terminated. As far as I'm
11  concerned it was concluded and terminated legally when you
12  unilaterally suspended it last time and then failed to
13  properly move the court to take further deposition. At that
14  point the deposition was concluded. However, we voluntarily
15  appeared here. I'm not willing to voluntarily appear again
16  for -- for what we've been doing here today.
17    So you can do with that what you'd like. If you
18  want to take that to Judge Nevitt, that's -- that's fine. I
19  don't believe I need to seek a protective order because we
20  had no duty to be here to begin with.
21    MS. LARKINS: Mr. Hersh, as I recall at the end of
22  the first hour and a half of this deposition on March 22nd,
23  2004, you said that you were perfectly willing to allow this
24  deposition to proceed if you're asking questions that are
25  pertinent to the case that brings us here and within the

47 (Pages 245 to 248)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 249

1  scope of discovery.
2      MR. HERSH: On that date.
3      MS. LARKINS: You made it clear that you
4  acknowledged that the deposition had not been finished, only
5  that I wanted to ask the court to compel you to answer
6  questions about Chula Vista Elementary School District. And
7  as it happens, you're quite correct that my motion to compel
8  was not granted because I did not attach a separate statement
9  of facts, so the court never did rule one way or the other as
10  to the scope of discovery. But you have very graciously come
11  today and answered questions about Chula Vista Elementary
12  School District which I appreciate very much. At this point
13  it seems to me that we're going along just fine in this
14  deposition. I have been asking the only questions I can ask
15  which are questions about what happened in Chula Vista
16  Elementary School District because that's where all my
17  evidence that I want to present to the jury in this case
18  originated. And
19      MR. HERSH: So -- I'm sorry.
20      MS. LARKINS: Well, I haven't finished asking my
21  questions.
22      MR. HERSH: Okay. I'm willing -- I don't know if
23  the court reporter would be, but I'd be happy to stay for you
24  to ask a question or two concerning the Exhibit A that we've
25  put in the record, your indication that you intended to ask

Page 250

1  questions concerning those two matters the -- that you
2  alleged in the complaint. And I -- you know, I certainly
3  think if you want to use this opportunity to actually ask
4  President Boyd if she has any recollection of anything that
5  might have to do with either of those allegations, that would
6  be perfectly appropriate. They should have been asked seven
7  or eight hours ago, but you know, I'm willing to stay for
8  another ten minutes while you actually ask the questions that
9  are relevant to the proceeding.
10      But if you're not and you really think that would
11  be a waste of your time as you indicated earlier, then I stay
12  with my position that the deposition was concluded. And we
13  can discuss it afterwards if you'd like, but -- but that's my
14  position at this point, and maybe you can convince me
15  otherwise, but not today.
16      MS. LARKINS: One of the things that I will be
17  working hardest to convince the jury of is the dishonesty of
18  the defendants in this case. Ms. Boyd has obliged me today
19  by contradicting Rick Werlin's sworn testimony on a number of
20  occasions, and there are many more incidents to which
21  Mr. Werlin -- regarding which Mr. Werlin gave sworn testimony
22  that I'd like to ask Ms. Boyd about. So that's -- to me
23  that's what this case hinges on. It's the obvious dishonesty
24  and secrecy is how I will prove my case to the jury. Not
25  by --

Page 251

1      MS. ANGELL: Excuse me. Are you saying that you
2  asked some questions today concerning information from an
3  arrest record? Because I didn't hear any questions along
4  those lines. Were there some and I missed them?
5      MS. LARKINS: Let me finish, please, and then you
6  can ask your question. In fact, why don't you ask it after
7  the court reporter leaves.
8      MS. ANGELL: I've already asked it.
9      MS. LARKINS: Okay. I'm going to continue with
10  what I was trying to say, if I can remember what I was trying
11  to say. Oh, yeah. It's that -- it's the sneaky, dishonest
12  behavior and the obvious lying of the defendants that will be
13  the main part of the case that I present to the jury.
14      MR. HERSH: But not my clients. You're talking
15  about her clients, right?
16      MS. LARKINS: No. Ms. Boyd has --
17      MR. HERSH: I'm shocked that you would say such a
18  thing. I'm completely flabbergasted.
19      MS. LARKINS: Well, listen, when you -- when
20  Ms. Boyd helped to get me dismissed and protected the people
21  who said that I was going to kill people, Ms. Boyd obviously
22  has a great deal of hostility toward me that she has masked
23  today. There -- there are a lot more instances of
24  contradictory testimony that I need to get on the record.
25      MR. HERSH: Well, you've explained your position,

Page 252

1  and I've explained my position. And I'm willing to continue
2  the discussion, but I'm not willing to continue the
3  deposition tomorrow. And I'm yet to be convinced that it
4  should be continued at all, so -- but I'm not closing the
5  door to you convincing me that there's legal support for your
6  position. My research has indicated that someone who
7  suspends a deposition and under the -- in the manner that you
8  suspended Ms. Boyd's deposition took a risk, and you went to
9  court and you lost. And as far as I can tell legally, you
10  don't have a right to a second deposition without an order
11  from the court.
12      MS. LARKINS: Well, fortunately you're not the
13  judge in this case, so we'll let Judge Nevitt decide, not
14  you.
15      MR. HERSH: If necessary, sure. So in light of
16  that, we would ask that the deposition be terminated.
17      MS. LARKINS: I'm not terminating the deposition.
18      MR. HERSH: Okay.
19      MS. ANGELL: Do you have any questions that you
20  would like to ask of this witness at this time concerning
21  either "A," her alleged illegal receipt of records of your
22  arrest; or "B," obstruction of justice, specifically
23  violations of California Penal Code Section 136.1 as
24  referenced in your September 8 memo concerning the subject
25  matter of this deposition?

48 (Pages 249 to 252)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 253

1    MS. LARKINS: Ms. Angell --
2    MS. ANGELL: Because he said he would stay if you
3    wanted to --
4    MS. LARKINS: That's --
5    MS. ANGELL: -- ask those questions.
6    MS. LARKINS: Ms. Angell, that's a rhetorical
7    question. It's a question that you have asked countless
8    times, just I think like more so the last time we met than
9    this time, but --
10    MR. HERSH: She's asking what you -- whether the
11    things that you put in your September 8th letter are truthful
12    or not. That's what she's asking. And apparently you
13    weren't truthful when you said that that was why you wanted
14    to have this deposition today, because you haven't asked
15    those questions. I'm afraid to tell you that I don't ever
16    like to accuse anyone of not being entirely forthright, but I
17    feel that you may have been somewhat deceptive in the manner
18    in which you conducted yourself today and having us come
19    here, because I wouldn't have come here if I believed that
20    you were going to spend the entire day asking about questions
21    that you know I believe to be completely irrelevant and not
22    likely to lead to discoverable evidence and not likely to
23    lead to admissible evidence.
24    MS. LARKINS: Within the first five minutes today
25    I told you exactly the questions I was going to ask today. I

Page 254

1    made it very clear.
2    MR. HERSH: And we stayed, and I drove down two
3    and a half hours from Los Angeles for that purpose, and I
4    intended to make good of the time here. And I wish you'd
5    been a little more organized and maybe you would have gotten
6    through another year or so of your faxes. But unfortunately
7    we really spent a lot more time here than I'd been prepared
8    to, and I'm ready to go home. So --
9    MS. LARKINS: Thank you for admitting that I've
10    made it very clear at the outset today exactly what the
11    entire day was going to consist of as far as questioning.
12    Well, Mr. Hersh has stated that he is going to go
13    home and is not coming back.
14    MS. ANGELL: Actually, what was stated on the --
15    by you off the record was that the court reporter is ill or
16    not feeling well and that the deposition needs to be
17    concluded for the evening. And Mr. Hersh offered to stay
18    additional time so that you could ask questions about those
19    two areas that you said you were going to ask questions on.
20    I guess that would be assuming that the court reporter could
21    stay. So that's an accurate reflection of what's occurred.
22    MS. LARKINS: So your suggestion is to keep the
23    court reporter here?
24    MR. HERSH: That was my suggestion half an hour
25    ago. It's no longer my suggestion because it's clearly

Page 255

1    beyond the pale to ask people to stay here after they've
2    been -- she's been typing since 10:00 o'clock -- before 10:00
3    o'clock this morning. So caring as much as I do about
4    working people, I wouldn't ask that she remain here any
5    longer.
6    MS. LARKINS: That's a relief to me.
7    MR. HERSH: So you're the one who called the
8    deposition, so it's really how do you want to --
9    MS. LARKINS: When would you like to continue this
10    deposition?
11    MR. HERSH: I've already said I'm not going to --
12    at this point, I'm not willing to continue the deposition, so
13    that's what I've told you. I'm willing to continue the
14    discussion with you afterwards, but I'm not willing to
15    continue the deposition at this point because you have not
16    shown me any reason why that would be productive, and I don't
17    believe we have any legal duty to do so.
18    MS. LARKINS: I think that pretty well settles
19    everything. We can take a break, end the deposition to --
20    and we'll see if I have to file a motion to compel or if I
21    might succeed in getting Mr. Hersh to continue the deposition
22    at some time.
23    THE REPORTER: Will there be any stipulation to
24    how to proceed with this transcript?
25    MR. HERSH: I would say that we reached certain

Page 256

1    stipulations at the end of the first day of deposition, and
2    why don't we just agree that the same stipulations that we
3    reached at that time -- is that okay?
4    MS. ANGELL: I don't recall what they were, but --
5    MR. HERSH: You read -- you basically dictated
6    something into the record.
7    MS. ANGELL: As long as the witness has like at
8    least a month, at least 30 days from the time she receives
9    the transcript to review it and make any changes, because
10    this is going to be a really long transcript. She might need
11    more time than that with her -- I don't know.
12    Would that -- would four weeks be enough time if
13    you're not receiving the transcript for another two or three
14    weeks? That's going to put it at Christmas time or
15    Thanksgiving. How much time do you need to review your
16    transcript.
17    MR. HERSH: It's probably going to be three times,
18    four times the size of the first one.
19    THE WITNESS: It's not how much time I'll need.
20    It will be how much time I have. So I don't know. That's a
21    very busy time. I would say I would need at least two or
22    three weeks.
23    MS. ANGELL: Okay. So the prior stipulation as
24    long as it has at least four weeks in there would be fine. I
25    don't remember what the time frame was, but it was probably

49 (Pages 253 to 256)

Larkins v. Werlin
GIC 781970

Deposition of Virginia Boyd
October 11, 2004

Page 257

1   four weeks.
2       MR. HERSH: I think it was four -- yeah, it was
3   four weeks.
4       MS. ANGELL: So the prior stipulation with the
5   four-week time frame for reviewing the deposition transcript,
6   faxed copy of signature is acceptable. If the original is
7   lost or otherwise unavailable, a certified copy whether
8   signed or whether the signature page is available or not will
9   be an adequate substitute and evidence of the testimony given
10  at this deposition for all purposes. So stipulated?
11      MS. LARKINS: So stipulated.
12      MR. HERSH: So stipulated.
13      THE VIDEOGRAPHER: This concludes today's
14  deposition. We're going off the record at 5:45 p.m.
15          * * * * *
16      I, VIRGINIA BOYD, swear under penalty of perjury
17  that I have read the foregoing, and that it is true and
18  correct, to the best of my knowledge and belief.
19      Signed on this    day of         , 2004,
20  at
        (City)          (State)
21
22
                VIRGINIA BOYD
23
24
25

Page 258

1   STATE OF CALIFORNIA )
2   COUNTY OF SAN DIEGO )
3
4       I, CLAUDIA A. WITT, Certified Shorthand Reporter
5   licensed in the State of California, License No. 10797,
6   hereby certify that the deponent was by me first duly sworn
7   and the foregoing testimony was reported by me and was
8   thereafter transcribed with Computer-Aided Transcription;
9   that the foregoing is a full, complete, and true record of
10  said proceeding.
11      I further certify that I am not of counsel or
12  attorney for either or any of the parties in the foregoing
13  proceeding and caption named or in any way interested in the
14  outcome of the cause in said caption.
15      The dismantling, unsealing, or unbinding of the
16  original transcript will render the reporter's certificates
17  null and void.
18      In witness whereof, I have hereunto set my hand
19  this day: October 28, 2004
20
21  _____
        CLAUDIA A. WITT, CSR
22  Certificate No. 10797
23
24
25

50 (Pages 257 to 258)

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

MAURA LARKINS,                          *
                                        *
                                        *
              Plaintiff,                *
                                        *
        vs.                             *    Case No. GIC 781970
                                        *
RICHARD T. WERLIN, etc.,                *
et al.,                                 *
                                        *
              Defendants.               *
                                        *

VIDEOTAPED DEPOSITION OF PEGGY MYERS

Taken at San Diego, California

November 29, 2004

Claudia A. Witt, CSR

Certificate No. 10797

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

Page 2

I-N-D-E-X

1
2  VIDEOTAPED DEPOSITION OF PEGGY MYERS          PAGE
   November 29, 2004
3
      Examination by Ms. Larkins          4
4
5
6  EXHIBITS:                    PAGE
7    1  Deposition Subpoena, one page          10
8    2. Notice of Motion and Motion to Quash          17
        Subpoenas for Third-Party Discovery
9       and, Alternatively, Motion for
        Protective Order, two pages
10
     3  The Star News article dated 8-20-04      22
11      two pages
12   4  La Prensa San Diego article dated      50
        9-17-04, two pages
13
     5  Excerpt from Education Code, Section      63
14      44930-44936, in part, two pages
15   6  Excerpt from Labor Code, Section      66
        430-432.7, in part, two pages
16
     7  La Prensa San Diego article dated      108
17      10-8-04, one page
18
19  INSTRUCTION NOT TO ANSWER          LINE/PAGE
20                              21  17
                               2  55
21                            20  64
                                8  94
22                              9  123
23
24
25

---

Page 3

1        VIDEOTAPED DEPOSITION OF PEGGY MYERS
2
3        Pursuant to Notice to Take Deposition, and on the 29th
4  day of November 2004, commencing at the hour of 10:16 a.m. at
5  319 Elm Street, Suite 100, in the City and County of San Diego,
6  State of California, before me, Claudia A. Witt, Certified
7  Shorthand Reporter in and for the State of California,
8  personally appeared:
9              PEGGY MYERS,
10  Witness herein, who, called as a witness by the Plaintiff,
11  being by me first duly sworn, was thereupon examined as a
12  witness in said cause.
13
              APPEARANCES
14
For the Plaintiff:  MAURA LARKINS
15          1935 Autocross Court
            El Cajon, California 92019
16          (619) 444-0065
            (In Propria Persona)
17
For Chula Vista    CALIFORNIA TEACHERS ASSOCIATION
18  Educators,    By:  MICHAEL HERSH, ESQ.
    California Teachers Post Office Box 2153
19  Association,     11745 East Telegraph Road
    Virginia Boyd and    Santa Fe Springs, California 90670
20  Timothy O'Neill:  (562) 942-7979
              (Appeared telephonically)
21
For Robin Donlan  STUTZ, ARTIANO, SHINOFF & HOLTZ
22  and Linda Watson:  By:  KELLY R. ANGELL, ESQ.
            401 West A Street, 15th Floor
23          San Diego, California 92101
            (619)232-3122
24
25  Also Present:    Gregg Eisman, Videographer

---

Page 4

1        THE VIDEOGRAPHER:  This is the video deposition of
2  Peggy Myers being taken on behalf of the plaintiff in the
3  matter of Maura Larkins versus Richard T. Werlin, et cetera,
4  et al., San Diego Superior Court case No. GIC 781970.  This
5  deposition is being held in the offices of San Diego Court
6  Reporting, located at 319 Elm Street, Suite 100, San Diego,
7  California.  Today is Monday, November 29th, 2004, and the
8  time is now 10:16 a.m.  My name is Gregg Eisman.  I'm a legal
9  video specialist with Videographics, located at 1903 30th
10  Street, San Diego, California.  The certified shorthand
11  reporter is Claudia Witt of San Diego Court Reporting.
12        For the video record, would counsel please state
13  their appearances.
14        MS. LARKINS:  Maura Larkins, plaintiff in pro per.
15        MS. ANGELL:  Kelly Angell for defendants Robin
16  Donlan and Linda Watson.
17        MR. HERSH:  Michael Hersh for the association
18  defendants.
19        THE VIDEOGRAPHER:  Would the reporter please swear
20  the witness.
21        (At this point, the deponent was placed under oath
22  by the court reporter.)
23
24  EXAMINATION BY MS. LARKINS:
25    Q.  Good morning, Ms. Myers.

---

Page 5

1    A.  Good morning.
2    Q.  How are you feeling today?
3    A.  Fine.
4    Q.  Is there any reason that you couldn't give your
5  best testimony today?
6    A.  Nope.
7    Q.  Okay.
8        MS. ANGELL:  If you could do me a favor and try --
9        THE WITNESS:  Not rock.
10        MS. ANGELL:  -- not to rock.  I rock like a --
11        THE WITNESS:  Shouldn't have given me this chair.
12        MS. ANGELL:  If you want a different one --
13        MS. LARKINS:  They're all the same.
14        MS. ANGELL:  Maybe that one.
15        THE WITNESS:  I'll try and refrain.
16  BY MS. LARKINS:
17    Q.  Okay.  I'd like to start with a -- sort of your
18  background in education and employment.  Could you tell me
19  where and when you graduated from high school?
20    A.  Park Ridge, Illinois, 1973.
21    Q.  Okay.  And after that what did you do in terms of
22  education or employment?
23    A.  I did not go to college until I came to San Diego
24  which was many years later.
25    Q.  Okay.  Then after college did you become employed

---

2 (Pages 2 to 5)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 6

1  shortly thereafter?
2      A.  Yes.
3      Q.  I mean -- I'm sorry.  Did I say college?
4      A.  Yes.
5      Q.  After high school did you become employed shortly
6  thereafter?
7      A.  I worked different jobs after high school, yes.
8      Q.  And what were those jobs?
9      A.  Oh, I waitressed.  I worked in -- worked for
10  Walgreen's.  Different jobs.
11      Q.  And what did you do at Walgreen's?
12      A.  I couldn't tell you.  I couldn't remember.  I
13  mean, office stuff.  You know, what you do when you're 18
14  years old.  File papers, those kinds of things.
15      Q.  Okay.  And after you finished what, ten years or
16  so of this sort of work?
17      A.  Well, I started college when I was about 26 or 27
18  years old, so yes, approximately.
19      Q.  And where did you go to college?
20      A.  Went to Mesa College in San Diego and San Diego
21  State.
22      Q.  Okay.  And what year did you graduate from
23  San Diego State?
24      A.  I couldn't tell you.
25      Q.  Okay.  Can you give me a ball park figure?

Page 7

1      A.  19 --
2      Q.  Let's see, you said you started college around '76?
3      A.  No.  I moved here in '76.  I did not start college
4  in '76.  I would have to say I graduated from San Diego State
5  about maybe '90, 1990.
6      Q.  Okay.  And what did you do after that as far as
7  education or employment?
8      A.  I -- which one, education?
9      Q.  Either one, whichever you did or both.
10      A.  I got my master's degree at San Diego State.  And
11  if you ask me when I graduated from them, I couldn't tell you.
12          That would be my phone probably.
13          And I did get a job at -- with the Chula Vista
14  Elementary School District.
15      Q.  Okay.  And do you remember what year that was?
16      A.  1992 I believe.
17      Q.  Okay.  And what school did you teach at when you
18  first started teaching in Chula Vista?
19      A.  I was a substitute.
20      Q.  Okay.  And about how long were you a substitute?
21      A.  One year.
22      Q.  Okay.  And then what school did you teach at?
23      A.  Then I had a temporary contract at Valley --
24  Valley Vista for one year.
25      Q.  Okay.  And then after that year?

Page 8

1      A.  Then I subbed for part of a year, and then I had a
2  40 percent contracted position at Rice.
3      Q.  Okay.  And how long did you have that 40 percent
4  position?
5      A.  Just one year.
6      Q.  Okay.  And then what did you do?
7      A.  Then I became the 5th grade teacher at Castle Park.
8      Q.  Okay.  And was that around the -- 1995?
9      A.  Probably.
10      Q.  Okay.  And who was the principal when you came to
11  Castle Park?
12      A.  Oscar Perez.
13      Q.  Okay.  And I'd like to kind of go off of the
14  chronological order of things for a moment.  Why did you
15  choose Ms. Angell to represent you here today?
16          MS. ANGELL:  Objection.  Not reasonably calculated
17  to lead to the discovery of admissible evidence.  It seeks to
18  invade attorney/client privilege.
19          MS. LARKINS:  Are you telling her to refuse to
20  answer the question?
21          MS. ANGELL:  You're seeking to invade the
22  attorney/client privilege.
23          MS. LARKINS:  Well, why don't you instruct your
24  client not to answer then.
25          Ms. Angell, you are staring at me in a very

Page 9

1  hostile manner.  Okay.
2          MS. ANGELL:  Move to strike plaintiff's
3  characterization of me.  I'm just sitting here at the table
4  not talking.
5          MS. LARKINS:  For the record, I would like to
6  state that Ms. Angell just made a severe grimace with her
7  mouth moving it far over to the right, and she was trying to
8  stare me down a minute ago when I asked her if she was
9  instructing her client not to answer the question.
10          MS. ANGELL:  Move to strike.  No question pending,
11  and inaccurate description of events.
12          Would you like to ask the witness another question
13  about a different topic other than her attorney/client
14  communications?
15          MS. LARKINS:  Ms. Angell, I am not the witness
16  here.  I get to speak when there's no question pending.  I'm
17  the one who asks the questions.
18      Q.  Ms. Myers, why did you choose Ms. Angell to be --
19  to represent you here today?
20          MS. ANGELL:  Do not respond to any attorney/client
21  privileged information.  Anything that you've discussed with
22  me is not within the realm of your knowledge for purposes of
23  any question in this deposition.  And I renew the objection
24  this is not reasonably calculated to lead to the discovery of
25  admissible evidence.  It's also vague and ambiguous.

3 (Pages 6 to 9)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

Page 10

1    MS. LARKINS: I would like to ask that this
2  document be labeled as Exhibit 1.
3    (Plaintiff's Exhibit No. 1 was marked for
4    identification.)
5  BY MS. LARKINS:
6    Q.  Ms. Myers, does this document look familiar to you?
7    A.  It just looks like a subpoena to me.  I mean,
8  familiar -- I don't know what you mean by familiar.
9    Q.  Have you ever seen this document before?
10    A.  I couldn't -- I couldn't be sure.
11    Q.  Were you served at your home with a subpoena from
12  the -- Stephen V. Love, the clerk of the Superior Court?
13    A.  Yes.
14    Q.  Was the subpoena -- did the subpoena have my name
15  and address at the top in place of -- in the box where it
16  says "attorney or party without attorney"?
17    A.  I can't remember if it did or not.  I don't
18  remember what was written on there.  I did receive a
19  subpoena, but I don't remember what was written.
20    Q.  Okay.  And do you remember that the subpoena
21  concerned me?
22    A.  Yes.  I assumed that.
23    Q.  Okay.
24    MS. ANGELL: Okay.  I'm going to instruct the
25  witness not to assume.  You need to testify as to what you

---

Page 11

1  know.  If you don't know the answer, say you don't know the
2  answer.  But no guesses in deposition testimony.
3    THE WITNESS: Okay.
4  BY MS. LARKINS:
5    Q.  Okay.  Did you know that the subpoena came from me?
6    A.  Yes.
7    Q.  Okay.  How did you feel when you received the
8  subpoena?
9    A.  I was upset that it was delivered to me late at
10  night.
11    Q.  How late at night was it delivered?
12    A.  I don't remember, but I was falling asleep on the
13  couch.
14    Q.  Okay.  Was there anything else about it that upset
15  you?
16    MS. ANGELL: And I'm going to object that this
17  line of questioning is not reasonably calculated to lead to
18  the discovery of admissible evidence.  For the record,
19  plaintiff has offered a one-page copy of a document
20  purporting to be a deposition subpoena in the matter of
21  Larkins V. Schulman, GIC 823858, and this is -- appears not
22  to be related to the instant case.  So I'll give you some
23  latitude here.  I don't know what you're going for, but if
24  you could kind of get to the point.
25    MS. LARKINS: Well, would you like me to tell you

---

Page 12

1  what I'm going for?
2    MS. ANGELL: Sure.
3    MS. LARKINS: What I'm going for here is attitudes
4  and motivations of employees of Chula Vista Elementary School
5  District regarding me and the events surrounding my removal
6  from my classroom at Castle Park Elementary School.
7    MS. ANGELL: Okay.  Well, that's not reasonably
8  calculated to lead to the discovery of admissible evidence in
9  this case, the attitudes of people at your school.
10    What is reasonably calculated to lead to the
11  discovery of admissible evidence would be questions
12  concerning whether this witness has any knowledge of any
13  statements that you were dangerous, possessed a handgun, had
14  been arrested, needed to be arrested, if she had been told
15  that you had a record of arrest, that kind of thing, because
16  those are the allegations in your complaint.
17    This business about your -- your -- the reasons
18  for your dismissal from employment with the district other
19  than issues having to do with your allegations that people
20  had information from your arrest records is totally
21  irrelevant to this case.  And if you can ask any questions
22  containing to -- pertaining to the allegations in the case,
23  that would be great.  But -- and I would not object to those
24  questions.
25    MS. LARKINS: Ms. Angell, would you like to have

---

Page 13

1  this objection which you have just made be a standing
2  objection to all the questions I ask today?
3    MS. ANGELL: Relevance?
4    MS. LARKINS: Yes.
5    MS. LARKINS: Yes.
6    MS. LARKINS: Okay.  Well, then you won't have to
7  state that over and over and over again because I stipulate
8  that this will be a standing objection to every question I
9  ask today.
10    MS. ANGELL: But that does not mean that you --
11  that I'm going to give you latitude to abuse and harass this
12  witness by going on and on and on about not relevant stuff.
13  I'll give you some latitude to get towards something, and
14  there may come a point in time where we have to ask that you
15  move on to a different line of questioning.  But I wish to
16  allow you every opportunity to elicit relevant evidence or
17  items calculated -- reasonably calculated to lead to the
18  discovery of admissible evidence from this witness, so --
19    MS. LARKINS: Well, Ms. Angell, I hope that when
20  you feel that you don't want the witness to answer any more
21  questions along a certain line that you will simply instruct
22  her not to answer the question.
23    MS. ANGELL: I will.
24    MS. LARKINS: Thank you.
25    Q.  Okay.  Ms. Myers, did you have -- was there

---

4 (Pages 10 to 13)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 14

1 anything else about receiving this subpoena that caused you
2 to be upset other than the fact that it was delivered when
3 you were falling asleep on the couch?
4    A.  No.
5    Q.  Okay.  Did you appear for a deposition on
6 July 27th, 2004, at 10:00 a.m.?
7    A.  No.
8    Q.  Why did you not appear?
9       MS. ANGELL:  To the extent that you know.
10       THE WITNESS:  Because there was a --
11       MS. ANGELL:  And not --
12       THE WITNESS:  -- proceeding.
13       MS. ANGELL:  -- revealing any communications
14 between you and counsel.
15       THE WITNESS:  There was a proceeding that
16 precluded me from having to attend.
17 BY MS. LARKINS:
18    Q.  Oh, okay.  So you understood that you were not
19 allowed to attend the deposition that was -- you were
20 subpoenaed for here?
21       MS. ANGELL:  Objection.  Misstates the testimony.
22 Argumentative.  And not reasonably calculated to lead to the
23 discovery of admissible evidence.
24 BY MS. LARKINS:
25    Q.  Can you answer the question?

Page 15

1    A.  Can you repeat the question?
2    Q.  Did -- is it your understanding that you were
3 forbidden to appear for this deposition?
4    A.  The wording of that question is a little bit --
5 it's worded strangely that I was forbidden.  What does that
6 mean?
7    Q.  That means that you were prevented by some
8 proceeding from attending this deposition.
9       MS. ANGELL:  Do you mean was she prevented from
10 attending the deposition versus did the court order that the
11 deposition not proceed?  I think you're trying to confuse the
12 witness.
13       MS. LARKINS:  No.
14       MS. ANGELL:  She's saying she can't understand
15 your question.
16 BY MS. LARKINS:
17    Q.  Okay.  Do we need to go back and ask the court
18 reporter what your answer was when I asked you why you didn't
19 attend this deposition or do you want to --
20       MS. ANGELL:  She said that the deposition had been
21 precluded.
22       MS. LARKINS:  Okay.
23       MS. ANGELL:  That's my recollection of the
24 statement.
25 ///

Page 16

1 BY MS. LARKINS:
2    Q.  Now, by the word precluded do you understand that
3 to mean forbidden?
4    A.  No, I don't.
5    Q.  What do you mean when you say it was precluded?
6    A.  There was a proceeding that took place that
7 basically said I did not have to attend.
8    Q.  Okay.
9    A.  That's much different than forbidden.
10    Q.  It certainly is.
11    A.  Yes.
12    Q.  I'm glad I understand that now.  Okay.
13       MS. ANGELL:  And I need to make an objection
14 belatedly that this is calling for legal conclusions.  This
15 person's not been designated as an expert witness concerning
16 the litigation.  These topics are concerning litigation
17 separate and apart from this in a separate case in front of a
18 different judge, and there are records which are public
19 documents that will respond to the questions being posed by
20 Mrs. Larkins as opposed to asking a lay witness for legal
21 conclusions.
22       MS. LARKINS:  Ms. Angell, I am not asking the
23 witness for legal conclusions.  I'm asking her why she didn't
24 appear at the deposition.
25       Okay.  I'd like to take a break to copy some

Page 17

1 documents.  Is counsel in agreement?
2       MS. ANGELL:  A brief break.
3       MS. LARKINS:  How about you, Michael?  Mr. Hersh?
4       MR. HERSH:  Hi.  Can you hear me?
5       MS. LARKINS:  Yes.
6       MR. HERSH:  What is the question?
7       MS. LARKINS:  Would you agree to a short break so
8 I can copy documents?
9       MR. HERSH:  Absolutely.
10       MS. LARKINS:  Okay.  Thank you.
11       THE VIDEOGRAPHER:  We're going off the record.
12 The time is 10:34 a.m.
13       (Recess taken.)
14       THE VIDEOGRAPHER:  We're going on the record.  The
15 time is 10:43 a.m.
16       MS. LARKINS:  Okay.  I would like to ask that this
17 document be labeled Exhibit No. 2.
18       (Plaintiff's Exhibit No. 2 was marked for
19       identification.)
20 BY MS. LARKINS:
21    Q.  Ms. Myers, have you ever seen this document before?
22       MS. ANGELL:  Objection.  Not reasonably calculated
23 to lead to the discovery of admissible evidence.  Seeks to
24 invade the attorney/client privilege.  Seeks to invade
25 attorney work product, and the witness will not answer this

5 (Pages 14 to 17)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

Page 18

1  question or any questions in this line. And I would ask you
2  to move on to your next topic.
3       MS. LARKINS: Okay. That's fine with me if the
4  witness doesn't answer, but in order that I can compel
5  testimony in the future I want to make sure that I get the
6  questions on record.
7       Okay. I need the answer to that question.
8       MS. ANGELL: She will not answer the question.
9       MS. LARKINS: Oh, I'm sorry. I'm speaking to
10  myself for my motion to compel. I'm going to need to compel
11  that one.
12       Or maybe I should just have a motion to compel
13  that whole line of questioning. Maybe I'll move on for right
14  now, because I do want to know why she came to you to ask
15  that she be excused from going to that deposition.
16       MS. ANGELL: Motion to strike. No question pending.
17       MS. LARKINS: Ms. Angell, I don't answer the
18  questions:
19       MS. ANGELL: If you're posing a question to the
20  witness, please, you know, proceed. It sounded like you were
21  just sort of talking like --
22       MS. LARKINS: Okay.
23       MS. ANGELL: -- you usually do.
24       MS. LARKINS: I think you're trying to state
25  something other than no question pending. I don't have to

---

Page 19

1  have a question pending in order to speak. The witness does.
2       MS. ANGELL: Mrs. Larkins, you don't get to
3  testify today.
4       MS. LARKINS: Ms. Angell, I would like you also to
5  think about that rule about not testifying and I'd like you
6  to follow it, because you're not the witness either.
7       Q. Ms. Myers, have you ever told anyone that I'm
8  crazy?
9       MS. ANGELL: Objection. Seeks to invade attorney/
10  client privilege. Not reasonably calculated to lead to the
11  discovery of admissible evidence.
12  BY MS. LARKINS:
13       Q. Have you ever told anybody other than your
14  attorney that I'm crazy?
15       A. Not to my knowledge that I can remember.
16       Q. Is it your opinion that I am crazy?
17       MS. ANGELL: Relevance. This is not an expert
18  witness unless you'd like to qualify her as an expert
19  witness. I don't believe that she's qualified to give an
20  opinion on whether or not you're crazy. And vague and
21  ambiguous as to term crazy.
22       MS. LARKINS: Unfortunately, Ms. Angell, people do
23  not seem to need to be qualified psychologically to give such
24  opinions about other people, and that's why we have laws
25  against slander.

---

Page 20

1       MS. ANGELL: Well, Mrs. Larkins, you do not have a
2  cause of action for slander here.
3       MS. LARKINS: I don't?
4       MS. ANGELL: Nope.
5       MS. LARKINS: Well --
6       MS. ANGELL: Not against this witness. You have a
7  cause of action for slander against Mr. Carlson. That's the
8  only witness I'm aware of.
9       MS. LARKINS: I don't have any cause of action
10  against this witness. This is a witness to slander.
11       MS. ANGELL: Uh-huh.
12       MS. LARKINS: Uh-huh.
13       MS. ANGELL: Concerning Mr. Carlson, the cause of
14  action for slander alleges that Mr. Carlson gave out
15  information from your arrest records. If you'd like to ask
16  this witness anything about whether she knows anything about
17  arrest records, I certainly would not object to any questions
18  along that line.
19       MS. LARKINS: Okay. Now, Ms. Angell, it would
20  really help things a lot if you would make clear when you're
21  objecting and when you're instructing the witness not to
22  answer. Because -- have you explained to the witness that
23  after an objection, she is then to answer the question?
24       MS. ANGELL: I'm not here to dialogue with you,
25  Mrs. Larkins.

---

Page 21

1  BY MS. LARKINS:
2       Q. Okay. I'm going to explain it to you then.
3  Ms. Myers, the way this is done is, for example, let's say I
4  asked you if you had ever told Ms. Angell that I was crazy,
5  Ms. Angell would have a legitimate objection in that and the
6  judge would uphold it. Now, there's two things she can do:
7  She can either say objection, attorney/client privilege and
8  then you answer the question despite the objection, or she
9  can instruct you not to answer the question. It's really two
10  different things. If she objects, you answer the question.
11  If she instructs you not to answer the question, then you
12  don't answer it.
13       Okay. Is it your opinion that I am crazy?
14       MS. ANGELL: Same objections. Calls for expert
15  testimony. Vague and ambiguous as to crazy. Not reasonably
16  calculated to lead to discovery of admissible evidence.
17  BY MS. LARKINS:
18       Q. Now you may answer.
19       MS. ANGELL: If you understand the question.
20  Answer anything that does not have to do with attorney/client
21  privilege.
22       THE WITNESS: What's the question again?
23  BY MS. LARKINS:
24       Q. Is it your opinion that I'm crazy?
25       A. I don't even know how to answer that. I have no

---

6 (Pages 18 to 21)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA  92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

Page 22

1  opinion.
2      Q.  Is it your opinion that I'm sane?
3      A.  I have no opinion on that either.
4      Q.  Okay.  I would like to ask that this document be
5  labeled as Exhibit 3.
6          (Plaintiff's Exhibit No. 3 was marked for
7          identification.)
8  BY MS. LARKINS:
9      Q.  Have you ever seen this article before, this news
10  article before?
11     A.  I am not sure if I've seen this one.
12     Q.  Were you aware that there was an article in The
13  Star News on or about August 20th, 2004, which discussed
14  details about you?
15         MS. ANGELL:  Objection.  This line of questioning
16  does not -- is not reasonably calculated to lead to the
17  discovery of admissible evidence in this case.  This is not a
18  case about Mrs. Myers' employment.  This is a case alleging
19  that Donlan and others had information from your arrest
20  records and passed that around.  And --
21         MR. HERSH:  Joined by association defendants.
22         MS. ANGELL:  -- any attempt to discuss this
23  witness's employment, the current status of this witness's
24  employment beyond who her employer is, where she works, what
25  her duties are, particularly your attempt to discuss a recent

---

Page 23

1  transfer by this employee by her employer.  I'm going to
2  object to that and instruct her not to answer.  It's not
3  reasonably calculated to lead to the discovery of admissible
4  evidence, and it's designed solely to harass this witness.
5          MS. LARKINS:  Ms. Angell, this is absolutely
6  necessary for me to prove my case.  The atmosphere of
7  hostility at Castle Park School that boiled over into the
8  press is an ongoing thing which was there long before Ollie
9  Matos came and was responsible for my being removed from
10  Castle Park.  In a sense Ms. Myers and I are both victims of
11  the sick culture at Castle Park.
12         MR. HERSH:  Ms. Larkins, this is Michael Hersh for
13  the association defendants.  I would move to strike your
14  monologue there, and I would also point out as a matter of
15  fact that the facts that you're stating are not correct.  You
16  were removed from your teaching position from Castle Park
17  because of your refusal to return to work when you were
18  instructed to do so.  I don't believe that Ms. Myers was
19  removed from her employment as a result of insubordination.
20         MS. LARKINS:  Mr. Hersh, I think you're quite
21  confused about things.  I was removed from my teaching
22  position at Castle Park more than a year before I was
23  dismissed for insubordination.
24         MS. ANGELL:  Another basis for my irrelevance
25  objection is that plaintiff is seeking to invade this

---

Page 24

1  witness's privacy concerning her employment -- the
2  particulars of her employment concerning a transfer that
3  occurred in August of 2004 when plaintiff last actively
4  worked at a school site in Chula Vista Elementary School
5  District in April 2001.  So we're talking about more than a
6  three-year time span.
7          MS. LARKINS:  Ms. Angell, your client made her
8  employment, particularly her transfer out of Castle Park
9  Elementary School, a matter of public discussion when she
10  went to the press.
11         (Phone interruption.)
12         MS. LARKINS:  I apologize for that.
13         MS. ANGELL:  If you would like to ask the witness
14  anything about what she said to a reporter, that kind of
15  thing, then I'm not going to object to that.  As far as other
16  aspects of this employment matter, the witness asserts her
17  right to privacy and will not be responding.
18         MR. HERSH:  I of course join that objection.  And
19  I would also remind you that insofar as you attempt to
20  question Ms. Myers concerning protected activities that are
21  under litigation in the grievance and possible unfair
22  practice charge being filed by the Chula Vista Educators on
23  Ms. Myers' behalf, I will also be instructing the witness as
24  counsel for Chula Vista Educators.
25         MS. ANGELL:  Michael?

---

Page 25

1          MR. HERSH:  Yes.
2          MS. ANGELL:  You dropped off.
3          MR. HERSH:  Okay.  Where did I drop off?
4          MS. ANGELL:  You'll be instructing the witness as
5  counsel for Chula Vista Educators --
6          MR. HERSH:  Yeah.  No, I didn't drop off.  That --
7  what I mean is that insofar as Ms. Larkins is attempting to
8  question Ms. Myers concerning the ongoing litigation and she
9  wishes to inquire into matters that are being litigated
10  elsewhere and that are completely irrelevant to her
11  allegations in any of her complaints that -- in this matter,
12  I would -- I will basically as counsel for the Chula Vista
13  Educators seek to protect Ms. Myers and Chula Vista Educators
14  from inquiries that are protected by the First Amendment of
15  the Constitution of the United States of America and this --
16  and the California Constitution, and I believe are
17  privileged.
18         MS. LARKINS:  Okay.  Are you Ms. Myers' boss or
19  are you going to ask her if she wants to be represented by
20  you?
21         MR. HERSH:  At this point I'm not going to ask
22  Ms. Myers that question.  I'm just going -- I'm telling you
23  as a matter of the record what I intend to do.
24         MS. LARKINS:  Well, Mr. Hersh, I'm very concerned
25  about your attitude. You have stated that you are going to

---

7 (Pages 22 to 25)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 26

1  be telling her what to do. Why don't we just ask her. I'll
2  ask her for you.
3      Is Mr. Hersh your counsel? Is he representing you?
4      MS. ANGELL: Objection. Vague and ambiguous.
5  Seeks to invade attorney/client privilege.
6      MS. LARKINS: That's not a privilege. If
7  Mr. Hersh is representing her during this deposition, I have
8  a right to know that.
9   Q. Is Mr. Hersh representing you?
10  A. It is my knowledge that I did talk to --
11     MS. ANGELL: Do not disclose anything that you've
12  discussed with counsel.
13     THE WITNESS: Okay. I did call the union and ask
14  if there would be someone that would be representing me as
15  far as questions that deal with this issue.
16     MS. LARKINS: Okay. So Mr. Hersh, are you
17  offering to represent Ms. Myers?
18     MR. HERSH: Did you hear me?
19     MS. LARKINS: Yeah, we can hear you.
20     MR. HERSH: Yeah. I am representing the Chula
21  Vista Educators, and insofar as you attempt to question
22  Ms. Myers concerning her Chula Vista Educator activity such
23  as filing a grievance, to that degree I will be representing
24  Ms. Myers as a representative of Chula Vista Educators,
25  Ms. Myers being a representative of Chula Vista Educators.

Page 27

1      MS. LARKINS: Mr. Hersh, I think this smacks of
2  really top-down control of C.T.A. which is a real serious
3  problem. Ms. Myers is an individual, and she has a right to
4  testify as an individual. And you can -- if you're not
5  representing her, you can object on behalf of Chula Vista
6  Educators but you cannot instruct her. So why don't -- I'm
7  sure she'll agree to let you represent her. Why don't you
8  just offer to represent her?
9      MR. HERSH: Didn't you hear me? Can you hear me?
10     MS. LARKINS: Yes, we can hear you.
11     MR. HERSH: Sure. Well, if you want to take a
12  break in the proceeding and allow me to consult with
13  Ms. Myers, I'd be happy to do that. I don't really feel it's
14  an appropriate topic for the deposition.
15     I would also remind you that I wrote you a letter,
16  Ms. Larkins, about two or three weeks ago in which I asked if
17  you intended to question Ms. Myers concerning her protected
18  activities, that you let me know so that I could move for a
19  protective order. But you didn't do that, and I had to
20  assume that you intended to question her about matters that
21  might actually be relevant to the case in point. But
22  apparently, as in many other respects, you disregard the
23  rules in order to proceed along your own path. And it's a
24  beautiful thing to see somebody march so independently, but
25  insofar as it impacts the rights of other people, I have to

Page 28

1  object to that. And if you want to go off the record and
2  allow me to consult with Ms. Myers, I'd be happy to do that.
3      MS. LARKINS: Yes, I would. But first I'd like to
4  say that I think it's you that is ignoring the rules. If you
5  think you have a right to instruct a witness in a deposition
6  just because you're a C.T.A. attorney, you certainly can
7  object, but you cannot instruct until you make that agreement
8  with her that you are representing her. So I'm agreeable to
9  going off the record now.
10     MS. ANGELL: How long of a break do you want,
11  Michael?
12     MR. HERSH: I think three or four minutes would be
13  fine.
14     MS. LARKINS: Okay.
15     THE VIDEOGRAPHER: We're going off the record.
16  The time is 11:01 a.m.
17     (Recess taken.)
18     THE VIDEOGRAPHER: We're going on the record. The
19  time is 11:27 a.m.
20  BY MS. LARKINS:
21   Q. Okay. Ms. Myers, is Michael Hersh representing
22  you?
23     MS. ANGELL: Vague and ambiguous.
24     If you understand the question and you wish to --
25  and you can respond to it without invading the

Page 29

1  attorney/client privilege, then answer.
2      THE WITNESS: Okay. He is representing me as far
3  as any C.V.E. related activity or business.
4  BY MS. LARKINS:
5   Q. Okay. So are -- let's see. When you were at
6  Castle Park were you a member of the C.V.E. Representative
7  Council?
8   A. Yes, I was.
9   Q. Did you hear any discussion of my case at any rep
10  council meeting?
11     MR. HERSH: Just for the record, this is an area
12  in which I will be representing the witness. I object to
13  these questions. They're harassing the witness concerning
14  matters that have nothing to do with this litigation. And
15  I'm not going to instruct the witness not to answer at this
16  time, but if you continue asking these questions concerning
17  discussions at the -- related to the grievance, I will
18  instruct the witness not to answer.
19     MS. ANGELL: Object. Not relevant. Vague and
20  ambiguous as to time. Vague and ambiguous as to discussing
21  Larkins.
22  BY MS. LARKINS:
23   Q. Ms. Myers, did you ever hear my name mentioned at
24  any Representative Council meeting for C.V.E. that you
25  attended?

8 (Pages 26 to 29)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

Page 30

1    A. C.V.E. rep council meeting?
2    Q. Uh-huh.
3    A. Not to my recollection.
4    Q. Okay. I want to make sure I understand what you
5    mean when you say not to my recollection. Is there some
6    uncertainty in your answer?
7    A. I do not remember any conversation.
8    Q. Okay. Now --
9       MS. ANGELL: Excuse me. You don't remember any
10   conversation coming up concerning Mrs. Larkins or you don't
11   remember any conversation at any of these meetings?
12      THE WITNESS: I don't recall any conversation
13   regarding Maura at these C.V.E. rep council meetings.
14   BY MS. LARKINS:
15   Q. Okay. When you say you don't recall, do you mean
16   that you clearly remember that there was never any discussion
17   of me or that -- okay. Let's leave it at that. Are you
18   saying that you clearly remember that there was never any
19   discussion of me?
20   A. I do not remember any discussion of you.
21   Q. Okay. Could there have been a discussion of me
22   that you might have forgotten?
23      MR. HERSH: Objection. Calls for speculative
24   answer.
25      MS. LARKINS: Well, I'm trying to gauge her degree

---

Page 31

1    of certainty about whether or not I was discussed at these
2    meetings.
3       MR. HERSH: And I'm objecting because your
4    question requests a speculative answer.
5       MS. LARKINS: Okay. Are you instructing her not
6    to answer?
7       MR. HERSH: I objected on the basis that I stated
8    on the record.
9    BY MS. LARKINS:
10   Q. Okay. Would you please answer the question.
11   A. I do not remember. I don't remember.
12   Q. No. This is a yes or no question. Are you
13   certain that no one ever spoke of me at a rep council meeting?
14      MS. ANGELL: Objection. Asked and answered.
15   Argumentative. Could you move on to the next question, please.
16      MS. LARKINS: You may instruct your client not to
17   answer.
18      MR. HERSH: I'm not going to instruct my client
19   not to answer at this point, but I do join Ms. Angell's
20   objection on the basis of it being argumentative and asking a
21   question that has already been asked and answered at least
22   twice.
23      MS. LARKINS: No, this question has not been asked
24   and answered. What I'm trying to find out is if Ms. Myers'
25   memory is vague or if she is -- if her memory is clear.

---

Page 32

1    There's a big difference between having problems with
2    remembering things and clearly remembering that there was
3    never any discussion. Ms. Angell, are you instructing your
4    client not to answer the question?
5       MS. ANGELL: I haven't done that.
6    BY MS. LARKINS:
7    Q. Okay. You may answer the question.
8    A. What's the question?
9    Q. The question is, are you sure there was never any
10   discussion of me at any rep council meetings?
11      MS. ANGELL: Same objections.
12   BY MS. LARKINS:
13   Q. Now you can answer.
14   A. I don't remember any conversations.
15   Q. That's -- you're not answering my question. It's
16   a yes or no answer.
17      MS. ANGELL: Objection. Argumentative. The
18   witness has answered.
19      MS. LARKINS: No, she hasn't. It's -- it's
20   unresponsive. Her answer is unresponsive to the question.
21      THE WITNESS: Repeat the question again.
22   BY MS. LARKINS:
23   Q. The question is, are you certain that I was never
24   discussed at any rep council meeting?
25   A. I do not remember any conversation about you at a

---

Page 33

1    rep council meeting.
2    Q. Okay. Are you answering no? Is that what your
3    answer is then, no, you're not certain?
4    A. Once again, my answer is I don't remember any
5    conversation regarding you at a rep council meeting.
6    Q. Ms. Myers, we've got a little problem here. I
7    guess I'll have to just compel you. We can do that. I can
8    do that on the compel thing.
9       Where's my list for compel. Oh, that's not it.
10   I'll start a new one.
11      Okay. Ms. Myers, I'd like to go back in time to
12   the spot where I jumped away from chronologically when we
13   were talking about Oscar Perez was your principal at Castle
14   Park. Did you have any conflicts with Mr. Perez, personal or
15   professional?
16   A. No.
17      MR. HERSH: Compound question. Objection.
18   BY MS. LARKINS:
19   Q. Okay. Let me rephrase. Did you have any personal
20   conflicts with Oscar Perez?
21   A. No.
22   Q. Did you have any professional conflicts with Oscar
23   Perez?
24   A. No.
25   Q. Okay. Why did Oscar Perez leave Castle Park

---

9 (Pages 30 to 33)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

Page 34

1  Elementary?
2         MS. ANGELL: Objection. Calls for speculation.
3  Vague and ambiguous.
4  BY MS. LARKINS:
5         Q. Let me rephrase. Did Oscar Perez leave Castle
6  Park Elementary after you had been there for two years?
7         A. He left. I don't know whether it was after two
8  years, to be honest with you, but he did leave while I was
9  there.
10        Q. Okay. And do you have any knowledge about why he
11 left?
12        A. No.
13        Q. Did anybody tell you why they thought he left?
14        A. No, not to my knowledge.
15        Q. Did you ever discuss with anybody why Oscar Perez
16 left?
17        A. I may have, but I don't remember what was said.
18        Q. If a principal were fired by the school
19 district -- if a principal at your school were fired by the
20 school district and most of the teachers in the district knew
21 about it and talked about it, would you also be likely to
22 know about it?
23        MS. ANGELL: Objection. Incomplete hypothetical.
24 Calls for speculation.
25        MS. LARKINS: Okay. Withdrawn.

---

Page 35

1         Q. Ms. Myers, do you have a good memory?
2         A. Fairly.
3         Q. Okay. Who was the next principal after Oscar
4  Perez?
5         A. I believe Gretchen Dondelinger.
6         Q. Yeah. Do you know why she was chosen to be
7  principal at Castle Park?
8         A. I was on the interview committee, but I signed a
9  confidentiality statement.
10        MS. ANGELL: Therefore, I'm going to object based
11 on --
12        MS. LARKINS: Okay. I won't proceed in that line
13 of questioning.
14        MS. ANGELL: So that's withdrawn?
15        MS. LARKINS: Oh, no, the last question isn't
16 withdrawn, but I -- I won't proceed any further.
17        MS. ANGELL: Okay.
18 BY MS. LARKINS:
19        Q. Did you ever apologize to other teachers for
20 having been part of -- been involved in choosing Gretchen
21 Dondelinger?
22        MS. ANGELL: And I'm going to object and renew the
23 objection that this line of questioning is not reasonably
24 calculated to lead to the discovery of admissible evidence in
25 this case.

---

Page 36

1  BY MS. LARKINS:
2         Q. You may answer.
3         A. Repeat the question, please.
4         Q. Did you ever apologize to any of your fellow
5  teachers for choosing Gretchen Dondelinger as principal of
6  Castle Park?
7         A. I --
8         MS. ANGELL: Objection. Misstates the evidence.
9  This witness did not say that she choose Dr. Dondelinger as
10 the principal of Castle Park. She said she was on an
11 interview committee.
12 BY MS. LARKINS:
13        Q. Okay. I'm going to make a statement and ask you
14 if you ever made a statement similar to this statement. I
15 apologize for choosing Gretchen Dondelinger as principal.
16 Did you ever make a statement similar to that one?
17        A. I don't recall.
18        Q. Okay. How many principals have there been at
19 Castle Park during the last ten years?
20        A. I don't know the exact number but more than five.
21        Q. The number eight has been printed in the newspaper
22 a couple of times recently. Does that sound about right to
23 you?
24        MS. ANGELL: Objection. Calls for speculation.
25        If you know, you know. And if you don't, you don't.

---

Page 37

1         THE WITNESS: I don't really know.
2  BY MS. LARKINS:
3         Q. Well, even if it's -- you said -- even if it's
4  just more than five, let's say six then, do you think that
5  Castle Park has had a higher rate of turnover of principals
6  than most elementary schools?
7         A. I really can't answer that. I don't -- I don't
8  look around to see how many years principals stay at schools.
9         Q. Okay. Let's see. When you first arrived it was
10 Oscar Perez, then Gretchen Dondelinger. Were there several
11 short-term principals after Gretchen Dondelinger left?
12        A. Yes.
13        Q. And who were they?
14        A. I couldn't even tell you who they all were.
15        Q. Was one of them Sam Snyder?
16        A. Yes.
17        Q. Was one of them a woman? Her name -- was Sam
18 Snyder co-principal with a woman?
19        A. Yes.
20        Q. Do you remember that woman's name?
21        A. I had forgotten about Sam until you mentioned it.
22 Helen?
23        Q. Okay. You're not real sure about that, though?
24        A. I believe her name was Helen.
25        Q. Okay. And then after Sam Snyder and the woman --

---

10 (Pages 34 to 37)

Page 38

1  did they work as principals for just a few months?
2      A.  I believe so.  I don't remember the time line.
3      Q.  Okay.  And then did Lowell Billings become interim
4  principal?
5      A.  At one point Lowell did, but I don't know if there
6  was somebody before him or not.
7      Q.  Okay.  Other than Sam Snyder and the woman?
8      A.  What's the question that you're asking?
9      Q.  You said you didn't know if there was anyone there
10  before Lowell Billings, and I'm asking you if you mean other
11  than Sam Snyder and the woman?
12      A.  There were other interim principals.  I don't know
13  if they came after Sam, before Lowell or after Lowell.  I
14  don't remember.
15      Q.  Okay.  Did you find it at all -- did you consider
16  it at all odd that Castle Park was getting all these interim
17  principals instead of having regular principals?
18      A.  There's a process for hiring principals and that
19  process hadn't been initiated yet, so I -- that would be why
20  we would have interim principals, because the process hadn't
21  started.
22          MS. ANGELL:  Move to strike.  Nonresponsive.  And
23  I'll ask the witness to answer the question that's asked.
24          THE WITNESS:  Okay.
25  ///

Page 39

1  BY MS. LARKINS:
2      Q.  Was the process to choose a new principal for
3  Castle Park somewhat delayed after Gretchen Dondelinger left?
4      A.  I would have no idea.
5      Q.  Okay.  But let me go back and ask you a question
6  about the transition between Oscar Perez and Gretchen
7  Dondelinger.  Were there any interim principals between Oscar
8  Perez and Gretchen Dondelinger?
9      A.  I don't remember.
10      Q.  Yet you were on the interview committee?
11          MS. ANGELL:  Objection.  Argumentative.
12  BY MS. LARKINS:
13      Q.  Okay.  And then who was the principal after all
14  these interim principals?
15      A.  After what -- I'm not --
16      Q.  Sam Snyder, the woman, and Lowell Billings.
17      A.  I really don't remember the time line.  There were
18  principals in and out.  I don't -- I don't remember.
19      Q.  Was there a Hispanic woman who became principal?
20          MS. ANGELL:  Objection.  Vague and ambiguous as to
21  time.
22  BY MS. LARKINS:
23      Q.  After Lowell Billings, a young Hispanic woman?
24      A.  There was a woman who was an interim principal,
25  but I -- once again, the time line, I'm being confused

Page 40

1  because it's not -- I'm not sure of the time line and -- so
2  there was a Hispanic principal, yes, but I can't tell you
3  when based on the time line you're coming up with.
4      Q.  Do you remember her name?
5      A.  Mariana.
6      Q.  Okay.  And do you know -- and did there come a
7  time that she left Castle Park?
8      A.  Yes.
9      Q.  Do you know why she left?
10      A.  No.
11      Q.  Did she get along well with the staff?
12      A.  Yes.
13      Q.  Did Oscar Perez get along well with the staff?
14      A.  I wouldn't know with everybody.
15      Q.  Did he get along well with you?
16      A.  I got along with him just fine.
17      Q.  Did he get in trouble for spending too much money?
18      A.  I would -- I don't know.
19      Q.  Did he get a lot of pressure from a clique of
20  upper grade teachers to spend money as they wished?  -
21      A.  I have no idea.
22      Q.  Did he also get a lot of pressure from a clique of
23  lower grade teachers to spend money as they wished?
24      A.  I have no idea.
25      Q.  Okay.  And then after Mariana who came next?

Page 41

1      A.  I believe Ollie Matos.
2      Q.  Was it Tim Allen?
3      A.  No, it was not.
4      Q.  Was Tim Allen ever principal of Castle Park
5  Elementary?
6      A.  Yes.
7      Q.  Okay.  And Ollie Matos is principal now, right?
8      A.  Yes.
9      Q.  Okay.  So Tim Allen had -- okay.  So Tim Allen
10  came before Ollie Matos?
11      A.  Yes.
12      Q.  Okay.  And -- okay.  And how did you get along
13  with Tim Allen?
14      A.  Fine.
15      Q.  Did you spend a lot of time talking to him in his
16  office?
17      A.  No.
18      Q.  Do you consider yourself one of the more
19  influential teachers at Castle Park as far as influencing the
20  direction the school goes in at least until Ollie Matos came
21  along?
22      A.  Possibly.
23      Q.  Were you influential in getting the Kingdoms
24  program ended?
25      A.  No.

11 (Pages 38 to 41)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

Page 42

1    Q. Who was influential in getting the Kingdoms
2    program ended?
3    A. I do not know.
4    Q. Was there a vote to get it ended?
5    A. There was a vote, but I don't know that that ended
6    it.
7    Q. Okay. When the Kingdoms program began, did you
8    like the idea?
9    A. Not particularly.
10   Q. Did you write a petition to have it only be 45
11   minutes a month?
12   A. Did I write a petition? No.
13   Q. Did you sign a petition to have it only 45 minutes
14   a month?
15   A. I don't recall.
16   Q. Okay. Was there a time that the staff voted with
17   a secret ballot and voted to end the Kingdoms program?
18   A. I don't recall.
19   Q. Did the staff/parent management team overrule the
20   teachers and say that they would have to have Kingdoms?
21   A. Yes.
22   Q. Okay. When that happened did you find that a
23   little troubling given that the staff decision was overruled
24   arbitrarily by the S.P.M.T.?
25   A. I'm not sure what you mean by troubling.

---

Page 43

1    Q. Was there anything you didn't like about that
2    decision when they overruled the teachers' decision?
3    A. Probably that Kingdoms was back.
4    Q. But actually the process by which the decision was
5    made didn't bother you?
6    MS. ANGELL: Objection. This entire line of
7    questioning is not reasonably calculated to lead to the
8    discovery of admissible evidence in this case where the
9    allegations are that --
10   MS. LARKINS: I'll end it.
11   Q. Okay. How well did you get along with Ollie Matos?
12   A. In a professional manner.
13   Q. How well did the rest of the staff get along with
14   Ollie Matos in staff meetings?
15   MS. ANGELL: You mean at staff meetings in which
16   she was in attendance?
17   MS. LARKINS: Yes.
18   MS. ANGELL: Objection. Vague and ambiguous.
19   You can answer to the extent you understand the
20   question.
21   THE WITNESS: I don't really understand the
22   question.
23   BY MS. LARKINS:
24   Q. Were hostile emotions expressed by members of the
25   staff toward Ollie Matos during the time -- during any staff

---

Page 44

1    meeting you attended at Castle Park?
2    A. Define hostile, please.
3    Q. Raised voice, saying things over and over, an
4    angry voice, angry tone of voice?
5    A. Yes.
6    Q. Was that in the beginning when Ollie Matos first
7    came or did that develop later?
8    A. I don't recall.
9    Q. Okay. Why were people angry at Ollie Matos?
10   MS. ANGELL: Objection. Vague and ambiguous as to
11   time. Vague and ambiguous as to people.
12   BY MS. LARKINS:
13   Q. To your knowledge, why were these hostile -- to
14   your knowledge, why were staff members hostile toward Ollie
15   Matos during staff meetings you attended?
16   A. They were upset with the way things were being done.
17   Q. In what sense?
18   A. That staff and parents were misinformed on issues.
19   Q. What were those issues?
20   A. I don't recall them all.
21   Q. But there were several issues?
22   A. Yes.
23   Q. Can you recall a single one of those issues?
24   A. The computer lab.
25   Q. Can you recall any others?

---

Page 45

1    A. There was an issue of coming up with after school
2    activities that would use summer school funds.
3    Q. Can you think of any other issues?
4    A. Just misrepresentation, things said to one person
5    that was not the same to another.
6    Q. And were these misrepresentations about the
7    computer lab and the summer school funds or -- let me end the
8    question there.
9    A. Repeat the question.
10   Q. Were these misrepresentations about the summer
11   school funds?
12   A. No.
13   Q. Were they about the computer lab?
14   A. Yes.
15   Q. Were they about anything else that you can recall?
16   A. Not to my -- not that I can recall.
17   Q. Okay. About what percentage of the staff was
18   angry at Ollie Matos about misrepresentations about the
19   computer lab?
20   MS. ANGELL: Vague and ambiguous. Calls for
21   speculation.
22   BY MS. LARKINS:
23   Q. Go ahead. --
24   A. I wouldn't be able to give you a percentage.
25   Q. Did you feel very much -- were you -- were you

---

12 (Pages 42 to 45)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 46

1  angry at Ollie Matos about misrepresentations about the
2  computer lab?
3      MS. ANGELL:  Vague and ambiguous as to time.
4  BY MS. LARKINS:
5      Q.  At any time.
6      A.  Yes.
7      Q.  Were you angry at Ollie Matos about
8  misrepresentations about the computer lab before you were
9  transferred out of Castle Park Elementary School?
10     A.  What's the question again?
11     Q.  Were you angry at Ollie Matos about
12  misrepresentations about the computer lab before you were
13  transferred out of Castle Park?
14     A.  Yes.
15     Q.  How did you express your anger toward Ollie Matos
16  regarding misrepresentations about the computer lab?
17     A.  I asked for clarification and reasons for what he
18  wanted to do.
19     Q.  Did you do this sometimes in private meetings
20  between yourself and Ollie Matos in his office?
21     A.  Yes.
22     Q.  About how many times would you say you met with
23  him regarding this issue in his office?
24     A.  I have no idea.
25     Q.  Was it more like two or more like 20?

Page 47

1      A.  I have no idea.  I discussed many issues with
2  Ollie Matos.
3      Q.  About how often did you discuss any issue with
4  Ollie Matos in his office?
5      A.  I have no idea.
6      Q.  Was it once a week?  Twice a week?
7      A.  I have no idea.
8      Q.  Could you say for certain that it was more than
9  once a month?
10     A.  For certain?  No.
11     Q.  Okay.  Could you say for certain that it was more
12  than once a year?
13     A.  Yes.
14     Q.  Okay.  Do you believe that there has been a long
15  history at Castle Park of teachers being removed without
16  being told the reason and without there -- okay.  Do you
17  think that -- do you believe that there is a long history at
18  Castle Park of teachers being removed without being told the
19  reason?
20     A.  No.
21     Q.  Do you believe that I was told the reason when I
22  was removed from Castle Park?
23     A.  I have no idea.
24     Q.  Do you believe that it is wrong to remove a
25  teacher from a school without telling that teacher the reason?

Page 48

1      MS. ANGELL:  Objection.  Vague and ambiguous.
2  Calls for legal conclusion.  Incomplete hypothetical.  And
3  insofar as you're calling for a legal conclusion, it's
4  calling for a guess because this person's not qualified so
5  far as a legal expert.
6      MS. LARKINS:  I'm not asking for a legal opinion.
7  I'm asking for Ms. Myers' opinion.
8      Q.  Do you believe that it is wrong to remove a
9  teacher from his or her position without telling that teacher
10  the reason?
11     MS. ANGELL:  Objection.  Vague and ambiguous as to
12  remove.  The same objection concerning legal conclusion.
13     And to the extent that you understand the
14  question, you can answer.
15     THE WITNESS:  What do you mean by remove?
16  BY MS. LARKINS:
17     Q.  To tell that teacher not to return to the
18  classroom or perhaps to -- well, leave it at that, to tell
19  the teacher not to return to the classroom.
20     A.  Okay.  So the original question is what?
21     Q.  Do you believe it's wrong to remove a teacher from
22  his or her position without telling that teacher the reason?
23     MS. ANGELL:  Objection.  Incomplete hypothetical.
24  If you mean the person's paid?  The person's not paid?  I
25  mean, this is a wildly incomplete hypothetical.

Page 49

1      MS. LARKINS:  Whether they're paid or unpaid,
2  either way.
3      MS. ANGELL:  Objection.  Compound question.
4      MR. HERSH:  Association defendants join in
5  Ms. Angell's objection.
6  BY MS. LARKINS:
7      Q.  Okay.  Ms. Myers, have you discussed this very
8  issue with the press?
9      A.  What issue?
10     Q.  The issue of whether it's right or wrong to remove
11  a teacher from his or her position without telling that
12  teacher the reason?
13     A.  Yes.
14     Q.  Okay.  Then can you discuss it here too?
15     A.  Only what has been said in the paper.
16     Q.  You discussed the issue in the paper, but you
17  don't feel like you should have to discuss it here in a
18  deposition?
19     MS. ANGELL:  What issue are you talking about?  We
20  need a foundation for this.  You're talking about, quote,
21  removing a teacher from a classroom, and I believe that any
22  newspaper articles would be related to the August 2004
23  transfers of some teachers three years after you last taught
24  at Castle Park Elementary School.  Therefore, this whole line
25  of questioning is not reasonably calculated to lead to the

13 (Pages 46 to 49)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

**Page 50**

1  discovery of admissible evidence. And if you could just
2  clarify --
3        MS. LARKINS: I'm going -- I'm going to drop it.
4        Q. Do you feel that before you were removed from your
5  classroom without being told why that all the other teachers
6  who had been removed before you had been told why?
7        MS. ANGELL: Objection as to the characterization
8  of removal from the classroom. There's no foundation for
9  this, and you can -- period. There's no foundation for it,
10 and I believe it mischaracterizes the facts which are not in
11 evidence.
12 BY MS. LARKINS:
13       Q. Okay. Let's move on to something a little
14 different. I'd like to ask that this document be labeled as
15 Exhibit 4.
16       (Plaintiff's Exhibit No. 4 was marked for
17 identification.)
18       MS. LARKINS: Whoops? Did I turn him off?
19       MS. ANGELL: I think so.
20       MS. LARKINS: I think we need to go off record
21 to -- would you agree to go off record till we get Michael
22 back?
23       MS. ANGELL: Sure.
24       MS. LARKINS: Okay.
25       THE VIDEOGRAPHER: We are going off the record.

---

**Page 51**

1  The time is 12:02 p.m.
2        (Recess taken.)
3        THE VIDEOGRAPHER: We're going on the record. The
4  time is 12:15 p.m.
5  BY MS. LARKINS:
6        Q. Ms. Myers, do you care whether or not I was
7  removed from my classroom without being told a reason?
8        A. Your business is your business, and I have nothing
9  to do with that.
10       Q. Okay.
11       A. That's between you and the district.
12       Q. Okay. So it's okay with you if teachers are
13 removed from their -- other teachers are removed from their
14 classrooms without being given a reason, but it's just not
15 okay if you're removed from your classroom without being
16 given a reason. Is that it?
17       MS. ANGELL: Objection. Argumentative.
18 BY MS. LARKINS:
19       Q. You may answer the question.
20       A. That's not what I said.
21       Q. Is it okay with you if other teachers other than
22 yourself are removed from their classrooms being without
23 being given a reason?
24       A. Say that again?
25       Q. Is it okay with you if other teachers other than

---

**Page 52**

1  yourself are removed from their classrooms without being
2  given a reason?
3        MS. ANGELL: Objection. Vague and ambiguous as to
4  removed from their classrooms. There's all kinds of reasons
5  why a teacher might not be in the classroom. Are you asking
6  her about transfers? Are you asking her about paid
7  administrative leave, sick leave?
8        MS. LARKINS: I don't want to limit it. I'm not
9  limiting it in any way.
10       MS. ANGELL: Then it's vague and ambiguous.
11       If you understand the question and can answer on
12 every single ground that a teacher might be not in their
13 classroom.
14       THE WITNESS: Yeah, that's a very confusing
15 question.
16 BY MS. LARKINS:
17       Q. Okay. I think I can ask it better. Let me restate.
18       Do you care whether other teachers other than
19 yourself -- let me try again.
20       Do you care whether or not other teachers other
21 than yourself are told not to return to their classrooms by
22 the school district without being given a reason?
23       A. What do you mean by care?
24       Q. Is it of any interest or concern to you at all?
25       A. I would have to say it would be a concern.

---

**Page 53**

1        Q. Can you tell me why?
2        A. Tell you why what?
3        Q. It would be a concern to you.
4        A. I think it's important to follow procedure.
5        Q. And what should be done do you think when the
6  district doesn't follow procedure?
7        MS. ANGELL: Objection. Vague and ambiguous.
8  That question could be about a hundred different things.
9  BY MS. LARKINS:
10       Q. What would you expect the union to do when the
11 district doesn't follow the contract?
12       A. File a grievance.
13       Q. Would you be surprised to know that the district
14 files grievances for some teachers but not others when the
15 exact same part of the contract is violated?
16       A. Say that again?
17       Q. Would you be surprised to find out that the union
18 files grievances for some teachers and not others when the
19 district violates the contract?
20       A. Yes, I would be surprised.
21       Q. So was I.
22       MS. ANGELL: Objection. Move to strike.
23       MR. HERSH: Joined.
24       MS. ANGELL: I'd like to take a quick break. Can
25 we take a real quick one, not even one minute? Stay on the

---

14 (Pages 50 to 53)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 54

1  record, just take 30 seconds.
2      (Discussion off the record.)
3      MS. ANGELL: Thanks. Sorry about that.
4  BY MS. LARKINS:
5      Q. Ms. Myers, since Ms. Angell is relying a lot on
6  attorney/client privilege in this case to keep information
7  from being put on the record, I need to know when you were
8  first represented by an attorney regarding any aspect of any
9  case having to do with me?
10      MS. ANGELL: Objection. Seeks to invade
11  attorney/client privilege.
12      MS. LARKINS: You object to the date being
13  revealed of when you first began to represent Ms. Myers?
14      MS. ANGELL: If this witness understands exactly
15  what capacity she had discussions with counsel in, that kind
16  of thing -- I mean, you can ask her when did she first
17  contact counsel as far as she remembers and I won't object to
18  that.
19      MS. LARKINS: Okay.
20      MS. ANGELL: But not as far as the contents of the
21  discussion, those kinds of things.
22      MS. LARKINS: Right. Would you be willing to tell
23  me when you first began to represent Ms. Myers?
24      MS. ANGELL: I'm not the witness here.
25      MS. LARKINS: Okay. I didn't think you would, but

Page 55

1  I just thought I'd throw it out there.
2      Q. Okay. Ms. Myers, when did Kelly Angell first
3  begin to represent you?
4      MS. ANGELL: Objection. Same objection. Seeks to
5  invade attorney/client privilege.
6      MS. LARKINS: You may answer.
7      MS. ANGELL: No, you may not. You don't answer
8  anything that is attorney/client privileged. So if the
9  question is when did you contact an attorney, that's one
10  thing. But as far as a discussion, things that happened
11  during the conversation, that's not for you to reveal. So if
12  you know the date that you first had contact with an
13  attorney, you can say something like that. You know, you
14  want to tell the truth, tell what you know, but not anything
15  that's attorney/client protected.
16      MS. LARKINS: Okay. This is what I want to know.
17  I want to know the date on which attorney/client privilege
18  started.
19      THE WITNESS: I don't know the date.
20  BY MS. LARKINS:
21      Q. Okay. Was it sometime in 2004?
22      A. Yes.
23      MS. ANGELL: And I'm going to object that this
24  client, this witness, is not a legal expert. She's not been
25  qualified as a legal expert; and therefore, she's not --

Page 56

1  qualified to make conclusions, legal conclusions. It calls
2  for a legal conclusion, your question. She's not qualified
3  to make those types of conclusions unless you want to
4  establish her as a legal expert.
5      MS. LARKINS: Okay. Are you trying to say,
6  Ms. Angell, that no -- clients that aren't lawyers don't know
7  when they're being represented by a lawyer?
8      MS. ANGELL: You asked her to come up with a legal
9  conclusion as to when the attorney/client privilege began,
10  and I'm telling you that this is not an expert witness, and
11  she can't give a conclusion like that.
12      MS. LARKINS: Okay. I'm trying to find out --
13  I'll tell you what. I'm willing to stipulate that any
14  conversations she had with an attorney -- well, wait a
15  minute. Maybe I shouldn't stipulate to that. No, I'm not
16  going to stipulate to that. Never mind.
17      Q. Okay. Were you represented by an attorney
18  regarding me before 2004?
19      A. No.
20      Q. Okay. I'd like to direct your attention back to
21  Exhibit 1 and ask you to recall that night when you were
22  about to fall asleep on the couch? This subpoena here was
23  issued if you look down at the bottom on June 11th, 2004. So
24  the process server that came to your door that night to serve
25  you with this subpoena would have come after June 11th, 2004?

Page 57

1      MS. ANGELL: Objection. Move to strike.
2      MR. HERSH: Objection. Move to strike.
3      MS. ANGELL: And I'll remind, Mrs. Larkins, that
4  the witness will not be responding to questions concerning
5  your separate litigation, Case No. GIC 823858, in particular
6  your attempts to elicit attorney/client privileged and
7  attorney work product information.
8      MS. LARKINS: Do you object to her answering
9  questions about anything that happened before she first spoke
10  to you?
11      MS. ANGELL: Information concerning Larkins V.
12  Schulman is totally irrelevant --
13      MS. LARKINS: Hardly.
14      MS. ANGELL: -- to the matter of Larkins V.
15  Werlin, et al. The allegations in Larkins V. Werlin are --
16  et al., are that Robin Donlan's brother Michael Carlson
17  accessed your criminal history records and gave that
18  information to Ms. Donlan, who then gave it to others.
19      MS. LARKINS: Okay. I --
20      MS. ANGELL: If you have any questions along those
21  lines for this witness, I would urge you to ask them. It's
22  now 12:30 and the next deposition is set for 2:00 p.m. as far
23  as -- I thought it was 1:00, but everybody else thinks it's
24  at 2:00, so --
25      ///

15 (Pages 54 to 57)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 58

1  BY MS. LARKINS:
2      Q.  Ms. Myers, the school district's law firm has
3  unfortunately been trying to keep evidence out by saying that
4  it's covered by attorney/client privilege, and they've been
5  doing this counter to the law.  And in fact, I'm filing a
6  tort claim against Ms. Angell for suborning perjury.
7      MS. ANGELL:  Move to strike.
8      Disregard these kinds of comments by her.  This is
9  not a place for her to tell you how things are, the way of
10 the world, et cetera.
11     The basis for my objection concerning your
12 questions regarding Larkins V. Schulman is irrelevance, as is
13 applicable to every question that you've answered here --
14 asked here, and with particular regard to your questions
15 concerning attorney/client communications, attorney/client
16 relationship, it's on the basis of attorney/client privilege
17 and attorney work product.
18     MS. LARKINS:  Ms. Angell, perjury is a felony
19 and --
20     MS. ANGELL:  Could you please pose a question to
21 the witness.  We're not here for your lectures concerning --
22     MS. LARKINS:  Ms. Angell --
23     MS. ANGELL:  -- what you think is going on.
24     MS. LARKINS:  -- perjury is a serious matter.
25 This witness perhaps does not know that she could be held

Page 59

1  liable both criminally and civilly for perjury even --
2      MS. ANGELL:  If you would like to lecture me,
3  Mrs. Larkins, why don't we go off the record so as not to
4  waste the court reporter's and everybody's time.
5      MS. LARKINS:  I do not agree.
6      MS. ANGELL:  This is not a fun game for you.  I
7  know you think you're going to make a -- what do you call it,
8  a documentary out of these videos, but you're not.  And this
9  is -- this litigation here is not your circus to harass these
10 witnesses for your alternate purposes.
11     The purpose of this deposition is to conduct
12 discovery in this case, Larkins V. Werlin, et al.
13     MS. LARKINS:  Well, you've brought up an
14 interesting topic -- and you've brought it up, not me -- the
15 topic of a documentary?  I'd like to know what makes you
16 think I'm not going to make a documentary out of it.
17     MS. ANGELL:  Because these proceedings are for use
18 in this litigation only.
19     MS. LARKINS:  I don't --
20     MS. ANGELL:  And if you attempt to use this
21 deposition or any deposition taken in this matter we'll seek
22 a protective order against your doing so.  And if it's your
23 stated intention to use these depositions for a documentary,
24 please so state on the record and we'll seek a protective
25 order now.

Page 60

1      MS. LARKINS:  I wouldn't do it until after the
2  case is over.
3      MS. ANGELL:  So it's currently not your intention
4  to use these depositions for purposes outside of this
5  litigation, including but not limited to creating your
6  documentary, correct?
7      MS. LARKINS:  Currently, no.  No, I'm not working
8  on it now.  It wouldn't be until after the case were over.
9      MS. ANGELL:  Mrs. Larkins, if it's your intention
10 to use this witness's deposition for purposes of documentary,
11 we'll stop the deposition now because that's an improper
12 purpose of discovery and that's harassing to this witness.
13 This discovery is for the purposes of Larkins V. Werlin only.
14     MS. LARKINS:  It may become a matter of public
15 concern if county counsel is suborning perjury.  The district
16 attorney could subpoena this deposition.
17     MS. ANGELL:  Which is an entirely different matter
18 from you attempting to use this -- this discovery process to
19 harass these witnesses and create a documentary.  That's an
20 improper purpose for discovery.  You've told me time and time
21 again that that's your intention, and I want it on the record
22 here that this witness does not agree to your use of her
23 deposition transcript or a video for any kind of documentary.
24     MS. LARKINS:  This witness has made herself a
25 matter of public interest by going to the media more than

Page 61

1  once.  She's done everything she could to make a public issue
2  out of herself.
3      MS. ANGELL:  That has absolutely nothing to do
4  with the litigation of Larkins V. Werlin.
5      MS. LARKINS:  Well, it certainly has a lot to do
6  whether -- with whether or not her deposition can be used in
7  a documentary.
8      MS. ANGELL:  That will be an issue for the court
9  to decide.  But I'm telling you, if you attempt to use her
10 deposition for any purpose other than this litigation, we
11 will seek a protective order.  And if that's your intent now,
12 I would like it if you would let me know so that I can seek
13 that protective order now and maybe it would save you the
14 added expense of all the additional depositions that you're
15 planning on taking and videotaping.  Because the application
16 for protective order will apply to all of them.
17     MS. LARKINS:  Well, Ms. Larkins, you've said this
18 a couple of times now.
19     MS. ANGELL:  I'm Ms. Angell.
20     MS. LARKINS:  Did I say Ms. Larkins?  Boy, I must
21 be stressed.
22     Ms. Angell, you've said this a couple of times
23 now, and you've now brought up the issue of wasting time.  So
24 if you just say it once and be done with it, then we don't
25 waste as much time.

16 (Pages 58 to 61)

Page 62

1    MS. ANGELL: Well, you haven't responded to the
2  question.
3    MS. LARKINS: I did. I responded to it the first
4  time you brought it up, that whole speech.
5    MS. ANGELL: No, you didn't. You said that at
6  this time you don't intend to do this. You don't intend to
7  use this video stuff until after the litigation is over.
8  That is not an answer to the question of whether it's your
9  intent to use this videotaped deposition and the other
10  videotaped depositions for purposes of doing -- creating a
11  documentary, unless of course your answer is yes, that you do
12  intend to do so after the litigation is over, in which case
13  we will seek a protective order.
14    MS. LARKINS: You think I'm the deponent, don't
15  you?
16    MS. ANGELL: I'm telling you that I think that
17  you're abusing the discovery process here.
18    MS. LARKINS: Well, I know that you're really
19  afraid of the discovery process. You had a protective order
20  against depositions for over a year, and then as soon as that
21  year went up -- was over -- as soon as the stay was lifted,
22  then you said oh, I don't remember the judge ever saying that
23  there was a -- the stay was lifted. And then Werlin suddenly
24  gets sick and although he's been seen walking around
25  perfectly healthy visiting the school district.

Page 63

1    MS. ANGELL: Move to strike that last portion,
2  everything starting from the discussion of a protective
3  order, as no question pending.
4    MR. HERSH: I join in that motion.
5  BY MS. LARKINS:
6    Q. Okay. Okay. I'd like to ask that this exhibit be
7  labeled Exhibit 5.
8    (Plaintiff's Exhibit No. 5 was marked for
9    identification.)
10  BY MS. LARKINS:
11    Q. Okay. Ms. Myers, does this look to you like some
12  sections of the Education Code of California?
13    MS. ANGELL: And for the record, since counsel's
14  not present, Mrs. Larkins has just handed the witness and me
15  two pages of an alleged printout from the internet it looks
16  like containing Sections 44930 through 44936, at least in
17  part, of the Education Code if it's actually an accurate
18  copy.
19    MR. HERSH: Thank you, Ms. Angell.
20  BY MS. LARKINS:
21    Q. Okay. Ms. Myers, would you look at the third
22  paragraph here which is numbered 44932?
23    MS. ANGELL: Before you even start, Mrs. Larkins,
24  I'm going to let you know that as far as you're seeking legal
25  conclusions from this witness, I object to the entire line of

Page 64

1  questioning unless you would like to establish that this
2  witness is qualified as a legal expert.
3    MS. LARKINS: Oh, no, I'm not asking her for any
4  legal opinions.
5    Q. Could you read the first two lines and then
6  numbers 1, 2, and 3.
7    A. "No permanent employee shall" --
8    Q. You don't have to read it out loud, just read it
9  quietly.
10    Okay. Ms. Myers, is it your understanding that a
11  teacher can be dismissed from employment for dishonesty?
12    MS. ANGELL: Objection. You're asking this
13  witness for a legal conclusion. It's totally improper to put
14  something that you purport to be an excerpt from the
15  Education Code in front of a lay witness and ask them to draw
16  legal conclusions. This witness cannot respond to such a
17  question, unless you have outside information.
18    MS. LARKINS: Ms. Angell, is it your -- okay. Let
19  me rephrase.
20    Q. Ms. Myers, assuming that this is a legitimate and
21  correct copy of Education Code Section 44932, do you
22  understand that teachers can be dismissed from employment for
23  dishonesty?
24    MS. ANGELL: Objection. Incomplete hypothetical.
25  Calls for legal conclusion. Vague and ambiguous.

Page 65

1    MS. LARKINS: It calls for third grade reading
2  comprehension.
3    MS. ANGELL: If you're able to form a legal
4  conclusion, if you're qualified as a legal expert, please
5  state your qualifications.
6    MS. LARKINS: Ms. Angell, you may phrase the
7  questions when I'm finished.
8    MS. ANGELL: She will not give you a legal
9  conclusion, Mrs. Larkins.
10    MS. LARKINS: You just rephrased and asked her a
11  different question from what I asked. How about you let me
12  ask the questions and then when I'm finished you can ask her
13  questions.
14    You may answer the question.
15    MS. ANGELL: No, you may not. You're not to give
16  legal conclusions.
17    Would you like to move on to another question,
18  Mrs. Larkins? If your question is does this piece of paper
19  say blah, blah, blah, that's one thing. You're asking this
20  witness who's not qualified as a legal expert to give a legal
21  conclusion. It's also an incomplete hypothetical. You
22  haven't -- it's so incomplete, I can't -- I don't even know
23  where to start to tell you how much is wrong with the
24  question.
25    MS. LARKINS: I think the only thing that's wrong

17 (Pages 62 to 65)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

Page 66

1  with the question, Ms. Angell, is that you are terrified that
2  witnesses might tell the truth. Question withdrawn.
3        MS. ANGELL: Move to strike plaintiff's comments
4  after -- her whole comment preceding question withdrawn
5  because there's no question pending in it.
6  BY MS. LARKINS:
7        Q. I'd like to ask that this exhibit be labeled
8  Exhibit 6.
9        (Plaintiff's Exhibit No. 6 was marked for
10       identification.)
11       MS. ANGELL: Let the record reflect that plaintiff
12  has handed out two pages with some writing on it by somebody
13  which purport to be a partial printout of Sections 430
14  through part of 432.7 of the Labor Code.
15  BY MS. LARKINS:
16       Q. Okay. Ms. Myers, assuming that this is a
17  legitimate document printed out from the web site that's
18  shown at the bottom of the page, does this look to you like
19  sections of the California Labor Code?
20       MS. ANGELL: Objection. Incomplete hypothetical.
21       Are you familiar with the Labor Code?
22       THE WITNESS: No, I'm not.
23  BY MS. LARKINS:
24       Q. Can you answer the question?
25       A. What is the question?

---

Page 67

1        Q. Does this look to you like sections of the
2  California Labor Code?
3        A. I have never looked at the California Labor Code
4  so I wouldn't be able to tell you if it is or not.
5        Q. Okay. Do you see at the top of the document where
6  it says "California Codes, Labor Code"?
7        A. Yes.
8        Q. Okay. Assuming that this is a legitimate document
9  printed out from this web site down here, www.leginfo.ca.gov,
10  would it seem reasonable to you that this was probably
11  sections of the Labor Code rather than some other document?
12       MS. ANGELL: Objection. Calls for speculation.
13  Incomplete hypothetical.
14       You can answer the question if you understand it.
15       THE WITNESS: I couldn't tell you if it is or not.
16  I am not familiar with the Labor Code.
17  BY MS. LARKINS:
18       Q. No, I didn't ask you that. I asked you does it
19  seem reasonable to you that if you assume that this is a
20  legitimate document actually printed out from this web site
21  that's given down here that this would be sections of the
22  California Labor Code?
23       MS. ANGELL: Same objections.
24       THE WITNESS: I would be assuming, so I wouldn't --
25  I wouldn't want to answer an assumption.

---

Page 68

1  BY MS. LARKINS:
2        Q. Uh-huh. No, actually we're -- the question is a
3  hypothetical. We're going to assume that it's a legitimate
4  document.
5        MS. ANGELL: Have you qualified this witness as an
6  expert?
7        MS. LARKINS: She's got a California teaching
8  credential. I'm sure -- and I happen to know her and she's
9  an intelligent person. I'm sure she has the reading
10  comprehension to read every single word on these two pages.
11       MS. ANGELL: I think you're attempting to get this
12  witness to authenticate this partial document which is not
13  something she can do unless you ask her whether she printed
14  out this document and got it and brought it.
15       MS. LARKINS: Well, you're -- now you're making a
16  false assumption.
17       MS. ANGELL: Well, then obviously your question is
18  vague and ambiguous because I can't understand it. I mean, I
19  think you're trying to get her to authenticate this document
20  and say that it is something that she's already told you she
21  doesn't know, she has no knowledge of --
22       MS. LARKINS: Well, you're wrong.
23       MS. ANGELL: -- so why do you keep asking the
24  question.
25       MS. LARKINS: That's not what I'm trying to do.

---

Page 69

1  I'm not trying to get her to authenticate this document.
2        Q. Ms. Myers, would you look at the bottom of the
3  page, the last paragraph that says 432.7. Could you read
4  that paragraph to yourself, please.
5        Okay. Do you understand that this case in which
6  you are testifying as a witness regards this section of the
7  Labor Code?
8        MS. ANGELL: Objection. Seeks to invade attorney/
9  client privilege. Do you mean other than statements made on
10  the record here or did you mean her understanding based on
11  statements that I've made on the record here today?
12  BY MS. LARKINS:
13       Q. Ms. Myers, do you have any idea why you're here
14  today?
15       A. Based on what Ms. Angell has said.
16       MS. ANGELL: Do you mean besides the fact that you
17  served a deposition notice or do you mean other than
18  attorney/client privileged communications? I'm not sure what
19  you're seeking here and the witness looks very confused, so
20  vague and ambiguous.
21  BY MS. LARKINS:
22       Q. Ms. Myers, before you were represented by an
23  attorney in 2004, did you become aware that some teachers at
24  Castle Park Elementary had been sued by me?
25       A. Yes.

---

18 (Pages 66 to 69)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 70

1    Q.  And what did you understand that they had been
2  sued for?
3    A.  I don't know.
4    Q.  Who told you that they had been sued by me?
5      MS. ANGELL:  Objection insofar as it seeks to
6  invade attorney/client privilege, and as to any
7  attorney/client communications I would instruct the witness
8  not to answer.
9      But please, answer as far as you know on any other
10  communications.
11      MS. LARKINS:  Your objection is -- is preposterous
12  because I'm asking her about -- I specifically prefaced the
13  question by saying before you were represented by an attorney.
14      MS. ANGELL:  That was not part of the question
15  that you last posed.
16      MS. LARKINS:  Okay.  Well, let me -- let me put
17  that preface again on this one.
18    Q.  When someone told you before you were represented
19  by an attorney that teachers at Castle Park Elementary had
20  been sued by me, who was that someone who told you?
21    A.  I don't recall.
22    Q.  How did you feel when you found out that
23  information?
24    A.  I don't remember.
25    Q.  How do you feel as you sit here today about the

Page 71

1  fact that I sued teachers at Castle Park Elementary?
2    A.  I really have no feeling one way or the other.
3    Q.  Do you think that the teachers who were sued by me
4  felt stress and anguish as a result of being sued?
5      MS. ANGELL:  Objection.  Calls for speculation.
6  Vague and ambiguous as to what teachers were sued by you.
7  BY MS. LARKINS:
8    Q.  You may answer.
9    A.  I'm not sure of the question.
10    Q.  Did you feel stress and anguish when you were told
11  that you were being transferred out of Castle Park
12  Elementary?
13    A.  Is this a new question?
14    Q.  Yes.
15      MS. ANGELL:  And it's not relevant.  It's not
16  reasonably calculated to lead to discovery of admissible
17  evidence.
18      MR. HERSH:  I join in that objection.
19  BY MS. LARKINS:
20    Q.  You may answer.
21      MS. ANGELL:  And it's being asked for the purpose
22  of harassing this witness.
23      MS. LARKINS:  No, it is not, Ms. Angell.
24      MS. ANGELL:  Yes, it is.  There's -- it's
25  absolutely totally irrelevant to the allegations in this

Page 72

1  case, a transfer in August of 2004 when you last taught in a
2  district school in April of 2001.  And you've not been an
3  employee for a number of years, at least you weren't an
4  employee during August 2004 for certain.  It's simply
5  irrelevant, and it can't be done for any other reason than to
6  harass this witness.
7      MS. LARKINS:  Ms. Angell, if the district had
8  acted properly and followed the law regarding my situation in
9  2001, then it might be irrelevant.  But the fact is,
10  Ms. Myers and other teachers have been covering up the
11  situation that happened in 2001, and you have been covering
12  it up since October 4th, 2001, and that's why it's still
13  relevant because the coverup has been continuing.
14      Actually, this Labor Code Section 432.7 which is a
15  misdemeanor, the statute of limitations has passed on this.
16  The people who committed these crimes are not going to be
17  brought before the criminal justice system.  The statute of
18  limitations has passed, but the coverup continues.  And just
19  as so often happens in Washington, the coverup is worse than
20  the original crime.
21      In fact, when I came back to work at Castle Park
22  in April of 2001, if the people who had comitted the crimes
23  against me had simply let me be, I could never have sued
24  anybody because I wouldn't have had any damages.  But they
25  couldn't let me be because the atmosphere at Castle Park was

Page 73

1  so poisonous with hostility, and there was such a struggle
2  for power, some people were just so intent on controlling
3  things.  And that is exactly what has happened now this year,
4  2004, when these same people who were -- have been struggling
5  for years and years to control everything at Castle Park,
6  finally the administration just got tired of it and said wait
7  a minute.  You know, we're going to have something other than
8  this little committee of teachers that -- that runs
9  everything.
10      MS. ANGELL:  Objection.  Move to strike everything
11  after when I returned to Castle Park in April 2001.  No
12  question pending.
13      MR. HERSH:  I will join in that objection.  But I
14  do want to add that I'm personally moved by plaintiff's
15  story.
16      MS. LARKINS:  Okay.  That's your first point for
17  the day, Michael.  That was good.
18      MS. ANGELL:  Mr. Hersh, humor won't reflect well
19  on the written record.
20      MS. LARKINS:  Actually, it will look like it was
21  sincere and it will make you seem like a nice guy.  And then,
22  Mr. Hersh, they'll think that C.T.A. cares about all teachers.
23      MR. HERSH:  Well, I appreciate your concern for
24  what people think about the California Teachers Association,
25  but I guess my thought is that in light of your soliloquy

19 (Pages 70 to 73)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 74

1 that the matters concerning the alleged coverup of the
2 wrongdoing might be better left for your next lawsuit since
3 that isn't what's being alleged in the current lawsuit that
4 brings us to this deposition today.
5        MS. LARKINS: Oh, you didn't get my add -- motion
6 for adding the true names of Does to obstruction of justice?
7        MR. HERSH: Yes, but I don't understand what that
8 has to do with your questioning of this witness.
9        MS. LARKINS: It's -- fortunately, I don't believe
10 this witness was involved in obstruction of justice -- which
11 by the way is a felony, not the misdemeanor that started the
12 whole thing -- but C.T.A. is.
13        MR. HERSH: Well, you're welcome to pursue your
14 motion, but that has nothing to do with what you just
15 testified concerning the alleged coverup. And you know, if
16 you're now saying that you want to conduct discovery
17 concerning those prior to the court's ruling on your motion,
18 then I would have to ask why you've refused to answer my
19 discovery concerning those matters on the basis that we're
20 not a party since we're still not a party.
21        MS. LARKINS: Well, Mr. Hersh, the felony
22 obstruction of justice occurred in February of -- well,
23 started in February of 2002, but the coverup preceded that by
24 quite a long time, and C.T.A. was involved in the coverup
25 long before the obstruction of justice happened. So the

Page 75

1 coverup -- I'm interested in the coverup that started before
2 the obstruction of justice and continued after the
3 obstruction of justice, but was not -- but people who were
4 involved in this coverup did not all commit obstruction of
5 justice.
6        MR. HERSH: I sincerely appreciate your interest
7 in the topic, and I understand that this is your life at the
8 center of all of this litigation. But we're here because you
9 have the right to depose witnesses concerning their personal
10 knowledge about things that are relevant to the allegations
11 in your complaint. And the line of questioning that you've
12 been pursuing most of this morning is not relevant to those
13 matters, nor apparently intended to elicit information that
14 would lead to the discovery of relevant evidence.
15        MS. LARKINS: That's just an excuse to continue
16 your coverup. It's very relevant. I have no proof -- I have
17 no smoking gun. I didn't see people with my arrest records.
18 I have to show the whole story of everything that happened at
19 Chula Vista, and I have not heard any other explanation that
20 makes any sense for what happened at Chula Vista other than
21 the ones I have alleged in my complaint.
22        MR. HERSH: And other than those that have already
23 been provided to you on a multitude of occasions by the
24 association defendants?
25        MS. LARKINS: That was just more coverup, more

Page 76

1 baloney.
2        MR. HERSH: Oh, I see.
3        THE REPORTER: Ms. Larkins, I'm almost out of
4 paper.
5        MS. LARKINS: Okay. The -- we're running out of
6 paper and videotape, and we need to break. Is that all right
7 with counsel?
8        MS. ANGELL: That's fine.
9        MS. LARKINS: Is that all right with you, Mr. Hersh?
10        MR. HERSH: Yes.
11        MS. LARKINS: Okay.
12        THE VIDEOGRAPHER: This is the end of Tape 1 and
13 Disk 1. We're going off the record at 12:53 p.m.
14        (Recess taken.)
15        THE VIDEOGRAPHER: Today is Monday, November 29th,
16 2004. The time is now 1:01 p.m. We're beginning Tape 2,
17 Disk 2 of the deposition of Peggy Myers. We're going on the
18 record.
19 BY MS. LARKINS:
20     Q. Ms. Myers, before you were represented by an
21 attorney in 2004, did anybody tell you that I had been
22 arrested?
23     A. No.
24     Q. Okay. Did anybody say anything about a police
25 report?

Page 77

1        MS. ANGELL: Vague and ambiguous. You mean a
2 police report concerning you at any time prior to?
3        MS. LARKINS: Yes.
4     Q. Before you were represented by an attorney
5 regarding me, did anyone -- did you hear anyone talk about a
6 police report that had anything to do with me?
7     A. No.
8     Q. Ms. Myers, do you recall a meeting that was held
9 at Castle Park Elementary School, an unusual meeting on a
10 Friday afternoon after school when all the teachers were told
11 to come into the auditorium after school on a Friday and then
12 the teachers were told that I would be coming back to work?
13     A. I do not recall.
14     Q. Do you recall saying to anyone that it wasn't fair
15 that I would be coming back because my substitute had worked
16 so hard on open house?
17     A. I do not recall.
18     Q. Do you recall feeling that way? Do you recall
19 thinking that it was unfair that I would be coming back when
20 my substitute had put so much work into open house?
21     A. What's the question?
22     Q. Do you recall thinking that it was unfair that I
23 was coming back because my substitute had put so much work
24 into open house?
25     A. I do not recall.

20 (Pages 74 to 77)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 78

1  Q.  Okay.  I'd like to talk about Exhibit 4 which is a
2  computer printout from the La Prensa web site.  Ms. Myers, do
3  these photographs and this article look familiar to you?
4      A.  Yes.
5      Q.  Okay.  Ms. Myers, have you ever contacted anyone
6  who works for La Prensa?
7      A.  You need to be more specific.
8      Q.  Do you know what I mean by La Prensa?
9      A.  Yes.
10     Q.  Okay.  Did you ever make a phone call to the
11 La Prensa offices?
12     MS. ANGELL:  Vague and ambiguous as to time.  Over
13 broad.  You mean maybe in 2004 or from 2000 forward or --
14     MS. LARKINS:  Let's make it 2004.
15     THE WITNESS:  I do not believe I phoned La Prensa.
16 BY MS. LARKINS:
17     Q.  Did La Prensa phone you?
18     A.  When?
19     Q.  In 2004.
20     A.  Yes.
21     Q.  Who was it who phoned you?
22     A.  I don't remember his name.
23     Q.  If you look on the second page of this document,
24 at the end of the article in which you are featured it says
25 "photos by" and then it's followed by a name.  Could that be

Page 79

1  the person who called you?
2      A.  It could be.
3      MS. ANGELL:  Sorry.  Quick answer.  Objection.
4  Calls for speculation.
5  BY MS. LARKINS:
6      Q.  Does the name Hawk sound familiar to you?  It's
7  regarding the reporter from La Prensa.
8      A.  Say that again?
9      Q.  Does the last name Hawk sound familiar to you
10 regarding the name of the reporter from La Prensa?
11     A.  Yes.
12     Q.  Okay.  About how many times did you speak to the
13 man who called you?  Or was it a man?  Is J.D. Hawk a man?
14     A.  Yes.
15     Q.  Okay.  And did you see him taking photos at the
16 board meeting on September 14th, 2004?
17     A.  Prior to this board meeting I had never seen him,
18 so I don't -- I wouldn't be able to say whether I saw him
19 taking these pictures or not.
20     Q.  Did you see somebody taking pictures at the board
21 meeting?
22     A.  Yes.
23     Q.  Did that person come and talk to you then?
24     A.  Yes.
25     Q.  Okay.  And did that person -- and was that person

Page 80

1  a man?
2      A.  Yes.
3      Q.  And did he represent himself as being a reporter
4  from La Prensa?
5      A.  I don't recall that he said he was a reporter.  He
6  said he was taking pictures for La Prensa.
7      Q.  Okay.  And did he take notes when you spoke to him?
8      A.  Yes.
9      Q.  On the first page of this document, the -- would
10 you read just to yourself the last three lines.
11     MS. ANGELL:  And I'll renew my objection that this
12 entire line of questioning concerning activities in
13 October -- or sorry, August thereafter related to this
14 witness's transfer from one school to another within the
15 Chula Vista Elementary School District is wholly irrelevant
16 to Larkins V. Werlin et al. and any cause of action therein.
17     MS. LARKINS:  Well, I would like to say that the
18 attitudes of teachers at Castle Park are intricately involved
19 in this case since I was removed from my classroom because
20 two teachers called up Rick Werlin and said I was going to
21 kill them, and other teachers looked the other way.
22     MS. ANGELL:  Mrs. Larkins, is that your purpose in
23 conducting this deposition today is to do discovery on the
24 issue that you just described, your removal from your
25 classroom while other teachers allegedly looked the other way?

Page 81

1      MS. LARKINS:  I'm not the deponent.
2      MS. ANGELL:  Because you've just stated that
3  that's your purpose in deposing this witness and that is an
4  improper use of discovery.  It is abuse of discovery process
5  because that is not the subject of this litigation.  The
6  matter of your dismissal from employment with this school
7  district has been adjudicated with finality some time ago.
8  And it's --
9      MR. HERSH:  I would join in the objection just
10 stated by counsel for Ms. Donlan.
11     MS. LARKINS:  I have agreed that you can have -- I
12 have stipulated to a standing objection here and yet you keep
13 repeating it and repeating it.  It's now past the time for
14 the next deponent to -- the deposition to start, and this
15 constant objection, objection really delays the progress of
16 this deposition.  So I'd really ask you to kind of shorten
17 your soliloquies a little.
18     MR. HERSH:  I would just ask plaintiff that -- to
19 check, because my understanding was that she noticed the
20 subsequent deposition for Ms. Perez at 2:00 p.m., not 1:00
21 p.m.
22     MS. LARKINS:  That's correct, 2:00 p.m.
23     MS. ANGELL:  Well, it's not 2:00 p.m. yet.
24     MS. LARKINS:  Oh, it's not?
25     MS. ANGELL:  It's 1:00.

21 (Pages 78 to 81)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 82

1        MS. LARKINS: Oh, okay.
2        MS. ANGELL: Are you planning on finishing this
3    deposition at some time prior to 2:00 p.m. so that there's a
4    break between the two or are you planning on just going
5    straight through, letting this one go and swearing in the
6    next one?
7        MS. LARKINS: Would you like to have a break
8    between the depositions?
9        MS. ANGELL: I just want to know what's going on.
10        MS. LARKINS: Well, I think we need to agree.
11        MS. ANGELL: It doesn't matter to me. When you're
12    done with this witness I'd like to release her and let her go.
13        MS. LARKINS: And then would you like a break
14    before the next witness comes?
15        MS. ANGELL: Well, the next witness is scheduled
16    at 2:00 based on your scheduling, so it needs to go when
17    you've got it noticed for.
18        MS. LARKINS: So you do not want a break?
19        MS. ANGELL: If you -- I'm hoping that you
20    scheduled these depositions considering taking a break
21    between them. But if you did not and you intend to proceed
22    without a break, I'm not going to object. I'm not the one
23    who's the deponent.
24        MS. LARKINS: Okay. I will -- I'm also happy to
25    do it either way, so I'll let you decide whether or not

Page 83

1    there's a break.
2        MS. ANGELL: Well, that would depend on when you
3    finish this witness because the next witness is scheduled to
4    go at 2:00.
5        MS. LARKINS: Okay. Let's go back to the
6    deposition.
7        Q. Could you tell me what point you were trying to
8    make here, Ms. Myers, when you made the statement that's
9    contained here in these last three lines on this page?
10        MS. ANGELL: Objection. Vague and ambiguous. Are
11    you referring to page 1 of Exhibit 4?
12        MS. LARKINS: Yes.
13        THE WITNESS: I think that the point is very clear
14    here actually.
15    BY MS. LARKINS:
16        Q. Do you think rotating subs is bad for students?
17        A. Yes, that's what I said.
18        Q. Did you think it was bad for my students when my
19    classroom had rotating subs in 2001?
20        A. I actually didn't have an opinion about it, Maura.
21        Q. So you only have opinion about whether or not
22    rotating subs are a bad thing when it's you that's involved --
23        MS. ANGELL: Objection. Argumentative.
24    BY MS. LARKINS:
25        Q. -- not someone else?

Page 84

1        MS. ANGELL: Oh, sorry. Are you done?
2        MS. LARKINS: Yeah.
3        MS. ANGELL: Objection. Argumentative.
4        MR. HERSH: Joined.
5    BY MS. LARKINS:
6        Q. Okay. But I do want to get this clear. When
7    Robin Donlan was transferred, you thought it was a bad thing
8    that she was replaced by rotating subs? Is that true?
9        A. Regarding this issue, yes.
10        Q. And what issue are you talking about, the issue of
11    rotating subs?
12        A. The issue of the response in this exhibit.
13        Q. Okay. I'm really not understanding your answer.
14    Ms. Myers, in what situations are rotating subs a bad thing?
15        MS. ANGELL: Objection. Vague and ambiguous.
16    Calls for speculation.
17        MS. LARKINS: I'm sorry. Let me say that.
18        Q. Ms. Myers, in your opinion are rotating subs
19    always a bad thing when there is a full-time teacher
20    available to teach a class?
21        MS. ANGELL: Objection. Vague and ambiguous.
22    Incomplete hypothetical. Calls for speculation.
23    BY MS. LARKINS:
24        Q. You may answer.
25        A. I would need you to be specific.

Page 85

1        Q. Are there some situations in which you think
2    rotating subs are acceptable as replacing a teacher, a
3    full-time teacher?
4        A. Once again, I'm confused. I would need a specific
5    example in order to give an opinion.
6        Q. So it depends on who the person is that's being
7    removed from the classroom?
8        A. That's not what I said. What I said is I would
9    need specific -- a specific situation as to determine whether
10    a sub, a rotating sub, would be correct or not.
11        Q. But you don't need a specific name of a person.
12        A. No.
13        Q. Okay. Here, I'll give you a situation. You have
14    a bilingual teacher and in the middle of the year she is
15    replaced by someone who hasn't even done her student teaching
16    and doesn't speak Spanish who is then replaced by a sub,
17    another sub, who does speak Spanish for a few weeks, and then
18    is replaced by another sub. Do you think that's a good thing
19    for the students?
20        MS. ANGELL: Objection. Vague and ambiguous.
21    Incomplete hypothetical.
22        And insofar as you understand the question within
23    the confines that were laid out to you and not taking account
24    of any other facts, please answer as far as you understand
25    it.

22 (Pages 82 to 85)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

**Page 86**

1        THE WITNESS: I don't think you can answer that
2   without taking other facts in.
3   BY MS. LARKINS:
4        Q.   Okay. What would be the other facts you would
5   need to know?
6        A.   No. My point is other facts being not said that
7   are being assumed here.
8        Q.   What do you feel that is being assumed here?
9        A.   Maura, you have just described your position.
10       Q.   Right.
11       A.   And I have no opinion on your position.
12       Q.   How about if the same thing happened to someone
13   who wasn't Maura Larkins? Then would it be bad? Then would
14   you have an opinion?
15       MS. ANGELL: Objection. Argumentative. I would
16   ask Mrs. Larkins to please frame your questions in a
17   nonargumentative fashion so as not to abuse this witness.
18   BY MS. LARKINS:
19       Q.   If I had asked you the same question only it was
20   someone other than myself that had been involved, then
21   would you have an opinion?
22       A.   Once again, I have to defer to the fact that this
23   whole proceeding deals with you, and for me to answer it
24   seems difficult for me to answer when I feel that you are
25   just trying to get me to respond to you specifically.

---

**Page 87**

1        Q.   Well, I am very curious about your attitudes
2   toward me. I'm extremely curious why rotating subs are a bad
3   thing in 2004 but they weren't bad in 2001. I'm just trying
4   to figure out how your mind works.
5        MS. ANGELL: Objection. Misstates the evidence.
6   Argumentative. The prior testimony was that in the situation
7   described in this news article, which based on my quick scan
8   the article talks about a special education teacher and a
9   transfer of a special education teacher, I think that was the
10   testimony about rotating subs. There was no reference I
11   don't think to yours or other situations.
12       THE WITNESS: Right. This comment was made based
13   on this specific situation of a noncredentialed special ed
14   teacher in a classroom and rotating subs. So in response to
15   that specifically I can, but --
16   BY MS. LARKINS:
17       Q.   Okay.
18       A.   -- this hypothetical is too difficult.
19       Q.   How about if it was at another school and a
20   different credentialed special ed teacher was replaced by
21   noncredentialed rotating subs at another school other than
22   Castle Park? Then would you think it would be a bad thing?
23       MS. ANGELL: Objection. Incomplete hypothetical.
24   Calls for speculation. Vague and ambiguous.
25       THE WITNESS: So am I to understand that what

---

**Page 88**

1   you're asking me is that if a special ed teacher were removed
2   from a school and a noncredentialed special ed teacher
3   replaced, would I think that that is not the right thing to
4   do?
5   BY MS. LARKINS:
6        Q.   And not just -- yes, please answer that question
7   first, yeah.
8        A.   Is that the question you asked?
9        Q.   Well, actually, I did mention rotating subs, but --
10       A.   So what is the question you're asking?
11       Q.   The question is, if you have a credentialed
12   special education teacher at a school other than Castle Park
13   who is replaced at the beginning of the year by rotating subs
14   who are not credentialed special education teachers, do you
15   consider that to be a bad thing?
16       MS. ANGELL: Objection. Incomplete hypothetical.
17   Calls for speculation. Vague and ambiguous.
18       And insofar as it's confined to the facts stated
19   in the question, not taking account for any other information
20   which you might base your opinion on, if you can answer the
21   question, please answer it.
22       THE WITNESS: And I believe you've just said what
23   I am thinking. Being able to answer this without other --
24   with knowing other things, I cannot make -- I don't think I
25   can answer the question.

---

**Page 89**

1   BY MS. LARKINS:
2        Q.   What are those other things that you need to know
3   in order to answer the question?
4        A.   It's not other things I need to know. It's other
5   things that I do know regarding this specific question about
6   a special ed credentialed teacher.
7        Q.   Okay. What are those other things that you do
8   know?
9        MS. ANGELL: Objection. Vague and ambiguous.
10   BY MS. LARKINS:
11       Q.   Go ahead.
12       MS. ANGELL: That she knows about what?
13       THE WITNESS: Yeah.
14       MS. ANGELL: I'm not going to let her answer that
15   question.
16       MS. LARKINS: She's the one who said it. She said
17   that there were other things she knows about this.
18       MS. ANGELL: Okay. So your question for her --
19   could you just ask her a complete question, because the
20   record is just going to be a horrible mess.
21       THE WITNESS: I'm very confused.
22   BY MS. LARKINS:
23       Q.   Okay. You said that the reason you were able to
24   make this statement which is contained here in Exhibit 4 is
25   because you knew other things about this situation than those

---

23 (Pages 86 to 89)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 90

1 that are contained here. I'd like to know what are those
2 other things that you know about this situation?
3 . A. You did not -- that is not what I said. You asked
4 me a question, and Ms. Angell objected saying that it was
5 ambiguous based on things that I do know. And it is
6 difficult for me to answer the question that you are asking
7 me because this situation involves me, and I do have
8 information other than what I have stated here.
9 Q. What is that information?
10 A. I'm sorry, but that is under the grievance
11 process, and I really don't believe that it has anything to
12 do with you, and it's not anything that you need to know.
13 Q. Well, I will be adding that to my motion to compel
14 because I think it has a whole lot to do with me. And I
15 think you never would have been transferred if what had
16 happened to me hadn't happened. You'd be still happily
17 teaching at Castle Park Elementary School if you and others
18 hadn't worked together to get rid of me. Okay.
19 THE WITNESS: I'm really warm. I want to take my
20 jacket off. Is that going to mess with your ears?
21 BY MS. LARKINS:
22 Q. Okay. When you spoke to the man from La Prensa on
23 September 14th, 2004 at the board meeting, what did you mean
24 when you said there's not a whole lot of learning going on
25 there?

Page 91

1 MS. ANGELL: Objection. Asked and answered about
2 a half an hour ago.
3 BY MS. LARKINS:
4 Q. Ms. Myers, did you go to Castle Park Elementary
5 School on the night that they were having open house recently?
6 A. Yes.
7 Q. Was your purpose to disrupt Castle Park School and
8 the -- okay, period. Was your purpose to disrupt Castle Park
9 School?
10 A. No.
11 Q. What was your purpose?
12 A. To pass out fliers regarding Jill Galvez.
13 Q. Were you -- why did you choose Castle Park School
14 as a place to do that?
15 A. Because many parents would be coming to open
16 house, and that would be a good forum to pass out fliers
17 regarding Jill Galvez and her election to the school board.
18 Q. Why didn't you go to another school where there
19 would also be many parents?
20 A. This was open house. Actually, it was back to
21 school night, so unless they were having a back to school
22 night it would not be in our best interest to hand out fliers
23 at a school that wasn't open.
24 Q. Okay. Is Castle Park the only school in Chula
25 Vista Elementary School District that has open house? . .

Page 92

1 A. No.
2 Q. Did you attend the open houses of other schools
3 other than the one you're teaching at in order to pass out
4 fliers for Jill Galvez?
5 A. No.
6 Q. Why did you choose Castle Park of all the schools
7 in Chula Vista?
8 A. I didn't necessarily choose Castle Park, but I had
9 conflicting things at other back to school nights that I
10 wasn't able to attend. So did I target Castle Park, no. It
11 worked into my schedule.
12 Q. Do you think Ollie Matos should be removed from
13 Castle Park?
14 MS. ANGELL: Objection. Not reasonably calculated
15 to lead to the discovery of admissible evidence.
16 MS. LARKINS: Well, it's certainly calculated to
17 reveal the hunger for power of this witness and her desire to
18 destroy other people's careers.
19 MS. ANGELL: Objection. Move to strike
20 plaintiff's comments. No question pending. And I believe --
21 MR. HERSH: Joined.
22 MS. ANGELL: -- those comments are meant to
23 intimidate and harass this witness, Mrs. Larkins, and I would
24 ask you to refrain from that type of behavior.
25 I would also remind you that it's now 1:30 -- 1:25

Page 93

1 and our next deposition is set to start at 2:00 p.m. So if
2 you have any other questions that are relevant to the
3 allegations in the complaint, I would respectfully urge you
4 to pose them to the witness.
5 BY MS. LARKINS:
6 Q. Did you consider your words that were published in
7 this article about Dr. Billings to be an attack on
8 Dr. Billings?
9 MS. ANGELL: Objection. Vague and ambiguous. Are
10 you referring to what's marked as Exhibit 4?
11 MS. LARKINS: Yes.
12 THE WITNESS: What's the question?
13 BY MS. LARKINS:
14 Q. When you said that Billings had misinterpreted his
15 rights, did you intend that as an attack on Lowell Billings?
16 A. No.
17 Q. How did you intend that?
18 A. That goes along with the whole grievance process
19 that is in the works right now and has nothing to do with
20 you, and I do not want to answer.
21 MS. ANGELL: But insofar as statements that you
22 made to the press that you've already made public, I'd like
23 you to answer the question concerning --
24 THE WITNESS: So what is the question again?
25 MS. ANGELL: Anything that you've already made

24 (Pages 90 to 93)

Page 94

1  public by talking to the press about it as separate from your
2  pending litigation.
3       THE WITNESS: Right. But specifically what is the
4  question that --
5       MS. ANGELL: I'm not sure what she wants.
6  BY MS. LARKINS:
7       Q. Let me -- let me rephrase it.
8       Why didn't you just quietly rely on the grievance
9  procedure rather than making statements about Billings to the
10 press?
11      MS. ANGELL: Just a moment. Michael?
12      MR. HERSH: Yes, I'm sorry. Someone just came in
13 my office. I missed that very last point.
14      MS. LARKINS: Do you want me to repeat the
15 question?
16      MR. HERSH: Yes.
17      MS. ANGELL: I'd like for her to read it back, the
18 question, please.
19      (Page 94, Lines 8 through 10 were read back.)
20      MR. HERSH: Thank you. Well, of course, I object
21 to this entire line of questioning. It's quite -- quite
22 absurd and ridiculous. But I would advise the witness that
23 in this matter, insofar as the plaintiff is attempting to ask
24 you about matters that have to do with your activities as a
25 Chula Vista educator, member of the Chula Vista Educators and

Page 95

1  your union activities, I will be representing you, and I will
2  object to any questions that attempt to elicit the reasons
3  why a grievance was filed or any confidential communications
4  between you and any staff or officers of the Chula Vista
5  Educators.
6  BY MS. LARKINS:
7       Q. Okay. You may answer the question.
8       A. I have a problem answering the question because I
9  believe that responding to this question goes beyond what I
10 have said to the media. So in that respect, I believe that
11 I'm going beyond what I should in responding.
12      MR. HERSH: Ms. Myers, if responding to the
13 question requires that you divulge any sort of confidential,
14 internal Chula Vista Educators information, you should let me
15 know that and I will then instruct you not to answer the
16 question.
17      THE WITNESS: I believe that this would require me
18 to discuss things that I discussed with C.V.E. regarding this
19 matter.
20      MR. HERSH: And were those discussions
21 confidential?
22      THE WITNESS: Yes.
23      MR. HERSH: Okay. On that basis then I would
24 instruct the witness not to answer the question posed by the
25 plaintiff.

Page 96

1  BY MS. LARKINS:
2       Q. Just because you talked about this to someone at
3  C.V.E. doesn't mean that you're -- you can refuse to answer
4  it here in a deposition regarding very serious charges that
5  are actually crimes.
6       A. I am not refusing to answer anything that wasn't
7  confidential. I'm refusing to answer based on discussions
8  that were made in a confidential discussion with C.V.E. --
9       Q. Okay.
10      A. -- specifically dealing with this issue and the
11 pending grievance.
12      Q. Okay. I want to know what were your thoughts and
13 your motivations? Just because you also happen to tell those
14 thoughts and motivations to someone at C.V.E. doesn't mean
15 that you have a right to talk about them here in
16 this deposition for Superior Court.
17      A. I beg to differ, because specifically one instance
18 that I'm thinking of it was a definite confidential statement
19 that was made about all of this dealing with the grievance in
20 particular, so --
21      MR. HERSH: Ms. Myers, you don't need to argue
22 with the --
23      THE WITNESS: Thank you.
24      MR. HERSH: -- with the plaintiff here, Ms. Larkins.
25 I've instructed you not to answer her question.

Page 97

1       THE WITNESS: Okay.
2       MS. LARKINS: Okay. And what question was that,
3  Mr. Hersh?
4       MR. HERSH: The question as to her motivation for
5  filing the grievance.
6       MS. LARKINS: Oh, it certainly was not, Mr. Hersh.
7  My question was about her motivation for going to the press.
8       MR. HERSH: Well --
9       MS. ANGELL: That's not what I heard you ask. I
10 didn't hear you ask what was her motivation for going to the
11 press in the last question. If you'd like to strike the
12 prior questions and start over with that question, maybe you
13 won't have an objection.
14      MS. LARKINS: I asked something along the lines of
15 why did she not rely on the grievance proceeding and instead
16 she went to the press. I'm asking her for -- about her
17 actions apart from the grievance proceeding.
18      MS. ANGELL: Actually, I think you're asking about
19 the rationale behind the grievance procedure which is what
20 counsel there is making objections to I think.
21 BY MS. LARKINS:
22      Q. Okay. I want to know your rationale about going
23 to the press. Why did you go to the press?
24      A. Actually, I did not go to the press.
25      Q. Okay. Why did you make these statements? Why did

25 (Pages 94 to 97)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 98

1    you make this statement about Lowell Billings to the press?
2        A.   The press came to me.
3        Q.   And then you made this statement to them?
4        A.   Yes.
5        Q.   Why?
6        A.   I was asked about what happened.
7        Q.   Well, you sure are good at not answering questions
8    here.  You seem to think --
9            MR. HERSH:  Motion to strike.  Argumentative.
10           MS. ANGELL:  Join.
11   BY MS. LARKINS:
12       Q.   You felt because a reporter asks you a question
13   you have to answer it?
14       A.   I will respond this way.  You asked me about this.
15   I did not go to the press.  They asked me a question, and I
16   responded.
17       Q.   Right.  They just caught you by surprise maybe and
18   it just popped out of your mouth?
19           MS. ANGELL:  Objection.  Argumentative.
20   Mrs. Larkins, can you please --
21           MR. HERSH:  Join.
22           MS. ANGELL:  -- limit yourself, change the tone
23   and topic of your questions.  Move on to the next topic.
24           MS. LARKINS:  I really would like an answer to
25   that.

Page 99

1            MS. ANGELL:  Well, if you can ask a question
2    that's not argumentative and designed to harass the witness,
3    you might get an answer.
4            MS. LARKINS:  Well, I'm trying to find out -- it's
5    sort of like -- she seems to be saying that this guy asked
6    her and then for some reason she had to answer, and I'm --
7            MS. ANGELL:  That's not what she said.  That's
8    what you said.
9            MS. LARKINS:  Well, I'm trying to find out --
10           MS. ANGELL:  She said that he asked her a question
11   and she responded.  You said why did you give that answer;
12   she said because I was asked a question.
13           MS. LARKINS:  No.  Okay.
14           MS. ANGELL:  Could you move on to the next
15   question, please?
16           MS. LARKINS:  I guess I asked -- I said why did
17   you give that answer.  That's not the question I wanted.
18   This is the question I wanted to ask.
19           Why did you answer at all?
20           MS. ANGELL:  Objection.  Vague and ambiguous.  You
21   mean why did she answer a question posed to her by somebody
22   representing themself to be a -- from the La Prensa San Diego
23   newspaper on September 16th approximately 2004?
24           MS. LARKINS:  Yeah.
25           THE WITNESS:  So what's the question?  I'm sorry.

Page 100

1    BY MS. LARKINS:
2        Q.   Why did you answer the reporter when he asked you
3    the question?
4        A.   He asked the question and I answered it, and I
5    didn't feel that it went beyond a simple answer.
6        Q.   Okay.  Were you aware that your words might be
7    printed in the press?
8        A.   Yes.
9        Q.   Were you aware that you were making a negative
10   comment about Lowell Billings to be printed in the press?
11       A.   When I made the comment, no.  I mean, the way --
12   the question you're asking -- what is it specifically that
13   you want to know, because I'm getting -- you're asking one
14   thing, but I have the feeling you're asking something else
15   without saying it.
16       Q.   No, I really want to know.  But I'll tell you
17   what.  I'm going to move to something different.  On
18   Exhibit 4 would you look at the third and -- the third line.
19   In the middle there's a sentence that starts "the
20   controversial transfer"?  Could you read that sentence to
21   yourself?
22       A.   Where is this?
23       Q.   The third line on the first page.
24       A.   Okay.
25       Q.   In the middle there's a sentence that starts "the

Page 101

1    controversial transfer"?
2            Did you make a statement to the man from La Prensa
3    that you thought the transfer was a mere power play by
4    Superintendent Lowell Billings?
5        A.   I can't remember if I made the comment or not.
6        Q.   Do you consider that to be a -- whether you made
7    it or not, do you consider that to be a negative comment
8    about Lowell Billings?
9        A.   What?
10       Q.   That the transfer was a mere power play.
11       A.   Do I perceive that to be --
12       Q.   Negative.
13           MS. ANGELL:  How is this line of questioning at
14   all relevant to your allegations that Robin Donlan's brother
15   got her arrest records in 2000 and spread around that
16   information?
17           MS. LARKINS:  If I tell you, you'll accuse me of
18   harassing the witness.
19           MS. ANGELL:  This line of questioning is totally
20   irrelevant, designed to harass the witness by keeping here --
21   keeping her here for this what is amounting to an abuse of
22   discovery and abuse of this witness concerning events which
23   happened in 2004 when the allegations in your complaint are
24   that events related to an arrest record in 2000 and 2001 and
25   I think even up to 2002.  That's the time frame of the

26 (Pages 98 to 101)

**Page 102**

1  allegations in your complaint, and this witness's impression
2  of a statement in a September 17th, 2004 newspaper article
3  that has nothing to do with you or your arrest records or
4  your employment by Chula Vista Elementary School District is
5  not relevant.
6  　　　MR. HERSH: I join in that objection.
7  　　　MS. LARKINS: Well, this witness seems to be
8  uncertain whether saying Billings has misinterpreted his
9  rights is a negative thing. So I'm just trying to figure out
10  what her motivations are and if she understands or if she
11  believes that she was attacking Lowell Billings in the press.
12  　　　MR. HERSH: Well, Ms. Larkins, as I've instructed
13  you or informed you at previous depositions, the purpose of
14  depositions is really not for you to satisfy your personal
15  curiosity about the deponent's state of mind, and it really
16  is in order to obtain evidence relevant to your claims. So I
17  would ask that you -- if you have any questions of this
18  witness pertaining to the matters that you've alleged in your
19  causes of action that you ask those questions and cease and
20  desist from pressing her about matters that are completely
21  unrelated to what happened to you in September 2000 and on.
22  　　　MS. LARKINS: Well, Mr. Hersh, I understand that
23  C.T.A. has been trying to cover up the facts of this case for
24  three and a half years. And you and Ms. Angell can instruct
25  this witness to leave at any time or instruct her not to

**Page 103**

1  answer, but I believe that these questions are absolutely
2  necessary. This witness was an important person at Castle
3  Park Elementary School with a great deal of power and
4  influence, and I believe that this witness is covering up
5  information that I need about my case.
6  　　　MS. ANGELL: Well, then why don't you ask her
7  something having to do with an allegation contained in your
8  complaint instead of asking her about her own transfer three
9  years after you stopped working at that school. You're
10  abusing this witness and it's so improper.
11  　　　MS. LARKINS: This witness was transferred because
12  of her habits of behavior which contributed to my loss of my
13  career. This witness was very much involved in the -- in the
14  destruction of my career, and she certainly was involved in
15  covering up, and she is today right now involved in covering
16  up.
17  　　　MS. ANGELL: Okay. Based on your statement that
18  you think that you have evidence of the reasons for this
19  person's transfer, why don't you ask her if she has
20  information about the reasons for her transfer and we'll see
21  how the questions come out.
22  　　　MS. LARKINS: What I'm trying to find out here is
23  this witness's motivations and actions in destroying other
24  people's careers.
25  　　　MS. ANGELL: What does that have to do with this

**Page 104**

1  employee's school assignment in 2004. You could ask her if
2  she was told that she was being transferred because X, Y, Z,
3  you know, but you're not asking anything relevant here. If
4  you -- it's totally not related to you the way that you're
5  asking these questions. If you can ask some sort of question
6  that's related to you, maybe I wouldn't have a reason to
7  object.
8  　　　MS. LARKINS: This witness is showing in public a
9  pattern of behavior of feeling that she's the one that's
10  supposed to be in charge, and she's happy to -- to say bad
11  things in the press about Ollie Matos, Lowell Billings. And
12  she thinks it's perfectly okay for people she doesn't like to
13  be removed from their positions, but all of a sudden when
14  it's a friend of hers or it's herself, all of a sudden it's a
15  terrible thing.
16  　　　MS. ANGELL: There's no testimony on the record as
17  to any of those things. Those are all your conclusions.
18  There's no testimony --
19  　　　MR. HERSH: And Ms. Angell, I'd like to add that
20  what we're really hearing here is plaintiff clearly revealing
21  that her purpose for this questioning is to punish this
22  witness for what she, plaintiff, apparently believes wrongs
23  committed by this -- by the deponent.
24  　　　MS. LARKINS: Well, I think it's very interesting
25  that this witness seems to think that saying things in the

**Page 105**

1  press about people is perfectly harmless. She doesn't even
2  understand that this is negative. And I -- this will be a
3  very important part of my case at trial because I need to
4  establish patterns of behavior of hostility toward co-workers
5  on the part of Peggy Myers and others which resulted in my
6  being removed from my classroom.
7  　　　MS. ANGELL: Okay. Mrs. Larkins, you just stated
8  on the record your improper purpose for continuing this
9  deposition. This litigation is not about your continued
10  employment or your dismissal from employment with the Chula
11  Vista Elementary School District, and you've just told us
12  that that is what you're trying to do here, get discovery on
13  that. That's improper. The allegations in this complaint
14  are that Mr. Carlson accessed your criminal history records
15  and provided that information to Ms. Donlan, who then
16  provided it to other teachers or employees or somebody, Linda
17  Watson and Does. All right?
18  　　　The issues related to your employment, whether you
19  should be employed at the district or not, all of those
20  things have been finally adjudicated. You had due process on
21  those things. Your attempt to force witnesses to come here
22  and testify, you're putting them under the gun by videotaping
23  them, your abusive questions over and over about their
24  personal employment that has nothing to do with you is
25  clearly an abuse of the discovery process and it's improper,

27 (Pages 102 to 105)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 106

1  and I would ask you to refrain from that.
2      MR. HERSH:  And I will also add that I informed
3  plaintiff in my letter a few weeks ago that if in fact she
4  was to proceed in the manner she has today, that I was going
5  to seek sanctions to recover costs and time that I've spent
6  in a deposition that's completely unrelated to this case and
7  is simply an abuse of the court's time and it's -- it's -- I
8  understand that plaintiff imagines that she has a right to do
9  this, but she doesn't.  And the court is going to hear a    --
10 motion this Friday, several motions this Friday, and
11 hopefully the court will clarify for plaintiff what she is
12 and what she cannot do as part of the discovery process.
13     MS. LARKINS:  Well, Michael, it's good I was
14 sitting down when you said that.  Otherwise I might have just
15 fallen over in shock that you're going to seek sanctions.
16     Q.  Okay.  Two teachers called up Rick Werlin on
17 February 10th, 2001 and said that I was going to kill them.
18 There is absolutely no explanation given for such a bizarre
19 event other than that they had information criminally
20 obtained from my arrest records.  No witness has given any
21 reason with -- anywhere near the ball park of rationality
22 which would account for me being taken out of my classroom
23 and being suspected of killing people.  And then I was
24 brought back --
25     MS. ANGELL:  Is there a question pending for this

Page 107

1  witness?  Because if you just want to make a monologue I
2  think we should excuse the witness.  You have 14 more minutes
3  until the beginning of the next deposition, Mrs. Larkins.  I
4  would suggest that you ask the witness questions instead of
5  making monologues.
6      MS. LARKINS:  Okay.  Are you planning to
7  unilaterally end the deposition in 14 minutes?
8      MS. ANGELL:  You're the one that noticed the next
9  deposition, and if you don't take the next person's
10 deposition, then I guess that you'll be waiving the
11 opportunity to take her deposition or whatever is appropriate
12 under the code.
13     MS. LARKINS:  Well, you didn't answer my question.
14     MS. ANGELL:  Yes, I did.
15     MS. LARKINS:  Was that a yes?
16     MS. ANGELL:  I answered the question.  You can
17 understand it however you want to.
18     MS. LARKINS:  Well, I'm taking it as a yes.  If
19 you do walk out, though, I will file a motion to compel.
20     Q.  Okay.  Ms. Myers, do you see making a statement to
21 be printed in the press -- and I'm not saying you made it,
22 but just if somebody made such a statement that the transfer
23 was a mere power play by Superintendent Lowell Billings,
24 would you perceive that to be a negative comment about
25 Mr. Billings?

Page 108

1      MS. ANGELL:  Objection.  Not relevant.  Incomplete
2  hypothetical.  Calls for speculation.  Vague and ambiguous.
3  BY MS. LARKINS:
4      Q.  You may answer.
5      A.  I see that as being a statement of somebody's
6  belief.
7      Q.  Do you consider it to be praise of Lowell Billings?
8      A.  I wouldn't know based on the question that was
9  posed to the person and whatever else ensued between the two
10 individuals.
11     Q.  Okay.  So it might have been praise.
12     MS. ANGELL:  Objection.  This is totally calling
13 for speculation.  You've said -- this witness has said that
14 she's not the person or she doesn't remember answering this
15 question, so you're asking her to make guesses about what a
16 newspaper reporter asked to apparently several different
17 people.  Because this thing refers to some -- some people,
18 and this line of questioning is harassing, not designed to
19 lead to admissible evidence, and is totally out of line.  And
20 I would request that you please move on to something else.
21 BY MS. LARKINS:
22     Q.  Ms. Myers, did you -- I'm going to ask that this
23 next exhibit be labeled as Exhibit 7.
24     (Plaintiff's Exhibit No. 7 was marked for
25 identification.)

Page 109

1  BY MS. LARKINS:
2      Q.  Is this La Prensa news article familiar to you,
3  Ms. Myers?
4      A.  I do not read Spanish.
5      Q.  That wasn't the question.
6      A.  How could it be familiar to me if I don't read
7  Spanish.
8      Q.  Did you and Stephanie Pettit sit down for an
9  interview with Luis Alonso Perez?
10     MS. ANGELL:  Objection.  Vague and ambiguous as to
11 time.
12 BY MS. LARKINS:
13     Q.  Before October 8th, 2004?
14     A.  Specifically did we sit down, what does that --
15 what do you mean, Stephanie and I sit down?  Together?
16     Q.  Yes.
17     A.  No.
18     Q.  Did you yourself alone talk to Luis Alonso Perez?
19     A.  I did not speak to Mr. Perez.
20     Q.  Are you aware that Luis Alonso Perez wrote an
21 article in La Prensa quoting you extensively?
22     A.  Yes.
23     Q.  Did you -- were you angry and upset when you found
24 out that Luis Alonso Perez had written an article in La Prensa
25 quoting you extensively?    --

28 (Pages 106 to 109)

Page 110

1   A.  No.
2   Q.  Why not?
3   A.  First of all, can I say -- how can I respond to
4   anything along this line when I don't know what this says?
5        MS. ANGELL:  If you're aware that there was a
6   newspaper article even without being able to read this
7   because we don't have any information as to what this
8   document is.  It's not been authenticated.  You've said that
9   you don't understand it because it's in a different language,
10  but -- she may be looking at this document, but you're
11  answering the question based on what you understand separate
12  from this document.  Okay?
13       THE WITNESS:  Okay.  So what is the question?
14  BY MS. LARKINS:
15  Q.  Were you upset when you found out that Luis Alonso
16  Perez had written an article for La Prensa in October of 2004
17  in which he quoted you extensively?
18  A.  No.
19  Q.  Why not?
20  A.  He quoted things I said. --
21  Q.  Who did you say them to?
22  A.  I did not say them.  He did not have a
23  conversation with me face to face or on the phone.
24  Q.  But you did say these things.
25  A.  I wouldn't know what these things are.

Page 111

1   Q.  Okay.  Did you just tell me that you said these
2   things?
3   A.  What things?
4   Q.  That are -- the things that Luis Alonso Perez
5   quoted you as saying?
6        MS. ANGELL:  She already told you that she doesn't
7   understand the Spanish language article.  So if you're asking
8   her about things contained in this article, she's already
9   testified that she doesn't understand the article so she
10  can't answer the question.  And your continued attempt to
11  press this witness and harass her into responding to some
12  foreign language document that she doesn't understand is
13  improper, patently improper.
14       MS. LARKINS:  Ms. Angell, I asked her why she
15  wasn't upset that she was quoted extensively by this person,
16  and she said she wasn't upset because she said these things.
17       MS. ANGELL:  What things were you referring to by
18  these things, do you know?
19       THE WITNESS:  No.
20  BY MS. LARKINS:
21  Q.  Okay.  Let's go back.  Could you explain why you
22  weren't upset when you learned that you'd been extensively
23  quoted in La Prensa by Luis Alonso Perez?
24  A.  If I said something publicly, how can I be upset.
25  Q.  So you publicly said the things that he wrote in

Page 112

1   his article?
2        MS. ANGELL:  How would she know?  She can't read
3   the article.  Do you have an English language version of this
4   to put in front of her so she can respond to your questions?
5        MS. LARKINS:  The English language version is so
6   awful I -- didn't I send you the English translation of this
7   article?
8        THE WITNESS:  No, you did not.
9   BY MS. LARKINS:
10  Q.  Ms. Myers, did I -- okay.  Did I send you a fax
11  recently?
12  A.  You sent a fax to my school.
13  Q.  And what did the fax say?
14  A.  I don't remember.
15  Q.  And you're sure that there wasn't an English
16  translation of this article attached?
17  A.  I am positive.
18  Q.  Okay.  Well, Google did an English translation of
19  the article, but it was just so awful that I -- it would be
20  rude to put it into evidence.
21       Okay.  Now, you say that you weren't angry because
22  you said these things in public.  When -- and when you say
23  these things, I assume you mean his quotations in the
24  article.
25  A.  Is that a question?

Page 113

1   Q.  Yeah.  Is that what you mean?
2   A.  So what is the question?
3   Q.  When you say you weren't angry because you had
4   said these things in public, by these things do you mean the
5   things he quoted in the article?
6   A.  My response to that would have to be based on not
7   knowing what these quotations were.  If they are quotations
8   from me, I was not -- what was the terminology that you used
9   regarding this?  Was I upset?
10  Q.  Uh-huh.
11  A.  I was not upset.
12  Q.  So somebody told you what it said?
13  A.  No.  I have no idea what these quotations are.
14  Q.  You never found out what you were quoted as saying
15  in the paper?
16  A.  It's in Spanish once again, Maura.  I do not read
17  Spanish.  You know that.  How could I know what these
18  quotations are if I can't read Spanish.
19  Q.  Did Stephanie --
20       MS. ANGELL:  Do you need a break?
21       THE WITNESS:  Yes.
22       MS. ANGELL:  Let's go off the record for a minute.
23  Five minutes?
24       THE VIDEOGRAPHER:  Is that agreed, Ms. Larkins?
25       MS. LARKINS:  Oh, yes, yes.

29 (Pages 110 to 113)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

Page 114

1    THE VIDEOGRAPHER: Okay. We're going off the
2 record. The time is 1:56 p.m.
3    (Recess taken.)
4    THE VIDEOGRAPHER: We're going on the record. The
5 time is 2:28 p.m.
6    MS. ANGELL: And I'd like to reflect what has
7 transpired off the record. Before 2:00 o'clock I asked for a
8 five-minute break, and in my absence plaintiff unilaterally
9 suspended the deposition until 2:30, and it's nearly 2:30 now
10 and we're going back on the record. I have not had the
11 opportunity to get lunch, was not informed, did not agree to
12 going off the record.
13    Also, during this intervening time period just
14 before we went back on, plaintiff Maura Larkins asked me what
15 I expect to happen with the videotapes of the depositions in
16 Larkins V. Werlin if the motion for terminating sanctions
17 filed by my clients and I assume others is granted on
18 December 3rd, and I stated that I expect that the deposition
19 videotapes will not be used for any purpose, in particular
20 because the litigation will be over and that the purpose of
21 these depositions is for discovery in this litigation and not
22 for outside reasons.
23    MS. LARKINS: Well, I would like to state for the
24 record that if this case were terminated this Friday, I think
25 it would a serious miscarriage of justice, not just for me

---

Page 115

1 because I'm just one person and that's not as important. But
2 I'm mostly concerned for the public good, and I think it's a
3 matter that should be discussed by the public the way
4 Ms. Angell and others in her law firm have been paid hundreds
5 of thousands of taxpayer dollars in this case to cover up
6 crimes. And I most certainly think that the public should
7 become aware of all the facts of this case. And I haven't
8 had as good a luck as Ms. Myers at getting media attention,
9 but I really do think that it's something that should be
10 discussed in public.
11    Oh, are we on the record? Okay.
12    MS. ANGELL: And I also would like to ask
13 Mrs. Larkins what her intentions are for continuing to keep
14 this witness seeing as how the last deposition was noticed
15 for 2:00 o'clock when you sent these people out on a break
16 and the deponent has been here since a quarter till 2:00.
17    MS. LARKINS: I'd like to finish this deposition.
18    MS. ANGELL: How much longer do you intend to keep
19 this witness?
20    MS. LARKINS: Well, it partly depends on how
21 lengthy your objections are, your little soliloquies. But I
22 would say as far as my questions go, I probably have about
23 45 minutes.
24    MS. ANGELL: Under the Code of Civil Procedure,
25 Mrs. Larkins, you're required to proceed with the deposition

---

Page 116

1 at the time that you've noticed it, and you noticed
2 Mrs. Perez's deposition and then negotiated an updated for
3 it for her to be here at 2:00 o'clock according to your
4 confirmation sent to my office over the weekend. And I just
5 want to let you know that Mrs. Perez will stay for some
6 period of time, but if you do not proceed with her deposition
7 we will most likely file a motion for sanctions and a motion
8 to preclude any deposition of Mrs. Myers -- or I'm sorry, of
9 Ms. Perez if that's authorized by the code.
10    MS. LARKINS: Okay. Would you like to continue
11 Ms. Myers' deposition at another time?
12    MS. ANGELL: I would like for you to take her
13 deposition at the noticed time period. This person's gone to
14 considerable inconvenience and expense to show up at the time
15 that you noticed and set for her deposition. You're keeping
16 Mrs. Myers here for the purpose of harassing her. You're not
17 asking relevant questions, and her deposition should be
18 concluded.
19    MS. LARKINS: Well, the taxpayers have gone to
20 considerable inconvenience and expense for this whole case
21 paying your firm hundreds of thousands of dollars and heaven
22 knows how much to the court and other public entities. And I
23 think it's very important that this case be -- that this case
24 proceed appropriately, and it would help if the witness
25 weren't trying so hard to evade questions.

---

Page 117

1    MS. ANGELL: Move to strike, argumentative, the
2 last comment about the witness.
3    MR. HERSH: I join that motion.
4 BY MS. LARKINS:
5    Q. Okay. Ms. Myers --
6    MS. ANGELL: I would like an answer to the
7 question, please, so that we know what to do with this
8 witness out front. I mean, she's here and she can stay here
9 until 5:00, but if you're not going to depose her, there's no
10 point in her staying.
11    MS. LARKINS: I believe I told you that I thought
12 I had about 45 more minutes of questions for Ms. Myers.
13    MS. ANGELL: Okay. So she can go and come back
14 and be ready for deposition at 3:15?
15    MS. LARKINS: Yeah.
16    MS. ANGELL: Let me just pop my head outside the
17 door and tell her to be back at 3:15. We can stay on the
18 record.
19 BY MS. LARKINS:
20    Q. Ms. Myers, first of all, given the statement that
21 Ms. Angell made a few minutes ago about the break, did you
22 relay to Ms. Angell the message that I asked you to give her?
23    A. I told her to speak to you, as I told you I would
24 have her speak to you.
25    MS. LARKINS: Okay. Well, Ms. Angell, during the

---

30 (Pages 114 to 117)

Page 118

```
1    break you were in one of the back rooms and Ms. Myers was
2    standing outside the room. And I went back to tell her that
3    we were going to take about a 15-minute break, 15 to
4    20-minute break, and I asked her to relay that message to you
5    when you came out of the room, but apparently she did not see
6    fit to do so.
7         THE WITNESS: Excuse me.
8         MS. ANGELL: You don't need to argue with her.
9    Let her make her record. Let's move on.
10   BY MS. LARKINS:
11        Q. Okay. When you learned that there was an article
12   in La Prensa by Luis Alonso Perez that quoted you
13   extensively, did you talk to Stephanie Parker Pettit about
14   the article?
15        A. No. I didn't see the article. This is the first
16   time I've seen that article.
17        Q. Okay. Let me -- okay. Now, I'm not really sure
18   what you mean by qualifying your "no" with I haven't seen the
19   article before. At some point before today did you learn
20   that there was an article in La Prensa by Luis Alonso Perez
21   that quoted you extensively?
22        A. What did you say?
23        Q. At some time before today did you learn that there
24   was an article in La Prensa that quoted you extensively?
25        A. Yes.
```

Page 119

```
1         Q. How did you learn that?
2         A. Actually, I think there was some reference by you
3    in something I read, but I'm not sure.
4         Q. So you believe that the only information that ever
5    came to you about this article which quoted you extensively
6    was from me?
7         MS. ANGELL: Objection. Argumentative. Asked and
8    answered.
9    BY MS. LARKINS:
10        Q. Okay. Do you -- is it possible that you got
11   information about this article from some other individual?
12        MS. ANGELL: Objection. Calls for speculation.
13   BY MS. LARKINS:
14        Q. Can you answer that question?
15        A. I -- I did not get the -- any information from
16   this article from someone else. It was something that you
17   wrote I believe in an editorial or to me that referenced this
18   article that I knew the article existed.
19        Q. Okay. And you're sure that the letter didn't
20   contain an English translation of the article?
21        A. I am positive.
22        Q. Okay.
23        MS. ANGELL: It's not fair for me to rock when you
24   can't.
25        THE WITNESS: I'm sorry.
```

Page 120

```
1         MS. ANGELL: I'll try and sit still myself.
2         THE WITNESS: I'll go back to shaking my foot.
3    BY MS. LARKINS:
4         Q. Okay. Now, earlier you said that you were not
5    upset when you learned that there was an article in La Prensa
6    which quoted you extensively because you had said those
7    things in public. So are you now changing your testimony and
8    you're saying you didn't know about it until today?
9         A. Know about what?
10        Q. That there was an article in La Prensa which
11   quoted you extensively.
12        A. What is the question?
13        Q. Are you changing your testimony?
14        A. I have not changed my testimony.
15        Q. Okay. Do you recall half an hour ago saying that
16   you were not upset because you had said these things in
17   public?
18        A. I recall having a conversation with you about that.
19        Q. Okay. Can you tell me what you were thinking of
20   when you said I said these things in public?
21        A. As I said to you before, these things -- I don't
22   know what these things are. I cannot -- I cannot read this
23   document; therefore, I don't know what these quotes are.
24        Q. Then how do you know you said them in public?
25        A. I'm assuming if they are quotes, if this person
```

Page 121

```
1    has quoted me, then I have made this public statement. But I
2    don't know what the quotes are, Maura. I do not read Spanish.
3         Q. Okay. Let me just give you some quick rough
4    translations and then you tell me if you said these things in
5    public.
6         MS. ANGELL: Objection. Are you qualified as a
7    certified translator by the court?
8         MS. LARKINS: No, I'm just --
9         MS. ANGELL: All right. Well, then I'm going to
10   object to any translation that you attempt to make of
11   these -- of this document. Unless you have a certified
12   translation of the document, I'm going to object.
13        MS. LARKINS: I'm a bilingual teacher. I --
14        MS. ANGELL: I'm sorry.
15        MS. LARKINS: I'm certified by the state of
16   California as a bilingual teacher.
17        MS. ANGELL: You are not certified by the court
18   you just told me, and this is not a proper method of
19   discovery. This is totally irrelevant.
20        MS. LARKINS: Okay.
21        MS. ANGELL: And it's not proper for you to pose
22   these questions.
23        MS. LARKINS: I won't --
24        MS. ANGELL: I'm going to instruct the witness not
25   to respond to you.
```

31 (Pages 118 to 121)

Larkins v. Werlin                                                    Deposition of Peggy Myers
GIC 781970                                                          November 29, 2004

Page 122

1  BY MS. LARKINS:
2      Q. Okay. Did you say in public -- let's see. Did
3  you ever say in public that the true motive for your transfer
4  from Castle Park was because you weren't afraid to show your
5  disagreement with the way Ollie Matos was running the school?
6      A. Say that again?
7      Q. Did you ever say in public that the true reason
8  for your transfer from Castle Park was because you weren't
9  afraid to show your disagreement with the way in which Ollie
10  Matos ran the school?
11      A. I don't know if those were my exact words.
12      Q. But have you said words similar to that?
13      A. You know --
14      MS. ANGELL: Statements that you made in public
15  are statements that you made in public.
16      THE WITNESS: You know what, to be honest with
17  you, at this point I don't know if this was made -- if that
18  exact statement was made, so you know, I don't want to
19  respond to anything I don't know for sure.
20      MS. ANGELL: Exactly, and you shouldn't.
21      THE WITNESS: Okay. So I don't know.
22      MS. LARKINS: So without referring to this
23  document, even though Mrs. Larkins is attempting to translate
24  impermissibly, we're going -- we're going to assume that
25  she's not attempting to translate. She asked you whether you

Page 123

1  ever made a statement in public to the effect that you think
2  the reason that you were transferred was because you were
3  standing up to Ollie Matos. So if you remember making a
4  statement like that, you should let her know. And if you
5  don't remember making a statement like that, let her know.
6      THE WITNESS: I don't remember making that
7  statement.
8  BY MS. LARKINS:
9      Q. Do you believe that the reason you were
10  transferred from Castle Park is because you weren't afraid to
11  stand up to Ollie Matos?
12      MS. ANGELL: And I'm going to renew my relevance
13  objection and the objection that this is argumentative and
14  this entire line of questioning is designed to harass this
15  witness. It's totally irrelevant to your litigation, and I
16  would ask you to move on to a different topic, Mrs. Larkins.
17      MS. LARKINS: Are you instructing the witness not
18  to answer?
19      MS. ANGELL: You're done with this line of
20  questioning. The witness will not respond.
21      MS. LARKINS: I'll take that as a yes. Okay.
22      MS. ANGELL: And for the purpose of the record, I
23  want to clarify that the line of questioning that the witness
24  will not be responding to anymore after all of the questions
25  that she's already answered today refer to the witness's

Page 124

1  transfer from one school site to another within the Chula
2  Vista Elementary School District in August of 2004. And
3  that's based specifically on plaintiff's comments during this
4  deposition which demonstrate that her purpose in asking those
5  questions is -- has several different aspects, including
6  harassing the witness and establishing in Mrs. Larkins' mind
7  the reasons for her, quote, removal from the classroom in
8  2001. Those things are not relevant to the litigation at
9  issue, and they have nothing to do with the causes of action
10  currently alleged and filed in this case. And on that basis
11  the witness has been instructed not to answer.
12      MS. LARKINS: Okay.
13      MS. ANGELL: Of course, you will answer any
14  questions relating to public statements that you made, that
15  kind of thing. Okay?
16      MS. LARKINS: Okay. Now I'm really confused.
17  You're saying she will answer questions relating to public
18  statements she made?
19      MS. ANGELL: If you want to ask her what she said
20  to a news reporter like you did here, we said did you make
21  this statement, she said no, I don't remember making that
22  statement.
23      MS. LARKINS: Okay.
24      MS. ANGELL: Those are public statements that
25  she's made publicly.

Page 125

1      MS. LARKINS: Okay.
2      MS. ANGELL: She granted an interview.
3      MS. LARKINS: Okay.
4      MS. ANGELL: But to -- that's not relevant to this
5  litigation. And insofar as you're attempting to press this
6  person for information concerning her transfer which is
7  totally irrelevant to your causes of action, it's not going
8  to happen. So you know, if you want to try and ask her some
9  more questions about, you know, did you say this quote, did
10  you say that quote, I probably won't object. But if you're
11  pressing her for a rationale and her feelings about her
12  transfer and that kind of stuff, I'm not going to allow those
13  questions. You're harassing this witness --
14      MS. LARKINS: Okay.
15      MS. ANGELL: -- and abusing the discovery process.
16  BY MS. LARKINS:
17      Q. Is Ms. Angell correct in stating that you granted
18  an interview to someone from the press?
19      A. Be specific as to interview with whom.
20      Q. Did you speak to a reporter at any time other than
21  the September 14th board meeting?
22      A. Yes.
23      Q. Who did you speak to other than at the September
24  14th board meeting?
25      A. Kelley Dupuis, Don Sevrens.

32 (Pages 122 to 125)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

---

Page 126

1    Q.  And who is Don Sevrens?
2    A.  Works for the Union Tribune.
3    Q.  Okay.  Did Kelley Dupuis call you on the phone at
4  some time last summer?
5    A.  I don't remember.
6    Q.  Did Kelley -- when you talked to Kelley Dupuis was
7  it in person or on the phone?
8    A.  I believe I've done both.
9    Q.  How many times did you talk to him in person?
10    A.  I have no idea.
11    Q.  How many times did you talk to him on the phone?
12    A.  I don't know.
13    Q.  Frequently?  Would you say that you talked to him
14  many times, so many that you can't remember the number?
15    A.  I don't know how many times I talked to him,
16  Maura.  I didn't count.
17    Q.  So it would have involved counting, so I guess
18  that means it's more than one.  How many times did you talk
19  to Don Sevrens?
20    A.  Once.
21    Q.  Okay.  When is the last time you talked to a
22  reporter?
23    A.  I don't remember.
24    Q.  Are you aware that an editorial or article -- let
25  me call it an editorial, about Castle Park came out in the

---

Page 127

1  Union Tribune on or about November 11th, 2004?
2        MS. ANGELL:  I'm going to renew my objections to
3  this line of questioning as being irrelevant to the causes of
4  action alleged in the sixth amended and unfair practices
5  complaint.  If you could please ask this witness something
6  that relates to the allegations in the complaint, otherwise
7  your intention to harass this witness and abuse the discovery
8  process is very clear.
9        MS. LARKINS:  Okay.  Can she answer the question?
10  May she answer the question?
11        MS. ANGELL:  I'm asking you to please ask this
12  witness something that is relevant to this litigation.
13  BY MS. LARKINS:
14    Q.  Okay.  You may answer the question.
15    A.  I don't remember the question.  And Maura, I'm
16  tired.  I haven't eaten.  You have.
17    Q.  I'm perfectly happy to continue this at another
18  time.  I offered to have a lunch break.
19    A.  When?
20    Q.  It's on the record.
21    A.  I was not prepared to have lunch, Maura.  Okay?  I
22  was under the impression that I would be in and be out, and I
23  did not bring anything with me to eat, and I am hungry and I
24  am tired and it is hot in here.  And I'd like to know --
25    Q.  I can give you the lunch I had.  I had almonds and

---

Page 128

1  a trail bar.
2    A.  I don't want your lunch.
3    Q.  Is it something personal?
4    A.  I would really appreciate it if you would ask me
5  something relevant to the case, because you -- to me, a lay
6  person, you are clearly not asking anything that's relevant
7  to your case.
8    Q.  Do you see any connection between your being taken
9  out of Castle Park and my being taken out of Castle Park?
10    A.  No.
11    Q.  What do you see as the difference?
12    A.  I can't see any difference because I don't know
13  your details, nor do I want to know your details, so I have
14  no idea if they're the same or not.  In my opinion -- and I'm
15  not even going to answer that because it's an opinion.  So
16  please ask me relevant questions so we can get this over with.
17    Q.  I think what happened to you and what happened to
18  me are extremely related.
19    A.  Well, you don't know about my case; I don't know
20  about yours, so you are assuming.
21    Q.  Well, I --
22        MR. HERSH:  I would like to object to this
23  dialogue that doesn't appear to be pursuant to the rules of
24  discovery.
25        MS. LARKINS:  Well, I know a lot about your case

---

Page 129

1  because you've been talking to the media.
2        MS. ANGELL:  Motion to strike.  Argumentative.  No
3  question pending.  Do you have a question for this witness
4  concerning any of the allegations in your case or do you
5  intend to continue questioning her for your remaining
6  25 minutes all in relation to her transfer?
7        MS. LARKINS:  I want -- I want to question this
8  witness about her efforts, her continuing efforts to make
9  this matter public knowledge by talking to the media.
10        MS. ANGELL:  What is this matter?
11        MS. LARKINS:  This matter is the very sick teacher
12  culture at Castle Park which has resulted in many, many
13  teachers being forced out over a period of many years.
14  Interestingly enough, two of them were bilingual out of only
15  four bilingual positions.  And in fact, the first one, there
16  was only one bilingual position when she was transferred out.
17  So the first -- at the end of the first year of the bilingual
18  program they transferred out -- actually, she was dismissed
19  like me.  I was dismissed too.  So the first year after the
20  bilingual program started, they transferred out 100 percent
21  of the bilingual teachers.
22        MS. ANGELL:  I'm sorry.  I totally cannot even
23  follow what you're trying to say.  You're really all over the
24  place.  If you have a question for this witness related to
25  anything not related to her transfer and her employment in

---

33 (Pages 126 to 129)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 130

1  2004, if you could pose that -- that question. I've stated
2  that I think that you're harassing this witness by continuing
3  to dwell on a matter that has absolutely nothing to do with
4  your litigation. And I would ask that you please move on to
5  another topic if you have another topic. And if you wish to
6  seek a motion to compel her testimony concerning her transfer,
7  you're free to file such a motion.
8      MS. LARKINS: Okay. I'll suspend the deposition
9  because I need to seek a motion to compel.
10      MS. ANGELL: If you have any other questions on
11  any other topic other than this witness's transfer and her
12  employment in 2004, anything else that has to do with the
13  allegations in your complaint in this case, that's what the
14  witness is here to testify about. Do you have any questions
15  along those lines for this witness?
16      MS. LARKINS: I'm not the deponent, Ms. Angell. I
17  have already suspended the deposition.
18      MS. ANGELL: No, you haven't. We haven't agreed.
19  There's not been any agreement to go --
20      MS. LARKINS: I have --
21      MS. ANGELL: We're on the record. There's not
22  been any agreement to go off the record, and I'm telling you
23  this witness has been here now since 10:00 -- quarter till
24  10:00, before you bothered to show up at 10:15 or 10:10 to
25  answer your questions relevant to this litigation. And so

Page 131

1  far I think you've asked two questions about two or three
2  hours ago relevant to this litigation. I just want to let
3  you know that if you have any other questions pertaining to
4  your allegations in the complaint, she's here to answer those
5  questions and wants to provide that information, if she knows
6  any information, to you.
7      MS. LARKINS: Well, I certainly would like to
8  thank this witness for being on time. She was the only one
9  of your clients who has ever been on time. I've waited for
10  every other one of your clients. I guess maybe I got tired
11  of waiting.
12      I do have the right, Ms. Angell, to suspend a
13  deposition to seek a motion to compel answers. I don't know
14  much about the law, but I know that. And I'd like to give
15  you, Ms. Angell, the transcript of my November 11th
16  deposition, and at the same time we can explain to the
17  witness --
18      MS. ANGELL: Is this witness still being deposed?
19  Because if not, if you -- if you're excusing her then let's
20  let her go. If you're deposing her --
21      MS. LARKINS: Well, I want to make the
22  stipulations about how long she has to look over her
23  transcript.
24      MS. ANGELL: So go ahead and make that.
25      MS. LARKINS: Yeah, that's what I want to do.

Page 132

1      What's going to happen is in a couple weeks, two,
2  three weeks you're going to get a transcript of this
3  deposition today. And this was from a different court
4  reporting service, but it will be something like this. And
5  what you are to do is to read through it, and if you believe
6  that anything in it is incorrect and -- or not your testimony
7  or you want to change your testimony, you'll have a sheet in
8  the front where you can make your changes, and then you sign
9  a signature page in the back, and then you will return it to
10  me. No -- right?
11      MS. ANGELL: No. She returns it to me.
12      MS. LARKINS: She returns it to you? Oh, okay.
13      You will return it to Ms. Angell. She'll probably
14  give you a, you know, stamped, self-addressed envelope or
15  something. And now we have to discuss how much time you have
16  to do this, to read it over --
17      THE WITNESS: I would like to make it very clear
18  to you that I'm getting ready to do parent/teacher
19  conferences and will not have time. And then my husband will
20  be here and I have no intention of reading that document
21  while my husband is here. My husband is out of the country
22  and has been out of the country for more than a year, and I
23  will not take precious time away from my visit with him to
24  read that document. I'm sorry.
25      MS. ANGELL: When will you be available to have a

Page 133

1  look at a document? You're probably not even going to get it
2  for two or three weeks.
3      MS. LARKINS: Not until after January 16th.
4      MS. ANGELL: Okay.
5      MS. LARKINS: Ms. Angell, you have been very
6  insistent that I only have a week to look over my documents.
7  Don't you think now especially in light of -- I am willing to
8  give your client the time she's asking for.
9      MS. ANGELL: Okay. Well, then give it to her and
10  we'll stipulate --
11      MS. LARKINS: Oh, I'm not giving it to her yet, not
12  yet. I'm saying I'm willing to do it if you --
13      MS. ANGELL: Mrs. Larkins, I am not going to sit
14  here and discuss with you your deposition and matters that
15  are under a motion to compel and a motion for sanctions.
16      MS. LARKINS: I'm not going to stipulate to it
17  then. I'm going to -- we'll just go with the regular
18  legal -- what is it, 30 days?
19      MS. ANGELL: You put whatever you want on the
20  record. Whether I stipulate to it or not is whether I
21  stipulate to it or not.
22      MS. LARKINS: Okay. I think that we should just
23  let the time that she has to look over it just be the regular
24  30-day period that I believe the law recommends.
25      MS. ANGELL: And I'll state my objection. This

34 (Pages 130 to 133)

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

**Page 134**

1  witness has stated that she's unavailable -- when do your
2  parent/teacher conferences start?
3      THE WITNESS: They start next week, go right up to
4  winter break.
5      MS. ANGELL: They start on what date?
6      THE WITNESS: Wednesday.
7      MS. ANGELL: Okay. So if you would like to order
8  an expedited transcript and get a certified -- or get the
9  original copy to this witness by Monday of next week which is
10  December 6th, her parent/teacher conferences start on
11  Wednesday, so I could ask that she review the document before
12  the parent/teacher conferences begin. But after that she's
13  stated that she's unavailable.
14      THE WITNESS: I hate to interject here. I feel
15  that that's unreasonable, because I am preparing report cards
16  and preparing for parent/teacher conferences. So basically
17  my time from now until the day of the parent/teacher
18  conferences, I'm going to be doing report cards and compiling
19  comments that need to be made, and I have some holistic
20  samples that need to be graded before that time. I really
21  would not be able to read it and read it thoroughly and
22  understand it because I would be rushed and be doing it just
23  cursory, and I don't think that that's fair to me.
24      MS. LARKINS: You know, this whole problem could
25  be removed completely if perhaps you and your fellow

**Page 135**

1  protestors went to the school board and demanded that the
2  school board follow the law.
3      MS. ANGELL: Based on your statements today,
4  Mrs. Larkins, I think that it's obvious that you're using
5  this deposition process to harass this witness. The witness
6  has stated her unavailability, has given you a reason for it.
7  You've stated two inappropriate reasons for demanding a short
8  time period for her ability to review and sign her deposition
9  transcript, that being that you want a tit for tat on your
10  deposition transcript and that being that you wanted her to
11  do something at a school board meeting. That's inappropriate
12  and abusive. The witness has stated that she can have it
13  done sometime after January 16th?
14      THE WITNESS: Yes.
15      MS. ANGELL: And we will stipulate that the
16  witness will have it back. Do you need more time after
17  January 16th or can you have it done by January 16th?
18      THE WITNESS: No. I don't even want to start it
19  until January 16th. I do not want time taken away from my
20  husband who is in a war zone and has been for a year and a
21  half and won't be home until May. I would like to have time
22  with him and my family which I don't think is unreasonable.
23      MS. LARKINS: Ms. Angell --
24      MS. ANGELL: January 16th is a Sunday. So if you
25  had it by the 17th, could you get it back to me within a few

**Page 136**

1  days?
2      THE WITNESS: A week.
3      MS. ANGELL: Could you have it back to me by
4  Friday, the 21st? That's five business days.
5      THE WITNESS: Yes.
6      MS. ANGELL: Mrs. Larkins, is that acceptable to
7  you?
8      MS. LARKINS: Do you admit, Ms. Angell, that you
9  are harassing me when I'm a witness and you insist on one
10  week for me?
11      MS. ANGELL: Mrs. Larkins, this is the deposition
12  of Peggy Myers. This is not your deposition. One has
13  absolutely nothing to do with the other, and I'm not going to
14  be discussing the things that you're demanding in your
15  deposition with regard to this witness. I will not discuss
16  it. It's not the same thing. It's not relevant, and that's
17  it. The witness will provide her responses by January 21,
18  assuming that she's received the transcript by January 16th.
19      MS. LARKINS: I'm afraid the law requires
20  something different. It's okay to harass me, but it's not
21  okay to harass Peggy Myers? I believe the cutoff date --
22  isn't the cutoff date January 14th? The discovery cutoff
23  date is January 14th. Ms. Angell, would you like to file a
24  motion to ask for a continuance in this case so that your
25  client will have enough time?

**Page 137**

1      MS. ANGELL: No.
2      MS. LARKINS: Okay. Well, then we're just going
3  to let the law rule here. I'd like to -- are you willing to
4  stipulate that -- oh, well. I think we can just let the law
5  rule here and we don't have to stipulate to anything. So I
6  think the deposition is over.
7      THE VIDEOGRAPHER: This concludes today's
8  deposition. We're going off the record at 3:02 p.m.
9          * * * * *
10      I, PEGGY MYERS, swear under penalty of perjury
11  that I have read the foregoing, and that it is true and
12  correct, to the best of my knowledge and belief.
13      Signed on this     day of          , 2004,
14  at
        (City)          (State)
15
16
        PEGGY MYERS
17
18
19
20
21
22
23
24
25

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Peggy Myers
November 29, 2004

Page 138

1  STATE OF CALIFORNIA )
2  COUNTY OF SAN DIEGO )
3
4        I, CLAUDIA A. WITT, Certified Shorthand Reporter
5  licensed in the State of California, License No. 10797,
6  hereby certify that the deponent was by me first duly sworn
7  and the foregoing testimony was reported by me and was
8  thereafter transcribed with Computer-Aided Transcription;
9  that the foregoing is a full, complete, and true record of
10 said proceeding.
11       I further certify that I am not of counsel or
12 attorney for either or any of the parties in the foregoing
13 proceeding and caption named or in any way interested in the
14 outcome of the cause in said caption.
15       The dismantling, unsealing, or unbinding of the
16 original transcript will render the reporter's certificates
17 null and void.
18       In witness whereof, I have hereunto set my hand
19 this day:  December 10th, 2004
20
21 _____
   CLAUDIA A. WITT, CSR
22 Certificate No. 10797
23
24
25

36 (Page 138)