**EXHIBIT 5**



BEFORE THE COMMISSION ON PROFESSIONAL COMPETENCE

CHULA VISTA ELEMENTARY SCHOOL DISTRICT

COUNTY OF SAN DIEGO, STATE OF CALIFORNIA


In the Matter of the Accusation )
Against:                        ) NO. L-2002050728
                                )
        MAURA LARKINS,          )
                                )
            Respondent.         )
_____ )


DEPOSITION OF RICHARD T. WERLIN

Taken at San Diego, California
September 4, 2002


CONDENSED TRANSCRIPT


Elaine Carlson, Reporter
Certificate No. 8344

I-N-D-E-X

DEPOSITION OF RICHARD T. WERLIN          PAGE
September 4, 2002

Examination by Ms. Schulman:          5

DEPOSITION EXHIBITS:
1 - Two pages, deposition preamble          6
2 - Multi-page group of documents, first          88
page Responses to request for production propounded
to Chula Vista Elementary School District

3 - One page, letter to Maura Larkins from          147
Richard T. Werlin, November 21, 2001

4 - One page, letter to Richard T. Werlin          149
from Maura Larkins, 4-3-01
5 - One page, letter to Richard T. Werlin          149
from John L. Otis, M.D., August 22, 2001

6 - One page, memorandum to Maura Larkins          150
from Richard T. Werlin, September 3, 2001
7 - One page, memorandum to Maura Larkins          152
from Richard T. Werlin, September 7, 2001

8 - One page, letter to Maura Larkins from          152
Richard T. Werlin, September 17, 2001
9 - One page, letter to Maura Larkins from          153
Richard T. Werlin, September 20, 2001

10 - One page, letter to Maura Larkins from          153
Richard T. Werlin, September 26, 2001
11 - One page, letter to Maura Larkins from          154
Richard T. Werlin, September 27, 2001

12 - One page, letter to Maura Larkins from          154
Libia S. Gil, October 3, 2001
///

13 - One page, letter to Maura Larkins from          155
Libia S. Gil, October 4, 2001

14 - 11 pages, Responses to special          155
interrogatories propounded to Chula Vista Elementary
School District

15 - Eight pages, Responses to requests for          157
admissions propounded to Chula Vista Elementary
School District

16 - Five pages, Responses to requests for          158
discovery propounded to Chula Vista Elementary
School District

Page 2

Page 3

DEPOSITION OF RICHARD T. WERLIN

Pursuant to notice to take deposition, on the 4th
day of September 2002, commencing at the hour of 9:10
o'clock a.m., at 1551 Fourth Avenue, executive suite
conference room, in the City of San Diego, County of San
Diego, State of California, before me, Elaine Carlson,
Certified Shorthand Reporter, Certificate No. 8344, in
and for the State of California, personally appeared:
RICHARD T. WERLIN,
called as a witness by the Respondent, who, being by me
first duly sworn, was thereupon examined as a witness in
said cause.

APPEARANCES

For the CHULA VISTA ELEMENTARY SCHOOL DISTRICT:

PARHAM & RAJCIC
BY:  MARK R. BRESEE, ESQ.
23195 La Cadena Drive, Suite 103
Laguna Hills, California 92653-1483
(949) 587-0585

For the RESPONDENT:

SCHULMAN & SCHULMAN, A.P.C.
BY:  ELIZABETH SCHULMAN, ESQ.
1551 Fourth Avenue, Suite 502
San Diego, California 92101
(619) 238-0303

Also present:  MAURA LARKINS

Page 4

EXAMINATION BY MS. SCHULMAN:
Q.  Could you state your full name for the record
and spell it, please.
A.  Richard T Werlin.  R-I-C-H-A-R-D.  Middle
initial T.  Werlin, W-E-R-L-I-N.
Q.  Mr. Werlin, I think you know I'm Elizabeth
Schulman.  You know me as Betty Schulman.  I'm the
attorney for Maura Larkins.  This is a matter involving a
teacher dismissal and administrative hearing to follow at
the end of the month.  We have noticed your deposition
today because we believe that you are a person who has
knowledge of the facts surrounding this matter.  Have you
ever had your deposition taken before today?
A.  Yes.
Q.  On approximately how many different occasions?
A.  Perhaps 5 to 10 different situations.
Q.  Were those all work related matters?
A.  Yes.
Q.  I gave you a document entitled, deposition
preamble, and asked you to read it to yourself before we
went on the record today.  Have you read that document?
A.  Yes.
Q.  Did you understand its contents?
A.  Yes.
Q.  Do you have any questions about having your

Page 5

2 (Pages 2 to 5)

1   deposition taken?
2     A. No.
3       MS. SCHULMAN: I'd ask the court reporter to
4   mark as Exhibit 1 the deposition preamble.
5     (Exhibit No. 1 marked for identification.)
6   BY MS. SCHULMAN:
7     Q. Are you currently employed?
8     A. Yes.
9     Q. And what is your employment?
10     A. I'm the assistant superintendent for human
11   resources services and support for the Chula Vista
12   Elementary School District.
13     Q. And how long have you held that position with
14   the school district?
15     A. I'm in my sixth year now.
16     Q. How long have you been employed totally by the
17   Chula Vista Elementary School District?
18     A. Six years.
19     Q. So your entire scope of employment or tenure of
20   employment with the school district has been in your
21   current position?
22     A. Correct.
23     Q. And I'm just going to refer to it as the school
24   district, and you'll understand when I say that, will you
25   not, that I'm referring to the Chula Vista Elementary

Page 6

1   School District?
2     A. Yes.
3     Q. What are your primary duties and
4   responsibilities as the assistant superintendent for
5   human resources services and support?
6     A. I'm one of five cabinet members. And the
7   primary responsibilities, separate from the human
8   resources functions for all employees in the district, is
9   to serve as a coach to the principals, to be one of the
10   principal decision-makers in the school district, and to
11   oversee as all the cabinet members do all areas of the
12   district, including instruction, business, community and
13   government relations. But with a primary focus on human
14   resources.
15     Q. I think we probably all understand when you say
16   with a primary focus on human resources and what it is
17   that you have reference to, but why don't you tell us
18   with respect to the school district what those primary
19   duties and responsibilities are of your human resources
20   function?
21     A. It's a pretty comprehensive list, so I will
22   attempt to be as poignant and succinct as possible.
23   Anything related to collective bargaining.
24   Implementation of joint agreements between the Chula
25   Vista Educators, C.V.E., which is the union of teachers,

Page 7

1   and also implementing and taking responsibility for the
2   joint agreement with the classified union which is
3   C.V.E.C.O., which is the Chula Vista Elementary
4   Classified Organization. I am also one of the chief
5   negotiators, along with Jackson Parham and John Rajcic,
6   R-A-J-C-I-C, who are partners with Mr. Bresee in Parham &
7   Rajcic. I'm responsible for all hiring and hiring
8   practices. I'm responsible for all recommendations for
9   disciplinary action, including but not limited to
10   recommendations for termination. I'm responsible for the
11   oversight of the grievance procedures and correct
12   implementation. I'm responsible for all dealings with
13   PERB, P-E-R-B, Public Employee Relations Board. I'm
14   responsible for staff development of all administrators
15   with regard to human resource functions in the district.
16   I am the Title IX officer in the district responsible for
17   sexual harassment in the work place. I also am
18   responsible for hearing and investigating all claims of
19   possible discrimination.
20     I am the recipient of all complaints that come
21   from EEOC and/or DFEH, Equal Employment Opportunity
22   Commission and/or the Department of Fair Employment and
23   Housing. I also have the responsibility to pull together
24   a team to address appropriate responses to claims that
25   would fall under those two categories. I have oversight

Page 8

1   responsibility for the benefits program in our district.
2   I have oversight responsibility for the risk management
3   department in our district, which includes but is not
4   limited to implementation legally of a workers'
5   compensation program for all employees in the district.
6   I'm sure there are many other things, but I would end
7   with I am responsible also to make sure that there is
8   fair and equitable compensation in the district for all
9   employees.
10     Q. I take it you have a four-year college degree?
11     A. I have both a Bachelor's and a Master's degree.
12     Q. When and where did you receive your Bachelor's
13   degree?
14     A. I received my Bachelor's degree in 1976 from
15   SUNY, New York, State University of New York near
16   Rochester, New York. And I received my Master's in
17   educational administration from Texas Southern University
18   in Houston, Texas. I've also taken postgraduate work for
19   the last six years at Harvard Law School for human
20   resources and collective bargaining.
21     Q. When did you receive your Master's degree?
22     A. To the best of my recollection I believe it was
23   in 1982, but approximately that time.
24     Q. And your postgraduate work at Harvard Law
25   School, is that done in the summers?

Page 9

3 (Pages 6 to 9)

1  A. It's done each November. And there's a human
2  resources, collective bargaining, personnel law type of
3  week conference, one-week conference that usually takes
4  place in Boston either the second or third week in
5  November.
6  Q. And it's operated under the auspices of Harvard
7  University Law School?
8  A. Yes. I believe it's actually a combination
9  between Harvard and MIT and Tufts. And it's both,
10  Harvard Law School is the principal in it, but it's both
11  the law and business schools of those respective
12  universities.
13  Q. And during that week is it the kind of thing
14  where you attend seminars where you're updated on
15  developments in the law, both case law and legislation?
16  A. That's part of it. Part of the training that's
17  essential for me is that I'm thrown into a group of
18  primarily teamsters and non-educators in the area of
19  collective bargaining, and it gives me an opportunity --
20  we go through many simulations referencing an interspaced
21  approach versus a more positional type of bargaining.
22  But there certainly is an update in laws. There are
23  particular professors, particularly at Harvard who
24  specialize in the area of gender bias, compensation,
25  getting to yes types of things, all different kinds of

Page 10

1  human resource areas.
2  Q. What did you major in at SUNY?
3  A. I had a double major, elementary education and
4  British literature.
5  Q. After graduating from SUNY what was your first
6  full-time employment? You can leave out, I don't want
7  summer employment. Major, full-time employment.
8  A. I taught severe and profoundly retarded children
9  at the Al Sigl Center, S-I-G-L, Center in Rochester, New
10  York.
11  Q. From what year to what year did you do that?
12  A. It would have been '76 to '77.
13  Q. And following that position what was your next
14  employment position?
15  A. Basically, there were no teaching positions in
16  upstate New York, schools were closing in the late
17  '70's. One position became open in a suburban school
18  district in Rochester called Webster, New York, and I
19  taught sixth grade for one year in Webster, in Webster
20  schools.
21  Q. So that would what have been the '77, '78 school
22  year?
23  A. Correct.
24  Q. And what was your next job after that?
25  A. For the next 10 years I moved to Houston and was

Page 11

1  an employee of the Houston Independent School District in
2  Houston, Texas.
3  Q. That would have been from '78 to '88, roughly?
4  A. Correct.
5  Q. And what kind of employment did you have with
6  the Houston Independent School District?
7  A. It was very varied. I started out as a
8  bilingual teacher to sixth grade students, bilingual
9  Spanish. I became an assistant principal in an
10  elementary school with 1800 children for almost two
11  years. I was a principal of a music and fine arts magnet
12  school for six years in Houston. I became one of 12
13  directors of human resources for the Houston school
14  district, and then I became bureau chief of all 12
15  directors. And throughout this tenure starting in 1978,
16  I recruited for the district as a teacher, as an
17  assistant principal, and as a principal. So I would
18  travel throughout, primarily the valley area we refer to
19  it in Texas where there was a large bilingual population
20  of undergraduate students. So right from that first
21  summer I recruited and worked in the personnel office
22  during the summers.
23  Q. Where did you learn your Spanish?
24  A. In high school in Albany, New York. I had five
25  years of it, and one year at the university, at SUNY.

Page 12

1  Q. And what was your next employment after Houston?
2  A. From 1988 to 1990, I was director of personnel,
3  which was a cabinet level position, for a small school
4  district called the Galveston, G-A-L-V-E-S-T-O-N,
5  Independent School District. It was the smallest school
6  district I had ever worked for, but I was responsible for
7  all the functions of human resources. Negotiating with
8  the teacher organizations, compensation, benefits,
9  interviewing. I had nobody to talk to about credentials.
10  I was the credentials analyst. So I was a singleton
11  doing everything, all the human resources functions, and
12  won that experience. It was about an hour from Houston.
13  Q. What was your next job after Galveston
14  Independent School District?
15  A. For the next three and a half years I moved to
16  the west coast of Florida with my family. My father was
17  very ill in a location called Longboat Key, Sarasota,
18  Florida. And I opened up my own business so I could be
19  with my family. I was an estate appraiser, worked with
20  Sotheby's and Christie's for almost four years. And
21  somewhere in the middle of 1993, I was offered an
22  assistant superintendent position for human resources in
23  San Antonio, Texas northeast schools, which was a very
24  similar size to Chula Vista. We had 45 schools, K-12.
25  And I was responsible for the human resources functions.

Page 13

4 (Pages 10 to 13)

1   Q. So you started that in mid '93 through when?
2   A. I would probably say June of '93. And I was
3  there for three years, and then took a job as a
4  consultant director for a private school for one year
5  from '96 to '97, back in Florida. And it was a
6  preparatory school, very wealthy preparatory school that
7  was in trouble and needed somebody to come in and clean
8  house. So I did that for one year. It was called the
9  Out-Of-Door Academy. It was a very wealthy preparatory,
10  K-12, school district. It was a single school.
11     And then I was offered the position in April or
12  May of '97 to join the Chula Vista School District
13  cabinet.
14   Q. When did you start?
15   A. June 15th, 1997.
16   Q. You have used the term cabinet. What do you
17  mean by that term?
18   A. It's, basically, separate from the board of
19  education it is the governing, leadership team of the
20  school district. It's all the assistant superintendents
21  and the superintendent.
22   Q. Going to the Chula Vista Elementary School
23  District, how many assistant superintendents are there
24  currently?
25   A. Well, currently there are four. For the most

Page 14

1  part of those years that I served there were only three
2  of us. In the last year we just added one assistant
3  superintendent. So the cabinet for the first five years
4  that I was in the district was primarily four people.
5   Q. Who was the one in terms of the position that
6  was added in the last year?
7   A. We switched the person who was in instructional
8  services, and he moved into a new position called
9  community and government relations.
10   Q. And that's the new position that was added?
11   A. Correct. And then we hired a superintendent
12  from New York City, Maria Guasp, G-U-A-S-P, who took over
13  instructional services and support.
14   Q. And who currently is the superintendent of
15  schools at the district?
16   A. For the next two weeks will be the last two
17  weeks for Dr. Libia, L-I-B-I-A, Gil, G-I-L. And
18  effective October 1 our business services superintendent,
19  Dr. Lowell, L-O-W-E-L-L, Billings, B-I-L-L-I-N-G-S, will
20  be the new superintendent.
21   Q. Do you know where Dr. Gil will be going to work
22  after Chula Vista?
23   A. Yes.
24   Q. And where is that?
25   A. She will be with a large international

Page 15

1  organization called New American Schools. And she will
2  be the chief academic officer for New American Schools.
3   Q. And do you know where her position will be
4  located?
5   A. It's going to be I believe outside of
6  Washington. But for the first year I think she actually
7  will still reside in Chula Vista.
8   Q. And Washington, you mean Washington, D.C.?
9   A. Excuse me. Yes.
10   Q. Are you acquainted with Maura Larkins?
11   A. Yes.
12   Q. And how did you become acquainted with her?
13   A. I don't recall the first time that I met her. I
14  became well-acquainted with most of the teachers at
15  Castle Park where she had taught when we had to replace a
16  principal who was leaving. And that was my very first
17  summer that I came to Chula Vista in 1997. I believe
18  that I met Maura along with the other staff, because I
19  spoke with the staff as a whole about the process and
20  engaging them and helping to select the next principal.
21   Q. And who is the principal who was being replaced?
22   A. I believe his name was, because I was, he was
23  gone, basically gone when I came, I believe, Oscar Perez,
24  I believe. P-E-R-E-Z.
25   Q. Were you given some understanding at the time as

Page 16

1  to why Mr. Perez was being replaced?
2   A. I really had very little knowledge.
3   Q. And did you then participate in the hiring
4  process for the new principal?
5   A. Yes, I did.
6   Q. Who was hired?
7   A. Dr. Gretchen, G-R-E-T-C-H-E-N, Donndelinger,
8  D-O-N-N-D-E-L-I-N-G-E-R.
9   Q. And did she start as principal of Castle Park
10  Elementary School in the fall of '97?
11   A. To the best of my knowledge it was in the fall.
12  I don't remember the exact date.
13   Q. Is she still the principal at Castle Park?
14   A. No, she is not.
15   Q. When did she end her tenure, if you will, as
16  principal? Loose definition of the word.
17   A. Approximately a year ago she left Chula Vista
18  School District.
19   Q. Would have been the fall 2001?
20   A. Yes. I believe that summer she left.
21   Q. And who was her replacement?
22   A. There was no replacement at the time. We had an
23  interim retired principal who came in. We had several
24  who assisted. I believe that Mr. Sam Snyder,
25  S-N-Y-D-E-R, and then our business superintendent, Dr.

Page 17

5 (Pages 14 to 17)

1 Lowell Billings, also played a role in oversight
2 responsibility.
3 Q. And when was that principal finally put into
4 place?
5 A. In December of 2001, I believe.
6 Q. And who was that?
7 A. Dr. Tim Allen.
8 Q. A-L-L-E-N?
9 A. Yes. A-L-L-E-N.
10 Q. Is he still the principal at Castle Park
11 Elementary School?
12 A. Yes, he is.
13 Q. Did you at some point in the course of your job
14 duties learn how long Ms. Larkins had been employed as a
15 teacher at the school district for the school district?
16 A. For the school district or at Castle Park?
17 Q. For the school district.
18 A. I don't recollect ever knowing exactly the
19 number of years. I knew that she was a tenured teacher,
20 and I knew she had been with the district for a number of
21 years. But I don't recall the number of years.
22 Q. Did there come some point in time when some
23 sort of issue developed that you became aware of
24 concerning Ms. Larkins?
25 A. Yes.

1 A. No.
2 Q. All right. Tell us then what it is that Dr.
3 Donndelinger told you about her concerns concerning these
4 perceived behaviors of Ms. Larkins.
5 A. Teachers appeared to be, according to what Dr.
6 Donndelinger shared with me, uncomfortable around Maura
7 due to some of her exhibited behaviors, such as raising
8 her voice, appearing to be quite angry with other
9 teachers. And Dr. Donndelinger shared with me that she
10 had the same concerns with her own interactions with
11 Maura.
12 Q. During this time period did Dr. Donndelinger
13 give you any specifics about any occurrences that she had
14 been told about?
15 A. I don't remember any specifics at this time.
16 Q. She give you any specifics at this time about
17 any of her own personally observed concerns?
18 MR. BRESEE: Objection. It's ambiguous
19 regarding at this time. I'm not sure exactly what the
20 time frame is.
21 BY MS. SCHULMAN:
22 Q. Did you understand, Mr. Werlin, that we were
23 talking about the spring of 2000 when you initially were
24 informed about concerns regarding the perceived behaviors
25 of Ms. Larkins?

1 Q. And when was that point in time?
2 A. I would probably say it was the spring prior to,
3 prior to the 2000-2001 school year.
4 Q. So it would have been the spring of 2000?
5 A. I believe so, yes.
6 Q. And what did you become aware of in the spring
7 of 2000?
8 A. That the principal was concerned with what she
9 perceived as some behaviors of Ms. Larkins in terms of
10 her interaction with both the principal as well as her
11 interaction with her colleagues.
12 Q. And how did you first learn of the principal's
13 concern about the perceived behaviors with respect to
14 interaction with both the principal and colleagues?
15 A. Dr. Donndelinger shared them with me.
16 Q. And when you say she shared them with you, what
17 do you mean by that?
18 A. She discussed them with me over the phone and in
19 person.
20 Q. Did you have a phone conversation prior to a
21 face-to-face discussion?
22 A. I don't recollect.
23 Q. Can you sitting here today separate out in your
24 mind what you were told over the phone versus what you
25 were told face-to-face?

1 A. I do now. You're referencing the spring of
2 2000.
3 Q. Yes.
4 A. Yes.
5 Q. Okay. All right. Well, then let's be sure
6 we're on the same wavelength here. Is it accurate that
7 during the spring of 2000 during the telephone
8 conversation and face-to-face meetings that no specifics
9 were provided to you by Dr. Donndelinger concerning Ms.
10 Larkins behaviors?
11 A. No. That is not what I said.
12 Q. Okay. Well, then I certainly didn't mean to
13 misquote you and there was simply a misunderstanding. At
14 that time were there specifics that were provided to you
15 by Dr. Donndelinger concerning Ms. Larkins behaviors?
16 A. Yes, there were. And to the best of my
17 recollection at this time I do not remember those
18 specifics.
19 Q. I see.
20 A. But she did share some specific situations.
21 Q. Was there any incident that stands out in your
22 mind?
23 A. I don't recall.
24 Q. Did either of you to your knowledge make any
25 notes of these conversations that you had in the spring

1 of 2000?
2   A. I don't believe that I had notes at all. In
3 terms of Maura -- not Maura's, but Dr. Donndelinger's, I
4 don't have any idea whether she had notes or not.
5   Q. Did you observe her making any notes?
6   A. Not during our face-to-face contact, no. Not to
7 the best of my knowledge.
8   Q. Did you observe her during your face-to-face
9 contact making any kind of reference to any notes?
10   A. I don't recall.
11   Q. I take it during your telephone conversations it
12 was not a video phone so you were unable to make any
13 observations?
14   A. That's correct.
15   Q. And you took no notes yourself during the phone
16 conversations?
17   A. No, I did not.
18   Q. With respect to your human resources
19 responsibilities, would this kind of concern fall
20 squarely within those responsibilities?
21   A. I wouldn't define it that way. I would more
22 importantly define the role of each superintendent is to
23 be a principal coach. And so we talk to our principals
24 almost daily, and they run things by us as a regular
25 course of action. So we're constantly having dialogues.

Page 22

1 What I do recall is that at this juncture I suggested
2 that if Dr. Donndelinger needed any support or help, that
3 I could certainly intervene and assist if she felt that
4 was necessary. And what she shared with me at that time
5 to the best of my knowledge is that she wanted to handle
6 it at a site level, and that she felt that it was not
7 necessary for me to enter into the picture at that time.
8   Q. When Dr. Donndelinger brought these issues
9 concerning Ms. Larkins to your attention was she doing it
10 in an agenda with other items that she was regularly
11 talking to you about during your daily conversations, or
12 were they separate and apart from other matters?
13   A. Separate.
14   Q. Did she at that time say anything to you that
15 gave you cause to believe that Ms. Larkins was in
16 immediate danger to herself or others?
17   A. I don't recollect that.
18   Q. And, again, sitting here today there's not any
19 specific incident that she related to you that you can
20 now remember?
21   A. The only thing that I do recall vividly is the
22 sense that I walked away with from both of those
23 conversations, and there were at least two, was that the
24 principal had some concerns with Maura's behavior and
25 Maura's difficulty in getting along with other staff

Page 23

1 members. But that the principal felt it was important to
2 give her an opportunity, and when I say her, the
3 principal an opportunity to try to resolve the issues at
4 the site level.
5   Q. At that juncture where you had at least two
6 conversations did you pull Ms. Larkins personnel jacket
7 to see if there had been any previous problems that had
8 been noted?
9   A. No.
10   Q. Did you take any action at that juncture to try
11 to discern whether or not there was any kind of history
12 of conduct or complaints about Ms. Larkins up to that
13 juncture?
14   A. The only action that I took was a coaching
15 statement that I made to Dr. Donndelinger. And that was
16 to remind her that she as an administrator had a
17 responsibility to address any issues that she was
18 perceiving, but to remember that it was important for her
19 to look at all sides. So to get the input from both
20 Maura as well as other teachers allegedly being impacted,
21 so that there was not a judgment at this point in time as
22 to being in a blame frame, but more so what we reference
23 as a name frame. Trying to get to the bottom of the
24 issues and make sure that all parties are treated fairly,
25 and that both sides are heard and heard clearly.

Page 24

1   Q. So you did nothing yourself to look at any kind
2 of written documentation to try to discern whether or not
3 this tenured teacher had had any kinds of problems
4 whatsoever?
5   A. It wasn't at that level. At that point in time
6 my engagement in the situation was limited to what I've
7 shared with you previously.
8   Q. And at that point in time did you gain an
9 understanding of what grade level and/or what subject
10 matter Ms. Larkins taught?
11   A. I was aware that Maura was a bilingual teacher,
12 and to the best of my recollection I recall that it was a
13 primary bilingual, but I'm not absolutely sure about
14 that. But to the best of my knowledge I remember her to
15 have had primary bilingual positions.
16   Q. And by primary do you mean grade?
17   A. K-3, somewhere in that category.
18   Q. Were there other bilingual teachers who worked
19 at that particular elementary school, Castle Park, along
20 with Ms. Larkins at that time?
21   A. Yes.
22   Q. How many others?
23   A. I have no idea.
24   Q. Do you know their names?
25   A. I'm sure that I know their names, but I can't

Page 25

7 (Pages 22 to 25)

1 connect credential with teacher right now. I'm staring
2 at a lady's face, but I can't remember her name. She
3 retired last year. And I really can't recall her name.
4 But Castle Park has a relatively large number of English
5 language learners, and being responsible for the
6 credential program I know there are a number of bilingual
7 teachers there.
8     Q. Have you in the course of your duties and
9 responsibilities as an assistant superintendent become
10 familiar with any kind of issues involving the bilingual
11 program at Castle Park Elementary and the attitudes of
12 non-bilingual teachers?
13     MR. BRESEE: Objection. Vague and ambiguous.
14     THE WITNESS: I'm not aware of, at that time I'm
15 not aware of any issues related to the bilingual program.
16 BY MS. SCHULMAN:
17     Q. At that time had you become aware that there
18 were certain elementary teachers at Castle Park who
19 didn't want bilingual students in their classrooms for
20 part of the teaching day?
21     A. No.
22     Q. Have you ever become aware that that was an
23 issue?
24     A. I can't say specifically with Castle Park,
25 counselor. I will say to you that I as one of the

Page 26

1 superintendents of the district am astutely aware that
2 district-wide we have a belief system about bilingual
3 education, but there's a discrepancy in how people feel
4 that it should be carried out. And our E.O. teachers
5 would differ in opinion from our BCLAD teachers,
6 B-C-L-A-D teachers, sorry, our bilingual teachers, as to
7 how a program should be carried out. I don't know that
8 Castle Park would be isolated in that situation.
9     Q. Would Castle Park be included in that situation?
10     A. Perhaps. I didn't have that knowledge at that
11 time that you're asking me.
12     Q. By E.O. do you mean English only?
13     A. English only.
14     Q. And sitting here today without necessarily
15 focusing on Castle Park what is your understanding of the
16 difference in philosophy or the implementation?
17     A. Well, really has to do with the legislation
18 passed and 227. We have, the district has supported
19 bilingual education. We always have and we always will.
20 But with the Unz initiative and mandated 227 the only way
21 that we can provide that is through a waiver signed by
22 parents or charter schools. Maura, among many other
23 teachers has been, has been a very positive advocate of
24 bilingual education, as many bilingual teachers have.
25 But there are staff members that fully support 227 and

Page 27

1 don't believe that there's a place in public education
2 for bilingual ed.
3     Q. And approximately what percentage did you say of
4 the student population in the Chula Vista Elementary
5 School District come from homes where English is not the
6 primary language?
7     A. I would say we probably have 50 to 60 percent.
8 And if I'm looking at two candidates, one who is
9 bilingual and one who is not, generally the candidate who
10 is bilingual has the greater strength because of the
11 diverse population that we have.
12     Q. And by candidate you mean teacher candidates
13 for hire?
14     A. Any type of candidate.
15     Q. Does Chula Vista Elementary School District
16 include all of that new development within, say, the last
17 10 years or so that stretches out to Eastlake and perhaps
18 beyond?
19     A. That's all Chula Vista. We have, all of that
20 growth is under our, we've opened up five or six new
21 schools in just the last five or six years. So that
22 encompasses Eastlake and all out H and Telegraph Canyon,
23 that's all our district.
24     Q. Have the statistics of non-speaking students,
25 non-English speaking students entering school changed at

Page 28

1 all with the development of these new subdivisions?
2     A. It makes our population more diverse in terms of
3 Spanish not being the only, or Spanish is still the
4 primary language other than English, but we have a large
5 influx of Asian, primarily Korean, Japanese, Chinese,
6 Filipino populations that have moved in that area.
7     Q. Where the children enter school speaking
8 English?
9     A. It's really a mixture.
10     Q. Going back to the situation with Ms. Larkins, so
11 you had a phone contact and a face-to-face conference
12 with Dr. Donndelinger, and those were at least two
13 contacts initially in the spring of 2000; is that
14 correct?
15     A. That's correct.
16     Q. And would it be fair to say there might have
17 been more contacts, but you just don't specifically
18 recall them?
19     A. No, I don't believe so. I don't believe there
20 were any more contacts that year.
21     Q. Okay. And by that year did you mean the
22 1999-2000 school year? I know you talk in school years.
23 Gets a little confusing sometimes, so I'm just trying to
24 clarify.
25     A. Right.

Page 29

8 (Pages 26 to 29)

1  Q. Did you check back to see if there had been some
2  resolution?
3  A. Sometime during the following school year Dr.
4  Donndelinger and I did have a conversation about it.
5  Q. To the best of your recollection when did that
6  conversation occur?
7  A. I have no idea. I don't remember the month or
8  the day. I just remember having that conversation.
9  Q. Did it occur prior to January 1 of 2001?
10 A. I really can't say. I don't recall.
11 Q. Was that a face-to-face conversation or
12 telephone conversation?
13 A. Both.
14 Q. So it was more than one conversation?
15 A. It was a continuation started on the phone and
16 continued in person.
17 Q. And can you distinguish those conversations in
18 your mind, or are they sort of melded together?
19 A. They were really a continuation of the same
20 conversation to the best of my knowledge. Like any
21 situation I would walk into, I tried to walk in as an
22 active listener without any judgment regarding any of the
23 teachers, including Maura. The difference in this
24 situation was when I became aware sometime during that
25 school year that the situation according to the principal

Page 30

1  had continued, I made a conscientious effort to enter the
2  picture and try to become engaged and offer my services
3  to try to mediate. First, to understand all parties'
4  sides, and to try to bring some agreement to both Maura
5  and the other teachers and the principal that were
6  involved.
7  Q. At that point in time, whenever that point in
8  time was during the 2000-2001 school year did Dr.
9  Donndelinger give you any specific instances of behavior
10 which she attributed to Ms. Larkins which she felt was
11 inappropriate behavior or behavior of some concern?
12 A. She did. But, again, I don't recall the
13 specifics. What I do recall is that I was not convinced
14 that there was any one particular party that was the
15 genesis of the problem. What I do vividly recall is that
16 I thought it was an issue or problem that was something
17 that needed to be investigated and looked into by an
18 administrator. But I don't recall that at that point in
19 time any judgment had been made in terms of whether it
20 was one person that was at the core of the issue or it
21 was another party. I don't, I didn't have that
22 knowledge.
23 Q. At that time did you have any knowledge that
24 there was at Castle Park a clique of teachers that
25 grouped together for purposes other than for educational

Page 31

1  benefits to children?
2  A. No.
3  Q. Have you ever become aware of that since?
4  MR. BRESEE: Object. Clique of teachers, and I
5  forget the rest of the question, but vague and ambiguous.
6  BY MS. SCHULMAN:
7  Q. Did you understand the question?
8  A. It would be helpful if you could describe it.
9  Are we referencing social or just at school or, I mean.
10 Q. Let me back it up a little bit. Did you ever
11 become aware at any point in time up to today that there
12 were a group of teachers at Castle Park who had been
13 responsible for the previous principal to Dr.
14 Donndelinger leaving the position of principal?
15 A. No.
16 Q. Did you ever become aware that there was a group
17 of teachers at Castle Park who banded together for the
18 purpose of influencing Dr. Donndelinger to take any
19 actions whatsoever, be they educational or for personnel
20 actions?
21 A. No.
22 Q. At this juncture, whenever it was -- I'm sorry.
23 Did you need a break?
24 A. In few minutes if you don't mind. I can hold it
25 for a few minutes.

Page 32

1  Q. Well, why don't we take a break now. That's
2  fine.
3  A. If that's okay.
4  MS. SCHULMAN: Five minutes or so. We're off
5  the record.
6  (Recess, 10:00 - 10:07 a.m.)
7  BY MS. SCHULMAN:
8  Q. So we were discussing the occurrences during the
9  2000-2001 school year when you became aware that this
10 matter had not found any kind of resolution. And did you
11 actually get to a point where you wanted to step in and
12 mediate?
13 A. Yes.
14 Q. And when you use the term mediate, are you using
15 that in a formal or an informal sense?
16 A. Well, I've gone through mediation training.
17 And about 70 percent of what I do on a daily basis is
18 mediation, I'm trying to come to common ground between
19 two or more parties. I don't know if I can say it was
20 formal or informal. It was just an attempt to come to
21 closure, to try to give everyone an opportunity to speak,
22 to hear all sides, and for people to reach common ground
23 and go back to the goal of working in the classroom and
24 meeting the needs of the kids. So whether that's formal
25 or informal, it's what I do every day.

Page 33

9 (Pages 30 to 33)

Q. And what, if any, action did you take during this 2000-2001 school year to set your definition of mediation into action?

A. I don't remember if I specifically had a conversation with Maura or it was communicated to her through a third party, but I do know that Maura became aware that I was interested in assisting, and that I wanted to provide some type of vehicle to give everyone a chance to be heard and to get to the bottom of the situation. And I recall -- that's all I recall. I don't know, I can't recall if I spoke directly with Maura or if it was through Gretchen that she got the message. But she clearly did get the message that I wanted to provide her assistance and was willing to visit with her and talk with her if she had any issues or concerns.

Q. At that juncture did you have any notion as to how many people might be involved with raising concerns about Ms. Larkins' conduct or behavior?

A. I don't recall the number.

Q. Do you know if it was fewer than 10?

A. I really don't recall. I know that there were several people who allegedly were having issues and concerns with Maura, but I didn't know specifics. And that was why I offered to become engaged in the situation.

Page 34

Q. And how do you know that Ms. Larkins got the message about your willingness to become engaged in the situation?

A. I received a pleasant note from her that said that at this time thank you for the offer, but we're going to -- to the best of my knowledge I think that the note said something about we're going to try to use the Comer method, C-O-M-E-R, Comer method to try to resolve any issues. But I do distinctly remember getting some type of communication from Maura. I remember that it was positive. I remember that it was clear to me that she knew, or at least my perception was that she knew that I had made the offer in good standing without any judgments, and that she had rejected the offer positively saying that she was wanting to try the Comer method.

Q. And what is the Comer method?

A. Well, we could spend hours talking about it. But basically, it's a, the Comer model is a model that came out of Yale University. And it's a reform model for education, but it can be applied to I think any business or organization. It's the way people resolve issues. It's the way people address issues. It's the way they treat each other in a meeting. It's about playing no-fault, having respect for your teammate, and listening, allow them to complete their statement without

Page 35

interrupting them. It's an approach to become focused on a unity of purpose, and in a school system it would be on powerful teaching and learning. So most of our schools that have adopted the Comer reform model it's about establishing a unity of purpose to address powerful teaching and learning.

Q. And had the Chula Vista Elementary School District adopted the Comer model?

A. Individual sites have independence to adopt whatever model they want. The district had some schools that adopted it, but the district per se doesn't adopt a model. We empower the schools to make their own decisions.

Q. And was Castle Park one of the schools that adopted the Comer model?

A. To the best of my knowledge they were looking at it. Whether or not they actually had adopted it, I'm not aware of. But they were looking at it with specific pieces in mind.

Q. And was the response then from Ms. Larkins in your mind at that time a reasonable response?

A. I'm not prepared to say that I thought it was a reasonable response. I remember being concerned with the response.

Q. What was your concern about her response?

Page 36

A. My concern was that up until that point things were continuing, and they were not being resolved. And so I would not have offered unless I felt like it was important to try to be that model, to model that type of good listening skills and problem-solving and so forth.

Q. If Ms. Larkins had agreed to participate in what you have described as your form of mediation, what would you have done?

A. What would I have done?

Q. Yes.

A. I would have met with both parties, both teachers and the principal, including Maura. And would have established some ground rules for dialogue and how each of us was going to conduct ourselves, what our principal goals were, in an environment where people felt comfortable speaking and saying what their perception was, so that we could try to get to the bottom of the issues that were at hand and move on.

Q. Was this a process where you envisioned that you would have Ms. Larkins and the other teachers and the principal together in one meeting to air their concerns?

A. Possibly, yes. It would be a mixture.

Q. What would that mixture be?

A. It would be an opportunity to speak with people both individually and in a large group.

Page 37

10 (Pages 34 to 37)

1    Q. And was that envisioning what you would do in
2  that particular kind of issue?
3    A. Yes.
4    Q. So one portion of it would be having everybody
5  in one room who had differences and letting each of the
6  people have their say while everyone was present in the
7  room with you?
8    A. I don't remember exactly the steps in sequential
9  order. But basically it was going to be an opportunity
10  for people to understand what the purpose was, what the
11  ground rules were, and to see what people's level of
12  comfort was.
13    Q. When you --
14    A. Because -- I'm sorry. Because the belief was
15  that people first had to buy into it. So whether it's
16  formal or informal, any mediation efforts in our district
17  must be mutually agreed upon. People need to be willing
18  to meet, and that's an initial premise.
19    Q. When you extended the offer, no matter how it
20  might have been extended, directly or indirectly, to Ms.
21  Larkins to participate in this mediation had you had any
22  contact with the other teachers involved to determine
23  their willingness to voluntarily participate in the
24  process?
25    A. Not at that time. Not when I heard from her.

Page 38

1    Q. During that kind of mediation process that
2  you've described are individual teachers permitted to
3  have their representative present?
4    A. We've never denied that. Very rarely would we
5  -- I would see no reason why they wouldn't. We didn't
6  get to that point for discussion. But if it was
7  something that I was facilitating, I would not have had a
8  problem with that.
9    Q. And during the 2000-2001 school year how many of
10  these type of mediations did you conduct?
11    A. Dozens. I do it constantly. I'm, by nature I'm
12  a peacemaker. And I remember that I had shared with you
13  -- well, dozens.
14    Q. So you conduct dozens in each school year?
15    A. Yes.
16    Q. And do you have any knowledge as to how many
17  issues are resolved using either the Comer method or some
18  other method?
19    A. Using the Comer method?
20    Q. Or any other method that any of these schools is
21  free to adopt.
22    A. I don't have data on that.
23    Q. Is there any data that's been obtained on that?
24    A. Not to the best of my knowledge.
25    Q. Did you ever find out whether or not in fact

Page 39

1  this Comer method was at least attempted to be used to
2  resolve the issues involving Ms. Larkins?
3    A. I don't recall.
4    Q. At the time that you offered to organize this
5  mediation process did you have any concern that Ms.
6  Larkins was a danger to herself or to others?
7    A. At the time that I made the offer?
8    Q. Yes.
9    A. I don't believe so at that time.
10    Q. Did you discuss the matter either verbally or in
11  writing with anybody other than Principal Donndelinger
12  and Ms. Larkins at that point when you were offering to
13  mediate?
14    A. I don't recall discussing it with anyone in
15  writing at all. I frequently discuss all issues with
16  cabinet. We talk every day. We're a very close group.
17  And I don't recall the dates and times, but I would have
18  certainly keep them abreast of issues such as this.
19    Q. So sitting here today you're confident that the
20  issue that was raised of the perceived behaviors on the
21  part of Ms. Larkins was brought up at cabinet discussions?
22    A. Um-hmm.
23    Q. Is that a yes?
24    A. Yes.
25    Q. And was that also true the first time that Dr.

Page 40

1  Donndelinger had brought these issues to you during the
2  previous school year?
3    A. I don't recall.
4    Q. Did you get any direction or suggestions from
5  other cabinet members as to how to perceive with this --
6  excuse me, as to how to proceed with this issue?
7    A. I don't recall anything specific. I would say
8  systematically our belief as a cabinet is to continue to
9  coach. So, to be there as support to the principal but
10  also a responsibility to make sure that all parties have
11  an opportunity to be heard. And so in my coaching with
12  the principal that's what I would have provided in terms
13  of direction.
14    Q. Do you have a specific recollection of doing
15  that, or is that simply what you are sitting here
16  testifying to is your business practice?
17    A. No. There's no question in my mind that I
18  shared that with Dr. Donndelinger. When I shared it with
19  her, I can't give you the specific date or time. But
20  there's no question in my mind that on more than one
21  occasion I was emphatic on this particular issue, to make
22  sure that all parties involved had the opportunity to be
23  heard out prior to any judgment.
24    Q. Did there come some time when you became once
25  again involved in these perceived behaviors?

Page 41

11 (Pages 38 to 41)

1    A. Yes.
2    Q. When was that?
3    A. I don't remember the exact date, but it was a
4  Saturday evening at about 8:15 in the evening.
5    Q. And were you at home?
6    A. Yes, I was.
7    Q. And what happened?
8    A. I received a phone call from a very concerned
9  Castle Park teacher.
10    Q. And who was that?
11    A. I believe her last name is Hamilton. Her first
12  name escapes me right now.
13    Q. And what did Ms. Hamilton tell you?
14    A. She was very alarmed very concerned. She had
15  had a prior incident, I believe that week, where she had
16  come into contact with Ms. Larkins. And to the best of
17  my knowledge she felt like Maura had invaded her personal
18  space, and she felt very threatened by Maura. She did
19  not say that Maura touched her or physically hit her.
20  But what she shared with me basically, and not
21  necessarily using this language, but this was the message
22  that she was sending me, she felt like her space had been
23  violated, that Maura was close to her, that she felt very
24  threatened by the glares and looks that Maura was giving
25  her. And she was very, very concerned, because she

Page 42

1  shared that she was a mother of two young children and
2  she feared for herself.
3    Q. And what, if anything, did you respond to Ms.
4  Hamilton by saying?
5    A. I shared with her that I appreciated the
6  information, that I would share it with her principal,
7  that I recommended that she also share it with her
8  principal, and that I would be getting back with her.
9    Q. Without making reference to any kind of
10  documentation can you place approximately what month this
11  phone call occurred in?
12    A. No, I really can't.
13    Q. Do you recall if it was 2001?
14    A. It was the 2000-2001 school year. I don't
15  recall the date.
16    Q. Did you ask Ms. Hamilton if she had shared this
17  information with the school principal prior to contacting
18  you?
19    A. I really don't recall.
20    Q. Did you get the impression that she felt the
21  school principal was ignoring her concerns?
22    A. I don't, I don't know that to be the case. I
23  don't recall that.
24    Q. Did Ms. Hamilton indicate to you whether or not
25  she had had any previous concerns regarding the perceived

Page 43

1  behavior of Ms. Larkins that she had raised with the
2  school principal?
3    A. No. 1, I don't know if she raised it with the
4  school principal at that time. I don't recollect that.
5  I don't know. No. 2, to the best of my knowledge -- and
6  this was on a Saturday evening. I was clearly caught off
7  guard hearing from a teacher on a Saturday evening. But
8  to the best of my knowledge she led me to believe that
9  Ms. Hamilton had very little dealings actually with
10  Maura. She was very uncomfortable, wasn't even sure why
11  this was happening. Because I slightly recall that there
12  was something about they don't work in the same grade
13  level, or they don't meet in the same teams, or something
14  along those lines. She was concerned that she would have
15  any engagement like this with Maura at all, and she
16  didn't really reference to the best of my knowledge past
17  problems with Maura that she per se had had.
18    Q. I'm sorry. She did?
19    A. Did not.
20    Q. Did not.
21    A. To the best of my knowledge. I don't recall
22  that.
23    Q. And have you since come to know what it is that
24  Ms. Hamilton was teaching at the time?
25    A. I don't know what grade level she was teaching.

Page 44

1    Q. Did she tell you when this confrontation, for
2  want of a better word, occurred?
3    A. Sometime during that week prior to that Saturday
4  evening.
5    Q. Did she indicate to you that it happened on
6  school grounds during school hours?
7    A. Yes.
8    Q. So it would have been sometime Monday through
9  Friday?
10    A. To the best of my knowledge, yes.
11    Q. Did you come to find out whether or not Dr.
12  Donndelinger was actually on site during that previous
13  school week?
14    A. I don't understand the question. On site
15  during, she was on site during that school year.
16    Q. During the school week, that previous school
17  week to that Saturday.
18    A. I don't know.
19    Q. Did anything said during the telephone
20  conversation that Saturday night give you any knowledge
21  as to why Ms. Hamilton had waited until 8:15 on a
22  Saturday night to contact you?
23    A. No.
24    Q. Did she indicate to you that, for example, maybe
25  there had been a phone call that had been made to her or

Page 45

12 (Pages 42 to 45)

1 somebody appearing on her doorstep, something that was of
2 such an immediate threat that she needed to do something
3 right then and there?
4    A. She to the best of my knowledge did not
5 reference any of her prior -- but I believe that she had
6 referenced that she had friends who had had problems with
7 Maura. People who had felt threatened, people that Maura
8 had gotten into their face and raised her voice with and
9 shown anger, inability to get along with other peers of
10 Ms. Hamilton's. And she was concerned that this could
11 escalate to a point where she may be in danger of her
12 life.
13    Q. That Ms. Hamilton felt it could escalate to a
14 point where she could be in danger of her life?
15    A. Yes. Yes.
16    Q. Did Ms. Hamilton tell you during that telephone
17 conversation of any specific threat that had been made to
18 her or she believed had been made to anybody else by Ms.
19 Larkins?
20    MR. BRESEE: Objection. Compound.
21 BY MS. SCHULMAN:
22    Q. You can answer it.
23    A. Can you repeat the question, please?
24    Q. Sure. During that telephone conversation you
25 had with Ms. Hamilton did she relate to you any specific

Page 46

1 threat that had been made to her by Ms. Larkins?
2    A. What she communicated to me was how she felt
3 when Ms. Larkins was next to her. In terms of a specific
4 threat, I don't recollect any particular language where
5 she further articulated other than what I shared with you.
6    Q. Was it clear to you from her verbal
7 communication during that telephone conversation that Ms.
8 Larkins had in fact not touched her?
9    A. To the best of my recollection I don't recall
10 hearing her say that she had touched her, no.
11    Q. Was it clear to you as a result of that
12 telephone conversation with Ms. Hamilton that Ms. Larkins
13 had not had any kind of object in her hand?
14    A. No. I was not aware of that. I don't recall
15 discussing any object.
16    Q. So you had no reason then to believe that there
17 was any kind of object in Ms. Larkins' hand that she was
18 threatening Ms. Hamilton with?
19    A. I don't know that.
20    Q. You don't know one way or the other?
21    A. I listened to what she said, and I don't recall
22 any object being mentioned at all.
23    Q. All right. At that time, irrespective of
24 whether or not you can now recall, did Ms. Hamilton
25 relate to you any words that were spoken by Ms. Larkins?

Page 47

1    A. I believe that she did, but I don't recall the
2 words.
3    Q. Sitting here today, just bottom line impression
4 do you remember any words that were in your estimation
5 threatening words that were mentioned?
6    A. What I remember very specifically was a grown
7 woman, a mother of two children who called me late on a
8 Saturday evening fearful of her life, very threatened by
9 a lady that she perceived invaded her personal space,
10 appeared to be very angry with her in the way she glared
11 at her and looked at her according to Ms. Hamilton. And
12 not having been there, all I can share with you is what
13 Ms. Hamilton shared with me. And that's basically the
14 extent of it.
15    Q. Did you ask Ms. Hamilton whether she had
16 complained or apprised anybody during the work week of
17 her concerns?
18    A. I may have. I don't recall.
19    Q. Did you ask her whether or not she had contacted
20 any law enforcement prior to calling you?
21    A. We may have had a conversation about that. I
22 don't recall.
23    Q. Do you know how she happened to have your home
24 phone number?
25    A. It's listed. Every employee is given my home

Page 48

1 phone number.
2    Q. Is it unusual for you to get after-hour phone
3 calls from employees?
4    A. Highly.
5    Q. Otherwise you might not give out your phone
6 number so easily?
7    A. I get many after-hour calls, primarily from
8 parents. It's highly unusual to get a phone call from a
9 teacher. On the weekends or during the work week in the
10 evenings I get frequent calls from administrators.
11 That's not unusual.
12    Q. Okay.
13    A. But from a classroom teacher, it's highly
14 unusual.
15    Q. Did you know anything about Ms. Hamilton prior
16 to the time that she made this phone call to your
17 residence?
18    A. Not any more than, with the exception of the
19 teachers that served on the interview committee, and I
20 don't recall every one of them. I know two or three of
21 them. But I didn't know her any more or less than any
22 other staff member.
23    Q. About how many school teachers does Chula Vista
24 Elementary School District employ?
25    A. We have almost 4,000 employees. We have about

Page 49

13 (Pages 46 to 49)

1  13- to 1400 teachers that are full contracted. We have
2  about 3- to 400 what we reference as short-term at will
3  employees. And the rest are subs, classified, and
4  administrators.
5    Q. So it would be fair to say that it would be
6  virtually impossible for you to know every single teacher
7  intimately?
8    A. (Witness nods head.)
9    Q. Would that be fair to say?
10   A. I don't know any teacher intimately.
11   Q. Maybe that was a poor choice of words on my
12  part.
13   A. With the exception of my twin sister who is a
14  teacher. I know my sister well. I do know some of the
15  teachers at Castle Park who served on the interview
16  committee. We put a lot of time in together. And so,
17  there is one in particular I would say we had a fairly
18  close relationship because she's what's called the
19  liaison with the committee and my office.
20   Q. Which one is that?
21   A. And I want to -- her name is Kathy, and Maura
22  she lives on a boat. That's all I recall. I don't
23  recall what her last name is. But she was the liaison
24  with the committee. And there's maybe two or three other
25  teachers and parents that were on the committee that I

Page 50

1ˡ  got to know better.
2    Q. When Ms. Hamilton called you at 8:15 on a
3  Saturday evening to apprise you of her concerns of
4  feeling endangered as a result of something that had
5  happened during the previous work week, did it give you
6  cause for concern that it was Saturday evening, that it
7  was some time after whatever had happened had happened,
8  and that she might be overdramatizing?
9    A. Never. That was never my perception.
10   Q. So getting called at 8:15 on a Saturday night
11  with something that had happened at least 24 hours prior
12  thereto, if not more than that. Since I take it the
13  school workday on a Friday must end by 5:00 o'clock.
14  Would that be an accurate statement?
15   A. Most teachers workday ends between 3:00 and
16  4:00.
17   Q. So this event would have happened more than 24
18  hours previous thereto. You have somebody calling you
19  who was not touched by another person, did not report to
20  you that there was any kind of object in the person's
21  hand that could conceivably be used as a weapon, did not
22  report to you that you can recall right now that she had
23  reported this event to anyone else, and did that not give
24  you pause to think that maybe there was
25  overdramatization going on by this person?

Page 51

1    MR. BRESEE: Objection. Argumentative.
2    THE WITNESS: Counselor, in almost 25 years of
3  doing personnel work I would absolutely say it is highly
4  common having dealt with dozens and dozens of cases where
5  people feel threatened or upset about an issue that
6  happened that they wait not only 24 hours, but some wait
7  weeks, months, and years before they come forward with
8  what is perceived to them as very upsetting and very
9  threatening. So it's, I didn't find it uncommon or
10  overdramatic by any means.
11  BY MS. SCHULMAN:
12   Q. And so this woman, Ms. Hamilton literally told
13  you in this phone conversation that she felt in danger of
14  her life, correct?
15   A. She felt, yes.
16   Q. And did you direct her to any law enforcement
17  agency?
18   A. Yes, I did.
19   Q. And did you direct her to some specific law
20  enforcement agency?
21   A. What I told her was that we had the school
22  resource officers that work with our school district. I
23  also referenced that she always had the right to go to
24  the police if she ever felt endangered. That I would
25  hope that she had the chance to speak with her spouse or

Page 52

1  family. And that I would be immediately sharing it with
2  her principal and recommending that our SROs, our school
3  resource officers would become involved.
4    Q. And on how many separate occasions during your
5  25 years of experience, Mr. Werlin, has somebody called
6  you at home on a weekend and told you that they felt
7  their life had been threatened?
8    A. Perhaps two or three times.
9    Q. In 25 years?
10   A. Um-hmm.
11   Q. Is that a yes?
12   A. Yes.
13   Q. And in any of those two or three times when you
14  were called at home on a weekend with somebody raising a
15  concern about their life being threatened did any of
16  those occasions involve some sort of object that could be
17  used as a weapon as told to you?
18   A. I don't recollect. I don't recall specifically.
19   Q. Were any of those while you were teaching --
20  strike that. Were any of those while you were acting as
21  assistant superintendent in Chula Vista?
22   A. Not to the best of my knowledge.
23   Q. And other than being called at home about a
24  purported life-threatening situation on the weekend, how
25  many other incidents have you been involved in in your 25

Page 53

14 (Pages 50 to 53)

1 years of experience where there were allegations of
2 threat to life?
3    A. Other than?
4    Q. Well, my first question to you as I phrased it a
5 few questions back was how many times other than this one
6 time had you been called on the weekend by a person
7 concerned about their life being threatened. Now my
8 question is, since I limited it to weekends, excluding
9 the ones we've already discussed how many other times
10 have you been called in your 25 years of experience with
11 an employee claiming that they felt they had been
12 threatened?
13    A. If I were to include employees who threatened
14 their own lives probably about a half a dozen.
15    Q. Let's exclude employees who threatened their own
16 life.
17    A. Probably the same number that I gave you, three,
18 approximately three.
19    Q. Were those all employees as opposed to perhaps
20 students or parents?
21    A. Correct.
22    Q. So you've gotten calls which are basically
23 suicide kinds of calls?
24    A. Separate from the approximately three that I
25 mentioned, yes.

Page 54

1    Q. If I don't get out of this classroom I'm going
2 to kill myself kind of calls?
3    A. No, no. We have people who for many years had
4 said they were going to kill themselves and no one ever
5 believed them, and we always took them seriously. They
6 were very serious calls.
7    Q. And what, if any, immediate step did you take
8 with respect to this 8:15 p.m. Saturday night phone call?
9    A. I immediately attempted to make contact with Dr.
10 Donndelinger. Left a message. To the best of my
11 knowledge I could not get ahold of her right away. And
12 also left a message to make sure that she involved our
13 school resource officer, SRO, which is our partnership
14 with the Chula Vista Police Department.
15    Q. So the SROs are Chula Vista Police Department
16 police officers who are assigned to be an officer for one
17 or more of the elementary schools; is that correct?
18    A. We actually pay for half of their salary. So
19 they're a city employee, but really are more than just
20 partners. We pay for half of their salary.
21    Q. And what was your next contact concerning this
22 matter after leaving a phone call message for Dr.
23 Donndelinger?
24    A. I don't recollect exactly what it was. It was
25 to the best of my knowledge Sunday or Monday, but I don't

Page 55

1 remember the exact time and date.
2    Q. And what happened next?
3    A. I shared with Dr. Donndelinger my concerns for
4 the teacher.
5    Q. Was this in a telephone conversation?
6    A. Yes. Followed up in person. And shared with
7 her that in any situation of this magnitude it would not
8 be uncommon to place the employee on administrative leave
9 pending a review of the situation.
10    Q. Now, when you say you expressed concern for the
11 teacher, which teacher are you speaking of?
12    A. Ms. Hamilton.
13    Q. And when you referred to the fact that it would
14 not be uncommon to place an employee on administrative
15 leave, who are you referencing?
16    A. Any employee that may have had an allegation
17 made against them of this magnitude.
18    Q. And in this situation you were referencing then
19 Ms. Larkins?
20    A. Yes.
21    Q. And did you make any recommendation to Dr.
22 Donndelinger about actually placing Ms. Larkins on
23 administrative leave?
24    A. No. Because she doesn't have the authority to
25 do so.

Page 56

1    Q. Who has the authority?
2    A. I do, and any cabinet member.
3    Q. And did you during any of these conversations,
4 telephone or face-to-face, following the Saturday evening
5 make any recommendation about getting any kinds of
6 written statements or investigating the matter?
7    A. I don't recall the specifics behind it, but we
8 had a number of conversations with Ms. Hamilton and with
9 the principal, but I don't recall the specifics.
10    Q. And what, if anything, was the result of the
11 conversations with Ms. Hamilton and the principal?
12    A. Well, there were no witnesses to the alleged
13 incident. However, given the concerns that were
14 expressed to us before regarding the allegations that Ms.
15 Larkins had problems getting along with other employees
16 over a relatively long period of time, and the fact that
17 we felt that it was important to take the time to look at
18 the situation closely because the teacher was very
19 alarmed and did feel very threatened, that we would take
20 the necessary steps to place Ms. Larkins on
21 administrative leave pending further review of the
22 situation.
23    Q. Is that paid administrative leave?
24    A. Yes, it is.
25    Q. And who is the we who made that decision?

Page 57

15 (Pages 54 to 57)

**Page 58**

1  A. Cabinet. I make it as a representative of
2  cabinet, but always talking with cabinet first.
3  Q. So it would be fair to say that you were the
4  primary person who made the decision?
5  A. Generally the superintendent for human resources
6  makes the final decision on administrative leaves.
7  Q. Prior to reaching the decision to place Ms.
8  Larkins on paid administrative leave had you spoken to
9  anybody other than Ms. Hamilton and Dr. Donndelinger?
10  A. I don't recall.
11  Q. Did you obtain any written statements from
12  anybody?
13  A. I don't recall receiving any written statements.
14  Q. Did the SRO or more than one SRO investigate the
15  matter prior to placing Ms. Larkins on paid
16  administrative leave?
17  A. There was no need to have a report or an
18  investigation from an SRO prior to making that decision.
19  We are the employer, and we reserve the right, the
20  authority and ability to place anyone on administrative
21  leave with pay.
22  Q. I know you intended to answer my question but
23  you haven't. My question simply was whether or not you
24  had any kind of written report, not whether or not you
25  were required to obtain one.

**Page 59**

1  A. Could you repeat the question, please?
2  Q. Surely. Did you have any kind of written report
3  from any SRO concerning any allegations leveled against
4  Ms. Larkins prior to reaching a decision to place her on
5  administrative leave?
6  A. I don't recollect whether there was a written
7  report before or after or any written report. I don't
8  recollect that.
9  Q. Did you speak with any SRO concerning the
10  allegations leveled against Ms. Larkins prior to making
11  the final decision to place her on administrative leave?
12  A. I don't recollect the time line.
13  Q. Prior to placing Ms. Larkins on administrative
14  leave did you find out whether or not Ms. Hamilton had
15  contacted anybody in law enforcement?
16  A. I don't recollect.
17  Q. Did you have any information about Ms. Larkins
18  prior to reaching a decision to place her on
19  administrative leave that you haven't already testified
20  about here today?
21  A. Not to the best of my knowledge.
22  Q. Did there come some time when you became aware
23  that Ms. Larkins had been involved in some sort of matter
24  involving an estate of a family member?
25  A. I remember getting a very, very bizarre

**Page 60**

1  communication from Ms. Larkins after this event took
2  place.
3  Q. And what was the communication about?
4  A. It's very difficult to recollect totally. It
5  was a rambling, something dealing with a personal issue
6  that I read the first sentence or two and then
7  communicated verbally with Ms. Larkins that not only was
8  I not associating any of her personal legal issues with
9  this incident, but I didn't have any interest in it nor
10  had I read the full document. She was alleging in a
11  search for wanting to know why all of this was happening,
12  was it perhaps somebody had told me something about a
13  personal situation involving, I believe, a family member.
14  And I had no idea what she was talking about, nor did I
15  see a nexus, nor would I validate that.
16  Q. She didn't leave you with a document, she just
17  asked you to read it?
18  A. No. I received a document.
19  Q. And did you retain that document?
20  A. To the best of my knowledge I believe I did.
21  Q. And does that document have some sort of name
22  that we can identify it by?
23  A. I haven't named it.
24  Q. Where did you maintain that document?
25  A. It will be in the files in the human resources

**Page 61**

1  office to the best of my knowledge. I have not seen or
2  looked at that document since I received it.
3  Q. And how was it that you received it from Ms.
4  Larkins, whatever it is?
5  A. I have no idea. I don't recollect.
6  Q. Was there a cover letter from her?
7  A. It was in a letter format I believe.
8  Q. Okay. So it wasn't a report of some kind?
9  A. I don't know. It was something that Ms. Larkins
10  constructed.
11  Q. And it was something that happened outside her
12  work place environment which apparently, to your
13  understanding Ms. Larkins had felt impacted your decision
14  to place her on administrative leave?
15  A. I don't know that.
16  Q. You don't know that. But in your mind whatever
17  it was it had nothing to do with what was going on
18  between Ms. Larkins and the school district with respect
19  to her teaching status?
20  A. It was part of her personal life. It had no
21  impact or bearing at all.
22  Q. At any time did any employee of the Chula Vista
23  Elementary School District make you aware of any
24  incidents in Ms. Larkins' personal life which whether
25  they were relevant or not to what was going on with the

16 (Pages 58 to 61)

1  school district that employee thought you ought to know?
2      A. I'm not aware of any, nor did I solicit any.
3      Q. Did you ever become aware that there was any
4  kind of dispute between Ms. Larkins and her brother
5  regarding the estate of a deceased parent?
6      A. I have no recollection. Not only do I not have
7  any recollection, I don't know anything about that. That
8  may have been in that document, but I dismissed it
9  immediately, had no relevance to what her role is or my
10  role is as a public school employee.
11      Q. All right. Then let's get back to this process
12  then of placing Ms. Larkins on administrative leave. How
13  did that come about in terms of once you've reached the
14  decision, what did you do next?
15      A. Basically, what we did was have an opportunity
16  to speak with Ms. Hamilton and the principal, and also I
17  began talking with other employees who volunteered
18  information about concerns that they had had with Maura.
19      Q. Is this before or after you reached the decision
20  to place Ms. Larkins on administrative leave?
21      A. After.
22      Q. And was it after Ms. Larkins had been notified
23  she was being placed on administrative leave?
24      A. I believe so, yes.
25      Q. And how was she notified that she was being

Page 62

1  placed on administrative leave?
2      A. I don't recall. I would assume that she
3  received a letter from my office that would have informed
4  her of that. But it may have just been a verbal contact.
5  I don't recall. I would have to check.
6      Q. Does the district have a procedure for placing a
7  person on administrative leave?
8      A. Yes. Generally we work with the teacher
9  organization. And at that time Maura, despite the fact
10  that she wavered back and forth whether she was going to
11  use a representative or not, at that time she was. And
12  our process is to work in combination with the teacher
13  organization or the classified. And so there was a
14  number of verbal communications. Generally there is also
15  written communication, but that may not always take
16  place. But in this particular case we worked closely
17  with Gina Boyd, who was president of and is president of
18  the Chula Vista Educators.
19      Q. Is there a collective bargaining memo of
20  understanding, whatever you would like to refer to it as,
21  that describes the procedure for placing teachers on
22  administrative leave?
23      A. No. It's outside of the collective bargaining
24  agreement.
25      Q. So what about statutes, do you have statutes, Ed

Page 63

1  Code statutes that you comply with with respect to
2  administrative leave?
3      A. Yes.
4      Q. And which statutes are those?
5      A. I would have to research what they are. But the
6  bottom line on administrative leave is as long as it's
7  with pay, the district has the right and reserves the
8  right to do that. And to answer your question about
9  process, there are no limitations to the best of my
10  knowledge in placing someone on administrative leave with
11  pay as long as they are being paid their daily rate of
12  pay. If they are not, they're on administrative leave
13  without pay, then there's both Ed Code and other
14  responsibilities involved.
15      Q. Has the district -- strike that. Had the
16  district prior to the time that Ms. Larkins was placed on
17  paid administrative leave adopted any kind of process for
18  placing somebody on paid administrative leave who was in
19  a teaching position?
20      A. It's, there is a process in place. It's
21  discussed by cabinet. A representative of cabinet, a
22  representative of the superintendent or the
23  superintendent has the authority to place anyone on
24  administrative leave. And I don't have the exact board
25  policy that would reference that. But it would be very

Page 64

1  clearly outlined in both board policy and also the
2  superintendent's contract.
3      Q. Okay. So there is a written board policy?
4      A. To the best of my knowledge, yes.
5      Q. That was a, yes, correct?
6      A. Yes.
7      Q. So Ms. Larkins was placed on paid administrative
8  leave. Was that then pending investigation and
9  validations?
10      A. No. It was to give us an opportunity to review
11  the situation and to determine whether or not we felt it
12  was all right for her to return to work.
13      Q. When you spoke to Ms. Hamilton after Ms. Larkins
14  had been placed on administrative leave did she give you
15  any more facts as to what had occurred?
16      A. To the best of my knowledge nothing more than
17  what I shared with you.
18      Q. Now, you mentioned that you had begun speaking
19  to other employees who volunteered their concerns?
20      A. Yes.
21      Q. You used the word volunteered. How did that
22  come about?
23      A. They volunteered information.
24      Q. Did you contact every teacher at Castle Park
25  Elementary School --

Page 65

17 (Pages 62 to 65)

1    A. No.

2    Q. -- to find out if any of those people had

3  information?

4    A. No. We limited it to people who expressed an

5  interest in visiting with me --

6    Q. And how --

7    A. -- and had a concern.

8    Q. How did those people find out that you had any

9  interest in visiting with them?

10    A. I have --

11    MR. BRESEE: Objection. Calls for speculation.

12    THE WITNESS: I have no idea.

13  BY MS. SCHULMAN:

14    Q. Did you use Dr. Donndelinger as a liaison?

15    A. No. I didn't use Dr. Donndelinger in any way.

16    Q. And who are these employees who volunteered to

17  discuss their concerns with you?

18    A. I don't remember everyone. But Linda Watson.

19  Rick Denmon. There was another gentleman, his name

20  escapes me, but he's relatively new. He had about five

21  or six years experience in the district. I don't recall

22  his name, but they're in the documents.

23    Q. Mr. Smith, Al Smith?

24    A. Perhaps, it may be Al. There were a number of

25  others.

Page 66

1    Q. About how many all together?

2    A. I don't recall.

3    Q. And when you say they're in the documents, what

4  documents are you referencing?

5    A. There was a report that was shared with Ms.

6  Larkins in terms of concerns that were expressed

7  regarding her.

8    Q. Is that a November 2001 report?

9    A. I don't recall when. It may have been.

10    Q. Without referencing that document do you have

11  any independent recollection as to the concerns that were

12  raised by each of these people?

13    A. Yes. There was a consistent pattern.

14    Q. And do you remember what each person said?

15    A. No.

16    Q. And what was the consistent pattern?

17    A. People who were frightened and uncomfortable by

18  Ms. Larkins' behavior, the way she would approach them

19  physically and get in their space. The volume of her

20  voice. The glare in which she would look at them. And

21  then there were many specific situations. For example,

22  Rick Denmon had any number of issues with Maura. But

23  Rick was the only one who came forth and said that all

24  issues that he had had with Maura, and some of them were

25  rather bizarre according to my recollection of what he

Page 67

1  shared with me, had been resolved between the two of

2  them. Ms. Watson said that issues with Maura had gone

3  back 10 or 12 years, but there had been a recent

4  situation where both teachers, Ms. Watson and Ms. Larkins

5  had taken their children on a swimming trip. And Ms.

6  Watson described being cornered in the locker room by Ms.

7  Larkins, and Ms. Larkins raising her voice and screaming

8  and yelling at her, and being very frightened by her.

9  And Ms. Watson has told this story many times and has

10  emotionally broken down most of the time when she talks

11  about it.

12    Q. She has told this story many times to you?

13    A. To me, yes.

14    Q. How many times?

15    A. Several. At least three or four.

16    Q. On which occasions, during what time period?

17    A. I have no idea. I don't remember the dates and

18  times. But she was emotionally distraught by her

19  interactions with Maura and had a need to talk about them

20  quite a bit.

21    Q. And when had this incident happened with the

22  swimming trip with the children?

23    A. I don't recall.

24    Q. And what did Ms. Watson say and what did Ms.

25  Hamilton -- I'm sorry, did Ms. Larkins say?

Page 68

1    A. I would have no further information other than

2  what I shared with you already.

3    Q. And is this set forth in your report?

4    A. Yes.

5    Q. And this is an incident that occurred after

6  school hours I take it?

7    A. No.

8    Q. This was during school hours?

9    A. Yes. And we're not referring to one incident.

10  We're referring to 10 or 12 years of a multitude of

11  experiences that were adverse in the perception of Ms.

12  Watson.

13    Q. Well, for the moment I was referring to the

14  swimming trip with the children. Was that something that

15  happened as part of a participation in a school activity?

16    A. To the best of my knowledge, yes. It was during

17  the workday and the student day.

18    Q. Okay. And this involved, when you said with the

19  kids, did you mean the students as opposed to their own

20  personal children?

21    A. There's nothing personal about their families.

22  This is, when I refer to children in this incident

23  between Ms. Watson and Ms. Larkins it's Ms. Watson's

24  students.

25    Q. I see. All right. That's I think where we were

Page 69

18 (Pages 66 to 69)

1  maybe on a different wavelength here.
2     A. Okay.
3     Q. All right. So this was a swimming trip that was
4  some trip that was sponsored by the school where the
5  teachers took their students with them, and there was
6  this confrontation, again I'll use that word, in the
7  locker room between these two women?
8     A. Yes.
9     Q. And was it that particular recent incident that
10 Ms. Watson broke down about when she spoke to you about
11 three or four times, or the whole series over 10 to 12
12 years?
13    A. Can you repeat that question, please?
14    Q. I'll try. You mentioned that Ms. Watson spoke
15 to you three or four times and each time she spoke to you
16 she broke down; is that correct?
17    A. That's correct.
18    Q. Was she speaking only about the swimming trip
19 during this time that she spoke to you when she broke
20 down three or four times?
21    A. Initially about the swimming trip.
22    Q. And then subsequently about other things that
23 had happened in the 10 to 12 years?
24    A. Well, through inquiry. I asked several
25 questions about any prior experiences, and she referenced

Page 70

1  a number of different situations that happened over the
2  years.
3     Q. And what were those situations?
4     A. I don't recall.
5     Q. Did you make notes?
6     A. I don't know. If I did take notes, they're part
7  of the record and I have them in my office.
8     Q. All right. And did you take part in the
9  production of documents that was requested for this
10 particular procedure?
11    A. Certainly.
12    Q. And did you do a diligent search of all your
13 documents in order to provide all the records that you
14 had that were requested?
15    A. Yes. You had asked me a question, and I hadn't
16 finished answering. I don't know if you want me to go
17 back.
18    Q. I apologize. I didn't realize I interrupted
19 you.
20    A. You had asked me who all these people were.
21 There is a librarian who's shared at Castle Park and
22 another school. And I'm sorry, I think it's Sobering,
23 but I'm not sure. But part-time librarian at Castle
24 Park. And not only her perception, but very much my
25 perception is that she was most uncomfortable during, and

Page 71

1  I believe it was during the last year that she had an
2  unexpected, unannounced, unwelcomed visit from Ms.
3  Larkins at her screen door one evening to discuss the
4  proceedings between Ms. Larkins and the school district.
5  This was yet another time where a teacher felt like her
6  space was violated and all of a sudden Ms. Larkins
7  appears at her doorstep. And again, it was uninvited, no
8  prior knowledge, all of a sudden Ms. Larkins appears at
9  her doorstep.
10    Q. When you say at her doorstep, are you speaking
11 about at her home?
12    A. At her home. And there's a screen door. I
13 don't know if it's in the front or back. She said her
14 only salvation was that her husband was also home. But
15 it was an extremely uncomfortable situation. And she did
16 share this with other staff members who were having
17 problems in their relationship, professional relationship
18 with Ms. Larkins, and they became even more fearful that
19 Ms. Larkins may attempt to contact them at their home.
20    Q. And you said that it was reported to you by this
21 librarian that this visit to her home occurred during the
22 process of, for want of a better word, the investigation
23 about what was going on?
24    A. It was during the last year. At what point in
25 time during all of these proceedings I can't exactly tell

Page 72

1  you, but it was sometime over the, during the last year.
2  From this date, from September 4th, I believe it was at
3  some point in time during the last year.
4     Q. But it was at some time subsequent to the time
5  that Ms. Larkins had been placed on this paid
6  administrative leave; is that correct?
7     A. Subsequent to it, yes.
8     Q. And do you know of any district rule or contract
9  rule or statute that prevents somebody who is essentially
10 defending themselves as a school teacher as to
11 allegations that had been raised from trying to speak to
12 people about it, about what their allegations are?
13    A. School rule, law, or statute?
14    Q. Yes.
15    A. No. No, I'm not aware of any.
16    Q. And other than the fact that she, she being the
17 librarian, felt uncomfortable with this visit to her home
18 to discuss the proceedings and shared this feeling about
19 being uncomfortable with others involved, did she tell
20 you that there had been any threats that had been made?
21    A. There is correspondence between Maura, from
22 Maura I believe to this librarian as to Maura's
23 perception of the proceedings. And to the best of my
24 recollection it was, appeared to be an attempt from Maura
25 to try to get this librarian to side with her. And the

Page 73

19 (Pages 70 to 73)

1  librarian's perception was that this visit was an attempt
2  to get this librarian to side with her during these
3  proceedings.
4      Q. And these proceedings would be part of due
5  process proceedings, correct?
6      A. All of the proceedings that are going on, yes.
7      Q. Okay. All right. And so based upon your
8  perception of this for whatever reason Ms. Larkins felt
9  that perhaps this librarian could actually in some
10  fashion be supportive of her, and so she went to her home
11  to discuss it with her?
12      A. She went to her home in the evening unannounced,
13  unwelcomed, and uninvited and this is what promoted an
14  atmosphere of high uncomfortability level. This
15  librarian was most uncomfortable. There had been a prior
16  situation in the library. I don't recollect all the
17  information regarding that, but there were some concerns.
18  And the fact that without a prior call, regardless of the
19  statute, the common courtesy to call someone if you're
20  going to visit them in the evening without any prior
21  knowledge, it did make her feel extremely uncomfortable.
22      Q. But sitting here today you're not aware of any
23  kind of rule or statute or contract provision which would
24  have precluded such a, as you have described it,
25  uninvited, unannounced evening visit at one's home?

Page 74

1  MR. BRESEE: Objection. Asked and answered.
2  You can answer again.
3      THE WITNESS: I'm not aware of any statute that
4  would prohibit it.
5  BY MS. SCHULMAN:
6      Q. So from your point of view would it be a fair
7  statement that from where you sit if you're going to go
8  visit somebody in the evening to try to solicit them as a
9  benefit to your position in a due process procedure, they
10  should at least call them first and make some arrangement
11  to do that?
12      MR. BRESEE: Objection. It's argumentative and
13  misstates his testimony.
14      MS. SCHULMAN: You can answer the question.
15      THE WITNESS: Do you want me to answer the
16  question?
17      MR. BRESEE: Yes.
18      THE WITNESS: I don't believe that that's what I
19  said. I believe that there's a lot of detail to that
20  situation. I don't recollect all of the detail. But
21  this is a person who had some history with Maura. I
22  don't recollect all the details. But as the assistant
23  superintendent for human resources, a person who is
24  responsible to make decisions in a district and to assess
25  situations, I thought it was highly unprofessional given

Page 75

1  all the situation that was going on, and the perceived
2  relationship between many of the employees at that school
3  and Maura at that time, that Maura would appear at the
4  doorstep of this librarian. I think the motive was
5  questionable. The fact that she was not invited, was not
6  welcomed, was not asked to be there, and there was no
7  prior announcement I thought was highly inappropriate.
8  BY MS. SCHULMAN:
9      Q. That's your personal opinion?
10      A. That is my personal and professional opinion.
11      Q. Do you recall whether or not the situation
12  between this librarian and Ms. Larkins had something to
13  do with the librarian failing to schedule Ms. Larkins'
14  bilingual class for a library session?
15      A. I don't recall the details.
16      Q. And did you include this particular incident in
17  your report that you referenced?
18      A. To the best of my knowledge I did, but I don't
19  recall.
20      Q. And how do you know that the librarian then
21  shared Ms. Larkins' visit to her home with other people?
22      A. Some of the staff members came to me very upset,
23  what are you going to do about this, we're concerned that
24  she's going to come visit us, we don't want anything to
25  do with her, we don't want any further interaction with

Page 76

1  her, she's already talked about a possible lawsuit naming
2  us. And they were very concerned. These are people that
3  are not generally speaking part of lawsuits or
4  interactions with legal counsel. So already their level
5  of concern was escalated. And I didn't know that the
6  librarian had shared that with them until they brought it
7  to my attention.
8      Q. How many people brought it to your attention?
9      A. I don't recall. I believe at least two or
10  three.
11      Q. And what, if anything, did you tell them?
12      A. Well, No. 1, I wasn't in a position to share
13  anything with them until I spoke with the librarian and
14  made sure that she was comfortable being, having this
15  discussed. Because it directly involved her, and I was
16  not aware that they had had the discussion. This was
17  what they had shared with me. So I spoke with her, and
18  she was very comfortable having them involved and engaged
19  in a conversation, and did express to me her concerns.
20      Q. Had you known about this incident directly from
21  the librarian before the other people came to you to
22  express their concerns?
23      A. I don't recall the sequence of events. I
24  believe that I did, but I really, I don't recall. I
25  don't know that I had a conversation with the librarian.

Page 77

20 (Pages 74 to 77)

1    I may have gotten a phone message, but I, again, don't
2    recall the sequence of events.
3        Q.  Are there any other people who expressed
4    concerns about Ms. Larkins during this 2000-2001 school
5    year that you haven't already mentioned either by
6    referencing by name or by some other generalization if
7    you can't recall the name?
8        A.  I can't make a definitive statement.  There
9    could very well be others.  There are certainly others
10   that have come forward since that time.
11       Q.  Did Mr. Denmon tell you how he and Ms. Larkins
12   had resolved their differences?
13       A.  He may have given me some detail.  To the best
14   of my knowledge it was basically through dialogue.
15       Q.  And you had characterized the information that
16   Mr. Denmon gave you about the incident or incidents that
17   had occurred between him and Ms. Larkins as bizarre.  Do
18   you recall that testimony?
19       A.  Yeah, absolutely.
20       Q.  And can you recall anything about what it was
21   that he said that led you to that conclusion?
22       A.  All I know is that he referenced some kind of
23   notebook incident.  And he didn't get into a lot of
24   detail, but there was I think something regarding a
25   notebook.  But basically he had all along said that he

Page 78

1    did have some concerns about his professional
2    relationship with Maura, but they had resolved them.  And
3    he was the only one that had shared that.
4        Q.  You mentioned a few moments ago that since, and
5    I take it the since was the 2000-2001 school year, other
6    persons have spoken to you about their concerns?
7        A.  Yes.
8        Q.  And who are those people?
9        A.  President of our board of education.
10       Q.  And what is that person's name?
11       A.  Mrs. Bertha Lopez.  L-O-P-E-Z.
12       Q.  And when did Ms. Lopez first speak to you about
13   her concerns?
14       A.  I believe that it was the weekend prior to this
15   Labor Day weekend.
16       Q.  The end of August 2002?
17       A.  Yes.
18       Q.  And what did she tell you?
19       A.  She called me saying that she had received a
20   phone message, and I believe it was on a Saturday
21   evening, from Ms. Larkins.  And she claimed that the
22   message was that Ms. Larkins had planned on amending her
23   lawsuit against the district.  That she had planned on
24   suing all the school board members with the exception at
25   this time of Ms. Lopez, and she would like to talk with

Page 79

1    her first and ask her some questions.  I attempted to
2    reach Ms. Lopez as a return call.  It was on a weekend,
3    and I was unable to reach her.  I called her a number of
4    times that Sunday.  I finally reached her.  But prior to
5    reaching her she had left me another message that she had
6    gotten another phone call from Ms. Larkins, basically
7    with the, with a similar interest, and that she was most
8    uncomfortable with these phone calls.  She felt that it
9    was an uncomfortable situation.  I'm not sure that I can,
10   that I have enough information that I can describe why
11   she felt it was uncomfortable, but she did.  And she
12   wanted the conversations, phone calls to be stopped.
13   Separate from Ms. Lopez there are others.
14       Q.  I'm getting there.  I'm aware that there are
15   multiple, and we'll do them one at a time.  And what, if
16   any, action did you take?
17       A.  We consulted our two attorneys involved in our
18   dealings with Ms. Larkins.
19       MS. SCHULMAN:  And I take it if I ask further
20   questions you would assert the attorney-client privilege;
21   is that correct?
22       MR. BRESEE:  Yes, I would.  Attorney-client
23   communications.
24       MS. SCHULMAN:  I will move on.  I'm going to
25   close this door, because I see what time it is, and we

Page 80

1    might have people who are coming down and using the gym
2    or going to the dispensing machines for food and drink.
3        MR. BRESEE:  Can we go off the record for a
4    second?
5        MS. SCHULMAN:  Sure.
6        (Recess, 11:30 - 11:34 a.m.)
7    BY MS. SCHULMAN:
8        Q.  You had mentioned there were others besides Ms.
9    Lopez, but before we move on let me ask you if there's
10   anything else that's not privileged conversation with
11   your attorneys about the Ms. Lopez situation that you
12   haven't already told us?
13       A.  Well, I shared with you that there were two
14   phone calls alleged by Ms. Lopez.  And she was very
15   uncomfortable, as were the other people that I have
16   referenced, because of the variety and the barrage of all
17   the different proceedings.  I mean, the school district
18   is named in lawsuits.  There are grievances.  There are
19   unfair labor practices.  Then there are amendments to all
20   of these things.  And so it's very uncomfortable when
21   someone doesn't know whether or not they should be
22   talking with someone or what the person's intent is.  And
23   when she received the phone call that said I'm amending
24   my lawsuit against the district and I'm suing the board
25   members, I haven't named you at this time but I'd like to

Page 81

21 (Pages 78 to 81)

**Page 82**

1  ask you a couple of questions, or I would like to have a
2  chance to talk with you or visit with you, the president
3  of the board told me that they made her feel very
4  uncomfortable and she did not want these phone calls.
5      Q.  Okay.  And these phone calls were actually phone
6  massages that were left on an answering machine?
7      A.  To the best of my knowledge they were messages.
8  There was no direct contact where they had a
9  conversation.
10     Q.  Okay.  Then you mentioned there have been
11 others.  Who are the others?
12     A.  There have been other situations or instances.
13 I don't know that I would recall all of them.  One of
14 them involved a phone call about six weeks ago that I
15 thought was difficult to explain.  Maura has been to the
16 best of my knowledge told that she's not to have any
17 communication with me without her attorney.  And yet
18 about six weeks ago I get a phone call from one of my
19 assistants, a message from one of my assistants in my
20 office that Maura called to speak with me.  And this was
21 about six, seven weeks ago.  And I was not sure where
22 that was coming from.  And then because of the length of
23 time with all of the different proceedings and all of the
24 different situations where several of our teachers are
25 named and then they're not named, they're not used to

**Page 83**

1  working within the legal parameters.  So there's a
2  lawsuit against the teachers, and then there's an
3  amendment where they're not named.  And then there's
4  discussion with people that there's going to be another
5  amendment.  So people are continuously calling and coming
6  up to me saying when are we going to be finished with
7  this, this is resting heavily on us, this is burdensome.
8  So people, their level of anxiety is very, very high and
9  they feel very threatened.
10     Q.  By the pending lawsuit?
11     A.  I think by a multitude of things.  There's, the
12 lawsuit is only one of many, many, many things going on.
13 It's only one of many.
14     Q.  Well, let me ask you the question like this, and
15 I understand that there have been a number of grievances
16 and there's a lawsuit and there is this proceeding.  I am
17 only involved in representation for this proceeding.
18 Aside from the legal battles, if you will, that are going
19 on, has there been anybody else who has complained to you
20 about something that's not related to legal battles,
21 other than these folks who complained to you during the
22 2000-2001 school year?
23     A.  There may have been.  I don't recollect at this
24 time.
25     Q.  And the subject matter of this particular

**Page 84**

1  proceeding doesn't have anything to do with those
2  particular complaints that may or may not exist that you
3  can't recall?
4      A.  I'm sorry, counselor.  I absolutely disagree
5  with that statement.  As the employer of these employees
6  I'm having a great deal of difficulty in understanding
7  how you can draw a line there.  When these employees call
8  me on a regular basis and say that they're being named in
9  this or named in that, and these are the same employees
10 that you are calling for depositions, it's very difficult
11 for them to draw the line.  They think that the case has
12 been dropped against them.  And their anxiety level can't
13 drop, because now they're being deposed, and they don't
14 understand that they're separate entities.  They see it
15 all as being very connected.  And so I understand where
16 you're coming from, but please understand that is not at
17 all the perception of most of the teachers that are
18 involved.
19     Q.  Well, have you explained to those teachers whose
20 notices of deposition have been provided to your counsel
21 that the district in fact initiated an action against Ms.
22 Larkins, and that their depositions are being taken with
23 respect to that action?
24     A.  Yes.
25     Q.  And does the Chula Vista Elementary School

**Page 85**

1  District disavow the notion of due process as an official
2  policy?
3      MR. BRESEE:  Objection.  Argumentative.
4      THE WITNESS:  Did I ever make that statement,
5  counselor?
6  BY MS. SCHULMAN:
7      Q.  I'm asking you a question.
8      A.  I'm answering the question with asking did I
9  ever make that statement.
10     Q.  No, that's not the question.  I asked a simple
11 question.  To your knowledge does the Chula Vista
12 Elementary School District --
13     A.  No.
14     Q.  -- have a policy that disvows due process?
15     A.  No.
16     Q.  Okay.  So would it be fair to say then that
17 there is with those teachers employed at the Chula Vista
18 Elementary School District who have been noticed to have
19 their depositions taken in this matter a degree of
20 hostility, if you will?
21     MR. BRESEE:  Objection.  Calls for speculation.
22 You're asking her to --
23     MS. SCHULMAN:  Well, he's been characterizing
24 their mental states to me voluntarily during the course
25 of this deposition.

22 (Pages 82 to 85)

1    MR. BRESEE: Same objection. And another
2    objection that it misstates the testimony. He's been
3    conveying his perceptions. He has not represented how
4    other people feel.
5    BY MS. SCHULMAN:
6      Q. I'll rephrase the question. Is it your
7    perception then that there is some degree of hostility
8    which has been expressed by the teachers whose notices of
9    deposition have been served on their counsel towards Ms.
10   Larkins?
11     MR. BRESEE: Same objections.
12     THE WITNESS: I've never perceived nor have I
13   ever communicated any sense of hostility on anyone's part
14   of those parties that I mentioned.
15   BY MS. SCHULMAN:
16     Q. Would it be fair to say these she's not the most
17   popular person amongst those people whose notices of
18   deposition have been served?
19     MR. BRESEE: Objection. Calls for speculation.
20     THE WITNESS: They have not communicated that to
21   me.
22   BY MS. SCHULMAN:
23     Q. But they have communicated to you high states of
24   anxiety; is that correct?
25     A. A teacher who is visited in the evening

Page 86

1    unannounced, unwelcomed, and uninvited who understands
2    that she may or may not be involved in different
3    situations is very uncomfortable. That's what I stated.
4      Q. And a school board member who has two messages
5    left saying, gee I'd like to come speak to you, is it
6    okay, is also somebody who is uncomfortable, correct?
7      MR. BRESEE: Objection. Calls for speculation.
8    It's argumentative. It blatantly misstates his
9    testimony. Go ahead and answer.
10     THE WITNESS: Can you repeat the question?
11     MS. SCHULMAN: I'll move on. I think my point
12   has been made here.
13     MR. BRESEE: It's lost on me, but I think it's a
14   good idea to move on.
15   BY MS. SCHULMAN:
16     Q. The point is really obvious. Is there anybody
17   else who has -- strike that. We've gone over that ground
18   already. I'm going to give you in its entirety a
19   response to request for production propounded to the
20   Chula Vista Elementary School District by respondent, Set
21   No. 1, with the response and the documents attached. I'm
22   going to ask this be marked as Exhibit 2, and ask that
23   you just simply peruse that. I don't really expect you
24   to read it thoroughly. I have another copy here.
25     A. Thank you.

Page 87

1    (Exhibit No. 2 marked for identification.)
2    BY MS. SCHULMAN:
3      Q. I have a few questions to ask about it. Let me
4    start by asking you whether or not you have actually ever
5    before today seen what is the response to request for
6    production of documents, which is the first seven pages
7    on this lined paper?
8      A. Have I ever seen the first seven pages prior to
9    just now?
10     Q. Yes, prior to just now.
11     A. Yes, I have.
12     Q. Did you take part in searching for the requested
13   documents?
14     A. One of several people that did, yes.
15     Q. And who else besides you did that?
16     A. Well, the key player would be my administrative
17   aide, Lupe L-U-P-E, Loredo, L-O-R-E-D-O. And I have
18   approximately 16 classified staff in my office. There
19   are times that she'll delegate the research into getting
20   a particular document that's dated a certain date or
21   pulling a file. So it could have been any number of
22   people in the office, but generally Lupe and I do that
23   together.
24     Q. Okay. So other than you and your staff, you're
25   not aware of other people, for instance other cabinet

Page 88

1    members or the superintendent or principal or anyone like
2    that?
3      A. No, I'm not aware.
4      Q. And the documents that are attached, are they
5    then all the documents that are responsive to these
6    requests?
7      A. To the best of my knowledge, yes.
8      Q. Do we have that report that you referenced
9    earlier attached here?
10     A. I'm sorry?
11     Q. You said that there was a report that you had
12   which reported what each of these people had stated.
13     A. Yes.
14     Q. Is that attached?
15     A. October 4th, yes. It's Page 8 I believe.
16     Q. Page 8 of?
17     A. The document that you shared with me has a No. 8
18   on the bottom I believe.
19     MR. BRESEE: It's not the eighth page.
20     THE WITNESS: It's maybe about the 15th or 20th
21   page.
22     MR. BRESEE: It's the sixth page of the attached
23   documents, or am I --
24     THE WITNESS: Of the attached.
25   BY MS. SCHULMAN:

Page 89

23 (Pages 86 to 89)

Q. It's entitled, interim summary?

A. Yes, that's correct.

Q. And was there a final summary as opposed to the interim summary?

A. No.

Q. So this is it?

A. Yes.

Q. And this is entitled, "Interim summary of concerns/allegations against Ms. Maura Larkins by staff members at Castle Park Elementary, response to request by Maura Larkins, October 4, 2001." Is that correct?

A. That's correct.

Q. Why does it say response to request by Maura Larkins?

A. Because Maura wanted to have something in writing in terms of what the people were saying, and this was an answer to a question that we had received from both Ms. Larkins and her then attorney, Pamela Havird.

Q. And did you use any particular documents in assembling this response?

A. Not to the best of my knowledge. It's basically a summary of what was verbally told to me.

Q. Were there not also individual statements that were given to you?

A. Written statements?

Page 90

Q. Yeah.

A. I would have to check. I'm not aware of any written statements. There may have been, but if there were they should be in here.

Q. All right. Let's go through this. Now, the Ms. Hamilton you were speaking of appears is Jo Ellen Hamilton?

A. That's correct.

Q. All right. Now, did you yourself write this report?

A. Yes, I did.

Q. And it consists of two pages that have small numbers 8 and 9 on the bottom; is that right?

A. That's correct.

Q. All right.

MR. BRESEE: Just for the record I believe on the second page there is a reference to an attached written statement which would be the page after that, so the complete document is three pages.

MS. SCHULMAN: All right. So 8, 9 and 10. Okay.

Q. Now, in this summary you mentioned this Saturday evening 8:15 phone call. Is that the one that you've testified to?

A. That's correct.

Page 91

Q. And again, you've cited the 2000-2001 school year, correct?

A. That's correct.

Q. And that's the most specific you can get on the date, correct?

A. Yes.

Q. And you use the word distraught in this report. Was that a conclusion that you reached?

A. That was my perception of how she was communicating to me. She felt very threatened and was beside herself.

Q. Now, you say that she, referring to Ms. Hamilton, claimed that conversations with Ms. Larkins were very strange and she felt very uncomfortable talking with Ms. Larkins.

A. Yes.

Q. Did she in fact relate more than one conversation to you that she had had with Ms. Larkins?

A. Apparently she must have, as a result of my writing this and seeing this now. But there was one primary conversation that prompted this phone call.

Q. And that was the visit to her home?

A. No. This is a different person.

Q. I'm sorry.

A. She was not visited at her home.

Page 92

Q. I'm getting my people mixed up. And so it was a particular conversation that she was concerned about?

A. To the best of my knowledge, yes.

Q. And is that the conversation you've already told us about?

A. Yes, ma'am.

Q. All right. And when you state, this was reported to the site principal by the assistant superintendent for human resources services and support, that was you reporting to Principal Donndelinger?

A. Yes.

Q. Alan Smith, does this help you recall that that was the --

A. Yes.

Q. -- name of the man who you recalled before. Now, you start by saying Mr. Smith indicated that while he had not worked with Ms. Larkins for many years, he still had professional concerns with her.

A. Um-hmm.

Q. Is that correct?

A. Yes.

Q. All right. And how many years had it been since Alan Smith had worked with Ms. Larkins to your knowledge?

A. I really don't know. I think it was under four or five years, but it may only have been a couple of

Page 93

24 (Pages 90 to 93)

1 years. I really don't know. It was a limited amount of
2 time, I know that. As compared to someone like Ms.
3 Watson who had a breadth of experience in working with
4 Ms. Larkins.
5    Q. And how long had Ms. Hamilton worked in the same
6 school as Ms. Larkins, if you know?
7    A. I really don't know. Just a guesstimate, I
8 would think she, I think that Ms. Hamilton has been there
9 8 or 10 years. But I really don't know for sure.
10    Q. And how long had Ms. Larkins taught at that
11 school?
12    A. I don't know. I believe that Maura has shared
13 with me that she taught at least at one other school, but
14 I don't recall her history.
15    Q. That she, meaning?
16    A. Maura.
17    Q. Maura had taught at least at one other school?
18    A. Correct.
19    Q. So you don't know if Ms. Hamilton and Ms.
20 Larkins went back 8, 10, or 12 years, or 2 or 4 years,
21 correct?
22    A. To the best of my knowledge anything that Ms.
23 Hamilton would have referenced to me was recent to her
24 phone call to me.
25    Q. Okay. All right. And here you say that Mr.

Page 94

1 Smith stated that she, meaning Ms. Larkins, did not speak
2 with him in a professional manner on more than one
3 occasion. Did he mention any specifics to you that you
4 can recall?
5    A. What I'm recalling is that he had a number of
6 conversations with her, because they had to work closely
7 together, he felt that they were disrespectful, that she
8 didn't talk to him in a professional tone of voice and
9 manner, and that he was uncomfortable working with her.
10    Q. But nothing that you specifically recall as
11 specific instances?
12    A. Beyond that, no.
13    Q. By the way, was Ms. Larkins evaluated from year
14 to year?
15    A. As a tenured teacher she would have been
16 evaluated every other year unless the principal wanted to
17 do her annually.
18    Q. And to your knowledge had any principal ever
19 done any kind of annual evaluation on Ms. Larkins?
20    A. I haven't looked at any recently, but I can
21 assure you that the practice in our district is that all
22 PERBs and temps are evaluated every year, all tenured are
23 evaluated every other year.
24    Q. And sitting here today do you have any knowledge
25 as to whether or not in any of the every other year

Page 95

1 evaluations received by Ms. Larkins there was any concern
2 raised about her ability to get along with other people?
3    A. I don't recall that.
4    Q. Did you ever read any of those?
5    A. I don't recall whether I read them or not.
6    Q. Would that have been important for you to check
7 back to see if there was any record in writing of any
8 concerns about getting along with your peers?
9    A. Perhaps.
10    Q. Now going to Rick Denmon, do you know how long
11 Rick Denmon and Ms. Larkins were in the same school?
12    A. For a number of years, but I don't know. I
13 assume minimum of five years, but I really don't know for
14 sure.
15    Q. And Mr. Denmon, did he tell you what this prior
16 difficulty in his professional relationship with Ms.
17 Larkins had been that had been resolved?
18    A. Rick wanted to meet with the other teachers who
19 had expressed concerns to show support for those
20 teachers, but he really was not interested in his issues
21 and concerns really being in the forefront. Because he
22 was very up front and said that they had really come to
23 closure on them. They had both, he said he confronted
24 Maura with his concerns with their professional
25 relationship, and that they resolved them.

Page 96

1    Q. Now, Ms. Watson is Linda Watson, correct?
2    A. Yes.
3    Q. And do you know how long Ms. Watson and Ms.
4 Larkins had worked in the same school together?
5    A. No, I do not. I know it's for a number of
6 years, but I don't know if they worked together in
7 another school or not. But I know that they've known
8 each other for a number of years.
9    Q. And how do you know that?
10    A. Because Ms. Watson references problems going
11 back 10 or 12 years ago.
12    Q. Do you know in any other way?
13    A. I do not, no.
14    Q. Did you ever discuss with Ms. Watson what, if
15 anything, she had tried to do about events that had come
16 up 10 or 12 years ago?
17    A. I talked with her on a number of occasions. She
18 said that she tried to talk with Maura and to share with
19 her what her concerns were. And that it normally would
20 result in a very stressful situation for her, and she
21 just was at a loss. She didn't feel like she was able to
22 get anything resolved with her.
23    Q. And Ms. Larkins -- you had spoken to us earlier
24 about the locker room incident and the swimming event.
25 Does this report contain everything that you can remember

Page 97

25 (Pages 94 to 97)

1   about that particular event?
2     A. Yes.
3     Q. And so sitting here today in reviewing this
4   report, other than the fact that Ms. Watson claimed that
5   Ms. Larkins spoke to her with an elevated voice and most
6   unprofessionally, you can't remember anything else that
7   might have specifically been said?
8     A. She felt like she had invaded her space and she
9   felt threatened and was very concerned with Maura yelling
10  at her and acting unprofessionally in that manner, and
11  that there were children around who witnessed this.
12     Q. And, I'm sorry, where here does it say that she
13  invaded her space?
14     A. It does not say that specifically, but that is
15  very much my recollection of the conversation that I had
16  with Ms. Watson.
17     Q. So that's an independent recollection on your
18  part?
19     A. No, I don't believe it is at all. I believe
20  that it's closely tied in with the statements that are in
21  that paragraph.
22     Q. You haven't used the phrase in the summary that
23  you composed, invaded her space, have you?
24     A. No, I have not.
25     Q. And you haven't specifically said here that

1   there were actually students who were in visual or
2   earshot of whatever this interaction was between Ms.
3   Watkins, or Ms. Watson, rather and Ms. Larkins, have you?
4     A. Well, I would say that I inferred that by the
5   statement that she approached her in the locker room
6   where her students had been swimming.
7     Q. I see.
8     A. I use the phrase, had been swimming, near where
9   their students had been swimming. My inference was that
10  children were within earshot.
11     Q. That was your inference, not something she
12  directly told you?
13     A. No. That was something she shared with me.
14     Q. But you didn't actually write in this report
15  that the students had either visually or auditorily
16  heard?
17     A. Yes.
18     Q. And that's what you meant to convey by the
19  phrase, approached her in the locker room near where
20  their students had been swimming?
21     A. That's what I believe I did convey.
22     Q. Is that what you intended to convey?
23     A. That's what I believe I did convey.
24     Q. Is that what you intended to convey?
25     A. Yes.

1     Q. And with regard to Michelle Leon-Scharmach,
2   that's an attached statement, correct?
3     A. Yes.
4     Q. And we'll get to that in a moment. Going down
5   to Dr. Donndlinger, and here you say that Dr.
6   Donndelinger, "has expressed numerous concerns about Ms.
7   Larkins' inability to be a team player with other
8   teachers on her grade level. She also has expressed
9   concerns with Ms. Larkins' behavior that would include
10  raising her voice with colleagues and her principal and
11  an unwillingness to work collaboratively with teachers on
12  her team." That's the total statement?
13     A. Yes.
14     Q. Do you have any recollection of any specific
15  instances for any of what Dr. Donndelinger described to
16  you about Ms. Larkins not being a team player, raising
17  her voice, not working collaboratively?
18     A. Nothing separate from what I shared with you
19  already.
20     Q. Then we go to Page 10, you've got the statement
21  from the librarian, Michelle Leon-Scharmach; is that
22  correct?
23     A. Correct.
24     Q. And this is the librarian who you were
25  referencing earlier; is that correct?

1     A. Yes.
2     Q. All right. This seems to be a pretty full and
3   complete statement of the incident that occurred, would
4   you agree?
5     A. To the best of my knowledge. I wasn't there
6   during the situation.
7     Q. Okay. And did she, that is the librarian, Ms.
8   Leon-Scharmach share any further information with you
9   concerning this matter that is not relayed in her
10  statement?
11     A. During this specific situation, not that I'm
12  aware of.
13     Q. And who's house was it that was being gone to at
14  night?
15     A. Ms. Scharmach's.
16     Q. And when did Ms. Scharmach give you this
17  particular document that appears as Page 10?
18     A. I assume that it would have been somewhere in
19  September or October of 2001.
20     Q. And was that before or after the going to the
21  home incident?
22     A. Long, long before.
23     Q. I see. And did she give you any other kind of
24  statement following the visit to the home?
25     A. Not written statement, not to the best of my --

1 there may be something in the records, and I would have
2 to check the records on that. I don't know. I would
3 have to check that.
4     Q. Did you check the records at the time of the
5 discovery request?
6     A. Yes, I believe I did. But again, I may have
7 omitted unintentionally. But there specifically was
8 communication as I entered into my sworn testimony
9 regarding Ms. Scharmach's concern about the visit.
10     MS. SCHULMAN: Perhaps this would be a good time
11 to take an hour break for lunch. I notice it's about 10
12 after 12:00.
13     MR. BRESEE: Okay.
14     MS. SCHULMAN: Off the record.
15     (Lunch recess taken, 12:06 p.m.)
16 AFTERNOON SESSION, WEDNESDAY, 9/4/2002, 1:11 P.M.
17 BY MS. SCHULMAN:
18     Q. You understand you're still under oath?
19     A. Yes.
20     Q. And I never did ask you this morning, actually,
21 if you knew of any reason why you couldn't give your best
22 testimony here today, so let me ask you that.
23     A. No. I don't know any reason why I could not.
24     Q. You're feeling okay today?
25     A. Feeling great.

Page 102

1     Q. Okay. Good. Standard question I usually ask.
2 Let's go back to the time now that you have put Ms.
3 Larkins out on paid administrative leave, then you
4 started talking to all of these people that we've been
5 reviewing their statements. Was there anybody else who
6 you spoke to whose statement does not appear as part of
7 this record that we reviewed this morning right before
8 lunch, or who you haven't yet testified about?
9     A. Well, I made reference to the fact that
10 throughout this period for the most part Maura was
11 represented by Chula Vista Educators. So on at least one
12 occasion, but more than one occasion, but at least on one
13 we sat down with Maura and shared with her what the
14 issues, what many of these issues were that were coming
15 up. And she had an opportunity to respond. In fact, one
16 of the events she brought her husband, and she also had
17 Gina Boyd as her representative.
18     Q. Well, let me stop you. I don't want to be
19 impolite, but the thrust of my question was simply to
20 find out whether or not there were other people who you
21 haven't yet mentioned who during this period when she was
22 out on paid administrative leave came to you with issues
23 or perceived issues concerning Ms. Larkins' conduct?
24     A. Excuse me. I'm sorry.
25     Q. And I should have --

Page 103

1     A. Not to the best of my knowledge.
2     Q. No. I should have narrowed my question. Maybe
3 we need to close this after all.
4     And were there grievances that were filed then
5 on behalf of Ms. Larkins?
6     A. Over the past two years there's been at least
7 four or five or six grievances. I haven't looked at them
8 recently or studied them: I don't know the time lines,
9 but there's a multitude of grievances.
10     Q. And I don't want to rehash those grievances.
11 Did there come some time when there was an effort on the
12 part of the school district to reassign or transfer Ms.
13 Larkins?
14     A. All along there has been. That actually is the,
15 was the primary goal and mission of the district.
16     Q. And when did that become the primary goal and
17 mission of the district?
18     A. When we received correspondence from Maura's
19 physician that she had a release to return to work. And
20 that would have been in the summer of 2001, I believe,
21 that we received notification from her physician. Our
22 intent was to invite her multiple times to sit down and
23 talk with us about what was open and finding another
24 location separate from Castle Park for her to be
25 successful in the district.

Page 104

1     Q. Was there some reason that you deemed she could
2 not go back to Castle Park?
3     A. Yes.
4     Q. What was that?
5     A. We did not feel it was in the best interest of
6 Maura or the other staff members that had expressed
7 concerns. We did not feel like the environment was such
8 that these teachers felt comfortable nor did we feel that
9 Maura was comfortable with these teachers. And we felt
10 like she deserved an opportunity for a fresh start where
11 people were not aware of the situation that she had been
12 through involving these other teachers. And that this
13 would be an opportunity for her to have a fresh start and
14 set her up for success.
15     Q. Now, you've said a lot. You started talking
16 about a physician's release to return to work. Was that
17 a requirement of the district?
18     A. If someone is using sick leave, they are out on
19 sick leave, they are not as a process returned to work
20 until we have a release from their physician. In this
21 particular case we received medical documentation from
22 Maura's physicians that she was under their care and was
23 not able to return to work until X date. Which I would
24 believe to be to the best of my knowledge sometime during
25 the summer of 2001. But I'm not sure about that, but to

Page 105

27 (Pages 102 to 105)

1   the best of my knowledge.
2       Q.  So if I understand you correctly the district
3   policy is that any time any of the employees is using
4   sick leave and you get a note initially from the doctor
5   that they're under doctor's care, then they need a
6   physician's release to come back to work?
7       A.  That's correct.  Generally, it's any time
8   they're out a consecutive number, anywhere from three to
9   five days on.  Somebody might have a bad flu and call in.
10  But generally speaking if there's a prolonged, anytime
11  after three to five days and we've received a notice from
12  the physician.
13      Q.  That is if somebody had just called in and said,
14  I'm home sick with the flue and I'll be a couple days,
15  and then they call back after a couple days and say I'm
16  still flat on my back, you don't require a doctor's note
17  then?
18      A.  Generally speaking, no.
19      Q.  All right.  Had there been any time during this
20  time period prior to the time that Mrs. Larkins provided
21  a release from her physician that there was any
22  suggestion or requirement that she undergo a fitness for
23  duty exam?
24      A.  I don't recall the specifics around that.  There
25  may have been some discussion about it, but I really

Page 106

1   don't recall any specifics.  She made us aware that she
2   was under a physician's care, and until we had a release
3   from the physician we were not aware of what the
4   circumstances were.  All we knew was that she was not
5   able to return to work.  She did not have a release for
6   fitness for her job to return to Castle Park, so we
7   waited until we got that.
8       Q.  Was there some period of time when she was on
9   administrative leave and you completed whatever it was
10  that you were looking into, and then she switched over to
11  sick leave?  Or did she switch over to sick leave while
12  she was still in the process of undergoing some sort of
13  investigation?
14      A.  Well, it's very complicated.  Because there were
15  two or three major instances that occurred before, so I
16  can't give a simple answer.  Yes, she was on
17  administrative leave.  But it switched to sick leave when
18  we received documentation that her physician was not
19  allowing her to return to work due to medical reasons.
20      Q.  And do you have any recollection of
21  approximately how long she was on administrative leave
22  before she provided a doctor's note?
23      A.  No.  Because there were a couple of situations.
24  She was placed on administrative leave pending the
25  initial call from Ms. Hamilton, and then she was

Page 107

1   subsequently placed on administrative leaving after an
2   incident that occurred between she and I.
3       Q.  And what was that incident?
4       A.  Maura was told that she was going to be released
5   from administrative leave, the first one, but that prior
6   to starting work she would have to have a meeting that
7   would be among her principal, her C.V.E. representation,
8   and my office prior to starting work and returning to
9   Castle Park.
10      Q.  So the plan was for her to return to Castle
11  Park?
12      A.  When I felt that after review of the information
13  that I had received from the principal and other teachers
14  that she was not a threat to anyone.  I did not believe
15  that her return to Castle Park would be a threat to
16  anyone.  We had decided that she could return, but prior
17  to that return she would need to sit down and have a
18  meeting with her union representation, her principal, and
19  myself.
20      Q.  Okay.  So let me see if I get the sequence of
21  events here.  Ms. Larkins was placed on administrative
22  leave.  You spoke to various people who had complaints,
23  perceived complaints, whatever, concerning Ms. Larkins.
24  You came to a conclusion that she did not pose an actual
25  threat if she were to return to the school, but the

Page 108

1   condition of her return was that she first meet with you,
2   her union rep, and the principal.  Is that a fair
3   summary?
4       A.  That's correct.
5       Q.  Okay.  All right.  And about how long did all of
6   that take?
7       A.  Well, we had spoken, it was at the end of the
8   week before the incident that occurred between Maura and
9   I at the school.  And she was to wait to hear from us
10  until we could set up that meeting prior to returning to
11  Castle Park or to work at all.  And we were having
12  trouble getting her union representatives a time when
13  they could be available and we could be available.  So we
14  were trying to establish that time line so that we could
15  conduct that meeting.
16      Q.  I am really more interested in just finding out
17  approximately, are we talking about two days, two weeks,
18  two months from the time she started the administrative
19  leave?
20      A.  I have no idea.  I don't recall without looking
21  at paperwork.  I imagine it was about a month, but I
22  don't know for sure.
23      Q.  Okay.  We can check the paperwork out later.
24  I'd just like to go along with the continuum of the story
25  here so we understand at least the chronology without the

Page 109

28 (Pages 106 to 109)

1  dates.

2    A. Certainly.

3    Q. So there was some time finding, or some problem

4  finding a mutually convenient time; is that correct?

5    A. That's correct.

6    Q. And then before this meeting actually convened

7  there was an incident between you and Ms. Larkins?

8    A. Yes. We made it very clear to Ms. Larkins that

9  she was going to be able to return to Castle Park and her

10  assignment, but not before a meeting was convened among

11  the parties I just mentioned. I received a phone call

12  that Monday from her principal that she was seen on

13  campus, and she was not supposed to be there. She was

14  not working. Supposedly she was getting some papers

15  together or something. And so we still had not been able

16  to establish the meeting. So unannounced I came on

17  Tuesday to make sure that Ms. Larkins was not there, and

18  she was there without permission. And we made it

19  very clear to her that she would be able to return, but

20  not until a prior meeting was set up. She was in the

21  office, and I saw her on that Tuesday. -

22    Q. She was in the office at Castle Park Elementary

23  School?

24    A. In the main office outside of the principal's

25  office.

Page 110

1    Q. And did you find out what she was doing there?

2    A. Her principal had said that she was gathering

3  together some paperwork or supplies or something. I

4  don't remember the exact statement, but something along

5  those lines.

6    Q. So if I understand you, Ms. Larkins was seen on

7  the Castle Hill campus on the Monday of whatever week

8  that was, correct?

9    A. Yes.

10    Q. And the principal reported this to you, correct?

11    A. Yes, that's correct.

12    Q. And did the principal on Monday say what she

13  thought Ms. Larkins was doing on the campus then?

14    A. To the best of my knowledge what I remember is

15  that she thought she was getting some paperwork together

16  or supplies or something.

17    Q. Is that to your knowledge what Ms. Larkins

18  conveyed to Dr. Donndelinger?

19    A. To the best of my knowledge. But I really don't

20  know what she was doing there.

21    Q. She wasn't in the classroom, was she?

22    A. I don't know where she was. My understanding

23  was she was in the lounge area and the outer office area,

24  which are connected.

25    Q. And the requirement that this meeting occur

Page 111

1  before she returned to school, how was that clearly

2  conveyed to Ms. Larkins?

3    A. It was communicated to both Ms. Larkins verbally

4  and through her union. And her union confirmed in a

5  meeting with us that they were aware that that was the

6  stipulation. And they were representing her at that

7  time.

8    Q. Was it your understanding that they ran this

9  idea or the conveyance of an idea was that she wasn't to

10  return to work at that site before this meeting, or that

11  she was barred period from putting a foot on that campus

12  before the meeting?

13    A. It was from the site, period.

14    Q. From the site, period. Was there any writing to

15  that effect that you're aware of at that time?

16    A. I don't believe so. We felt that it was

17  sufficient that we had verbally communicated that both

18  with Maura and her union representative. And the

19  executive director of CTA, Mr. Tim O'Neill, confirmed

20  that that was the understanding.

21    Q. Okay. And so you went over on Tuesday to Castle

22  Hill, Castle Park rather to see if in fact Ms. Larkins

23  might be there again on Tuesday?

24    A. Correct.

25    Q. Had anybody called you to say, hey, she's here

Page 112

1  again?

2    A. No.

3    Q. So you went over, picked an arbitrary time?

4    A. Yes.

5    Q. You found her there?

6    A. Yes.

7    Q. Then what happened?

8    A. I quietly asked her to leave the main office so

9  that we could speak directly outside of the office where

10  there weren't parents and children in the main office.

11    Q. And what happened next?

12    A. I quietly shared with Maura that we had directed

13  her not to come back to the site until there was a

14  meeting that was to be held with her union

15  representative, her principal, and myself. And she

16  immediately started to have erratic behavior. She got

17  angry, started yelling and screaming at me, started to

18  glare at me. Ran away, ran back, ran away again. I

19  quietly said, Maura, I'm trying to have a quiet

20  conversation with you. She had pencils or pens or

21  something in her hand, and she was so angry she threw

22  them down, and they fell near where I was standing. And

23  she would not stay still. Her behavior was very erratic,

24  again, yelling and screaming. And at that time it was

25  very clear to me that she was not acting in a

Page 113

29 (Pages 110 to 113)

1 professional manner in which we could conduct a
2 conversation.
3 Q. Okay. So let me review this so that I'm sure
4 that I understand it. You found her in the main office
5 and quietly asked her to leave the main office with you
6 so you would be away from students, parents, and anybody
7 else so you could have a private conversation?
8 A. Staff members, yes.
9 Q. Did she do that?
10 A. Yes, she did.
11 Q. Where did the two of you go?
12 A. Right outside of the main office door or about
13 50 feet from the main office door.
14 Q. Were you then outside the building?
15 A. Yes.
16 Q. Okay.
17 A. But on the campus.
18 Q. And were you and she talking while you were
19 walking this 50 feet away?
20 A. No.
21 Q. And about how long did it take you to walk that
22 50 feet?
23 A. About five seconds.
24 Q. And then did you get to some point where the two
25 of you stopped?

Page 114

1 A. Yes.
2 Q. And what did you say to her and what did she say
3 to you?
4 A. I shared with her that we had directed her not
5 to be at the site until further notice, until we had had
6 an opportunity to meet with her union representative, her
7 principal, and myself. That we had decided that she
8 would be able to return to work, but not until this
9 meeting took place. And she got very angry, raised her
10 voice, started yelling and screaming at me and very
11 erratic behavior, almost jumpy and jerky, running back
12 and forth. Until I called her quietly, please come back
13 so we could finish our conversation. And there was a
14 glare in her eyes and there was a behavior that resembled
15 what other people had shared with me had been their
16 experiences, but I had personally never experienced that
17 with her. But it was very reminiscent, reflective of
18 what others had described her behavior to be.
19 Q. What was she yelling and screaming, what was
20 she saying?
21 A. You're not listening to me. That's not what was
22 said. I want to return to work. I want to work. And
23 she was angry, and she threw her pencils down. And just
24 the kind of behavior, it was extremely erratic and jerky.
25 Her body movements were very jerky. She would be running

Page 115

1 back, and run back to me and run away, run back, and it
2 was, it was very difficult to follow. Because she was,
3 it was very, very difficult to follow her. Her behavior
4 was extremely erratic.
5 Q. Had she walked out the door with you carrying
6 these pens and pencils?
7 A. I really don't recall looking at her. I knew
8 that she had something in her hand when I stopped and
9 talked with her, but I didn't know. You know, I didn't
10 really pay much attention to it.
11 Q. Now were these pens and pencils in boxes or were
12 they separate in her hands?
13 A. I really don't know. I can't recall.
14 Q. Did she throw them at the ground, or did they
15 fall on the ground?
16 A. All I know is that she threw them down, and they
17 fell to the ground right next to me.
18 Q. But your perception is that she threw them as
19 opposed to dropping them?
20 A. To the best of my recollection, yes.
21 Q. Now, was she holding anything else at that time
22 besides the pens and pencils?
23 A. I don't recall. Her behavior was very jerky.
24 Her movements were very abrupt and jerky. They were back
25 and forth, back and forth. She'd run away, she'd come

Page 116

1 back, she'd run away, she'd come back. So whatever she
2 was carrying was not, I don't recall what it was. But it
3 was very clear that her movements were very abrupt.
4 Q. Did she have a handbag with her?
5 A. I have no idea what she had with her.
6 Q. So when you first saw her in this main office
7 area as far as you know maybe she was gathering pens and
8 pencils as supplies?
9 A. I don't know. I was rather surprised to see her
10 given the directive she had received from us, and her
11 principal had made it clear to her that she wasn't
12 supposed to be there either. So it was very surprising
13 to see her there. So I thought the best thing would be
14 to have, quietly have a conversation away from the
15 parties there. Staff were very concerned. They did not
16 expect to see her there. I had shared with staff that we
17 had been talking to when who had concerns that I would let
18 them know when she would be returning, because people
19 were still very fearful.
20 Q. Now, you have several times described your voice
21 as doing something or saying something quietly.
22 A. Yes.
23 Q. So it's your recollection that in walking this
24 50 feet and seeing Ms. Larkins' actions that you have
25 described as you perceived them that you never raised

Page 117

30 (Pages 114 to 117)

1 your voice?
2     A. That I ever raised my voice?
3     Q. That you never raised your voice this entire
4 time; is that your recollection?
5     A. It's not only my recollection, I'm 100 percent
6 confident I never raised my voice.
7     Q. Were there other people who were around who saw
8 any of this to your knowledge?
9     A. Not to the best of my knowledge. Nor has anyone
10 ever confronted me or shared with me that they were
11 witness to this meeting.
12     Q. And how long were the two of you together at
13 this approximate 50-foot difference span from the front
14 door?
15     A. Maybe a minute to two minutes.
16     Q. And was it your perception that she threw any of
17 these pens or pencils at you?
18     A. I know that she threw them down, and they fell
19 at my feet. Whether or not she threw them at me, I can't
20 get into her head. I don't know what -- I think it was
21 part of a very abrupt and jerky movement. And they were
22 thrown down and they fell at my feet. Whether she was
23 throwing them at me or not, I don't know.
24     Q. How far apart were the two of you standing when
25 the pens and pencils ended up on the ground?

Page 118

1     A. Maybe a foot and a half, two feet away from each
2 other.
3     Q. Were you on grass or cement?
4     A. Sidewalk.
5     Q. And the glaring, what do you mean by glaring?
6     A. Very bizarre behavior. Very bizarre.
7     Q. Well, when you say glaring, could you describe
8 what you mean by glaring?
9     A. Staring at somebody with a very bizarre look in
10 her eyes. Just focused, very angrily looking at me. Her
11 eyes appeared to be glassy and very angry as when someone
12 glares at you giving you what might be perceived as a
13 dirty look, or with their eyes glaring. And she was
14 quite hostile and quite angry.
15     Q. Would it be fair to say that she had a different
16 understanding than yours of where she was and wasn't
17 permitted to be?
18        MR. BRESEE: Objection. Calls for speculation.
19        THE WITNESS: At that time I don't know that.
20 BY MS. SCHULMAN:
21     Q. She conveyed to you, did she not, that she did
22 not understand that she was not supposed to be at that
23 school at that time?
24     A. After her abrupt behavior, yes, she did.
25     Q. And what do you mean by after her abrupt

Page 119

1 behavior?
2     A. First she was abrupt and raising her voice and
3 yelling. And quite frankly whether she had a different
4 perception or not, that wasn't justification or support
5 for her behavior. And the way she did her reacting
6 response, her yelling and her language, her unwillingness
7 to listen or unwillingness to quietly dialogue, her
8 unwillingness to stand in one place and have a
9 professional conversation was very disconcerting.
10     Q. Am I to understand that after this meeting after
11 two minutes that then there was quieted down time when
12 the two of you spoke?
13     A. No. We separated.
14     Q. After that, that was it. So when did you come
15 to understand that she had a different understanding than
16 yours of what the directive was?
17     A. At some point in time I believe, and I don't
18 recall the exact timing, I believe she said something,
19 but she later said something to her union representative.
20 And she clarified it for both of us very clearly that it
21 was very clear she was given a directive that she was not
22 to return to the site until that meeting took place.
23     Q. But before her union representative made that
24 statement did she indicate to you that she had not
25 understood that she was barred?

Page 120

1     A. Yes.
2     Q. In other words, she thought she could go to the
3 site, it's just that she wasn't going to be able to teach
4 there until this meeting was held?
5     A. That was her understanding.
6     Q. Okay. All right. So, you know, given that
7 knowledge with 20/20 hindsight did it strike you as being
8 so bizarre or erratic that she would have been angered by
9 your appearing and telling her she shouldn't be there?
10     A. Absolutely. Her behavior was unprofessional, it
11 was bizarre, it was erratic and was unacceptable to the
12 district.
13     Q. And it was between you and her 50 feet away from
14 the front door of the office and as far as you know
15 nobody else heard or saw the two of you in this
16 discussion?
17     A. That's correct.
18     Q. Okay.
19     A. And it's the perception of the assistant
20 superintendent for human resources. It's my
21 responsibility to make those judgments and to relay that
22 to the cabinet. And that continues to be my perception
23 and assessment of the situation.
24        MS. SCHULMAN: Motion to strike. There was no
25 question pending that response was responsive to.

Page 121

31 (Pages 118 to 121)

1    Q. Now, she didn't give you any problem about
2  walking out of the office with you and walking the 50
3  feet away from the main door, did she?
4    A. I don't really recall, because I just gave her
5  the directive and walked out.
6    Q. And if I understood your testimony correctly as
7  a result of this incident between the two of you a
8  decision was reached that she would not be permitted to
9  return to Castle Park?
10    A. Correct, for that point in time.
11    Q. And whose decision was that?
12    A. It was a collective decision of both myself and
13  cabinet.
14    Q. And had the decision to return her to Castle
15  Park subsequent to the condition precedent of having the
16  meeting that we were speaking of earlier, was that a
17  decision that was also a collective decision made by the
18  cabinet and including yourself?
19    A. Yes. It was a joint decision.
20    Q. And was the decision now not to return her at
21  that point in time to Castle Park to your knowledge
22  conveyed to Ms. Larkins?
23    A. Yes, it was.
24    Q. And do you know how it was conveyed to Ms.
25  Larkins?

Page 122

1  physician's care and that she was unable to return to
2  work until X date. And we weren't sure when and for how
3  long. But I would have to go back through those records
4  and check that time line. I have not reviewed that in a
5  while, so.
6    Q. So would this in your recollection be a second
7  time when she was placed on medical leave by a physician?
8    A. I'd have to check the records. I believe so.
9    Q. Was there ever then a time when the school
10  district informed her to your knowledge that she was to
11  report to work at a different school site?
12    A. Yes.
13    Q. And when was that?
14    A. Long after many things happened. I don't have
15  the exact date, but it would have been in the fall of
16  2001. And it would have been after numerous attempts to
17  ask her to come in and visit with us about viable options
18  for employment in the district.
19    Q. Were those numerous attempts through her union
20  rep or directly with her or a combination of both?
21    A. We continued to communicate both to Maura and
22  her union, until we were notified by Pamela Havird that
23  we were to only contact Maura and Pamela Havird, that the
24  union was, to the best of my knowledge Ms. Havird was
25  representing her.

Page 124

1    A. She received a directive in writing from us.
2    Q. And was that something signed by you?
3    A. Yes, it was.
4    Q. And did the, this directive direct her to go
5  someplace else to work?
6    A. I don't recall. I would have to read the
7  memorandum. But I believe it restrained her from coming
8  to Castle Park or any other Chula Vista site until
9  further notification.
10    Q. So she was restrained from appearing at any
11  district site until further notification?
12    A. That's correct. To the best of my recollection,
13  yes.
14    Q. And at that point was she no longer on sick
15  leave and no longer on paid administrative leave?
16    A. She was on paid administrative leave at that
17  point in time.
18    Q. And did there come some time when she was then
19  redirected to some other site?
20    A. No.
21    Q. Did their come some time when she was told to
22  report to another site?
23    A. I'll have to go back, because I'm not sure
24  exactly what transpired. I know that we received
25  information from her physician that she was under a

Page 123

1    Q. Perhaps if we look at some of this documentation
2  we can pin this down.
3    A. Sure.
4    Q. Look at this, well, it looks like Page 2 and 1
5  got reversed, but they look like the first three pages
6  perhaps of some sort of form perhaps. Are you familiar
7  with these doctors excuses?
8    A. Yes, I am.
9    Q. Unfortunately, sometimes you get copies of
10  copies of copies on these things. But it does appear
11  that she was off work until June 15, 2001?
12    A. That's correct.
13    Q. And are these the kinds of forms that the
14  district accepts?
15    A. Yes. If the physician is from Kaiser, yes.
16  Depends on the physician, but this is the type of form
17  that is acceptable, yes.
18    Q. And then I have something that actually has a
19  little 2 typed on the bottom of it, which might be
20  repetitive, but that is a note that is typed on Kaiser
21  Permanente stationery with Dawn Engel's letterhead. Is
22  this a document that was then provided to you? There's
23  no date on this.
24    A. I really don't recall how we got it. We have
25  literally hundreds of faxes and E-mails from Maura and

Page 125

32 (Pages 122 to 125)

1 the organization constantly throughout the years, so I
2 don't really remember. Apparently, this appears to be
3 something that Gina Boyd, president of C.V.E., may have
4 shared with us because there's a note to us. It was a
5 note that Gina had apparently had copied to us because it
6 appears that it was from Maura to Gina. I don't know
7 that we ever received this. I have to check the records.
8 But obviously we received it in this format.
9    Q. And going to Page 4, it appears to be an April
10 26, 2001 letter to you from Ms. Larkins indicating that
11 she was ill?
12    A. Correct.
13    Q. Is this a letter that you received at or about
14 the time indicated of the mailing?
15    A. I assume. I can't say for sure, but I have no
16 reason to believe that we didn't.
17    Q. Does the district use a date received stamp on
18 mail that comes in?
19    A. Generally we do. But, again, I would have to
20 look to see, because many things were faxed. In fact
21 most of our correspondence from Maura was faxed and then
22 it was duplicated in receipt through the U.S. mail. So
23 this may have been a duplicate that we already received a
24 fax of and we didn't give you a copy of both.
25    Q. Then if we go a couple of pages there's an

Page 126

1 October 19th, 2001 letter addressed to Dr. Gil. I see
2 you've got that one. It has No. 1 typed on the bottom.
3    A. Yes.
4    Q. It appears to be date stamped as received by the
5 superintendent's office on October 19th, 2001, and then
6 it says scanned October 22nd, 2001. You see that?
7    A. Yes.
8    Q. Are you familiar with either of those stamps?
9    A. I'd have to check on this scanned. I'm not
10 really quite sure who wrote that. But I do know that the
11 October 22nd on the top is our division stamp.
12    MR. BRESEE: For the record the scanned is from
13 our office.
14    MS. SCHULMAN: I see. Thank you.
15    MR. BRESEE: There are several documents that
16 were already in our possession.
17    MS. SCHULMAN: All right. Good. Thank you.
18 That clears up that mystery. Does that mean that you
19 scanned them into the computer?
20    MR. BRESEE: We have been engaging in a feeble
21 attempt to have a paperless office. Feeble might not be
22 the right word. Unsuccessful.
23 BY MS. SCHULMAN:
24    Q. All right. I see that the subject matter of
25 this letter appears to be whether Ms. Larkins would be

Page 127

1 permitted to set foot on school district grounds. Was
2 this a letter that you saw contemporaneously with it
3 being received by the district?
4    A. I don't know if it was contemporaneously. I
5 received it and was totally confused by it.
6    Q. Okay. Had there at that point been any kind of
7 offer for Ms. Larkins to teach at Loma Verde?
8    A. There were a number of offers prior to this time.
9    Q. And had Loma Verde been one of them?
10    A. I would have to check, but I believe it was, to
11 the best of my knowledge. Let's think for a minute. The
12 principal at Loma Verde was Marge Brigsbe. In trying to
13 look at possible options for Maura we tried to pick
14 principals, also, that we thought were compassionate and
15 thoughtful and would be positive for a fresh start. And
16 Marge is a very compassionate person, and she was one of
17 the choices for that reason.
18    Q. I also see from this letter that there is
19 expression of concern about whether Ms. Larkins would be
20 able to go to any campus in the district if she were to
21 work at Loma Verde, particularly whether or not she could
22 only go to Loma Verde or whether she could set foot on
23 any other school property. Had there been some decision
24 made by mid October of 2001, regarding whether or not Ms.
25 Larkins would be permitted to step foot on any other

Page 128

1 school property other than the school where she would
2 agree to be assigned to work?
3    A. We never put any constraints separate from the
4 fact that we wanted to establish a mutually agreed upon
5 work place for her and where she felt she would be
6 successful and we felt she would. There was never any
7 dialogue about any further restraints. We were ready to
8 bring her back. With the release from the physician we
9 did not feel like she was a threat to anyone. We wanted
10 her to merely teach.
11    Q. You felt she wasn't a threat to anyone
12 subsequent to the time that you and she had this
13 encounter that you've described with the pens and
14 pencils?
15    A. Subsequent, yes.
16    Q. And this October 19th of 2001, would have been
17 in the time subsequent to that discussion?
18    A. Yes, correct.
19    Q. If you could go to the next piece of
20 correspondence, very next page which appears to be
21 received by the superintendent's office on February 27th,
22 2002 and is dated February 25th, 2002, from Ms. Larkins
23 to the school board. Is this a document that you saw
24 fairly contemporaneously with the end of February of
25 2002?

Page 129

33 (Pages 126 to 129)

1    A. This, I received this memo. And I assume that
2  I received it the week of February 27th. I completely
3  was at a loss with this memo. I had no idea what this
4  was about.
5    Q. Is that your handwriting on the bottom where it
6  says Mark Bresee?
7    A. Yes, it is.
8    Q. And that's your signature down there?
9    A. Right.
10   Q. And I don't want to inquire as to what
11 conversation might have ensued between you and your
12 attorney. I think I probably can take a good guess at
13 what your scrawling meant.
14   A. Well, actually, I just shared with you what it
15 meant. That this was more information that I had no
16 idea, this was similar to what I had received in the
17 past. I really didn't know who Robin Colls was. I knew
18 she was a teacher, but I couldn't identify her name with
19 the face, nor did I know any legal involvement with her
20 families. I had no idea what this was about. More of
21 this stuff I don't know about, more questions.
22   Q. Do you know anything about two men visiting her
23 home?
24   A. At this point in time I knew absolutely nothing.
25   Q. Since that point in time do you know anything

Page 130

1  this was related to anything that we were doing. This
2  was of a personal nature. We had no idea about two men.
3  I still don't know about two men. I don't know anything
4  about this.
5    Q. Did Robin Colls express to you that she was
6  upset that she hadn't been to the meeting because she had
7  this information that was information about something or
8  other going wrong outside the school, or that she had
9  information that she wanted to share with you about
10 something that was going on in the school?
11   A. I really don't remember to be quite frank with
12 you. I think that she was concerned that we had never
13 discussed anything with her. And I didn't see any reason
14 to discuss anything with her, because I wasn't aware that
15 their relationship professionally had a positive or
16 negative. I didn't think it impacted in our area of
17 jurisdiction. To me this was a personal.
18   Q. Did Robin Colls relate to you that her brother
19 or some other family member had some relationship with
20 law enforcement?
21   A. She did share that with me.
22   Q. Was it her brother who --
23   A. I really don't remember. Because we -- again, I
24 dismissed it. It was not anything that was relative to
25 either people who were having a difficult time in

Page 132

1  about two men visiting Ms. Larkins' home?
2    A. The only thing that I know about this is that
3  Robin Colls, who is a teacher at Castle Park, was very
4  upset with me because I had not included her in any
5  meetings. And I wouldn't have included her in any
6  meetings, because I didn't know she had any involvement.
7  I had no idea what this was about. I had, and to this
8  day I felt like this was something that was totally
9  irrelevant to what we were trying to do. We were trying
10 to get her back to work. We were trying to get a
11 successful situation. This was completely out of the
12 blue. Robin had never shared with me any concerns. This
13 appeared to me, again, to be something of a personal
14 nature which didn't sway us in any way.
15   Q. Have you spoken to Robin Colls about the
16 contents of this letter or any aspect of her relationship
17 with Ms. Larkins?
18   A. Only when Robin expressed concern that she was
19 not invited to a meeting with other teachers who had
20 shared what I mentioned earlier. And she said to me that
21 there was some involvement on a personal level that one
22 of her relatives, you know. I said, it doesn't involve
23 the school district and we're not going to get involved
24 in this. Quite frankly we told her we had no intention
25 of purposefully offending her, we just didn't feel like

Page 131

1  performance of professional relations with Maura at
2  school nor with finding Maura a position. During this
3  tenure, during 2001-2002 our goal had been we were trying
4  to get her back to work.
5    Q. Did anybody ever attempt to show you any kind of
6  police report or law enforcement report that had anything
7  to do with Maura Larkins?
8    A. To the best of my knowledge, no. And if they
9  had I would have completely dismissed it, because it was
10 not, it was like the other information I received from
11 Maura. It had no impact. It had no, it had nothing to
12 do with what we were trying to accomplish for Maura.
13   Q. Did Robin Colls express to you that she had
14 seen some sort of police report concerning Ms. Larkins?
15   A. I absolutely do not remember that, and I
16 remember very little about any dialogue with Robin.
17   Q. If we can skip one page and then to go to the
18 letter that appears to be addressed to Dr. Gil from Maura
19 Larkins, "Pursuant to Article 38 of the contract." You
20 see that?
21   A. Yes, ma'am.
22   Q. All right. Was there some time when Maura
23 Larkins had been suspended without pay? I see there is a
24 reference to a letter of yours of September 26th, 2001.
25   A. Maura was never suspended without pay.

Page 133

34 (Pages 130 to 133)

1    Q. Looking at the next letter that is dated August
2 31st for Libby Gil, had you seen this contemporaneously
3 with Ms. Gil receiving it? This is one where she needs
4 to have access to her property so that she can provide
5 evidence for her grievance.
6    A. I don't remember when I saw it. But, yes, I did
7 see it. To the best of my knowledge it would have been
8 the same day, because our date stamp was the same.
9    Q. Was this before or after the pencil incident?
10    A. I would assume this is long after the pencil
11 incident.
12    Q. And do you have any knowledge as to whether or
13 not Mrs. Larkins was ever provided with the documents she
14 needed to process her grievance as requested in this
15 letter?
16    A. Yes.
17    Q. And was she?
18    A. We, in meeting with both Ms. Harvard on a number
19 of occasions and meeting with Ms. Boyd on a number of
20 occasions the district bent over backward and actually
21 hired additional personnel to provide for many hours for
22 Mrs. Larkins to take her personal belongings away. To
23 the best of my knowledge I remember somewhere between
24 three and a half and five and a half hours having to pay
25 a custodian overtime so that it was mutually agreed upon

Page 134

1 when she could gather all these things. So the district
2 through my facilitation did provide ample time. It was
3 my understanding that there was still more material even
4 after that number of hours that had to be picked up, and
5 there were attempts to try to arrange for that pick up.
6 And that is documented.
7    Q. And was Ms. Larkins then present with the
8 overtime staff going through documents?
9    A. I wasn't there. But to the best of my knowledge
10 we paid the custodian to be there so that she could get
11 her things. And she did during at least one time that
12 I'm aware of.
13    Q. Then if we go to the next letter. That is dated
14 as received on October 3rd, 2001. She is requesting the
15 formal complaint packet and policy. She says in the
16 letter, as long as the ban on my setting foot on district
17 property is in effect for all other times except
18 meetings, I do not feel safe having meetings on district
19 property. Had she been banned from district property at
20 that point in time except for meetings?
21    A. No. She had been told that we were trying to
22 establish a work place for her, and that we had
23 established certain times to meet with her. I don't
24 remember discussing any banning of any coming to any
25 property. We begged her in writing, it's documented at

Page 135

1 least 10 or 12 times that we wanted to set up a meeting
2 so that we could establish a work place for her. I'm not
3 sure what she's saying because we made it very clear in
4 writing that we were trying to establish a work place for
5 her.
6    Q. But in the interim to establishing that work
7 place for her was she or was she not permitted to go on
8 school property except for any of the meetings?
9    A. I don't recall, I would have to check the files,
10 but I don't recall there being a banning. There were
11 specific directives earlier in these proceedings when she
12 was directed not to go back to Castle Park. But that was
13 during times that she was on administrative paid leave.
14    Q. And as of October 3rd, 2001, was she no longer
15 on administrative paid leave?
16    A. No, she was not.
17    Q. She makes some reference to the policeman who
18 questioned my husband at Werlin's request his gun --
19 excuse me, had his hand on his gun. I'll read that
20 again. The reference is, the policeman who questioned my
21 husband at Werlin's request had his hand on his gun. Did
22 you ever request any kind of law enforcement officer,
23 including any SRO directly or indirectly to question
24 either Mrs. Larkins or Mr. Larkins?
25    A. No. I wouldn't have directed. I did call an

Page 136

1 SRO because Mr. Larkins demanded to immediately have Ms.
2 Larkins materials removed from our warehouse. And what
3 we shared with Mr. Larkins was we couldn't just
4 automatically drop everything that was being done. First
5 of all, most of the warehousemen don't stay at the
6 warehouse. They were deliverymen. They would have to
7 arrange a time and place that was agreeable to both
8 parties. That was unacceptable to him, and he was very
9 upset about it. So we did call the SRO and I talked with
10 the SRO. And he told me, stand here, I would like to
11 talk with him. And the SRO made that decision to talk
12 with him. Now, I don't recall his demeanor or behavior
13 being any different with Mr. Larkins than it was with me.
14    Q. I take it then this was a face-to-face incident
15 that occurred?
16    A. I believe there was some phone communication as
17 well as face-to-face.
18    Q. And so had Mr. Larkins actually physically gone
19 down to the warehouse site to gather up his wife's
20 belongings?
21    A. He was actually at my office area to do so.
22    Q. And had he been given any understanding to your
23 understanding that --
24    A. No.
25    Q. -- her belongings were at your office?

Page 137

35 (Pages 134 to 137)

1    A. Maura was given the understanding in writing
2  that we needed to meet with her so that we could come up
3  with a mutual time in which she could pick up the remains
4  of her belongings. On a number of occasions she refused
5  to meet with us. Most of the time after an invitation to
6  do so, she didn't even respond to us. She just didn't
7  show up.
8    Q. So would it be accurate to say that you at least
9  at that point had the impression that Maura did not
10  believe she could go on school grounds so she sent her
11  husband to gather up her things?
12    A. No.
13    MR. BRESEE: Objection, calls for speculation.
14  BY MS. SCHULMAN:
15    Q. All right. So there was some face-to-face
16  meeting near your office and an SRO was called and the
17  SRO wanted to speak to Mr. Larkins?
18    A. To the best of my recollection I was out of the
19  office when Mr. Larkins appeared on our ed center
20  property. My secretary and I had a conversation that he
21  was rather upset that he could not pick up Maura's
22  belongings. I in turn remember calling an SRO to the
23  site so that when I got there I could visit with the SRO
24  about the situation. I was not sure whether I would see
25  Mr. Larkins or not. So to the best of my knowledge I was

Page 138

1  away, off the campus. I was somewhere else. I came
2  back. Mr. Larkins was still at the site. I spoke with
3  the SRO, explained to him the situation. He asked Mr.
4  Larkins to stand to the side and he would talk to him in
5  a minute. And after the SRO spoke with me, in the same
6  demeanor and approach he went over and talked with Mr.
7  Larkins for a few minutes. And then to the best of my
8  knowledge Mr. Larkins left after that.
9    Q. All right. You didn't see the SRO with his hand
10  on his gun I take it?
11    A. His demeanor to the best of my recollection was
12  no different than it was with me. I don't remember where
13  his hands were.
14    Q. Go then to the next to page. It appears to be a
15  letter with some cute little logos on it that goes on for
16  a few pages, addressed to Michelle Leon-Scharmach from
17  Maura Larkins dated December 27th, 2001. And I see at
18  the very end what looks like it says Merry Christmas,
19  Michelle from Maura Larkins, and then it says scanned
20  12/11/01. And it's got a pussycat at the very last page
21  of this document, that looks like the end of it, sitting
22  on top of a gift box. Is this a document that you have
23  seen before?
24    A. To the best of my knowledge I have, yes.
25    Q. And how did you get a copy of this document?

Page 139

1    A. I believe that I got it from the librarian, but
2  I don't know exactly.
3    Q. From Ms. Scharmach?
4    A. To the best of my knowledge. She was rather
5  upset about it.
6    Q. And did she tell you how this particular
7  communication was received by her?
8    A. No. I don't recall how she, she may have. I
9  don't recall.
10    Q. Who is Cindy Miller?
11    A. Cindy was one of my assistants. She was the
12  director of classified personnel and risk management,
13  benefits and so forth.
14    Q. Benefits as well?
15    A. Yes.
16    Q. So I see that the next page after the end of the
17  letter to the librarian appears to be a December 10th,
18  2001, letter to Cindy Miller from Maura Larkins having to
19  do with life insurance. Would she have been the proper
20  person then to have contacted?
21    A. Correct, yes.
22    Q. And if Ms. Larkins in the last few months had
23  some question about benefits, would it be a question that
24  could be answered through your office?
25    A. Through Cindy's office, yes.

Page 140

1    Q. Cindy directly rather than you?
2    A. Correct.
3    Q. She's still doing this?
4    A. No. She's retired.
5    Q. When did she retire?
6    A. In December.
7    Q. December 2001?
8    A. Yes.
9    Q. So if it was in the last few months then who
10  would be the person to contact?
11    A. It would have been both Cindy while she was
12  still there and then Dr. Tom Cruz.
13    Q. So he's the more direct person in charge of
14  benefits?
15    A. Now he is. Now he's over risk management and
16  benefits.
17    MR. BRESEE: C-R-U-Z.
18    (Discussion off the record.)
19  BY MS. SCHULMAN:
20    Q. Who is Cheryl Cox?
21    A. Dr. Cox is currently a board member on the Chula
22  Vista board of trustees, formerly an administrator with
23  the district.
24    Q. Who is Larry Cunningham?
25    A. Larry Cunningham is also an elected board

Page 141

36 (Pages 138 to 141)

1  official.
2      Q. And who is Pamela Smith?
3      A. The same.
4      Q. Elected board official?
5      A. Yes.
6      Q. And is Patrick Judd also an elected board
7  official?
8      A. Yes, he is.
9      Q. Did there come some time when Ms. Larkins was
10 not receiving paychecks that were due her to your
11 knowledge?
12     MR. BRESEE: Objection. Assumes facts not in
13 evidence.
14     THE WITNESS: Actually, Ms. Larkins was overpaid
15 by two months. I'm not aware that Ms. Larkins ever
16 reached a point where she should have received a check
17 and didn't. She was actually overpaid.
18 BY MS. SCHULMAN:
19     Q. And what makes you say she was overpaid?
20     A. She failed to report to work as she had been
21 numerously directed in our attempts to minimize and set
22 up a successful situation for her. Our school year
23 starts in July. One of the options we were looking at
24 was a year-round position for her. When we looked at
25 Loma Verde as a possibility different than Castle Park,

Page 142

1  Loma Verde is a year-round school that starts in July,
2  not in August like Castle Park does. So, basically, we
3  did not want to divert her monies, so we didn't stop her
4  pay in July and August because we had assumed that once
5  her physician released her that she would come to work.
6  We had no reason to -- now we weren't sure whether she
7  was going to work year-round or traditional. I made a
8  decision not to stop her pay, because I assumed that all
9  along our goal was to get her back in to work in a
10 successful situation. And so the months of July and
11 August she received pay but never worked.
12     Q. If you could flip a few pages, probably about a
13 little bit more than halfway through this whole packet is
14 a September 28th, 2001 letter to you from Ms. Larkins.
15 Looks like this. I went through quite a bit, past the
16 grievance stuff.
17     A. Past the grievance. Okay.
18     Q. All right. Did you receive this communication
19 somewhere around the date that it bears of September 28,
20 2001?
21     A. I remember --
22     MR. BRESEE: Just for the record this is the one
23 that starts, "I am wondering"? I want to make sure I'm
24 looking at the same document.
25     MS. SCHULMAN: Right. I am wondering if and

Page 143

1  when you expect to lift your ban against my setting foot
2  on any district property.
3      THE WITNESS: I remember seeing it, receiving
4  this. I don't recall the exact date. However, I don't
5  have any reason to believe that it wasn't on or about
6  this date.
7  BY MS. SCHULMAN:
8      Q. All right. And was it your understanding that
9  at the end of September 2001, that there had been a ban
10 against Ms. Larkins coming on to any district property?
11     A. I don't recall the exact stipulations. I do
12 recall that by the time September 28th came, we had a
13 number of meetings scheduled that she refused to come to,
14 did not communicate to us. And so she wasn't allowing
15 any communication. So I'm not sure. We had no
16 opportunity to tell her about a ban or no ban. Our only
17 effort was to get her back into work, and there was no
18 opportunity to talk to her about a ban. We did talk to
19 her attorney. We made it perfectly clear to her attorney
20 that this was not about a ban. This was about trying to
21 get her to look at viable options for employment in the
22 district for 2001, for that school year.
23     Q. If you could go to the November 14, 2001 letter
24 from you to Ms. Larkins. It's part of a grievance
25 attachment. Looks like this (indicating).

Page 144

1      A. November 14th?
2      Q. I think you're too far back.
3      A. I'm too far back, okay. Yes.
4      Q. Is this a true copy of the letter that you sent
5  and there were attachments with it?
6      A. Yes.
7      Q. And are then the attachments with this the --
8  you know, this is the way I got it. Assuming, my
9  secretary copied all of this documentation for me, this
10 is the way my office received it from your attorney's
11 office. So I'm not sure what is supposed to be attached.
12     MR. BRESEE: Well, in the upper right it says,
13 grievance Page 3 of 4, grievance Page 4 of 4, so I
14 believe those are the only documents, these are the
15 attachment to the grievance. Those were the only
16 documents that were part of it.
17 BY MS. SCHULMAN:
18     Q. Was this disciplinary action ever filed,
19 actually filed against her that you reference in your
20 November 14th letter?
21     A. Yes. The board of education took specific
22 action, and Maura had been notified prior to that action
23 that it was going to take place.
24     Q. And did she then file a grievance over that
25 action?

Page 145

37 (Pages 142 to 145)

1 · A. I would have to check. There are so many
2 grievances.
3 Q. I don't want to belabor the point. Still
4 looking for the letter that I know I've seen in this
5 packet so we can talk about it. Did any of those
6 grievances get ultimately resolved?
7 MR. BRESEE: Objection. Vague and ambiguous.
8 THE WITNESS: I would have to check. We
9 followed the contract and responded to the grievances and
10 met with level, set up Level 2 meetings. In fact Maura
11 generally did not show up. Mr. Groth was there on a
12 number of occasions when Maura never showed up. And
13 subsequent to that the grievances were filed with PERB in
14 an attempt to arbitrate. And I, we gave responses to
15 those grievances.
16 BY MS. SCHULMAN: Okay. All right. There's a
17 particular communication that I know I've seen that
18 doesn't appear to be in that packet of materials. So let
19 me see if I can find it.
20 MR. BRESEE: Can we have a break?
21 MS. SCHULMAN: Sure.
22 (Recess, 2:25 - 2:34 p.m.)
23 BY MS. SCHULMAN:
24 Q. Let me give you what will be Exhibit 3 which is
25 simply one page.

1 correct?
2 A. That's correct.
3 Q. All right. You can stop doing that task now.
4 She'll take care of those.
5 A. Whose are these (indicating)?
6 Q. Those are yours to keep, yes. And then you'll
7 get a transcript. So you don't need to worry about all
8 that.
9 A. Very good.
10 Q. Okay. All right. I have a number of pieces of
11 correspondence between you and Ms. Larkins that I think
12 were not included in the packet of materials that were
13 provided to us. Now there might be some redundancy,
14 because I don't have everything memorized. But I just
15 want to make sure we have everything on the record.
16 A. Sure.
17 Q. Let me show you an April 3rd, '01 letter from
18 Ms. Larkins addressed to you. We'll mark this as Exhibit
19 4. And I'm simply going to ask you if you received this
20 letter at or about the time that it appears to be dated?
21 A. I don't remember seeing this letter. It
22 certainly may be in the file, but these names don't
23 strike a bell or mean anything to me.
24 Q. So the name Kathleen Elton means nothing to you?
25 A. Nothing.

1 A. Thank you.
2 Q. A letter dated November 21st, 2001. You don't
3 need to do that. She'll write it in. And ask you if
4 this is a letter that you sent to Ms. Larkins attaching
5 the interim summary which we have earlier identified as
6 part of Exhibit 2? And that summary was dated early
7 October, I think the 3rd or 4th.
8 A. No.
9 (Exhibit No. 3 marked for identification.)
10 BY MR. SCHULMAN:
11 Q. What was attached to this?
12 A. This was not sent to her. This was finally
13 given to her when she and her attorney finally agreed to
14 respond to our numerous invitations to meet. This was
15 hand-delivered to her in person in Dr. Gil's office.
16 Q. All right. At a meeting?
17 A. Yes.
18 Q. Along with the interim summary?
19 A. Yes.
20 Q. Actually, I'd like you to not write on those
21 because the court reporter, those are her copies. She'll
22 put her stamp on them.
23 A. I apologize. I thought these were our copies.
24 Q. They're yours to use during the deposition, but
25 then we'll leave them. You've marked 1, 2 and 3,

1 Q. And Mr. Wigdahl means nothing to you?
2 A. Nothing.
3 (Exhibit No. 4 marked for identification.)
4 BY MR. SCHULMAN:
5 Q. And you have no recollection of seeing this
6 before?
7 A. But I will say to you that in our records, and
8 you should have a copy of this completely, there was a
9 mass of paperwork that Maura sent me about a personal
10 lawsuit and/or something. This may have been stuck in
11 the middle of it, but I never read it.
12 Q. Let me show you a 8/22/01 letter from Dr. Otis
13 addressed to you. Mark this Exhibit 5. I want to know
14 if you have ever seen this before?
15 A. I do recall this.
16 (Exhibit No. 5 marked for identification.)
17 BY MR. SCHULMAN:
18 Q. Did you receive this at or about the time the
19 letter is dated, end of August?
20 A. I assume I did. I would have to check, but I
21 believe I did.
22 Q. And is this what you would call a full medical
23 release satisfactory to the district for Ms. Larkins to
24 return to work?
25 A. To the best of my knowledge, yes.



1    Q. Next in order, Exhibit 6, is a September 3, 2001
2  memorandum to Maura Larkins from Richard Werlin regarding
3  assignment for 2001-2002 school year. That's the letter
4  I was looking for. It was right under my fingertips.
5    A. Yes.
6    Q. And is this a letter that you caused to be
7  provided to Maura Larkins?
8    A. Is this a letter that I what? I'm sorry.
9    Q. Is this a letter you caused to be provided to
10  Maura Larkins?
11    A. I sent it to Maura.
12    (Exhibit No. 6 marked for identification.)
13  BY MR. SCHULMAN:
14    Q. I notice that it's dated September 3rd with a
15  direction to, "report to my office at 8:00 a.m. on
16  September 4th." How was this delivered to her?
17    A. I would have to check, but most information was
18  faxed to her. She had a fax machine that she was
19  receiving, and I would have to check our records. But
20  most of our communication was through certified return
21  receipt mail through her attorney. It was faxed to her
22  attorney. And we have most receipts from her fax
23  machine, so I'd have to pull our records.
24    Q. Before a teacher can be transferred in the Chula
25  Vista Elementary School District is there some procedure

Page 150

1  that needs to be followed?
2    A. Yes.
3    Q. What is that procedure?
4    A. We call the teacher in, and she has a meeting
5  generally with both myself and the superintendent. And
6  we discuss what our intentions are, and give the teacher
7  an opportunity to talk with us. And basically we try to
8  explore together what our intentions are with an
9  administrative transfer. Our goal though prior to doing
10  that is always to try to find a mutually agreed upon
11  placement.
12    Q. Is there an Article 33 in the memo of
13  understanding with the teachers union that sets forth
14  requirements for voluntary and involuntary transfers?
15    A. Absolutely. There's an article. It's not a
16  memorandum of agreement. It's part of the contract. I
17  don't know what article it is. And it was followed, like
18  all other articles. The meeting, numerous meetings were
19  scheduled to discuss viable options long before
20  administrative assignment was to take place.
21    Q. And the next in order would be Exhibit 7, is a
22  September 7th, 2001 letter to Maura Larkins apparently
23  from you. And I merely need to ask you if this was a
24  communication that you caused to be sent to Ms. Larkins?
25    A. Yes.

Page 151

1    (Exhibit No. 7 marked for identification.)
2  BY MR. SCHULMAN:
3    Q. And as Exhibit 8 is a September 17th letter to
4  Maura Larkins, again from you. And the same question,
5  did you cause this to be sent to Ms. Larkins?
6    A. Yes.
7    Q. Yes?
8    A. Yes.
9    (Exhibit No. 8 marked for identification.)
10  BY MR. SCHULMAN:
11    Q. Do you keep a file with these documents in it?
12    A. Um-hmm.
13    Q. That was a yes?
14    A. Yes.
15    Q. And was this part of the documentation that was
16  provided in production?
17    MR. BRESEE: No, I don't think it was. And I
18  don't think -- there's two reasons for that. One is
19  these are all attachments to the charges which you
20  obviously already have, because you filed an answer to
21  the charges. And secondly, I don't think that these were
22  responsive to your specific discovery requests. Most of
23  the discovery requests were related to grievances and
24  documents relating to the spring of 2001.
25    MS. SCHULMAN: Well, I don't need to go through

Page 152

1  the nomenclature, but thank you for the explanation. I
2  merely want to be sure we have everything at this point.
3    Q. Exhibit 9 appears to be a September 20th letter
4  from you to Maura Larkins, and ask you to identify it as
5  well. We'll mark it as Exhibit 9.
6    A. Yes.
7    Q. And you caused that to be sent to Ms. Larkins;
8  is that correct?
9    A. Yes.
10    (Exhibit No. 9 marked for identification.)
11  BY MR. SCHULMAN:
12    Q. Next is a letter from you dated 9/26/01 to Ms.
13  Larkins, apparently from you. And, again, I want to ask
14  you if this is a letter that you caused to be sent to
15  her?
16    MR. BRESEE: What are we on, 10?
17    MS. SCHULMAN: 10.
18    THE WITNESS: Yes.
19    (Exhibit No. 10 marked for identification.)
20  BY MR. SCHULMAN:
21    Q. And here as Exhibit No. 11 is a 9/27/01, looks
22  like a fax to Maura Larkins from you. Mark this as 11.
23  Is that in fact a fax that was faxed to your knowledge on
24  or about the same date to Ms. Larkins or to her
25  representative?

Page 153

39 (Pages 150 to 153)

1    A. Yes.
2       (Exhibit No. 11 marked for identification.)
3    BY MR. SCHULMAN:
4    Q. This series of letters that we're going through
5    now in September, or memos and faxes, this represents
6    your efforts that you talked about to get Ms. Larkins
7    back into the work place?
8    A. In part.
9    Q. And we have as Exhibit 12 a letter from Dr. Gil
10   which you were carbon copied on to Ms. Larkins about an
11   October 5th meeting. And it's dated October 3rd. And I
12   simply want to know if you've ever seen this letter
13   before?
14   A. Yes.
15      (Exhibit No. 12 marked for identification.)
16   BY MR. SCHULMAN:
17   Q. Did you see it fairly contemporaneously with the
18   date appearing on the letter?
19   A. I would assume. I can't verify the date, but I
20   assume it was near that time.
21   Q. And then as Exhibit 13 is a letter faxed to Ms.
22   Larkins from Dr. Gil, dated October 4th, a carbon copy to
23   you. And again my question is did you see a carbon copy
24   of this fax communication from Dr. Gil to Ms. Larkins on
25   or about the date of the communication?

Page 154

1    A. Yes.
2       (Exhibit No. 13 marked for identification.)
3    BY MR. SCHULMAN:
4    Q. Exhibit 14, I'm going to provide you with a copy
5    of the district's responses to special interrogatories.
6    Have you ever seen this response before?.
7    A. Yes, I have.
8       (Exhibit No. 14 marked for identification.)
9    BY MR. SCHULMAN:
10   Q. Did you help in any way with the preparation of
11   this response?
12   A. Yes, I did.
13   Q. Did anybody else, other than your attorneys, to
14   your knowledge help in the preparation of this response?
15   A. Not to the best of my knowledge.
16   Q. And is all the information contained in here
17   true and correct to the best of your knowledge? And I
18   don't expect you to comment on the legal objections.
19   A. To the best of my knowledge, yes.
20   Q. Do you sitting here today have any other
21   information which you've discovered subsequent to the
22   response to these interrogatories which you now wish to
23   add in response to any of these interrogatories?
24   A. Not to the best of my knowledge.
25      MR. BRESEE: Do you want him to read the whole

Page 155

1    document?
2       MS. SCHULMAN: If he -- he's answered my
3    question. But if he feels he needs to read the whole
4    thing, please do.
5       MR. BRESEE: You had said to him previously you
6    don't expect him to read the whole thing I believe. I
7    think that's what you said.
8       MS. SCHULMAN: And I see what happened here is
9    that, at least on my copy maybe this got stuck together.
10   I think the request for admissions are also -- well, I
11   see this was integrated. Okay. So this also includes
12   the request for admissions. Or at least maybe they got
13   screwed up here when they copied them. Maybe take a look
14   at this. Nope, he didn't.
15      MS. LARKINS: One of the things in the
16   interrogatories, there's a whole list of comments on the
17   requests.
18      MS. SCHULMAN: Okay.
19      MR. BRESEE: I believe your interrogatory No. 8
20   requested a reason for the denial of any requests for
21   admissions that were denied.
22      MS. SCHULMAN: Thank you. You're absolutely
23   right. It did.
24   Q. Did you have anything else you wanted to add
25   after reading the document?

Page 156

1    A. No.
2    Q. Have you had enough time to look at it?
3    A. Yes.
4    Q. And then we'll go to the requests for admissions
5    and that is 15. And this is the response to requests for
6    admissions propounded to Chula Vista Elementary School
7    District by respondent. And my question is did you take
8    part in preparing any of these responses?
9    A. Yes.
10      (Exhibit No. 15 marked for identification.)
11   BY MR. SCHULMAN:
12   Q. Other than you and your attorneys, are you aware
13   of any other school district employee who participated in
14   preparing responses to the requests for admissions?
15   A. Not that I'm aware of, no.
16   Q. Sitting here today do you have any additional
17   knowledge which would in any way change or enhance the
18   responses contained in Exhibit 15?
19   A. No.
20      MR. BRESEE: You know, I want to make an
21   objection on the record. This is, it's an eight-page
22   document. You're asking him a narrative question
23   regarding a discovery response that contains objections
24   and obviously was prepared, propounded to counsel and
25   prepared by counsel with Mr. Werlin's input. So I think

Page 157

40 (Pages 154 to 157)

1  it's impossible for him to effectively answer these
2  questions when you're asking him an open-ended question
3  about an eight-page document.
4      MS. SCHULMAN: Your objection is on the record.
5      Q. And we'll go to the responses to requests for
6  discovery propounded to Chula Vista Elementary School
7  District by respondent. Mark this as Exhibit 16. And if
8  you could look at these, Mr. Werlin, please. Have you
9  had an opportunity to read these pages?
10     A. Yes, I have.
11         (Exhibit No. 16 marked for identification.)
12  BY MR. SCHULMAN:
13     Q. And did you take part in preparing any of the
14  responses to this particular discovery request?
15     A. Yes.
16     Q. Other than you and your attorney do you know of
17  any other school district employee who participated in
18  preparing the responses?
19     A. No.
20     Q. Is there anything that you would in any way
21  change or enhance at this point in time based on
22  information which you now have that you weren't aware of
23  at the time that these responses were propounded?
24     MR. BRESEE: Same objections.
25  BY MS. SCHULMAN:

Page 158

1      Q. And I understand that there are legal
2  objections. I'm not asking you to address those. I'm
3  simply asking you to address informational issues.
4      MR. BRESEE: Same objections. And vague and
5  ambiguous.
6      THE WITNESS: No.
7  BY MS. SCHULMAN:
8      Q. And just so it's clear, this isn't a trick
9  question. For example, in the response to No. 1 there is
10  an indication that there may be information discovered as
11  part of responding party's continuing investigation. I
12  just want to find out if there was anything else since
13  the middle of July when these answers were propounded
14  that you discovered that you now want to add?
15     A. Not to the best of my knowledge.
16     Q. Did you become aware at some point in time that
17  Ms. Larkins had filed a six-month tort claim with the
18  school district?
19     MR. BRESEE: Object. Vague, ambiguous. I
20  think he understands and I understand what you mean by
21  six months tort claim, but it's not real clear.
22  BY MS. SCHULMAN:
23     Q. You can answer the question if you understand
24  it.
25     A. Can you clarify that for me, the six-month tort

Page 159

1  claim, please?
2      Q. Okay. Do you understand in your position, your
3  cabinet position that before certain kinds of lawsuits
4  can be filed against a school district or any of its
5  board members or employees that a law in California
6  requires what we call a tort claim to be filed?
7      A. Yes.
8      Q. Within six months of occurrence. So you
9  understand that?
10     A. My confusion is that there's been reference to
11  many claims and lawsuits. So I'm trying to understand
12  are you referencing one that addresses the EEOC claim, or
13  are you referencing -- I mean, there's a lot of different
14  issues here. And the word suit and claim have been used
15  repeatedly with more than one claim.
16     Q. All right.
17     A. So my confusion, so which are you referencing?
18     Q. Let's break it down. You understand then based
19  upon that definition what I'm talking about?
20     A. Yes.
21     Q. Six-month tort claim?
22     A. Yes.
23     Q. Was there some time when you had some
24  understanding or knowledge that one or more six-month
25  tort claims had been filed by Ms. Larkins?

Page 160

1      A. Yes.
2      Q. And sitting here today do you recall how many
3  tort claims were filed by her?
4      A. No.
5      Q. Did you take part in the decision to file the
6  current dismissal action?
7      A. What dismissal action are you referencing?
8      Q. Well, there are charges that cause exists for
9  dismissal of a permanent certified employee.
10     A. Yes.
11     Q. Which is the subject matter of this particular
12  proceeding. Did you take part in the decision --
13     A. Yes.
14     Q. -- to file those. All right. And who else
15  besides you took part in that decision?
16     A. Cabinet, each of the cabinet members.
17     Q. And with respect to filing of this dismissal
18  action, was that then approved by the board of education?
19     A. Yes.
20     Q. And was subsequently filed?
21     A. Yes.
22     Q. And do you have any knowledge as to whether or
23  not these charges of cause to dismiss were filed
24  following the filing of any of the six-month tort claims
25  by Ms. Larkins?

Page 161

41 (Pages 158 to 161)

1    A. I would have to go back and look at the time
2  lines. This action was not as a result of any claims
3  that were filed by Ms. Larkins. This action was
4  exclusively filed based on her continued insubordination
5  and refusal to return to duty.
6    Q. And that it's your understanding is the sole
7  subject matter of this dismissal action, her refusing to
8  return to duty?
9    A. I understand that to be your questions of the
10  last hour, but not the predominance of the day's
11  questions. I don't see them as being related to that. I
12  do so the last hour, yes.
13    Q. And so it's clear then to you that the earlier
14  discussions that we had for the approximate first few
15  hours of this deposition concerning allegations that were
16  brought by these various co-workers and by Dr.
17  Donndelinger is not the subject of the current dismissal
18  action?
19    A. They were not the basis for the charges that
20  were filed with the board.
21    MS. SCHULMAN: If we could take a few minutes
22  break, I might review my notes and figure out if there's
23  anything else I need to ask.
24    MR. BRESEE: Okay.
25    (Recess, 3:08 - 3:13 p.m.)

Page 162

1    MS. SCHULMAN: I don't even have the usual, I
2  only have one more question, which is a lawyer's biggest
3  lie. I think I've covered everything that I need to
4  cover. I'll offer the stipulation with respect to the
5  transcript that the court reporter will have the
6  transcript delivered to -- do you want it to your office,
7  or to go directly to the school district office?
8    MR. BRESEE: It will be a rather short time
9  frame. Why don't we deliver it straight to --
10    MS. SCHULMAN: Straight to Mr. Werlin. Mr.
11  Werlin will give the court reporter the information about
12  the delivery site address and phone number off the
13  record. He'll have it on or before the 13th of the
14  month. Is that sufficient time before the hearing -- or
15  it will probably be before that. The court reporter is
16  going on vacation on the 13th.
17    THE WITNESS: So I have how many days to
18  respond? Normally I'm used to 30 days response time.
19    MS. SCHULMAN: I know. We're too close to that,
20  because we originally wanted to take the depositions last
21  month but there was availability problems. So if I had
22  it returned to my office the Friday before the hearing
23  date I can deal with any changes by that time.
24    THE WITNESS: Okay. So I will receive it when?
25    MS. SCHULMAN: On or before September 13th,

Page 163

1  probably before. And then you'll get it to my office --
2    THE WITNESS: That's less than five days.
3    MS. SCHULMAN: No, no. By, the hearing date is
4  I think on the 23rd. It starts on a Monday. So whatever
5  that Friday is it will be delivered to my office by 3:00
6  o'clock Friday signed. If it's not signed under penalty
7  of perjury --
8    THE WITNESS: But that's what I'm saying.
9  That's about five days. You have the weekend, but in
10  terms of workdays.
11    MS. SCHULMAN: How many days do you need?
12  You'll have to -- -
13    THE WITNESS: I understand you're extending it
14  the most you can. I'm just saying it's a lot to do.
15    MS. SCHULMAN: You have the weekend before.
16    MR. BRESEE: Yeah. It's five workdays.
17    THE WITNESS: I've fasting that weekend. I'm
18  going to be very weak. Are we off the record?
19    MS. SCHULMAN: No. We're on the record.
20    THE WITNESS: Then I won't say.
21    MS. SCHULMAN: I get it.
22    THE WITNESS: I understand. I'm just saying I
23  won't even be here at that time. I'll be with my family.
24    THE REPORTER: Can we go off the record?
25    MS. SCHULMAN: Yes.

Page 164

1    (Discussion off the record.)
2    MS. SCHULMAN: All right. In an off the record
3  discussion it's been agreed that any changes to the
4  deposition and the signature page will be faxed to my
5  office by 3:00 p.m. on the Friday before the hearing; and
6  that the transcript can be signed under penalty of
7  perjury; that the school district then and its attorney
8  will be custodian of the original and will produce the
9  original at the hearing; and if for any reason the
10  original should become lost, destroyed, or otherwise
11  unusable, a certified copy may be used in its place. And
12  the court reporter has indicated that she expects that
13  the transcript will more than likely be delivered on or
14  before the 11th of the month, but certainly by the 13th
15  at the very latest. So stipulated?
16    MR. BRESEE: So stipulated.
17    MS. SCHULMAN: Anything else to add?
18    MR. BRESEE: No.
19    MS. SCHULMAN: I take it you didn't want to ask
20  the deponent any questions. I didn't give you that
21  opportunity.
22    MR. BRESEE: You're correct.
23    MS. SCHULMAN: All right. I think that takes
24  care of it. We're off the record.
25    (TIME NOTED: 3:20 P.M.)

Page 165

42 (Pages 162 to 165)

**EXHIBIT 6**



BEFORE THE GOVERNING BOARD OF THE

CHULA VISTA ELEMENTARY SCHOOL DISTRICT

```
---------------------------------
IN THE MATTER OF THE ACCUSATION )
AGAINST                         )
          MAURA LARKINS,        ) Case No. L-2002050728
                                )
                   Respondent.  )
---------------------------------
```

DEPOSITION OF GRETCHEN DONNDELINGER

Taken on Tuesday, September 10, 2002
At 9:00 A.M.
At 84 East J Street
Chula Vista, California 91910

**CONDENSED TRANSCRIPT**

---

**Page 2**

```
 1        APPEARANCES
 2
 3   For the Plaintiff:
 4        MARK R. BRESEE
          BY: MARK R. BRESEE, ESQ.
 5        23195 La Cadena Dr., Suite 103
          Laguna Hills, California 92653
 6        (949) 587-0585
 7
 8   For the Respondent:
 9
          SCHULMAN & SCHULMAN A.P.C.
10        BY: ELIZABETH SCHULMAN, ESQ.
          1551 Fourth Ave., Suite 502
11        San Diego, California 92101
          (619) 238-0303
12
13   Also present:
14        Maura Larkins
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1        GRETCHEN DONNDELINGER,
 2   called as a witness by the defendant, who, being by me first
 3   duly sworn, was thereupon examined as a witness in said cause.
 4
 5        EXAMINATION
 6
 7        MS. SCHULMAN: Could you state and spell your full
 8   name?
 9    A   Gretchen Maria Donndelinger, G-r-e-t-c-h-e-n
10   M-a-r-i-a D-o-n-n-d-e-l-i-n-g-e-r.
11    Q   And is it Dr. Donndelinger?
12    A   Yes, it is.
13    Q   Is that a doctorate in education?
14    A   Yes.
15    Q   My name is Elizabeth Schulman, and I'll representing
16   Maura Larkins in the defense of the wrongful dismissal at the
17   district against her. And we have asked you to come here today
18   to give deposition testimony relevant to some issues, which we
19   believe you have knowledge of, concerning that dismissal
20   action.
21        Have you ever had your deposition taken before today?
22    A   On this case?
23    Q   No, in any matter.
24    A   Yes.
25    Q   On how many separate occasions?
```

**Page 4**

```
 1    A   One.
 2    Q   And was that related to an employment issue?
 3    A   Yes -- no. It was a hiring issue.
 4    Q   All right. There are certain rules that govern the
 5   taking of depositions, and over the years I've learned to
 6   summarize these in a written form which we've attached as
 7   Exhibit 1 to a previous deposition in this matter.
 8        Counsel, would it be all right with you if we just
 9   seriatim, continue on with the exhibits, so that I can simply
10   show a copy of Exhibit 1 to this witness, and if I wanted,
11   examine her on Exhibits 1 through 16, which we attached in the
12   first deposition in this case? That way we could simply make
13   reference to those and any new exhibits, to start with 17, in
14   this matter.
15        MR. BRESEE: That would be fine.
16        MS. SCHULMAN: Let's go off the record for a moment.
17        (Discussion held off the record.)
18        Back on the record. I'm going to show you a copy of
19   the deposition preamble which we've previously marked as
20   Exhibit 1 in this matter and ask that we go off the record as
21   you read it to yourself. Let us know when you're finished.
22        (Discussion held off the record.)
23        Back on the record. The witness off the record
24   indicated that she had completed her reading of the deposition
25   preamble.
```

**Page 5**

```
 1    Q   You've completed reading the document that we have
 2   marked as Exhibit 1?
 3    A   Yes.
 4    Q   And do you have any questions about any of the
 5   information contained in the document?
 6    A   No.
 7    Q   Did you understand the information contained in the
 8   document?
 9    A   Yes.
10    Q   Do you know of any reason why you couldn't give your
11   best testimony here today?
12    A   No.
13    Q   All right. Then we'll proceed. What is the highest
14   level of education that you've completed?
15    A   Doctorate in education.
16    Q   And when and where did you obtain that degree?
17    A   University of Southern California, completed in 1997.
18    Q   Where did you do your undergraduate work?
19    A   San Diego State.
20    Q   And what degree did you get and when?
21    A   Degree in psychology, 1978.
22    Q   And did you obtain a master's degree?
23    A   Master's at National University, completed '92.
24    Q   And what was the master's in?
25    A   Education.
```

2 (Pages 2 to 5)

1  Q  And where did you graduate from high school?.
2  A  Brent school, B-r-e-n-t, in the Philippines, 1970.
3  Q  1970?
4  A  Uh-huh.
5  Q  You'll have to say yes instead of uh-huh.
6  A  Yes.
7  Q  Thank you. It just makes life so much easier.
8  Following your graduation from college, did you obtain gainful
9  employment?
10  A  No. I was pregnant and had children, and so I didn't
11  really work in any long-term position until the children were
12  grown.
13  Q  What was the first long-term position that you worked
14  in?
15  A  I was -- became a teacher in the Poway Unified School
16  District in 1990.
17  Q  1990?
18  A  1990.
19  Q  And what level did you teach?
20  A  Third grade.
21  Q  And how long did you remain a teacher in the Poway
22  Unified School District?
23  A  Until '93.
24  Q  Did you teach third grade the entire time?
25  A  No. I taught third, fourth, and sixth.

1  Q  Did you obtain tenure in that school district?
2  A  Yes.
3  Q  And what was your next position?
4  A  Assistant principal.
5  Q  In Poway?
6  A  Yes.
7  Q  At what school?
8  A  At Deer Canyon Elementary and Westwood Elementary.
9  Q  Were those two separate positions?
10  A  Right, yes.
11  Q  You didn't hold them simultaneously?
12  A  No.
13  Q  During what period of time were you the assistant
14  principal at Deerwood Canyon?
15  A  Deer Canyon, I was assistant principal from, I
16  believe, '94, '95.
17  Q  And at Westwood?
18  A  '95 until '97.
19  Q  And did there come a time when you departed the
20  employment of the Poway Unified School District?
21  A  Yes.
22  Q  And when was that?
23  A  '97.
24  Q  And what was your reason for leaving?
25  A  I took a position in Chula Vista as principal at

1  Castle Park.
2  Q  That would be Chula Vista Elementary School District,
3  correct?
4  A  Yes.
5  Q  Prior to your becoming a full-time teacher in 1990,
6  had you gone and engaged in any kind of educational employment,
7  part time, substitute, anything of that sort?
8  A  No.
9  Q  From the time you graduated from college until the
10  time that you obtained employment in Poway Unified School
11  District, were you a full-time, stay-at-home mom?
12  A  No, not exactly. I did a little bit of real estate.
13  I did -- I worked at a health spa. I think that was after
14  college. Worked for Exclusively Women's Spa. I was a manager
15  of one of their health spas, and I did real estate for a little
16  while, like, maybe a year. I think that's it.
17  Q  Okay.
18  A  But I was a PTA mom galore.
19  Q  And how many children did you raise?
20  A  Two.
21  Q  Upon coming to the Chula Vista Elementary School
22  District, which I'll probably just refer to as "the district,"
23  is that agreeable with you?
24  A  Yes.
25  Q  You'll understand what I'm referring to, from this

1  point on?
2  A  Uh-huh.
3  Q  You'll have to say yes.
4  A  Yes.
5  Q  Upon coming to the district, did you gain the
6  acquaintanceship of the teachers who taught at that time, 1997,
7  at Castle Park?
8  A  The friendship of?
9  Q  The acquaintanceship of.
10  A  The acquaintance of.
11  Q  And was Maura Larkins one of those teachers?
12  A  Yes.
13  Q  So, she was here in 1997 when you took over the
14  principalship?
15  A  Yes. Right. We hired her that year.
16  Q  When you say "we," who do you mean?
17  A  The panel at Castle Park Elementary. We interviewed
18  her.
19  Q  And who is on that panel?
20  A  I don't remember. That was the first time I was
21  principal. Let's see. I don't remember.
22  Q  Was she transferring from another school in the
23  district?
24  A  I believe she was coming from leave.
25  Q  And how do you spell leave?

1    A    L-e-a-v-e.
2    Q    That was simple, too simple.
3         MR. BRESEE:  You mean leave of absence, not leave of
4    elementary school.
5    BY MS. SCHULMAN:
6    Q    That's what I was wondering.
7    A    Right.  I seem to recall that she was coming off of a
8    leave of absence.
9    Q    As opposed to transferring from another school?
10   A    Uh-huh, yes.
11   Q    And was she hired to teach a particular class at that
12   time?
13   A    She was hired to teach, I believe, it was a third
14   grade bilingual position.
15   Q    Was that a Spanish/English bilingual class?
16   A    Yes.
17   Q    And at that time did the elementary school have other
18   bilingual educators teaching at the school?
19   A    Yes.
20   Q    And who was that or who were those people?
21   A    There was a kindergarten teacher, a first grade
22   teacher, and a second grade teacher.  I know there was.  I
23   can't remember who the second grade teacher was, but I believe
24   that the program went with the third grade position.  It went
25   from K through three with the bilingual program.

Page 10

1    Q    Do you remember the name of the kindergarten teacher
2    at that time?
3    A    Now, I remember, yes, Michelle Tellez.
4    Q    Could you spell the last name?
5    A    T-e-l-l-e-z.
6    Q    And first grade teacher?
7    A    The first grade teacher was Stephanie Parker.
8    Q    Parker?
9    A    Parker, P-a-r-k-e-r.
10   Q    And the second?
11   A    The second was Maria Beers.
12   Q    B-e-e-r-s?
13   A    B-e-e-r-s.  Right.  Like the drink, B-e-e-r-s.
14   Q    And was Ms. Larkins taking over for some previous
15   third grade teacher, or was this a newly created position?
16   A    I can't remember.  I think it was new.
17   Q    At that time, in 1997, when you were first principal
18   at the elementary school, did you come to know any kind of
19   tension that existed about the implementation of the bilingual
20   program?
21   A    At the time -- it wasn't so much the bilingual
22   program, per say.  There was tension among the team as to the
23   psychology of activities, so that the bilingual children could
24   be more included in the -- what Maura wanted was more inclusion
25   in the academic program of the bilingual students, more

Page 11

1    integration.
2    Q    I don't mean to overdramatize this by using the word
3    "factions," but were there factions who were lined up on one
4    side and wanted it one way, and one side wanted it another way?
5    A    I wouldn't agree with the word "factions" either.
6    What it is, is we had three English only teachers with their
7    classrooms and this was a new team, basically, who were trying
8    to get their programs together, and Maura, being new in that
9    position, trying to get her program together.
10        And at the time I think Maura was a little bit more
11   experienced than at least two of the other teachers in that
12   grade and was wishing for more integration among her Spanish
13   only speaking students and the English only speaking students.
14        But there was trouble.  It was a hardship on the team
15   to do that.  They couldn't really figure out how to include the
16   Spanish only speakers because they couldn't speak Spanish and
17   so that they didn't feel like they could do a good job teaching
18   those children.
19        And philosophically, I agreed that children shouldn't
20   be segregated, in any way, and I really don't feel like the
21   other teachers wanted to segregate them either.  I think it was
22   just a challenge to try to figure out how to do that and we
23   worked on that.
24        I think it took the better part of that year to try
25   to figure out how to schedule the change.  And I think an idea

Page 12

1    did come up where we could do that, somehow, and the team
2    agreed.  And I thought the rest of the year proceeded, you
3    know, not totally smoothly because it's a continuous challenge
4    trying to meet all children's needs but, you know, fairly well.
5    I think trying to meet the needs of Spanish speakers is a
6    continuous problem that no one has the magic potion, or else we
7    would all be doing it.
8    Q    Who were the three English only teachers?  And is
9    this the '97, '98, school year we're speaking about?
10   A    '97, '98, I think Linda Watson was the veteran third grade
11   teacher.  Rick Denman was new in that he was coming from a
12   sixth-grade position the year before, and Jim Marshall, he
13   was --
14   Q    I'm sorry?
15   A    Marshall.
16   Q    Jim, did you say?
17   A    Jim.
18   Q    He had never taught before?
19   A    I believe he was a brand new teacher.  We hired him
20   just a couple of days before we hired Maura.
21   Q    And sitting here today, do you recall approximately
22   how much prior -- excuse me, I'll rephrase that.  How much
23   prior teaching experience had Mr. Denman had?
24   A    I don't remember.  I just know he had taught sixth
25   grade before.

Page 13

4 (Pages 10 to 13)

1  Q   And were each of these three teachers teaching other
2  third grade classes: Linda Watson, Rick Denman, and Jim
3  Marshall?
4  A   Yes.
5  Q   Was this integration problem a problem only with the
6  third grade, or did it reach down into the kindergarten through
7  second grade?
8  A   I don't think there was much of it in kindergarten or
9  first, at that time. Second grade, I know that Mrs. Beers was
10  doing a wonderful program where she had her children switching
11  with another English only classroom for science. She did the
12  science for both classrooms or something like that and that
13  was, I think, the model that Maura was hoping for at the time.
14  Q   And Ms. Beers was bilingual, correct?
15  A   Yes.
16  Q   So, she was able to teach that science class in both
17  English and Spanish, is that the way it worked? Or did she
18  teach it only in English?
19  A   I believe she taught -- I don't remember, but she
20  could speak both. So, she was able to teach it in both
21  languages. I don't remember exactly how it worked.
22  Q   Was there integration in the second grade in more
23  than just the science class?
24  A   It was just her class with that other classroom, and
25  it was because the other teacher cooperated with that. She was

Page 14

1  able to include that in her schedule or work it out somehow.
2  Q   And who is that other teacher?
3  A   Lewis Fowers.
4  Q   Did you say Flowers, like the flower?
5  A   F-o-w, without the l. F-o-w-e-r-s.
6  Q   Okay.
7  A   And that was what we presented, sort of, to the other
8  teachers. Here's a way to do it. They couldn't figure out how
9  to do that, and still get the academics that -- "they," meaning
10  the other third grade teachers, couldn't figure out how to have
11  a plan like that and still keep their class achieving what they
12  felt their kids needed to achieve. They just couldn't see
13  doing that. They thought that it would take away from their
14  program. So we worked at that.
15  Q   And how did that finally resolve, if it did?
16  A   Well, one of the teachers, I believe it was Linda
17  Watson -- see, I can remember formulating or talking to Linda
18  about this possibility. I can't remember -- and I remember her
19  trying, it and I can't remember if it continued or not. But
20  what it was, was Maura would bring her children into Linda's
21  classroom for X amount of time during the morning for morning
22  activities, such as calendar, and maybe the pledge. And then,
23  that way, the children could get, you know, that time with
24  English only speakers.
25  Q   Something that would be an activity but would be

Page 15

1  nonacademic in nature?
2  A   It would be academic in that they learned days of the
3  week and months of the year and whatever, you know, the morning
4  activities were at that time they did a little bit of, you
5  know, the typical daily stuff, daily oral language, and I
6  just -- I can't remember everything that -- and I don't even
7  remember exactly how much time that was. It was a good half an
8  hour I think, in the morning.
9  Q   And was that a successful integration?
10  A   Well --
11  MR. BRESEE: Objection. Vague and ambiguous. You
12  can answer.
13  THE WITNESS: It seemed to work at the time.
14  BY MS. SCHULMAN:
15  Q   Was it used the next year?
16  A   I don't remember. I don't even remember how long
17  that went on.
18  Q   Would it be fair to say that the third grade became a
19  pivotal, focus because that was the last year for the bilingual
20  program? And the concept of integration was, perhaps, more
21  dramatic?
22  A   I didn't see it -- at the time I certainly didn't see
23  it that way. It was a new program. We were trying to do the
24  best we could. I mean, there was really no model for that. We
25  were trying to meet the needs of these students as well as we

Page 16

1  could.
2  We thought that we were getting an extra year,
3  because the year before they didn't have it at all. You know,
4  come third grade it was all English. So we thought, wow, this
5  is great to be able to extend it some, and the understanding
6  was that in that bilingual class, the second half of the year
7  would be mostly in English anyway. So, it was a transitional
8  time anyway within the classroom.
9  So, what she was asking for was sort of above and
10  beyond that which, philosophically, I totally agreed with the
11  more we can do, the better. However, not at the expense of the
12  English only program that the two of the teachers were
13  struggling to just learn and get to know. And also, not at the
14  expense of the team effort, you know, working together as a
15  team, coming up with ideas and programs that they all agreed to
16  do, you know, that was very, very important to keep that team
17  effort going. And I felt the other members of the team worked
18  at it, did work diligently at trying to create the program for
19  all the third graders.
20  Q   When you say "team," are you referring to all the
21  third grade teachers?
22  A   Right, that's what I mean.
23  Q   And would there be then a team for all second grade
24  and all first grade and all kindergarten teachers?
25  A   Yes.

Page 17

5 (Pages 14 to 17)

**Page 18**

1   Q   And typically, are there four classes at each grade
2 level, at that particular school, at that historical point in
3 time?
4   A   I think so, yes. There might have even been two, or
5 three at that time. I can't remember.
6   Q   A combined second and third grade?
7   A   Uh-huh.
8   Q   Was that a yes?
9   A   Yes. She was the brand new --
10   Q   That's okay. It's all right. You don't need to tax
11 your memory on which year what was occurring in.
12     And Ms. Larkins continued to teach at Castle Park
13 until some time in 2001; is that correct?
14   A   Yes.
15   Q   And over the course of that time period, were you
16 consistently the principal at Castle Park?
17   A   Yes.
18   Q   And you still are, correct?
19   A   No. I am no longer there.
20   Q   Where are you now?
21   A   I am -- right now, I'm not at any school.
22   Q   Are you currently employed?
23   A   I am employed by National University.
24   Q   And when did you start at National University?
25   A   Actually, I've been a professor since '94.

**Page 19**

1   Q   And when did you leave your employment with the Chula
2 Vista Elementary School District?
3   A   I left in 2001.
4   Q   Do you recall what month?
5   A   The end of school, so, actually the -- it must have
6 been the 30th of June then.
7   Q   And did you take up full-time employment at National
8 University?
9   A   No. I took up full-time employment at Carlsbad
10 Unified.
11   Q   And what was your position there?
12   A   Principal.
13   Q   Excuse me?
14   A   Principal.
15   Q   At what school?
16   A   Kelly.
17   Q   I'm sorry?
18   A   Kelly elementary, K-el-l-y.
19   Q   And how long did you stay principal at Kelly?
20   A   I was there for this year.
21   Q   So, that would be the two --
22   A   2000, 2002 school year.
23   Q   2001, 2000?
24   A   What did I say? 2001, 2002, yes.
25   Q   And you're no longer employed at Carlsbad?

**Page 20**

1   A   No.
2   Q   And you are currently employed at university?
3   A   Yes.
4   Q   Is that a full-time position?
5   A   It's a part-time position.
6   Q   And what was your reason for leaving Carlsbad?
7   A   I am really seeking a different position. I'm ready
8 to move on from principal, principling. I'd like to retire,
9 actually I am. I'm retiring.
10   Q   So, from 1997 until you left the employ of the Chula
11 Vista Elementary School District at the end of June of 2001,
12 did you notice or become aware of any increasing tension
13 between Ms. Larkins and any other teachers who taught at Castle
14 Elementary School?
15   A   Yes.
16   Q   Castle Park Elementary School is what I meant to say.
17   A   Castle Park Elementary. I wouldn't say increasing
18 tension. I would say, not increasing tension with any
19 particular person, but just -- it appeared -- especially the
20 last year, more the last year, not especially, but the last
21 year 2001, there appeared to be more incidents of disagreements
22 with Maura and other teachers, escalated, you know. It just
23 seemed like --
24   Q   What was the name of these disagreements?
25   A   That was the part that was difficult. Teachers would

**Page 21**

1 come to me and say that they had had a disagreement, or had an
2 incident, with Maura and didn't quite understand why it had
3 become a problem.
4   Q   What do you mean by "why it had become a problem"?
5   A   For example, there was an incident in the library
6 where there was a very, sort of, simple, scheduling problem
7 that had occurred with the librarian and Maura. And the way
8 that Maura brought it to the librarian's attention, it then
9 became a problem instead of just, you know, a scheduling
10 misunderstanding.
11     It then became a problem because of the way that she
12 handled it. She had brought -- she had come into the library
13 during another teacher's library time and confronted the
14 librarian in front of children and the teacher, which then
15 created a bigger problem instead of fixing it, you know, being
16 able to handle it professionally. Then it became just a bigger
17 problem. I hate to sound vague.
18   Q   When did you first become aware of this problem?
19   A   I didn't hear about it until later.
20     MR. BRESEE: Objection. I'm not clear. Are you
21 asking about the incident, that specific incident, she was just
22 talking about?
23     MS. SCHULMAN: Yes.
24   Q   That's what you understood, didn't you?
25   A   I understand that. And I didn't hear about that

6 (Pages 18 to 21)

1 until much later.
2 Q And how did you hear about it?
3 A The teacher, who was there at the time that Maura
4 came into the library to confront the librarian came to me and
5 said -- I don't know why she waited so long, or why, then, she
6 came to me, but she relayed what happened. And she said she
7 just wanted me to know that she was uncomfortable with that
8 situation and wanted to be sure I knew about it.
9 Q And who was that teacher?
10 A Lynne Delgado.
11 Q Lynne Delgado?
12 A It's D-e-l-g-a-d-o.
13 Q And the first name is Lynne?
14 A Lynne, uh-huh.
15 Q I'm sorry, was that L-y-n-n?
16 A L-y-n-n-e.
17 Q And the librarian was Michelle with a hyphenated last
18 name?
19 A Scharmack.
20 Q So, it was not the librarian who initially reported
21 this incident to you? It was the teacher who was there?
22 A No, right.
23 Q And what did Ms. Delgado tell you, as far as she
24 could specifically recall, had happened?
25 A What she said was that Maura came in very upset and

Page 22

1 began to -- I think her words were "yell at the librarian,"
2 Michelle, about her schedule and how she messed it up. And she
3 didn't think it was fair or something to that nature, and that
4 she tried to say, "Well, can we talk about this later, because,
5 you know, my kids are here and it's my library time now." And
6 apparently, Maura couldn't -- would not be appeased.
7 Q Do you know how it came about that Ms. Larkins
8 actually left the library, assuming that that did happen on
9 that occasion?
10 A From what I remember I think the librarian just told
11 her, "We'll talk about this later." I don't remember anything
12 else.
13 Q Okay. And when, if ever, had you discussed with
14 Ms. Larkins this library incident, after it had been reported
15 to you by Ms. Delgado?
16 A I don't think I did. So much time had passed,
17 Ms. Delgado had said, you know, "I don't want to bring it up at
18 this time. It's over. It's done. I just wanted to let you
19 know that it had happened," and that she couldn't figure out,
20 you know, why, why it happened at all.
21 Q And approximately, when was this when Ms. Delgado
22 made this report to you about the library incident?
23 A That, I can't remember. I think that the whole thing
24 occurred at the beginning of the school year. That's when the
25 schedules are happening, and teachers are trying to schedule

Page 23

1 everything, PE, and library and computer times. That's when it
2 happened, and I don't think she told me about it happening
3 until either just before Christmas holidays or after. So, some
4 time.
5 Q So, some time in late 2000, or early 2001?
6 A Late 2001 -- late 2000, early 2001.
7 Q And the incident itself probably happened in
8 September?
9 A In September. But I think it was because she was
10 feeling that it hadn't -- that Maura hadn't dropped it. I
11 think that she said what she said because she -- I can't
12 remember. Either she wasn't talking to her or was giving her
13 the cold shoulder or something. I can't remember what it was
14 that prompted her to tell me.
15 Q Did you speak to the librarian about the incident
16 after Ms. Delgado reported it to you?
17 A I asked Ms. Delgado to, you know, to talk to her and
18 ask her to come and to talk to me about it.
19 Q And did the librarian come and speak to you about it?
20 A Yes, she did.
21 Q And what did the librarian tell you?
22 A She told me pretty much the same thing that Lynne
23 did, and she also said, you know, "It's done. It's over. I
24 don't know what would have caused her to act that way." But,
25 you know, it's done. She just wanted to forget it.

Page 24

1 Q Did the librarian or Ms. Delgado give you some notion
2 as to span of time that this library incident took place?
3 A It took long enough that that was the reason the
4 teacher was upset, was because it was taking such a long time,
5 and it was taking away from the kids. The kids were
6 kindergartners, and they were running around waiting for the
7 librarian to talk to them, and it was taking up that time. So,
8 I don't know exactly.
9 Q Was it five minutes, ten minutes, one minute, do you
10 know?
11 A My impression was that it was 15 minutes maybe, at
12 least 15 minutes.
13 Q Did you have any understanding as to whether or not
14 this was a discussion that was being carried on within earshot
15 of the students?
16 A It sounded like it. I think that's the reason,
17 really, that the teacher was upset, and that the librarian
18 just, you know, was also upset was because they didn't want to
19 have to discuss this in front of the children.
20 Q So, you spoke to Ms. Delgado. You spoke to Michelle,
21 the librarian. Both of them indicated to you it was a long
22 time ago, to forgot it, correct?
23 A Right.
24 Q And so, did you then, after speaking to each of these
25 two women, in your mind, feel comfortable not speaking to

Page 25

7 (Pages 22 to 25)

**Page 26**

1  Ms. Larkins concerning the events?
2     A   Right. I really feel like they handled it. They
3  took care of it. They didn't want to bring it up again, to
4  either make Maura upset, or anything, because it had happened
5  so long ago. They just -- again, I don't remember why they
6  came and told me at all. I don't know if they know why they
7  came and told me at all.
8     Q   You alluded to Ms. Delgado feeling that Ms. Larkins
9  was giving her the cold shoulder and not speaking to her.
10     A   Something like that, but again, I just don't -- I
11  don't know, you know, I don't know why.
12     Q   But whatever it was, at that point in time, you felt
13  comfortable putting it to bed, so to speak?
14     A   Right. I said, "Okay. It's over it's done. You
15  guys took care of it. The schedule is fine. She's happy with
16  it. She didn't come to me to complain about it," meaning,
17  Maura didn't come to me to complain, so there was no problem.
18     Q   Who told you the schedule was fine?
19     A   Michelle did, that she found a spot for Maura that
20  she was happy with.
21     Q   Was there some other concern that you became aware of
22  concerning Ms. Larkins during the school year?
23     A   It was towards the end of the year, after the
24  holiday, where things started to happen that were very
25  concerning to me. I wish I had my notes. I can't remember too

**Page 27**

1  clearly the timing at all. But at one point there was a change
2  in the schedule, and Maura was upset about it and confronted a
3  teacher about the change in a schedule, and the teacher was
4  upset by the confrontation. And so the teacher came to tell
5  me.
6     Q   And who is that teacher?
7     A   It was Robin Colls.
8     Q   C-o-l-l-s?
9     A   C-o-l-l-s.
10     Q   And what grade did she teach?
11     A   She taught a special day class.
12     Q   And what is a special day class?
13     A   It's for children with special needs.
14     Q   And what was it that Robin Colls said Ms. Larkins was
15  upset about?
16     A   Robin was sitting in the lounge as she does almost
17  every morning, that's her place. And there was a change in
18  scheduling, and so she became the messenger, telling all the
19  teachers that something had been changed. And when Maura came
20  in, she told Maura just like she told all the teachers, you
21  know.
22        I think it was a Kingdoms thing. I'm not sure.
23  Kingdoms is a program that we had. I think either it was
24  cancelled or it was scheduled for that day. And so she was
25  just telling everybody and, apparently, when she told Maura,

**Page 28**

1  Maura became extremely upset, I mean, very, very upset at in
2  what she felt like was upset, and said things that were
3  targeted to Robin directly. And so she felt threatened, and
4  she came to me.
5     Q   Robin came to you?
6     A   Right. She didn't understand why she would be
7  directing, why Maura would be directing, her anger towards her
8  when she was just the messenger.
9     Q   In other words, don't shoot the messenger if you
10  don't like the message?
11     A   Right, right.
12     Q   I think we've had a problem with that from the days
13  of the ancient Greeks.
14        And who taught or participated in the Kingdom's
15  program?
16     A   The whole school.
17     Q   And what kind of program is that?
18     A   It's a program where the entire school is split up,
19  and everyone takes a kingdom, a portion of that partitioning
20  off of all the children. So, for example, each group of 20
21  children would be a group of, I think, at that time it was just
22  first, first through six grade. So, there would be 20
23  children, first through six grades, in a kingdom and then those
24  kids would go to a teacher and/or other staff member. And they
25  would talk about character traits like responsibility, respect,

**Page 29**

1  caring, and the whole school would have a lesson, the same
2  lesson in that particular style, that way. So, I can't
3  remember if it was cancelled that day or it was scheduled for
4  that day.
5        It was a surprise, anyway, for everybody, and that's
6  why we wanted to be sure that everybody got the message.
7     Q   And what was the reason that Robin was relating this
8  message to other people? Was it simply because she was at the
9  lounge that day?
10     A   She was just there.
11     Q   She was not tasked to that responsibility was she?
12     A   No. I didn't tell anybody --
13     Q   So, she took it upon herself to deliver the message?
14     A   Uh-huh.
15     Q   Was that a yes?
16     A   Yes.
17     Q   What was it that Robin told you was the response from
18  Ms. Larkins when she delivered this message to Ms. Larkins?
19     A   She said that she -- I can't remember her exact
20  words, but basically that she got very, very upset and said
21  very threatening like things. And I don't even remember what
22  those things were now that upset her so much that she felt like
23  she had to come to me, and there were other people in the room
24  that saw that. And they agreed. Robin said, "What happened or
25  why did she do that?" And then she came to me with that.

Jan White & Associates  619-234-0991
1-888-311-0991

1   Q  The other people in the room, were these teachers?
2   A  There were other teachers. You know it was a very
3 busy time in the morning, lots of teachers coming in and out
4 because that's just before school starting. Everyone coming in
5 to get their mail to get a cup of coffee.
6   Q  This was the teacher's lounge?
7   A  Teachers lounge, and read any messages on the board.
8   Q  At the time even though you can't recall the words
9 now, did Robin Colls relate to you what she believed the words
10 were spoken to her.
11   A  I'm sure she did. I just don't remember the words.
12 I just know that she was upset by it. She felt threatened by
13 it. That's really all I remember, and she didn't understand
14 why she was being targeted and she had said, "I'm just the
15 messenger. I'm just telling you."
16   Q  So, were these threats to Ms. Colls's physical
17 safety or professional standing?
18   A  There's no threats to her profession. What do you
19 mean professional standing? She just felt threatened. "She
20 scares me," I think is what she said.
21   Q  By professional standing I mean was it something
22 like, "Oh, here it is again. Now you've changed the schedule.
23 The kids aren't going to get the kinds of chances that they
24 should get," something like that, professionally as opposed to,
25 "I'd like to slap you across the face," kind of thing?

Page 30

1   A  I don't think there was any physical threat. I
2 think -- I don't know. I just know that she felt threatened,
3 and she said something to the words of, "She scares me. What's
4 going on?" She didn't understand, and that's why she came to
5 me.
6   Q  And what did you do, if anything, in response to
7 Ms. Colls's reporting those events to you?
8   A  I talked to Maura. I remember that, and I can
9 remember saying, "You know, Maura," and I don't know if it was
10 that day. I think it was that day saying I'm sorry, Maura. It
11 was my fault. I was the one who scheduled that. It wasn't
12 anybody's fault but mine. I remember saying those words, but I
13 can't -- I don't remember.
14   Q  What happened after that. What was Maura's response,
15 if any?
16   A  I don't remember. I remember that the conversation
17 did not follow a linear pattern as far as I was concerned. I
18 remember feeling frustrated and confused after my conversation
19 with her. I can't remember the exact words. I know I wrote
20 them down, but I just really can't remember exactly what was
21 said.
22   Q  This is the second time in the last few minutes that
23 you've made reference to notes or knowing that you wrote words
24 down. Did you maintain some sort of notes then of the
25 incident?

Page 31

1   A  I maintained some notes. Mostly, I think it was just
2 so that I -- because I had a tough time. Again, the
3 conversation did not follow a very linear path, and so it was
4 difficult for me to understand exactly sometimes the reason our
5 conversation went the way it did. And so, I would write things
6 down as much as I could remember to try to analyze it. Because
7 I wanted to do whatever I could to understand the problem so
8 that I could help make it better, but I don't have those notes
9 and I don't remember.
10   Q  You also had notes concerning the report to you about
11 the library incident, correct?
12   A  Yes.
13   Q  And did you turn those notes over to someone?
14   A  Yes.
15   Q  Who did you turn them over?
16   A  To Dr. Shinoff.
17   Q  Dan Shinoff?
18   A  Dan Shinoff, yes.
19   Q  And who is Dan Shinoff?
20   A  He was an attorney in the case where Maura brought
21 against the school district.
22   Q  When did you turn those notes over to Mr. Shinoff?
23   A  That was during the case. I can't remember now. It's
24 taken so long. It's been months.
25   Q  Months?

Page 32

1   A  Uh-huh.
2   Q  Was that would have been some time in 2002?
3   A  2002.
4   Q  And would those notes help you to more accurately
5 recall the events?
6   A  It would help me, right. What I said, right.
7   MS. SCHULMAN: Let's go off the record for just a
8 moment.
9   (Recess taken.)
10   I'm going to ask have marked as Exhibit 17, a letter
11 or note dated 1-17-01, addressed to Maura and apparently signed
12 Gretchen. I ask you just to take a moment to look at that.
13 Okay. Have you had the opportunity to look at that note?
14   (Exhibit No. 17 was marked for identification and is
15   annexed hereto.)
16   A  Uh-huh.
17   Q  Was that a yes?
18   A  Yes.
19   Q  All right. Is that a note that's entirely in your
20 own handwriting?
21   A  Yes.
22   Q  And I think your handwriting is pretty clear, but
23 with why don't you just read the whole thing into the record
24 for us, including the date.
25   A  1-17-01, "Maura, I would like to talk to you soon

Page 33

9 (Pages 30 to 33)

**Page 34**

1 about the misunderstanding about Kingdom's. Unfortunately, I
2 will be unavailable today. Please see Sally about scheduling a
3 time most convenient for you, Gretchen."
4  Q And who is Sally?
5  A The secretary.
6  Q All right. And so, the meeting took place with
7 Ms. Larkins some time after January 17?
8  A I presume that, yes.
9  Q And do you recall approximately how long after
10 January 17th you met with Maura?
11  A No. I thought it was right away. So, it must
12 have --
13  Q Is your best recollection that it would have occurred
14 within a week of January 17, 2001?
15  A I assume so. I don't know. Again, I just -- I
16 thought it was right away. I can remember, you know,
17 apologizing for it and everything. I thought it was right
18 away.
19  Q Does the sentence here, "unfortunately I will be
20 unavailable today," refresh your recollection that it was not
21 the same day?
22  A Right. It sounds like I had a meeting or something
23 that day. I don't know.
24  MS. SCHULMAN: Mr. Bresee, do you have a copy of
25 Dr. Donndelinger's others notes that she's turned over to Dan

**Page 35**

1 Shinoff?
2  MR. BRESEE: No, I don't.
3 BY MS. SCHULMAN:
4  Q Did you give Mr. Shinoff the original of the notes.
5  A I just gave him -- yes.
6  Q And you did not retain a copy of them for yourself?
7  A No.
8  Q Big mistake. Never give an attorney anything without
9 maintaining a copy.
10  A I just didn't think -- first of all, they were just
11 scribbles really. I wasn't taking notes. You know I just --
12 they were just more for my recollection more than anything
13 else.
14  Q And let me ask you about those scribbles how many
15 pages offer scribbles were there?
16  A There were several incidents, so maybe 30.
17  Q 30 separate pieces of paper?
18  A Possibly.
19  Q Were they all written on the same kind of paper?
20  A Oh, no. They were whatever I could scribble on at
21 the time.
22  Q What size papers were they?
23  A I believe they were this size, legal, both sizes,
24 mostly yellow I think.
25  Q Both legal pad size an 8 1/2 by 11?

**Page 36**

1  A It was mostly this size.
2  Q Mostly legal pad size?
3  A Yes.
4  Q Lined?
5  A Yes.
6  Q And --
7  MR. BRESEE: Just for the record, what she's pointing
8 to is 8 1/2 by 11.
9  MS. SCHULMAN: You have an 8 1/2 by 11.
10  MR. BRESEE: Yes, not legal.
11 BY MS. SCHULMAN:
12  Q All right. And was it a pad that you would write on
13 and then tear the piece of paper? Is that it?
14  A Yes.
15  Q And as a general rule were the pages all filled, all
16 lines filled, half filled, some filled with not too much?
17  A I say mostly spaces actually. I would just write a
18 sentence as I remember. You see my writing, it's kind of big.
19 So, no, not very filled.
20  Q Now, I note that this particular Exhibit 17 appears
21 to be on lined paper but appears to be one of those maybe 3 1/2
22 by 5 1/2 kind of pads?
23  A Little notepad. This is what I would use when I
24 would write notes to teachers. This might even have a little
25 sticky on the back. Is that another note in -- yeah, I would

**Page 37**

1 use whatever I could find.
2  Q And so, most of your 8 1/2 by 11 had jottings on
3 them. Would that be a good description?
4  A Jottings, yes, that would be good.
5  Q And basically they were what, memory teasers for you?
6  A It was for me just to try to keep things straight. I
7 have a palm pilot now. Now, I put everything in that. It
8 would have been better.
9  Q Until it loses its memory.
10  A Oh, don't say that.
11  Q Was it your custom and practice to keep notes about
12 matters in the manner in which you kept notes about these
13 matters that came to the fore concerning Ms. Larkins?
14  A I kept notes whenever I thought that it was something
15 that I needed to remember, notes you know. Kids would come in
16 and be in trouble, you know, ongoing curriculum problem, yeah
17 it was just more for me. They were just my notes.
18  Q Was this the first time in all your years of
19 experience of being a principal that you had maintained notes
20 about some incidents or incidents involving a teacher?
21  A Oh, no. No. I kept notes, especially my first year.
22 In fact, I was hoping -- I mean I was wishing that I had all my
23 notes from my first year as a principal because I think it
24 would have been fun to look back on all of those notes, but I
25 generally just throw them out at the end of the year. I threw

10 (Pages 34 to 37)

**Page 38**

1  all those out. I wish I hadn't. No, I would keep them. A lot
2  of them were funny little anecdotes or things that I didn't
3  wants to forgot. Because you think you're going to remember
4  everything, but you don't. I mean even this that I was so --
5  it took up so much of my time. I don't remember so many
6  details. You know you ask me stuff, and I can't remember,
7  terrible.
8     Q   But you do you recall meeting about this issue of the
9  Kingdoms with Ms. Larkins?
10    A   I remember the apology.
11    Q   And who apologized?
12    A   Me. It was my fault. I changed the schedule. That
13  started the whole thing.
14    Q   And did Ms. Larkins become rude or abrasive with you
15  during this meeting?
16    A   Maura is very excitable. That's just her
17  personality, and so often times I remember our conversations as
18  being very excited. I don't know if she was rude in this
19  particular incident or not. I just remember that she was upset
20  by it and that she felt I was taking sides when it was just a
21  very simple change of schedule that -- I had a difficult time
22  understanding what she wanted, what she wanted me to do.
23    Q   This Kingdoms program affected all children, not just
24  bilingual children?
25    A   Right. This was an integration I mean to the nth

**Page 39**

1  degree. The entire school was integrated in this by grade
2  level even. I mean everybody, all the Special Ed children were
3  all in this. It was a great program.
4     Q   What happens when this Kingdom's program put into
5  effect?
6     A   This was the second year we had it.
7     Q   And how many times in a school year would this
8  Kingdom's program happen?
9     A   It started out as twice a week, I believe, and the
10  last year it was once a month.
11    Q   And when was the first school year that this program
12  started out?
13    A   '99, 2000.
14    Q   And was there some reason that it was reduced from
15  twice a week to once a month?
16    A   It's difficult. With a new high accountability
17  there's so much curriculum to get, in that some of the teachers
18  felt it was taking away from that curriculum time, and so we
19  cut it down some.
20    Q   Once you explained to Ms. Larkins that it was your
21  sole decision that the Kingdoms program be rescheduled, did
22  that appear to satisfy her as an explanation?
23    A   From what I remember it was no. It was not. I don't
24  believe she left that office satisfied or happy because for
25  some reason then -- it was -- she took it as a personal thing.

**Page 40**

1  I can't -- it's so difficult to relay the conversations that I
2  had with her because, again, it was so convoluted. Things she
3  would bring up, topics that were obscure that -- then I didn't
4  understand what that had to do -- the relevance of that with
5  the particular topic we were talking about, and so it was
6  difficult to have a clear cut conversation with her. So, I am
7  feeling with this conversation, it still was not clear exactly
8  why she was so upset. It wasn't just the scheduling then, it
9  was other stuff. The fact that either we were having Kingdoms
10  or whether or not we were having Kingdoms, and why do I listen
11  to other teachers more than others. That sort of conversation
12  that I didn't understand why that had anything to do with what
13  we were talking about and why then she was bringing that topic
14  up at all.
15       And so, I don't remember how that conversation ended,
16  but I do you remember feeling frustrated that her needs and
17  wants were things that I couldn't seem to get to the bottom of.
18    Q   Did she express an opinion or a concern to you during
19  that meeting that she viewed that the English only teachers had
20  somehow influenced you to reschedule a Kingdoms session and
21  that somehow she felt that this negatively impacted the concept
22  of integration?
23    A   It was not a bilingual program. There was no rift
24  between the bilingual teachers and the nonbilingual teachers in
25  reference to this program. It was two different things.

**Page 41**

1     Q   I understand what you're saying. But my question was
2  from what Ms. Larkins was expressing and from what I've heard
3  from you did she try to convey to you that it was her concern
4  that you had somehow been influenced by the English only
5  teachers to eliminate or postpone a Kingdoms session, which
6  would have enabled these bilingual children to be integrated
7  fully with the English only children?
8     A   It's possible that she said that to me, that that is
9  her viewpoint.
10       But first of all, that was not the reason that it was
11  changed. It was -- I don't even remember why it was changed,
12  but it had nothing to the with any kind of disagreement between
13  bilingual and nonbilingual teachers.
14    Q   And I understand that. That's your vision of what
15  happened here. I'm simply trying to fathom out what
16  Ms. Larkin's vision of what happened and what she might have
17  conveyed to you as best as you can recall it.
18    A   Right.
19    Q   I take it at that point in time that integrating
20  third grade bilingual children into the English only classes
21  was still and issue. Would that be correct?
22    A   No.
23    Q   Had that issue been resolved then?
24    A   At the team level, I felt that was pretty much
25  resolved. They were doing lots of things together to

11 (Pages 38 to 41)

1 accommodate the students, fieldtrips and swimming, you know,
2 other things. There was controversy with the program just
3 because it took so much time. I mean the teachers were
4 unbelievably pressured to get academics across to these kids.
5 It just felt like it was no fun anymore and Kingdoms all though
6 it's so important to teach children responsibility, respect
7 caring, citizen qualities that every student should have. And
8 I don't think there's a soul in this United States that would
9 think that that is not something important.
10     On the other hand, it's not what's tested on the Sat
11 9, and teachers were very pressured to keep things very, very
12 basic. And some teachers felt that pressure more than others.
13 Others felt that no citizenship is just as important and that
14 the Kingdoms program worked to that effect. That was the rift.
15 It didn't have anything to do with bilingual kids and
16 integration. It had to do with time for subjects such as
17 citizenship versus subjects such as mathematics.
18 Q   Okay. You've said a lot. So, let me see if I
19 understand this. As of January of 2001, is it your estimation,
20 sitting here today, that the bilingual and English only
21 integration had been happily accomplished in that there were
22 fieldtrips and swimming and other activities that the groups
23 participated in together?
24 A   Yes. And not only that, but we were expanding our
25 bilingual program.

Page 42

1 Q   So, to go into further grades?
2 A   To go into fourth grade. It wasn't perfect by any
3 means, but we were slowly moving in that direction.
4 Q   And was that the plan for the next school year?
5 A   We hired a bilingual fourth grade teacher to teach an
6 English only class that year with the understanding that the
7 next year that program could grow. It's not easy with
8 everything that was going on. But these children speak
9 Spanish, and if you want to teach them science and history, you
10 better teach them in a language that they can understand.
11 Otherwise, they lose so much ground.
12     That's my basic philosophy, and I know that that's
13 Maura's also and so, we were moving as a school towards that,
14 not that it was an easy road, and there were bumps along the
15 way.
16 Q   So, for the 2000, 2001 school year there was actually
17 a fourth grade teacher hired who was teaching an English only
18 class but who had the capability of teaching a bilingual class,
19 and it was the hope or participation that in the last school
20 year meaning the 2000 school year?
21 A   2001, 2002.
22 Q   2001, 2002, school year that teacher might have a
23 fourth grade bilingual class; is that correct?
24 A   Uh-huh.
25 Q   Was that a yes?

Page 43

1 A   Yes.
2 Q   And who is that teacher?
3 A   I can't remember her name.
4 Q   Okay. And as far as you were concerned, with regard
5 to the bilingual and English only integration issue, that had
6 been accomplished by the beginning of June of 2001, for the
7 third grade at least?
8 A   Yes.
9 Q   Did you have any perception communicated to you in
10 January of 2001, that Ms. Larkins had a different view as to
11 the success of the integration program between the bilingual
12 students and the English only students?
13 A   You know, this is the first that I'm hearing. I
14 don't recall her complaining about it or coming to me about it
15 since that time in 97, really, as a bilingual problem. Other
16 than it's a continual challenge to be sure that we get the
17 bilingual program, itself, perfected. I mean, that was going
18 through enormous changes at the time, and how we can, you know,
19 we were revamping that and changing that all the time. And we
20 talked about that, we, being Maura and the other bilingual
21 teachers, that that is a continual challenge. Okay. How do we
22 make sure that these children are getting what they need to?
23 There were new language arts, English learner's language arts
24 standards, that we had to learn and know and create lessons
25 towards. I mean, it was huge changes. But by 2001, the

Page 44

1 English only teachers were really saying, oh, my gosh. You've
2 got a big challenge here and more than that you're here, rather
3 than, we don't want you here, or we're going to go against your
4 program. They had pretty much realized how difficult it was.
5 And if anything, there was more respect for the bilingual
6 program, which is why we were able to talk about expanding the
7 program. So, I don't feel that that was a problem at all.
8 Q   And was there more respect for the bilingual program
9 in light of the fact that the state testing requirements had
10 now become more astringent, and the academics had to be taught
11 to these children?
12 A   Just everything. Everything, I think, is just
13 knowledge. As teachers become more knowledgeable about the
14 challenges and that they are responsible for these kids
15 learning, the more respect that they had for the bilingual
16 program. Because, otherwise, they would have to teach these
17 children, whom they couldn't relate to, if we didn't have a
18 bilingual program.
19 Q   Did the Stat 9 test -- is that test given other than
20 in English?
21 A   It's given in Spanish but they have to take the
22 English version also.
23 Q   And at what grade level does that testing start?
24 A   Second.
25     MR. BRESEE:  Is this a convenient breaking point?

Page 45

12 (Pages 42 to 45)

1    MS. SCHULMAN: Sure.
2    (Recess taken.)
3       Let's go back on the record.
4    Q  You've mentioned now, two instances of people coming
5    to you with concerns raised about Ms. Larkins. Were there more
6    than two times that this happened?
7    A  Since over the years, yes, since '97, definitely more
8    than two times.
9    Q  You mentioned the library incident, and you
10   mentioned --
11   A  Right.
12   Q  And you mentioned the Kingdom incident, and you
13   seemed to have zeroed in on this particular time period?
14   A  Right. Well, then after that, it was almost
15   right away. It couldn't have been more than a couple weeks
16   later, we had a science -- a science day schedule where all the
17   teachers sign up to teach certain lessons for the children.
18   And so, teachers sign up, and they say what it is that they're
19   going to teach.
20      And somebody had come in, just popped their head in
21   my office, and said Maura signed up to teach creationism. I
22   think it was creationism. So I said my goodness. So, I
23   went in there, and I saw it and I talked to Maura. I can't
24   remember exactly when I did, if it was that day. I think it
25   was that day and she said that it was a joke, ha, ha, ha. And

Page 46

1    I said well, okay. Well, good. People didn't take it as a
2    joke because, you know, they were still pretty much reeling
3    from the last time you were all upset about something. And so,
4    I guess, maybe, Maura -- people don't understand you.
5       And so, what I did was, I went into the lounge and I
6    told everyone, you know, this was just a joke, and so on the
7    board I just put "ha, ha" next to creationism to show that it
8    was just in jest.
9       And I talked to Maura about that. I remember talking
10   to her about how, maybe, people didn't know her very well and
11   that they didn't know her well enough to understand that that
12   was just a joke. And that maybe we needed to do something, she
13   and I, to make sure that, maybe, people got to know her a
14   little better, and she said -- we agreed. I think that was one
15   conversation where I felt that, you know, we had come to some
16   kind of understanding and, you know, I felt pretty good about
17   that conversation.
18      And again, I'm not sure about the timing, but not
19   long after that there was the problem with JoEllen.
20   Q  I'm sorry. Problem with what?
21   A  With JoEllen Hamilton. And I received a call from
22   Rick over the weekend or an evening.
23   Q  That would be Rick Werlin?
24   A  Rick Werlin, saying that JoEllen had called him very
25   upset that she had a confrontation with Maura, and that we

Page 47

1    should talk about it or have a meeting where we could talk
2    about it.
3       And now, I feel like I've blocked the whole incident
4    out of my brain. I tell you, I have been trying so hard to try
5    to remember exactly what happened, but I --
6    Q  Did Mr. Werlin tell you that JoEllen Hamilton had
7    called him over the weekend at home?
8    A  Yes. She was upset and felt threatened and was
9    afraid, and so I waited for his further direction, basically.
10   That's what I felt I needed to do. He was going to schedule a
11   meeting to talk about, talk to JoEllen, talk to Maura, talk to
12   the other teachers, about what was happening or what had
13   happened.
14   Q  And did that meeting take place?
15   A  Yes.
16   Q  And when did it take place?
17   A  Again, I don't remember the date.
18   Q  And do you recall the month?
19   A  I can't even remember the month. It was after -- I
20   think it was after April. It was in April some time.
21   Q  And who was present at that meeting? And this is
22   April 2001, correct?
23   A  Yes. The third grade teachers, Ms. Beers was there,
24   I think as the union rep. It seemed like we would call her in
25   for meetings when it was a teacher issue of some sort because

Page 48

1    she was our union rep, and I believe she took notes at that
2    meeting. Teachers talked about their relationships and what
3    they recalled about the incident.
4    Q  Was Rick Werlin present?
5    A  Yes. Rick was -- it was his meeting.
6    Q  He conducted the meeting?
7    A  He conducted the meeting.
8    Q  And were all the third grade teachers, including Ms.
9    Larkins, present?
10   A  No. All the teachers except Maura were there.
11   Q  Was she on any kind of leave of absence at that time?
12   A  I can't -- I'm sorry. I can't remember now if he had
13   placed her on leave before that meeting or after that meeting.
14   Q  He, meaning Mr. Werlin?
15   A  Mr. Werlin. I can't remember.
16   Q  And you observed that Ms. Beers was taking notes?
17   A  Yes.
18   Q  And did she ever show you those notes?
19   A  No.
20   Q  Do you have any knowledge as to whether or not
21   Ms. Larkins had been invited to attend that meeting?
22   A  I don't know. So many things sort of happened within
23   a short time frame, and in my mind it's all kind of jumbled
24   together, unfortunately. And so, I truly cannot remember. I
25   remember that meeting with the teachers and I remember inviting

Page 49

13 (Pages 46 to 49)

1  her to meetings and there were meetings where she couldn't make
2  it. And so, I don't know which is which. I don't know if she
3  was invited or not invited.
4      Q   Would your notes that you handed over to Dan Shinoff
5  be useful to you in helping you to refresh your recollection?
6      A   It would be useful, yes.
7      Q   Do you have any recollection of who said what at that
8  meeting?
9      A   I think I remember JoEllen just -- now, I do think
10  I'm mixing up meetings because the meeting with the grade level
11  team was after she came back -- you know what, I'm mixing it
12  up.
13          It was after she came back, and there was the
14  incident at the swimming pool where Rick called the meeting
15  with the third grade team, and Marie Beers was there. That's
16  when that meeting occurred.
17          Now, after the call from JoEllen, I believe there was
18  a meeting -- there was a meeting, I think it was here at the
19  district office with Maura and Gina and me and JoEllen. I'm
20  sorry. I remember --
21      Q   And Gina, is that Gina Boyd?
22      A   Gina Boyd.
23      Q   The president of the teacher's union?
24      A   Yes. JoEllen was there, JoEllen and Rick, Gina,
25  Maura, and myself.

Page 50

1  JoEllen was just scared. The way the topic came about and the
2  way that she had come in and started, you know, that's what I
3  remember.
4      Q   Now, if I understand you correctly, JoEllen went to
5  Rick Werlin with this complaint. She did not come to you; is
6  that correct?
7      A   I don't remember her coming to me first. I may
8  have -- I think I heard someone else, maybe, tell me about it,
9  but I was surprised when I got the call from Rick.
10      Q   Did you ever ask, either JoEllen Hamilton or anyone
11  else, why JoEllen had not initially come to you about her
12  concern?
13      A   No, I didn't. I didn't. I think it happened -- I
14  might not have been there, it was the weekend and so, you know,
15  maybe she tried to get ahold of me. I don't think that even
16  was brought up. I don't think I even thought about why she
17  didn't.
18      Q   Is it your understanding that this incident happened
19  during the school week, that is, some day Monday through
20  Friday?
21      A   Right. It happened during the week, during a school
22  day, a regular school day, not on a weekend.
23      Q   And is it your understanding that JoEllen Hamilton
24  contacted Mr. Werlin in the evening at home?
25      A   Uh-huh.

Page 52

1      Q   Sitting here today, can you tell us any specifics
2  about what JoEllen expressed made her frightened or concerned,
3  other than saying she was scared or frightened or concerned?
4      A   I can't remember the words exactly. I just remember
5  that it was the way she came into the room and the things that
6  she said, things that is, Maura said that were not
7  comprehensible to JoEllen, that were off the wall.
8          And she didn't understand why she was being attacked
9  the way she was, couldn't understand it at all, and so that's
10  what frightened her, the heightened emotion for something she
11  couldn't understand.
12      Q   Was she being attacked, as you understand, to be a
13  verbal attack as opposed to a physical attack?
14      A   Verbal attack, verbal attack.
15      Q   And what is your understanding based upon JoEllen's
16  rendition, if you have one, of where this event occurred?
17      A   It occurred in the teacher's mail box area. The
18  lounges are divided into two sections, the sitting area and
19  then there's the mail box area where the Xerox machine is.
20      Q   Did you gain some understanding about the topic of
21  this verbal exchange, if you will?
22      A   Exchange. That's the part I can't remember. I can't
23  even believe that I can't remember it, but I can't. It was
24  packed with more emotion, I think that I remember the emotion
25  more than the actual words, that she was frightened, just --

Page 51

1      Q   Is that a yes?
2      A   That's a yes.
3      Q   Was it late? Did he tell you that it was a Saturday
4  evening?
5      A   It was on the weekend, Saturday, because I think I
6  received the call like Sunday.
7      Q   From whom?
8      A   From Rick.
9      Q   At home?
10      A   At home.
11      Q   And what did he tell you?
12      A   He said that he received a call from JoEllen. She
13  was very upset and -- because of a confrontation with Maura and
14  that he would be contacting me in the morning. So, that had to
15  have been on Sunday.
16      Q   So, then a meeting was set up with you and JoEllen
17  and Rick Werlin and Maura Larkins?
18      A   And that was here at the district office.
19      Q   And when did that meeting occur? In terms of the --
20  was it the following week?
21      A   The following week some time.
22      Q   And was Gina Boyd or some other union rep present at
23  that meeting?
24      A   Gina.
25      Q   What, if anything, was the result of that meeting?

Page 53

14 (Pages 50 to 53)

**Page 54**

1   A  I thought that it was then that Rick told her not to
2  come back to Castle Park until something, until it was
3  resolved, whatever that meant. I can't remember exactly what
4  that resolution was.
5     I remember feeling very concerned about her health,
6  maybe that things were upsetting her at home. That it was
7  causing her to be so upset. I can't remember now, exactly,
8  much more than that.
9   Q  Did Ms. Larkins ever tell you that there was anything
10  going on in her personal life that was upsetting her, at that
11  juncture, or at any time?
12   A  The year before she had gone on some leave, extended
13  leave, and I thought that it had something to the with that.
14  She was gone. She really wouldn't tell me what it was, but I
15  received the note from personnel that it was a leave. And that
16  when she came back, she came back not full time, but she had a
17  substitute coming in for part of the time. So, I just assumed
18  that it was something between her and personnel, and that it
19  was a problem that she was having that then got resolved in the
20  year 2000, 2001.
21   Q  So, that was a problem you understood to have
22  existed?
23   A  The year before.
24   Q  Okay.
25   A  And so, then, I thought when this was going on that

**Page 55**

1  it may have had something to do with that, that she was still
2  upset or ill about something. And so, you know, I was
3  concerned because things that were happening were very unusual,
4  and she seemed not all there. I mean, not -- I certainly
5  couldn't understand her behavior, very incomprehensible.
6   Q  You mentioned an incident with a -- strike that.
7     Before I get there, did during this meeting did
8  Ms. Larkins offer up a rendition of what she believed had
9  happened, if anything, between herself and JoEllen Hamilton?
10   A  She must have. I don't remember what she said
11  exactly. I do remember that we all came to the same conclusion
12  though.
13   Q  Which was?
14   A  That we all decided that yes, she should take off for
15  a few days and rest.
16   Q  So, is that an administrative leave with pay, if you
17  know?
18   A  I believe it was with pay, but I don't know. I don't
19  know why I think that, but I believe it was.
20   Q  You mentioned an incident involving a swimming pool?
21   A  That was afterwards, after she came back, after, you
22  know, some time had gone by.
23     And one day, I was called to the district. We had a
24  meeting and she was to come back. This must have been, say, on
25  a Thursday or Friday, and that she was going to come back on a

**Page 56**

1  Monday. And there was an absolute directive as to the steps I
2  needed to take for her to come back.
3   Q  And who did you get that directive from?
4   A  From Rick. And so, I just followed everything to the
5  letter, you know. We were to have a meeting first thing in the
6  morning to welcome her back and a meeting with the team to plan
7  for her -- plan the curriculum and the rest of the year and
8  then to, sort of, have a plan for future, I believe, mediation.
9     And so, all of those things were happening, and they
10  were -- we were in the middle of all of that when there was a
11  confrontation at the pool. The third graders go swimming at
12  the recreation center pool.
13   Q  Okay. If I may interrupt you, you said "we were in
14  the middle of all that." I'm not sure what you meant by that.
15   A  We were in the middle of welcoming her. We had had
16  our meeting first thing in the morning on Monday to welcome her
17  back, and we had the meeting with the team, her third grade
18  team, to talk about, you know, what's the plan. Where are we,
19  because she hadn't been there, you know, catch her up. Where
20  are we in the curriculum, where are the goods, what's been
21  happening, where are the fieldtrips you know just everything.
22  We had that meeting.
23     We also, I believe, had a meeting with Gina at that
24  time, Gina Boyd, to talk about okay, what do we do about
25  mediating? You know, how are we going to do that? There were

**Page 57**

1  just initial talks. That's what I mean by being in the middle
2  of it. We hadn't scheduled any meetings yet. We were still
3  talking about how were we going to do that, how were we going
4  to do it.
5   Q  Talking about the mediation?
6   A  Yes.
7   Q  Okay. But the other two meetings had occurred, to
8  meet, to go welcome her back, and the team meeting to plan the
9  curriculum for the rest of the year that had happened?
10   A  Yes.
11   Q  And so, the mediation plan was still in the talking
12  stage?
13   A  Yes.
14   Q  And Gina Boyd was included in that discussion?
15   A  Yes. She was a big part of that, and in the
16  meantime, of course, the kids are still coming to school and
17  teaching is still happening and there was the swimming. The
18  third graders go swimming and her class, Maura's class, and
19  Linda Watson's class happened to be scheduled together. So,
20  they were at the pool together, and there was an incident there
21  where Maura had confronted Linda Watson and scared her.
22   Q  Okay. How did you glean that information?
23   A  She came back right from swimming, she came right
24  into my office and she said Maura, I think her words were,
25  Maura attacked me.

15 (Pages 54 to 57)

1    Q    Okay. Does she --
2    A    She was so upset, I was like woe, woe, woe, sit down.
3    Let's talk about it. I believe there was another teacher there
4    with us. Oh, it was Al Smith. I believe Al Smith was the one
5    who -- because she was so upset, he kind of ushered her in and
6    stayed.
7    Q    Okay. But he wasn't at the pool, was he?
8    A    No, he wasn't. But I think he was the one that she
9    first relayed the story to, and so he came with her.
10        And from what she said, and I can't remember exactly,
11   but she was cornered in the pool area, in the dressing area,
12   and Maura came at her. I mean, just -- she related it as a
13   very physical confrontation where Maura was stepping towards
14   her, and Linda was stepping back and was feeling scared until
15   she had her back against the wall. And Maura was still kind of
16   coming forward telling her how upset she was about something,
17   something about a field trip, I think, or chaperones. I can't
18   even remember what exactly it was. But it scared her. It
19   scared her very much, and there were kids, apparently, who
20   witnessed that and that really upset the teacher also. And
21   because this had happened in front of children, that really was
22   very, very inappropriate. And I called Rick, and that's when
23   he set up the meeting at the site with the teachers.
24   Q    With all the third grade teachers?
25   A    Yes.

1    Q    Excluding Ms. Larkins; is that correct?
2    A    I don't believe she was there. I don't know if she
3    was invited.
4    Q    And how long after the swimming pool incident did
5    this meeting occur?
6    A    It must have been the next day.
7    Q    And was there a representative from the teacher's
8    union present?
9    A    That's Maria Beers, who's our union rep.
10   Q    Who was taking notes?
11   A    Yes.
12   Q    And what, if anything, resulted from that meeting?
13   A    She was then placed on leave again. And Rick said to
14   find a long-term sub until the end of the year, or who could
15   stay till the end of the year, because he wasn't sure how long
16   this would take. In other words, a very reliable sub for those
17   children since they had been -- our concern was the kids at
18   this point because she had been gone and they had had several
19   subs at this point and they had witnessed this incident. And
20   so, we were really caring, really trying to care for the kids
21   at this point.
22   Q    This incident took place in the locker room area?
23   A    Right. The kids all changed out of their suits into
24   there walking clothes or, you know, got dried off so they could
25   have walked back to school.

1    Q    And this would have been in the girl's locker room
2    area?
3    A    Uh-uh.
4    Q    Was that a yes?
5    A    Yes.
6    Q    To your knowledge were any of the parents of
7    Ms. Larkin's students contacted and told that she would be out,
8    and the substitute would be in the class?
9    A    Absolutely. Yes. I called each and every, I called
10   every parent.
11   Q    And what did you tell every parent?
12   A    I just told every parent that Ms. Larkins would not
13   be back for a while and that we were having a substitute. And
14   I talked mostly about the substitute.
15   Q    Did you define what a while meant?
16   A    No, because I didn't know. I'm sure Rick has that
17   letter.
18   Q    Was there a letter that was sent to the parents?
19   A    Uh-huh.
20   Q    Was that a yes?
21   A    Yes.
22       MS. SCHULMAN: Was that a letter that was produced,
23   Mr. Bresee?
24       MR. BRESEE: I don't know --
25       MS. SCHULMAN: I just seem to recollect it.

1        MR. BRESEE: I don't know for sure. I wasn't
2    involved in the final production. I was on vacation I believe
3    my office asked for an extension, so I didn't see the actual --
4        MS. SCHULMAN: Could you check that, and if you don't
5    have it could you get it?
6        MR. BRESEE: Yeah, I'd be happy to give it to you.
7    As I'm thinking of the specific request, like I mentioned
8    previously, your request was related to -- I'm not sure it
9    would fall within the request, but I will request it.
10       MS. SCHULMAN: I know the way that I request, and I
11   generally have a dragnet question.
12   Q    Do you speak Spanish?
13   A    No.
14   Q    And the parents you were calling, were they mainly
15   Spanish speakers?
16   A    Most of them are Spanish speakers, but between my,
17   sort of very, very broken Spanish and their very broken
18   English, we managed to talk. A lot of times I would, sometimes
19   I would talk with the child, who would then translate and back
20   and forth.
21       I do believe I asked Maria Beers to call, maybe, a
22   parent as a follow-up type of a call to make sure they
23   understood. But, pretty much, most of them were able to
24   understand. The letter went out in English and Spanish, I'm
25   sure, as everything did.

1   Q   And how many students were in her class, Ms. Larkin's
2   class?
3   A   No more than 20. The third grade is less than 20.
4   Q   Were there any other incidents that happened that
5   were reported to you during the 2000, 2001, school year
6   concerning Ms. Larkin's perceived conduct, or actual conduct,
7   which you haven't already told us this morning?
8   A   Well, the one thing that really concerned me was that
9   my number one concern, were the children. And when
10  Ms. Larkins, Maura, was asked not to have contact with the
11  kids, I was very concerned that she did have contact with the
12  parents and children, after she was asked not to.
13  Q   When was Ms. Larkins asked not to have any contact?
14  A   At that second meeting, or after she was asked to
15  leave the second time.
16  Q   And who told her not to have any contact with the
17  kids?
18  A   I believe Rick Werlin did.
19  Q   By the way, how long was she actually back teaching
20  between the end of the first leave and that school year, and
21  the beginning of the second leave?
22  A   No more than a week, I think. She came back on a
23  Monday, and I think it was Thursday when it happened a very,
24  very short time.
25  Q   So, during that meeting Mr. Werlin gave a directive

Page 62

1   to Ms. Larkins that she was not to have any contact with her
2   students; is that correct?
3   A   Yes, that was my understanding.
4   Q   Did you hear him?
5   A   He told me that I think.
6   Q   He told you that he had said that to Ms. Larkins?
7   You didn't actually hear him first hand?
8   A   I don't remember actually hearing that. It may have
9   happened at that meeting. I don't remember how I know that,
10  but he told me that she was not to have contact with the
11  children and that she would not come back until he said so, you
12  know, that he would tell me when she was going to be back.
13  Q   So, he had essentially taken this problem from your
14  hands?
15  A   Pretty much. Yes, from the time -- actually, I felt
16  from the time she was on leave the first time, he, you know,
17  from the time JoEllen called him, I feel that -- I took all
18  directives from him.
19  Q   Now did you understand from what Rick Werlin told you
20  that not having any contact with the students meant that she
21  wasn't to come on campus at school?
22  A   I meant -- I understand that to mean not to have any
23  contact with them, period.
24  Q   And did you come to find out that that directive, as
25  you understood it, had been violated by Ms. Larkins?

Page 63

1   A   Yes.
2   Q   And how did you learn that?
3   A   Yes. A teacher, I believe it was Maria Beers called
4   me, and told me. I can't remember now, how she told me, told
5   me that she had heard from a parent that they were meeting --
6   children were meeting Maura at the library to learn English, I
7   think. I can't remember specifically, to do work together.
8   But these were her students.
9   Q   At the public library?
10  A   Yes.
11  Q   In Chula Vista someplace?
12  A   In Chula Vista someplace. I wasn't sure which
13  particular -- there are two, and I wasn't sure which one
14  exactly and neither was Maria.
15  Q   Did Maria have any information about how many
16  students were participating?
17  A   Apparently, there were quite a few. I don't know.
18  That's all I know.
19  Q   And what, if anything, did you do upon learning this
20  information?
21  A   I told Rick. I told Rick and --
22  Q   Do you know what happened next?
23  A   I believe he tried to contact her to reiterate the
24  directive. I don't know if he was successful in that.
25      I actually went to the library a couple of times to

Page 64

1   see if she was actually there.
2   Q   Did you see her?
3   A   No, I did not. But I wasn't sure of the timing, you
4   know so I don't know. I was just trying to follow up.
5   Q   Did you contact any of the parents to find out if
6   parents were permitting their children to meet with
7   Ms. Larkins?
8   A   I can't remember now if I had done that or Ms. Beers
9   had done that. But she was offering students free tutoring
10  because she didn't want the students to get behind. And so,
11  that's what she was telling parents, you know, I am willing to
12  teach your children for free because I don't want -- because I
13  care about them, and I don't want them to get behind.
14  Q   Did you believe that that was a true statement?
15  A   You know, I believe that Maura Larkins loves
16  children. I always did. Her motivation for this, I don't
17  know.
18  Q   Did the school district, to your knowledge,
19  irrespective of how you gained that knowledge, take any steps
20  to stop Ms. Larkins from meeting with these students?
21  A   I thought that Rick had called her to do that.
22  Q   Had called whom?
23  A   Had called Maura. I don't know if that happened. I
24  called the children and told them not to do that.
25  Q   And did you speak to the children or their parents?

Page 65

17 (Pages 62 to 65)

1   A  I spoke to the parents.

2   Q  And --

3   A  And just said, no, that she cannot do that, that --
4 please don't do that. Please don't go to the library because
5 Ms. Larkins cannot teach your children, cannot tutor your
6 children, at this time.

7   Q  Did you tell them why?

8   A  No. I mean, that's all I said, just basically that,
9 I think. Just getting that much information across was
10 difficult enough.

11   Q  Did anyone ask you why?

12   A  Yes. They all asked me why. Why, what's wrong,
13 what's happening? And I said well, I can't -- and that was
14 what was so difficult because they all asked, "Why? We love
15 her. She's so, wonderful."

16     And I would say, "Yes, I agree she's wonderful but
17 she can't at this time, and I can't tell you any more than
18 that."

19     And it was that vagueness that was very difficult for
20 parents to hear. They didn't want to hear that. They wanted
21 to hear exactly why, but I couldn't tell them.

22   Q  And do you have any knowledge as to whether or not
23 the children stopped meeting with Ms. Larkins after your phone
24 calls to the parents?

25   A  I think that they did. Ms. Beers didn't hear of any

Page 66

1 more and I certainly didn't hear of anything more.

2   Q  The substitute teacher that you had told the parents
3 about in your previous telephone conversations, was that a
4 person who was a bilingual teacher?

5   A  Yes.

6   Q  And what was her name?

7   A  Sandra Ornelas.

8   Q  How do you spell the last name?

9   A  How can I remember her and not -- I think it was
10 Sandra O-r-n-e-l-a-s.

11   Q  Were there any other instances of conduct of behavior
12 on the part of Ms. Larkins that occurred during the 2002, 2001,
13 school year, that you haven't already related to us this
14 morning?

15   A  Just one more that I remember, and it was after the
16 swimming -- not swimming, after the library incidents or the --
17 after all that, I don't remember exactly how long after, maybe
18 a week or two, where Rick had received a call, I believe from
19 Maura.

20   Q  After the library incidents, you mean the public
21 library incidents?

22   A  Public library incidents -- saying that, let's call
23 channel, some radio station or some TV station, and meet at
24 Castle Park or something. It was a very strange message, but
25 what I was -- what occurred to me was that maybe she was

Page 67

1 meeting children at the school, and so I went down there. I
2 went to the school and called our resource officer, who then
3 called other police, and we waited there at the school. I
4 didn't know what I was waiting for exactly. I just knew that
5 if she had called kids to come to the school, that I wanted to
6 be there because the call was so unusual.

7   Q  Okay. Let me back you up because I'm not too sure I
8 understand this. Rick Werlin called you at home; is that
9 correct?

10   A  Uh-huh, yes.

11   Q  Was this a weekend or an evening?

12   A  I believe it was a weekend, Sunday morning, or maybe
13 Saturday night, saying that this was going to happen Sunday
14 morning.

15   Q  And did he receive a phone call from somebody
16 respecting themselves to be a radio station?

17   A  No. My recollection was that it was Maura who called
18 him and said, call the radio station. Let's see -- you know, I
19 don't even want to paraphrase it. Something about calling the
20 radio station or that she called the radio station, and that
21 meet me at Castle Park with the kids, something to that nature.
22 I mean, I remember radio station, kids, Castle Park. She was
23 going to be there and so -- I think there was a time, like 9:00
24 o'clock, because I remember I needed to be there at 8:00
25 o'clock to be sure that if kids did come that they would be

Page 68

1 sent home.

2   Q  And so, you went down at the appointed hour or
3 somewhat before that?

4   A  Oh, yes, way before. And I had the resource officer
5 there.

6   Q  And what happened?

7   A  Nothing. I was there. We were waiting and nobody
8 came. I think maybe one child. I seem to remember a child
9 kind of looking in to see. I mean, it wasn't even in her class
10 or anything. What's going on because there were police cars?
11 No, that was it, and we waited about an hour, I think. I mean
12 an hour past the time. It was 9:00 o'clock.

13     We left around 10:00 o'clock, and I went down, at
14 that point, down to the library, you know, thinking maybe it
15 was supposed to be the library. And I went down there, and
16 there was nobody there. So I went home.

17   Q  In addition to the resource officer there, were other
18 Chula Vista police officers there?

19   A  Right. They responded also.

20   Q  About how many altogether?

21   A  There were, I believe, two squad cars.

22   Q  Besides the resource officer?

23   A  You know what, I don't think the resource officer
24 actually came. I think he sent the two squad cars. Or if he
25 came, he came later. I can't remember. I just remember there

Page 69

18 (Pages 66 to 69)

**Page 70**

1      was a bunch of police there, two squad cars there.

2      Q   Did you ever speak to Ms. Larkins about whether or

3      not she had actually called Rick Werlin to say that there was

4      going to be a radio station?

5      A   No, no. At this point, really, I didn't feel that I

6      could call her in anyway. I just --

7      Q   Did you ever hear of some incident involving Rick

8      Werlin, and pens or pencils that were said to have been thrown

9      at him or near him by Ms. Larkins?

10      A   He relayed that to me.

11      Q   What did he tell you?

12      A   That he had had a conversation with her out front, in

13      front of the office. And -- actually, when he was relaying the

14      story, and again, I don't remember the exact words, but I can

15      remember what I was thinking and that was well, yeah, that

16      seems just like the other conversations that I have had with

17      her, and other teachers have said that they have had with her.

18      And it was sort of the same reaction but that she

19      apparently threw a pencil at him or shoved it at him or

20      something like that.

21      I think I wrote that incident down because I thought

22      it was so strange.

23      Q   In your notes that you gave to Dan Shinoff?

24      A   I think so, yes. That and the incident in the

25      office. Actually, the incident in the office happened before

**Page 71**

1      that pen throwing thing. He reminded me of that.

2      Q   Which incident in the office?

3      A   Okay. There was an incident, it was after -- the

4      timing, now, is kind of hazy. I can't remember exactly when it

5      was. But it was a time when, I do believe, she wasn't supposed

6      to be on campus. Well, I know that. She wasn't supposed to be

7      there, and she was there and -- oh, yeah. It was before the

8      swimming pool incident.

9      And she had come back. She had come back before she

10      was officially supposed to be back. She had come back, and she

11      was standing in front of the office with some parents and I

12      said oh, Maura, you're back. Nobody told me you were back.

13      And so, we were opening the door into the office and

14      coming in and I was going, "Come on in. I want to talk to

15      you."

16      And she said she was still talking to the parents

17      telling the parents -- this was bizarre, telling the parents

18      that, "There she is. She's the one who's telling everybody

19      that I'm trying to hurt your children. I'm trying to kill your

20      children. Isn't that awful? Ha, ha, ha."

21      And I wasn't really understanding what she was saying

22      at the time because, you know, my Spanish is not very good. I

23      just --

24      Q   And this was a conversation being conducted in

25      Spanish?

**Page 72**

1      A   In Spanish, to these parents. There were about three

2      or four of them all kind of being ushered into the office, the

3      office secretary was there, and the attendance clerk was there.

4      The office was relatively full of people and she was saying

5      this very loudly, and I knew it wasn't good. I mean, I

6      couldn't understand everything, but I knew it was not good.

7      I said, "Come on. Let's talk about it. Come into

8      the office. Let's talk about it."

9      On the way in she was saying all these things.

10      Linda, the attendance clerk, is one person who is bilingual and

11      she can understand everything, and she was saying she's telling

12      all these parents that you want to -- that you're saying that

13      she wants to kill them, and I was horrified. I was just

14      mortified that this was happening, and I was able to, sort of,

15      usher her into the office. And then that conversation now,

16      again, I can't remember exactly. I think I wrote that down

17      too, exactly what I said or she said. I do remember thinking,

18      you know, Maura, I don't understand that. I didn't think you

19      were going to be here. What's going on? Why are you telling

20      the parents this? I just can't remember exactly with I said at

21      that point but just that I was mortified.

22      Q   Did you contact Mr. Werlin at that point and tell him

23      what had happened?

24      A   Yes, I did. I think it may have been that day that

25      he came and then had that confrontation with Maura.

**Page 73**

1      Q   With the pencils?

2      A   Uh-huh.

3      Q   Was that a yes?

4      A   Yes. Either that day or the following day. I think

5      it was that day, just because I don't recall that she was on

6      campus that many times, and so it may have been another day

7      where I wasn't there or I was on another part of the campus.

8      Q   Did you have some understanding, at that point in

9      time, that Ms. Larkins had been barred from returning to Castle

10      Hills, I'm sorry Castle Parks Elementary school until further

11      notice on that day when she was there speaking to the parents?

12      A   I do think she was not supposed to come back. That's

13      why I was surprised to see her. But again, that was between

14      her and HR. I mean, I was told she wasn't going to be back and

15      so I was surprised that she was there, but I don't know exactly

16      what the conditions were. I was just told she wasn't coming

17      back until Rick told me she was coming back. That's why I was

18      surprised that she was there.

19      Q   And did Ms. Larkins ever tell you what it was that

20      she was doing there that --

21      A   No, she didn't. No. If she did, I don't remember.

22      Q   At some point in your rendition of this factual

23      narrative, you said that Ms. Larkins in saying, you know, this

24      person is saying I'm trying to hurt or kill your children

25      Ms. Larkins said ha, ha. Did I understand you correctly?

Jan White & Associates  619-234-0991
1-888-311-0991

**Page 74**

1 A. Yes. But it was -- it wasn't, it was not a -- the
2 parents were not laughing. It was not a joke among them. If
3 she was joking, they were not laughing.
4 I would have to say that her nature at that time was
5 more hysterical than ha, ha, ha, this is, you know, this is
6 what's happening. It wasn't lighthearted in any way.
7 Q. More hysterical, meaning, Ms. Larkin's attitude was
8 more hysterical?
9 A. It was more emotionally, highly emotionally charged
10 and not lighthearted and in a joking way.
11 Q. And your ability to understand and communicate in
12 Spanish is derived from what kind of learning experience or
13 life experience or both?
14 A. High school Spanish, Filipino. I am fairly fluent in
15 Filipino which has a lot of Spanish basis, you know, a lot of
16 the same words.
17 Q. Which Filipino language?
18 A. Tagalog mostly. Ilocano, actually, is much more
19 Spanish based, but the colloquial Spanish that's spoken at
20 Castle Park amongst the parents is very different.
21 And so, I have to really listen very intently in
22 order to really catch the full meaning of things. You can sort
23 of understand when somebody's angry or somebody's excited, you
24 know, but not -- I can't pick up every word.
25 Q. Okay. To the best of your recollection, have you now

**Page 75**

1 told us about all the incidents that you can recall this
2 morning that occurred in that 2000, 2001, school year involving
3 Ms. Larkins, or at least allegedly involving her?
4 A. Yes.
5 Q. Okay. I'd like to have marked as Exhibit 18 a group
6 of documents, numbering five. The top one is dated December
7 20, 2001. It appears to be handwritten except for obvious fax
8 communications that are put on the fax machine receipts on top.
9 And the last one is typewritten and is marked December 11,
10 2001. This would be Exhibit 18. Just look at them and let us
11 know when you're finished. Are you finished looking at them?
12 (Exhibit No. 18 was marked for identification and is
13 annexed hereto.)
14 A. Uh-huh, yes.
15 Q. Have you ever seen any of these and I'll call them
16 unsigned statements or letters before?
17 A. No.
18 Q. And you actually left June 30th of 2001 correct?
19 A. Right.
20 Q. And it appears, at least as to the dated ones, that
21 these were dated in December of 2001, correct?
22 A. Right.
23 Q. And nobody's ever asked you any information about the
24 contents of these particular statements?
25 A. No. I did hear about, that she came to her home.

**Page 76**

1 Q. Okay. You're pointing to the last page which is
2 signed?
3 A. The letter about going to her home.
4 Q. And who do you understand this to be?
5 A. I don't know who this is from, but I do know that she
6 had gone to Michelle Scharmack's home because Michelle
7 Scharmack called me and told me, saying that this is your last
8 chance to, basically, to be on my side so as not to be named in
9 the litigation.
10 Q. And did Ms. Scharmack tell you that after you had
11 already left the school?
12 A. Yes.
13 Q. And what more did Ms. Scharmack tell you about Ms.
14 Larkins's visit to her home?
15 A. That was it. She thought that I would receive the
16 same visit. She called me to warn me, I guess, because it had
17 taken her by surprise. It scared her to death. She was just
18 scared that, now, she is actually comeing to her home and now,
19 you know, her family was in jeopardy, and she wanted me to be
20 aware of that and tell my family so that I would not be
21 surprised.
22 Q. And did Michelle Scharmack, rather, tell you that
23 there was a discussion between her and Ms. Larkins about
24 Michelle not being named as some sort of party in litigation.
25 A. Right. That was her understanding, was that Maura

**Page 77**

1 wanted her to change her story, basically, in that this was her
2 chance to change her story and be on her side or else she
3 would -- you know, I tried to block this. Because I'm just
4 remembering it now and how upset I was. So that she wouldn't
5 be named in this lawsuit and she said I can't change my story
6 because -- how can I change my story? This is what happened.
7 So, I said don't worry about it. Just relax. I
8 don't think -- did you call somebody? And I think she said she
9 called Rick, and I don't know if she did or not.
10 Q. And did Michelle tell you whether or not there had
11 been any other contacts between her and Ms. Larkins over this
12 possible lawsuit?
13 A. No.
14 Q. Did she share with you whether or not she had
15 received any kind of written communication?
16 A. No.
17 Q. Written communication from Ms. Larkins?
18 A. No.
19 Q. And did Ms. Larkins ever contact you concerning some
20 upcoming lawsuit?
21 A. No.
22 Q. And are you named in some lawsuit that Ms. Larkins
23 has filed?
24 A. This was the one that we had, right, that we had
25 earlier.

20 (Pages 74 to 77)

1  Q  Okay.  And is it your understanding that you're still
2  a defendant?
3  A  No, I don't -- I think that whole thing had been
4  either dropped or resolved or something because it's no longer
5  there.  It's gone.
6  Q  And you understand you're not a defendant in this
7  matter, here?
8  A  Right, I understand that.  But I'm still -- it kills
9  me that I can't remember everything, though, because I think
10  it's important to remember everything.
11  Q  And your notes, perhaps, would help you.  Did you
12  make notes about this incident involving Michelle Sharmack's
13  calling you?
14  A  No, no, I didn't.  And it's Scharmack,
15  S-c-h-a-r-m-a-c-k, I believe.
16  Q  We have it spelled out, but I'm so bad at auditory
17  stuff that I think I'll stick with Michelle on this one because
18  I keep doing it wrong.  We have a few letters.  Mark this next
19  Exhibit as 19, appears to be 1-23-01 letter from Maura Larkins
20  to Dr. Donndelinger.  Okay.  Have you had a chance to read it?
21      (Exhibit No. 19 was marked for identification and is
22      annexed hereto.)
23  A  Yes.
24  Q  Did you receive this particular letter from Laura
25  Larkins some time in or about the date of January 23, 2001?

Page 78

1  A  Yes.
2  Q  And did you ever discuss the contents of this letter
3  with Ms. Larkins?
4  A  Yes.
5  Q  And did you come to some understanding about what it
6  was that Ms. Larkins was talking about when she said I first
7  tried to report to you a problem with inappropriate behavior
8  toward me on the part of the staff members.  You dismissed the
9  matter as insignificant.  I have endured in silence?
10  A  I don't believe we were able to discuss that.  I
11  asked -- that's when I had called Rick Werlin to set up a
12  meeting.  I told her, in fact, I said, "You know, it sounds
13  like this is a problem that we're going to need some help and I
14  have contacted Rick to get in on this with us," and she agreed
15  to that.  And we tried to set up a meeting, Rick Werlin and we
16  did.
17      We set up a time that she, then, I believe she
18  couldn't make it, and I decided that she didn't want to meet
19  anymore.  I think that's the right timing for that.
20  Q  Did you understand without speaking to her what she
21  was talking about when first trying to report a problem to
22  you the year before, which you dismissed as insignificant?
23  A  You know, this is the type of thing that sometimes
24  she would say.  I mean, I never, ever would dismiss a problem
25  as insignificant that somebody comes to -- I mean inappropriate

Page 79

1  behavior as insignificant.  There was nothing that she ever
2  came to me with that I didn't talk to the teacher about or talk
3  to her about or try to do something about.
4      Nothing is insignificant.  Maybe we didn't resolve it
5  to her liking, but never was anything treated as insignificant.
6      And so, when I read that, I thought this is not
7  possible.  I think what she was trying to -- what I thought she
8  was referring to was a problem she had had the year before,
9  that I had called Rick Werlin on, and again, at some point, she
10  decided that we could handle that on-site.
11      That's a whole, long story in itself, but again, it
12  was about and with fellow staff members.  Rick Denman and Robin
13  Colls were part of that and, again, it was a misunderstanding
14  that got blown totally out of proportion.
15      And that's what, I'm sure, she was talking about.
16  And we went through the entire information on that and for her
17  to say insignificant.  I mean, it did get dropped, and we
18  talked about it, but not dismissed.
19  Q  Did Robert -- Robin Colls ever share with you any
20  kind of information concerning a police report allegedly,
21  somehow, involving Maura Larkins?
22  A  Actually, that did come up at some point when she was
23  talking, but she, herself, said you know, you don't want to
24  hear anything about that.  And I'm not going to tell you.  I
25  know that there is something, but I have no clue what it is.

Page 80

1  She didn't want me to know.
2  Q  So she said there's something in the police report?
3  A  It was a personal thing.
4  Q  Involving something that was a nonschool matter but
5  that Robin Colls was aware of?
6  A  Uh-huh.
7  Q  Was that a yes?
8  A  Yes, I do recall hearing something like that.  I have
9  no details whatsoever.
10  Q  Was this in a face-to-face conversation with Robin
11  Colls?
12  A  Yes.
13  Q  And what year was that?
14  A  That was the year, I think she told me about that
15  this year, the year --
16  Q  2002?
17  A  Two -- 1999, 2000 school year.  It was the year
18  before.
19  Q  That this occurred?
20  A  It occurred in the 1999, 2000 school year.
21  Q  But you found out about it in which year?
22  A  There was an incident that this is referring, to my
23  belief.  They had a problem with a staff member the year before
24  and -- that's what I understood this to mean anyway.
25  Q  Exhibit 19?

Page 81

21 (Pages 78 to 81)

1   A   Yes. It happened 1999, September. It was like the
2   first week back from vacation. That's when that happened, and,
3   I believe, that's when Robin told me that there was an
4   incident, there was a personal, a side incident, but she said
5   you don't want to know about it. And I said no, it's personal,
6   doesn't have anything to do with school, I don't want to know.
7   Q   And she told you it involved some sort of police
8   report or law enforcement report?
9   A   I think so, yes.
10  Q   Did you ask her how she knew that?
11  A   Uh-uh.
12  Q   No?
13  A   That was it. That's all she said. She said I have
14  this thing going on with her on the side. Outside of school.
15  You don't want to know about it.
16  Q   Was it an indication that she had it going on, that
17  it was something personal?
18  A   It was a personal issue outside of school going on
19  with Maura and her somehow, and I don't know if it was her or
20  her family or -- but that was it. That's all she said.
21  Q   Did Ms. Colls, rather, leave you with the impression
22  that it was going on -- that somehow, Ms. Colls was actually
23  involved in this personal incident?
24  A   That she or her family, you know, she knows about it
25  or it was -- something else going on outside of school,

Page 82

1   something to do with Robin and or her family and Maura. I
2   don't know even why I remember that. Somehow somebody told me,
3   and I think it was Robin.
4   Q   It had something to do with either Robin or a family
5   member of Robin's?
6   A   Yeah. I think if it was actually Robin I probably
7   would have wanted to know, just natural curiosity. I don't
8   think it was against her. I think it was a family member.
9   Q   Going back to January of 2001, our next exhibit is a
10  January 26 letter addressed to you from Maura Larkins. We'll
11  mark that as Exhibit 20.
12      (Exhibit No. 20 was marked for identification and is
13.      annexed hereto.)
14  A   Okay.
15  Q   Have you had a chance to read it?
16  A   Well, yes.
17  Q   Did you receive this letter at, or about the date of
18  January 26, 2001?
19  A   Right. This was after we had set up a meeting with
20  Rick and then she decided that she would rather just, she and
21  I, talk about it.
22  Q   And this reference to a Comer method. Was the school
23  at that time a Comer school?
24  A   We were trying to become a Comer school. We hadn't
25  officially become one. We had been trying very hard. I had

Page 83

1   been trained at Yale University, and we were getting it going.
2   We didn't quite have all the pieces yet.
3   Q   And is that a problem solving method?
4   A   No. It's a school reform method to increase
5   student's achievement.
6   Q   I'm sorry. It was a school reform method for what?
7   A   Reform program, to improve school achievement,
8   student's achievement.
9   Q   And was part of that program, then, inclusive of
10  mediation at the school level of some sort of staff disputes?
11  A   No. No, it really -- that -- this part of it,
12  whenever she would bring up Comer as a process that's
13  failing -- it was always very confusing to me because,
14  obviously, it was a misunderstanding on Maura's part as to what
15  Comer is.
16      Comer is a school reform process. It's a process
17  through which a school handles all of its management and -- of
18  the school in order for the school to best serve students, and
19  it's a three-prong program where you try to increase parental
20  involvement. You try to increase staff involvement for the
21  governing of the school, and then you try to meet the students'
22  needs at an individual level and so -- and in that effort we
23  were moving forward.
24      It's difficult when you're going through a change,
25  you know, a staff, a whole school change in the way you do

Page 84

1   things, but we were moving along in that process. But it
2   doesn't really have a mediation thing where it would solve any
3   kind of one-on-one problem with the teacher, and another
4   teacher or a teacher and myself.
5   Q   Is Comer a model or approach to give individual
6   autonomy?
7   A   No. The schools in Chula Vista already have
8   autonomy. What it is, it taps the talents of the entire staff
9   so that it's not a top-down organization but rather a very flat
10  organization.
11      So, I don't make all the decisions. The whole team
12  makes the decisions for the good of the whole school. And so,
13  we have several committees that handle all the different
14  aspects of the governing of the school from technology, you
15  know, to curriculum to the beautification of the school as well
16  as curriculum.
17  Q   So, having received this letter, then, did you take
18  any further action to meet with Ms. Larkins?
19  A   I can't remember if we met after this letter or what
20  else happened during this time because it seemed to me that
21  things kind of started snowballing after this, that something
22  else happened.
23      I think this is about the time when the science thing
24  was put on the board and then soon thereafter, the JoEllen
25  thing.

Page 85

22 (Pages 82 to 85)

1    I can't remember if we actually had this meeting, but
2    I do remember that there was some time when we did have that
3    conversation where I said well, it seems to me Maura, that the
4    staff doesn't really know you, understand you. They don't
5    understand that this was a joke. Remember the thing with the
6    science? Maybe we need to come together, and let's talk about
7    getting to know the staff, the staff getting to know you a
8    little bit better so that they will understand you. I said,
9    you know, maybe you've been isolated too long. Let's work on
10   that. I think that was around the same time here.
11       So, I don't know if we formally met. I don't think
12   we formally met on this because other things were happening at
13   the same time that preempted it.
14   Q    Had you been in contact with Cyndi Miller on January
15   20, the day before the date appearing on Exhibit 20, to discuss
16   Ms. Larkins?
17   A    And it could be that's -- yeah. Because again, you
18   know, I was trying to call HR to get help on this because I
19   thought it was time to get HR's help again. Then we did set up
20   a meeting and to me, at that time, Cyndi Miller and Rick were,
21   I mean, they were one. If I talked to Cyndi, I knew Cyndi was
22   going to tell Rick and vice versa. When I say Rick, it may
23   have been Cyndi Miller instead.
24   Q    And then you got the letter the next day or so from
25   Ms. Larkins?

Page 86

1    A    Right.
2    Q    Which wanted the meeting with you, as opposed to a
3    meeting with --
4    A    Right.
5    Q    -- rick Werlin involved?
6    A    Right.
7    Q    And that was a process you did not wish to engage?
8    A    Oh, no. Believe me, this is, like, okay. Good, yes.
9    Let's do that. I have never turned Maura away as long as I can
10   remember. I mean, I'm happy to talk to any teacher about
11   anything.
12   Q    But the meeting did not occur in that fashion?
13   A    And I don't know why. I really think it's because,
14   then, the JoEllen thing came in the middle of this, or maybe
15   the science incident came in the middle of this. I can't
16   remember what the timing was, but there was no reason not to
17   have this meeting. And I was totally up to have any meeting
18   with her to talk about how we can improve our relationships,
19   or her relationship, with her team.
20   Q    Let's look at what I've marked as Exhibit 21 which
21   appears to be a note from you dated 2-5-01 to Maura, and your
22   handwriting's pretty clear as are your little jots of
23   abbreviations. Why not just read the whole thing out loud?
24       (Exhibit No. 21 was marked for identification, and is
25       annexed hereto.)

Page 87

1    A    Yeah. "Ellen cannot meet on Wednesday after school.
2    She would like to meet after at a later date with a mediator.
3    Let's talk."
4    Q    You provided this note to Ms. Larkins on or about the
5    date; is that correct?
6    A    Yes.
7    Q    And this involved the incident with JoEllen Hamilton?
8    A    It did -- I don't know if it's the same -- I don't
9    think it's the same. I think it was still -- this might have
10   been, still been about the science thing. That JoEllen was the
11   one who came to me. JoEllen was in charge of the science day
12   and wanted to talk with Maura, or at some point, Maura and I
13   must have talked and said yeah, Ellen maybe should be part of
14   this talk, but JoEllen didn't want to meet without a mediator.
15       We were working towards some sort of meeting of the
16   minds here, as I recall. But this, I don't think that this is
17   the same incident that she then called Rick on. This was about
18   the science thing, still trying to resolve that.
19   Q    And did the meeting ever occur?
20   A    I don't think -- no, because she wanted it to be with
21   a mediator, and so it's difficult to find somebody to do that.
22   We never did find a mediator for anything.
23   Q    Was there supposed to be some sort of meeting with
24   Roger Cunningham, maybe around the beginning of February?
25   A    Uh-huh.

Page 88

1    Q    And who is Roger Cunningham?
2    A    He was our Comer, sort of mentor, I guess. He is
3    around -- he is hired by the Comer Institute as, sort of, just
4    a source of information.
5    Q    I'm sorry. I interrupted you.
6    A    And Maura had suggested that maybe he could mediate a
7    session with us, to talk about what was going on. And I asked
8    him if he could, and he was going away on a trip or something
9    and then when he came back, he wanted to know the nature of it,
10   and it sounded like an HR issue, not a school issue, and he
11   felt that he couldn't mediate that.
12   Q    So he declined to mediate?
13   A    Yes.
14   Q    We'll mark as Exhibit 22 a letter purportedly
15   addressed to you from Maura Larkins dated April 20th, 2001,
16   with a carbon copy to Rick Werlin.
17       (Exhibit No. 22 was marked for identification and is
18       annexed hereto.)
19   A    Yes.
20   Q    Did you receive this communication on or about
21   April 20th?
22   A    Yes.
23   Q    Yes?
24   A    Yes, I did.
25   Q    And what, if anything, did you do as a result of

Page 89

23 (Pages 86 to 89)

1  receiving this letter, where Ms. Larkins seems to be raising
2  issues concerning Linda Watson?
3      A   Right. Well, this was the incident in the pool that
4  she's referring to. And so, after that incident, I called Rick
5  and basically put it in Rick's hands, and he was going to call
6  the meetings and do everything. And so, I felt that it was not
7  my place, at that point, to call Maura and get her side of the
8  story, that that would happen on a much higher level, much more
9  formal way.
10     Q   Did you ever provide Rick Werlin with any kind of
11 written documentation regarding any of the complaints about
12 Maura Larkins?
13     A   No. Any of my notes you mean?
14     Q   Anything?
15     A   No. I sent him -- I would send him, not this Maura
16 letter one, but I'm pretty sure I sent him -- he got this one
17 and this one and this one.
18     Q   Meaning the letters that we've attached as exhibits
19 to the deposition?
20     A   Right.
21     Q   19, 20, 21, 22?
22     A   Not 21.
23     Q   Not 21? Okay.
24     A   I don't think I did. But the ones that she wrote me,
25 I just made sure that he got it too, so he would know what was

Page 90

1  particular classroom. They don't have to work with other
2  teachers and open up their classrooms and their programs to
3  other kids.
4      The integration of bilingual students happens very
5  naturally at Castle Park, or did while I was there. It -- we
6  had a bilingual program to meet their needs, and they were
7  fully integrated in things like music that we did and all of
8  the PE and recesses, and that's plenty of time for integration.
9      To go above and beyond that, to require teachers to
10 do that, I can't. We can't require them to do it. We can ask
11 them, which is what I tried to do, ask them is there -- are
12 there other things, that is, you can do to combine them in, and
13 they did. By the last year there, they were including them in
14 lots of fieldtrips, planned fieldtrips, et cetera in order to
15 have them.
16     So, they were trying very hard but for them to say
17 that they refused to work with her, implies that they were
18 refusing because of her personally, which I don't believe that
19 is so. I believe that they refused to, maybe, work with her
20 children on some occasions because it would take time from
21 their own children and their own responsibilities.
22     Q   Did they ever tell you that?
23     A   They were telling me -- yes, they were telling me all
24 the time they don't have time to do any more than what they're
25 doing. They're already doing their this, this, and this, and

Page 92

1  going on.
2      Q   Did you ever make any request of Rick Werlin or any
3  other person employed by the Chula Vista Elementary School
4  District, that she be transferred from the Castle Park
5  Elementary school, that is, Ms. Larkins be transferred?
6      A   No.
7      Q   Where there ever any teachers who refused to team
8  with Ms. Larkins?
9      A   Team, as like be a member of third grade because she
10 was in third grade?
11     Q   Right.
12     A   No.
13     Q   Did Ms. Watson ever refuse the team with Ms. Larkins?
14     A   Be a part of third grade? No.
15     Q   Did Mr. Denman ever refuse to team with Ms. Larkins?
16     A   No.
17     Q   Did Al Smith ever refuse the team with Ms. Larkins?
18     A   No.
19     Q   Was there ever any time when either of those three
20 people ever refused, in any manner, to work with Ms. Larkins?
21     A   Work with her -- okay. I think -- I hate to interpret
22 but if she's referring to teaming, as to exchanging kids or
23 having kids be integrated, that is not a requirement of
24 teachers.
25     They are responsible for their 20 children in their

Page 91

1  isn't that enough? Of course, we're always asking for more.
2      Q   Did there ever come some time when any of the
3  teachers at Castle park school relayed to you that they simply
4  didn't want to be around Ms. Larkins anymore?
5      A   Towards the end there. They were afraid of her.
6      Q   Towards the end, meaning, the end of --
7      A   Especially after the incident at the pool.
8      Q   And did they relay to you that if she were to come
9  back, they would want to see her transferred to some other
10 school?
11     A   They didn't tell me, come right out and say that, no.
12     Q   They simply indicated to you, they were fearful to
13 work with her?
14     A   They were fearful. They were afraid because the
15 things she did and said were so incomprehensible to them, and
16 inappropriate, that they -- it was like, what else can happen?
17     Q   And how many teachers expressed that opinion to you?
18     A   A third of them, maybe.
19     Q   One third of the teaching population?
20     A   Uh-huh.
21     Q   And how many teachers is that, approximately?
22     A   Okay. All the third grade teachers, the first grade
23 teachers, second, Michelle, of course. Kindergarten was Lynne
24 and, then, Robin, and her aide.
25     Quite a few teachers had said, in their own way, that

Page 93

24 (Pages 90 to 93)

1 they were afraid and what are we doing about it, and I'd say,
2 "It's in Rick's hands. He's handling it. I don't think we
3 need to be afraid."
4     "Can you guarantee that?"
5     I said, "Well, no I can't guarantee anything, but
6 Rick is handling it."
7     That's what I would tell them.
8 Q  Robin is Robin Colls?
9 A  Right.
10 Q  And what was her aide's name at the time?
11 A  Kim.
12 Q  And one or more kindergarten teachers?
13 A  Well, at least Lynne Delgado, the first grade
14 teacher. All of them, JoEllen and Nicky and Kathy Bingham.
15 Q  Had Kathy Bingham ever, to your knowledge, had any
16 kind of personal incident with Ms. Larkins?
17 A  Actually, yes, but I can't remember exactly what it
18 is. There was something and I can't remember.
19 Q  Is it in your notes?
20 A  I don't know.
21 Q  Had Kim, Robin Colls's aide, ever had any personal
22 incidents, to your knowledge?
23 A  No. I just think -- just that Kim and Robin were,
24 sort of inseparable and so --
25 Q  Have you now told us about all the incidents that you

Page 94

1 can recall, without looking at your notes that occurred
2 involving Ms. Larkins' conduct or perceived behavior?
3 A  Yes.
4 Q  Do you have any knowledge as to Mr. Werlin inviting
5 Ms. Larkins to return to work after her first leave of absence?
6 A  After her first leave of absence? We all met her
7 where he said you are to return to Castle Park, that part?
8 Q  Right.
9 A  Right.
10 Q  And did you agree with the decision to ask
11 Ms. Larkins to return to Castle Park at that time?
12 A  It wasn't my decision.
13 Q  Did you agree or disagree with the decision that
14 Mr. Werlin made?
15 A  It was a decision made. I, frankly, my opinion does
16 not matter. I do what I'm told.
17 Q  If it had been your decision, am I to take it from
18 your answer that it would have been a different decision?
19 MR. BRESEE: Objection. Calls for speculation.
20 THE WITNESS: I don't know of any details. I didn't
21 know of any details of her leaving, Rick's decision for her to
22 leave and come back. If I knew all of these things maybe I
23 would have been able to make a decision.
24 MS. SCHULMAN: Okay. I think I probably have asked
25 all the questions I'd like to ask, but I'd just like five

Page 95

1 minutes to review my notes to make sure I've done that.
2 Before we go off the record, I do have subpoenas for
3 witnesses to appear at the hearing which is the 23rd, and I can
4 certainly provide this witness with a subpoena. Would you
5 prefer I do that? Do you want to make the arrangements for her
6 to appear at a time that's reasonable, rather than sitting
7 around and waiting.
8 MR. BRESEE: Yes.
9 MS. SCHULMAN: Okay. And I'll just find a copy of
10 the subpoena and give it to her. Okay. Thank you.
11 (Recess was taken.)
12 Okay. Back on the record. I have nothing further,
13 and I have provided a subpoena for the hearing in that matter.
14 And I will be in contact with Mark Bresee so that we can figure
15 out where and when -- we know where but when, in the sequence
16 of events, we would like to have you there. Because we
17 certainly don't want people sitting downtown cooling their
18 heels in the state of California building, particularly in that
19 building.
20 Do you have any questions?
21 MR. BRESEE: I don't. No, I don't.
22 MS. SCHULMAN: I'd offer the same stipulations as the
23 last deposition but we've got a new court reporter. That the
24 deposition can be signed under penalty of perjury, that it can
25 be delivered directly to the witness at her residence, which we

Page 96

1 can provide, after we go off the record to the court reporter.
2 Since we have a really short time before the hearing,
3 in this matter, madam court reporter, could you let us know,
4 off the record how long it will take you to deliver the
5 transcript?
6 (Discussion held off the record.)
7 Off the record the court reporter indicated she can
8 deliver the transcript to the deponent next Tuesday or before.
9 The deponent will read it and report any changes,
10 additions, or deletions and the fact of her signature to
11 Mr. Bresee, who will by 3:00 p.m. that Friday afternoon, which
12 will be the Friday afternoon immediately preceding the hearing.
13 Fax me the signature page and any pages that might have changes
14 on them. And if for some reason the original is lost or
15 destroyed, an uncertified copy may be used in its place.
16 MR. BRESEE: So stipulated.

Page 97

25 (Pages 94 to 97)

1 I certify (or declare) under penalty of perjury under the laws
2 of the State of California that the foregoing is true and
3 correct.
4 _____Date
5
6 _____Signature
7 GRETCHEN DONNDELINGER
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    EXAMINATION INDEX
2    BY MS. SCHULMAN    Page 3
3
4
5    EXHIBITS INDEX
6    GRETCHEN DONNDELINGER
7
8 NUMBER         DESCRIPTION           IDENTIFIED
9 17 A letter or note dated 1-17-01, addressed    33
10    to Maura and signed by Gretchen.
11 18 A group of documents, numbering five.    75
12    The top one is dated December 20, 2001.
13 19 A 1-23-01 letter from Maura Larkins to    78
14    Dr. Donndelinger.
15 20 January 26 letter addressed to         83
16    Dr. Donndelinger from Maura Larkins.
17 21 A note from Dr. Donndelinger, dated    87
18    2-5-01, addressed to Maura.
19 22 A letter addressed to Dr. Donndelinger    89
20    from Maura Larkins, dated April 20th, 2001.
21
22
23
24
25

1 State of California)
2                    :
3 County of San Diego)
4
5     I, Nyree-Dawn Lloyd, a Certified Shorthand Reporter,
6 Certificate No. 12587, do hereby certify that the witness in
7 the foregoing deposition was by me first duly sworn to testify
8 to the truth, the whole truth, and nothing but the truth in the
9 foregoing cause; that the deposition was then taken before me
10 at the time and place herein named; that said deposition was
11 reported by me in shorthand and then transcribed through
12 computer-aided transcription, and the foregoing transcript
13 contains a true record of the deposition of said witness.
14     I do further certify that I am a disinterested person
15 and am in no way interested in the outcome of this action or
16 connected with or related to any of the parties in this action
17 or to their respective counsel.
18     In witness whereof, I have hereunto set my hand on
19 this 17th day of September, 2002, at San Diego County,
20 California.
21
22
23 ------------------------------
24 Nyree-Dawn Lloyd, CSR No. 12587
25

EXHIBIT 7

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN DIEGO


MAURA LARKINS,                     *
                                   *
                                   *
          Plaintiff,               *
                                   *
                                   *
     vs.                           * Case No. GIC 781970
                                   *
                                   *
RICHARD T. WERLIN, etc.,           *
et al.,                            *
                                   *
                                   *
          Defendants.*
                                   *


DEPOSITION OF ROBIN DONLAN
Taken at San Diego, California
November 4, 2004


VOLUME I


T. A. Martin, CSR
Certificate No. 3613

**COMPLIMENTARY**

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

**Page 2**

1
2           I-N-D-E-X
3    DEPOSITION OF ROBIN DONLAN - VOLUME I        PAGE
        November 4, 2004
4 —
        Examination by Ms. Larkins            5
5
6
     EXHIBITS:                    PAGE
7
     1  One-page handwritten notes            28
8
     2  Copy of a Star News article
9       August 20, 2004, two pages        36
10   3  One-page memo, February 25, 2002      42
11   4  Two-page bilingual flier            73
12   5  Condensed transcript, deposition
        of Gretchen Donndelinger,
13      September 10, 2002              124
14
15
16   RECORD MARKED AT THE REQUEST OF MS. ANGELL   LINE/PAGE
                                6  72
17                              3  88
                                6  89
18
19
20
21
22
23
24
25

---

**Page 3**

1
2        DEPOSITION OF ROBIN DONLAN
3
        Pursuant to Notice to Take Deposition, and on
4
    the 4th day of November, 2004, commencing at the hour of
5
    1:00 o'clock p.m., at 319 Elm Street, Suite 100, in the
6
    City and County of San Diego, State of California, before
7
    me, T. A. Martin, Certified Shorthand Reporter in and for
8
    the State of California, personally appeared:
9
        ROBIN DONLAN,
10
    who, called as a witness by the Plaintiff, being by me
11
    first duly sworn, was thereupon examined as a witness in
12
    said cause.
13
        APPEARANCES
14
    For the Plaintiff:   MAURA LARKINS
15                   1935 Autocross Court
                     El Cajon, California 92109
16                   (In Propria Persona)
17   For Chula Vista    CALIFORNIA TEACHERS ASSOCIATION
     Educators, California: By: MICHAEL HERSH
18   Teachers Association, 11745 East Telegraph Road
     Virginia Boyd and   Post Office Box 2153
19   Timothy O'Neil:     Santa Fe Springs, California 90670
20   For Robin Donlan    STUTZ, ARTIANO, SHINOFF & HOLTZ
     and Linda Watson:   By: KELLY R. ANGELL
21                   401 West "A" Street, 15th Floor
                     San Diego, California 92101
22
     Specially appearing  McCORMICK & MITCHELL
23   for Michael Carlson:  By: DEBORAH K. GARVIN
                     625 Broadway, Suite-1400
24                   San Diego, California 92101
25   Videographer:      Alan Peak, Videographics

---

**Page 4**

1    VIDEOGRAPHER:  This is the deposition of Robin
2    Donlan, being taken by plaintiffs in the matter Maura
3    Larkins versus Richard T. Werlin, et al., in Superior
4    Court of California for the County of San Diego, Case No.
5    GIC 781970.  This deposition is being held in the offices
6    of San Diego Court Reporting, at 319 Elm Street in San
7    Diego, California on Thursday, November 4, 2004 at 1:18
8    p.m.
9        My name is Alan Peak.  I'm the Legal Video
10   Specialist with Videographics, 1903 30th Street in San
11   Diego, California.  The Certified Shorthand Reporter is
12   Tadzia Martin with San Diego Court Reporting.
13       Would counsel please state their appearances for
14   the record.
15       MS. LARKINS:  Maura Larkins, plaintiff in pro
16   per.
17       MS. ANGELL:  Kelly Angell for Robin Donlan and
18   Linda Watson.
19       MS. GARVIN:  Deborah Garvin for Michael Carlson.
20       MR. HERSH:  Michael Hersh for the Chula Vista
21   Educators, California Teachers Association, Gina Boyd and
22   Tim O'Neil.
23       VIDEOGRAPHER:  And the witness may now be sworn.
24       (Whereupon the witness was duly sworn.)
25

---

**Page 5**

1    EXAMINATION BY MS. LARKINS:
2        Q.  Good morning --
3        A.  Morning.
4        Q.  -- Mrs. Donlan -- or afternoon.
5            Has your lawyer explained to you how a
6    deposition works?
7        A.  Yes, she has.
8        Q.  Okay.  Are you feeling well today?
9        A.  Well enough.
10       Q.  Is there any reason why you can't give your best
11   testimony today?
12       A.  Not that I'm aware of, no.
13       Q.  Okay.  First thing I wanted to ask you about was
14   your relationship with Richard Werlin.
15           Are you acquainted with Richard Werlin?
16       A.  I'm acquainted with him through work only.
17       Q.  Okay.  Have you ever spoken to him on the
18   telephone when he was at home?
19       A.  No, I have not.
20       Q.  Okay.  When did you first meet Rick Werlin?
21       A.  I don't recall the exact date.
22       Q.  Okay.  Let's start with when did you first --
23   let's see.  Let's just go over your education and
24   employment real quick.
25           Where did you graduate from high school?

---

2 (Pages 2 to 5)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

Page 6

1    A. Chula Vista High School.
2    Q. Okay. And did you go to college?
3    A. Yes, I did.
4    Q. Where did you go to college?
5    A. University of San Diego.
6    Q. And did you graduate --
7    A. Yes.
8    Q. -- from there.
9       Okay. Where did you get your teaching
10   credential?
11   A. University of San Diego.
12   Q. Can you give me the dates for when you graduated
13   from University of San Diego and when you got your
14   teaching credential?
15   A. I graduated with my bachelor's degree in May of
16   1984 and got my teaching credential at the same time.
17   Q. Okay. And then did you become employed soon
18   after that?
19   A. No.
20   Q. What did you do after that?
21   A. I went to graduate school.
22   Q. Okay. Where did you go to graduate school?
23   A. University of San Diego.
24   Q. Okay. And did you get another degree there?
25   A. Yes, I did.

Page 7

1    Q. What degree was that?
2    A. A degree, specialist in learning handicapped.
3    Q. And when was that?
4    A. In January of 1986.
5    Q. Okay. And then did you become employed shortly
6    after that?
7    A. No.
8    Q. Okay. What did you do then?
9    A. I was caretaker for my grandmother who had had a
10   stroke shortly afterwards.
11   Q. Okay. And how long were you caretaker for your
12   grandmother?
13   A. Until about 19 -- almost 1987.
14   Q. Okay. And what happened in 1987?
15   A. I was employed by a book store, because she no
16   longer needed the type of care that I was providing.
17   Q. Okay. And how long were you employed by the
18   book store?
19   A. Only a few months. I was Christmas help.
20   Q. Okay. And then what did you do after that?
21       MS. ANGELL: Objection. Vague and ambiguous.
22       Do you mean what kind of work did she do?
23   BY MS. LARKINS:
24   Q. Were you employed in a different job shortly
25   after that, after you left the book store?

Page 8

1    A. Yes, I was.
2    Q. Okay. What was that job?
3    A. I was employed as a file clerk in an attorney's
4    office.
5    Q. Who was the attorney?
6    A. James Frantz.
7    Q. How long did you work for him?
8    A. A little less than two years.
9    Q. And when you left his employment, did you become
10   employed again soon after that?
11   A. Yes.
12   Q. And where was that?
13   A. Several different districts. I was employed on
14   the substitute list for about four districts at that
15   point.
16   Q. Uh-huh. What were those districts?
17   A. San Diego City, Grossmont -- not Grossmont -- La
18   Mesa Spring Valley, Cajon Valley and Chula Vista.
19   Q. Okay. And for how long were you employed as a
20   substitute?
21   A. Until -- I'm not quite sure what the exact date
22   I switched over. It would be the fall of 1990.
23   Q. That was when you stopped being a substitute?
24   A. Yes.
25   Q. Okay. And I'm sorry. Did you say you were a

Page 9

1    file clerk at the attorney's office?
2    A. Yes.
3    Q. Okay. And then in the fall of 1990, where were
4    you employed?
5    A. Castle Park Elementary School.
6    Q. Who was the principal there at that time?
7    A. Tony Gonzalez.
8    Q. Okay. Did you become acquainted with Gina Boyd
9    in the fall of 1990?
10   A. I don't recall exactly when I became acquainted
11   with Gina Boyd, but I believe she was teaching there at
12   the time, yes.
13   Q. What was your position when you first came to
14   Castle Park?
15   A. When I first came to Castle Park I was a
16   long-term sub in the special grade class.
17   Q. Was that upper grades or --
18   A. It was upper grades sheltered. They were --
19       MS. ANGELL: Excuse me. If I can just remind
20   the witness to let Mrs. Larkins ask her whole question.
21       THE WITNESS: Okay. I'm sorry.
22       MS. ANGELL: Because you're expected to
23   understand the question when you answer it.
24       THE WITNESS: Okay.
25

3 (Pages 6 to 9)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

**Page 10**

1  BY MS. LARKINS:
2      Q. What does that mean, "sheltered"?
3      A. It was a previous designation on special day
4  classes for students who were achieving lower than a
5  regular special day class.
6      Q. Okay. And have you always worked in upper grade
7  assignments? We are speaking of upper elementary
8  school -- we know what we're talking about -- for the
9  entire time you have been at Castle Park -- I mean that
10  you were at Castle Park?
11      A. Yes.
12      Q. Were there some upper grade teachers that you
13  didn't become acquainted with in your first year at
14  Castle park?
15      A. That I didn't become acquainted with?
16      Q. Uh-huh.
17      A. I believe I met all the teachers. I guess I'm
18  not quite certain what you mean by "acquainted with."
19      Q. Okay. I'm trying to figure out what you meant
20  when you said that you didn't remember becoming
21  acquainted with Gina Boyd when you first got there,
22  although you thought that she was teaching there at that
23  time.
24      Let me see how I can ask this. Well, here.
25  Here's a question.

**Page 11**

1      Did you become acquainted with Linda Watson
2  during your first year of teaching at Castle Park?
3      A. No.
4      Q. Did you meet her during your first year?
5      A. No.
6      Q. Was she teaching at Castle Park during your
7  first year?
8      A. I don't believe so, no.
9      Q. Okay. Do you recall when she came to Castle
10  Park?
11      A. Not the exact year, but it was not that first
12  year.
13      Q. Okay. Did you become better acquainted with
14  upper grade teachers than lower grade teachers during
15  your first year at Castle Park?
16      A. Yes.
17      Q. About how many of the lower grade teachers were
18  you acquainted with?
19      MS. ANGELL: Vague and ambiguous as to time.
20      MS. LARKINS: During your first year at Castle
21  Park.
22      THE WITNESS: Again, if you could clarify what
23  you mean by "acquainted with."
24  BY MS. LARKINS:
25      Q. Okay. I'm going to define "acquainted" as

**Page 12**

1  knowing someone by name, greeting them and them greeting
2  you when you see them in the lounge, stopping to chat
3  sometimes when you see each other.
4      A. So you want to know how long it was before I
5  became acquainted?
6      Q. Let me start over.
7      A. Okay.
8      Q. Okay. Giving that as the meaning of
9  "acquainted," were there some lower grade teachers that
10  you did not become acquainted with during your first year
11  there?
12      A. As far as the stopping to chat on occasion,
13  probably, yes.
14      Q. Okay.
15      A. Most lower grade teachers I knew their names; I
16  would say hello.
17      Q. Uh-huh. Would it be fair to say that upper
18  grade teachers and lower grade teachers really don't have
19  that many opportunities to become acquainted in an
20  elementary school such as Castle Park?
21      A. That would probably be fair, yes.
22      Q. Okay. Did you become acquainted with Susan
23  Dikeman during your first year at Castle Park?
24      A. I don't recall.
25      Q. Okay. Can you tell me when you became

**Page 13**

1  acquainted with Gina Boyd?
2      A. Sometime within the first couple of years.
3      Q. Did you become friends with Gina Boyd at any
4  time?
5      A. We became co-workers that were friendly. I
6  don't know that you would call us friends -- would have
7  called us friends.
8      Q. Okay. Did you ever go off the school grounds
9  with Gina Boyd at lunchtime?
10      A. Not to my recollection, but I do not recall
11  specifically.
12      Q. I'm going to ask about staff meetings with
13  different principals.
14      A. Okay.
15      Q. Let's see. Let's start. We know that Tony
16  Gonzalez was your first principal. Who was the second
17  principal -- your second principal at Castle Park?
18      A. Second hired principal or second person in the
19  auspices of principal?
20      Q. Second person in the auspices of principal.
21      A. Okay. Bob French.
22      Q. Was -- can you explain to me if he was like in
23  the auspices of principal or --
24      A. He was an interim principal.
25      Q. Interim. How long was he an interim principal?

---

4 (Pages 10 to 13)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

Page 18

1 for them, and I don't believe that's a leadership quality
2 that is desirable in a principal of an elementary school.
3     Q. I have to agree with you there. I mean I don't
4 know the man, but I think you're right about that
5 quality.
6     Can you give -- did he have any problems in his
7 relationship with any teachers?
8     A. I wouldn't know. You would have to ask those
9 teachers.
10     Q. Was there a teacher named Heather Smith at
11 Castle Park during -- when Oscar Perez was principal?
12     A. I believe so, yes.
13     Q. Do you remember what grade she taught?
14     A. She taught kinder -- I believe she had a combo
15 kindergarten/first. I'm not exactly sure, but it was
16 either kindergarten or kindergarten/first grade.
17     Q. Okay. Was she a bilingual teacher?
18     A. Yes.
19     Q. Do you remember how long she remained as Castle
20 Park?
21     A. I believe she was there for two years.
'22     Q. And do you know why she left?
23     A. No, I don't know why she left. I have
24 speculation, but I don't know exactly why. I'm not privy
25 to that information.

---

Page 19

1     Q. Well, I'd be -- please tell me what you have
2 speculated that was the reason for her leaving Castle
3 Park.
4     MS. ANGELL: Objection. Calls for speculation.
5     And I'll instruct the witness to answer the
6 question that's asked, please.
7     MS. LARKINS: Okay.
8     Q. Did anybody tell you what they thought was the
9 reason she left?
10     MS. ANGELL: Objection. Vague and ambiguous as
11 to time.
12 BY MS. LARKINS:
13     Q. Did anybody tell you why they thought she
14 stopped working at Castle Park?
15     MS. ANGELL: Same objection.
16 BY MS. LARKINS:
17     Q. But you can answer it.
18     MS. ANGELL: If you understand it.
19.     THE WITNESS: I don't understand who they --
20 BY MS. LARKINS:
21     Q. I think I said -- oh, they means anyone. I
22 said -- I should have used the singular.
23     Did anyone tell you why he or she thought
24 Heather Smith stopped working at Castle Park?
25     MS. ANGELL: Objection. This is calling

---

Page 20

1 basically for double speculation, kind of like double
2 hearsay.
3     MS. LARKINS: Yes, it's hearsay. I would like
4 to know what people told you.
5     MS. ANGELL: Right, beyond hearsay. What I'm
6 talking about is you're asking for her to talk about
7 somebody else's speculation. So we want to know what she
8 remembers.
9     Am I misunderstanding your question.
10     MS. LARKINS: I want to know what she heard,
11 what people said.
12     THE WITNESS: Do I answer?
13     MS. ANGELL: Whatever you remember about it.
14     THE WITNESS: I don't recall specifics. I do
15 remember a mention that she did not receive tenure, but
16 other than that, no.
17 BY MS. LARKINS:
18 •  Q. Do teachers at Castle Park -- let me rephrase.
19 In your experience, have you ever been aware of any
20 teacher at Castle Park talking about another teacher at
21 Castle Park?
22     MS. ANGELL: Vague and ambiguous as to time.
23     MS. LARKINS: Ever in your experience at Castle
24 Park.
25     MS. ANGELL: Vague and ambiguous generally.

---

Page 21

1 What do you mean by talking about? I think that they
2 could say, you know, Teacher Suzy has second grade or
3 Teacher Jill has sixth grade or are we all going to the,
4 you know, teacher staff meeting.
5     MS. LARKINS: You're quite right. I'm trying to
6 work up gradually to get something eventually. I'm
7 having difficulty with this line of questioning. So I
8 want to start with that, even though -- I think I'm
9 pretty safe that I'm going to get a yes here. If I don't
10 get a yes, I'm going to ask for a break.
11     Q. In your experience at Castle Park, have you ever
12 heard one teacher talking about another teacher?
13     MS. ANGELL: And you mean to include things like
14 Suzy Q is showing up at work?
15     MS. LARKINS: Yes.
16     THE WITNESS: Yes.
17 BY MS. LARKINS:
18     Q. Good. We can go on.
19     In your experience at Castle Park, have you ever
20 heard one teacher discuss another teacher's personal
21 life?
22     A. Yes.
23     Q. Okay. In your experience at Castle Park, have
24 you ever heard one teacher criticize another teacher's
25 personality?

---

6 (Pages 18 to 21)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

**Page 22**

1  A. As in -- I guess if you could clarify that for
2  me, please.
3  Q. Well, like say something on the line of I don't
4  like the way she dresses, isn't her hair awful, so-and-so
5  was late to arrive at school, things like that?
6  A. Occasionally.
7  Q. Occasionally. In your experience at Castle
8  Park, did you ever hear any teacher make negative remarks
9  about parents of students?
10  A. Occasionally.
11  Q. Okay. Did you ever discuss my son with any
12  teacher at Castle Park?
13  A. I don't know your son, so no.
14  Q. Okay. I think we are going to have to work on
15  that a little more.
16  MS. ANGELL: Objection. Argumentative.
17  MS. LARKINS: Okay. I think the answer --
18  objection to the answer -- the answer was argumentative.
19  You said I don't know your son; therefore, the answer
20  must be no.
21  MS. ANGELL: Actually the objection was to your
22  comment. There was no question posed.
23  MS. LARKINS: I'm sorry. Sometimes I talk to
24  myself trying to figure out how I'm going to proceed
25  here. Okay.

**Page 23**

1  MS. ANGELL: And move to strike the comment --
2  everything -- the comment after Ms. Donlan's response.
3  BY MS. LARKINS:
4  Q. Do you believe that it is necessary for you to
5  personally know someone in order to talk about them?
6  A. It depends -- clarify what you mean by "talk
7  about them."
8  Q. Well, for example, discuss something that that
9  person might have done. Do you believe that it is
10  necessary to know someone personally in order for you to
11  discuss something that that person might have done?
12  A. No, probably not.
13  Q. Okay. But you're not certain?
14  THE WITNESS: Do I answer that one?
15  MS. ANGELL: Yes. You answer unless I instruct
16  you not to answer.
17  THE WITNESS: It depends on what is being
18  discussed.
19  BY MS. LARKINS:
20  Q. Okay. Has anybody ever told you anything about
21  someone you didn't know?
22  MS. ANGELL: Objection. Vague and ambiguous as
23  to time; vague and ambiguous in its entirety; over broad.
24  BY MS. LARKINS:
25  Q. If you understand the question, you can answer

**Page 24**

1  it. Has anyone ever told you anything about someone you
2  didn't know?
3  A. Yes.
4  Q. Okay. Have you ever asked questions about
5  someone you didn't know?
6  A. Occasionally, yes.
7  Q. Okay. Have you ever listened to anecdotes about
8  someone you didn't know?
9  MS. ANGELL: Vague and ambiguous in its
10  entirety; vague and ambiguous as to time.
11  Do you mean in the workplace? I mean this is
12  really broad questioning.
13  MS. LARKINS: No. I mean ever.
14  Q. Has anyone -- have you ever listened to an
15  anecdote about someone you didn't know?
16  A. Yes.
17  Q. Have you ever told anyone an anecdote about
18  someone they didn't know?
19  A. Yes.
20  Q. Okay. So would you agree that it's perfectly
21  possible to discuss someone you don't know?
22  A. Telling someone an anecdote is not discussion.
23  Q. Okay. Could you explain to me what
24  discussion -- the word "discussion" means to you?
25  A. To me discussion means discourse between two

**Page 25**

1  people. Telling an anecdote is discourse from one
2  person.
3  Q. Okay. Have you ever made a comment on an
4  anecdote told to you about someone you didn't know?
5  A. I can't recall specific events.
6  Q. Okay. Has anyone ever told you an anecdote
7  about my son?
8  A. Not to my recollection, no.
9  Q. Have you ever told anyone that you were afraid I
10  would kill you?
11  A. No.
12  Q. Did you tell Tim Allen that you were afraid of
13  me?
14  A. I don't recall specifically.
15  Q. Have you ever been afraid of me?
16  A. Yes.
17  Q. Can you explain that to me?
18  MS. ANGELL: Objection. Vague and ambiguous.
19  MS. LARKINS: Okay.
20  Q. Why were you afraid of me?
21  MS. ANGELL: Objection. Vague and ambiguous as
22  to time.
23  BY MS. LARKINS:
24  Q. Okay. Can you tell me when were you afraid of
25  me?

7 (Pages 22 to 25)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

**Page 26**

1      MS. ANGELL: Do you mean when was she first
2   afraid of you?
3      MS. LARKINS: Well --
4      MS. ANGELL: Because the objection is vague and
5   ambiguous as to -- it's just a vague and ambiguous
6   question.
7      MS. LARKINS: That's a good question.
8   Ms. Angell has helped me out here.
9      Q. When were you first afraid of me?
10     A. I first became concerned after an incident in
11  the staff lounge where you confronted me in front of many
12  people there unprovoked.
13     Q. Okay. By unprovoked, do you mean that you had
14  not said anything?
15     A. Not at that moment, no.
16     Q. About how long before this alleged confrontation
17  had you said something?
18     A. Probably 10, 15 minutes. Maybe longer. I don't
19  recall exactly the time.
20     Q. How long did this confrontation last?
21     A. Probably about five minutes.
22     Q. Okay. And do you remember what you were doing
23  before this confrontation began?
24     A. I was standing in the lounge talking to people.
25     Q. Do you remember where you were standing?

**Page 27**

1      A. I was standing behind one of the tables near the
2   white board.
3      Q. Uh-huh. And you're sure you weren't sitting?
4      A. I'm not sure I wasn't sitting.
5      Q. Okay. As I recall, you were sitting right there
6   next to the white board.
7      MS. ANGELL: Objection --
8      MR. HERSH: Objection --
9      MS. LARKINS: Move to strike.
10     MS. ANGELL: Objection. Move to strike
11  plaintiff's comments after Ms. Donlan's response.
12     MS. LARKINS: Okay.
13     Q. So I understand that you were standing or
14  sitting next to the white board in the lounge. And who
15  was in the lounge?
16     MS. ANGELL: Objection. Vague and ambiguous as
17  to time. Do we have a time frame going on this line of
18  questioning?
19  BY MS. LARKINS:
20     Q. Do you remember when this happened?
21     A. It was in the morning.
22     Q. Okay. Do you remember what year?
23     A. Not specifically.
24     Q. Can you relate it to some other events?
25     A. It was when Dr. Donndelinger was principal.

**Page 28**

1      Q. Okay. And was there any personnel action taken
2   against me shortly after this?
3      MS. ANGELL: If you know.
4      THE WITNESS: I wouldn't know.
5   BY MS. LARKINS:
6      Q. Okay. Do you remember a time when I stopped
7   working at Castle Park Elementary School?
8      A. I don't recall when you stopped working at
9   Castle Park Elementary School.
10     Q. Okay. Okay. Let's go back to this incident.
11  Okay. Dr. Donndelinger was principal, and you were
12  standing or sitting next to the white board and it was in
13  the morning. I'm going to see if I can help out here.
14  Do you think this might have been around -- on or about
15  January 17th or so, maybe January 16th of 2001?
16     A. I wouldn't know. I don't have any recollection
17  of the date.
18     Q. Okay.
19     MS. ANGELL: Do you need some water or anything?
20     (Brief interruption.)
21     MS. LARKINS: Okay. I would like to ask that
22  this document be labeled Exhibit 1. I can give one extra
23  one here. Okay.
24     (Exhibit 1 marked for identification.)
25

**Page 29**

1   BY MS. LARKINS:
2      Q. Would you please read the first two lines on
3   this document.
4      A. "January 16th; controversy on Kingdom day; on
5   schedule, not in bulletin. January 17th; Kingdoms,
6   Robin, Kim informing everyone."
7      Q. Okay. Thank you. And do you see a number at
8   the lower right-hand area of this paper?
9      A. 68.
10     Q. Yes. And do you see a number at the upper
11  right-hand corner of this paper?
12     A. Yes.
13     Q. What number is that?
14     A. Five.
15     Q. Okay. Are you familiar with Bates stamps on
16  documents?
17     A. Date stamps?
18     Q. Bate.
19     A. No, I have no --
20     Q. That was the question -- for a long time I
21  thought it was date stamps too.
22     A. No, I don't know.
23     Q. Okay. This is a Bates stamp here. It's Bates
24  stamped 68. This document was an exhibit produced by the
25  Chula Vista Elementary School District in my

---

8 (Pages 26 to 29)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

Page 30

1  administrative hearing.
2      MS. ANGELL: Objection to Mrs. Larkins
3  testifying. If you have a question, if you could ask the
4  question, that would be great.
5      MS. LARKINS: Okay. I'm just trying to get it
6  clear on the record.
7      Q. This is from Exhibit 14 of the District's
8  document -- exhibits, and it's --
9      MS. ANGELL: Objection again. Mrs. Larkins is
10  continuing to testify.
11      Could maybe you ask a question about this
12  document, ask the witness if she made it or if she
13  recognizes it or anything like that instead of giving
14  testimony on it?
15      MS. LARKINS: Okay. I could do that. Okay.
16      Q. Does this appear to you to be Page 5 of a series
17  of documents?
18      A. I have no idea.
19      Q. What do you think the 5 means?
20      A. I don't know.
21      MS. ANGELL: Objection. Calls for speculation.
22      Give me a chance to make my objection before you
23  answer.
24      THE WITNESS: Okay.
25

Page 31

1  BY MS. LARKINS:
2      Q. Okay. Well, what is the first word on the page?
3      MS. ANGELL: Objection. The document speaks for
4  itself.
5  BY MS. LARKINS:
6      Q. Go ahead and answer.
7      A. "Incident."
8      Q. "Incident." Okay. Does this appear to be notes
9  written down by -- does "Kingdoms" ring a bell with you?
10  Does the word "Kingdoms" -- does this document appear to
11  you to be about the incident that you were describing?
12      MS. ANGELL: Excuse me. Objection. I've heard
13  four or five questions. What is the question pending?
14      MS. LARKINS: Let's do the last one.
15      Q. Does this document appear to you to describe the
16  confrontation that you have -- between yourself and me
17  which you have been talking about?
18      A. Describe? No.
19      Q. Does it appear to refer to that confrontation?
20      A. Refer, yes.
21      Q. Okay. So in this line that says, "Kingdoms,
22  Robin/Kim informing everyone," you have a suspicion that
23  that Robin refers to you?
24      A. I do.
25      Q. And who do you think Kim refers to?

Page 32

1      A. Kim Brown.
2      Q. And who is she?
3      A. She is a special day class assistant.
4      Q. Okay. Is she a friends of yours?
5      A. Yes.
6      Q. Okay. Do you have a close working relationship?
7      A. Not currently.
8      Q. Well, when you were working together, did you
9  have a close working relationship?
10      A. Yes.
11      Q. Okay. Can you tell me about the Kingdoms
12  program at Castle Park Elementary?
13      A. The Kingdoms program was a character program
14  that was school wide. It was in place at Castle Park --
15  I'm not quite certain if it was two or three years, but
16  it was like a virtues, character-building program similar
17  to Tribes.
18      Q. And how did this program come to be used at
19  Castle Park?
20      MS. ANGELL: If you know.
21      THE WITNESS: To be used? I don't understand
22  that.
23  BY MS. LARKINS:
24      Q. Okay. Let me try again. How did Castle Park
25  come to have a Kingdoms program?

Page 33

1      A. I don't recall when the exact decision was made.
2  I believe it was sponsored by -- actually, I don't know
3  who it was sponsored by. I don't know whose idea it was.
4      Q. Okay. Is it possible that Gretchen Donndelinger
5  presented the idea to the staff?
6      MR. HERSH: Objection. Calls for speculation.
7      MS. ANGELL: And I'll instruct the witness to
8  listen to the question and answer the question that is
9  asked.
10      MS. LARKINS: Okay.
11      Q. Do you have any memory of Gretchen
12  Donndelinger --
13      A. Yes.
14      Q. -- suggesting the Kingdoms program to the staff?
15      A. Suggesting? I do not recall who suggested it.
16      Q. Okay. Let me ask about staff meetings with
17  Gretchen Donndelinger. How clear a memory do you have of
18  the staff meetings of any -- let's see. Do you have any
19  memory of any staff meeting when Gretchen Donndelinger
20  was principal at Castle Park?
21      MS. ANGELL: I'm going to ask that the question
22  be clarified for the record because we just had several
23  questions on, and when we are reading the transcript
24  you're not going to be able to tell which one she's
25  answering.

9 (Pages 30 to 33)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

**Page 34**

1     MS. LARKINS: Okay.
2     MS. ANGELL: So what's the question that you
3 want her to answer?
4 BY MS. LARKINS:
5     Q. Do you have any memory of any staff meeting that
6 occurred when Gretchen Donndelinger was principal?
7     A. Yes.
8     Q. What do you -- what percentage of the staff
9 meetings do you have a memory of?
10     A. I don't know.
11     Q. Okay. Were programs instituted at Castle Park
12 without the approval of the teachers?
13     MS. ANGELL: Objection. Vague and ambiguous as
14 to "programs instituted" --
15 BY MS. LARKINS:
16     Q. Were programs such as Kingdoms started at Castle
17 Park without the approval of the staff?
18     MS. ANGELL: Objection. Vague and ambiguous as
19 to time.
20 BY MS. LARKINS:
21     Q. When Dr. Donndelinger was principal.
22     A. If I could clarify the question, are you asking
23 if Kingdoms was started without the approval -- I'm not
24 sure what exactly you're asking. Programs or Kingdoms?
25     Q. Well --

**Page 35**

1     A. Because it's a different --
2     Q. Yeah. I think I already asked about Kingdoms
3 and you didn't remember, so I'm trying to find out about
4 if you remember about any other program.
5     Does it make you angry if a principal decides to
6 start a program at a school where you're teaching without
7 the approval of the staff?
8     MS. ANGELL: Objection. Incomplete
9 hypothetical; vague and ambiguous.
10 BY MS. LARKINS:
11     Q. Do you understand the question?
12     A. Does it make me angry if a principal starts a
13 program without the approval of the staff?
14     Q. Uh-huh.
15     A. Angry? No.
16     Q. Does it make you angry if a principal stops a
17 program without the approval of the staff at a school at
18 which you are working?
19     A. Angry? No.
20     Q. How does it make you feel when a principal stops
21 a program at a school at which you are working without
22 the approval of the staff?
23     MS. ANGELL: Objection. It's vague and
24 ambiguous as to "program." I don't understand what
25 you're talking about.

**Page 36**

1     Do you understand what "program" means?
2     THE WITNESS: No.
3 BY MS. LARKINS:
4     Q. How did you come to leave Castle Park Elementary
5 School? How did you come to stop working at Castle Park
6 Elementary School?
7     MS. ANGELL: Objection. Assumes facts not in
8 evidence.
9 BY MS. LARKINS:
10     Q. Okay. Let me try this. Did there come a time
11 when you stopped working at Castle Park Elementary
12 School?
13     A. Yes.
14     Q. When was that time?
15     A. August --
16     MS. ANGELL: And I'm going to object here on
17 privacy and on relevance. And if you'd like to make an
18 offer of proof as to why this is relevant to the
19 litigation, I'm all ears.
20     MS. LARKINS: Or otherwise you're going to
21 instruct her not to answer the question? Okay.
22     I would like to say something about privacy.
23 I'd like to ask that this document be entered as Exhibit
24 2.
25     (Exhibit 2 marked for identification.)

**Page 37**

1     MR. HERSH: Copies of each of these documents
2 will be served along with the transcript; is that
3 correct?
4     THE REPORTER: Yes.
5     MS. LARKINS: I have an extra first page. Sorry
6 I don't have more second pages. Here's another one.
7 Okay.
8     MS. ANGELL: And I'm going to object to any line
9 of questioning concerning this document as not being
10 relevant. I see that the document is apparently dated
11 August 20, 2004, and that the allegations contained in
12 the sixth amended complaint discuss issues that allegedly
13 occurred in September of 2000 and not later than April of
14 2002. And, therefore, this news article, two and a half
15 years later, is not relevant unless you'd like to make an
16 offer of proof and talk about why it's relevant.
17     MS. LARKINS: Yeah. I'll do that.
18     My entire case rests on events which happened at
19 Chula Vista Elementary School District after the acts
20 were committed that I have alleged in my complaint. I
21 had no idea that the acts were being committed at the
22 time they were committed. It wasn't until long after
23 that I became aware. Everything in my case rests on the
24 bizarre behavior of Chula Vista Elementary School
25 District employees after I alleged that some of these

10 (Pages 34 to 37)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

**Page 38**

1 employees violated Section 432.7 of the Labor Code.
2     You have just made a claim of privacy regarding
3 Robin Donlan's leaving Castle Park, and yet Robin Donlan
4 herself caused her name to be repeated again and again in
5 the Star News and the Union-Tribune. She has totally
6 lost any right to privacy by the fact that she herself
7 has discussed widely, including going back to Castle Park
8 on curriculum night and talking to teachers and talking
9 to parents and making as public as possible her -- the
10 circumstances under which she left Castle Park.
11     MS. ANGELL: You mean in August of 2004? I'm
12 sorry. I haven't heard an offer of proof related to why
13 Ms. Donlan's employment status in August of 2004 is
14 relevant to your allegations concerning things that
15 allegedly Ms. Donlan and others did in 2000.
16     MS. LARKINS: Well, one of my allegations is
17 that Ms. Donlan and other teachers who were involved in
18 egregious clique behavior behaved very abusively to
19 principals and teachers, and that that is why Castel Park
20 could not function with Robin Donlan on staff and --
21     MS. ANGELL: I don't remember that being in the
22 complaint. Is that somewhere in the sixth amended
23 complaint?
24     MS. LARKINS: That is in my proof that your
25 client committed a crime.

**Page 39**

1     MS. ANGELL: You just said that that is one of
2 the allegations. I've never seen that in the sixth
3 amended complaint. Is that some sort of cause of action
4 or do you have some sort of cause of action against
5 Ms. Donlan for anything other than the -- I mean I know
6 that there is a cause of action in the sixth amended
7 complaint alleging conspiracy against Ms. Donlan and a
8 separate cause of action alleging violation of the Labor
9 Code by accessing and possessing information from an
10 arrest record concerning you, but I don't know of any
11 other causes of action against her.
12     MS. LARKINS: My proof of the conspiracy and
13 Labor Code violations is -- rests on the behavior of
14 Robin Donlan and others at Chula Vista Elementary School
15 District.
16     MS. ANGELL: So what does that have to do with
17 Ms. Donlan's employment status now?
18     MS. LARKINS: This is powerful -- a powerful
19 indication that Robin Donlan is very confrontational. She
20 has an enormous amount of hostility. She is
21 perfectly happy to destroy the reputations of other
22 people. And this here is proof -- well, it's proof of a
23 pattern of behavior of Robin Donlan of basically
24 character assassination and efforts to destroy the
25 careers of others.

**Page 40**

1     MS. ANGELL: So you want to ask Mrs. Donlan
2 about information contained in this news article
3 concerning Mr. Matos?
4     MS. LARKINS: I had -- I had planned on that.
5 But the reason -- I hadn't planned on bringing this out
6 at this moment because I was questioning her about
7 something else, about her removal from Castle Park, and
8 you claimed that she shouldn't answer those questions
9 because of privacy. And I brought this out to indicate
10 that she does not seem to be that interested in privacy.
11     MS. ANGELL: Well, I'm looking at this document
12 that you have given me marked as Exhibit 2, and I don't
13 see where Ms. Donlan has been quoted in this. So maybe a
14 good place to start would be by asking her if she, you
15 know, was interviewed or contributed to this article, and
16 then deal with the privacy issues after that.
17     MS. LARKINS: Actually, I would prefer to
18 continue with the line of questioning that I had been
19 working on before you brought up the privacy issue.
20     MS. ANGELL: Well, I've asked for an offer of
21 proof as to why Ms. Donlan's current employment status is
22 relevant to the litigation which has allegations of
23 events in 2000 and 2001, and so far I haven't heard.
24     MS. LARKINS: Okay. Well, if you think it
25 appropriate, you can instruct your client not to answer a

**Page 41**

1 question. Okay.
2     MS. ANGELL: If you want to ask things about
3 what you -- you mentioned something about a pattern and
4 practice of character assassination or talking about
5 people -- you said something about their careers --
6 that's something different than her current employment
7 status, but as to her current employment status and any
8 reasons for her transfer, she's not going to answer those
9 questions.
10     MS. LARKINS: Okay. Okay.
11     Q. Ms. Donlan, were you recently transferred out of
12 Castle Park Elementary School?
13     THE WITNESS: Do I answer that?
14     MS. ANGELL: You want to talk to me for a
15 minute?
16     THE WITNESS: Sure.
17     VIDEOGRAPHER: Off the record, Counsel? Yes?
18     MS. GAVIN: Fine with me.
19     MR. HERSH: Sure.
20     MS. LARKINS: Fine with me.
21     VIDEOGRAPHER: Off the record at 2:13.
22     (Recess taken.)
23     VIDEOGRAPHER: Back on the record at 2:31.
24     MS. ANGELL: With regard to any questions that
25 you had related to statements that Mrs. Donlan has made

11 (Pages 38 to 41)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

Page 42

1  to the press, I'm not going to have any objection to any
2  lines of questioning on those lines, so I just wanted to
3  let you know.
4      MS. LARKINS: Oh, great. Thank you.
5      MR. HERSH: I may, but --
6      MS. LARKINS: Okay.
7      Q. Did you ever tell Richard Werlin that your
8  brother was in law enforcement?
9      A. Yes.
10     Q. What was the situation when you told him that?
11     A. I was in a meeting with Mr. Werlin and Mrs. Boyd
12 regarding a letter they had received from you that made a
13 reference to a brother of mine in law enforcement, and he
14 asked me if I had a brother who was in law enforcement
15 and I said yes.
16     Q. Uh-huh. Can you -- did he ask you -- what else
17 did he ask you at that meeting?
18     A. He asked me if I had any knowledge of the letter
19 or the events described in the letter.
20     Q. Do you recall how you felt at that meeting?
21     A. Confused.
22     MS. LARKINS: Let's see. I would like to ask
23 that this document be labeled as Exhibit 3.
24     (Exhibit 3 marked for identification.)
25

Page 43

1  BY MS. LARKINS:
2      Q. Does this document look to you like -- did Rick
3  Werlin -- okay. Did Rick Werlin tell you that he had
4  received a letter from me?
5      A. Yes.
6      Q. And did he say that the letter concerned you?
7      MS. ANGELL: Excuse me. Do you mean at this
8  meeting between Mr. Werlin and Ms. Donlan and Gina?
9      MS. LARKINS: Yes.
10     Q. At this meeting between you and Mr. Werlin and
11 Gina Boyd, did Mr. Werlin say that he had received a
12 letter from me about you?
13     A. About me? No.
14     Q. What did he say the letter was about? Did he
15 say he had received a letter from me?
16     A. Yes.
17     Q. Okay. And did he give an explanation for why he
18 called -- did he call -- okay. Let me see. How did
19 this -- how was this meeting arranged?
20     MS. ANGELL: Have you retracted the prior
21 questions?
22     MS. LARKINS: Yes. Any time I -- yeah.
23     Q. How was this meeting arranged?
24     A. He called and asked me to come to the district
25 office to meet with him and with Gina Boyd.

Page 44

1      Q. Okay. Okay. And did you have any idea what it
2  was about?
3      A. No.
4      Q. And when you got there, he said that he had
5  received a letter?
6      A. Yes.
7      Q. And what did he say about the letter? Did he --
8  I'm sorry. Let me ask this. This is a better question.
9      Did he show you the letter?
10     A. No.
11     Q. What did he say was in the letter?
12     MS. ANGELL: Objection. Assumes facts.
13 BY MS. LARKINS:
14     Q. Did he tell you anything about the letter?
15     A. He said that it made reference to a brother that
16 I had in law enforcement, and he asked me if I had a
17 brother who was in law enforcement, and I said yes.
18     Q. Okay. Did he tell you anything else about the
19 letter?
20     A. He shared some of the items in the letter and
21 asked if I knew anything about them.
22     Q. What were some of the items -- what was one of
23 the items that he shared?
24     A. That my brother had sent people to your house.
25     Q. And do you remember anything else he said about

Page 45

1  the letter?
2      A. That he had gotten it in -- as a fax from you, I
3  believe. But it was something that he received from you
4  and wanted to find out if I actually had a brother who
5  was in law enforcement, which I confirmed.
6      Q. Okay. How did you feel as he --
7      A. Confused.
8      Q. Okay. Did you become upset?
9      MS. ANGELL: Vague and ambiguous as to time.
10 BY MS. LARKINS:
11     Q. Did you become upset when Mr. Werlin was talking
12 to you about this letter?
13     A. Not that I recall.
14     Q. Do you recall anything you said to Mr. Werlin?
15     A. Specific words, no.
16     Q. Do you recall any general -- do you recall your
17 general response to Mr. Werlin?
18     A. That I had no idea what the letter was talking
19 about.
20     Q. Did you tell him that you were upset that you
21 hadn't been included in a meeting at Castle Park?
22     MS. ANGELL: You mean during this meeting
23 concerning the February 25 --
24     MS. LARKINS: Yes.
25     Q. During this meeting concerning -- during this

12 (Pages 42 to 45)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

Page 46

1  meeting that Mr. Werlin called you to attend regarding a
2  letter from me, did you tell Mr. Werlin that you were
3  upset about not having been included in a meeting at
4  Castle Park?
5      A. I don't recall specifically saying that.
6      Q. Do you recall ever having been upset about not
7  having been included in a meeting about me at Castle
8  Park?
9      A. Upset? No.
10     Q. Do you recall ever having been concerned about
11  not having been included in a meeting about me at Castle
12  Park?
13     A. Yes.
14     Q. Can you tell me about that concern?
15     A. I was concerned because I wished to relate the
16  incidents that had happened.
17     Q. Okay. You used the plural, incidents. Can you
18  tell me -- you told me -- we started talking about one of
19  them. Can you tell me another?
20     A. Yes. I was falsely accused of moving a notebook
21  and making comments to you which I did not make.
22     Q. Okay. If we refer to this second incident as
23  the notebook incident, would that help clarify it in your
24  mind for us to talk about?
25     A. It doesn't help or not help. I mean --

---

Page 47

1      Q. Okay. Will you understand what I mean if I
2  refer to this incident that you're talking about now
3  about being falsely accused of moving a notebook?
4      A. (Witness nods head.)
5      MS. ANGELL: I'm sorry. You're going to have to
6  respond audibly; yes, no, I don't know.
7      THE WITNESS: Yes.
8  BY MS. LARKINS:
9      Q. Okay. So we understand what we are talking
10  about.
11         Can you tell me this incident, explain what
12  happened?
13     A. I was called in to a meeting in
14  Dr. Donndelinger's office with myself, other teachers and
15  yourself. I was accused of moving a notebook from the
16  table to another table and telling you that you could not
17  sit with us. I explained during the meeting that I did
18  not say these things; I did not move the notebook; no one
19  who was at the table had any recollection of the words
20  being said or my moving the notebook.
21         The resolution of the meeting was that I
22  apologized if you had mistakenly got the impression that
23  we did not want you to sit there or I did not want you to
24  sit at the table with us. And I had understood at that
25  point that it was resolved.

---

Page 48

1      Q. Okay. Okay. Now, and you -- okay. Now, I'm
2  going back to something that you said just before we
3  discussed this second incident. You said that you had
4  wanted to be included at a meeting so you could discuss
5  this incident?
6      A. (Witness nods head.)
7      Q. Okay. Can you tell me another incident?
8      A. That would be the incident by the white board in
9  the morning where I felt -- I feel that I was unjustly
10  and unprovokedly verbally attacked by you.
11     Q. Is that that -- are you now talking about the
12  first incident we discussed today earlier? Because we
13  discussed this -- this sounds exactly like the incident
14  we were discussing a while ago.
15     A. That would be the incident, yes.
16     Q. So let's call that the first incident. We will
17  call that the white board incident. And then there is
18  the notebook incident.
19         Can you tell me --
20     MS. ANGELL: Excuse me. Just for clarity on the
21  record, because I think we are going to have some trouble
22  because it was stretched out --
23     MS. LARKINS: Right.
24     MS. ANGELL: Is this thing that you want to call
25  the white board incident the scenario that was previously

---

Page 49

1  discussed concerning Kingdoms?
2      MS. LARKINS: Yes.
3      MS. ANGELL: Okay.
4      MS. LARKINS: Yes. Let's call that the white
5  board and Kingdoms incident. That's a good idea to add
6  that word "Kingdoms." That helps make it clear. Okay.
7      Q. And is there another incident?
8      A. No.
9      Q. Okay. Was there any other interaction you ever
10  had with me that was negative?
11     MS. ANGELL: Objection. Vague and ambiguous.
12  You mean -- do you mean interactions other than the
13  notebook incident and the Kingdoms incident at Castle
14  Park Elementary School while you both taught there?
15     MS. LARKINS: That's very well stated. I'll try
16  to say that myself.
17     Q. Were there any incidents other than the white
18  board/Kingdoms incident and the notebook incident during
19  the time you and I taught at Castle Park that you
20  consider to have been negative between you and me?
21     A. Not to my recollection.
22     Q. Okay. So when you wanted to be included in a
23  meeting at Castle Park about me, you wanted to discuss
24  the white board incident and the notebook incident?
25     A. Yes.

13 (Pages 46 to 49)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

Page 50

1    Q. Okay. Let's go back to that white board
2  incident. Can you tell me what happened?
3        Oh, you know what? That's kind of asking for a
4  narrative. Let me try to remember where we left of. We
5  left off where you were standing or sitting next to the
6  white board, and you said there were other people there
7  in the room?
8    A. Uh-huh.
9    Q. Do you remember who those other people were?
10   A. I remember a couple of them, yes.
11   Q. Who were they?
12   A. Victoria Singleton, Kim Brown. I believe Linda
13  Candle was there. There were others, but I don't recall
14  specifically.
15   Q. Okay. Then did you say anything?
16     MS. ANGELL: Objection. Vague and ambiguous.
17  BY MS. LARKINS:
18   Q. Okay. Then what happened?
19   A. From what point?
20   Q. Well, how did -- I believe you referred to --
21  you said that there was a confrontation with me. Could
22  you tell me how that began?
23   A. The confrontation portion or -- there were two
24  portions to that incident.
25   Q. How about you tell me the first one.

Page 51

1    A. There was a change in the -- a change, and then
2  a change back in the Kingdoms schedule for that day. It
3  was noted on the board that the Kingdoms would be a video
4  that we were all to watch for that afternoon. You became
5  very upset at this and seemed to be more upset than the
6  situation required. Another teacher made a comment to
7  you that it was only -- was a video; it was very simple
8  to turn on the TV. You remarked to that teacher that you
9  thought her -- her comment was not very polite. You left
10  the room. You returned a few moments later and started
11  verbally attacking me about that you hoped that me and
12  Joe Ellen were happy and that we were out -- I don't
13  recall the specific words, but it was very aggressive,
14  very aggressive posture, very aggressive stance, very
15  accusatory that somehow I had done something to change
16  the Kingdoms on purpose to frustrate your lesson plan for
17  the day.
18       My response, while being shocked, was that I had
19  nothing to do with Kingdoms; that I was on the budget
20  committee, and I asked you to stop yelling at me.
21   Q. Okay. I'm interested in the first part of your
22  response. Was Victoria Singleton the other teacher?
23   A. Yes.
24   Q. And was she rude to me?
25   A. She was rude to many people, but, yeah, she was

Page 52

1  a little out of line, yes.
2    Q. Okay. And did you ever tell anyone that you
3  thought she was rude to me?
4    A. I may have told Dr. Donndelinger when I spoke to
5  her about the incident, yes.
6    Q. Uh-huh. At that time did you say that I was
7  rude to -- that I -- did you tell Dr. Donndelinger that I
8  had said that Victoria was rude?
9    A. Yes. You said to Victoria that she was rude or
10  impolite or -- I don't remember the exact words. You
11  addressed her by name; you said that you thought that she
12  was rude, impolite, and you left the room.
13   Q. Okay. Now, this incident caused you to fear me?
14   A. No. The second incident caused me to fear you,
15  yes. The verbal attack after you had returned to the
16  room.
17   Q. Okay.
18     MR. HERSH: Objection. Or -- I'm not clear as
19  to what you're referring to as the second incident.
20     THE WITNESS: The second part of that incident.
21     MS. ANGELL: Will you describe what you mean by
22  the second part of the incident.
23     THE WITNESS: When Mrs. Larkins verbally
24  attacked me unprovoked.
25     MS. ANGELL: When she returned to the room on

Page 53

1  the same day?
2    THE WITNESS: Yes.
3    MS. ANGELL: Are we all clear?
4  BY MS. LARKINS:
5    Q. Then what happened?
6    A. Then what happened from what point?
7    Q. After I allegedly verbally attacked you.
8    A. You left the room. I went and expressed my
9  concerns to Dr. Donndelinger.
10   Q. Okay. Did you -- okay. That's fine. Okay.
11       And this incident made you afraid of me. What
12  did you fear that I would --
13     MS. ANGELL: Hold on. Objection. I didn't hear
14  a question, and I didn't hear an audible response.
15     THE WITNESS: Okay.
16     MS. ANGELL: So if you could please give audible
17  responses and make sure that you understand that a
18  question has been asked and that you understand the
19  question before you answer it.
20  BY MS. LARKINS:
21   Q. Okay. After this incident, what were you afraid
22  of that I might do to you?
23     MS. ANGELL: After what incident? Where you
24  yelled at her by the white board?
25     MS. LARKINS: Yes.

14 (Pages 50 to 53)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

Page 54

1    THE WITNESS: That another unprovoked response
2  or unprovoked attack would occur.
3  BY MS. LARKINS:
4    Q. A verbal attack?
5    A. Verbal mostly, yes. Any type of attack. I
6  don't know.
7    Q. Did you fear that I might attack you physically?
8    A. Not at that time, no.
9    Q. Okay. After I allegedly yelled at you in the
10  white board/Kingdoms incident, you were not afraid that I
11  would attack you physically?
12    MS. ANGELL: Excuse me. Is that a question?
13  BY MS. LARKINS:
14    Q. Is that correct?
15    A. I was afraid that your behavior was
16  unpredictable and not rational. I don't know
17  specifically whether it would just pertain to verbal or
18  physical as well.
19    Q. Okay. I'm really trying to get your state of
20  mind at that time. Okay.
21    Now, a minute ago you said you were not afraid
22  of me physically at that time after that incident, and
23  now you're saying maybe you were?
24    A. I don't specifically recall making any
25  statements that I was afraid of you physically, but I'm

Page 55

1  not sure. I mean unpredictable behavior is unpredictable
2  behavior.
3    Q. Okay. What -- okay. Anyway, at some point in
4  time you began to fear that I might physically attack
5  you?
6    A. Not specifically, but unpredictable behavior is
7  unpredictable behavior.
8    Q. Okay. Okay. So may I -- okay. Were you afraid
9  because you felt uncertain about my behavior?
10    A. Could you clarify that, please.
11    Q. Were you -- okay. Is it fair to say that you
12  were worried that I might verbally attack you? After
13  that incident you were afraid that I might verbally
14  attack you?
15    A. That more unpredictable behavior would follow,
16  might follow. No specifics on what type of behavior that
17  might be.
18    Q. But I want to know what you feared.
19    MS. ANGELL: Objection. Asked and answered;
20  argumentative.
21    You have asked the question several times and
22  she continues to try and give you the answer.
23    MS. LARKINS: Okay.
24    Q. You're saying that you don't know what you
25  feared. I'm asking you to try to remember what it was

Page 56

1  that you feared.
2    MS. ANGELL: She's already answered the
3  question.
4    THE WITNESS: I did answer that.
5    MS. LARKINS: Okay.
6    Q. I really need to hear the answers again, because
7  I really do not know what the answer is.
8    A. I feared that more than -- that unpredictable
9  behavior -- unprovoked unpredictable behavior would occur
10  again. There were no specifics of what type of behavior
11  I feared.
12    MS. ANGELL: Do you mean you didn't tell anybody
13  specifically what behavior, or you weren't sure --
14    THE WITNESS: I was just not sure. I did not
15  know what I might expect.
16  BY MS. LARKINS:
17    Q. Okay. Did you think I might bring a gun to
18  school and shoot you?
19    A. No.
20    Q. Did you think I might punch you in the nose?
21    A. I don't know. Unpredictable behavior is
22  unpredictable behavior. I have no specific things that I
23  was afraid of.
24    Q. Would it be fair to say you just had a
25  generalized anxiety directed towards me?

Page 57

1    MS. ANGELL: Objection. Vague and ambiguous;
2  incomplete hypothetical, "would it be fair to say." If
3  you could ask a question about what she did or what she
4  remembered, she'd be able to answer that.
5  BY MS. LARKINS:
6    Q. After this incident -- this white board/Kingdoms
7  incident, did you feel anxious around me?
8    A. Yes.
9    Q. When you felt anxious around me, was there a
10  specific action on my part that you feared?
11    A. No. Other than unpredictable behavior, but
12  nothing specific, no.
13    Q. Okay. Were you afraid that I might report your
14  aggressive behavior toward me?
15    A. No.
16    MS. ANGELL: Objection. Vague and ambiguous as
17  to time.
18    Let me get my objections in.
19    THE WITNESS: Sorry.
20    MS. ANGELL: Argumentative.
21  BY MS. LARKINS:
22    Q. Okay. I'd like to -- do you recall which one of
23  these two incidents happened first, the notebook incident
24  or the white board/Kingdoms incident?
25    A. The notebook incident.

15 (Pages 54 to 57)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

Page 58

1    Q. Okay. And did you feel falsely accused after
2  the notebook incident?
3    A. I've already stated that, yes.
4    Q. Okay. At that time after the notebook incident,
5  were you afraid that I might start yelling at you?
6    A. No.
7    Q. Were you afraid that I might falsely accuse you?
8    A. I don't know that I was afraid that you might
9  falsely accuse me again, no.
10    Q. Okay. Were you afraid that I might truthfully
11  accuse you?
12    A. No.
13    Q. Okay. Going back to that notebook incident, do
14  you remember sitting at a table before an in-service?
15    A. A specific in-service --
16    Q. During that meeting where I allegedly falsely
17  accused you -- regarding which I allegedly falsely
18  accused you?
19    A. Do I recall sitting at a table before that
20  meeting? Yes.
21    Q. Okay. And you recall sitting at a table during
22  that in-service?
23    A. Yes.
24    Q. Okay. And was I sitting at that table?
25    A. No.

Page 59

1    Q. Had I made any attempt to sit at that table?
2    A. I don't know that you made an attempt to sit at
3  the table. You came to the table looking for your
4  notebook.
5    Q. Did you tell me to go over -- go over there and
6  point to the kindergarten table?
7    A. I don't recall what I said specifically, but I
8  don't recall telling you to go over somewhere. I may
9  have referred that your notebook might be over there, but
10  I don't recall telling you to go sit somewhere else, no.
11    Q. Was Rick Denmen sitting next to you at the time?
12    A. I don't know where Rick Denmen was sitting. He
13  was at the table, but I don't recall who was sitting next
14  to me.
15    Q. At the meeting that -- and the meeting -- at the
16  meeting about this incident did you say, "Rick Denmen
17  always gets me in trouble"?
18    A. Probably.
19    MS. ANGELL: I'm going to instruct the witness
20  to answer what you know or what you don't know as opposed
21  to guessing.
22    THE WITNESS: I don't recall specifically making
23  that statement, but I have made that statement, yes.
24    MS. ANGELL: Okay.
25

Page 60

1  BY MS. LARKINS:
2    Q. Can you tell me about another time when you made
3  that statement?
4    A. After more than one staff meeting.
5    Q. Is Rick Denmen your friend?
6    A. Yes.
7    Q. Okay. Do you discuss school issues together?
8  Or when you were working at Castle Park, did you discuss
9  school issues together?
10    A. Occasionally.
11    Q. Did he talk to you about me?
12    A. Not to my recollection.
13    Q. Okay.
14    MS. ANGELL: And I have a belated objection to
15  that. It's vague and ambiguous as to time. It kind of
16  sounds like that question means for all time. Do you
17  mean as to a specific time period, or while they were
18  both working at Castle Park or --
19    MS. LARKINS: The question is withdrawn.
20    Q. The anxiety that you felt regarding me, did that
21  become more severe over time?
22    A. No.
23    Q. Okay. Did you think I was crazy?
24    MS. ANGELL: Objection. Vague and ambiguous as
25  to time; lacks foundation.

Page 61

1    MR. HERSH: Calls for expert witness testimony.
2  BY MS. LARKINS:
3    Q. When you say you believed that I was
4  unpredictable, how did you come to that conclusion?
5    A. That was based on your behavior towards me
6  during the white board incident.
7    Q. Okay. During the white board incident were you
8  afraid that I might report that you were aggressive
9  toward you?
10    A. No.
11    Q. Okay. Did you ever tell Tim Allen that you
12  thought I might bring a gun to school?
13    A. No, not to my recollection.
14    Q. Did you tell Tim Allen that you were afraid of
15  me?
16    A. Yes. You have already asked that.
17    Q. Did you tell Tim Allen what you were afraid I
18  was going to do?
19    A. I don't recall specifically what I told Tim
20  Allen except for that I was apprehensive about you.
21    Q. Okay. And at this time you told Tim Allen this,
22  I was not employed at Castle Park, was I?
23    A. No.
24    Q. Were you afraid I might come to Castle Park?
25    A. Personally?

16 (Pages 58 to 61)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

**Page 62**

1    Q. Yes.
2    A. I had no feelings whatsoever about you coming to
3 Castle Park or not.
4    Q. What were you apprehensive of when you told
5 Tim --
6    A. The unpredictable behavior on your part towards
7 me.
8    Q. I hadn't -- I hadn't appeared at Castle Park for
9 many, many months at the time you reported this to
10 Mr. Allen, right?
11    A. (Witness nods head.)
12    Q. Okay. And yet you were --
13     MS. ANGELL: I'm sorry. I didn't hear an
14 audible response.
15     THE WITNESS: Yes.
16     MS. LARKINS: Thank you.
17     MS. ANGELL: I'm going to instruct the witness
18 that questions that seek to invade an attorney-client
19 privilege, which would mean meetings where counsel was
20 present, are not to be answered.
21     THE WITNESS: Okay.
22 BY MS. LARKINS:
23    Q. Why did you discuss me with Tim Allen?
24     MS. ANGELL: Objection. Vague and ambiguous as
25 to time.

**Page 63**

1 BY MS. LARKINS:
2    Q. Why did you talk to Tim Allen about me when Tim
3 Allen was principal of Castle Park Elementary?
4    A. It was concerning a meeting with the attorney
5 and I choose not to answer.
6     MS. LARKINS: Okay. I'm trying to figure this
7 out.
8     MS. ANGELL: Do you need to talk to me for a
9 second?
10     THE WITNESS: No. You instructed me not to
11 answer questions that had to do with meetings where
12 counsel was present.
13     MS. ANGELL: Let's go off for a second. I'll
14 see if I can get it cleared up.
15    Are we all in agreement.
16     VIDEOGRAPHER: Off the record?
17     MS. LARKINS: Yes.
18     VIDEOGRAPHER: Off the record.
19    (Recess taken.)
20     VIDEOGRAPHER: Back on the record at 3:09.
21     MS. LARKINS: Could you read back the last
22 question.
23    Never mind. I just remembered. Okay.
24    Q. When you told Tim Allen that you were
25 apprehensive about me, was there an attorney present?

**Page 64**

1    A. No.
2    Q. Okay. Why did you tell Tim Allen that you were
3 apprehensive about me?
4    A. He asked me.
5    Q. Okay. Do you recall exactly how he asked it?
6    A. No.
7    Q. Had he heard from someone else that you were
8 apprehensive about me?
9     MS. ANGELL: You mean other than attorney-client
10 communications and attorney privileged and attorney work
11 product?
12     MS. LARKINS: Yeah.
13     MS. ANGELL: If you know.
14     THE WITNESS: I don't know.
15 BY MS. LARKINS:
16    Q. How did he begin the conversation?
17     MS. ANGELL: You mean the conversation in which
18 she told Mr. Allen that she was apprehensive concerning
19 you?
20     MS. LARKINS: Yes.
21     THE WITNESS: I don't recall precisely how the
22 conversation began.
23 BY MS. LARKINS:
24    Q. Is he the one who brought up my name during that
25 conversation?

**Page 65**

1    A. I believe so.
2    Q. Is it possible that you were the one that
3 brought up my name?
4     MS. ANGELL: Objection. Calls for speculation.
5     THE WITNESS: I don't know.
6 BY MS. LARKINS:
7    Q. Okay. Are you certain that he was the one who
8 brought up my name during that conversation?
9    A. No, I'm not certain that he is the one.
10    Q. Okay. So you think it -- it's possible that you
11 were the one who brought up my name?
12     MS. ANGELL: Objection. Asked and answered.
13 BY MS. LARKINS:
14    Q. Go ahead.
15     MS. ANGELL: Asked and answered.
16     MS. LARKINS: That's the objection, but I would
17 like you to answer it.
18     THE WITNESS: I did answer it previously.
19 BY MS. LARKINS:
20    Q. What was your answer?
21    A. I don't recall.
22     MS. ANGELL: She doesn't need to answer it.
23 She's already answered it once.
24 BY MS. LARKINS:
25    Q. Okay. When Tim Allen was principal at Castle

17 (Pages 62 to 65)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

**Page 66**

1  Park, about how often did you become apprehensive about
2  me?
3      A. I don't recall making note of occurrences of
4  apprehension.
5      Q. Would you say it was a rare event?
6      A. No. I don't believe there were events.
7      Q. The event I'm referring to is your feeling
8  apprehensive about me. Was that a rare event?
9      A. No.
10     Q. Was it a common event?
11     A. Yes.
12     Q. Okay. Did you feel constantly apprehensive
13  about me?
14     A. I don't recall specifically.
15     Q. Okay. What were you afraid of that I would do?
16     A. Exhibit more unpredictable behavior.
17     Q. Where were you afraid that I would exhibit this
18  behavior?
19     A. I had no specific location that I was concerned
20  about.
21     Q. Did you think I would exhibit this behavior in a
22  location where you were located?
23     A. Yes.
24     Q. Okay. Did you think I would seek you out?
25     A. I did not speculate on that, no.

**Page 67**

1      Q. Did you think I might accidentally come across
2  you?
3      A. I did not speculate on that.
4      Q. Did you think that somehow you and I would be
5  together and I would behave unpredictably?
6      A. I didn't specifically speculate on that.
7         I guess I'm not understanding the question being
8  asked.
9      Q. Okay. Let me try. Were you afraid that somehow
10  you and I would end up at the same location and I would
11  behave unpredictably?
12     A. Yes.
13     Q. Okay. How afraid were you?
14        MS. ANGELL: Vague and ambiguous.
15        MS. LARKINS: You're right. That is vague and
16  ambiguous.
17     Q. Would you say that this was kind of a mild
18  anxiety in the back of your mind?
19        MS. ANGELL: Objection. Calls for expert
20  testimony. This person has not been established to be a
21  psychiatrist, psychotherapist or anything like that, and
22  it sounds to me like you're talking about medical
23  diagnoses.
24        MS. LARKINS: A mild anxiety in the back of your
25  mind? Okay.

**Page 68**

1      Q. Let's see. Let's not use the word "anxiety."
2  Let's say did you feel stressed about the possibility
3  that I might somehow appear and act unpredictable?
4      A. At times, yes.
5      Q. Okay. How often did these times occur?
6      A. I've not really speculated on that.
7      Q. Uh-huh. And this anxiety stemmed simply from
8  this white board/Kingdoms incident; is that correct?
9      A. Yes.
10     Q. And you were afraid that I might do something
11  worse than yell at you?
12     A. I didn't say that.
13     Q. Were you afraid that I might do something worse
14  than yell at you?
15     A. I was afraid that you would exhibit more
16  unpredictable behavior.
17     Q. Okay. In other words, you thought I might --
18  you were afraid -- were you afraid that I would exhibit
19  behavior which you had never experienced me exhibiting
20  before?
21        MS. ANGELL: Is the question before "were you
22  afraid" -- is all that other stuff stricken?
23        MS. LARKINS: Yes.
24        MS. ANGELL: Do you understand the question?
25        THE WITNESS: No.

**Page 69**

1        MS. ANGELL: She can read it back from "were you
2  afraid."
3        MS. LARKINS: No. That is all right. I'll
4  restate it.
5        MS. ANGELL: Okay.
6  BY MS. LARKINS:
7      Q. When you were feeling apprehensive about me when
8  Tim Allen was principal, did you think I might exhibit
9  behavior which I had never before exhibited?
10     A. I don't know what behavior you had exhibited
11  before, so I have no -- I need you to clarify that. Do
12  you mean exhibited to me?
13     Q. Yes. I mean to you.
14     A. Yes. That would go along with unpredictable
15  behavior.
16     Q. Okay. I'm going to leave that for a while.
17        Did you ask Tim Allen to get a restraining order
18  against me?
19     A. No.
20     Q. Did you ask Tim Allen to make sure that I didn't
21  come on the school grounds?
22     A. Not to my recollection.
23     Q. Did you tell Tim Allen about the white board
24  incident?
25     A. I don't recall.

18 (Pages 66 to 69)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

Page 70

1   Q. Did you give any reason to Tim Allen for your
2   apprehension about me?
3   A. I don't recall specific reasons.
4.  Q. If you had given him a reason for your
5   apprehension about me, it would have been the white board
6   incident, correct?
7   MS. ANGELL: Objection. She already testified
8   that she didn't recall; therefore, the question is
9   argumentative.
10  MS. LARKINS: Okay.
11  Q. When I was working at Castle Park and Gretchen
12  Donndelinger was working at Castle Park, did you ever
13  talk to her about a police report involving me or anyone
14  connected with me?
15  A. No.
16  Q. Did you ever tell her that you knew something
17  about me, but you -- she wouldn't want to know it?
18  A. No.
19  Q. Did you ever tell her that there was some sort
20  of non-school relationship between my family and your
21  family?
22  A. Not to my recollection, no.
23  Q. Apart from the white -- talking about the white
24  board incident and the notebook incident to Gretchen
25  Donndelinger, did you ever talk to her at any other time

---

Page 71

1   about me?
2   MS. ANGELL: Objection. Vague and ambiguous.
3   And insofar as it seeks to invade attorney-client
4   privilege and attorney work product, it's objected to on
5   those grounds.
6   MS. LARKINS: Okay. Let me try again.
7   Q. Did you ever talk to Gretchen Donndelinger
8   without an attorney present about me at any other time
9   other than the times you were discussing the white board
10  incident and the notebook incident?
11  A. I don't recall any, no.
12  Q. If you had knowledge about a police
13  report about a teacher at your school, is that something
14  you'd be likely to remember?
15  A. Probably.
16  Q. Okay. Did you ever speak to Chris Moran, a
17  Union-Tribune reporter?
18  A. I don't know. I may have.
19  Q. Okay. Did you speak to any Union-Tribune
20  reporter regarding your transfer out of Castle Park
21  Elementary?
22  A. Yes.
23  MS. ANGELL: Objection. Issues relating to
24  Ms. Donlan's transfer or employment status are not
25  relevant to the litigation.

---

Page 72

1   MS. LARKINS: I thought when you came back in
2   you said that would be okay to talk about that.
3   MS. ANGELL: I'm still making the objection that
4   it's not relevant.
5   MS. LARKINS: Oh, okay.
6   MS. ANGELL: The whole line of questioning is
7   not relevant. And if you want to stipulate that all the
8   line of questioning related to any current employment
9   status -- if you want to do what you did before --
10  MS. LARKINS: Yeah.
11  MS. ANGELL: I'll just object based on relevance
12  for all of that, and then I don't have to say it each
13  time on this line of questioning then. That will be
14  fine.
15  MS. LARKINS: Okay.
16  MR. HERSH: And I would join in that objection,
17  running objection.
18  MS. LARKINS: Okay. So stipulated.
19  Q. Did you talk to a Union-Tribune reporter about
20  your transfer from Castle Park Elementary?
21  MS. ANGELL: Vague and ambiguous as to time.
22  BY MS. LARKINS:
23  Q. Since last August.
24  A. I don't recall the exact date, but yes.
25  Q. Okay. Did you talk to more than one

---

Page 73

1   Union-Tribune reporter?
2   A. No.
3   Q. Okay. Did you call the reporter or did the
4   reporter call you?
5   A. I did not call the reporter; the reporter did
6   not call me.
7   Q. Did you talk to the reporter in person?
8   A. Yes.
9   Q. Okay. Where were you when you talked to the
10  reporter?
11  A. I was at Castle Park Elementary School.
12  Q. Okay. At what time of day was it?
13  A. I don't recall specifically. It was in the
14  evening.
15  Q. Okay. And was this at a rally to protest your
16  transfer?
17  A. It was at a rally to inform the parents about
18  the transfer.
19  Q. Okay. I'd like to enter a document -- I'd like
20  to ask that this document be labeled Exhibit 4.
21  (Exhibit 4 marked for identification.)
22  THE WITNESS: Thank you.
23  BY MS. LARKINS:
24  Q. Okay. Is this document familiar to you?
25  A. Yes.

---

19 (Pages 70 to 73)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

**Page 74**

1    Q. When was the first time you saw this document?
2    A. A few days before the rally.
3    Q. Okay. How did you -- who showed you the
4  document?
5    A. I showed me the document.
6    Q. Did you prepare this document?
7    A. Yes, I did.
8    Q. Do you feel that it is wrong for someone to be
9  transferred without being told why?
10    A. Without being told why and -- if I -- I need
11  more clarification.
12    MS. ANGELL: Objection. Vague and ambiguous.
13  BY MS. LARKINS:
14    Q. Okay. Did you write this document in order to
15  protest your transfer out of Castle Park Elementary
16  School?
17    A. I wrote this document to make parents aware of a
18  meeting that was being held to inform the public, the
19  parents of Castle Park Elementary School about our
20  transfer and what they could to do to prevent it if they
21  so chose.
22    Q. Did you want the parents to prevent your
23  transfer?
24    A. Yes.
25    Q. Okay. Did you think your transfer was wrong?

**Page 75**

1    MS. ANGELL: Objection. Vague and ambiguous;
2  calls for a legal conclusion.
3  BY MS. LARKINS:
4    Q. Did you think that you're transfer was morally
5  wrong?
6    MR. HERSH: Calls for a theological expert
7  response.
8  BY MS. LARKINS:
9    Q. How did you feel about your transfer?
10    A. I felt it was sudden and without appropriate
11  reason.
12    Q. Okay. Have you ever become aware at any time
13  before today that I was taken out of my classroom and
14  placed on administrative leave without being told why?
15    A. No.
16    Q. Were you ever aware until today -- before today
17  that I was taken out of my classroom at Castle Park and
18  placed on administrative leave?
19    MS. ANGELL: Hold up. You're answering real
20  quick. Give me a chance to get my objections on the
21  record. Okay?
22    Let me clarify -- ask for clarification of the
23  question. Do you mean other than in attorney-client
24  privileged situations, attorney work product and in the
25  course of this litigation?

**Page 76**

1    MS. LARKINS: Yes.
2    MS. ANGELL: So unrelated to this litigation --
3  her question is unrelated to this litigation, were you
4  told -- what did you say -- put on administrative leave?
5    MS. LARKINS: Yes.
6    THE WITNESS: We knew -- I was aware you were on
7  leave. I did not know the specifics pertaining to that
8  leave, no.
9  BY MS. LARKINS:
10    Q. Who told you that I was on leave?
11    A. I don't recall.
12    Q. Were you happy when I was on leave?
13    MS. ANGELL: Objection. Vague and ambiguous.
14  Vague and ambiguous as to time. And the whole thing is
15  vague and ambiguous.
16    MS. LARKINS: Okay.
17    Q. Were you happy when you found out -- when you
18  first found out that I had been placed on leave?
19    MS. ANGELL: Vague and ambiguous as to time. I
20  believe the facts are that you were on leave multiple
21  times during you time as a teacher at Castle Park
22  Elementary School.
23    MS. LARKINS: That's why I said first.
24    MS. ANGELL: Do you know when she was first on
25  leave?

**Page 77**

1    THE WITNESS: No.
2    MS. ANGELL: If you could give a time frame,
3  maybe she could answer your question.
4    MS. LARKINS: When you first found out.
5    MS. ANGELL: I'm sorry. This is still vague and
6  ambiguous, because, as I said, my understanding of the
7  facts are that there were multiple different times.
8    MS. LARKINS: I don't know when she first found
9  out that I was ever taken -- placed on administrative
10  leave.
11    Q. Okay. I am hoping that you'll be able to think
12  back and try to remember the very first time. And I
13  would imagine it would be a memorable moment, because
14  it's pretty unusual for a teacher to be placed on
15  administrative leave.
16    I'm trying -- I'm asking you to think back and
17  try to remember when you first found out that I had ever
18  been placed on administrative leave from Castle Park
19  Elementary.
20    MS. ANGELL: Objection. Move to strike all of
21  the testimony given by plaintiff before the last
22  question. Objection. It's been asked and answered; that
23  she was not told you were on administrative leave and any
24  circumstance other than attorney-client privileged
25  discussions and/or discussions in relation to this

---

20 (Pages 74 to 77)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

Page 78

1  litigation. And the question has already been answered.
2  She said that she didn't know what kind of leave you were
3  on.
4  　　MS. LARKINS: Okay. This litigation,
5  Ms. Angell, was filed -- well, actually it was filed in
6  January of 2002, but it wasn't served until about March
7  12, 2002. And I don't think that Ms. Donlan became aware
8  of this litigation until March 12, 2002.
9  　　Now, I was placed on administrative leave the
10  first time on February 12, 2001, so we are talking about
11  a period of over a year before there was any litigation,
12  any attorneys, any attorney-client privilege. And of
13  course Ms. Donlan wants to tell us the truth here.
14  　　Q. So I need to ask you during the period of time
15  between February 12, 2001 and the time in 2002 when you
16  discovered that I had filed a lawsuit, did you ever find
17  out that I had been placed on administrative leave?
18  　　MS. ANGELL: Objection. Incomplete
19  hypothetical; assumes facts not in evidence. And move to
20  strike all of that commentary before the question that
21  came out, because it's not your opportunity to testify,
22  and I think you were formulating your question.
23  　　MS. LARKINS: Okay.
24  　　Q. Did you find out at some time that I had filed a
25  lawsuit?

---

Page 79

1  　　MS. ANGELL: Vague and ambiguous.
2  　　THE WITNESS: Yes.
3  BY MS. LARKINS:
4  　　Q. Okay. How soon after teachers were served at
5  Castle Park Elementary did you find out that they had
6  been served?
7  　　A. I don't recall.
8  　　Q. Okay. Do you think it was pretty soon after?
9  　　A. I don't recall.
10  　　Q. Okay. At any time before you spoke to an
11  attorney regarding this case, did you find out that I had
12  been placed on administrative leave when I was a teacher
13  at Castle Park?
14  　　A. I don't specifically recall when -- the time.
15  　　Q. When you were at Castle Park, was there a
16  table -- a certain table in the teachers' lounge that you
17  liked to sit at?
18  　　A. Yes.
19  　　Q. Okay. Were there other teachers who frequently
20  sat there with you?
21  　　A. Yes.
22  　　Q. Could you tell me who those teachers were?
23  　　A. It varied from day to day.
24  　　Q. Who were the most like -- who sat there with you
25  more often -- most often?

---

Page 80

1  　　A. My assistant Kim Brown. Occasionally Victoria
2  Singleton would sit there. Occasionally Mimi January,
3  Linda Candle, sometime -- generally Virginia Copeland.
4  Occasionally Terry Coffey.
5  　　Q. Okay.
6  　　MS. ANGELL: I'm sorry. Can you read back who
7  was before Linda Candle. I missed the name.
8  　　(The record was read.)
9  　　MS. ANGELL: Thank you.
10  BY MS. LARKINS:
11  　　Q. How do you feel about principal Ollie Matos?
12  　　MS. ANGELL: Objection. Vague and ambiguous.
13  BY MS. LARKINS:
14  　　Q. You can try to answer it, or do you need me to
15  restate it?
16  　　A. I'm --
17  　　MS. ANGELL: And the relevance objection,
18  because --
19  　　THE WITNESS: I'm curious as to why my feelings
20  about Mr. Matos are relevant.
21  　　MS. ANGELL: Well, you don't get to ask those
22  kinds of questions, but -- because I think her --
23  　　(Brief interruption.)
24  　　MS. LARKINS: I apologize for that.
25  　　MS. ANGELL: I'm just raising the relevance

---

Page 81

1  objection again because we moved away from the transfer
2  issue I think for a little bit, and I think you are
3  moving back toward there, so it would be another one of
4  those relevance objections.
5  　　MS. LARKINS: I believe that Robin Donlan's
6  attitudes toward Ollie Matos are typical of her attitudes
7  toward quite a few people, and I believe she has sought
8  to damage him in a similar way that she sought to damage
9  me.
10  　　MS. ANGELL: Move to strike. No question
11  pending.
12  　　MS. LARKINS: I was talking to you.
13  　　MS. ANGELL: I don't understand what you're
14  saying. It sounds like you're testifying.
15  　　MS. LARKINS: No. You wanted to know how this
16  was relevant, and I'm just telling you that.
17  　　MS. ANGELL: Well, the allegations in this
18  litigation are that Ms. Donlan conspired with her brother
19  Michael Carlson to get access to your records of arrest;
20  that she didn't -- that Mr. Carlson did in fact get
21  access to those records, gave the info to Mrs. Donlan,
22  then passed it along to other people. And I haven't seen
23  any allegation concerning Ollie Matos.
24  　　MS. LARKINS: I believe that conspiracy to
25  commit slander was one of the causes of action.

21 (Pages 78 to 81)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

| | Page 82 |
|---|---|
| 1 | MS. ANGELL: That's alleged against Ms. Donlan |
| 2 | and Mr. Carlson. |
| 3 | MS. LARKINS: Exactly. I believe that |
| 4 | Ms. Donlan has a pattern of behavior of conspiracy to |
| 5 | commit slander and slander. That's why I think this |
| 6 | question is relevant. |
| 7 | MS. ANGELL: Okay. Go ahead. |
| 8 | THE WITNESS: Could you restate the question. |
| 9 | BY MS. LARKINS: |
| 10 | Q. How do you feel about Ollie Matos? |
| 11 | A. Personally or professionally? |
| 12 | Q. Both. |
| 13 | A. I do not care for him. |
| 14 | Q. Could you tell me why not? |
| 15 | A. I do not feel that he is an effective |
| 16 | administrator. |
| 17 | Q. Why not? |
| 18 | A. Because he has proven on more than one occasion |
| 19 | to not be completely truthful, and I believe truthfulness |
| 20 | is very important -- an important administrative quality. |
| 21 | Q. Do you believe truthfulness is important for |
| 22 | teachers? |
| 23 | A. I believe truthfulness is important for |
| 24 | everyone. |
| 25 | Q. Okay. Have you ever discussed my son with any |

| | Page 83 |
|---|---|
| 1 | of the teachers at Castle Park Elementary School? |
| 2 | A. Not to my recollection. |
| 3 | Q. Okay. Did you enjoy a great deal of influence |
| 4 | over decisions being made by administrators at Castle |
| 5 | Park Elementary School during most of the time you were |
| 6 | there? |
| 7 | A. If you could clarify that, please. |
| 8 | Q. Did you enjoy -- let me say this. Did Gretchen |
| 9 | Donndelinger listen to what you said to her and do what |
| 10 | you suggested a significant amount of the time? |
| 11 | MR. HERSH: Objection. It's a compound -- |
| 12 | combined question. |
| 13 | MS. LARKINS: Let me try to separate it. |
| 14 | Q. Did you frequently go in to Gretchen |
| 15 | Donndelinger's office and talk to her? |
| 16 | A. Not to my recollection, no. |
| 17 | VIDEOGRAPHER: Counsel, I need to pause for a |
| 18 | tape change. |
| 19 | MS. LARKINS: Okay. Everybody, shall we take a |
| 20 | break? |
| 21 | VIDEOGRAPHER: This concludes Tape 1 of the |
| 22 | deposition of Robin Donlan. Off the record at 3:40 p.m. |
| 23 | (Recess taken.) |
| 24 | VIDEOGRAPHER: This is Tape 2 of the deposition |
| 25 | of Robin Donlan. Back on the record at 3:54 p.m. |

| | Page 84 |
|---|---|
| 1 | BY MS. LARKINS: |
| 2 | Q. Did you ever give a written statement about me |
| 3 | to Gretchen Donndelinger? |
| 4 | A. Not to my recollection, no. |
| 5 | Q. Do you think you would remember if you had? |
| 6 | A. I don't recall, no. |
| 7 | Q. But do you usually have a pretty good memory for |
| 8 | things like that? |
| 9 | A. I have a pretty good memory for certain things, |
| 10 | but -- since I don't recall, I don't know that I would be |
| 11 | able to speculate whether or not that I would recall |
| 12 | something that I can't recall. |
| 13 | Q. Do you frequently give written statements about |
| 14 | other teachers to principals? |
| 15 | A. No. |
| 16 | Q. Okay. So it probably would be an event that |
| 17 | would stand out in your mind if you did that? |
| 18 | A. I don't know that it would or would not. |
| 19 | Q. Did you ever tell anyone that you were a |
| 20 | victim of me? |
| 21 | A. No. |
| 22 | Q. Okay. Do you recall a year at Castle Park when |
| 23 | Gretchen Donndelinger was principal and you said that you |
| 24 | might want to switch to a regular fourth grade class |
| 25 | instead of your special education class? |

| | Page 85 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Do you remember why you -- strike that. Did you |
| 3 | tell Gretchen Donndelinger that you wanted to switch to a |
| 4 | regular fourth grade class? |
| 5 | A. I inquired about a fourth grade opening that was |
| 6 | becoming available. |
| 7 | Q. Okay. Do you remember how that opening became |
| 8 | available? |
| 9 | A. I don't recall specifically. I believe that Al |
| 10 | Smith was transferred to third grade. |
| 11 | Q. Okay. Do you think it could have been that a |
| 12 | new portable was brought to the school that was going to |
| 13 | create a new class? |
| 14 | MS. ANGELL: Are you asking her to guess? |
| 15 | BY MS. LARKINS: |
| 16 | Q. Do you remember -- do you remember a year when a |
| 17 | new portable was brought to Castle Park School and it is |
| 18 | now numbered Rooms 704 and 705? |
| 19 | A. I don't remember specifically when that was |
| 20 | brought. |
| 21 | Q. Okay. Do you think that might have been the |
| 22 | time when you asked to switch to a regular fourth? |
| 23 | MS. ANGELL: Vague and ambiguous. |
| 24 | THE WITNESS: I don't recall that being |
| 25 | specifically the time, no. |

22 (Pages 82 to 85)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

Page 86

1  BY MS. LARKINS:
2      Q.  Okay.  Why did you decide not to switch to the
3  regular fourth grade class when you had discussed it with
4  the principal?
5      A.  I did not make that decision.  Dr. Donndelinger
6  made that decision.
7      Q.  Were you unhappy when you were not allowed to
8  switch to a fourth grade regular class?
9      A.  I was disappointed.
10     Q.  Are you now teaching a regular fourth grade
11  class?
12     A.  Yes.
13     Q.  But you weren't happy when you were given this
14  regular fourth grade class?
15         MS. ANGELL:  Objection.  Vague and ambiguous.
16         If you understand the question, you can answer
17  it.
18         What's this fourth grade class?  I don't know
19  what you mean.
20         MS. LARKINS:  I withdraw the question.
21     Q.  Do you recall one year when the teachers had a
22  food fight in the staff lounge at Castle Park?
23     A.  I wasn't present for that.
24     Q.  Okay.  Did that food fight occur on the last day
25  of school?

---

Page 87

1      A.  I don't recall.
2      Q.  The following year did you come to the lounge
3  dressed in a rain coat in the expectation of having
4  another food fight?
5      A.  I don't recall.
6      Q.  Was Lowell Billings an interim principal at
7  Castle Park when you were there?
8      A.  Yes.
9      Q.  What did you think of his administrative skills?
10     A.  I didn't think anything.  He wasn't there very
11  often.
12     Q.  Okay.  Do you think that Castle Park has had
13  many principals with poor administrative skills?
14     A.  No.
15     Q.  Did you think that Gretchen Donndelinger had
16  good administrative skills?
17     A.  Certain of her administrative skills were good,
18  yes.
19     Q.  What skills were those?
20         MS. ANGELL:  I'm going object to this line of
21  questioning as to administrators' administrative or
22  management skills as not being relevant nor reasonably
23  calculated to lead to the discovery of admissible
24  evidence.
25         MS. LARKINS:  Okay.  I would like to ask some

---

Page 88

1  questions about that, and it's fine with me to stipulate
2  that that would be a standing objection.
3         MS. ANGELL:  To all of the questions concerning
4  her opinions about administrators' skills and expertise?
5         MS. LARKINS:  Yes.
6         MS. ANGELL:  Okay.  So stipulated.
7  BY MS. LARKINS:
8      Q.  What were Gretchen Donndelinger's administrative
9  skills in your point of view?
10     A.  She cared for the children; she liked being
11  around children.  She -- I felt that she had the best
12  interests of the children in heart.  I feel those are
13  skills that are important for an administrator.
14     Q.  Was she your friend?
15     A.  She was my work acquaintance.
16     Q.  Did you have a positive relationship with her?
17     A.  I believe so.
18     Q.  Okay.  Did your relationship with her get better
19  over time?
20     A.  I wouldn't say it got better or worse.
21     Q.  Okay.  Did you ever have problems with her when
22  she refused to suspend a student of yours that you wanted
23  suspended?
24         MS. ANGELL:  Objection.  Not reasonably
25  calculated to lead to the discovery of admissible

---

Page 89

1  evidence.  This is something different from
2  administrative skills.  Now you're asking about
3  discipline of students, that kind of thing.
4         MS. LARKINS:  I am happy to have that be a
5  running objection to every single question I ask.
6         MS. ANGELL:  Okay.  So stipulated.
7         Anyone joining?
8         MR. HERSH:  I'll join in.
9         MS. LARKINS:  Do you want me to repeat the
10  question?
11         THE WITNESS:  No.  I heard the question.
12         Do I answer it?
13         MS. ANGELL:  I'd like to hear the question back,
14  please.
15         MS. LARKINS:  Let me just ask the question
16  again.  I've got to stop saying "um."
17     Q.  Were you ever unhappy with Gretchen Donndelinger
18  when she refused to suspend one of your students whom you
19  wanted suspended?
20         MS. ANGELL:  Objection.  Assumes facts.
21         THE WITNESS:  I was -- I wouldn't say I was
22  unhappy.  I wasn't pleased.
23  BY MS. LARKINS:
24     Q.  Did you ever ask Gina Boyd to come and have a
25  meeting with you and Gretchen --

---

23 (Pages 86 to 89)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA  92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

**Page 90**

1    A. I don't recall.
2    Q. -- regarding suspending students?
3    A. I don't recall.
4    Q. Did you ever ask Gina Boyd to come to Castle
5  Park and have a meeting with Gretchen Donndelinger about
6  anything?
7    A. I don't recall specifics.
8    Q. Do you recall ever asking Gina Boyd to come and
9  have a meeting with you and the principal at Castle Park?
10    A. I don't recall any specific events.
11    Q. But you think it might have happened?
12    A. It might have happened, yes.
13    Q. Okay. From that I would assume that Gina Boyd
14  was a pretty -- you felt -- strike that.
15       Was Gina Boyd very supportive of you when you
16  were at Castle Park?
17    A. Gina Boyd was supportive of everybody who was at
18  Castle Park in my belief.
19    Q. Was her relationship with you closer than it was
20  with other teachers?
21    A. She had known me for longer. We had been
22  acquaintances, been friendly work partners for longer.
23    Q. Uh-huh. Okay. What were some of Gretchen
24  Donndelinger's problems as an administrator?
25    A. Are you asking me to speculate -- I'm --

---

**Page 91**

1    Q. In your opinion.
2    A. Her problems with being an administrator or with
3  administrative traits or -- I'm unclear as to what you're
4  asking me.
5    Q. Okay. Let me try again.
6       Did you ever discuss with other teachers
7  Gretchen Donndelinger's failings as an administrator?
8    A. I don't recall specifically.
9    Q. Okay. In your opinion, has Castle Park had more
10  than its share of poor administrators?
11    MS. ANGELL: Objection. Asked and answered.
12    MS. LARKINS: Are you telling your client to
13  refuse to answer the question?
14    MS. ANGELL: Didn't you already ask her the same
15  question about 20 minutes ago?
16    MS. LARKINS: No. I've been talking about
17  specific administrators.
18    MS. ANGELL: No. You asked the question has
19  Castle Park had a lot of bad administrators, and she
20  answered that she didn't think so.
21  BY MS. LARKINS:
22    Q. Okay. In your opinion is Ollie Matos the worst
23  administrator that Castle Park has had during the time
24  you worked there?
25    A. Possibly.

---

**Page 92**

1    Q. Who do you think might come close to him as a
2  bad administrator?
3    A. Mr. Perez.
4    Q. Okay. Do you believe that Ollie Matos should be
5  fired?
6    A. No.
7    Q. Do you believe that Ollie Matos should be
8  removed from Castle Park?
9    A. I believe that he would most likely be a better
10  fit at a different school.
11    Q. Why is that?
12    A. Because I believe that his skills would be
13  better suited to a different type of staff than Castle
14  Park was.
15    Q. When you say type of staff that Castle Park is,
16  what do you mean by that?
17    A. Castle Park is an independent staff. The staff
18  pretty much as a whole is used to being involved in
19  decision making. I believe that Mr. Matos' experience is
20  not of that, but there are schools where the staff is not
21  involved as closely in decision making. It's my belief
22  that he might be better suited to a school like that.
23    Q. Okay. Are you acquainted with one of the PTA --
24  let me rephrase that. Are you acquainted with PTA
25  president Kim Simmons?

---

**Page 93**

1    A. Yes.
2    Q. How long have you known her?
3    A. Approximately two years.
4    Q. How did you first become acquainted?
5    A. I don't recall.
6    Q. Has she ever called you up to report events at
7  Castle Park since you left?
8    A. Yes.
9    Q. About how often?
10    A. Occasionally, not very often.
11    Q. Have you suggested to her actions that she might
12  take at Castle Park since you left?
13    A. Yes.
14    Q. What actions were those?
15    A. I suggested at one incident that she call Gina
16  Boyd.
17    Q. What incident was that?
18    A. It was the incident where you were handing out
19  literature on the campus to the students.
20    Q. Okay.
21    A. The literature had Gina Boyd's name on it.
22    Q. Uh-huh. How did you feel about that?
23    MS. ANGELL: Vague and ambiguous.
24  BY MS. LARKINS:
25    Q. How did you feel about me handing out literature

---

24 (Pages 90 to 93)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

Page 94

1    that had Gina Boyd's name on it?
2       A.  You're entitled to your opinion.  But opinion is
3    opinion.
4       Q.  It didn't bother you at all?
5       A.  I really didn't have any opinion about it at
6    all.
7       Q.  Did you have any feelings about it?
8       A.  (Witness shakes head.)
9       I didn't -- I failed to understand the purpose,
10   but your opinion is your opinion.  You're entitled to it.
11      Q.  Okay.  And what other reports has Kim Simmons
12   made to you about Castle Park since you left?
13      A.  She called to ask me if I knew two gentlemen
14   that had attended a PTA meeting, which I did not.
15      Q.  Was she concerned about these two gentlemen?
16      A.  You would have to ask her that.
17      Q.  Did she tell you she was worried about these two
18   gentlemen?
19      A.  No.  She did not know who they were.  She asked
20   me if I knew who they were and why they were there, and I
21   said no.
22      Q.  Did you go to curriculum night at Castle Park
23   recently and hand out fliers?
24      A.  For Jill Galvez, yes.  She was running for the
25   school board seat that is currently occupied by Patrick

Page 95

1    Judd.
2       Q.  Why did you choose Castle Park as a place to
3    hand out your fliers that night?
4       A.  I -- I saw no reason not to.
5       Q.  Who was with you when you were handing out the
6    fliers?
7       A.  Certain parents, Gina Boyd, other people I don't
8    recall specifically, and Peg Myers.
9       Q.  Okay.  Peg Myers was also recently transferred
10   from Castle Park, wasn't she?
11      A.  Yes, she was.
12      Q.  Were you trying to prove to the principal that
13   you could be there and he couldn't get rid of you?
14      A.  I was not trying to prove anything.  I was
15   handing out fliers in support of Jill Galvez.
16      Q.  Were any of the parents or teachers who were
17   with you holding up signs?
18      A.  Yes.
19      Q.  What did those signs say?
20      A.  Different things.  "Support the teachers."
21      Q.  What did that mean, "support the teachers"?
22      A.  Support the teachers who were transferred.
23      Q.  So these parents and teachers were protesting
24   your transfer?
25      A.  I believe the parents were.  The teachers who

Page 96

1    were out there were myself and Peg Myers, and we were
2    handing out fliers for Jill Galvez.
3       Q.  Okay.  Do you remember when the bilingual
4    program began at Castle Park Elementary School?
5       A.  I don't remember a specific year, but yes.
6       Q.  Okay.  Were the teachers involved in deciding
7    whether or not there would be a bilingual program?
8       A.  I can't recall how much involvement the teachers
9    had in making the decision to have one.
10      Q.  How did you feel about the bilingual program?
11      MS. ANGELL:  Vague and ambiguous as to time.
12   BY MS. LARKINS:
13      Q.  At Castle Park when it was being discussed that
14   it was going to be -- it might be coming.
15      A.  I didn't have a strong belief in bilingual
16   education.
17      Q.  Do you think bilingual education is a bad idea?
18      A.  I wouldn't go to say that it's a bad idea.  I
19   just don't have a belief that it's beneficial.
20      Q.  Okay.  Did you express these opinions at staff
21   meetings?
22      A.  Yes, I did.
23      Q.  Did other people express similar opinions?
24      A.  Similar and opposed, yeah.
25      Q.  Okay.  Were these -- did people get pretty angry

Page 97

1    at these staff meetings?
2       A.  Not to my recollection.
3       Q.  Okay.  When you were at Castle Park, did there
4    come a time when a rule was established that teachers
5    couldn't be working on their own personal class work
6    during staff meetings?
7       A.  That rule has been established more than once.
8       Q.  Okay.  Can you remember the first time it was
9    established?
10      A.  Tony Gonzalez had that rule I believe during his
11   principalship.
12      Q.  And --
13      A.  I don't know when it was established.
14      Q.  Okay.  And then did that rule sort of get lost
15   by the wayside after Tony Gonzalez left?
16      A.  Each administrator has their own style for
17   meetings.  With the different administrators came
18   different standards.
19      Q.  Okay.  I think his name was French.  Was it --
20   was Bob French the principal that followed --
21      A.  Yes.
22      Q.  Did he have that rule about no work being done
23   during staff meetings?
24      A.  I don't recall specifically.
25      Q.  Okay.  Was there a practice of keeping a

25 (Pages 94 to 97)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

Page 98

1  speakers list at staff meetings?
2      A. Some staff meetings, not all, no.
3      Q. Who usually kept the speakers list?
4      A. At times Joe Ellen Hamilton, for the most part.
5      Q. Who else?
6      A. I don't recall, but other teachers have done it.
7      Q. Okay. Was Joe Ellen Hamilton a friend of yours?
8      A. Not particularly.
9      Q. Was Karen Synder a friend of yours?
10     A. Yes.
11     Q. Would you say Karen Synder was your closest
12  friend at Castle Park?
13     A. No.
14     Q. Who was your closest friend at Castle Park?
15     A. Kim Brown.
16     Q. Okay. Did the staff at Castle Park ever get an
17  in-service about how to conduct staff meetings?
18         MS. ANGELL: Vague and ambiguous as to time.
19         MS. LARKINS: At any time that you were there at
20  Castle Park.
21         THE WITNESS: An in-service?
22  BY MS. LARKINS:
23     Q. Uh-huh.
24     A. I don't recall a specific in-service on how to
25  conduct staff meetings. There may have been, but I don't

---

Page 99

1  recall one.
2      Q. Okay. After the bilingual program was
3  instituted, was there hostility remaining among the staff
4  toward the bilingual program?
5      A. I don't believe so.
6      Q. Okay. But a bilingual teacher -- the first
7  bilingual teacher was dismissed by the school district,
8  Heather Smith?
9      A. I don't know if she was dismissed or not.
10     Q. Okay. Do you know that I was dismissed by the
11  school district?
12         MS. ANGELL: You mean other than conversations
13  that are attorney-client privileged, attorney work
14  product and information related to Ms. Donlan in the
15  course of this litigation?
16         MS. LARKINS: Yes.
17         THE WITNESS: We were told during a meeting,
18  so --
19         MS. ANGELL: Well, you don't discuss anything
20  that was told to you by your counsel, things that you
21  discussed with counsel.
22         So the question is did you know, other than
23  through your counsel or through this litigation, that she
24  had been dismissed?
25         THE WITNESS: No.

---

Page 100

1         MS. ANGELL: Did I state your question right?
2         MS. LARKINS: Yes.
3      Q. Okay. Have you ever talked to Star News
4  reporter Kelley Dupuis?
5      A. Yes.
6      Q. Did you ever discuss me with him?
7      A. Not that I can recall.
8      Q. Did you ever discuss Lybia Gill with him?
9      A. No, not that I can recall.
10     Q. Okay. Going back to Exhibit No. 4, which is the
11  flier that you prepared --
12     A. Uh-huh.
13     Q. Did you do this translation into Spanish
14  yourself or did someone do that for you?
15     A. Someone did that for me.
16     Q. Who was that?
17     A. Stephanie Pettit.
18         MS. ANGELL: Is there another exhibit or
19  something? You were talking about this translation?
20         MS. LARKINS: Yeah. I'm sorry. How about we
21  staple this to Exhibit 4. This is the translation of it.
22     Q. Okay. On the tenth line of the English version
23  which you wrote, did you refer to the Castle Park family?
24     A. Yes.
25     Q. What did you mean by that?

---

Page 101

1      A. I meant the teachers, students and parents.
2      Q. Okay. Do all teachers belong to the Castle Park
3  family?
4      A. If they desire to, yes.
5      Q. How do they exclude themselves from the Castle
6  Park family?
7      A. Some teachers choose not to participate in
8  things.
9      Q. What things are those?
10     A. Staff meetings, other in-services. There are
11  some teachers who remain to themselves. They are still
12  considered part of the family -- the Castle Park, you
13  know, community, but sometimes they don't participate in
14  items, no.
15     Q. Okay. Now, do you think it is wrong for a
16  principal to transfer a member of the Castle Park family
17  who is a teacher out of the school?
18         MS. ANGELL: Objection. Asked and answered
19  about an hour or two ago.
20         MS. LARKINS: I've never asked this question
21  before.
22         MS. ANGELL: You asked the question whether it
23  was wrong for a person to be transferred involuntarily.
24  Isn't that the same question?
25         MS. LARKINS: I -- this time I'm talking about

---

26 (Pages 98 to 101)

Larkins v. Werlin                                               Deposition of Robin Donlan
GIC 781970                                                              November 4, 2004

---

Page 102

1   the Castle Park family.
2        MS. ANGELL: And the teachers that you were
3   talking about before were something separate from that?
4        MS. LARKINS: I believe before I was just
5   talking about teachers, and now I'm talking about
6   teachers who are in the Castle Park family.
7        MS. ANGELL: So whatever the objection was to
8   the prior question would remain.
9        MR. HERSH: Lack of theological expertise.
10        MS. ANGELL: And incomplete hypothetical and not
11   relevant. It's the standing objection.
12        MS. LARKINS: I think it is preposterous, the
13   idea that someone couldn't tell whether something is
14   right or wrong because they didn't have theological
15   expertise, but you can instruct your client not to
16   answer.
17        MR. HERSH: It just helps me in making my own
18   determination. I assume other people need that kind of
19   guidance as well.
20        MS. LARKINS: You get a point for sense of
21   humor. Okay.
22        Your objection -- as far as I'm concerned -- in
23   fact, you know what we did in my deposition with Matt
24   Smith? What we did was we said --
25        MS. ANGELL: Did you want to go off the record

---

Page 103

1   if you're going to have a --
2        MS. LARKINS: I'm talking to you, Ms. Angell.
3   I'm suggesting a way to solve this problem that I think
4   was better solved in my deposition by Matt Smith. He
5   said let's have all objections -- what was that? You
6   keep them until later. You can make them later.
7   Reserve? Was that -- what is the world you would use?
8   All objections -- your right to object to every single
9   question is reserved.
10        MS. ANGELL: Sounds good to me; however, when
11   you're seeking to invade the attorney-client privilege,
12   seeking other privileged information, the witness will
13   not answer those questions.
14        MS. LARKINS: Fine.
15        MS. ANGELL: However -- so we are stipulating
16   that as to all questions in this entire deposition,
17   Counsel, you're waiving -- I don't even know if she can
18   do that. You're waiving the requirement that the
19   objection be made at the deposition or otherwise waived?
20   So we are stipulating --
21        MR. HERSH: I don't think we can -- there may be
22   some like relevancy objections where that wouldn't be a
23   problem, but I think questions as to the form of a
24   question -- excuse me -- objections as to a form of
25   question need to be made at the time in order -- not so

---

Page 104

1   much to preserve the right as --
2        MS. LARKINS: Sure. Exactly. Yeah, that is
3   fine. And instructions not to answer, too. That's fine.
4        MS. ANGELL: So that will mean vague and
5   ambiguous, because when I'm objection vague and ambiguous
6   that means I don't think that the question is clear, so
7   that I don't think that it can be answered. Or there
8   might be objections as -- that the question is compound
9   which again is really a vague and ambiguous objection.
10        MS. LARKINS: Okay. So in other words, when you
11   say vague and ambiguous, that means that the client is
12   not to answer the question?
13        MS. ANGELL: That's not what I said.
14        Do you need her to read back what I said?
15        MS. LARKINS: Well, no. I'm trying to find out
16   here why you would say vague and ambiguous if it weren't
17   for the purpose of objecting to the question.
18        MS. ANGELL: That's exactly what I just said. I
19   think that when I say that something is -- when I object
20   on the basis of vague and ambiguous, it's because I think
21   the question is vague and ambiguous. It can't be
22   answered if it's not understood.
23        MS. LARKINS: How about we agree to have vague
24   and ambiguous be a standing objection?
25        MS. ANGELL: We can't do that, because if you're

---

Page 105

1   asking -- it's just not possible; it's the form of the
2   question kind of objections.
3        MS. LARKINS: Okay.
4        MS. ANGELL: I can't have her answering
5   questions that she doesn't know what she's answering.
6        So is there some sort of stipulation ongoing
7   here or not?
8        MS. LARKINS: Fine with me.
9        MS. GAVIN: I haven't stipulated to reserving
10   the objections or waiving the objections or not
11   objecting.
12        MS. ANGELL: Do you wish to?
13        MS. GARVIN: No.
14        MS. LARKINS: Will you stipulate that all the
15   objections that Ms. Angell has made today or you or
16   Mr. Hersh has made -- have made today are standing
17   objections for all questions?
18        MS. GARVIN: No. I think some of Ms. Angell's
19   questions were specific to the questions, not standing
20   objections to all questions.
21        MS. LARKINS: Okay. Fine. Let's try this
22   again.
23        Q. Do you think it's wrong for a teacher who is a
24   member of the Castle Park family to be transferred out of
25   the school?

---

27 (Pages 102 to 105)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

Page 106

1    MS. ANGELL: Incomplete hypothetical; asked and
2  answered; vague and ambiguous as to time.
3    And I think she's asking for an opinion. So if
4  you have an opinion about the vague and broad category of
5  all transfers of all teachers at any time for any reason
6  from Castle Park Elementary School, then please tell her
7  what your opinion is.
8    MS. LARKINS: Ms. Angell, you have misstated my
9  question.
10    MS. ANGELL: See. Vague and ambiguous. That's
11  what I thought your question was.
12    MS. LARKINS: No. Your question was more vague
13  than mine. My question specified teachers who are
14  members of the Castle Park family.
15    THE WITNESS: I think that teachers who are
16  transferred should have reasons given to them in the form
17  of some sort of administrative paper trail before they
18  are transferred. It should not be a surprise.
19  BY MS. LARKINS:
20    Q. And if there is no reason given orally or on
21  paper, what should be done in your opinion?
22    A. I'm unclear.
23    Q. If a teacher is transferred from Castle Park
24  Elementary School without being given a reason, what do
25  you think should be done?

---

Page 107

1    A. Without being given an administrative trail --
2  paper trail reason?
3    Q. Yes.
4    MS. ANGELL: Objection. Calls for a legal
5  conclusion; calls for -- I think this seeks to impinge on
6  matters unrelated to this litigation that may or may not
7  be currently ongoing within the school district related
8  to transfers, and that's not a proper area for
9  examination in this litigation.
10    MR. HERSH: And I would join in that objection.
11    MS. LARKINS: Are you instructing your client
12  not to answer the question?
13    THE WITNESS: Well, if she has a legal opinion
14  and she's qualified as a lawyer about what needs to
15  happen when people get transferred, she can by all means
16  answer.
17    Do you have a legal opinion?
18    THE WITNESS: No.
19  BY MS. LARKINS:
20    Q. Do you have just a personal opinion?
21    A. I gave you my personal opinion as to how I felt
22  about transfers.
23    Q. But I asked you what you personally thought
24  should be done if a transfer takes place without any
25  administrative paper trail or any oral reasons.

---

Page 108

1    MS. ANGELL: Same objection. This person has
2  not been qualified as an expert; she's not been qualified
3  as an attorney to give opinions on this kind of thing;
4  she's not been qualified as an expert on the collective
5  bargaining agreement. She's already testified as to
6  whether she thinks generally that transfers are a good
7  idea or bad idea.
8    And, by the way, you haven't cleared up whether
9  you're talking about involuntary transfers, some other
10  kind of transfers. I'm assuming there could be many
11  types of transfers.
12    MS. LARKINS: Okay.
13    Q. If a teacher is involuntarily transferred from
14  Castle Park Elementary School, do you think he or she has
15  a right to come back to the school and pass out
16  literature about the transfer?
17    MS. ANGELL: Objection. Incomplete
18  hypothetical.
19    THE WITNESS: In the school, outside the school,
20  inside the school grounds, outside the school grounds?
21  Please clarify.
22  BY MS. LARKINS:
23    Q. Okay. If a teacher is involuntarily transferred
24  out of Castle Park Elementary School without an
25  administrative paper trail, do you think that teacher

---

Page 109

1  should come back and hold rallies inside the school?
2    MS. ANGELL: Vague and ambiguous as to time.
3    THE WITNESS: If the -- I believe that after
4  school hours a school becomes a public park. Public
5  parks are available for distribution -- for voicing
6  opinions, holding rallies, having soccer games, letting
7  your children play.
8  BY MS. LARKINS:
9    Q. Do you think Ollie Matos is apprehensive about
10  your returning to Castle Park Elementary and doing
11  something unpredictable?
12    MS. ANGELL: Objection. Calls for speculation.
13  If he told you --
14    MS. LARKINS: Question withdrawn.
15    Q. Okay. So we talked about -- do you think that
16  it is right for a teacher who has been involuntarily
17  transferred from Castle Park Elementary School without a
18  paper trail of the administrative reasons to come and
19  pass out literature on the sidewalk out in front of the
20  school?
21    MS. ANGELL: Asked and answered. Isn't that the
22  same question she just answered?
23    MS. LARKINS: No. That was inside the school
24  grounds.
25    MS. ANGELL: My mistake.

---

28 (Pages 106 to 109)

SAN DIEGO COURT REPORTING SERVICE                    619-232-1164
319 ELM STREET, SUITE 100, SAN DIEGO, CA  92101      FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

Page 110

1    And objection insofar as it call for a legal
2  conclusion.
3        MS. LARKINS:  I just mean morally right when I
4  asked if it is right.
5        THE WITNESS:  The sidewalk is a public venue.
6  BY MS. LARKINS:
7    Q.  So, for example, you felt that it was right for
8  me to pass out literature on the sidewalk in front of
9  Castle Park School regarding my involuntary transfer?
10   A.  I had no opinion on that.
11       MS. ANGELL:  Objection -- give me a chance to
12  make my objection.  Assumes facts not in evidence.
13       If you want to go back and lay a foundation for
14  these kinds of questions, I'll withdraw the objection,
15  but --
16       MS. LARKINS:  I withdraw the question.
17   Q.  Do you think having a teacher removed from the
18  school during the summer harms a child who was planning
19  on having that teacher in the following school year?
20       MS. ANGELL:  Objection.  Calls for a legal
21  conclusion.  This person is not established as an expert
22  in any type of genre.  It sounds like you're asking for a
23  psychological opinion.
24  BY MS. LARKINS:
25   Q.  Do you feel that you are -- rather, do you feel

Page 111

1  that you have a good deal of knowledge about children?
2        MS. ANGELL:  Vague and ambiguous.
3  BY MS. LARKINS:
4    Q.  How many years have you taught children?
5    A.  Sixteen.
6    Q.  During those 16 years, did you develop opinions
7  about events at schools that might help children?
8        MS. ANGELL:  Vague and ambiguous.
9        THE WITNESS:  I'm not clear what you mean by
10  "events."
11  BY MS. LARKINS:
12   Q.  During your 16 years teaching children, did you
13  develop any opinions about classroom situations that
14  might help children?
15   A.  Yes.
16   Q.  Did you develop any opinions about classroom
17  situations that might harm children?
18   A.  Yes.
19   Q.  Do you think that having their teacher disappear
20  suddenly during the middle of the year is harmful for
21  children?
22       MS. ANGELL:  Objection.  Calls for an expert
23  opinion.  Again, this person is not established as an
24  expert in psychological issues, and I believe you're
25  asking for a psychological analysis.

Page 112

1        MS. LARKINS:  Are you instructing her not to
2  answer the question?
3        MS. ANGELL:  She can't answer the question.
4    Q.  Are you qualified as a -- do you have any
5  training -- are you licensed as a psychologist?
6        THE WITNESS:  No.
7        MS. ANGELL:  Are you license as a psychiatrist?
8        THE WITNESS:  No.
9        MS. ANGELL:  Have you had training in counseling
10  and guidance for school children?
11       THE WITNESS:  No.
12       MS. ANGELL:  Do you have any qualifications that
13  make you an expert as to what is harmful to school
14  children?
15       THE WITNESS:  No.
16       MS. LARKINS:  Okay.  That's fascinating to me
17  that you have no qualifications for deciding what is
18  harmful for school children.  Wow!  Okay.
19   Q.  When you passed out this flier, were you trying
20  to impact the children of Castle Park Elementary School?
21   A.  No.
22       MS. ANGELL:  Which flier are you referring to?
23  That is a vague and ambiguous objection.
24       MS. LARKINS:  Actually I should probably state
25  that Exhibit 4, which has two pages --

Page 113

1        MS. ANGELL:  Why don't you ask the witness a
2  question instead of you testifying about it.
3        MS. LARKINS:  Okay.  Thank you.  That is a good
4  suggestion.
5    Q.  When you passed out Exhibit 4, did you have
6  English on one side and Spanish on the other side of the
7  paper?
8    A.  Yes.
9    Q.  Okay.  So this exhibit that is now two pages
10  actually was originally just one page; is that correct?
11   A.  Correct.
12   Q.  Okay.
13       MS. ANGELL:  You mean it was a double-sided
14  document that was just printed on one piece of paper?
15       MS. LARKINS:  Thank you.  That is an excellent
16  description.
17       MS. ANGELL:  I don't have an answer.  I mean I'm
18  asking you is that the question you were asking?  Because
19  she can answer that.  I think your question was vague,
20  and it's going to be confusing when we try and go back
21  and look at the record later.
22       MS. LARKINS:  It's okay.  I withdraw the
23  question.
24   Q.  Do you think your transfer was in the best
25  interests of the educational program of Castle Park?

29 (Pages 110 to 113)