Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

Page 114

1    A. No.
2    Q. Why do you think you were transferred?
3    A. I was only given that reason. I don't choose to
4  speculate on any other reasons.
5    Q. Do you think you were transferred because you
6  were -- you talked a lot in staff meetings?
7    A. I don't choose to speculate on any other
8  reasons. I'm not privy to that information as to why I
9  was transferred other than the information I was given,
10 which is that it was in the best interests of the
11 educational program.
12   Q. Did you tell any reporter that you were
13 transferred because you disagreed with Ollie Matos?
14   A. I don't specifically recall making that
15 statement.
16   Q. Did you discuss your transfer with a reporter?
17   A. Yes, I did.
18   Q. What do you recall saying to the reporter?
19   A. I expressed my concerns that I would be replaced
20 with a person who was not credentialed in special ed and
21 that that would not be in the best interest of those
22 students.
23   Q. What do you feel that a uncredentialed teacher
24 in special ed would do differently from you?
25   A. They don't have the training or the background

Page 115

1  on theory, behavior --
2    MS. ANGELL: I'm going to interpose an
3  objection. This calls for speculation.
4    THE WITNESS: Okay.
5    MS. ANGELL: So you're not to guess.
6    THE WITNESS: Okay.
7    A credential provides training as to how to deal
8  with the special ed population. An uncredentialed person
9  would be lacking this training.
10 BY MS. LARKINS:
11   Q. But I'm trying to figure out what you feared
12 would result.
13   A. That the students would not receive the best
14 quality education possible from an unqualified teacher.
15   Q. Okay. Are you afraid that they would not be
16 properly disciplined?
17   A. Discipline is not specific to special ed.
18   Q. Do special ed classrooms have different
19 discipline problems from regular classrooms?
20   A. Not that I've seen.
21   Q. Do you consider yourself an above-average
22 teacher as far as discipline goes?
23   MS. ANGELL: Objection. Vague and ambiguous.
24 Do you mean her ability to maintain the classroom without
25 having to impose discipline? I don't really understand

Page 116

1  the question.
2  BY MS. LARKINS:
3    Q. Do you feel that you are able to get your
4  students to behave better than other teachers are able
5  to?
6    A. I believe that I'm able to get my students to
7  behave.
8    Q. And by "behave," what do you mean by that?
9    A. Remain on task, behave in a civilized manner,
10 follow the rules of the school and of the classroom.
11   Q. Okay. Does that involve walking around the
12 room?
13   MS. ANGELL: Vague and ambiguous.
14   THE WITNESS: I don't understand what you mean.
15 BY MS. LARKINS:
16   Q. Do you allow your students to walk around the
17 room?
18   A. Occasionally, yes.
19   Q. But for the most part, they should stay in their
20 seats?
21   A. Yes.
22   Q. Okay. Do you allow your students to talk?
23   A. Not during their instructional time or during
24 quiet work time, no.
25   Q. Okay. Do you require that your children walk in

Page 117

1  a very straight line?
2    MS. ANGELL: Objection. Vague and ambiguous as
3  to time. Are you talking about now in the 2004-2005
4  school year for this question and the previous question
5  concerning discipline?
6    MS. LARKINS: Good suggestion.
7    Q. When you were at Castle Park, did you require
8  your students to walk in a very straight line?
9    MS. ANGELL: Do you mean -- excuse me. Vague
10 and ambiguous as to time. Are you talking about a 13 or
11 14-year time span and continuously requiring students to
12 walk in a straight line for 14 years?
13   MS. LARKINS: That's an interesting question.
14   Q. Did you ever require that students walk in a
15 straight line for 14 years?
16   A. No.
17   Q. I didn't think so.
18   Did you change your discipline requirements over
19 the years at Castle Park?
20   A. My discipline requirements were adjusted to suit
21 the needs of the students that I had.
22   Q. Did you require straighter lines some years than
23 other years?
24   A. No.
25   Q. So during all the years that you taught at

30 (Pages 114 to 117)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

| Page 118 | Page 120 |
|---|---|
| 1 Castle Park, you required your students to walk in a | 1 MS. LARKINS: No. Let's keep this on. |
| 2 straight line? | 2 MS. ANGELL: Well, I think that we will have to |
| 3 A. My emphasis was more on a quiet line than a | 3 consult scheduling. I know that there are a number of |
| 4 straight line. | 4 additional depositions noticed next week and -- oh, yeah, |
| 5 Q. Okay. What do you think of teachers who don't | 5 there is some the following after that and then the |
| 6 require their students to walk in a straight line? | 6 following week after that, and then there is |
| 7 MS. ANGELL: Vague and ambiguous as to this | 7 Thanksgiving. I mean you have depositions scheduled |
| 8 straight line business. I don't know what you are | 8 every week in November. |
| 9 talking about. Do you mean when students walk to a | 9 MS. LARKINS: This case has been going on for |
| 10 recess or any particular time, or do you mean every time | 10 two and a half years, and I'm happy that we are |
| 11 more than one student is standing they need to be in line | 11 finally -- we have only had one and a half depositions |
| 12 or -- not being a teacher, I don't know what you are | 12 that I have taken in this case before today. |
| 13 talking about. | 13 MS. ANGELL: You took Linda Watson's deposition |
| 14 MS. LARKINS: Okay. I think since we know what | 14 and Gina Boyd's deposition. |
| 15 we are talking about, I think I assume too much. Okay. | 15 MS. LARKINS: Gina Boyd's was not finished. You |
| 16 Q. When students are walking in a line, do you | 16 were here. |
| 17 think their teachers are remiss if they don't require the | 17 MS. ANGELL: I was here for two volumes of Gina |
| 18 line to be straight? | 18 Boyd's deposition, but that's not really relevant to the |
| 19 A. No. I think the teachers just have a different | 19 question of the scheduling time for a continuation of |
| 20 expectation than I have. | 20 this deposition. So I think that what we will need to do |
| 21 Q. Okay. Do you think that some of the teachers at | 21 is agree to consult -- you guys need to consult |
| 22 Castle Park during the time you were teaching there were | 22 calendars? Because I don't have a current calendar with |
| 23 not as good teachers as you? | 23 me. |
| 24 A. I wouldn't have any opinion on that. I have not | 24 MR. HERSH: Yeah, I do. |
| 25 observed many teachers in their classroom teaching. | 25 MS. ANGELL: You have one with you or you need |

| Page 119 | Page 121 |
|---|---|
| 1 Q. And that would stop you from having an opinion | 1 to -- |
| 2 about them? | 2 MR. HERSH: I have one with me, but, you know, |
| 3 A. If I have no knowledge from which to base it on. | 3 obviously if you don't -- |
| 4 Q. Good. | 4 MS. ANGELL: We can check and see if there is |
| 5 When you passed out these fliers, were you | 5 another date available in November. And if not, we will |
| 6 trying to make it impossible for Ollie Matos to lead the | 6 try for November 1st and then -- you know, the month of |
| 7 school? | 7 November 1st. |
| 8 MS. ANGELL: Objection. Vague and ambiguous. | 8 THE WITNESS: December. |
| 9 Are you referring to Exhibit 4? | 9 MS. ANGELL: Then if not in November, then we |
| 10 MS. LARKINS: Yes. Thank you. | 10 will check the dates in December. |
| 11 Q. When you passed out the fliers such as Exhibit | 11 MS. LARKINS: I have a trial starting on |
| 12 4, were you trying to make it impossible for Ollie Matos | 12 December 3rd. |
| 13 to lead the school? | 13 MS. ANGELL: Uh-huh. |
| 14 A. No. | 14 MS. LARKINS: In a companion case. |
| 15 Q. What were you trying to accomplish? | 15 MR. HERSH: What's the companion case? |
| 16 A. Inform the parents of the transfer and how they | 16 MS. LARKINS: Elizabeth Schulman. |
| 17 could stop it if they so chose. | 17 MR. HERSH: You have a trial date? |
| 18 Q. Okay. | 18 MS. LARKINS: Yeah. I expect that to be a |
| 19 MS. ANGELL: Do you need a break? | 19 couple weeks at least. |
| 20 THE WITNESS: Yeah, if I could, please. | 20 MS. ANGELL: Okay. So what are you telling |
| 21 MS. GARVIN: Do you know how much longer you're | 21 me -- |
| 22 going to be, Ms. Larkins? | 22 MS. LARKINS: That I can't schedule depositions |
| 23 MS. LARKINS: No, I don't, but I'm willing to | 23 during that time. |
| 24 end this and continue another day anytime you'd like. | 24 MS. ANGELL: Okay. |
| 25 VIDEOGRAPHER: Do you want to go off? | 25 MS. LARKINS: Okay. |

31 (Pages 118 to 121)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

Page 122

1　　　MS. ANGELL: And I'm also going to request that
2　whenever you reset Mrs. Donlan's deposition -- how much
3　longer do you anticipate that you would probably have?
4　How much in your time frame of questioning, how much
5　longer do you anticipate you'll have?
6　　　MS. LARKINS: One day.
7　　　MS. ANGELL: Okay. Well, then, if you would not
8　mind, let's start it in the morning so that she doesn't
9　have to take additional days -- multiple days off work,
10　so we can get it all done in one day.
11　　　MS. LARKINS: Okay.
12　　　MS. ANGELL: That would be great.
13　　　MS. LARKINS: Okay.
14　　　MS. ANGELL: All right.
15　　　So why don't we agree that you all can do what
16　you want to check your schedules. I'll check my schedule
17　and Ms. Donlan's schedule and propose an alternative
18　date, hopefully in November --
19　　　MS. LARKINS: Okay.
20　　　MS. ANGELL: -- to continue.
21　　　Does that sound agreeable?
22　　　MR. HERSH: Uh-huh.
23　　　MS. GARVIN: Yes.
24　　　MS. LARKINS: That's fine with me.
25　　　So do you want to quit for the day now, quit

---

Page 123

1　this session now?
2　　　MS. ANGELL: Well, it's not 5:00 o'clock yet.
3　We are happy to stay. I don't know what everybody else's
4　schedule is.
5　　　MR. HERSH: When I stay here, I hit the highway
6　and I'm going to be sitting one way or the other.
7　　　MS. LARKINS: 7:00 o'clock is the best time.
8　　　He's happy to stay here for quite a few more
9　hours.
10　　　MS GARVIN: Are we going to take a break and go
11　off the record?
12　　　MS. LARKINS: Okay. Shall we do that now?
13　　　THE WITNESS: I would like to do that.
14　　　MS. LARKINS: Okay. I'll agree.
15　　　VIDEOGRAPHER: Off the record at 4:49.
16　　　(Recess taken.)
17　　　VIDEOGRAPHER: Back on the record at 4:55.
18　　　MS. LARKINS: Okay. I would like to ask that
19　this document be labeled -- okay -- as Exhibit 5.
20　　　I want to make sure that you get one,
21　Ms. Garvin, because this relates so specifically to your
22　client. Okay. Let's see. And I've got one for you,
23　Ms. Donlan. Then I'm afraid that's all I have.
24　　　MR. HERSH: This is going to be an exhibit so
25　I'll get a copy eventually.

---

Page 124

1　　　MS. LARKINS: Yes. Yes. I should put this --
2　this is Exhibit 5. Okay.
3　　　(Exhibit 5 marked for identification.)
4　BY MS. LARKINS:
5　　　Q. Ms. Donlan, would you please read the heading at
6　the top of the first page of this document?
7　　　A. "Before the Governing Board of the Chula Vista
8　Elementary School District."
9　　　Q. And would you read the rest of the heading,
10　please.
11　　　A. "In the Matter of the Accusation Against Maura
12　Larkins, Respondent."
13　　　Q. Okay. We won't worry about the case number.
14　Okay.
15　　　And do you -- what does it say just below the
16　word "respondent"?
17　　　A. "Deposition of Gretchen Donndelinger."
18　　　Q. How many pages does this document have?
19　　　A. I have no idea.
20　　　MS. ANGELL: It purports to be a condensed
21　transcript, so do you mean every page which has four
22　pages on it or what? I'm going to object that the
23　document speaks for itself.
24　　　THE WITNESS: It's not numerically ordered.
25　　　MS. LARKINS: It's not?

---

Page 125

1　　　THE WITNESS: No.
2　BY MS. LARKINS:
3　　　Q. Oh, yes. Okay. At the very bottom of each page
4　there -- could you turn to the second page, please, and
5　look at the very bottom of the page.
6　　　A. (Witness complies.)
7　　　Q. Okay. Do you see a number at the lower
8　right-hand corner?
9　　　A. I see more than one set of numbers.
10　　　Q. Can you read what you see?
11　　　A. I see one that says Page 5, and one that says 2,
12　Pages 2 to 5.
13　　　Q. Okay. So do you understand from looking at this
14　that each page has four condensed pages on it?
15　　　A. It's the entire document. Okay.
16　　　Q. Okay. Now, just looking at the numbers on the
17　condensed pages, would you please find Page 80.
18　　　A. (Witness complies.)
19　　　Q. Would you look at Page 80, Line 19. Could you
20　read the question there that starts on Line 19 and goes
21　to Line 21.
22　　　A. "Did Robert -- Robin Colls ever share with you
23　any kind of information concerning a police report
24　allegedly, somehow, involving Maura Larkins?"
25　　　Q. And could you please read the answer starting on

---

32 (Pages 122 to 125)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

Page 126

1  Page -- Line 22 and continuing on to the next page.
2      A. "Actually that did come up at some point when
3  she was talking, but she herself said, you know, you
4  don't want to hear anything about that, and I'm not going
5  to tell you. I know that there is something, but I have
6  no clue what it is."
7      Q. And the first line, please, on Page 81.
8      A. "She didn't want me to know."
9      Q. Was there ever something about a police report
10  that you didn't want Gretchen Donndelinger to know?
11      A. Not to my recollection, no.
12      Q. Okay. So according to your recollection,
13  Gretchen Donndelinger's testimony about you here is
14  false?
15      A. As far as I recall.
16      Q. Okay. Did your brother ever talk to you during
17  the year 2000 about my having been arrested?
18      MR. GARVIN: Vague and ambiguous.
19      THE WITNESS: No.
20  BY MS. LARKINS:
21      Q. Okay. Would you please read the question on
22  Line 2 of Page 81.
23      A. "So she said there's something in the police
24  report?"
25      Q. And could you read Line 3?

Page 127

1      A. "It was a personal thing."
2      Q. Could you read Lines 4 and 5 which are another
3  question.
4      A. "Involving something that was a non-school
5  matter but that Robin Colls was aware of?
6      Uh-huh.
7      Was that a yes?"
8      Do I continue?
9      Q. Okay. Now that you have read almost half a page
10  of Gretchen Donndelinger's testimony about a conversation
11  she claims to have had with you, are you getting any
12  memories at all of this conversation?
13      A. No, none whatsoever.
14      Q. Okay. Do you have any explanation for why
15  Gretchen Donndelinger would have said that you talked
16  about a police report?
17      MS. ANGELL: Objection. Calls for speculation.
18      You don't guess in a deposition, but if you have
19  information, if she told you something or if you have
20  knowledge, then you express it.
21      MR. HERSH: Did she testify that there was a
22  police record or was that the question about a police
23  record? Since I don't have it.
24      MS. ANGELL: The question at Page 80, Line 19
25  was: "Did Robin Colls ever share with you any kind of

Page 128

1  information concerning a police report allegedly,
2  somehow, involving Maura Larkins?" So it was concerning
3  a police report allegedly, somehow, involving Maura
4  Larkins.
5      MR. HERSH: Okay.
6      MS. LARKINS: Okay.
7      Q. Well, I'm going to try help jog your memory
8  here. So could you read the question that was asked of
9  Gretchen Donndelinger that is recorded here on Line 10 on
10  Page 81.
11      A. "Was this in a face-to-face conversation with
12  Robin Colls?"
13      Q. And what was Gretchen's answer?
14      A. "Yes."
15      Q. Okay. You don't remember any face-to-face
16  conversation with Gretchen Donndelinger about a police
17  report that allegedly somehow involved me?
18      A. No, I don't.
19      Q. Okay. Do you have any experience of Gretchen
20  Donndelinger having hallucinations?
21      A. No. Personally, no.
22      Q. Okay. But you heard -- her testimony here is
23  false; is that your testimony?
24      A. I don't have any recollection of that event.
25      Q. Could this conversation have had happened and

Page 129

1  you might have forgotten it?
2      A. I doubt that.
3      Q. So you're quite sure this conversation never
4  took place?
5      A. I don't recall it.
6      Q. Okay. Could you please turn to the next -- you
7  know, the next page, and then at the top of the next page
8  is condensed Page 82. Oh, actually -- I'm sorry.
9      You know, it won't make any sense unless we
10  finish reading 81. Could you read Line 20 on 81.
11      A. "It occurred in the 1999-2000 school year."
12      Q. Then could you read the question --
13      A. "But you found out about it in which year?"
14      Q. And could you read the answer.
15      A. "There was an incident this is referring, to my
16  belief. They had a problem with a staff member the year
17  before and -- that's what I understood this to mean
18  anyway."
19      MS. LARKINS: Okay. Okay. I'd like to go on
20  break because I need to copy a document.
21      THE WITNESS: She has to leave anyway, don't
22  you?
23      MS. GARVIN: I'm sorry?
24      MS. LARKINS: Do you want to continue or do you
25  want to end this session now? Because what I would do

33 (Pages 126 to 129)

Larkins v. Werlin                                    Deposition of Robin Donlan
GIC 781970                                                 November 4, 2004

---

**Page 130**

1  next is I would go on break and I would copy this
2  document.
3       MS. GARVIN: Let me see that.
4       Does this involve Michael Carlson?
5       MS. LARKINS: This involves Line 25 of Page 81
6  of the deposition that we are discussing.
7       MS. GARVIN: This is Exhibit 19 to --
8       MS. LARKINS: Yes.
9       MS GARVIN: -- the deposition.
10      MS. LARKINS: Actually what Elizabeth Schulman
11  did was she had exhibits for the deposition and then she
12  kept the same numbers when she prepared this exhibit book
13  for the administrative hearing.
14      MS. GARVIN: Go ahead and finish this up.
15      MS. LARKINS: Okay. I need to go on break to
16  make a copy.
17      VIDEOGRAPHER: Off the record at 5:08.
18      (Recess taken.)
19    - VIDEOGRAPHER: Back on the record at 5:11.
20      MS. LARKINS: Did you want to say something?
21      MS. GARVIN: It's your deposition.
22      MS. LARKINS: I am willing to conclude this
23  session of this deposition now. I believe that
24  Ms. Garvin supports that idea. And Mr. Hersh will not
25  object. So I think it's up to you, Ms. Angell.

---

**Page 131**

1       MS. ANGELL: I have no problem with it. I'm
2  thinking about possible dates. Maybe sometime during the
3  week of November 13th -- sorry -- November 15th, based on
4  Ms. Donlan -- I don't know if you have any testing of
5  children going on, but if maybe we could consider that
6  week.
7       MS. GARVIN: I know that on the 17th is the
8  deposition of the sheriff's department is already
9  scheduled.
10      MS. ANGELL: So maybe we should just go off and
11  then talk about possible scheduling dates.
12      VIDEOGRAPHER: Okay?
13      MS. LARKINS: Wait a minute.
14    · MS. ANGELL: So yeah.
15      MR. HERSH: So the Carlson deposition is off on
16  the 15th?
17      MS. LARKINS: Yeah
18      MR. HERSH: We are off the record now?
19      VIDEOGRAPHER: No. We are still on.
20      MS. LARKINS: It's on the 17th?
21      MS. ANGELL: Not Carlson. I mean the sheriff.
22      MS. LARKINS: Okay. The sheriff is the 17th and
23  Carlson's is 23rd?
24      MS. GARVIN: Yes.
25      MR. HERSH: At what time?

---

**Page 132**

1       MS GARVIN: 1:00 o'clock.
2       MS. LARKINS: Is it 1:00 o'clock? I probably
3  have that written down.
4       MS. GARVIN: Here.
5       MS. LARKINS: 1:00 o'clock, Carlson.
6       MS. GARVIN: Are we going off the record and
7  concluding the depo, going off the record now?
8       MS. LARKINS: Can we agree on the 15th?
9       MS. ANGELL: I need to go check my calendar at
10  the office, but I'd like to aim for that week.
11      MS. LARKINS: Okay. That's fine.
12      Then I guess we can conclude here for this
13  session.
14      Do we need to say all that stuff about what to
15  do with the transcript?
16      MS. ANGELL: Yes.
17      MS. LARKINS: Okay. Someone else want to do it?
18  Do you want me to try?
19      Oh, hey. Darn it. I don't have a deposition
20  with me. Usually I have someone else's deposition and I
21  can read it.
22      MS. GARVIN: You have that one, the Donndelinger
23  one.
24      MS. LARKINS: Let's see what it says. They were
25  a lot more casual on this one.

---

**Page 133**

1       MS GARVIN: Are we going to have the witness
2  review it now or wait until it's complete to review all
3  of the transcript at the same time?
4       MS. LARKINS: Why don't we let her review this
5  part.
6       MS. GARVIN: And so we need to know how long it
7  would take Ms. Donlan to review her transcript.
8       MS. ANGELL: Well, it depends on when she gets
9  it, I would assume. So customary we are talking a month
10  to review. I don't know how long it's going -- I don't
11  know if you're going to expedite the transcript or what.
12  I don't know what your plan is.
13      MS. LARKINS: I don't think we need to expedite
14  it, but -- a whole month she needs to review it?
15      MS. ANGELL: That's the usual. People who are
16  working --
17      MS. LARKINS: Okay.
18      MS. ANGELL: It's normal.
19      So since you're apparently not going to do a
20  stipulation, I'll propose the following stipulation:
21  That the court reporter be relieved from her duties under
22  the code as well as the videographer be relieved from his
23  duties under code, and that counsel have agreed on the
24  record to continue this deposition to its second volume
25  at a mutually agreed-upon date, hopefully during

---

34 (Pages 130 to 133)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

**Page 134**

1 November, but counsel will confer on that matter.
2     And we also stipulate that the original of this
3 transcript, including a condensed and word index, will be
4 forwarded to Ms. Donlan for her review and signature;
5 that a postage-paid envelope will be -- excuse me. I'm
6 going to take that back. You're going to send it me to
7 be forwarded to Ms. Donlan, and I'll take care of the
8 envelope.
9     And that from the time -- I will forward it to
10 Ms. Donlan for her review and signature and any
11 corrections that are necessary. And from the time
12 Ms. Donlan receives the transcript, she'll have 30 days
13 to make her changes and sign it. If the changes are not
14 made and the signature not done within that 30 days, it
15 will be deemed signed as is.
16     MS. LARKINS: Can I interrupt a moment?
17     I'm trying to figure out why you wanted me to
18 sign my deposition in one week and yet hers would be a
19 month.
20     MS. ANGELL: Because we're going to continue
21 your deposition. Your deposition is not done, but that
22 doesn't really have anything to do with hers. We were
23 talking -- I can't remember if we were talking about -- I
24 explained it on the record at the time. I know that
25 there was a discussion of it and we explained on it the

---

**Page 135**

1 record at the time. So if you want to go back and look
2 at your transcript -- if you want to propose the
3 stipulation, I don't care. Go ahead. You just weren't
4 doing it.
5     MS. LARKINS: You're right. I'm a crummy
6 lawyer. I have stipulated to that on other occasions.
7     MS. ANGELL: So my proposed stipulation is then
8 stricken. Go ahead.
9     MS. LARKINS: Okay. I did not agree that it be
10 stricken.
11     I want to talk about how long it takes her to
12 sign it, and I would like you to explain --
13     MS. GARVIN: I'll agree to whatever stipulation
14 you eventually are able to work out.
15     MR. HERSH: I stipulate that Ms. Garvin pay my
16 salary for the day.
17     MS. LARKINS: Two points.
18     (Ms. Garvin not present.)
19     MS. LARKINS: I cannot for the life of me figure
20 out why there is such a huge difference between my
21 deposition and Ms. Donlan's deposition.
22     MS. ANGELL: Well, for one thing, you're not
23 employed, to my knowledge, and she has a full-time job.
24 For the second thing, you're a party to this litigation;
25 you're bringing the litigation, and we knew that your

---

**Page 136**

1 deposition was going to continue in multiple parts, and I
2 asked you if that was enough time for you and you said
3 that it was.
4     MS. LARKINS: I agree. I think one month is too
5 long for Ms. Donlan.
6     MS. ANGELL: Well, you can think that.
7     How long do you need? This is going to be this
8 thick (indicating).
9     THE WITNESS: Yeah. And I don't -- I want to be
10 thorough before I sign it.
11     MS. ANGELL: It also depends on when she gets
12 it. Do you have any travel that is going to take you out
13 of town? Normally it takes several weeks for these
14 things to be produced.
15     THE WITNESS: No. I don't have any plans
16 currently.
17     MS. ANGELL: All right. So you're not planning
18 to leave town between now and December 31?
19     THE WITNESS: No.
20     MS. ANGELL: Okay. So how long do you think
21 that you'll need to -- the transcript looks like a
22 screenplay or like a movie script, you know, question,
23 answer, just like this
24     THE WITNESS: Comb-bound, correct?
25     MS. ANGELL: Usually. So it's basically going

---

**Page 137**

1 to look like this, so --
2     THE WITNESS: But thicker.
3     MS. ANGELL: Each page is on its own.
4     THE WITNESS: Well, I'll only be able to read at
5 night, along with everything else I do in the evenings.
6     MS. ANGELL: Like grade papers --
7     THE WITNESS: Grade papers, make lesson plans,
8 take care of my husband, you know.
9     MS. LARKINS: It would be much easier if all you
10 had to do was fight off four huge law firms.
11     THE WITNESS: I mean I don't want to feel like
12 I'm rushed in going through it.
13     MS. ANGELL: How long do you think you need?
14 It's probably going to be several hundred pages, double
15 spaced.
16     THE WITNESS: At least three to four weeks, I
17 would think.
18     MS. LARKINS: How about three weeks?
19     MS. ANGELL: All right. So three weeks from the
20 time that she receives it.
21     Now, do you want to make the stipulation or do
22 you want me to put it on? I don't approve when you
23 strike things; you don't approve when I strike my own
24 comments.
25     MS. LARKINS: Okay. So it really is stricken?

---

35 (Pages 134 to 137)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004

---

Page 138

1    MS. ANGELL: When you strike you own questions,
2  I don't go back and -- you know, I have control over what
3  I say and you have control over what you say.
4    MS. LARKINS: Okay. I'm sorry. I didn't --
5    MS. ANGELL: Do you want me to put it on or do
6  you prefer to do it yourself? I'm trying to help you out
7  here because you don't seem to know what you're doing.
8    MS. LARKINS: That's right. I don't know what
9  I'm doing, but I will tell what I'll do. I'll try.
10  Okay.
11    Now, we still have, I believe -- I don't think
12  it was stricken when Ms. Garvin asked whether or not we
13  would have this session, this volume, signed, so that's
14  still in.
15    Ms. Donlan is going to read and sign this volume
16  of it without regard to whenever we continue the
17  deposition. And the deposition is going to be delivered
18  to Kelly Angell when the court reporter has it ready.
19    MS. ANGELL: The original of the deposition.
20    MS. LARKINS: Thank you.
21    MS. ANGELL: With the documents that I
22  previously listed.
23    MS. LARKINS: Yes. I'm quite sure our court
24  reporter was planning on doing that.
25    Then you will provide it to Ms. Donlan, and from

---

Page 139

1  the time that you provide it, Ms. Donlan will have three
2  weeks to sign it. And if she doesn't sign it, a
3  certified copy will be acceptable as -- the same as an
4  original. And, in fact, a certified copy will be
5  acceptable in lieu of an original whether she signs it or
6  not. But if she doesn't sign it within three weeks, when
7  it will be considered signed and accepted in the state
8  that it was in when prepared by the court reporter.
9    Let's see. Is there anything else? I don't
10  think they did all this stuff here. Oh, yeah, they did.
11    MS. ANGELL: Could I ask the court reporter --
12  well, I might as well ask you while we are all here. I
13  don't know if it's possible to go back and mark before
14  you print everything out the standing objections. If
15  that is possible to mark it in the transcript, if you
16  would, that would be great.
17    THE REPORTER: I will mark it -- I'll put
18  "record marked at the request of Ms. Angell," and I will
19  mark where you have stated your standing objections.
20    MS. ANGELL: Yeah. There was a stipulation as
21  to all -- as to relevance objections being made for
22  everything. That is particularly what I'm interested in.
23    MS. LARKINS: Okay. I can't think of anything
24  else to stipulate. If you want anything else
25  stipulated --

---

Page 140

1    MS. ANGELL: A facsimile copy of signature will
2  be deemed sufficient evidence of Ms. Donlan's signature
3  on the deposition for all purposes. Ms. Donlan's counsel
4  will retain the original copy and produce it upon timely
5  request. However, if the original is not available, a
6  certified copy will be -- we agree that the certified
7  copy is to be used for all purposes.
8    Anything else?
9    MR. HERSH: Not that I can think of.
10    VIDEOGRAPHER: Is that it? This concludes
11  Volume I --
12    MS. ANGELL: Wait a minute. Everybody didn't
13  stipulate.
14    MS. LARKINS: I stipulate.
15    MR. HERSH: I stipulate.
16    VIDEOGRAPHER: This concludes --
17    MS. ANGELL: What is happening with the
18  exhibits?
19    THE REPORTER: I have 1 through 5. They will be
20  attached to the copies.
21    MS. ANGELL: So are those exhibits coming back
22  to the next volume of the deposition?
23    MS. LARKINS: Yes.
24    MS. ANGELL: So the court reporter needs --
25  you're going to have the same court reporter and she's

---

Page 141

1  going to bring those same exhibits back to the next depo
2  or what?
3    THE REPORTER: I can leave a set here in the
4  office, and they will be here. That's not a problem. I
5  can make a set here or I can start an exhibit binder so
6  that we can mark them continuously, but I'll keep a
7  working copy here in the office so that they will be here
8  and they will also be attached to Volume I.
9    MS. LARKINS: Okay. Sounds good.
10    VIDEOGRAPHER: Ready to go off?
11    MS. LARKINS: Yes.
12    VIDEOGRAPHER: This concludes Volume 1 of the
13  deposition of Robin Donlan. Off the record at 5:24.
14      * * * * *
15    I, ROBIN DONLAN, swear under penalty of perjury
16  that I have read the foregoing, and that it is true and
17  correct, to the best of my knowledge and belief.
18    Signed on this      day of      , 2004, at
19
20    (City)      (State)
21
22
23    ROBIN DONLAN
24
25

---

36 (Pages 138 to 141)

Larkins v. Werlin
GIC 781970

Deposition of Robin Donlan
November 4, 2004



Page 142

1
2
    STATE OF CALIFORNIA  )
3               ) ss.
    COUNTY OF SAN DIEGO  )
4
5        I, T. A. Martin, a Certified Shorthand Reporter,
6    Certificate No. 3613, do hereby certify that the witness
7    in the foregoing deposition was by me first duly sworn to
8    testify to the truth, the whole truth, and nothing but
9    the truth in the foregoing cause; that the deposition was
10   then taken before me at the time and place herein named;
11   that said deposition was reported by me in shorthand, and
12   then transcribed through computer-aided transcription
13   under my direction, and that the foregoing transcript
14   contains a true record of the testimony of said witness.
15        I do further certify that I am a disinterested
16   person and am in no way interested in the outcome of this
17   action, or connected with or related to any of the
18   parties in this action or to their respective counsel.
19        IN WITNESS WHEREOF, I have hereunto set my hand
20   on this 16th day of November, 2004.
21
22
23   T. A. MARTIN
    Certificate No. 3613
24
25

37 (Page 142)

**EXHIBIT 8**

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN DIEGO


MAURA LARKINS,                          )
                                        )
            Plaintiff,                  )
                                        )
vs.                                     ) GIC 823858
                                        )
ELIZABETH SCHULMAN, and DOES 1          )
through 10, inclusive,                  )
                                        )
            Defendants.                 )
_____)


DEPOSITION OF MAURA LARKINS
Volume I
(Pages 1 through 23, inclusive.)
October 28, 2004
Taken at San Diego, California


BONNIE G. BREEN,
CSR NO. 5582

COMPLIMENTARY

Larkins v. Schulman
GIC 823858

Deposition of Maura Larkins
October 28, 2004

---

Page 2

```
1              I N D E X
2   DEPOSITION OF MAURA LARKINS           PAGE
3   October 28, 2004
4
5   EXAMINATION
6   By Ms. Larkins                 4
7
8   EXHIBITS
9   1 - Labor Code, Section 11001-1102.5      5
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
1          DEPOSITION OF MAURA LARKINS
2       Pursuant to Notice to take deposition on the
3   28th day of October, 2004, commencing at the hour of 1:25
4   p.m., at 319 Elm, Suite 100, in the City of San Diego,
5   County of San Diego, State of California, before me,
6   Bonnie G. Breen, Certified Shorthand Reporter in and for
7   the State of California, personally appeared:
8          MAURA LARKINS,
9   who, called as a witness by the Plaintiff, being by me
10  first duly sworn, was thereafter examined as a witness in
11  said cause.
12          APPEARANCES
13  For the Plaintiff:    MAURA LARKINS
    (In Propria Persona)   1935 Autocross Court
14                         El Cajon, California  92019
                           (619) 444-0065
15
    For the Defendants:   KLINEDINST, P.C.
16                        BY: MATTHEW C. SMITH
                          501 West Broadway, Suite 600
17                        San Diego, California
                          92101-3584
18                        (619) 239-8131
19  Videographics:     Frank Pisacane, Videographer
                       1903 30th Street
20                     San Diego, California  92102
21
22
23
24
25
```

---

Page 4

```
1       THE VIDEOTAPE TECHNICIAN:  This is the video
2   deposition of Maura Larkins, Volume I, being taken on
3   behalf of the plaintiff in the matter of Maura Larkins,
4   plaintiff, versus Elizabeth Schulman, defendant, in the
5   San Diego County Superior Court, Case Number GIC 823858.
6   This deposition is being held in the offices of San Diego
7   Court Reporting Service located at 319 Elm Street, Suite
8   100, San Diego, California 92101.
9       Today is Thursday, October 28th, 2004; and the
10  time is approximately 1:25 p.m.  My is Frank Pisacane.
11  I'm the legal video specialist with Video Graphics at
12  1903 30th Street, San Diego, California.  The certified
13  shorthand reporter is Bonnie Breen of San Diego Court
14  Reporting Service.
15      For the record, would counsel please state
16  their appearances.
17      MR. SMITH:  Matthew Smith of Klinedinst, P.C.,
18  on behalf of Elizabeth Schulman.
19      MS. LARKINS:  Maura Larkins, Plaintiff, in pro
20  per.
21      THE VIDEOTAPE TECHNICIAN:  Will the court
22  reporter please swear the witness.
23      (Deponent sworn.)
24      THE WITNESS:  I do.
25      THE VIDEOTAPE TECHNICIAN:  Please begin.
```

---

Page 5

```
1       MS. LAKINS:  Okay.  I would like to start by
2   asking that an exhibit be numbered as Exhibit Number 1.
3   And let's see.  I have a copy for the -- may I use
4   these -- for the court reporter and for Mr. Smith --
5       MR. SMITH:  Thank you.
6       (EXH. 1 was marked for identification.)
7       MS. LARKINS:  -- and myself.
8   EXAMINATION BY MS. LARKINS:
9       Q.  Question:  Can you please state for the record
10  what is contained in the exhibit numbered number one.
11      A.  Answer:  This is part of the labor code, the
12  California Labor Code, Sections 1101, 1102, and 1102.5;
13  though, I'm actually not certain that is all of 1102.5.
14  There may be another page.  It may continue on another
15  page.
16      MR. SMITH:  Ms. Larkins, can I interrupt for a
17  moment.
18      MS. LARKINS:  Yes.
19      MR. SMITH:  A thought just occurred to me.
20  There may be a number of times throughout this deposition
21  when I would want to raise an objection as to the form of
22  the question or for some other reason.  What I would
23  propose as a possible compromise to avoid me interrupting
24  the flow of your questions, if you are willing to
25  stipulate that all objections are reserved until the
```

---

2 (Pages 2 to 5)

SAN DIEGO COURT REPORTING SERVICE                    619-232-1164
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101       FAX 619-232-2616

Page 6

1  point of trial, so if we have to have an objection with
2  respect to any specific question, I can raise that before
3  Judge Stin or whoever our trial judge is at the time of
4  trial rather than now. That will limit the number of
5  objections that I have to make today.
6        Is that acceptable?
7        MS. LARKINS: That is acceptable to me.
8        MR. SMITH: I still may object from time to
9  time if there is a question that I think is really
10 problematic; but, otherwise, I will keep my objections to
11 a minimum in that regard.
12       MS. LARKINS: That sounds great. So
13 stipulated. I'm not sure there is a question pending; so
14 let me ask a question.
15 BY MS. LARKINS:
16    Q. Question: Do you contend that Labor Code
17 Section 1102.5 is pertinent to this lawsuit?
18    A. Answer: Yes. This a labor code, which forbids
19 employers from retaliating against employees when they
20 report wrongdoing to a public agency.
21       In this case, I was an employee of Chula Vista
22 Elementary School District. I filed grievances. I filed
23 tort claims. I filed PERB charges, PERB being Public
24 Employment Relations Board, and I finally filed a
25 lawsuit.

Page 7

1        The lawsuit was served on the school district
2  on approximately March 12th, 2002. And within less than
3  two months, the school district voted to terminate my
4  employment. This was obviously retaliation and should
5  have been brought up during my administrative hearing.
6     Q. Question: Did your lawyer, Elizabeth Schulman,
7  bring up this statute at any time during your
8  administrative hearing?
9     A. Answer: No.
10       MS. LARKINS: I need to ask for some copies to
11 be made. I would like to take a break for a couple
12 minutes. Would you be agreeable to that?
13       THE VIDEOTAPE TECHNICIAN: Stand by. Off the
14 record at 1:21 p.m.
15       (Discussion off the record/Recess.)
16       THE VIDEOTAPE TECHNICIAN: Back on the record
17 at 1:39 p.m.
18 BY MS. LARKINS:
19    Q. Question: Did you speak to your lawyer,
20 Elizabeth Schulman, on the morning before your
21 administrative hearing started?
22    A. Answer: Yes.
23    Q. Question: Did you indicate to Mrs. Schulman
24 that she had made some mistakes in the little notes she
25 had printed up about witnesses?

Page 8

1     A. Answer: Yes.
2     Q. Question: What were the mistakes that you felt
3  that Mrs. Schulman had made?
4     A. Answer: She had completely confused some of
5  the witnesses, someone who was a librarian at the school.
6  She had written them down as -- I think it was as the
7  person who lived across the street from me. They were
8  just completely wrong, a couple of the witnesses.
9     Q. Question: How did Mrs. Schulman respond when
10 you pointed this out to her?
11    A. Answer: She became extremely angry. I had
12 crossed out one paragraph that was incorrect. And she
13 said: Please do not mark on my papers. And I said:
14 Well, these are wrong. And I finally got her to listen
15 to me. And she made a couple marks on the papers.
16    Q. Question: Did the district's witness,
17 Assistant Superintendent Richard Werlin, speak to
18 Mrs. Schulman before the hearing started?
19    A. Answer: He came over to the defense desk
20 and completely ignoring me began to speak in a very
21 friendly manner to Mrs. Schulman. He was chatting about
22 foods that they apparently each knew about. I didn't
23 know about them, though; so I didn't join into the
24 conversation.
25    Q. Question: Did you ever have any concerns that

Page 9

1  the relationship between Richard Werlin and your lawyer,
2  Elizabeth Schulman, was improper?
3     A. Answer: Yes, I did.
4     Q. Question: Could you please tell one or more
5  incidents that caused you to become worried about this
6  relationship?
7     A. Answer: Well, one of the things that made me
8  worry was that the crime that had been committed by
9  Mr. Werlin, which preceded this entire 3-1/2 year series
10 of events, was that he had illegally obtained my arrest
11 records from the time that my brother and
12 ex-sister-in-law had had me arrested for trespassing in
13 my father's apartment after my father's death when I was
14 co-administrator of my father's estate.
15       I had told Mrs. Schulman that this was
16 obviously the reason that I was taken out of my classroom
17 on February 12th, 2001, supposedly because two teachers
18 were afraid that I would kill them.
19       And Mrs. Schulman told me at one time that this
20 shouldn't be a law, the law that makes this a crime, to
21 illegally obtain -- to obtain arrest records of an arrest
22 that did not lead to a conviction.
23       As my lawyer, I needed her to enforce the law
24 on my behalf, and she didn't do it. And it appeared to
25 me that part of her reason for not doing it was that she

3 (Pages 6 to 9)

Page 10

1  didn't want to accuse Rick Werlin of committing any
2  crimes or apparently any wrongdoing of any sort.
3      · Q.  Question:  Did you tell Mrs. Schulman that you
4  wanted her to discuss the police report at your
5  administrative hearing?
6      A.  Answer:  Yes, I did.  In fact, the last time we
7  met before my administrative hearing began, I asked
8  Mrs. Schulman what was going to be her -- her plan for my
9  defense, what did she have in mind for arguing in my
10  defense.
11      Oh, I forgot to say "answer."  Oh, I didn't.
12  Okay.
13      And she said:  Well, this is the plan.  We are
14  going to put you on the stand, and then we are going to
15  put your witnesses on the stand, and then we are going to
16  say that the district didn't prove its case.
17      And I said:  Do you think that that is going to
18  succeed?
19      And she said:  Well, no.  I -- I haven't had
20  very good luck with these sorts of cases, and they are
21  really difficult, and I certainly can't guarantee that
22  this is going to succeed.
23      Q.  Did you say anything further to Mrs. Schulman
24  at that time?
25      Question:  Did you say anything further to

Page 11

1  Mrs. Schulman at that time?
2      A.  Answer:  Yes.  I said that the reason I had
3  paid her all the money I had paid her, more than half a
4  year's salary for me, was that I wanted the truth to come
5  out.  I told her I really had nothing to lose in this
6  administrative hearing, because my career had already
7  been destroyed long before the district had voted to
8  dismiss me.  In fact, more than a year before the
9  district voted to district me, my career had been  .
10  destroyed.  So the administrative hearing couldn't really
11  do me any further harm.
12      I said the one thing that I wanted from her was
13  to have the truth brought out.  And I said:  If you
14  can't -- if you aren't confident that this case, the way
15  you have it planned is going to succeed, that your plan
16  is going to succeed, then I want you to just tell the
17  whole story and not worry about what the outcome of the
18  case is.
19      Q.  Question:  Did Mrs. Schulman make an effort to
20  tell your story in the administrative hearing?
21      A.  Answer:  No, she did not.  I prepared multiple
22  copies, five each, of many exhibits and told her I wanted
23  these put into evidence, and she refused.
24      Q.  Question:  What were the reasons that
25  Elizabeth Schulman gave for refusing to put your exhibits

Page 12

1  into evidence?
2      A.  Answer:  She said she knew what she was doing.
3  She said that many times.  Sometimes she would say the
4  point has already been made.
5      She told me a story about a contractor that
6  came to her neighbor's house, and her neighbor had wanted
7  to have a lot of input into the contractor's decision-
8  making.  And she told how angry the contractor was about
9  that and that her neighbor should have just let the
10  contractor do his job.
11      And she said I should do the same thing.  I
12  should just let her do her job, because she knew what she
13  was doing.
14      Q.  Question:  Was there any behavior by the judge
15  in the administrative hearing that caused you concern?
16      A.  Answer --
17      MR. SMITH:  Are you referring to the judge
18  separate and apart from the other panelists?
19      MS. LARKINS:  Yes.  Yes.
20      THE WITNESS:  Answer:  The judge seemed to be
21  very hostile from the beginning, but there were·
22  particular times when his hostility became remarkable.
23  BY MS. LARKINS:
24      Q.  Question:  Please describe one of those times.
25      A.  Answer:  There was one time when I was talking

Page 13

1  about Linda Watson, who is one of the people who accused
2  me of exhibiting behavior that indicated that I wanted to
3  kill her.  I was telling about how the night before I was
4  taken out of my classroom for a second time.  I was taken
5  out of my classroom for a second time on April 20th,
6  2001.
7      And the night before, Linda Watson had spoken
8  to someone at the school and Kathy Bingham.  Kathy
9  Bingham told Linda Watson that I had told Kathy Bingham
10  that she looked good, and I had told her that I thought
11  she was going to be fine.
12      Now, I said this in reference to Kathy
13  Bingham's statements when I had been out on leave after I
14  had been taken out of my classroom the first time that I
15  might have brought food to the lounge.
16      And when I was out on leave, Kathy Bingham had
17  noticed -- I think she had noticed that I had been
18  scheduled that week to bring food for the lounge or for
19  some other reason; I don't know exactly why.  But Kathy
20  Bingham suggested that people not eat the food in the
21  lounge because Maura Larkins might have brought it, and
22  it might be poisoned.
23      And it just so happened that that very day when
24  I was talking to Kathy Bingham, April 19th, 2001, I had
25  brought food to the lounge that day for a little party we

4 (Pages 10 to 13)

Page 14

1  were having. And Kathy Bingham had eaten at the lounge
2  that day. And I just wanted to tell her that she -- this
3  was later that I talked her, a couple hours later after
4  school. I said she looked good, and I thought she was
5  going to be okay.
6        Well, she went to Linda Watson and said:
7  Something really strange happened today. Maura Larkins
8  told me that I was going to be okay.
9        So Linda Watson took this information home and
10  worried about it. She was trying to figure out what
11  could that mean, when Maura Larkins said that Kathy
12  Bingham would be okay.
13       So Linda Watson discussed this with her son
14  while eating pizza that night. And, apparently, her son
15  had recently had some training about violence in schools,
16  and he quickly came up with an explanation for my
17  statements. He said: Mom, what she means is that Kathy
18  Bingham is going to be okay, and the rest of you are
19  going to be dead. And Linda Watson at that time,
20  according to her own deposition, began to be terribly
21  afraid that I was going to kill her.
22       Well, I told this story in my administrative
23  hearing. And the judge immediately jumped up and stood
24  there for a moment. And then he turned around and walked
25  to a little room in the back of the hearing room, and

Page 15

1  then he stood there for a few moments. And then he
2  called the other two panelists to come over to the little
3  room with him.
4        We were still on the record. The lawyers and
5  the parties were all sitting. I was sitting in the
6  witness stand. And I overheard the first part of what
7  the administrative law judge, whose name is James Ahler,
8  said to the women. He told them that they should not
9  consider what I had just said, because it didn't go to
10  show my state of mind in 2001, because I hadn't learned
11  that this was Linda Watson's feeling until her deposition
12  in 2002.
13       And then he noticed that I was sitting right
14  there, and I could hear everything he was saying. And he
15  closed the door. And he stayed in there for about 10
16  minutes talking to them. I could hear the voices, but I
17  couldn't hear what they were saying.
18       And then he came back out, and everybody sat
19  down and continued.
20       That was a long answer. Let's see.
21  Q.  Question: Why did this make you concerned
22  about Judge Ahler's attitude or behavior?
23  A.  Answer: Well, I thought that the judge was
24  playing with ideas and just distorting the law to come up
25  with an excuse to ignore my testimony, because it is

Page 16

1  obvious that this testimony was very important in
2  determining Linda Watson's state of mind.
3        And since her allegations were the reasons that
4  I was taken out of my classroom two times, I think the
5  administrative hearing panel should seriously have
6  considered the evidence: That Linda Watson had distorted
7  thinking, was paranoid and that the district was trying
8  to protect her for having made -- even though she had
9  made false allegations, in order to cover up the crime
10  that had been committed by Rick Werlin when he obtained
11  illegally my arrest records, and the crime that had been
12  committed by the district when I was taken out of my
13  classroom on the basis of those records, which is a
14  separate violation of Labor Code Section 432.7; and the
15  crimes of teachers, who had obtained my arrest records;
16  and the crimes of the union, the California Teachers
17  Association Representatives, who had conspired with the
18  district to violate labor -- the labor code, thereby
19  committing crimes.
20       MS. LARKINS: I am tired. I would like to take
21  a break.
22       THE VIDEOTAPE TECHNICIAN: Stand by one second.
23  Going off the record at 2:00 p.m.
24       (Recess.)
25       THE VIDEOTAPE TECHNICIAN: We are back on the

Page 17

1  record at 2:11 p.m.
2  BY MS. LARKINS:
3  Q.  Question: Did you tell Elizabeth Schulman what
4  questions you wanted her to ask during the depositions of
5  Chula Vista Elementary School District employees in your
6  administrative case?
7  A.  Answer: Yes.
8  Q.  Question: Did you ask Mrs. Schulman to
9  question the deponents about whether or not they had seen
10  or learned about a police report of your arrest?
11  A.  Answer: Yes.
12  Q.  Question: Did she ask them?
13  A.  Answer: Yes. That was one thing that she did
14  that I asked. And I thank her for it and give her credit
15  for asking that question.
16  Q.  Question: Were there other questions that you
17  asked her to ask the deponents that she failed to ask?
18  A.  Answer: Yes. There are many, many, many
19  questions that she failed to ask.
20  Q.  Question: Could you give a specific example?
21  A.  Answer: The deposition of Richard Werlin was
22  the deposition, which I found to be most disappointing.
23       I prepared many pages of questions for --
24       MR. SMITH: Is this still answering the
25  original question or do you have a new question?

5 (Pages 14 to 17)

Page 18

1      MS. LARKINS:  I will ask a new question.
2  BY MS. LARKINS:
3      Q.  Did you prepare questions for Elizabeth
4  Schulman to ask Richard Werlin?
5      A.  Answer:  Yes.
6      Q.  Did Elizabeth Schulman look at the questions
7  that you prepared?
8      A.  Answer:  Yes.
9      Q.  Question:  Did she ask the questions that you
10  had prepared?
11      A.  Answer:  No, at least not -- not most of them.
12      Q.  Question:  Did she have your questions before
13  her during the deposition of Rick Werlin?
14      A.  Answer:  No.
15      Q.  Question:  Did you express concern when you saw
16  that she didn't have your list of questions before her
17  during the deposition of Rick Werlin?
18      A.  Answer:  Yes.  I -- I pointed out.  I held up
19  lists of questions up to her, and I said:  When are you
20  going to ask these questions?
21          And she said:  Oh, well, right now, we are just
22  going to let him tell his story.  And then, later on,
23  we'll pin him down.
24      Q.  Question:  Did she let him tell his story?
25      A.  Answer:  Yes, she did.

Page 19

1      Q.  Question:  Did she then later pin him down?
2      A.  Answer:  No, she didn't.
3      Q.  Question:  Was Richard Werlin's deposition
4  ended suddenly in a way that surprised you?
5      A.  Answer:  Yes, it was.  It was a total shock to
6  me when the deposition was suddenly over.  And I said to
7  her:  I thought we were going to pin him down.
8          And she just shrugged and ignored me and walked
9  out.
10      Q.  Question:  Why do you think Elizabeth Schulman
11  refused to ask your questions?
12      A.  Answer:  It appeared to me that she wanted to
13  protect him in particular and the district in general.
14      Q.  Question:  On the morning of Rick Werlin's
15  deposition, did you bring evidence, documents to
16  Mrs. Schulman to use?
17      A.  Answer:  Yes..  I brought a pile of documents
18  about -- about a foot in height.  There were notebooks in
19  which I had placed letters in plastic sheets.  There were
20  quite a bit of plastic sheets that I had taken out of
21  other notebooks.  There was just a huge pile.
22      Q.  Question:  Was Elizabeth Schulman interested in
23  these documents that you brought that day?
24      A.  Answer:  No.  She told me to leave them all in
25  her office while we went down to the conference room for

Page 20

1  the deposition and then to take them home with me after
2  the deposition.
3      Q.  Question:  Was there any other time when you
4  tried to give documents about your case to Elizabeth
5  Schulman when she refused to accept them?
6      A.  Answer:  Yes.  I had previously brought her
7  copies of my PERB charges, my PERB exhibits, my documents
8  that I had sent to the district, documents the district
9  had sent to me, documents I had sent to CTA, and
10  documents they had sent to me.  And she was willing to
11  accept only a tiny fraction of them.  I would say maybe
12  about one-fifth of all the documents I had offered to her
13  before that day had she accepted.  And then, on that day,
14  she accepted zero.  Okay.
15      Q.  Question:  Do you have any reason to believe
16  that Elizabeth Schulman was more interested in another
17  case and therefore just put your case on the back burner?
18      A.  Answer:  I -- I do have evidence that
19  Mrs. Schulman was interested in another case.
20      Q.  Question:  What case is that?
21      A.  Answer:  It was a case against her husband; and
22  that case was filed right about the time that
23  Mrs. Schulman agreed to represent me.  And she devoted a
24  great deal of time to that case.  The record is at the
25  courthouse of all the filings she made during the time

Page 21

1  when she refused to meet with me, refused to look at my
2  information.
3          And that's it.  I would like to take a break,
4  because it seems that you are feeling very tired, and I'm
5  feeling tired, too.
6          THE VIDEOTAPE TECHNICIAN:  We are off the
7  record at 2:22 p.m.
8          (Recess.)
9          THE VIDEOTAPE TECHNICIAN:  Back on the record
10  at 2:49 p.m.
11          MS. LARKINS:  Mr. Smith and I have agreed to go
12  off the record for the day and to continue this
13  deposition Monday morning, November 1st.  At what time
14  would you like?
15          MR. SMITH:  Your preference.  Nine?  Ten?
16          MS. LARKINS:  Ten.
17          MR. SMITH:  10:00.
18          MS. LARKINS:  At 10:00.
19          MR. SMITH:  Same place?
20          MS. LARKINS:  Same place.
21          MR. SMITH:  With respect to a stipulation,
22  we'll withhold any stipulation until the end of this,
23  until this deposition is finally completed.  So we will
24  ask the court reporter -- we'll just go by code until
25  then; but, hopefully, we'll have a stipulation that will

6 (Pages 18 to 21)

Larkins v. Schulman
GIC 823858

Deposition of Maura Larkins
October 28, 2004

Page 22

1  resolve all that.
2      THE VIDEOTAPE TECHNICIAN:  This will conclude
3  Volume I in the deposition of Maura Larkins.  We have
4  produced a total of one original video tape, and we are
5  off the record at 2:50 p.m., approximately.
6      (The deposition was concluded at 2:50 p.m.)
7      I, the undersigned, say that I have read the
8  foregoing deposition and hereby declare under penalty of
9  perjury the foregoing is true and correct.
10     Executed this _____ day of _____, 2004,
11 at _____, _____.
12 (City)    (State)
13
14 _____
15     DECLARANT
16
17
18
19
20
21
22
23
24
25

Page 23

1  STATE OF CALIFORNIA        )
                             ) ss
2  COUNTY OF SAN DIEGO        )
3
4      I, Bonnie Breen, CSR No. 5582, a Certified Shorthand
5  Reporter in and for the County of San Diego, State of
6  California, do hereby certify:
7      That prior to being examined, the witness named in
8  the forgoing deposition was by me duly sworn to testify
9  to the truth, the whole truth, and nothing but the truth.
10     That said deposition was taken before me at the time
11 and place set forth and was taken down by me in shorthand
12 and thereafter reduced to computerized transcription
13 under my direction and supervision; and I hereby certify
14 the foregoing deposition is a full, true and correct
15 transcript of my shorthand notes so taken.
16     I further certify that I am neither counsel for nor
17 related to any party to said action nor in anywise
18 interested in the outcome thereof.
19     IN WITNESS WHEREOF, I have hereunto subscribed my
20 name this _____ day of _____, 2004 at San Diego,
21 California.
22
23 _____
     Bonnie G. Breen
24
25

7 (Pages 22 to 23)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA  92101

619-232-1164
FAX 619-232-2616

Case 3:07-cv-02202-WQH-WMC    Document 1-4    Filed 11/19/2007    Page 17 of 72
Larkins v. Schulman                                    Deposition of Maura Larkins
GIC 823858                                                      November 1, 2004

Page 24

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SAN DIEGO

MAURA LARKINS,                        )
                                      )
             Plaintiff,               )
                                      )
vs.                                   )  GIC 823858
                                      )
ELIZABETH SCHULMAN, and DOES 1        )
through 10, inclusive,                )
                                      )
             Defendants.              )
_____)

DEPOSITION OF MAURA LARKINS
Volume II
(Pages 24 through 69, inclusive.)
November 1, 2004
Taken at san Diego, California

BONNIE G. BREEN,
CSR NO. 5582

# COMPLIMENTARY

SAN DIEGO COURT REPORTING SERVICE                    619-232-1164
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101       FAX 619-232-2616

Page 25

1           I N D E X
2    DEPOSITION OF MAURA LARKINS          PAGE
3    November 1, 2004
4
5    EXAMINATION
6    By Ms. Larkins                   4
7
8    EXHIBITS
9    2 - Letter dated 4-7-03 addressed to CTA        28
        Advisory Panel from Elizabeth Schulman
10
     3 - Fax dated 5-1-03 to Elizabeth Schulman       28
11       from Maura Larkins, one page
12   4 - Fax dated 5-1-03 to Elizabeth Schulman       30
        from Maura Larkins, two pages
13
     5 - Memo dated 4-29-03 to Betty Schulman         30
14      from Maura Larkins
15   6 - Memo dated 3-27-03 to Elizabeth Schulman     31
        from Maura Larkins
16
     7 - Memo dated 3-26-03 to Elizabeth Schulman     31
17      from Maura Larkins
18   8 - Memo dated 3-15-03 to Elizabeth Schulman     31
        from Maura Larkins
19
     9 - Handwritten notes dated Tues, Feb 6          40
20      by JoEllen Hamilton
21   10 - Pages 1, 2, 49, 50, 51, 52 from            42
         Transcript of Hearing dated 1-6-03
22
23   11 - Pages 2 through 9 and 42 through 49         46
         of the Condenst Deposition Transcript
24       of JoEllen Hamilton, 9-10-02
25

Page 26

1              DEPOSITION OF MAURA LARKINS
2         Pursuant to Notice to take deposition on the
3    1st day of November, 2004, commencing at the hour of
4    10:25 a.m., at 319 Elm, Suite 100, in the City of San
5    Diego, County of San Diego, State of California, before
6    me, Bonnie G. Breen, Certified Shorthand Reporter in and
7    for the State of California, personally appeared:
8            MAURA LARKINS,
9    who, called as a witness by the Plaintiff, being by me
10   first duly sworn, was thereafter examined as a witness in
11   said cause.
12            APPEARANCES ·
13   For the Plaintiff:   MAURA LARKINS
        (In Propria Persona)   1935 Autocross Court
14          El Cajon, California 92019
            (619) 444-0065
15
     For the Defendants:   KLINEDINST, P.C.
16       BY: MATTHEW C. SMITH
            501 West Broadway, Suite 600
17          San Diego, California
            92101-3584
18          (619) 239-8131
19   Videographics:   John Sisson, Videographer
            1903 30th Street
20          San Diego, California 92102
21
22
23
24
25

Page 27

1          THE VIDEOTAPE TECHNICIAN:  This is Volume II in
2    the videotaped deposition of Maura Larkins being taken on
3    behalf of the plaintiff in the matter of Maura Larkins
4    versus Elizabeth Schulman and DOES 1 through 50,
5    inclusive, in Superior Court, State of California, County
6    of San Diego, Case Number GIC 823858.  This deposition is
7    being held at the offices of San Diego Court Reporters at
8    319 Elm Street in San Diego, California.  Today is
9    Monday, November 1, 2004, and it is now 10:25 a.m.  My
10   name is John Sisson, and I am the legal video specialist
11   with Videographics at 1903 30th Street in San Diego,
12   California.  Our certified shorthand reporter is Bonnie
13   Breen of San Diego Court Reporters.
14         For the video record, will counsel now please
15   state their appearances.
16         MR. SMITH:  Matthew Smith of Klinedinst P.C. on
17   behalf of defendant, Elizabeth Schulman.
18         MS. LARKINS:  Maura Larkins, plaintiff in pro
19   per.  .
20         THE VIDEOTAPE TECHNICIAN:  Thank very much.
21   Will our reporter now re-swear the witness, please.
22         (Deponent sworn.)
23         THE WITNESS:  Yes.
24         MS. LARKINS:  Good morning.
25         MR. SMITH:  Good morning.

Page 28

1          MS. LARKINS:  I said I was going to try to make
2    some copies of some documents, and I have done a few;
3    although, I've been very busy working on oppositions to
4    motions and things like that.  I believe I already -- we
5    have one exhibit already.  So this will be Exhibit 2.  I
6    would like to ask that this be numbered as Exhibit 2.
7          (EXH. 2 was marked for identification.)
8    FURTHER EXAMINATION BY MS. LARKINS:
9        Q.  Question:  Have you ever seen this document
10   before?
11       A.  Answer:  Yes.  This is a document prepared by
12   Elizabeth Schulman at my request to send to CTA,
13   California Teachers Association, because I was asking
14   them to help me pay my legal fees.
15          Okay.  That's 2.  I will come back to that
16   later.
17          (EXH. 3 was marked for identification.)
18          MS. LARKINS:  I would like to have this next
19   document entered as Exhibit 3.
20   BY MS. LARKINS:
21       Q.  Question --
22          MR. SMITH:  Before your question, this
23   document, Exhibit 3, the top says: Page 1 of 2.  Are you
24   intentionally excluding the second page or did you want
25   to include that, as well?

2 (Pages 25 to 28)

Case 3:07-cv-02202-WQH-WMC   Document 1-4   Filed 11/19/2007   Page 19 of 72
Larkins v. Schulman                                    Deposition of Maura Larkins
GIC 823858                                                      November 1, 2004

Page 29

1    MS. LARKINS: I'm not intentionally excluding
2  the second page. And that's one of the reasons why it is
3  good to do a deposition before trial, because then you
4  figure out what documents you haven't got. Let me ask
5  myself some questions about this document, and see if I
6  can figure out what page 2 was.
7    MR. SMITH: That one that you have your hands
8  on I believe is page 2; although, I could be wrong. Is
9  there a fax stamp on that?
10    MS. LARKINS: No, there is not. Let's see. I
11  wonder why I even would have a fax stamp on this. You
12  would think that the original that I had sent to her
13  would not have a fax stamp on it. Wouldn't you?
14    MR. SMITH: You would, yes.
15    MS. LARKINS: Shall we put -- shall we put
16  these two together as a possibility, and we are going to
17  explore in the future the accuracy of.
18    MR. SMITH: It might be better to keep them
19  separate for now.
20    MS. LARKINS: Keep them separate. Okay. Let's
21  do that. Let me talk about this Exhibit 3.
22  BY MS. LARKINS:
23    Q. Okay. Ms. Larkins, have you ever seen the
24  document labeled Exhibit 3 before?
25    A. Answer: Yes. This is a document, which I

Page 30

1  prepared and sent to Elizabeth Schulman. I wrote it -- I
2  must have written it at approximately May 1st, 2003.
3    Q. And I would like to come back to this document
4  later. Okay.
5    Now, I would like to -- here we go. We have
6  got it all solved now. Okay. As Exhibit 4, I would like
7  to offer a two-page document. The first page is the same
8  as Exhibit 3, and it is the original -- a copy of the
9  original document before it was ever faxed. Okay.
10  Original, Exhibit 4 has two pages, and they are the
11  original two pages of the document, which is Exhibit 3
12  and which shows a fax stamp.
13    (EXH. 4 was marked for identification.)
14  BY MS. LARKINS:
15    Q. Question: Mrs. Larkins, have you ever seen
16  this document before?
17    A. I already asked myself that, didn't I.
18    Yes. This --
19    Q. I'm going to come back to this. Okay. I'm
20  just trying to get this document straightened out.
21    As Exhibit 5, I would like to enter a one-page
22  document.
23    (EXH. 5 was marked for identification.)
24  BY MS. LARKINS:
25    Q. Question: Have you ever seen this document

Page 31

1  before? It is labeled Exhibit 5.
2    A. Answer: Yes. This is a letter I wrote to
3  Elizabeth Schulman on or about April 29th, 2003.
4    Q. We can come back to that.
5    I would like to ask this next document be
6  labeled Exhibit 6.
7    (EXH. 6 was marked for identification.)
8  BY MS. LARKINS:
9    Q. Question: Have you seen this document before?
10    A. Answer: Yes. This is a document I faxed to
11  Elizabeth Schulman on or about March 27, 2003.
12    Q. And I would like to come back to that later.
13    I would like to ask that the next document be
14  labeled Exhibit 7.
15    Question: Have you ever seen this document
16  before?
17    A. Answer: Yes. This is a fax. This is a
18  letter, which I faxed to Elizabeth Schulman on
19  approximately March 26, 2003.
20    (EXHS. 7 and 8 were marked for identification.)
21    MS. LARKINS: I would like to ask that the next
22  document be labeled Exhibit 8.
23  BY MS. LARKINS:
24    Q. Question: Have you ever seen this document
25  before?

Page 32

1    A. Answer: Yes. This is a letter that I wrote to
2  Elizabeth Schulman on or about March 15th, 2003.
3    Q. I think I'm going to go ahead and start talking
4  about these in a little more detail or asking the witness
5  about these in a little more detail.
6    Question: Regarding Exhibit 8, why did you
7  write this letter?
8    A. Answer: I wrote this letter to ask my
9  attorney, Elizabeth Schulman, to please allow me access
10  to the exhibits in my administrative hearing, which had
11  already taken place.
12    Also, at this date, I asked, and in this
13  letter, I asked Elizabeth Schulman to please give me the
14  pages, which her assistant Bruce had typed up, regarding
15  phone calls made by Elizabeth Schulman to Maria Beers and
16  Lorena Vieyra, who were two witnesses on my behalf.
17    Q. Question: Did you have difficulty getting
18  these documents from Elizabeth Schulman?
19    A. Answer: Yes. I had tremendous difficulty
20  getting any documents of any kind from Elizabeth
21  Schulman. For some reason, she did not want me to see
22  the documents in the case.
23    Q. Question: Did she give you a reason for this?
24    A. Answer: No, she didn't; but I suspected it was
25  because she didn't want me to ask questions about them.

3 (Pages 29 to 32)

Page 33

1  She didn't want to discuss them with me. She didn't have
2  time for me. She just wanted me not to talk to her at
3  all.
4      Q. Question: Did she respond to most of your
5  faxes?
6      A. Answer: No, she rarely responded to any of my
7  faxes.
8      Q. Question: Regarding Exhibit Number 7, can you
9  state what is contained in the letter?
10     A. This -- I wrote this letter asking
11 Mrs. Schulman for some help with an appeal of the
12 decision in my administrative hearing.
13     Q. I'm going to come back to this.
14     MR. SMITH: Before your next question,
15 Ms. Larkins, can I just confirm on the record that I am
16 reserving all my objections with respect to this
17 questioning throughout the entire course of this
18 deposition over however many days it takes until trial;
19 is that correct?
20     MS. LARKINS: Uh-huh.
21     MR. SMITH: All objections are waived?
22     MS. LARKINS: Uh-huh.
23     MR. SMITH: Is that a "yes"?
24     MS. LARKINS: Yes. We did the same thing in
25 one of my other depositions. In fact, we did it a little

Page 34

1  differently. I like -- I like your idea, because then
2  you can come up with any objection. That's better.
3      But what they did was they made objections, and
4  then we stipulated that those objections would apply to
5  all questions. But this is actually more clever. If I'm
6  ever a lawyer, I think I will do it this way.
7  BY MS. LARKINS:
8      Q. The Exhibit numbered six, question: Why did
9  you write the letter labeled Exhibit 6?
10     A. This was a question about the relationship
11 between my civil suit, which I filed before the district
12 voted to dismiss me, and my administrative hearing. At
13 the time that I wrote this, my administrative hearing had
14 already taken place, and I had been dismissed.
15     This is a very interesting letter in that one
16 of the -- one of the things that I didn't write about in
17 my complaint against Elizabeth Schulman was the fact that
18 if I had won my administrative hearing, her failure to
19 bring up the issues that were in my civil suit would have
20 prevented me from suing the district on the basis of
21 those issues in civil court.
22     After my administrative hearing, as I was
23 researching the law for my appeal, I discovered that
24 Mrs. Schulman had done the exact opposite of what she
25 should have done to protect my Superior Court lawsuit.

Page 35

1  She worked very hard to keep issues out of the
2  administrative hearing when she should have worked to
3  bring them into the administrative hearing.
4      Q. Question: Did Elizabeth Schulman tell you that
5  she wanted to keep these issues out of your
6  administrative hearing in order to protect your civil
7  suit?
8      A. Answer: Yes. Several times, she told me that
9  she wanted to keep the issue of the police report out and
10 as many issues as possible out in order to protect my
11 civil suit.
12     Q. Okay. We can come to that later.
13     Question: What was your purpose in writing the
14 letter that is labeled as Exhibit 5? .
15     A. Answer: I was asking for a document from
16 Elizabeth Schulman. The document was the motion in
17 limine that she had told me that she had filed in
18 December 2002, and I was asking her to send me a copy.
19     I was also asking about Terry Ryan, who was
20 someone at the county office of education, whom she had
21 contacted regarding a panelist to be chosen by me. And I
22 was asking her to clarify whether he was indeed the
23 person at county schools, who had said he did not have a
24 list of teachers.
25     Q. Question: Did Terry Ryan's failure to provide

Page 36

1  a list of teachers that could be appointed to the panel
2  have any effect on your administrative hearing?
3      A. Answer: Yes, it did. This was the -- there
4  was no panelist that was available for me. And so my
5  original hearing date of September 23rd, 2002 was
6  cancelled on that basis.
7      Q. Question: Did you ask for any other document
8  in this Exhibit 5 letter?
9      A. Answer: Yes. I asked for a letter from Terry
10 Ryan stating that he did not have a list of teachers.
11     Q. Question: Did Mrs. Schulman ever provide you
12 with such a letter?
13     A. Answer: No, she didn't.
14     Q. Question: For what purpose did you write the
15 letter labeled Exhibit 4?
16     A. Answer: Well, this is an ironic letter,
17 because, at this time, May 1st, 2003, I was under the
18 impression -- because Elizabeth Schulman had told me that
19 the code gave me 90 days to write my appeal, I was under
20 the impression that I still had time to file my appeal.
21     And I was pleased that the law gave me as a
22 teacher a particularly high -- a particularly good
23 opportunity for success in Superior Court, because the
24 law entitled me to a review, using an independent
25 judgment standard of judicial review; whereas, most

4 (Pages 33 to 36)

Page 37

1  petitions for Writ of Mandate allow only a substantial
2  evidence standard to be used in Superior Court.
3          And I was still very happy, and she still
4  hadn't told me that her advice to me was wrong and that
5  my time for filing an appeal had already passed.
6          I note here that I also asked for the motion in
7  limine. This is the same request I had made two days
8  earlier. And I had not received any response from her
9  about the motion in limine request that I had made on
10  April 29th.
11     Q.  Question: Is there anything else that you
12  discussed in this letter labeled Exhibit 4?
13     A.  Answer: Yes. I was starting to become quite
14  perplexed by this time about Elizabeth Schulman's refusal
15  to help me in any way, even to give me documents, which I
16  had paid for. And I asked her if she was embarrassed
17  about this case. I thought that she was embarrassed
18  because she had lost the case.
19          Of course, now, in hindsight, it seems to me
20  that she had wanted me to lose the case, and she simply
21  didn't want the case to be brought to the attention of
22  the Superior Court or the public and be exposed as -- as
23  what it was, was a really bad job done by Elizabeth
24  Schulman, and pretty embarrassing for Rick Werlin, the
25  district, CTA, and the Office of Administrative Hearings.

Page 38

1          I actually had thought that the reason she had
2  acted as she did was more out of incompetence than
3  intentional -- than intentionally -- well, I would say
4  fraud. She represented herself to me as someone who
5  would represent my interests, and she didn't do that.
6          Now I believe that it was intentional. At this
7  time, I thought she was just -- just a bad lawyer. And I
8  was trying to encourage her, telling her that she didn't
9  need to be afraid to give me these documents; that it
10  wouldn't hurt her to give them to me but that it would
11  hurt me if she refused to give them to me.
12          And there was a second page here where I put in
13  large print: I understand that you don't want to give me
14  legal advice, but please send me a copy of that motion in
15  limine and the other things I asked for. Thanks.
16     Q.  Question: Why did you write the document
17  labeled Exhibit 3?
18     A.  Answer: This is the same as Exhibit 4. And
19  what I did with this was I faxed it from my condo number.
20  This number at the top, 660-6695, is the fax number at
21  the condo where I had my office. And I apparently faxed
22  it to my home fax, and that's why we have this heading on
23  it.
24          MS. LARKINS: I would sort of like to take a
25  break.

Page 39

1          MR. SMITH: Okay.
2          THE VIDEOTAPE TECHNICIAN: All right. At
3  10:52, we are off the record.
4          (Recess.)
5          THE VIDEOTAPE TECHNICIAN: At 11:21, we are
6  back on the record.
7          MS. LARKINS: Okay. So you don't have your
8  exhibits.
9          MR. SMITH: I don't.
10          MS. LARKINS: Okay. Is it all right with you
11  if I get you copies after?
12          MR. SMITH: That's fine.
13          MS. LARKINS: Okay. Thanks. I would like to
14  have labeled as Exhibit 7. And I should make a list of
15  this.
16          MR. SMITH: I think we are on 9.
17          MS. LARKINS: Okay. Thank you. Labeled as
18  Exhibit 9. And I really do need to start making a list.
19  This will be my list. Okay. Exhibit 9, it's --
20  question -- this document, I will copy this, have it
21  copied and give it to you later.
22          MR. SMITH: Is there a bates number on that
23  document?
24          MS. LARKINS: No, but it does say Exhibit 13.
25          MR. SMITH: It was Exhibit 13 in the

Page 40

1  administrative hearing?
2          MS. LARKINS: Yes, it was. What do you call
3  the opposite of respondent? Plaintiff?
4          MR. SMITH: Petitioner.
5          MS. LARKINS: Right. It was the Petitioner's
6  Exhibit 13.
7          (EXH. 9 was marked for identification.)
8  BY MS. LARKINS:
9     Q.  Okay. Question: Have you ever seen this
10  document before?
11     A.  Answer: I saw this document for the first time
12  shortly before my administrative hearing.
13     Q.  Question: What -- can you tell us who wrote
14  the document?
15     A.  Answer: Yes. JoEllen Hamilton, a teacher at
16  my school, wrote this document on February 6, 2001. This
17  is the reason I was taken out of my classroom.
18          In a minute, I can read the transcript of
19  the -- of Richard Werlin's testimony of my administrative
20  hearing. And he makes it very clear that this one
21  incident was the reason that I was removed from my
22  classroom. And I would like to --
23     Q.  Question: Please read what the document
24  states.
25     A.  Answer: It states: "Tuesday, February 6,

5 (Pages 37 to 40)

Larkins v. Schulman
GIC 823858

Deposition of Maura Larkins
November 1, 2004

---

**Page 41**

1  11:25 a.m.
2  "Maura and I were both in the lounge doorway.
3  And I said, 'Gretchen told me that you submitted a
4  written complaint about me.' Maura said, 'Gretchen lied.
5  Would you like to see the letter that I have wrote?'
6  "'I have already seen it.'
7  "'You saw the letter that I gave to Gretchen?'
8  she asked.
9  "'Yes, I saw the letter.'
10  "Then she said, 'You are part of the problem.
11  You have done many inappropriate things.' When I started
12  to respond, she turned and walked away."
13  And to the side, it says:  I said, "What is the
14  problem?" and "That is your perspective."
15  Q.  Question:  How could any administrator in his
16  right mind remove a teacher from her classroom and ask
17  her to provide a fitness for duty letter from a mental
18  health care practitioner because of this incident?
19  A.  Answer:  Well, this incident happened on a
20  Tuesday.  And on the Saturday following this incident,
21  JoEllen Hamilton called up Rick Werlin in the evening at
22  his home and made some statements.
23  At the same time, within a few minutes, Linda
24  Watson called up Rick Werlin and said she feared for her
25  life.

---

**Page 42**

1  And so Rick Werlin claims that, because those
2  two teachers obviously got together and planned to call
3  him at the same time one Saturday night at his home, he
4  had to take me out of my classroom.
5  Q.  Question:  Isn't it a little odd that if this
6  incident made someone fear for her life that she would
7  wait, let's see, Wednesday, Thursday, Friday, Saturday,
8  four days before she would report it?
9  A.  Answer:  Yes, it is.  It is very odd.
10  Q.  Question:  How could anybody possibly think
11  that this describes an incident where someone's life was
12  threatened?
13  A.  Answer:  No one did.  No one did.  It was -- it
14  was a lie.  It was a lie done for petty, political
15  reasons at an elementary school.
16  Q.  Question:  What testimony did Richard Werlin
17  give when stating that JoEllen Hamilton feared for her
18  life as a result of this incident?
19  A.  Answer:  Not in this folder.
20  Q.  I would like to have this next document marked
21  as Exhibit 10.  Let's have this stick out there so we'll
22  find it easily to copy later.  Here is Exhibit 10.
23  (EXH. 10 was marked for identification.)
24  BY MS. LARKINS:
25  Q.  Question:  Did you --

---

**Page 43**

1  MR. SMITH:  Before you do, looks like Exhibit
2  10 for the record is five pages long, the first two pages
3  of which are pages 1 and 2 of the reporter's transcript
4  from the January 6, 2003 hearing; and the remaining are
5  pages 49, 50, 51, and 52.  So it is six pages in total,
6  all from the same reporter's transcript.  Is that what it
7  is, Ms. Larkins?
8  MS. LARKINS:  Yes, thank you.  I will try to
9  remember how you did that and do it myself.  Okay.
10  Q.  Question:  Is this document as Mr. Smith
11  described?
12  A.  Answer:  Yes, it is.
13  Q.  Question:  Does this document contain testimony
14  by Richard Werlin?
15  A.  Answer:  Yes.
16  Q.  Question:  What does Mr. Werlin say in this
17  document?
18  A.  Answer --
19  Q.  Question:  Does Elizabeth Schulman ask
20  Mr. Werlin a question in this document?
21  A.  Answer:  Yes.
22  MR. SMITH:  I'm sorry.  What was the question?
23  MS. LARKINS:  Does Mrs. Schulman ask Mr. Werlin
24  a question in this document?  Oh, no.  No.  No.  No.
25  Thank you.

---

**Page 44**

1  BY MS. LARKINS:
2  Q.  Question.  Does Mr. Bresee, B-r-e-s-e-e, ask
3  Mr. Werlin a question in this document?
4  A.  Answer:  Yes.
5  Q.  What is the question that Mr. Bresee asked?
6  A.  Answer:  Mr. Bresee asked Mr. Werlin:  Do you
7  recall when the next time you heard about the issues at
8  Castle Park was?
9  MR. SMITH:  Are you referring to page 49, lines
10  19 through 20?
11  MS. LARKINS:  Yes.  Thank you.
12  BY MS. LARKINS:
13  Q.  Question:  What did Mr. Werlin answer?
14  A.  Answer:  Mr. Werlin said:  I don't have the
15  exact date, but it was sometime shortly after this that
16  there was -- I received a phone call from the teacher.
17  Q.  Would you continue to read the transcript,
18  please.
19  A.  Answer:  Mr. Bresee asked:  Who was the
20  teacher?  Mr. Werlin answered:  JoEllen Hamilton.
21  On page 50 of Exhibit 10, the questioning
22  continues.  Mr. Bresee asks:  And where and when was this
23  phone call received?
24  Mr. Werlin said:  I received the phone call at
25  my home on a Saturday evening at approximately 8:15 in

---

6 (Pages 41 to 44)

Page 45

1 the evening.
2 And Mr. Bresee asked: And what was
3 communicated to you in this phone call?
4 Mr. Werlin answered: Well, Mrs. Hamilton first
5 apologized for reaching me on a Saturday night and
6 alleging that she was interrupting me, and I said no, it
7 was not an interruption, and she had had a great deal of
8 concern and trepidation in her voice. She had a concern
9 about a fellow teacher, and she went into discussing a
10 conversation that she had had with Maura Larkins where
11 she was alleging that Maura invaded her space, got very
12 close to her, and it was very frightening the way Maura
13 looked at her and the tone of voice. She shared with me
14 that she was very concerned about her life because she
15 was the mother of two small children, and it was very
16 concerning to her and wanted to make sure that I knew
17 about this.
18 "Question: Did she say when this conversation
19 had taken place?
20 "Answer: It had happened that week, but I
21 don't recall when it had happened that week.
22 "Question: Did she say why she waited until
23 Saturday night to call you?
24 "Answer: I don't recall the reason.
25 "Question: Did you question why she had waited

Page 46

1 until Saturday night to call you?
2 "Answer: I did not at the time quite frankly
3 because she was so upset and unnerved by this alleged
4 confrontation with Maura Larkins that it was more
5 important to play the role of an active listener than to
6 doing a lot of inquiry at that time.
7 "Question: In your experience as a human
8 resources administrator for school districts, have you
9 had employees call you at home on weekends previously to
10 express concerns?
11 "Answer: It is very rare. Perhaps in almost
12 30 years, for a teacher to call, it is a rarity,
13 particularly on a Saturday evening. In the evening, it's
14 highly unusual.
15 (EXH. 11 was marked for identification.)
16 MS. LARKINS: I would like to ask this next
17 document be labeled Exhibit 10.
18 MR. SMITH: 11.
19 MS. LARKINS: 11, thank you.
20 BY MS. LARKINS:
21 Q. Can you please characterize this document?
22 A. Answer: This is a few pages from the
23 administrative hearing transcript of my dismissal hearing
24 for January 6th, 2003.
25 MR. SMITH: Did you say this is from the

Page 47

1 dismissal hearing?
2 MS. LARKINS: Oops. Thank you. This is not
3 from the dismissal hearing. No. Wait a minute. Wait.
4 Wait. Wait. What am I doing with this in my hand?
5 Yeah, these two belong -- these two belong over here.
6 Let me see what I gave you. I might have given you the
7 wrong document. Good. That is right. And you have
8 this, right?
9 MR. SMITH: If this is excerpts from the
10 deposition of JoEllen Hamilton, the condensed transcript,
11 it looks like pages 2 through 9 and pages 46 through 49.
12 MS. LARKINS: Yes.
13 MR. SMITH: Total of four pages in the exhibit?
14 MS. LARKINS: Yes. Thank you. Okay.
15 BY MS. LARKINS:
16 Q. Question: Is this the deposition of JoEllen
17 Hamilton?
18 A. Answer: Yes.
19 Q. Question: On page 46 of the condensed version
20 of JoEllen Hamilton's deposition -- you know, I have
21 to -- I really need page 45, and it is not here. Oops.
22 Is it all right with you if I add a page to this same
23 exhibit or do you want to make it a separate exhibit?
24 MR. SMITH: No, you can go ahead. What are you
25 adding?

Page 48

1 MS. LARKINS: This page.
2 MR. SMITH: It's from the same deposition
3 transcript?
4 MS. LARKINS: Yes.
5 MR. SMITH: Condensed page number 12, which
6 covers deposition pages 42 through 45. And that is going
7 to be added to Exhibit 11, which will then be five pages
8 long in total.
9 MS. LARKINS: Yes.
10 MR. SMITH: Is this my copy?
11 MS. LARKINS: Why don't you keep that for now.
12 Can I get you another copy later?
13 MR. SMITH: Why don't we go off the record and
14 make some copies.
15 THE VIDEOTAPE TECHNICIAN: At 11:41, we are off
16 the record.
17 (Recess.)
18 THE VIDEOTAPE TECHNICIAN: At 11:48, we are
19 back on the record.
20 MS. LARKINS: We have added a page to Exhibit
21 11. We now all have five pages. The page that has been
22 added is page 12 of the deposition, which covers --
23 pardon me -- page 12 of the condensed version of the
24 deposition, which covers pages 42 to 45 of the
25 deposition.

7 (Pages 45 to 48)

Page 49

1  BY MS. LARKINS:
2      Q.  Question: Please look at page 45, line 14.
3  And please read from the deposition, from that point on,
4  until I tell you to stop.
5      A.  "Question: Did you ever contact Rick Werlin at
6  home about any conduct of Ms. Larkins?
7      "Answer: Yes, I did."
8      Okay. I want to end that answer now.
9      Q.  This is me speaking as sort of my own counsel
10  right now. This question was asked by Elizabeth
11  Schulman, and the answer was given by JoEllen Hamilton.
12      Now I want to go back into question, ask myself
13  to read again.
14      Question: Please continue reading starting at
15  line 17.
16      A.  Answer: "Question: How did that come about?
17      "Answer: Mrs. Larkins had written this letter
18  which I thought -- I was very shocked and surprised at
19  it. We tried to have several meetings and she cancelled.
20  We had our interaction in the doorway, in which she was
21  visibly and verbally upset, pointing at me, very angry
22  and I had spoken with Mr. Werlin at some time. I don't
23  remember when, around this time about this situation, and
24  he had told me that he had a meeting with her planned.
25  And if I had any concerns or questions, to call him. And

Page 50

1  it happened to be a Saturday evening, and I called him to
2  see if the meeting had gone through. And I don't
3  remember what else."
4      Okay. That is the end of that answer.
5      Q.  Mrs. Larkins, do you find this passage at all
6  shocking?
7      A.  Answer: Yes, I do. I think it is really
8  shocking that it turns out that Mr. Werlin had invited
9  JoEllen Hamilton to call him at home. And it underlines
10  how dishonest he was, pretending when he testified for
11  the commission on professional competence that he was
12  shocked to have a teacher call him at home and that it
13  was such an unusual and unexpected thing.
14      I'm also surprised by this passage in that it
15  says that JoEllen Hamilton called up to ask if Mr. Werlin
16  had met with me, not to say that she feared for her life.
17      Q.  Question: Would you please read from the
18  deposition, page 46, line 17.
19      A.  Answer: "Question: And when he said, 'You
20  call me at any time,' did you take that to mean that it
21  was okay to call him on a Saturday evening and not on
22  school time?
23      "Answer: Yes, I did.
24      "Question: Was there something that had
25  happened over that weekend that caused you to call him on

Page 51

1  a Saturday evening, as opposed to waiting until regular
2  school hours?
3      "Answer: He was supposed to have a meeting
4  with her on Friday afternoon.
5      "Question: That was your understanding?
6      "Answer: That was my understanding."
7      End of answer.
8      Q.  Question: Mrs. Larkins, did Mr. Werlin ever
9  contact you about a meeting on that Friday afternoon,
10  which would have been February 9th, 2001?
11      A.  Answer: Mr. Werlin left a message on my phone
12  answering machine; but when I called back, he was
13  unavailable.
14      Q.  Question: So Mr. Werlin tried to contact you
15  before that Saturday night?
16      A.  Answer: Yes.
17      Q.  So something was already in the planning stages
18  about some sort of action or meeting involving you before
19  the two teachers called on Saturday night?
20      A.  Answer: Yes. Obviously, the Saturday night
21  phone calls were carefully planned. The incident, which
22  had happened the previous Tuesday, was a completely
23  harmless incident, as recorded by JoEllen Hamilton on
24  that day.
25      And the incident that Mr. Werlin reported, the

Page 52

1  incident that caused JoEllen Hamilton to fear for her
2  life and talk about her two small children, must have
3  been manufactured in the intervening four days.
4      Q.  Question: Maura Larkins, is this description
5  of this event given by JoEllen Hamilton in Exhibit 9
6  accurate?
7      A.  Answer: She leaves out how threatening she was
8  to me. The fact was, I was coming out of the copy room
9  door to the outside, and she was blocking my way. And I
10  had to pause for a moment, and then she stepped aside and
11  confronted me.
12      And I didn't -- I was very shocked when she
13  said that I had written a report about her, because I had
14  written a short letter to the principal saying that I had
15  been harassed for some time, but I did not mention a
16  single name. And so I thought it was very odd that
17  JoEllen Hamilton would feel that this was a written
18  report about her, unless perhaps she had some guilty
19  feelings, because she was indeed one of the people, who
20  had been harassing me.
21      Q.  Is there anything else about this report that
22  is inaccurate?
23      A.  Well, it is incomplete. The fact is, when I
24  turned and walked away, she yelled at me, "I did not do
25  anything inappropriate to you." And she kept yelling it

8 (Pages 49 to 52)

Larkins v. Schulman
GIC 823858

Deposition of Maura Larkins
November 1, 2004

---

Page 53

1  over and over again as I walked away. She was yelling
2  very loud. And all the kids were right there. It was
3  recess time. And I was quite far away before she stopped
4  yelling at me.
5      Q.  I would like to skip down. Question: Please
6  skip down to deposition page 47, line 23.
7      MR. SMITH: Are you referring to an exhibit
8  right now?
9      MS. LARKINS: Oh, yes. Thank you.
10 BY MS. LARKINS:
11     Q.  In Exhibit 11, please read Exhibit 11, page 47,
12 line 23 and continuing.
13     A.  Answer: "Question: Did you ever tell him,
14 Rick Werlin, in that telephone conversation or at any
15 other time that there was something that Mrs. Larkins had
16 done, which made you fear for your life?
17     "Answer: No.
18     "Question: Did you have any kind of
19 communication either directly or with Rick Werlin or with
20 anybody else, wherein you made a statement to the fact
21 that you were fearful of your life because of
22 Mrs. Larkin's conduct?"
23     Actually, it says "contact."
24     "Answer: No.
25     "Question: Did Mrs. Larkins ever threaten your

---

Page 54

1  life?
2      "Answer: No."
3      End of answer.
4      Q.  Question: Did JoEllen Hamilton contradict Rick
5  Werlin's testimony at your administrative hearing?
6      A.  Answer: Yes.
7      Q.  Question: Did your lawyer, Elizabeth Schulman,
8  use JoEllen Hamilton as a witness in your administrative
9  hearing?
10     A.  Answer: No.
11     Q.  Question: Your lawyer did not inform the
12 panelists in the administrative hearing that Rick
13 Werlin's testimony had been contradicted under oath by
14 the person he was talking about?
15     A.  Answer: No.
16     Q.  Question: Did Mrs. Schulman ever give you any
17 explanation for not calling JoEllen Hamilton as a
18 witness?
19     A.  Answer: No. I begged her to bring out the
20 full story about my case. I begged her to call
21 witnesses. She refused to call JoEllen Hamilton. She
22 refused to call Cynthia Miller. She refused to call Gina
23 Boyd. She refused to call David Dow.
24     MS. LARKINS: I need to take a break.
25     MR. SMITH: Okay.

---

Page 55

1      THE VIDEOTAPE TECHNICIAN: All right. At
2  12:00, we are off the record.
3      (Recess.)
4      THE VIDEOTAPE TECHNICIAN: At 12:18, we are
5  back on the record.
6      MR. SMITH: During our break, Mrs. Larkins
7  informed me that she is unwilling to continue with the
8  deposition today. Is that correct?
9      MS. LARKINS: Yes. I need to go home and make
10 copies of documents for you, the documents that you have
11 requested the court to order me to produce, and I need
12 about eight hours. I need about eight hours of time.
13     MR. SMITH: Did you get any of that?
14     THE VIDEOTAPE TECHNICIAN: Oh, yes, all of it.
15     MR. SMITH: Just to be perfectly precise, the
16 court has already ordered you to produce supplemental
17 responses to my written discovery and produce documents.
18 That was to have been completed by October 12th. It has
19 not yet been completed, and I'm still waiting for the
20 supplemental responses and the documents.
21     I also understand that you have my motion for
22 terminating sanctions currently pending, as well as a
23 motion for terminating sanctions in your other case
24 currently pending. And those, your oppositions to those
25 motions are creating a time pressure for you, as well,

---

Page 56

1  which makes you unwilling to continue with your
2  deposition today.
3      Am I accurately reflecting your position on
4  this matter?
5      MS. LARKINS: Exactly. Obviously, I'm taking
6  my own deposition. And I certainly like all the
7  questions I'm asking, and it is not that I don't want to
8  ask myself questions. It is just that I really want to
9  get home and copy these documents for you.
10     MR. SMITH: As we discussed off the record, the
11 lack of discovery responses, the lack of complete
12 production of documents, is making it difficult, if not
13 impossible, for me to fully prepare my case prior to our
14 pending discovery cutoff and trial readiness conference
15 with a December 3 trial date. Continued delays are
16 creating further pressures with respect to the
17 formulation of the defense case.
18     So with all that said, and as we discussed, I
19 can't force you to remain here today; but I caution you
20 that I am going to seek -- reserve my right to seek any
21 and all remedies that may be appropriate to me, including
22 further sanctions, a revised trial schedule to permit
23 further discovery on my part as necessary to follow up to
24 whatever discovery you -- discovery responses you provide
25 and potentially dispositive motions, as well.

9 (Pages 53 to 56)

Page 57

1  All that being said, I understand that you are
2  willing to come back tomorrow for further questioning in
3  your deposition; is that correct?
4  MS. LARKINS: Yes. And I'm willing to end my
5  questioning of myself.
6  MR. SMITH: Okay.
7  MS. LARKINS: And allow you to do your
8  questioning.
9  MR. SMITH: Okay. So we will pick up tomorrow
10  morning at 10:00, and I will begin questioning of you.
11  Understand that I may not complete my questioning
12  tomorrow, and also understand that, given the lack of
13  discovery responses, lack of complete discovery
14  responses, I may need to come back and ask further
15  deposition questions at an even later point in time once
16  I have received your supplemental discovery responses if
17  there are any questions that raised by those discovery
18  responses. Is that acceptable?
19  MS. LARKINS: Yes, that is acceptable. I would
20  like to note that you have not turned over a single
21  document to me and although you have said that you
22  believe that you are fully within your rights within the
23  law in not having turned over a single document.
24  I want to point out another problem. You are
25  going to be having the same problem I have been having.

Page 58

1  I'm going to have to ask for these documents that I need
2  from you to be produced at trial, since it is too late
3  now for me to ask for them to be produced before trial.
4  I will ask Elizabeth Schulman as a witness to produce
5  documents.
6  I think it's funny, talking about how I have
7  failed to produce discovery when I think I have produced
8  something like well over 2000 documents in this case, and
9  you haven't produced one. But, obviously, you and the
10  three law firms -- your very large law firm and the three
11  large law firms that are opposing me in the companion
12  case are all trying overwhelm me, a third grade teacher,
13  with motions and discovery demands so that I will give up
14  this case, but I won't.
15  And I don't believe that any terminating
16  sanctions are going to be offered, because I have been so
17  extremely cooperative regarding discovery in this case.
18  And I don't -- tomorrow, I'm not going to be
19  saying, like Elizabeth Schulman did, that I always try to
20  forget everything, and I won't be evading questioning
21  like she did. And the court will be able to look at
22  these deposition transcripts when it makes its decisions
23  about whether or not these issues should be brought to
24  trial.
25  Also, I'm sort of concerned about the threats

Page 59

1  against me, all these motions and things that you say you
2  want to bring against me. And I'm thinking: What if the
3  bar association knew about how Elizabeth Schulman had
4  acted? I think she could be disbarred for her outrageous
5  behavior. She's shown greed, callousness. She's -- she
6  said she didn't think that the law broken by the school
7  district against me should be a law and refused to bring
8  it up; although, she did put into evidence some documents
9  provided to her by Maria Beers, which raised the question
10  of police and arrest and things like that.
11  So, yes, I'm willing to come tomorrow. And I'm
12  willing to turn over this deposition to you, because I
13  imagine I can -- any further testimony I want to give, I
14  can just give it in a written declaration or on the
15  witness stand during the trial. And I will be happy to
16  answer your questions tomorrow for a reasonable length of
17  time. And, then, if you can't finish your questioning
18  tomorrow within a reasonable length of time, I will be
19  happy to come back another day and let you ask as many
20  questions as you want.
21  MR. SMITH: Just so we are clear on what our
22  respective positions are, we have -- you talk about being
23  attacked by motions. We have repeatedly and specifically
24  tried to avoid motions. We have repeatedly and
25  specifically contacted you requesting further discovery

Page 60

1  responses. We have repeatedly offered stipulations and
2  compromises that would have avoided first the motion to
3  compel. We were exceedingly patient with respect to your
4  failure to comply with the court's order compelling
5  further discovery responses and have been forced based on
6  the time pressures of a December 3 trial date to file
7  both a motion to compel and then, subsequently, the
8  motion for terminating sanctions based on failure to
9  comply with the court order.
10  I understand that, Mrs. Larkins, you are a pro
11  per plaintiff, as you say over and over again, and that
12  you are only a third grade teacher, as you like to state;
13  but that doesn't relieve you of obligations to prosecute
14  your case in a timely manner. And the leisurely pace in
15  which you are conducting this case is making it difficult
16  for us to prepare our defense in a timely manner.
17  So while you say that you are willing to be
18  deposed tomorrow for a reasonable time, it is my position
19  that we will be entitled to take the deposition as long
20  as it takes up until, absent some stipulation on the
21  record tomorrow with respect to the end time. And if you
22  can tell me right now if it is your intention to stop
23  your deposition short of a complete day, I need to know
24  that now.
25  MS. LARKINS: A complete day, would you

10 (Pages 57 to 60)

Page 61

1  consider that to be 5:00, or what do you mean by a
2  complete day?
3        MR. SMITH: 5:00 would be a complete day.
4        MS. LARKINS: Okay. And you want to start at
5  ten?
6        MR. SMITH: Yes.
7        MS. LARKINS: I can't give you seven hours of
8  my time tomorrow. I have to -- I have to respond to your
9  motion for terminating sanctions.
10        MR. SMITH: The motion for terminating
11  sanctions has been on calendar for over a week. Well, at
12  least a week. There is no reason why a response couldn't
13  have been prepared prior to today.
14        MS. LARKINS: Are you sure of that?
15        MR. SMITH: Well, the motion for terminating
16  sanctions went on calendar, what, last Tuesday.
17        MS. LARKINS: And you are sure that there is no
18  reason why it couldn't have been prepared before now?
19  How do you know that?
20        MR. SMITH: Well, I don't know that. What I do
21  know is that, when the court sets deadlines, those
22  deadlines should be taken seriously. And the time issues
23  in this case are largely a function of your own making.
24        I have been asking for dates for your
25  deposition as early as early September. We didn't

Page 62

1  finally get a date for your deposition until October.
2        MS. LARKINS: Wait. Wait. Wait. Now, this is
3  too much. I had a date for my deposition, and you very
4  leisurely waited for a couple of weeks before you told me
5  that you were not going to be available on that date.
6        MR. SMITH: Right.
7        MS. LARKINS: You went to court and forced me
8  to make my deposition later.
9        MR. SMITH: I asked you to make your deposition
10  earlier. I proposed well --
11        MS. LARKINS: Oh, that's true.
12        MR. SMITH: -- over a dozen deposition days,
13  none of which you accepted. You didn't comply with the
14  court's order to propose three alternate dates of your
15  own, until we finally got -- after my third or fourth
16  letter of issue, you finally proposed the dates of
17  October 27, 28th, and 29th.
18        And then after I suggested we start on October
19  27th, you said: No, I can't do the 27th. Let's do the
20  28th. Then, on the 28th, we started and went for about
21  an hour and a half and then had to suspend it because you
22  were too tired and couldn't go on the 29th for some
23  reason that you haven't revealed to me or that I don't
24  recall. So we are picking up now on November 1st.
25        MS. LARKINS: Okay. Hey, I will stipulate that

Page 63

1  I am a really crummy lawyer.
2        MR. SMITH: Regardless of whether you are a
3  crummy lawyer or not, there are deadlines.
4        MS. LARKINS: I am the worst lawyer.
5        MR. SMITH: There are deadlines that need to be
6  complied with.
7        MS. LARKINS: Well, maybe the case will just be
8  thrown out.
9        MR. SMITH: If you want to stipulate that the
10  case will be thrown out, that can resolve all our
11  scheduling issues right now.
12        MS. LARKINS: No. Someone has to throw it out
13  for me. I will fight that.
14        But, look, your client didn't have the least
15  respect for the basic obligations of a lawyer under the
16  law. I have trouble with deadlines. Your client doesn't
17  even understand her basic obligations to her client.
18        MR. SMITH: I understand that that is the
19  position you are going to be taking. It is really
20  neither here nor there with respect to the discovery
21  issues that we are talking about.
22        So I think we have both made our positions
23  clear. And I understand we are both in agreement that
24  we'll be back at 10:00 tomorrow to pick up this
25  deposition. And then we can -- I would expect that it

Page 64

1  will go all day, but you are telling me that it is not
2  going to go all day, and we'll address that tomorrow.
3        MS. LARKINS: Okay. You know, I would like to
4  address it right now. Let's see. I'm willing to come
5  here at 10:00 tomorrow, and I would be willing go until
6  1:00; but we can argue that then.
7        Let's see. What will it take? Will we spend
8  an hour arguing about it? So maybe we should start
9  arguing at twelve?
10        MR. SMITH: Why don't we just start the
11  deposition tomorrow. And, hopefully, we will --
12        MS. LARKINS: Okay. I need to figure out
13  beforehand when I start arguing about quitting. So
14  what -- why don't you just stipulate that we can go
15  until -- from ten until one. You get three hours of
16  questions. And I will answer your questions, unlike your
17  client. Your client wouldn't answer questions. I will
18  give you three hours of good answers to your questions
19  tomorrow, and then we'll continue another day. How about
20  that?
21        Let's not -- I mean, we both -- our time is
22  valuable. I mean, you know, life is finite. Let's --
23  how long have we spent talking about this now?
24        MR. SMITH: Long enough.
25        MS. LARKINS: Long enough. Okay. Okay. I

11 (Pages 61 to 64)

---

**Page 65**

1  don't want to be here after 1:00 tomorrow. I'm willing
2  to go from ten to one. And I'm willing to answer your
3  questions and come back another day. How about we agree
4  to that?
5      MR. SMITH: I can't agree to that. Let's just
6  start at 10:00. We'll raise the issue at 1:00, if
7  necessary.
8      MS. LARKINS: No. No. I'm going to raise the
9  issue at 12:00, because I want to be out of here by 1:00.
10      MR. SMITH: You can raise the issue at 12:00.
11      MS. LARKINS: Okay. That's what we'll do.
12      Why don't we just do what I did at Kelly
13  Angel's? That was so much quicker. We'll do that at
14  1:00. I will leave. I will just leave at 1:00.
15      And you can be talking about contempt of court.
16  And I can tell you that -- actually, I would ask the
17  court not to give me financial sanctions for contempt of
18  court but to put me in jail, because then, I think that
19  this case would really get some publicity.
20      MR. SMITH: That's what your preference would
21  be?
22      MS. LARKINS: Yes. I think of myself as Rosa
23  Parks.
24      MR. SMITH: If you would like, we can stipulate
25  to the court entering a contempt of court order, and I

---

**Page 66**

1  will not seek monetary sanctions.
2      MS. LARKINS: Okay. No. No. No. Wait a
3  minute. No. I shouldn't. I have no idea what you are
4  talking about.
5      MR. SMITH: Okay. Let's --
6      MS. LARKINS: No. Since you brought that up,
7  explain to me how that would work.
8      MR. SMITH: I don't know how it would work. I
9  haven't sought contempt of court sanctions in the past
10  and hoped I wouldn't have to in this case.
11      MS. LARKINS: Well, the court would probably
12  just give me monetary sanctions. Just the fact that you
13  didn't ask for the monetary sanctions wouldn't get me in
14  jail. How about you ask -- you agree -- you stipulate to
15  ask that I be put in jail?
16      MR. SMITH: I will consider it.
17      MS. LARKINS: Thank you.
18      MR. SMITH: We'll pick up at 10:00 tomorrow.
19  It's still my intention to go the entire day. I
20  understand that you have no intention of going the entire
21  day, but we can address that tomorrow.
22      MS. LARKINS: Yes.
23      What I plan to do is: I tell you what, I will
24  answer your questions for three hours, and then I will
25  leave at 1:00.

---

**Page 67**

1      MR. SMITH: I understand that that is what your
2  intention is.
3      MS. LARKINS: Okay.
4      MR. SMITH: I think you are clear that it is
5  my --
6      MS. LARKINS: No more talking. That is what is
7  going to happen. You do whatever you want to do. Let's
8  end this. This is really getting boring.
9      MR. SMITH: I appreciate that. I would like to
10  make my position perfectly clear.
11      MS. LARKINS: Your position is clear. You are
12  going to do everything you can against me when I walk
13  out. I understand that.
14      MR. SMITH: Okay.
15      THE VIDEOTAPE TECHNICIAN: All right. Then
16  this will end tape one and Volume II of the deposition of
17  Maura Larkins. And, at 12:37, we are off the record.
18  Thank you.
19      (The deposition was adjourned at 12:37 p.m.)
20
21
22
23
24
25

---

**Page 68**

1      I, the undersigned, say that I have read the
2  foregoing deposition and hereby declare under penalty of
3  perjury the foregoing is true and correct.
4      Executed this _____ day of _____, 2004,
5  at _____, _____.
6  (City)        (State)
7
8      _____
9      DECLARANT
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

12 (Pages 65 to 68)

Case 3:07-cv-02202-WQH-WMC    Document 1-4    Filed 11/19/2007    Page 29 of 72
Larkins v. Schulman                                    Deposition of Maura Larkins
GIC 823858                                                    November 1, 2004

Page 69

```
 1   STATE OF CALIFORNIA        )
                                ) ss
 2   COUNTY OF SAN DIEGO        )
 3
 4       I, Bonnie Breen, CSR No. 5582, a Certified Shorthand
 5   Reporter in and for the County of San Diego, State of
 6   California, do hereby certify:
 7       That prior to being examined, the witness named in
 8   the forgoing deposition was by me duly sworn to testify
 9   to the truth, the whole truth, and nothing but the truth.
10       That said deposition was taken before me at the time
11   and place set forth and was taken down by me in shorthand
12   and thereafter reduced to computerized transcription
13   under my direction and supervision; and I hereby certify
14   the foregoing deposition is a full, true and correct
15   transcript of my shorthand notes so taken.
16       I further certify that I am neither counsel for nor
17   related to any party to said action nor in anywise
18   interested in the outcome thereof.
19       IN WITNESS WHEREOF, I have hereunto subscribed my
20   name this _____ day of _____, 2004 at San Diego,
21   California.
22
23       _____
         Bonnie G. Breen
24       Certified Shorthand Reporter No. 5582
25
```

13 (Page 69)

Page 70

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SAN DIEGO

MAURA LARKINS,                          )
                                        )
            Plaintiff,                  )
                                        )
vs.                                     )  GIC 823858
                                        )
ELIZABETH SCHULMAN, and DOES 1          )
through 10, inclusive,                  )
                                        )
            Defendants.                 )
_____)


DEPOSITION OF MAURA LARKINS
Volume III
(Pages 70 through 127, inclusive.)
November 2, 2004
Taken at San Diego, California


BONNIE G. BREEN,
CSR NO. 5582

**COMPLIMENTARY**

**Page 71**

1           INDEX
2    DEPOSITION OF MAURA LARKINS          PAGE
3    November 2, 2004
4
5    EXAMINATION
6    By Mr. Smith                    73
7
8    EXHIBITS
9    (None.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 72**

```
1           DEPOSITION OF MAURA LARKINS
2         Pursuant to Notice to take deposition on the
3    2nd day of November, 2004, commencing at the hour of
4    10:20 a.m., at 319 Elm, Suite 100, in the City of San
5    Diego, County of San Diego, State of California, before
6    me, Bonnie G. Breen, Certified Shorthand Reporter in and
7    for the State of California, personally appeared:
8              MAURA LARKINS,
9    who, called as a witness by the Plaintiff, being by me
10   first duly sworn, was hereafter examined as a witness in
11   said cause.
12           APPEARANCES
13   For the Plaintiff:   MAURA LARKINS
     (In Propria Persona)   1935 Autocross Court
14                         El Cajon, California 92019
                           (619) 444-0065
15
     For the Defendants:   KLINEDINST, P.C.
16                   BY: MATTHEW C. SMITH
                         501 West Broadway, Suite 600
17                       San Diego, California
                         92101-3584
18                       (619) 239-8131
19   Videographics:    Gregg Iseman, Videographer
                         1903 30th Street
20                       San Diego, California 92102
21
22
23
24
25
```

**Page 73**

```
1         THE VIDEOTAPE TECHNICIAN: This is the video
2    deposition of Maura Larkins, Volume III, being taken on
3    behalf of defendants in the matter of Maura Larkins
4    versus Elizabeth Schulman, et al, San Diego Superior
5    Court Case Number GIC 823858.
6         This deposition is being held at 319 Elm Street
7    at the offices of San Diego Court Reporting, San Diego,
8    California. Today is Tuesday, November 2nd, 2004. The
9    time is now 10:20 a.m. My name is Gregg Iseman. I am a
10   legal video specialist with Video Graphics located at
11   1903 30th Street, San Diego, California. The certified
12   Shorthand Reporter is Bonnie Breen of San Diego Court
13   Reporting, San Diego, California.
14        For the video record, would counsel please
15   state their appearances.
16        MR. SMITH: Matthew Smith of Klinedinst P.C. on
17   behalf of Defendant Elizabeth Schulman.
18        MS. LARKINS: Maura Larkins, plaintiff, in pro
19   per.
20        THE VIDEOTAPE TECHNICIAN: Would the reporter
21   please swear the witness.
22        (Deponent sworn.)
23   EXAMINATION BY MR. SMITH:
24   Q.  Could you state your name for the record,
25   please.
```

**Page 74**

```
1    A.  Maura Larkins.
2    Q.  Could you spell that, please.
3    A.  M-a-u-r-a, L-a-r-k-i-n-s.
4    Q.  Ms. Larkins, how many times have you had your
5    deposition taken?
6    A.  Well, I had it taken last on October 25th --
7    that wasn't finished -- by Kelly Angel in the Larkins
8    versus Werlin matter and then this deposition.
9    Q.  Any other depositions you have taken?
10   A.  No.
11   Q.  Have you ever testified in court before?
12   A.  I testified at my administrative hearing.
13   Q.  Other than your testimony at the administrative
14   hearing, have you ever testified in court?
15   A.  No.
16   Q.  Other than this case and the other lawsuit that
17   you are currently prosecuting in pro per against the
18   school district and numerous other individuals, what
19   other lawsuits have you been a party to, either as a
20   plaintiff or a defendant?
21   A.  I -- there was a third case that was related to
22   this current case I filed, I think it was January of
23   2003, yes, against Kathleen Elton, who was the person who
24   initiated the allegations that led to you and I sitting
25   here today.
```

Case 3:07-cv-02202-WQH-WMC    Document 1-4    Filed 11/19/2007    Page 32 of 72
Larkins v. Schulman                                  Deposition of Maura Larkins
GIC 823858                                                    November 2, 2004

Page 75

1    Q. Let me see if I can get a comprehensive list of
2 all your lawsuits. You have currently got a lawsuit
3 against Ms. Schulman, correct?
4    A. Yes.
5    Q. You have currently got a lawsuit against the
6 school district?
7    A. Well, the school district isn't involved. The
8 name on the case is Larkins versus Werlin, Richard
9 Werlin.
10    Q. Is Werlin still a defendant in that case?
11    A. He's not currently a defendant.
12    Q. Who are the defendants in that case right now
13 as it stands?
14    A. Linda Watson, Robin Donlin, Gina Boyd, Tim
15 O'Neal, Chula Vista Educators, and Michael Carlson. I
16 think that is all. I don't think California Teachers
17 Association is in it, but that is the other possibility.
18 They might. I just have to check.
19    Q. Is there any relationship between Chula Vista
20 Educators and California Teachers Association?
21    A. Yes. Chula Vista Educators is a local
22 affiliate of the California Teachers Association.
23    Q. Am I correct in characterizing California
24 Teachers Association as a labor union of some kind?
25    A. Yes.

Page 76

1    Q. Chula Vista Educators is the local affiliate of
2 that union?
3    A. Yes.
4    Q. Now, you also filed a lawsuit that was
5 consolidated into the Werlin case, correct?
6    A. Yes.
7    Q. And who is the lead defendant in that lawsuit?
8    A. I'm going to say California Teachers
9 Association. It was either that or the National
10 Education Association, which is the -- the institution
11 that has a federal charter that is to which CTA is
12 affiliated.
13    Q. And who are the defendants in that lawsuit?
14    A. They were -- you mean the ones that had been
15 dismissed?
16    Q. Let's do it this way: Who are currently the
17 defendants in that lawsuit?
18    A. The ones I already named, since it has been
19 consolidated. That was consolidated into the Werlin
20 matter.
21    Q. When -- before it was consolidated, who were
22 the defendants in that case?
23    A. Beverly Tucker, the head counsel for California
24 Teachers Association; Wayne Johnson, who was the former
25 president of California Teachers Association, but I was

Page 77

1 unable to serve him; Barbara Kerr, the current president
2 of California Teachers Association; and Carolyn Doggett,
3 the Executive Director of California Teachers
4 Association; plus the defendants, the other defendants
5 you have, plus Gina Boyd and Tim O'Neal and CTA.
6    Q. Are you reading off my notes?
7    A. I'm pointing to where it is written.
8    Q. Do me a favor. Don't read my notes, please.
9    A. Okay. I can't really read them. I know that
10 you wrote those things. Thanks.
11    Q. I understand that you are just trying to give a
12 list of people.
13    A. Tell you what, just to make sure, I will put my
14 purse here so I can't see them. You are safe.
15    Q. Okay. If that is what you want to do, that is
16 fine.
17    A. You can read my notes. The camera can probably
18 even read my notes.
19    Q. And then, in addition to that, you had a
20 lawsuit against Kathleen Elton?
21    A. Yes.
22    Q. Were there any other defendants other than
23 Kathleen Elton?
24    A. Just DOES.
25    Q. What is the status of the Elton case?

Page 78

1    A. That was settled and dismissed.
2    Q. What was the settlement?
3    A. I was given $75,000 in return. It was actually
4 settled in my father's probate. Do you want me to
5 explain it to you?
6    Q. Yes.
7    A. Okay. Kathleen Elton and my brother wanted
8 control of my father's apartment after my father died.
9 My brother and I were co-administrators of the estate.
10 And my brother had control over all the money, because he
11 wanted to, and I let him, and I trusted him, that he was
12 taking good care of things. And I let him do work on the
13 apartment building. And I thought that he was informing
14 me correctly of how much he was -- money he was using.
15      And when the estate first opened, it was a
16 very, very small estate. There was $28,000 in cash and
17 an apartment building on Broadway in Golden Hill that at
18 the time was appraised at $143,000.
19      In, I think it was, let's see, May of 2000. My
20 father died in 1998. The probate was opened in 1999.
21 And in May of 2000, I finally got my brother to tell me
22 what the financial status was of the estate.
23      And he told me that he had spent all the cash
24 in the estate, and he had worked off a chunk of the
25 equity that we had in the apartments. And I told him not

3 (Pages 75 to 78)

Page 79

1  to do any more work on the apartments, because if he kept
2  going at this rate, pretty soon, he would own the entire
3  building, and my sister and I would have nothing.
4      Well, he became very angry, and he said the
5  apartments could rot, and he wasn't going to have
6  anything more to do with them. So I took over taking
7  care of the apartments, collecting the rent, paying the
8  bills. In fact, he had quit paying the bills before he
9  told me he was stopping. And, one weekend, I had to run
10 downtown and pay the water bill, because Kathleen Elton
11 herself called me up and told me that the water had been
12 turned off.
13     So, long story short, one day, my
14 ex-sister-in-law, Kathleen Elton, called the police on me
15 and had me arrested for trespassing in my father's
16 apartment. And she told the police that I was mentally
17 ill and that I had a gun. And I was taken to jail.
18     So, as part of the settlement of the estate, my
19 brother decided to give me $75,000 in return for some
20 property in Guatemala and a promise not to name him, not
21 to sue him in my case against Kathleen Elton for making a
22 false police report, because there was the possibility
23 that I would name him because he had -- he had told
24 Kathleen to call the police, and he had coached her on
25 what to say. So on the basis of that settlement in the

Page 80

1  probate, I dismissed the lawsuit against Kathleen Elton.
2      Q. So you sued Kathleen Elton for making a false
3  police report, correct?
4      A. Yes.
5      Q. And you dismissed the lawsuit against Kathleen
6  Elton, correct?
7      A. Yes.
8      Q. And Kathleen Elton never paid you any money for
9  dismissing that?
10     A. No.
11     Q. What is your brother's name?
12     A. Joseph Hogan. I should mention that Kathleen
13 Elton was homeless at the time that I let her stay at my
14 father's apartments. She and my brother were divorced
15 several years ago. But she is the mother of my niece.
16 So when she came to me homeless and unemployed with
17 problems with substance abuse, I took her in.
18     And, of course, the way the story turned out
19 just goes to show that no good deed goes unpunished.
20     MR. SMITH: I'll move to strike that last
21 response.
22 BY MR. SMITH:
23     Q. Are there any other lawsuits that you are
24 currently a party of?
25     A. No.

Page 81

1      Q. Are there any other lawsuits that you have ever
2  been a party to?
3      A. My development, where my house is, sued the
4  developer for putting in a PVC pipe in the plumbing.
5  This was about 15 years ago, 10 years ago. That was the
6  only other lawsuit I was ever involved in.
7      Q. Who were the parties that in lawsuit?
8      A. Well, all the homeowners. And I actually
9  forget the name of the developer.
10     Q. Were the homeowners suing as individuals or as
11 part of a homeowners association?
12     A. There was no homeowners association.
13     Q. So you as an individual person, Maura Larkins,
14 sued the housing developer?
15     A. Well, nobody asked me if I wanted to sue them.
16 I think there was some sort of class action suit or
17 something like that.
18     Q. Do you recall the name of the developer?
19     A. No, I don't. I was actually the second owner
20 of the house; so I never had any direct relationship with
21 the developer before that.
22     Q. Any other lawsuits?
23     A. No.
24     Q. How many depositions have you taken?
25     A. Let's see. Your client, Gina Boyd, and Linda

Page 82

1  Watson. I don't believe I have taken any more than that,
2  yes.
3      Q. Three total, in addition to the two partial
4  days that you spent questioning yourself, here today in
5  this deposition?
6      A. Yes, that's right. I took my own deposition.
7      Q. What -- what books have you read to help inform
8  you about the deposition process?
9      A. Well, I read the Nōlo book and state, state
10 codes and Code of Civil Procedure.
11     Q. You read the California Code of Civil procedure
12 as it relates to taking depositions?
13     A. Part of it, yes.
14     Q. What other steps did you take to inform
15 yourself on the deposition process?
16     A. Actually, I must say that a lot of what I
17 learned I learned from your client, Elizabeth Schulman,
18 in the deposition -- watching her take deposition.
19     Q. So you observed a number of depositions?
20     A. Yes.
21     Q. How many depositions have you observed?
22     A. Five.
23     Q. And those were the five depositions that Betty
24 Schulman took?
25     A. Yes.

4 (Pages 79 to 82)

Page 83

1    Q.  Are you under the influence of any medication
2    or alcohol today that would impair your ability to
3    testify?
4    A.  No.
5    Q.  Is there any reason that you can't give your
6    best testimony here today?
7    A.  No.
8    Q.  When did you first start working with the Chula
9    Vista Elementary School District?
10    A.  In September 1974.
11    Q.  When did you first start at Castle Park
12    Elementary?
13    A.  In August 1997.
14    Q.  Did you work at Castle Park through your
15    termination in 2001?
16    A.  Yes.  Up until I was taken out of my classroom,
17    yes.
18    Q.  You were taken out of are classroom in 2001?
19    A.  Yes.  Although, excuse me, I apologize, the
20    decision to dismiss wasn't made until May 2002.
21    Q.  I will clarify that.  I understand you were
22    taken out of your classroom on multiple occasions, more
23    than one occasion?
24    A.  Twice, yes.
25    Q.  When was the first time you were taken out of

Page 84

1    your classroom?
2    A.  February 12th, 2001.
3    Q.  Who made the decision to take you out of the
4    classroom at that point?
5    A.  Richard Werlin.
6    Q.  How was that decision communicated to you?
7    A.  I was called by my principal, Gretchen
8    Donndelinger, the previous day and told to come to a
9    meeting at the school district office on February 12th.
10    Q.  Where is the school district office?
11    A.  84 East J Street in Chula Vista.
12    Q.  Did you understand what the meeting was going
13    to be about?
14    A.  No, no clue.
15    Q.  Did you attend that meeting?
16    A.  Yes.
17    Q.  Why did you attend that meeting?
18    A.  It never occurred to me not to.
19    Q.  Who attended that meeting besides yourself?
20    A.  Gretchen Donndelinger, the principal; Gina Boyd
21    the president of my local teachers union; Cynthia Miller,
22    an administrator at the district; and Richard Werlin.
23    Q.  How long did that meeting last?
24    A.  I'd say it was close to an hour, I'd say.
25    Q.  And --

Page 85

1    A.  45 minutes at least.
2    Q.  What time did the meeting take place?
3    A.  It was around ten in the morning.
4    Q.  Was it during school hours?
5    A.  Yes.
6    Q.  Was there another teacher covering your
7    classroom?
8    A.  Yes.
9    Q.  Your substitute?
10    A.  Yes.
11    Q.  What was discussed at that meeting?
12    A.  I was told that I was going to be placed on
13    administrative leave -- no -- yes, yes -- for three days,
14    during which time I was supposed to get a letter from my
15    doctor saying that I was fit to teach; and if I didn't
16    get a letter from my doctor saying I was fit to teach
17    within those three days, which I didn't, I was being
18    placed on sick leave.
19    Q.  What was the reason given for placing you on
20    administrative leave?
21    A.  That two teachers had called Rick Werlin at
22    about 8:30 Saturday night, February 10th, and told him
23    that I had acted like I was going to kill them.
24    Q.  Do you know who those two teachers are?
25    A.  I know now.

Page 86

1    Q.  Did they tell you who those two teachers were?
2    A.  No.
3    Q.  Did you ask at that meeting who those two
4    teachers were?
5    A.  Yes, I did.
6    Q.  Did they tell you why they wouldn't tell you?
7    A.  No.
8    Q.  Is it possible they were acting appropriately
9    to protect the identities of people who might be
10    retaliated against if you were in fact somebody who was
11    dangerous?
12    A.  It is obvious that they did not think I was
13    dangerous, because they asked me to come back without any
14    fitness to teach letter and without any investigation.
15    What they were afraid of was that the crime
16    that they had committed would be revealed.  And as a
17    matter of fact, to this day, Linda Watson has never
18    admitted being the second caller that night.
19    MR. SMITH:  Move to strike as nonresponsive.
20    BY MR. SMITH:
21    Q.  Why didn't you get a fitness for duty letter?
22    A.  I discovered -- I went to Kaiser, I believe
23    that -- I think I went -- I went very quickly.  And I
24    discovered what I'm sure the district already knew and
25    that is Kaiser does not do fitness-for-duty evaluations.

5 (Pages 83 to 86)

**Page 87**

1    Q.  Did you check with any other medical care
2 provider to see if you get a fitness-for-duty letter?
3    A.  Not at that time.
4    Q.  Ever?
5    A.  Yes.
6    Q.  Why didn't you at that time?
7    A.  Asking me to get that fitness-for-duty letter
8 was a violation of the education code.  Also, I felt --
9 I -- this allegation against me was triggered by my
10 reporting having been harassed.  I had been harassed for
11 quite a while, and it had become quite severe at this
12 time.  And this was the ultimate harassment, for these
13 two teachers to make up this bizarre story in order to
14 prevent me from reporting their actions against me.
15         I did not want to go back to work until these
16 charges had been retracted.  I thought this needed to be
17 investigated.  If somebody thinks I'm going to kill them,
18 well, if they are lying, that needs to be discussed.  And
19 maybe they are the ones that should be placed on
20 administrative leave.  And if they are not, maybe they
21 need some mental health care; but the charges needed to
22 be investigated.  And, to this day, the district has
23 never investigated them.
24    Q.  You were unwilling to return to work until the
25 charges were investigated?

**Page 88**

1    A.  At that time, I held out hope at that time that
2 the charges would be investigated before I went back to
3 work.  As it turned out, in April, I ended up going back
4 to work without the charges being investigated, because
5 Rick Werlin promised me that no more secret allegations
6 or false allegations would be allowed or anonymous
7 allegations would be allowed against me.
8    Q.  When was the second time you were taken out of
9 your classroom?
10    A.  April 20th, 2001.
11    Q.  I'm sorry.  When did you go back to your
12 classroom after the first time you were taken out?
13    A.  April 16th, 2001.
14    Q.  So you were initially taken out of your
15 classroom February 12th, correct?
16    A.  Uh-huh.
17    Q.  Yes?
18    A.  Yes.
19    Q.  And you remained out of your classroom for
20 approximately two months and came back on April 16th?
21    A.  Yes.
22    Q.  April 16th was the first day back in the
23 classroom?
24    A.  Uh-huh.
25    Q.  Yes?

**Page 89**

1    A.  Yes.
2    Q.  And you were taken out again on April 20th,
3 2001?
4    A.  Yes.
5    Q.  Were you actually removed from the classroom
6 April 20th, 2001, or was that the first day that you were
7 absent from the classroom?  Does that make sense?
8    A.  Yes.  I understand your question.
9    Q.  Let me ask it differently.  You were in the
10 classroom on April 19, 2001, correct?
11    A.  Yes.
12    Q.  Were you in the classroom on April 20th, 2001?
13    A.  Yes.  I worked the entire day.
14    Q.  So April 21 was actually the first day that you
15 missed class?
16    A.  It was a Saturday, but right.
17    Q.  So April 20th was a Friday?
18    A.  Yes.
19    Q.  When were you told that you were being removed
20 from the classroom the second time on April 20th?
21    A.  I was called at my home about five p.m. by Rick
22 Werlin.
23    Q.  What did he say?
24    A.  He said:  You are not to return to your
25 classroom, and you are not to set foot on Chula Vista

**Page 90**

1 property.  And he said:  And I will follow up this
2 directive in writing.
3         Oh, what happened was, I said:  Hold on a
4 second.  I want to go get some paper and a pencil to
5 write down what you say.  He said:  No.  No.  No, that's
6 not necessary.  I'm going to follow up in writing.
7         But, fortunately, I did go, and I wrote down
8 what he said.  It was kind of strange.  When I came
9 back -- I went to get the paper.  And when I came back,
10 the phone was sitting there on the couch.  And out of --
11 out of the handset, I could hear this voice yelling:
12 Maura.  Maura.  He was -- he was really excited that
13 night.  So he never did follow up in writing.
14    Q.  What was the reason Mr. Werlin gave you for
15 asking you not to return to your classroom?
16    A.  I don't believe he gave any reason.
17    Q.  How long was that telephone conversation?
18    A.  Very short, like less than five minutes.  Maybe
19 three minutes.
20    Q.  And he simply said don't return to your
21 classroom; I'm not telling you why?
22    A.  Yes.  And I think he said we'll have a meeting
23 next week.  He didn't say, "I'm not telling you why."  He
24 just didn't tell me why.
25    Q.  Well, I assume you asked him why?

6 (Pages 87 to 90)

Case 3:07-cv-02202-WQH-WMC   Document 1-4   Filed 11/19/2007   Page 36 of 72
Larkins v. Schulman                                        Deposition of Laura Larkins
GIC 823858                                                        November 2, 2004

Page 91

1    A.  You know, we have -- thanks to me going and
2  getting the paper that day, we have a transcript of that
3  conversation.  I -- I'm not sure I did ask him why.
4  Everything was so insane.  I mean, the guy was -- he
5  would -- really, there is an important other part of this
6  story that you --
7    Q.  I --
8    A.  Please let me answer this question.  Please
9  don't interrupt me when I'm answering a question.
10    Q.  You are no longer answering the question.  You
11  are talking about another important part of the story.
12  Wait.  Wait, Ms. Larkins.  I sat here for two days while
13  you asked yourself questions and gave yourself answers.
14  You have given me a limited time period today to ask you
15  questions.  You said you are leaving at one.  You showed
16  up 15 to 20 minutes late today on this limited day that
17  you are going to permit me to ask you questions.
18    I understand that you have a burning need to
19  tell your story, not on my time.  I will ask you
20  questions.  You can give answers.  Please try to
21  refrain -- to restrain yourself to answering my
22  questions.
23    A.  As my own counsel, I would like to say
24  something, not as a witness.
25    You came 25 minutes late to Schulman's

Page 92

1  deposition.  You left and said:  We're finished.  We are
2  not coming back.  You unilaterally ended Schulman's
3  deposition.  You came 15 minutes late yesterday.
4    It is important to me that you understand that
5  I had actually seen Rick Werlin about three hours before
6  this conversation.  I had attempted to talk to Rick
7  Werlin.
8    Now, when you are asking me whether I asked him
9  why I was being taken out on leave, it is important for
10  you to understand that he was hiding in the principal's
11  office at Castle Park Elementary School.  And I was
12  waiting outside the principal's office at Castle Park
13  Elementary School for, oh, let's see, what was it, about
14  40 minutes, when finally the principal told me that she
15  wouldn't speak to me.  And when she opened the door, I
16  could see Rick Werlin was in there trying to hide.
17    What I didn't see, but I found out later, was
18  there were a whole bunch of other teachers hiding,
19  successfully hiding behind the door when Rick Werlin was
20  unsuccessfully trying to hide.
21    So that is very important when you asked me
22  whether or not I asked Rick Werlin why I was being taken
23  out.  Obviously, he did not want to talk to me.  They did
24  not want to discuss anything with me.  They did not want
25  to --

Page 93

1    He had promised me that there would be no
2  anonymous and secret allegations against me.  And,
3  obviously, he was determined that there would be secret
4  and anonymous allegations against me.
5    MR. SMITH:  Move to strike.
6  BY MR. SMITH:
7    Q.  When did you first meet Rick Werlin?
8    A.  He was hired by the district right about the
9  same time I moved to Castle Park Elementary School.  And
10  I remember seeing him, but I never really met him until
11  that day when he took me out of my classroom.
12    Q.  On February 12th, 2001?
13    A.  Yes.
14    Q.  Did you ever have any disciplinary actions
15  taken against you prior to February 12th, 2001?
16    A.  No.
17    Q.  Did you ever have any complaints lodged against
18  you prior to 2001?
19    A.  I believe that teachers had made some anonymous
20  and secret complaints against me, but that has pretty
21  much been kept secret.
22    Q.  What evidence do you have to support that
23  belief?
24    A.  I guess the principal told me so.  Yeah, she
25  told me so.  She said that she encouraged them to come

Page 94

1  and report to her.
2    And, also, it was pretty well known.  I mean,
3  you could ask any teacher there.  There were a certain
4  group of teachers, Robin Donlin, prominent among them,
5  Linda Watson, too, who were constantly going into the
6  principal's office complaining about kids, parents,
7  teachers.  The principal herself, she -- basically, they
8  had her under control.  She was very intimidated by them,
9  did what they wanted.
10    Q.  Are you done?
11    A.  (Witness nods head up and down.)
12    Q.  Prior to the events leading up to you being
13  taken out of your classroom on February 12th, 2001, did
14  you ever have any friction or conflicts with the school
15  district administration?
16    A.  No.
17    Q.  After being taken out of your classroom April
18  20th, 2001, did you ever return to the school?
19    A.  Not to teach.
20    Q.  Sounds like you returned to the school to do
21  things other than teach?
22    A.  Well, I came back to get my stuff.
23    Q.  When did you go back to get your stuff?
24    A.  In the summer, I got some of my stuff, and
25  then, apparently -- but the district wouldn't let me.

7 (Pages 91 to 94)

**Page 95**

1   They banned me from all district property. So I couldn't
2   get my stuff.
3       And, in fact, this ban against me setting foot
4   on any district property was in effect when they asked me
5   to come back to work the following year, which shows how
6   extremely schizophrenic the district's thinking was, that
7   they would be -- they keep taking me out of my classroom,
8   saying that I'm going to kill people, and that I for some
9   reason need to be banned from all district property, and,
10  yet, they keep asking me to come back.
11  Q.  When -- excuse me.
12      When the school district took you out of the
13  classroom, did you understand that they were making a
14  conclusion that you weren't in fact somebody that was
15  dangerous and likely to kill somebody or were they taking
16  precautionary measures to investigate an allegation?
17  A.  Well, they obviously were not taking any
18  precautionary measures to investigate, because they never
19  investigated.
20  Q.  So when they took you out of the classroom,
21  that was because they had concluded that you were
22  dangerous and likely to kill people?
23  A.  I believe that it was a -- it was a political
24  action to prevent me from getting any release from --
25  relief from the harassment I had been receiving.  I

**Page 96**

1   don't -- I don't think they thought I was going to kill
2   anybody.
3   Q.  When did you first decide to hire an attorney
4   in relation to your dispute with the school district?
5   A.  On -- I hired an attorney on May 2nd, 2001.
6   Q.  And who was that attorney?
7   A.  Pamela Havird.
8   Q.  Why did you hire Pam Havird?
9   A.  Because when they took me out the second time
10  and refused to tell me what the allegations were or who
11  had made them, and then when I contacted CTA, I talked to
12  Beverly Tucker, who we mentioned as a defendant.
13  Q.  Somebody that you have sued?
14  A.  Yes.  She -- it was unbelievable.  She was
15  just -- she put up a stone wall.  I called her up.  And I
16  was starting to tell her what had happened.  And she
17  said, Well, you put yourself on sick leave.  And I said,
18  Oh, did you talk to Tim O'Neal?  And she said, No, I'm
19  talking to you.
20      It was obvious she had talked to Tim O'Neal,
21  and she was just lying to me about it.  And she just
22  didn't want to hear anything from me.
23      And that's when I realized that I was not going
24  to get any help from the union; and that's when I
25  realized I needed an attorney.

**Page 97**

1   Q.  Did you have any communications with the school
2   district administration in-between April 20th, 2001 when
3   Rick Werlin called your house and asked you not to return
4   to your classroom and when you hired Pam Havird?
5   A.  Well, I got faxes from them telling me that I
6   should come to a meeting on April 25th.  And, you know,
7   I'm a strong person emotionally.  And I was able to cope
8   very well the first time this happened.  Partly, it was
9   probably because I was just in disbelief.  I just
10  couldn't believe this could be happening.  And I figured
11  pretty soon they are going to realize how insane they are
12  and they are going to fix this.
13      But then when I was taken out the second time,
14  then I realized they were never ever going to hear my
15  side of the story.  They were never going to tell me what
16  the allegations were against me.  I could never -- I
17  realized they were never going to let me go back to my
18  classroom.
19      And, you know, it wasn't really just that, what
20  was happening to me.  It really had a big effect on me,
21  as far as my faith in human beings.  I had spent my
22  professional career with innocent children, who hardly
23  ever lie, and they always try to do the right thing.
24      And I -- I realize now that I had an
25  unrealistic view of the world.  I thought that 90 percent

**Page 98**

1   of people were honest and maybe about 10 percent were
2   dishonest.
3       And it was such a shock to me to realize that
4   this school district, people in a public entity in these
5   positions of power, had absolutely no respect for right
6   or wrong or violating the contract or violating the law.
7   They didn't care what was true.  They didn't care what
8   they did to those children in my classroom, who were
9   really traumatized.
10      I -- it really -- it really was devastating to
11  me emotionally; and I became -- I became really
12  depressed.  I was in bed for 10 days.  And during that 10
13  days, the district demands that I come to this meeting.
14  And Gina Boyd demanded that I go to that meeting.  And I
15  said:  Wait a minute.  You are representing Linda Watson.
16  By this time, Gina Boyd had made it clear that she was
17  representing Linda Watson, not me; and, yet, she was
18  going to be there as my representative.  Well, obviously,
19  she was not on my side.
20      There was no one there that would be on my
21  side.  There would be Rick Werlin, Gina Boyd.  There was
22  Maria Beers, who was in the middle.  Gina -- did I say
23  Maria Beers?  Maria Beers was a teacher representative,
24  who was honest and fair, but she was in the middle.  She
25  had to represent Linda Watson.  And Robin Donlin wasn't

8 (Pages 95 to 98)

1  mentioned at that time. And she had to represent me.
2  But there was really no one on my side.
3      And I didn't feel it would be safe for me to go
4  to such a meeting without a lawyer. And, anyway, I
5  really was sick in bed. And Gina just demanded that I go
6  to that meeting. And I said: But just last week, you
7  had said that Linda Watson should go home in the middle
8  of the day because she was emotionally upset, and I'm
9  really emotionally upset; but no one wanted to believe
10  that.
11      And, in fact, it seems that the judge that
12  wrote the decision in my administrative hearing didn't
13  want to believe it either. He didn't believe that I was
14  depressed, so depressed that I was in bed for 10 days.
15      I think there was a process of dehumanizing me
16  that these people went through; that the judge went
17  through in the administrative hearing; that Elizabeth
18  Schulman went through; that these teachers went through.
19  I think I just wasn't -- to them, I wasn't a human being
20  with feelings.
21      In fact, it is interesting, because Gretchen
22  Donndelinger, the principal, took notes at that meeting;
23  I think it was that very meeting on April 25th. And Gina
24  Boyd herself said: We haven't taken Maura's feelings
25  into account. And it is true. They didn't.

1      MR. SMITH: Move to strike as nonresponsive.
2  BY MR. SMITH:
3      Q.  In-between being asked to remove --
4          In-between the date you were asked not to
5  return to the classroom on April 20th, 2001, and when you
6  hired an attorney, Pam Havird, did you have any
7  communications with the school district administration?
8      A.  I sent a fax back in return to the fax I just
9  told you about in my answer to this same question the
10  first time you asked it telling them that I was ill and
11  couldn't come to the meeting.
12      Q.  Any other communications you had with the
13  school district administration during that time period
14  other than their letter asking to you attend the April 25
15  meeting and your fax saying you were ill and could not
16  attend?
17      A.  Yes. Yes, I called. I called Rick Werlin on
18  April 20th, and he didn't pick up, but I left a message.
19  I was really concerned, because I didn't realize that --
20  I mean, I didn't think that he realized what a serious
21  step he was taking by removing me from Castle Park; that
22  by making it clear that he had no intention of obeying
23  the law, no intention of showing any concern at all for
24  the kids in my classroom, who had a series of substitutes
25  and had a very bad rest of the year, he was just making

1  an enormous, enormous step.
2      Before that phone call, I didn't have any
3  damages. I wasn't really damaged before that
4  emotionally. I wasn't emotionally damaged before that.
5      This was when -- April 20th was the district's
6  really big mistake. I called him, and I said that I had
7  students that were coming the next day, Saturday, that --
8  to my classroom, and I had planned to tutor them to help
9  them catch up from all the substitutes they had had up to
10  that point. They had had three different substitutes in
11  that short period of time when I had been out.
12      And I said -- actually, I had told him about
13  the kids coming when he first called, when he told me not
14  to come, not to set foot on the property. And I remember
15  he was mad, and he said: Did you have permission to
16  tutor those kids?
17      And I said, Well, no. I thought it was a good
18  thing. And he goes: Well, you should have the parents'
19  permission. And I said: Well, I did have the parents'
20  permission.
21      And so, anyway, when I called him back -- oh,
22  and I said: Will you inform them, call up the parents
23  tonight and inform them that there won't be any tutoring
24  tomorrow? He said: Well, I don't know. We'll see what
25  we can do.

1      And so I called him back, and I said: Maybe we
2  could have a reporter there to tell the kids not to come.
3  I was trying to help him think of the future; that if
4  this, what he had been doing, became public knowledge,
5  were exposed in the media, that it wouldn't look good. I
6  was trying to help him before Monday, before his -- what
7  he had just said to me became irreversible, to think
8  about what he was doing.
9      But his response to my --
10      Q.  Threat?
11      A.  -- threat to involve the media was to call the
12  police.
13      Yes, Rick Werlin by then had committed a couple
14  of misdemeanors; and it really wouldn't be a good thing
15  for his actions to be exposed in the media. He had also
16  violated the education code and the contract. And it
17  really, really wasn't in his interest for this to be
18  exposed in the media.
19      It was in his interest not to damage me and to
20  make things right, because then he could have gotten away
21  with his crimes. As it is, his career seems to have
22  pretty much taken a downturn.
23      It could be -- my call could be characterized
24  as a threat. But I don't know if you understand that
25  some people really do try to help things be better

Page 103

1  instead of worse, and I'm one of those people. And I
2  really hoped that he would see that it was not in his
3  best interest to remove me from my classroom the way he
4  was doing without -- while refusing earlier in the day to
5  even talk to me.
6      Q.  How did you find Pamela Havird?
7      A.  I believe I called up the San Diego Bar
8  Association, and they referred me to her. And she's a
9  wonderful lawyer. She's the most honest lawyer I have
10  met in the last three and a half years. She's very
11  smart, too.
12      Q.  How much did you pay Ms. Havird in total?
13      A.  She -- I paid her 2500 for the -- and we signed
14  an agreement, that she would help me through the
15  grievance process with my school district, and that she
16  would write a demand for me, and that that was it. She
17  didn't want to go to court.
18      Later on, I sent her -- without her asking me,
19  I sent her another 2500, because I thought she earned it
20  because she really was doing good work.
21      Q.  And she was just to represent you or to assist
22  you in the grievance process?
23      A.  Yes.
24      Q.  Could you explain to me what the grievance
25  process with the school district was at the time?

Page 104

1      A.  Yes. The first grievance was filed by -- the
2  first alleged grievance was allegedly filed by the union;
3  although, during -- in the Werlin case, I have asked them
4  to produce that grievance, and they say they don't have
5  it. So I think maybe it was a hoax. Anyway, they told
6  me they were filing a grievance.
7      According to the contract, a teacher or the
8  union can file a grievance and within 35 days of an
9  incident. And within a certain number of days, the
10  district has to meet with the grievant. And,
11  interestingly enough, in that case, I said: Can I be
12  there at the meeting regarding this grievance you are
13  filing on my behalf? And they said: No, you can't be
14  there. So I don't think there even was one. But then
15  they claimed that there was a meeting.
16      And then there is a certain number of days when
17  the district has to respond. And, sure enough, Rick
18  Werlin responded. He was put in charge of the grievance
19  against himself.
20      Q.  Let me interrupt you. I'm going to ask you
21  about your grievances. You will get an opportunity to
22  talk about all your grievances. I'm just asking if you
23  could describe in an abstract, general manner what the
24  grievance process is; and then I'm going to ask you about
25  all your individual grievances. Okay?

Page 105

1      A.  Okay. But, right now, you understand that
2  there is a certain number of days to file, certain number
3  of days to meet, then a certain number of days for the
4  district to respond.
5      Q.  So those three steps are the grievance process;
6  that it is a teacher or union files a complaint within 35
7  days of an incident; the teacher or union meets with the
8  administration to discuss the incident?
9      A.  Uh-huh.
10      Q.  And then the -- within a certain number of
11  days, the administration writes -- prepares a written
12  response to the grievance?
13      A.  Yes.
14      Q.  That written response, is that -- well, never
15  mind.
16      What if the grievance is not resolved by that
17  third step when the district provides a written response?
18      A.  The grievant has an opportunity to go up a
19  level to a level two grievance.
20      Q.  So what we just described, that three-step
21  process, is a level one grievance?
22      A.  Yes.
23      Q.  What is a level two grievance?
24      A.  You have a certain number of days to file sort
25  of an appeal.

Page 106

1      Q.  How many days?
2      A.  I have no idea.
3      Q.  If you wanted to find out, where would you
4  look?
5      A.  In the contract.
6      Q.  Does it say it in the contract?
7      A.  Yes. It is all explained in the contract.
8      Q.  Have you investigated that in the past?
9      A.  Yeah. If you had asked me these questions
10  three years ago, I could probably could have quoted you
11  the passages in the contract, but it has been a while.
12      Q.  Is there anything beyond a level two grievance?
13      A.  That would be arbitration.
14      Q.  What is the process for a level two grievance?
15      A.  Oh, you file a similar paper to the level one
16  grievance, only it just says level two at the top, and it
17  is a similar process.
18      Q.  Is there another meeting?
19      A.  I'm 99 percent sure, yeah. Yeah.
20      Q.  Does the district prepare a response?
21      A.  You know, what often happens, the level one
22  grievance is often submitted to a lower-level
23  administrator. And, often, the level two grievance would
24  go up to a higher administrator.
25      Q.  What level of administration would a level one

10 (Pages 103 to 106)

Page 107

1  grievance go to?
2      A.  It could go to just about any administrator in
3  the district. I think even a principal could conceivably
4  be given a grievance. In not exactly sure, but I know
5  there is more than one person that can handle the level
6  one.
7      Q.  Who can handle a level two grievance?
8      A.  I think Rick Werlin might be or the
9  superintendent handles that. You know what? I think it
10 is superintendent's designee handles level two.
11     Q.  What is the -- what is the point of the
12 grievance process?
13     A.  Good question. The point of the grievance
14 process is: If someone has union support, they can
15 actually cause the district to follow the contract.
16     Q.  And if the district still doesn't follow the
17 contract after a level two grievance, the matter can be
18 taken to arbitration; is that correct?
19     A.  Yeah. Uh-huh.
20     Q.  Where somebody makes a decision whether the
21 district is violating the contract?
22     A.  Yes.
23     Q.  Have you ever filed any level one grievances?
24     A.  Yes.
25     Q.  On how many different occasions have you filed

Page 108

1  level one grievances?
2      A.  I believe I filed seven.
3      Q.  When was the first level one grievance?
4      A.  You know, this would be a lot easier if I had
5  my papers with me, but I will do my best. Okay. When
6  did I file the first one? Actually, it was Pamela
7  Havird, I believe, that filed the first one.
8      Q.  So all of your grievances were filed after you
9  hired Pamela Havird?
10     A.  Yes, except for -- well, I guess even the union
11 one was filed after. If it was filed, it was filed after
12 I hired Pamela Havird.
13     Q.  Have you ever filed any level two grievances?
14     A.  Pamela Havird filed a level two grievance. But
15 I believe all the ones I filed, there were six others,
16 were, I believe -- I believe I only did level one.
17         You know, this might be good for me to do this
18 on a day when I could have all my papers, and I could
19 give you -- if you really want the exact answers.
20     Q.  We'll go over all that. I'm just trying to get
21 your recollection as you sit here today. As you sit here
22 today, it is your recollection that you have never filed
23 a level two grievance?
24     A.  Besides the one Pamela Havird filed, I don't
25 recall that. I think I just let it go with the level

Page 109

1  one.
2      Q.  You filed seven level one grievances, and you
3  believe Pamela Havird one level two grievance?
4      A.  I alone filed six, and Pam -- level one
5  grievances. Pamela Havird I believe filed a level one
6  and a level two. And the union allegedly filed a level
7  two. They started at level two. The union can start at
8  level two.
9      Q.  The union filed a level two grievance on your
10 behalf?
11     A.  That's what they say.
12     Q.  Was the union's level two grievance related to
13 one of the grievances that you or Pamela Havird already
14 filed or was it independent?
15     A.  Well, they were the first to file a grievance,
16 but their alleged grievance was very similar to the one
17 Pamela Havird filed.
18     Q.  Is it your understanding that the first
19 grievance that was filed by or on your behalf was the one
20 filed by the union or allegedly filed by the union?
21     A.  Yes.
22     Q.  And then Pamela Havird came in and filed a
23 level one grievance, as well?
24     A.  Do you know what? I'm thinking that the
25 grievance Pamela Havird filed, I think maybe she filed

Page 110

1  the level two of the -- you know, I'm thinking maybe she
2  worked off of that date. I bet you. I think that is
3  what happened.
4      Q.  I will tell you what, we'll look at the
5  documents later and discuss it.
6          Have you ever pursued arbitration through the
7  contract?
8      A.  I sure tried. I sure tried to get the union to
9  do that. I cannot myself do it. Only the union can do
10 it.
11     Q.  You have the right to file a level one
12 grievance, correct?
13     A.  Yes.
14     Q.  Do you have the right to file a level two
15 grievance if your level one grievance is not resolved
16 satisfactorily?
17     A.  I believe I do.
18     Q.  And if your level two grievance isn't resolved
19 satisfactorily, do you have the right to pursue
20 arbitration or only the union can do that?
21     A.  Only the union.
22     Q.  If you aren't satisfied with the resolution of
23 the level two grievance, you are just stuck with what
24 happened?
25     A.  Yes. At that point, what I did was I filed a

11 (Pages 107 to 110)

**Page 111**

1  complaint with PERB, Public Employment Relations Board.
2  Q. What was the subject of that complaint?
3  A. That the union had behaved -- hadn't
4  represented me equally with other Teachers.
5  Q. Did you only file one complaint with PERB?
6  A. No. I filed -- at the beginning, I filed one
7  against the union and one against the employer. And then
8  I filed, I believe, three others against the union.
9  Q. When was your first PERB complaint?
10  A. It was around February, the beginning of
11  February 2002.
12  Q. When was your last PERB complaint?
13  A. I think it was the very end, November or
14  December of 2003.
15  Q. Have all those been resolved?
16  A. Yes.
17  Q. How have they been resolved?
18  A. Every single one of them dismissed for -- just
19  by the board agent. And then the -- I appealed a couple
20  of them, and the board just upheld the dismissal.
21  Q. What was the reason given for the dismissal?
22  A. They could not find any -- any inequality in
23  how I was treated. They could not find anything wrong
24  with how I was treated; the board agent couldn't.
25  And I asked to have a different board agent

**Page 112**

1  appointed, and they refused. And their board agents are
2  chosen randomly, and they just defy the laws of
3  probability up there. I just kept getting the same board
4  agent.
5  Q. How many board agents are there?
6  A. Oh, maybe about 10 or something. In fact, it
7  was -- the first board agent that it was randomly
8  assigned to, Christine Rossi, it was mysteriously taken
9  away from her and given to my own personal board agent,
10  Robin Wesley. Sometimes, strangely enough, the head
11  counsel would get them, too. So it was either Robin
12  Wesley or the head counsel, Robert Thompson.
13  Q. And the decision of the board agent that there
14  was no unequal treatment was upheld whenever you
15  appealed --
16  A. Yes.
17  Q. -- that decision?
18  A. Yes.
19  Q. And was there any rationale given for the
20  decision on appeal?
21  A. They just -- they couldn't see it. They
22  couldn't see anything the board agent didn't see. They
23  just figured, they just couldn't see anything there.
24  Q. Did -- do you believe that the Public Employees
25  Relations Board is somehow conspiring to deny your

**Page 113**

1  complaints?
2  A. The Public Employees Relation Board works very
3  closely with CTA. In fact, you will find Beverly Tucker,
4  the head counsel for CTA, and Robert Thompson, the head
5  counsel for PERB, together on a whole lot of appeals
6  court cases, working together. They have a very close
7  relationship.
8  In fact, and you won't believe this, this past
9  year when California was having such a huge budget
10  crisis, CTA wanted to have its members be allowed to wear
11  buttons in the classroom advertising CTA. And there was
12  already a case right here in San Diego that said no,
13  teachers can't wear buttons in the classroom.
14  Are you okay?
15  Q. Go ahead.
16  A. We can quit if you want.
17  Q. Did I ask to quit?
18  A. It was just that huge yawn. That was really
19  big.
20  Q. I may be yawning. It doesn't mean I want to
21  quit.
22  A. Okay.
23  Here in San Diego, there was an appeals case
24  that said teachers cannot politic in the classroom. They
25  can't wear their buttons in class. But CTA didn't like

**Page 114**

1  this appeals court decision; so it goes up to a different
2  appeals court district and files with PERB and says we
3  should be allowed to wear buttons.
4  The PERB administrative law judge said no,
5  there is already a case; you can't wear buttons in the
6  classroom. The PERB board overturned the decision of its
7  own judge and said: Well, if CTA wants to wear buttons
8  in the classroom, they darned well should be allowed to
9  wear buttons in the classroom, even if the San Diego
10  appeals court says they shouldn't.
11  So PERB used the State of California's money,
12  at a time when there is problems in classrooms, problems
13  in fire stations, to appeal the decision that the PERB
14  board overturned of its own judge to wear buttons.
15  Yes, I do believe that the PERB board and the
16  PERB head counsel and Robin Wesley are snug in the pocket
17  of CTA.
18  MR. SMITH: Move to strike everything before
19  "yes."
20  BY MR. SMITH:
21  Q. When did Pamela Havird's representation of you
22  end?
23  A. January of 2002.
24  Q. What was the reason that it ended?
25  A. She had, excuse me, written a demand, as we had

12 (Pages 111 to 114)

**Page 115**

1  agreed. The district -- this is great. She had offered
2  to settle for one year's salary in December of 2002. The
3  district has spent that amount over and over and over
4  again on lawyers in this case since then. The district
5  did not even respond.
6      And she called them up, and she said: Well,
7  you know, what did you think of my demand? And the
8  district said: Well, we'll give her three months' pay.
9      So I told Pamela that I would not accept that.
10  And the only thing left was to go to court. And so she
11  didn't want to go to court. She didn't want to do that
12  part. So that's why she quit working on the case.
13      Q.  Did you authorize her to write a demand for one
14  year's salary?
15      A.  Yes.
16      Q.  Would that have been a satisfactory resolution
17  of the case for you at that point?
18      A.  I believe there was something -- there might
19  have been something else in there about some sort of
20  retraction or an investigation, too.
21      Q.  You still wanted an investigation or a
22  retraction?
23      A.  Wouldn't you if I said that you were going to
24  kill someone and your career was destroyed and you
25  couldn't be a lawyer anymore?

**Page 116**

1      Q.  You can't answer a question with a question.
2      A.  I thought that's what lawyers always did.
3      Q.  You are not a lawyer.
4      A.  I can pretend, can't I?
5      Q.  You wanted a retraction or an investigation
6  proving that you did not threaten anyone?
7      A.  Well, I sure did want that. You know, and
8  right as I sit here now, I'm trying to remember what that
9  demand stated. It might not have stated that.
10      I think she was trying to open up discussions.
11  And I believe that the exact words were: I am
12  recommending that my client accept one year's salary. I
13  think it was -- it was about two pages setting out what
14  she thought the situation was.
15      It wasn't an exact demand. It wasn't saying,
16  you know, you give one year's salary. We will hide your
17  crimes. You will never hear from us again.
18      It was an attempt to begin negotiations. And
19  when they didn't even respond, it was clear that there
20  weren't going to be any useful negotiations.
21      Q.  I thought you said that they responded with an
22  offer of three months salary?
23      A.  I told you that they did not respond but that
24  Pamela Havird called them up, and then they said they
25  would give three months.

**Page 117**

1      Q.  And three months salary was not an acceptable
2  resolution four?
3      A.  Let me see. Destroy my reputation; have
4  children, who loved me, cringe from me as I walked down
5  the street; commit misdemeanors; violate the contract.
6  Three months salary? No. Motion to strike everything
7  after --
8      That was a "no."
9      Q.  Oh, I got the "no."
10      A.  Good. I hope you got the rest, too.
11      Q.  If the school district had asked you to come
12  back to work at any point after April 20th, 2001, would
13  you have done so?
14      A.  They did ask me to come back to work, and I did
15  not.
16      Q.  And why did you not come back to work when they
17  asked you?
18      A.  Because I was still banned from setting foot on
19  all district property.
20      Q.  You didn't think when they asked you to come
21  back to work that that was at least implicitly revoking
22  the ban that you come back on school district property?
23      A.  As a matter of fact, I specifically and in
24  writing asked that question.
25      Q.  So your understanding was they wanted you to

**Page 118**

1  come back to work for the school district but to do so
2  without setting foot on any school district property. Is
3  that what you understood they were asking?
4      A.  I asked them that question in writing. So it
5  isn't just something I assumed.
6      Q.  What was their response?
7      A.  I said: This is to confirm; I'm writing to
8  confirm that I am still banned from all district
9  property. And there was no response.
10      Q.  So your understanding is when they said we
11  would like you to come back to work, you understood that,
12  you took that to mean work from some place other than the
13  school district property?
14      A.  Well, actually, I asked them. That was in
15  September that I sent that letter that I just described
16  to you. Then when they started talking about asking me
17  to come back to work, I wanted it -- I really wanted that
18  ban lifted.
19      Q.  As a matter of principle?
20      A.  As a matter of my own safety. When there is a
21  ban against you on all district property, there is an
22  understanding that the district considers you dangerous.
23  It is -- you are definitely -- I mean, that's a big
24  shadow, to be banned from setting foot on all district
25  property. That is identifying you as a person that there

13 (Pages 115 to 118)

## Page 119

1  is something really wrong with.
2      Q.  And you didn't understand that the ban was
3  being lifted by them asking you to come back to work?
4      A.  It wasn't.  They made it clear.  I asked them
5  specifically.  I said: Obvious --
6      Q.  What --
7      A.  Please let me finish.  Please.  Okay.  I will
8  say this as counsel.  Please let my client finish.
9  Please.  Please let me finish.
10      I specifically asked them.  I said: I
11  assume -- and I put this in writing.  I assume that if
12  you want me to come to this specific school that the ban
13  is lifted at that school.  I said: Please confirm.
14  Please write to me and tell me if the ban is lifted on
15  other district property.  And they -- they did not.  They
16  refused to put in writing that they were lifting the ban
17  on other district property.
18      Q.  Did they communicate with you in any way with
19  respect to whether the ban was going to be lifted or not?
20      A.  No.
21      Q.  And you took them ignoring your request to mean
22  that you were still banned?
23      A.  I found that to be true.  I had specific
24  experience that summer of 2001 regarding the ban.  I
25  needed to go to my classroom to get my possessions.  And

## Page 120

1  I called the union.  I said: You know, I'm banned.  How
2  do I get my possessions?  And they said: Was the ban
3  ever placed in writing?  And I said: No.
4      And Tim O'Neal told me: Well, then, I figure
5  anything that is not in writing doesn't exist.  So I took
6  him at his word.
7      I made the mistake you are making now to assume
8  that this ban was something sort of reasonable.  I made
9  the mistake you are making of assumming that they were
10  being rational about this ban.  And I went to my
11  classroom, and I got some of my stuff.
12      And then Rick Werlin got really angry.  And he
13  said one of his guys that was there saw me there and that
14  I knew I wasn't supposed to be there.
15      And one thing I found is that they don't like
16  to put anything in writing.  The amount of writing by the
17  district in this case is, I think, troublesome.  And I
18  think it should be known by the public that they didn't
19  put anything in writing on February 12th when they took
20  me out.  They didn't put anything in writing on April 4th
21  when they asked me to come back.  Instead, the very day
22  that they asked me to come back, they put in writing that
23  I was banned from setting foot on all property.
24      And then they didn't put anything in writing
25  when they took me out on April 20th.  They didn't put

## Page 121

1  anything in writing on August 13th when they told me that
2  I was not going to be allowed to come back in the fall,
3  even if I had a fitness-for-duty letter.
4      They have a really, I think, dishonest and
5  dangerous habit of not making any paper trail and then
6  saying whatever they want.  If they want to say there was
7  a ban in effect, that's what they'll say.  If they want
8  there not to have been a ban in effect, they'll say that.
9      This very same question was addressed in the
10  administrative hearing and in Rick Werlin's deposition.
11  And he could come up with nothing other than mealymouthed
12  statements, about like, Well, we didn't want there to be
13  a ban so much.  We didn't really intend there so much to
14  be a ban at that time.
15      It became clear to me when I went there
16  thinking that there was no ban that it was very dangerous
17  for me to set foot on Chula Vista school property without
18  express written permission.
19      MR. SMITH:  Move to strike as nonresponsive.
20  Could you read the last question back.
21      (Question read page 50, line 21 through 22.)
22      THE WITNESS:  Answer: Yes.
23  BY MR. SMITH:
24      Q.  When was the formal decision made to terminate
25  your employment with the school district?

## Page 122

1      A.  May 7th, 2002.
2      Q.  Who in the district made the decision to
3  terminate your employment?
4      A.  The school board.
5      Q.  What justification did the school board give
6  for terminating your employment?
7      A.  Rick Werlin's complaint saying that I was
8  insubordinate.
9      Q.  Is that the only justification that he gave?
10      A.  Yes.
11      Q.  In what way did Rick Werlin say you were
12  insubordinate?
13      A.  Because, poor Rick Werlin, he really made a
14  mess that September 2001.  He demanded that I come and
15  meet with him.  And I said -- and I told the
16  superintendent: I am not meeting alone with Rick Werlin.
17  This is the man that made up this bizarre story about me
18  running back and forth, jerking the entire time.  And I
19  have tried that.  You can't do it.  You can't.  You just
20  can't do it.  And he said that I was yelling and
21  screaming.
22      This is when he took me to a place where there
23  were no witnesses.  He took me.  He beckoned me to come
24  out of the office, outside of the school when there was
25  no recess.  No one was outside.  I was not going to meet

Page 123

1  alone with him. And I was insubordinate for not meeting
2  alone with him.
3      Q.  Were you ever asked to meet with anyone other
4  than Rick Werlin to discuss your potential reassignment
5  with the school district?
6      A.  Not until my pay had been stopped. And, at
7  that time, when my pay was stopped, it was because I was
8  on -- I had been suspended, and then I was suspended
9  without pay. I was entitled to a full evidentiary
10 hearing. And then I demanded a full evidentiary hearing.
11 According to the contract, I was entitled to that,
12 because I was suspended without pay.
13     Q.  Did you ever -- were you ever asked to meet
14 with -- were you ever asked to attend a meeting that was
15 going to be attended by someone other than Rick Werlin
16 after April 20th, 2001?
17     A.  Yes.
18     Q.  On how many occasions?
19     A.  Not many. We did attend one. I remember,
20 September 27th, there was supposed to be a meeting. And
21 I asked the superintendent to attend, and she refused or
22 she said she wasn't available. So I didn't attend that
23 one. But then I did attend a meeting at the beginning of
24 October with the superintendent and Rick Werlin.
25     Q.  Do you believe that the school board's

Page 124

1  justification for terminating your employment was a
2  pretext?
3      A.  Yes. I had informed the school board long
4  before that that Rick Werlin had violated the law, that
5  he was -- he had committed a crime. The school board
6  knew that they should have investigated him. And,
7  instead, they just accepted a complaint, and it was
8  written only by him. They knew there was -- I believe
9  that the school board knew everything. They knew about
10 the crimes.
11     Q.  And they were firing you to cover up the
12 crimes?
13     A.  Yes.
14     Q.  Do you believe that you were insubordinate?
15     A.  No.
16     Q.  Do you think any reasonable person could look
17 at the facts and conclude that you were insubordinate?
18     A.  No.
19     Q.  Is it your understanding that the Commission on
20 Professional Competence concluded that you were
21 insubordinate?
22     A.  Yes.
23     Q.  Do you believe that there was some conspiracy
24 between the Commission on Professional Competence and the
25 school district that caused them to reach the conclusion

Page 125

1  that you were insubordinate?
2      A.  No. I think that -- no, I don't think there
3  was any discussion between them.
4          I have to get this filed by noon; so I have to
5  leave. I told you yesterday that I would be leaving at
6  1:00 today. But, this, I need to leave earlier. And
7  since I know you are not going to agree to reschedule
8  this at some reasonable time, I'm just going to leave,
9  and you can make your statement then after I leave. So I
10 am going off the record now.
11     Q.  So you are leaving right now?
12         (Ms. Larkins is no longer present.)
13         MR. SMITH: It's quarter to 12:00. Ms. Larkins
14 has just walked out after her speech there announcing the
15 fact she agreed to be deposed up until 1:00 today. I
16 guess we'll end it here and address it with the court.
17         THE VIDEOTAPE TECHNICIAN: This concludes
18 today's deposition. We are going off the record at 11:46
19 a.m.
20         (The deposition was adjourned at 11:46 a.m.)
21
22
23
24
25

Page 126

1          I, the undersigned, say that I have read the
2  foregoing deposition and hereby declare under penalty of
3  perjury the foregoing is true and correct.
4          Executed this _____ day of _____, 2004,
5  at _____, _____.
6  (City)        (State)
7
8          _____
9              DECLARANT
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA  92101
619-232-1164
FAX 619-232-2616

Larkins v. Schulman
GIC 823858

Deposition of Maura Larkins
November 2, 2004

Page 127

```
 1    STATE OF CALIFORNIA        )
                                 ) ss
 2    COUNTY OF SAN DIEGO        )
 3
 4         I, Bonnie Breen, CSR No. 5582, a Certified Shorthand
 5    Reporter in and for the County of San Diego, State of
 6    California, do hereby certify:
 7         That prior to being examined, the witness named in
 8    the forgoing deposition was by me duly sworn to testify
 9    to the truth, the whole truth, and nothing but the truth.
10         That said deposition was taken before me at the time
11    and place set forth and was taken down by me in shorthand
12    and thereafter reduced to computerized transcription
13    under my direction and supervision; and I hereby certify
14    the foregoing deposition is a full, true and correct
15    transcript of my shorthand notes so taken.
16         I further certify that I am neither counsel for nor
17    related to any party to said action nor in anywise
18    interested in the outcome thereof.
19         IN WITNESS WHEREOF, I have hereunto subscribed my
20    name this _____ day of _____, 2004 at San Diego,
21    California.
22
23    _____

      Bonnie G. Breen
24
25
```

16 (Page 127)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101

619-232-1164
FAX 619-232-2616

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

MAURA LARKINS,                          *
                                        *
                                        *
            Plaintiff,           *
                                  *
                                        *
       vs.                        *      Case No. GIC 781970
                                        *
RICHARD T. WERLIN, etc.,         *
et al.,                           *
                                        *
            Defendants.           *
                                        *

VIDEOTAPED DEPOSITION OF LINDA WATSON

Taken at San Diego, California

April 30, 2004

VOLUME I

(Pages 1 through 161, inclusive)

COMPLIMENTARY

Claudia A. Witt, CSR
Certificate No. 10797

Page 2

1        I-N-D-E-X
2   VIDEOTAPED DEPOSITION OF LINDA WATSON        PAGE
      April 30, 2004
3
          Examination by Ms. Larkins        5
4
          Examination by Ms. Angell        150
5
6   EXHIBITS:                    PAGE
7     1  Deposition preamble, two pages        5
8     2  Condensed transcript of the deposition    8
         of Ms. Watson dated 9-11-02 before the
9        Governing Board of the Chula Vista
         Elementary School District, 21 pages
10
      3  Summary Evaluation Report concerning    107
11       Ms. Larkins dated 4-28-00, three pages
12    4  Condensed transcript of the deposition  53
         of Virginia Boyd dated 3-22-04, 17 pages
13
14    6  Handwritten note by Ms. Hamilton dated  53
         2-6, one page
15    9  Handwritten notes, four pages        33
16   10-A  Pages 51 to 54 from a condensed reporter's  54
           transcript dated 1-6-03, one page
17
     10-B  Pages 79 to 82 from a condensed reporter's  54
18         transcript dated 1-6-03, one page
19    14  Typewritten document entitled "Maura   140
          Documentation," one page
20
     20  Handwritten notes, two pages        88
21
     22  Pages 59 to 62 from a condensed reporter's 136
22       transcript dated 1-6-03, one page
23   23  Typewritten notes, one page        144
24   24  Handwritten notes, two pages        103
25

Page 3

1        VIDEOTAPED DEPOSITION OF LINDA M. WATSON
2                    VOLUME I
3        Pursuant to Notice to Take Deposition, and on the 30th
4    day of April, 2004, commencing at the hour of 10:11 o'clock
5    a.m. at 319 Elm Street, Suite 100, in the City and County of
6    San Diego, State of California, before me, Claudia A. Witt,
7    Certified Shorthand Reporter in and for the State of
8    California, personally appeared:
9            LINDA M. WATSON,
10   Defendant herein, who, called as a witness by the Plaintiff,
11   being by me first duly sworn, was thereupon examined as a
12   witness in said cause.
13
             APPEARANCES
14
     For the Plaintiff:    MAURA LARKINS
15                1935 Autocross Court
                  El Cajon, California 92019
16                (In Propria Persona)
17   For Robin Donlan    STUTZ, ARTIANO, SHINOFF & HOLTZ
     and Linda Watson:    By:  KELLY R. ANGELL, ESQ.
18                401 West A Street, 15th Floor
                  San Diego, California 92101
19                (619) 232-3122
20   For Chula Vista    CALIFORNIA TEACHERS ASSOCIATION
     Educators, California    By:  MICHAEL D. HERSH, ESQ.
21   Teachers Association,    11745 East Telegraph Road
     Virginia Boyd and    Post Office Box City 2153
22   Timothy O'Neil:    Santa Fe Springs, California 90670
                  (Appeared telephonically)
23
24
25   Also present:    Christopher Jordan, Videographer

Page 4

1        THE VIDEOGRAPHER:  This is the videotaped
2    deposition of Linda Mae Watson being taken on behalf of
3    plaintiff in the matter of Maura Larkins versus Richard T.
4    Werlin, et al., San Diego Superior Court Case No. GIC781970.
5    This deposition is being held in the offices of San Diego
6    Court Reporting, located at 319 Elm Street, Suite 100, in
7    San Diego, California.  Today's date is April 30th, 2004.
8    The time now is 10:11 a.m.  My name is Christopher Jordan
9    with the firm Videographics, 1901 30th Street in San Diego,
10   California.  I am the legal video specialist.  The certified
11   shorthand reporter is Claudia Witt in association with
12   San Diego Court Reporters.
13       For the video record would all counsel please
14   state their appearances.
15       MS. LARKINS:  My name is Maura Larkins, plaintiff
16   in pro per.
17       MS. ANGELL:  Kelly Angell for Ms. Watson.
18       THE VIDEOGRAPHER:  Mr. Hersh, if you could state
19   your appearance, please.
20       MR. HERSH:  Okay.  Sure.  Michael D. Hersh from
21   the California Teachers Association here on behalf of
22   Virginia Boyd, Tim O'Neil, the Chula Vista Educators, and the
23   California Teachers Association.
24       THE VIDEOGRAPHER:  Thank you, Counsel.  The
25   witness may now be sworn.

Page 5

1        (The witness was sworn in at this point by the
2    court reporter.)
3
4    EXAMINATION BY MS. LARKINS:
5        Q.  Would you please state and spell your full name
6    for the record.
7        A.  Linda Mae Watson, L-i-n-d-a, M-a-e, W-a-t-s-o-n.
8        MS. LARKINS:  Before we went on record here today,
9    I asked Ms. Watson to read this two-page document entitled
10   Deposition Preamble.  I ask that this exhibit be marked as
11   Exhibit 1.
12       (Plaintiff's Exhibit No. 1 was marked for
13   identification.)
14   BY MS. LARKINS:
15       Q.  Did you read it --
16       A.  Yes.
17       Q.  -- Ms. Watson?
18       A.  Yes.
19       Q.  Did you understand the information contained in
20   the document?
21       A.  Yes.
22       Q.  Do you have any questions about having a
23   deposition taken?
24       A.  No.
25       Q.  You know of no reason why you couldn't give your

2 (Pages 2 to 5)

Page 6

1  full and best testimony today?

2      A.  No.

3      Q.  Okay.  Have you had your deposition taken before?

4      A.  Yes.

5      Q.  Was Gina Boyd in your deposition when it was taken

6  before?

7      A.  No.  I don't think she was.  I don't remember.

8      MS. ANGELL:  Okay.  If you don't recall the

9  answer, just say that you don't recall.

10      THE WITNESS:  Okay.  I don't recall.  I thought I

11  was all by myself at the Ed Center when we had the deposition.

12      Oh, you know what, now I do remember.  She was

13  there.

14  BY MS. LARKINS:

15      Q.  Okay.  Thank you very much.

16      A.  I remember now.

17      Q.  Okay.  Did you ask Gina Boyd to attend the

18  deposition?

19      A.  I don't remember.

20      Q.  Were you glad she was there?

21      A.  Yes.  I -- I like to be represented by the union.

22      Q.  So she was there representing you?

23      A.  I guess so, yes.  Yes.

24      Q.  How nice for you.

25      A.  And she was protecting my rights as a union

Page 7

1  member.

2      Q.  Okay.  Did you discuss Jo Ellen Hamilton's

3  testimony with Gina Boyd before your deposition?

4      A.  No.

5      Q.  Did you discuss what you were going to say with

6  Gina Boyd before your deposition?

7      A.  I don't remember talking to Gina Boyd about

8  it.  I talked to my lawyers.

9      Q.  Okay.  Were you afraid that something that could

10  come out of that deposition might cause you to lose your job

11  or be disciplined by the school district?

12      A.  No.

13      Q.  Okay.

14      MR. HERSH:  Excuse me.  I'm having trouble picking

15  up the deponent's voice.

16      MS. ANGELL:  While he's adjusting sound, let's

17  take a break real quick.

18      THE VIDEOGRAPHER:  Off the record.  The time is

19  10:15 a.m.

20      (Recess taken.)

21      THE VIDEOGRAPHER:  We are back on the record.  The

22  time now is 10:21 a.m.

23  BY MS. LARKINS:

24      Q.  I am giving you a copy of the transcript of the

25  deposition which you gave for my dismissal hearing.  I ask

Page 8

1  that this exhibit be marked as Exhibit 2.

2      (Plaintiff's Exhibit No. 2 was marked for

3  identification.)

4  BY MS. LARKINS:

5      Q.  First I want to compliment you on your correct

6  memory.  As you can see on Page 2 of this deposition, the

7  appearances page --

8      MS. ANGELL:  Objection.  This document lacks

9  foundation.

10      MS. LARKINS:  I represent that this is a condensed

11  version of the deposition given by Linda Watson for my

12  dismissal hearing.

13      Q.  Mrs. Watson, have you had a chance to look over

14  that document at all?

15      A.  No.

16      MS. ANGELL:  Please note for the record that we're

17  talking about a deposition -- it looks to be a deposition

18  transcript which purports to be approximately 81 pages which

19  we've just been handed in the deposition.

20      MR. HERSH:  And if I may, I would like to, of

21  course, obtain copies of any documents whether they're

22  exhibits or not that are shown to the witness.  I don't need

23  them today, but I would appreciate being served with a copy.

24      MS. LARKINS:  Certainly.

25      Q.  Okay.  You recall having your deposition taken.

Page 9

1  Do you recall signing your deposition, a copy was given to

2  you, and you were allowed to look over it and check for

3  errors?

4      A.  I don't remember.  I don't remember if I did or

5  not.

6      Q.  Okay.

7      A.  I do remember that Gina Boyd was at my deposition,

8  and I don't know who she was representing.  I don't know why

9  she was there.

10      Q.  Okay.  Would you just take a minute to look this

11  document over, just -- just the first few pages, and then

12  when we discuss it, if anything looks to you like it might

13  not be genuine, you can point it out to us.

14      MS. ANGELL:  Mrs. Larkins, do you anticipate

15  asking questions about various portions of this document --

16      MS. LARKINS:  Yes.

17      MS. ANGELL:  -- to this witness?

18      MS. LARKINS:  Yes.

19      MS. ANGELL:  I would suggest that the witness

20  needs the opportunity to review the 80 pages, 81 pages of

21  this transcript in order to be able to answer questions.

22  Would you prefer to have her look over the document now or

23  maybe have her look it over on a lunch break and ask

24  questions about this after that?  Because I'm going to ask

25  her to make sure that she reads it before she responds to

Page 10

1  questions about it.
2      MS. LARKINS: Would it be acceptable to you if I
3  just pointed out certain specific -- there's really not much
4  in here I want, certainly not the whole 81 pages, just a few
5  little passages. How about if I point out those passages to
6  you?
7      MS. ANGELL: Why don't we start with that for --
8  to be expeditious and give the witness the opportunity to
9  read the pages that you're looking into and the surrounding
10  pages, and I'll reserve my ability to object if it seems
11  appropriate.
12  BY MS. LARKINS:
13      Q.  Okay.  What I would like to do is, very often I've
14  seen in depositions the lawyer will have the witness read
15  something into the record.  But what I'll do is I'll read
16  this to you just so, you know, you're keeping at an arm's
17  length from this material until you decide that you're ready
18  to answer questions for it.  This is the portion I'm
19  interested in.  It's on Page 14?
20      MS. ANGELL:  Ms. Larkins, if it's possible if you
21  could let us know the series of pages that you'll ask about
22  and she could read all of them at once, so -- I think that
23  you've probably had plenty of opportunity to review this
24  document, but the client -- the witness testified that she
25  has not.

Page 11

1      MS. LARKINS:  Yes.  Let me see if I can go through
2  and give you some specifics.  It's Page 13 through page --
3  lines -- Page 14, Line 16 through Page 17, Line 7.  Page 18,
4  Lines 4 through 6.
5      THE WITNESS:  May I have a pen so I can kind of --
6      MS. LARKINS:  Sure.  Here you go.
7      THE WITNESS:  All right.  Would you start over,
8  please.
9  BY MS. LARKINS:
10      Q.  Sure.  On Page 14 --
11      A.  Uh-huh.
12      Q.  -- lines -- Page 14, Line 16 --
13      A.  Okay.
14      Q.  -- through Page 17, Line 7.
15      A.  Okay.
16      Q.  Page 18, Lines 4 through 6.  Oh, here's one I
17  haven't found yet.  I'm going to have to find this at a break
18  myself.  I actually haven't had plenty of time to go over it.
19  Page 31 --
20      MS. ANGELL:  I'm going to ask you not to write on
21  the document, please.  I'll have notes here that you can look
22  at.
23      THE WITNESS:  Okay.
24      MS. LARKINS:  I can give you an extra copy.
25      MS. ANGELL:  We have one.  We're fine.  You can

Page 12

1  just go ahead and just keep telling us the pages so she can
2  read them.
3      THE WITNESS:  I don't have a Page 31 in this.
4      MS. LARKINS:  Maybe it was good we did this.
5  Maybe you do need the extra copy.  Let's see if this one has
6  it.
7      MS. ANGELL:  Is it this?
8      THE WITNESS:  I go from 27, 29 to 34.
9      MS. ANGELL:  Yours skips it.
10      THE WITNESS:  Mine skips it unless it's in
11  another --
12  BY MS. LARKINS:
13      Q.  Here's that page that's missing.
14      Okay.  31, Line 8 to 32, Line 4; back to Page 18,
15  Line 17; Page 19, Lines 2 through 7; Page 20, Line 23 to Page
16  21, Line 6; Page 22, Lines 3 to 16.  Also, there's something
17  on Page 70 which I didn't get a line for.  I'll have to find
18  that myself.  Page 22, Line 17.
19      MS. ANGELL:  Is that about all of it, Ms. Larkins,
20  or is that just a portion of the part that you'd like to ask
21  questions about?
22      MS. ANGELL:  I -- it is not all of it.  It is a
23  portion.
24      MS. ANGELL:  Is that about like half or a third
25  or --

Page 13

1      MS. LARKINS:  I'd say it's about two-thirds.
2      MS. ANGELL:  Okay.
3  BY MS. LARKINS:
4      Q.  Page 46 -- actually, I think there were a lot of
5  page -- all of Page 46, all of Page 47, let's just say all of
6  Page 48 and 49.  Although I might not discuss all of it, we
7  might as well just go ahead and set that up.
8      Pages 54 to 56, let's just say all of it.  Page
9  63, I'm not sure what line.  Page 74, I'm not sure what line.
10  Page 62, I'm not sure what line.  And that's it.
11      MS. ANGELL:  Okay.  Since you've identified areas
12  throughout this document, I'm going to ask that the witness
13  read the document so that she knows what she's looking at
14  before she answers questions.  Would you prefer to do that
15  after a break or do you want to wait while she reads it now?
16      MS. LARKINS:  Let's take a break.
17      MS. ANGELL:  Okay.
18      THE VIDEOGRAPHER:  We're going off the record.
19  The time now is 10:31 a.m.
20      (Recess taken.)
21      THE VIDEOGRAPHER:  Back on the record.  The time
22  now is 11:27 a.m.
23  BY MS. LARKINS:
24      Q.  Okay.  Now, let's see if I can remember where I
25  was an hour ago.  I gave you the transcript of the

4 (Pages 10 to 13)

San Diego Court Reporting Service

Page 14

1  deposition. your deposition, and we had it marked.
2       Now -- now that you've had a chance to read it for
3  the last hour, are you pretty confident that that is your
4  testimony?
5       MS. ANGELL: Objection. That mischaracterizes
6  what's occurred. And I'll represent for the record that we
7  were handed at this deposition a document in excess of 80
8  pages and that there was a break when the witness had an
9  opportunity to scan the document as opposed to reading and
10 digesting that kind of thing. So just so that we're clear,
11 it's not something that's been studied and poured over. It's
12 been scanned. Okay?
13      MS. LARKINS: Yeah.
14      THE WITNESS: Yes.
15      MS. ANGELL: Do you understand what question was
16 just asked of you?
17      THE WITNESS: Yes.
18      MS. ANGELL: I don't. Can you read it back.
19      THE WITNESS: Well, I agreed with what you said,
20 Kelly.
21      MS. ANGELL: Oh, okay. That's what I'm saying.
22      (Page 14, Lines 2 through 4 were read back.)
23      THE WITNESS: No. I need more time to digest
24 this. This is too long for me to just go over in a few
25 minutes. This happened a long time ago, and I need more time.

Page 15

1  BY MS. LARKINS:
2       Q. Are you concerned that this document may have been
3  altered and that is actually not what you said?
4       A. I don't remember some of this. I don't know if it
5  has or hasn't.
6       Q. Okay. Let's try to find out what you do remember.
7       MS. ANGELL: And I'll renew my objection that the
8  document lacks authentication and foundation.
9  BY MS. LARKINS:
10      Q. I want to ask you a question about when Maura
11 Larkins came to Castle Park. Do you remember the time that
12 Maura Larkins came to Castle Park school?
13      A. I don't remember the exact time. I don't remember
14 the exact year. Is that what you're asking me?
15      Q. No. I'm just -- do you remember the event?
16      A. I remember you were hired as our bilingual teacher.
17      Q. Yes. Had -- how long had the school had a
18 bilingual program?
19      MS. ANGELL: Vague and ambiguous as to time.
20      MS. LARKINS: At that time.
21      For how many years had there been a bilingual
22 program at the school?
23      MS. ANGELL: Starting when?
24 BY MS. LARKINS:
25      Q. When did the bilingual program begin at Castle Park?

Page 16

1       A. I don't exactly understand what you mean.
2       Q. I don't need the exact year.
3       A. What do you mean by a bilingual program?
4       Q. Okay. When a teacher who is called a bilingual
5  teacher, officially a bilingual teacher, is teaching a
6  classroom that's officially called a bilingual class, I'll go
7  ahead and call that a bilingual program even if it's just one
8  class.
9       Do you remember a time when a bilingual program
10 began at Castle Park?
11      A. There was a bilingual program started for grades K
12 through 3, as I remember, when Oscar Perez was principal.
13 That's when he started it.
14      Q. Okay. The first year of the bilingual program --
15 let me just tell you what I remember and see if you agree
16 with me.
17      Maura Larkins was not at the school when the
18 bilingual program first began. Is that your recollection?
19      A. I'm not involved in bilingual programs, so I don't
20 remember those dates. I remember you coming either shortly
21 after it started or at the beginning, but I don't remember
22 exactly what we had in place before you came.
23      Q. Do you remember the planning discussions when the
24 staff was discussing whether or not to have a bilingual
25 program come to Castle Park school?

Page 17

1       A. There was discussions about it during staff
2  meetings.
3       Q. What do you remember about those discussions?
4       A. I remember there were pro and cons. There were
5  people that, you know, said we needed this program, there
6  were people that felt that we didn't need it, and obviously
7  we decided that we needed it because we had so many, you
8  know, bilingual children that needed that help.
9       Q. Okay. Were there some people that were quite
10 hostile to the idea of having a bilingual program?
11      A. I don't remember anybody being quite hostile. I
12 don't know what quite hostile means. What does that mean?
13      Q. Raising voices, repeating again and again
14 negative --
15      A. I don't remember that. I don't remember that.
16      Q. Okay. Do you remember any of the bilingual
17 teachers who came to Castle Park school besides Maura
18 Larkins?
19      A. I remember Maria Beers and Rick Ramirez and -- I
20 can't remember the other one's name. Let's see. Those are
21 the only ones I remember right now. I'll think about it.
22      Oh, Lynne Del Gado. She taught kindergarten I
23 thought.
24      Q. As a bilingual teacher?
25      A. Well, she was -- I think after you left she was

5 (Pages 14 to 17)

Page 18

1  put in kindergarten as the bilingual teacher. I don't
2  remember, but she -- no, you know what, no. Forget Lynne
3  Del Gado. It was Rick Ramirez that they teamed together in
4  kindergarten and Rick Ramirez was the bilingual teacher.
5  Pardon me.
6      Q. And who is the bilingual kindergarten teacher now?
7      A. Rick Ramirez who was 1st grade.
8      Q. He was in 1st grade? And how about --
9      A. Dave Sommers.
10     Q. Dave Sommers in kindergarten?
11     A. Is in 1st grade now. They switched.
12     Q. Dave Sommers is in 1st grade and Rick is in
13  kindergarten?
14     A. Yes. It was -- they just switched this year.
15     Q. Okay. How about at your grade level?
16     A. This year?
17         MS. ANGELL: Objection. These questions are not
18  relevant. Ms. Larkins has not been an employee of the Castle
19  Park Elementary School District for a number of years, and
20  these questions are about who are teachers currently.
21         Go ahead.
22         MS. LARKINS: Okay. I'm trying to help -- I'm
23  trying to help her remember. I thought if she remembered who
24  was the bilingual teacher at her grade level this year, then
25  she could go back and remember the past years if she could

Page 19

1  get that name.
2         THE WITNESS: You want -- okay. What do you want
3  to know?
4  BY MS. LARKINS:
5      Q. Is Stephanie Parker Pettit a bilingual teacher?
6      A. Yes, yes. She is -- she is the 3rd grade teacher,
7  but I thought you said prior when you were there. I thought
8  you meant when you were teaching 3rd grade. That's why I
9  didn't mention her name. Yes, Stephanie Pettit is our 3rd
10  grade bilingual teacher that --
11     Q. Okay.
12     A. Yes.
13     Q. Now, do you remember someone named Michelle
14  Tellez?
15     A. I remember her, but I didn't work with her.
16     Q. But she was a bilingual teacher at Castle Park?
17     A. Okay. You know what, you know, I really don't
18  remember what she did. I didn't know if she was a teacher or
19  an aide. I don't remember. I did not work with her
20  directly.
21     Q. Do you remember a kindergarten teacher named
22  Ms. Heather, someone who developed cancer?
23     A. Heather Smith? Yes, I remember her.
24     Q. Okay.
25     A. But I did not know she was bilingual.

Page 20

1      Q. Do you remember what happened with her employment
2  situation?
3      A. No, I don't know what happened to her employment
4  situation.
5      Q. Did she just stop coming to school? Is that how
6  you recall?
7         MS. ANGELL: Objection. Relevance.
8         MS. LARKINS: I believe that this is relevant
9  because there's been a very high percentage of bilingual
10  teachers fired from Castle Park school, and I'm trying to
11  find out about the circumstances by which -- you have a few
12  people, like maybe seven people, and how two of them have
13  been dismissed by the school board.
14         MS. ANGELL: Mrs. Larkins, what does that have to
15  do with any cause of action alleged in the case at bar?
16         MS. LARKINS: I believe that there have been many
17  false stories made up about my dismissal from Chula Vista,
18  and I'm trying to get at the atmosphere at the school, the
19  attitudes at the school, and the truth about my dismissal.
20         MS. ANGELL: There's no cause of action here
21  related to your dismissal. The cause of action is for use of
22  information from an arrest record against this witness, and
23  for other defendants I believe that the remaining causes of
24  action are a cause of action for slander against someone
25  named Mr. Carlson, a cause of action for conspiracy to

Page 21

1  slander against Mr. Carlson and Ms. Donlan, and just the
2  Labor Code violations. So I'm not -- I'm not sure what any
3  of this has to do with your dismissal before the Commission
4  on Professional Competence.
5         MS. LARKINS: Okay. I'll tell you what. I do
6  want to get back to this, but I'd be happy to move on to
7  something else right now perhaps that would be more related
8  in your mind to the causes of action.
9         MS. ANGELL: Thank you.
10  BY MS. LARKINS:
11     Q. Okay. I really do want to come back to this. Let
12  me put a note to myself. We're going to save Exhibit 3 for
13  that later discussion.
14         Okay. I think this will please you. We're going
15  to go right to September 2000. Do you recall that Maura
16  Larkins was teaching half days at the beginning of the 2000,
17  2001 school year?
18     A. No, I don't remember.
19     Q. Do you recall coming up to Maura Larkins at the
20  beginning of the -- I'm kind of trying to help you jog your
21  memory -- and saying that you were worried that she might be
22  sick and asking her why she had been taking half days off?
23     A. Maybe. I don't remember that.
24     Q. Okay.
25         MS. ANGELL: So for clarification, is your answer

6 (Pages 18 to 21)

Page 22

1  yes or no?
2        THE WITNESS: My answer is no, I don't remember.
3  BY MS. LARKINS:
4     Q.  But you're not denying that it could have
5  happened?
6     A.  I don't remember.
7     Q.  Okay. Are you certain that it didn't happen?
8        MS. ANGELL: Asked and answered.
9        MS. LARKINS: I don't remember is different. Now,
10 a person can have no memory at all, just a complete blank
11 about something, or they can be sure it didn't happen. And
12 I'd like to know which.
13       MS. ANGELL: She's already testified that she
14 doesn't remember.
15 BY MS. LARKINS:
16    Q.  It's a complete blank for you?
17    A.  (Witness nods head.)
18    Q.  Okay. Thank you. A complete blank.
19       Okay. Do you remember something about a notebook,
20 a notebook incident?
21    A.  Yes.
22    Q.  Can you tell me about that?
23    A.  The only thing I remember is that we were having a
24 meeting on the first day of school or first week that we were
25 back from school. It wasn't necessarily on the first day.

Page 23

1  We were meeting in the auditorium. There were tables in the
2  auditorium that had white notebooks on them, and we were told
3  to go into the auditorium for a meeting. I don't remember
4  what the meeting was for. I don't remember what the
5  notebooks were for. And I don't remember even where we were
6  supposed to sit, if we were supposed to sit with our grade
7  levels. I don't remember if we were just supposed to sit
8  wherever we wanted to. And other than that, all I remember
9  is you got very upset because your notebook was moved or you
10 thought it was moved. You accused somebody of moving it, but
11 I don't know who moved it. I don't know if it was moved. I
12 don't know anything more about it. I was not involved in
13 that.
14    Q.  When you say "you got upset," did you witness
15 this?
16    A.  Yes, I did. You were -- you were walking around
17 asking people if they moved your notebook.
18       MS. ANGELL: Excuse me. What time frame are we
19 talking about?
20 BY MS. LARKINS:
21    Q.  I do not believe this was the first week of
22 school. Could it be possible that this was a meeting about
23 standards perhaps like in the spring of the year?
24    A.  No. I remember it being when we came back from
25 school, and it was like one of those meetings that we'd have

Page 24

1  the first week back from school. That's what I remember.
2        MS. ANGELL: I'm sorry. I still didn't get the
3  answer to the question. I'm wondering what year we're
4  talking about? I think you were an employee for more than
5  one year.
6        MS. LARKINS: I'm not sure right now what year it
7  was. I'm just trying to gather some memory from your witness.
8        MS. ANGELL: Well, if you don't know what year the
9  incident is you're talking about, how is the witness supposed
10 to know?
11       MS. LARKINS: I asked her do you remember a
12 notebook incident. I'm trying to just find something in her
13 memory, and she does remember a notebook incident.
14    Q.  Do you remember more than one notebook incident?
15    A.  No. No.
16    Q.  I think we've pretty well pinpointed that this is
17 the notebook incident. And you are sure that it was the
18 first week of school?
19       MS. ANGELL: Asked and answered.
20       THE WITNESS: No, I'm not sure if it was the first
21 week.
22       MS. ANGELL: If I make an objection --
23       THE WITNESS: I'm sorry.
24       MS. ANGELL: -- hold off.
25       THE WITNESS: Okay.

Page 25

1  BY MS. LARKINS:
2     Q.  Okay. Do you -- you really -- okay. You remember
3  sitting -- were you sitting and you were watching Maura
4  Larkins walk around asking people where her notebook was?
5     A.  I don't remember where I was. I don't know if I
6  was standing or sitting.
7     Q.  But you do remember seeing Maura Larkins walking
8  around?
9     A.  I remember that, yes.
10    Q.  Do you remember anything else that happened, what
11 the conclusion of this walking around was?
12    A.  No, I don't remember.
13    Q.  Okay. Did you consider this to be an important
14 event?
15    A.  No, I did not.
16    Q.  Okay. Do you remember in approximately -- in
17 February 2001, not approximately, in February 2001 that Maura
18 Larkins was put on leave?
19    A.  I don't remember when you were put on leave.
20    Q.  Okay. But you do remember that I was put on
21 leave?
22    A.  All I know is you weren't there. I don't know why
23 you weren't there.
24    Q.  Okay. I think we really do need to refer to this
25 prior testimony. And you know, if at some future time you

Page 26

1  wish I -- further proof, we could bring in the court
2  reporter, we can do whatever we need and prove that this is a
3  valid document.
4      Could you look around Page 29.
5      MS. ANGELL: Renew the objection. Lack of
6  foundation. Lacking authenticity of the document marked as
7  Exhibit 2.
8      What page?
9      MS. LARKINS: 29.
10     Q  Line 11, could you read your answer there, those
11  four lines into the record.
12     A  Out loud?
13     Q  Yes, please.
14     A  Well, before that, I knew something had happened
15  between Maura Larkins and Jo Ellen Hamilton, but I didn't
16  know, and I still don't know really what happened.
17     Q  Okay. And the questioner asked you, "And how did
18  you know that something had happened?" Could you read your
19  answer to that question?
20     A  On Line 17?
21     Q  Yes.
22     A  And "how did I know? You know, I don't even know
23  how to answer that. You know, I guess the words -- you know,
24  I don't even know how to answer that. She was -- I can't
25  even think -- with people talking about it at school, but she

Page 27

1  was -- we must have talked about it. Jo Ellen must have -- I
2  mean -- I don't know."
3      Q  Okay. And the questioner said, "But you don't
4  know what it was that happened?"
5      MS. ANGELL: I'm going to object to this entire
6  line of questioning. The document speaks for itself. We're
7  here to talk about what Ms. Watson's memory is now I think.
8  Do you have any question related --
9  BY MS. LARKINS:
10     Q  Okay. I see here that when the questioner said
11  "but you don't know what it was that happened," you said,
12  "No, I don't know."
13      And the questioner said, "But sitting here today,
14  you knew at the time, that you knew something had happened?"
15      And you said, "I knew something had happened, and
16  Maura Larkins wasn't at the school. She was put on leave?"
17     A  Well, at that time maybe that's what we were told.
18  I don't remember.
19      MS. ANGELL: And I'll ask the witness to wait
20  until a question is asked, please.
21  BY MS. LARKINS:
22     Q  Okay. So if this document is legitimate -- and
23  you have some doubts as to whether this document is
24  legitimate? Do you think that you said these things?
25     A  I don't remember some of this. I -- maybe, maybe

Page 28

1  I did.
2      MS. ANGELL: Would you like me to ask the
3  question? Ms. Larkins, do you want me to ask the question?
4      MS. LARKINS: Is this a joke?
5      MS. ANGELL: No.
6      MS. LARKINS: What are you saying?
7      MS. ANGELL: The document that's being referred to
8  as Exhibit 2 purports to be a copy of a deposition transcript
9  in a matter before the Governing Board of the Chula Vista
10  Elementary School District entitled "In the Matter of the
11  Accusation Against Maura Larkins, Respondent, No. L-2002050728.
12  The cover sheet of that document says Deposition of Linda
13  Watson taken at 84 East J Street, Chula Vista, California, at
14  9:05 a.m., on Wednesday, September 11, 2002, before a court
15  reporter. And the cover sheet continues to purport that it's
16  a condensed transcript.
17      Ms. Watson, did you give testimony in a matter
18  related to Maura Larkins at any prior time before today?
19      THE WITNESS: Yes.
20      MS. ANGELL: Do you know what the nature of that
21  matter was that you were giving testimony for?
22      Do you understand the question?
23      THE WITNESS: Say it again, please.
24      MS. ANGELL: Do you know if it was a lawsuit in
25  a --

Page 29

1      THE WITNESS: Yes. It was a lawsuit alleging
2  slander.
3      MS. ANGELL: Are you certain that the deposition
4  that you gave in September 11, 2002, that says that it's in
5  the matter of the accusation against Laura -- Maura Larkins,
6  that that was a lawsuit for slander? It says that it's
7  before the Governing Board of the Chula Vista Elementary
8  School District.
9      THE WITNESS: I don't -- I don't know. I'm
10  confused.
11      MS. ANGELL: Okay.
12      THE WITNESS: I don't know. I don't understand
13  this.
14      MS. ANGELL: But you do know that you gave a
15  deposition at some time in the past?
16      THE WITNESS: Yes, I did.
17      MS. ANGELL: Thinking about the day that you gave
18  your deposition at some time in the past, was there a court
19  reporter present that day?
20      THE WITNESS: Yes, there was.
21      MS. ANGELL: Did you have an attorney there that
22  day?
23      THE WITNESS: Yes, I did.
24      MS. ANGELL: Did the court reporter swear you in
25  to tell the truth in your deposition testimony?

8 (Pages 26 to 29)

Page 30

1    THE WITNESS: Yes.
2    MS. ANGELL: When you gave your deposition
3  testimony that day, did you tell the truth to the best of
4  your ability that day?
5    THE WITNESS: Yes, I did.
6    MS. ANGELL: Do you know whether or not that
7  deposition transcript was ever provided to you afterwards for
8  your review?
9    THE WITNESS: I don't remember.
10   MS. ANGELL: Okay. But you do remember that at
11 the time that you gave the deposition testimony it was the
12 truth to the best of your ability?
13   THE WITNESS: Yes.
14   MS. ANGELL: If the document that's been presented
15 today as Exhibit 2 is in fact a copy of that deposition
16 transcript, which we can't tell because it's unsigned and
17 it's not certified -- let me strike that last question.
18   Would you please look at the last page of the
19 deposition transcript. That would be Page 80 -- 80, 81. Do
20 you see that there's a place there for the signature of the
21 deponent?
22   THE WITNESS: (Witness nods head.)
23   MS. ANGELL: Were you the deponent in this
24 deposition?
25   THE WITNESS: (Witness nods head.)

Page 31

1    MS. ANGELL: The person being deposed?
2    THE WITNESS: Yes.
3    MS. ANGELL: Okay. Did you sign this document?
4    THE WITNESS: No, I didn't.
5    MS. ANGELL: Okay. Do you have any knowledge
6  whether or not the document actually in front of you as
7  Exhibit 2 is a correct copy of the transcript of your prior
8  testimony?
9    THE WITNESS: No, I don't know if it is or isn't.
10   MS. ANGELL: In referring to Exhibit 2 during
11 today's deposition, will you be able to answer questions
12 assuming that the document in front of you is a correct and
13 accurate copy, just referring to this document that's before
14 you and not knowing whether it's actually correct and
15 accurate, you just say that -- that question is so bad,
16 please strike it.
17   THE WITNESS: No. I --
18   MS. ANGELL: Don't answer. It was such a bad
19 question, we had to strike it.
20   THE WITNESS: Okay.
21   MS. ANGELL: In your testimony today when
22 referring to Exhibit 2 --
23   THE WITNESS: This is Exhibit 2.
24   MS. ANGELL: Yes, this deposition transcript --
25   THE WITNESS: Yes, yes.

Page 32

1    MS. ANGELL: -- purported deposition transcript,
2  can you refer to the document, meaning look at it if you need
3  to, based on what's actually in the document in front of you
4  and separate that in your mind from whatever testimony you
5  gave? Can you rely on this document and just refer to and
6  talk about what's in front of you in this document?
7    THE WITNESS: (Witness nods head.)
8    MS. ANGELL: Yes?
9    THE WITNESS: Yes.
10   MS. ANGELL: Okay.
11   THE WITNESS: Yes.
12   MS. LARKINS: Thank you very much, Ms. Angell.
13 That was a big help. I have a question about one of
14 Ms. Watson's answers to your line of questioning.
15   Q.  Now, I can see clearly when Ms. Angell asked you
16 if you signed this document, we can all see that nobody
17 signed this particular document here, this signature sheet
18 back here that was copied for me. I would like to know if
19 you signed a similar signature sheet?
20   A.  I don't remember.
21   Q.  Okay. Okay. Well, just to be completely honest,
22 this is a lot harder than I had imagined it would be. So I'm
23 going to -- you know what, I'm going to need a five-minute
24 break just to figure out a new way to approach this whole
25 deposition. Would you agree to that?

Page 33

1    MS. ANGELL: Fine.
2    MS. LARKINS: Thank you.
3    THE VIDEOGRAPHER: We're going off the record.
4  Off the record. The time now is 11:56 a.m.
5    (Recess taken.)
6    THE VIDEOGRAPHER: Back on the record. The time
7  now is 12:03 p.m.
8  BY MS. LARKINS:
9    Q.  Okay. What I would like to do now is to show you
10 some documents, four pages, that purports to be notes written
11 by you, and I would ask that this be -- I'd like that this be
12 marked as Exhibit 9.
13   (Plaintiff's Exhibit No. 9 was marked for
14   identification.)
15 BY MS. LARKINS:
16   Q.  Looking at this first page here, at first glance
17 does this appear to be your handwriting?
18   A.  Yes.
19   Q.  Okay. Could you read the first paragraph that
20 starts with Mon., the abbreviation for Monday, Mon. 4/16?
21   A.  Monday, 4/16, I was in Loma Verde locker room
22 following my students' swimming lesson. Maura was coming in
23 as I was leaving. I looked up at her and said, "Welcome
24 back, Maura." Maura glared at me and looked the other way.
25 I took that response as not wanting to talk to me so I didn't

9 (Pages 30 to 33)

San Diego Court Reporting Service

Page 34

1 say anything else.
2    Q. Can you now remember this incident independently
3 of these notes?
4    A. Yes, I can remember this.
5    Q. Okay. Can you tell me something about what was --
6 why would you take notes about -- about this incident?
7    A. Because there were -- okay. I was -- I was told
8 by Dr. Donndelinger that you were coming back to school and
9 that we should be friendly and, you know, cooperate, get
10 along and so forth; and so I made it a point to welcome you
11 back. And I remember saying this right in front as you're
12 walking into Loma Verde pool where there's dirt right by the
13 chain link fence. That's where our class -- our two classes
14 passed. You were coming and we were leaving, and I said,
15 "Welcome back, Maura" right to your face, and you just gave
16 me this -- this look that was not very friendly and just --
17 and then just looked the other way. You didn't say anything.
18    MS. ANGELL: Objection. Nonresponsive. Move to
19 strike.
20 BY MS. LARKINS:
21    Q. Would you please read again the first sentence of
22 this.
23    A. I was in Loma Verde locker room following my
24 students' swimming lesson.
25    Q. Thank you. So according to these notes you were

Page 35

1 in the locker room. Is it possible that your memory of the
2 fence is somewhat confused?
3    A. Okay. I don't understand why I put that first
4 sentence, because on Monday I clearly remember that this
5 incident happened as we were coming and going. I was -- when
6 I wrote this, I was very upset because of the incident that
7 happened on Friday. And I came back to my -- to the school
8 shaking. You can see by my writing. I was crying. I was
9 very upset. And I put down -- I tried to document everything
10 that had happened during that week. And that's why I may
11 have -- you know, this all related to the Loma Verde pool
12 incident, and I put things in order so that I would remember
13 them and try to understand what had happened.
14    Q. Okay. But at this point in time you are sure that
15 this is incorrect where it says "I was in Loma Verde locker
16 room"?
17    A. Yes, that is incorrect. I remember it was right
18 in front of the fence as we were passing with our classrooms.
19    Q. Okay. Okay. Now, I want to stick with this
20 Monday, April 16th.
21    MS. ANGELL: What year are you talking about?
22    MS. LARKINS: It's 2001.
23    Q. Now, you say that you wanted to welcome Maura
24 Larkins back because the principal had told you to. But
25 personally how did you feel about Maura Larkins coming back?

Page 36

1    A. I had -- I had no problem you coming back. I
2 mean, you had been gone a lot. We were happy that you would
3 come back and be with our team again.
4    Q. Okay. I'm just going to say here just -- I'm not
5 an expert at giving depositions, but I just want you to know
6 that I distinctly recall this happening inside the locker
7 room. So you know, I just want to tell you that that's --
8 that's my story is that this happened in the locker room.
9 But I'm going to -- but I think that, you know, if we just
10 kind of forget about whether it's a fence beside us or
11 lockers beside us, we can -- see if we can just try to
12 remember this interaction itself.
13    Okay. Now, when you first saw Maura Larkins what
14 did you see?
15    MS. ANGELL: Objection. Vague and ambiguous as to
16 time.
17 BY MS. LARKINS:
18    Q. In this encounter here when you said Maura was
19 coming -- well, here you say "Maura was coming in as I was
20 leaving," and I think what you want to say is that Maura was
21 coming to the pool and you were finished and you were leaving
22 the pool. I think we can work with this, this difference.
23    Do you remember the first moment you laid eyes on
24 Maura Larkins at that -- in this encounter?
25    A. Yes.

Page 37

1    Q. Okay. What was she doing?
2    MS. ANGELL: Can I just make a little statement
3 real quick. I will make a number of objections as to time,
4 vague and ambiguous as to time when it doesn't -- when you
5 don't ask a question that talks about a specific date or year
6 you like point at something. Because when we have a
7 transcript that's a piece of paper, it will be very hard to
8 cite to the piece of paper. Citing to five pages of
9 deposition testimony won't work very well.
10    So I will continue to make objections unless there
11 are specific dates associated with it. And I'll try to hold
12 off as much as possible, but for clarity's sake I'll need to
13 go ahead and continue making those objections unless you
14 decide to include dates and time frames in your questions.
15    MS. LARKINS: Well, I'll try to include dates and
16 time frames in my questions. And if I fail, I'm actually
17 appreciative of you clarifying things.
18    Q. Okay. When you first looked at her at this
19 incident which we've been talking about --
20    A. Yes.
21    Q. -- here --
22    A. Yes, yes.
23    MS. ANGELL: For the record, you need to say --
24 instead of point, because the transcript can't understand
25 pointing.

10 (Pages 34 to 37)

San Diego Court Reporting Service

Page 38

1    MS. LARKINS: I -- please ignore my fingers.
2  Please try not to focus on them. Let them just do whatever
3  they're going to do and just ignore them.
4    Could you read back the question.
5    (The last question was read back.)
6  BY MS. LARKINS:
7    Q.  Okay. I will -- that's all right. Just ignore my
8  fingers. When you first looked at her during this encounter
9  which we've been talking about here, what did you see?
10    MS. ANGELL: Do you mean April 16, 2001?
11    MS. LARKINS: Okay. I mean, April 16th, 2001, and
12  I would prefer not to have to say April 16th, 2001, in every
13  single question until I'm finished talking about this
14  encounter. So April 16th, 2001 is the date for all my
15  questions until I tell you that we're changing dates.
16    MS. ANGELL: Great.
17    Do you understand?
18    THE WITNESS: Yes.
19  BY MS. LARKINS:
20    Q.  Okay. What did you see when you first saw Maura
21  Larkins in this encounter?
22    A.  Okay. On Monday you were bringing your children
23  to the pool as we were leaving because we had our lessons
24  first. We were passing right by the side of Loma Verde pool
25  where the chain link fence was where the dirt meets the

Page 39

1  pavement, and that was the first time I saw you that day on
2  your return. And you looked up and I looked up and our eyes
3  met, and I said, "Welcome back, Maura." That is all I said.
4  And you just ignored -- you just kind of glared at me and
5  then you looked the other way. You didn't say anything, and
6  I continued to walk with my children back to Castle Park.
7  That's all that happened on Monday.
8    Q.  Okay. Thank you. So this was pretty much an
9  instantaneous event or did you -- were you looking at Maura
10  Larkins for 10 seconds? 20 seconds?
11    A.  No. It was just being friendly and welcoming you
12  back.
13    Q.  This was a very short encounter. Are you saying
14  this was a very short encounter?
15    A.  Yes. It was short because I only said, "Welcome
16  back, Maura," and you said nothing.
17    Q.  Okay. And -- okay. So this probably lasted
18  three, four, five seconds?
19    A.  Yes.
20    Q.  Okay. Okay. How did you feel after that?
21    A.  I didn't feel good because I thought you were
22  ignoring me and you were not being friendly.
23    Q.  Okay. Did you think that I suspected you of
24  having some involvement in my being put on leave?
25    A.  I don't know what you were thinking.

Page 40

1    Q.  You weren't worried about that?
2    MS. ANGELL: Asked and answered.
3    MS. LARKINS: No, I'm not asking her what I was
4  thinking. She hasn't answered the question.
5    THE WITNESS: I thought that's what you were
6  saying.
7  BY MS. LARKINS:
8    Q.  No, no. I don't want you -- I'm not asking you
9  what I was thinking. I'm asking you if you were worried
10  about that possibility?
11    A.  No.
12    Okay. Ask me the question again, what possibility?
13    Q.  Were you worried that Maura Larkins might be
14  thinking you were responsible for her being put on leave?
15    A.  Maybe. I didn't know what you were thinking.
16  Maybe -- maybe you were. I don't know. I didn't know what
17  you were feeling because you weren't expressing anything.
18  You weren't talking.
19    Q.  So is that a worry that might have flittered
20  through your mind?
21    MS. ANGELL: If you remember.
22    THE WITNESS: I don't -- I don't know. I don't
23  remember. I really don't. It was so long ago.
24  BY MS. LARKINS:
25    Q.  Okay. I'd like to refer to Exhibit 2, Page 31.

Page 41

1    A.  Exhibit 2, Page 31?
2    Q.  Uh-huh. Page 31, Line 5. According to this
3  transcript the questioner asked you, "On that Monday at the
4  pool when you got no response from Maura Larkins, did you
5  consider that to be rude?"
6    MS. ANGELL: And I'm going to object to this
7  entire line of questioning on relevance. This is not
8  reasonably calculated to lead to the discovery of admissible
9  evidence with regard to causes of action for violation of
10  Labor Code and slander by Mr. Carlson and conspiracy to
11  slander by
12  Ms. Colls.
13  BY MS. LARKINS:
14    Q.  Would you please read your answer which begins on
15  Line 8.
16    A.  I considered it to be rude, but in hindsight, you
17  know, she may not have even heard me." She may not have
18  even -- "she may not have even heard me say it. You know,
19  I'm walking with kids, she's going this way, and I'm going
20  this way. If she didn't hear that, she could have said,
21  "Well, I didn't hear you say that to me," instead of calling
22  me a liar, and I'm delusional and all of the other bad names
23  she called me. It was not an appropriate response.'
24    Q.  Okay. So now, here when you say -- you say that
25  Maura Larkins called you a liar and delusional, it didn't

Page 42

1  happen at this very time.
2      A.  No.  It --
3      Q.  It happened some other time.
4      A.  No.  It happened on Wednesday.
5          MS. ANGELL:  Wednesday what?
6  BY MS. LARKINS:
7      Q.  We haven't changed to Wednesday yet.  We're still
8  on Monday.  We're still on Monday, April 16th.
9          MS. ANGELL:  Be careful to listen to the question
10  that Mrs. Larkins is asking and only answer that question.
11          THE WITNESS:  Okay.
12  BY MS. LARKINS:
13      Q.  Okay.  Here you're saying something which is
14  actually quite charitable and pathetic here.  You know, I
15  considered it to be rude, but in hindsight she may not have
16  even heard me.  And then you go on here and say "if she
17  didn't hear that, she could have said, 'Well, I didn't hear
18  you say that to me,' instead of calling me a liar, and I'm
19  delusional and all these other bad names she called me."
20          Okay.  What I'm asking you is, did Maura Larkins
21  call you these names on Monday, April 16th?
22      A.  No.
23      Q.  These names you claim she called you on some other
24  date?
25      A.  Yes.

Page 43

1      Q.  And you claim that that date was Wednesday?
2      A.  Yes.
3      Q.  Okay.  Let's move our questioning to Wednesday,
4  April 18th, 2001.  Okay.  Why don't you -- never mind.  I
5  want to keep these dates straight.
6          MS. ANGELL:  Again, I'll renew my objection to
7  this entire line of questioning.  It is not reasonably
8  calculated to lead to the discovery of admissible evidence in
9  the case at bar.
10  BY MS. LARKINS:
11      Q.  Okay.  Well, I am going to ask about a different
12  date.  I'm not going to talk right now about Wednesday,
13  April 18th.  I want to talk about Tuesday, April 17th, 2001.
14  You have a notation here in the middle of this page, Tuesday
15  4/17?
16      A.  Yes.
17      Q.  Could you read what you wrote for that date.
18          MS. ANGELL:  What exhibit are you referring to?
19          MS. LARKINS:  This is Exhibit 9.
20          MS. ANGELL:  Thank you.
21          MS. LARKINS:  Thank you.
22          THE WITNESS:  Tuesday, April 17th, 2001.  "It
23  seemed obvious that Maura was avoiding me.  So I didn't have
24  any reason to talk to her so we didn't say anything to each
25  other."

Page 44

1  BY MS. LARKINS:
2      Q.  Okay.  So you had come to the conclusion that
3  Maura was avoiding you.  Is that true?
4      A.  Yes.
5      Q.  And do you still believe that to be true?
6      A.  I don't understand.
7      Q.  Okay.  Do you believe you were correct when you
8  made this -- when you came to this conclusion?
9      A.  Yes.
10      Q.  Okay.  And was your reason because you felt that
11  she had -- Maura Larkins had snubbed you the day before?
12          MS. ANGELL:  Again, objection.  This is totally
13  irrelevant and not calculated to lead to the discovery of
14  admissible evidence.
15          Ms. Watson, please answer to the extent that you
16  remember.
17          THE WITNESS:  Ask me the question again, please.
18          MS. LARKINS:  I forget the question.  Could you
19  read it.
20          THE WITNESS:  Me too.
21          (The last question was read back.)
22          THE WITNESS:  I don't remember.  I mean, I just
23  stated that we did not have a conversation on Tuesday when
24  we -- when our classes passed, neither one of us said
25  anything.  I don't remember what I was thinking or what

Page 45

1  conclusion or anything I came to.
2  BY MS. LARKINS:
3      Q.  Okay.  So you don't remember what your reasons
4  were for concluding that Maura was avoiding you?
5          MS. ANGELL:  Asked and answered.
6          MS. LARKINS:  I really would appreciate -- I
7  really need this to be -- to be clear.
8      Q.  You don't remember why you came to this
9  conclusion.  Is that correct?
10          MS. ANGELL:  Objection.  Asked and answered.
11          THE WITNESS:  Do I have to answer it?  I don't --
12  I mean, that's what went through my mind.  I thought that --
13  that you were mad, upset.  I don't know -- I didn't know
14  what your feelings were.  I still don't know what your
15  feelings were.
16          All I know is that you did not respond to me, and
17  you never talked to me when we walked by.  You didn't greet
18  me on Tuesday when we passed.  You didn't say hello to me,
19  and I didn't say anything to you.  It was very odd.
20  BY MS. LARKINS:
21      Q.  Do you recall passing Maura Larkins on Tuesday?
22      A.  Yes, I do.
23      Q.  Where did this take place?
24      A.  At the same place.  It was right as you were
25  coming in, we were going out, exactly the same as Monday.

12 (Pages 42 to 45)

## Page 46

1    Q.   At --
2    A.   But on Tuesday neither one of us said anything to
3  one another
4    Q.   Okay.  So are you telling me that it was the two
5  days of -- when you believe that Maura Larkins did not say
6  hello to you -- by the way, my testimony will be that I said
.7  "Hi, Linda" on Monday, and I do not recall seeing you on
8  Tuesday.
9       MS. ANGELL:  Objection to plaintiff's giving
10  testimony on the record and move to strike.  This is the
11  deposition of Linda Watson, not the deposition of Maura
12  Larkins.
13       MS. LARKINS:  That's fine with me.  I just -- one
14  of the things I like to do is to kind of go along with the
15  deponent's story so they can tell their story, and I just
16  want to make it clear that when I say okay, this happened and
17  this happened and this happened, that doesn't mean that I am
18  accepting that this is what happened.
19       MS. ANGELL:  Understood.
20       Do you understand that, Ms. Watson?
21       THE WITNESS:  Yes.
22  BY MS. LARKINS:
23    Q.   Okay.  So you have given two reasons why you came
24  to this conclusion that Maura was avoiding you, because you
25  didn't believe Maura had spoken to you when you encountered

## Page 47

1  her on Monday and because you believe that you encountered
2  her on Tuesday and she didn't speak to you.
3       MS. ANGELL:  Actually, I believe the testimony was
4  that she doesn't remember today what she was feeling
5  three years ago and that she was guessing at what might have
6  occurred three years ago.  I think that's the accurate
7  reflection of the testimony.
8       THE WITNESS:  Yes.
9       MS. ANGELL:  Yes what?
10       THE WITNESS:  I agree to that statement that
11  Ms. Angell said.  I do not remember how I was feeling
12  three years ago.
13  BY MS. LARKINS:
14    Q.   Okay.  I think we have enough on that.  Let's see.
15  You know what, I'm kind of getting interested in -- we seem
16  to have such a problem with memory here that I think maybe we
17  should just go a little further into the nitty-gritty of this
18  case.  Here it is.
19       Okay.  Have you ever at any time been concerned
20  that Maura Larkins might have a gun?
21       MS. ANGELL:  You mean other than attorney-client
22  privileged communications?
23       MS. LARKINS:  If you're only concerned when you're
24  talking to your lawyer, then --
25       MS. ANGELL:  Do you want me to restate it

## Page 48

1  differently?
2       MS. LARKINS:  -- you don't have to tell me about
3  that.
4       MS. ANGELL:  Sorry.  Was I unclear?  Do you want
5  me to say it differently?
6       MS. LARKINS:  Sure.  Go ahead.
7       MS. ANGELL:  I want to make sure that we're
8  differentiating between -- I think that you're asking about
9  any fears that she might have had related to a weapon of some
10  sort, and I want to clarify that the question that you're
11  asking the witness asks for information outside of anything
12  that would have been discussed between her and an attorney.
13       MS. LARKINS:  Oh, no, I don't think so.  Just
14  because -- you don't get to hide information just because you
15  discussed it with your attorney.  I mean, I'm an elementary
16  school teacher, but even I know that.
17       MS. ANGELL:  If you're asking --
18       MS. LARKINS:  If you tell your attorney "oh, I
19  killed this guy and then I killed that guy and then I killed
20  the other guy, whew, now I'm out free because I never have to
21  admit I because I told my attorney," that's not how it works.
22       MS. ANGELL:  If you're asking for information that
23  was discussed between or learned from counsel, I object and
24  raise attorney-client privilege and instruct the witness not
25  to answer.

## Page 49

1       If you're asking for information that is separate
2  and apart from things -- information learned from an
3  attorney, then of course, the attorney-client privilege I
4  don't think would be applicable to that question.  I just
5  want to clarify what you're asking.
6  BY MS. LARKINS:
7    Q.   Okay.  Before you ever met Ms. Angell or
8  Mr. Bresee or Mr. Shinoff or any other attorney that you
9  might have discussed any of these matters with, were you ever
10  afraid that Maura Larkins might have a gun?
11    A.   No, never.
12    Q.   Did you at any time before you met these attorneys
13  fear that Maura Larkins might kill you?
14    A.   I was afraid of Maura Larkins because of some of
15  the statements she had made and the incident with my son that
16  made me fearful, not necessarily you're going to kill me.  I
17  didn't know what was going to happen, but it made me feel
18  very uncomfortable.
19    Q.   Thank you.  Did you think that Maura Larkins'
20  killing you was a possibility?
21    A.   Yes, because at the time there were many violent
22  things going on in the world like school shootings and things
23  like that.
24    Q.   Okay.  When Maura Larkins was on leave after
25  February 12th, 2001, and according to this transcript --

13 (Pages 46 to 49)

Page 50

1  we'll someday find out if it's accurate or not -- you believe
2  that it had something to do with Jo Ellen Hamilton.
3      MS. ANGELL: Are you referring to Exhibit 2?
4      MS. LARKINS: Yes, thank you. I'm referring to
5  Exhibit 2.
6      Q. Okay. In this transcript you say that you believe
7  that Maura Larkins was put on leave on February 12, 2001
8  because of something to do with Jo Ellen Hamilton.
9      MS. ANGELL: Objection. That mischaracterizes the
10  testimony. I believe the testimony is that she wasn't sure
11  and she assumed that it had something to do with that, I
12  think. What page are you on?
13     MS. LARKINS: Page 30.
14     MS. ANGELL: See Line 12?
15     MS. LARKINS: See Line 11. She said, "I guess so
16  I mean, yes." And then you're correct. In Line 12 she says
17  "I don't know." So we have several answers and we don't know
18  exactly how to interpret them. It will be up to a jury to
19  interpret them.
20     Q. Okay. Did you ever ask Gretchen Donndelinger if
21  Maura Larkins had a gun?
22     A. No. Oh -- I don't remember. I don't -- I don't
23  remember. I may have been concerned about that. I may have
24  asked her that.
25     Q. What would cause you to worry about that?

Page 51

1      A. Because of the statement that you had made to
2  Kathy Bingham in the hallway.
3      Q. Yes, tell us about that statement.
4      A. You apparently were walking down the hallway and
5  met Kathy Bingham, and your statement was "Kathy, you'll be
6  all right" and just walked on and didn't say anything more
7  and Kathy didn't say anything more to you.
8          And then that was so odd and Kathy was wondering
9  about that, and in a conversation we had she relayed that to
10  me and I relayed that to my son who at the time was in high
11  school, La Jolla High School. And he just looked at me and
12  said, "Mom, she just threatened you." And I said, "What do
13  you mean?" And he said, "She was telling Kathy that she
14  would be all right but that the rest of you were all going to
15  die or have something happen to you." And I just -- I was
16  just stunned. I hadn't even thought of that. That didn't --
17  had not even come into my mind until my son said that, and it
18  just -- it just made me feel sick to my stomach.
19          And you have to remember, this was after the
20  Santana shootings, the one in Colorado and -- Columbine, and
21  he had been counseled at school on lots of violence
22  awareness, and it was a very timely situation, and it did
23  make me very fearful.
24     Q. Okay. So you had hearsay that Maura Larkins had
25  said you're going to be all right, and then you thought that

Page 52

1  Maura Larkins might harm you with a gun?
2      MS. ANGELL: Objection. Misstates the testimony.
3  Again, I renew my objection that this is not reasonably
4  calculated to lead to the discovery of admissible evidence.
5  BY MS. LARKINS:
6      Q. Do you -- at this point in time do you feel that
7  your reaction was a reasonable one?
8      A. I felt like my reaction was a reasonable one
9  because you were acting so irrationally, and we couldn't
10  communicate with you, and I didn't know what you were going
11  to do next or what you were capable of. But I didn't dwell
12  on a gun. I don't even -- you know, I may have just asked
13  that, but that wasn't something I was -- you know, I don't
14  know. It was -- it was very odd. It was odd behavior
15     Q. Okay. Okay. You just said that Maura Larkins was
16  acting irrationally. Can you tell us more about that.
17     MS. ANGELL: Objection. Calls for a narrative
18     MS. LARKINS: Okay. I'd like to take a break.
19  Would that be all right with you?
20     MS. ANGELL: Sure.
21     THE VIDEOGRAPHER: We're going off the record.
22  The time now is 12:35 p.m.
23     (Recess taken.)
24     THE VIDEOGRAPHER: Back on the record. The time
25  now 12:41 p.m.

Page 53

1  BY MS. LARKINS:
2      Q. Okay. I would like to ask that this document
3  which is a condensed version of the deposition of Virginia
4  Boyd which was taken on March 22nd, 2004, here in these
5  offices, I'd like to have this marked as Exhibit 4, and I'd
6  like to give a copy to you, Ms. Watson, and to you, Ms. Angell.
7      (Plaintiff's Exhibit No. 4 was marked for
8  identification.)
9      MS. LARKINS: Okay. I'd like to give one to
10  myself too.
11     MS. ANGELL: I'm sorry, you said Exhibit 4?
12     MS. LARKINS: Yes. Okay.
13     MS. ANGELL: Mr. Hersh, are you with us?
14     MR. HERSH: I am.
15     MS. LARKINS: Just to get some documents out there
16  and then I'll try to get them all discussed. Let's see, I
17  want to make sure I discuss Exhibit 4.
18         I would also ask that this next exhibit which is
19  some handwritten notes by Jo Ellen Hamilton be marked
20  Exhibit 6.
21     (Plaintiff's Exhibit No. 6 was marked for
22  identification.)
23  BY MS. LARKINS:
24     Q. Okay. I'm also -- I'm going to do some more
25  exhibits too. I think it will all come together better if we

14 (Pages 50 to 53)

Page 54

1   have everything out here and I can easily refer to everything.
2           Okay.  I would like to ask that this exhibit be
3   marked as Exhibit 10-A.  This is Pages 51 to 54 of the
4   transcript of Maura Larkins' administrative hearing.
5           MS. ANGELL:  Do you have a complete copy of that
6   transcript here?
7           MS. LARKINS:  No, I don't.
8           MS. ANGELL:  And what administrative hearing are
9   you referring to?
10          MS. LARKINS:  The administrative hearing on
11  January 6th, 2003, in the matter of Maura Larkins, the very
12  one for which Exhibit 2 was taken.
13          MS. ANGELL:  And what was the nature of that
14  administrative hearing?
15          MS. LARKINS:  The dismissal of Maura Larkins from
16  employment from Chula Vista Elementary School District.
17          Okay.  10-A.
18          (Plaintiff's Exhibit No. 10-A was marked for
19  identification.)
20          MS. LARKINS:  The next one is called -- I would
21  ask that the next one be marked 10-B because this is Pages 79
22  through 82 of the same matter for -- as was document for -- a
23  document for 10-A.  This is 10-B.
24          (Plaintiff's Exhibit No. 10-B was marked for
25  identification.)

Page 55

1           MS. LARKINS:  Okay.  I would ask that this next
2   exhibit be marked Exhibit 22.  Oh, dear.
3           MS. ANGELL:  Do any other exhibits between 10 and
4   22 have subparts, you know how 10 had A and B?
5           MS. LARKINS:  Oh, no, that was the only one.
6           Okay.  Now, why can't I find 22.  Well,
7   then strike that.  I am not going to give you 22 now because
8   I'm going to have to look for it.  Okay.  I'm hoping that
9   these exhibits will make our job a little bit easier.
10      Q.  Okay.  On April 20th, 2001, did you make a
11  complaint to Gretchen Donndelinger and Richard Werlin about
12  Maura Larkins?
13          MS. ANGELL:  Again, objection to this line of
14  questioning.  It is not reasonably calculated to lead to the
15  discovery of admissible evidence on the causes of action in
16  front of this court.
17          THE WITNESS:  I made a complaint to Gretchen
18  Donndelinger.  I don't remember if I called Rick Werlin on
19  that day.
20  BY MS. LARKINS:
21      Q.  Okay.  Do you recall a meeting which took place on
22  that day after school which included you and Rick Werlin?
23      A.  This was a day that I came back from Loma Verde
24  pool and was very upset, and I had to go home because I was
25  so emotionally upset.  So I --

Page 56

1       Q.  I can help you out here a little bit I think.
2       A.  I can't remember if the --
3       Q.  Yeah.  Okay.  I think we might be a little
4   confused on dates here.  Monday was the day that you felt
5   that you had been snubbed by Maura Larkins.  That was --
6           MS. ANGELL:  Objection.  Misstates the testimony.
7   BY MS. LARKINS:
8       Q.  Okay.  Monday was the day that you believe that
9   Maura Larkins didn't speak to you.  That was the 16th.
10          MS. ANGELL:  Of 2001?
11          MS. LARKINS:  Of 2001.
12      Q.  Then the 17th, Tuesday, according to your own
13  notes, that was another day when you believed that Maura
14  Larkins didn't speak to you even though she was close to you.
15          Okay.  Then Wednesday, the 18th, I think earlier
16  you were saying that was the day that you felt that you were
17  called a liar and delusional, and that was the day that you
18  went home?
19          MS. ANGELL:  I don't recall the testimony on that
20  but I -- exactly, but I think that misstates the testimony.
21  I don't think we got to that date.  We didn't have testimony
22  on the 18th.
23          MS. LARKINS:  I think it was when we were talking
24  about the 16th that Ms. Watson said that happened, talked
25  about Wednesday.

Page 57

1           MS. ANGELL:  Objection.  Misstates the testimony
2   concerning the events of the 18th.  We can certainly explore
3   the events of the 18th of 2001.
4           THE WITNESS:  That's right.  On Wednesday --
5   Wednesday was the day that I was so upset I had to go home,
6   and Friday was the day we had the meeting with Rick Werlin,
7   yes.
8   BY MS. LARKINS:
9       Q.  Okay.
10      A.  That's right.
11      Q.  So you do recall a meeting with Rick Werlin on
12  Friday, April 20th, 2001?
13      A.  Actually, I know we had a meeting, and I'm just --
14  I want to make sure that Rick Werlin was there.  I -- I don't
15  remember.  I assume he was there.  I don't remember.
16      Q.  Okay.  Do you recall that Maura Larkins never
17  worked at Castle Park school again after April 20th?
18          MS. ANGELL:  Object.  Let me just take that right
19  back.
20          THE WITNESS:  I don't believe you did come back
21  after that.
22  BY MS. LARKINS:
23      Q.  And do you understand that the reason was because
24  you and someone else made a complaint about Maura Larkins?
25      A.  I didn't know why you were put out on leave.

15 (Pages 54 to 57)

Page 58

1    Q. After -- okay. Now, let me be clear here. I'm
2  not talking about February 12th. I'm talking about April
3  20th, 2001. You recall that you had a meeting with Rick
4  Werlin on that day or you don't?
5        MS. ANGELL: Asked and answered.
6  BY MS. LARKINS:
7    Q. Okay. Let's look at your own notes here. You
8  might believe your own handwriting. On the -- this page that
9  is Bates stamped with a 03 here?
10        MS. ANGELL: Of Exhibit number?
11        MS. LARKINS: Of Exhibit 9. Thank you.
12        THE WITNESS: Excuse me. What? Where?
13  BY MS. LARKINS:
14    Q. Yeah, this one that says -- yeah, this is it. At
15  the bottom it says Friday at 10:45? Could you just read
16  those three lines there.
17    A. At 10:45 Gretchen told me that we would meet as a
18  team with Rick Werlin at 2:30.
19    Q. Okay. So does that help refresh your memory at
20  all?
21    A. I guess so. Yeah, I guess we met. I don't --
22    Q. But you don't have any present -- at present you
23  don't have a clear --
24    A. I want to make sure I'm remembering exactly what
25  happened, and I -- I assume that we met, but I don't -- I

Page 59

1  know there was a meeting. I know that Gina was -- Gina was
2  out of town for one of the meetings, so I just can't remember
3  who was there at that meeting.
4    Q. Okay.
5    A. Because I was very upset at that point also.
6    Q. Is there -- okay. Well, that's -- yeah. That's
7  good. You remember that Gina was out of town. So it sounds
8  like you are starting to remember this -- this meeting.
9        MS. ANGELL: Excuse me. That misstates the
10  testimony. What she said is she remembered that Gina Boyd
11  was out of town for some meeting. She didn't remember which
12  meeting it was.
13        THE WITNESS: That's right. That's why I don't
14  remember who was at what --
15        MS. LARKINS: All I --
16        THE WITNESS: -- meeting.
17  BY MS. LARKINS:
18    Q. No. All I said was Gina Boyd was out of town.
19  And this meeting took place at Castle Park school, right?
20    A. There was a meeting on Friday afternoon at Castle
21  Park Elementary School, but I don't remember who was at that
22  meeting.
23    Q. But you do remember Gina Boyd wasn't there.
24    A. No, I don't remember if Gina Boyd was at -- if she
25  was out of town for the Wednesday meeting or for the Friday

Page 60

1  meeting.
2    Q. Tell me about the Wednesday meeting.
3        MS. ANGELL: Objection. Calls for a narrative.
4  BY MS. LARKINS:
5    Q. Okay. Did you have a meeting with -- on Wednesday?
6    A. Yes.
7    Q. Who was at the meeting?
8        MS. ANGELL: Do you mean Wednesday, April 18th,
9  2001?
10        MS. LARKINS: Yes, thank you.
11        THE WITNESS: I remember coming back from the
12  pool, and the first person I remember right now that I talked
13  to was Maria Beers and going to Gretchen Donndelinger and
14  meeting with them in regard to what happened at Loma Verde
15  pool that day.
16  BY MS. LARKINS:
17    Q. Okay. So you remember meeting with Maria Beers
18  and Gretchen Donndelinger.
19    A. Yes. And I believe Gina Boyd was called that day,
20  but I can't remember if she was there or not. I believe she
21  was there.
22        MS. ANGELL: Again, I'm objecting to this line of
23  questioning as not reasonably calculated to lead to the
24  discovery of admissible evidence. All this stuff about
25  incidents at the pool and meeting with union reps, same

Page 61

1  objection.
2  BY MS. LARKINS:
3    Q. When you walked back to school from the pool on
4  Wednesday, April 18th, 2001, were there -- was Richard Denmon
5  with you?
6    A. Yes.
7    Q. Were -- do you remember your -- your encounter
8  with Maura Larkins on that day?
9    A. Yes.
10    Q. You remember that clearly?
11    A. Very clearly, yes.
12    Q. Okay. When you were talking to Maura Larkins,
13  were you crying?
14    A. No, not at the pool. It wasn't until I got back
15  to school that I was crying.
16    Q. Or was it just when you got back to school that
17  you started to cry or on the way back?
18    A. I don't remember. I don't remember.
19    Q. Okay. And did you discuss with Richard Denmon
20  what had transpired between you and Maura Larkins?
21    A. Mr. Denmon knew that -- that there were words
22  exchanged. He knew that something was going on that --
23    Q. I'm not asking you what Mr. Denmon knew. I'm
24  asking you if you talked to him.
25    A. I probably talked to him, but I don't remember

San Diego Court Reporting Service

Page 62

1    what I said.
2        Q.  Okay.  Do you recall that the summer following
3    this week that you -- we have been discussing, this week from
4    April 16th to the 20th, 2001, you were called by Rick Werlin
5    and asked to come to the district and tell Maura Larkins
6    to -- face to face what your allegation against her had been?
7        MS ANGELL:  Objection.  This is totally
8    irrelevant to the causes of action in the case at bar.  We're
9    here to talk about allegations of use of information from a
10   record of arrest.  We're not here to talk about your
11   dismissal, about your behavior leading to your dismissal, any
12   of that, but we're here to talk about this witness's having
13   information from an alleged record of arrest.  And this stuff
14   about meetings with Mr. Werlin and in particular the last
15   question is irrelevant and not reasonably calculated to lead
16   to the discovery of admissible evidence on the causes of
17   action that remain alive.
18       Although you attempted to sue on negligence and
19   other theories related to your investigation related to your
20   dismissal from employment, those causes of action are
21   dismissed without leave to amend.  So therefore, we have a
22   narrower scope of discovery, and I'd really appreciate you
23   wouldn't have to object so much if we could limit the
24   questions to something reasonably calculated to lead to the
25   discovery of admissible evidence in this case for causes of

Page 63

1    action that exist.
2        MS. LARKINS:  Okay.  Thank you, Ms. Angell.  I
3    believe that these questions I am asking are relevant to this
4    case.  And you can tell your client to stop answering
5    questions at any time.  And I really don't think you need to
6    keep repeating and repeating the same objection.  I think
7    that the judge -- you know, if he thinks that this is
8    irrelevant, he'll throw it out.  And I already had to pay for
9    a whole hour for you guys to read a deposition, and I really
10   think it's just basically a waste of time to just keep saying
11   the whole thing over and over.  Why don't you say just
12   objection, irrelevant, because I have to pay for all those
13   words that you say.
14       MS. ANGELL:  Mrs. Larkins, you can stop the
15   deposition at any time you want.  This is your opportunity to
16   ask questions of this witness.  If you don't want to pay for
17   it, you can stop it.
18       MS. LARKINS:  I know.
19       Q.  Okay.  You can answer the question.
20       A.  I don't remember what the question was.
21       Q.  Well, I sure don't either.
22       Oh, wait a minute.  Yes, I do.  I do remember what
23   it was.  It was, do you remember in the summer after these
24   events of this week that we've been discussing Richard Werlin
25   called you up and asked you to come to the school district

Page 64

1    and state your allegations against Maura Larkins face to face?
2        MS. ANGELL:  Same objection.
3        THE WITNESS:  Yes.  But it was as a forum.  It
4    wasn't to state allegations.  It was to -- I thought it was
5    just to talk to you.  I don't know what it was really for.
6    BY MS. LARKINS:
7        Q.  Okay.  Did you think that it was appropriate that
8    Maura Larkins never heard the allegations you had made about
9    her?
10       MS. ANGELL:  Objection.  Assumes facts not in
11   evidence.  Calls for speculation.  Lacks relevance.
12   BY MS. LARKINS:
13       Q.  Did you ever tell Maura Larkins what your
14   allegations against her during the week of April 16th to 20th,
15   2001 were?
16       MS. ANGELL:  Objection.  Not reasonably calculated
17   to lead to the discovery of admissible evidence.
18   Mischaracterizes the testimony regarding calling things
19   allegations.
20       THE WITNESS:  I don't know what allegations, what
21   you're talking about.
22   BY MS. LARKINS:
23       Q.  You made a complaint about Maura Larkins on
24   April 20th, 2001, to Gretchen Donndelinger and Rick Werlin?
25       A.  I just stated what had happened.  I stated exactly

Page 65

1    what had happened between you and I at that time.
2        Q.  Okay.  Did you make a complaint about Maura
3    Larkins to Gretchen Donndelinger and Rick Werlin on April 20th,
4    2001?
5        MS. ANGELL:  Asked and answered.  The witness
6    already said that she told those people what had transpired
7    between the two of you.  I think you're asking her to make
8    some sort of a legal conclusion or something about what that
9    equals, but she said she doesn't know.
10       MS. LARKINS:  I'm just trying to build on it.  We
11   need to establish that in order to ask the next question.
12       THE WITNESS:  I answered the question.
13   BY MS. LARKINS:
14       Q.  Okay.  I'm assuming that the answer was yes, and
15   now I want to ask the next question.
16       MS. ANGELL:  Misstates the testimony.
17   BY MS. LARKINS:
18       Q.  What did you tell Rick Werlin on April 20th, 2001
19   about Maura Larkins?
20       A.  That's all written down here.  Did you want to --
21   want me to read this out loud?
22       Q.  If you wish.
23       A.  Okay.  Friday --
24       Q.  Are you sure that you -- that's exactly what you
25   told him?

San Diego Court Reporting Service

Page 66

1    A.  I told him exactly what had happened at the pool.
2    I was very upset.
3    Q.  You don't remember right now?  I'd really prefer
4    that you -- you know, if you remember, that you don't read.
5    A.  Sure.  Absolutely.
6    Q.  Okay.
7    A.  I will tell you what happened.
8    Q.  Okay.
9    A.  Now, you want me just to -- for on Friday what had
10   happened?
11   Q.  Yeah.  What did you tell Rick Werlin and Gretchen
12   Donndelinger on Friday about Maura Larkins?
13        MS. ANGELL:  Do you mean at the Friday, April 20,
14   2001 afternoon meeting sometime around 2:45 that she doesn't
15   know whether or not Mr. Werlin was there?  Is that the
16   meeting you're talking about?
17   BY MS. LARKINS:
18   Q.  Okay.  Just a minute.  Have you come to have a
19   clearer memory of that meeting than you had when we first
20   started talking about it?
21   A.  I remember what I said at the meeting.  I'm not
22   sure who was there.
23   Q.  Do you remember that Rick Werlin was there?
24   A.  I'm not sure.  I'm just not sure.  He might have
25   been there, but he may not have been there.

Page 67

1    Q.  When you made -- when you -- okay.  Can you just
2    tell me in a nutshell what was your basic complaint about
3    Maura Larkins on that date, April 20th, 2001?
4    A.  Because -- well, I went through the whole week,
5    what had happened, all the events that led up to Friday and
6    the fact that I felt that you threatened me at Loma Verde
7    pool in the pool house inside the dressing room area.
8    Q.  On what date?
9    A.  On Friday, April 20th --
10   Q.  Okay.
11   A.  -- 2001.
12        MS. ANGELL:  Do you mean that you felt that she
13   threatened you on Friday, April 20th, 2001 at the pool house?
14        THE WITNESS:  Yes.
15   BY MS. LARKINS:
16   Q.  Threatened physically?
17   A.  Yes.
18   Q.  Okay.  In what way?
19   A.  That you came up to me when I was getting my
20   children ready to go back to school, and you started talking
21   to me.  And I said -- I said, "Maura, I don't want to talk to
22   you unless Gretchen or Rick Werlin or Maria Beers or Gina
23   Boyd were present, and you did not accept that, and "leave me
24   alone."  You continued to talk to me in a very loud manner,
25   and I repeated it a second time.  I said, "I don't want to

Page 68

1    talk to you unless those people were present."
2        And you just started raising your voice, ranting
3    and raving about the truth will come out in court, and you
4    had your fist up in the air like this right by my face.  And
5    you -- I remember because it reminded me of the Statue of
6    Liberty.  And you were ranting and raving the truth will come
7    out, and I put my hands up like this because I was afraid
8    that you were going to come at me.  You had me backed into a
9    corner.  And I was very fearful for my children that were
10   around, and I just started saying anything I could think of
11   to diffuse you and to walk around you and get out of there.
12   And I got back to school as fast as I could and I said that's
13   it.
14   Q.  And this happened the day after your son convinced
15   you that only Kathy Bingham would be saved and everyone
16   else --
17        MS. ANGELL:  Objection --
18        MS. LARKINS:  -- would be dead?
19        MS. ANGELL:  -- misstates prior testimony.
20   BY MS. LARKINS:
21   Q.  Okay.  Did you fear that Maura Larkins might kill
22   or harm everyone but Kathy Bingham?
23   A.  I didn't know what you meant.  I just knew that it
24   wasn't appropriate and it was fearful, and it was not
25   appropriate behavior, and we -- I don't know what you were

Page 69

1    thinking, but it wasn't making me feel very calm.  I felt
2    upset about it.
3    Q.  Okay.  So you were already upset and fearing
4    possible physical harm from Maura Larkins before this
5    incident that you report?
6    A.  If you'd like to go back to Wednesday, you did not
7    go over Wednesday's incident at Loma Verde pool that led up
8    to the Friday incident.  Would you like to go back to that?
9    Q.  Honestly, Ms. Watson, your memory is so poor that
10   I'm -- it's just -- it's so difficult to go over these events
11   with you, and I'm trying to get through them as quickly as
12   possible.  Can you just answer my question?
13        MS. ANGELL:  I don't remember the question.  Can I
14   have --
15   BY MS. LARKINS:
16   Q.  Was Thursday the day when your son convinced you
17   that Maura Larkins was going to kill or somehow physically
18   harm everybody but Kathy Bingham?
19        MS. ANGELL:  Same objection.  Mischaracterizes
20   prior testimony as to son convincing somebody.
21        THE WITNESS:  Yeah.  My son -- my son stated that
22   he thought you were threatening me and that I was, you know,
23   in danger.  And you also on Wednesday had yelled at me at the
24   pool and called me a liar and delusional, and never once did
25   I raise my voice to you.  And so all these incidents just

18 (Pages 66 to 69)

1  snowballed, and I don't know why you were acting that way
2  towards me.
3  BY MS. LARKINS:
4      Q.  Do you think that these incidents could have been
5  perceived by you because you were already in a great state of
6  fear and tension?
7      A.  No.
8      Q.  You're quite sure that you got everything right
9  except for that little problem about whether you were in the
10  locker room or by the fence?
11      A.  That's right.
12      Q.  Okay.  So you told these things to Mr. Werlin on
13  Friday about a fist being very near your face?
14      A.  I said I didn't know if Mr. Werlin was there on
15  Friday.
16      Q.  Okay.  But you did say this to Gretchen?
17      A.  Yes.
18      Q.  Okay.  You made this report on Friday to Gretchen.
19      MS. ANGELL:  Friday, April 20, 2001, correct?
20      THE WITNESS:  Yes.
21  BY MS. LARKINS:
22      Q.  Okay.  I'd like you to look at Exhibit 2, Page 47.
23      A.  Exhibit 2, Page 47.
24      Q.  Actually, can I change that to Page 46.
25      A.  Which one, mine or Gina Boyd's?

1      Q.  It's yours.  Actually, can I -- let's go up to 46
2  up there, Line 22.  Could you just read that one paragraph
3  there which extends down onto Page 47.
4      A.  "As I was walking out, trying to get around her, I
5  said, 'Maura, I had nothing to do with the Jo Ellen thing.  I
6  thought we were friends.'  I was trying to think of anything
7  I could say to get out of there.  She had her fist up in the
8  air like this, like the Statue of Liberty.  She said,
9  'Justice will be served.  Justice will come out,'" and you --
10      Q.  Would you like to continue?
11      A.  If you want me to.
12      Q.  Yes, please do.  Read the next paragraph.
13      A.  "Her voice was raised.  She was shaking.  I didn't
14  know what she was going to do with her fist.  If she was
15  going to -- I said, 'Are you going to sue me?'  She said,
16  'Justice will be served.'  And by that, I was out of there,
17  and that's -- I was very upset.  That was a big part of
18  it" -- "that was a big part of it that I didn't say."
19      Q.  Okay.  Are you confident that you have Maura
20  Larkins' exact words here or was it -- would you like to
21  maybe say that it was words to that effect?
22      A.  No.  You --
23      Q.  Something about justice?
24      A.  You said --
25      Q.  Those exact words?

1      A.  You said the truth will come out in a court of
2  law.  That's what you said.  Justice will be served.
3      Q.  Okay.  Thank you.  The truth will come out in a
4  court of law?
5      A.  Yes.
6      Q.  Okay.
7      A.  That's not in there, but that's -- I remember you
8  saying that.
9      Q.  Okay.  All right.  Now, here you say justice will
10  be served.  Justice will come out.  And then you ask, "Are
11  you going to sue me?"  Why did you think Maura Larkins would
12  sue you?
13      A.  Because of what you were saying.  You were saying
14  that the truth will come out in a court of law and justice
15  will be served and all of those things, and that's what
16  brought to my mind that you were thinking about suing
17  somebody.
18      Q.  Somebody.  Why did you think it might be you?
19      A.  I don't know.  I was just -- I was so frightened,
20  I was just trying to get out of there.  I -- that was just
21  the first thing that came to my mind.
22      Q.  Were you frightened of being sued?
23      A.  I -- at that point I didn't even -- didn't even
24  think that you would be suing anybody.
25      Q.  Were you afraid of the truth coming out?

1      A.  I don't even know what truth you're talking about,
2  because --
3      Q.  Well, whatever truth you said -- I think you just
4  quoted me as saying something like the truth will come out in
5  a court of law.  I think you said I said that?
6      A.  Yes.
7      Q.  Were you afraid of that happening?
8      A.  No, I'm not.
9      Q.  Then why did I have to wait a year and a half to
10  have this deposition?
11      MS. ANGELL:  Objection.  Argumentative.
12      Ms. Watson, don't respond.
13      MS. LARKINS:  That was just a total rhetorical
14  thing.  Pardon me, I shouldn't do that.
15      Q.  Okay.  So did you -- do you think that Maura
16  Larkins may have used the word deposition?
17      A.  When, at that time?
18      Q.  Yeah.
19      A.  No.
20      Q.  You're sure Maura Larkins didn't use the word
21  deposition?
22      A.  (Witness shakes head.)
23      MS. ANGELL:  Asked and answered.
24  BY MS. LARKINS:
25      Q.  Okay.

19 (Pages 70 to 73)

Page 74

1    MS. ANGELL: Please remember to answer in audible
2  yes, no responses rather than shaking the head and stuff like
3  that.
4    THE WITNESS: Okay.
5  BY MS. LARKINS:
6    Q.  Now, here you talk about "she had her fist up in
7  the air, like this, like the Statue of Liberty," but this
8  doesn't say anything about it being near your face.  Do you
9  think that could be something that your memory has created
10  since then?
11    MS. ANGELL: Objection.  Argumentative.
12    THE WITNESS: No.
13  BY MS. LARKINS:
14    Q.  Okay.  You have no idea why you didn't mention
15  that, what I would think would be an important detail at this
16  time?
17    MS. ANGELL: Objection.  Argumentative.  In
18  addition, this line of questioning is not reasonably
19  calculated to lead to the discovery of admissible evidence,
20  is irrelevant.  That's it.
21  BY MS. LARKINS:
22    Q.  How long was Maura Larkins' fist up in the air?
23    MS. ANGELL: On April 20th, 2001 in the pool house
24  at Loma Verde pool?  Is that what you mean?
25    MS. LARKINS: Yes.

Page 75

1    THE WITNESS: Is that the question?  Okay.  The
2  whole incident probably took -- took place in about two or
3  three minutes.  And after I told you not to talk to me, you
4  just started getting very upset, and your fist -- I remember
5  going around you and getting out the door, and you were kind
6  of going back towards me also, and as I was at the door, your
7  fist was still up in the air.  You and I are about the same
8  height, so it was at my face level.
9  BY MS. LARKINS:
10    Q.  I was going back?
11    A.  You were -- you were -- as I was going around, you
12  were kind of -- I was trying to get out of there, and you
13  were continuing to go back towards the door.
14    Q.  So we were both going in the same direction?
15    A.  I was trying to get out of there as fast as I
16  could.  Exactly, you were trying to keep -- you were still
17  talking to me and ranting and raving with your fist in the
18  air as I was getting out of there as fast as I could.  So you
19  were backing towards the door as I was trying to get around
20  you to go out the door.
21    Q.  So you were forcing me backward?
22    A.  I wasn't forcing you backwards.  I was trying to
23  get out of there.  That's what was happening.
24    Q.  Okay.  So was Maura Larkins' fist up in the air
25  for two or three minutes?

Page 76

1    A.  At least a minute.
2    Q.  A minute.  She must work out.
3    MS. ANGELL: Objection.  Argumentative.
4    No response, Ms. Watson.
5  BY MS. LARKINS:
6    Q.  Okay.  What did Maura Larkins say when you asked
7  if she was going to sue you?
8    A.  I remember you saying -- you just kept saying over
9  and over again the truth will come out in a court of law.
10  The truth will be said.  Justice will be served.  And you
11  just kept -- I mean, it didn't make any sense to me at all.
12    Q.  About how many times did Maura Larkins repeat
13  justice will be served.  The truth will come out?
14    MS. ANGELL: To the best of your recollection,
15  Ms. Watson.
16    THE WITNESS: The best of my recollection,
17  probably around two or three times each of those items, each
18  of those statements.
19  BY MS. LARKINS:
20    Q.  Uh-huh.  Okay.  It sounds like quite a -- quite an
21  experience.  Did Maura Larkins say anything about a lie
22  detector?
23    MS. ANGELL: Vague and ambiguous as to time.
24  BY MS. LARKINS:
25    Q.  At this encounter that we've been talking about

Page 77

1  here on April 20th, 2001.
2    A.  I don't remember you saying anything about a lie
3  detector.
4    Q.  I don't either.
5    Were you worried that you might have to take a lie
6  detector test?
7    MS. ANGELL: Vague and ambiguous as to time.
8  BY MS. LARKINS:
9    Q.  On this date, April 20th, 2001?
10    MS. ANGELL: Objection.  Argumentative.
11    MS. LARKINS: I just want to know if she was
12  worried that she might have to take a lie detector test.
13    THE WITNESS: No.  It never occurred to me.  I
14  don't know what I would be lying about.  I don't even
15  understand what -- why I would be having a problem.  Taking a
16  test for what.
17    MS. LARKINS: Okay.  I need another five-minute
18  break.
19    MS. ANGELL: It's now about 20 after 1:00.
20  Ms. Watson, did you need a lunch break?
21    THE WITNESS: Yes.  Yes, please.
22    THE VIDEOGRAPHER: Going off the record.
23    MS. LARKINS: Yeah, let's.
24    THE VIDEOGRAPHER: This concludes Tape 1 of the
25  deposition of Linda Watson.  We're off the record.  The time

Page 78

1    now is 1:19 p.m.
2        (Lunch recess taken.)
3        THE VIDEOGRAPHER: This is Tape 2 of the
4    deposition of Linda Mae Watson. We're back on the record.
5    The time now is 2:32 p.m.
6    BY MS. LARKINS:
7        Q. I would like to go to the summer of 2001 when Rick
8    Werlin called you and asked if you would come to the district
9    to meet with Maura Larkins. Did you -- what did you tell him
10   when he asked you to come?
11       A. When he asked me to come, it was -- I thought it
12   was just an informal forum. We were just going to talk face
13   to face with you and talk about issues or whatever, and
14   that's all I remember it being. And I declined to go because
15   I -- I did not feel that I was represented by an attorney at
16   that time, and I knew that you did have an attorney. That
17   was one of the questions I asked him, does Maura Larkins have
18   an attorney, and he said yes. And I said well, I don't have
19   an attorney, so I declined to go.
20       Q. Did you tell Mr. Werlin that you were emotionally
21   distraught?
22       A. When?
23       Q. At the time that you declined to go to the
24   summer meeting.
25       A. I don't remember being emotionally distraught.

Page 79

1        MS. ANGELL: Objection. Move to strike.
2    Nonresponsive.
3    BY MS. LARKINS:
4        Q. Did you tell him you were emotionally distraught?
5        A. I don't remember.
6        Q. Did you tell him that you were healing?
7        A. I don't remember what I said to him other than
8    what I just told you.
9        Q. Okay. I would like to go to Exhibits 10-A and
10   10-B. Actually, I'd like to go to 10-B. On Page 81 -- this
11   is the deposition of Richard Werlin in the matter of the
12   administrative hearing for the dismissal of Maura Larkins.
13       MS. ANGELL: I'm sorry, Ms. Larkins. It appears
14   that Exhibit B is not the deposition of Mr. Werlin. 10-B,
15   sorry, is not the deposition of Mr. Werlin. Am I
16   misunderstanding --
17       MR. HERSH: I'm sorry, but is there a way to
18   increase the volume at your end? I'm having a lot of trouble
19   hearing --
20       MS. ANGELL: Me too, Mr. Hersh?
21       MR. HERSH: -- everybody.
22       MS. ANGELL: Are you hearing me okay?
23       MR. HERSH: Very light.
24       MS. LARKINS: I'm sorry. Did I say deposition?
25       MS. ANGELL: Yes. You said it was the deposition

Page 80

1    of Mr. Werlin.
2        MS. LARKINS: I meant to say that it was -- yeah,
3    I think I did use the word deposition.
4        What I meant to say is that it's the reporter's
5    transcript of the hearing on the day of January 6th, 2003.
6    Thank you for setting that straight.
7        Okay. Could we look at Page 81.
8        MS. ANGELL: I object to the -- this document,
9    this exhibit. It lacks foundation.
10       MS. LARKINS: Okay. Tell you what, I will
11   withdraw this Exhibit 10-B, but I will let you keep it. And
12   I just thought it might be interesting to you to see what
13   Mr. Werlin said about teachers not wanting to come to this
14   meeting.
15       MS. ANGELL: Mrs. Larkins, what does this have to
16   do with any of the causes of action in this litigation,
17   teachers not going to a meeting in the summer of 2001?
18       MS. LARKINS: As I recall, you've reminded me
19   several times that I'm the one giving the deposition.
20       Okay. That will be a gift for you for future
21   reference.
22       MS. ANGELL: Objection to plaintiff's
23   characterizations which are not questions, the
24   characterizations entered into the record, as argumentative,
25   badgering, and disrespectful.

Page 81

1        MS. LARKINS: Okay. Maybe it'd be better if I
2    took them back? Should I take back the exhibits? Would that
3    be better? Would that be less respect -- more respectful?
4        MS. ANGELL: Mrs. Larkins, it's your comments on
5    the record that are disrespectful. If we can just continue
6    with the deposition, any questions related to the litigation,
7    that would be great.
8        MS. LARKINS: Okay. Could you read me back
9    Ms. Watson's last answer.
10       MS. ANGELL: If you wouldn't mind if we could
11   start with the question. I don't even remember the question.
12       (Page 79, Lines 6 through 8 were read back.)
13       MS. LARKINS: Thank you.
14       Q. Did Mr. Werlin urge you to come to the meeting?
15       A. What do you mean by urge?
16       Q. Try to talk you into it, impress upon you that it
17   was important.
18       A. Yes, I think he did. He wanted me to be there if
19   at all possible.
20       MS. ANGELL: And for purposes of clarity, you're
21   referring to the summer 2001 meeting, correct?
22       MS. LARKINS: Thank you.
23       Q. Did you consider even for a moment the possibility
24   that you might go to that meeting?
25       A. I probably considered it. But when I found out

21 (Pages 78 to 81)

Page 82

1  that you had a lawyer and I didn't, I didn't think that was
2  wise so I didn't go.
3    Q.  Okay.  So you were afraid you might be sued; is
4  that true?
5    A.  I don't know what I was thinking at that point.
6  That was just a meeting I didn't want to go to.
7    Q.  Okay.  And it was acceptable to you -- oh, you
8  know what, could we look at Exhibit 2, Page 49, Line 6.
9  Could you read -- I'll read the question and then perhaps you
10  could read the answer.  The question which begins on Line 2
11  is, "In retelling to other people what had transpired in that
12  locker room, did you mention to any other people the words
13  that were spoken about justice in a court of law?"  Could you
14  read your answer.
15    A.  "Well, I expressed it to Dr. Donndelinger when I
16  got back, and that's when she called Rick Werlin, and I
17  believe that was the day Gina Boyd was out of town at a
18  conference, so she wasn't available to be there, and that's
19  when we all got together in Dr. Donndelinger's office, and
20  Rick Werlin -- I guess that was what led him to put her on
21  leave again.  I don't know.  That was the decision that was
22  made at the district level."
23    Q.  Do you believe that this page here is discussing
24  April 20th, 2001?
25    A.  I don't know.

Page 83

1    Q.  Well, you mention here "I believe that was the day
2  Gina Boyd was out of town at a conference," which you earlier
3  said you believed about April 20th.
4    MS. ANGELL:  Objection.  Misstates the testimony.
5  She did not say that she believed she was gone on April 20th.
6  I believe that the testimony was that she -- that Ms. Boyd
7  was gone at a conference at some point during this week under
8  discussion.
9  BY MS. LARKINS:
10    Q.  Do you believe that Gina Boyd was out of town on
11  April 20th, 2001?
12    A.  I don't know if she was.  I don't remember.
13    Q.  Okay.  Let's continue here.  I'll read the
14  question, and if then you can read the answer that starts on
15  Line 17.  "Did you hear Dr. Donndelinger telephone Rick
16  Werlin?"
17    A.  You want me to read?
18    Q.  Yeah.  Could you read on Line 17.
19    A.  "No.  I don't remember the conversation.  I'm sure
20  she did, but I don't remember the conversation.  I was
21  probably talking with the other people.  We were probably
22  trying to gather up the people involved to have a meeting."
23    Q.  Okay.  So do you recall this, that you were trying
24  to gather up people to have a meeting?
25    MS. ANGELL:  Vague and ambiguous as to time.

Page 84

1  BY MS. LARKINS:
2    Q.  On April 20th, did you -- 2001, did you try to
3  gather up people to have a meeting?
4    A.  I didn't try to gather anyone up.  I was very
5  upset, distraught at that point.  I don't know who did or
6  what happened after that.  I don't know how these people were
7  asked to come to the meeting.
8    Q.  Okay.  Could you look at line -- on this same page
9  that we've been discussing the last couple questions, at Line
10  12
11    MS. ANGELL:  Page 49, Line 12?
12    MS. LARKINS:  Yes, the same page.
13    Q.  "I guess that was what led him to put her on leave
14  again."  So on this day, whatever day it is, you talked to
15  Donndelinger, and she called Rick Werlin, according to your
16  testimony, you believed that -- you believe that Gina Boyd
17  was out of town on a conference, and you guessed that -- I
18  guess your expressions are what caused Mr. Werlin to put
19  Maura Larkins on leave again?
20    MS. ANGELL:  Objection.  The document speaks for
21  itself.  Ms. Larkins, this is a separate deposition that was
22  taken, and the point of our deposition today is for you to
23  have the opportunity to ask Ms. Watson about what her
24  recollection is at this time as opposed to asking her to read
25  into the record, you know, large excerpts from this document

Page 85

1  that speaks for itself.  You certainly have a right to
2  attempt to authenticate the document, et cetera, and use it
3  for whatever purpose you wish with whatever pleadings you may
4  need to use it for.  But we're here today to find out what
5  Ms. Watson knows at this point.
6  BY MS. LARKINS:
7    Q.  You can answer the question.
8    MS. ANGELL:  If you understand it and recollect.
9    THE WITNESS:  What was the question again.
10    MS. LARKINS:  I have no idea.
11    I think I can answer.  Let me ask a different one.
12    Q.  Do you believe that the report you made on April
13  20th, 2001, was what caused Rick Werlin to place Maura
14  Larkins on leave again?
15    A.  No.  That was not my intent.  I at no time said
16  anything to that effect, and that was in my previous
17  deposition.
18    Q.  Okay.  You didn't answer my question.  Do you
19  believe that your report on April 20th, 2001 was what caused
20  Mr. Werlin to place Maura Larkins on leave again?
21    A.  No.  There are other people in the office that
22  were at that meeting that were expressing concerns, Kathy
23  Bingham, for example, went through that statement.
24    MS. ANGELL:  Excuse me.  I'll ask the witness to
25  answer the question that's asked.

22 (Pages 82 to 85)

San Diego Court Reporting Service

Page 86

1    THE WITNESS: Okay.
2  BY MS. LARKINS:
3    Q.  Okay. Did Kathy Bingham agree to go on record as
4  making an allegation against Maura Larkins?
5    MS. ANGELL: Objection. Assumes facts not in
6  evidence. Vague and ambiguous as to time.
7  BY MS. LARKINS:
8    Q.  Okay. On April 20th, 2001, when you were in this
9  meeting with Kathy Bingham --
10    A.  Uh-huh, uh-huh.
11    Q.  -- and did she say that she would allow her
12  allegation to go on record?
13    A.  I don't remember. I don't remember what -- what
14  she said.
15    Q.  All right.
16    MS. ANGELL: I'll renew my objection to this
17  entire line of questioning again as being not reasonably
18  calculated to lead to the discovery of admissible evidence in
19  the case at bar.
20  BY MS. LARKINS:
21    Q.  Okay. Did you tell Mr. Werlin that you would go
22  on record with your allegation?
23    MS. ANGELL: Objection. Vague and ambiguous as to
24  time.
25  ///

Page 87

1  BY MS. LARKINS:
2    Q.  At the -- did you tell Mr. Werlin at the
3  April 20th, 2001 meeting that you were willing to -- to go on
4  record as having made the allegation --
5    MS. ANGELL: Objection.
6    MS. LARKINS: -- against Maura Larkins?
7    MS. ANGELL: Assumes facts not in evidence. I
8  think there's been testimony that it's not clear whether or
9  not Mr. Werlin was at a meeting on April 20th and that your
10  question assumes that he was at an April 20th meeting. So
11  it's confusing to me. I don't know how the witness could
12  understand the question.
13  BY MS. LARKINS:
14    Q.  On April 20th, 2001 when you made your report to
15  Dr. Donndelinger and perhaps Mr. Werlin also, did you agree
16  to have your allegations go on record officially as an
17  official complaint against --
18    A.  I don't know.
19    Q.  -- Maura Larkins?
20    A.  I don't know what official means because I was
21  just there expressing what had happened and expressing how I
22  felt.
23    Q.  I might have -- I might have some notes that might
24  help a little bit.
25    Okay. I ask that this exhibit which is

Page 88

1  handwritten notes by Gretchen Donndelinger that were produced
2  in the matter of the administrative hearing for the dismissal
3  of Maura Larkins, these pages are Bates stamped 31 and 32,
4  and as I recall this was Exhibit 14 of the school district's
5  exhibits. Could we label this as Exhibit 20.
6    (Plaintiff's Exhibit No. 20 was marked for
7    identification.)
8    MS. ANGELL: And I'll make an objection for the
9  record as to each and every one of the documents proffered to
10  be marked as exhibits, not entered as exhibits for lacking
11  foundation and having authenticity not been established. And
12  I also object to plaintiff Ms. Larkins' characterization of
13  the documents seeing as how they lack foundation.
14    MS. LARKINS: Thank you.
15    MS. ANGELL: And excuse me. This -- you were
16  talking about this exhibit -- proffered exhibit to be marked
17  as No. 20 as being Exhibit 14 to what. You said the school
18  district's Exhibit 14 to -- what are you talking about?
19    MS. LARKINS: The administrative hearing for the
20  dismissal of Maura Larkins.
21    MS. ANGELL: Some sort of trial exhibit or
22  something?
23    MS. LARKINS: Yeah.
24    Q.  Okay. This page is labeled 4/20/01. And could
25  you read the first three-line section there, Ms. Watson?

Page 89

1    A.  Where, under my name?
2    MS. ANGELL: I'm objecting to the use of this
3  document that is not marked as an exhibit here. We don't
4  know what it is, where it came from, it lacks foundation.
5  And if you're wanting the witness to testify as to -- I'm not
6  sure what you want her to testify to on it, but I don't know
7  where this document came from.
8    MS. LARKINS: I'm trying to help her jog her
9  memory. I'm just thinking this might help a little bit.
10    Q.  Could you read the first three lines.
11    MS. ANGELL: Do you mean to herself?
12    MS. LARKINS: No, out loud, please.
13    THE WITNESS: Under where it says my name?
14  BY MS. LARKINS:
15    Q.  No, at the very top.
16    A.  Where it says Rick?
17    Q.  Yeah.
18    A.  "In workplace, sometimes people lose it. We want
19  to support. We will be fair."
20    Q.  And what does that say right next to Rick?
21    A.  Meeting at teachers -- of teachers after school,
22  4-20-01.
23    Q.  Okay. And what is the next name after -- Rick is
24  the first name and then there's some writing. And then
25  what's the next name that comes next?

23 (Pages 86 to 89)

Page 90

1    A.  Kathy B.
2    Q.  Kathy B.  Since this is a meeting -- okay.  Could
3  you read what Kathy B. said.
4        MS. ANGELL:  Again, I'm objecting to this line of
5  questioning concerning exhibit -- the document marked as
6  Exhibit 20.  The exhibit lacks foundation.  As far as I can
7  tell so far, this is not calculated to lead to the discovery
8  of admissible evidence in the matters before the case at bar.
9        MS. LARKINS:  Okay.  I am a 3rd grade teacher, not
10  a lawyer, and I am struggling here today.  This is very
11  difficult for me.  I'm trying to get some information, and I
12  am not being very successful at it, but I'm going to soldier
13  on here.
14        MS. ANGELL:  Mrs. Larkins, would you like to stop
15  so that you can retain counsel to ask these questions for you?
16        MS. LARKINS:  I will take that as a rhetorical
17  question.
18        MS. ANGELL:  Because we can stop if you'd like to
19  retain counsel to ask the questions for you and conduct the
20  deposition.
21        MS. LARKINS:  Okay.  Let me see if I understand
22  you.  Are you offering to stop this deposition so that I can
23  retain counsel to represent me in this matter?
24        MS. ANGELL:  You're complaining and making
25  statements on the record that you're not qualified and that

Page 91

1  it's difficult for you to conduct a deposition.  And I'm
2  stating that if you feel that you're not qualified or you
3  don't want to conduct the deposition, that's up to you.  It's
4  your deposition.  If you need to have a lawyer do this for
5  you, then that's entirely up to you.
6        MS. LARKINS:  Let's see.
7        MS. ANGELL:  As far as complaints about --
8        MS. LARKINS:  I think --
9        MS. ANGELL:  -- you're not being a lawyer, that's
10  argumentative.  That does not need to be inserted into our
11  record here, and could we just move the deposition along
12  without the additional commentary.  It would go much more
13  quickly.
14  BY MS. LARKINS:
15    Q.  Okay.  Did you call Rick Werlin at his home at any
16  time?
17    A.  No.
18    Q.  Would you object to your phone records being
19  produced for February 10th, 2001?
20    A.  I have no objection to that.
21    Q.  Okay.  What was your phone company at that time?
22    A.  I have to get that information for you, because --
23  I think it was Pac Bell, but my husband pays the bills and I
24  think -- you know, company's change.
25    Q.  Uh-huh.  Okay.

Page 92

1    A.  I'll get you that information.
2    Q.  Do I understand correctly that you were upset on
3  April 20th, 2001, when Maura Larkins mentioned the word court
4  to you?
5        MS. ANGELL:  I'm going to object to that question.
6  I think that is vague and ambiguous because the witness has
7  already testified that she was upset based on being
8  approached physically and yelled at by Maura Larkins on that
9  date in the locker room at the school.
10        MS. LARKINS:  Well, then we haven't answered this
11  question.
12        THE WITNESS:  What was the question?
13  BY MS. LARKINS:
14    Q.  Were you upset by Maura Larkins mentioning the
15  word court?
16    A.  I was upset with your mannerisms and the fist in
17  my face and the inappropriateness of the location and not
18  respecting me by stopping and having the conversation at
19  school with a representative after what I'd been through
20  prior during that week, like on Wednesday afternoon when you
21  called me a liar and said I was delusional in front of all
22  the children and was shouting at me.
23        MS. ANGELL:  Again, I renew my objection to this
24  entire line of questioning.  It's not reasonably calculated
25  to lead to the discovery of admissible evidence about the

Page 93

1  cause of action -- the causes of action that exist in this
2  litigation.  This litigation has a cause of action related to
3  the use of information from an alleged arrest record.  So far
4  we've not had any question about an alleged record of arrest
5  or use of information therefrom.  We did have a question or
6  two about a gun.  But other than that, that's -- that's the
7  only thing that's been relevant to this case.  And I would
8  just, you know, respectfully request that we get some
9  questions that have something to do with the causes of action
10  that exist as opposed to causes of action which have been
11  dismissed without leave to amend.
12  BY MS. LARKINS:
13    Q.  So on Friday, April 20th, what was it that Maura
14  Larkins wanted to talk to you about?
15        MS. ANGELL:  Asked and answered.
16  BY MS. LARKINS:
17    Q.  Tell us.
18        MS. ANGELL:  Let me state for the record that I
19  believe that this repetitive questioning is harassing to the
20  witness.  These questions about the April 20th conversation
21  have been asked and answered, and I request respectfully that
22  plaintiff move along and get to a topic that hasn't already
23  been exhaustively covered.
24        MS. LARKINS:  I honestly do not recall asking this
25  witness what Maura Larkins wanted to talk to her about on

24 (Pages 90 to 93)

San Diego Court Reporting Service

Page 94

1  April 20th.
2      Could you answer the question what did Maura
3  Larkins want to talk to you about?
4      MS. ANGELL: If you were told and you know it.
5      THE WITNESS: I believe that you were not
6  satisfied with the answer that you got at our grade level
7  meeting on Thursday about not doing the teaming the following
8  week, and you were -- when you approached me, your words were
9  "I have an" -- and I know you were going to say "I have an
10  idea as to how we can still team," because you were not going
11  to let that subject die. You were going to continue. And
12  that's when I cut you off and I said "I don't want to talk
13  about it unless we, you know, have a representative present."
14  BY MS. LARKINS:
15      Q. Okay. I understand that at that moment you were
16  fully convinced that you knew what Maura Larkins was going to
17  say. Now that you think back on it, are you 100 percent sure
18  that you know what Maura Larkins was going to say?
19      A. I knew that you had had trouble accepting a
20  decision, and if you didn't like the decision it was -- you
21  just kept coming back trying to modify it until it would suit
22  your needs or be what you wanted. And I just feel that this
23  was another attempt to continue teaming for the next week.
24      Q. So your answer is yes, you are quite certain that
25  you know what Maura Larkins was going to say?

Page 95

1      A. No, I'm not certain what you were going to say
2  because you only said about three words out of your mouth.
3  But I'm saying I did not want to talk to you at that point in
4  that situation, and you came right at me. You came really
5  close to me and after what had happened two days prior to
6  that, I didn't know what to expect, and I didn't really feel
7  like talking to you in that situation.
8      Q. Okay. In another situation, though, if someone
9  came up to you and said I have an idea, you probably would
10  have heard them out?
11      MS. ANGELL: Objection. Calls for speculation.
12  BY MS. LARKINS:
13      Q. Go ahead and answer.
14      A. Sure. If -- you know, if the person was talking
15  rationally and I had a relationship with that person where I
16  could communicate with them in a reasonable manner, yes, I
17  would let them finish talking to me.
18      Q. Okay. Now, at this point do you recall that Maura
19  Larkins had been back at work for about a week?
20      A. Yes.
21      MS. ANGELL: Excuse me. I don't understand the
22  question as to time. At what point?
23      MS. LARKINS: The time in the last question. Is
24  that not permissible to like go from one question to the
25  next?

Page 96

1      MS. ANGELL: Well --
2      MS. LARKINS: No, honestly, that's a true
3  question.
4      MS. ANGELL: What's going to happen is that when
5  we get to a motion for summary judgment we'll have to make
6  citations to the transcript of the deposition.
7      MS. LARKINS: Yeah.
8      MS. ANGELL: And your -- quite often your
9  questions are very long or there are objections in between.
10  So the question might be five pages back from the answer, and
11  it will be very difficult for purposes of managing using that
12  document in the future if the facts aren't close in the
13  question to the answer. That's why I --
14      MS. LARKINS: Okay. I'm going to try to do it
15  every question to include a date, although I know that's not
16  how --
17      MS. ANGELL: Well, if we stick with one topic --
18      MS. LARKINS: -- other lawyers have done it.
19      MS. ANGELL: -- then that's one thing. But we're
20  kind of jumping around a lot, and sometimes you talk about
21  one day and then the next day and back and forth, so just for
22  purposes of clarity.
23      MS. LARKINS: Okay. Let's see. Could you read
24  back my last question.
25      (Page 95, Lines 18 through 20 were read back.)

Page 97

1  BY MS. LARKINS:
2      Q. On April 20th, 2001, do you recall that
3  Ms. Larkins had been back at work for about a week?
4      A. Yes.
5      Q. Okay. Had you objected to anybody about her
6  coming back?
7      A. No.
8      Q. Did you feel that she had a right to come back?
9      A. All of that decision making was at the district
10  level. I really didn't know why you were on leave. I didn't
11  know any details. That was all very hush hush and private,
12  and that was to respect your privacy, and we didn't -- I
13  didn't inquire.
14      Q. I believe that we established -- strike that.
15      I believe that you mentioned that you thought that
16  it had to do with Jo Ellen Hamilton, the reason that Maura
17  Larkins was taken out?
18      MS. ANGELL: I believe the testimony -- that
19  misstates -- objection. It misstates the testimony. I
20  believe the testimony was that something read out of an
21  Exhibit 2 which is not -- which lacks foundation. It was a
22  reading out of Exhibit 2 which said that she assumed that it
23  had something to do with Jo Ellen Hamilton but that she
24  didn't know.
25      MS. LARKINS: Okay.

25 (Pages 94 to 97)

Page 98

1    MS. ANGELL: Renew my objection on relevance
2  grounds.
3  BY MS. LARKINS:
4    Q. Okay. I'm going to try a different tack. Could
5  we go to Exhibit 4 which is the deposition of Virginia Boyd,
6  Page 40. Fortunately there's a date right here on the top of
7  the page. Okay. Could you read out loud, Mrs. Watson, that
8  first question?
9    MS. ANGELL: I object to the use of this document
10  that's been marked but not entered as Exhibit 4. It lacks
11  foundation.
12    And I ask, Ms. Watson, whether or not you've ever
13  seen a copy of this document that's now placed in front of
14  you marked as Exhibit 4?
15    THE WITNESS: No, I've never seen this.
16  BY MS. LARKINS:
17    Q. Yes. Could you go ahead and read the first
18  paragraph. It's a question.
19    MS. ANGELL: I'm sorry, what page?
20    MS. LARKINS: Page 40. It's -- in fact, it's a
21  question asked by me.
22    Q. Could you go ahead.
23    A. "Okay. Let's go ahead and talk about this meeting
24  on February 12th. I believe you said that -- here it is. It
25  was an early morning meeting; you thought that either Tim --

Page 99

1  Tim O'Neil or Richard Werlin had called you."
2    Q. Okay. That's fine. I just wanted to establish
3  that on this page we're talking about this -- you know, I
4  think maybe we should just keep going to keep this date
5  established. Could you read the next little paragraph?
6    A. "Did you speak to Maura Larkins before the
7  February 12th meeting?"
8    Q. Okay. And the answer, since this is the
9  deposition of Virginia Boyd, was Virginia Boyd's answer, and
10  she said, "Briefly outside the office. That would be the
11  district office."
12    MS. ANGELL: I have two objections. First is,
13  it's -- whatever's going on here is vague and ambiguous.
14  We're talking about February in some year.
15    In addition, this witness is -- was not present.
16  I'll represent that this witness, Ms. Watson, was not present
17  at the deposition of Gina Boyd and that this is not a proper
18  subject of testimony, reviewing the deposition testimony for
19  this witness. If -- I don't see how this is even remotely
20  relevant to the question of whether or not Ms. Watson
21  received or passed on information from a record -- an alleged
22  record of arrest concerning Maura Larkins.
23    MS. LARKINS: Okay.
24    MR. HERSH: And I would further object because the
25  transcript that you're reading has not yet been finalized

Page 100

1  because the period for corrections hasn't expired.
2  BY MS. LARKINS:
3    Q. Okay. Thank you.
4    All right. And -- okay. Gina Boyd said that she
5  had spoken to Maura Larkins briefly outside the office. That
6  would be the district office.
7    And then the questioner, which was me said, "In
8  the meeting -- what do you remember that Rick Werlin said in
9  the meeting?" And could you read Gina Boyd's answer there on
10  Line 12.
11    A. "Rick Werlin indicated that more than one person
12  had contacted me and indicated that they feared for their
13  personal safety."
14    Q. Okay. And earlier -- as far as establishing the
15  year for this, the year is established on Page 39. It is the
16  year 2001 that -- in which this meeting took place on
17  February 12th.
18    Okay. I wanted you to note that there is sworn
19  testimony that more than one person complained. It was not
20  just Jo Ellen on February 12th, although Jo Ellen did come
21  forward with her complaint and put herself on the record.
22  And I'd like to have you look at Jo Ellen's complaint which
23  is on page -- Exhibit 6.
24    MS. ANGELL: I object to whatever that just was.
25  If it was a question, I don't know, but I find it to be

Page 101

1  argumentative, badgering, and harassing of this witness.
2  This is not an opportunity for plaintiff to convince the
3  witness of events. This is an opportunity for plaintiff to
4  ask questions and take testimony.
5    MS. LARKINS: Thank you.
6    MS. ANGELL: In addition, in referring to the
7  document that's been marked as Exhibit 6 and not entered as
8  an exhibit, I object to the proposed exhibit because it lacks
9  foundation, lacks authenticity, and I ask the witness whether
10  or not you've ever seen this document before.
11    THE WITNESS: Never.
12  BY MS. LARKINS:
13    Q. Okay. Could you tell -- could you state out loud
14  the date that is written at the top of this document.
15    A. Tuesday, February the 6th.
16    Q. And there's even a time of day, isn't there?
17  Could you tell that?
18    A. 11:25 a.m.
19    Q. Okay. Could you read what this document says?
20    MS. ANGELL: Objection. This line of questioning
21  is not reasonably calculated to lead to the discovery of
22  admissible evidence with regard to the matters in the case at
23  bar.
24    THE WITNESS: "Maura and I were both in the lounge
25  doorway, and I said, 'Gretchen told me that you submitted a

26 (Pages 98 to 101)