Page 102

1  written complaint about me.' Maura said, 'Gretchen lied!
2  Would you like to see the letter that I wrote?' 'I've
3  already seen it.' 'You saw the letter that I gave to
4  Gretchen?' she asked. 'Yes, I saw the letter.' Then she
5  said, 'You are part of the problem' (2). 'You have done many
6  inappropriate things.' When I started to respond," they
7  turned -- "she turned and walked away."
8  Q.  And I think that "2" that we saw refers to this
9  little side note here. Could you read this little side note?
10  A.  "I said, 'What is the problem?' And 'that's your
11  perspective.'"
12  Q.  Thank you.
13  Did anyone ever discuss an incident like this with
14  you? Does this incident sound at all familiar?
15  MS. ANGELL:  Objection. That question is
16  compound. Could we maybe have one question at a time.
17  BY MS. LARKINS:
18  Q.  Certainly. Does this incident that you have just
19  read about sound at all familiar to you?
20  A.  It's vaguely familiar, but I didn't know the
21  details. I knew that there was a problem with -- you had
22  with Jo Ellen, but I don't know and I still don't know what
23  the problem was about.
24  Q.  Well --
25  A.  Now I can see I guess.

Page 103

1  Q.  This is the reason that Maura Larkins was placed
2  on leave on February 12th, 2001.
3  MS. ANGELL:  Do you have a question?
4  MS. LARKINS:  Except for the question of the
5  second caller.
6  MS. ANGELL:  Move to strike the plaintiff's
7  testimony given there since we don't have a question.
8  BY MS. LARKINS:
9  Q.  Did you ever tell anybody that you thought Maura
10  Larkins was the type of person who became a mass murderer?
11  A.  No, I never said anything like that.
12  Q.  I have a two-page document which I ask to be
13  marked as Exhibit 24.
14  (Plaintiff's Exhibit No. 24 was marked for
15  identification.)
16  BY MS. LARKINS:
17  Q.  I represent that this is a copy of some notes I
18  took very messily on -- in February of 2001. The top where
19  it says "Salem syndrome. Respect for all. Apple and tree.
20  Parents, slash, clothes," that's just some notes about what I
21  was thinking. The part of this note that's -- I'd like to
22  bring special attention to is the note that occurs past
23  the -- below the diagonal line that I drew there. Could you
24  read the first sentence there below the diagonal line?
25  MS. ANGELL:  I object to reference and use of this

Page 104

1  document which is marked but not entered as Exhibit 24. It
2  lacks foundation, and it's been represented that these are
3  notes done by plaintiff herself, not anything that this
4  witness would have personal knowledge of.
5  I also object on the basis that it lacks -- the
6  question is not relevant. It's not designed to lead to the
7  discovery of admissible evidence in the case at bar.
8  BY MS. LARKINS:
9  Q.  Thank you.
10  Could you read that first sentence.
11  A.  "I talked to Maria on 2-25."
12  Q.  Okay. You know what, I think I'll read the next
13  part because my handwriting was so messy that it would be an
14  imposition to ask you to decipher it. "Tuesday or Wednesday,
15  February 20th or 21st, Linda had been talking with Jo Ellen
16  and Denmon. Linda W. asked about me." And then it says
17  "Linda" with a colon there, but this was actually Maria who
18  said this quote, and I'll read Maria's quote. "Two maybe
19  three people on staff initiated the destruction of another
20  teacher's career." And then it shows Linda Watson -- Linda
21  W. saying something, and Linda W. -- could you read what is
22  written there that Linda W. says?
23  A.  You mean the second one where it says Linda W.
24  right there?
25  Q.  Right here.

Page 105

1  MS. ANGELL:  Let the report reflect that plaintiff
2  is pointing to a section at the bottom of the document marked
3  as Exhibit 24.
4  MS. LARKINS:  Thank you.
5  THE WITNESS:  "Do you really think Maura is
6  dangerous. That's what they say about people who are mass
7  murderers."
8  BY MS. LARKINS:
9  Q.  Okay. And since my handwriting gets pretty messy
10  here, I will do the reading from now on. Then I have Linda,
11  colon. "That's why we didn't want to team with her." And
12  then in these quotation marks, that is not what Linda said.
13  That was my own note, "but it was after two or three days
14  without talking to me."
15  Okay. And then it says "Linda said there was a
16  meeting where Maria was not present where I was very
17  violent," and the "I" referred to Maura Larkins. Could you
18  read -- at the very bottom there are four lines of a quote
19  from Linda W. Could you read that.
20  MS. ANGELL:  I object to the characterization of
21  anything written on this document as a quote from Linda
22  Watson. This document lacks foundation, is not authenticated,
23  and purportedly is a document based on plaintiff's
24  representations that she created.
25  ///

27 (Pages 102 to 105)

Page 106

BY MS. LARKINS:

2    Q. I did not say Linda Watson I don't think. I tried
3 to say Linda W.
4         Could you read that last four lines?
5    A. "We're scared of her. Her way of doing things is
6 so different from ours."
7    Q. Did you ever tell anyone that you believed Maura
8 Larkins' way of doing things was different from yours?
9    A. I don't remember saying that.
10    Q. Ever?
11    A. I don't remember saying that, no.
12    Q. Do you remember thinking that?
13         MS. ANGELL: Vague and ambiguous as to time.
14 BY MS. LARKINS:
15    Q. Was that ever a thought that entered your mind,
16 that Maura Larkins did things differently from you?
17    A. No. I mean, everybody does things differently,
18 you know. Everybody does things in their own way. It
19 doesn't make sense.
20    Q. Was there anything about the way Maura Larkins did
21 things that bothered you?
22         MS. ANGELL: Vague and ambiguous as to time.
23 BY MS. LARKINS:
24    Q. Ever. Ah, let's say before Maura Larkins sued
25 you.

Page 107

1    A. You have to be more specific. What time are you
2 talking about?
3    Q. Okay. When Maura Larkins came to Castle Park
4 school as the bilingual teacher, did -- was her class
5 included in the 3rd grade academic teaming?
6    A. In the beginning -- the first year? I don't
7 remember. I know you were either that first year or the
8 second year.
9         MS. ANGELL: I'm going to object to this line of
10 questioning, wherever it's going. I'm assuming that
11 Ms. Larkins came to work at Castle Park Elementary School at
12 some point. It's not established I don't think on this
13 record. I'm assuming that she came to work at some point
14 prior to the '00-01 school year. Therefore, these questions
15 are not reasonably calculated to lead to the discovery of
16 admissible evidence whether or not Ms. Larkins' classroom was
17 on a teaming schedule with other teachers in the 1990s or
18 1980s whenever she came to that school.
19         MS. LARKINS: I would like to ask that this
20 document be marked as Exhibit 3.
21         (Plaintiff's Exhibit No. 3 was marked for
22    identification.)
23 BY MS. LARKINS:
24    Q. Does it seem to you that Maura Larkins came to
25 Castle Park around the fall of '97, 1997? Does that sound

Page 108

1 about right?
2    A. I don't know. I don't know.
3    Q. Okay. About how many years do you think that
4 Maura Larkins taught at Castle Park before she was taken out
5 of her classroom?
6    A. Gosh, I don't know.
7    Q. Well, was it more like 20 or more like two or --
8    A. No, it wasn't 20 years. Approximately I'd say
9 five years, something like that. But I'm just guessing.
10         MS. ANGELL: Would that be an estimate or a guess?
11         THE WITNESS: Estimate.
12 BY MS. LARKINS:
13    Q. Would you believe me if I told you that she came
14 in 1997, and like I say, got that -- '98 would be -- '98,
15 '99, 2000. So it would have been three and a half years
16 before she was taken out of her classroom? Does that sound
17 about right to you?
18    A. I guess so.
19    Q. Okay. We can establish that at some other time.
20         Okay. Now, do you recall Richard Denmon saying
21 that he did not want to team with Maura Larkins?
22         MS. ANGELL: Vague and ambiguous as to time.
23 BY MS. LARKINS:
24    Q. Ever.
25         MS. ANGELL: And I renew my objection on

Page 109

1 relevance. This stuff about teaming is not reasonably
2 calculated to lead to the discovery of admissible evidence
3 with regard to causes of action for alleged use of
4 information from a record of arrest in the year 2000 and
5 thereafter.
6         THE WITNESS: Ask the question again, please.
7 BY MS. LARKINS:
8    Q. Did Richard Denmon ever tell you that he didn't
9 want to team with Maura Larkins?
10    A. We did team with you, so it wasn't a matter of if
11 we wanted to or not. We did team with you in more than one
12 year while you were there.
13    Q. Okay. Let me see how I can do this. Before you
14 and Richard Denmon began to team with Maura Larkins, had
15 Richard Denmon said that he didn't want to team with Maura
16 Larkins?
17    A. I don't -- I don't remember.
18    Q. Okay. Let's look at Exhibit 3. At the top it
19 says Chula Vista Elementary School District, Summary
20 Evaluation Report, and the name on it is Maura Larkins. The
21 job description title is 3rd grade bilingual teacher. And if
22 you look at the last of the three pages, you'll see that it
23 is dated April 28th, '00, which is 2000.
24         Okay. I would like to look at the first page, the
25 very last sentence on the page which is under "Instructional

28 (Pages 106 to 109)

Page 110

1  Techniques"? There's a box under "Instructional Techniques"
2  and a paragraph of writing. The very last sentence there,
3  could you please read that sentence.
4      MS. ANGELL: I object to the use of this document.
5  It lacks foundation and is not authenticated, and it also is
6  not reasonably calculated -- questions on this document are
7  not reasonably calculated to lead to the discovery of
8  admissible evidence with regard to causes of action related
9  to using information from a record of arrest or causes of
10  action against Mr. Carlson for slander or Mr. Carlson and
11  Ms. Donlan for conspiracy to slander. Those are the only
12  causes of action we have here. Could we please talk about
13  something that relates to the causes of action that exist.
14  BY MS. LARKINS:
15      Q. It says, "Maura took a leadership role with her
16  team this year to offer students an equitable and consistent
17  program."
18      Okay. So it appears that in the year -- school
19  year 1999 to 2000 there was some sort of change in the --
20  her -- Maura Larkins' team.
21      MS. ANGELL: Objection. Assumes facts not in
22  evidence, and that's not a question. Therefore, I move for
23  it to be stricken from the record.
24  BY MS. LARKINS:
25      Q. Is 1999 to 2000 the school year in which you began

Page 111

1  to do academic teaming with Maura Larkins?
2      A. I don't remember. I don't remember the dates.
3      Q. Do you remember there ever having been a time
4  where you did not do teaming with Maura Larkins?
5      A. It's -- I remember there was one year that we
6  decided not to team with you on the elective subjects like
7  art, social studies, but we did continue to team with you on
8  P.E.
9      Q. So it is your testimony that when Maura Larkins
10  first came to Castle Park, you included her classroom in your
11  grade level's academic teaming?
12      A. I don't know what year it was that we started, but
13  it seems like it was the first or the second year that you
14  were there that we got our team together and we established
15  this teaming of all of our children.
16      Q. Okay. Is it possible that the first two years
17  that the only teaming that was done was P.E.?
18      A. I don't remember.
19      Q. Does that sound like that might be right?
20      MS. ANGELL: Asked and answered.
21      THE WITNESS: I don't know.
22      MS. LARKINS: It's a different question.
23      THE WITNESS: I don't remember.
24      MS. LARKINS: Okay. Okay. Can we take a break?
25      MS. ANGELL: Fine.

Page 112

1      THE VIDEOGRAPHER: We're off the record. The time
2  is 3:29 p.m.
3      (Recess taken.)
4      THE VIDEOGRAPHER: We're back on the record. The
5  time is 3:39 p.m.
6      MS. ANGELL: Now that we're back on the record,
7  Ms. Watson indicated to me on the break that she needs to
8  make a correction to earlier testimony.
9      Go ahead.
10      THE WITNESS: In regards to phoning Rick Werlin
11  on -- I don't know if it was a weekend night or whatever,
12  I've thought about it, and I may have called him, but I do
13  not remember reaching him. And I don't even remember what
14  the purpose of the call was.
15  BY MS. LARKINS:
16      Q. Thank you. Do you think that might have been in
17  February 2001?
18      A. I don't remember.
19      Q. Okay. Was it about -- in reference to Maura
20  Larkins?
21      A. I don't remember. I don't remember what it was
22  about. And I was trying to figure out when it could have
23  been made, and I can't -- I can't put the dates together as
24  to when it would make sense.
25      Q. But you believe that you -- at most you only

Page 113

1  called him one time ever?
2      A. Yes. I'm -- you know, I want to say I'm pretty
3  sure that if I did, and I'm not even sure I did, that it was
4  one time to his house on a weekend. But I did not reach him,
5  did not have a conversation with him at that time.
6      MS. ANGELL: Could I ask a question on that?
7      Do you remember whether or not you called or are
8  you just saying that you don't remember not calling?
9      THE WITNESS: I don't remember whether I called or
10  not. But I want to be careful how I answer that. I don't
11  remember whether I called him or not at home.
12      MS. ANGELL: Okay. Thanks.
13      THE WITNESS: It's been about three or four years
14  ago, and I -- you know, it's been a long time ago. A lot's
15  happened since then.
16  BY MS. LARKINS:
17      Q. Assuming that you did call Rick Werlin or attempt
18  to call him, it would have been a matter of significant
19  importance, would it not, about which you called him?
20      MS. ANGELL: Calls for speculation. That's an
21  objection.
22  BY MS. LARKINS:
23      Q. Is Rick Werlin a personal friend of yours?
24      A. No.
25      Q. Is it possible that you called him up just to chat?

29 (Pages 110 to 113)

Page 114

1    A.  No.

2    Q.  So if you called Rick Werlin at home, it would

3  have been something related to Chula Vista School District?

4    A.  Yes.

5    Q.  If you called Rick Werlin at home, it would have

6  been related to some important matter?

7    A.  Pardon me.  Yes.

8    Q.  Is it possible that you called him regarding Maura

9  Larkins?

10    A.  It's possible.

11    Q.  Okay.  Thank you.  Could I ask you to look at

12  Exhibit 20.  It's these notes of Gretchen Donndelinger dated

13  4-20-01.

14      MS. ANGELL:  And I'm going to object to the

15  characterization as the document marked as Exhibit 20 but not

16  entered as notes of Gretchen Donndelinger.  The document

17  lacks foundation.  We actually have no idea what it is other

18  than it's a piece of -- it's some sort of document that's two

19  pieces of paper stapled together.

20  BY MS. LARKINS:

21    Q.  Okay.  I'd like you to look at the second page of

22  these two pages.  There are four lines together and then

23  there is a space and then there's a second area of writing.

24  Could you read that second area of writing, those three lines.

25    A.  "The truth will come out," that one?

Page 115

1    Q.  Uh-huh.

2    A.  "The truth will come out in court.  We'll all take

3  lie detector test.  The truth will come out."

4    Q.  Okay.  Looking back on the previous page, do you

5  see that someone has written "Linda Watson" with a sort of

6  strange "L" that looks more like an "S," and then there is an

7  area of writing that continues through and including the

8  sentence you just wrote -- read?

9    A.  Is there a question?  Is that a question?

10    Q.  I'm asking you, are you with me?  Do you see

11  that -- that this sentence you just read is part of this

12  group of lines written under the name Linda Watson?

13      MS. ANGELL:  Objection.  The document speaks for

14  itself.

15  BY MS. LARKINS:

16    Q.  Okay.  So I think we're on the same page now.

17  These notes seem to be indicating that this passage is

18  something that you said to Gretchen Donndelinger and she

19  wrote down.  This does sound a lot like what you were quoting

20  regarding the incident that same morning, April 20th, 2001 at

21  Loma Verde.

22      MS. ANGELL:  I'm going to object to plaintiff's

23  comments because they are not a question and move to strike

24  them and request that plaintiff ask questions of this witness

25  rather than testify.

Page 116

1      MS. LARKINS:  I'm sorry.  I'll try.  I'll do my

2  best.  I'm really not trying to irritate anyone.

3    Q.  Do you believe that you said these words to

4  Gretchen Donndelinger on April 20th, 2001?

5      MS. ANGELL:  Objection.  Vague and ambiguous.

6    Answer if you understand.

7      THE WITNESS:  I haven't read it.  You want me to

8  read it?  I haven't read it completely.

9      MS. LARKINS:  Sure.  Go ahead.

10      THE WITNESS:  It's kind of hard to read.

11      MS. ANGELL:  If you could be more specific about

12  what words you're talking about, I think I could hold off

13  from making the objection.

14  BY MS. LARKINS:

15    Q.  Okay.

16    A.  I don't -- I can't read that.  I don't know what

17  that means.  12 years?

18    Q.  Perhaps known 12 years, known Maura since Rice?

19    A.  Oh, okay.  Then what does that say in parentheses?

20    Q.  Gosh, something that -- loner maybe, loner there?

21  Would you have said something like that?  I'm just guessing.

22    A.  I don't know.

23    Q.  Lover?

24    A.  Lover there, didn't say that.

25    Q.  Oh, come on.

Page 117

1    A.  Is that supposed to be me?

2      MS. ANGELL:  I have no idea.  Did you create this

3  document?

4      THE WITNESS:  No, I didn't.  I've never seen it.

5      MS. ANGELL:  Well, I didn't create it, so I have

6  no idea what it's supposed to be.

7      THE WITNESS:  I can't read half of the words on

8  this document.

9  BY MS. LARKINS:

10    Q.  Yeah, it's pretty bad handwriting.  I believe that

11  there is just one section that's quoting you, and it stops

12  right there after that line that you read.

13    A.  Which one?

14    Q.  The line "the truth will come out in court.  We'll

15  all take lie detector test.  The truth will come out"?

16      MS. ANGELL:  I'm going to object to plaintiff's

17  testifying again regarding what she believes and what she

18  doesn't believe.  If she could ask a question about the

19  document, that would be one thing.  But, you know, this

20  document lacks foundation.  I object to this.  This is a

21  waste of time for everybody here.  If you have a question,

22  please go ahead and proceed and ask it.

23  BY MS. LARKINS:

24    Q.  Okay.  Did you have a chance to read this -- the

25  bottom of the first page after the words "Linda Watson"?

Page 118

1      MS. ANGELL: Exhibit 20?
2   BY MS. LARKINS:
3      Q.  And the first two paragraphs of the second page,
4   yes, of Exhibit 20?
5      A.  Yes.
6      Q.  Okay.  Does this sound like what you reported to
7   Gretchen Donndelinger on April 20th, 2001?
8      A.  Yes, it does.
9      Q.  Okay.  And now that you see that she apparently
10  reported that you said everybody -- "we'll all take lie
11  detector test," do you think maybe you did say that to her?
12     MS. ANGELL:  Again, I'm going to -- I'm going to
13  object to plaintiff's characterization of where this document
14  came, who made it, and what it is because that's not
15  established.  The document lacks foundation, and I'm
16  reminding the witness to answer about what she knows, not
17  what she guesses.
18     THE WITNESS:  I may have said this to her.  And
19  there again, you may have said that at the pool.  I was
20  scared; I was upset.  You were ranting and raving, and it was
21  hard to understand a lot of the things you were saying at the
22  pool.
23  BY MS. LARKINS:
24     Q.  Okay.  And is it possible that you were so
25  frightened at this time that you didn't remember everything

Page 119

1   exactly correctly?
2      MS. ANGELL:  Objection.  Calls for speculation.
3   It's possible that there could be a banana boat parked out
4   front.
5   BY MS. LARKINS:
6      Q.  Do you believe that your memory of what happened
7   on April 20th, 2001, in the locker room at Loma Verde is
8   perfect?
9      A.  I went back to school -- immediately went back to
10  school, and I went to my desk and I wrote this up so that my
11  memory would be clear and I would have it documented with
12  dates.  And except for that one statement that said I was
13  at -- in Loma Verde locker room, this is -- this is my
14  recollection this is what happened on April 20th, 2001.
15     MS. ANGELL:  And for the record, the written
16  record, let me reflect that the witness was holding up the
17  document that's been marked not entered as Exhibit 9.
18     MS. LARKINS:  Can I get these documents entered
19  now?  I move to enter all these documents.  Do you agree?
20     MS. ANGELL:  No.  I object.  The documents lack
21  foundation.
22     MR. HERSH:  And I also object on the same grounds.
23  BY MS. LARKINS:
24     Q.  Okay.  Okay.  I'm getting the impression that you
25  are relying on your notes to know what happened during the

Page 120

1   week of April 16th, 2001.  Do you have -- are you relying on
2   those notes to help you remember what happened during the
3   week of April 16th, 2001?
4      A.  I was so traumatized on that day, that whole week,
5   I will never forget what happened to me during that week,
6   what you put me through during that week.  These notes may
7   refresh my memory a little bit, but I -- I remember this.  I
8   was telling you this before I even looked at that.
9      Q.  You were in a state of terror that week?
10     A.  I wouldn't say I was in a state of terror that
11  week.  I was very calm.  I was collected.  I never raised my
12  voice to you.  I never acted in a irrational way.  I went
13  through the whole week, and I was upset Wednesday after you
14  called me those names in front of all the children and were
15  shouting at me, which I never shouted back or called you any
16  names.
17     And then Thursday I was at school, and I -- I'd
18  had no -- no one had talked to me Thursday about what had
19  happened on Wednesday, and I was -- I even went to Maria
20  Beers and asked her if you had even known what had happened,
21  because no one had said anything about -- I expected you to
22  come and talk to me or to apologize or -- you never did.  And
23  so as of Thursday, we had our meeting, and even then we were
24  meeting amicably.  And it was Friday when all of this
25  happened, and the fist in the face and being out of control

Page 121

1   was too much.
2      Q.  You remember this fist in the face and Maura
3   Larkins being out of control occurred the day after you began
4   to believe that your life was in danger?
5      A.  No.  I didn't feel that my life was in danger at
6   that point, not until after the incident with the first up in
7   the air and you making irrational statements.
8      Q.  What were the irrational statements?
9      A.  The truth will come out in a court of law.  Just
10  that kind of thing.
11     Q.  The truth will come out in a court of law?
12     A.  We hadn't even had a conversation.  It was -- it
13  was -- you said three words to me.  I said not to talk to me,
14  and you just started making no sense at all.
15     Q.  Okay.  Did -- did Maura Larkins say something --
16  to me that makes perfect sense, the truth will come out in a
17  court of law.  That does not seem irrational at all.
18     MS. ANGELL:  Objection.  Argumentative.  Move to
19  strike.  Plaintiff again is attempting to testify.  Could you
20  please ask the witness a question.
21  BY MS. LARKINS:
22     Q.  Thank you.
23     Did Maura Larkins say anything more irrational
24  than the truth will come out in a court of law?
25     A.  All I know is I was trying to get out of there as

31 (Pages 118 to 121)

Page 122

1  fast as I could. I started talking saying I thought I was
2  your friend. I said I didn't have anything to do with -- I
3  didn't know what -- I didn't know what you were upset about.
4  I didn't know why you were so -- I don't know what this truth
5  is you're talking about so it did not make sense to me. I
6  still don't know what you were saying the truth will come out
7  about. About what?
8      Q. I'd like to talk about Wednesday at -- April 18th,
9  2001. You say that Maura Larkins came up to you and asked
10  about teaming?
11     MS. ANGELL: Asked and answered.
12     THE WITNESS: I was lining my kids up counting the
13  kids to make sure they were all there ready to go back to
14  school. You came up to me and you -- you said that you
15  wanted to continue the rotation group for the next week,
16  which we had already said we weren't going to do because your
17  substitute needed more time to do the -- her special testing,
18  bilingual testing. And we didn't know you were coming back
19  and so she didn't know how much time she would need, so we
20  had agreed before you came back that she would take that next
21  week to finish the testing. And then you came back and said
22  that you could do the testing much faster, but we had already
23  planned to do our Mother's Day project that we needed to get
24  started on. And normally that's not a problem when we adjust
25  our schedule around, but you could not accept that and you

Page 123

1  were -- and that's when I said let's discuss it at the grade
2  level meeting which would be the next day, Thursday. Just
3  wait one day and we'll all discuss it together, because I'm
4  only one member of the team. I don't make all the decisions.
5  BY MS. LARKINS:
6      Q. So you did not want to discuss this at all?
7      A. We had already discussed it, Maura. That's --
8  that was the whole point is that we had discussed it, and we
9  had come to an agreement that we would not do the test -- or
10  not do the rotation group the following week.
11     Q. Who had discussed it?
12     A. As a team with your substitute we discussed it,
13  Rick Denmon, Al Smith. We had decided that we wouldn't do
14  the teaming because the substitute said she needed more time
15  to do the testing.
16     Q. But Maura Larkins was not involved in that
17  discussion?
18     MS. ANGELL: Again, I renew my objection to this
19  entire line of questions about teaming, team teaching during
20  the 2000-2001 school year. This is totally irrelevant and
21  not calculated to lead to the discovery of admissible
22  evidence with regard to use of or knowledge or passing on
23  knowledge contained in an alleged record of arrest. Is there
24  any question that has to do with a cause of action alleged
25  against this witness?

Page 124

1  BY MS. LARKINS:
2      Q. You can answer the question.
3      A. What was the question? Sorry, this is --
4      Q. Was Maura Larkins involved in this discussion that
5  you've been talking about?
6      A. I believe that we had a discussion with you upon
7  your return, but I can't -- I can't remember a specific date
8  or time. It could have been in the hallway. It could have
9  been with Gretchen and Maria Beers. I don't remember.
10     Q. Is it possible that Maura Larkins had not been
11  included in the discussion?
12     Something tells me that says "I don't recall."
13     A. I would have assumed that you were part of the
14  decision making, you know, because as you returned back you
15  were there, we were there, you know, we all talked together.
16  But we had decided before you came back and, you know, we had
17  already made plans and we had a -- we were on a time -- you
18  know, we were on a time line to get these Mother's Day projects
19  done, and so that's what we had decided to do.
20     Q. And basically you simply didn't want to talk to
21  Maura Larkins that week.
22     MS. ANGELL: Objection. Argumentative. Asked and
23  answered.
24     THE WITNESS: That's not true. I welcomed you
25  back on Monday morning, and I would have talked to you on

Page 125

1  Tuesday but you just walked by me and didn't say anything to
2  me. Didn't greet me. And I assumed you didn't want to talk
3  to me because you were so mad about what had transpired
4  before, so there was --
5  BY MS. LARKINS:
6      Q. And what was that that transpired before?
7      A. Well, that you went out on leave for whatever
8  reason. I didn't know if you were blaming me or whatever. I
9  didn't know why you weren't talking to me.
10     Q. Let's go back to this Wednesday. So Maura Larkins
11  came up to you and wanted to talk about teaming, and you did
12  not want to talk about teaming. You said we'll talk about it
13  at a meeting?
14     MS. ANGELL: Asked and answered. I object. This
15  repeated line of questioning, the same thing over and over is
16  argumentative and it's harassing to this witness. You've
17  asked the question. Can we move on to something that you
18  haven't asked about?
19     MR. HERSH: And I'd like to add for the record
20  that I also believe that this is a misuse of the discovery
21  process, and I'm probably going to be filing a motion for
22  sanctions based on your wasting everyone's time without --
23  I'm talking to Ms. Larkins, without having dealt with the
24  issues that you've alleged in the complaint.
25  ///

Page 126

1  BY MS. LARKINS:
2      Q.  Okay.  Did Maura Larkins say to you if we're going
3  to be a team, we need to talk?
4          MS. ANGELL:  Vague and ambiguous as to time.
5  BY MS. LARKINS:
6      Q.  Thank you.  On Wednesday, April 18th, 2001, did
7  Maura Larkins say to you if we're going to be a team, we need
8  to talk?
9      A.  I remember you coming up to me and wanting to
10 discuss the teaming for the next week, and I said let's wait
11 until tomorrow when we can discuss it on Thursday as a team
12 member, and then you said you didn't like my attitude.  So I
13 don't remember you saying that other statement, no.
14     Q.  Is the line "I don't like your attitude," is that
15 a line that you often use with children?
16     A.  No, I don't -- maybe there's -- you know, maybe
17 once -- I mean, that is -- that's a possibility, but that's
18 not a statement I use regularly.
19     Q.  Is there anybody that you know that uses that line
20 a lot?
21         MS. ANGELL:  Objection.  This is totally
22 irrelevant.  Not calculated to lead to the discovery of
23 admissible evidence.  Let's talk about the causes of action
24 at issue in this matter.
25         THE WITNESS:  No, I don't know of anyone that says

Page 127

1  that.
2  BY MS. LARKINS:
3      Q.  Have you ever heard Maura Larkins use that line
4  other than this alleged time?
5      A.  I don't remember you using that phrase before.
6      Q.  Okay.  And do you remember -- this is a yes or no
7  question:  Do you remember Maura Larkins saying if we're
8  going to be a team, we have to talk?
9          MS. ANGELL:  Asked and answered.
10         THE WITNESS:  No, I don't remember.
11 BY MS. LARKINS:
12     Q.  Okay.  Thank you.  Thank you.
13         Okay.  Do you remember saying if you want to talk,
14 let's talk?
15     A.  I remember saying let's talk about it at the grade
16 level meeting on the next day which was Thursday.
17     Q.  Do you remember leading Maura Larkins away from
18 the children over to the sandbox where the playground
19 equipment was so you'd be far away from the children in order
20 to talk?
21         MS. ANGELL:  Vague and ambiguous as to time.
22 BY MS. LARKINS:
23     Q.  On Wednesday, April 18th, 2001.
24     A.  I know that I was at the back of the line when you
25 approached me.  Whether I moved over, I don't remember.  I

Page 128

1  didn't think it was appropriate to have that conversation in
2  front of the children, and I don't know where we had the
3  conversation other than in that vicinity where the children
4  were lined up.
5      Q.  Did you say to Maura Larkins "I've had it with
6  you.  I'm through with you" in a very angry and loud tone of
7  voice?
8      A.  No, I never said that.  I never said anything like
9  that
10     Q.  Did you say "I welcomed you back on Monday and you
11 wouldn't even give me the time of day"?
12     A.  My exact words were, after you said "I don't like
13 your attitude," I said "well, speaking of attitude -- of a
14 bad attitude," I said, "I welcomed you back Monday and you
15 never even responded to me."  That's what I said.
16     Q.  But now -- but later did you think that perhaps
17 Maura Larkins hadn't heard your welcome on Monday, that you
18 might have been mistaken about that?
19     A.  I have no idea whether you heard it or not.
20     Q.  Okay.  Can you tell me how -- how you said this
21 welcome, like in what tone of voice?
22     A.  I said welcome back, Maura.  I don't know.  I
23 just -- you know, I meant it.
24     Q.  And where were you looking when you said it?
25     A.  I was looking right at your face, and that's why I

Page 129

1  saw you look away.  You looked at me, you kind of glared, and
2  then you just looked over by the fence and walked on.
3      Q.  The fence.
4      A.  Because this happened right in front of -- as
5  you're walking toward Loma Verde pool --
6      Q.  Yes.  Yes.  We're clear on that.  That is your
7  current memory.
8          Okay.  Did Maura Larkins at that time ask you a
9  question "are you lying or are you delusional?"
10         MS. ANGELL:  Vague and ambiguous as to time.
11 BY MS. LARKINS:
12     Q.  On Wednesday, April 18th, 2001.
13     A.  And ask me the question again, please.
14     Q.  On Wednesday, April 18th, 2001, did Maura Larkins
15 ask you "are you lying or are you delusional?"
16     A.  You said to me "you're a liar.  You're
17 delusional."  You shouted it at me.
18     Q.  Okay.  So this wasn't asked calmly, "are you lying
19 or are you delusional?"
20     A.  No, it was not asked calmly at all.
21     Q.  Okay.
22     A.  It was shouting at me.
23     Q.  Did the suggestion that you might be lying upset
24 you quite a bit?
25     A.  The whole situation was upsetting to me, to have

33 (Pages 126 to 129)

Page 130

1  anybody raise their voice and shout accusations at me.
2      Q.  I'm sure it would.
3          Okay.  I'm going to try to get you to answer this
4  question.  It's a yes or no question.  Did the suggestion on
5  Wednesday, April 18th, 2001, that you might be lying upset
6  you?
7      A.  Sure it upset me, because I wasn't lying.
8      Q.  Okay.  Did the --
9          MS. ANGELL:  I'm sorry.  I'm confused.  Lying
10  about what?
11         THE WITNESS:  Yeah.  Exactly.
12         MS. ANGELL:  Lying about -- I don't understand
13  what you're talking about.
14         MS. LARKINS:  Anything.  She says that Maura
15  Larkins called her a liar.
16         MS. ANGELL:  Well, that's different from your --
17  what you're trying to get her to say, which is that you're
18  trying to get her to say that you said you're lying, and she
19  said no, you called me a liar and you're delusional by
20  screaming it at me in front of my students.  And you're
21  asking her about lying, and I'm confused because it seems
22  like different things.
23         MS. LARKINS:  Well, you're quite mistaken that I'm
24  trying to get her to say that I asked a question.  I'm
25  working with her on her memories.

Page 131

1      Q.  Okay.  Some form of the word -- the verb to lie
2  was used.  You and I agree on that.
3          MS. ANGELL:  Objection.  That mischaracterizes the
4  evidence.  The testimony is that the noun liar was used, not
5  that a verb was used.  She testified that you called her a
6  liar and you called her delusional, and you're -- you're
7  mischaracterizing the testimony.  I'm sorry.
8  BY MS. LARKINS:
9      Q.  All right.  Some word with the same root word as
10  the word lie was used by me on that day.  We are in agreement
11  with that.  And I want to know if that upset you?
12     A.  Yes, it upset me.
13     Q.  Okay.  Now, we're clear on delusional.  I guess
14  that's an adjective.
15         MS. ANGELL:  Again, move to strike plaintiff's
16  testimony.  If you can keep it to questions, that'd be great.
17  BY MS. LARKINS:
18     Q.  Did the use of the word delusional upset you?
19     A.  Yes, it did.
20     Q.  Why did that upset you?
21     A.  Because you were calling me a liar, and I guess
22  delusional means I don't know what I'm talking about when I
23  told you that I said hello to you and you were calling me a
24  liar and said I didn't know what I was talking about.  And
25  that was not true, because I did.

Page 132

1      Q.  Uh-huh.  And you had not earlier said that Maura
2  Larkins was the type of person who became a mass murderer?
3          MS. ANGELL:  Objection.  Asked and answered.
4  Argumentative.
5  BY MS. LARKINS:
6      Q.  You must have been very angry.  Were you very
7  angry?
8          MS. ANGELL:  And I'm going to move to strike the
9  portion before the question.  Object to the plaintiff
10  testifying.
11  BY MS. LARKINS:
12     Q.  Right.  Were you very angry on -- when Maura
13  Larkins used the word delusional on Wednesday, April 18th,
14  2001?
15     A.  I wouldn't say that I was angry.  I -- well, I was
16  frustrated, because I -- I felt that we had discussed the
17  teaming thing, that we had already agreed to the time frame,
18  and that you were coming back wanting to discuss more -- you
19  know, to have the date changed so that we could do teaming
20  again.  So it was more of a frustration.  Is that what you're
21  after?  I don't understand.
22     Q.  So you were more upset about teaming than about
23  the suggestion that you might be delusional?
24     A.  No.  I was upset with the names that you called
25  me.  I was very upset.

Page 133

1      Q.  Okay.  But you're not certain -- but you admit
2  that it's possible that you had called up Rick Werlin in
3  February and made some statement that caused Maura Larkins to
4  be taken out of her classroom?
5          MS. ANGELL:  I object to that if it's a
6  characterization of prior testimony, because that's not what
7  the testimony was.  The testimony had nothing to do with when
8  any phone call might have been made or what was said during
9  any phone call.
10         MS. LARKINS:  I'm sorry.
11     Q.  Do you admit that it's a possibility that you
12  called Rick Werlin in February 2001 and told him that you
13  feared for your life, that Maura Larkins was unstable -- that
14  you feared for your life and that Maura Larkins was unstable
15  and that you feared she might kill you?
16         MS. ANGELL:  Calls for speculation.
17         THE WITNESS:  What I remember --
18         MS. ANGELL:  The question is, is it a possibility
19  that blank, blank, blank.  That calls for speculation.
20         THE WITNESS:  If I called him -- when you first
21  asked me the question, I just -- no, there was no reason to
22  call him.  But I'm thinking about it, and if I did call him,
23  I -- I vaguely remember the phone ringing and not reaching
24  him.  But that could have been a call to his office at the
25  district level.  I don't remember whether it was his home or

34 (Pages 130 to 133)

Page 134

1  if it was a weekend or when it was, because a lot was going
2  on and this has been so long ago.
3  BY MS. LARKINS:
4  Q.  Do you think there's -- if this phone call was
5  made, do you think it's possible that it did not concern
6  Maura Larkins?
7  A.  I don't know.
8  Q.  Okay.  Do you recall there being a time in the
9  year 2002 or thereabouts when you had a lockdown at your
10  school and you got under your desk and you are very
11  frightened?
12  MS. ANGELL:  Objection.  This line of questioning
13  is not calculated to lead to the discovery of admissible
14  evidence in the matter of the case at bar.  Here we're
15  talking about plaintiff who was not actively working in a
16  classroom during the 2002 school year, at any time in 2002 as
17  far as I can recall.  And this is not reasonably calculated
18  to lead to the discovery of admissible evidence in the case
19  at bar, anything happening in Ms. Watson's classroom in 2002.
20  THE WITNESS:  What was the question?
21  BY MS. LARKINS:
22  Q.  I think it might have been -- did you answer the
23  one that I asked about could it -- oh, no, I remember you
24  answered that one.
25  (The last question was read back.)

Page 135

1  THE WITNESS:  We have had many lock -- well, many
2  lockdowns, we've had more than one lockdown.  I don't
3  remember which specific one you're talking about and when it
4  occurred.
5  BY MS. LARKINS:
6  Q.  Have you gotten under your desk more than one of
7  those lockdowns?
8  A.  Yes, we have.
9  Q.  Okay.  Do you remember one of those lockdowns in
10  which you were thinking that it might be Maura Larkins coming
11  to get you?
12  A.  I think that thought crossed my mind, but it was
13  just out of the fear that I've had since our incidents.
14  Q.  Okay.  Do you believe that that was a rational
15  fear?
16  A.  I'd -- there again, if it's irrational or
17  rational, it's still a fear, and that's the way I feel, and I
18  have reason to feel that way.
19  Q.  But you do believe that you can judge Maura
20  Larkins' behavior as to whether it's rational or not?
21  MS. ANGELL:  Objection.  Argumentative.  And
22  there's no question there.
23  MS. LARKINS:  Okay.
24  MS. ANGELL:  So therefore, I move to strike it.
25  MS. LARKINS:  Okay.  I need a break.

Page 136

1  THE VIDEOGRAPHER:  Off the record.  The time now
2  is 4:15 p.m.
3  (Recess taken.)
4  THE VIDEOGRAPHER:  Back on the record.  The time
5  now is 4:23 p.m.
6  MR. HERSH:  So are we on the record?
7  MS. LARKINS:  Yes, we're on the record.
8  MR. HERSH:  I'm sorry.  I had to deal with another
9  matter.
10  MS. LARKINS:  You didn't miss anything.
11  MR. HERSH:  Okay.
12  MS. LARKINS:  I would like to ask you to mark this
13  as Exhibit 22.  I don't think I've given this out yet.
14  (Plaintiff's Exhibit No. 22 was marked for
15  identification.)
16  BY MS. LARKINS:
17  Q.  Okay.  I'm representing this to be the reporter's
18  transcript for the office of administrative hearings hearing
19  regarding the dismissal of Maura Larkins in January 2003.
20  And these are Pages 59 to 62 of that transcript, and this
21  questioning occurred on January 6th, 2003.
22  MR. HERSH:  Objection.  I would ask that if this
23  is going to be made an exhibit, that the entire transcript be
24  the exhibit.
25  MS. LARKINS:  Okay.  Is it all right if we do that

Page 137

1  later?
2  MR. HERSH:  Yes.
3  MS. LARKINS:  Okay.
4  Q.  Okay.  I want to establish the time here let's say
5  at the bottom of Page 59.  This is right after February 12th,
6  2001, and at the top you can see they're talking about the
7  meeting where she was placed on administrative leave.  I
8  represent that that meeting is the February 12th, 2001
9  meeting.
10  And then as you can see, this talks about the
11  receipt of some document, which it doesn't really matter.
12  And then down on Line 14 Mr. Bresee, the district's lawyer,
13  asks a question of Mr. Werlin.  He says, "And after this
14  meeting with Maura Larkins and others, subsequent to the
15  phone call that you received, did you follow up conducting
16  additional inquiry or investigation at Castle Park?"  And
17  Mr. Werlin answered yes.
18  The question next was "and can you describe
19  generally what you did?"  Mr. Werlin answered, "We had
20  numerous conversations with the principal where we had an
21  opportunity to ask her about her perception of the
22  relationship that Maura had with Ms. Hamilton.  We also had a
23  chance to speak with Ms. Hamilton again who continued to be
24  very concerned for her welfare, very concerned for her
25  safety, and several other teachers had come up and talked

Page 138

1　with me while I was at the site about similar concerns." I
2　went into Page 60 there.
3　　　　Now, on 60, Line 3 --
4　　　MS. ANGELL: Excuse me. I'd just like to
5　interject an objection that this document that's offered to
6　be marked as Exhibit 22 lacks foundation, has not been
7　authenticated, and that plaintiff is testifying about the
8　contents of this document, who said what, when, where, to
9　whom, what it related to, and I move that the entire portion
10　that she read be stricken from the record.
11　BY MS. LARKINS:
12　　Q.　Okay. Ms. Watson, have you had a chance to read
13　that last answer on Page 59 of Exhibit 22, "we had numerous
14　conversations"?
15　　　MS. ANGELL: Again, I object to the use of this
16　document. It lacks foundation. It's not been authenticated.
17　I don't know what it is, and I don't know what kind of
18　competent testimony this witness could give about this
19　document other than that there's a piece of paper in front of
20　her and what it does or does not say.
21　　　MS. LARKINS: Okay.
22　　　THE WITNESS: I read it, yes.
23　BY MS. LARKINS:
24　　Q.　Okay. And then on Page 60, Line 3, could you read
25　that question, please.

Page 139

1　　A.　"Do you recall who some of those teachers were?"
2　　Q.　And what is the answer there?
3　　A.　"Linda Watson, Rick Denmon, librarian,
4　Ms. Scharmach."
5　　Q.　Do you recall talking to Mr. Werlin while Maura
6　Larkins was out on leave after February 12th, 2001, and
7　before Maura Larkins came back to work?
8　　　MS. ANGELL: I object to this line of questioning,
9　the entire line of questioning, because it relates to a cause
10　of action which has been dismissed with prejudice from this
11　lawsuit. These questions do not relate to the issue, any
12　issue reasonably calculated to lead to the discovery of
13　admissible evidence with regard to the causes of action that
14　exist in this lawsuit, and I request that you please limit
15　your questions to those which are calculated to lead to the
16　discovery of admissible evidence in the matter that's before
17　the judge, not matters that had been dismissed on demurrer
18　which was sustained without leave to amend. This is an abuse
19　of the discovery process. It's harassing of this witness.
20　It's a waste of public funds.
21　BY MS. LARKINS:
22　　Q.　Do you want me to repeat the question?
23　　A.　Yes.
24　　Q.　Do you recall talking to Werlin -- Richard Werlin
25　between February 12th, 2001, and the time Maura Larkins came

Page 140

1　back to work?
2　　A.　I don't recall.
3　　Q.　Well, I think I'm going to leave that document
4　then, set that aside.
5　　　　Okay. I have another document I would like marked
6　as Exhibit 14.
7　　　　(Plaintiff's Exhibit No. 14 was marked for
8　identification.)
9　　　MS. LARKINS: I will be sure to authenticate all
10　these documents before any summary judgment or trial. I
11　represent that this document was entered as evidence in the
12　administrative hearing regarding Maura Larkins' dismissal in
13　January 2003. This was entered as the equivalent of the
14　sworn testimony of Alan Smith without his being present.
15　　　　Okay. Now, I want to relate this to Exhibit 2,
16　Page 19. If we could have both these documents in front of
17　us, I'm going to ask Ms. Watson about --
18　　　THE WITNESS: Which two documents?
19　BY MS. LARKINS:
20　　Q.　Exhibit 2, the Linda Watson deposition, Page 19 --
21　actually, if we look at 18 at the top left.
22　　A.　Uh-huh.
23　　Q.　At the bottom there say 16 to 25?
24　　A.　On Page 18?
25　　Q.　Yeah.

Page 141

1　　A.　16 to 25, okay.
2　　Q.　Would you please read that paragraph out loud.
3　　A.　"There were," that one?
4　　Q.　Uh-huh.
5　　A.　"There were two separate swimming times, and that
6　first Monday, the first class I saw Maura Larkins, was when
7　I was walking my children back from the pool, when she was
8　walking them to the pool. We met right outside the fence" --
9　there's the fence -- "by Loma Verde School, and I looked her
10　right in the face and said, 'Welcome back, Maura.' And she
11　just looked the other way. And I thought wow, you know,
12　okay. If that's the way you're going to be, fine, you know."
13　　Q.　Okay. Do you believe that this paragraph is
14　talking about -- well, at least everything except for the
15　Line 16 which talks about two separate swimming times, but
16　that first Monday refers to April 16th, 2001?
17　　A.　Yes.
18　　Q.　Okay. So we're at April 16th, 2001. And could
19　you now look at Page 19 where your testimony continues and
20　could you read that next paragraph?
21　　A.　"So I went back to school. When I got to school,
22　Al Smith was upset because he had had a confrontation with
23　Maura that morning on the way to the swimming pool." I'm
24　sorry, put my glasses on here. So to some -- "so to some
25　effect, like, she got upset and said he was negative" -- "and

36 (Pages 138 to 141)

San Diego Court Reporting Service

Page 142

1   said he was negative about something, and that she accused
2   him of not wanting to walk with her class down to the pool.
3   So anyway, I didn't see Maura Larkins the rest of that day."
4       Q.  Okay.  Thank you.  So you've testified there about
5   what you observed about Al Smith on Monday, April 16th, 2001.
6          MS. ANGELL:  Objection.  That's a statement, not a
7   question.  And it -- I don't know what you're talking about.
8   if you're saying that in some prior deposition she offered
9   testimony about something?  I don't know if you're
10  characterizing her reading something at your request as
11  current testimony which it's not?
12         MS. LARKINS:  Okay.  Thank you.
13      Q.  On April 16th, 2001, did you meet Al Smith -- meet
14  with Al Smith at some time?
15      A.  I don't remember.  I must have.
16      Q.  Okay.  Now I would like you to look at Exhibit 14?
17      A.  Exhibit 14.  Which is that?  Oh, this one?
18      Q.  This one I just gave you.
19         MS. ANGELL:  I again renew my objection to the use
20  of these documents, all of which lack foundation and none of
21  which have been entered as exhibits.
22  BY MS. LARKINS:
23      Q.  Okay.  Could you read the title of this document?
24      A.  Maura Documentation, 4-16-01.
25      Q.  Right.  Okay.  Could you read the first two

Page 143

1   paragraphs.
2       A.  "On the way to swimming she told me, 'We need to
3   be positive.'  All I said was that the children were not
4   listening to directions very well today."
5       Q.  Now that you have read this, does it in any way
6   jog your memory about talking to Al Smith on April 16th, 2001?
7       A.  I -- I remember that Al was upset with you on the
8   first day that you two went swimming, because you were the
9   team that went first -- or it would be second.  I don't --
10  you know, I don't remember what the exact details were.
11      Q.  Okay.  Could you read this second little paragraph
12  there of Maura documentation?
13      A.  This down -- for 4-17?
14      Q.  The tiny little one because I didn't let you
15  finish.
16      A.  She said she thought it would be better if we
17  didn't bring the children to the pool together.  It was too
18  dangerous having so many children walk together.
19      Q.  Okay.  So does that sound about right, that sounds
20  like what Alan was telling you?
21         MS. ANGELL:  Objection.  Asked and answered.  She
22  said she didn't remember the particulars.
23  BY MS. LARKINS:
24      Q.  Has this -- reading this jogged your memory at
25  all?

Page 144

1       A.  I doesn't make sense, because we always walked
2   with two classes together.  So I don't know why he or you
3   would say -- I don't know who's saying this.  You said this?
4       Q.  Well --
5       A.  That he told me that you said this?  Is this
6   secondhand information or what?
7       Q.  Did --
8       A.  It's not clear.
9       Q.  Okay.  Did Al Smith tell you that Maura Larkins
10  thought it would be better if we didn't bring the children to
11  the pool together?
12      A.  I don't remember.
13      Q.  Okay.  Okay.  And then we have two more little
14  vignettes by Alan Smith here.
15         MS. ANGELL:  Objection as to characterization of
16  the author or origin of this document.  We have no
17  information as to where it came from.  It lacks foundation,
18  and I object to any characterization of its origin.
19  BY MS. LARKINS:
20      Q.  Okay.  I'm going to set that document aside now,
21  and I would like to enter into -- I know I can't enter into
22  evidence, can I.  I would like to ask that this document be
23  marked as Exhibit 23.
24         (Plaintiff's Exhibit No. 23 was marked for
25  identification.)

Page 145

1   BY MS. LARKINS:
2       Q.  Okay.  Do you see a date on this document?
3       A.  Yes.
4       Q.  What's the date on the document?
5       A.  April 25th, 2001.
6       Q.  So would you agree this meeting happened a few
7   days after Maura Larkins was placed on leave the second time?
8       A.  Yes.
9       Q.  Okay.  And could you read who attended this
10  meeting?
11         MS. ANGELL:  I'm going to object to the use of
12  this document marked as Exhibit 23.  It lacks foundation.  It
13  hasn't been authenticated.  We don't know where it's from,
14  what it is.
15         MS. LARKINS:  I'm sorry.  I probably should have
16  said more.  I represent that this document was faxed to me by
17  Gina Boyd, and you can see there's a little fax heading here
18  June 4th, '01, from South County Teachers United.  She was --
19  Gina represented to me that these were her notes of this
20  meeting that took place.
21         MS. ANGELL:  Counsel, are you with us?  Counsel?
22         MS. LARKINS:  Michael?
23         MR. HERSH:  Oh, I'm sorry.  I had the mute on on
24  my phone.  Yeah, I would like a copy of the document that
25  you're showing to the witness.  Can you fax that to me.

37 (Pages 142 to 145)

Page 146

1    MS. LARKINS: Sure.
2    MR. HERSH: Thank you.
3    BY MS. LARKINS:
4    Q.  Okay. Could you read who the attendees were at
5    this meeting?
6    A.  Richard Werlin --
7    MR. HERSH: I would like you to fax the document
8    before you proceed with questioning the witness about it.
9    MS. LARKINS: Okay.
10    MR. HERSH: Thank you.
11    MS. LARKINS: Is that an excuse for a break?
12    THE VIDEOGRAPHER: Going off the record. This
13    concludes Tape 2 of the deposition of Linda Mae Watson.
14    We're off the record. The time is 4:40 p.m.
15    (Recess taken.)
16    THE VIDEOGRAPHER: This is Tape 3 of the
17    deposition of Linda Mae Watson. We're back on the record.
18    The time now is 4:44 p.m.
19    MS. LARKINS: Okay. As I said before, I represent
20    this to be the notes that Gina Boyd took at a meeting at the
21    Chula Vista School District on April 25th, 2001, and she
22    typed the notes up and sent them to me. And Mr. Hersh,
23    you've received the notes? Okay. I bet he said yes and he
24    just has his mute on.
25    MS. ANGELL: Mr. Hersh, are you there?

Page 147

1    MR. HERSH: I am.
2    MS. ANGELL: Did you hear the question posed?
3    MR. HERSH: No.
4    MS. LARKINS: Have you received the document of
5    Gina Boyd's note?
6    MR. HERSH: Yes. The one page? Yes.
7    BY MS. LARKINS:
8    Q.  Yes. Okay. Could you read to us the attendees at
9    this meeting.
10    A.  Richard Werlin --
11    MS. ANGELL: Excuse me. I'm going to object as to
12    the characterization. What you're asking the witness to do
13    is read what's written on the document instead of her
14    attributing who the attendees at a meeting were.
15    MS. LARKINS: You're quite correct.
16    Q.  Could you go ahead and read those.
17    A.  Richard Werlin, Cindy Miller, Gretchen
18    Donndelinger, I guess that's Maria Beers, and Gina Boyd.
19    Q.  Okay. And my guess is going to be that R.T. is
20    Richard T. Werlin, R.T. statements. Okay.
21    MS. ANGELL: Move to strike plaintiff's
22    characterization and guesses about whose statements are
23    whose.
24    BY MS. LARKINS:
25    Q.  Could you -- this is only a few lines long. Looks

Page 148

1    like maybe about 10 or 12. Could you just read these short
2    lines.
3    A.  All of it?
4    Q.  Yeah.
5    A.  "Will not be able to have employee meeting with
6    Maura. Will need a fitness for duty medical examination.
7    Will not pay for her sub today. Situations over a long
8    period of time. Has a pattern with many people. Will give a
9    directive to Maura to attend a meeting. Has concerns about
10    safety of staff and children. Raised voice in front of
11    children with Linda Watson. Witnessed behavior at
12    school-most likely refers to pencil incident. Threatened to
13    involve the media. Had a face-off with Al."
14    Q.  Okay. In these lines -- I'm going to go ahead and
15    count them. Let's see, three, six, nine, 12. In these 12
16    lines what names do you see, proper names of people, besides
17    Maura Larkins -- besides Maura?
18    A.  I see Linda Watson and I see Al.
19    Q.  Okay. Since this meeting occurred just a few days
20    after the April 20th, meeting that you had with Gretchen
21    Donndelinger -- strike that.
22    At the April 20th meeting that you had with
23    Gretchen Donndelinger, do you recall Al Smith being there?
24    A.  I don't recall.
25    Q.  Okay. You -- do you recall anybody other than

Page 149

1    Rick Werlin, Gretchen Donndelinger, and yourself and Kathy
2    Bingham?
3    MS. ANGELL: Vague and ambiguous.
4    MS. LARKINS: At the meeting on April 20th, 2001.
5    MS. ANGELL: Objection. Misstates prior
6    testimony. The testimony previously has been that she
7    doesn't know whether or not Rick Werlin was at a meeting on
8    April 20th, 2001.
9    MS. LARKINS: I'm not saying he was there. I'm
10    just saying, can she think of anyone else.
11    THE WITNESS: I really don't want to name names
12    because I really can't remember. That was like four years
13    ago, three years ago. I can't remember. I know Kathy was
14    there. I can't remember who else was there.
15    MS. LARKINS: Okay. Well, I think we'll just
16    leave that at that. I'll set that aside. Since this office
17    has to close at 5:00 o'clock, Ms. Angell and Mr. Hersh, I
18    think it might be a good idea if we talked about when we will
19    continue this deposition? Do any of you have any
20    preferences?
21    MR. HERSH: Are we still on the record?
22    MS. LARKINS: Yes.
23    MR. HERSH: Well, I would suggest that we go off
24    the record and have a discussion and then go back on with
25    what has been determined.

Page 150

1    MS. ANGELL: Are you sure that you want that
2 discussion off the record?
3    MR. HERSH: Well -- well, it was just my
4 suggestion.
5    MS. LARKINS: Perhaps Ms. Angell would like to say
6 something about it on the record.
7    MS. ANGELL: Well, before we conclude this
8 deposition, I have a couple of questions for Ms. Watson about
9 the issues that you discussed today. And I know that we
10 don't have time for me to ask all my questions, so I'll just
11 ask one or two very briefly.
12
13 EXAMINATION BY MS. ANGELL:
14    Q. Concerning any meeting which may or may not have
15 occurred on April 25, 2001, that would be a meeting that
16 Ms. Larkins was asking about with regard to the document
17 offered to be marked as Exhibit 23, were you in attendance at
18 any meeting described in that document on April 25, 2001?
19    A. No, I was not.
20    Q. Okay
21    A. And I've never seen this document before.
22    Q. Do you recall ever asking anyone whether or not
23 Maura Larkins had a gun?
24    A. No, I don't remember asking -- well, can you be
25 more specific?

Page 151

1    Q. Yeah. I'll rephrase. At any time prior to the
2 instigation of this litigation -- that means this lawsuit in
3 Superior Court which according to your deposition notice was
4 filed on January 24th, 2002 -- were you ever told that Maura
5 Larkins had a gun?
6    A. No.
7    Q. Did you ever tell anyone else prior to January 24,
8 2002, that Maura Larkins had a gun?
9    A. No. The only -- the only time I was concerned
10 about a gun was after I received this current lawsuit which
11 she alleged that -- with allegations in it about some kind of
12 an arrest. That's when I was concerned.
13    Q. And please be mindful that I'm not asking you
14 about anything that you may have discussed with attorneys who
15 represent you.
16    A. That's right. I had not talked about a gun. I
17 didn't even consider a gun until this current lawsuit which
18 stated in it that there was an arrest record. And I knew
19 nothing about it. I knew nothing about an arrest record. I
20 still don't know anything about an arrest record.
21    Q. Okay. The next question is, in your discussions
22 about the April 20th, 2001 Friday incident at the Loma Verde
23 pool, there was a question about how Maura Larkins physically
24 threatened you, some discussion about that. And I wondered
25 whether or not Maura Larkins physically approached you?

Page 152

1    A. Yes, I feel that she physically approached me.
2 She came right up into my face, and she -- I asked her not to
3 talk to me unless there was somebody representing us and I
4 mentioned those names already, and she just kept talking.
5 She wouldn't stop. She wouldn't back off. And I kind of
6 went around her to the side talking as much as I could to
7 calm her down and to get out of the situation. And she had
8 the fist up in the air, and it was very close to my face.
9 And she just started ranting and raving not making any sense
10 at all, and I was scared. I was very scared.
11    Q. Thank you. With regard to the document purported
12 to be -- offered to be marked as Exhibit 6, can you flip to
13 that document.
14    A. Yes.
15    Q. Have you ever seen that document before today?
16    A. I've never seen that document before today.
17    Q. Thank you. Was there anything -- going back to
18 April 20th, 2001, the day of the confrontation at the Loma
19 Verde pool, was there anything besides Maura Larkins' actual
20 words that occurred in the locker room that made her behavior
21 seem irrational to you?
22    A. Yes. Having her fist up in the air, ranting and
23 raving and not stopping when I asked her to stop talking to
24 me, and we were surrounded by children. It seemed like a
25 very dangerous situation.

Page 153

1    Q. So is it accurate to say that Ms. Larkins'
2 behavior toward you in front of the children that day on
3 April 20th, 2001, also made you fearful?
4    A. Yes, very fearful.
5    Q. Fearful for your own safety?
6    A. Yes.
7    Q. Were you also fearful for the safety of your
8 students?
9    A. Yes, I was.
10    Q. With regard to the allegations in the sixth
11 amended complaint, have you ever seen a criminal justice
12 record concerning Maura Larkins --
13    A. Never.
14    Q. -- at any time?
15    A. Never. Not at any time.
16    Q. Have you ever been provided information from
17 anyone not including your lawyers which was told to you came
18 from any criminal records information concerning Maura
19 Larkins?
20    A. No, none whatsoever.
21    Q. Do you have any malice toward Maura Larkins?
22    A. No, I don't.
23    MS. ANGELL: That's all. Counsel?
24    MR. HERSH: I have no questions for the witness,
25 but I do appreciate her enduring this.

39 (Pages 150 to 153)

Page 154

1       THE WITNESS: Thank you. Thank you for listening.
2       MS. ANGELL: Are we finished with testimony from
3   Ms. Watson?
4       MS. LARKINS: I believe so. We were going to
5   discuss when to continue. Did you want to make a statement
6   on the record about that?
7       MS. ANGELL: Well, I'd like to know how much more
8   you have for Ms. Watson, because we've been here since 10:00
9   a.m. this morning, and you haven't asked more than one
10  question that has anything to do with this litigation. So I
11  was just wondering how much more you thought that you would
12  have for this witness.
13      MS. LARKINS: Well, I can't give you an exact
14  amount of time, but I do have more. So I will need to
15  continue this.
16      MS. ANGELL: Can you give me an estimate?
17      MS. LARKINS: Somewhere between half a day and --
18  I'm going to guess between half a day and one day.
19      MS. ANGELL: Okay. So we should be able to wrap
20  this up in one more full day's worth of testimony?
21      MS. LARKINS: I believe so.
22      MS. ANGELL: And is there any subject matter other
23  than incidents which occurred April 16th through April 20th,
24  2001, that you're going to be asking this witness about?
25  Because I'm assuming that she's testified to your

Page 155

1   satisfaction about incidents on those days since we've now
2   talked about it for about seven hours, not counting breaks.
3       MS. LARKINS: Is that a rhetorical question?
4       MS. ANGELL: No. It's a question.
5       MS. LARKINS: Okay. Would you repeat that
6   question.
7       MS. ANGELL: Could you read it back, please.
8       (Page 154, Lines 22 through 24 were read back.)
9       MS. LARKINS: Yes.
10      MS. ANGELL: Do you agree that you have
11  exhaustively questioned this witness on the incidents from
12  April 16th through April 20th, not 25th, 2001?
13      MS. LARKINS: Do you agree that I'm the one that's
14  giving the deposition, I'm not the deponent here?
15      MS. ANGELL: Well, I think that we've been here
16  for seven hours and I'm just wanting to know if we're going
17  to go back -- you're planning on coming back and covering the
18  same ground again or if you're looking at asking some sort of
19  other question that has something to do with the litigation?
20      MS. LARKINS: I think your question is very
21  disrespectful, and it's part of the many year long effort to
22  keep from revealing the truth about this matter.
23      MS. ANGELL: The matter before the court now is
24  the alleged use of information -- receipt and use of
25  information in a record of arrest. The matter before the

Page 156

1   court is not anything that you've discussed in this
2   seven-hour long deposition today. That's why I'm asking if
3   you're going to ask about something other than the events of
4   April 16 to 20, 2001, that had to do with the pool and these
5   meetings and these other teachers.
6       MS. LARKINS: I thought I already answered that
7   one. I said yes.
8       MS. ANGELL: And the next question was, do you
9   agree that we have already exhaustively discussed the events
10  that occurred between April 16th and April 20th of 2001?
11      MS. LARKINS: I don't feel like answering that
12  question, Ms. Angell.
13      MS. ANGELL: Counsel, you have any comments?
14      MR. HERSH: Well, I think I expressed myself
15  earlier. Since I'm not attending the deposition, I think it
16  would be more appropriate for me to raise my concerns in a
17  motion for sanctions for misuse of the discovery process.
18  But I'm open to other suggestions. I certainly can't imagine
19  going through another day like the one we've just gone
20  through without dealing with any of the issues in the
21  complaint. So it seems to me it would be a waste of
22  everyone's time to continue this deposition, you know, unless
23  there is some unusual reason why -- why another day would
24  produce evidence when this hearing today produced nothing
25  that would be useful in terms of Ms. Larkins prosecuting the

Page 157

1   matter.
2       MS. LARKINS: So when will we continue this?
3   Monday, 10:00 o'clock?
4       MS. ANGELL: No, I'm not available on Monday at
5   10:00 o'clock and neither is this witness. It's after 4:00
6   p.m. She'd have to get a substitute for her class, and
7   there's really no reason for the deposition to continue. If
8   you have any questions that you can propound in the form of
9   written interrogatories, maybe that would be a more
10  economical use of time and get you the answers that you're
11  looking for. That might be more productive.
12      MS. LARKINS: I believe I've propounded written
13  discovery to you before, Kelly, and I did not find that --
14      MS. ANGELL: Please, don't call me by my first
15  name.
16      MS. LARKINS: Okay. Ms. Angell, I believe that I
17  got -- I remember I gave you 20, what was it, special
18  interrogatories, and I got 20 objections back. So I don't
19  think I will be taking that tactic.
20      When would you like to continue it?
21      MS. ANGELL: Ms. Watson, do you need to check a
22  schedule to know when you will be able to appear?
23      THE WITNESS: Yes, I need to check a schedule.
24      MS. ANGELL: Okay.
25      THE WITNESS: I need to see what I have planned

Page 158

1  for next week.

2        MS. ANGELL:  Can you check that schedule on Monday

3  and be in contact with me so I can --

4        THE WITNESS:  Yes.

5        MS. ANGELL:  -- provide dates --

6        THE WITNESS:  Yes.

7        MS. ANGELL:  -- to Ms. Larkins by the end of the

8  day on Monday?

9        THE WITNESS:  Yes, I will do that.

10        MS. ANGELL:  Okay.  How about that?

11        MS. LARKINS:  That's fine with me.

12        MS. ANGELL:  All right.  So I'll provide some

13  dates for a continuation of this deposition by the end of

14  business on Monday, May 3rd.

15        MS. LARKINS:  Sounds good to me.  Is that okay

16  with you, Mr. Hersh?

17        MR. HERSH:  We're going to provide dates by May

18  5th?

19        MS. ANGELL:  I'm going to provide dates that

20  Ms. Watson would be available for a second volume of this

21  deposition.  I'm going to provide that in writing by the end

22  of the day on Monday, May 3rd, this coming Monday.  She needs

23  to go and check her calendar.

24        MR. HERSH:  And I just -- before we -- we're still

25  on the record, right?

Page 159

1        MS. ANGELL:  Yes.

2        MR. HERSH:  I would I guess just make it clear

3  that it would be my intent to participate by telephone as I

4  did today on any further deposition -- continued date of this

5  deposition.

6        MS. ANGELL:  I have no objection to that.

7        MS. LARKINS:  Well, I guess we're ready to

8  conclude.

9        THE VIDEOGRAPHER:  Going off the record.  This

10  concludes Volume I of the videotaped deposition of Linda Mae

11  Watson.  Today's deposition has been recorded on a total of

12  three digital videotapes.  Videographics will retain custody

13  of the original videotapes.  We're off the record.  The time

14  now is 5:02 p.m.

15        (After discussion among the various parties, it

16  was agreed that the original deposition transcript will be

17  sent to Ms. Angell, who will provide it to the deponent for

18  review and signature within 30 days of receipt; that

19  Ms. Larkins will receive a certified copy of the transcript;

20  that once the original deposition is signed it will be

21  retained by Ms. Angell; that a certified copy will be

22  sufficient evidence of the record of the deposition and can

23  be used for all purposes; and that a facsimile of the

24  signature line will be usable for all purposes.)

25  ///

Page 160

1        (The deposition was concluded at 5:07 p.m.)

2              * * * * *

3        I, LINDA M. WATSON, swear under penalty of perjury

4  that I have read the foregoing, and that it is true and

5  correct, to the best of my knowledge and belief.

6        Signed on this       day of          , 2004,

7  at

         (City)              (State)

8

9

                    LINDA M. WATSON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 161

1  STATE OF CALIFORNIA )

           ) ss.

2  COUNTY OF SAN DIEGO )

3        I, Claudia A. Witt, a Certified Shorthand Reporter,

4  Certificate No. 10797, do hereby certify that the witness in

5  the foregoing deposition was by me first duly sworn to

6  testify to the truth, the whole truth, and nothing but the

7  truth in the foregoing cause; that the deposition was then

8  taken before me at the time and place herein named; that said

9  deposition was reported by me in shorthand, and then

10  transcribed through computer-aided transcription under my

11  direction, and that the foregoing transcript contains a true

12  record of the testimony of said witness.

13        I do further certify that I am a disinterested person

14  and am in no way interested in the outcome of this action, or

15  connected with or related to any of the parties in this

16  action or to their respective counsel.

17        IN WITNESS WHEREOF, I have hereunto set my hand on this

18  10th day of May, 2004.

19

20

21

22  CLAUDIA A. WITT

     Certificate No. 10797

23

24

25

San Diego Court Reporting Service

1    (The deposition was concluded at 5:07 p.m.)

2       *   *   *   *   *

3    I, LINDA M. WATSON, swear under penalty of perjury

4 that I have read the foregoing, and that it is true and

5 correct, to the best of my knowledge and belief.

6    Signed on this *25* day of *July* , 2004,

7 at *San Diego* , *California* .
    (City)    (State)

8

9    *Linda M. Watson*
      LINDA M. WATSON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 10**

Case 3:07-cv-02202-WQH-WMC    Document 1-5    Filed 11/19/2007    Page 18 of 101
Larkins v. Werlin                                                    Deposition of Teresa Coffey
GIC 781970                                                           November 8, 2004

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO


MAURA LARKINS,                    *

          Plaintiff,              *

     vs.                          * Case No. GIC 781970

RICHARD T. WERLIN, etc.,          *
et al.,                           *

                Defendants.*



DEPOSITION OF TERESA COFFEY

Taken at San Diego, California

November 8, 2004


COMPLIMENTARY


T. A. Martin, CSR

Certificate No. 3613

SAN DIEGO COURT REPORTING SERVICE                          619-232-1164
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101             FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

---

**Page 2**

I-N-D-E-X

DEPOSITION OF TERESA COFFEY      PAGE
   November 8, 2004

    Examination by Ms. Larkins     5

    Examination by Ms. Angell     95

EXHIBITS:           PAGE

   1 Copy of a Star News article
    August 20, 2004, two pages     10
   3 Two-page bilingual flier     57

INSTRUCTION NOT TO ANSWER     LINE/PAGE
               1  10
             23  19
               1  24
            12  30
              9  33
              6  65
              2  82
            25  82

RECORD MARKED AT THE REQUEST OF MS. ANGELL    LINE/PAGE
            23  17

---

**Page 3**

DEPOSITION OF TERESA COFFEY

   Pursuant to Notice to Take Deposition, and on the 8th day of November, 2004, commencing at the hour of 10:00 o'clock a.m., at 319 Elm Street, Suite 100, in the City and County of San Diego, State of California, before me, T. A. Martin, Certified Shorthand Reporter in and for the State of California, personally appeared:

        TERESA COFFEY,

who, called as a witness by the Plaintiff, being by me first duly sworn, was thereupon examined as a witness in said cause.

APPEARANCES

For the Plaintiff:   MAURA LARKINS
          1935 Autocross Court
          El Cajon, California 92109
          (In Propria Persona)

For Chula Vista   CALIFORNIA TEACHERS ASSOCIATION
Educators, California  By: MICHAEL HERSH
Teachers Association,  11745 East Telegraph Road
Virginia Boyd and   Post Office Box 2153
Timothy O'Neil:   Santa Fe Springs, California 90670
          (Appearing telephonically.)

For Robin Donlan   STUTZ, ARTIANO, SHINOFF & HOLTZ
and Linda Watson:   By: KELLY R. ANGELL
          401 West "A" Street, 15th Floor
          San Diego, California 92101

Videographer:   Gregg Eisman, Videographics

---

**Page 4**

   VIDEOGRAPHER: This is the deposition of Teresa Coffey being taken on behalf of the plaintiff in the matter of Maura Larkins versus Richard T. Werlin, etcetera, et al., San Diego Superior Court Case No. GIC 781970. This deposition is being held in the offices of San Diego Court Reporting located at 319 Elm Street, Suite 100, San Diego, California. Today is Monday, November 8, 2004, and the time now 10:17 a.m. My name is Gregg Eisman. I'm the Legal Video Specialist with Videographics, 1903 30th Street, San Diego, California. The Certified Shorthand Reporter is Tadzia Martin of San Diego Court Reporting.

   For the video record, would counsel please state their appearances.

   MS. LARKINS: Maura Larkins, plaintiff in pro per.

   MS. ANGELL: Kelly Angell for Robin Donlan and Linda Watson.

   MR. HERSH: Michael Hersh on behalf of the association defendants.

   VIDEOGRAPHER: Would the reporter please swear the witness.

   (Whereupon, the witness was duly sworn.)

---

**Page 5**

EXAMINATION BY MS. LARKINS:

   Q. Good morning.

   A. Morning.

   Q. Do you understand why we're here today?

   A. Not exactly.

   Q. Okay. Let me try to explain it. I have sued Linda Watson and Robin Donlan and California Teachers Association -- actually, I don't think California Teachers Association is still in this. I'm not sure -- and Gina Boyd and Tim O'Neil and Chula Vista Educators. And my lawsuit -- my case is based on events that happened in Chula Vista Elementary School District and Castle Park Elementary School before and after I was taken out of my classroom in 2001.

   Do you have any other questions about why we are here?

   A. No.

   Q. Okay. So you have a pretty good understanding of why we're here?

   A. I understand what you said.

   Q. Okay. I want to find out what you know about events at Castle Park Elementary School and Chula Vista Elementary School District related to my loss of my career.

   Are you feeling well today?

---

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

**Page 6**

1    A. Yes.
2    Q. Okay. Are you able to give your best testimony
3  today?
4    A. I believe so.
5    Q. Okay. Can you think of any reason why you might
6  not be able to give your best testimony?
7    A. No, no reason.
8    Q. Okay. Let's just back up and start about -- ask
9  some questions about your education and employment. Can
10  you tell me were you graduated from high school?
11    A. Dearborn, Michigan, Dearborn High School.
12    Q. And what year was that?
13    A. '75.
14    Q. Okay. And what did you do after that as far as
15  education or employment?
16    A. Generally speaking?
17    Q. Did you go to College after that?
18    A. No. I went in the Navy.
19    Q. Okay. And where were you stationed in the Navy?
20    A. I was in Texas and then San Diego.
21    Q. Okay. And how many years were you in the Navy?
22    A. Four.
23    Q. Okay. And after you left the Navy, what did you
24  do then as far as education or employment?
25    A. I had some unskilled jobs, like office work, and

**Page 7**

1  then I went to college.
2    Q. Okay. Where were you employed when you were
3  doing the office work?
4    A. I was -- for a time I worked for the City of
5  Imperial Beach, and then I worked for Southwood Hospital
6  when it used to be Southwood Hospital.
7    Q. Uh-huh. What was your job in Imperial Beach?
8    A. General office work.
9    Q. And how about at Southwood?
10    A. General office -- well, both of them are
11  specific to personnel departments.
12    Q. Okay.
13    A. You're asking me to remember a long time ago.
14    Q. I know. When they asked me these questions at
15  my administrative hearing I was struggling a little bit
16  to remember all the years.
17    A. It seems like I've always been a teacher.
18    Q. Okay. Then -- I'm sorry. I think you told me
19  what you did after Southwood, but I forget.
20    A. That's when I started college.
21    Q. Okay. What college did you go to?
22    A. Well, I went to Southwestern Community College
23  at first, then San Diego State University.
24    Q. Okay. When did you graduate from San Diego
25  State?

**Page 8**

1    A. Somewhere around '86, '87. I don't have those
2  dates memorized. I'd have to look.
3    Q. I'm bad on that, too. I wouldn't -- well,
4  actually I guess I would know.
5    MS. ANGELL: Move to strike. No question
6  pending. And that would be the comments by Mrs. Larkins
7  after the response that I was referring to.
8  BY MS. LARKINS:
9    Q. Okay. Actually, now that I think of it, I'm a
10  little curious. You really don't remember what year you
11  graduated from college?
12    MS. ANGELL: Objection. Argumentative; asked
13  and answered.
14  BY MS. LARKINS:
15    Q. Okay. All right. When did you get your
16  teaching credential?
17    A. Somewhere around that same time.
18    Q. Okay. And after you got your teaching
19  credential, what did you do?
20    A. Began working as a teacher.
21    Q. Okay. At what school?
22    A. My first job was Chula Vista Hills.
23    Q. Do you remember what year you began teaching at
24  Chula Vista hills?
25    A. Right around that same time. As soon as I got

**Page 9**

1  my credential, I became employed.
2    Q. Okay. And can you just give me a ballpark
3  figure for that -- the year of that?
4    A. The same that I said. Somewhere around '87.
5    Q. Okay.
6    MS. ANGELL: Excuse me. Just for clarification,
7  I think that you all may know what you're talking about,
8  but for the record Chula Vista Hills is an elementary
9  school?
10    THE WITNESS: It is. In the same district.
11    MS. ANGELL: In the Chula Vista Elementary
12  School District?
13    THE WITNESS: Uh-huh.
14    MS. ANGELL: Thank you.
15  BY MS. LARKINS:
16    Q. Who was your principal at Chula Vista Hills?
17    A. Cheryl Cox.
18    Q. How many years did you teach there?
19    A. Around five.
20    Q. Okay. Was she your principal the entire time?
21    A. No.
22    Q. Who else was your principal at Chula Vista
23  Hills?
24    A. There was a lady named Martha Villafranca.
25    Q. Okay. And was she a good principal?

3 (Pages 6 to 9)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 10

1    MS. ANGELL: Objection. This is -- I'm -- this
2  line of questioning that you're seeking to go into
3  concerning this witness's opinions about her supervisors,
4  former supervisors, current supervisors is not, in my
5  understanding, relevant to the allegations in this
6  litigation. So if you'd like to make an offer of proof,
7  we can discuss it further. But in the absence of an
8  offer of proof, I'm going to instruct the witness not to
9  answer.
10    MS. LARKINS: Okay. Well, I would like to try
11  to make an offer of proof.
12    This witness -- actually, what I'd like to do is
13  I'd like to put a document into evidence.
14    MS. ANGELL: So the question is then withdrawn?
15    MS. LARKINS: Yes.
16    MS. ANGELL: Okay.
17    MS. LARKINS: I'd like to ask that this document
18  be labeled Exhibit 1.
19    (Exhibit 1 marked for identification.)
20  BY MS. LARKINS:
21    Q. Ms. Coffey, does this exhibit look familiar to
22  you?
23    A. Uh-huh. Sure.
24    Q. Can you tell me what it is?
25    A. It's an article from the Star News.

Page 11

1    MS. ANGELL: Excuse me. I'm going to instruct
2  the witness that the question concerning familiarity
3  means have you seen this before, not what does this look
4  like to you today. So she's asking you about what your
5  knowledge of this document is. So if you have seen it
6  before and it's familiar to you on that basis, then it
7  is.
8    THE WITNESS: Yes.
9    MS. ANGELL: Do you understand the difference?
10    THE WITNESS: Yes, sort of. But, yes, I'm
11  familiar with it. I'm not sure where we are going with
12  that.
13    MS. LARKINS: Okay. I'm going to take a moment
14  now to offer my proof for the necessity of a line of
15  questioning about the witness's opinions and
16  relationships with principals and other fellow employees.
17    MS. ANGELL: Before you do that, since we
18  have someone appearing telephonically, did you already
19  state a description of what this exhibit is so maybe he
20  can follow along.
21    MR. HERSH: Thank you.
22    MS. LARKINS: This -- did you want me to state
23  it?
24    MS. ANGELL: If you want to lay a foundation for
25  the document or anything like that --

Page 12

1    MS. LARKINS: Actually --
2    MS. ANGELL: I don't see how he can follow along
3  if he doesn't know what you're referring to in your
4  exhibits since he can't see them.
5    MS. LARKINS: You know what? I think I'll just
6  go ahead and offer my proof first, and then I'll get back
7  to this document.
8    This witness has brought herself to the
9  attention of the media in an effort to reverse a decision
10  by the principal of Castle Park Elementary School and the
11  superintendent of Chula Vista Elementary School District
12  to reassign five teachers at Castle Park Elementary
13  School. This witness has injected herself very much for
14  many years into the power structure of Castle Park
15  Elementary School and possibly other schools. I am
16  seeking to prove that her political and personal
17  motivations regarding her friends and political
18  associates at the school caused her to engage in
19  concerted efforts to destroy the careers of a number of
20  people, myself among them, and I want to know all about
21  her efforts to destroy the careers of Ollie Matos,
22  Lowell Billings, and a number of other individuals who
23  have been employed by Chula Vista Elementary School
24  District. Okay.
25    Now, I'd like to get back --

Page 13

1    MR. HERSH: If I can for the record state an
2  objection, Ms. Larkins. This is Michael Hersh.
3    Ms. Coffey, you and I have never met, but I am
4  an attorney with the California Teachers Association, and
5  I'm representing the Chula Vista Educators in an unfair
6  practice charge proceeding that is related to the
7  transfer of you and the four others from Castle Park.
8    MS. ANGELL: Excuse me.
9    THE WITNESS: I wasn't transferred.
10    MR. HERSH: You were not?
11    THE WITNESS: No, no. I'm still there.
12    MR. HERSH: Okay. But nonetheless, my objection
13  is that any questions that go to the grievance that has
14  been filed or the reasons why CVE -- Chula Vista
15  Educators -- have filed a grievance, I would just advise
16  you is a matter that is confidential and I believe
17  protected by the First Amendment right to association.
18  So if you're asked any questions along those lines, would
19  you please pause and give me an opportunity to object
20  further if I need to.
21    THE WITNESS: Absolutely.
22    Now, let me make sure I understand you.
23  Anything that has to do with the reassignment of the five
24  teachers, those are the questions you want me to pause
25  before?

4 (Pages 10 to 13)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 14

1    MR. HERSH: No, I'm only concerned, Teresa,
2  about any knowledge you might have concerning internal
3  deliberations of the Chula Vista Educators as to the
4  merits of that matter.
5    If you have personal knowledge apart from -- you
6  know, with the Chula Vista Educators, I don't have any
7  objection to you answering questions on that basis other
8  than relevancy.
9    THE WITNESS: Okay. I'm not 100 percent clear,
10  but we'll give it a shot.
11    MS. ANGELL: It's not for you interpret. The
12  bottom line is please just take an extra moment to
13  pause -- since we have telephonic, I don't know how long
14  the delay is -- before answering to give counsel an
15  opportunity to object.
16    THE WITNESS: Good enough.
17    MS. LARKINS: Mr. Hersh, you have raised a
18  question in my mind. You said you're representing CTA in
19  an unfair practices lawsuit?
20    MR. HERSH: No. I said I am a CTA attorney.
21  I'm representing CVE.
22    MS. LARKINS: Okay. You're representing CVE in
23  an unfair practices lawsuit?
24    MR. HERSH: It's an unfair practice charge.
25    MS. LARKINS: An unfair practice charge?

Page 15

1    MR. HERSH: Related to the transfer of the five
2  teachers from Castle Park that you're referring to.
3    MS. LARKINS: Oh.
4    MR. HERSH: It has not yet been filed, but I'm
5  representing them in that matter.
6    MS. LARKINS: Oh. May I ask you, Mr. Hersh, are
7  you representing CVE regarding Labor Code 432.7
8  violations?
9    MR. HERSH: In this case you mean?
10    MS. LARKINS: Yes.
11    MR. HERSH: Of course.
12    MS. LARKINS: Okay. I think I understand.
13    Q. Okay. Ms. Coffey, is Exhibit No. 1 a copy of a
14  newspaper article?
15    A. Yes.
16    Q. And what is the publication that published this
17  article?
18    A. The Star News.
19    Q. Okay. You can tell me the date on it?
20    A. August 20, 2004.
21    Q. Have you ever read this article before?
22    A. Yes, I have.
23    Q. Okay. Did you talk to the reporter Kelley
24  Dupuis before he wrote this article?
25    A. Yes, I did.

Page 16

1    Q. Okay. Did you tell him that you didn't want to
2  be quoted by name?
3    MS. ANGELL: I'm going to object to this entire
4  line of questioning concerning events that occurred in
5  August of 2004 and forward related to the transfer of
6  teachers at Castle Park Elementary School as not being
7  calculated to lead to the discovery of admissible
8  evidence.
9    MR. HERSH: And I will join in that objection.
10    MS. LARKINS: Are you instructing your client
11  not to answer the question?
12    MS. ANGELL: When I have instructed her not to
13  answer, you'll know because I will say it out loud.
14    MS. LARKINS: Okay.
15    Q. Did you ask Kelley Dupuis not to quote you by
16  name for this article?
17    A. No, I didn't.
18    Q. Okay. Does your photo appear in this article?
19    A. Yes, it does.
20    Q. Can you tell me where your photo appears?
21    A. On the bottom of the front page.
22    Q. Okay. There is a photo here of several
23  individuals, there is a person on the right side of
24  the photo holding a sign that says "Castle Park
25  Supports." Is that your photo there?

Page 17

1    A. Yes.
2    Q. Can you tell me why you -- did you attend the
3  demonstration that is discussed in this article?
4    MS. ANGELL: Objection. Relevance.
5    MS. LARKINS: You can answer.
6    MS. ANGELL: If it's public knowledge, if you
7  discussed it with the newspaper reporter, I've made my
8  objection that this is not very relevant to the
9  litigation.
10    THE WITNESS: All right.
11    Yes. Uh-huh.
12    BY MS. LARKINS:
13    Q. Okay. What was your reason for attending this
14  demonstration?
15    A. To show support for my colleagues who were being
16  transferred.
17    Q. And were you there to support all five of them?
18    MS. ANGELL: Objection. Relevance.
19    Do you want to do another stipulation that I'm
20  objecting on relevance for all of these so I don't have
21  to say it for every single one?
22    MS. LARKINS: Yes, let's do that.
23    MS. ANGELL: Okay. So we stipulate that I have
24  an objection for relevance on every question that you ask
25  during this deposition proceeding today, correct?

5 (Pages 14 to 17)

Larkins v. Werlin
GIC 781970

Page 18

1    MS. LARKINS: Yes. So stipulated.
2    Do you want to so stipulate, Mr. Hersh?
3    MR. HERSH: Yes, and I would like to join in the
4 stipulation as an objector as well.
5    MS. LARKINS: So stipulated.
6    Q. I'm sorry. Did you say that you were there to
7 support all of them?
8    A. I didn't say, but, yes, I was.
9    Q. Okay. I noticed that your sign that you were
10 carrying only stated the name of Ms. Singleton. Did you
11 feel particularly aggrieved on her behalf?
12    MS. ANGELL: Objection. Mrs. Larkins is
13 testifying.
14    If you'd like to ask questions about what is in
15 the picture, about what was in the sign, that is
16 something else, but you're attempting to give testimony,
17 and I'm going to object on that basis. I also want to
18 let you know that I'm going to give you a little bit of
19 latitude on this subject matter, but not a lot, seeing as
20 how this is not relevant to the litigation. We will go
21 down this path for a little while, and if you link it in
22 some way to any of your allegations, then -- and there is
23 some sort of proof, because your purported offer of proof
24 did not link this topic to this litigation. So you'll
25 have a little bit of latitude. My refraining from

Page 19

1 instructing this witness not to answer at this point is
2 not any kind of admission that this stuff is relevant,
3 but I want to in good faith give you an opportunity to
4 show how it is relevant.
5    MS. LARKINS: Thank you.
6    Q. What did the sign -- did you carry a sign at
7 this demonstration?
8    A. Yes.
9    Q. What did your sign say?
10    A. This one right here?
11    Q. Yes.
12    A. "Castle Park Supports Miss Singleton."
13    Q. Did you carry any other signs at that
14 demonstration?
15    A. Probably. Yes.
16    Q. Do you have any memory of what those other signs
17 might have said?
18    A. Well, I know that we made one for each -- at
19 least one for each of the five teachers that were being
20 transferred.
21    Q. Okay. And why did you object to these
22 transfers?
23    MS. ANGELL: Objection. This witness is a
24 current employee of the Chula Vista Elementary School
25 District. She has an interest in maintaining her

Page 20

1 employment and not giving her opinions concerning
2 supervisors' decisions. If she has any facts that you
3 wish to ask her if she knows about concerning that,
4 unless and until you make an offer of proof of how this
5 transfer and how her attending some sort of public thing
6 in relation to it in 2004 has to do with the allegations
7 in your sixth th amended complaint, I'm going to instruct
8 her not to answer.
9    MS. LARKINS: Okay. Your objection to me seems
10 patently absurd. This witness went and demonstrated in
11 front of the district against her direct supervisor and
12 the superintendent of the district. She obviously was
13 not concerned then about any sort of retaliation that
14 might occur toward her. And so why would she be
15 concerned now, given that several months have passed?
16 Let's see. Almost three months have passed and she's --
17 there has been no retaliation against her. Why would she
18 expect any now?
19    MS. ANGELL: You're seeking to elicit comments
20 and opinions from this witness about her current
21 supervisors and the administration of the district where
22 she's employed, and she's not going to give them unless
23 you make an offer of proof and you demonstrate to me why
24 that's relevant to the allegations that in September of
25 2000 somebody had information about you and passed that

Page 21

1 around.
2    If you would like to establish whether this
3 witness had any information about that and perhaps link
4 that to why she did or didn't take action on your behalf,
5 something like that, and we show that it's somehow
6 relevant, then the objection -- I would need to look at
7 the objection again; however, there's not been any
8 evidence of that.
9    MS. LARKINS: Ms. Angell, I am concerned that
10 you are putting words in this witness's mouth, claiming
11 that she is afraid of retaliation, and I would like to
12 ask this witness if she is indeed afraid of retaliation.
13    MS. ANGELL: That's a very broad question. If
14 you want to be specific -- the witness is under
15 testimony, she's under oath, and anything that's relevant
16 to the litigation, to your litigation, she'll answer.
17 However, your questions about her opinions about
18 administrators, about the righteousness or wrongfulness
19 about transfer of other employees that has nothing to do
20 with your case is not relevant and she's not going to
21 answer.
22 BY MS. LARKINS:
23    Q. Ms. Coffey --
24    MS. ANGELL: Let me just clarify why she's not.
25 Because these depositions that you have noticed is

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

---

Page 22

1  clearly your attempt to harass these employees and that's
2  not going to be allowed to occur.
3      MS. LARKINS: This employee has clearly
4  attempted to harass her principal and her superintendent
5  of her district. This is harassment. She has a legal
6  obligation to be here today and tell what she knows about
7  the events surrounding my removal from this school.
8      MS. ANGELL: So why don't you ask her something
9  about your removal from the school which occurred in
10  2001.
11  BY MS. LARKINS:
12     Q. Ms. Coffey, did you believe that the district
13  was wrong to remove me from my classroom in 2001?
14     MS. ANGELL: Objection. Vague and ambiguous.
15  What do you mean wrong? Do you mean legally wrong?
16  BY MS. LARKINS:
17     Q. Ms. Coffey, did you object to the district
18  removing me from my classroom in 2001?
19     A. I didn't have an opinion one way or the other.
20     Q. Ms. Coffey, what do you see as the difference
21  between the transfers of these five teachers to which you
22  objected vehemently and my being taken out of my
23  classroom in 2001?
24     MS. ANGELL: Objection. Assumes facts not in
25  evidence. You're assuming that this person was aware of

---

Page 23

1  what was going on in your life in 2001. Maybe you want
2  to lay a foundation and ask whether she was.
3  BY MS. LARKINS:
4     Q. Ms. Coffey, were you aware that I was taken out
5  of my classroom and placed on administrative leave in
6  2001?
7     A. Yes, I was aware of that.
8     Q. Did you think that was wrong?
9     A. I didn't know. I didn't have an opinion and I
10  still don't know what was behind the whole thing.
11     Q. Do you assume that -- did you assume that the
12  district must have had a good reason?
13     A. I didn't have an opinion one way or the other.
14  It didn't involve me. I was --
15     MS. ANGELL: You have answered the question.
16     THE WITNESS: Okay. Sorry.
17  BY MS. LARKINS:
18     Q. Did the transfer of these five teachers involve
19  you?
20     A. Yes.
21     Q. How did it involve you?
22     A. One was my team partner and she and the others
23  are good friends.
24     Q. So it's okay if someone who is not your friend
25  is removed?

---

Page 24

1      MS. ANGELL: Objection. Argumentative.
2  Don't answer it.
3      THE WITNESS: Okay.
4  BY MS. LARKINS:
5      Q. Ms. Coffey, do you believe teachers should
6  object when the district violates the law in its actions
7  against another teacher?
8      MS. ANGELL: Objection. Calls for a legal
9  conclusion; vague and ambiguous in its entirety; vague
10  and ambiguous as to time.
11      If you have a specific question concerning
12  yourself, maybe that would not be so objectionable.
13      MS. LARKINS: This is not asking for a legal
14  opinion. I want to know if Ms. Coffey believes that it
15  is objectionable for the school district to violate the
16  law in its actions against a teacher.
17      MS. ANGELL: How would this witness, who is not
18  an attorney, as far as I know, or a sheriff or any kind
19  of law enforcement person be able to make a decision as
20  to whether the school district has violated the law, as
21  you put it? That's what's vague and ambiguous about it.
22      MS. LARKINS: I did not ask this witness if the
23  school district had violated the law. I asked her does
24  she believe that it is objectionable for a school
25  district to violate the law against a teacher.

---

Page 25

1      THE WITNESS: I don't know how to answer that.
2  I don't understand the question.
3  BY MS. LARKINS:
4      Q. Okay. Let me see if I can help out here.
5      Do you think it would be objectionable if an
6  administrator walked up to a teacher and poured a gallon
7  of enamel red paint on her head? Would you object to
8  that?
9      A. Yes.
10     Q. Okay. Would you object if the district --
11  someone -- an administrator from the district came in to
12  a teacher's classroom and stole her wallet with $100 in
13  it?
14     MS. ANGELL: Objection. Vague and ambiguous as
15  to "object." And this is totally not relevant. These
16  are incomplete hypotheticals. And if you want to ask
17  this witness about something that is relevant to this
18  case, let's get on with it.
19  BY MS. LARKINS:
20     Q. Do you believe that the district violated the
21  law in its actions against the five teachers whose
22  transfer you objected to?
23     A. I don't know.
24     MS. ANGELL: Objection. Relevance. This person
25  is not -- this person is not qualified in any way as a

---

7 (Pages 22 to 25)

Page 26

1 legal expert. You're asking for something that calls for
2 expert testimony.
3 　　MS. LARKINS: No, I'm not.
4 　　MS. ANGELL: Yes, you are. You asked if she
5 believed that the district violated the law. She's not a
6 lawyer. Unless you want to lay a foundation that she is,
7 she doesn't have knowledge to answer that question. I'm
8 objecting on that basis.
9 　　MS. LARKINS: This witness went to the school
10 district and carried signs and -- her mouth is open in
11 this picture; it looks like she might be yelling. I want
12 to know if her motivation for doing this was because she
13 believed that the district had violated the law.
14 　　THE WITNESS: Well, I can tell you what my
15 motivation was. I wanted my friends to stay there.
16 That's all. I wanted my friends to stay.
17 BY MS. LARKINS:
18 　　Q. Did you want the principal to leave?
19 　　MS. ANGELL: Objection --
20 　　THE WITNESS: That was not part of it --
21 　　MS. ANGELL: Objection.
22 Don't answer until I've gotten my objection in.
23 　　THE WITNESS: Sorry. Sorry.
24 　　MS. ANGELL: Okay. This witness is not going to
25 testify as to her opinions and impressions of a principal

Page 27

1 who is at this school. It's not relevant; it's not
2 reasonably calculated to lead to the discovery of
3 admissible evidence and she's not giving you that
4 testimony, so please move on to another topic.
5 　　MS. LARKINS: Well, that's fine. Actually it's
6 perfectly obvious that she wanted the principal to leave.
7 　　MS. ANGELL: Objection. Move to strike. No
8 question pending.
9 BY MS. LARKINS:
10 　　Q. Ms. Coffey, are you currently trying to sabotage
11 the educational program at Castle Park Elementary School?
12 　　MS. ANGELL: Objection. Argumentative.
13 You can answer.
14 　　THE WITNESS: Absolutely not.
15 BY MS. LARKINS:
16 　　Q. Did you tell your classroom that there would be
17 no sixth grade camp because you were angry at the
18 principal?
19 　　A. I did not.
20 　　Q. Are you currently planning to have sixth grade
21 camp this year?
22 　　MS. ANGELL: Objection. Not relevant. What
23 she's doing this year has nothing to do with your
24 allegations that people were talking about you in
25 September of 2000.

Page 28

1 　　MS. LARKINS: Are you instructing her not to
2 answer?
3 　　MS. ANGELL: I'm asking you to ask her something
4 that has something to do with the allegations in this
5 litigation.
6 BY MS. LARKINS:
7 　　Q. Okay. Apparently your lawyer is not instructing
8 you not to answer. So would you tell me if you are
9 currently planning to have sixth th grade camp this year.
10 　　A. Yes, we are.
11 　　Q. Is the PTA -- let me ask another question. Are
12 you -- in this Exhibit 1, do you recognize the person on
13 the far left-hand side of the photo?
14 　　A. Yes.
15 　　Q. Can you tell me who that is?
16 　　A. Mrs. Star.
17 　　Q. Mrs. Star. And can you tell me what Mrs. Star's
18 relationship is to these five teachers?
19 　　MS. ANGELL: If you know.
20 　　THE WITNESS: Friends and colleagues.
21 BY MS. LARKINS:
22 　　Q. How is Mrs. Star a colleague?
23 　　MS. ANGELL: Vague and ambiguous.
24 BY MS. LARKINS:
25 　　Q. What do you mean when you say that they are

Page 29

1 colleagues?
2 　　A. She --
3 　　MS. ANGELL: With whom? Excuse me. I don't
4 even understand the question. Who are you talking about?
5 　　MS. LARKINS: I asked this witness about the
6 relationship between Ms. Star and these five teachers who
7 were transferred.
8 　　MS. ANGELL: Okay. You're pointing to a
9 document, but you don't have anything in the record about
10 four teaches who were transferred. It's going to be
11 really hard to read this transcript.
12 　　MS. LARKINS: Please try to ignore my hands.
13 Please just focus on what I say.
14 　　MS. ANGELL: I have been, and what you have said
15 is vague and ambiguous and confusing. And when we try
16 and go back and read this record later, it's going to be
17 a big mess because you haven't said who you're asking the
18 questions about.
19 BY MS. LARKINS:
20 　　Q. Ms. Coffey, what did you mean when you said they
21 are colleagues?
22 　　A. Can I ask for that to be repeated, because I
23 don't know exactly what I said.
24 　　Q. Okay. Let me ask another question. What is the
25 relationship between Ms. Star and the five teachers who

8 (Pages 26 to 29)

Page 30

1 were recently transferred?
2        MS. ANGELL: Vague and ambiguous. The five
3 teachers who were recently transferred, do you want to
4 say who they were? And if you want to ask about all five
5 together, then I'm going to object as compound and
6 conjunction, vague and ambiguous. This person -- if you
7 want to ask it maybe one person at a time or if she
8 knows -- if she has knowledge on that topic of them as a
9 group perhaps?
10        MS. LARKINS: Are you instructing her not to
11 answer the question?
12        MS. LARKINS: Yeah. Unless she understands how
13 to answer a question about I don't know who, several
14 different people that you haven't identified, I don't
15 know how she's supposed to answer that question.
16 BY MS. LARKINS:
17     Q. Do you understand the question?
18     A. Not exactly.
19     Q. Tell me what is Felicia's -- withdrawn, question
20 withdrawn.
21        Is this woman's name Felicia Star?
22     A. Yes.
23     Q. What is her relationship to you?
24     A. She's -- we don't really have a relationship.
25 She has children at the school where I work.

Page 31

1     Q. Okay. On the day of this demonstration, did you
2 speak to her?
3     A. Probably, yeah.
4     Q. How about how many people were at this
5 demonstration?
6     A. I really couldn't say that. I can't remember.
7     Q. Was it closer to five or 50?
8     A. It wasn't close to either one of those.
9     Q. Was it more than 50?
10     A. No.
11     Q. Okay. Well, I can see that it was -- I can see
12 five people right here.
13        MS. ANGELL: Objection. Move to strike.
14 Plaintiff again is testifying.
15        If you'd like to ask a question for the witness,
16 perhaps she could answer it.
17 BY MS. LARKINS:
18     Q. Was the number of people at this demonstration
19 closer to six or closer to 40?
20     A. Oh, geez. I would say probably somewhere around
21 20 or 25.
22     Q. Was Robin Donlan at that demonstration?
23     A. I don't remember.
24     Q. I'd like to go back and ask you -- we got off on
25 the topic of principals when I was talking to you about

Page 32

1 your tenure at Chula Vista Hills Elementary School. Did
2 you have any principals at Chula Vista Hills other than
3 the two you have already named?
4     A. I didn't work for any other principal than those
5 two at Chula Vista Hills.
6     Q. Okay. Why did you leave Chula Vista Hills?
7     A. At the time I needed foot surgery and it was
8 also just a time for a change.
9     Q. Okay. Can you explain to me how the foot
10 surgery made you want to change schools?
11     A. No.
12        MS. ANGELL: I'm going to object on the basis of
13 this witness's right to privacy and her medical history
14 and status. This person is not a defendant in this
15 matter, and you have no right to invade her privacy
16 concerning her medical status. I would ask that you
17 please refrain from asking questions on that issue, and
18 advise the witness that she need not respond to questions
19 concerning her medical status.
20 BY MS. LARKINS:
21     Q. Okay. Well, we will just leave it that you
22 changed schools because you had foot surgery and it was
23 time for a change. And that will be where we will leave
24 the medical questions.
25        Did you have a conflict with your principal at

Page 33

1 Chula Vista Hills?
2        MS. ANGELL: Objection. Not relevant. This
3 witness is not going to testify as to her interactions,
4 opinions, etcetera, concerning her supervisors and her
5 principals no matter how many times or in how many
6 different ways you ask the question.
7        MS. LARKINS: So you are instructing her not to
8 answer?
9        MS. ANGELL: On those issues, yes, until you
10 give me an offer of proof that shows how that is relevant
11 to any allegation in your litigation.
12        MS. LARKINS: Okay. Fine.
13     Q. What school did you go to when you left Chula
14 Vista Hills?
15     A. I spent a year between -- half and half time at
16 Palomar and Valle Lindo.
17        MS. ANGELL: Excuse me. Are those both
18 elementary schools?
19        THE WITNESS: Yes, they are, in the district.
20 Half time at each.
21 BY MS. LARKINS:
22     Q. Okay. Am I to understand that on the same day
23 you worked at both schools, or did you work like half a
24 year at one and half a year --
25     A. Half a week.

---

**Page 34**

1    Q. Half a week. Okay.
2    A. Two and a half days at each.
3    Q. Okay. So you immediately -- did you take any
4  time off of work between Chula Vista Hills and this job,
5  these two half-time jobs?
6    A. Yes.
7    Q. How much time did you take off of work?
8    A. Several months. I can't remember exactly.
9    Q. Okay. Did you leave Chula Vista Hills in the
10  middle of a school year?
11    A. No.
12    Q. You left at the end of the school year?
13    A. No, I left at the beginning of a school year.
14    Q. Okay. So you taught for a short while at the
15  beginning of a school year?
16    A. To the best of my memory, yes.
17    Q. Okay.
18    MS. ANGELL: I'm sorry. What year are you
19  talking about? In the eighties?
20    THE WITNESS: We are talking about the year that
21  I left Chula Vista Hills. So you know me and years. I
22  can't give you the year. I'm not good at that. I have
23  it written down.
24    MS. ANGELL: Thank you.
25

---

**Page 35**

1  BY MS. LARKINS:
2    Q. And then what did you do after the year where
3  you taught at Valle Lindo and Palomar?
4    A. After I taught at Valle Lindo and Palomar I was
5  hired at Castle Park.
6    Q. Okay. And who was the principal when you
7  arrived at Castle Park?
8    A. Oscar --
9    Q. Perez?
10    A. Was that his last name? Mr. Perez. Yeah, I
11  think that's right.
12    Q. Okay. What grade was your first assignment at
13  Castle Park?
14    A. Sixth.
15    Q. And did you quickly become acquainted with the
16  other sixth grade teachers?
17    A. Of course.
18    Q. And who were they?
19    MS. ANGELL: Vague and ambiguous as to time.
20  You mean the first year that she taught at Castle Park
21  School?
22    MS. LARKINS: I'm happy to accept her answer as
23  it is.
24    MS. ANGELL: I'm not when the question is vague
25  and ambiguous as to time or as to a term in it. What's

---

**Page 36**

1  really important here is that the witness understands the
2  question before she answers it. And if I don't
3  understand the question, I'm going to guess that the
4  witness doesn't understand the question, and I need to be
5  certain that she knows what she's saying when she answers
6  your questions, because the purpose of this deposition is
7  to find out what the facts are. So if she doesn't
8  understand your question, she can't give you the facts.
9    MS. LARKINS: I'm not going to continue on that
10  line of questioning.
11    Q. When you arrived at Castle Park, who were the
12  other sixth grade teachers?
13    A. Mrs. Brockhausen, and there was a -- it was a
14  combo five/six with Ms. Acevedo.
15    Q. Did you soon after you arrived at Castle Park --
16  say, within a few months -- become acquainted with all of
17  the upper grade teachers?
18    A. Become acquainted?
19    Q. Uh-huh.
20    A. Probably, yeah, I would say.
21    Q. And can you tell me who the fourth and fifth
22  grade teachers were if you remember?
23    MS. ANGELL: You mean the first year she was
24  there?
25    MS. LARKINS: I believe I said within a few

---

**Page 37**

1  months of arriving at Castle Park.
2    THE WITNESS: Yeah. That's going to be tough,
3  but --
4  BY MS. LARKINS:
5    Q. Maybe I can help you out. Was Gina Boyd there?
6    A. No. No.
7    MS. ANGELL: You only need to answer the
8  question once.
9    THE WITNESS: Okay.
10    MS. LARKINS: Okay. Well, Ms. Angell, I know
11  that you like to know time frames. I think I can pretty
12  well pin this down then. I believe that Gina Boyd left
13  to take her job as CVE president in '95, so I think the
14  year -- no --
15    MS. ANGELL: Would you like to perhaps maybe ask
16  this witness if she knows it, because I'm objecting to
17  your testifying on the record.
18    MS. LARKINS: Well, the witness has made clear
19  that she doesn't remember.
20    MS. ANGELL: Well, it's not for your to testify
21  here. You don't put questions to yourself during a
22  deposition.
23    MS. LARKINS: Okay. I just thought you would
24  like to know what year it was.
25    MS. ANGELL: So move to strike the plaintiff's

---

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 38

1    comments after the witness's response.
2        MS. LARKINS: Okay.
3        Q.  How many years was Oscar Perez your principal at
4    Castle Park?
5        A.  One or two.
6        Q.  You don't remember --
7        A.  No.
8        Q.  -- which?
9            You know, I need a break, because I need to
10   figure out how to ask questions when the memory is so
11   bad. Are you willing to take a short break? I just to
12   need to think a bit.
13       MS. ANGELL: Fine with me.
14   Michael?
15       MR. HERSH: Yes.
16       MS. ANGELL: Break?
17       MR. HERSH: Sure.
18       VIDEOGRAPHER: We are going off the record. The
19   time is 11:00 o'clock a.m.
20       (Recess taken.)
21       VIDEOGRAPHER: We are going on the record. The
22   time is 11:11 a.m.
23   BY MS. LARKINS:
24       Q.  Okay. Ms. Coffey, can you tell me what you
25   remember of your first year at Castle Park School as

Page 39

1    regards to any salient events, any important events so we
2    can try and figure out what year it was?
3        MS. ANGELL: I renew my relevance objection.
4        THE WITNESS: No.
5        MS. ANGELL: Go ahead and answer.
6        THE WITNESS: No. I can't -- there are no
7    significant events. I mean -- it's a job; it was work,
8    teaching every day.
9    BY MS. LARKINS:
10       Q.  Was there a bilingual program at Castle Park
11   when you got there?
12       A.  There were bilingual teachers; there were
13   bilingual classrooms. So other than that, I can't say if
14   it was a bilingual program.
15       Q.  We will call that a bilingual program.
16       A.  Well, I'm not saying it was a bilingual program.
17   There were bilingual classrooms.
18       Q.  Who were the bilingual teachers when you
19   arrived?
20       A.  I'm having a lot of trouble with something that
21   happened ten years ago. I really am.
22       MS. ANGELL: I'm going to instruct the witness
23   that if she doesn't know the answer because she can't
24   remember, she should just say -- if you don't know, say
25   that you don't remember. If you know, you give the

Page 40

1    answer and you tell the truth, but if you don't know, you
2    just say that you don't remember. It's okay.
3        THE WITNESS: All right. I don't remember.
4    BY MS. LARKINS:
5        Q.  Okay. Did you ever meet a bilingual teacher
6    named Heather Smith?
7        A.  I believe so, yeah. Yeah, I think. If it's the
8    person I'm thinking of, yeah.
9        Q.  Okay. Is it your recollection that she was a
10   kindergarten teacher?
11       A.  No. I don't remember. It was a primary grade.
12   That's all I can tell you.
13       Q.  Is it true that primary grades and upper grades
14   have different schedules and so the teachers tend not to
15   see much of one another?
16       A.  Different break schedules, yes.
17       Q.  Okay. Was Heather Smith dismissed by the school
18   board?
19       A.  I don't know.
20       Q.  Did you notice that Heather Smith quit teaching
21   at Castle Park Elementary School?
22       A.  I don't know about quit, but I noticed that she
23   wasn't there anymore.
24       Q.  Okay. Did you ever ask anybody why she wasn't
25   there anymore?

Page 41

1        A.  No.
2        Q.  Okay. Did you notice when principal Oscar Perez
3    stopped working at Castle Park Elementary School?
4        A.  Yes.
5        Q.  Do you know why he stopped working at Castle
6    Park?
7        A.  No.
8        Q.  Who was the next principal after Mr. Perez?
9        A.  It was Dr. Donndelinger. I think it was
10   Dr. Donndelinger.
11       Q.  Did Dr. Donndelinger ever have a committee of
12   teachers at the school involved in making plans for
13   improving discipline at the school?
14       A.  I'm not sure if it was a separate committee or
15   not.
16       Q.  Okay. Were you ever involved in a discipline
17   committee at Castle Park Elementary School?
18       A.  I can't recall that it was called that.
19       Q.  Okay. Did you become involved in that when
20   Mr. Perez was principal?
21       MS. ANGELL: Objection. Assumes facts;
22   argumentative. The witness testified that she was not on
23   a committee that is characterized or called a discipline
24   committee and you're asking her did you become involved
25   in that committee before, so --

11 (Pages 38 to 41)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 42

1    MS. LARKINS: I believe the witness testified
2    that she didn't know if it was called that.
3    MS. ANGELL: Right. And you're asking her were
4    you involved in that, meaning a discipline committee when
5    the prior principal was there. So that's argumentative
6    and it's assuming facts. It's not what she testified to.
7    Maybe I just misunderstand what your question
8    is.
9    BY MS. LARKINS:
10    Q. Were you involved in a committee whose purpose
11    was to discuss discipline of children when you were at
12    Castle Park Elementary School?
13    A. That -- discipline, behavior code was probably
14    part of the work of whatever the name of the committee
15    was. I know it wasn't a discipline committee, though.
16    Q. Okay. I'm trying to think of something we can
17    call this committee.
18    A. Climate committee.
19    Q. Okay. We'll call it that.
20    A. Sorry. I don't know if that's what it was
21    called either, but it was more to do with climate as a
22    whole.
23    Q. Okay. But now you and I know what we're talking
24    about when we talk about the climate committee. It's
25    this committee that you were on that discussed behavior,

Page 43

1    discipline, things like that and other things.
2    MS. ANGELL: Vague and ambiguous. I can't tell
3    from the question if you're talking about behavior of
4    certain students, because it sounds like you might be
5    trying to talk whether there was discipline problems with
6    individual students, or if the question is, you know --
7    was the purpose of this committee to discuss behavior
8    issues as whole for the whole school, that kind of thing.
9    BY MS. LARKINS:
10    Q. Was the purpose of this committee to discuss
11    behavior issues for the whole school?
12    A. Okay. You're talking about a committee or team
13    under Gretchen Donndelinger. Because there has been a
14    number of changes as far as the name of that committee
15    and what it's called and what they do. So I'm having
16    trouble remembering exactly at that time what it was
17    about.
18    Q. Okay. Do you remember when Gretchen
19    Donndelinger came to Castle Park as principal?
20    A. Yeah. I remember her working there. I don't
21    know exactly what you mean.
22    Q. Do you recall giving a presentation about school
23    discipline at the first -- at one of the early staff
24    meetings when Gretchen Donndelinger first arrived?
25    A. I do.

Page 44

1    Q. How did you come to be the person who spoke
2    about discipline at that time?
3    A. It was somewhat of a specialty of mine.
4    Q. Okay. Had you been working during the summer on
5    a -- some sort of plan for improving behavior of the
6    children of the school?
7    A. Yes.
8    Q. Had you been working by yourself or with someone
9    else?
10    A. Well, I can't remember that. I know I went to
11    some training, so that would be considered someone else,
12    I guess, but I can't remember.
13    Q. Okay. So this training that you went to, you
14    attended it before Gretchen Donndelinger came to Castle
15    Park; is that true?
16    A. I can't say. I really don't know as far as the
17    sequence of events. It's too long ago.
18    Q. Okay. How did this come to be an interest of
19    yours, a specialty of yours?
20    A. I don't know how to answer that, how it came to
21    be.
22    Q. Okay. Do you feel that discipline of students
23    is an important issue?
24    MS. ANGELL: Objection. Vague and ambiguous.
25    THE WITNESS: Yeah. I don't get it.

Page 45

1    BY MS. LARKINS:
2    Q. Did you feel that you were particularly well
3    equipped to deal with the issue of discipline as a result
4    of your training?
5    A. I don't understand. I'm having trouble. I'm
6    getting confused.
7    Q. Let me try to reword.
8    Was this training helpful to you?
9    MS. ANGELL: What training? Vague and
10    ambiguous.
11    MS. LARKINS: Okay. Let me reword.
12    Q. Was this training which you just mentioned that
13    you attended regarding discipline helpful to you?
14    A. But I didn't say discipline.
15    Q. Okay. Can you tell me what this training
16    consisted of that you just mentioned?
17    A. Peace building.
18    Q. Okay.
19    MS. ANGELL: Can we go off the record just for a
20    second. I want to ask you something.
21    VIDEOGRAPHER: We are going off the record. The
22    time is 11:22 a.m.
23    (Recess taken.)
24    VIDEOGRAPHER: We're going on the record. The
25    time is 11:24 a.m.

12 (Pages 42 to 45)

Page 46

BY MS. LARKINS:

1    Q. Do you recall that when you spoke to the staff
right about the time that Gretchen Donndelinger came to
Castle Park you were announcing that some of the older
children would be wearing jackets at recess which had
some sort of name on it like "peace maker" or -- the word
"peace," I believe, might have been on the jacket. And
that these older children would be helping the younger
children at recess resolve their conflicts?

A. Yes.

Q. Okay. How successful was that program?

MS. ANGELL: Objection. Vague and ambiguous.

BY MS. LARKINS:

Q. Were you in charge of that program?

A. Yes.

MS. ANGELL: Objection. Vague and ambiguous.
What program are you talking about? We have been off the
record, you know, so you don't understand how hard it's
going to be to look at this deposition transcript later
and refer to it for evidence.

MS. LARKINS: Okay.

Q. Do you have a name for this program which you
described to the staff at this meeting shortly after
Gretchen Donndelinger arrived?

A. Peace patrol.

Page 47

Q. Peace patrol. Were you charge of peace patrol?

A. Yes.

Q. Did you enjoy doing peace patrol?

A. Yes.

Q. Did you feel it helped the children?

A. I thought it was a positive program.

Q. Okay. What were you trying to achieve with this
program?

MS. ANGELL: I'm going to renew my relevance
objection.

How does this relate to anything having to do
with the allegations in your complaint?

MS. LARKINS: Are you asking me?

MS. LARKINS: Yeah, I am.

MS. LARKINS: Okay. Ms. Coffey was an important
and powerful figure at Castle Park. This committee,
which, as Ms. Coffey has stated, went through different
names and descriptions, missions over the years, became
an extremely powerful committee at the school. And I
want to find out what Ms. Coffey knows about the role of
this committee and the individuals in charge of this
committee on decisions that were made in 2001 and years
before and after that regarding how the school would be
run.

MS. ANGELL: You mean concerning your employment

Page 48

and issues related to your employment and this
litigation?

MS. LARKINS: Yes.

MS. ANGELL: Okay. If you want to ask her
questions related to your employment and this litigation,
she'll answer, but this is not an opportunity for you to
ask Mrs. Coffey about every decision that has occurred
since 1997 up to the present. So if you want to ask her
anything related to your allegations, anything related to
you or things that you were involved with, she'll
respond.

MS. LARKINS: Okay. Are you being ironic when
you say you don't want me to ask about every decision
since 1997?

MS. ANGELL: I don't understand your question.

MS. LARKINS: Okay.

Q. Was peace patrol discontinued at some time?

MS. ANGELL: Objection. Can you ask her
something that relates to the litigation? Because I just
made an objection and asked you to tell me about -- make
an offer of proof about how this issue of peace patrol,
which I understand to be some sort of student thing where
they have their names on the back of a shirt -- I'm
assuming that's what you're talking about -- how that has
to do with your employment. So can you tell me how that

Page 49

relates to your employment? And if so, then we will go
on down the road of peace patrol. And if not, then I'll
ask you to move on to a different topic.

MS. LARKINS: Okay. Ms. Coffey exerted a great
deal of power over Gretchen Donndelinger. This power was
shared with Joe Ellen Hamilton. There were two cliques
at the school which shared power basically and controlled
more than one weak principal. And these two cliques were
very much involved in my being taken out of my classroom.
Gretchen Donndelinger was a somewhat gentle and timid
person and would never have conceived of the idea of
having me being taken out of my classroom if she hadn't
been pressured by powerful teachers at the school.

MS. ANGELL: Okay. So if you would like to ask
this witness about her involvement, what she did, saw or
knows concerning discussions with Gretchen Donndelinger
concerning you, she'll respond to that. With regard to
myriad other things that have nothing to do with you --
you just talked about why you want to ask her questions
about this clique stuff. If you want to ask her about
the clique stuff, she'll answer you. But as far as the
other tangential stuff that has nothing to do with this
litigation -- if we could just start with what relates
and then if you establish that what is directly -- that
there is something that is directly related to this

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

---

Page 50

1  litigation, then that might open a door to some sort
2  of -- you know, something else that seems to be more
3  tangential.
4      MS. LARKINS: Okay. Ms. Angell, as I have said
5  to you ad nauseam, my proof for my allegations of
6  criminal actions by teachers at Castle Park Elementary
7  and administrators at Chula Vista Elementary School
8  District is based on events at Castle Park Elementary
9  School and Chula Vista Elementary School District. I was
10  not present when Robin Donndelinger -- Robin
11  Donndelinger -- when Robin Donlan asked her brother to
12  obtain my arrest record.
13      MS. ANGELL: Do you have any proof that
14  Mrs. Donlan asked her brother to obtain your arrest
15  records? Because it seems to me that you're attempting
16  to testify on the record again.
17      MS. LARKINS: I have made this allegation --
18      MS. ANGELL: I understand that you have made the
19  allegation.
20      MS. LARKINS: -- under oath.
21      MS. ANGELL: I'm asking if you have any proof of
22  it.
23      MS. LARKINS: I am trying to get proof of it
24  right now from this witness.
25      MS. ANGELL: Then why don't you ask the witness

Page 51

1  if she knows anything about your arrest records or police
2  or anything having to do with you. And if she does, then
3  you go on beyond that.
4  BY MS. LARKINS:
5      Q. Ms. Coffey, do you have -- do you know anything
6  having -- do you know of anything having to do with me?
7      MS. ANGELL: Objection. Vague and ambiguous.
8  Do you mean does she know of anything having to do with
9  connecting your name with maybe a police report or an
10  arrest record, something like that? Is that what you
11  mean?
12      MS. LARKINS: Ms. Angell, why don't you ask for
13  a protective order if you want to stop me from asking
14  questions of this witness.
15      MS. ANGELL: The witness is here to answer all
16  questions that are reasonably calculated to lead to the
17  discovery of admissible evidence in this case, which
18  questions don't seek privileged material. If you'll ask
19  her something that has something to do with this
20  litigation that's not otherwise objectionable because
21  it's so vague and ambiguous that I as her your counsel
22  can't understand exactly what question you're asking her,
23  then please ask the question.
24      MS. LARKINS: Ms. Angell, as I have told you
25  again and again, my proof of my allegations of crimes

Page 52

1  committed by your clients rests on the complete lack of
2  any logical explanation for the events at Castle Park
3  Elementary School. No one has come up with any sort of
4  explanation for why they thought I was going to kill
5  people. In fact, your clients have said they didn't ever
6  hear anything about a gun; they -- Robin Donlan sat here
7  the other day and said that she didn't know what she was
8  afraid of; she's just -- anything could happen. The
9  school district has behaved shamefully in never
10  investigating this case, and you as their lawyers -- you
11  and your fellow lawyers in your law firm I believe told
12  the district not to keep a paper trail. They never made
13  any sort of written document regarding my being taken out
14  of my classroom on February 12th.
15      MS. ANGELL: Let the record reflect that the
16  plaintiff, about three sentences ago, began staring at
17  the witness, and therefore is directing her comments
18  allegedly to counsel to the witness.
19      Do you have a question for this witness?
20  Because if you have no more questions, we will leave. If
21  you have a question for the witness, please present it.
22      MS. LARKINS: I would like to put into evidence
23  a book which I would like labeled as Exhibit 2.
24      Q. Mrs. Coffey, could you please state for the
25  record the title and subtitle of this book?

Page 53

1      A. "Mobbing, Emotional Abuse in the American
2  Workplace."
3      Q. Okay. Could you please read the little blurb
4  above the title.
5      A. "Until evil is named, it cannot be addressed.
6  This book names mobbing, a common and bloodless form of
7  workplace mayhem and proceeds with brilliance to show its
8  roots and possible cures."
9      Q. Okay. And just could you give the name of the
10  person who made that statement?
11      A. Daniel McGuire, professor of ethics, Marquette
12  University.
13      Q. Okay. Thank you.
14      Could you read the little blurb just below the
15  subtitle.
16      MS. ANGELL: I'm going to object. This document
17  speaks for itself. If you have brought this witness here
18  to read from the cover and excerpts from this book, that
19  is unnecessary and it's harassing to this witness, and
20  it's a waste and abuse of the discovery process.
21      If you want to move this book -- if you believe
22  that this book is evidence of something and you have an
23  expert to testify on it or somebody who has knowledge of
24  this book to testify on it, that's one thing, but asking
25  a witness to come here and read from some document that

---

14 (Pages 50 to 53)

Page 54

1  we don't even know if she's ever seen before, that is
2  harassing and it's a waste of time.
3          MS. LARKINS: That is an excellent question.
4      Q. Have you ever seen this book before?
5      A. No.
6      Q. Did Gretchen Donndelinger ever tell you that
7  Maura Larkins had given her a book?
8      A. No.
9      Q. Did Gretchen Donndelinger ever discuss with you
10 the concept of mobbing?
11     A. Never.
12     Q. Did she -- did Gretchen Donndelinger ever
13 discuss with you conflicts between teachers at Castle
14 Park Elementary School?
15         MS. ANGELL: Objection. Vague and ambiguous.
16     Only answer it if you understand the question.
17         THE WITNESS: Can you ask it again to make sure
18 I heard it right.
19 BY MS. LARKINS:
20     Q. Let me -- let me restate it. Did you
21 frequently -- about how often did you go in and talk to
22 Gretchen Donndelinger after a school day was over?
23         MS. ANGELL: Objection. Vague and ambiguous as
24 to time.
25         Do you mean the entire time that

Page 55

1  Dr. Donndelinger was principal that Mrs. Coffey also
2  worked at the same school?
3          MS. LARKINS: Yes.
4          MS. ANGELL: On that basis, you can answer.
5          THE WITNESS: Yeah. I don't know how to say how
6  often.
7  BY MS. LARKINS:
8      Q. Once a week?
9      A. Just sometimes.
10     Q. Twice a week?
11         MS. ANGELL: The witness has answered.
12         THE WITNESS: I couldn't count.
13 BY MS. LARKINS:
14     Q. Was it more than once a year?
15     A. Yes.
16     Q. Was it more than once a month?
17     A. Yes.
18     Q. Was it more than twice a month?
19     A. Did you say specifically after school hours?
20     Q. Yes.
21     A. I couldn't say. I never kept tallies of what
22 time it was or how many times.
23     Q. Okay.
24     A. It was much more casual than that.
25     Q. Let's change the time to be before school or

Page 56

1  during breaks or lunchtime or after school. Did you go
2  and talk to her at those times more than once a month?
3          MS. ANGELL: During the same time frame while
4  they were both employed at the same school,
5  Dr. Donndelinger and Ms. Coffey?
6          THE WITNESS: Probably.
7  BY MS. LARKINS:
8      Q. Was it do you think as much as once a week?
9      A. I didn't count. I can't say. I don't know.
10     Q. Let me get back to this -- I'd like to enter as
11 Exhibit 3 -- these two pages are -- have one in English
12 and one in Spanish, and they were originally two sides of
13 a two-sided document.
14         MS. ANGELL: Do you have a copy of this for me?
15         THE WITNESS: That's yours, isn't it?
16         MS. ANGELL: That's the witness copy. Do you
17 have a copy of this for me?
18     MS. LARKINS: Oh, let's see. I probably do.
19         THE WITNESS: I don't need to keep this.
20         MS. ANGELL: And you want both of these pages to
21 be marked as Exhibit 3?.
22         MS. LARKINS: Yes. I'm sorry I don't have a
23 stapler today.
24         MS. ANGELL: So Exhibit 3, Page 1 is the English
25 language?

Page 57

1          MS. LARKINS: Yes, we will call it that.
2          MS. ANGELL: And Page 2 is the Spanish language
3  page.
4          MS. LARKINS: Fine with me to call it that.
5          (Exhibit 3 marked for identification.)
6  BY MS. LARKINS:
7      Q. Ms. Coffey, have you ever seen this document
8  before?
9      A. Yes.
10     Q. Can you tell me when you first saw this
11 document?
12     A. This summer.
13     Q. And can you tell me what was the occasion?
14     A. Should he know what we are looking at?
15         MS. ANGELL: Counsel, do you have any questions
16 about what the exhibits are?
17         MR. HERSH: Not this one. Thank you.
18         MS. ANGELL: And I'm going to renew my objection
19 that events that occurred in summer and fall of 2004 and
20 forward when plaintiff had not been an employee of the
21 school district for a long time before that are not
22 reasonably calculated to lead to the discovery of
23 admissible evidence. And I'm going to give you a little
24 bit of latitude concerning this exhibit to see if you
25 make an offer of proof or somehow show that it's

15 (Pages 54 to 57)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 58

1  connected. Because if it is connected, we want to give
2  you the opportunity to explore that issue.
3       MS. LARKINS: Ms. Angell, I think some of the
4  best proof of the guilt of your clients has happened
5  since I left Castle Park. The obviousness that you're
6  covering up crimes is remarkable.
7       MS. ANGELL: All right. Well, let's get to some
8  of that evidence then. You have a piece of evidence, a
9  factual question to ask this person about regarding what
10  she knows? And I don't know what you're talking about,
11  but if you're talking about crimes, I assume you're
12  talking about Labor Code 437.2 which you have alleged
13  that Ms. Donlan, Ms. Watson and unnamed persons possessed
14  and basically passed around information from your arrest
15  records. If you have any questions for this witness
16  concerning those allegations related to Labor Code 432.7
17  and/or your arrest records, police records, that kind of
18  thing, please, by all means, ask them.
19       However, this witness's attendance at a public
20  function or for political reasons or whatever in 2004
21  after you haven't been an employee of the district in
22  excess of a year or more before that is not reasonably
23  calculated to lead to the discovery of admissible
24  evidence in this case, and this is not a free for all;
25  you don't get to pry into this person's employment,

Page 59

1  current employment and her political activities and
2  anything like that. It's harassing.
3       MS. LARKINS: Your client has recently been
4  closely related to two of the defendants in this case,
5  Gina Boyd and Robin Donlan, who I believe it is obvious
6  are desperately trying to cover up their crimes.
7       MS. ANGELL: Well, why don't you ask this
8  witness some sort of question relating to your
9  allegations about these "crimes," in quotes, that you
10  keep talking about.
11       MS. LARKINS: Well, it makes it difficult when
12  you keep going over and over again this objection which I
13  have already stipulated is a running objection.
14       MS. ANGELL: The fact that there is a
15  stipulation that all of your questions are irrelevant --
16  because nearly all of them are -- does not mean that you
17  get to ran havoc over this witness. And I'm not going to
18  allow it. So if you can please ask her something that
19  has something to do with this case, she'll give you a
20  response.
21       MS. LARKINS: My point is, Ms. Angell, you ask
22  me why don't I ask her questions. Well, one of the
23  reasons that I'm unable to ask her questions is because
24  you keep repeating this very long objection over and over
25  again despite the fact that I've already stipulated that

Page 60

1  it can be a running objection.
2       MS. ANGELL: What does Exhibit 3 have to do with
3  the allegations in your sixth amended complaint or the
4  unfair practice complaint?
5       MS. LARKINS: It is part of your clients'
6  desperate to cover up wrong doing.
7       MS. ANGELL: Who is that?
8       MS. LARKINS: Robin Donlan. Oh, Linda Watson
9  was involved in this, too.
10       MS. ANGELL: Okay. So this has something to do
11  with an arrest record; is that correct? This document
12  Exhibit 3?
13       MS. LARKINS: Yes.
14       MS. ANGELL: So if you can ask the witness
15  anything about how this piece of paper relates to the
16  allegations in your complaint, she'll answer.
17       MS. LARKINS: Could I maybe -- could you make
18  this very, very long objection maybe only like once every
19  10 minutes?
20       MS. ANGELL: If you could ask a relevant
21  question or a question that's not vague and ambiguous, I
22  wouldn't have to make the objection.
23       MS. LARKINS: The whole point of having a
24  stipulation is that you can later go to the judge and
25  say, "Judge, these questions are irrelevant; will you

Page 61

1  throw them out." And the judge can say, "Well, I see you
2  had a running objection, so, yes, I can throw them all
3  out."
4       MS. ANGELL: Yes, that's true in talking about
5  the relevance objection. However, I'm not going to sit
6  here and let you abuse and harass this witness, ask her
7  about things that have absolutely nothing to do with this
8  case and keep her here for hours upon end. It's not
9  going to happen.
10       MS. LARKINS: That's fine.
11       MS. ANGELL: You do not get to harass this
12  witness.
13       MS. LARKINS: You can end this deposition -- and
14  by can, I mean you are physically able to.
15       By the way, when I'm deposed by you -- I think
16  it's next week --
17       MS. ANGELL: Do you have any questions for this
18  witness? Because if you don't, we'll go.
19       MS. LARKINS: Will you agree not to ask me any
20  questions that you have objected to?
21       MS. ANGELL: Mrs. Larkins, if you have no more
22  questions for this witness, we are going to leave. Do
23  you have any questions for her related to this
24  litigation?
25       MS. LARKINS: I have many, many questions. As I

16 (Pages 58 to 61)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 62

1  told you, I plan to take about four hours.
2      MS. ANGELL: Okay. Well, let's get on with it
3  and get something on the record that has to do with this
4  deposition -- with this litigation.
5      MS. LARKINS: I'm afraid it will probably be
6  more like five hours now, though, since you have spent so
7  much time making these constant objections. If we could
8  just allow these objections to run --
9      MS. ANGELL: No.
10     MS. LARKINS: -- instead of continually
11 repeating them, we could end this deposition much sooner.
12     MS. ANGELL: When your questions are vague and
13 ambiguous, the witness will not respond. When your
14 questions seek to invade this witness's privacy or to
15 harass her, she will not respond regardless of this fact
16 that there is a standing objection based on relevance.
17 So you ask your question, I'll object. If I instruct her
18 not to answer, move on to your next question.
19     MS. LARKINS: It would be much quicker if you
20 would simply instruct your client not to answer these
21 question if you don't want her to answer these questions.
22 That takes so much less time.
23     MS. ANGELL: Okay. We are going to sit here for
24 about one more minute of your colloquy, and if you don't
25 have a question for the witness, then I'm going to assume

Page 63

1  that the deposition is over and we are going to leave.
2  So if you have a question, please pose it. We've been
3  listening to your colloquy for almost ten minutes.
4      MS. LARKINS: Is colloquy like a monologue when
5  only one person is talking?
6      MS. ANGELL: Do you have a question for this
7  witness?
8      MS. LARKINS: Because I believe you have been
9  doing quite a bit of the talking.
10     MS. ANGELL: Do you have a question for this
11 witness concerning this litigation?
12     MS. LARKINS: So I would say this colloquy is
13 your colloquy as much as it is mine.
14     MS. ANGELL: I assume that the lack of response
15 means that you have no questions for this witness, and
16 because you have no questions for this witness, we are
17 leaving. If you have a question for this witness
18 concerning this litigation, please pose it. If you don't
19 have a question, we are going.
20     MS. LARKINS: I have many questions for this
21 witness.
22     MS. ANGELL: Then please pose it.
23 BY MS. LARKINS:
24     Q. Were you and I both members of the peace
25 committee at Castle Park Elementary School when Gretchen

Page 64

1  Donndlinger was principal and the Comer program was
2  being followed?
3      A. I don't remember.
4      MS. ANGELL: Let the record reflect that
5  plaintiff is staring and smiling at the witness with
6  hands folded in an apparent expression of disbelief of
7  the witness's response. I don't know what she's trying
8  to communicate, but she's trying to communicate
9  something.
10 BY MS. LARKINS:
11     Q. Do you recall there was a program called the
12 Comer program?
13     A. I do.
14     Q. What do you recall about that program?
15     A. Just that some people went to training at -- I
16 can't remember what university, but where it had
17 originated, back East somewhere -- and that we never
18 fully adopted it at the school.
19     Q. So are you saying that it was partially adopted
20 at the school?
21     A. No, I'm not saying that. I'm just saying that
22 you asked me what I remember about it, and that's all I
23 remember about it.
24     Q. Okay. Can you help me understand what you mean
25 by never fully adopted it?

Page 65

1      A. We did not adopt the name of Comer School.
2      Q. Okay. Did Castle Park change its legally
3  mandated governing board from having the name site
4  council to having the name staff/parent management team?
5      MS. ANGELL: Objection. Vague and ambiguous as
6  to time; calls for a legal conclusion. And in that
7  regard, concerning legal conclusion, I'm going to
8  instruct the witness not to answer unless she's a
9  qualified legal expert.
10     MS. LARKINS: Ms. Angell, you objected before I
11 was finished with my question. Could you just please
12 pause a little longer before your objection so I can --
13     MS. ANGELL: Sure. I thought you were done.
14     MS. LARKINS: Thank you.
15     MS. ANGELL: Do you want the question read back?
16     MS. LARKINS: No, I don't.
17     MS. ANGELL: You're going to start over then?
18 Because I can't remember what the question was.
19     THE WITNESS: I remember it. I remember it.
20     MS. LARKINS: Okay.
21     THE WITNESS: But you asked me not to answer.
22     MS. ANGELL: You said you weren't done.
23 BY MS. LARKINS:
24     Q. Okay. During the time Gretchen Donndlinger was
25 principal at Castle Park Elementary School.

17 (Pages 62 to 65)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 66

1       MS. ANGELL: Can I have the question back,
2 because I don't remember it.
3       MS. LARKINS: I'll restate the question.
4       Q. To your knowledge, do elementary schools usually
5 have a council that is -- that governs the school.
6       MS. ANGELL: Vague and ambiguous as to
7 "council," as to "governing the school."
8       MS. LARKINS: I'll restate.
9       Q. Did Castle Park at any time, to your knowledge,
10 have a committee that was called a site council?
11       A. School site council, yes.
12       Q. Okay. Does it currently have a school site
13 council?
14       A. Yes.
15       Q. Okay. When you first arrived at Castle Park
16 Elementary, did it have a school site council?
17       A. I can't tell you. I don't know.
18       Q. Okay. When Gretchen Donndelinger was principal
19 of Castle Park Elementary, was there a school site
20 council?
21       A. I don't remember. I don't want to say I assume
22 so because I don't know.
23       Q. Okay. When Gretchen Donndelinger was principal
24 of Castle Park Elementary, was there a committee called
25 staff/parent management team?

Page 67

1       A. I don't know if that's when she was there, but
2 there has been an SPMT.
3       MS. ANGELL: I'm going to ask the witness to
4 answer the question that is posed.
5       THE WITNESS: Okay.
6       MS. LARKINS: Okay.
7       Q. Was the naming of this staff/parent management
8 team influenced by the Comer program?
9       A. I don't know.
10       Q. Were committees formed at Castle Park Elementary
11 School as part of the Comer program?
12       A. I believe so.
13       Q. Was the Comer process discussed in the school
14 improvement plan of Castle Park Elementary school when
15 Gretchen Donndelinger was principal?
16       A. I don't know.
17       Q. Did the entire staff work on creating the school
18 improvement plan each year when Gretchen Donndelinger was
19 principal?
20       MS. ANGELL: If you know.
21       THE WITNESS: I'm sorry. I don't remember.
22 BY MS. LARKINS:
23       Q. Do you remember ever going to a staff meeting
24 where staff members wrote down on large pieces of butcher
25 paper their suggestions for what should be put into the

Page 68

1 school improvement plan?
2       A. I can remember writing on the butcher paper, but
3 I don't remember what for.
4       Q. Okay. Was there a committee formed as a result
5 of the Comer process called the peace committee?
6       MS. ANGELL: I'm going to renew my objection on
7 relevance of this discussion of Comer and school
8 improvement plan. I don't see how it has any relation to
9 any element of any cause of action in the sixth amended
10 complaint or in the unfair labor practice, the two
11 intentional infliction of emotional distress causes of
12 action that remain. And I would like to provide an
13 opportunity for plaintiff to make an offer of proof as to
14 how this discussion of a Comer process or school
15 improvement plan has anything to do with allegations that
16 Robin Donlan and her brother got a copy plaintiff's
17 arrest records and spread it around to other people or
18 that the district intentionally inflicted emotional
19 distress on plaintiff with relation to a grand jury
20 subpoena. If you can make an offer of proof on that,
21 this witness will answer anything she knows. And if you
22 can't make an offer of proof, that makes it even more
23 clear that this is just designed to harass this witness
24 as a district employee.
25       MS. LARKINS: Robin Donlan, Linda Watson, Joe

Page 69

1 Ellen Hamilton, Richard Werlin -- let me strike Richard
2 Werlin -- could not have destroyed my career if it
3 weren't for the Comer program. This program rearranged
4 the power structure of the school in such a way that
5 Ms. Coffey and others acquired enormous power for their
6 personal agenda.
7       MS. ANGELL: So the Comer process had something
8 to do with how information is passed around or something?
9       MS. LARKINS: It had something do with how
10 decisions were made.
11       MS. ANGELL: Okay. So if you have any questions
12 for this witness about whether any decisions were made,
13 to her knowledge, whether she was involved with any
14 decisions related to this Comer thing, related to your
15 record of arrest or the allegations contained in the
16 complaint, she will answer them.
17       MS. LARKINS: Thank you.
18       Q. Okay. Do you recall a program called Kingdoms?
19       A. Yes.
20       Q. At Castle Park?
21       A. Yes.
22       Q. What was your involvement in the Kingdoms
23 program?
24       MS. ANGELL: Objection. Assumes facts not in
25 evidence; vague and ambiguous.

18 (Pages 66 to 69)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

---

Page 70

1    MS. LARKINS: I assume no facts. She might
2  answer I had no involvement.
3    MS. ANGELL: Well, then you should ask her,
4  Mrs. Coffey, were you involved with the Kingdoms program.
5  By saying what was your involvement, you're assuming that
6  she was involved, and she apparently doesn't understand
7  the question.
8    MS. LARKINS: Well, I will be happy --
9    MS. ANGELL: It's vague and ambiguous.
10    MS. LARKINS: I will be happy to restate it.
11   Q. Were you involved in the Kingdoms program?
12   A. Yes.
13   Q. What was the Kingdoms program?
14    MS. ANGELL: Vague and ambiguous as to time.
15   Is there a particular time frame that you are
16  referring to? I don't know how long this program --
17  we're not going to know from the transcript how long the
18  program was going.
19  BY MS. LARKINS:
20   Q. How long was the Kingdoms program used at Castle
21  Park?
22   A. Somewhere between two and three years.
23   Q. Okay. Were you a supporter of the Kingdoms
24  program?
25   A. Yes.

---

Page 71

1    Q. Was there a conflict between teachers about the
2  Kingdoms program?
3    MS. ANGELL: It's vague and ambiguous as to
4  "conflict."
5    THE WITNESS: Be more specific.
6  BY MS. LARKINS:
7    Q. Do you recall sitting at a table in your
8  classroom with hundreds of index cards, each which had
9  the name of a student on it, and you and others were
10  dividing these index cards into groups so they could be
11  in different Kingdoms families?
12   A. I do remember that.
13   Q. Okay. Do you recall who was with you at that
14  meeting?
15   A. I know that you were there. And I think
16  Mr. Ramirez -- I think Mr. Ramirez. Mrs. Bartkiewitz was
17  there, and there may have been others, but I can't recall
18  exactly. It's a long time ago.
19   Q. Do you think Kevin Richardson was there?
20   A. I can't recall.
21   Q. Do you think Jerry Acevedo was there?
22   A. I can't recall.
23   Q. And was this group of people that was there the
24  members of the peace committee?
25   A. I couldn't say every single one was or not.

---

Page 72

1    Q. Okay. And what was the purpose of this meeting?
2    A. As you said, to sort all of the students into
3  their Kingdom.
4    Q. Was every child in the school placed into a
5  Kingdom?
6    A. To the best of our ability.
7    Q. Okay.
8    MS. ANGELL: I'm sorry. Was that a yes or no?
9    THE WITNESS: That was a -- yes, it's my
10  understanding that every child was.
11    MS. LARKINS: Okay.
12   Q. Does it sound correct to you to say that this
13  was at the beginning of the 1999-2000 school year?
14   A. I can't say. I don't know.
15   Q. Okay. And then did there come a time when these
16  children were told what Kingdom they would be in and sent
17  to that Kingdom?
18    MS. ANGELL: Objection. Vague and ambiguous. I
19  don't understand the question.
20    MS. LARKINS: Let me rephrase.
21   Q. Did the children start going to different
22  classrooms for Kingdoms?
23   A. Yes.
24   Q. Okay.
25    MS. ANGELL: For clarity in the record, does

---

Page 73

1  this -- are we talking about students being pulled out
2  for short periods during certain days or something for
3  some sort of activity related to a program called
4  Kingdoms; is that what you're discussing?
5  BY MS. LARKINS:
6    Q. Was this a program where a few children were
7  pulled out of their classrooms?
8    A. No.
9    Q. Can you tell us how this was structured?
10    MS. ANGELL: You mean how the program worked?
11  BY MS. LARKINS:
12   Q. How did the program work?
13   A. Well, it was a school-wide program, and it
14  divvied up the kids, every child in the school, to a
15  staff member, and they were across grade levels. And if
16  I recall, we tried to have a mix of boys and girls and
17  every grade level in each Kingdom.
18   Q. Okay. And were you the chairman of the peace
19  committee?
20   A. I don't remember.
21   Q. Okay. Was Jerry Acevedo on the peace committee?
22   A. I don't remember.
23   Q. Okay. When Maura Larkins, me, signed up for the
24  peace committee, were you happy at first about that?
25   A. I didn't feel one way or the other. I don't

---

19 (Pages 70 to 73)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

---

Page 74

1  remember how I felt, I should say. I don't remember
2  feeling anything about it.
3      Q. Do you remember saying to me that you were happy
4  that I had signed up for it?
5      A. I don't remember saying that. It doesn't mean
6  that I didn't say it, but I don't remember saying it.
7      Q. Did the Kingdoms program -- how often were
8  children involved in the Kingdoms program?
9      A. At first -- I can't remember. I can't remember
10 if it was once a week or once every two weeks. I can't
11 remember. I really can't. And it changed.
12     Q. Why did it change?
13     A. I don't know how to answer that either. I don't
14 know why it changed.
15     Q. Was this something arbitrarily decided by the
16 peace committee?
17     MS. ANGELL: Objection. Argumentative.
18 You can answer if you know.
19     THE WITNESS: No, no, it wasn't arbitrarily
20 decided by the peace committee.
21 BY MS. LARKINS:
22     Q. Was it decided by the principal?
23     A. No.
24     Q. Who decided?
25     A. That was in the days of site-based management,

---

Page 75

1  and I believe it was a staff decision every time it
2  changed.
3      Q. Okay. Each time there was a Kingdoms event, did
4  it start with an assembly outside in the school yard?
5      A. It did. Unless it was raining, I think.
6      Q. And did you sometimes lead the assembly?
7      A. I did.
8      Q. Did Joe Ellen Hamilton sometimes lead the
9  assembly?
10     A. She did.
11     Q. Okay. And after the assembly, what would
12 happen?
13     A. That's when they would go to their individual
14 Kingdom.
15     Q. Okay. Do you have any memories of the very
16 first Kingdoms assembly?
17     A. No.
18     Q. Do you remember being very happy that Joe Ellen
19 Hamilton came with a crown on her head and supported the
20 Kingdoms program?
21     A. I don't remember how I felt.
22     Q. Do you remember you and Joe Ellen Hamilton
23 having worked together on a discipline document for the
24 Castle Park School?
25     MS. ANGELL: Objection. Vague and ambiguous as

---

Page 76

1  to time.
2  BY MS. LARKINS:
3      Q. When Dr. Donndelinger was principal.
4      A. No, I don't remember working with Joe Ellen on
5  anything like that.
6      Q. Do you remember working with Gretchen
7  Donndelinger during one summer to write a document to be
8  sent to all the student homes?
9      A. No, I don't.
10     Q. Do you remember Joe Ellen Hamilton being angry
11 that you and Gretchen Donndelinger had produced this
12 document without her involvement?
13     A. No, I --
14     MS. ANGELL: Objection. She just testified that
15 she doesn't remember doing such a document.
16 BY MS. LARKINS:
17     Q. Okay. Do you remember that Joe Ellen Hamilton
18 at first refused to support the Kingdoms program?
19     A. No, I don't remember that.
20     Q. Okay. At that first assembly, how did all of
21 the children find their Kingdom?
22     A. I believe it was by color, color coded.
23     Q. Okay. Was every child given a name tag of a
24 certain color with his name and the name of the teacher
25 he was to go to?

---

Page 77

1      A. I don't remember exactly what was on it, but I
2  know it was color coded. That's all I can remember.
3      Q. Do you recall who made all of those name tags?
4      A. No, I don't.
5      Q. Would it jog your memory if I suggested that it
6  was Kevin Richardson and me?
7      A. No, it wouldn't.
8      Q. Okay. Do you recall that you wanted to read the
9  names of all the students out loud at the first assembly
10 and tell them what their teacher they were supposed to go to?
11     A. No, I don't remember that.
12     Q. Okay. I want to get back to Exhibit 3 for a
13 second so that we can set it aside, because I wasn't
14 finished with it.
15     Could you read the title of this document?
16     A. "Attention Castle Park Parents and Community."
17     Q. I'm going down seven lines here to the seventh
18 line. In the middle of the seventh line a new sentence
19 starts with the words "no reason." Could you read that
20 sentence.
21     MS. ANGELL: Do you mean to herself?
22     MS. LARKINS: Out loud, please.
23     MS. ANGELL: The document speaks for itself.
24 This witness is not here to read documents and book
25 titles to you for purposes of getting it on the record.

---

20 (Pages 74 to 77)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 78

1  The document speaks for itself. If you would like her to
2  read it to yourself to refresh her recollection, that's
3  one thing. Having this witness here to continually read
4  things for you is harassing and abuse of the discovery
5  process.
6  BY MS. LARKINS:
7      Q. Okay. Why don't you read that sentence by
8  yourself.
9      Do you support that statement?
10     MS. ANGELL: Objection. Relevance.
11     You're back to the same issue of asking this
12  person what their opinions are concerning transfers of
13  teachers a number of years after you left employment with
14  this district, and this witness is not here to talk about
15  that. She's here to give testimony on anything that is
16  reasonably calculated to lead to the discovery of
17  admissible evidence concerning your allegations that
18  Robin Donlan and other people had access and passed
19  around information from your arrest records.
20     MS. LARKINS: It would be so much faster if your
21  would just instruct your client not to answer the
22  question if that is your goal.
23     MS. ANGELL: If you would like to make an offer
24  of proof as to how this flier is relevant to information
25  concerning your arrest records, then I won't ask -- tell

Page 79

1  the witness not to respond. This is your opportunity to
2  make that offer of proof.
3      MS. LARKINS: Your have said those same words
4  several times today.
5      MS. ANGELL: Uh-huh.
6      MS. LARKINS: Do you want me to stay it again?
7  Okay. I'll say it again.
8      MS. ANGELL: If you have something different to
9  say from what you said before, please, by all means, say
10 it. If there is something that makes this document
11 relevant to your arrest records and people having
12 knowledge or information about your arrest records or the
13 intentional infliction of emotional distress causes of
14 action that are named in your unfair practice complaint,
15 then have at it.
16     MS. LARKINS: Okay. Ms. Angell, as you know
17 from Robin Donlan's deposition, Robin Donlan admitted to
18 having written this document. Robin Donlan is the very
19 person who is accused by me of having obtained my arrest
20 records and having used them to destroy my career.
21     MS. ANGELL: I understand that that's your
22 allegation. So what does this document have to do with
23 that?
24     MS. LARKINS: Robin Donlan started looking more
25 guilty when she got transferred out of the school because

Page 80

1  it then became apparent that any problems I had at Castle
2  Park School were not simply my problems, but that there
3  was indeed a problem with other teachers at the school;
4  in fact, the very teachers who worked to destroy my
5  career.
6      The fact that this witness tried to help these
7  other teachers who caused problems for me and for several
8  other employees of Castle Park Elementary School is
9  evidence of awareness of guilt. If Robin Donlan and Gina
10 Boyd and other defendants weren't so desperate to avoid
11 responsibility for the wrong-doing alleged in my
12 complaint, they would have just calmly accepted these
13 transfers. It's not like they lost their jobs; they were
14 just transferred to another school, no loss in pay; they
15 were told weeks before that they were going to be
16 transferred. These same people thought it was perfectly
17 fine for me to be taken out of my classroom in the middle
18 of the year.
19     MS. ANGELL: What same people?
20     MS. LARKINS: Robin Donlan, Nicki Perez. None
21 of these people, including this witness, objected to my
22 being taken out of my classroom in the middle of the
23 year.
24     MS. ANGELL: This witness didn't say that she --
25 actually, her testimony was that she had no opinion. I

Page 81

1  don't believe that you have testimony from any other
2  person. So to the extent that you're again attempting to
3  give testimony here, I'm going to make sure that there is
4  an objection on the record. But you're giving your offer
5  of proof, and so far, I'm sorry, but I just don't follow
6  how this piece of paper is in any way related to the
7  allegations concerning arrest records or intentional
8  infliction of emotional distress on you. But you got to
9  something right there at the end where you think that --
10 something about this person -- this witness supporting
11 somebody who had something to do with you. So if you
12 want to ask that question of this witness, you know --
13 are we -- do you understand what I'm talking to, or do I
14 need to go back and look at what she is typing?
15     MS. LARKINS: You need to listen more carefully
16 to what I'm saying. What I said was that this witness
17 made no objection when I was taken out.
18     MS. ANGELL: Well, you previously said that all
19 of these people thought that it was fine for you to be
20 transferred, and you were also attributing that to this
21 witness. I mean it's your dollar here on the deposition
22 transcript. We can sit here and argue about this stuff
23 forever. I don't care.
24     MS. LARKINS: Okay. Let me ask that.
25     Q. Ms. Coffey, did you think it was not fine for me

21 (Pages 78 to 81)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

---

**Page 82**

1 to be taken out of my classroom?
2 MS. ANGELL: Objection. Asked and answered.
3 She already said she had no opinion.
4 Do not answer again: And make sure that you
5 give audible responses, please. Yes, no, instead of
6 shaking your head.
7 THE WITNESS: Well, I wasn't answering. I was
8 just listening to what you were saying and nodding my
9 head, remembering.
10 MS. LARKINS: Okay.
11 THE WITNESS: Excuse me. I'm going to need to
12 use the restroom.
13 MS. ANGELL: So do I. Do you have a topic you
14 want to finish up on or should we break now?
15 MS. LARKINS: Well, I have a question pending.
16 MS. ANGELL: Okay. What's the question?
17 MS. LARKINS: The question was if she supported
18 this statement.
19 MS. ANGELL: And I told you that's not relevant,
20 and unless you make an offer of proof showing why it's
21 relevant to the allegations in your complaint, she's not
22 answering.
23 MS. LARKINS: Okay. So I have made an offer of
24 proof. Can she answer it now?
25 MS. ANGELL: No. You haven't shown how this is

**Page 83**

1 in any way relevant to your allegations that people had
2 information from your arrest records, and she's not
3 answering.
4 MS. LARKINS: Okay. Let's take a break.
5 VIDEOGRAPHER: We're going off the record. The
6 time is 12:17 p.m.
7 (Recess taken.)
8 VIDEOGRAPHER: Today is Monday, November 8th,
9 2004. The time is now 12:26 p.m. We are beginning Tape
10 2, Disk 2 of the deposition of Teresa Coffey. We're
11 going on the record.
12 BY MS. LARKINS:
13 Q. Ms. Coffey, how many teachers that you were
14 acquainted with personally have been dismissed by Chula
15 Vista Elementary School District?
16 MS. ANGELL: Vague and ambiguous as to
17 "dismissed."
18 If you know personally that any teaches have
19 been dismissed I suppose over your -- how many years was
20 it? 20 something?
21 THE WITNESS: Oh, no. 17th year.
22 MS. ANGELL: Okay. So if you understand the
23 question --
24 THE WITNESS: Zero.
25 MS. LARKINS: While I'm remembering this, I took

**Page 84**

1 back the mobbing book because I decided to withdraw it as
2 a --
3 (Brief interruption.)
4 MS. ANGELL: We lost counsel.
5 Let's go off while we get counsel back.
6 VIDEOGRAPHER: We're going off the record. The
7 time is 12:28 p.m.
8 (Recess taken.)
9 VIDEOGRAPHER: We are going on the record. The
10 time is 12:29 p.m.
11 MS. ANGELL: Thanks. Before we continue with
12 the questioning, I'd like to reflect -- let the record
13 reflect that Mrs. Larkins has stated that she wishes to
14 withdraw her Exhibit 2 and strike all questions related
15 to Exhibit 2.
16 Is that an accurate reflection of what occurred
17 during the off-record time?
18 MS. LARKINS: Yes. That is correct.
19 MS. ANGELL: And I also would like to request
20 that Mrs. Larkins refrain from going through documents
21 that I've been working with, documents that are in my
22 stack of things over here. Attorney impressions,
23 etcetera, are confidential and not for your perusal. So
24 I would appreciate it if you would refrain from going
25 through my things when I'm not in the room.

**Page 85**

1 MS. LARKINS: I just took back my book which was
2 laying out there. I did not have any interest at all in
3 any of your documents and I couldn't tell you a single
4 word.
5 MS. ANGELL: Mrs. Larkins, I don't know what you
6 did because you did it while I was out and you went
7 through my stuff. And I'm just asking you to please
8 don't do that again.
9 BY MS. LARKINS:
10 Q. Ms. Coffey, how did you feel when Lucy Flowers
11 left Castle Park Elementary School?
12 MS. ANGELL: Objection. Vague and ambiguous;
13 lacks foundation and not relevant.
14 MS. LARKINS: Are you instructing her not to
15 answer?
16 MS. ANGELL: If she understand the question and
17 knows what it is -- there is no foundation for that
18 question. Do you want to ask her if she knows who Lucy
19 Flowers is, if Lucy Flowers was a teacher or an employee
20 at Castle Park?
21 BY MS. LARKINS:
22 Q. Do you know who Lucy Flowers is?
23 A. Yes, I do.
24 Q. Was she a teacher as Castle Park?
25 A. Yes, she was.

22 (Pages 82 to 85)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

---

Page 86

1    Q. How did you feel when she left Castle Park?
2    A. I don't know how to answer how did I feel.
3    Q. Did you feel upset when she left Castle Park?
4    A. No. No.
5    Q. Okay. How did you feel when Heather Comen left
6    Castle Park?
7        Wait a minute. I didn't establish foundation.
8        Do you know someone named Heather Comen?
9    A. I did.
10   Q. Was she a teacher as Castle bark?
11   A. She was.
12   Q. How did you feel when she left Castle Park?
13   A. Same thing. I don't know how to describe how I
14   feel.
15   Q. Did you object when she left?
16       MS. ANGELL: Vague and ambiguous as to "object."
17   BY MS. LARKINS:
18   Q. Did you go to the district and carry signs when
19   she left?
20   A. No.
21       MS. ANGELL: Who is she?
22       MS. LARKINS: Heather Comen.
23       THE WITNESS: No.
24   BY MS. LARKINS:
25   Q. Okay. Did you go to the district and carry

---

Page 87

1    signs when Heather Smith left?
2    A. No.
3    Q. And did you go to the district and carry signs
4    when Lucy Flowers left?
5    A. No.
6    Q. Okay. Were you ever involved in a food fight in
7    the staff lounge at Castle Park Elementary School
8    District?
9    A. What?
10       MS. ANGELL: If you could respond with a yes or
11   no or I don't know --
12       THE WITNESS: I'm sorry. I'm sorry. I don't
13   know. I -- I don't believe so.
14       A food fight? No.
15   BY MS. LARKINS:
16   Q. Did you ever tell me about a food fight in the
17   lounge at Castle Park Elementary School?
18   A. Not that I recall.
19       Oh, there was a -- oh, maybe -- okay. Maybe a
20   whipped cream incident, not a food fight.
21   Q. Okay. Well, tell me about the whipped cream
22   incident.
23   A. Just a couple people were spraying each other
24   with it. That's the only thing even close to what I
25   think you might be talking about.

---

Page 88

1    Q. Okay. And do you know -- did this happen on --
2    during lunchtime?
3    A. I don't know.
4    Q. Okay. Did you ever tell me that on the last day
5    of school you just needed to let off steam?
6    A. I don't know.
7    Q. Okay. Do you recall that one year the
8    custodians worked for about a week to clean the carpet
9    and walls in the staff lounge?
10   A. No.
11   Q. Okay. Do you recall that on the last day of the
12   school year following that, Robin Donlan came
13   in to the staff lounge while you were sitting there and
14   she was wearing a raincoat in the expectation of having
15   another food fight?
16   A. Yeah, I remember that.
17   Q. And what did you say to her?
18   A. I don't remember.
19   Q. Did you --
20   A. I probably laughed.
21   Q. Okay.
22       MS. ANGELL: Excuse me. I'd like to ask a
23   question before we get too far away from this topic, if
24   you don't mind.
25       Mrs. Larkins?

---

Page 89

1        MS. LARKINS: Yes?
2        MS. ANGELL: Do you mind if I ask a question?
3        MS. LARKINS: Go ahead.
4        MS. ANGELL: How do you know what Robin Donlan
5    was thinking about why she was wearing a raincoat inside
6    the teachers' lounge during whatever this unspecified
7    time was that you just mentioned when you saw her in a
8    raincoat inside the teachers' lounge? Did she tell you
9    why she was wearing a raincoat?
10       THE WITNESS: Everyone is asking me to remember
11   things that I don't remember. I cannot remember
12   conversations from years ago. I can't even remember
13   things from last week. I don't know how to answer any of
14   this stuff that asks me for when things happen.
15       MS. ANGELL: Okay.
16       THE WITNESS: I don't remember that long ago.
17       MS. ANGELL: Okay. The question was -- you
18   testified a minute ago that you remember a day that Robin
19   Donlan was wearing a raincoat in expectation of having
20   another food fight. My question to you is what's the
21   basis for your statement that Robin -- why Robin Donlan
22   was wearing a raincoat inside the teachers' lounge? Did
23   she tell you it had something to do with a food fight?
24   And if you don't recall, then your testimony is that you
25   don't recall.

---

23 (Pages 86 to 89)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 90

1    THE WITNESS: Well, here's what I'm having
2  trouble with. What does this have to do with anything?
3    MS. ANGELL: Well, that's not the issue. The
4  issue for you is do you have a memory of it or do you not
5  have a memory of it?
6    THE WITNESS: I have a memory of her in the
7  raincoat, yes.
8    MS. ANGELL: Do you have a memory of her telling
9  you why she was wearing a raincoat?
10    THE WITNESS: No.
11    MS. ANGELL: So, therefore, do you know why she
12  was wearing a raincoat in the teachers' lounge one day?
13    THE WITNESS: Can you say you think you know --
14    MS. ANGELL: I want to know --
15    THE WITNESS: -- or you know?
16    MS. ANGELL: I want to know if you were told --
17    THE WITNESS: I don't remember if I was told.
18    MS. ANGELL: Okay. So is it true that you don't
19  know why she was wearing the raincoat?
20    THE WITNESS: I'm totally confused. I'm sorry.
21    MS. ANGELL: Let's go off the record for a
22  second.
23    VIDEOGRAPHER: We're going off the record. The
24  time is 12:37 p.m.
25    (Recess taken.)

Page 91

1    MS. ANGELL: I'm going to need to hear the last
2  question.
3    VIDEOGRAPHER: We're going on the record. The
4  time is 12:48 p.m.
5    MS. ANGELL: Or if it would be easier to just
6  read over your shoulder.
7    There was a question posed by me at Mrs. Coffey.
8    (The question at Page 90, Line 18 was read.)
9    THE WITNESS: Correct. That's true.
10    MS. ANGELL: Thank you. I'm done. Thank you
11  for letting me ask that question.
12    MS. LARKINS: Are we on the record?
13    VIDEOGRAPHER: Yes.
14    MS. ANGELL: Yes.
15    MS. LARKINS: Okay.
16    Q. Does it ever rain in the teachers' lounge?
17    MS. ANGELL: Objection. Argumentative.
18    MS. LARKINS: I withdraw it. I have watched
19  enough Matlock to do this. Okay.
20    MS. ANGELL: Is Mr. Hersh with us?
21    MS. LARKINS: Mr. Hersh?
22    MR. HERSH: I am certainly with you guys.
23    MS. LARKINS: I don't hear you laughing.
24    MR. HERSH: I have the mute button on, but I
25  assure you I am laughing appropriately.

Page 92

1    MS. LARKINS: Oh, good.
2    Q. Okay. Can you tell me what were the main
3  principles of the Comer program?
4    A. No, I can't.
5    Q. Was one -- I'm going to try to help you
6  remember. If I say something that you remember, then
7  just tell me so. Was one of the principles that every
8  person should have a voice?
9    A. I don't remember.
10    Q. Okay. What was the purpose of Kingdoms?
11    MS. ANGELL: Objection. Vague and ambiguous.
12    To the extent that you understand the question
13  and you know the answer, you can answer it; however, I'd
14  like to renew the relevance objection. We have been
15  going for I think an hour on Comer-related issues, and
16  there is no evidence -- there is no offer of proof that
17  shows why this is relevant to anything concerning
18  plaintiff's arrest records.
19    Do you understand the question, Ms. Coffey?
20    THE WITNESS: It's a little too broad for me to
21  figure out how to answer it.
22  BY MS. LARKINS:
23    Q. Did you work hard to keep the Kingdoms program
24  when other teachers complained that they wanted it to be
25  ended?

Page 93

1    A. I don't know what you mean by "work hard."
2    Q. Okay. Did some of the teachers at Castle Park
3  want to end the Kingdoms program soon after it started?
4    A. I don't know.
5    Q. Was there a vote held on whether Kingdoms would
6  be discontinued?
7    MS. ANGELL: Objection. Vague and ambiguous as
8  to time.
9    MS. LARKINS: Soon after it started.
10    THE WITNESS: I don't remember.
11    When you look at me like that it makes me feel
12  upset. It makes me feel like I'm stupid or something for
13  not remembering.
14  BY MS. LARKINS:
15    Q. Okay. I'm going to try to -- do you remember
16  one peace committee meeting where you and I and Virginia
17  Copeland and Heather Comen and Kevin Richardson were
18  meeting in Kevin Richardson's room?
19    A. No, I don't.
20    Q. Do you remember being angry at Linda Watson,
21  Karen Snyder and Peggy Myers because they wanted to end
22  the Kingdoms program?
23    A. No.
24    Q. No?
25    A. I can't remember.

24 (Pages 90 to 93)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

---

Page 94

1    Q. Okay. Do you believe that it's important for
2  teachers to be honest?
3       MS. ANGELL: Objection. Argumentative,
4  relevance.
5  BY MS. LARKINS:
6    Q. Is one of the reasons that you work hard to have
7  Kingdoms is because you thought it was important for
8  children to be honest?
9    A. Yes.
10    Q. Do you think it's also important for teachers to
11  be honest?
12       MS. ANGELL: Same objection. Argumentative,
13  relevance.
14       MS. LARKINS: Are you instructing her not to
15  answer?
16       MS. ANGELL: I made my objection.
17       MS. LARKINS: You can answer.
18       THE WITNESS: I think it's important for
19  teachers to be honest. I believe it's important for
20  everyone to be honest.
21       MS. LARKINS: Thank you. Thank you.
22    Q. Do you remember ever being upset when teachers
23  were having a conflict over whether or not to have
24  Kingdoms and saying that you were going to resign?
25       MS. ANGELL: Objection. Assumes facts. I

---

Page 95

1  believe she testified that she does not know that people
2  wanted to get rid of a program. I don't recall if it was
3  Kingdoms or Comer, but it's confusing to me, and I think
4  she already testified that she doesn't have knowledge of
5  that, unless I'm misunderstanding.
6       MS. LARKINS: Let me ask the question
7  differently.
8    Q. When you were on the Kingdoms -- I'm sorry --
9  the peace committee, did you ever talk about resigning
10  your membership?
11    A. To the committee?
12    Q. Yes.
13    A. I don't remember.
14       MS. LARKINS: Okay. I have no more questions.
15  I'm finished. You can go ahead.
16
17  EXAMINATION BY MS. ANGELL:
18    Q. Mrs. Coffey, outside of any discussions that you
19  have had with counsel -- because we don't want any
20  information that has come out of discussions that you
21  have had with counsel in this case -- but outside of
22  discussions with counsel, have you ever been told in any
23  context prior to this litigation beginning that
24  plaintiff, Maura Larkins, was a dangerous person who had
25  at least one handgun -- and that was a quote. I'm sorry.

---

Page 96

1  Let me strike that question it stunk so bad.
2       Starting over. Other than discussions that you
3  have had with counsel and not including discussion of
4  allegations made by Mrs. Larkins in relation to this
5  litigation, have you ever been told the following --
6  words to the effect of the following that, quote:
7  "Plaintiff Maura Larkins needed to be arrested by police
8  because she was a dangerous person who had at least one
9  handgun," end quote?
10    A. No. I've never heard that before.
11    Q. Has anyone other than counsel and in the context
12  of discussing the allegations made by Mrs. Larkins -- has
13  anyone ever told you that Mrs. Larkins was arrested?
14    A. Never.
15    Q. Has anyone -- outside of your discussions with
16  counsel and in the context of the allegations made by
17  Mrs. Larkins in this litigation, has anyone ever told
18  that you Mrs. Larkins has a handgun?
19    A. No.
20       MS. ANGELL: That's it.
21       MS. LARKINS: We're done.
22       VIDEOGRAPHER: Stipulation on the record?
23       MS. ANGELL: No, there is no stipulation on the
24  record. You want to put one on?
25       MS. LARKINS: Let me try. Okay. This might not

---

Page 97

1  been in the usual order.
2       One thing I wanted to say is that a fax
3  signature will be accepted the same as an original
4  signature.
5       I would like to stipulate that the transcript
6  will be provided to Ms. Angell, and she will keep the
7  original of the transcript. And she will -- from the
8  time that she gives the transcript to Ms. Coffey -- let's
9  see. You thought that I should have one week to do mine,
10  so how long do you think Ms. Coffey should have to do
11  hers?
12       THE WITNESS: To do my what?
13       MS. ANGELL: Ms. Coffey, how long -- the
14  plaintiff didn't tell you how it works, but the lady over
15  here has been typing down every word that we say. It's
16  going to kind of look like a movie transcript. We have
17  been going in the neighborhood of three hours, so it's
18  probably going to be two-inches thick or more.
19       THE WITNESS: Oh.
20       MS. ANGELL: What you'll need to do when you
21  receive a copy of the transcript is to review it for
22  accuracy to make sure that the court reporter took down
23  your testimony correctly.
24       THE WITNESS: Uh-huh.
25       MS. ANGELL: And that's your opportunity, if you

---

25 (Pages 94 to 97)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 98

1  need to make corrections to the transcript, to do so.
2  The process is that you read it, check it for accuracy in
3  the transcript, and you make any changes if necessary,
4  and then you sign and date it and you return it to me.
5  We notify plaintiff that it's been signed and dated, and
6  if any corrections have been made, we let her know.
7      THE WITNESS: So I send it you by mail?
8      MS. ANGELL: Uh-huh. And the question is how
9  long do you anticipate -- in light of the other things
10  that are going on for you --
11      How long is it going to take, ma'am, to get the
12  transcript done? About a week?
13      So after the Veterans Day weekend. So probably
14  around the 17th of November. If you're provided with the
15  transcript sometime before November 19th, how long is it
16  going to take you to read through a document about double
17  spaced about this thick for accuracy and make any changes
18  or corrections and return it to me?
19      THE WITNESS: Can you make a suggestion?
20  Because I don't have the foggiest.
21      MS. ANGELL: Well, plaintiff suggested a week.
22      THE WITNESS: A week after I receive it?
23      MS. ANGELL: Uh-huh. A lot of time -- I mean I
24  don't know if you -- you don't need to give any
25  information as to whether you'll be in town or out of

Page 99

1  town, but you know what your commitments are.
2      THE WITNESS: Right, because the following week
3  is a holiday weekend.
4      MS. ANGELL: Thanksgiving weekend.
5      THE WITNESS: Uh-huh.
6      MS. ANGELL: Do you need four weeks; do you need
7  three weeks?
8      THE WITNESS: I'd like to have at least until
9  the end of the month.
10      MS. ANGELL: So you if you receive it on
11  November 19th -- that's the Friday before Thanksgiving --
12  so the end of the month is -- I don't think it's two
13  weeks after that.
14      THE WITNESS: Oh.
15      MS. LARKINS: Shall we say two weeks?
16      THE WITNESS: I wasn't expecting this question,
17  so I don't -- I mean not that I was expecting any of
18  them, but I had no idea I was going to have to make a
19  decision here, so --
20      MS. LARKINS: If it would help you at all, I'll
21  tell you that my decision -- I have one week to do mine.
22      MS. ANGELL: Well, you're the plaintiff in this
23  case, and as far as I'm aware, you have no job.
24  Ms. Coffey has a full-time job and she does lesson plans
25  and she corrects papers, and there is a vacation coming

Page 100

1  up, etcetera, etcetera, so --
2      THE WITNESS: My dad's going in for surgery.
3      MS. ANGELL: And we're on the record, so
4  anything you don't want said, don't say it.
5      THE WITNESS: Friday the 19th. Here's
6  Thanksgiving. So if you get it on that day, when can you
7  have it done? That day being the 19th. It's a guess as
8  to when you'll receive it.
9      THE WITNESS: What's fair? I don't know what is
10  fair.
11      MS. ANGELL: Can you the get it finished and
12  returned to me by Friday, December 10? That would be
13  one, two, three Fridays.
14      THE WITNESS: Okay.
15      MS. ANGELL: Yeah? December 10th? That's three
16  weeks.
17      MS. LARKINS: Okay.
18      MS. ANGELL: So she'll have three weeks from the
19  time that she receives the transcript from me to review
20  it and make any corrections necessary and provide any
21  changes and her signature page to me, upon which time
22  I'll notify Mrs. Larkins.
23      MS. LARKINS: And let's see. The original will
24  be kept by Ms. Angell and/or her law firm, and a

Page 101

1  certified copy will be deemed as good as the original.
2      And if there is anything else that needs to be
3  said, I need either Ms. Angell or Mr. Hersh to say it.
4      MS. ANGELL: Mr. Hersh, you got anything?
5      MR. HERSH: No.
6      MS. ANGELL: All right. So stipulated.
7      MS. LARKINS: So stipulated.
8      VIDEOGRAPHER: This concludes today's
9  deposition. We are going off the record at 1:03 p.m.
10          * * * * *
11      I, TERESA COFFEY, swear under penalty of perjury
12  that I have read the foregoing, and that it is true and
13  correct, to the best of my knowledge and belief.
14      Signed on this        day of       , 2004, at
15
16      (City)          (State)
17
18
19          TERESA COFFEY
20
21
22
23
24
25

26 (Pages 98 to 101)

Larkins v. Werlin
GIC 781970

Deposition of Teresa Coffey
November 8, 2004

Page 102

1
2
    STATE OF CALIFORNIA  )
3              ) ss.
    COUNTY OF SAN DIEGO  )
4
5
6     I, T. A. Martin, a Certified Shorthand Reporter,
7 Certificate No. 3613, do hereby certify that the witness
8 in the foregoing deposition was by me first duly sworn to
9 testify to the truth, the whole truth, and nothing but
10 the truth in the foregoing cause; that the deposition was
11 then taken before me at the time and place herein named;
12 that said deposition was reported by me in shorthand, and
13 then transcribed through computer-aided transcription
14 under my direction, and that the foregoing transcript
15 contains a true record of the testimony of said witness.
16     I do further certify that I am a disinterested
17 person and am in no way interested in the outcome of this
18 action, or connected with or related to any of the
19 parties in this action or to their respective counsel.
20     IN WITNESS WHEREOF, I have hereunto set my hand
21 on this 19th day of November, 2004.
22
23
24     T. A. MARTIN
    Certificate No. 3613
25

27 (Page 102)

EXHIBIT 11

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN DIEGO

———————————————————————   *

MAURA LARKINS,                         *
                                       *
            Plaintiff,                 *
                                       *
    vs.                                *  Case No. GIC 781970
                                       *
RICHARD T. WERLIN, etc., et al.,       *
                                       *
            Defendants.                *
———————————————————————   *

DEPOSITION OF KAREN SNYDER

Taken at San Diego, California
Tuesday, November 9th, 2004

Diane M. Holnback, C.S.R.
Certificate No. 11686

COMPLIMENTARY

Larkins v. Werlin, etc., et al.                                Deposition of Karen Snyder
Case No. GIC 781970                                            November 9, 2004

---

**Page 2**

```
 1              I-N-D-E-X
 2   DEPOSITION OF KAREN SNYDER              PAGE
       November 9, 2004
 3
       Examination by Ms. Larkins          5
 4
                                74
 5   Examination by Ms. Angell             69
 6
 7   EXHIBITS:          REFERRED/MARKED
 8     1  One page of handwritten notes   65   64
          dated 4/20/01
 9        (Bates Stamp No. 31)
10
11     2  One page of handwritten notes   65   64
          continuing from Exhibit 1 herein
12        (Bates Stamp No. 32)
13     3  One page of handwritten notes   68   64
          continuing from Exhibit 2 herein
14        (Bates Stamp No. 33)
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1        VIDEOGRAPHER:  This is the video deposition of
 2   Karen Snyder being taken on behalf of Plaintiff in the
 3   matter of Maura Larkins versus Richard T. Werlin, et
 4   cetera, et al., San Diego Superior Court Case No. GIC
 5   781970.
 6        This deposition is being held in the offices of
 7   San Diego Court Reporting located at 319 Elm Street,
 8   Suite 100, San Diego, California.  It is Tuesday,
 9   November 9th, 2004 and the time is now 1:10 p.m.
10        My name is Gregg Eisman.  I am a legal video
11   specialist with Videographics located at 1903 30th
12   Street, San Diego, California.  The certified shorthand
13   reporter is Diane Holnback of San Diego Court Reporting.
14        For the video record would counsel please state
15   their appearances?
16        MS. LARKINS:  Maura Larkins, Plaintiff in pro
17   per.
18        MS. ANGELL:  Kelly Angell, counsel for Robin
19   Donlan and Linda Watson.
20        MR. HERSH:  Michael Hersh for the Association
21   Defendants.
22        VIDEOGRAPHER:  Would the reporter please swear
23   the witness?
24        THE REPORTER:  Would you raise your right hand,
25   please?  Do you solemnly swear the testimony you're about
```

---

**Page 3**

```
 1           DEPOSITION OF KAREN SNYDER
 2
 3        Pursuant to Notice to take Deposition and on
 4   the 9th day of November, 2004, commencing at the hour of
 5   1:08 o'clock p.m. at 319 Elm Street, Suite 100, in the
 6   City and County of San Diego, State of California, before
 7   me, Diane M. Holnback, Certified Shorthand Reporter in
 8   and for the State of California, personally appeared:
 9           KAREN SNYDER,
10   who, called as a witness by the Plaintiff, being by me
11   first duly administered the oath, was thereafter examined
12   as a witness in said cause.
13           APPEARANCES
14
     For the Plaintiff:  MAURA LARKINS
15   (In Propria Persona)  1938 Autocross Court
                        El Cajon, California 92019
16                      619.444.0065.
17   For Robin Donlan    STUTZ, ARTIANO, SHINOFF & HOLTZ
     and Linda Watson:   By:  KELLY R. ANGELL, ESQ.
18                      401 West "A" Street, 15th Floor.
                        San Diego, California 92101
19                      619.232.3122.
20   For Chula Vista    CALIFORNIA TEACHERS ASSOCIATION
     Educators, California  By:  MICHAEL HERSH, ESQ.
21   Teachers Association, 11745 East Telegraph Road
     Virgina Boyd and      Post Office Box 2153
22   Timothy O'Neil:    Santa Fe Springs, California 90670
                        562.942.7979.
23
     Videographer:      Gregg Eisman, N.P.
24                      Videographics.
25
```

---

**Page 5**

```
 1   to give in this matter shall be the truth, the whole
 2   truth, and nothing but the truth, so help you God?
 3        THE WITNESS:  I do.
 4             EXAMINATION
 5   BY MS. LARKINS:
 6        Q.  Good morning.
 7        A.  (Witness nods head.)
 8        Q.  Do you understand what we are doing here today?
 9        A.  Yes.
10        Q.  Good.  Are you feeling well today?
11        A.  Yes.
12        Q.  Can you think of any reason why you couldn't
13   give your best testimony today?
14        A.  No.
15        Q.  I'd like to just do a typical review of your
16   education and employment.  Can you tell me where you
17   graduated from high school?
18        A.  Castro Valley High School in Northern
19   California.
20        Q.  Hmm.  And what year was that?
21        A.  1968.
22        Q.  Okay.  And what did you do after that as far as
23   education or employment?
24        A.  Went to Cal Berkeley for four years; then moved
25   to San Diego; went to San Diego State.
```

---

2 (Pages 2 to 5)

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

Page 6

1    Q. Okay. So, where did you graduate from college?
2    A. Cal Berkeley.
3    Q. Okay. And then did you get a degree at
4  San Diego State?
5    A. Yes.
6    Q. And what was that?
7    A. A teaching credential and a masters degree.
8    Q. Okay. And the masters was in education?
9    A. Yes.
10   Q. Okay. Do you remember what year that was when
11 you got your masters and teaching credential?
12   A. Teaching credential was 1973 -- excuse me,
13 1974 -- and the masters was 1975.
14   Q. And then what did you do?
15     MS. ANGELL: Objection. Vague and ambiguous.
16 You mean with regard to employment? With regard to
17 education? With regard to what?
18 BY MS. LARKINS:
19   Q. With regard to education and employment.
20   A. When I got my teaching credential, I started
21 subbing in Chula Vista in 1973 and have been there ever
22 since.
23   Q. So you were working on your masters at the same
24 time --
25   A. Uh-huh.

Page 7

1    Q. -- that you were substituting?
2    A. Yes.
3    Q. Okay. And what was the first school where you
4  worked full-time?
5    A. Allen School.
6    Q. And how long were you there, just approximately?
7    A. Approximately three years.
8    Q. Okay. And -- I am sorry -- how many -- how long
9  did you say you were substituting?
10   A. September of '73 through January of '74.
11   Q. Okay. And then after you left Allen School
12 where did you go?
13   A. I went to Sunnyside School.
14   Q. Okay. And why did you leave Allen School?
15     MS. ANGELL: Objection. This witness has
16 privacy rights concerning her employment. So, with
17 regard to any kind of disciplinary matters, that kind of
18 thing, the witness will not be responding to the
19 question. But, other than those types of issues, other
20 privacy-protected things such as her personnel records,
21 her medical records, she can respond, if she understands
22 the question.
23     MS. LARKINS: And she can respond to questions
24 about disciplinary actions against me, correct?
25     MS. ANGELL: If she was involved in disciplinary

Page 8

1  actions concerning you and has that information, she --
2  she will know when she is not to respond to a question.
3  I will let her know.
4      MS. LARKINS: Okay.
5    Q. And then how long were you at Sunnyside?
6    A. I was at Sunnyside approximately three -- three
7  years.
8    Q. Okay. And who was your principal there?
9    A. I don't recall.
10   Q. It's a long time ago. Do you remember your
11 principal at Allen?
12   A. Yes. Charles Welsh.
13   Q. Okay. And after Sunnyside where did you go?
14   A. I went to Castle Park.
15   Q. Okay. So, can you give a rough estimate of what
16 year that was?
17     MS. ANGELL: Objection. Vague and ambiguous.
18 BY MS. LARKINS:
19   Q. When you went to Castle Park?
20     MS. ANGELL: Do you mean when she was first
21 employed full-time as a teacher at Castle Park? Do you
22 mean substituting at Castle Park?
23     MS. LARKINS: I mean when she was first employed
24 full time as a teacher.
25     THE WITNESS: I have been at Castle Park

Page 9

1  approximately 25 years.
2  BY MS. LARKINS:
3    Q. Okay. And do you remember who was principal
4  when you first arrived?
5    A. I can see his face.
6    Q. Okay.
7    A. I don't recall his name.
8    Q. Actually, let's -- do you remember having Oscar
9  Perez for your principal?
10   A. Yes.
11   Q. And before that did you have Tony Gonzalez for
12 your principal?
13   A. Yes.
14   Q. And do you remember anyone before that?
15   A. Yes, Shirley Helleis.
16   Q. Uh-huh. Okay. Was she there a long time?
17   A. No.
18   Q. Okay. About how long was she there?
19     MS. ANGELL: Do you mean while Ms. Snyder was
20 employed as a teacher there?
21 BY MS. LARKINS:
22   Q. Did she become principal while you were already
23 there?
24   A. Yes.
25   Q. Okay.

3 (Pages 6 to 9)

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

Page 10

1    A. About two years.
2    Q. Okay.
3        MS. ANGELL: I don't understand that answer.
4    You had been teaching there for two years or Ms. Helleis
5    was --
6        THE WITNESS: Mrs. Helleis was principal
7    approximately two years.
8        MS. ANGELL: Thank you.
9    BY MS. LARKINS:
10    Q. Do you recall when Castle Park staff engaged in
11    discussions about having a bilingual program?
12    A. Yes.
13    Q. About how many staff meetings were devoted to
14    discussing whether or not to have a bilingual program at
15    Castle Park?
16    A. I don't know.
17        MS. ANGELL: And I am going to object to this
18    line of questioning. Please remember to allow counsel,
19    including counsel that's on the phone, an opportunity to
20    state objections, if necessary.
21        Based on the allegations in the complaint, which
22    claim that there was a conspiracy to slander by
23    Ms. Donlan and her brother, slander by Ms. Donlan's
24    brother, and the repetition of access and repetition of
25    information from Mrs. Larkins' arrest records, as well as

Page 11

1    an intentional infliction of emotional distress, two
2    causes of action I think related to grand jury subpoenas,
3    these questions concerning meetings for the bilingual
4    program at Castle Park Elementary School are not
5    reasonably calculated to lead to the discovery of
6    admissible evidence in this litigation.
7        And your bringing this witness to be deposed
8    today on things that are not relevant nor calculated to
9    lead to the discovery of admissible evidence in this
10    matter is harassing and is an abuse of the discovery
11    process. Therefore, I am letting you know where I stand
12    with regard to your questioning this witness on things
13    unrelated to this litigation. And I request that you
14    limit your questions to those that are relevant or
15    designed to bring about relevant information and will let
16    you go for a little while, give you some latitude
17    assuming you can establish, make an offer of proof,
18    concerning the relation of these unrelated issues to your
19    allegations, but it's not going to go on forever.
20        MR. HERSH: And I would like to join in on that
21    myself on behalf of the association defendants.
22    BY MS. LARKINS:
23    Q. As an offer of proof that attitudes about
24    bilingual education at Castle Park are related to this
25    case, I offer the fact that two bilingual teachers at

Page 12

1    Castle Park Elementary School were dismissed by the
2    District within a period of seven years.
3        And, as a teacher in Chula Vista schools since
4    1974 myself, I know that having a teacher dismissed by
5    the school board from a school is a very, very rare
6    event. And I never, in my many, many years in the Chula
7    Vista School District, knew of a single teacher who had
8    been dismissed by the school board.
9        And so the fact that out of only four bilingual
10    positions at Castle Park Elementary two bilingual
11    teachers have ended up being dismissed by the school
12    board, the first one within a year of the bilingual
13    program being instituted -- in fact, as I understand it,
14    she was the only bilingual teacher at that time -- so you
15    could say 100 percent of the bilingual teachers were
16    dismissed in 1995 and 25 percent were dismissed in 2002.
17    And this is extremely interesting, given the fact that
18    the School District was bound by the Federal Civil Rights
19    Act and state laws about civil rights. And I plan to
20    bring this up at trial.
21        MS. ANGELL: Any response, Michael?
22        MR. HERSH: Can you hear me?
23        MS. ANGELL: Yes.
24        MR. HERSH: Yeah. Well, I am not sure this is
25    the place to do a battle over relevance. But,

Page 13

1    Ms. Larkins, I would just remind you this is not a
2    wrongful termination case. This is a case where you
3    specifically alleged that my clients wrongfully possessed
4    criminal justice records information pertaining to you.
5    And the other allegations have nothing to do with the
6    reasons given for your termination by the District.
7        So, and in fact, your -- what you just said
8    makes no sense, in light of the theory of your case. You
9    know, it's just -- it's completely contrary to, you know,
10    if you -- if you're now saying that you were dismissed as
11    part of some sort of campaign to get rid of bilingual
12    teachers, why would that have anything to do with
13    wrongful possession of criminal justice records
14    information?
15        I understood your theory of the case to be that,
16    because people circulated this criminal justice records
17    information and slandered you, the District or, you know,
18    the District then had some reason to terminate you. So,
19    I don't understand the connection between your
20    allegations in the sixth amended complaint and where
21    you're going here.
22        MS. LARKINS: I will try to help you understand,
23    Mr. Hersh. First of all, people don't just decide to
24    circulate arrest information. They don't just suddenly
25    decide to slander somebody. They start out with a

4 (Pages 10 to 13)

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

**Page 14**

1  motivation. And what I am going to be presenting to the
2  jury is, among other motivations, that several teachers
3  at Castle Park Elementary School were motivated to cause
4  problems for the bilingual program.
5      And, as a matter of fact, the other teacher, I
6  do not believe that any arrest records were distributed
7  in her case. I believe that probably slander was part of
8  what happened, but the motive is different from the
9  method of achieving the goal.
10      I am offering this as one motive. And I am
11  hoping that the jury will grasp what I am trying to say
12  better than you're able to.
13      MS. ANGELL: My relevance objection stands and
14  the witness may answer questions to some degree and
15  we will spend some time on this topic and then there will
16  come a point at which we will not any more.
17      MS. LARKINS: Any time you wish to instruct your
18  client not to answer questions, that's fine. In fact, I
19  prefer that to long objections.
20      Q. Okay. About how many staff meetings were there
21  at which the idea of having a bilingual program come to
22  Castle Park was discussed?
23      MS. ANGELL: Objection. Vague and ambiguous as
24  to time.
25      THE WITNESS: I don't recall.

**Page 15**

1      MS. LARKINS: Okay.
2      MS. ANGELL: Do you understand what time frame
3  she was talking about? It's really important that you
4  understand the question before you answer it.
5      THE WITNESS: Okay.
6      MS. ANGELL: Okay? So make sure you understand
7  what she is asking.
8      THE WITNESS: Okay.
9  BY MS. LARKINS:
10      Q. Well, let me ask you some more lead-up
11  questions, because I was not there at the time that these
12  meetings happened and you were.
13      A. (Witness nods head.)
14      Q. Okay.
15      MS. ANGELL: Objection as to plaintiff's
16  testifying. Move to strike.
17  BY MS. LARKINS:
18      Q. Do you recall a time during you were teaching at
19  Castle Park when the prospect of bringing a bilingual
20  program to Castle Park was brought up at a staff meeting?
21      MS. ANGELL: Objection, relevance. Do you want
22  the same stipulation that all your questions are not
23  relevant or designed to lead to the calculation of
24  admissible evidence or do you want me to just make it?
25  Whatever way you want to handle it is fine with me.

**Page 16**

1      MS. LARKINS: Well, I'm happy to have a
2  running -- running objection and a stipulation that your
3  objection of relevance will apply to all questions.
4      MS. ANGELL: Okay. So stipulated.
5  Michael, you're joining in that?
6      MR. HERSH: Yes.
7      MS. LARKINS: So stipulated.
8      Q. Okay. Do you remember the question?
9      A. Could you repeat the question?
10      Q. Sure.
11      A. Please.
12      Q. Did there come a time when you were a teacher at
13  Castle Park when the subject of bringing a bilingual
14  program to Castle Park came up at a staff meeting?
15      A. Yes.
16      Q. Can you remember when this was, approximately?
17      A. No.
18      Q. But you have in your mind a memory that one of
19  those years awhile back this came to be discussed; is
20  that true?
21      A. Yes.
22      Q. Do you remember who was principal when this idea
23  came up?
24      A. No. I don't recall.
25      Q. Okay. Do you remember how many years Oscar

**Page 17**

1  Perez was principal at Castle Park? If I give you a
2  suggestion --
3      A. (Witness shakes head.)
4      Q. -- do you want to tell me if it sounds right to
5  you? Would it sound right to you that he was principal
6  from fall of '94 to the fall -- wait a minute.
7      Do you remember when Gretchen Donndelinger came
8  to Castle Park High School?
9      MS. ANGELL: Excuse me. Is the prior question
10  stricken?
11      MS. LARKINS: Yes.
12      Q. Would you like some help on that?
13      A. (Witness nods head.)
14      MS. ANGELL: Is the prior question stricken,
15  when you ask multiple questions?
16      MS. LARKINS: Yes.
17      MS. ANGELL: Okay.
18      MS. LARKINS: Yeah. Any time I ask more than
19  one question, the prior question is stricken.
20      MS. ANGELL: Well, that's not going to be what's
21  understood by the witness. The witness is going to try
22  and respond to whatever question is in front of her,
23  unless you say "strike that" or something along those
24  lines so she knows where to start.
25      MS. LARKINS: I will try to say that.

5 (Pages 14 to 17)

Case 3:07-cv-02202-WQH-WMC    Document 1-5    Filed 11/19/2007    Page 51 of 101

Larkins v. Werlin, etc., et al.                                    Deposition of Karen Snyder
Case No. GIC 781970                                                November 9, 2004

Page 18

1    MS. ANGELL: And I'd like to remind the witness,
2  please, that you need to give audible responses so that
3  the court reporter can type down what you're saying. So,
4  instead of shaking your head like you are right now --
5    THE WITNESS: (Witness nods head.)
6    MS. ANGELL: -- you would say, "Yes," or, "I
7  understand," or something like that. Do you understand?
8    THE WITNESS: Yes.
9    MS. ANGELL: Thank you.
10  BY MS. LARKINS:
11    Q. Okay. Does it sound about right to you that
12  Gretchen Donndelinger came to be principal in the fall of
13  1997?
14    A. I don't recall.
15    Q. Okay. Does it sound like it's kind of maybe
16  ballpark accurate?
17    MS. ANGELL: Objection. Asked and answered.
18  You already asked a ballpark question. She said she
19  didn't know.
20    MS. LARKINS: As a matter of fact, Ms. Angell, I
21  asked a specific question.
22    MS. ANGELL: You asked does it sound right that
23  she came in about 1997 and she said she doesn't know.
24    MS. LARKINS: Yes.
25    MS. ANGELL: So repeatedly asking the same

Page 19

1  question is harassing and, if you could just do each
2  question maybe once, that would be good.
3    MS. LARKINS: Ms. Angell, the witness has stated
4  that she doesn't know if Gretchen Donndelinger came in
5  1997. Now, that does not mean that she has no concept at
6  all of the time when Gretchen Donndelinger -- I'll bet if
7  I said, "Did she come sometime after 1990," I'll bet the
8  witness could answer that and that way we could narrow
9  down the time frame a little here, because I know you, in
10  particular, really like to have time frames narrowed
11  down. And I think that might help you as well as me, if
12  we could narrow this down a little bit better to "I don't
13  know." I am sure she has some concept of when Gretchen
14  Donndelinger came.
15    MS. ANGELL: I think she already answered that
16  question, but you can try one more time.
17    MS. LARKINS: Well, let's ask that specific
18  question.
19    Q. Do you have any concept at all of when Gretchen
20  Donndelinger came?
21    MS. ANGELL: And let the record reflect that
22  plaintiff is shaking her head, gesturing with her hands
23  and rolling her eyes while talking to the witness.
24    You can answer.
25    MS. LARKINS: Excuse me. I would like to say

Page 20

1  something. I would -- gesturing with my hands is very,
2  very vague. Ms. Angell, could you be more clear in
3  describing the gestures of my hands?
4    MS. ANGELL: I have just described it. Your
5  behavior toward this witness, I believe, is intended to
6  intimidate her and to mock her and to make her generally
7  feel uncomfortable and pressured and it was sarcastic.
8  And, because the court reporter is typing and doesn't
9  recognize things like hand gestures, like I just rotated
10  my left hand forward --
11    MS. LARKINS: Did you intend that as sarcasm?
12    MS. ANGELL: No, I didn't. Because the court
13  reporter doesn't take down things like rolling of eyes,
14  staring, hand gestures, leaning forward in the chair,
15  when I feel that you're doing this to intimidate the
16  witness I am going to reflect it for the record.
17    MS. LARKINS: Okay. I want you to reflect it
18  accurately, Ms. Angell.
19    MS. ANGELL: Well, you can feel free to state
20  what you think is accurate.
21    MS. LARKINS: I would like you to do it.
22    MS. ANGELL: I already have.
23    MS. LARKINS: You said I was gesturing with my
24  hands. Could you please describe my gestures?
25    MS. ANGELL: You were waving your hands about.

Page 21

1    MS. LARKINS: Haphazardly or more controlled,
2  like you said, you rotated your hand? Would you say I
3  was rotating my hands like this?
4    MS. ANGELL: You were -- you were shaking both
5  of your hands in a forward-moving motion showing what
6  appeared to me to be exasperation combined with your tone
7  of voice and the rolling of your eyes looking at the
8  witness. It appeared to me that you were exhibiting your
9  exasperation.
10    MS. LARKINS: Okay. What I was trying to
11  exhibit is the broadness of the question that I am asking
12  you. That's why I moved my hands outward to the sides to
13  show the broadness.
14    MS. ANGELL: Well, if you would like to reflect
15  broadness of your question, you can do that with words,
16  because, see, the court reporter needs to be able to type
17  down everything that's being asked. And if you're
18  attempting to ask additional things by your hands or by
19  your -- any particular tone of voice you're using or
20  facial gestures any of that kind of thing, it needs to be
21  reflected in such a way that the court reporter can get
22  it.
23    MS. LARKINS: Fortunately, we have a video
24  camera and audio, audio recorder here, so the tone of
25  voice is going to be recorded for posterity here.

6 (Pages 18 to 21)

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

---

**Page 22**

1    MS. ANGELL: But it's not reported in the typed
2    transcript and there is no videotape of counsel, because
3    that's not permitted by the code. So, therefore, I am
4    entitled to reflect when you're behaving in such a way
5    that I think is set to intimidate the witness and I will
6    reflect it. Would you like to continue questioning the
7    witness or not?
8        MS. LARKINS: I want to make it clear that your
9    false description of the movement of my hands was false.
10   I was not shaking my hands and I was certainly not
11   shaking them forward. I was -- had my hands together and
12   then I moved them out laterally out to the sides, both of
13   the hands at the same time out to the sides.
14       Q. Do you have an idea of what decade Gretchen
15   Donndelinger came to Castle Park School?
16       A. Yes.
17       Q. What decade was that?
18       A. 1990's.
19       Q. Can you tell us if it was at the beginning, at
20   the middle or the end of that decade?
21       A. I don't recall.
22       Q. Okay. Well, then were you ever the
23   representative to Chula Vista Educators for Castle Park
24   Elementary School?
25       A. Yes.

---

**Page 23**

1        Q. About how many years did you hold that position?
2        A. I don't recall.
3        Q. Was it more than one or just one?
4        A. It was more than one.
5        Q. Do you think it was more than two?
6        A. Yes.
7        Q. Do you think it was more than three?
8        A. I don't recall.
9        Q. Okay. So we know that it was at least three.
10   Okay.
11       A. No.
12       Q. Oh, then it might have been two and a half, two
13   plus a small, partial year?
14       MS. ANGELL: Her testimony was that it was more
15   than two. You asked if it was three. She said she
16   didn't remember. So the testimony is that it was more
17   than two.
18       MS. LARKINS: Okay.
19       Q. Did you hold these positions for an entire year
20   or just partial years?
21       MS. ANGELL: Which position? It's vague and
22   ambiguous.
23   BY MS. LARKINS:
24       Q. This position of as Castle Park representative
25   to Chula Vista Educators.

---

**Page 24**

1        A. Entire year.
2        Q. Okay. So, if it were more than two and it was
3    always an entire year segment, it would have to be a
4    minimum of three; is that not true?
5        A. I don't recall.
6        Q. Okay. Actually, that's a math question.
7        MS. ANGELL: Objection. Move to strike
8    plaintiff's comment after the witness's response and I
9    will ask Ms. Larkins to refrain from the commentary to
10   the witness.
11   BY MS. LARKINS:
12       Q. Okay. When you were Castle Park representative
13   to CVE, what was your job?
14       MS. ANGELL: Objection, vague and ambiguous. Do
15   you mean what duties did she perform as a union rep?
16       MS. LARKINS: Yes.
17       THE WITNESS: I attended the union rep meetings
18   and would bring the information back to the staff at
19   union meetings that were held after school to anyone that
20   wanted to attend and represented teachers, if they needed
21   representation.
22   BY MS. LARKINS:
23       Q. What sorts of situations would cause you to
24   represent teachers?
25       A. If a teacher needed someone to be in a meeting,

---

**Page 25**

1    if a teacher wanted another person in a parent meeting or
2    a meeting with a principal.
3        Q. And what did you see your role in those meetings
4    to be?
5        A. Someone that took notes and was a witness to
6    what went on in the meeting.
7        Q. Okay. And what did you do with the notes that
8    you took?
9        MS. ANGELL: Objection. Vague and ambiguous.
10   BY MS. LARKINS:
11       Q. What did you do with the notes that you took at
12   meetings that you attended as a representative for a
13   teacher?
14       MS. ANGELL: Objection. Vague, ambiguous and
15   overbroad. If you remember what you did with every note
16   that you ever took at every meeting that you ever
17   attended for a teacher, you can answer.
18       MS. LARKINS: I'd like to strike my question and
19   I'd like to ask this.
20       Q. What did you usually do with the notes that you
21   took at these meetings where you represented teachers?
22       MS. ANGELL: Objection, assumes facts. Would
23   you like to ask her if she had a usual practice for what
24   she did with notes?
25       MS. LARKINS: Okay. That's great.

---

7 (Pages 22 to 25)

Larkins v. Werlin, etc., et al.                                    Deposition of Karen Snyder
Case No. GIC 781970                                                November 9, 2004

Page 26

1    Q.  Did you have a usual practice for what you did
2  with the notes that you took at these meetings that you
3  attended where you represented teachers?
4    A.  Yes.
5    Q.  Okay.  What was your usual practice?
6    MS. ANGELL:  What was your usual practice
7  concerning where you put the notes; is that what you
8  wanted to ask?
9    MS. LARKINS:  Yes.
10    THE WITNESS:  I usually put the notes in my
11  teacher bag after discussion with the teacher that I was
12  in to represent.
13  BY MS. LARKINS:
14    Q.  Okay.  And was that a temporary place to keep
15  them or did you leave them there permanently?
16    A.  I left them there permanently for awhile.
17    Q.  Okay.  And about how long was that while?
18    A.  It depended on the situation as to whether the
19  information was still needed or not.
20    Q.  Okay.  So, if it were an ongoing situation, you
21  would keep the notes longer?
22    A.  Yes.
23    Q.  Okay.  And did there ever come a time when you
24  would throw notes away?
25    A.  Yes.

Page 27

1    Q.  And when would that be?  How did you determine
2  when you would throw notes away?
3    MS. ANGELL:  Do you want to strike the first
4  question?
5    MS. LARKINS:  Yes.
6    THE WITNESS:  When the situation had been
7  resolved.
8    MS. LARKINS:  Okay.
9    MS. ANGELL:  Were you finished with your answer?
10    THE WITNESS:  Yes.
11    MS. ANGELL:  Okay.
12  BY MS. LARKINS:
13    Q.  Did you ever attend a meeting where you
14  represented Robin Donlan when Gretchen Donndelinger was
15  principal?
16    MS. ANGELL:  Objection.  Seeks to invade the
17  privacy rights of Robin Donlan; not reasonably calculated
18  to lead to the discovery of admissible evidence.
19    Ms. Donlan is not the plaintiff here.  You do
20  not have a right to Ms. Donlan's employment records.
21  And, if you wish to seek her employment records, you can
22  do a subpoena for them.  Don't answer.
23    MS. LARKINS:  I want to state that Ms. Donlan is
24  a defendant in this case and that one of the actions that
25  she has been charged with is a criminal matter, Labor

Page 28

1  Code Section 432.7.  And part of my proof of my charges
2  at trial will be that Robin Donlan, through her influence
3  at Castle Park School, particularly her influence over
4  Gretchen Donndelinger, caused harm to me for which I am
5  seeking compensation in this lawsuit.
6    MS. ANGELL:  Mrs. Larkins, it doesn't matter.
7  Anything, what you just said, is totally irrelevant.
8  Your allegations in this litigation are that Robin Donlan
9  got access to your arrest records information and
10  disseminated that information.  Whether or not Ms. Donlan
11  had any, quote, influence on other people is totally
12  irrelevant.  You have no cause of action.
13    Your cause of action for wrongful termination
14  has been dismissed on demurrer.  You cannot now reallege
15  that.  It's finished.
16    Your cause of action -- your causes of actions
17  now are for slander against Ms. Donlan and her brother
18  or -- sorry -- conspiracy against Ms. Donlan and her
19  brother, slander against the brother, and Labor Code
20  violations.  And then you have got some Doe allegations
21  about intentional infliction of emotional distress.
22  However, this continued attempt to go into wrongful
23  termination facts is inappropriate.
24    MR. HERSH:  Can I add something, Ms. Angell?
25    MS. ANGELL:  Please do.

Page 29

1    MR. HERSH:  This is Mr. Hersh.  Karen, I am the
2  attorney representing the Chula Vista Educators in this
3  case.  And, on that basis, I would also like to state
4  that the plaintiff is attempting to question a union
5  representative pertaining to confidential information the
6  union member that may have shared with her in the context
7  of some sort of disciplinary meeting as she herself has
8  said.
9    On that basis, I would raise the first amendment
10  privilege and ask that the plaintiff cease and desist
11  from attempting to have the witness divulge confidential
12  information.
13    MS. LARKINS:  Mr. Hersh, you are free -- well,
14  she is not your client, though, is she?  I am sure
15  Ms. Angell will be happy to instruct the witness not to
16  answer a question, but that is what she needs to do.
17    If you want to make an objection of relevance,
18  that's one thing, and then Ms. Snyder can answer the
19  question.  And we can ask the judge to decide if the
20  matter is relevant.  Or you could instruct -- Ms. Angell
21  can instruct her client not to answer the question.  But,
22  I am not retracting my question, because the fact is this
23  is a lawsuit claiming that statutes have been violated
24  and I have to prove that statutes have been violated.
25  But, another thing I have to prove when we go to trial is

8 (Pages 26 to 29)

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

---

Page 30

1  the damages that I have sustained.
2      MR. HERSH:  Well, first of all, Ms. Larkins, to
3  the degree that you are now attempting to question
4  Ms. Snyder as a union representative, she is my client.
5  So, I would again ask that you cease and desist from
6  attempting to question her concerning confidential
7  matters that are absolutely irrelevant to the causes of
8  action that remain in this lawsuit.
9      MS. LARKINS:  I believe I have the right to
10  waive any confidentiality privilege I myself have as far
11  as Ms. Snyder representing me as my union representative.
12  So, what I would like to do is to limit my questioning to
13  a meeting where I was present with Ms. Snyder.
14      MR. HERSH:  I have no objection to that.
15      MS. ANGELL:  And you want to ask her about
16  information pertaining to yourself, not disciplinary
17  matters pertaining to others; is that correct?
18      MS. LARKINS:  Yes.
19      MS. ANGELL:  Okay.
20      MS. LARKINS:  Okay.
21      MS. ANGELL:  So the prior question is withdrawn
22  then?
23      MS. LARKINS:  Yes.
24      Q.  Do you recall a meeting with Gretchen
25  Donndelinger that was attended by me and Maria Biers and

---

Page 31

1  Richard Denman and Robin Donlan and you?
2      A.  Yes.
3      Q.  At that meeting did you act as a union
4  representative?
5      A.  Yes.
6      Q.  And was I a union member at that time?
7      A.  Yes.
8      Q.  And did you have any obligation toward me at
9  that meeting?
10      MS. ANGELL:  Objection.  Calls for a legal
11  conclusion.  Vague and ambiguous as to "any obligation."
12  This witness has not been qualified as being -- as an
13  expert to give testimony concerning legal obligations of
14  union representatives.
15      MS. LARKINS:  Let me ask it a different way.
16  Strike my original question.
17      Q.  Did you feel you had any obligation to make
18  certain that my rights were honored at that meeting?
19      MS. ANGELL:  Objection, relevance.  Do you
20  want to start with asking her who she was representing,
21  if she knows who she was representing?
22      MS. LARKINS:  I would like her to answer that
23  question.  Do you want to instruct her not to answer it?
24      MS. ANGELL:  It's not relevant.  If you
25  remember what you felt like.

---

Page 32

1      THE WITNESS:  Would you repeat the question?
2      MS. LARKINS:  Yeah.
3      Q.  Did you feel that you had any obligation at that
4  meeting to make sure that my rights were honored?
5      MS. ANGELL:  That question is not do you feel
6  today.  The question is do you remember if you felt
7  whenever this undated meeting was between Donndelinger,
8  Donlan, Plaintiff, Denman, in which you were present, if
9  you felt that you had a duty to represent Mrs. Larkins.
10      MS. LARKINS:  Excuse me, Ms. Angell, that is not
11  the question.
12      MS. ANGELL:  Well, could you clarify it, then?
13  Because apparently the question is too vague for me to
14  understand.
15  BY MS. LARKINS:
16      Q.  Let's try again.  At that meeting did you feel
17  that you had any obligation to make sure that my rights
18  were honored?
19      MS. ANGELL:  Objection.  Calls for a legal
20  conclusion, relevance.
21  BY MS. LARKINS:
22      Q.  You can answer.
23      A.  I don't recall.
24      Q.  Okay.  As we sit here today, do you believe that
25  you had any obligation to make sure that my rights were

---

Page 33

1  not violated.
2      MS. ANGELL:  Objection.  Incomplete
3  hypothetical, vague and ambiguous, lacks relevance, not
4  qualified as an expert.
5  BY MS. LARKINS:
6      Q.  Can you answer it?
7      MS. ANGELL:  If you know what she is talking
8  about, try and answer.
9      THE WITNESS:  Would you clarify?
10  BY MS. LARKINS:
11      Q.  Okay.  One of the things you need to do here is
12  you have to kind of remember the question during
13  Ms. Angell's objections.  And sometimes they get kind of
14  long, so you kind of have to keep the question in your
15  head.
16      MS. ANGELL:  The court reporter could read back
17  the question.  That way you wouldn't have to restate it.
18      MS. LARKINS:  Ms. Angell, I am happy to
19  stipulate that the objection that you just made will
20  apply to this next question, which I am going to make
21  right now.
22      MS. ANGELL:  I can't stipulate to your -- to any
23  kind of standing objection concerning vague and ambiguous
24  when it calls for legal conclusions, that kind of
25  thing --

---

9 (Pages 30 to 33)

Page 34

1      MS. LARKINS: Okay.
2      MS. ANGELL: -- because, quite frankly, your
3   questioning will get completely way more out of hand than
4   it already is. So, because what's so important for all
5   witnesses to do is to respond to the question that's
6   being asked of them and to make sure they understand the
7   question, when the question is so vague and ambiguous
8   that I don't understand it or it calls for a legal
9   conclusion that they can't possibly answer because they
10  are not a qualified legal expert or other type of maybe
11  medical expert, I need to be able to make that objection.
12  So, that's why I can't stipulate to a running objection
13  on all those bases.
14     MS. LARKINS: Okay. Then if you can't remember
15  it this time, we will have the court reporter read it to
16  you.
17     MS. ANGELL: So you have stricken the prior
18  question? You're doing a new one now; is that correct?
19     MS. LARKINS: Yes.
20     Q. Okay. As you sit here today, do you feel that
21  you had an obligation to make sure that my rights were
22  not violated at that meeting that we have been talking
23  about?
24     MS. ANGELL: Same objections.
25     THE WITNESS: (Witness shakes head.) I don't.

Page 35

1   BY MS. LARKINS:
2      Q. You don't feel that you had any obligation?
3      A. I don't recall from --
4      Q. Oh.
5      A. -- that time --
6      Q. Okay.
7      A. -- to now.
8      Q. That's not what I am asking you. We already did
9   that one. What I am asking you now is do you at this
10  moment feel that you had an obligation then.
11     MS. ANGELL: Vague and ambiguous. This witness
12  can't answer. Part of the way that witnesses get into
13  trouble in depositions is that they try and guess what
14  the questioning person is trying to ask.
15     Mrs. Snyder has no way of knowing what you mean
16  by "give representation to." If you would like to be
17  specific as to a particular act that you think
18  Mrs. Snyder should have done and ask her whether she did
19  it, that might be one way to be specific enough so that
20  she could answer the question. But, with your question
21  being so vague and ambiguous, she can't read your mind
22  and respond to whatever you're trying to ask her.
23  BY MS. LARKINS:
24     Q. Once again, you have substituted the word
25  "represent" for things that I have said. I did not use

Page 36

1   the word "represent."
2      MS. ANGELL: Can we have the question back,
3   please?
4      THE REPORTER: "What I am asking you now is
5   do you at this moment feel that you had an obligation
6   then."
7      MS. ANGELL: To do what? Vague and ambiguous.
8   What was she obliged to do? She can't answer that
9   question.
10     MS. LARKINS: Okay. Let me try again. Let's
11  strike all preceding questions.
12     Q. As you sit here today, do you feel that you had
13  an obligation at that time during the meeting at which
14  you and I and Dr. Donndelinger were present to make sure
15  that my rights weren't violated?
16     MS. ANGELL: Same objections.
17     THE WITNESS: I don't recall.
18  BY MS. LARKINS:
19     Q. Okay. I am not asking you to recall anything.
20  I am asking you what you believe right now.
21     MS. ANGELL: If you don't understand the
22  question and can't answer it on that basis, just say so
23  so she knows and we will move on to something. If you
24  can answer, if you have knowledge, then give her the
25  answer.

Page 37

1      THE WITNESS: The way that it was asked sounded
2   to me like you were still asking about the past. And I
3   don't recall.
4      MS. LARKINS: Okay.
5      THE WITNESS: That's why I did not ask for
6   clarification.
7   BY MS. LARKINS:
8      Q. Okay. Did you take notes at the meeting where
9   you and I and Robin Donlan and Gretchen Donndelinger and
10  others were present?
11     MS. ANGELL: Objection. Vague and ambiguous.
12  Can I just ask a real quick question? I think this can
13  avoid some future objections from me. Do you mind?
14     The question is do you recall, Ms. Snyder,
15  attending more than one meeting between Dr. Donndelinger,
16  Robin Donlan, Plaintiff and Mr. Denman which you attended
17  or was there only the one that you can recall right now?
18     THE WITNESS: There is only the one that I
19  recall.
20     MS. ANGELL: Okay. So we will understand that
21  you're discussing this one meeting. Do you recall at
22  approximately the point in time at which this meeting
23  occurred, even a school year that the meeting occurred
24  in?
25     THE WITNESS: No.

10 (Pages 34 to 37)

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

---

**Page 38**

1    MS. ANGELL: Okay. Thank you.
2 BY MS. LARKINS:
3    Q. Okay. Did you take notes at this meeting that
4 we have been talking about?
5    A. Yes.
6    Q. Okay. Do you still have those notes?
7    A. No.
8    Q. Do you assume that you must have thrown them
9 away?
10    A. Yes.
11    Q. Are you sure that you threw them away?
12    A. Yes.
13    Q. Okay. Why did you throw them away?
14    A. I threw them away after several months had
15 passed and discussion of that meeting was over.
16    Q. Okay. Can you tell me what happened at that
17 meeting?
18    A. I remember taking notes. That's all I recall.
19    Q. Okay. Were you a representative for Castle Park
20 to Chula Vista Educators when Gina Boyd was president of
21 Chula Vista Educators?
22    A. Yes.
23    MS. LARKINS: Okay. You know, I never did ask
24 the questions about the bilingual. And, if you want to
25 instruct your client not to answer this question, that's

**Page 39**

1 fine. But I want to make sure that I ask it.
2    Q. Did you note that there was hostility on the
3 part of some teachers toward the idea of having a
4 bilingual program at Castle Park?
5    MS. ANGELL: Objection. Vague and ambiguous as
6 to time, not relevant.
7 BY MS. LARKINS:
8    Q. During staff meetings that were discussing the
9 possibility of the program coming to Castle Park?
10    MS. ANGELL: Objection. Vague and ambiguous as
11 to time, not relevant.
12    THE WITNESS: I don't recall.
13 BY MS. LARKINS:
14    Q. Do you recall that the discussion was very
15 pleasant and harmonious?
16    A. I don't recall.
17    Q. Okay. Do you remember a teacher named Heather
18 Smith?
19    A. Yes.
20    Q. Did you have any personal acquaintance with her?
21    A. Yes.
22    Q. Okay. Was she your friend?
23    A. Yes.
24    Q. Did you ever represent her in any meetings with
25 the principal?

**Page 40**

1    MS. ANGELL: Objection as to Ms. Smith's right
2 to privacy in her employment records, particularly any
3 disciplinary matters. She is not here. To my knowledge,
4 there is no waiver of her right to privacy concerning her
5 own personnel records.
6    MR. HERSH: And my same objections with regard
7 to confidential internal union communications between a
8 member seeking representation and a union representative.
9    MS. LARKINS: I don't believe that you have any
10 privilege to hide criminal actions. I don't believe that
11 you can rely on this sort of union privilege when there
12 were discussions of a crime going on in any of these.
13    MR. HERSH: Are you saying that you believe that
14 Heather was abetting a crime in her conversation with her
15 union representative?
16    MS. LARKINS: No. I'm saying that you're trying
17 to use this union privilege very broadly in preventing me
18 from finding out events at Castle Park Elementary School.
19 And I am telling you that Gina Boyd and Tim O'Neill and
20 CVE have been accused of criminal activity. And I think
21 it's preposterous of you to try to use this union
22 confidentiality idea --
23    MR. HERSH: Sure. Are you done?
24    MS. LARKINS: -- to prevent knowledge of a crime
25 being exposed.

**Page 41**

1    MR. HERSH: Sure. First of all, Ms. Larkins, I
2 have no objection to questions that you're asking the
3 witness about events at Castle Park. My only objection
4 here is you're asking her about confidential discussions
5 between someone who suffered apparently, according to
6 you, some sort of discipline with her union
7 representative and that's my objection.
8    I don't care about you asking her about events
9 at Castle Park, although Ms. Angell might. But, you
10 know, the fact that you want to make allegations that
11 people are engaged in criminal conduct, as you freely do,
12 doesn't give you the right to interfere with other
13 people's constitutional rights and the confidential
14 nature of their personnel matters and their
15 representational matters.
16    You don't get a carte blanche just because you
17 file a lawsuit to screw with other people's lives and
18 that's what you're doing here and I object to it.
19    MS. LARKINS: Well, I think that that's fine and
20 I think it will be good to bring this to the attention of
21 the judge and have the judge decide if conversations that
22 involved union representation should be privileged when
23 we are trying to ferret out criminal activity here. And,
24 as I have said before, it's fine with me if you object
25 and then have the witness answer the question. It's also

11 (Pages 38 to 41)

Case 3:07-cv-02202-WQH-WMC     Document 1-5     Filed 11/19/2007     Page 57 of 101

Larkins v. Werlin, etc., et al.                                          Deposition of Karen Snyder
Case No. GIC 781970                                                      November 9, 2004

Page 42

1  fine with me if you instruct the witness not to answer.
2      MR. HERSH: Well, I will instruct the witness
3  not to answer questions pertaining to the confidential
4  communications, if they were confidential. I don't know.
5      MS. LARKINS: Is she your --
6      MR. HERSH: Ms. Snyder, if these were, indeed --
7  if she is asking you about matters that -- about
8  conversations of employees with the District who spoke to
9  you believing that they were speaking in confidence, then
10  I would instruct you not to answer these questions.
11      But, Ms. Larkins, I have no problem with you
12  asking the witness about her knowledge of any unlawful
13  acts. If you want to ask her if she knows anything about
14  criminal justice records information or, you know,
15  allegations that you have raised concerning what
16  people -- you know, information they may have gotten from
17  such records, that's fine. But you're -- you're asking
18  her questions that are completely irrelevant and have,
19  you know, no basis in law. So, you know, that's -- it's
20  just ridiculous.
21      MS. LARKINS: Well, I think it's ridiculous when
22  the president of a union, the executive director of a
23  union, the union itself, and a couple of union members
24  have been accused of working together in various
25  groupings to commit a crime to say that any time union

Page 43

1  members are talking together that it has to be kept
2  secret. I assure you, Mr. Hersh, if you want to say that
3  any conversation, when the participants thought that it
4  was going to be confidential, cannot be discussed here
5  today, that will certainly preclude them from discussing
6  conversations where crimes were being talked about,
7  because --
8      MR. HERSH: (Inaudible.)
9      MS. LARKINS: Excuse me. Excuse me, Mr. Hersh,
10  I am not finished.
11      I am certain that any time crimes were discussed
12  by any of these people I have mentioned that they
13  expected complete confidentiality. And you certainly
14  have given them every reason to think that CTA all the
15  way up to president Barbara Kerr is going to work very
16  hard to make sure that no one ever finds out what was
17  discussed by these individuals.
18      MR. HERSH: If I may, first of all, I already
19  said to you, if you want to ask questions concerning this
20  witness's knowledge of criminal actions, I am not going
21  to object. So, if you believe those criminal matters
22  were discussed, I am going to allow you to ask those
23  questions.
24      I am not going to allow you to ask questions of
25  this witness concerning an innocent person who this women

Page 44

1  apparently is. You're not accusing her of having
2  participated in some unlawful act, are you?
3      MS. LARKINS: She is a fellow victim. She is
4  the other bilingual teacher that was dismissed by the
5  School District.
6      MS. ANGELL: Who is "she"?
7      MR. HERSH: Well, maybe -- has she authorized
8  you to divulge her confidential information?
9      MS. LARKINS: I am conducting an investigation
10  about criminal activity.
11      MR. HERSH: You are conducting a deposition in a
12  superior court case. You are not conducting an
13  investigation. You are conducting a deposition under the
14  order of the Court and you are limited by the rules of
15  discovery.
16      MS. LARKINS: The judge is the one who decides
17  whether a question is relevant or not. So, until we talk
18  to the judge, how about we do it -- you make objections;
19  she answers; or you instruct her not to answer. And
20  let's get back to the business, because I had really
21  hoped to have this be a short deposition, but it's
22  already 2:00 o'clock and we have hardly gotten anywhere
23  yet.
24      MS. ANGELL: There has already been an
25  instruction by Mr. Hersh to this witness not to respond

Page 45

1  for union-related matters. I have instructed the witness
2  that she is not to discuss disciplinary matters where she
3  attended as the union rep, if there were disciplinary
4  matters actually at issue. And I would like to ask
5  whether you are claiming that you are representing
6  Heather Smith.
7      MS. LARKINS: I am not the deponent, Ms. Angell.
8      MS. ANGELL: Well, you just said that you're
9  conducting an investigation and that Heather Smith is the
10  other injured party. Do you claim that you're
11  representing Heather Smith?
12      MS. LARKINS: That still doesn't make me the
13  deponent, Ms. Angell.
14      MS. ANGELL: I didn't say that you were. Do you
15  claim that you're representing Heather Smith? Because
16  you're asking questions about Heather Smith's personnel
17  information and you're purporting that she was dismissed.
18      Do you have evidence to put in front of this
19  witness concerning whether or not Ms. Smith was
20  dismissed?
21      MS. LARKINS: Ms. Angell, I am going to allow
22  you to depose me on November 11th. I am not going to
23  allow you to depose me today.
24      MR. HERSH: May I say something? I just wanted
25  to clarify. What Ms. Angell said isn't about my

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

**Page 46**

1 objection. And my instruction to the witness is a little
2 broader than what I intended. I am simply instructing
3 the witness not to answer questions concerning
4 communications from union members that were intended to
5 be confidential. And even in that I would allow
6 questions concerning communications concerning unlawful
7 activity to be asked.
8     In other words, if you want to ask Ms. Snyder if
9 Gina Boyd ever said to her that she had some access to
10 criminal justice information, I wouldn't consider that an
11 improper question in this case --
12     MS. LARKINS: I would.
13     MR. HERSH: -- even if they intended it to be
14 confidential. So I am allowing you to ask questions
15 that, even though confidential, where any sort of
16 criminal matter would be, you know, related to your
17 allegations in this lawsuit, but I -- well, I think I
18 have clarified it.
19     MS. LARKINS: Okay. I have two questions.
20 First of all, let me just tell you that asking simple,
21 direct questions like the ones you're suggesting is going
22 to get me nowhere. There have been so many evidences of
23 perjury so far in this case I am not going to get
24 anywhere. What am I going to do, ask her, "Did Robin
25 Donlan ever show you any arrest records of mine?" She is

**Page 47**

1 just going to say no. There is no point in doing that.
2     I need to get this information by asking
3 questions about events which reflect back to causes which
4 are not being admitted, but you get enough events which
5 point back to an inescapable conclusion of what was
6 causing all these bizarre events to occur. That is how I
7 am planning to prove my case at trial.
8     My other comment is actually more of a question.
9 I am a little concerned or confused, rather. What are
10 you -- are you representing Ms. Snyder, also?
11     MR. HERSH: I had no idea until a few minutes
12 ago that you were intending to question Ms. Snyder as a
13 union representative. I assumed that you were going to
14 question her as a witness to actual matters that are
15 relevant to this proceeding.
16     MS. LARKINS: Well, that's fine and good, but
17 could you answer my question? Are you representing
18 Ms. Snyder?
19     MS. ANGELL: Why should he answer your question
20 when you wouldn't answer my question as to whether you
21 were purporting to represent Heather Smith?
22     MS. LARKINS: I am not a lawyer.
23     MR. HERSH: I will answer that question.
24     MS. ANGELL: No kidding.
25     MR. HERSH: Yes. If she was acting as a

**Page 48**

1 representative of the Chula Vista Educators and you're
2 questioning her concerning her actions as a
3 representative of the Chula Vista Educators, yes, I am
4 representing her as regards her actions as a Chula Vista
5 representative.
6     MS. LARKINS: Okay.
7     Q. And I need to ask you this. Is Mr. Hersh
8 representing you at this deposition?
9     A. Yes.
10    Q. Okay. Fine. All right. I think we will leave
11 the bilingual thing. It seems that you have developed
12 some memory problems regarding that.
13    MS. ANGELL: Objection. Move to strike.
14 Argumentative. Ms. Larkins, if you can't control
15 yourself concerning abusing this witness, we are not
16 going to stay. So, if you can confine your commentary,
17 we would be happy to proceed, but otherwise we will go.
18    MS. LARKINS: Okay.
19    Q. During the 2003/2004 year at Castle Park were
20 you a union rep?
21    A. No.
22    Q. Who was the union rep during that year?
23    A. Peggy Meyers.
24    Q. Okay. And can you tell me anyone else at Castle
25 Park who was a union rep since -- well, let's just say in

**Page 49**

1 the last few years, the last 10 years or so.
2     MS. ANGELL: Objection. Vague and ambiguous as
3 to time. Do you want to limit it to five years? Ten
4 years?
5     MS. LARKINS: Well, I want to limit it to
6 whatever she feels comfortable with.
7     MS. ANGELL: Well, then why don't you tell her
8 the time period that you're discussing as part of your
9 answer?
10    THE WITNESS: The time period that I remember is
11 myself and Maria Biers and Peggy Meyers.
12    MS. LARKINS: Okay. Thank you.
13    Q. Okay. Do you remember a program at Castle Park
14 called Kingdoms?
15    A. Yes.
16    Q. Could you tell me a little bit about that
17 program, what you remember of it?
18    MS. ANGELL: Objection. Vague and ambiguous.
19 Are you asking her for a description of what the program
20 was, its time frame, what its purpose was, how it was
21 implemented?
22    MS. LARKINS: Thank you. That's perfect.
23 Strike the previous question.
24    Q. What was the purpose of the Kingdoms program?
25    A. For children to work with other children of

13 (Pages 46 to 49)

Larkins v. Werlin, etc., et al.                                                                    Deposition of Karen Snyder
Case No. GIC 781970                                                                                November 9, 2004

Page 50

1   different ages at the school and to bring -- to bring
2   groups closer together, the opportunity to work with
3   different teachers while working on values.
4       Q. Okay. And were there conflicts between teachers
5   at Castle Park Elementary about whether or not to
6   implement this program?
7          MS. ANGELL: Vague and ambiguous as to time.
8   Vague and ambiguous as to "conflicts."
9   BY MS. LARKINS:
10      Q. Can you answer?
11      A. Yes.
12      Q. Okay. What were those conflicts?
13      A. I don't recall.
14      Q. Okay. Was it some people wanted Kingdoms
15  and others didn't?
16      A. Yes.
17      Q. Okay. Were you one of the people who didn't
18  want it?
19      A. Yes.
20      Q. Was Peggy Meyers one of the people who didn't
21  want it?
22      A. I don't recall.
23      Q. Okay. Do you recall that the staff voted on
24  whether or not to have Kingdoms?
25      A. I don't recall.

Page 51

1       Q. Do you recall that the organization or committee
2   which is often called the School Site Council, but at
3   that time was called the Staff Parent Management Team,
4   made a decision about Kingdoms?
5       A. Would you clarify?
6       Q. Do you remember when -- okay. Strike the
7   previous question.
8          Do you remember when the SPMT decided that
9   Castle Park would have Kingdoms?
10         MS. ANGELL: Objection. Vague and ambiguous as
11  to SPMT; assumes facts.
12  BY MS. LARKINS:
13      Q. Can you answer it?
14      A. Yes.
15      Q. You do recall that?
16      A. Yes.
17      Q. Okay. And do you recall what their decision
18  was? I am sorry. Maybe I already said that. Okay. I
19  believe we did. I think I said that in my question. I
20  said do you recall when they decided that we would have
21  them. Okay.
22         Do you recall a program that was implemented
23  temporarily at Castle Park that was called the Comer
24  Program?
25      A. Yes.

Page 52

1       Q. Can you tell me the purpose of that program?
2       A. I don't recall.
3       Q. Did it have to do with every person having a
4   voice?
5          MS. ANGELL: Objection. Vague and ambiguous. I
6   don't understand the question.
7          MS. LARKINS: Okay.
8       Q. Was one of the tenets of the Comer belief system
9   that every individual should have a voice in decision-
10  making?
11      A. I don't remember.
12      Q. Okay. Do you recall that consensus was one of
13  the tenets of the Comer program?
14      A. Yes.
15      Q. Okay. And do you recall what consensus was?
16  What did consensus mean as far as the Comer program went?
17      A. I will answer as much as I remember. Consensus
18  meant that it was no longer a hand vote of individuals
19  and that we needed to decide as a group, even if we
20  weren't in favor of it, as to whether we could live with
21  that decision that was made. And we tried to get
22  everyone to be able to live with the decision that was
23  made.
24      Q. Okay. Do you recall a time when I was taken out
25  of my classroom and placed on administrative leave?

Page 53

1       A. No.
2       Q. Okay. Do you recall a time when I -- strike
3   that.
4          Do you recall a time in April of 2001 when
5   Dr. Donndelinger held a staff meeting on a Saturday
6   afternoon -- Saturday -- on a Friday afternoon and said
7   Maura Larkins will be coming back to work?
8       A. Yes.
9       Q. Okay. At that time at that meeting did you
10  express concern because Sandra Ornellis had worked so
11  hard on open house?
12         MS. ANGELL: Objection. Vague and ambiguous.
13  Express concern about what? I don't understand the
14  question.
15         MS. LARKINS: Can you answer it?
16         MS. ANGELL: Do you understand the question?
17         THE WITNESS: Yes. And the answer is no.
18  BY MS. LARKINS:
19      Q. You did not express concern about Sandra?
20      A. I don't remember expressing concern.
21      Q. Okay.
22         MS. ANGELL: I don't understand. Concern about
23  what? What are you talking about?
24         THE WITNESS: Your question was about Sandra
25  putting so much time into open house and did I state that

14 (Pages 50 to 53)

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

---

Page 54

1  that was a concern of mine?
2       MS. LARKINS: Uh-huh. Uh-huh.
3       THE WITNESS: And I don't remember ever saying
4  that.
5       MS. LARKINS: Okay.
6       MS. ANGELL: Thank you.
7  BY MS. LARKINS:
8       Q. Do you recall a time when I did come back to
9  work after that meeting that we were just discussing,
10 that Friday afternoon meeting?
11      A. Yes.
12      Q. Okay. Do you recall teachers coming to you and
13 expressing concern about my returning to work?
14      A. No. I don't remember.
15      Q. Do you recall telling Gretchen Donndelinger that
16 teachers felt that they were walking on egg shells
17 because I had come back to work?
18      A. No, I don't recall that.
19      Q. Were you at all concerned that I was coming back
20 to work?
21      A. No. I don't recall.
22      Q. Have you and I ever had any conflict?
23      A. No, not that I am aware of.
24      Q. Have you ever -- have you and I ever spoken any
25 negative words to each other?

Page 55

1       A. Not that I remember.
2       Q. When Gretchen announced that I was returning to
3  work, what was your understanding of why I had been taken
4  out?
5       MS. ANGELL: Objection. Assumes facts not in
6  evidence, claiming that she had an understanding of why
7  you were not working, also claiming that she understood
8  that you had, quote, been taken out of your classroom.
9  There is no testimony on that.
10      MS. LARKINS: Okay.
11      Q. Let's go back to the meeting. Does April 6th,
12 2001 sound about right for that Friday afternoon meeting
13 when Gretchen announced I would be returning to work?
14      A. I don't recall. I'm sorry.
15      Q. Okay. Did some people at that meeting express
16 concern about my returning to work?
17      A. I don't remember.
18      Q. Did Gretchen Donndelinger say that there would
19 be some kind of mediation available to teachers who were
20 concerned about my coming back to work and that they
21 should come up to her after the meeting and give her
22 their names?
23      A. I don't recall.
24      Q. Okay. Did this seem strange to you that there
25 would be meeting on a Friday afternoon to announce that a

Page 56

1  teacher was coming back to work?
2       A. I don't remember. I don't remember the meeting.
3  I remember -- I remember the meeting, but I don't
4  remember anything about the meeting other than we were
5  told you were coming back. That is all I remember about
6  that meeting.
7       Q. Okay. How many meetings have you attended in
8  your 20-some years at Castle Park where the meeting was
9  held for the sole purpose of announcing that a teacher
10 would be coming back to work?
11      A. One.
12      Q. Okay. Do you recall about how long I worked
13 when I came back to work after that meeting?
14      A. No, I don't recall.
15      Q. If a teacher came to you and said they were
16 afraid that another teacher had a gun, would you remember
17 that?
18      A. Yes.
19      Q. Did any teachers come to you when I came back to
20 work at Castle Park and say that they were afraid I had a
21 gun?
22      A. No.
23      Q. Did you notice that I stopped working at Castle
24 Park during the school year of 2000/2001?
25      A. Yes.

Page 57

1       Q. Did you ever ask anybody what happened to me?
2       A. No.
3       Q. Did you know -- did anybody tell you what
4  happened to me?
5       MS. ANGELL: Objection. Seeks to invade
6  attorney-client privilege, attorney work product. So, if
7  you would like to restrict it to --
8       MS. LARKINS: Yes. Okay.
9       MS. ANGELL: So, nothing that you have gotten
10 from counsel.
11 BY MS. LARKINS:
12      Q. Did anyone -- actually, I want to restrict this
13 to 2000 -- I want to restrict this to a time before any
14 attorneys were involved in this case, except perhaps
15 mine. Between the time you noticed that I had stopped
16 working during the 2000/2001 school year and the end of
17 the school year, did anyone ever tell you why I wasn't
18 working?
19      MS. ANGELL: You mean the end of the 2000 -- you
20 mean by June of 2001?
21      MS. LARKINS: Yes.
22      THE WITNESS: No. No one had ever told me
23 anything.
24 BY MS. LARKINS:
25      Q. Okay. In your 20-some years at Castle Park, how

15 (Pages 54 to 57)

Case 3:07-cv-02202-WQH-WMC    Document 1-5    Filed 11/19/2007    Page 61 of 101

Larkins v. Werlin, etc., et al.                                    Deposition of Karen Snyder
Case No. GIC 781970                                                November 9, 2004

**Page 58**

1    many teachers have suddenly quit working in the middle of
2    the school year and you never knew what happened to them?
3        A.  None.
4        Q.  Except me.
5        MS. ANGELL:  Objection.  That's not her
6    testimony.
7        MS. LARKINS:  Okay.
8        MS. ANGELL:  Misstates the testimony.
9        MS. LARKINS:  Right.  You're correct.
10       Q.  How many teachers stopped working in the middle
11   of the year of teachers who were working at Castle Park
12   Elementary School during the time you taught there and
13   nobody told you for months why they had disappeared?
14       A.  Could you clarify it?
15       Q.  Okay.  I'm going to try to make it quicker,
16   because it's so long you forget the beginning by the time
17   you get to the end.
18       How many cases have there been similar to mine
19   at Castle Park where a teacher suddenly stopped working
20   and no one told you for months why they weren't working
21   any more?
22       A.  Other than yourself?
23       Q.  Yeah.
24       A.  Zero.
25       Q.  Okay.  Did you have any feeling of thinking that

**Page 59**

1    I might have died?
2        A.  No.
3        Q.  What made you confident that I hadn't died?
4        MS. ANGELL:  Objection.  Misstates the
5    testimony.  She didn't say she was confident you hadn't
6    died.
7    BY MS. LARKINS:
8        Q.  What made you think I hadn't died?
9        A.  We used to put passings or illnesses of people
10   on the white board in the teachers' lounge, e-mails from
11   the District or handwritten if anyone was ill or had
12   passed away.  And nothing was ever on there to that
13   effect.
14       Q.  Okay.  So would it be correct to say that you
15   didn't think I was ill?
16       MS. ANGELL:  Objection.  Vague and ambiguous.
17   Do you mean that she didn't think, based upon any
18   information given to her by School District personnel
19   that you were ill or --
20       MS. LARKINS:  Let me misstate.
21       MS. ANGELL:  So the former question is stricken?
22       MS. LARKINS:  Yes.
23       Q.  Did you think that I had stopped working because
24   I was ill?
25       A.  No.

**Page 60**

1        Q.  Do you think that teachers should be removed
2    from their classrooms and not be told why?
3        A.  No.
4        Q.  Would you feel it's your duty as a union rep to
5    object, if a teacher is taken out of her class and not
6    told why?
7        A.  As a union rep?
8        MS. ANGELL:  Objection.  Calls for a legal
9    conclusion, vague and ambiguous, incomplete hypothetical.
10       MS. LARKINS:  Okay.
11       MS. ANGELL:  Calling for an expert conclusion.
12   BY MS. LARKINS:
13       Q.  Did you rule out as a possibility in your mind
14   when I stopped working at Castle Park Elementary School
15   that I might have been taken out of my classroom and been
16   banned from talking to anyone or setting foot on the
17   school grounds and not having been told why?
18       MS. ANGELL:  Vague and ambiguous.  I don't even
19   understand that question.  Can we get it read back?
20       MS. LARKINS:  It's a little long.
21       MS. ANGELL:  Is it stricken or should we read it
22   back?
23       MS. LARKINS:  Let's strike it.
24       Q.  Let me see how I can ask it quicker.  Were you
25   confident when I stopped working at Castle Park in 2001

**Page 61**

1    that my rights hadn't been violated?
2        MS. ANGELL:  Objection.  Calls for a legal
3    conclusion.  Calls for a legal conclusion as of 2001.
4    BY MS. LARKINS:
5        Q.  Okay.  Did you care, in 2001, whether or not my
6    rights had been violated?
7        MS. ANGELL:  Renewing the stipulation, just
8    keeping in mind the stipulation on relevance is still in
9    effect on all these questions.
10   BY MS. LARKINS:
11       Q.  Okay.  You can answer.
12       A.  I didn't know.  Therefore, I didn't -- wasn't
13   able to have an opinion either way.
14       Q.  And you weren't interested enough to find out?
15       MS. ANGELL:  Objection.  Argumentative.  You
16   don't need to answer that.
17   BY MS. LARKINS:
18       Q.  Did you ever --
19       MS. ANGELL:  Is the question withdrawn?
20       MS. LARKINS:  Yes.
21       Q.  Did you ever think that my situation should be
22   investigated?
23       A.  What do you mean?  Can you clarify?
24       Q.  No.  I am going to just let that one -- strike
25   that one.

16 (Pages 58 to 61)

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

---

**Page 62**

1    Okay. Can you tell me who were your closest
2  friends at Castle Park Elementary School?
3        MS. ANGELL: Vague and ambiguous as to time.
4        MS. LARKINS: Thank you.
5    Q. Can you tell me who were your closest friends at
6  Castle Park Elementary School for the last 10 years or
7  so?
8        MS. ANGELL: Objection. Overbroad.
9  BY MS. LARKINS:
10   Q. You can answer.
11       MS. ANGELL: You want to know every person that
12  she was friends with that worked at Castle Park for a
13  10-year period? Could you not be more specific than
14  that?
15       MS. LARKINS: I think I used the word "closest
16  friends," not every. Closest not every.
17       MS. ANGELL: You mean the five closest
18  acquaintances, friends that she had for each school year?
19  Do you mean her top five friends for that -- you know,
20  collectively for that entire 10-year period? You just
21  want five names? What are you looking for?
22  BY MS. LARKINS:
23   Q. Did you have a best friend at Castle Park
24  Elementary School during the last 10 years?
25       MS. ANGELL: You mean at any one single point in

---

**Page 63**

1  time during the last 10 years?
2        MS. LARKINS: Yeah.
3        THE WITNESS: At any single point?
4        MS. LARKINS: Yeah.
5        THE WITNESS: Yes.
6  BY MS. LARKINS:
7    Q. Okay. Who would that person be?
8    A. Peggy Meyers.
9        MS. ANGELL: At which point in time? Throughout
10  the 10-year period?
11       THE WITNESS: Over the last five years.
12  BY MS. LARKINS:
13   Q. Okay. And before Peggy Meyers became your
14  closest friend at Castle Park during the five years
15  previous did you have one person that you would say was
16  your closest friend then?
17       MS. ANGELL: You mean her closest friend out of
18  all the employees? Sorry. I can't even speak right.
19       MS. LARKINS: Yes, at Castle Park.
20       MS. ANGELL: At Castle Park.
21       THE WITNESS: That's why I didn't answer. I
22  would say Robin Donlan, because I team taught with her.
23  BY MS. LARKINS:
24   Q. Uh-huh. Okay. Was Gina Boyd ever a friend of
25  yours, not necessarily real close, but was she a friend

---

**Page 64**

1  of yours at Castle Park?
2    A. No.
3    Q. No? Did you have some conflict with Gina Boyd?
4    A. No.
5    Q. Okay. Who would you say was closest to Gina
6  Boyd at Castle Park?
7        MS. ANGELL: If you know.
8        THE WITNESS: I don't recall.
9        MS. LARKINS: Okay.
10   Q. I'd like to take a break, because I need to make
11  a copy of a document. Is that all right with you?
12       MS. ANGELL: Fine with me.
13       VIDEOGRAPHER: We are going off the record. The
14  time is 2:32 p.m.
15       (A recess was taken from 2:32 to 2:46 p.m.)
16       (Exhibits 1 through 3 were marked.)
17       VIDEOGRAPHER: We are going on the record. The
18  time is 2:46 p.m.
19       MS. LARKINS: Okay. I would --
20       THE WITNESS: Before -- sorry to interrupt.
21       MS. LARKINS: Okay.
22       THE WITNESS: Before we continue, I'd like to go
23  back to some previous testimony regarding best friends,
24  because I -- I think I answered a question incorrectly.
25  You were asking about my best friends, Peggy Meyers, and

---

**Page 65**

1  then I said Robin Donlan. And then you asked me was Gina
2  Boyd a friend. And I was thinking best friend so I
3  answered no, but Gina Boyd was a friend at Castle Park
4  when she taught there.
5        MS. LARKINS: Okay. Thank you. I'd like to
6  ask that this document be labeled Exhibit No. 1.
7    Q. Ms. Snyder, in my administrative hearing the
8  District put some documents into evidence and a good
9  number of them were notes written by Gretchen
10  Donndelinger.
11   A. Could I have a moment to read this?
12   Q. Sure. Sure.
13   A. I would appreciate that. Thank you.
14       MS. LARKINS: Take your time.
15       MS. ANGELL: And I am going to object to
16  Plaintiff's testifying. If you have a question to ask
17  this witness concerning this document, such as have you
18  seen this, do you know what that is, that would be
19  appropriate, but I am going to move to strike your
20  comments, because this is not your opportunity to
21  testify.
22       MS. LARKINS: Before we talk about this --
23       THE WITNESS: Is there more to it?
24       MS. LARKINS: Yeah. I'd like to put this
25  document labeled Exhibit 2 -- I mean, I don't put it into

---

17 (Pages 62 to 65)

Larkins v. Werlin, etc., et al.                                    Deposition of Karen Snyder
Case No. GIC 781970                                                 November 9, 2004

---

Page 66

1  evidence. I'd like to ask that this be labeled 2.
2      Q. After having read these documents, does this --
3  do these quotes written down here remind you of a meeting
4  that you attended on April 20th, 2001 in Gretchen
5  Donndelinger's office?
6      MS. ANGELL: Objection. Assumes facts not in
7  evidence. You assume that she can read this document.
8  You assume that she has finished reading it, but you
9  haven't asked her if she has. You assume that she
10 attended a meeting.
11     Could you maybe start with finding out if she
12 attended a meeting, if she can read the document, that
13 kind of thing, so I have no objection on form?
14     MS. LARKINS: Sure. Okay.
15     Q. Were you able to read the handwriting on these
16 documents?
17     A. Pretty much. What is this?
18     Q. Well, I'm not going to testify what it is.
19     A. Oh, okay. But that's the way it came out?
20 Okay.
21     Q. Yeah.
22     MS. ANGELL: And let the record reflect that the
23 witness is pointing to the last line on Exhibit 2 --
24     THE WITNESS: To the outside.
25     MS. ANGELL: -- asking what the writing in the

---

Page 67

1  margin on Exhibit 2 at the bottom of the page is stating
2  that she -- what are you stating, that you can't read it?
3      THE WITNESS: I can't tell what that letter is.
4      MS. ANGELL: All right. But you can read the
5  rest of the handwriting?
6      THE WITNESS: I can read the rest of it.
7      MS. ANGELL: Okay.
8  BY MS. LARKINS:
9      Q. Okay. Do you know any of the people who are --
10 whose names are listed on these pages?
11     A. Yes.
12     Q. Okay. Can you tell who these people are who are
13 listed on these pages?
14     A. Some.
15     Q. Okay. Who are they?
16     MS. ANGELL: Objection. Vague and ambiguous.
17 BY MS. LARKINS:
18     Q. Who are the people named, if you can tell, on
19 these two pages?
20     MS. ANGELL: Objection. Document speaks for
21 itself. I'd like to go off the record for a minute.
22 Objections?
23     VIDEOGRAPHER: Is that agreeable, Ms. Larkins?
24     MS. LARKINS: Oh, yeah.
25     VIDEOGRAPHER: We are going off the record. The

---

Page 68

1  time is 2:51 p.m.
2      (A recess was taken from 2:51 to 2:58 p.m.)
3      VIDEOGRAPHER: We remember going on record. The
4  time is 2:58 p.m.
5  BY MS. LARKINS:
6      Q. Okay. As Ms. Angell has pointed out, the
7  document speaks for itself. So, let me ask my question
8  this way. Do you recall meeting with the people who are
9  named in these two pages on approximately April 20th,
10 2001?
11     A. No. I don't recall.
12     Q. Do any of the statements made on these two pages
13 ring a bell with you at all that you have heard those
14 statements before?
15     MS. ANGELL: You mean other than through
16 discussions with counsel and you mean prior to this
17 litigation having been filed?
18     MS. LARKINS: Yes.
19     THE WITNESS: No.
20     MS. ANGELL: Okay. I'd like to ask that this
21 document be labeled Exhibit 3. Okay.
22     Q. Do you remember ever having said to anyone that
23 I -- regarding Kingdoms, that I could not let it go?
24     A. I don't remember saying that.
25     Q. Do you remember saying that it was very

---

Page 69

1  stressful this week, since I came back to work?
2      A. I don't remember saying that. (Witness shakes
3  head.)
4      Q. Do you remember saying that you and the staff
5  were afraid she might bring a gun?
6      A. I don't remember saying that.
7      MS. LARKINS: Okay. I have no more questions.
8                  EXAMINATION
9  BY MS. ANGELL:
10     Q. I am sorry if we already covered this, but I
11 didn't write it down, if we did. So, a long time ago
12 there was some discussion, Mrs. Snyder --
13     A. Ms.
14     Q. Ms. Snyder, I'm sorry.
15     A. I want to make that correction.
16     Q. -- concerning a meeting that you attended which
17 was -- also in attendance were Dr. Donndelinger, Robin
18 Donlan, Plaintiff and Rick Denman -- whoops, strike that.
19 I see that I already asked about the year. Strike that,
20 please.
21     Concerning Heather Smith. Do you recall the
22 time frame that Ms. Smith -- strike that. Concerning
23 Heather Smith, was Ms. Smith an employee, to your
24 knowledge, of the Chula Vista Elementary School District
25 at any time?

---

18 (Pages 66 to 69)

Larkins v. Werlin, etc., et al.                                    Deposition of Karen Snyder
Case No. GIC 781970                                                November 9, 2004

**Page 70**

1  A. Yes.
2  Q. To your knowledge, do you know what her job
3  title was when she was employed with the School District?
4  A. She was a bilingual first grade teacher at our
5  school.
6  Q. Do you know -- at your school, meaning Castle
7  Park Elementary School?
8  A. At Castle Park.
9  Q. Okay. If you could do me a favor and a let me
10  get the whole question out, that would be great.
11  A. I am sorry. Okay.
12  Q. Okay? And I am going to try and do you the same
13  favor of talking one of us at a time. It's hard.
14  Depositions are a little different than regular
15  conversation. So, I will try and keep that in mind.
16  To the best of your recollection, was Heather
17  Smith employed at Castle Park Elementary School before
18  Plaintiff was first employed at Castle Park Elementary
19  School?
20  A. I don't recall.
21  Q. Do you recall whether Ms. Smith was employed at
22  Castle Park Elementary School at the same time
23  concurrently with the plaintiff?
24  A. I don't recall.
25  Q. Do you know whether Ms. Smith was a Chula Vista

**Page 71**

1  Elementary School District employee during the 1990s at
2  all?
3  A. Hmm. I am not --
4  Q. I am just trying to get a time frame.
5  A. Yes. And I am not -- I am not sure. I am not
6  sure of the time frame.
7  Q. Could it have been that she was an employee more
8  than 10 years ago or was it within the last 10 years?
9  And, if you don't know, you don't know.
10  A. I just -- I don't know.
11  Q. Okay. Are you aware of whether or not there
12  were any shootings at school campuses in San Diego County
13  within the last five years?
14  A. Yes.
15  Q. And were there any shootings at public school
16  district facilities in San Diego County during the last
17  five years?
18  A. Yes.
19  Q. And how do you know about those shootings?
20  A. From radio and television and newspapers.
21  Q. During the time frame of those shootings were
22  you employed as a teacher in a public school district in
23  San Diego County?
24  A. Yes.
25  Q. Were you concerned for your safety subsequent to

**Page 72**

1  those shootings in a different degree than you had been
2  concerned for your safety before those shootings?
3  A. Yes.
4  Q. Were you more concerned for your personal safety
5  at school after the shootings than you were before the
6  shootings?
7  A. Yes.
8  Q. Do you continue to be as concerned for your
9  personal safety at public school district property today
10  as you were around the same time as the school shootings?
11  A. Yes.
12  Q. Concerning the Comer Program, do you know, in
13  fact, whether or not the Comer Program was formally
14  adopted or implemented at Castle Park Elementary School?
15  A. Formally adopted, no, I do not know.
16  Q. Are you an expert on the Comer Program?
17  A. No.
18  Q. When the Comer Program was under discussion at
19  Castle Park Elementary School, were you the person who
20  was in charge of the Comer Program?
21  A. No.
22  Q. Was the school principal in charge of the Comer
23  Program?
24  A. Yes.
25  Q. Mrs. Snyder, has any person at any time -- other

**Page 73**

1  than your discussions with counsel, has any person at any
2  time made a statement to you of the words that Plaintiff,
3  meaning Maura Larkins, needed to be arrested by police
4  because she was a dangerous person who had at least one
5  handgun?
6  A. No.
7  Q. Has anyone, other than your discussions with
8  counsel in relation to this litigation, ever made a
9  statement or words to that effect, not maybe exactly
10  those words, but words to the effect that Maura Larkins
11  needed to be arrested by police because she was a
12  dangerous person who had at least one handgun?
13  A. No.
14  Q. Ms. Snyder, have you ever seen any arrest
15  records concerning Maura Larkins?
16  A. No.
17  Q. Prior to the instigation of this litigation were
18  you aware that Plaintiff had, in fact, been arrested at
19  any point in her life?
20  A. No.
21  Q. Are you aware of whether now -- other than
22  conversations with counsel, are you aware of whether
23  plaintiff has ever been arrested for committing a
24  misdemeanor?
25  A. No.

19 (Pages 70 to 73)

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

---

**Page 74**

1    Q. Other than conversations with counsel in
2  relation to this litigation, are you aware at this point
3  in time whether Plaintiff has ever been arrested related
4  to a felony?
5    A. No.
6    Q. Other than discussion with counsel in relation
7  to this litigation, do you have any knowledge concerning
8  whether individuals are permitted to possess information
9  from other people's criminal records information?
10   A. Could you clarify?
11   Q. Other than discussions with counsel, do you know
12  whether it is --
13   A. Repeat.
14   Q. I am forming the question. Strike what I did so
15  far, please.
16      Other than discussions with counsel, have you
17  ever been informed by anyone that it is illegal to
18  possess information from another person's records of
19  arrest when that arrest did not result in conviction?
20   A. No.
21      MS. ANGELL: That's it.
22      FURTHER EXAMINATION
23  BY MS. LARKINS:
24   Q. I'd like to do a little follow-up. I know what
25  you call it. Redirect?

---

**Page 75**

1      When you were afraid of shootings at schools --
2  strike that.
3      When you became afraid of shootings at schools,
4  did you ever suspect that one particular teacher might
5  shoot people at your school?
6      MS. ANGELL: Objection. Misstates the
7  testimony. To the extent that you understand the
8  question regarding whether you ever had a fear that any
9  particular teacher would do a shooting, I don't object to
10  you making an answer.
11      MS. LARKINS: Would you like me to restate?
12      THE WITNESS: (Witness nods head.)
13      MS. ANGELL: Is the prior question stricken,
14  then?
15      MS. LARKINS: Yes.
16   Q. When you became afraid of shootings at schools,
17  did you become afraid that a particular teacher might
18  come to Castle Park and shoot people?
19   A. No.
20   Q. Did it -- when you became afraid of shootings at
21  schools, did it ever cross your mind that a teacher might
22  come to your school and shoot people?
23      MS. ANGELL: Objection. Vague and ambiguous,
24  overbroad.
25      THE WITNESS: Not that I remember.

---

**Page 76**

1  BY MS. LARKINS:
2    Q. Okay. At the present time do you have fear that
3  a teacher might come to Castle Park School and shoot
4  people?
5    A. No.
6    Q. Regarding your statements that you didn't
7  remember anyone telling you that Maura Larkins needed to
8  be arrested or that Maura Larkins had a handgun, are you
9  very clear in your memory that no one ever made those
10  statements to you or do you simply not remember anyone
11  making those statements?
12   A. I am very clear that no one ever made those
13  statements.
14   Q. Okay. Are you aware that it is a misdemeanor to
15  possess records of an arrest which did not lead to a
16  conviction?
17   A. No.
18      MS. LARKINS: Okay. That's all.
19      MS. LARKINS: Mr. Hersh, anything from you?
20      MR. HERSH: No.
21      MS. LARKINS: Okay. Should I make my halting
22  and difficult stipulation about what to do with these?
23  Okay. I would like to stipulate that the transcript of
24  this deposition be given to Kelly Angell when it is
25  ready. And we seem to have settled on a three-week

---

**Page 77**

1  period for most of the deponents in this case. Let me
2  try to explain to you what happens now.
3      The transcript of this deposition will be given
4  to you by Ms. Angell. And you will want to read it over
5  and make sure that it states what you want it to state.
6  And, if there are any changes or corrections you want to
7  make, you have an opportunity to make them. And the last
8  couple people who have been deposed here agreed to a
9  period of a three-week period to have to read over the
10  deposition and decide if they wanted to make any changes.
11  And then you sign it when you have made your changes or
12  decided you didn't want to make changes. And you mail it
13  to Ms. Angell.
14      Do you want two discuss the three-week period or
15  does that sound good to both of you?
16      MS. ANGELL: Will you be traveling out of town
17  at any time between now and the end of the year?
18      THE WITNESS: Yes.
19      MS. ANGELL: We don't need to know where you're
20  going, but what are the approximate dates of your first
21  travel?
22      THE WITNESS: The 16th of November through the
23  30th of November.
24      MS. ANGELL: And will you also be traveling in
25  December?

---

20 (Pages 74 to 77)

Larkins v. Werlin, etc., et al.
Case No. GIC 781970

Deposition of Karen Snyder
November 9, 2004

**Page 78**

1   THE WITNESS: Yes. Well, Mrs. Larkins, if you
2   wish to pay to have this transcript expedited so that it
3   can be received by Mrs. Snyder by November 15th, not just
4   mailed to her, but received by her that day, I don't
5   know. I mean, are you going on a vacation? You're going
6   on a vacation?
7   THE WITNESS: I am going -- yes, I am going out
8   of town to see family.
9   MS. ANGELL: Okay.
10  MS. LARKINS: I don't particularly think that we
11  need to have it expedited. So, you will be back in town
12  around December 1st?
13  THE WITNESS: Correct.
14  MS. LARKINS: And then how long will you be in
15  town?
16  THE WITNESS: I will be in town for a week and
17  then I will be out of town for four days.
18  MS. ANGELL: Let's stop right there. During the
19  first week of December --
20  THE WITNESS: Uh-huh.
21  MS. ANGELL: -- assuming that the deposition
22  transcript is at your house when you return --
23  THE WITNESS: Uh-huh.
24  MS. ANGELL: -- from your trip, will you be able
25  to have an opportunity to review that transcript and get

**Page 79**

1   it back to me by December 10th?
2   THE WITNESS: Yes.
3   MS. ANGELL: Okay. So, as long as I have the
4   transcript at my office two weeks from today -- that
5   would be the 23rd -- so that I can get it delivered to
6   her, then she will have 10 days to make any corrections
7   to it from the time that she receives it, because she
8   won't receive it until when she gets back. So, that
9   would be aiming for December 10th, assuming that I
10  receive it on or before November 23.
11  MS. LARKINS: So from that I conclude that you
12  two are -- you're also going out of town then right after
13  the 23rd?
14  MS. ANGELL: I can't read her depo for her. She
15  is going to be gone.
16  MS. LARKINS: No.
17  MS. ANGELL: And I have to have an opportunity
18  to get it in the mail to her. So, she won't receive it
19  until December 1.
20  MS. LARKINS: Uh-huh. I see.
21  MS. ANGELL: So, she said that, you know,
22  assuming that she actually has it by December 1, she
23  should be able to review it, make any changes and let me
24  know about the changes by December 10.
25  MS. LARKINS: I see. So you just feel you need

**Page 80**

1   a week --
2   THE WITNESS: (Witness nods head.)
3   MS. LARKINS: -- to do the turnaround?
4   MS. ANGELL: She needs at least that long.
5   MS. LARKINS: No. I meant you.
6   THE WITNESS: Yes. Yes.
7   MS. ANGELL: You're not deposing her any more.
8   You're finished deposing her. You and I are making a
9   stipulation. And I am having this conversation with her
10  in front of you. Okay?
11  MS. LARKINS: Okay.
12  MS. ANGELL: So, and for every day after
13  November 23rd that I do not have the transcript, if the
14  transcript is not received by me by November 23rd at 4:00
15  p.m., then I am going to need additional time because of
16  the holiday and mail and problems and stuff like that.
17  But you can get it -- to the court reporter, you can get
18  it within two weeks, right?
19  THE REPORTER: Uh-huh.
20  MS. ANGELL: Yes? Thank you. All right. So
21  are you done proposing your stipulation, Ms. Larkins?
22  MS. LARKINS: No. I can think of two more
23  things I can say.
24  MS. ANGELL: All right. Let's hear them.
25  MS. LARKINS: The original will be kept by

**Page 81**

1   Ms. Angell and/or her law firm. And, in the event the
2   original is lost, a certified copy will be acceptable in
3   place of an original and a faxed signature will be
4   acceptable in place of an original. That's all I can
5   think of. If anyone else wants to stipulate to anything
6   further --
7   MR. HERSH: Not from me.
8   MS. ANGELL: And the original transcript that
9   you're sending is going to have an index and a condensed?
10  THE REPORTER: The original does not. If you
11  order a copy, then you get a disk and a condensed.
12  MS. ANGELL: I don't need a disk. I need an
13  index and a condensed.
14  THE REPORTER: Okay. Just so you know, that's a
15  copy, though, the equivalent of a copy. The original is
16  just the original that she is paying for, the 0 and one
17  copy.
18  MS. ANGELL: Okay. We'll talk about it after.
19  That will work. So stipulated.
20  MS. LARKINS: You, Michael?
21  MR. HERSH: So stipulated. Did I interrupt?
22  MS. LARKINS: Did you stipulate?
23  MR. HERSH: Yes.
24  MS. LARKINS: Okay.
25  VIDEOGRAPHER: All right. This concludes

21 (Pages 78 to 81)

Larkins v. Werlin, etc., et al.                                    Deposition of Karen Snyder
Case No. GIC 781970                                                November 9, 2004

Page 82

1    today's deposition. We are going off the record at 3:18
2    p.m.
3          (The deposition was concluded at 3:18 p.m.)
4                • • • • • •
5          I, Karen Snyder, swear, under penalty of
6    perjury, that I have read the foregoing deposition, and
7    that it is true and correct, to the best of my knowledge
8    and belief.
9          Signed on this _____ day of _____, 2004
10   at _____, _____
          (City)              (State)
11
12
                    _____
13                     KAREN SNYDER
14
15
16
17
18
19
20
21
22
23
24
25

Page 83

1    STATE OF CALIFORNIA)
                          ss
2    COUNTY OF SAN DIEGO)
3
4          I, Diane M. Holnback, a Certified Shorthand
5    Reporter, Certificate No. 11686, in and for the County of
6    San Diego, State of California, do hereby certify that
7    the witness in the foregoing deposition was by me first
8    duly sworn and that the foregoing testimony was reported
9    by me and was thereafter transcribed with computer-aided
10   transcription under my direction, and that the foregoing
11   is a full, complete, and true record of said proceeding.
12         I further certify that I am a disinterested
13   person and am in no way interested in the outcome of this
14   action, nor connected with or related to any of the
15   parties in this action or to their respective counsel.
16         The dismantling, unsealing or unbinding of the
17   original transcript will render the reporter's
18   certificates null and void.
19         IN WITNESS WHEREOF, I have hereunto set my hand
20   on this 22nd day of November, 2004.
21
22   _____
     Diane M. Holnback, C.S.R.
23   Certificate No. 11686
24
25

22 (Pages 82 to 83)

SAN DIEGO COURT REPORTING SERVICE                        619-232-1164
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101           FAX 619-232-2616

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

MAURA LARKINS,                          *
                                        *
                                        *
            Plaintiff,                  *
                                        *
    vs.                                 *    Case No. GIC 781970
                                        *
RICHARD T. WERLIN, etc.,                *
et al.,                                 *
                                        *
            Defendants.                 *
                                        *

VIDEOTAPED DEPOSITION OF NIKKI PEREZ

Taken at San Diego, California

November 29, 2004

Claudia A. Witt, CSR

Certificate No. 10797

Larkins v. Werlin
GIC 781970

Deposition of Nikki Perez
November 29, 2004

---

Page 2

1        I-N-D-E-X
2    VIDEOTAPED DEPOSITION OF NIKKI PEREZ          PAGE
        November 29, 2004
3
        Examination by Ms. Larkins          4
4
        Examination by Ms. Angell           7
5
6
     EXHIBITS:                          PAGE
7
        (None offered)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1        VIDEOTAPED DEPOSITION OF NIKKI PEREZ
2
3        Pursuant to Notice to Take Deposition, and on the 29th
4    day of November 2004, commencing at the hour of 3:26 p.m. at
5    319 Elm Street, Suite 100, in the City and County of San Diego,
6    State of California, before me, Claudia A. Witt, Certified
7    Shorthand Reporter in and for the State of California,
8    personally appeared:
9                NIKKI PEREZ,
10    Witness herein, who, called as a witness by the Plaintiff,
11    being by me first duly sworn, was thereupon examined as a
12    witness in said cause.
13
                   APPEARANCES
14
15    For the Plaintiff:  MAURA LARKINS
                        1935 Autocross Court
16                      El Cajon, California 92019
                        (619) 444-0065
17                      (In Propria Persona)
18    For Chula Vista    CALIFORNIA TEACHERS ASSOCIATION
      Educators,    By:  MICHAEL HERSH, ESQ.
      California Teachers  Post Office Box 2153
19    Association;    11745 East Telegraph Road
      Virginia Boyd and   Santa Fe Springs, California 90670
20    Timothy O'Neill:   (562) 942-7979
                        (Appeared telephonically)
21
      For Robin Donlan   STUTZ, ARTIANO, SHINOFF & HOLTZ
22    and Linda Watson:  By:  KELLY R. ANGELL, ESQ.
                        401 West A Street, 15th Floor
23                      San Diego, California 92101
                        (619)232-3122
24
25    Also Present:    Gregg Eisman, Videographer

---

Page 4

1        THE VIDEOGRAPHER:  This is the video deposition of
2    Nikki Perez being taken on behalf of plaintiff in the matter
3    of Maura Larkins versus Richard T. Werlin, et cetera, et al.,
4    San Diego Superior Court case No. GIC 781970.  This
5    deposition is being held in the offices of San Diego Court
6    Reporting, located at 319 Elm Street, Suit 100, San Diego,
7    California.  Today is Monday, November 29th, 2004, and the
8    time is now 3:26 p.m.  My name is Gregg Eisman.  I'm a legal
9    video specialist with Videographics, located at 1903 30th
10    Street, San Diego, California.  The certified shorthand
11    reporter is Claudia Witt of San Diego Court Reporting.
12        For the video record, would counsel please state
13    their appearances.
14        MS. LARKINS:  Maura Larkins, plaintiff in pro per.
15        MS. ANGELL:  Kelly Angell for Robin Donlan and
16    Linda Watson.
17        MR. HERSH:  Michael Hersh on behalf of the
18    association defendants.
19        THE VIDEOGRAPHER:  Would the reporter please swear
20    the witness.
21        (At this point, the deponent was placed under oath
22    by the court reporter.)
23
24    EXAMINATION BY MS. LARKINS:
25    Q.  Good afternoon.

---

Page 5

1    A.  Good afternoon.
2    Q.  Ms. Perez, are you feeling well today?
3    A.  Yes, I am.
4    Q.  Can you think of any reason why you wouldn't be
5    able to give your best testimony?
6    A.  No.  There is none.
7    Q.  Okay.  I'd like to just do a quick review of your
8    education and employment.  Could you state for the record
9    where and when you graduated from high school?
10    A.  I graduated from Castle Park High School in 1975.
11    Q.  And then as far as education or employment goes,
12    what did you do after that?
13    A.  I continued on at Southwestern College, community
14    college.  Then I went to night school.  I continued there,
15    finished my A.A., and over many years later transferred to
16    San Diego State and eventually graduated from San Diego
17    State.  And in there I was a mommy.
18    Q.  Yeah, when you only talk about education and
19    employment, you leave quite a bit out.  And what did you do
20    after you graduated from San Diego State?
21    A.  I entered the credential program, and I finished
22    in '95, May of '95.  And then I received employment from
23    Chula Vista Elementary School District in August of '95.
24    Q.  And what school did you work at?
25    A.  Castle Park Elementary School.

---

2 (Pages 2 to 5)

Larkins v. Werlin
GIC 781970

Deposition of Nikki Perez
November 29, 2004

---

**Page 6**

1  Q. Okay. At some time did you come to know someone
2  named Shelley Rudd?
3  A. Yes.
4  Q. And how did that come to pass?
5  A. Shelley Rudd is -- was the teacher that taught my
6  children, my eldest, to read. She was the 1st grade teacher
7  at --
8  Q. Harborside?
9  A. Harborside. Thank you. Yes, she was a 1st grade
10 teacher at Harborside.
11 Q. Okay. And did you become friends with Shelley
12 Rudd when she was your children's teacher?
13 A. I -- I wouldn't characterize it as being friends,
14 but I respected her greatly because I admired her as a
15 teacher, and I thought she did a wonderful job for my children.
16 Q. When you became a teacher yourself, did you have
17 occasion to speak with Shelley Rudd during the workday?
18 A. No, I did not.
19 Q. Were you ever on any committees together after
20 school?
21 A. No.
22 Q. Did you at all communicate with Ms. Rudd after
23 your children left her classroom?
24 A. I recently ran into Ms. Rudd at a district-
25 sponsored writing workshop, and that was the first and only

---

**Page 7**

1  time I recall running into her since we left Harborside School.
2  Q. Did you ever tell anyone at Castle Park that you
3  had talked on the phone to your friend Shelley at Harborside?
4  A. I have never spoken to Ms. Rudd on the phone before.
5  Q. In other words, you're saying that apart from this
6  recent -- did you say writing --
7  A. Writing workshop.
8  Q. Writing workshop you've never spoken to Shelley
9  Rudd since your children left her classroom?
10 A. Correct.
11 MS. LARKINS: Okay. That's all the questions I
12 have.
13
14 EXAMINATION BY MS. ANGELL:
15 Q. I have a question. I don't understand what is
16 meant by -- regarding time frame of when your children left
17 Ms. Rudd's classroom. What time frame are you talking about?
18 A. Ms. Rudd was my eldest child's teacher. That
19 means she was -- my eldest child was born in '81, so she
20 entered 1st grade -- what would that make it, '86, 1986, and
21 she was my daughter's 1st grade -- so it would be 1986.
22 1987, 1988 time frame she was my son's 1st grade teacher, and
23 after that encounter we were gone from that school when my
24 eldest child -- my eldest child did -- went through 2nd grade
25 at Harborside Elementary.

---

**Page 8**

1  Q. Okay. So I think that clarifies. Did you
2  understand Ms. Larkins' questions to be asking you about your
3  own children that you're the mother to --
4  A. Yes.
5  Q. -- versus other children that you teach?
6  A. No, I did not. I thought she was referring to
7  only my own children.
8  Q. Okay.
9  A. Yes.
10 Q. And that's what you answered?
11 A. Right.
12 MS. ANGELL: Okay.
13 THE WITNESS: That's the capacity.
14 MS. ANGELL: No more questions.
15 Q. Oh, I got a question. Sorry.
16 Mrs. Perez, did anyone ever tell you that Maura
17 Larkins was a dangerous person who needed to be arrested
18 because she had a handgun or at least one handgun?
19 A. No.
20 MS. ANGELL: That's all.
21 MS. LARKINS: Okay. Ms. Perez, what's going to
22 happen now -- this is going to be real easy for you because
23 this was a really short deposition, is you're going to get a
24 copy of this transcript in the mail. This is one volume of
25 my deposition. And you're going to get to read over it, and

---

**Page 9**

1  if there's anything in it that you want to change, you can
2  make changes on this page in the front. And then when you
3  have -- you know, you're ready to state that with these
4  changes this deposition is my correct testimony, there will
5  be a signature page in the back that you sign. And this is
6  mine, and I'm going to give it to you right now, Ms. Angell.
7  Okay. I had one week to look over that deposition and sign
8  it. How long do you think you would need to look over yours?
9  THE WITNESS: I know in my --
10 MS. LARKINS: It's my --
11 THE WITNESS: In my job capacity I have parent/
12 conferences coming up so I know I'll be extremely busy with
13 that, and so I really don't see getting to it until beyond
14 parent conferencing. I'm sorry.
15 MS. LARKINS: Well, that's fine. The law actually
16 sort of recommends 30 days. You can stipulate to something
17 shorter, but 30 days would be fine with me. Does that sound
18 good to you?
19 MS. ANGELL: Do you mean 30 days from the date
20 that she receives a copy of the transcript?
21 MS. LARKINS: That's exactly what I mean.
22 THE WITNESS: Yes, I believe I can do that.
23 MS. LARKINS: Okay. All right then. Shall we
24 stipulate that the court reporter will send this transcript
25 to Kelly Angell, right, and then Kelly Angell will send it to

---

Larkins v. Werlin
GIC 781970

Deposition of Nikki Perez
November 29, 2004

Page 10

1   you. When you receive it, you get 30 days to look it over
2   and sign it and return it to Kelly Angell. And let's stipulate
3   that a fax signature is as good as an original on the
4   signature page of the deposition. And if no signature is
5   received within 30 days, we'll consider it signed as it is.
6   And the original will be kept by Ms. Angell. And if the
7   original is lost or unavailable, a certified copy will be
8   acceptable in place of the original. And shall we stipulate
9   to that?
10      MS. ANGELL: So stipulated.
11      MS. LARKINS: Mr. Hersh?
12      MR. HERSH: Stipulated.
13      MS. LARKINS: Okay. I think we're finished.
14      THE VIDEOGRAPHER: This concludes today's
15  deposition. We're going off the record at 3:35 p.m.
16          * * * * *
17      I, NIKKI PEREZ, swear under penalty of perjury
18  that I have read the foregoing, and that it is true and
19  correct, to the best of my knowledge and belief.
20      Signed on this      day of          , 2004,
21  at          ,
          (City)          (State)
22
23
          NIKKI PEREZ
24
25

Page 11

1   STATE OF CALIFORNIA )
2   COUNTY OF SAN DIEGO )
3
4       I, CLAUDIA A. WITT, Certified Shorthand Reporter
5   licensed in the State of California, License No. 10797,
6   hereby certify that the deponent was by me first duly sworn
7   and the foregoing testimony was reported by me and was
8   thereafter transcribed with Computer-Aided Transcription;
9   that the foregoing is a full, complete, and true record of
10  said proceeding.
11      I further certify that I am not of counsel or
12  attorney for either or any of the parties in the foregoing
13  proceeding and caption named or in any way interested in the
14  outcome of the cause in said caption.
15      The dismantling, unsealing, or unbinding of the
16  original transcript will render the reporter's certificates
17  null and void.
18      In witness whereof, I have hereunto set my hand
19  this day: December 10th, 2004
20
21  _____
          CLAUDIA A. WITT, CSR
22  Certificate No. 10797
23
24
25

4 (Pages 10 to 11)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA  92101

619-232-1164
FAX 619-232-2616

**EXHIBIT 13**

Larkins v. Werlin, et al.
Case No. GIC 781970

Deposition of Michele Leon-Scharmach
November 10, 2004

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN DIEGO


------------------------------------
                                    *
MAURA LARKINS,                      *
                                    *
            Plaintiff,              *
                                    *
      vs.            .              *  Case No. GIC 781970
                                    *
RICHARD T. WERLIN, etc., et al.,    *
                                    *
            Defendants.             *
------------------------------------*




DEPOSITION OF MICHELE LEON-SCHARMACH


Taken at San Diego, California
Wednesday, November 10th, 2004



Diane M. Holnback, C.S.R.
Certificate No. 11686
T.A. Martin, C.S.R.
Certificate No. 3613

Larkins v. Werlin, et al.
Case No. GIC 781970

Deposition of Michele Leon-Scharmach
November 10, 2004

---

**Page 6**

1  Q. Are you feeling well today?
2  A. Yes.
3  Q. Do you feel that you can give your best
4  testimony today?
5  A. I certainly do.
6  Q. Okay. Great. I will just do a standard
7  history, you know, of your education and employment.
8  Can you tell me where you graduated from high
9  school?
10  A. Bakersfield High School.
11  Q. Okay. And what did you do after that as far as
12  education or employment?
13  A. I went to Bakersfield Junior College; then
14  transferred to San Jose State, where I stayed a year; and
15  then I worked a year and went to Fresno State Extension
16  and then ended up with more upper division units in my
17  major with Fresno State. So I transferred to Fresno
18  State and graduated there --
19  Q. Uh-huh.
20  A. -- and worked a year as a social worker and then
21  was in Child Welfare and decided I wanted to be a
22  teacher. And so I went back and got my teaching
23  credential --
24  Q. Okay.
25  A. -- and then worked my first two years in

---

**Page 7**

1  Riverside and then transferred to San Diego -- I mean to
2  Chula Vista -- in 1969.
3  Q. And do you remember when you came to Castle Park
4  Elementary?
5  A. Oh, I had been in and out of there for years as
6  a librarian and I was there for awhile and I don't
7  remember the exact date.
8  Q. Right.
9  A. You know, I remember, you know, Oscar was
10  principal there for awhile. George somebody was
11  principal there for awhile years ago, years ago. And
12  then I was transferred to several other schools and then
13  I came back to Castle Park. So I was in and out of there
14  for quite a few years.
15  MS. ANGELL: I am going to ask the witness to
16  please listen carefully to the question asked and respond
17  only to the question that's asked.
18  THE WITNESS: Okay.
19  MS. ANGELL: Thanks.
20  BY MS. LARKINS:
21  Q. Okay. Did there come a time when you became
22  acquainted with me?
23  A. Yes.
24  Q. And, just ballpark, about when was that?
25  A. Maybe the year 2000, 2001 --

---

**Page 8**

1  Q. Okay.
2  A. -- 2002, someplace in there.
3  Q. Maybe sooner?
4  A. You know, I really don't remember the exact
5  date. I don't recall.
6  Q. Okay. Because -- okay. Would the year 1997
7  sound also a possibility?
8  A. Yeah. Uh-huh.
9  Q. Could well have been?
10  A. Could be. Could be.
11  MS. ANGELL: And I am going to instruct the
12  witness to please wait until the question is fully asked
13  before responding, because you're expected to understand
14  the entire question.
15  THE WITNESS: Okay.
16  MS. ANGELL: There can only be one person
17  talking on the record at a time because, otherwise, we
18  will drive the poor court reporter insane.
19  THE WITNESS: I am sorry.
20  MS. ANGELL: She has to take down every word
21  that's being said. So, if you could, please wait until
22  Mrs. Larkins is done with her question.
23  THE WITNESS: Okay.
24  MS. ANGELL: Provide an opportunity for counsel
25  on the phone and for me to make our objections, if

---

**Page 9**

1  necessary, and then you can respond.
2  THE WITNESS: Okay.
3  MS. ANGELL: Okay. Thanks.
4  BY MS. LARKINS:
5  Q. Do you recall a time when Gretchen Donndelinger
6  came to be principal of Castle Park Elementary?
7  A. Yes.
8  Q. Okay. Does it seem to you that Gretchen
9  Donndelinger and I came to Castle Park around the same
10  time?
11  A. I just don't recall.
12  Q. Okay. But, if I told you that we both came in
13  in 1997, you wouldn't disagree?
14  A. I have no reason to disagree.
15  Q. Okay. What kind of relationship did you have
16  with me when we first became acquainted?
17  MS. ANGELL: Objection. Vague and ambiguous.
18  MS. LARKINS: I will try again.
19  Q. Did you and I have a positive, friendly
20  relationship when we first became acquainted?
21  A. I thought so.
22  Q. Do you have positive relations with most or all
23  of the staff that you work with?
24  A. Yes.
25  MS. ANGELL: Objection. Compound and

---

3 (Pages 6 to 9)

Larkins v. Werlin, et al.
Case No. GIC 781970

Deposition of Michele Leon-Scharmach
November 10, 2004

Page 10

1  conjunctive. Do you want to know if she has what she
2  considers to be a positive relationship with most or --
3      MS. LARKINS: I will rephrase.
4      MS. ANGELL: So the first question is stricken?
5      MS. LARKINS: Yes.
6      MS. ANGELL: Okay.
7  BY MS. LARKINS:
8      Q. Do you have a positive relationship with most of
9  the staff that you work with?
10     A. Yes.
11     MS. ANGELL: And you mean currently in the
12 2004/2005 school year on that question?
13     MS. LARKINS: Let me ask another question. We
14 can strike that question.
15     MS. ANGELL: And the response?
16     MS. LARKINS: And the response.
17     MS. ANGELL: Do you see how you need to let me
18 get the objection in so that you understand the question?
19     THE WITNESS: Uh-huh.
20     MS. ANGELL: Because that question could have
21 been for your 30 years or however long you have been with
22 the District.
23     THE WITNESS: Uh-huh. Uh-huh.
24     MS. ANGELL: So, let's make sure you understand
25 the question before you answer it.

Page 11

1      THE WITNESS: Okay.
2  BY MS. LARKINS:
3      Q. Okay. Do you try to have a positive
4  relationship with the people you work with wherever and
5  whenever you work?
6      A. Yes.
7      Q. Do you remember what grade level classroom I
8  taught when I was at Castle Park?
9      A. Yes.
10     Q. What grade level was that?
11     A. Third.
12     Q. And do you remember whether I taught a bilingual
13 class?
14     A. Yes.
15     Q. And did I?
16     A. Yes.
17     Q. Okay. I think it's going to be important for us
18 to get a better ballpark on the time frames we are
19 talking about. And I might be able to help with that by
20 putting in some exhibits.
21     MS. ANGELL: Move to strike Plaintiff's
22 commentary. No question pending. Plaintiff's comments
23 are not testimony and are not to influence the testimony
24 that you give today.
25     THE WITNESS: Okay.

Page 12

1      MS. ANGELL: You testify as to what you know,
2  not what she tells you.
3      THE WITNESS: Okay.
4      (Exhibit 2 was marked for identification.)
5      MS. LARKINS: Okay. I'd like to ask that this
6  document be labeled Exhibit 2.
7      Q. And could you just look over that document?
8  Have you ever seen this document before?
9      A. No.
10     Q. Okay. Did there ever come a time when you
11 worked at Castle Park that you became aware that I had
12 complained that I was being harassed?
13     A. No.
14     Q. Okay.
15     A. No.
16     Q. Okay. Could you make a -- could you tell me the
17 date on this document?
18     MS. ANGELL: Objection. Give me time to object.
19 Okay?
20     THE WITNESS: Uh-huh.
21     MS. ANGELL: The document speaks for itself.
22 BY MS. LARKINS:
23     Q. You can go ahead and answer the question.
24     MS. ANGELL: She wants to know what whoever made
25 this thing wrote on it.

Page 13

1      THE WITNESS: Okay.
2      MS. ANGELL: So she wants you to read the
3  letter, part of the letter, into the record.
4      THE WITNESS: The date? Oh, read the letter?
5      MS. ANGELL: She wants you to read the first
6  line.
7      THE WITNESS: The date? January 23rd, 2001.
8  BY MS. LARKINS:
9      Q. Were you teaching -- were you the librarian at
10 Castle Park in January of 2001?
11     A. Yes.
12     Q. Okay. Do you believe that you became acquainted
13 with me before this date?
14     MS. ANGELL: Before what date? Vague and
15 ambiguous.
16 BY MS. LARKINS:
17     Q. This date of January 23rd, 2001.
18     A. I think so. I think you were a member of the
19 staff for some time. Yeah.
20     Q. Okay. When you say "a member of the staff for
21 some time," do you mean as much as three and a half
22 years?
23     A. You know, I'm -- I'm not sure when you were
24 hired on, but I remember you as being a part of the staff
25 for some time there.

4 (Pages 10 to 13)

Larkins v. Werlin, et al.
Case No. GIC 781970

Deposition of Michele Leon-Scharmach
November 10, 2004

---

Page 14

1    Q. Okay. And by "some time" you mean a few years?
2    A. A few years, yeah.
3    Q. Okay. And you would not rule out the
4    possibility that it was about three and a half years
5    before this date?
6    A. I don't know for sure. I had two staffs. And
7    so I just, you know, remember you being a part of the
8    Castle Park staff.
9    Q. Okay. And do you remember that sometimes my
10   kids wouldn't get their books turned in on library --
11   before Library Day. And you would call my room and ask
12   me to collect the library books from my students and send
13   them over?
14   A. That's general procedure, yeah. We can't be
15   prepared for a class to come in, if we don't have the
16   books checked in. We always like to have your overdue
17   list ready and be prepared for you.
18   Q. I am really not trying to say anything negative.
19   I am just trying to help establish memories.
20   A. Right.
21   MS. ANGELL: And I am going to instruct the
22   witness to listen to the question that's asked and
23   respond only to the question that's asked, please.
24   THE WITNESS: Okay. Okay.
25   MS. LARKINS: Okay. Let's see. Okay. This is

---

Page 15

1    Exhibit 2.
2    Q. Okay. Some of the questions I ask I know the
3    answers to, but we have to put them in the record.
4    A. Uh-huh.
5    Q. So I am going to ask you a question that sounds
6    sort of silly coming from me.
7    A. Okay.
8    Q. Did you work half time at Castle Park?
9    A. Yes. Uh-huh.
10   Q. Okay.
11   MS. ANGELL: Objection. Vague and ambiguous as
12   to time, do you mean did she work the entire time that
13   she ever worked at Castle Park half time during a 30-plus
14   year time period.
15   Do you see? Let me make my objection before you
16   answer.
17   THE WITNESS: Yeah. Yeah. Okay.
18   MS. ANGELL: Okay?
19   MS. LARKINS: Okay. Let me try again.
20   MS. ANGELL: Are you striking the prior
21   question?
22   MS. LARKINS: Sure.
23   MS. ANGELL: And the response?
24   MS. LARKINS: Sure.
25   MS. ANGELL: Okay.

---

Page 16

1    BY MS. LARKINS:
2    Q. Are you presently working full time at Castle
3    Park?
4    A. Yes.
5    Q. Okay. Are you presently teaching second grade?
6    A. Yes.
7    Q. About how long have you been working full time
8    at Castle Park?
9    A. Two years. This is my second year.
10   Q. Okay. Before you began to work full time at
11   Castle Park two years ago, were you working half time for
12   a number of years at Castle Park?
13   A. Yes.
14   Q. And when you were working half time for those
15   years at Castle Park were you employed as a librarian?
16   A. Yes.
17   Q. Do you have any idea about how long that period
18   was when you were continually employed as a librarian
19   half time at Castle Park just before you went into a
20   second grade classroom at Castle Park?
21   A. Because I have been at so many schools, I think
22   it was about maybe 9 or 10 years.
23   Q. Okay. When you were working half time at Castle
24   Park, you weren't able to attend all staff meetings, were
25   you?

---

Page 17

1    A. No.
2    Q. Okay. Did you attend some staff meetings at
3    Castle Park during that time --
4    A. Yes.
5    Q. -- you were employed half time?
6    Do you recall the staff ever discussing the
7    Comer Program?
8    A. Oh, yes.
9    Q. Do you remember any of the basic principles of
10   the Comer Program?
11   A. Uh-huh. Both my schools were on Comer.
12   MS. ANGELL: Stop.
13   THE WITNESS: Okay. Yes, I do.
14   MS. ANGELL: You have answered the question.
15   BY MS. LARKINS:
16   Q. Could you tell me what you remember to have been
17   the basic principles of the Comer Program?
18   MS. ANGELL: I am going to object that this line
19   of questioning concerning a Comer Program is not
20   reasonably calculated to lead to the discovery of
21   admissible evidence in this case.
22   Causes of action here relate to alleged labor
23   code violations, conspiracy to slander and slander
24   related to Mrs. Larkins' allegations that Robin Donlan
25   and her brother agreed to access Plaintiff's arrest

---

5 (Pages 14 to 17)

Larkins v. Werlin, et al.
Case No. GIC 781970

Deposition of Michele Leon-Scharmach
November 10, 2004

Page 18

1  records and disseminate information and, in fact, did
2  disseminate information from Plaintiff's arrest record.
3       There is also a cause of action against Does,
4  two of them, for intentional infliction of emotional
5  distress. And, therefore, the line of questioning
6  concerning the Comer Process is not relevant nor designed
7  to lead to the discovery of admissible evidence
8  concerning those causes of action. And we will provide
9  some small measure of latitude on exploring the issue to
10  see if you get to anything that's relevant. And, if not,
11  then I will ask you to move on.
12       MS. LARKINS: Okay. Shall we agree to stipulate
13  that the objection you just made will apply to all
14  questions today?
15       MS. ANGELL: That all of your questions are
16  neither relevant nor designed to lead to the discovery of
17  admissible evidence?
18       MS. LARKINS: Yes.
19       MS. ANGELL: Yes.
20       MS. LARKINS: Okay. Would you like to stipulate
21  also, Mr. Hersh?
22       MR. HERSH: Yes. Can you hear me?
23       MS. LARKINS: Yes, we can.
24       MR. HERSH: Okay. So stipulated.
25       MS. LARKINS: So stipulated. Okay. Now, let me

Page 19

1  see if I remember. Oh, oh, yes.
2       MS. ANGELL: If you want to withdraw the
3  question and start over, that would be one thing, or she
4  can maybe read it back.
5       MS. LARKINS: I will withdraw the question and
6  ask it again.
7       Q. What do you recall to have been the basic
8  principles of the Comer Program?
9       A. Agreement by consensus, giving people equal
10  chance to have an opinion on a subject, but I remember we
11  had the timer so that subjects were not allowed to go on
12  forever, that there was a no-blame policy, and that's the
13  general stuff that I really remember that I liked so much
14  about the program. Yes.
15       Q. What was the other school where you became
16  familiar with the Comer Program?
17       A. Silver Wing Elementary.
18       MS. ANGELL: Silver Wing?
19       THE WITNESS: Silver Wing, two words.
20  BY MS. LARKINS:
21       Q. Would you say that the Comer Program was more
22  successful at Silver Wing than it was at Castle Park?
23       A. Yes.
24       Q. In what way was it more successful?
25       A. I think the staff was more committed and they

Page 20

1  took it very seriously. And they followed the mandates
2  of the program. And there was a different buy-in at
3  Castle Park where it was a little more surface than
4  really in-depth commitment to the program.
5       Q. Do you remember a program at Castle Park called
6  Kingdoms?
7       A. Yes.
8       Q. Do you remember that there was conflict at
9  Castle Park among teachers regarding the Kingdoms
10  Program?
11       A. Yes.
12       Q. Was the conflict at Castle Park regarding the
13  Kingdoms Program partly over whether or not to have the
14  program?
15       A. Yes.
16       Q. Do you recall the time when the teachers voted
17  on whether or not to continue the Kingdoms Program?
18       A. Yes.
19       MS. ANGELL: I want to remind you to testify to
20  what you know.
21       THE WITNESS: I remember, yes.
22       MS. ANGELL: Okay.
23  BY MS. LARKINS:
24       Q. Do you remember more than one time when the
25  teachers voted on whether to continue the Kingdoms

Page 21

1  Program?
2       A. Yes.
3       Q. Was the first time the teachers voted done by
4  secret ballot?
5       A. I don't recall.
6       Q. Okay. The first time the teachers voted did
7  they vote to discontinue the Kingdoms Program?
8       A. I don't recall whether that was the first vote
9  or not.
10       Q. Okay.
11       A. I just remember the discussions.
12       Q. Do you recall that a decision was made by the
13  Staff Parent Management Team to continue Kingdoms at
14  Castle Park?
15       A. Yes.
16       Q. Now that you have recalled this decision by the
17  SPMT, do you recall that that decision was overruling a
18  decision by the teachers to discontinue Kingdoms?
19       A. I don't recall.
20       Q. Okay.
21       A. I may have missed that meeting.
22       Q. Okay.
23       MS. ANGELL: I'd like to take a break, please.
24       MS. LARKINS: Certainly.
25       MS. ANGELL: Let's take a break for a minute.

6 (Pages 18 to 21)

Larkins v. Werlin, et al.
Case No. GIC 781970

Deposition of Michele Leon-Scharmach
November 10, 2004

| Page 22 |
| --- |

1    MS. LARKINS: Is that all right with you,
2  Mr. Hersh?
3        MR. HERSH: I am sorry. I missed the question.
4        MS. ANGELL: Michael, we are just going to take
5  a real quick break.
6        MR. HERSH: Sure. Thanks.
7        VIDEOGRAPHER: We are going off the record. The
8  time is 10:42 a.m.
9        (A recess was taken.)
10        VIDEOGRAPHER: We are going on the record. The
11  time is 10:49 a.m.
12        MS. ANGELL: And Mrs. Scharmach needs to clarify
13  something that she said before we went off the record.
14        THE WITNESS: Okay. I don't -- you know, when
15  we discussed the decision that was made, I was just at
16  the staff meeting. I don't remember truly them stating
17  this organization, this group or this group, you know,
18  overrode a decision or made a decision. I just remember
19  it being announced that we were going to have Kingdoms.
20        MS. LARKINS: Okay.
21        THE WITNESS: I wasn't part of the program.
22  BY MS. LARKINS:
23    Q. Okay. Were you at a staff meeting when Roger
24  Cunningham came to the -- he was a Comer representative
25  and a retired principal from Chula Vista Schools and he

| Page 23 |
| --- |

1  came and talked to the staff about the fact that the SPMT
2  had decided that Kingdoms would continue and instruct the
3  staff on --
4    A. I don't recall that.
5    Q. -- how it should be handled?
6    A. No, I don't recall.
7        MS. ANGELL: I am going to instruct the witness
8  to wait until the question is asked, give me a chance to
9  object to it --
10        THE WITNESS: Okay.
11        MS. ANGELL: -- and refrain from doing head
12  nods, yes or no, because the poor court reporter over
13  there needs to be able to type everything down. And
14  that's also kind of interrupting, you know, even though
15  it doesn't seem like it.
16        THE WITNESS: Yeah. Okay.
17        MS. ANGELL: All right? So I will move to
18  strike the question as actually being testimony, because
19  it wasn't a question.
20        MS. LARKINS: I withdraw the question. Let's
21  see.
22    Q. Are you afraid at this time that I might
23  physically harm you?
24    A. No.
25        MS. LARKINS: I am happy to hear that.

| Page 24 |
| --- |

1        MS. ANGELL: Move to strike Plaintiff's comment
2  after deponent's response to the question.
3  BY MS. LARKINS:
4    Q. Okay. Was there a time when you were afraid
5  that I might physically harm you?
6    A. No.
7    Q. Okay. Do you recall a time at the beginning of
8  a school year when there-was a problem about scheduling
9  my class for library?
10    A. Uh-huh. Yes, I do.
11    Q. Okay. Did you -- what was the name of your aide
12  when you worked in the library?
13    A. Janet Clark.
14    Q. Okay. Do you recall discussing with Janet Clark
15  the problem of scheduling my library time?
16    A. Yes.
17        MS. ANGELL: I am going to ask the witness to
18  pause --
19        THE WITNESS: Okay.
20        MS. ANGELL: -- before answering and give me a
21  chance to object.
22        THE WITNESS: Okay.
23        MS. ANGELL: The question is vague and ambiguous
24  as to time. I think your testimony is that Janet Clark
25  was your aide the entire time that you were --

| Page 25 |
| --- |

1        THE WITNESS: Uh-huh. Uh-huh.
2        MS. ANGELL: -- hold off on answering until I
3  get my question out.
4        THE WITNESS: Okay. Okay.
5        MS. ANGELL: I know it's hard. It's not like
6  normal conversation.
7        THE WITNESS: Yeah. Okay.
8        MS. ANGELL: All right? Is it your testimony
9  that Janet Clark was your library aide the whole time
10  that you worked as a librarian at Castle Park Elementary
11  School?
12        THE WITNESS: She was -- no, she was not my aide
13  the whole time.
14        MS. ANGELL: Okay. Well, then I don't think
15  that she understood your question, Mrs. Larkins. Do you
16  want to clarify that point or should I?
17        MS. LARKINS: I withdraw the question.
18        MS. ANGELL: Okay.
19        MS. LARKINS: Did you have any objections to the
20  question about -- you know what? I am going to reask
21  everything about Janet Clark.
22        MS. ANGELL: Thank you. It was confusing.
23        MS. LARKINS: Okay.
24    Q. Was it only one year when there was a problem
25  with scheduling my class for library time?

7 (Pages 22 to 25)

Larkins v. Werlin, et al.                                    Deposition of Michele Leon-Scharmach
Case No. GIC 781970                                         November 10, 2004

---

**Page 26**

1    A. That's the only year I recall.
2    Q. Okay. During the year where you recall that
3 there was a problem with scheduling my class --
4    A. Uh-huh.
5    Q. -- did you discuss the problem with Janet Clark?
6    A. Yes. We discussed all scheduling problems.
7    Q. Okay. Did I -- rather did my class miss their
8 first lesson of the year that year when there was a
9 problem scheduling my class?
10    A. Yes.
11    Q. Okay. Did Janet Clark tell you that she told me
12 afterward that my class had missed their lesson?
13    MS. ANGELL: Objection. Vague and ambiguous as
14 to time. Did Janet tell her when?
15    MS. LARKINS: Okay. Strike the question. I am
16 trying to figure out how to ask this.
17    Q. Do you know how I found out that my class had
18 missed their library time?
19    A. No.
20    Q. Okay. Do you recall why I wasn't told when my
21 library time was?
22    MS. ANGELL: Objection. Assumes facts not in
23 evidence.
24    MS. LARKINS: Okay.
25    MS. ANGELL: And it's argumentative.

---

**Page 27**

1    MS. LARKINS: Okay. Let me strike that and try
2 again.
3    THE WITNESS: Uh-huh.
4    MS. ANGELL: You could ask her if she told you
5 or directed someone to tell you or something like that.
6 BY MS. LARKINS:
7    Q. Do you know why my class missed their first
8 library lesson that year?
9    A. You weren't on the schedule. The schedule was
10 distributed at the beginning of, you know, that month.
11 And we missed it. We were automating the library. We
12 were just head over heels in data. And so we had made a
13 different decision as to scheduling that year at the
14 very, very first staff meeting. And we had said -- it
15 was the decision of the staff to post the schedule in the
16 lounge and that everybody would sign up on their own that
17 year.
18    Usually I take, you know, a sheet and I go from
19 classroom to classroom. That year, because we were
20 automating, you know, they didn't want to lose a day of
21 my time, which is a lot of time when you're only every
22 other week with me walking around, you know, with a
23 clipboard. So they said, "Just post it in the lounge."
24    And then everybody would write in pencil. And
25 then, if they have team meetings and they want to change

---

**Page 28**

1 or they want a block of time, they would do that within,
2 you know, themselves. And then Jan and I could be
3 working on the automation so we could open as soon as
4 possible.
5    So, it was posted a month, and after a month we
6 took it down, put it into the computer and distributed a
7 schedule to everybody. So, and when we discovered we had
8 missed you, we really did feel bad, but it was at the
9 beginning of a workday. And we had classes back to back
10 to back in the library. And we had written you a little
11 note: "We have got to get together with you and schedule
12 a time. Okay?"
13    Q. I distinctly recall the little note that you
14 wrote. Was the note that you wrote on a small blue
15 paper?
16    A. I don't recall.
17    Q. Okay. Did you not start library classes until a
18 month had passed?
19    A. That's right. We were automating. (Witness
20 nods head.)
21    Q. Okay.
22    A. And the schedule was posted for that month in
23 the lounge. And that was the decision of the staff
24 meeting and of the teachers as a body. And so everybody
25 had a chance and there were lots of changes, you know, to

---

**Page 29**

1 put in the time that was best for them.
2    MS. ANGELL: I am going to ask the witness to
3 please --
4    THE WITNESS: Yes.
5    MS. ANGELL: -- listen to the question that's
6 asked --
7    THE WITNESS: Okay.
8    MS. ANGELL: -- and respond only to the question
9 that's asked, instead of giving an explanatory narrative.
10 If Plaintiff needs some additional information, she is
11 going to ask you for it. Okay?
12    THE WITNESS: Okay.
13 BY MS. LARKINS:
14    Q. Okay. Did I write my name on the schedule?
15    A. No.
16    Q. Are you sure?
17    MS. ANGELL: Objection. Argumentative.
18    THE WITNESS: I am not.
19 BY MS. LARKINS:
20    Q. Okay. When you say that I didn't write my name
21 on the schedule, do you say that with absolute certainty?
22    A. I can't be absolutely certain. I don't have it
23 here.
24    Q. Okay. So you think it's possible that I had
25 written my name and that you had forgotten that fact?

---

8 (Pages 26 to 29)

Larkins v. Werlin, et al.                                          Deposition of Michele Leon-Scharmach
Case No. GIC 781970                                                 November 10, 2004

**Page 30**

1      MR. HERSH: Objection. Calls for speculation.
2      MS. ANGELL: And argumentative.
3  BY MS. LARKINS:
4      Q. Okay. Well, I think I have got the information
5  I need when you say you're not absolutely sure.
6      A. Uh-huh.
7      Q. Okay.
8      MS. ANGELL: Move to strike Plaintiff's comments
9  after the witness' response. No question pending.
10     MS. LARKINS: Okay.
11     Q. Did Jan Clark tell you that she had seen me in
12  the lounge at recess and had directed me to find the note
13  in my mailbox about my library time?
14     MS. ANGELL: Objection. Compound and
15  conjunctive. Do you want to ask one part of it at a time
16  so she can answer?
17     MS. LARKINS: It's not compound and it's not
18  conjunctive.
19     MS. ANGELL: Yes, it is. You asked her did she
20  tell you this and this. You can ask one thing at a
21  time -- "Did she tell you the sky was blue; did she
22  tell you the light was green" -- instead of, "Did she
23  tell you the sky was blue and the light was green?"
24     MS. LARKINS: Please listen carefully,
25  Ms. Angell, to the questions so that we don't waste time

**Page 31**

1  with your making mistaken objections to questions.
2     MS. ANGELL: Can we have the question read back,
3  please?
4     THE REPORTER: "Question: Did Jan Clark tell
5  you that she had seen me in the lounge at recess and had
6  directed me to find the note in my mailbox about my
7  library time?"
8     MS. LARKINS: I stand corrected.
9     Q. Did Jan Clark tell you that she had directed me
10  to find the note in my mailbox about my library time?
11     A. I don't recall.
12     Q. Okay. How many library sessions did my class
13  miss that year?
14     A. One, that I recall, and we made that up.
15     Q. Yes, I believe we made that up in January of
16  2001.
17     MS. ANGELL: Objection as to Plaintiff's
18  testifying on the record. Do not base your responses on
19  anything that Plaintiff tells you.
20     THE WITNESS: Okay.
21     MS. ANGELL: You're here to give your testimony
22  on what you know and remember, not the version of the
23  facts that Plaintiff wants to tell you she thinks
24  occurred.
25     THE WITNESS: Uh-huh. Okay.

**Page 32**

1  BY MS. LARKINS:
2     Q. Did you ever ask Rick Werlin to obtain a
3  restraining order against me?
4     MS. ANGELL: Objection. Seeks to invade
5  attorney-client insofar as it seeks to invade attorney-
6  client privilege. If the issue was discussed during a
7  meeting at which counsel were present, that's not part of
8  your knowledge for purposes of this deposition and you're
9  directed not to respond.
10     THE WITNESS: Okay.
11     MS. ANGELL: So, if you had some sort of
12  conversation with Mr. Werlin other than during meetings
13  with counsel on the issue and other than at the direction
14  of counsel on the issue, then you can respond. But if
15  it's an attorney-client issue, then no response to that.
16     THE WITNESS: Okay.
17  BY MS. LARKINS:
18     Q. Did you ever meet with Rick Werlin to discuss me
19  without any lawyers present?
20     A. Yes.
21     Q. About how many times did you meet with Rick
22  Werlin to discuss me without any lawyers present?
23     A. I don't recall. One or two times.
24     Q. Okay.
25     MS. ANGELL: And I am going to instruct the

**Page 33**

1  witness that with regard to questions that were posed to
2  you or were or were not posed to you by Rick Werlin or
3  anybody --
4     THE WITNESS: Uh-huh.
5     MS. ANGELL: -- insofar as questions were posed
6  to you at the direction of counsel in relation to the
7  litigation brought by Ms. Larkins, you're not to respond.
8     THE WITNESS: Okay.
9     MS. ANGELL: So, do you understand what I am
10  saying?
11     THE WITNESS: I am not sure.
12     MS. ANGELL: Well, attorney-client
13  communications --
14     THE WITNESS: Uh-huh.
15     MS. ANGELL: -- and since Ms. Larkins sued you
16  some time ago in this litigation, although you're no
17  longer a defendant, so any discussions that you had with
18  counsel, but also it's called attorney work product and
19  it's a particular privilege. But an attorney's thoughts
20  and impressions are not available for opposing parties
21  to peruse.
22     THE WITNESS: Uh-huh. Okay.
23     MS. ANGELL: So, if counsel directed questions
24  to be asked of you --
25     THE WITNESS: Uh-huh.

9 (Pages 30 to 33)

Larkins v. Werlin, et al.
Case No. GIC 781970

Deposition of Michele Leon-Scharmach
November 10, 2004

Page 34

1    MS. ANGELL: -- then counsel's thought processes
2  and investigating are not opened for Mrs. Larkins to
3  explore.
4        THE WITNESS: Okay.
5       MS. ANGELL: So, why don't you confine your
6  responses on this to the time before January of 2002 when
7  this litigation started and we will see if that's
8  satisfactory to Mrs. Larkins.
9  BY MS. LARKINS:
10    Q. Okay. So I am only going to be asking you about
11  discussions when there were no lawyers present.
12    A. (Witness nods head.)
13    Q. Okay. Let's strike the last question and I'll
14  try to ask it again. When you met with Richard Werlin to
15  discuss me without any lawyers present, did you ask him
16  to get a restraining order against me?
17    A. No, I did not ask for that. I was concerned.
18       MS. ANGELL: I am going to instruct the witness
19  to answer the question that's asked. You have already
20  answered it, so please stop talking.
21       THE WITNESS: Yeah.
22  BY MS. LARKINS:
23    Q. I was going to ask you anyway. Why did you meet
24  with Rick Werlin regarding me without any lawyers
25  present?

Page 35

1    A. I was not always at the meetings. I had two
2  schools. So, if I missed a meeting that concerned this,
3  this problem where the other teachers were included, then
4  he would come and just inform me of what had happened at
5  that meeting. Okay? Because I was a part of the group
6  and I couldn't be there, because they would not release
7  me from my school.
8        So, it was strictly on an informative kind of
9  thing. You know, "This is what happened at the meeting.
10  Do you have a question?"
11       MS. ANGELL: Do you mean part of the group of
12  people that Mrs. Larkins sued?
13       THE WITNESS: Yes.
14       MS. ANGELL: So these meetings were concerning
15  the litigation?
16       THE WITNESS: Right.
17       MS. ANGELL: All right. I don't want you
18  answering any questions concerning meetings held with
19  lawyers or in relation to comments made by lawyers.
20       THE WITNESS: Okay.
21       MS. ANGELL: All right? That's attorney-client
22  privilege --
23       THE WITNESS: Okay. Okay.
24       MS. ANGELL: -- and attorney work product and
25  you're not to give her that information.

Page 36

1        THE WITNESS: Okay.
2       MS. LARKINS: And, to make this simple, neither
3  do I. I am going to a time before I filed the lawsuit.
4        THE WITNESS: Uh-huh.
5       MS. ANGELL: So you mean January 2002 or
6  previous; is that correct?
7       MS. LARKINS: We can -- let's just confine this
8  to 2001.
9    Q. Before I ever sued anybody, did you meet with
10  Richard Werlin to discuss me without lawyers present?
11    A. I don't recall.
12    Q. Okay. Was there ever a time when you felt I
13  might harm you physically?
14       MS. ANGELL: Objection. Asked and answered.
15  You have already answered the question. You don't need
16  to respond to it multiple times.
17       THE WITNESS: Okay.
18       MS. LARKINS: Okay. Fine.
19       MS. ANGELL: You know what? I think I am wrong.
20  I think your prior question was whether she feared that
21  you would harm her physically. So, I am sorry. This
22  question was whether you felt that she would harm you
23  physically.
24       THE WITNESS: No.
25       MS. LARKINS: I'd like to ask that this document

Page 37

1  be labeled Exhibit 3. And I would like to ask that this
2  exhibit be labeled Exhibit 4.
3        (Exhibits 3 and 4 were marked.)
4       MS. ANGELL: Mrs. Scharmach, have you seen
5  Exhibit 3 before today?
6        THE WITNESS: No. I -- I don't know if I --
7  well, I am not sure.
8       MS. ANGELL: Do you need a break?
9        THE WITNESS: Yeah. Let's break and talk about
10  this a minute.
11       MS. ANGELL: Okay. And I have to go to the
12  bathroom anyway. Excuse me.
13       THE WITNESS: Okay.
14       VIDEOGRAPHER: We remember going off the record.
15  The time is 11:11 a.m.
16        (A recess was taken.)
17       VIDEOGRAPHER: We are going on the record. The
18  time is 11:33 a.m.
19  BY MS. LARKINS:
20    Q. Okay. Let's look back at Exhibits 3 and 4.
21  After having some time to look at them, do they seem
22  familiar to you now?
23    A. I don't remember writing them. It was a long
24  time ago, but what it did do is take me back to the
25  feelings that I felt at the time.

10 (Pages 34 to 37)

Larkins v. Werlin, et al.
Case No. GIC 781970

Deposition of Michele Leon-Scharmach
November 10, 2004

| Page 38 | Page 40 |
|---|---|
| 1   Q. Uh-huh.<br>2   A. And that was, you know, good, because over time<br>3 you forget things and you forget the urgency you might<br>4 have felt at the time. So, I don't remember writing<br>5 them, but I do remember the feelings now that I was<br>6 experiencing at the time.<br>7   Q. Do you now remember that you were afraid that I<br>8 might physically harm you?<br>9   A. I was very uncomfortable with you coming to my<br>10 home. I thought it was inappropriate. And I guess that<br>11 I was uncomfortable with -- you know, I guess maybe I did<br>12 think you might in some way intimidate me. Okay?<br>13   Q. Okay.<br>14   A. In some way intimidate me, yeah.<br>15   Q. And, now that your memory has been refreshed, do<br>16 you recall asking Richard Werlin in a meeting where there<br>17 was no lawyers present to obtain a restraining order<br>18 against me?<br>19   A. I don't remember asking him to do that. No.<br>20   Q. Do you remember discussing with other teachers<br>21 in 2001 the idea of getting a restraining order against<br>22 me?<br>23     MS. ANGELL: And you mean other than<br>24 conversation concerning attorney-client privileged<br>25 meetings and attorney work product, meaning direction | 1     MS. LARKINS: Okay. So, let's say an attorney<br>2 instructed her to discuss Maura Larkins with her fellow<br>3 staff members when the attorney was not present. She<br>4 should not tell me about that; is that your --<br>5     MS. ANGELL: It depends. Why don't you ask a<br>6 specific question and I will evaluate the questions as<br>7 they come.<br>8     MS. LARKINS: Okay. I am going to try to ask<br>9 that last one again.<br>10   Q. Did you ever discuss with other teachers,<br>11 without an attorney present, the idea of asking for a<br>12 restraining order against me?<br>13     MS. ANGELL: If there was such a discussion and<br>14 it was at the direction of counsel and you were acting on<br>15 counsel's direction in doing whatever it was --<br>16     THE WITNESS: Uh-huh.<br>17     MS. ANGELL: -- the things that you're directed<br>18 to do by counsel and conversations with counsel are not<br>19 part of your knowledge for purposes of depositions.<br>20 Okay?<br>21     THE WITNESS: Okay. I think I discussed it<br>22 primarily with Rick Werlin and the counsel.<br>23     MS. ANGELL: And you're not going to discuss<br>24 anything that you talked about with counsel. So --<br>25     THE WITNESS: Okay. |

| Page 39 | Page 41 |
|---|---|
| 1 given by the attorneys?<br>2     MS. LARKINS: Yes.<br>3     MS. ANGELL: So anything that is direction given<br>4 by the attorneys --<br>5     THE WITNESS: Uh-huh.<br>6     MS. ANGELL: -- if you were told to discuss with<br>7 your boss, Mr. Werlin -- I am assuming he was your<br>8 boss -- with Mr. Werlin, or if the attorneys told you to<br>9 do anything, she can't ask about that. So just -- she<br>10 means separate. And, if you can't distinguish whether<br>11 something was done at the direction of counsel or not,<br>12 then don't answer it. Okay?<br>13     THE WITNESS: Okay.<br>14     MS. ANGELL: Do your best, though.<br>15     MS. LARKINS: Are you directing your client to<br>16 simply say, "I can't answer that because of attorney-<br>17 client privilege"?<br>18     MS. ANGELL: I am instructing her that when<br>19 something is attorney-client privileged, as I have<br>20 already said on the record twice or three times now, or<br>21 if things are attorney work product -- and she is not a<br>22 lawyer, so that's hard for her to distinguish, but I<br>23 tried to explain it by saying, if something is being done<br>24 at the direction of counsel, then she is not to respond<br>25 to that question at all. | 1     MS. ANGELL: -- she doesn't get to find out what<br>2 you talked about with counsel. All right?<br>3     THE WITNESS: Okay.<br>4     MS. ANGELL: If you talked with counsel about<br>5 your house being pink, she doesn't get to find out about<br>6 that you discussed the color of your house with counsel.<br>7     THE WITNESS: When this occurred, I called Rick<br>8 right away, the next day.<br>9     MS. ANGELL: When what occurred?<br>10     THE WITNESS: When Maura came to my house,<br>11 because that concerned me. And then in the discussion it<br>12 was suggested that we do this. Okay?<br>13 BY MS. LARKINS:<br>14   Q. Was there an attorney present during this<br>15 discussion?<br>16   A. With Rick?<br>17   Q. (Ms. Larkins nods head.)<br>18   A. Do you know whether Mr. Werlin had<br>19 an attorney in his office while he was talking to you?<br>20     THE WITNESS: I don't know.<br>21     MS. ANGELL: Do you know whether or not<br>22 Mr. Werlin was acting on advice of counsel in discussing<br>23 a restraining order with you?<br>24     THE WITNESS: I don't know.<br>25     MS. ANGELL: Did he tell you that he was acting |

11 (Pages 38 to 41)

Larkins v. Werlin, et al.                                    Deposition of Michele Leon-Scharmach
Case No. GIC 781970                                                        November 10, 2004

| Page 42 |
|---|
1  on advice of counsel concerning a restraining order?
2          THE WITNESS: He got back to me after a day or
3  so.
4          MS. ANGELL: All right. Well, then I am going
5  to instruct you not to answer.
6          THE WITNESS: Okay. Okay.
7  BY MS. LARKINS:
8      Q. Okay. Ms. Scharmach, do you believe that you
9  did write these letters that are in Exhibits 3 and 4?
10     A. I don't recall writing them.
11     Q. Do you believe that Janet Clark may have written
12 them?
13     A. No.
14     Q. Okay.
15         MS. ANGELL: And, by the way, I am renewing my
16 objection that this is all irrelevant to the causes of
17 action here and you're going to get a couple of more
18 minutes on this stuff and then I am going to ask you to
19 move on to something else.
20         MS. LARKINS: Okay. I'd like to ask that these
21 four pages be labeled Exhibit 5.
22         (Exhibit 5 was marked for identification.)
23         MS. ANGELL: Is this big one with the cat on it
24 the first page of Exhibit 5?
25         MS. LARKINS: Yes. Let's call it that.

| Page 43 |
|---|
1          THE WITNESS: I remember this letter.
2  BY MS. LARKINS:
3      Q. Does this four-page document that's labeled as
4  Exhibit 5 look familiar to you?
5      A. Yes. I remember this.
6      Q. Can you tell me when you first became familiar
7  with this document?
8      A. Isn't this a letter that you brought to my home?
9      Q. Uh-huh.
10     A. Uh-huh.
11     Q. Okay. And do you recall that the first page was
12 printed on thick paper, thick stock paper similar to the
13 exhibit that you have now?
14     A. Uh-huh.
15     Q. Okay. Did this -- Page 1 of this exhibit, did
16 you find this threatening?
17     A. No.
18     Q. What did you -- how did you interpret this Page
19 1 of this document --
20         MS. ANGELL: Objection. Vague and ambiguous.
21 BY MS. LARKINS:
22     Q. -- when you first saw it?
23         MS. ANGELL: I don't understand what you mean:
24 How did you interpret it?
25         MS. LARKINS: How did you -- strike my previous

| Page 44 |
|---|
1  question.
2      Q. How did you feel about this document when you
3  first saw it?
4      A. The document or the card?
5      Q. The card.
6      A. Just this?
7      Q. Yes.
8      A. Just this.
9          MS. ANGELL: You mean the day when you showed up
10 at her house and handed it to her?
11         THE WITNESS: Yeah.
12         MS. ANGELL: Is that what you mean?
13         MS. LARKINS: We will get to that in a minute,
14 but --
15         MS. ANGELL: Well, I'm telling you I think the
16 question is vague and I am asking for clarification.
17         MS. LARKINS: Okay. Let's try it again.
18     Q. When did you first see this document?
19     A. When you came to my home and you gave me this
20 document and this letter.
21     Q. Okay. Do you remember looking at the card --
22     A. Uh-huh.
23     Q. -- on that night?
24     A. Uh-huh.
25     Q. What sort of message did you think was intended

| Page 45 |
|---|
1  by me when I gave you this card?
2      A. I didn't know. I was surprised, because to me
3  that's a very friendly greeting. I was surprised, but I
4  wasn't sure what the intent of it was.
5      Q. Did you think that there might be some -- some
6  hidden intent other than a friendly greeting?
7      A. Yes.
8      Q. Okay. And why did you think that?
9          MS. ANGELL: Before you continue responding to
10 that, I want you to have the opportunity to review the
11 text --
12         THE WITNESS: Okay.
13         MS. ANGELL: -- of Pages 2 through 4 of this
14 exhibit, because you're being asked questions about how
15 you felt about it and I didn't see you read it.
16         THE WITNESS: Okay. I need to read it again.
17         MS. ANGELL: And that's going to be my copy. So
18 she didn't bring a copy for me of this little packet,
19 Exhibit 5.
20         THE WITNESS: Uh-huh.
21         MS. ANGELL: Have you finished reviewing it,
22 Ms. Scharmach?
23         THE WITNESS: Uh-huh.
24         MS. ANGELL: Can you pose your next question,
25 Mrs. Larkins? She is done reading it.

12 (Pages 42 to 45)

Larkins v. Werlin, et al.
Case No. GIC 781970

Deposition of Michele Leon-Scharmach
November 10, 2004

---

Page 46

1    MS. LARKINS: Just a second.
2    Q. Okay. Do you recall the first time you read
3  this letter?
4    A. Uh-huh.
5    Q. How did you feel when you read it?
6    A. A little angry, because I didn't agree with your
7  evaluation of the incident. Going back in my thinking, I
8  had great concern, because I thought that there were
9  innuendos that I -- you know, that were hidden underneath
10  the sentences. And I thought, you know, I really need to
11  discuss this with someone and see if I understand what's
12  being discussed here.
13    But mainly I felt that you and I have a
14  different interpretation of what happened that day. I
15  felt that I was surprised by some of your comments, in
16  particular, because it wasn't the way I perceived what
17  happened that day. And the fact that we really did lean
18  over backwards to give you an immediate -- as I remember
19  it, the next week or the week after you had a double
20  library time so that we could, you know, make that time
21  up to your children.
22    So, you know, you were making allegations that
23  were different from my recollection of the incident we
24  had together. Okay? And also the suggestions of my
25  intent, the intent for my actions in this, surprised me,

---

Page 47

1  because they aren't intentions I would have, certainly
2  not towards staff members, you know. So --
3    Q. Okay. Were you surprised when I was removed
4  from my classroom at Castle Park Elementary?
5    MS. ANGELL: Objection. Not relevant. Calls
6  for -- oh, it's an incomplete hypothetical. It assumes
7  facts not in evidence. There is no testimony that this
8  witness knows that you were, quote, removed from your
9  classroom at Castle Park Elementary.
10  BY MS. LARKINS:
11    Q. Did there come a time when you became aware that
12  I had been removed by Rick Werlin from my classroom at
13  Castle Park Elementary?
14    MS. ANGELL: You mean other than in the course
15  of this litigation and through attorney-client privilege
16  and attorney work product conversations and information?
17    MS. LARKINS: Yes.
18    THE WITNESS: Yes.
19  BY MS. LARKINS:
20    Q. Okay. And what did you understand was the
21  reason I had been removed?
22    MS. ANGELL: Other than attorney-client
23  conversations. You understand that she is asking you
24  about stuff that you have not discussed with counsel.
25    THE WITNESS: Okay.

---

Page 48

1    MS. LARKINS: May I clarify this?
2    MS. ANGELL: Please.
3    MS. LARKINS: If she obtained information before
4  she ever met any lawyers in this case and then she
5  discussed this information with the lawyers, are you
6  telling her that she should not -- she is not required by
7  the California law to reveal that information?
8    MS. ANGELL: No.
9    MS. LARKINS: Good.
10    MS. ANGELL: I don't hardly even understand your
11  question. You have no idea when lawyers were first
12  brought in on your case. You're asking this person, who
13  also has no idea when lawyers were first brought in with
14  regard to you, to talk about things that I don't think
15  that she had any knowledge of before she talked with
16  counsel about it. So, I am making sure that you
17  understand that the questions being posed to you always
18  exclude anything that you discussed with counsel.
19  Conversations you had with counsel, information given to
20  you by counsel that you didn't already have, that's not
21  part of your body of knowledge and you will not testify
22  to it today.
23    THE WITNESS: Okay.
24    MS. ANGELL: So, if somebody besides counsel or
25  in the course of defending against this litigation told

---

Page 49

1  you that Mrs. Larkins was removed from her classroom or
2  taken out of her classroom, I think, were her words, or
3  if they told you that the sky was purple, because
4  Ms. Larkins made it that way or, you know, that
5  Ms. Larkins was on sick leave or something like that --
6    THE WITNESS: Uh-huh.
7    MS. ANGELL: -- if it's not something --
8  information given to you by counsel or in defense related
9  to this matter, well, then she can ask you about it.
10  But, if it was given to you by counsel or in relation to
11  defense of this matter, then you're not to answer. It's
12  not part of your body of knowledge.
13    Do you understand that?
14    THE WITNESS: Uh-huh.
15    MS. ANGELL: Okay.
16    MS. LARKINS: Okay. Speaking not as the
17  Plaintiff, but as a person representing myself, I'd like
18  to remind you, Ms. Angell, that your associate, Dan
19  Shinoff, told me in your presence that he became involved
20  in this case on October 4th, 2001.
21    MS. ANGELL: Move to strike. No question
22  pending. Disregard every comment like that made from
23  her. Okay? She is not giving testimony. Don't let her
24  comments guide what you say. You just testify what you
25  know about. Okay?

13 (Pages 46 to 49)

Larkins v. Werlin, et al.
Case No. GIC 781970

Deposition of Michele Leon-Scharmach
November 10, 2004

Page 50

1    THE WITNESS: Okay.
2    MS. LARKINS: I don't think there is any need to
3    strike Ms. Angell's statement that I have no idea when
4    lawyers became involved in this case. We can just leave
5    it there.
6    MS. ANGELL: Move to strike.
7    MS. LARKINS: Okay. You are under oath.
8    MS. ANGELL: Objection. Argumentative.
9    MS. LARKINS: It appears that Ms. Angell is
10   trying to get you to hide information that you are
11   lawfully required to give at this --
12   MS. ANGELL: Objection. Argumentative. If you
13   can't control yourself, we are going to leave. So, if
14   you want to ask questions without being argumentative,
15   please have at it.
16   MS. LARKINS: Okay. Well, that would be
17   interesting if you got up and left.
18   MS. ANGELL: Since you haven't asked a single
19   question yet that's relevant to the allegations in this
20   litigation, your time is running short. So I would
21   suggest that you get to it, that you stop being
22   argumentative with the witness, and that you get to a
23   question that has something to do with the allegations in
24   this case. We have been here for -- well, we got here
25   before you did, but we have been going since about 10:17

Page 51

1    this morning and it's now five till 12:00. So, if you
2    can get to something that's relevant, that would be
3    great.
4    MS. LARKINS: Ms. Angell, it's very, very
5    difficult for me to get to anything that you consider
6    relevant in this case, because you have stated again and
7    again that all events which occurred at Chula Vista
8    Elementary School District are irrelevant to this case.
9    On the other hand, events at Chula Vista
10   Elementary School District constitute my entire argument
11   in this case. My presentation to the jury in this case
12   will involve almost entirely events which occurred at
13   Chula Vista Elementary School District.
14   I think it would be very exciting if you got up
15   and left, but I think it's an empty threat and I think
16   you're just trying to intimidate me, because I am an in
17   pro per plaintiff.
18   MS. ANGELL: Move to strike. No question
19   pending. If you have a question for the witness, please
20   ask it. And, if you don't have a question, let me know
21   and we will leave.
22   MS. LARKINS: I have many, many questions
23   for this witness.
24   MS. ANGELL: Well, then please proceed with
25   questioning the witness about something that has

Page 52

1    something to do with some allegation in the complaint,
2    please, not dismissed allegations, not things that have
3    already been dismissed on demurrer.
4    We have allegations of Labor Code violations,
5    conspiracy to slander and intentional infliction of
6    emotional distress related to a grand jury subpoena.
7    That's it. So, can we please get to something that's
8    relevant?
9    And the witness is directed that, again,
10   comments made by Mrs. Larkins -- just pretend that it's
11   white noise. I mean, anything she is telling me has
12   nothing to do with your testimony. Okay?
13   THE WITNESS: Okay.
14   BY MS. LARKINS:
15   Q. Before lawyers were involved in this case --
16   A. Uh-huh. Uh-huh.
17   Q. -- did you learn why I had been taken out of my
18   classroom?
19   MS. ANGELL: Objection. Lacks foundation.
20   Would you like to ask her if she knows when lawyers
21   became involved in this case and what "this case" is?
22   Because I think you're talking about your dismissal, in
23   addition to this litigation. And I don't know that this
24   witness has any information about when lawyers became
25   involved in your dismissal.

Page 53

1    MS. LARKINS: Okay.
2    MS. ANGELL: And I also don't know whether this
3    witness has any information concerning when lawyers got
4    involved in this case. I mean I know she was a defendant
5    at some point. You can ask her those questions to lay a
6    foundation, if you'd like.
7    MS. LARKINS: Okay. I am going to try again.
8    Q. Before you ever spoke to a lawyer about me, did
9    anyone tell you why I had been taken out of my classroom?
10   A. I don't recall. I don't recall. (Witness
11   shakes head.) I was at two schools. And I came back and
12   you weren't there, as I recall.
13   Q. Okay. You said that when I brought this card
14   and letter to you --
15   A. Uh-huh.
16   Q. -- that you were surprised to see me.
17   A. Uh-huh.
18   Q. Is that because you thought that perhaps I had
19   died?
20   A. No. Because we were involved in a litigation
21   and I was surprised to see you there. You know, I
22   thought that, um, that was an unusual circumstance.
23   Q. Okay. Tell me about what you mean by saying,
24   "We were involved in a litigation."
25   A. Well, there was a lawsuit pending, wasn't there?

14 (Pages 50 to 53)

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

```
                                    *
MAURA LARKINS,                      *
                                    *
          Plaintiff,                *
                                    *
     vs.                            *  Case No. GIC 781970
                                    *
RICHARD T. WERLIN, etc.,            *
et al.,                             *
                                    *
          Defendants.               *
                                    *
```

DEPOSITION OF RICHARD DENMON

Taken at San Diego, California

November 30, 2004

T. A. Martin, CSR

Certificate No. 3613

Larkins v. Werlin                                                        Deposition of Richard Denmon
GIC 781970                                                               November 30, 2004

---

**Page 2**

```
 1
 2                    I-N-D-E-X
 3    DEPOSITION OF RICHARD DENMON            PAGE
        November 30, 2004
 4
        Examination by Ms. Larkins        5
 5
        Examination by Ms. Angell        90
 6
 7    EXHIBITS:                    PAGE
 8    1  Two-page handwritten document      55
 9
10
      RECORD MARKED AT THE REQUEST OF MS. ANGELL   LINE/PAGE
11                  16  35
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1          DEPOSITION OF RICHARD DENMON
 2       Pursuant to Notice to Take Deposition, and on
 3    the 30th day of November, 2004, commencing at the hour of
 4    10:00 o'clock a.m., at 319 Elm Street, Suite 100, in the
 5    City and County of San Diego, State of California, before
 6    me, T. A. Martin, Certified Shorthand Reporter in and for
 7    the State of California, personally appeared:
 8              RICHARD DENMON,
 9    who, called as a witness by the Plaintiff, being by me
10    first duly sworn, was thereupon examined as a witness in
11    said cause.
12
              APPEARANCES
13
14    For the Plaintiff:   MAURA LARKINS
                      1935 Autocross Court
15                    El Cajon, California  92109
                      (In Propria Persona)
16
17    For Chula Vista    CALIFORNIA TEACHERS ASSOCIATION
      Educators, California  By:  MICHAEL HERSH
18    Teachers Association,  11745 East Telegraph Road
      Virginia Boyd and    Post Office Box 2153
19    Timothy O'Neil:     Santa Fe Springs, California 90670
                      (Appearing telephonically.)
20
21    For Robin Donlan    STUTZ, ARTIANO, SHINOFF & HOLTZ
      and Linda Watson:   By:  KELLY R. ANGELL
22                    401 West "A" Street, 15th Floor
                      San Diego, California  92101
23
24    Videographer:     Gregg Eisman, Videographics
25
```

---

**Page 4**

```
 1          (Reporter's note:  Reporter's clock was out of
 2    sync with video; time stamping codes reveal one hour
 3    earlier than actual time.)
 4          VIDEOGRAPHER:  This is the video deposition of
 5    Richard Denmon, being taken on behalf of the plaintiff in
 6    the matter of Maura Larkins versus Richard T. Werlin,
 7    etcetera, et al., San Diego Superior Court Case No. GIC
 8    781970.  This deposition is being held in the office of
 9    San Diego Court Reporting, located at 319 Elm Street,
10    Suite 100, San Diego, California.  Today is Tuesday,
11    November 30, 2004, and the time is now 10:21 a.m.
12          My name is Gregg Eisman.  I'm a Legal Video
13    Specialist with Videographics, located at 1903 30th
14    Street, San Diego, California.  The Certified Shorthand
15    Reporter is Tadzia Martin of San Diego Court Reporting.
16          For the video record, would counsel please state
17    their appearances.
18          MS. LARKINS:  Maura Larkins, plaintiff in pro
19    per.
20          MS. ANGELL:  Kelly Angell for Robin Donlan and
21    Linda Watson.
22          MR. HERSH:  Michael Hersh for the Chula Vista
23    Educators, California Teachers Association, Gina Boyd and
24    Tim O'Neil.
25          VIDEOGRAPHER:  Would the reporter please swear
```

---

**Page 5**

```
 1    the witness.
 2          (Whereupon, the witness was duly sworn.)
 3
 4    EXAMINATION BY MS. LARKINS:
 5      Q.  Good morning, Mr. Denmon.
 6      A.  Good morning.
 7      Q.  You look like you're feeling well, but I need to
 8    ask you anyway.  Are you feeling well today?
 9      A.  Yes, I am.
10      Q.  Can you think of any reason why you couldn't
11    give your best testimony today?
12      A.  No.
13      Q.  Could you state for the record where you are
14    employed?
15      A.  With the Chula Vista Elementary School District.
16      Q.  And what is your position there?
17      A.  Certificated teacher.
18      Q.  And where do you work?
19      A.  As a substitute.
20      Q.  Okay.  But you're not receiving a substitute's
21    pay, are you?  Are you receiving your full salary?
22      A.  Yes, I am.
23      Q.  Okay.  And where -- what school were you working
24    at before you became a substitute?
25      A.  Castle Park.
```

---

2 (Pages 2 to 5)

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

Page 6

1    Q. Okay. And can you tell me what was the time
2  frame where you were working at Castle Park?
3    A. I believe it was 19 -- 1996 through 2004.
4    Q. Okay. Do you have a clear memory of a time when
5  I was working at Castle Park?
6    A. I remember when you worked at Castle Park
7  School, yes.
8    Q. Do you have a clear memory of the time when I
9  left Castle Park School?
10    A. I have a memory of you leaving Castle Park
11  School, yes.
12    Q. What do you remember about that?
13    MS. ANGELL: Objection. Vague and ambiguous.
14  BY MS. LARKINS:
15    Q. Well, what did you mean when you said I have a
16  memory of you leaving Castle Park School?
17    A. That I remember there was a time when you were
18  no longer there.
19    Q. Did somebody tell you that I was no longer
20  there?
21    MS. ANGELL: Objection. Vague and ambiguous.
22  BY MS. LARKINS:
23    Q. What made you realize that I was no longer
24  there?
25    MS. ANGELL: At -- teaching at Castle Park?

Page 7

1    MS. LARKINS: Yes.
2    THE WITNESS: I didn't see you at school.
3    MS. LARKINS: Okay.
4    Q. Where you at all curious when you stopped seeing
5  me at school as to why you were not seeing me at school
6  anymore?
7    A. No.
8    Q. Was I a member of your grade level teaming?
9    A. Yes.
10    Q. And was I replaced by a substitute who didn't
11  have a teaching credential or any teaching experience
12  named Sharon Frank?
13    MS. ANGELL: Objection. Vague and ambiguous as
14  to the term "replace," and I think it may be calling for
15  a legal conclusion, but insofar as you're just talking
16  about whether a body was there --
17    MS. LARKINS: Right.
18    MS. ANGELL: -- if you know the answer, tell
19  her --
20    THE WITNESS: Yes, there was a substitute there.
21  BY MS. LARKINS:
22    Q. And do you remember Sharon Frank being the
23  substitute?
24    A. She was one of many, yes.
25    Q. One of many. Do you remember any of the others?

Page 8

1    MS. ANGELL: Objection. Vague and ambiguous as
2  to time. Do you mean any other substitutes who
3  substituted in the third grade bilingual classroom during
4  the 2001 school year?
5    MS. LARKINS: No. I mean after I stopped
6  working at Castle Park.
7    MS. ANGELL: Do you mean for the three years
8  since you haven't been working there? Vague and
9  ambiguous as to time. Over broad.
10    MS. LARKINS: Well, that is an interesting
11  question.
12    Q. Do you recall that I stopped working at Castle
13  Park during the middle of a school year?
14    A. Yes.
15    Q. Okay. And when the next year came around, do
16  you recall who was in my classroom?
17    A. Yes.
18    Q. Who was that?
19    A. Stephanie Pettit.
20    Q. Was she a substitute?
21    A. No, she wasn't.
22    Q. So if I were to ask you who were the substitutes
23  in my classroom after I left, it would just be for that
24  half-year period from the middle of the year when I left
25  until the end of the year, correct?

Page 9

1    A. Yes.
2    Q. Okay. Who were the substitutes that you
3  remember during that period?
4    A. Sharon Frank. I believe there was a
5  gentleman -- I don't remember his name.
6    Q. Maybe Flores?
7    A. I don't remember. And Mrs. Ornelas -- Ornelias,
8  I think.
9    Q. Sandra Ornelas?
10    A. That's probably it.
11    Q. Okay. When there is all these substitutes in my
12  place, that didn't arouse any interest on your part?
13    A. What do you mean?
14    Q. Well, the teacher -- your teammate is gone and
15  all these substitutes are in her place, and you weren't
16  interested as to why I was gone?
17    MS. ANGELL: Objection. Argumentative and
18  misstates the testimony. Mr. Denmon testified that there
19  were three substitutes, so the objection is to the
20  characterization of all these substitutes.
21    MS. LARKINS: Well, I think Mr. Denmon was the
22  one who said there was a lot of them.
23    Q. However many substitutes there were, did it
24  arouse your interest as to why there were substitutes
25  instead of the regular teacher in my classroom?

3 (Pages 6 to 9)

Larkins v. Werlin                                         Deposition of Richard Denmon
GIC 781970                                                November 30, 2004

Page 10

1      A. Not particularly.
2      Q. Uh-huh.
3      MS. ANGELL: I would respectfully ask that the
4  plaintiff please refrain from making comments such as
5  "uh-huh," "oh, really," bursting out in laughter -- that
6  kind of thing -- which has already happened I think three
7  times so far this morning after answers by the witness,
8  because I perceive it to be an attempt to harass or
9  intimidate the witness. So if you wouldn't mind just
10  limiting that, that would be great.
11      MS. LARKINS: Okay. I'll try, but it's kind of
12  hard. You know, saying "hum" and "uh-huh" is kind of a
13  reflex response to respond when somebody says something,
14  and I think it's usually really not carefully thought
15  out, oh, I'm going to say "uh-huh." So I can't guarantee
16  that I won't be saying something like that again.
17      Q. Mr. Denmon, did you want to have me removed from
18  my classroom?
19      MS. ANGELL: Objection. Vague and ambiguous as
20  to time, not reasonably calculated to lead to the
21  discovery of admissible evidence.
22      MS. LARKINS: You may answer.
23      THE WITNESS: No.
24      MS. ANGELL: Vague and ambiguous as to time.
25  For what time period is the question referring?

Page 11

1  BY MS. LARKINS:
2      Q. Did you ever have a desire to see me removed
3  from my classroom?
4      A. No.
5      Q. Did you ever make a report to Werlin, Rick
6  Werlin, the assistant superintendent, that you were --
7  you had problems with me?
8      MS. ANGELL: Vague and ambiguous.
9      THE WITNESS: I shared concerns about things
10  that had come up, yes.
11  BY MS. LARKINS:
12      Q. Okay. Now, how did you come to be sharing
13  concerns about me with the assistant superintendent?
14      A. I was called in to a meeting with him.
15      Q. And where was this meeting?
16      A. I believe it was at Castle Park.
17      Q. Do you recall in what room?
18      A. Probably the office.
19      Q. And do you recall who else was there?
20      A. No, I don't.
21      MS. ANGELL: I'm just going to interrupt and ask
22  that the witness not guess.
23      THE WITNESS: Okay.
24      MS. ANGELL: You said probably the office. So
25  if you know, please respond with what you know, and when

Page 12

1  you don't know, say you don't know.
2      THE WITNESS: Okay.
3      MS. ANGELL: Thank you.
4  BY MS. LARKINS:
5      Q. Can you remember the names of the other people
6  who were there?
7      MS. ANGELL: At the first meeting that
8  Mr. Denmon attended with assistant superintendent Rick
9  Werlin concerning you during 2001?
10      MS. LARKINS: Well, I don't want to say that.
11  That would be assuming facts that are not in evidence.
12      MS. ANGELL: Well, then your question I'm
13  objecting to on the basis that it's vague and ambiguous.
14      MS. LARKINS: Well, I'm not the one that said
15  the first meeting. You're the one that said the first
16  meeting. I think before we ask him about the first
17  meeting, we should make sure there was more than one
18  meeting.
19      Q. Mr. Denmon, was there more than one meeting
20  between you and Mr. Werlin?
21      A. Yes.
22      Q. Now, this meeting that you're thinking of --
23  well, about how many meetings were there between you and
24  Mr. Werlin?
25      MS. ANGELL: Objection. Vague and ambiguous as

Page 13

1  to time. This is an employee of the school district. He
2  could have bumped into, had discussions with Mr. Werlin
3  over -- I don't know how many years he's been a district
4  employee. Please narrow it down a little.
5      MS. LARKINS: Sure. I can do that.
6      Q. How many times -- how many meetings did you have
7  with Mr. Werlin about me?
8      A. I'm not sure.
9      Q. Was it more like one or more like ten?
10      A. Not one, not ten.
11      Q. Okay. Can you -- could you say that it was
12  closer to two or closer to nine?
13      A. I don't remember how many meetings I had.
14      Q. So it was either two, three, four, five, six,
15  seven, eight or nine?
16      A. It could have been. I don't remember.
17      Q. Okay. Fine. When was the first one?
18      A. I don't remember exactly when the first meeting
19  was.
20      Q. Okay. Why did you happen to be called in to a
21  meeting with Mr. Werlin?
22      MS. ANGELL: Objection. Calls for speculation.
23  Unless Mr. Werlin told you why you had been -- why he
24  called you in. She's asking you that.
25      MS. LARKINS: Let me say it that way.

4 (Pages 10 to 13)

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

---

Page 14

1    Q. Did Mr. Werlin tell you why he had called you
2  in?
3    A. Yes.
4    Q. What did he say?
5    A. He was disturbed about some of the events that
6  had taken place.
7    Q. Okay. And he felt they involved you?
8    MS. ANGELL: Objection. Calls for speculation.
9  If you could ask the question in the form of did he tell
10  you.
11    MS. LARKINS: Yes.
12    Q. Did he say that he thought the events involved
13  you?
14    A. No, not that I recall.
15    Q. So you have no idea why it was you he called in?
16    MS. ANGELL: Objection. Argumentative.
17    MS. LARKINS: Okay. I can rephrase it.
18    Q. Do you have any idea why it was that he
19  called in?
20    MS. ANGELL: Objection. Calls for speculation.
21    MS. LARKINS: No. I'm just trying to find out
22  if he has an idea.
23    Q. Do you have -- do you have any thought about why
24  it was?
25    MS. ANGELL: Objection. Calls for speculation.

Page 15

1  If you'll ask the witness whether he was told why it was
2  him versus other teachers he was called in, that is
3  different and isn't calling for speculation.
4    MS. LARKINS: Okay. Let's skip that.
5    Q. Do you recall one meeting with Mr. Werlin that
6  took place when you and some other teachers were sitting
7  in the teachers' lounge and Gretchen came in and asked
8  you to come in to the principal's office and discuss me?
9    MS. ANGELL: Objection. Vague and ambiguous,
10  compound question, assumes facts not in evidence.
11  Perhaps you could ask him to list the meetings that he
12  remembers or something like that instead of, you know,
13  kind of trying to testify to a whole bunch of things for
14  him in a question.
15    MS. LARKINS: Let me just try to rephrase it.
16    Q. Do you recall any time when you were sitting in
17  the teachers' lounge and Gretchen came in -- this is --
18  you know, before I ask that, let me ask this.
19    Do you recall that I was taken out of my
20  classroom for a while, then I came back to work for about
21  a week, and then was taken out again?
22    MS. ANGELL: Objection as to characterization of
23  "taken out of my classroom." Vague and ambiguous, calls
24  for speculation.
25    If you're asking him did he see you there and

Page 16

1  not there -- I don't really understand what your question
2  is. Are you asking him for a conclusion as why you were
3  not there or whether or not you were present? Do you see
4  my confusion?
5    MS. LARKINS: I understand exactly where you're
6  coming from, Kelly. I'm going to have to look for an
7  exhibit here that I think will help on this. We are
8  going to have to come back to this.
9    Q. Mr. Denmon, did you ever say to anybody that you
10  liked Gretchen Donndelinger being principal because you
11  could intimidate her into doing what you wanted?
12    A. No.
13    Q. Okay. Mr. Denmon, in September of 1998, did
14  Gretchen Donndelinger instruct you to team -- instruct
15  you to start teaming with my bilingual classroom?
16    MS. ANGELL: Objection. This line of
17  questioning is not reasonably calculated to lead to the
18  discovery of admissible evidence. We are here today on
19  allegations concerning activities in September -- or
20  September of 2000 through, I think, December of 2002
21  related to records of arrest, and questioning this
22  witness concerning whether as a school teacher he
23  teamed -- was instructed by a principal to team with
24  you --
25    MR. HERSH: I join in that --

Page 17

1    MS. ANGELL: -- three years prior is not
2  relevant, nor reasonably calculated to lead to the
3  discovery of admissible evidence, and I would
4  respectfully request that you ask questions related to
5  this litigation.
6    MR. HERSH: I join in that objection.
7    MS. LARKINS: Okay. Ms. Angell, would you be
8  willing to stipulate that such matters are outside the
9  scope of discovery in this case?
10    MS. LARKINS: I am willing to stipulate that all
11  of your questions today, other than questions concerning
12  the allegations made in your complaint, are not relevant.
13    MS. LARKINS: How about questions when you're
14  doing the deposition of me?
15    MS. ANGELL: If you have objections to questions
16  that I asked during your deposition, you feel free to
17  have an attorney there or act as your own attorney and
18  make your objections for the record. This is the
19  deposition of Rick Denmon.
20    MS. LARKINS: Okay. Well, I think that your
21  objection is simply an attempt to prevent evidence from
22  being revealed in this case, because you questioned me
23  about events at Castle Park School. You wanted to know
24  who said what about what, and now suddenly when I'm not
25  the witness all of a sudden these things are outside the

5 (Pages 14 to 17)

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

---

Page 18

1  scope of discovery.
2       But I will be willing to have this be a standing
3  objection today. I will stipulate that this can be a
4  standing objection to all of the questions I ask today,
5  and perhaps that way you won't have to repeat it so many
6  times.
7       Mr. Hersh, would you be willing to stipulate to
8  that standing objection?
9       MS. ANGELL: The standing objection being that
10 each and every question is not reasonably calculated to
11 lead to the discovery of admissible evidence in this
12 case?
13      MS. LARKINS: Yes.
14      MR. HERSH: Yes.
15      MS. ANGELL: So stipulated.
16      MS. LARKINS: Okay. So now you don't have to
17 say that quite so many times.
18      MS. ANGELL: Even though your questions are not
19 relevant, we are here to provide deposition testimony.
20 So even though the questions, almost all of them, are not
21 relevant, as I have been doing with other witnesses, I'll
22 provide you with latitude to see if you can establish how
23 anything is relevant. But there will come a point in
24 time -- there may come a point in time at which I'll
25 instruct the witness that he doesn't have to continue

---

Page 19

1  answering irrelevant questions.
2       MS. LARKINS: Fine. And at that point I will
3  suspend the deposition and seek an order to compel
4  testimony.
5       Q. Okay. Do you remember the question?
6       A. No.
7       Q. I wouldn't expect you to. Okay. That's why it
8  helps to have a standing objection. Then that doesn't
9  have to interfere between the question and the answer.
10      In September of 1998, did Gretchen Donndelinger
11 instruct you to begin to allow the bilingual classroom
12 third grade level to team with your classroom and the
13 other third grade classrooms?
14      A. At some point we were instructed to team, yes.
15      Q. And what did you do at that point?
16      MS. ANGELL: Objection. Vague and ambiguous.
17 BY MS. LARKINS:
18      Q. Did you tell -- question withdrawn.
19      Did you outright refuse when Gretchen
20 Donndelinger asked you to do this?
21      A. No.
22      Q. Are you perhaps confused between 1998 and 1999?
23      MS. ANGELL: Objection. Argumentative.
24 BY MS. LARKINS:
25      Q. Okay. Now, in 1999, you began teaming with my

---

Page 20

1  class. You allowed my 100 percent Hispanic class to team
2  with English-only classes so that they weren't spending
3  their entire classroom time in a classroom that was
4  grossly in violation of the Civil Rights Act. In 1999,
5  after -- shortly into the year, you did begin to allow my
6  class to be integrated.
7       MS. ANGELL: Objection. Move to strike. No
8  question pending. And I'll direct the witness to
9  disregard plaintiff's attempt to inform you as to what
10 happened. What we're here for today is for plaintiff to
11 ask you questions about what you know, what you saw, what
12 you did, what you remember. So please disregard her
13 attempt to testify for you and tell you what happened.
14 Okay.
15 BY MS. LARKINS:
16      Q. Do you recall a time when you refused to team
17 with my classroom?
18      A. No.
19      Q. Do you have a clear memory of when I arrived at
20 Castle Park Elementary School?
21      A. I believe it was after the remodel.
22      Q. Yes, it was.
23      MS. ANGELL: Objection. Move to strike
24 plaintiff's comments, everything after "remodel."
25      Please disregard comments made to you by

---

Page 21

1  Mrs. Larkins when she's trying to confirm, deny, tell you
2  what went on, and just testify as to what you know
3  without being influenced by her comments. Okay.
4       MS. LARKINS: I'm sorry. Is "um" also an
5  attempt to harass the witness, or is it just "uh-huh"
6  that is an attempt to harass the witness? I need to know
7  so I don't harass the witness.
8       MS. ANGELL: Mrs. Larkins, your sarcasm is not
9  well taken, and I would ask that you please redirect your
10 attention to asking the witness questions about what he
11 knows.
12      MS. LARKINS: Well, since you call it sarcasm, I
13 believe you mean that the idea that "um" would be
14 harassment is ridiculous, so I will assume that I'm not
15 harassing the witness when I say "um." I'm only
16 harassing the witness when I say "uh-huh."
17      Q. Did you pointedly refuse to speak to me when I
18 first arrived at Castle Park Elementary School?
19      A. No.
20      Q. Did you and I ever become friends?
21      A. We were friendly.
22      Q. Did you and I ever have a meaningful discussion
23 about anything?
24      MS. ANGELL: Objection. Vague and ambiguous.
25      MS. LARKINS: You may answer the question if you

---

6 (Pages 18 to 21)

Page 22

1  can.
2      THE WITNESS: In regards to curriculum or
3  whatnot, I would assume we had, but specifically I don't
4  recall.
5  BY MS. LARKINS:
6      Q. And would you assume that such discussions would
7  have taken place in a meeting?
8      MS. ANGELL: Objection. Calls for speculation.
9  Plaintiff is not entitled to your guesses. She's
10 entitled to your memory, your testimony about what you
11 did, saw, heard, what you know, but not guesses. So if
12 you can restrict yourself to not guessing -- I know
13 sometimes it's hard, but don't guess.
14 BY MS. LARKINS:
15     Q. Do you believe that any of these discussions
16 happened outside of a meeting?
17     MS. ANGELL: Objection. Calls for speculation.
18     MS. LARKINS: No. I'm asking what he believes.
19     MS. ANGELL: It's the same thing. You're asking
20 him for speculation. What do you believe; what do you --
21 you know, it's the same thing. Do you remember. That is
22 different.
23     MS. LARKINS: Okay. Thank you. That is a good
24 suggestion.
25     Q. Do you remember any such discussion that

Page 23

1  happened outside of a meeting?
2      MS. ANGELL: Objection. Vague and ambiguous.
3  What such discussion? You mean discussion concerning
4  curriculum, school curriculum?
5      MS. LARKINS: Yes.
6      THE WITNESS: Not that I recall.
7      MS. LARKINS: Neither do I.
8      MS. ANGELL: Objection. Move to strike.
9  That, Mrs. Larkins, is your attempt to
10 intimidate and harass the witness, and I would ask that
11 you refrain from making commentary after his responses.
12 BY MS. LARKINS:
13     Q. Did you ever have any personal discussion with
14 me about our relationship?
15     MS. ANGELL: Objection. Vague and ambiguous.
16     MS. LARKINS: Answer it if you can.
17     THE WITNESS: No.
18 BY MS. LARKINS:
19     Q. Did you tell Rick Werlin that you had?
20     A. No.
21     Q. Did you ever make any attempt to speak to me
22 directly about any problems you had with me?
23     A. I shared my concerns at our grade level
24 meetings.
25     Q. So -- did you ever make any attempt to talk to

Page 24

1  me about any problem you had with me outside of the grade
2  level meeting?
3      A. Not that I recall.
4      Q. Can you think of any reason why Linda Watson
5  would say that you were always coming to her and asking
6  her to go with you to the principal to make some kind of
7  a negative report about Maura?
8      MS. ANGELL: Objection. Calls for speculation.
9  And it's compound.
10     If you can answer the question without guessing
11 and you understand the question --
12     THE WITNESS: Can you restate the question?
13     MS. LARKINS: Yeah. And I can replace the "and"
14 with a "to," and then it wouldn't be compound.
15     Q. Can you think of any reason why Linda Watson
16 would say that you were always coming to her to ask her
17 to go with you to the principal to report about something
18 you didn't like about me?
19     MS. ANGELL. Objection. It calls for
20 speculation. Asking the witness can you think of any
21 reason is different from saying what do you know about,
22 did so-and-so tell you. So that's the basis of the
23 objection. It's continuing to call for speculation.
24     MS. LARKINS: Can you answer the question?
25     THE WITNESS: Can you restate it?

Page 25

1      MS. LARKINS: Yes, I can. And this will be even
2  better this time. Okay. I won't say can you think of
3  any reason.
4      Q. Do you know of any reason why Linda Watson would
5  say that you were always coming to her to ask her to go
6  with you to the principal to make a report about
7  something you didn't like about me?
8      A. No, not to make a report about something I
9  didn't like about you.
10     Q. Okay. Do you think she might have said such a
11 thing -- is there some other reason why she might have
12 said that you were always coming to her to ask her to go
13 with you to the principal to talk about me?
14     MS. ANGELL: Objection. Compound, and it --
15 read the question back. It's like several questions
16 there.
17     MS. LARKINS: Let me try it again. I know where
18 I have to put the word "to" instead of the word "and."
19 Okay. I think I can do this.
20     Q. Do you know of any reason why Linda Watson said
21 that you were always coming to her to ask her to go to
22 the principal with you to talk about me?
23     MS. ANGELL: Assumes facts not in evidence.
24     If you don't know, you don't know.
25     THE WITNESS: No, I don't know.

7 (Pages 22 to 25)

|  | Page 26 |
|---|---|

1  BY MS. LARKINS:
2      Q.  Okay.  Okay.  Did you frequently talk to
3  Gretchen Donndelinger about me?
4      MS. ANGELL:  Objection.  Vague and ambiguous as
5  to time.
6      MS. LARKINS:  During the time I was working at
7  Castle Park Elementary School.
8      MS. ANGELL:  Can you state the whole question so
9  the witness knows what he's answering?
10      MS. LARKINS:  Uh-huh.  If I can remember it.
11      Q.  Did you frequently talk to Gretchen Donndelinger
12  about me during the time I was working at Castle Park
13  Elementary School?
14      A.  Not frequently.
15      Q.  About how often did you speak to Gretchen
16  Donndelinger about me?
17      A.  I don't recall.
18      Q.  Okay.  Did you -- when you spoke to Gretchen
19  Donndelinger about me, was it to tell about something you
20  were concerned about?
21      MS. ANGELL:  Objection.  Vague and ambiguous.
22      MS. LARKINS:  You may answer.
23      THE WITNESS:  Could you restate the question?
24  BY MS. LARKINS:
25      Q.  When you spoke to Gretchen Donndelinger about

|  | Page 27 |
|---|---|

1  me, was it to tell her about something you were concerned
2  about?
3      A.  Yes.
4      Q.  Okay.  Do you recall one of your meetings with
5  Rick Werlin -- there is no "d" on the end of that -- in
6  which you and several other teachers were in Gretchen
7  Donndelinger's office talking about me when I knocked on
8  the door?
9      A.  No.
10      Q.  Do you recall a meeting in Gretchen
11  Donndelinger's office when you and several other teachers
12  hid behind the door?
13      A.  No.
14      Q.  How could you forget a thing like that?
15      MS. ANGELL:  Objection.  Move to strike.
16      Mrs. Larkins, if you can't control yourself from
17  making comments and attempting to harass and intimidate
18  this witness, we will leave and seek a protective order.
19  So I would respectfully request that you please stop from
20  the comments and pose questions to this witness without
21  commenting back to him indicating your opinion of the
22  testimony.
23      MS. LARKINS:  Okay.  Ms. Angell, I would like to
24  caution you that while making smart cracks might not be
25  the most Kosher thing to do during a deposition, perjury

|  | Page 28 |
|---|---|

1  is a far more serious offense.  Supplying the perjury is
2  very serious.
3      MS. ANGELL:  This is a continuing attempt by you
4  to intimidate this witness, and I would request that if
5  you have comments for me, that you excuse the witness and
6  you can say whatever you want to me.  This is to depose
7  Mr. Denmon about what he knows concerning the allegations
8  in your complaint, not for you to threaten me and lecture
9  me about what you think is perjury and what you think is
10  not.  Mrs. Larkins, just because people don't testify to
11  what you think they should, because your allegations
12  never happened, does not mean that there was perjury.
13  This stuff never happened.  Your litigation is frivolous.
14      MS. LARKINS:  You think that any teacher that
15  sits here and says something that you don't want them to
16  say is violating attorney-client privilege.
17      MS. ANGELL:  You have no idea what I think.
18      MS. LARKINS:  You have made it very clear in
19  deposition after deposition that you think that if
20  somebody in your office told somebody at Castle Park to
21  discuss something with the other teachers in Castle Park,
22  that all those discussions between employees of Chula
23  Vista Elementary School District with no lawyer present
24  are covered by attorney-client privilege, and you have
25  said that in depositions.  It's on the record,

|  | Page 29 |
|---|---|

1  Ms. Angell.
2      MS. ANGELL:  Please disregard all of
3  Mrs. Larkins' comments.  These are not questions for you.
4  She doesn't get to testify today and she doesn't inform
5  your knowledge of what is going on.  Just remember that
6  you're here to testify to what you know.  Okay?
7  BY MS. LARKINS:
8      Q.  Mr. Denmon, did you discuss your testimony here
9  today with anyone other than Ms. Angell?
10      MS. ANGELL:  Vague and ambiguous.  Seeks to
11  invade attorney-client privilege.
12      MS. LARKINS:  It specifically avoids
13  attorney-client privilege.
14      MS. ANGELL:  I'm not the only attorney in the
15  world.
16      MS. LARKINS:  I stand corrected.
17      Q.  Did you discuss your testimony here today with
18  anyone other than an attorney?
19      MS. ANGELL:  Objection.  Vague and ambiguous.
20      MS. LARKINS:  You may answer.
21      THE WITNESS:  No.  I haven't given the testimony
22  up until now.
23  BY MS. LARKINS:
24      Q.  I mean did you discuss what might happen in this
25  deposition and -- let me just say it this way.  Did you

8 (Pages 26 to 29)

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

---

Page 30

1    talk to Peggy Myers yesterday or today?
2        A. I talked to Peggy yesterday.
3        Q. Did you talk to Peggy after her deposition?
4        A. Yes, I did.
5        Q. Okay. So let me try the question again. Did
6    you discuss your testimony here today with anyone other
7    than an attorney?
8        MS. ANGELL: Asked and answered. He stated that
9    he --
10       MS. LARKINS: It's a different question.
11       MS. ANGELL: No, it's not. He stated he has not
12   given the testimony yet. You said did you discuss your
13   testimony here today with anyone other than an attorney.
14   That's the question you just posed. It's the same thing
15   you previously said when he said he hadn't given the
16   testimony yet.
17       MS. LARKINS: Then that is a nonresponsive
18   answer. The question definitely needs to be asked again.
19       MS. ANGELL: He's already answered. You can
20   pose it as many times as you want, but he's already
21   answered the question.
22       MS. LARKINS: No, he has not. He did say he
23   talked to Peggy Myers last night.
24       MS. ANGELL: He didn't say he talked to Peggy
25   Myers about his testimony today. He said that he hadn't

---

Page 31

1    given testimony today.
2        MS. LARKINS: Exactly. That's why the question
3    hasn't been asked yet.
4        Q. Did Peggy Myers talk to you about how her
5    deposition had gone yesterday?
6        A. Yes.
7        Q. Okay. Did she tell you about any specific
8    questions that had been asked of her?
9        A. No.
10       Q. Did she give you any advice?
11       MS. ANGELL: Objection. Vague and ambiguous.
12   This is harassing.
13       MS. LARKINS: Anything that you don't want to be
14   revealed you consider harassing. You just say that any
15   time you want. Even if someone says "uh-huh" you say
16   that is harassing.
17       MS. ANGELL: Well, Mrs. Larkins, it totally
18   depends on the manner in which you make your comments,
19   and the way that you do it is usually harassing to the
20   witness.
21       MS. LARKINS: Are you instructing him not to
22   answer the question?
23       MS. ANGELL: No.
24       MS. LARKINS: You may answer the question.
25       THE WITNESS: What's the question?

---

Page 32

1    BY MS. LARKINS:
2        Q. Did Peggy Myers give you any advice?
3        A. No.
4        Q. Mr. Denmon, after I had quit working -- and you
5    have testified that you didn't really think much about
6    it -- were you then surprised when I sued teachers at
7    Castle Park Elementary School?
8        MS. ANGELL: Objection. Compound.
9        MS. LARKINS: You may answer.
10       THE WITNESS: Could you restate the question?
11       MS. LARKINS: Sure.
12       Q. Were you surprised when you found out that I had
13   sued teachers at Castle Park Elementary School?
14       A. No.
15       Q. Why not?
16       A. I think that somebody who loses their job would
17   want to try to keep it, so that would be a course of
18   action they might take.
19       Q. So you knew that I had lost my job?
20       A. Yes.
21       Q. How did you find that out?
22       MS. ANGELL: Objection. Vague and ambiguous as
23   to time, seeks to invade attorney-client privilege.
24   BY MS. LARKINS:
25       Q. Were you represented by an attorney before I

---

Page 33

1    sued teachers at Castle Park Elementary School -- were
2    you represented by an attorney regarding my case before I
3    sued teachers at Castle Park Elementary School?
4        MS. ANGELL: Objection. Calls for a legal
5    conclusion. I think that you're asking this witness
6    whether any counsel that was present in depositions in
7    your dismissal proceeding, that kind of thing, whether
8    they were his lawyer, the district's lawyer, so I think
9    you're asking him to give legal conclusions. Maybe you
10   can clarify for him so I wouldn't object.
11       MS. LARKINS: Ms. Angell, apparently you have
12   forgotten -- perhaps it's wishful thinking -- that I was
13   dismissed after I sued, in violation of Labor Code
14   1102.5. You're trying to pretend that this case was
15   something normal where someone would sue after they were
16   dismissed, but it was just the reverse in this case.
17   Okay.
18       MS. ANGELL: Move to strike. No question
19   pending.
20       MS. LARKINS: Okay.
21       MS. ANGELL: It's my understanding,
22   Mrs. Larkins, that you were afforded a due process
23   hearing before a commission on professional competence.
24   It's my understanding that the proceedings in your
25   dismissal started probably with an accusation after some

---

9 (Pages 30 to 33)

Page 34

1  other meetings with the school -- this is just what I
2  understand the situation to be -- and that the district
3  had the assistance of counsel in addressing those issues.
4      So I can't tell you when -- I think you're
5  asking this witness to give you information about when
6  the district had lawyers and whether -- you know, in what
7  capacity he was being represented. So that's why I think
8  that it's vague, and I think that you're asking for a
9  legal conclusion. So maybe if you could ask the question
10  in such a way that -- do you see my problem?
11      MS. LARKINS: Oh, I see your problem. You're
12  doing a good job coming up with excuses for trying to
13  stop the truth from coming out in this case.
14      Ms. Angell, the -- my lawsuit was served on
15  teachers at Castle Park on about March 12, 2002. I was
16  dismissed on May 7th, 2002.
17      MS. ANGELL: And when was the accusation served
18  upon you?
19      MS. LARKINS: Interestingly enough, on March
20  29th I mailed a tort claim to the district.
21      MS. ANGELL: Uh-huh.
22      MS. LARKINS: And the accusation -- no. It was
23  April -- April 29th I mailed the tort claim to the
24  district, and then on April 30th -- the accusation I
25  think was dated April 30th, and it was mailed May 1st.

Page 35

1  How's that? How's that for a time frame? Doesn't look
2  too good for you and the district, does it?
3      MS. ANGELL: Please recall that what she says is
4  not to inform your knowledge here today. Base your
5  testimony on what you know.
6      MS. LARKINS: You should also know that even if
7  the lawyer advises you to commit perjury, you're still
8  responsible, and it's a felony.
9      MS. ANGELL: Objection. Argumentative. Move to
10  strike.
11      Mrs. Larkins, please stop instructing this
12  witness as if you were his attorney. Please stop arguing
13  with the witness and accusing him of lying, which is what
14  you just did here.
15      MS. LARKINS: It's a warning.
16      MS. ANGELL: Could you mark the record, please.
17      MS. LARKINS: Ms. Angell, if you weren't afraid
18  of the facts of this case being revealed publicly, then
19  why do you keep worrying about these videotapes?
20      MS. ANGELL: Do you have a question for the
21  witness? If you have no questions for the witness, we
22  will leave.
23      MS. LARKINS: I have many questions for the
24  witness.
25      MS. ANGELL: Then I suggest you pose one instead

Page 36

1  of asking questions to me.
2      MS. LARKINS: I would be happy to do so. Okay.
3      MS. ANGELL: And by the way, this witness is
4  here in response to a notice of deposition that you
5  served because he is an employee of the Chula Vista
6  Elementary School District and is here giving testimony
7  for the purpose of use in this litigation only, San Diego
8  Superior Court Case GIC 781970, and he does not consent
9  to this deposition -- the videotape of this deposition or
10  the transcript of this deposition to be used for any
11  purpose outside this litigation.
12  BY MS. LARKINS:
13      Q. Mr. Denmon, have you recently spoken to members
14  of the press?
15      A. Yes.
16      MS. ANGELL: Let the record reflect that
17  Ms. Larkins is turned and is looking at me with eyebrows
18  raised.
19      MS. LARKINS: Well, I'm just thinking, Ms.
20  Angell, if this witness has been recently speaking to the
21  press -- let me ask some further questions.
22      Q. Have you spoken to the press about events at
23  Castle Park Elementary School?
24      A. Yes.
25      MS. ANGELL: Objection. Vague and ambiguous as

Page 37

1  to time.
2  BY MS. LARKINS:
3      Q. Have you spoken during the year 2004 to members
4  of the press about events at Castle Park Elementary
5  School?
6      A. A member, yes.
7      Q. Okay. Who was that?
8      A. Kelley Dupuis I believe is his name.
9      MS. LARKINS: Okay. The reason I raised my
10  eyebrows, Ms. Angell, is that when someone goes to the
11  press to discuss something, they are pretty much giving
12  up their right to privacy about it.
13      MS. ANGELL: Move to strike. Nonresponsive or
14  no question pending.
15      MS. LARKINS: Well --
16      MS. ANGELL: This isn't your time to inform this
17  witness and tell him how to testify, Mrs. Larkins.
18  That's not your job. Your job is to ask him questions
19  about what he knows, not to tell him how he should act,
20  not to try to harass him, not to try and accuse him of
21  lying when he's under oath. Please pose questions to
22  this witness instead of telling him what you think he
23  should testify to.
24      MS. LARKINS: Ms. Angell, you're the one that
25  brought up the idea that these deposition videotapes

10 (Pages 34 to 37)

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

| Page 38 |
| --- |

1  could not be used for any purpose other than this trial.
2  You brought up the idea, and I responded to it. You
3  know, Ms. Angell, as soon as somebody admits the truth,
4  this whole case can be over.
5      MS. ANGELL: So you're admitting that you're
6  bringing these witnesses in for these depositions, these
7  videotape depositions in order to harass them into
8  getting whatever you want them to say?
9      MS. LARKINS: That is an extremely dishonest
10  response. Ms. Angell, you know perfectly well that the
11  truth in this case is completely obvious. There is a
12  mountain of evidence.
13      MS. ANGELL: Yes, and it was put out in front of
14  the CPC and you were dismissed.
15      MS. LARKINS: No, it wasn't. My lawyer in that
16  case made -- never mentioned Labor Code 432.7; she never
17  mentioned Labor Code 1105.2. I was dismissed for filing
18  tort claims in a lawsuit which is against the law. The
19  Constitution allows for the right to petition for redress
20  of grievances. And I think due to our law firm's bad
21  legal advice, the district violated that Constitutional
22  right.
23      MS. ANGELL: Excuse me, Mrs. Larkins. Do you
24  have a question for this witness? Because this is a
25  waste of his time and it's an abuse of the discovery

| Page 39 |
| --- |

1  process for you to sit here and lecture to me on whatever
2  your legal theories are or what you believe the facts
3  are. Could you please ask this witness some question
4  about what he knows about the allegations contained in
5  your complaint.
6      MS. LARKINS: Okay. I -- never mind. I don't
7  need to use this. Okay.
8      Q. I want to go back to when you said you weren't
9  surprised when I sued. Okay.
10      How -- did Gretchen Donndelinger ever have a
11  staff meeting in which she told the staff that I would
12  not be returning to Castle Park?
13      A. No.
14      Q. You're sure of that?
15      MS. ANGELL: Objection. Argumentative, asked
16  and answered.
17  BY MS. LARKINS:
18      Q. Okay. I want to give you some wiggle room here
19  in case, you know, some notes of Gretchen Donndelinger
20  are produced that showed she did have such a meeting. Is
21  your memory of this very clear, or is it just that you
22  don't remember such a staff meeting?
23      A. I don't remember Gretchen Donndelinger saying
24  that you would not return.
25      Q. Do you remember someone else saying it?

| Page 40 |
| --- |

1      A. Yes.
2      Q. Who was that?
3      A. Mr. Werlin.
4      Q. And when did he say that?
5      MS. ANGELL: Objection.
6  BY MS. LARKINS:
7      Q. Was it a meeting with the entire staff when he
8  said that?
9      MS. ANGELL: Objection. Vague and ambiguous as
10  to what Mr. Werlin said. Do you mean that you wouldn't
11  return during the 2001 school year, that you were no
12  longer an employee? I don't understand the question that
13  is being posed.
14  BY MS. LARKINS:
15      Q. Was this my last day of work at Castle Park that
16  Mr. Werlin said this?
17      MS. ANGELL: What is this? Vague and ambiguous.
18      MS. LARKINS: That I would not be returning to
19  Castle Park.
20      MS. ANGELL: Ever or that school year or what?
21  I don't understand your --
22      MS. LARKINS: Well, let's let the witness tell
23  us.
24      MS. ANGELL: Why don't you ask the witness what
25  Mr. Werlin said.

| Page 41 |
| --- |

1      MS. LARKINS: Ms. Angell, you're really making
2  this difficult.
3      MS. ANGELL: Actually, Mrs. Larkins, you're
4  making it difficult by your failure ask appropriate
5  questions, notwithstanding the fact that none of this is
6  relevant. You haven't asked one relevant question and we
7  have been in deposition for and hour.
8      MS. LARKINS: Well, I guess that means that you
9  didn't ask me very relevant questions when it was my
10  deposition, doesn't it?
11      MS. ANGELL: The allegations in this litigation
12  pertain to a record of arrest. How about asking this
13  witness about something pertaining to a record of arrest,
14  whether he was ever told about a record of arrest, any of
15  the things that are alleged in your complaint, as opposed
16  to the causes of action which have already been dismissed
17  from this litigation? It's improper and an abuse of
18  discovery for you to sit here and question this witness
19  concerning causes of action which have been dismissed.
20      MS. LARKINS: So it was improper and abuse of
21  discovery for you to be questioning me about these same
22  events?
23      MS. ANGELL: I'm not here to discuss and argue
24  those things with you, Mrs. Larkins. I'm here to defend
25  this witness's deposition, and I will not engage in legal

11 (Pages 38 to 41)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101

619-232-1164
FAX 619-232-2616

Larkins v. Werlin                                                        Deposition of Richard Denmon
GIC 781970                                                               November 30, 2004

Page 42

1  argument with you concerning your deposition. In your
2  deposition you were nonresponsive; you walked out of your
3  deposition despite court order to be there, and you're
4  well aware that there is a motion for terminating
5  sanctions pending that will be heard this Friday
6  concerning your deposition, if you want to discuss your
7  deposition, but that is not relevant here, and I would
8  really prefer to just stick to questions for this
9  witness.
10      MS. LARKINS: If it's not relevant, why did you
11  just bring it up?
12      MS. ANGELL: You brought it up.
13      MS. LARKINS: I brought up a motion for
14  terminating sanctions?
15      MS. ANGELL: You're bringing up your deposition.
16  We are not here to talk about your deposition. This
17  witness was not at your deposition, so he can't testify
18  to what happened at your deposition. You're talking
19  about that in order to harass and inform this witness and
20  to try to influence his testimony.
21      MS. LARKINS: And I think you are talking about
22  terminating sanctions in an effort to influence this
23  witness. And I think that we should not just leave it
24  there, but let's go ahead, you know, since you bring up
25  terminating sanctions. I want to show respect for this

Page 43

1  subject that you have brought up.
2      MS. ANGELL: Do you have a question for this
3  witness? Because if you don't, he needs to be released.
4      MS. LARKINS: I have respect for -- when you
5  bring up the subject here and --
6      MS. ANGELL: Mrs. Larkins --
7      MS. LARKINS: I want to respond.
8      MS. ANGELL: I was responding to your launching
9  again into a diatribe about your deposition. That is not
10  proper for this witness. You don't get to sit here and argue with me
11  questions. You don't get to sit here and argue with me
12  all day. It's a tremendous waste of everybody's time and
13  resource. Could you please ask this witness a question
14  about his knowledge.
15      MS. LARKINS: Well, it's sure lucky we are not
16  wasting time and resources by having you launch into a
17  diatribe.
18      Okay. Ms. Angell is trying to prevent this line
19  of questioning, but I'm really going to try to keep at
20  it. Then maybe you guys will walk out, but I'm going to
21  try to do this. And if you walk out, I will seek an
22  order to compel testimony. Okay.
23      Q. Now, it seems like we left off with you saying
24  that Werlin told you I would not be coming back. Was
25  this at that meeting where everybody except Donndelinger

Page 44

1  and Werlin hid behind the door?
2      MS. ANGELL: Objection. Argumentative,
3  misstates the evidence. In fact, he testified that
4  nobody hid behind a door.
5  BY MS. LARKINS:
6      Q. Did you testify that no one ever hid behind a
7  door in a meeting that you were at in the office where I
8  was being discussed, or just that you didn't remember?
9      A. I don't remember what I said. I don't remember
10  it ever happening. I'm saying no, it didn't happen and I
11  don't remember it happening. I don't know what I said
12  earlier.
13      Q. Okay. You don't want to leave yourself any
14  wiggle room there?
15      MS. ANGELL: Objection. Argumentative,
16  badgering the witness.
17      Mrs. Larkins, please stop doing that. The
18  witness answers your question. Just because you don't
19  like his answer doesn't mean that you need to try to
20  convince him to give some other answer. Please stop
21  harassing the witness. Ask him questions, let him answer
22  and move on to the next question.
23      MS. LARKINS: Are you really protecting your
24  witness? I have testimony from other people --
25      MS. ANGELL: You're asking this witness about

Page 45

1  what he remembers. Let him tell you what he remembers.
2      MS. LARKINS: Okay.
3      MS. ANGELL: That's what he remembers.
4  BY MS. LARKINS:
5      Q. This is sworn testimony, and you're saying that
6  you were never at a meeting where teachers hid behind the
7  door?
8      A. I'm saying I don't remember being at a meeting
9  where teachers hid behind a door.
10      MS. LARKINS: Well, that's different, isn't it,
11  Ms. Angell?
12      MS. ANGELL: It's the same testimony he has
13  given three times now.
14      MS. LARKINS: No. There is a difference between
15  I was never at a meeting where teachers hid behind the
16  door and I don't remember being at a meeting.
17      MS. ANGELL: Do you need a break?
18      THE WITNESS: Yeah, we can take a break. That
19  would be nice.
20      MS. LARKINS: She really wants to avoid
21  testimony on this.
22      Ms. Angell, do you want to ask --
23      MS. ANGELL: Move to strike. Nonresponsive, no
24  question pending.
25      MS. LARKINS: Do you want to ask the other two

SAN DIEGO COURT REPORTING SERVICE                          619-232-1164
319 ELM STREET, SUITE 100, SAN DIEGO, CA 92101             FAX 619-232-2616

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

---

**Page 46**

1  counsel here if they would also like a break?
2      MS. ANGELL: You mean plaintiff in pro per and
3  the other attorney? The witness needs a break.
4      MS. LARKINS: It's normal custom during a
5  deposition of -- not for you, though. You have this
6  habit of walking out of depositions without saying where
7  you're going, just leaving, and saying that I don't have
8  to agree to the break because I'm not a lawyer.
9      MS. ANGELL: Move to strike. No question
10  pending.
11      The witness has stated that he wants a break.
12  Are you saying you don't want the witness to take a
13  break?
14      MS. LARKINS: No, I'm not.
15      MS. ANGELL: Well, then, we are agreed.
16  Michael, are you agreed.
17      MR. HERSH: I am agreed.
18      MS. ANGELL: How long do we want to break for?
19  How long do you want to break for?
20      MR. HERSH: I couldn't hear that.
21      MS. ANGELL: She didn't answer.
22      MR. HERSH: Okay.
23      MS. LARKINS: Who didn't answer?
24      MS. ANGELL: You. How long do you want the
25  break for? The witness said he wants a break.

---

**Page 47**

1      MS. LARKINS: Well, why don't we ask the
2  witness.
3      How long a break would you like.
4      THE WITNESS: Ten minutes would be fine.
5      MS. LARKINS: That would be fine. I agree to a
6  ten-minute break.
7      How about you, Mr. Hersh?
8      MR. HERSH: That's fine. I will call back, or
9  can Rosie call me.
10      VIDEOGRAPHER: We are going off the record. The
11  time is 11:22 a.m.
12      (Recess taken; reporter's clock was synchronized
13  with video.)
14      VIDEOGRAPHER: We're going on the record. The
15  time is 11:40 a.m.
16  BY MS. LARKINS:
17      Q. Mr. Denmon, can you -- I think you and I have a
18  pretty good idea of this meeting that took place when
19  Mr. Werlin said that I wouldn't be coming back. And I
20  remember that teachers were hiding behind the door. I
21  didn't know it at the time, but I found out later. Let's
22  see. What else did you say about this meeting? Well, I
23  think the only thing -- let's just talk about this
24  meeting where Werlin said that I wouldn't be coming back.
25      Do you recall Joe Ellen leaving that meeting

---

**Page 48**

1  early?
2      MS. ANGELL: Move to strike everything preceding
3  "let's just talk about this meeting" as no question
4  pending. If you can answer the question.
5      THE WITNESS: Ask the question again, please.
6  BY MS. LARKINS:
7      Q. Do you -- at this meeting when Werlin told you
8  that I wouldn't be coming back, did Joe Ellen leave that
9  meeting early?
10      A. Not that I recall. I don't recall her being
11  there or not being there.
12      Q. Okay. Would it jog your memory if I asked you
13  if she ever left one of these meetings saying, "Have fun,
14  you guys"?
15      A. No.
16      Q. You have no memory of that?
17      A. No, I have no memory of that. I don't recall.
18      Q. Okay. So is it because of this meeting that you
19  weren't surprised when I sued teachers?
20      MS. ANGELL: Vague and ambiguous, "this
21  meeting." What are you talking about?
22  BY MS. LARKINS:
23      Q. Was it because of this meeting where Werlin said
24  I wouldn't be coming back -- is that why you weren't
25  surprised when you found out I had sued teachers?

---

**Page 49**

1      A. No. I think I testified that I wasn't surprised
2  that a person who was no longer working would seek a
3  legal resolution or some legal something to get their job
4  or keep their job or whatever.
5      Q. Okay. And the way you found out that I was no
6  longer working was when -- at this meeting when Werlin
7  said I wouldn't be coming back?
8      MS. ANGELL: Objection. Seeks to invade
9  attorney-client privilege.
10  BY MS. LARKINS:
11      Q. Okay. Before this meeting when Werlin said I
12  wouldn't -- was there an attorney at this meeting when
13  Werlin said I wouldn't be coming back?
14      A. This meeting that you're talking about right now
15  is when you said there was people behind the door?
16      Q. Well, let's not assume that, because you don't
17  remember that. Let's just talk about this meeting when
18  Werlin said that I wouldn't be coming back.
19      A. Okay. What's the question?
20      Q. Was there an attorney there?
21      A. I don't recall if there is an attorney present
22  or not.
23      Q. Okay. Was this meeting in the middle of the
24  school year?
25      MS. ANGELL: Objection. Vague and ambiguous.

---

13 (Pages 46 to 49)

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

---

Page 50

1  What school year?
2  BY MS. LARKINS:
3      Q. Well, was this meeting -- okay. I believe we
4  have established through your testimony that I left in
5  the middle of a school year. Wasn't that your testimony?
6          MS. ANGELL: Objection. Vague and ambiguous
7  or -- I'm sorry. Not vague and ambiguous. Misstates the
8  testimony. I think his testimony was that -- something
9  along the lines that you weren't showing up to teach; you
10  weren't showing up to perform your employment. And the
11  problem I have is your characterization of it being that
12  "I left." You know, it's your characterization of it.
13  If you want to ask him if he saw you there, whether you
14  were present or whether he was told about any
15  particular --
16  BY MS. LARKINS:
17      Q. On the day of this meeting when Werlin said I
18  wouldn't be coming back, had I been at school that day?
19      A. I believe there were -- to the best of my
20  recollection, there were different meetings in which I
21  and others were told that you would not be coming back.
22      Q. Were there -- was there anyone other than Werlin
23  who told you that I would not be coming back?
24          MS. ANGELL: Objection. Seeks to invade the
25  attorney-client privilege, vague and ambiguous as to

---

Page 51

1  time.
2  BY MS. LARKINS:
3      Q. Was there anyone besides Werlin who told you
4  that I would not be coming back when an attorney was not
5  present?
6          MS. ANGELL: Vague and ambiguous as to time.
7  Do you mean during the year 2001?
8          MS. LARKINS: Well, Mr. Denmon has just
9  testified that there were a number of meeting at which he
10  was told that I would not be coming back, so I'm going to
11  leave it up to him.
12      Q. Whatever these meetings are that you're thinking
13  of, this number of meetings at which you were told that I
14  would not be coming back, during those meetings was there
15  ever anyone other than Werlin who told you that I would
16  not be coming back when an attorney wasn't present?
17      A. Is your question was I ever told at a meeting
18  with an attorney that I would not be coming back?
19      Q. No. It's the opposite. If there was an
20  attorney present, you don't have to tell me anything
21  about it.
22      A. I can't -- Mrs. Larkins, I can't remember if I
23  was told at a meeting with an attorney present or not. I
24  don't remember who was at a meeting.
25      Q. Okay. Let's assume that -- does it sound

---

Page 52

1  right to you that this meeting happened around April
2  2001?
3          MS. ANGELL: You mean the meeting where Werlin
4  said that you would not be coming back?
5          MS. LARKINS: Thank you. Yes.
6          THE WITNESS: Is that when --
7          MS. ANGELL: She doesn't testify here. You tell
8  what you remember.
9.         THE WITNESS: Okay.
10          MS. ANGELL: If you don't know, the answer is
11  you don't know. If you do know, just tell her what you
12  know.
13          THE WITNESS: Could you ask the question again?
14          MS. LARKINS: Yeah. Let me --
15          THE WITNESS: I'm sorry. I got confused.
16  BY MS. LARKINS:
17      Q. Okay. Now, I believe you have testified that
18  you recall that I left during a school year or I stopped
19  working at Castle Park during the middle of a school year
20  and that I was gone for the rest of that school year and
21  replaced and there were substitutes in my classroom. And
22  then the next year someone else had -- took over my
23  classroom. Now, I want to talk about that partial year
24  there between the time when I stopped working and the end
25  of the year.

---

Page 53

1          Do you recall any attorneys coming to Castle
2  Park to have meetings during that time?
3      A. Yes.
4      Q. Really? And who were those attorneys?
5      A. Mr. Shinoff I believe I met with.
6          MS. ANGELL: I'm objecting insofar as you're
7  seeking to invade attorney-client privilege here.
8          MS. LARKINS: No. He doesn't have to --
9          MS. ANGELL: Or attorney work product.
10          MS. LARKINS: He doesn't have to tell what
11  happened during the meeting, but the fact of the meeting
12  is not covered by attorney-client privilege. Okay.
13          MS. ANGELL: Had you finished your answer?
14          THE WITNESS: What was the question?
15          MS. ANGELL: She asked the names of all the
16  lawyers or any lawyers that came during that 2001 school
17  year. Just tell her, as best as you know, the names if
18  you remember. If you don't remember --
19          THE WITNESS: It may not have been during the
20  2000 school -- 2000 --
21          MS. LARKINS: I know what you mean. It may not
22  have been during that period.
23          THE WITNESS: -- period, but I did --
24  Mr. Shinoff and Mr. Brazee.
25

---

14 (Pages 50 to 53)