Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

---

Page 54

1  BY MS. LARKINS:
2  Q. Could it have been later?
3  A. Yes.
4  Q. Could it have been the following year?
5  A. Yes, it could have been.
6  Q. Okay.
7  MS. ANGELL: So are you testifying that you
8  don't recall the dates of these meetings with the
9  attorneys?
10  THE WITNESS: I don't recall the dates of the
11  meetings with the attorneys, no.
12  BY MS. LARKINS:
13  Q. Okay. I think I would really like to just focus
14  on this one meeting when Werlin said you wouldn't be
15  coming back. I mean he said I wouldn't be coming back.
16  Did Mr. Werlin tell you why I wouldn't be coming
17  back?
18  MS. ANGELL: At that meeting you mean?
19  MS. LARKINS: Yeah, at that meeting.
20  THE WITNESS: I don't remember if it was a
21  specific meeting or different meetings in which we were
22  told you wouldn't be coming back. I do remember
23  Mr. Werlin said it was a personnel matter. And that's
24  all I remember being told; that it was a personnel
25  matter.

---

Page 55

1  MS. LARKINS: I would like to enter -- I would
2  like to ask that this document be labeled as Exhibit 1.
3  I'm afraid I just have three.
4  (Exhibit 1 marked for identification; discussion
5  off the record.)
6  MS. ANGELL: Now that the court reporter is
7  back, are you still wanting a break to confer with
8  counsel?
9  THE WITNESS: I needed to ask what a word was.
10  I can't figure it out.
11  THE WITNESS: You don't say what you want to ask
12  counsel. You just say you want to take a break.
13  MS. LARKINS: Yeah. I don't think counsel can
14  tell you what the word is either. She can't be a
15  witness.
16  MS. ANGELL: If you have questions for counsel,
17  it's none of Mrs. Larkins' business what your questions
18  for counsel are.
19  THE WITNESS: No. It's simple. It's just
20  penmanship. I wasn't able to --
21  MS. LARKINS: She can't help you.
22  THE WITNESS: Okay.
23  Is that true?
24  MS. ANGELL: Don't -- disregard everything said
25  by Mrs. Larkins. If you have questions for counsel, say

---

Page 56

1  that you need to talk to counsel for a minute; ask for a
2  break and we will go off. If you don't have questions
3  for counsel, then we can proceed.
4  MS. LARKINS: I hope you won't tell him what you
5  think the word is.
6  THE WITNESS: Let's just proceed.
7  MS. ANGELL: Okay.
8  BY MS. LARKINS:
9  Q. Have you had a chance to look this over at all?
10  A. Yes, I read it.
11  Q. Okay. Does this refresh your memory about what
12  happened on April 29th, 2001?
13  MS. ANGELL: Objection. Lacks foundation.
14  There is no evidence in this record that this witness has
15  ever seen this before, that he created it, that he knows
16  what it is. As far as he knows, you could have written
17  this last night.
18  MS. LARKINS: Exactly.
19  Q. As far as you know, I could have written this
20  last night, but still I'm wondering does this refresh
21  your memory at all about what happened on April 20th,
22  2001?
23  A. The events are familiar, yes.
24  MR. HERSH: I'm objecting and moving to strike
25  on the basis that by giving the witness a document in

---

Page 57

1  this manner -- it's essentially a leading question.
2  MS. ANGELL: Joined.
3  MS. LARKINS: And -- okay. So the Court can
4  throw it out, then, if it wants to, if it thinks this is
5  wrong.
6  MS. ANGELL: Mrs. Larkins, in deposition
7  proceedings it's impermissible for you to lead the
8  witness like this. Our purpose here is to state
9  questions like do you know, what do you know, what --
10  open questions like that, instead of trying to testify
11  for the witness. That's basically what he's saying.
12  MS. LARKINS: Okay.
13  Q. Mr. Denmon, do you know that this document was
14  produced by the school district for my dismissal hearing?
15  A. No, I don't know that.
16  Q. Do you know that this document was presented by
17  the school district -- was represented by the school
18  district as being the notes of Gretchen Donndelinger?
19  A. No, I didn't know that.
20  Q. Do you know that Gretchen Donndelinger swore
21  under oath that these were her notes?
22  A. No, I don't know that.
23  MS. ANGELL: I'll remind the witness that you're
24  here to testify about what you know, as you're doing, and
25  disregard representations -- I think plaintiff's attempt

---

15 (Pages 54 to 57)

Larkins v. Werlin
GIC 781970

Page 58

1 to testify for you. Okay. So just keep on with what
2 you're doing.
3 BY MS. LARKINS:
4 Q. Okay. On or about April 20th, 2001, did you go
5 into the office -- the principal's office at Castle Park
6 Elementary with Linda Watson?
7 A. Yes, I believe so.
8 Q. Did Linda say that I had attacked her again?
9 A. I don't remember exactly what Linda had said.
10 I'm reading it here on this paper, but I don't remember
11 exactly what she had said.
12 Q. Do you recall that Linda said something about me
13 that was negative?
14 MS. ANGELL: Objection. Leading. Stating a
15 question by do you remember that Linda said
16 blah-blah-blah is different from do you remember whether
17 Linda said anything about me or do you remember what
18 Linda said.
19 MS. LARKINS: Okay.
20 Q. Do you remember what Linda said?
21 A. Yes, I have a recollection.
22 Q. Can you tell us what Linda said?
23 A. She had shared an incident in which she was in
24 the locker room and you had approached her, and she told
25 you that she didn't want to speak to you then, and that

Page 59

1 you kept moving towards her and kept talking and she
2 repeated that she didn't want to speak to you then.
3 Q. Uh-huh. Okay. Anything else you can remember
4 about what she said?
5 MS. ANGELL: At that meeting, that meeting in
6 Gretchen Donndelinger's office?
7 MS. LARKINS: Yeah, at this same meeting that
8 you're talking about.
9 THE WITNESS: To the best of my remembering, is
10 that she felt very uncomfortable with you walking towards
11 her, kept walking towards her, and she told you no, I
12 don't want to talk to you; stop, and you didn't do it.
13 Q. Uh-huh. Uh-huh.
14 A. And it made her feel very uncomfortable. She
15 didn't feel safe. Those are my words.
16 Q. Was there like a crash of bodies? Did I keep
17 coming toward her and not stop and was there a crash of
18 bodies?
19 MS. ANGELL: Objection. Lacks foundation.
20 You're not asking him what Linda said. If you want to
21 ask him --
22 MS. LARKINS: That's what I meant.
23 Q. Did Linda say that I crashed into her?
24 A. I don't recall that being said.
25 Q. Okay. So apparently I -- she said that I

Page 60

1 stopped, but apparently not soon enough to please her?
2 MS. ANGELL: Objection. Argumentative,
3 misstates the testimony.
4 MS. LARKINS: Well, the testimony was that I --
5 Linda said I didn't stop. So obviously. if there was not
6 a crash of bodies, I must have stopped.
7 THE WITNESS: So what's the question to me?
8 BY MS. LARKINS:
9 Q. So Linda apparently said -- okay. The testimony
10 is that I -- Linda said that I was coming toward her and
11 wouldn't stop. Then what happened? I'm coming toward
12 her and not stopping, and then what happened?
13 A. I don't know what happened. I wasn't there to
14 witness it.
15 Q. No. But what did she say?
16 A. I don't remember what she said.
17 Q. So it wasn't anything memorable apparently?
18 MS. ANGELL: Objection. Argumentative,
19 misstates the testimony.
20 BY MS. LARKINS:
21 Q. Okay. So Linda's complaint was that I just came
22 toward her, and that was what she didn't like, the coming
23 toward? That's all you can remember, as far as her
24 complaint?
25 MS. ANGELL: Objection. Mischaracterizes the

Page 61

1 testimony. I don't think the witness said anything about
2 a complaint. I think he said that he was in a meeting.
3 BY MS. LARKINS:
4 Q. Okay. Was Linda angry about this event?
5 MS. ANGELL: You mean when you came after her in
6 the -- wherever this incident was that you've just been
7 discussing, this coming toward her? Is that what you
8 mean by this event? You mean the meeting or what do you
9 mean? Vague and ambiguous.
10 MS. LARKINS: Ms. Angell, I didn't come after
11 her. Your client has said under oath statements that I
12 have contradicted under oath. Somebody is lying, or
13 maybe they are just not in contact with reality. That is
14 the other option.
15 MS. ANGELL: Move to strike. No question
16 pending.
17 Do we need to have some sort of testimony read
18 back or something to see where we are at?
19 MS. LARKINS: Okay.
20 Q. So you don't remember anything more dramatic
21 than just my coming toward her as being the problem that
22 day, according to Linda's testimony?
23 MS. ANGELL: Objection. He's not here to
24 testify about Linda's testimony. This witness is
25 testifying about what he saw or heard or was told in a

16 (Pages 58 to 61)

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

---

Page 62

1  meeting in approximately April 2001.
2      MS. LARKINS: Yeah. I want to know what Linda
3  said on approximately April 20th, 2001.
4      Q. And so far you have testified that she said that
5  I came toward her too close.
6      A. I testified that you kept coming toward her
7  after she told you to stop.
8      Q. Uh-huh.
9      A. And that she wanted to talk about it later.
10     Q. Uh-huh.
11     A. That's what I testified to.
12     Q. Okay. Can you think of anything else that she
13  was unhappy that I did?
14     MS. ANGELL: That she said during that April
15  2001 meeting concerning you?
16     MS. LARKINS: Exactly.
17     THE WITNESS: You mean at the pool or at this
18  meeting in the office obviously? I'm confused. Were are
19  we?
20     MS. ANGELL: Objection. Vague and ambiguous.
21  The witness obviously cannot understand the question.
22     MS. LARKINS: Okay.
23     MS. ANGELL: Can we have the testimony read
24  back, his first response to what was said at the meeting.
25  And if I need to come over there and read it myself, I

---

Page 63

1  can do that.
2      I think these questions have been asked and
3  answered.
4      (The record starting at Page 58, Line 20 to Page
5  59, Line 15 was read.)
6      MS. ANGELL: Thank you.
7  BY MS. LARKINS:
8      Q. And do you believe that this was the day that --
9  that this was one of the days when Rick Werlin came to
10  the school?
11     MS. ANGELL: Vague and ambiguous. That same day
12  that --
13  BY MS. LARKINS:
14     Q. On this April 20, 2001, this day that you and
15  Linda went to the principal's office to report this
16  event at the pool, do you believe that that was the day
17  when Rick Werlin came to the school?
18     MS. ANGELL: To the extent that it calls for
19  speculation, I'm objecting. To the extent that you're
20  asking him what he recalls, if he recalls, he can answer.
21     MS. LARKINS: I'm sorry.
22     Q. Do you recall that Rick Werlin came to the
23  school for a meeting on this day, April 20th, 2001, when
24  you and Linda went to Gretchen to report an incident at
25  the pool?

---

Page 64

1      A. I don't recall if he came to the school on that
2  day, no.
3      Q. Okay. Did Linda say that my behavior was
4  bizarre to her?
5      MS. ANGELL: During the April 2001 meeting
6  between Linda and Donndelinger and Mr. Denmon?
7      MS. LARKINS: Yes.
8      THE WITNESS: I don't know if she used the word
9  "bizarre." I interpreted it as her saying in my opinion
10  it was unusual because she told you to do something, to
11  stop, and you hadn't. I don't remember which word she
12  said.
13  BY MS. LARKINS:
14     Q. Did you agree with her, however she
15  characterized my behavior?
16     MS. ANGELL: Objection. Vague and ambiguous.
17     MS. LARKINS: At this meeting that we are
18  talking about.
19     MS. ANGELL: Agree with her about what?
20     MS. LARKINS: About my behavior being as you
21  have described her to have said my behavior was.
22     THE WITNESS: I don't recall, Maura, what I
23  said --
24     MS. LARKINS: Okay.
25     THE WITNESS: -- at this meeting.

---

Page 65

1  BY MS. LARKINS:
2      Q. Okay. Do you see in the middle of this page
3  there is a line with just two words on it. It looks --
4  can you read that?
5      A. Looks like "baboon," but I'm assuming it's
6  "Behavior is bizarre to Linda; Rick agreed."
7      Q. Uh-huh. Do you think it's possible that Linda
8  did characterize my behavior as bizarre and that you
9  agreed with that?
10     MS. ANGELL: Objection. Calls for speculation.
11  BY MS. LARKINS:
12     Q. I mean does that sound -- is that wrong, or do
13  you just not remember?
14     MS. ANGELL: Objection. Vague and ambiguous
15  question. Could you ask the whole question in one shot.
16  BY MS. LARKINS:
17     Q. Is this written statement false?
18     MS. ANGELL: What written statement?
19     MS. LARKINS: "Behavior is bizarre to Linda;
20  Rick agreed."
21     THE WITNESS: I can't determine if it's false or
22  not, because I don't know the words that were used or who
23  wrote what in the notes.
24  BY MS. LARKINS:
25     Q. Okay. How about if we skip a line and then the

---

17 (Pages 62 to 65)

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

Page 66

1  next little paragraph there. Do you believe that that
2  statement is true or false or you don't know?
3      A. I remember a meeting -- being asked to meet with
4  Rick Werlin. I don't think that this Rick is me, Rick
5  Denmon, but I believe there was a meeting asked to meet
6  with Rick Werlin. But I don't know if that meeting took
7  place at 2:30 as it says or not. I don't remember when
8  there was a meeting held.
9      Q. Okay. Okay.
10     MS. ANGELL: I'm going to remind the witness
11  that when plaintiff puts documents in front of you, that
12  doesn't mean that you adopt what's in the document. She
13  can put the document in front of and ask you whether you
14  created it, if you have seen it before, what you know
15  about it. Perhaps if it refreshes your recollection,
16  that is one thing. But just because plaintiff says
17  something in a question to you or puts a piece of paper
18  in front of you that says the sky is purple doesn't mean
19  the sky is purple. Do you understand?
20     THE WITNESS: Yeah, I understand.
21     MS. ANGELL: Okay.
22     MS. LARKINS: Of course if Kelly Angell tells
23  you the sky is purple, then it's true.
24     Q. Okay. Could you look at the second page of this
25  exhibit. Did you have a chance yet to read this?

Page 67

1      A. Yes, I did read it.
2      Q. Okay. Assuming -- obviously if I have falsely
3  created this document, I'm going to lose the case, but
4  assuming that this is a true document and that the --
5  it's down at the Office of Administrative Hearings in the
6  exhibits of my file, does -- do you believe that Gretchen
7  wrote correctly when she wrote this middle paragraph?
8      MS. ANGELL: Objection. Hold up here. This
9  assumes facts not in evidence. This document has not
10  been authenticated; there is no evidence in the record
11  that these are notes --
12     MS. LARKINS: Withdrawn.
13     Q. Do you recall Gretchen telling you later that
14  day or -- wait a minute. Do you recall somebody telling
15  you that day that there would be a meeting, and you going
16  to that meeting along with Linda, Alan, Maria, Karen, Joe
17  Ellen and Kathy B?
18     MS. ANGELL: That day being the same day as the
19  meeting between Linda Watson and Gretchen Donndelinger
20  and Mr. Denmon?
21     MS. LARKINS: Yes.
22     MS. ANGELL: The question is do you recall.
23     THE WITNESS: I recall having a meeting, but I
24  don't recall on which day or who was present. If these
25  were notes of a meeting that I was at, then these -- if

Page 68

1  I'm to believe that, then these people may have been
2  there, yes.
3      MS. ANGELL: You're not to believe, as I said,
4  documents that are put in front of you by Mrs. Larkins.
5  You're here to testify to what you know, what you
6  remember, what you did.
7      MS. LARKINS: Never mind. This is not getting
8  anywhere. No more questions on this document. It will
9  be better when we have everybody together in court. We
10  can establish things more easily.
11     Is Rick Werlin planning on testifying during the
12  trial?
13     MS. ANGELL: Do you have questions for this
14  witness? Please pose it. Seeing as how that was
15  directed to me. Was that directed to the witness?
16     MS. LARKINS: So you won't be directing any
17  questions to me in this deposition?
18     MS. ANGELL: Do you have a question for the
19  witness? If so, please ask it.
20     MS. LARKINS: Okay. Just make sure you take a
21  slice of your own advice and don't direct questions at
22  me.
23     Q. Okay. How did you find out that teachers had
24  been sued?
25     MS. ANGELL: Objection. Seeks to invade

Page 69

1  attorney-client privilege, vague and ambiguous.
2      MS. LARKINS: You may answer the question
3  unless --
4      MS. ANGELL: If you understand it. Teachers
5  have been sued by who, when, what, where, concerning
6  what? I don't understand the question.
7      MS. LARKINS: Well, I'm sure you knew that I
8  meant me, but Kelly has a good point. Let me say it
9  again.
10     Q. How did you find out that I had sued teachers?
11  But don't tell me if it was an attorney who told you.
12     A. I don't recall who told me.
13     Q. Okay. Do you think you found out pretty soon
14  after they were served?
15     MS. ANGELL: Objection. Calls for speculation.
16  BY MS. LARKINS:
17     Q. Are you kind of a -- at Castle park did you tend
18  to be kind of a loner?
19     A. What do you mean?
20     Q. At Castle park did you often spend your
21  lunchtimes talking to other teachers?
22     A. Yes. I ate in the lounge and talked to people
23  in the lounge.
24     Q. Okay. Were there some teachers who were loners?
25     MS. ANGELL: Objection. Vague and ambiguous as

18 (Pages 66 to 69)

Page 70

1  to time, vague and ambiguous as to who you're talking
2  about and what you think loners are.
3      MS. LARKINS: Well, I don't mean l-o-a-n-e-r-s.
4  I mean l-o-n-e-r-s. I guess the substitutes are loaners.
5      Q. Were there -- did all of the teachers congregate
6  in the lounge at most recesses?
7      MS. ANGELL: Objection. Vague and ambiguous as
8  to time.
9      MS. LARKINS: Let's just talk about Castle
10  Park during the 2000-2001 school year.
11      THE WITNESS: To the best of my recollection, I
12  don't believe everybody went into the lounge on their
13  break time.
14  BY MS. LARKINS:
15      Q. Okay. So to the best of your recollection,
16  there were some teachers who stayed in their rooms or
17  worked in the -- were making copies or going to other
18  places during breaks?
19      MS. ANGELL: Objection. Leading. If you could
20  ask this witness what he knows instead of trying to
21  testify for him. You just testified a compound statement
22  for him. His testimony was that he thinks that not
23  everybody went in the lounge.
24      MS. LARKINS: Thank you. I will try.
25      Q. If teachers weren't in the lounge, where were

Page 71

1  they?
2      MS. ANGELL: Objection. Vague and ambiguous as
3  to time, as to what teachers.
4      MS. LARKINS: Can you answer the question?
5      THE WITNESS: I don't know where the other
6  teachers were.
7  BY MS. LARKINS:
8      Q. Okay. Were you probably one of the better
9  informed teachers on the staff as far as gossip went?
10      MS. ANGELL: Objection. Calls for speculation.
11  Vague and ambiguous as to time. Vague and ambiguous
12  generally.
13      MS. LARKINS: Answer if you can.
14      THE WITNESS: Well, define gossip.
15  BY MS. LARKINS:
16      Q. I have to define gossip?
17      A. As you're using it in this question.
18      MS. ANGELL: It's vague. He doesn't understand
19  the question. If you could rephrase it so he can
20  understand, then he could answer it maybe.
21      MS. LARKINS: Talking about other people's
22  business will be the definition of gossip.
23      Q. Did you do a lot of that at Castle Park during
24  the 2000-2001 school year?
25      MS. ANGELL: Objection. Vague and ambiguous.

Page 72

1      MS. LARKINS: You may answer.
2      THE WITNESS: What do you mean by a lot?
3      MS. LARKINS: Question withdrawn.
4      Q. Who were the teachers that you were closest to
5  personally at Castle Park?
6      MS. ANGELL: Objection. Vague and ambiguous as
7  to time.
8      MS. LARKINS: You may answer.
9      MS. ANGELL: If you know what time frame she's
10  talking about.
11      THE WITNESS: Which time frame are you referring
12  to?
13      MS. LARKINS: Well, let's do the 2000-2001
14  school year.
15      Q. Who were the teachers you were closest to
16  personally during that year?
17      A. Mrs. Watson, Mrs. Comen, Mr. Marshall,
18  Mrs. Hamilton, Mrs. Bingham, Mrs. Salenz and Ms. Perez.
19      Q. Boy, that practically reads like a list of
20  defendants in this case.
21      MS. ANGELL: Move to strike. No question
22  pending.
23      MR. HERSH: Joined.
24  BY MS. LARKINS:
25      Q. How close were you to Robin Donlan?

Page 73

1      MS. ANGELL: Objection. Vague and ambiguous as
2  to time.
3  BY MS. LARKINS:
4      Q. Was there ever a time during your -- when you
5  worked at Castle Park when you were close personally with
6  Robin Donlan?
7      A. I was physically close to her because her room
8  was right next to mine, so I saw her probably more
9  frequently than other people. And we shared as time-out
10  rooms for each other, so we talked to each other often
11  about sending students for time-out.
12      Q. Do you recall a staff meeting or rather an
13  in-service before which you were sitting with Robin
14  Donlan at a table in the auditorium and I came up to the
15  table, and as I was coming up to the table you suggested
16  to her that she tell me to go to another table?
17      A. No.
18      Q. Okay. Do you recall a meeting with Gretchen
19  Donndelinger at which Robin Donlan said, "Rick always
20  gets me in trouble"?
21      A. No.
22      Q. Okay. Do you believe it's wrong to remove a
23  teacher from his or her position without telling that
24  teacher the reason?
25      MS. ANGELL: Objection. Vague and ambiguous as

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

---

Page 74

1  to "remove teacher from their position."
2      MS. LARKINS: Answer it if you can.
3      THE WITNESS: Ask the question again, please.
4  BY MS. LARKINS:
5      Q. Do you believe it is wrong to remove a teacher
6  from his or her position without telling that teacher the
7  reason?
8      MS. ANGELL: Same objection. Vague and
9  ambiguous as to "remove teacher from position." And
10  insofar as it's calling for a legal conclusion, the
11  witness is not qualified as a legal expert.
12      MS. LARKINS: Are you instructing the witness
13  not to answer the question?
14      MS. ANGELL: I'm asking you to clarify the
15  question. It's vague and ambiguous. I don't understand
16  what you mean by "remove from the classroom," because I
17  think that you have a very different meaning in that it
18  could mean a million things. It could mean being placed
19  on administrative leave; it could mean dismissed; it
20  could mean suspended; it could mean a teacher goes on
21  sick leave. It could mean a million things.
22      MS. LARKINS: Of course. And I think Rick and I
23  both understand that.
24      MS. ANGELL: So ask your specific question.
25  Which one of those -- you have just admitted that your

Page 75

1  question is vague and ambiguous.
2      MS. LARKINS: It's not vague or ambiguous. I
3  think the meaning is clear. Let me try again, though.
4      Q. Do you believe it is wrong for the
5  administration to tell a teacher not to return to his or
6  her classroom without telling that teacher the reason?
7      A. Are you asking my opinion?
8      Q. Yes.
9      MS. ANGELL: Incomplete hypothetical, vague and
10  ambiguous, calls for a legal conclusion.
11      MS. LARKINS: You may answer.
12      THE WITNESS: I believe that the teacher should
13  have their due process rights, and they should be
14  followed if there was a cause for a teacher being told
15  not to return to their room, yes.
16  BY MS. LARKINS:
17      Q. Do you believe that I should have been allowed
18  to hear Linda Watson's allegations against me?
19      MS. ANGELL: Objection. Vague and ambiguous as
20  to time, assumes facts not in evidence.
21      MS. LARKINS: Referring to these allegations of
22  April 20th, 2001.
23      MS. ANGELL: Same objection. Vague and
24  ambiguous as to time, assumes facts not in evidence.
25      MS. LARKINS: You may answer the question.

Page 76

1      MS. ANGELL: It's calling for speculation I
2  think.
3      MS. LARKINS: Are you instructing the witness
4  not to answer?
5      MS. ANGELL: It would be better if you would ask
6  him a more specific question so I don't object to it.
7  BY MS. LARKINS:
8      Q. Mr. Denmon, is it your opinion that I should
9  have been allowed to hear the allegations about me which
10  Linda Watson made on April 20th, 2001 when you went with
11  her to the principal's office?
12      A. At that time, no. Linda was very upset and I
13  think she needed to have a safe environment in which to
14  express her concerns.
15      Q. Okay. Is it your opinion that I should have
16  been told within a week?
17      MS. ANGELL: I'm going to renew my objection.
18  We have a standing stipulation for objections on the
19  basis of relevance. We have been here for two and a half
20  hours and we haven't had a single question concerning the
21  allegations contained in the complaint, particularly
22  there is no -- and the line of questioning we are at here
23  is not a question concerning Mrs. Larkins' allegations
24  concerning -- related to records of arrest.
25      MR. HERSH: Association defendants join in

Page 77

1  Ms. Angell's objection.
2      MS. LARKINS: Right. We have a stipulation on
3  that.
4      MS. ANGELL: Right. And you're -- we have been
5  allowing this -- a great deal of latitude for you to ask
6  all kinds of questions that have nothing to do with the
7  litigation for two and a half hours now, and you're
8  continuing to press this witness about his opinion three
9  years ago, assuming he remembers it, about stuff that has
10  nothing to do with this litigation. I'm well aware that
11  you intend to use this video deposition for purposes of
12  doing a documentary, and I believe that you're abusing
13  the discovery process by asking these irrelevant,
14  unrelated questions of this witness and requiring him to
15  be here under guise of a deposition notice in the case
16  entitled Larkins v. Werlin.
17      MR. HERSH: Joined.
18      MS. ANGELL: I believe your questioning is
19  improper; it's harassing; it's an abuse of the discovery
20  process, and I would respectfully request you to move
21  on --
22      MR. HERSH: Joined.
23      MS. ANGELL: -- and to get to something that is
24  alleged in the complaint.
25      MS. LARKINS: Obviously you are afraid of

---

20 (Pages 74 to 77)

Page 78

1 testimony that agrees that the district violated my
2 rights.
3     MS. ANGELL: Mrs. Larkins, there is no cause of
4 action in this complaint for due process. You have been
5 dismissed -- you have been afforded due process; you
6 tried to sue the district on those issues, and you
7 cannot; you're precluded; it's been finally adjudicated.
8 And your attempt to harass this witness and keep him here
9 to answer these unrelated questions for whatever your
10 ulterior motives are are totally improper, and, again, I
11 will ask you to please address issues that are alleged in
12 the sixth amended complaint which causes of action have
13 not been dismissed.
14     MS. LARKINS: It's interesting that you want to
15 say that due process in this case is of no importance any
16 more. It might not be of importance to you, Ms. Angell,
17 and it might not even be litigatable, but there is the
18 problem of the public interest. And even if your
19 sanctions -- terminating sanctions are granted at the end
20 of this week, I don't think I'm going to appeal to the
21 Court of Appeals. I think I'm going to appeal to the
22 court of public opinion. And I think that the public has
23 an interest in knowing that my due process rights were
24 violated, particularly --
25     MR. HERSH: Speaking on behalf of the public, we

Page 79

1 actually don't.
2     MS. LARKINS: I -- sometimes your humor just
3 misses the mark, Michael. But, boy, I'm going to enjoy
4 quoting you on that.
5     MS. ANGELL: Are you finished?
6     MS. LARKINS: We have got five minutes left on
7 this tape. We need to take a break to change tape.
8     MS. ANGELL: Well, Mrs. Larkins, I'd like to
9 thank you for admitting on the record your improper
10 purpose of deposing this and other witnesses in this
11 case. And I will let you know that if you do not move
12 your questioning along to something having to do with the
13 allegations contained in the complaint, that we are going
14 to be finished.
15     So if you have some questions for this witness
16 pertaining to any of the allegations contained in the
17 complaint, please pose them. And he's here and prepared
18 and willing and able to give testimony related to the
19 complaint.
20     MS. LARKINS: So are you saying you don't want
21 to allow the videographer to change the tape?
22     MS. ANGELL: No. I'm saying that you have
23 admitted your improper purpose; that you're trying to
24 address your due process administrative hearing through
25 the discovery in the Larkins v. Werlin case. I'm telling

Page 80

1 you it's improper. I'm asking you to move along. I have
2 no comment concerning the videographer changing his tape;
3 however, I would like to state that I don't know how much
4 longer you plan to depose this witness, but we are going
5 to need a lunch break if we're going to be going into the
6 afternoon.
7     MS. LARKINS: Hallelujah. Ms. Angell agreeing
8 to lunch break. You have no idea how lucky you are. The
9 other witnesses didn't get them. In fact, I even got in
10 trouble yesterday for letting the court reporter sneak
11 back for 15 minutes to eat her lunch.
12     MS. ANGELL: Move to strike. Nonresponsive.
13 I'll direct the witness to disregard comments made by
14 Mrs. Larkins.
15     MS. LARKINS: Okay. Let's take a break.
16     MS. ANGELL: How long will the lunch break be?
17     MS. LARKINS: Let's talk about that after we get
18 back. Let's just take this break now. Shall we let the
19 videographer change the tape?
20     MS. ANGELL: Oh, you mean just for purposes of
21 changing the tape?
22     MS. LARKINS: Yeah.
23     MS. ANGELL: That's fine with me.
24     MS. LARKINS: Agreed, Michael?
25     MR. HERSH: Agreed.

Page 81

1     VIDEOGRAPHER: This is the end of Tape 1, Disk
2 1. We're going off the record. The time is 12:34 p.m.
3     (Recess taken.)
4     VIDEOGRAPHER: Today is Tuesday, November 30,
5 2004. The time is now 12:42 p.m. We're beginning Tape
6 2, Disk 2 of the deposition of Richard Denmon. We're
7 going on the record.
8     MS. ANGELL: Before we proceed with determining
9 how long our lunch break will be, I would like to reflect
10 something that happened after we went off the record. I
11 observed and heard Mrs. Larkins ask -- I don't know if it
12 was to me or to Mr. Denmon -- the following words which I
13 wrote down: "Did you hear that? The CTA lawyer just
14 said that he didn't care about my due process rights."
15 And then I observed Mrs. Larkins made a face and reach
16 over to the speaker phone and disconnect union counsel
17 off the speaker phone. That's it.
18     MS. LARKINS: I would like to state for the
19 record that everything that Ms. Angell has said except
20 for the making the face is true.
21     Ms. Angell, could you describe the face that you
22 were talking about? What kind of face was it?
23     MS. ANGELL: Kind of just scrunched up mouth and
24 eyes, kind of showing an angry face.
25     MS. LARKINS: Kind of like you're doing right

21 (Pages 78 to 81)

Page 82

1  now?
2      MS. ANGELL: I'm not making a face right now.
3      MS. LARKINS: You just made a face. I bet you
4  were trying to show what I was doing perhaps?
5    -  MS. ANGELL: Possibly, but I don't think so.
6      At any rate, how long do we want to go for the
7  lunch break?
8      MS. LARKINS: Actually, I would like to get this
9  finished up within -- by -- it's a quarter to 1:00; is
10  that what time it is?
11      MS. ANGELL: Uh-huh.
12      MS. LARKINS: I'd like to get it finished by
13  1:00 o'clock and not have a lunch break.
14      MS. ANGELL: Okay. If you can finish by 1:00,
15  that is fine. But if you're not finished by 1:00, we're
16  going to need to take a lunch break at that time.
17      MS. LARKINS: God bless Peggy Myers. She must
18  have really said something about how bad it was for her
19  yesterday. Okay.
20      Mr. -- I would like to ask a question similar to
21  the one I answered just before the break. I mean the one
22  I asked just before the break. And I would be willing to
23  stipulate that all of your objections -- they can be
24  standing and applied to this question, too. It's the
25  question about -- I'm trying to find out if it's

Page 83

1  Mr. Denmon's opinion that I should have been told about
2  Ms. Watson's allegations about me within a week. Okay.
3      Q. Mr. Denmon, do you believe that I should have
4  been told about the allegations that Linda Watson in
5  your presence to Gretchen Donndelinger on April 20th,
6  2001 within a week?
7      MS. ANGELL: Objection. Not relevant, not
8  reasonably calculated to lead to the discovery of
9  admissible evidence, incomplete hypothetical, calls for
10  speculation. Insofar as it calls for a legal conclusion,
11  this witness is not qualified as a legal expert.
12      MS. LARKINS: Okay. It doesn't call for a legal
13  conclusion, so you may answer.
14      THE WITNESS: Do I think you should have been
15  notified within a week of these allegations that are on
16  that paper?
17      MS. LARKINS: Yes.
18      MS. ANGELL: Excuse me. It also assumes facts
19  not in evidence.
20      MS. LARKINS: I'm so curious. What are the
21  facts that aren't in evidence?
22      MS. ANGELL: The facts that aren't in evidence
23  is that you weren't told and you haven't elicited from
24  this witness whether he's aware of whether you were told.
25    -  MS. LARKINS: No.

Page 84

1      MS. ANGELL: You haven't elicited anything from
2  this witness about what he knows about what you were
3  told, so you're assuming facts not in evidence.
4      MS. LARKINS: No. I could have been told. For
5  all you know, maybe I was told that very night. But what
6  I want --
7      Q. The question I'm asking you is, in your opinion,
8  should I have been told of the allegations that Linda
9  Watson made to Gretchen Donndelinger in your presence on
10  April 20th, 2001 within a week?
11      MS. ANGELL: Incomplete hypothetical.
12      Do you mean under the facts known to this
13  witness on April 20th, 2001? Did he believe --
14      MS. LARKINS: No. I mean as he sits here today.
15      Q. Do you believe that; that I should have been
16  told within a week?
17      MS. ANGELL: Based on the facts that he knows,
18  knowing that he does not know the entire situation
19  related to your employment? Because, as he testified, he
20  didn't even know why you were not teaching other than it
21  was a personnel matter.
22      MS. LARKINS: Right. This is -- yeah. This
23  is -- not based on any other knowledge, but just the
24  question I'm asking.
25      THE WITNESS: I'm sorry.

Page 85

1      In my opinion I think it's reasonable to expect
2  to be notified if there were concerns about you at work,
3  yes.
4  BY MS. LARKINS:
5      Q. Within a week?
6      A. In a timely manner.
7      Q. How about within a month?
8      A. I think the sooner the better would probably be
9  the best option.
10      Q. How long could it go on and still be okay? Like
11  if you're told a year later, is that acceptable to you?
12  Is that appropriate treatment of an employee?
13      MS. ANGELL: Objection. Vague and ambiguous.
14  This witness is not qualified as an expert witness in any
15  matter, and the question is vague.
16  BY MS. LARKINS:
17      Q. Mr. Denmon, have you spoken to the press
18  recently about teachers being told not to go back to
19  their classrooms without being told the reason?
20      MS. ANGELL: Objection. Vague and ambiguous.
21  Do you mean has this witness given any interviews or
22  talked with the press concerning the August 2004
23  transfers of a number of teachers from Castle Park
24  Elementary? Is that what you're referring to?
25      MS. LARKINS: No. I really -- the question I

22 (Pages 82 to 85)

Larkins v. Werlin
GIC 781970

Deposition of Richard Denmon
November 30, 2004

Page 86

1 asked was the one I wanted answered.
2     THE WITNESS: Could you please ask it again.
3     MS. LARKINS: Yes.
4     MS. ANGELL: The problems is your
5 characterization of "removing from the classroom." As I
6 previously stated, that is vague and ambiguous. I think
7 that you mean one thing. It could -- you have agreed
8 that it could mean any number of things, like five or six
9 different things. Your question is vague.
10     MS. LARKINS: Ms. Angell, I believe I said told
11 not to go back to their classrooms. I said it so you
12 wouldn't have to interrupt. Okay.
13     MS. ANGELL: Let the record reflect that we have
14 had several faces from Mrs. Larkins at me and at the
15 witness at times, include baring her teeth, raising her
16 eyebrows.
17 BY MS. LARKINS:
18   Q. Mr. Denmon, did I just smile at you? Did we
19 just smile at each other?
20   A. I assume. I was looking at you and I was
21 looking at Ms. Angell. I really didn't register --
22   Q. No, but we were looking right at each other.
23 Did we just smile at each other?
24   A. I assume it was a smile, yes. I don't --
25     MS. LARKINS: Okay. That preceded this false

Page 87

1 representation by Ms. Angell.
2     Baring teeth? My goodness gracious, Ms. Angell.
3 You're going to have to explain that one for the record.
4 What do you mean by baring teeth?
5     MS. ANGELL: I mean that you made a grimace; you
6 bared your teeth; you raised your eyebrows.
7     MS. LARKINS: When did I do that?
8     MS. ANGELL: It's unusual. You usually don't do
9 that. Sometimes you smile. It just looks different.
10     MS. LARKINS: Just then when I just smiled at
11 him, you're calling that baring teeth?
12     MS. ANGELL: I'm reflecting what I am observing
13 for the record, because there is no video camera on you,
14 and you're continuing to harass the witness.
15     MS. LARKINS: Ms. Angell, your behavior is
16 outrageous. I interpreted it as a smile; Mr. Denmon
17 interpreted it as smile, and you interpreted it as baring
18 teeth. I believe that you are trying to create a false
19 record.
20     MS. ANGELL: You're entitled to your belief. Do
21 you have a question for the witness?
22 BY MS. LARKINS:
23   Q. Have you recently, since the beginning of August
24 2004, spoken to a member of the press regarding the
25 problem of teachers being told not to go back to their

Page 88

1 classrooms without being given a reason?
2   A. I spoke to the press -- a reporter about my
3 concerns.
4   Q. And what were your concerns that you talked to
5 the reporter about?
6   A. My concerns about the administrator at the site
7 of Castle Park.
8   Q. What were those concerns?
9   A. They were varied. They were different reasons.
10   Q. Did it include teachers being told not to go
11 back to their classroom without being given a reason?
12     MS. ANGELL: Objection. Vague and ambiguous
13 concerning the characterization of teachers being told
14 not to return to their classroom.
15     If you could just tell her whatever you told the
16 reporter.
17     THE WITNESS: To the best of my recollection --
18     MS. LARKINS: We know what you mean.
19     THE WITNESS: -- I told him that I was -- that I
20 had requested a transfer, and that I was assured one
21 thing and that that did not happen. That's what I remember my
22 conversation with the reporter was about.
23 BY MS. LARKINS:
24   Q. Why did you request a transfer?
25   A. Personal reasons.

Page 89

1   Q. Did you read the article that resulted?
2   A. It was read to me over the phone.
3   Q. Did it say that you requested a transfer because
4 you were angry about teachers being told not to go back
5 to their classrooms without being given a reason?
6   A. I believe it said that I was concerned that it
7 was not a safe environment at this time at Castle Park.
8   Q. What did you mean by safe environment?
9   A. Was not an environment that I felt was conducive
10 to educating my students.
11   Q. Why? What made it not a safe environment?
12     MS. ANGELL: We are talking about August of
13 2004; is that your question, Mrs. Larkins?
14     MS. LARKINS: Well, we are talking about --
15   Q. When did you request your transfer?
16   A. August of 2004.
17   Q. Then, yes, we are talking about August 2004.
18 Why was Castle Park not a safe place for --
19   A. I had personal concerns and personnel concerns
20 with the administrator at the site.
21     MS. ANGELL: Insofar as this line of questioning
22 is absolutely irrelevant to the litigation at issue, I'm
23 going to ask the plaintiff to please direct her comments
24 and inquiry to something relating to the allegations in
25 the complaint. This witness's personnel issues regarding

23 (Pages 86 to 89)

| Page 90 | Page 92 |
|---|---|
| 1  any request for transfer that he might have made in | 1  Do you want Mr. Denmon to have the same time |
| 2  August of 2004, unless you can link it somehow to your | 2  that you wanted me to have for a turn-around on this |
| 3  allegations that somebody had your arrest records and | 3  deposition or a different amount of time?  Perhaps you'd |
| 4  spread around that information, it's not relevant, and | 4  like him to have more time. |
| 5  you're seeking to invade his privacy by persisting with | 5  MS. ANGELL:  Why don't you propose a |
| 6  this line of questioning.  It's improper. | 6  stipulation. |
| 7  MS. LARKINS:  I have no more questions, unless | 7  MS. LARKINS:  Okay.  You have done this before, |
| 8  you have questions, and then I might have some follow-up | 8  so you know that what you're going to do is you're going |
| 9  questions. | 9  to get a copy of the deposition in two or three weeks. |
| 10 | 10  And let's stipulate that the court reporter will |
| 11  EXAMINATION BY MS. ANGELL: | 11  send it to Ms. Angell and Ms. Angell will send it to you. |
| 12  Q.  Mr. Denmon, did anyone ever tell you -- outside | 12  And you're going to read it over, and if you see |
| 13  of discussions with counsel in defense of this matter, | 13  something that you think is incorrect, you want to change |
| 14  did anyone ever tell you that Mrs. Larkins was a | 14  your testimony, there is a sheet in the front where you |
| 15  dangerous person who needed to be arrested because she | 15  write down any changes. |
| 16  had at least one handgun? | 16  I remember the other time when you -- when Ms. |
| 17  A.  No. | 17  Schulman deposed you, you corrected a spelling in it.  I |
| 18  Q.  Has anyone -- other than your discussions with | 18  think it was "bazaar."  I think they had it b-a-z-a-a-r. |
| 19  counsel in defense of this matter -- made statements to | 19  Then you have a certain amount of time to read it over, |
| 20  you to that effect?  Maybe not in those same words, but | 20  make the corrections and sign it and return it to |
| 21  that Larkins is dangerous, needs to be arrested because | 21  Ms. Angell. |
| 22  she has a gun? | 22  Now, Ms. Angell insists that I should have one |
| 23  A.  No. | 23  week turn-around, one week to read my deposition and sign |
| 24  Q.  Anyone ever told you that Mrs. Larkins does in | 24  it and return it. |
| 25  fact own a gun? | 25  Does that sound about right to you? |

| Page 91 | Page 93 |
|---|---|
| 1  A.  No. | 1  THE WITNESS:  That's fair. |
| 2  Q.  Has anyone ever said to you that Mrs. Larkins | 2  MS. LARKINS:  Okay.  Then -- and shall we |
| 3  has been arrested? | 3  stipulate that a fax signature will be -- |
| 4  A.  No. | 4  MS. LARKINS:  Mr. Denmon, please be informed that |
| 5  Q.  Has anyone ever told -- shown you -- excuse me. | 5  this is not a conversation between you and Mrs. Larkins, |
| 6  Has anyone ever shown you a police report concerning Mrs. | 6  and it's improper for her to be questioning you at this |
| 7  Larkins? | 7  point.  This is a stipulation among counsel, so you don't |
| 8  A.  No. | 8  need to make any further responses. |
| 9  Q.  Other than conversations with counsel and in | 9  MS. LARKINS:  Okay.  Would you like to discuss |
| 10  defending this matter, have you ever been told that | 10  the time for his deposition turn-around with him and then |
| 11  Mrs. Larkins has ever been arrested? | 11  you tell me? |
| 12  A.  No. | 12  MS. ANGELL:  No.  But you propose your |
| 13  MS. ANGELL:  That's it. | 13  stipulation to me and not to the witness. |
| 14  Mr. Hersh? | 14  MS. LARKINS:  Would you like me to do that? |
| 15  MS. LARKINS:  Any questions, Mr. Hersh? | 15  MS. ANGELL:  Please, continue. |
| 16  He's playing Mine Sweeper again. | 16  MS. LARKINS:  Would you like me to propose the |
| 17  MS. ANGELL:  Maybe he dropped off. | 17  stipulation? |
| 18  MR. HERSH:  I'm sorry.  The mute button was on. | 18  MS. ANGELL:  I'm not sure.  Are you doing that |
| 19  I was speaking, but I just assumed that everybody was | 19  now or -- |
| 20  ignoring me. | 20  MS. LARKINS:  Well, I -- it's sort of a repeat, |
| 21  Yeah.  I have no questions for the witness. | 21  but do you want me to repeat the whole process? |
| 22  Thank you, Mr. Denmon. | 22  MS. ANGELL:  Why don't you just continue. |
| 23  THE WITNESS:  You're welcome. | 23  MS. LARKINS:  I think that would be a much |
| 24  MS. LARKINS:  Okay.  Shall we see if we can | 24  better idea than stopping and having conversations about |
| 25  enter into some stipulations here? | 25  it.  Okay. |

24 (Pages 90 to 93)

Page 94

1    A fax signature will be deemed as acceptable as
2 an original, and if there is no signature after 30 --
3 after one week, it will be considered signed. And the
4 original will be kept by Ms. Angell's law firm. And if
5 the original is lost or unavailable, a certified copy
6 will be acceptable in place of the original.
7    Does anybody want to stipulate to that?
8    MS. ANGELL: The proposed stipulation is that
9 there will be a signature within one week of Mr. Denmon's
10 receipt of the transcript from my office. I will notify
11 counsel of any written changes that he makes to the
12 deposition transcript within a reasonable amount of time
13 after receiving those changes.
14    MS. LARKINS: So stipulated.
15    MS. ANGELL: I do not stipulate and move to
16 strike plaintiff's commentary that was not a stipulation,
17 her statement to the witness about her time frame for her
18 turnover of the deposition transcript, that kind of
19 thing, but insofar as the stipulation of time for
20 reviewing, signature, retention of the transcript and
21 those regular stipulated matters, I do stipulate to
22 those.
23    MS. LARKINS: Okay. Now, things have changed
24 and some parts of what I said have been requested to be
25 stricken from the record, so --

Page 95

1    MS. ANGELL: What's changed in the stipulation
2 that you have proposed? I was just getting out anything
3 that wasn't part of the stipulation.
4    MS. LARKINS: Well, let's just do it right.
5 Okay.
6    I withdraw my stipulation to what I had
7 previously said because Ms. Angell has asked for part of
8 it to be stricken.
9    MS. ANGELL: So you want to wipe all that --
10    MS. LARKINS: Yes. Everything is clean.
11    MS. ANGELL: And start over again?
12    MS. LARKINS: Yes. Let's do it right this time.
13    I stipulate that the transcript will be sent to
14 Ms. Angell when it's ready. She will provide it to
15 Mr. Denmon. If there is no signature provided by
16 Mr. Denmon within seven days of his receiving it, it will
17 be deemed signed and dated. A fax signature is as good
18 as an original. The original will be kept by Ms. Angell.
19 And if the original is lost or unavailable, a certified
20 copy will be acceptable in place of the original.
21    MS. ANGELL: Who do you propose gives notice of
22 any changes and signature to the deposition transcript?
23    MS. LARKINS: Thank you. I should write that
24 here.
25    I propose that Ms. Angell will give notice of

Page 96

1 any changes to the deposition transcript.
2    MS. ANGELL: Within a reasonable amount of time.
3    MS. LARKINS: Okay. Thank you.
4    MS. ANGELL: Stipulate to that, Michael?
5    MR. HERSH: I stipulate.
6    MS. ANGELL: So stipulated. Thanks.
7    MR. HERSH: Good afternoon, folks.
8    MS. LARKINS: The public signs off.
9    MR. HERSH: When is the next deposition?
10    VIDEOGRAPHER: This concludes today's
11 deposition. We're going off the record at 1:03 p.m.
            * * * * *
13    I, RICHARD DENMON, swear under penalty of
14 perjury that I have read the foregoing, and that it is
15 true and correct, to the best of my knowledge and belief.
16    Signed on this      day of      , 2004, at
17
18    (City)          (State)
19
20
21         RICHARD DENMON
22
23
24
25

Page 97

1
2

STATE OF CALIFORNIA  )
3              ) ss.
COUNTY OF SAN DIEGO  )
4
5    I, T. A. Martin, a Certified Shorthand Reporter,
6 Certificate No. 3613, do hereby certify that the witness
7 in the foregoing deposition was by me first duly sworn to
8 testify to the truth, the whole truth, and nothing but
9 the truth in the foregoing cause; that the deposition was
10 then taken before me at the time and place herein named;
11 that said deposition was reported by me in shorthand, and
12 then transcribed through computer-aided transcription
13 under my direction, and that the foregoing transcript
14 contains a true record of the testimony of said witness.
15    I do further certify that I am a disinterested
16 person and am in no way interested in the outcome of this
17 action, or connected with or related to any of the
18 parties in this action or to their respective counsel.
19    IN WITNESS WHEREOF, I have hereunto set my hand
20 on this 6th day of December, 2004.
21
22
23
24 T. A. MARTIN
Certificate No. 3613
25

25 (Pages 94 to 97)

EXHIBIT 5



BEFORE THE GOVERNING BOARD OF THE

CHULA VISTA ELEMENTARY SCHOOL DISTRICT

```
-----------------------------------
IN THE MATTER OF THE ACCUSATION )
AGAINST                         )
          MAURA LARKINS,        ) Case No. L-2002050728
                                )
                  Respondent.   )
-----------------------------------
```

DEPOSITION OF JOELLEN HAMILTON

Taken on Tuesday, September 10, 2002
At 1:00 A.M.
At 84 East J Street
Chula Vista, California 91910

**CONDENSED TRANSCRIPT**



**Page 2**

```
 1                  APPEARANCES
 2
 3    For the Plaintiff:
 4         MARK R. BRESEE
           BY: MARK R. BRESEE, ESQ.
 5         23195 La Cadena Dr., Suite 103
           Laguna Hills, California 92653
 6         (949) 587-0585
 7
 8    For the Respondent:
 9
           SCHULMAN & SCHULMAN A.P.C.
10         BY:  ELIZABETH SCHULMAN, ESQ.
           1551 Fourth Ave., Suite 502
11         San Diego, California 92101
           (619) 238-0303
12
13    Also present:
14         Maura Larkins
15         Gina Boyd
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1    A   No.
 2         MS. SCHULMAN:  And I note that we have another person
 3    who is present in the deposition. Ma'am, are you Gina Boyd?
 4         MS. BOYD:  Yes, I am.
 5         MS. SCHULMAN:  And you're president of the Teachers'
 6    Union for this district; is that correct?
 7         MS. BOYD:  Yes.
 8         MS. SCHULMAN:  And what is your purpose in being here
 9    today?
10         MS. BOYD:  As an observer with one of my union
11    members.
12         MS. SCHULMAN:  I would note and I have noted this
13    with Mr. Bresee, that I object to your presence here since
14    there is a teacher dismissal that is involved in this
15    proceeding, which I am defending on behalf of -- not one of
16    your current members, then, one of your former members.  And it
17    seems to me, you are here in the capacity representing one
18    member against the other, which as I understand it is not
19    something that is permissible.
20         So, as far as I'm concerned, I really don't think
21    it's appropriate for you to be here and request that you leave.
22         MS. BOYD:  I'm sorry.  I will stay as an observer
23    with my union member.
24         MS. SCHULMAN:  You understand you are not allowed to
25    participate, in any matter, with this procedure or interfere
```

**Page 3**

```
 1                  JOELLEN HAMILTON,
 2    called as a witness by the defendant, who, being by me first
 3    duly sworn, was thereupon examined as a witness in said cause.
 4
 5                  EXAMINATION
 6
 7    BY MS. SCHULMAN:
 8    Q   Could you please state your full name for the record?
 9    A   JoEllen Hamilton.
10    Q   Have you ever had your deposition taken before today?
11    A   No.
12    Q   And how do you spell your name?
13    A   J-o-E-l-l-e-n H-a-m-i-l-t-o-n.
14    Q   Before we went on the record, I gave you a document
15    entitled "Deposition Preamble," which I asked you to read.  We
16    marked this as Exhibit 1 to the previous deposition.  Have you
17    taken the time to read it?
18    A   Yes.
19    Q   Do you understand the information contained therein?
20    A   Yes.
21    Q   And do you have any questions about the information
22    contained in that document?
23    A   Not so far.
24    Q   All right.  Do you know of any reason why you
25    couldn't give your best testimony here today?
```

**Page 5**

```
 1    with it?
 2         MS. BOYD:  Absolutely.
 3         MR. BRESEE:  I would like to put on the record that I
 4    think it's somewhat unusual to suggest that -- two things, one,
 5    that an individual shouldn't be present when there's no basis
 6    that the individual is going to interrupt the deposition in any
 7    way, shape, or form.
 8         And secondly, when you talked about one union member
 9    against the other.  The respondent in this case, Maura Larkins,
10    has made accusations against other members and in this filing
11    a, lawsuit, naming the deponent as a defendant.  So, to suggest
12    that this is being transformed into one union member over
13    another because of Ms. Boyd's presence when Ms. Larkins, long
14    ago, made this into a union member against others dispute, I
15    think, is misstating the history of this case.  I just want
16    that on the record also.
17         And I think that she has every right to be here.  The
18    deponent has every right to have a representative here.
19         MS. SCHULMAN:  This case involves an action of
20    dismissal that was brought by the school district against
21    Ms. Larkins.
22         As I understand it, any civil action that might have
23    been brought against Ms. Hamilton has already been resolved by
24    the court.  So, there is nothing current as to that.
25         It is my understanding that this union has in the
```

2 (Pages 2 to 5)

**Page 6**

1  past represented Ms. Larkins, if not in this matter, then in
2  related matters. And I will say that in 26 years of practicing
3  law, I have never once had anybody other than a witness, the
4  parties' attorneys, and an attorney representing a deponent
5  from time to time, I have never had an observer. I have never
6  requested an observer be present in any deposition that I have
7  participated in, and I find this highly inappropriate.
8      But my choice is to either proceed or delay the
9  proceedings before the appropriate body that we have here. And
10  as far as the presence of Ms. Boyd, I don't know and I have no
11  personal quarrel with her. We voiced our objections. We elect
12  to go forward, but we may take some action, further action,
13  that will not delay these proceedings regarding this matter.
14      And I must say from a personal point of view, since I
15  was requested to change the depositions for this week at your
16  request, Mr. Bresee, to this location, which I agreed to do and
17  which I promised I am abiding by at this point in time, I feel
18  somewhat like I have been corralled here. And all of a sudden,
19  over my protest, there is a union representative present, who I
20  believe would not be here if it were conducted in my office.
21  And at this juncture, I am seriously considering moving
22  tomorrow's depositions to my office.
23      MR. BRESEE: Well, that's fine. She will be there at
24  your office tomorrow if you choose to do that. Her presence
25  here has nothing to do with the fact that we asked, and you

**Page 7**

1  agreed, to move the depositions here. Just so that the
2  individuals being deposed would have less time away from the
3  work place than they otherwise might. But if you want to move
4  it back to your office, that's fine.
5      MS. SCHULMAN: I will mull that one over. I also
6  will note for the record that this witness's deposition was
7  noted for 2:00 o'clock at her request made through your office.
8  I agreed to do my best to move it up to 1:00 o'clock, which we
9  have done. It is now 1:15. So, I intend to get started with
10  this deposition.
11  BY MS. SCHULMAN:
12      Q   Ms. Hamilton, do you have any kind of college
13  degrees?
14      A   Yes.
15      Q   And where did you graduate from college?
16      A   San Diego State University.
17      Q   And when?
18      A   1988.
19      Q   And with what degree?
20      A   Degree in liberal studies, and then, also, I got my
21  teaching credential.
22      Q   And did your teaching credential involve teaching
23  students at a particular grade level?
24      A   Yes, student teaching.
25      Q   What grade level?

**Page 8**

1      A   I do my student teaching in kindergarten and in a
2  fourth grade classroom.
3      Q   And did part of your educational studies at San Diego
4  State University involve studies in early childhood education?
5      A   Yes.
6      Q   And approximately, how many credits did you earn in
7  education areas, undergraduate?
8      A   Well, the credential is 30 units, and I cannot recall
9  before that how many units I took in early childhood education.
10  I'd have to look at my transcripts.
11      Q   And did you graduate with any particular honors?
12      A   No.
13      Q   Do you have any degrees, beyond your bachelor's from
14  San Diego State?
15      A   No.
16      Q   Have you pursued any additional courses of study,
17  beyond your bachelor's degree?
18      A   Yes, I have.
19      Q   And what courses of studies have you pursued?
20      A   Classes that I took, probably six years ago to -- in
21  order to work on my CLAD certificate.
22      Q   And what is your CLAD certificate?
23      A   It's a Cross-Cultural Language Development
24  Certificate that the district encourages us to pursue.
25      Q   And did you complete that certificate?

**Page 9**

1      A   Not quite yet. I have to take another Spanish class.
2      Q   If I understand you correctly, did you take
3  everything that you needed six years ago except for that one
4  Spanish class, or have you been doing this over the course of
5  six years?
6      A   No. I just took four classes. I believe they were
7  back to back. It was so long ago. Four classes through
8  National. They have a special program there for the CLAD
9  certificate for the teachers. So, I took these four classes,
10  and then I took a Spanish class last year. But I believe I
11  still have to obtain one or two more units in Spanish before
12  I'm completely ready to apply for the certificate.
13      Q   And once you get that certificate, what will that
14  certificate make you eligible to do, if anything?
15      A   The only thing different, I believe, is to be able to
16  transfer to another school.
17      Q   Any particular type of school?
18      A   No.
19      Q   Why is that? You are --
20      A   It's also so that I can have the second language
21  students in my classroom, but as far as transferring to another
22  school, I have no desire at this time. But you never know when
23  I'll be ready for a change.
24      Q   So, at this time are you not able to transfer to
25  another school?

1    A  I haven't attempted to.
2    Q  What is it about the certificate which will enable
3  you to transfer to another school, simply that you're more
4  versatile?
5    A  The district just requires it for transfer because
6  they want teachers to have it, as far as my understanding --
7    MR. BRESEE: It's called an incentive.
8    THE WITNESS: Incentive.
9  BY MS. SCHULMAN:
10   Q  Following college, did you become gainfully employed?
11   A  I was a substitute teacher in the Santee School
12  District for one year and then after that, the next year, in
13  the fall of '89, I started working in this district.
14   Q  Chula Vista Elementary School District?
15   A  Yes.
16   Q  So, if we refer to the Chula Vista Elementary School
17  District as "the district," you'll understand that that's what
18  we're talking about? Okay?
19   A  Yes.
20   Q  And are you currently tenured?
21   A  Yes.
22   Q  And when did you obtain your tenure?
23   A  I believe it's the first day of your third year.
24   Q  Which would have been when for you?
25   A  '91, fall of, or '92, '92, I guess. I don't have the

Page 10

1  question.
2    Q  I'm just asking, to your knowledge, do you have --
3  and I'm just interested, basically, in percentages here. Do
4  you have some percentage of your current first grade class
5  where you believe that students are bilingual?
6    A  Yes. I don't know the percentage, but I do have
7  students that speak both English and Spanish.
8    Q  Do you have an estimate of what the percentage is?
9    A  I do not, yet. The school just started.
10   Q  Just started? When did you start school?
11   A  Last Tuesday.
12   Q  Day after Labor Day?
13   A  September 3rd, we started.
14   Q  Did you speak to anybody about having your deposition
15  taken here today?
16   A  Yes, I did.
17   Q  And who did you speak to?
18   A  My husband. I believe I spoke with Gina. I spoke
19  with some colleagues at work.
20   Q  Anyone else?
21   A  I spoke with Mr. Bresee and Mr. Werlin this morning.
22   Q  Was Mr. Bresee present when you spoke to Mr. Werlin?
23   A  Yes, he was.
24   Q  At all times?
25   A  Yes, he was.

Page 12

1  dates down.
2    Q  So, you started working for the school district in
3  1989?
4    A  '89. I believe that that is the date.
5    Q  And you have worked that entire time at Castle Park
6  Elementary School?
7    A  Yes, I have.
8    Q  And what grades have you taught at Castle Park?
9    A  My first year I taught a one-two combination. Then I
10  taught third grade for one year. I taught sixth grade for four
11  years, and this is my 8th year teaching first grade. And if
12  those total up to 14, then I did it correctly.
13   Q  Well, all this time, have you had English speaking
14  students?
15   A  Yes. I have also had bilingual students in my
16  classroom also.
17   Q  Who were integrated into your classroom for various
18  purposes?
19   A  They were just signed up in my class. Their parents
20  chose for them to be in an English only classroom. I don't
21  know why.
22   Q  This year do you have students whose parents chose
23  for them to be in an English only classroom who are bilingual?
24   A  I'm not aware. You'd have to ask the secretary about
25  that, I guess. I'm not sure. I don't understand your

Page 11

1    Q  And is Mr. Bresee representing you here today?
2    A  Yes.
3    Q  And at what time this morning, did you speak to
4  Mr. Werlin and Mr. Bresee?
5    A  Maybe at 7:40.
6    Q  And how long did you speak to them?
7    A  For about 15 minutes, 10 minutes, 15 minutes.
8    MR. BRESEE: I might clarify things for future
9  depositions. I met with all of the individuals that you
10  deposed as a group, just to tell them what a deposition is,
11  answer any questions that they have, just a basic intro
12  meeting.
13   MS. SCHULMAN: Okay.
14   Q  And did you, in fact, discuss your taking your
15  deposition here today with Gina Boyd?
16   A  I believe I did, yes.
17   Q  And did you discuss the substance of what your
18  expected testimony would be?
19   A  Not with Gina.
20   Q  You mentioned that you discussed your deposition with
21  colleagues at work. Do you recall that?
22   A  Uh-huh.
23   Q  Yes? You'll have to answer audibly or else our court
24  reporter has a heck of a time.
25   A  Yes.

Page 13

4 (Pages 10 to 13)

1  Q  And which colleagues did you discuss your deposition
2  with?
3  A  I know the other teachers that were in the meeting
4  this morning.
5  Q  Okay.  And who were those?
6  A  Rick Denman and Linda Watson.
7  Q  Anyone else?
8  A  I don't recall, I probably mentioned to my first
9  grade team that I would be leaving this afternoon for the
10  deposition.
11  Q  Did you discuss the substance of your deposition with
12  them?
13  A  I actually didn't know the substance of the
14  deposition.
15  Q  So the answer is no?
16  A  No.
17  Q  And who is your first grade team?
18  A  Kathy Bingham, Nicky Perez, and Rick Ramirez.
19  Q  I'm sorry.  Kathy Bingham, and who is the next one?
20  A  Nicky Perez.
21  Q  And?
22  A  Rick Ramirez.
23  Q  Are these all other first grade teachers?
24  A  Yes.
25  Q  And what was your purpose in discussing the

Page 14

1  A  We were very surprised that we were called for a
2  deposition, and we didn't know why.
3  Q  Was there any topic discussed besides your surprise?
4  A  I guess the topic of frustration that it's gone on
5  this long.
6  Q  What has gone on this long?
7  A  That this lawsuit has gone on for such a long time.
8  Q  What do you believe the proceeding that you've been
9  called to testify, here in deposition, about this afternoon is
10  concerning?
11  MR. BRESEE:  Are you asking her what she knows now,
12  or what she knew at the time she had the conversation with Rick
13  Denman?
14  MS. SCHULMAN:  Let's start with at the time you had
15  the conversation with Mr. Denman.
16  A  Can you repeat the question, please?
17  Q  Yes.  What was your understanding at the time you had
18  the conversation with Rick Denman about what the underlying
19  claim here, procedure, or proceeding was about, which you were
20  being asked to testify?
21  A  We didn't know what it had to do with.  We assumed it
22  had to do with a lawsuit, but we didn't know why we were being
23  called.  Because to the best of my knowledge, the case against
24  me had been dismissed.
25  Q  Did anybody ever show you any kind of document that

Page 16

1  deposition with the other first grades teachers?
2  A  To tell you why I would be absent.
3  Q  And have you been away the whole day?
4  A  No, just this afternoon.
5  Q  And what time does your teaching day start?
6  A  We have to be at school at 7:30 a.m.
7  Q  And what time does it end?
8  A  2:30 p.m.
9  Q  Did you discuss the substance of your deposition
10  testimony with Rick Denman?
11  A  I didn't know the substance of the deposition.
12  Q  Did you discuss anything that you may believe, you
13  know, or actually know, about Maura Larkins?
14  MR. BRESEE:  Hold on a second.  Are you asking about
15  outside of the meeting?
16  MS. SCHULMAN:  With Rick Denman.
17  MR. BRESEE:  But not in the meeting this morning?
18  MS. SCHULMAN:  Not in the meeting with your attorney
19  present.
20  MR. BRESEE:  Not in my presence.  She's asking about
21  conversations you had with him outside of my presence.
22  THE WITNESS:  Yes, we had a conversation about it.  I
23  don't recall exactly what was said.
24  BY MS. SCHULMAN:
25  Q  Do you recall the substance of what was being said?

Page 15

1  was entitled "Notice Of Deposition" to have your deposition
2  taken?
3  A  Yes.  I received that this morning.
4  Q  Okay.  So, you didn't see that at the time that you
5  had this conversation with Rick Denman?
6  A  We just received the notice this morning.
7  Q  Okay.  But some time before you received the notice
8  this morning, somebody had told you that your deposition was
9  going to be taken at a particular time and place?
10  A  Yes.
11  Q  But you didn't know what it was related to?
12  A  Well, I assumed it was related to the lawsuit, but I
13  don't know why I, personally, am being called here.
14  Q  Having been given your notice of deposition and
15  whatever other knowledge you might have gained, do you now have
16  any understanding as to what this procedure is for, which you
17  have been called for a deposition?
18  A  I can only guess, but I'd rather just wait for your
19  questions.
20  Q  Perhaps I didn't ask the question in a meaningful
21  way.
22  A  I'm not quite sure what you're asking me.
23  Q  Do you know, in this matter, whether or not the
24  school district or Ms. Larkins was the instigator of the
25  proceeding?

Page 17

5 (Pages 14 to 17)

1  A  That, I do not know.
2  Q  Do you know what kind of proceeding it is?
3  A  Deposition.
4  Q  Do you know what the kind of administrative claim or
5 lawsuit or what form of litigation there is that was filed that
6 has caused you to be here today for your deposition?
7  A  I guess I understood that the district was moving to
8 terminate Mrs. Larkins, and I don't know why I am here.
9  Q  Okay. So, you now have an understanding that the
10 matter that underlies this deposition here today was instituted
11 by the district; is that correct?
12  A  Now that you've told me.
13  Q  You didn't have that understanding before I told you?
14  A  No.
15  Q  Okay. We can move on from there, certainly. When
16 you had this conversation with Mr. Denman, was Ms. Watson there
17 at the same time, or is that a separate conversation?
18  A  I believe Mr. Denman and I were in my classroom.
19  Q  And so, the conversation with Ms. Watson was a
20 separate conversation?
21  A  I don't think I talked about it with Linda outside
22 the -- outside of the meeting this morning. We had this
23 meeting this morning, and then we went in and started teaching.
24  Q  When you spoke to your colleagues, the only separate
25 conversation you had apart from your meeting this morning was a

1  Q  And when she first started teaching at the school,
2 did you have some knowledge as to what she was teaching, what
3 grade, what subject matter?
4  A  She was teaching the third grade bilingual class.
5  Q  You're acquainted with Dr. Donndelinger, are you not?
6  A  Yes I am.
7  Q  And you knew her because she became principal of
8 Castle Park in 1997, correct?
9  A  Yes. If that's the year you say, then I believe you.
10  Q  Okay. And who was the principal of Castle Park prior
11 to that time?
12  A  Tony Gonzalez -- no, I'm sorry, Oscar Perez. It was
13 Tony and then Oscar.
14  Q  And how long was Oscar Perez principal?
15  A  I don't know if it was two years.
16  Q  And how long was Tony Gonzalez principal?
17  A  I believe he was at Castle Park for either six or
18 seven years.
19  Q  Were there any other principals who were principal at
20 Castle Park other than these three people, and not including
21 who is principal right now?
22  A  No. Those are the only three principals that I have
23 worked with other than Mr. Allen.
24  Q  Who is the current principal?
25  A  Yes.

1 conversation with Rick Denman?
2  A  And then I spoke with, as I told you, my colleagues
3 on my team.
4  Q  Right. To let them know that you weren't going to be
5 there this afternoon, correct?
6  A  Yes.
7  Q  Did there come some time when you became acquainted
8 with Maura Larkins?
9  A  Yes, through work.
10  Q  And when was that?
11  A  You know, I do not remember. I do not remember if
12 she was at our school for three years or for four years. I can
13 not give you a date.
14  Q  Do you recall ever having been acquainted with her,
15 prior to the time that she came to your school as a teacher?
16  A  No.
17  Q  So, if I told you that she came to your school in
18 1997, would that help refresh your recollection?
19  A  That would sound like, you know, four years.
20  Q  Before you met her, had you heard anything about her?
21  A  No.
22  Q  You had heard no rumors?
23  A  No.
24  Q  You had formed no opinion about her?
25  A  No.

1  Q  Did there ever come some time while you were teaching
2 at Castle Park that you experienced any kind of problems,
3 whatsoever, with Ms. Larkins?
4  A  Yes.
5  Q  And when was that first time?
6  A  I do not recall the first time.
7  Q  Do you recall, approximately, what year it was?
8  A  No.
9  Q  Do you recall what the subject matter of the issue
10 was?
11  A  I would -- to the best of my knowledge I would say
12 the issue over Kingdoms, which was a program that we had at our
13 school. But I do not remember the day or month or year.
14  Q  Would something like the school year of 2000, 2001
15 sound approximately correct to you?
16  A  That would be two years ago. Two or three years ago.
17  Q  I do not recall the date.
18  Q  Was that the first problem that you remember with
19 Ms. Larkins?
20  A  To the best of my recollection, that is.
21  Q  And what happened with Kingdoms?
22  A  Can you be more specific? A lot of things happened,
23 it seems.
24  Q  What was the issue that arose with Kingdoms and
25 Ms. Larkins?

1    A    The only issue that I can remember was -- and it
2    stands out in my mind -- was a time that she didn't think --
3    Kingdoms was a weekly activity with the entire school and,
4    then, later it became biweekly. So, I don't remember if this
5    was a weekly time or biweekly time. But she thought that we
6    were not going to have Kingdoms that week, and we were. And
7    she got very upset and raised her voice at me. It was over
8    scheduling.
9    Q    Where were the two of you when the incident occurred?
10   A    I believe we were in the lounge because there were
11   the dates posted for Kingdoms. I believe it was on, like, a
12   master schedule on the lounge wall.
13   Q    And that would have been the teacher's lounge?
14   A    Yes.
15   Q    And was that a place that you typically had a habit
16   of stopping in on your way into work every morning?
17   A    Yes, yeah. I don't sit in the lounge a lot, but I
18   stop in there to see if there are notes written on the board,
19   if there's anything written up on the wall that I need to see.
20   Q    And had you been responsible for the scheduling of
21   Kingdoms?
22   A    Not me personally, but I was on the piece design team
23   that coordinated the activities.
24   Q    That coordinated the Kingdoms activities?
25   A    Yes.

Page 22

1    Q    And just briefly, if you could, describe for us what
2    this Kingdoms program was about, please?
3    A    Well, the Kingdoms program was developed at Castle
4    Park, and it was based on a program at another school. And the
5    basis for the program is to bring students and teachers of all
6    grade levels together and have a whole school activity. And
7    so, the students were -- we have kindergarten through sixth
8    grade. And so, the students were divided into different
9    kingdoms. And for instance, in my kingdom I had students,
10   kindergarten through grade six. Like, I might have three
11   kindergarteners and three first graders and three second
12   graders, like that.
13   So, the kids were dispersed with a different teacher
14   for that time, just like -- I think it was about an hour that
15   we did the activities. So, I believe when we started it out,
16   it was Friday afternoon. So, every Friday afternoon the entire
17   school would come out on the black top, and we would do a
18   little assembly and talk about school rules. We would talk
19   about self-esteem issues. We would talk about different
20   character behavior. And then the students would be excused to
21   go to their kingdom.
22   And that's what we called it because we're Castle
23   Park, and another school, they call it Families. And so, the
24   grades that were assigned to me, kindergarten through sixth
25   grade came with me into my classroom, and we had lesson plans

Page 23

1    that we followed that had to do with character education. And
2    the next year, it had to do with school safety, bullying,
3    character education again. And so, it was really a wonderful
4    program that I can say just about every student enjoyed at our
5    school and looked forward to.
6    Q    And so, here you were on this one particular day
7    sitting in the --
8    A    I don't think I was sitting there. I think I, kind
9    of, passed by, and I dot got nailed as I went by.
10   Q    Okay. And so, the bulletin board indicated what,
11   that there had been a Kingdoms session that had been deleted,
12   or changed, rescheduled, what?
13   A    I believe on the weekly bulletin -- at the beginning
14   of the year, we were given a schedule with every date and the
15   lesson that was to be taught on that date. So we could put it
16   up on our board. I put mine right by my desk. I believe there
17   was an enlarged one in the lounge so we could see it. I
18   believe on this particular occasion it was not in the weekly
19   bulletin that our principal put out.
20   Q    So, that weekly bulletin differed from the chart that
21   was --
22   A    The original chart, yes.
23   Q    And what happened?
24   A    Can you be more specific?
25   Q    Well, Ms. Larkins came in, and did she note this by

Page 24

1    reading a weekly bulletin that you observed in what happened?
2    A    When I came in the lounge, I heard her speaking in a
3    very angry voice to another teacher, and I could be mistaken,
4    but Mrs. Larkins at one time was on the piece design team
5    committee. But when I came into the lounge, she was speaking
6    in a very angry voice at another teacher. I don't remember
7    what was said. And then that teacher said something like, "I'm
8    not even on that design team."
9    And so then, I was walking through and she turned to
10   me and said something in an a very angry voice about, you know,
11   "Kingdoms is not on the schedule."
12   And I said, "It is on the original schedule."
13   And she was very upset, visibly shaking, and walked
14   very quickly out of the room. But the deletion of Kingdoms on
15   the weekly schedule was not my fault, and it was not the other
16   teacher's fault.
17   Q    Who is the other teacher that you observed
18   Mrs. Larkins speaking to?
19   A    It was Robin Colls.
20   Q    Approximately, what period of time expired between
21   you first observing Maura Larkins speaking, in which you have
22   said a very angry voice, to the other teacher Robin Colls and
23   the time that you observed Maura Larkins walk out of the
24   lounge?
25   A    When she spoke to Robin, and then she spoke to me and

Page 25

7 (Pages 22 to 25)

1 then, I believe, she just left the lounge.
2 Q  And how long did that all take?
3 A  Couple minutes, few minutes.
4 Q  One minute, two minutes, three minutes, about how
5 long?
6 A  I don't remember it being a long argument.  I
7 remember looking at the schedules, and I would say just a few
8 minutes.
9 Q  And in this few minutes, were there any other words
10 that were spoken?
11 A  Not that I remember.
12 Q  Was there any other topic that was discussed?
13 A  Not that I remember.  Again, this is three years ago,
14 four years ago.
15 Q  So, when you walked in, your observation was that
16 Ms. Larkins was speaking in a very angry voice to Robin Colls?
17 A  Yes.
18 Q  And what you recall Maura Larkins saying to you is,
19 "Kingdoms is not on the schedule;" is that correct?
20 A  Right.
21 Q  And she said that in what, a loud voice, an angry
22 voice?
23 A  Very angry voice, very upset.
24 Q  And you said to her, "It was on the original
25 schedule"?

Page 26

1 A  Yes.
2 Q  And in what tone of voice did you respond in that
3 statement?
4 A  Probably, "It was on the original schedule".
5 Q  And then Ms. Larkins simply walked out of the room
6 after you said that?
7 A  I do not remember her saying anything else.
8 Q  Your best memory is she simply, after you said that,
9 walked out of the room?
10 A  Yes.
11 Q  Now, what, if anything, did you do about this scene
12 that you had first observed and, then, become a bit of a
13 participant in?
14 A  I don't remember doing anything.
15 Q  Did you report it to anybody?
16 A  Not that I recall.
17 Q  At some later time, did you report this occurrence to
18 anyone?
19 A  Not that I recall.  I might have asked Gretchen
20 Donndelinger why it hadn't been put on the schedule, or the
21 weekly bulletin.  That would seem like a natural thing, but I
22 do not recall reporting this.
23 Q  You have no specific recollection?
24 A  No.
25 Q  Were you in fear of your personal safety during the

Page 27

1 time that Ms. Larkins was in the teacher's lounge, at that
2 point in time, discussing this matter about the Kingdoms?
3 A  No.
4 Q  Did Robin Colls express to you that she was fearful
5 for her personal safety?
6 A  Not that I recall.
7 Q  And after Ms. Larkins walked out, in your mind, was
8 it sort of a done deal?
9 A  This was a long time ago you're asking me about.  I
10 don't recall.
11 Q  Did there come some time when there was some other
12 incident involving Ms. Larkins, which gave you some concern?
13 A  Can you be more specific?
14 Q  No.  I'm just asking you if there is anything else?
15 A  Yes.
16 Q  And what was it?
17 A  I was very concerned when I went in to Ms.
18 Donndelinger's office one morning and she showed me a letter,
19 and I read the letter and it stated that there was a staff
20 member who had constantly been harassing her for a year.
21 Q  And who was the letter from?
22 A  It was signed by Mrs. Larkins, and I don't have the
23 date.  I didn't bring my notes with me.  And I asked Gretchen,
24 I said, "Why are you showing me this?  Who is this about?"
25     And she said, "It's about you."

Page 28

1     And I said, "What do you mean?"
2     And she said, "Maura said this letter is about you."
3 Q  And why were you so surprised at that?
4 A  I was completely shocked because I had very little
5 contact with Maura Larkins let alone harass her about anything.
6 I take constant harassment, to mean daily, or on a consistent
7 basis.  To the best of my knowledge, there had been no
8 harassment.
9 Q  And did the letter mention you by name?
10 A  No.  My name was verbally attached to it.
11 Q  And what do you mean by "verbally attached to it"?
12 A  She told, Mrs. Larkins told Dr. Donndelinger that the
13 letter was about me.
14 Q  And did you ask Dr. Donndelinger if there had been
15 some specific incidents related to Dr. Donndelinger that
16 weren't recited in the letter?
17 A  Can you say that again, please?
18 Q  Did you -- I'll put it in a different way.  Perhaps
19 it would be easier.  Did Dr. Donndelinger impart any
20 information to you about any specific events, which Ms. Larkins
21 had related to Dr. Donndelinger wherein she claimed that you
22 harassed her?
23 A  No.  In fact I asked her, I said, "Well, what is this
24 about?"
25     And she said, "I don't know."

Page 29

8 (Pages 26 to 29)

1  Q  We have attached certain exhibits to depositions.
2  Perhaps we can find the letter that is being referenced here.
3    MR. BRESEE: 19?
4    MS. SCHULMAN: Yeah, that's the one we're at. Could
5  you show the witness Exhibit 19, please?
6    Q  Is that the letter?
7    A  It looks like the letter. It looks like, maybe, it's
8  typed differently, but that looks like the letter.
9    Q  All right. And that's the letter addressed to
10  Dr. Donndelinger, dated January 23, 2001, which says:
11    "One year ago I first tried to report to you a
12  problem with inappropriate behavior towards me on the part of a
13  staff member. You dismissed the matter as insignificant. I
14  have endured in silence. During the past few weeks, the
15  problem has escalated into constant harassment. Please set up
16  a meeting and time to discuss this problem."
17    That's it, right?
18    A  Yes.
19    Q  Had there been any kind of problems for the few weeks
20  preceding January 23, 2001, with Ms. Larkins that you were
21  aware of, that implicated you in some way?
22    A  Not that I recall. I don't know when the Kingdoms
23  incident occurred. I don't know if it was at that time, but I
24  do not recall any particular incident.
25    Q  But up until that point, you had not reported the

Page 30

1  mediator?
2    A  Because we were using the Comer model at the time,
3  Comer reform model, and I wanted to have someone else there
4  present at this meeting, because I took this letter very
5  seriously.
6    Q  And why did you take Exhibit 19 very seriously?
7    A  Because it was written about me. I didn't know where
8  this letter was going to be sent. I didn't know if it was
9  going to be sent to the district office, if it was going to be
10  put in a file of any kind. And so, I wanted this taken care
11  of.
12    Q  You wanted the matter clarified and resolved?
13    A  Yes.
14    Q  And that never happened?
15    A  It never happened.
16    Q  Did Dr. Donndelinger or anybody else tell you that
17  the representative of the Comer reform model, who was attached
18  to the school, had declined to mediate the issue?
19    A  I do not recall that.
20    Q  Did you suggest any other mediator besides somebody
21  who was a Comer mediator?
22    A  I do not recall who else I suggested. This was
23  several years ago, or two years ago. I do not recall.
24    Q  Did there ever come some time when you felt that
25  Ms. Larkins had, for want of a better term, invaded your body

Page 32

1  Kingdoms incident to any person, correct?
2    A  Not that I recall.
3    Q  And do you have any knowledge as to whether or not
4  anybody else, including Robin, had reported this Kingdoms
5  incident to anybody?
6    A  I don't know.
7    Q  So, you were perplexed; is that correct?
8    A  Uh-huh.
9    Q  You'll have to answer audibly.
10    A  Yes. I was very surprised.
11    Q  What, if anything, did you do at that point in time
12  to try to clear up the situation.
13    A  Well, Gretchen said, "Let's just -- let's just wait
14  and see what happens."
15    And I said that I would like to have a meeting set up
16  with Mrs. Larkins to discuss this issue, but I would like to
17  have a mediator present, such as a Comer representative. And to
18  the best of my knowledge, several meetings were set up that
19  were cancelled by Mrs. Larkins. I believe the initial meeting
20  she may have said, "Oh, I can meet on this day."
21    And I said, "I cannot meet on that day because I have
22  to pick up my daughter from school."
23    But I never cancelled a meeting, and to the best of
24  my knowledge, Mrs. Larkins cancelled several.
25    Q  Why did you suggest a Comer representative as a

Page 31

1  space?
2    A  Yes.
3    Q  When was that?
4    A  I don't remember the date. I have it written in my
5  notes at school, but the meetings had, meetings one after
6  another had been cancelled, and I had not talked to
7  Mrs. Larkins about this issue yet. And one day, it was -- I
8  don't know if it was morning recess or lunch recess, but we
9  were passing in the doorway, and we were in, like, the doorway
10  to the work room, and I said, you know, "Hello." And then I
11  said, "I understand that you wrote a letter of complaint about
12  me to Gretchen."
13    And she said, "Gretchen lied."
14    And I said, "She lied? I saw the letter."
15    And she said -- I know this because I just reviewed
16  this before I came over.
17    And she said, "You saw the letter?"
18    And then I said, "Yes, I saw the letter."
19    And she said, and she looked at me with a very angry
20  face. She was starting to shake, and she pointed at me and she
21  said, "You are part of the problem."
22    And I said, "Maura, what problem?"
23    And she said, "You are part of the problem. You have
24  done many inappropriate things at this school."
25    And I said, "Well, Maura, that's your perspective."

Page 33

9 (Pages 30 to 33)

1    And she just pointed at me again and said, "You are
2  part of the problem."
3    And she was very close to me, very angry, visibly
4  shaken, and she turned and walked very quickly to her
5  classroom.
6    Q  Were any people within earshot of this conversation
7  of whom you are aware of?
8    A  Not that I know of.
9    Q  And approximately, how long did this conversation
10  take?
11    A  What does that take, one or two minutes?
12    Q  Is that your best estimate?
13    A  Yes.
14    Q  Was there anything else said during that conversation
15  that you can recall?
16    A  No.
17    Q  Were there any other topics discussed?
18    A  No.
19    Q  And -- from mentioning this letter, alluding to what
20  we've marked as Exhibit 19?
21    A  Yes.
22    Q  And you were the one who broached the subject,
23  correct?
24    A  Yes.
25    Q  And about how long after you had seen the letter, to

Page 34

1  your best estimate, did this hallway or doorway interlude take
2  place?
3    A  I would say a week and a half because we were waiting
4  for meetings to be set up, and meeting after meeting was
5  cancelled. So, I would -- my estimate would be a week and a
6  half. I have the dates written down at school.
7    Q  You alluded to notes. What kind of notes did you
8  keep on this?
9    A  I went to my classroom right away and wrote down
10  everything that I remembered.
11    Q  Is that kept in some sort of calendar or diary that
12  you keep at your desk?
13    A  No. Just a notepad.
14    Q  And how many notes do you have on that notepad, or
15  those notepads, that refer to Ms. Larkins?
16    A  Just two pages.
17    Q  And what size note papers are these?
18    A  This size.
19    Q  So, if we took an 8 1/2 by 11 and just longitudinally
20  put it in half?
21    A  And then there's a little school picture going around
22  there. So, the lines are even smaller. There's some sort of
23  school logo, little, cute, teacher stuff. And it was a
24  situation that was very upsetting to me. And so, I went back
25  to my classroom and wrote exactly what was said.

Page 35

1    Q  Where have you maintained those notes that you have
2  every since?
3    A  In the drawer of my desk.
4    Q  Are they still there now?
5    A  No.
6    Q  Have you provided them to any attorney in this
7  matter?
8    A  When we were questioned or interviewed by --
9    MR. BRESEE: Dan Shinoff.
10    THE WITNESS: Dan Shinoff. Thank you. I did read
11  those notes.
12  BY MS. SCHULMAN:
13    Q  You read those notes to him?
14    A  Yes.
15    Q  And did you leave those note with him?
16    A  No.
17    Q  You took them back?
18    A  Yes.
19    Q  And where do you keep them now?
20    A  They're in a notebook.
21    Q  At home?
22    A  No. They're at school.
23    Q  Does that notebook have a title?
24    A  No. Actually, they've just been sitting in my desk
25  drawer, and just today I put them in a notebook because I was

Page 36

1  going to bring them today to refer to the dates.
2    Q  And why didn't you?
3    A  I forgot it. I had two stacks of things. And I put
4  one stack in my mailbox, and one stack I took with me, which
5  was work to do at home this evening. And when I parked in the
6  parking lot and got my stuff to come in here, I realized that I
7  did not have my folder. It is in my mailbox at school.
8    Q  I'm sure everybody in this room has done something
9  like that on more than one occasion. Was there ever a time
10  when you raised your voice towards Maura Larkins?
11    A  No, absolutely not.
12    Q  Did you ever report to anyone that Maura Larkins was
13  going to teach creationism on science day?
14    A  I did not report that.
15    Q  Did you ever say that?
16    A  I read what she wrote on the board.
17    Q  And where was that board?
18    A  It was posted in the lounge for science week.
19    Q  The teacher's lounge?
20    A  Yes, it was.
21    Q  And when was science week?
22    A  At that particular year, we had it, probably, the
23  second week in January.
24    Q  Was that a project you were in charge of?
25    A  Yes.

Page 37

1  Q  Would that be 2001?

2  A  Must be.

3  Q  Why must it be?

4  A  I'm just going back in time. I don't have the dates.

5  I did not keep notes on this -- except for that one incident.

6  I don't have dates written down but that's probably the month.

7  Q  And you just read aloud that it said that Ms. Larkins

8  was going to teach creationism?

9  A  Well, as part of the science committee, it was my job

10  and, actually, there were two or three of us that put up the

11  posters to have teachers sign up for life science, earth

12  science, or physical science so that we can get an assortment

13  of science activities for the students. They go to three

14  different science activities on science day. Mrs. Larkins had

15  not signed up for a day, and I don't believe it was me, but

16  I -- to the best of my recollection, I believe that someone

17  mentioned to her and maybe another teacher, you know, you need

18  to figure out your activities so you can write it on the

19  science board.

20      And we do that so that we make sure we have an

21  assortment of activities so that two teachers aren't doing the

22  same activities. Because if I did the same activity as

23  Ms. Bingham, then two students would do the same activity

24  twice. So, we ask the teachers to sign up.

25      And so, I don't remember asking her myself. So, I

Page 38

1  Q  You indicated earlier that you really didn't have

2  much interaction with Ms. Larkins, correct?

3  A  Right.

4  Q  And what interaction did you have in the regular

5  ordinary course of business, going back to '97 through the end

6  of the teaching year 2001, with Ms. Larkins, which would have

7  enabled you to become familiar with her handwriting?

8  A  We signed up for various committees. We sign up for

9  lounge duty. We sign up for different committees that we're

10  going to be on, you know. You see, people sign up for things

11  and you kind of get to know, approximately, who wrote what.

12  Q  And that statement "creationism or something less

13  controversial." Was that printed or was it in script?

14  A  I would -- to the best of my memory, script.

15  Q  And did you ever discuss with Ms. Larkins whether or

16  not she had written that statement on that sign up sheet?

17  A  No.

18  Q  Did you ever discuss the contents of the same with

19  Ms. Larkins?

20  A  No.

21  Q  Did you ever discuss the statement with anybody?

22  A  I do not remember who was there, but there were,

23  whoever was on the science committee at that time. We were

24  confused.

25  Q  Did Ms. Larkins ever tell you she had jury duty on

Page 40

1  believe it was someone else on the science committee that asked

2  her and maybe two or three others that had not signed up.

3  Please figure out what activity you're doing. Sign up on the

4  board. I don't remember how long after that we had went in,

5  she had written "creationism and something else less

6  controversial." Personally, I thought it was very strange.

7  Q  Did you think it was a joke?

8  A  No. I felt like she was undermining what we were

9  trying to do. I did not see it as a joke.

10  Q  And how did you know it was she who had written that?

11  A  Because she had her name by it. Each teacher, we put

12  our name and then we put our science activity.

13  Q  Did you recognize her handwriting?

14  A  I don't recall. I believe, to the best of my memory,

15  that her name was with it.

16  Q  Are you familiar with her handwriting?

17  A  No.

18  Q  So, would you know if somebody else had put it up

19  there as a joke?

20  A  No.

21  Q  So, you didn't know if it was Maura Larkins's

22  handwriting or somebody else's handwriting?

23  A  Well, since her name was there, I assumed it was

24  hers. And I haven't seen her handwriting in a few years. But

25  at the time I probably recognized that it was her handwriting.

Page 39

1  science day that year?

2  A  No, not that I remember.

3  Q  And what was it that you were confused about?

4  A  It seems like a strange topic to teach first, second,

5  and third graders.

6  Q  So, you didn't take it as some sort of sarcastic

7  statement that it was creation or something less controversial?

8  A  I did take it as a sarcastic statement.

9  Q  Did you take it seriously that whoever intended to

10  be --

11  A  Sarcastic.

12  Q  But you didn't take it that they intended to teach

13  creationism, did you?

14  A  No. I interpreted it as being sarcastic.

15  Q  Unnecessarily sarcastic, perhaps?

16  A  Yes.

17  Q  Because you had worked hard putting this together,

18  and somebody was making light of it?

19  A  No.

20  Q  And do you remember who on the science committee you

21  discussed the statement with?

22  A  No, I do not. This was, again, two years ago, three

23  years ago.

24  Q  How many teachers were on the science committee,

25  typically?

Page 41

11 (Pages 38 to 41)

1    A    Three to four.

2    Q    It would have been the same that year?

3    A    Probably, and I think other people saw it in the
4    lounge also. I mean, it was up there for, you know, a day,
5    two, probably a day.

6    Q    Did Ms. Larkins, to your recollection, ever write on
7    that chart what it was she intended to teach for science day.

8    A    Not that I remember.

9    Q    Do you know if she ever did teach for science day
10   that particular year?

11   A    That particular year, she did have a substitute that
12   came if on science day and that actually ended up teaching an
13   identical activity that another teacher had already signed up
14   to do, to the best of my recollection.

15   Q    Do you remember what that activity was?

16   A    It was water tension on pennies, I believe.

17   Q    Which is different than water tension on dimes,
18   perhaps?

19   A    It's a typical elementary science activity. You test
20   to see how many drops of water you can put on a penny, and it
21   stood out in my mind because Mrs. Right had done that activity
22   each year. And then I was surprised when some of my students
23   came back and said they did the same activity twice.

24   Q    Did you ever find out why there was a substitute for
25   Ms. Larkins that day?

Page 42

1    A    No.

2        MS. SCHULMAN: Show the witness Exhibit 18, please.

3    Q    I'd like you to look through this pack of materials.
4    I'm simply going to ask you if you recognize any of these notes
5    as yours?

6    A    No. I never wrote a note regarding Mrs. Larkins. I
7    have never seen those.

8    Q    And you've never seen these notes before?

9    A    No.

10   Q    Did you ever have any kind of discussion with
11   Ms. Larkins concerning the integration of her bilingual
12   students into the third grade classes?

13   A    Not that I recall. I teach first grade.

14   Q    Did you ever witness any discussions between
15   Ms. Larkins and any other teacher, or teachers, at Castle Park
16   Elementary School concerning the integration of her students
17   into English classes, English only classes?

18   A    Not that I recall. Again we're talking two, three
19   years ago.

20   Q    Did you ever team your first grade class, English
21   only classes, with any of the bilingual classes?

22   A    Yes, we did. We teamed for PE to mainstream the
23   students at that time.

24   Q    Any other classes besides PE?

25   A    I believe the first few years, the first couple of

Page 43

1    years we just mainstreamed for PE. We mixed the four classes
2    up into four different groups so that we could mainstream the
3    students through physical education.

4    Q    Did there ever come a time during the 2002, 2001
5    school year that Maura Larkins engaged in any kind of conduct
6    which frightened you, or made you feel uncomfortable?

7    A    She made me feel uncomfortable on a number of
8    occasions.

9    Q    And have you told us about all of those occasions
10   yet?

11   A    You know, we're talking a long time ago, and I can't
12   remember and cite every occasion, but there were a number of
13   other occasions that I witnessed her verbally attacking other
14   teachers in the lounge. I would see her visibly upset. I do
15   not remember the specific instances, but I did feel
16   uncomfortable enough to where I just did not attempt to engage
17   in conversation with her.

18   Q    Did you ever tell anyone during the 2000, 2001 school
19   year that Ms. Larkins frightened you?

20   A    I don't remember using the word frightened. I know
21   that -- what's a good word? Her behavior -- in my opinion, her
22   behavior was irrational at times.

23   Q    Did you ever relay that observation to anyone else?

24   A    Yes, but I do not recall who.

25   Q    Did you ever tell Rick Werlin?

Page 44

1    A    Yes.

2    Q    And when was the first time you relayed that
3    information to Rick Werlin?

4    A    I do not recall.

5    Q    Was it during the 2000, 2001 school year?

6    A    It must have been. I didn't have any reason to
7    verbalize that, before then.

8    Q    Was there anyone else besides Rick Werlin that you
9    expressed that concern to about the irrational behavior?

10   A    Yes. But I do not recall who.

11   Q    Did you express it to Dr. Donndelinger?

12   A    I'm sure I did. It came up when I was requesting a
13   meeting.

14   Q    Did you ever contact Rick Werlin at home about any
15   conduct of Ms. Larkins?

16   A    Yes, I did.

17   Q    And how did that come about?

18   A    Mrs. Larkins had written this letter which I
19   thought -- I was very shocked and surprised at it. We tried to
20   have several meetings and she cancelled. We had our
21   interaction in the doorway, in which she was visibly and
22   verbally upset, pointing at me, very angry and I had spoken
23   with Mr. Werlin at some time. I don't remember when, around
24   this time about this situation, and he had told me that he had
25   a meeting with her planned. And if I had any concerns or

Page 45

12 (Pages 42 to 45)

1 questions, to call him. And it happened to be a Saturday
2 evening, and I called him to see if the meeting had gone
3 through. And I don't remember what else.
4     Q So, you called him at home?
5     A Yes, I did. He had told me if I had any questions or
6 concerns, that I could call him.
7     Q At any time?
8     A Uh-huh.
9     Q That was a yes?
10     A Yes. I believe that's what he said. I don't
11 remember the specific words.
12     Q Okay. And did he give you his home telephone number?
13     A No, he did not.
14     Q Was that a number that was available to you, as an
15 employee of the district?
16     A Yes, it is.
17     Q And when he said, "You call me at any time," did you
18 take that to mean that it was okay to call him on a Saturday
19 evening and not on school time?
20     A Yes, I did.
21     Q Was there something that had happened over that
22 weekend that caused you to call him on a Saturday evening, as
23 opposed to waiting until regular school hours?
24     A He was supposed to have a meeting with her on Friday
25 afternoon.

Page 46

1     Q That was your understanding?
2     A That was my understanding.
3     Q He had told you that?
4     A Yes. To the best of my recollection, he had told me
5 that he was going to have a meeting with her to talk about this
6 issue on Friday.
7     Q The issue being, the letter?
8     A The letter, the confrontation in the staff room.
9     Q And you wanted to find out if the meeting had
10 occurred and what the results were?
11     A If the meeting had occurred, what the results were,
12 did we have something set up for the following week.
13     Q And what did he tell you the results of the meeting
14 were, if in fact, the meeting had occurred?
15     A You know, I do not recall what he said.
16     Q Did he tell you the meeting occurred?
17     A I do not even remember.
18     Q So, you called at his invitation to contact him,
19 correct?
20     A He said if I had any questions or concerns, to
21 contact him. And I thought well, if his number's in the
22 directory, then it would be okay to contact him.
23     Q Did you ever tell him, Rick Werlin, in that telephone
24 conversation or at any other time that there was something that
25 Ms. Larkins had done, which made you fear for your life?

Page 47

1     A No.
2     Q Did you have any kind of communication either
3 directly or with Rick Werlin or with anybody else, wherein you
4 made a statement to the fact that you were fearful of your life
5 because of Ms. Larkins's contact?
6     A No.
7     Q Did Ms. Larkins ever threaten your life?
8     A No.
9     Q Other than this one conversation at home with the --
10 with Mr. Werlin, did you have any other conversations with
11 Mr. Werlin outside of regular school hours concerning
12 Ms. Larkins?
13     A In and out, outside of regular school hours?
14     Q Did you participate in any kind of meeting during the
15 school week concerning Ms. Larkins?
16     A Yes, I believe we had a meeting. I don't remember
17 when or exactly what was discussed.
18     Q And was it concerning Ms. Larkins?
19     A Yes.
20     Q And was it in 2001?
21     A I believe so.
22     Q And who was present at that meeting?
23     A You know, I do not recall.
24     Q Was Ms. Larkins present?
25     A No. She was — I do not believe she was at school,

Page 48

1 at that time.
2     Q Was she on some sort of leave?
3     A I do not know.
4     Q Do you remember, generally, the gist of what was
5 discussed about Ms. Larkins?
6     A I guess -- let me see. We were concerned about her
7 behavior at school, and I can only speak for myself. I was
8 concerned about her behavior at school.
9     Q Was anything else discussed?
10     A Not that I recall.
11     Q How many people were at the meeting?
12     A A hand full. I don't remember who was there.
13     Q Was Mr. Werlin there?
14     A Yes.
15     Q Was Dr. Donndelinger there?
16     A I believe she was, but I do not recall who else was
17 there.
18     Q And where was the meeting held?
19     A It would have been in Dr. Donndelinger's office.
20     Q And was this during a time when Ms. Larkins was on
21 campus teaching or when she was on a leave of absence?
22     A I don't believe she was on campus. I do not know why
23 she was not on campus.
24     Q What, if anything, were the results of this meeting?
25     A I'm trying to remember. Mr. Werlin, I believe, was

Page 49

13 (Pages 46 to 49)

1  just informing us that he was going to be meeting with her to
2  discuss concerns.
3      Q  Did he indicate to you that he was going to meet with
4  her, and she would be returning to Castle Park to teach?
5      A  I believe at some time, at some point. I don't
6  remember when, but he did say that she would be returning to
7  Castle Park.
8      Q  Was it during this meeting?
9      A  I do not recall.
10     Q  And what, if anything, did you respond upon being
11 told that she would be returning to Castle Park at some time?
12     A  I don't remember what I said exactly. Personally, I
13 was not thrilled about it.
14     Q  And why was that?
15     A  Because of the interaction that I had had with her.
16 I thought that the letter she wrote about me was unprovoked,
17 and I think that the interaction that we had in the doorway was
18 very irrational and unprofessional and a little frightening.
19     Q  Did you ever make a suggestion to anyone employed at
20 the school district that Ms. Larkins might be advised to seek
21 some sort of professional help?
22     A  I don't recall saying that.
23     Q  Did you ever hear anybody else say that?
24     A  To a district employee?
25     Q  Yes.

Page 50

1      A  Can you be more specific?
2      Q  No.
3      A  I'm trying to think. I believe I have had heard
4  someone say that. I do not remember who or when.
5      Q  Did there come some time when you were told that
6  Ms. Larkins would not be returning to Castle Park for the rest
7  of the school year?
8      A  I believe so. I don't remember exactly the meeting,
9  time, or place or who was there, but I believe someone told me.
10 I don't know if it was Mr. Werlin or Dr. Donndelinger that said
11 that she would not be returning. Because she did return, and I
12 don't know what happened with that situation. And then she
13 left.
14     Q  She was gone for a while. She returned for what? A
15 short period of time?
16     A  I would guess.
17     Q  And then she was gone for the rest of the year and
18 hasn't returned since?
19     A  I believe so.
20     Q  Do you recall meeting on or about April 20th with
21 Rick Werlin and Dr. Donndelinger concerning Ms. Larkins?
22     A  I don't recall that. It's possible. I just don't
23 recall.
24     Q  Do you recall having any meeting with Mr. Werlin and
25 Dr. Donndelinger about Ms. Larkins that you haven't already

Page 51

1  testified to today?
2      A  I don't recall a specific meeting. There was
3  probably a meeting to discuss something, but I did not keep
4  notes and dates on everything. I have a lot going on, and I
5  don't remember the exact dates and meetings.
6      Q  When you contacted Mr. Werlin at home on that
7  Saturday evening, did you believe that you were emotionally
8  distraught during that telephone conversation?
9      A  No.
10     Q  Did you tell him during that telephone conversation
11 that you were the mother of a young child and were frightened
12 by Ms. Larkins?
13     A  That's probable. I don't recall exactly what I said.
14     Q  Did you ever discuss Ms. Larkins's behavior with
15 Linda Watson?
16     A  Yes.
17     Q  On how many separate occasions?
18     A  I don't know, a few.
19     Q  A few. Did you ever discuss with Rick Denman the
20 behavior of Ms. Larkins?
21     A  Yes. They were both friends of mine.
22     Q  Outside of school?
23     A  I have socialized with Linda outside of school but
24 not Rick unless you consider going out to lunch off campus
25 socializing outside of school.

Page 52

1      Q  Did you ever discuss the contact of Ms. Larkins with
2  the librarian, Michelle Scharmack?
3      A  Yes. She related the incident that occurred in the
4  library to me.
5      Q  When did she relay that event to you?
6      A  I do not recall.
7      Q  What did she tell you?
8      A  This was such a long time ago. I can't recall
9  specifics. I can just give you a short summary.
10     Q  The best that you can do.
11     A  Because she told me this, what, a year and a half,
12 two years. She said that Mrs. Larkins came in during another
13 teacher's library time and was visibly upset with her and, I
14 guess, accused her of not giving Mrs. Larkins the library time
15 and they wanted, or Mrs. Scharmack wanted, her to just wait.
16 Michelle is very friendly, very helpful, bends over backwards
17 to, you know, get what you need. And so, she said that, you
18 know, she asked Mrs. Larkins to come back at recess or after
19 school or whenever and check the library schedule and that
20 Mrs. Larkins was very upset about that.
21     Q  And did Linda Watson relate some events to you that
22 she had experienced with Ms. Larkins?
23     A  Yes.
24     Q  And what events was that?
25     A  Again, this was quite a long time ago. So, I can

Page 53

14 (Pages 50 to 53)

1 only give a brief summary. She said that there was some
2 instance when they took the students swimming and where
3 Mrs. Larkins frightened her with her behavior.
4    Q Sitting here today, do you recall what that conduct
5 or behavior was?
6    A Raising her arm at her and raising her voice and
7 coming in close contact with her.
8    Q And did she tell you whether or not there were any
9 witnesses to this event?
10    A She said that students were around.
11    Q And did she tell you what, if anything, triggered
12 that event to occur?
13    A I do not recall that.
14    Q And did Mr. Denman relay to you any issues that he
15 had concerning Ms. Larkins?
16    A Yes. I don't recall -- well, I don't recall
17 specifically. But I know that he had related a couple of
18 instances over the last few years.
19    Q Going back to the period of time, from the time that
20 Ms. Larkins first started working at Castle Park Elementary
21 School until the spring of 2001, in an average week, how many
22 times would you have contact with her, of any kind?
23    A Passing in the hallway, that sort of contact?
24    Q Yes?
25    A Once or twice a day.

Page 54

1    Q And was the contacts any more structured than simply
2 passing in the hallway?
3    A Maybe a hello once in a while.
4    Q And was there any other contacts, besides that kind
5 of contacts that you typically have --
6    A With another teacher? No.
7    Q So that basically was it, correct?
8    A Yes.
9    Q You didn't team with her class --
10    A No.
11    Q Because it was different a grade level, right?
12    A Right.
13    Q And so, your concern with her conduct, with respect
14 to your personal experiences, had to do with those two
15 experiences, which you've already testified to; is that
16 correct?
17    A The Kingdoms issue, science day, events that wasn't
18 personal contact but she was aware that I was one of the people
19 in charge of it, and the letter of complaint and, then, the
20 incident in the doorway. There were other occasions that we
21 spoke, but, I mean, I can't recall every one.
22    Q The letter and the incident in the doorway were the
23 two main concerns that you had, correct?
24    A Yes. I had seen other behavior, but to the best of
25 my recollection, that's it with me.

Page 55

1    Q Okay. And the other behavior that you had seen, is
2 there any other behavior that you have seen that you have not
3 already described here?
4    A I saw her get visibly upset. I heard her -- I would
5 say, verbally attack another teacher by making loud, angry
6 comments to them.
7    Q Did you see her, on a number of occasions, visibly
8 upset trying to get her students in line?
9    A Yes.
10    Q Anything else?
11    A Not that I recall, at the moment.
12    Q Did you ever see her, in your estimation, abuse a
13 student?
14    A No.
15    Q Do teachers sometimes raise their voices trying to
16 get their students to lineup?
17    A Yes.
18    Q Have you done that on occasion?
19    A Yes.
20    Q And what kind of angry comments do you recall
21 witnessing her make?
22    A I don't recall -- I can't remember the exact
23 statement that she made.
24    Q On how many separate occasions, over the years, did
25 you witness such angry comments?

Page 56

1    A Maybe three or four.
2    Q That would have been over the course of about four
3 school years?
4    A Yeah.
5    Q I probably don't have any other questions for this
6 witness. I'd just like five minutes to review my notes, and we
7 can figure that out.
8    THE WITNESS: I do need to go soon.
9    MS. SCHULMAN: Okay. Why don't I take two minutes,
10 okay? I want to discuss the subpoena issue.
11    MS. SCHULMAN: Back on the record. I did have one
12 more question. Attorney's biggest lie, one more question.
13    MR. BRESEE: Well, you did say one more. So, I'll
14 hold you to the one part.
15 BY MS. SCHULMAN:
16    Q Did Robin Colls ever discuss with you some sort of
17 police matter concerning something about Ms. Larkins's personal
18 life?
19    A Yes, she did.
20    Q And what did she tell you?
21    A Oh, this was a long time ago, said something about
22 Mrs. Larkins was accusing Mrs. Colls's brother of harassing her
23 in some way, and Mrs. Colls expressed her surprise because her
24 brother doesn't even live in this area.
25    Q Do you know what Mrs. Colls's brother does for a

Page 57

15 (Pages 54 to 57)

1  living?
2      A  I believe he is a, some sort of law enforcement.  I
3  don't know what exactly.
4      Q  Did she tell you in what manner Ms. Larkins claimed
5  that Ms. Colls's brother was harassing Ms. Larkins in some way?
6      A  No, she did not.
7      Q  Do you know where her brother lives?
8      A  I think maybe Taft.  I don't even know where that is.
9  I've heard her mention it.
10     Q  Okay.  I've put a subpoena for the hearing in front
11 of you in this matter, and the hearing is due to start a week
12 from Monday at 9:00 o'clock in downtown San Diego in the
13 luxurious state of California building.  And I'm sure that you,
14 like everybody else, would not like to show up there at 9:00
15 o'clock in the morning and then figure out which of the three
16 or four days is going to be your slot.
17         So, if it's agreeable with you and Mr. Bresee, we'll
18 just make some arrangements for you to get down there, through
19 Mr. Bresee's auspices, when we need you.
20     A  So, I don't need to come at this time?
21     Q  You just need to make yourself available and let Mr.
22 Brasee know how we can reach you.
23     A  The earlier the better, I've got carpool.
24     MR. BRESEE:  Earlier in the day?
25     THE WITNESS:  That's why I had to make this earlier.

Page 58

1  I certify (or declare) under penalty of perjury under the laws
2  of the State of California that the foregoing is true and
3  correct.
4  _____Date
5
6  _____Signature
7  JOELLEN HAMILTON

Page 60

1  It's my carpool day.
2  BY MS. SCHULMAN:
3      Q  We'll do the best that we can.  We'll keep the
4  stipulations the same as the previous deposition.  Is getting
5  the transcript to the deponent on Tuesday agreeable as well?
6      COURT REPORTER:  Yes.
7      MS. SCHULMAN:  Okay.  And, then, if you can read it.
8  If you have any corrections, additions, deletions, get those to
9  Mr. Bresee a week from Friday, which will be the Friday before
10 the 23rd.  He can just fax that to my office by 3:00 p.m.  It
11 won't be very long.
12     THE WITNESS:  Do I need to keep this?  I'll need to
13 know ahead of time so I can plan for my substitute.
14     MS. SCHULMAN:  Thank you very much.
15
16
17
18
19
20
21
22
23
24
25

Page 59

1  State of California)
2                     :
3  County of San Diego)
4
5      I, Nyree-Dawn Lloyd, a Certified Shorthand Reporter,
6  Certificate No. 12587, do hereby certify that the witness in
7  the foregoing deposition was by me first duly sworn to testify
8  to the truth, the whole truth, and nothing but the truth in the
9  foregoing cause; that the deposition was then taken before me
10 at the time and place herein named; that said deposition was
11 reported by me in shorthand and then transcribed through
12 computer-aided transcription, and the foregoing transcript
13 contains a true record of the deposition of said witness.
14     I do further certify that I am a disinterested person
15 and am in no way interested in the outcome of this action or
16 connected with or related to any of the parties in this action
17 or to their respective counsel.
18     In witness whereof, I have hereunto set my hand on
19 this 17th day of September, 2002, at San Diego County,
20 California.
21
22
23 -------------------------------
24 Nyree-Dawn Lloyd, CSR No. 12587
25

Page 61

16 (Pages 58 to 61)

EXHIBIT 16

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN DIEGO

--------------------------------- *
                                  *
MAURA LARKINS,                    *
                                  *
        Plaintiff,                *
                                  *
    vs.                           *   Case No. GIC 823858
                                  *
ELIZABETH SCHULMAN, and DOES 1    *
through 10, inclusive,            *
                                  *
        Defendants.               *
                                  *
--------------------------------- *

DEPOSITION OF ELIZABETH SCHULMAN, ESQ.

Taken at San Diego, California
Friday, July 16th, 2004

Diane M. Holnback, C.S.R.
Certificate No. 11686

COMPLIMENTARY

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 2

```
                I-N-D-E-X
  1
  2   DEPOSITION OF ELIZABETH SCHULMAN, ESQ.      PAGE
  3   July 16, 2004
  4       Examination by Ms. Larkins        6
  5   EXHIBITS:
  6    1  One-page February 11, 2003 cover      7
          letter with 28-page "Decision of
  7       the Commission on Professional
          Competence" with one-page
  8       "Certification of Mail"
  9    2  Two-page excerpt from Exhibit 3       24
          herein, Pages 7 and 8
 10
       3  107-page "Agreement Between Chula,    25
 11       Vista Elementary School District
          and Chula Vista Educators' Association
 12       July 1, 1997 - June 30, 2001"
       4  One-page March 27, 2003 letter from   39
 13       Ms. Schulman to Ms. Larkins
 14
       5  One-page June 17, 2003 memo from      44
 15       Ms. Larkins to Ms. Schulman
 16    6  One-page March 27, 2003 memo to       45
          Ms. Schulman from Ms. Larkins
 17
       7  Two-page May 1, 2003 memo from        49
 18       Ms. Larkins to Ms. Schulman
 19    8  One-page March 4, 2003 letter to      50
          Ms. Larkins to Ms. Schulman
 20
       9  Two-page June 7, 2001 letter from     56
 21       Ms. Havird to Mr. Werlin
 22   10  One-page July 6, 2001 letter from     60
          Ms. Havird to Mr. Werlin
 23
      11  One-page July 17, 2001 letter         60
 24       Ms. Havird to Mr. Werlin
 25   12  Two-page August 15, 2001 letter from  60
          Ms. Havird to Mr. Werlin
```

---

Page 3

```
  1             I-N-D-E-X (Continued)
  2   EXHIBITS:
  3   13  One-page August 23, 2001 letter from   60
          Ms. Havird to Mr. Werlin
  4
      14  Two-page September 10, 2001 letter     60
  5       from Ms. Havird to Mr. Werlin
      15  Two-page September 19, 2001 letter     60
  6       from Ms. Havird to Mr. Werlin
  7
      16  Two-page "Index to Respondent's        76
  8       Hearing Exhibits"
  9   17  One-page questionnaire entitled        81
          "Is Kingdoms a Good Program?"
 10
      18  237-page "Reporter's Transcript" of    93
 11       Volume I of the hearing before the
          Commission of Professional Competence
 12
      19  48 pages of handwritten notes         118
 13
 14   INSTRUCTION NOT TO ANSWER:        LINE/PAGE
 15                          6    8
                            22   70
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

---

Page 4

```
  1          DEPOSITION OF ELIZABETH SCHULMAN, ESQ.
  2
  3       Pursuant to Notice to take Deposition and on
  4   the 16th day of July, 2004, commencing at the hour of
  5   10:24 o'clock p.m. at 319 Elm Street, Suite 100, in
  6   the City and County of San Diego, State of California
  7   before me, Diane M. Holnback, Certified Shorthand
  8   Reporter in and for the State of California, personally
  9   appeared:
 10          ELIZABETH SCHULMAN, ESQ.,
 11   Defendant herein, who, called as a witness by the
 12   Plaintiff, being by me first duly administered the oath
 13   was thereafter examined as a witness in said cause.
 14
 15                 APPEARANCES
 16
      For the Plaintiff:   MAURA LARKINS
 17   (In Propria Persona)  1935 Autocross Court
                             El Cajon, California 92019
 18                          619.444.0065.
 19   For the Defendants:   KLINEDINST, P.C.
                             By:  MATTHEW C. SMITH, ESQ.
 20                          501 West Broadway, Suite 600
                             San Diego, California 92101-3584
 21                          619.239.8131.
 22
 23
 24
 25
```

---

Page 5

```
  1       VIDEOGRAPHER:  This is the video deposition of
  2   Elizabeth Schulman being taken on behalf of the Plaintiff
  3   in the matter of Maura Larkins versus Richard T. Werlin,
  4   et al.
  5       MS. LARKINS:  No.  It's a different case.  I
  6   gave the --
  7       VIDEOGRAPHER:  Oh, okay.  New case.  The case is
  8   -- this deposition is being taken on behalf of the
  9   plaintiff in the matter of Maura Larkins versus Elizabeth
 10   Schulman, San Diego Superior Court, Case No. GIC 823858.
 11       This deposition is being held in the offices of
 12   San Diego Court Reporting located at 319 Elm Street,
 13   San Diego, California.  Today is Friday, July 16th, 2004.
 14   The time is now 10:27 a.m.
 15       My name is Greg Eisman.  I am the legal video
 16   specialist with Videographics located at 1903 30th
 17   Street, San Diego, California.  The Certified Shorthand
 18   Reporter is Diane Holnback of San Diego Court Reporting.
 19       For the video record, would counsel please state
 20   their appearances?
 21       MR. SMITH:  Matthew Smith of Klinedinst, P.C.,
 22   on behalf of Defendant Elizabeth Schulman.
 23       MS. LARKINS:  Maura Larkins, Plaintiff in pro
 24   per.
 25       VIDEOGRAPHER:  Would the reporter please swear
```

2 (Pages 2 to 5)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

**Page 6**

1  in the witness.
2       THE REPORTER:  Would you raise your right hand,
3  please?  Do you solemnly swear the testimony you're about
4  to give in this matter shall be the truth, the whole
5  truth, and nothing but the truth, so help you God?
6       THE WITNESS:  Yes.
7            EXAMINATION
8  BY MS. LARKINS:
9    Q.  Good morning, Mrs. Schulman.  How are you doing
10  today?
11    A.  Just fine, thank you.
12    Q.  Okay.  I think I'd like to start by asking some
13  general questions just to get a feeling for how you feel
14  or how you felt, actually, about this, the case that you
15  handled for me in the Office of Administrative Hearings.
16       Could you tell me why you took that case?
17       MR. SMITH:  Vague, ambiguous.
18       THE WITNESS:  You requested that I take the
19  case.
20  BY MS. LARKINS:
21    Q.  Okay.  Do you always take every case that
22  someone requests you take?
23       MR. SMITH:  Argumentative.
24       THE WITNESS:  Not always.
25  ///

**Page 7**

1  BY MS. LARKINS:
2    Q.  What are the criteria you use to decide whether
3  or not you will take a case?
4    A.  They would vary from case to case.
5    Q.  What were the criteria you used in my case when
6  you decided to take it?
7    A.  I don't recall.
8    Q.  You don't recall.  Okay..  I'd like to put -- I'd
9  like to ask that this exhibit be marked Exhibit 1.  This
10  is the decision from the Office of Administrative
11  Hearings signed by James Ahler, A-h-l-e-r, Administrative
12  Law Judge.  It was mailed February 11th, 2003 in the
13  matter of the accusation against Maura Larkins, Chula
14  Vista Elementary School District, OAH No. L2002050728.
15       (Exhibit 1 was marked for identification.)
16  BY MS. LARKINS:
17    Q.  Mrs. Schulman, do you recognize this exhibit?
18    A.  This is 28 pages.  Did you want me to read
19  through all of it?
20    Q.  Well, actually, you yourself submitted it as an
21  exhibit in your written discovery that you propounded to
22  me.  So I believe it was Exhibit B and you asked me to
23  acknowledge that that was a correct copy of the decision.
24  So, I assume you had read it.
25       MR. SMITH:  Is that a question?

**Page 8**

1  BY MS. LARKINS:
2    Q.  Had you read it when you propounded it to me?
3       MR. SMITH:  Now, wait.  You're asking her about
4  actions that were taken in this litigation?
5       MS. LARKINS:  Yes.
6       MR. SMITH:  Okay.  We are going -- I am going to
7  object and instruct not to answer.  That's not the focus
8  of your lawsuit.  The lawsuit is about stuff that
9  happened prior to this litigation.
10       Asking her about things that were taken in the
11  context of the litigation, I will represent for the
12  record that I, as her attorney, propounded discovery.
13  That's why people hire lawyers to do that sort of thing.
14       So, asking her questions -- if you want to ask
15  questions about discovery, you and I can talk about
16  discovery off the record, but you don't need to ask
17  Ms. Schulman about discovery.
18       MS. LARKINS:  Okay.  Well, let's find out if
19  Mrs. Schulman thinks that you propounded something
20  genuine.
21    Q.  Does that look to you like the genuine decision
22  that you received on about February 12th, 2003?
23       MR. SMITH:  Objection, argumentative.
24       THE WITNESS:  I would have to look at what is in
25  my file to see if it matches what you have just given me.

**Page 9**

1  BY MS. LARKINS:
2    Q.  Okay.  I would like to suggest that after this
3  deposition is over, or at least for the day, that you
4  could go to your office with your copy of this exhibit
5  and, if it turns out to be different, then certainly you
6  would have a very legitimate right to demand that all the
7  questions I ask about this be thrown out.  I'd like to
8  propose that we tentatively -- that you tentatively
9  answer questions based on the assumption that they will
10  only be useful as evidence if it turns out that this is,
11  indeed, the genuine document.
12       MR. SMITH:  We have got a document in front of
13  the witness.  Just ask her questions about the document.
14  That's probably the best way to do it.  We can worry
15  about objections and everything afterwards.
16       MS. LARKINS:  Okay.  Fine.
17    Q.  Before we go on, I wanted to ask about when you
18  took me on as your client.  You weren't able to remember
19  just why you did.  So I would like to know Do you
20  sometimes take cases when you believe that the client is
21  lying about -- about major, important aspects of your
22  case?
23       MR. SMITH:  Vague, ambiguous, argumentative.
24  The preamble misstated testimony.  Go ahead.
25       THE WITNESS:  I can't answer that question.

3 (Pages 6 to 9)

SAN DIEGO COURT REPORTING SERVICE
319 ELM STREET, SUITE 100, SAN DIEGO, CA  92101

619-232-1164
FAX 619-232-2616

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 10

1  It's a hypothetical question.
2  BY MS. LARKINS:
3      Q. Okay. Do you remember thinking that Maura
4  Larkins was lying when she spoke to you about her case?
5      MR. SMITH: During what time period?
6      MS. LARKINS: When she first came in June of
7  2002 to meet you for the first time and spoke about her
8  case.
9      MR. SMITH: Vague, ambiguous, go ahead.
10     THE WITNESS: I have no way of making that
11  assessment. I simply have a person in front of me who is
12  telling me a story.
13  BY MS. LARKINS:
14     Q. Okay. So, are you saying that it might be
15  possible that you thought that Maura Larkins was lying;
16  you just don't remember?
17     A. That was not my answer.
18     Q. Okay. Do you think it's possible that Maura
19  Larkins was lying to you?
20     A. I think that's highly speculative. Are you
21  asking me what I thought at the time?
22     Q. Well, I believe you said you didn't remember
23  what you thought at the time.
24     MR. SMITH: Then why do you continue asking
25  questions about it?

---

Page 11

1      MS. LARKINS: Well, I'm trying to find out if
2  she has a habit and custom of taking cases for clients
3  when she believes they are lying.
4      MR. SMITH: Is that your question?
5      MS. LARKINS: That's my answer to you, because
6  you wanted to know why I was asking her these questions.
7      Q. My question is: Do you have a habit and custom
8  of taking on clients when you believe they are lying to
9  you?
10     A. At what point?
11     Q. When you sign the agreement to represent them.
12     A. You're asking me to make a generality. You're
13  asking for information which potentially would require me
14  in some sort of analysis to reveal attorney-client
15  privileged information, which I cannot do. You came in.
16  You told me a story. Essentially, your case was a
17  defense case and you were seeking a defense.
18     MR. SMITH: The question was do you have a
19  custom and habit of taking cases where you think your
20  clients are lying. Yes or no?
21     THE WITNESS: The answer is no.
22  BY MS. LARKINS:
23     Q. Okay. Thank you. Do you have a custom and
24  habit of taking clients who can't pay?
25     MR. SMITH: Argumentative, calls for

---

Page 12

1  speculation.
2      THE WITNESS: Can't pay for what?
3  BY MS. LARKINS:
4      Q. Your services.
5      A. It depends on the type of case.
6      Q. Do you sometimes -- oh, what's the word -- take
7  cases with the expectation that you will receive your fee
8  out of a judgment or settlement, if it occurs, but not
9  before then?
10     A. If what the word you are seeking is contingency,
11  the answer is yes.
12     Q. Thank you. That is exactly the word I was
13  seeking and it just completely escaped my mind. Okay.
14  Thank you. Okay.
15     So, we are going to go ahead and look at this
16  decision. The first page is just sort of a preamble sort
17  of setting up this situation here for this case. Could
18  you please turn to Page 2 of the decision?
19     MR. SMITH: The second page of the exhibit or
20  what's numbered Page 2? The second page of Exhibit 1 is
21  labeled Page 1.
22     MS. LARKINS: Oh, okay. Yes, I see.
23     MR. SMITH: The first page of Exhibit 1 is a
24  letter, essentially a transmittal letter, that goes along
25  with the decision, apparently.

---

Page 13

1      THE WITNESS: Actually, my copy is different
2  than what my counsel's copy is.
3      MS. LARKINS: Let's see.
4      Q. Let me give you a copy of the letter that --
5      A. I have the letter. I don't have Page 1.
6      Q. Oh, okay. Let me give you a copy of that, then.
7      MR. SMITH: Okay. Just a second here. Let me
8  take a look at this and make sure we have got a complete
9  exhibit. It's missing Page 5.
10     MS. LARKINS: Oh, dear.
11     MR. SMITH: And, for whatever reason, there's
12  been -- proof of service or the certification of mail is
13  in between Pages 27 and 28. So I am going to move that
14  to the end --
15     MS. LARKINS: Okay. Thank you.
16     MR. SMITH: -- after Page 28.
17     MS. LARKINS: I think that's all. Okay.
18     MR. SMITH: We are now inserting a copy of Page
19  5, putting these back together making no representations
20  about whether, in fact, any of these pages are authentic.
21     MS. LARKINS: Great. Okay. The page I would
22  like to refer to is Page 2 of the decision itself. So it
23  would be Page 3 of the exhibit.
24     Q. Okay. Are these the factual findings of the
25  commission on professional competence in this

---

4 (Pages 10 to 13)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 14

1  administrative hearing --
2      MR. SMITH: Objection.
3  BY MS. LARKINS:
4      Q. -- according to this document?
5      MR. SMITH: Objection. Document speaks for
6  itself, calls for speculation, hearsay.
7      THE WITNESS: The document speaks for itself.
8  BY MS. LARKINS:
9      Q. Okay. Do you recall reading this decision?
10     A. I read the decision, yes.
11     Q. Okay. Did you read it approximately on or about
12  February 12th, 2002?
13     MR. SMITH: Vague, ambiguous.
14     THE WITNESS: I read it on or about the time it
15  arrived in my office.
16  BY MS. LARKINS:
17     Q. Did you read the entire decision?
18     A. As far as I recall I read the entire decision as
19  it arrived in my office.
20     Q. Okay. I wanted to point out something
21  interesting. There is a tremendous amount of interesting
22  material in this decision. And I thought it was
23  particularly -- I thought it was humorous, actually, that
24  even this first paragraph was so interesting or this
25  first finding.

Page 15

1      Could you please read the first finding, the
2  first factual finding?
3      A. You want me to read it to myself or aloud?
4      Q. Could you read it out loud, please?
5      MR. SMITH: You're referring to Paragraph 1 on
6  Page 2?
7      MS. LARKINS: Yeah. I'd like you to read all
8  three paragraphs of that first factual finding.
9      MR. SMITH: Do you want her to read them out
10  loud?
11     MS. LARKINS: Actually. Yes, please.
12     THE WITNESS: Well, you know --
13     MR. SMITH: I am not sure we are going -- are we
14  going to spend all day here reading paragraphs out loud?
15  If you have a question about the paragraphs --
16     MS. LARKINS: Well, if you don't. Okay. I am
17  just -- this is my third deposition I have ever given in
18  my life. So I am just kind of learning how to do this.
19  And some people are very demanding about having lots of
20  information. And others -- I personally prefer your
21  attitude of let's just get to work.
22     MR. SMITH: Well, the purpose of the deposition
23  is for you to ask questions that the witness answers. If
24  you ask relevant questions, the witness will provide
25  answers to the best of her ability, subject to my

Page 16

1  objections. Let's -- we are all busy people. Let's try
2  and move this process along and not spend a whole lot of
3  time reading from documents into the record.
4      MS. LARKINS: Okay. Well, since you appear to
5  wish to discuss this matter in depth, I just want to tell
6  you where I am coming from.
7      MR. SMITH: I don't need to know where you're
8  coming from. All I want you to do is just ask a question
9  and the witness will answer.
10     MS. LARKINS: Kelly Angell, with whom you were
11  conferring here just a short while ago, attended one of
12  my two previous depositions and she had quite the
13  opposite attitude from you. And it's interesting that
14  you two work together closely, but you have very
15  different attitudes about depositions.
16     She wanted -- every single question had to have
17  the entire date, month, day and year. We really spent a
18  lot of time wasting time. And I am very happy to know
19  that we don't have to do that with you.
20     Q. Now, I'd like to go on to this. Actually, what
21  I want to focus on here are the middle two paragraphs.
22     MR. SMITH: I am sorry. Which paragraphs are
23  you referring to?
24     MS. LARKINS: In Factual Finding No. 1, there
25  are a total of four paragraphs in that factual finding.

Page 17

1  I am very interested in the second paragraph.
2      Q. Mrs. Schulman, did you find anything surprising
3  in that second paragraph?
4      MR. SMITH: Vague, ambiguous, not reasonably
5  calculated to lead to the discovery of admissible
6  evidence.
7      THE WITNESS: Not that I was focusing on at the
8  time that I read it.
9  BY MS. LARKINS:
10     Q. Do you find anything surprising now?
11     MR. SMITH: Same objections.
12     THE WITNESS: Well, what I find surprising is
13  the statement that the sixth member, the superintendent
14  of schools, is hired by the other board members.
15  BY MS. LARKINS:
16     Q. It's an amazing statement, isn't it?
17     A. I don't find it amazing.
18     Q. But do you find it interesting?
19     MR. SMITH: Relevance.
20     MS. LARKINS: What I am going for here is the
21  outrageousness of this decision. It's a laughable
22  decision. It's a -- it's a disturbing and troubling
23  decision. And it starts unbelievably in the very first
24  factual finding when you would think any normal
25  administrative law judge or, if the panelists were

5 (Pages 14 to 17)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

| Page 18 | Page 20 |
|---|---|
| 1 consulted in the writing of this decision, any normal | 1 Constitution of the United States and the rights and |
| 2 teachers or principals would have corrected this, but it | 2 authority they have to direct the work of their |
| 3 gets more interesting when we go to the third paragraph. | 3 employees? |
| 4 Q. Do you see anything interesting in the third | 4 MR. SMITH: Same objections. |
| 5 paragraph? | 5 THE WITNESS: Calls for a legal conclusion. I |
| 6 MR. SMITH: Objection. Ambiguous, vague, calls | 6 am not here in a position to provide a lecture or a |
| 7 for speculation. | 7 seminar on what public employees' and employers' |
| 8 THE WITNESS: Not particularly. | 8 relationships are. That's not the subject matter of this |
| 9 BY MS. LARKINS: | 9 deposition. |
| 10 Q. You know, I don't either. Actually, I think my | 10 BY MS. LARKINS: |
| 11 question was a waste of time. There is nothing strange | 11 Q. So, when Maura Larkins went to you and made an |
| 12 about that -- that one. Okay. | 12 agreement with you to represent her, you did not feel |
| 13 I'd like to go to Factual Finding No. 2 now. | 13 that you were responsible for making sure that all her |
| 14 I'm not so much interested in the factual finding as in | 14 rights under the constitution were obeyed by the School |
| 15 the footnote. Do you see on Factual Finding No. 2 there | 15 District? |
| 16 is a little "1" at the end that directs us down to the | 16 MR. SMITH: Objection, argumentative. Ask |
| 17 bottom of the page? | 17 another question. For the purposes of the deposition, |
| 18 A. Yes. | 18 this isn't for you to have a debate with Ms. Schulman. |
| 19 Q. Do you find anything strange about that | 19 You can ask her questions about the facts and |
| 20 footnote? | 20 circumstances surrounding her representation. Your time |
| 21 A. No. | 21 for argument is going to be at trial. You can argue to |
| 22 MR. SMITH: Vague, ambiguous, not reasonably | 22 the jury. Don't argue to the witness right now. Okay? |
| 23 calculated to lead to discovery of admissible evidence. | 23 MS. LARKINS: Okay. Are you instructing your |
| 24 BY MS. LARKINS: | 24 client not to answer the question? |
| 25 Q. Okay. Is it your understanding that a district | 25 MR. SMITH: No, I am not instructing the client |

| Page 19 | Page 21 |
|---|---|
| 1 could possibly retain all rights and authority to direct | 1 not to answer the question. I am asking you to ask a |
| 2 the work of its employees? | 2 better question so we don't have to go to the judge and |
| 3 MR. SMITH: Vague, ambiguous, calls for a legal | 3 discuss the subject matter of your questions. And I |
| 4 conclusion, calls for speculation, not reasonably | 4 would like to get this deposition over and done with. |
| 5 calculated to lead to the discovery of admissible | 5 And I am asking you to please ask factual questions of |
| 6 evidence. | 6 the witnesses, not make legal arguments, not engage in |
| 7 BY MS. LARKINS: | 7 debate, ask factual questions that are the proper subject |
| 8 Q. You can answer. | 8 of a deposition. |
| 9 A. What was your question? | 9 MS. LARKINS: Okay. Mr. Smith, I believe that |
| 10 Q. Do you believe that a district can possibly | 10 my question is a fair one. I believe that a judge would |
| 11 legally retain all rights and authority to direct the | 11 say, yes, she should answer that question. And I am not |
| 12 work of its employee? | 12 going to withdraw my question. If you wish, you can |
| 13 MR. SMITH: Same objections. | 13 instruct your client not to answer it. |
| 14 THE WITNESS: I would have to look at Article | 14 MR. SMITH: I am not going to instruct my client |
| 15 5.1 to see what it says. | 15 not to answer it. If you insist on asking argumentative |
| 16 BY MS. LARKINS: | 16 questions and you continue in this tack to ask |
| 17 Q. Well, here is Article 5.1. But, before I give | 17 argumentative questions, what we will do is suspend the |
| 18 that to you, is it not your understanding as a lawyer who | 18 deposition and we will seek a protective order to prevent |
| 19 has practiced employment law for many, many years, that | 19 you from asking any argumentative questions. I would |
| 20 there are rights and authorities -- there are rights that | 20 hope that that wouldn't be necessary, but I have given |
| 21 are reserved to employees beyond any agreement between -- | 21 you an opportunity to withdraw the question. You're |
| 22 well, this doesn't even allow for the agreement. It just | 22 insisting on asking argumentative questions. |
| 23 says all rights and authority to direct the work of its | 23 Ms. Schulman can answer to the best of her ability. |
| 24 employees. Let me ask the question a different way. | 24 MS. LARKINS: Well, Mr. Smith, if you were to |
| 25 Are school districts limited by the | 25 decide to suspend the deposition, I wouldn't be terribly |

6 (Pages 18 to 21)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

**Page 22**

1 surprised. One of the previous two deponents that I
2 deposed stopped answering questions after an hour and a
3 half. And, obviously, I believe that the facts in this
4 case are glaringly clear. And I think perhaps if I were
5 Ms. Schulman's lawyer I too might suspend the deposition.
6     MR. SMITH: If you have had an experience in
7 previous depositions where they are been suspended and
8 people are seeking protective orders, one might take the
9 inference that your questions could use some improvement.
10 That being said, if the case and the facts are very
11 clear, there is no need for us to have a
12 deposition. However, you have noticed the deposition.
13 We are here ready to answer factual questions. Ask your
14 questions. We will provide answers.
15     MS. LARKINS: One of the things I need in order
16 to win a court case or a motion for summary judgment is
17 testimony under oath by the witness.
18     MR. SMITH: And we are here to provide that
19 testimony. I don't want to engage in an extensive
20 debate. We are all busy people. We have all got things
21 to do. You have got a limited amount of time here.
22 Please ask your questions. The witness will answer.
23     MS. LARKINS: I am very interested in your last
24 statement. Could you please let me know how limited my
25 time is?

**Page 23**

1     MR. SMITH: Will you please just ask questions?
2 You know, regardless of how limited your time is, we are
3 going to be here for a reasonable period of time. If
4 this tack of questioning continues, we will seek a
5 protective order. My patience is starting to wear thin
6 on this. So, ask your questions. We are here ready to
7 answer. Again, please, just ask a question.
8     MS. LARKINS: Okay. I would like to do that.
9     Q. When you represent a client who is in a wrongful
10 termination case, do you normally try to make sure that
11 the client's constitutional rights are honored by the
12 employer?
13     MR. SMITH: Objection, vague, ambiguous,
14 argumentative, potentially invades the attorney-client
15 privilege. You can answer, if you're able.
16     THE WITNESS: It's an incomplete hypothetical.
17 I can't answer that question.
18 BY MS. LARKINS:
19     Q. So, you would never advertise that you actually
20 protect your clients' constitutional rights?
21     MR. SMITH: Objection. Argumentative, vague,
22 ambiguous.
23     THE WITNESS: I don't understand your question.
24     MS. LARKINS: Okay. Let's go on. I brought so
25 many boxes, because I didn't know which exhibits I would

**Page 24**

1 be needing. I am going to go ahead and give this -- I
2 would like to ask that this be marked as Exhibit 2.
3     (Exhibit 2 was marked for identification.)
4     MR. SMITH: Just a second. For the record,
5 Exhibit 2 is a two-page document; Pages 7 and 8 of some
6 document dated December 12th, 2000. And Ms. Larkins has
7 placed a sticky note on the second page of Exhibit 2 with
8 an arrow pointing to the first paragraph on the second
9 page of this exhibit, which is labeled Page 8.
10     Are you going to ask a question about this
11 document?
12     MS. LARKINS: Give me a second, sir. I
13 haven't -- I need to say something.
14     MR. SMITH: I am wondering, before you ask a
15 question about the document, I would ask that
16 Ms. Schulman be given an opportunity to read the document
17 which you're asking a question about.
18     MS. LARKINS: Oh, please do. You know, it's 5.1
19 is what I'd like you to read.
20     Q. Okay. Now that you have read it, do you find a
21 problem with the Commission on Professional Competence's
22 footnote here on Page 2 of its decision?
23     A. No.
24     Q. Okay. Do you understand Article 5, which
25 provides that the district retains all rights and

**Page 25**

1 authority to direct the work of its employees to be
2 limited in any way whatsoever?
3     MR. SMITH: Argumentative, calls for a legal
4 conclusion, calls for an expert opinion.
5     THE WITNESS: The footnote says what the
6 footnote says.
7 BY MS. LARKINS:
8     Q. Does the footnote, which purports to explain
9 Article 5.1 of the District CVEA agreement -- I think I
10 should -- I should put the whole document into evidence.
11 Let me put this entire document into evidence. Okay. So
12 Exhibit 3 will be the contract, the agreement between --
13     (Exhibit 3 was marked for identification.)
14     MS. LARKINS: Oh, sorry. Here I am talking on.
15     Q. Does Article 5.1 according -- you know, assuming
16 that this document that I have given you is correct, talk
17 about the District retaining rights?
18     MR. SMITH: I am sorry. Are you asking if the
19 document talks about the District retaining rights?
20     MS. LARKINS: Yes. Article 5.1, the one I gave
21 you as Exhibit 2, does that talk about -- does that talk
22 about District rights?
23     MR. SMITH: Best evidence.
24     THE WITNESS: The document says what the
25 document says. The footnote says what the footnote says.

7 (Pages 22 to 25)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 26

1  The footnote is sort of a short little brief summary that
2  I don't think was intended, although I don't know, to
3  cover everything and anything.
4     MS. LARKINS: Well, when you go through the rest
5  of this decision, it certainly looks like Mr. Ahler meant
6  just what he said there in the footnote.
7     MR. SMITH: Do you have a question?
8  BY MS. LARKINS:
9     Q. To the best of your knowledge, does Article 5.1
10 of this agreement talk about District rights?
11    MR. SMITH: Asked and answered. The document
12 speaks for itself and I don't see how this is reasonably
13 calculated to the lead to the discovery of admissible
14 evidence. You can answer to the best of your ability.
15    MS. LARKINS: Okay.
16    THE WITNESS: Article 5 says the subject matter
17 is district rights and 5.1 is the first paragraph. There
18 are a few other paragraphs following 5.1.
19 BY MS. LARKINS:
20    Q. Okay. 5.1 starts on Page 7, I believe, and then
21 it continues to Page 8. And on the third line of Page 8
22 is some text that limits the power of the District. Can
23 you tell me by looking at that third line on Page 8 in
24 what way the power of the District to direct the work
25 that its employees is limited?

Page 27

1     MR. SMITH: Objection. Calls for an expert
2  opinion, calls for a legal conclusion. The document
3  speaks for itself, vague, ambiguous. You can answer, if
4  you can.
5     THE WITNESS: It says whatever it says.
6  BY MS. LARKINS:
7     Q. Well, whatever does it say?
8     MR. SMITH: Wait. Wait. Wait. We are --
9     THE WITNESS: It says what it says.
10    MR. SMITH: Are we going to spend time here
11 having her read documents and telling you what they say?
12 BY MS. LARKINS:
13    Q. Would you agree that this footnote on Page 2 has
14 neglected to mention any limitation on the power of the
15 District?
16    MR. SMITH: The document speaks for itself.
17 BY MS. LARKINS:
18    Q. This does not say --
19    A. Well, all that footnote says is subject matter
20 of retained all rights and authorities to direct the work
21 of its employees. I emphasize the word "work."
22 BY MS. LARKINS:
23    Q. Is there also a period after "work of its
24 employees" in the contract itself or does the contract
25 itself continue on after discussing this, the District

Page 28

1  retains all rights and authority to direct work of its
2  employees and specify exactly what the rights are in
3  detail so much so that it takes several lines on Page 7
4  and then it continues onto Page 8 and then finally on
5  Line 3 of Page 8 it mentions the limitations on the
6  District. And I believe it says it is limited by this
7  agreement and the law.
8     Is that difficult for you to admit?
9     MR. SMITH: Is there a question in there?
10 BY MS. LARKINS:
11    Q. Does it say that?
12    MR. SMITH: Does the document say what you just
13 said it says; is that your question?
14    MS. LARKINS: Yes. Yes.
15    MR. SMITH: The document speaks for itself. I
16 hope we are not going to sit here all day to discuss
17 admissions about what documents say or don't say. The
18 documents are written down. We can all read what the
19 documents say. The judge, the jury will be able to read
20 what the document says. There is no reason to have
21 Ms. Schulman here telling you what a document does or
22 does not say.
23    MS. LARKINS: I would prefer that you make this
24 argument that you're making to me right now to a judge.
25 And I would like Mrs. Schulman to answer the question.

Page 29

1     MR. SMITH: I have a feeling we are going to be
2  making this argument that I am just making right now to a
3  judge.
4     MS. LARKINS: I hope so.
5     MR. SMITH: So your question is did you
6  accurately characterize what the document says?
7     MS. LARKINS: Yes.
8     THE WITNESS: The document says whatever it
9  says. I -- you know, I don't have a transcript of
10 exactly how you worded your question. Whatever it says,
11 it says.
12 BY MS. LARKINS:
13    Q. Okay. That's not my question. I know the
14 document says what it says. What I want to know is if
15 you believe that the document limits the power and
16 authority of the District over its employees.
17    MR. SMITH: Vague, ambiguous. Which document
18 are you talking about?
19    MS. LARKINS: The contract, Article 5, Section
20 5.1.
21    MR. SMITH: Is it an exhibit?
22    MS. LARKINS: It's Exhibit 2.
23    MR. SMITH: Vague, ambiguous, calls for a legal
24 conclusion, calls for an expert opinion, best evidence.
25    THE WITNESS: It simply says, "except as

8 (Pages 26 to 29)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 30

1  otherwise provided in this agreement or by law." That's
2  what it says.
3       MS. LARKINS: Thank you.
4       Q. Do you consider yourself an expert in employment
5  law?
6       MR. SMITH: Vague, ambiguous.
7       THE WITNESS: It's the major emphasis of my
8  practice.
9  BY MS. LARKINS:
10      Q. So you do consider yourself an expert in
11  employment law?
12      A. It's the major emphasis in my practice.
13      Q. Okay. I will count that as a yes. And, if you
14  disagree with me, please say so.
15      MR. SMITH: Well, no. That's an argumentative
16  question. The answer is what the answer is. You can
17  count it however you want to count it. Just ask your
18  next question.
19      MS. LARKINS: Okay. I will do that.
20      Q. Would you please look on Page 3 of Exhibit 1,
21  Factual Finding 6? Do you see anything interesting or
22  problematical in the first sentence?
23      MR. SMITH: Objection. Vague, ambiguous,
24  argumentative, calls for speculation.
25      THE WITNESS: At this point in time I don't have

---

Page 31

1  the time line in my head to be able to say one way or the
2  other.
3  BY MS. LARKINS:
4       Q. So, in this decision it hasn't -- it hasn't
5  really given the facts. It's kind of hard to know how to
6  respond to this decision, this line of this decision,
7  because it doesn't give any specifics, does it?
8       MR. SMITH: What's your question?
9  BY MS. LARKINS:
10      Q. On Factual Finding No. 6, the first sentence, it
11  doesn't give any specifics, does it, about who was
12  involved in this?
13      A. No.
14      MR. SMITH: Well, the document speaks for
15  itself.
16  BY MS. LARKINS:
17      Q. Does this document -- okay. It says: "In the
18  1999/2000 school year Mrs. Larkins' feelings were hurt by
19  a fellow teacher."
20      Does that sentence reveal the name of the fellow
21  teacher?
22      A. No.
23      Q. Thank you. I am just a third grade teacher,
24  third grade elementary school teacher. So, Mr. Smith,
25  try to be patient with me.

---

Page 32

1       MR. SMITH: Well, a third grade elementary
2  school teacher can read a sentence and determine whether
3  it reveals the name of the teacher. We don't need to
4  have Ms. Schulman here to answer obvious questions that a
5  third grade elementary school teacher or a third grade
6  elementary school student could determine from reading a
7  sentence. The sentence says what the sentence says.
8       MS. LARKINS: Well, perhaps I'm not quite as
9  smart as the average third-grade elementary school
10  teacher or, as you point out, the average third grade
11  student, but even people of diminished mental capacity
12  have a right to justice in our legal system. And I would
13  appreciate it if you would have some patience with me and
14  allow me to do my best to ask questions in this
15  deposition.
16      MR. SMITH: I am not interfering with your right
17  to ask questions. I am encouraging you to ask questions.
18  We are here to answer questions. I would just hope that
19  we would spend this time productively.
20      MS. LARKINS: I am sure we have different ideas
21  about what productively means here. Perhaps in your case
22  productively would mean avoiding giving information.
23      Q. Okay. Mrs. Schulman, have you read many
24  decisions that have been issued by the Office of
25  Administrative Hearings in California?

---

Page 33

1       MR. SMITH: Vague, ambiguous, not reasonably
2  calculated to lead to the discovery of admissible
3  evidence.
4       THE WITNESS: I don't know what you mean by "many
5  decisions."
6  BY MS. LARKINS:
7       Q. Have you read more than 10 decisions that were
8  issued by the Office of Administrative Hearings in
9  California?
10      A. I have no way of answering that question.
11      MR. SMITH: Same objections.
12      THE WITNESS: I really don't know.
13  BY MS. LARKINS:
14      Q. Have you read more than one decision that issued
15  from the Office of Administrative Hearings?
16      A. Well, I have certainly read this one.
17      Q. So, you don't really know if you ever read
18  another decision from the Office of Administrative
19  Hearings in California?
20      MR. SMITH: Argumentative.
21      THE WITNESS: You're asking me for what I might
22  have done over 27 years and I really can't answer that
23  question.
24      MS. LARKINS: During my administrative hearing I
25  recall that you once said to me, "Usually the judges in

---

9 (Pages 30 to 33)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 34

1   these cases don't wear robes." From that I understood
2   that you had been involved in one or more administrative
3   hearings previously.
4       MR. SMITH: Is there a question?
5   BY MS. LARKINS:
6       Q. Had you been involved in one or more
7   administrative hearings before you took my -- before you
8   argued my case?
9       A. Yes.
10      Q. Can you estimate how many?
11          MR. SMITH: Vague, ambiguous.
12          THE WITNESS: No.
13  BY MS. LARKINS:
14      Q. So, you're sure it's more than one. You're sure
15  it's one other one besides me, but you're not sure if it
16  was as many as 10 or more than 10?
17      A. Well, now you have asked me about administrative
18  hearings.
19      Q. Okay. Apparently I have hit on a magic word.
20  Okay. How many administrative hearings have you been
21  involved in?
22      A. Many.
23      Q. Many. Okay. How many decisions issued by
24  those -- issued as a result of those administrative
25  hearings have you read?

Page 35

1       A. Many.
2       Q. Okay. I am sure you have read -- well, I'm not.
3   Well, I am. I am sure that you have read more than I
4   have. But when I was preparing my petition regarding
5   this decision I read a few, I'd say. Well, actually,
6   what I read were appeals to the California Court of
7   Appeal from administrative decisions. And one of the
8   things I noticed is that the factual findings in those
9   decisions had been very specific about what happened on
10  what date and the names of the people involved. And I
11  noticed that there was a stark contrast between the
12  decisions I was reading about that had been issued in
13  other cases and my own decision.
14          Did the fact that this decision didn't give
15  dates or names or specifics about incidents strike you as
16  being out of the norm for administrative decisions?
17          MR. SMITH: Could you try asking that question
18  one more time?
19  BY MS. LARKINS:
20      Q. Do most administrative decisions give specific
21  dates and names and descriptions of events?
22          MR. SMITH: Vague, ambiguous, calls for
23  speculation.
24          THE WITNESS: I can't answer that question. I
25  don't know what most decisions do.

Page 36

1   BY MS. LARKINS:
2       Q. Have you ever seen an administrative decision
3   that gave specific dates and names and descriptions of
4   events?
5           MR. SMITH: Vague, ambiguous, calls for
6   speculation.
7           THE WITNESS: I have not read an administrative
8   decision with that question in mind.
9   BY MS. LARKINS:
10      Q. So, are you saying that you don't remember?
11      A. I am simply saying I have not read an
12  administrative decision with that question in mind.
13      Q. So, if you had read an administrative decision
14  that had specific dates, names and descriptions of
15  events, you wouldn't have remembered it, because you
16  weren't focusing on that issue?
17          MR. SMITH: Is this a hypothetical question?
18  BY MS. LARKINS:
19      Q. I am asking you if you're saying that you can't
20  remember whether or not decisions have specific names,
21  dates and descriptions of events. Are you able to
22  remember whether or not, after you read a decision, are
23  you able to remember whether or not it had specific
24  dates, names and descriptions of events?
25          MR. SMITH: Ask that question again, please.

Page 37

1   BY MS. LARKINS:
2       Q. After you -- in your experience, after you have
3   read an administrative decision, are you able to remember
4   whether or not the decision cited specific dates, names
5   and descriptions of events?
6           MR. SMITH: You're asking if Ms. Schulman is
7   able to retain in her memory for any period of time
8   whether the decision contained specific names and dates?
9           MS. LARKINS: Yes.
10          MR. SMITH: Vague, ambiguous, not reasonably
11  calculated to lead to the discovery of admissible
12  evidence and argumentative, calls for speculation.
13          THE WITNESS: I am not really sure I can answer
14  that question. I really don't understand it.
15          MS. LARKINS: Okay.
16      Q. Do you consider yourself to have a reasonably
17  good memory?
18          MR. SMITH: Vague, ambiguous, argumentative, not
19  reasonably calculated to lead to the discovery of
20  admissible evidence.
21          THE WITNESS: Yes, I have a reasonably good
22  memory for what I am working on at the time I am working
23  on it.
24  BY MS. LARKINS:
25      Q. Okay. But after you've finished working on

10 (Pages 34 to 37)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 38

1  something you generally forget, forget about it?
2      A. I do my best to do that.
3          MR. SMITH: Argumentative.
4  BY MS. LARKINS:
5      Q. You do your best to forget about it?
6      A. Yes.
7      MS. LARKINS: Okay.
8      MR. SMITH: Could we take a break when you come
9  to a reasonable stopping point?
10     MS. LARKINS: We could take a break right now.
11     MR. SMITH: Okay.
12     VIDEOGRAPHER: We are going off the record. The
13  time is 11:16 a.m.
14     (A recess was taken.)
15     VIDEOGRAPHER: We are going on the record. The
16  time is 11:29 a.m.
17     MS. LARKINS: Okay.
18     MR. SMITH: Just for the record, we just came
19  back from a break and we've spent some time off the
20  record while Ms. Larkins was preparing her exhibits. I
21  just don't want there to be any question about the length
22  of the break or responsibility for the length of the
23  break.
24     MS. LARKINS: Good point.
25     Q. I would like to ask that this letter from

Page 39

1  Elizabeth Schulman to me written on March 27, 2003 be
2  marked as Exhibit 4.
3      (Exhibit 4 was marked for identification.)
4  BY MS. LARKINS:
5      Q. Okay. What was your purpose -- oh,
6  Mrs. Schulman, do you recognize this letter as a letter
7  that you wrote to me?
8      A. Yes, I do.
9      Q. Okay. What was your purpose in writing this
10  letter?
11     A. My purpose in writing this letter was to respond
12  to your fax of 3/26/03.
13     Q. Okay. In this letter did you inform me that I
14  had 90 days in which to file my petition for writ of
15  mandate?
16     A. No.
17     MR. SMITH: Objection, best evidence.
18  BY MS. LARKINS:
19     Q. In this letter did you tell me that California
20  Code of Civil Procedure Section 1094.6(b) requires a
21  petition to be filed no later than the 90th day following
22  the date on which the decision became final?
23     MR. SMITH: Are you asking if that's what the
24  letter says?
25     MS. LARKINS: Yes.

Page 40

1      MR. SMITH: The document speaks for itself.
2  Argumentative.
3      THE WITNESS: The letter says what it says.
4  BY MS. LARKINS:
5      Q. Was it your purpose when you wrote this letter
6  to let me know that I had -- to let me know how much time
7  I had in which to file my petition?
8      A. No. I had already done that.
9      Q. Why did you mention that the Code of Civil
10  Procedure Section 1094.6(b) allows 90 days before filing
11  a petition?
12     MR. SMITH: Objection. Vague, ambiguous
13  argumentative, calls for speculation.
14     THE WITNESS: I mentioned a lot of avenues for
15  you to look at. The first avenue I suggested you look at
16  were the CEB books at the library that were available on
17  mandamus and administrative mandamus which set forth the
18  proper forms, procedures and time lines. I also said you
19  may also wish to refer to CCP Section 1085, et cetera,
20  and that you may wish to study other code sections, which
21  included 1094.6(b).
22     I was doing nothing more than if I had had a
23  colleague call me on the phone and say, "Hey, I have got
24  this issue. What should I do about it?"
25     I would say, "Go take a look at these things."

Page 41

1      Q. In hindsight, do you regret that you wrote this
2  sentence, "CCP Section 1094.6(b) requires a petition to
3  be filed no later than the 90th day following the date on
4  which the decision becomes final," et cetera?
5      MR. SMITH: Vague, ambiguous, argumentative.
6      THE WITNESS: No.
7  BY MS. LARKINS:
8      Q. Do you think you were doing a good thing when
9  you wrote this sentence?
10     MR. SMITH: Argumentative.
11     THE WITNESS: I was just giving you some
12  information. Go ahead and take a look at this stuff. I
13  wasn't telling you what to do. I had already told you
14  what to do in a letter that I had sent you in February.
15  BY MS. LARKINS:
16     Q. Okay. I want to really specifically refer to
17  this one sentence that's in the second paragraph of your
18  letter. I believe it is the fourth sentence in the
19  second paragraph. And it comes after the sentence, "More
20  specifically, you may wish to study CCP Section 1094.5
21  and 1094.6."
22     MR. SMITH: Are you referring to the sentence,
23  "CCP Section 1094.6(b) requires a petition be filed no
24  later than the 90th day following the date on which the
25  decision becomes final with respect to any commission

11 (Pages 38 to 41)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 42

1  decision"?
2        MS. LARKINS: Yes.
3        Q. Okay. Does that sentence, the one which
4  Mr. Smith just read, tell me to study?
5        MR. SMITH: Argumentative. The document speaks
6  for itself.
7        THE WITNESS: I had previously said in the
8  previous sentence, "You may wish to study."
9  BY MS. LARKINS:
10       Q. Okay. Why did you write this sentence?
11       MR. SMITH: This sentence in isolation from any
12  other sentence in the letter or the letter itself?
13  BY MS. LARKINS:
14       Q. This sentence, this fourth sentence in the
15  second paragraph, why did you write that sentence?
16       MR. SMITH: Vague, ambiguous. You're taking one
17  sentence out of context.
18       THE WITNESS: I simply wrote the whole letter to
19  say, you know, "You're going to do this on your own. Go
20  take a look at these resources." That was it.
21  BY MS. LARKINS:
22       Q. Let's look at the next sentence, Sentence 5 in
23  that Paragraph 2 of Exhibit 4. It says, "In an abundance
24  of caution, I may have previously told you 60 days." By
25  writing that were you intending for me to understand that

Page 43

1  that 60-day period was not correct?
2        MR. SMITH: Vague, ambiguous, argumentative,
3  calls for speculation.
4        THE WITNESS: No.
5  BY MS. LARKINS:
6        Q. If 60 days were the actual final time limit, why
7  would you refer to it as "an abundance of caution"?
8        A. Because, if you take a look at the CEB books and
9  go to the proper section, you would have found that under
10  certain circumstances that the type of petition that you
11  were filing could have been filed at 90 or even 120 days
12  out. And I had absolutely no idea what you were doing at
13  this point in time. You were on your own. And I was
14  directing you to take a look at some of this other stuff,
15  if that, in fact, is what you wanted to do. But, in my
16  mind, I had clearly already told you 60 days. And it
17  turns out that, apparently, that's what you needed to
18  have done.
19       Q. Were you representing me on March 27th, 2003?
20       A. No.
21       Q. Did we -- did Elizabeth Schulman and Maura
22  Larkins have an attorney-client relationship on March
23  27th, 2003?
24       A. No.
25       MR. SMITH: Vague and ambiguous.

Page 44

1  BY MS. LARKINS:
2        Q. Why did you write this letter?
3        A. I wrote the letter --
4        MR. SMITH: Asked and answered.
5        THE WITNESS: -- in response to your fax of
6  3/26/03. In fact, I think there were two faxes that you
7  sent on that day and another fax on March 27th wherein
8  you wanted to meet with me. You wanted my help in
9  helping you do your writ, even though you understood that
10  I was not representing you. You just wanted some period
11  of my time. And I was simply trying to be helpful here.
12  BY MS. LARKINS:
13       Q. Were you trying to delay my filing of my
14  petition?
15       A. No.
16       Q. Okay. I would like to put into evidence Exhibit
17  5. I mean I'd like this marked. I do want it to be put
18  into evidence, but for now please just mark it as Exhibit
19  5.
20       (Exhibit 5 was marked for identification.)
21       MS. LARKINS: You know, I am not going to talk
22  about this, but we will just leave it here for now.
23  Okay? That's Exhibit 5. There was a different letter I
24  wanted, actually. This is the one I meant to offer.
25       Okay. I'd like to have this marked as Exhibit

Page 45

1  6.
2        (Exhibit 6 was marked for identification.)
3  BY MS. LARKINS:
4        Q. Is this one of the faxes that you were referring
5  to that I --
6        MR. SMITH: For the record, what Ms. Larkins has
7  marked as Exhibit 6 is a one-page facsimile which bears
8  the date March 27, 2003, but which also looks like it has
9  a fax date stamp of March 28th, 2003 up at the very top.
10  The fax is to Elizabeth Schulman from Maura Larkins.
11  BY MS. LARKINS:
12       Q. Okay. So it appears that I faxed you this fax
13  after you wrote the letter that is Exhibit 4 but
14  apparently, since it was very early in the morning on the
15  28th, the day that you wrote this letter, I hadn't
16  received the letter yet.
17       Okay. Now, when you received this fax, Exhibit
18  6, you had written me a letter saying that a petition was
19  required to be filed no later than the 90th day. And you
20  had referred to your previous advice of a 60-day period
21  as having been given in an abundance of caution. And now
22  you receive a letter from me that says, "I believe I have
23  until April 11th to petition Superior Court."
24       Did you think about the effect that your letter
25  would have on my plans?

12 (Pages 42 to 45)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 46

1    MR. SMITH: I am sorry. There was a long speech
2  there followed by what appeared to be a question. Could
3  you try and isolate your question?
4    MS. LARKINS: Sure.
5    Q. When you received Exhibit 6, did you think about
6  the effect that your letter in Exhibit 4 would have on
7  the date on which I filed my petition?
8    MR. SMITH: Objection, vague, ambiguous, calls
9  for speculation.
10    THE WITNESS: No.
11  BY MS. LARKINS:
12    Q. Okay. This is four. This is six. This is
13  five. Mrs. Schulman, do you consider yourself to be
14  familiar with the ethical standards required of lawyers
15  in California?
16    MR. SMITH: Objection. Vague, ambiguous
17  argumentative.
18    THE WITNESS: I was required to pass an exam,
19  which I passed, on the subject matter.
20  BY MS. LARKINS:
21    Q. I am not referring to academic standards. I am
22  talking about ethical standards. Are you familiar with
23  the ethical standards required of lawyers in California?
24    MR. SMITH: Vague, ambiguous, argumentative, not
25  reasonably calculated to lead to the discovery of

Page 47

1  admissible evidence.
2    THE WITNESS: I was required to pass an exam on
3  that subject matter, which I passed.
4  BY MS. LARKINS:
5    Q. Okay. Is it your understanding that a lawyer,
6  after he or she finishes representing a client, is
7  ethically obliged to provide documents which will help
8  that client in a different case or in the same case with
9  a different lawyer?
10    MR. SMITH: Objection. Vague, ambiguous,
11  argumentative, calls for a legal conclusion, calls for an
12  expert opinion.
13    THE WITNESS: That depends on what the documents
14  might be.
15  BY MS. LARKINS:
16    Q. If the documents are needed. Okay. Let's say
17  documents -- okay. So there are some documents that you
18  might not be ethically obliged to provide to a client,
19  even though they are needed by that client?
20    MR. SMITH: Vague, ambiguous, argumentative.
21    THE WITNESS: Well, I'm not sure what you mean
22  by "documents."
23  BY MS. LARKINS:
24    Q. By documents -- I will be specific. Let's not
25  call them documents. Let's call them -- well, let's call

Page 48

1  them writings prepared by a lawyer for a hearing which
2  work has been paid for by the client.
3    MR. SMITH: What is your question?
4  BY MS. LARKINS:
5    Q. Are you not obliged to turn those over to the
6  client?
7    A. Do you have some specific example that could be
8  helpful?
9    Q. For example, let's say that you had your
10  secretary type up in large print some notes that you had
11  taken talking to various witnesses and you note these
12  notes that you had included in a binder that you brought
13  to the hearing.
14    MR. SMITH: What's the question?
15  BY MS. LARKINS:
16    Q. Are you obliged to turn those over to the
17  client?
18    MR. SMITH: Okay. Is this a hypothetical
19  question?
20    MS. LARKINS: Well, actually, this did happen,
21  but I am --
22    MR. SMITH: Well, if it did happen, why don't
23  you just ask a specific question, rather than dancing
24  around with a hypothetical. The way this question is
25  phrased is making it very difficult for me to understand

Page 49

1  what the question is and, you know, I can't imagine
2  Ms. Schulman can answer it any better than I could.
3    So, if your question is is there an ethical
4  obligation for attorneys to turn over client files in
5  response to a client request --
6    MS. LARKINS: I like the way you worded that.
7    Q. Is there an ethical obligation for attorneys to
8  turn over client files in response to a client request?
9    A. Yes.
10    Q. Is it your habit and custom of turning over
11  files, client files, to clients in response to the
12  client's request?
13    A. Yes.
14    MS. LARKINS: Okay.
15    MR. SMITH: How long do you have meter-wise and
16  everything?
17    THE WITNESS: A few more minutes.
18    MS. LARKINS: Okay. I'd like to place this
19  exhibit -- I'd like to ask you to number this exhibit as
20  No. 7.
21    (Exhibit 7 was marked for identification.)
22    MR. SMITH: For the record, what plaintiff has
23  marked as Exhibit 7 is a one-page document which appears
24  to be half of a complete document. At the top it's
25  handwritten notation says Page 2 of 2 and the fax date

13 (Pages 46 to 49)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

**Page 50**

1  stamp appears to read -- although it's cut off -- looks
2  like May 1, 2003 and it bears Page 2. Exhibit 7 does not
3  have Page 1 of this document attached.
4  BY MS. LARKINS:
5     Q. Do you recognize this fax?
6     A. I can't say one way or the other. There were a
7  number of faxes.
8     MS. LARKINS: Okay. I'd like to put this next
9  letter into evidence. I'd like to have this next letter
10  marked as Exhibit 8.
11     (Exhibit 8 was marked for identification.)
12     MR. SMITH: For the record, what Plaintiff has
13  marked as Exhibit 8 is a one-page facsimile bearing the
14  date March 4th, 2003 from Maura Larkins to Elizabeth
15  Schulman.
16  BY MS. LARKINS:
17     Q. Okay. Would you agree that Exhibit 8 is a
18  client request for client files?
19     MR. SMITH: Objection. Vague, ambiguous, the
20  document speaks for itself. Are you asking if this is a
21  request for a complete client file?
22     MS. LARKINS: No. I am asking if this is a
23  request for a partial client file.
24     THE WITNESS: I think it was a request probably
25  for something that was work product of mine.

**Page 51**

1  BY MS. LARKINS:
2     Q. Okay. Do you consider notes that have been
3  typed up and brought to a hearing to be work product?
4     MR. SMITH: Objection. Vague, ambiguous, calls
5  for a legal conclusion, calls for an expert opinion. Are
6  you referring to a specific request in this letter,
7  because it looks to me like there are a few things that
8  are being discussed in this letter. So, do you have a --
9  are you referring to a specific item that's been
10  requested in here?
11     MS. LARKINS: Yes. I am referring to, and I
12  quote, notes which you took and which Bruce typed up for
13  the hearing of the phone conversations you had with
14  Lorena Vieyra and Maria Beers.
15     MR. SMITH: Okay. And so your question is?
16  BY MS. LARKINS:
17     Q. Do you consider that to be attorney work
18  product?
19     A. I do believe it was attorney work product in the
20  format that I used it, yes.
21     Q. If you have shown documents to a client, do you
22  not then have an ethical obligation to give the client
23  copies?
24     MR. SMITH: Based on the fact that the documents
25  were shown to a client, is that your question?

**Page 52**

1     MS. LARKINS: Yes.
2     MR. SMITH: Vague, ambiguous, calls for a legal
3  opinion, calls for expert opinion.
4     THE WITNESS: Depends on what the documents may
5  have been.
6     MS. LARKINS: Okay. Fine. All right. Just
7  going back for a few seconds to Exhibit No. 7 --
8     MR. SMITH: Not to interrupt, but we are coming
9  up on five minutes till 12:00. At some point we are
10  going to want to take a lunch break.
11     MS. LARKINS: Okay.
12     MR. SMITH: When is a good time for you?
13     MS. LARKINS: How about I just ask one more
14  question?
15     MR. SMITH: Okay.
16  BY MS. LARKINS:
17     Q. Okay. My question is, Exhibit 7, is this a
18  client request for client files?
19     MR. SMITH: Objection. Vague, ambiguous. The
20  witness already testified that she is not sure she
21  recognized this document. This document is clearly a
22  partial document. There is at least a page missing. So,
23  I am not sure that anybody can answer that question.
24  But, to the extent you think you can answer it, go ahead.
25     MS. LARKINS: Oh, yeah.

**Page 53**

1     MR. SMITH: Are you looking for the other page
2  of this document?
3     MS. LARKINS: Yes, I am.
4     MR. SMITH: Just for the record, Ms. Larkins
5  appears to be looking for the other page of Exhibit 7.
6     MS. LARKINS: I believe I have found it. Okay.
7  I don't know if I have multiples. Okay. Let me just
8  give you this copy. I think maybe the copy machine lost
9  this page, but --
10     MR. SMITH: The court reporter may have a copy
11  machine that we could borrow.
12     MS. LARKINS: Okay. So, I don't know the
13  procedure. Can we add this to the exhibit or do we have
14  to make a new exhibit?
15     THE REPORTER: You can add it.
16     MS. LARKINS: Okay. We want to add this to
17  Exhibit 7.
18     MR. SMITH: I am just going to write a little
19  "7" on the corner of it. Just a second here, Betty. I
20  will grab this.
21     MS. LARKINS: Okay. Well, since this document
22  has become more complicated, I think I can hold my
23  questions until after lunch.
24     MR. SMITH: Okay. So we are going to break for
25  lunch and during the break we are going to get some more

14 (Pages 50 to 53)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 54

1  copies made of what's going to now be the first page of
2  Exhibit 7 is my understanding.
3      MS. LARKINS: Yes.
4      MR. SMITH: Okay.
5      VIDEOGRAPHER: We are going off the record. The
6  time is 11:59 a.m.
7      (The noon recess was taken.)
8      VIDEOGRAPHER: We are going on the record. The
9  time is 01:13 p.m.
10 BY MS. LARKINS:
11     Q. Good afternoon.
12     A. Hello.
13     Q. As I was looking over this exhibit we were
14 talking about just before we went to lunch --
15     MR. SMITH: Which exhibit are you referring to?
16     MS. LARKINS: This is Exhibit 7.
17     MR. SMITH: Thank you.
18 BY MS. LARKINS:
19     Q. I don't really have much to ask about this,
20 except that if you look at Page 2 of Exhibit 7 do you
21 interpret this final paragraph on this page -- thank
22 you -- as a request for documents in a client file?
23     MR. SMITH: Objection. Vague, ambiguous, the
24 document speaks for itself, not reasonably calculated to
25 lead to the discovery of admissible evidence.

---

Page 55

1      THE WITNESS: I haven't interpreted it in any
2  fashion. It just says what it says.
3  BY MS. LARKINS:
4      Q. What does it say?
5      MR. SMITH: You're asking her to read into the
6  record what the document says?
7      MS. LARKINS: She could either read it in or she
8  could say it in her own words.
9      MR. SMITH: And you're referring simply to Page
10 2 to Exhibit 7, not the rest of Exhibit 7?
11     MS. LARKINS: Actually, I am just referring to
12 the middle sentence there on Page 7.
13     MR. SMITH: The one that says, "But please send
14 me a copy" --
15     MS. LARKINS: Yes.
16     MR. SMITH: -- "of that motion in limini" --
17 spelled l-i-m-i-n-i -- "and the other things I asked
18 for." Period.
19     MS. LARKINS: Yes.
20     MR. SMITH: You want her to read what that
21 sentence says?
22     MS. LARKINS: She could either read it or tell
23 me if she believes that that is a request for documents
24 in a client file.
25     MR. SMITH: Vague, ambiguous.

---

Page 56

1      THE WITNESS: It says what it says.
2      MS. LARKINS: Okay. Fine. What I'd like to
3  do -- well, I just got these copies, so let's use these
4  copies here. I would like -- I think I will do these. I
5  would like to enter -- I would like to ask that these
6  documents be marked as exhibit -- are we on 8?
7      THE REPORTER: 9.
8      MR. SMITH: 9.
9      MS. LARKINS: 9. Okay. Exhibit 9.
10     (Exhibit 9 was marked for identification.)
11     MR. SMITH: Do you have an extra copy of these?
12     MS. LARKINS: Yes, I believe I do. Let's see.
13 Here is my original and here is a copy I can use. And
14 then here is an extra copy.
15     MR. SMITH: For the record, what plaintiff has
16 marked as Exhibit 9 looks like several letters. In
17 total, it's 11 pages altogether. There's a letter dated
18 June 1, 2001, a letter dated July 6th, 2001, a letter
19 dated July 17th, 2001, a letter dated August 15, 2001, a
20 letter dated September 19, 2001, a letter dated August
21 23, 2001, a letter dated September 10th, 2001.
22     Do you have a paper clip?
23     MS. LARKINS: I have these things. Okay. Thank
24 you for specifying what those documents are. Okay.
25 These are exhibits from my administrative hearing.

---

Page 57

1      This first letter, June 7th, 2001, is Exhibit
2  R29. The second letter, July 6th, 2001, is Exhibit R30.
3  The third letter --
4      MR. SMITH: Just, you know, it might -- two
5  issues. First of all, I am looking at the copy that you
6  gave me and I think there are some extra pages in the
7  copy that you provided for me that are different from the
8  copy that we have marked.
9      MS. LARKINS: Oh, yeah. I can fix it.
10     MR. SMITH: In addition, this entire package has
11 been marked as Exhibit 9. If that's the way you want to
12 do it, that's fine. I am just asking. You're referring
13 to them also by Exhibit Nos. R29, et cetera. It may be
14 confusing when we are talking about renaming documents
15 two separate exhibit numbers. So I am going to ask if
16 we can clarify that, perhaps.
17     MS. LARKINS: Okay. Shall we go ahead and give
18 them their original -- mark them with the original
19 numbers and can I withdraw Exhibit 9?
20     MR. SMITH: If I can offer a suggestion, this is
21 your deposition.
22     MS. LARKINS: Yes. Yes.
23     MR. SMITH: You can mark them any way you want.
24 If you want to talk about these documents separately,
25 let's just mark them as separate exhibits in order 9, 10,

---

15 (Pages 54 to 57)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 58

1   11 and so on and so forth.
2       MS. LARKINS: Okay. Fine.
3       MR. SMITH: But let's just not refer to them by
4   different names.
5       MS. LARKINS: Okay. Let's -- okay. Then how
6   about we just refer to the June 7th letter as Exhibit 9.
7       MR. SMITH: So, for the record, you're referring
8   to the June 7th, 2001 letter to Mr. Richard T. Werlin
9   from Pamela Havird?
10      MS. LARKINS: Yes.
11      MR. SMITH: All right. That's Exhibit 9?
12      MS. LARKINS: Uh-huh.
13      MR. SMITH: Okay.
14      MS. LARKINS: Okay. Exhibit 10 will be the July
15  6th, 2001 letter from Pamela Havird to Richard Werlin.
16      THE WITNESS: You need to let the court reporter
17  have time to mark these.
18      THE REPORTER: Counsel, if you just want to put
19  them on there, I don't know how many more we need.
20      THE WITNESS: That's the problem. They are not
21  quite in chronological order.
22      MR. SMITH: Okay. Well, let's go through this
23  carefully and make sure we have got it right. Okay. So
24  the July 6th, 2001 letter from Pamela Havird --
25      MS. LARKINS: Havird.

Page 59

1       MR. SMITH: -- to Richard Werlin is -- we are
2   going to mark as Exhibit 10?
3       MS. LARKINS: Yes.
4       MR. SMITH: That's one page?
5       MS. LARKINS: Yes.
6       MR. SMITH: Okay.
7       MS. LARKINS: Then July 17th, 2001 from Pamela
8   Havird to Richard Werlin.
9       MR. SMITH: Just a second. This is -- I think
10  I've got your copies here. This one is --
11      THE WITNESS: Well, wait a moment. This is July
12  6th, 2001.
13      MR. SMITH: Yeah. That's the one we just marked
14  as Exhibit 10.
15      THE WITNESS: Okay.
16      MR. SMITH: So this is my copy of 10. This
17  is -- okay. So July 17th we are going to mark as 11.
18  And that's one page?
19      MS. LARKINS: Yes.
20      MR. SMITH: One-page letter dated July 17th,
21  2001 from Pamela Havird to Richard Werlin.
22      Did we mark that as 11?
23      MS. LARKINS: Yes. Okay. Then Exhibit No. 12
24  will be the August 15th, 2001 letter from Pamela Havird
25  to Richard Werlin.

Page 60

1       (Exhibits 10 through 12 were marked.)
2       MR. SMITH: That's a two-page letter?
3       MS. LARKINS: Yes.
4       THE WITNESS: This is out of order. It should
5   be 33, then 34.
6       MS. LARKINS: Are we ready for 13?
7       MR. SMITH: Yeah.
8       MS. LARKINS: Okay. 13 is the September 19th,
9   2001 --
10      MR. SMITH: Do you want to do that or the August
11  letter? .
12      MS. LARKINS: Good idea. Let's do. Let's
13  change that. Let's make No. 13 be the August 23rd, 2001
14  letter.
15      MR. SMITH: Okay.
16      . MR. SMITH: That's a one-page letter from Pamela
17  Havird to Richard Werlin.
18      MS. LARKINS: Okay. Let's go ahead and make
19  this September 10th, 2001 letter from Pamela Havird to
20  Richard Werlin Exhibit 14 and that is two pages. And
21  then this September 19th, 2001 letter from Pamela Havird
22  to Richard Werlin will be Exhibit 15.
23      MR. SMITH: That also is two pages?
24      MS. LARKINS: Yes.
25      (Exhibits 13 through 15 were marked.)

Page 61

1       MR. SMITH: Ms. Larkins, I am going to hand back
2   to you three pages that were in the copy that you gave me
3   that we haven't marked. So --
4       MS. LARKINS: Thank you. Okay. What I would
5   like to do is point out that these letters, which were
6   exhibits in the administrative hearing, completely
7   contradict several findings of the Commission on
8   Professional Competence. And the first of those findings
9   I'd like to point out is finding -- Factual Finding 50 in
10  the decision, which is Exhibit 1.
11      Q. Mrs. Schulman, do you find this factual finding
12  to contradict, to be contradicted by exhibit -- our
13  Exhibit 14? Do you have your Exhibit 1?
14      MR. SMITH: Just a second. Are you planning to
15  ask Ms. Schulman to compare statements that are made in
16  these various letters and argue with her whether they
17  contradict or don't contradict specific factual findings
18  contained within the decision set forth by the Commission
19  on Professional Competence.
20      MS. LARKINS: No. As a matter of fact, what I
21  am asking her to do is to notice that the findings say
22  that the letters do not exist, were not sent, that there
23  were no responses made by Mrs. Larkins or her attorney,
24  and just the existence of the letters in themselves shows
25  that these are obviously false findings.

16 (Pages 58 to 61)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 62

1     MR. SMITH: Okay. Well, you know, I think
2 that's an argument that you can definitely make at trial.
3 I am not sure what the question is for Ms. Schulman.
4     MS. LARKINS: Okay.
5     Q. When you read this decision, Mrs. Schulman, were
6 you shocked and appalled by Factual Finding No. 50?
7     MR. SMITH: Wait just a second. You're
8 referring to Exhibit 1?
9     MS. LARKINS: Yes.
10     MR. SMITH: And your question is was she shocked
11 and appalled when she read Paragraph 50 of Exhibit 1?
12     MS. LARKINS: Yes.
13     MR. SMITH: Let me for the record voice my
14 objection. Vague, ambiguous, not reasonably calculated
15 to lead to the discovery of admissible evidence and
16 argumentative. That being said, we can turn to Paragraph
17 50 of Exhibit 1 and you can tell Ms. Larkins whether you
18 were shocked and appalled.
19     Paragraph 50 is on Page 10 of the decision; is
20 that correct?
21     MS. LARKINS: Yes.
22     THE WITNESS: That's what you want me to read,
23 Paragraph 50?
24     MR. SMITH: And the question is were you shocked
25 and appalled when you read that.

Page 63

1     THE WITNESS: No.
2     MS. LARKINS: Okay. Since you don't like to
3 read, I guess I will read it myself. Okay. Factual
4 Finding 50 of the decision states: "Mrs. Larkins
5 received this letter through her home fax machine.
6 Neither Mrs. Larkins nor her attorney responded to it."
7 And when the decision says "this letter," it is referring
8 to the preceding factual finding, No. 49, which says, "A
9 letter dated September 7th, 2001 was faxed to
10 Mrs. Larkins' home."
11     And the second paragraph states: "You are once
12 again directed to report to my office on Wednesday,
13 September 12th, 2001 at 8:00 a.m. to receive your
14 teaching assignment for the 2001/2002 school year." I
15 think that's enough to get the idea that the letter is
16 directing me to report to work at this date.
17     Now, three days later, Pamela Havird wrote a
18 letter back to Mr. Werlin, this Exhibit 14. Do you --
19 okay. You weren't appalled by this.
20     Do you find factual finding to be inaccurate in
21 light of the fact that this Exhibit 14 proves that
22 Mrs. Larkins' attorney did respond to that fax?
23     Go ahead.
24     MR. SMITH: Oh, okay. I am going to ask you to
25 rephrase the question, because there was a long speech

Page 64

1 preceding the question that went a lot of different
2 directions. It's compound, vague and ambiguous,
3 contained a characterization of a document that I am not
4 sure is entirely accurate and hearsay. So I am just
5 going to ask you to see if you can reframe your question
6 so it's a little bit more clear.
7     MS. LARKINS: Okay. You know what I am going
8 to do? I am just going to read this into the record.
9 Okay. Exhibit 14 is a letter from Pamela Havird to
10 Richard Werlin dated September 10th, 2001. And it
11 states: "I am writing as a follow-up to you to your
12 letter of September 3rd, 2001 and our telephone
13 conversation last week regarding your directive for
14 Mrs. Larkins to report to your office for her assignment
15 on September 5th, 2001."
16     "As we discussed on the telephone, the District
17 has created a hostile work environment for Mrs. Larkins
18 by wrongfully placing her on administrative leave as set
19 forth in the April 4th, 2001 letter and by failing to
20 complete the investigation of the underlying allegations
21 leading up to the administrative leave for more than five
22 months."
23     "While this office agreed to stay the grievance
24 process to give you the opportunity to organize the
25 necessary hearing or hearings for the teachers making

Page 65

1 charges against Mrs. Larkins, to inform her of those
2 charges, Mrs. Larkins has not been given the opportunity
3 to respond to the alleged charges against her. To date,
4 Mrs. Larkins still has not been informed of any of the
5 specific instances of alleged misconduct other than those
6 stated by Allen Smith at the meeting on August 13th,
7 2001."
8     "Since the initial allegations of irrational and
9 inappropriate conduct have created a series of horrible
10 rumors in the School District indicating that
11 Mrs. Larkins is not safe to teach at the Castle Park
12 School or that she has allegedly threatened the safety of
13 one or more of the teachers, until these mistaken rumors
14 are cleared up with a formal apology by the District,
15 Mrs. Larkins' reputation and credibility have been
16 damaged throughout the entire District, making it
17 impossible for her to effectively teach at any location
18 in the District."
19     "Even though Mrs. Larkins is fit to teach, as
20 set forth in the letter from Dr. Otis, it would not be
21 reasonable for any person in Mrs. Larkins' shoes to
22 return to teaching at any location in the District until
23 this entire situation can be cleared up."
24     "To date, the charges by Mr. Smith wherein
25 Mrs. Larkins said that he was a rubber stamp and that

17 (Pages 62 to 65)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 66

1  Mrs. Larkins should have allowed her students to walk on
2  the road to swim, in spite of Mrs. Larkins' safety
3  concerns for the children, are ridiculous grounds for
4  being placed on the administrative leave."
5      "Furthermore, your personal allegations of
6  Mrs. Larkins' inappropriate conduct because of the way
7  she has looked at you or her abrupt behavior around you
8  following the April 4th, 2001 letter" --
9      MR. SMITH: You missed a word in there.
10     MS. LARKINS: Can you tell me what the word was?
11     MR. SMITH: "Alleged."
12     MS. LARKINS: Oh, "... or her alleged abrupt
13 behavior around you following the April 4th, 2001 letter
14 is suspect, since you have personally been responsible
15 for taking Mrs. Larkins out of the classroom and have not
16 informed her of the alleged instances of misconduct
17 leading up to her administrative leave."
18     "While you have admitted that Mrs. Larkins has
19 good teaching skills, your personal handling of the
20 investigation surrounding Mrs. Larkins' situation has
21 delayed any resolution to the allegations against
22 Mrs. Larkins."
23     "I am sympathetic with the enormous
24 responsibilities you have in the District and the other
25 lawsuits the District is fighting at this time. However,

---

Page 67

1  Mrs. Larkins' case has been placed on the back burner for
2  the last few months."
3      "In the event that the charges against
4  Mrs. Larkins can be disclosed to her, this office is
5  prepared to make a response to you within 10 days so that
6  we can either resolve the matter or go to the next level
7  for Mrs. Larkins' grievance process. Until the grievance
8  process is completed or the District agrees to withdraw
9  the original claims against her and give her back pay
10 since being placed on administrative leave, it is my
11 position that Mrs. Larkins should remain on
12 administrative leave with the District until a final
13 resolution of this matter."
14     "Please contact me to discuss completing the
15 grievance process. Thank you for your prompt attention
16 to this matter.",
17     Q. Do you believe that the Factual Finding 50 is
18 correct in saying that neither Mrs. Larkins nor her
19 attorney responded to this letter, presumably meaning 49?
20     MR. SMITH: I am sorry. Could you repeat that
21 question, please? You're referring to Factual Finding
22 50 --
23     MS. LARKINS: Uh-huh.
24     MR. SMITH: -- of Exhibit 1 --
25     MS. LARKINS: Uh-huh.

---

Page 68

1      MR. SMITH: -- on Page 10 of Exhibit 1?
2      MS. LARKINS: Uh-huh.
3      MR. SMITH: And your question is does
4  Mrs. Schulman believe that the factual finding contained
5  in Paragraph 50 on Page 10 of the Exhibit 1 is correct?
6      MS. LARKINS: Uh-huh.
7      MR. SMITH: Vague, ambiguous, calls for improper
8  opinion, irrelevant, speculation.
9      THE WITNESS: You have lost me.
10 BY MS. LARKINS:
11     Q. Did Pamela Havird respond to Rick Werlin's
12 September 7th fax?
13     MR. SMITH: Vague, ambiguous, calls for
14 speculation.
15     THE WITNESS: I wasn't there at the time. I
16 don't know.
17 BY MS. LARKINS:
18     Q. If three days after a person receives a letter
19 they send a response to the sender discussing the issues
20 in the original letter, do you consider that a response?
21     MR. SMITH: You're asking a hypothetical
22 question?
23     MS. LARKINS: Uh-huh.
24     MR. SMITH: Incomplete hypothetical, vague,
25 ambiguous, not reasonably calculated to lead to the

---

Page 69

1  discovery of admissible evidence, improper opinion.
2  BY MS. LARKINS:
3      Q. How -- in your understanding, how does one
4  respond to a letter?
5      MR. SMITH: Vague, ambiguous, calls for
6  speculation, improper opinion, not reasonably calculated
7  to lead to the discovery of admissible evidence.
8  BY MS. LARKINS:
9      Q. Do you understand Factual Finding 50?
10     MR. SMITH: Vague, ambiguous, not reasonably
11 calculated to lead to the discovery of admissible
12 evidence.
13     THE WITNESS: It says what it says.
14     MS. LARKINS: But I am asking if you understand
15 it.
16     MR. SMITH: How is somebody supposed to answer
17 that?
18     THE WITNESS: It says what it says.
19 BY MS. LARKINS:
20     Q. Do you know what it says?
21     MR. SMITH: You're asking if she is able to read
22 the words that are printed on that paragraph?
23     MS. LARKINS: No.
24     Q. I asked: Do you know what it says?
25     A. I can see and read what it says.

---

18 (Pages 66 to 69)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 70

1    Q. Okay. So you know what it says?
2       MR. SMITH: Well, "know what it says," it says
3    what it says. If you're asking does she know what the
4    Commission meant when they wrote that, it's a written
5    document. It's subject to interpretation. It's written
6    in English. We can read it. What it says is, I am sure,
7    subject to debate.
8    BY MS. LARKINS:
9       Q. Do you believe that administrative decisions are
10   sometimes wrong?
11      MR. SMITH: Vague, ambiguous, calls for
12   speculation, calls for an improper opinion, not
13   reasonably calculated to lead to the discovery of
14   admissible evidence.
15      THE WITNESS: I don't have any belief about
16   administrative decisions.
17   BY MS. LARKINS:
18      Q. Have you ever appealed an administrative
19   decision?
20      A. Yes.
21      Q. Why did you appeal it?
22      MR. SMITH: Calls for attorney-client privilege,
23   attorney work product. I am going to instruct you not to
24   answer.
25      MS. LARKINS: Okay. Let me just get through

---

Page 71

1    this quickly. Number -- Factual Finding No. 53 says:
2    "Mrs. Larkins received this letter through her home fax
3    machine and by certified mail. Neither Mrs. Larkins nor
4    her attorney responded to it." And that presumably
5    refers to the letter and the preceding factual finding
6    which was mailed on September 17th.
7       Q. Do you believe that this factual finding is a
8    dreadful mistake?
9       MR. SMITH: Wait a second. Which factual
10   finding are you referring to?
11      MS. LARKINS: 53. And I would ask you to look
12   at Exhibit 15, which is a letter dated September 19th,
13   2001 from Pamela Havird to Richard Werlin.
14      MR. SMITH: Okay. So you're asking her to look
15   at Exhibit 15.
16      MS. LARKINS: Uh-huh.
17      MR. SMITH: Go ahead and look at Exhibit 15.
18      THE WITNESS: Did you want me to read Exhibit
19   15?
20      MS. LARKINS: No, just to note the date and that
21   it is a letter from Pamela Havird to Richard Werlin.
22      THE WITNESS: Well, it's dated 19 September,
23   2001. It's addressed to Mr. Werlin and it appears to
24   have been signed by Ms. Havird.
25   ///

---

Page 72

1    BY MS. LARKINS:
2       Q. Okay. Would you say that appears to be a
3    response to this letter that is described in Factual
4    Finding 52 of Exhibit 1?
5       MR. SMITH: Vague, ambiguous, calls for
6    speculation, best evidence, hearsay.
7       THE WITNESS: I have no idea.
8    BY MS. LARKINS:
9       Q. If Mr. Werlin wrote a letter to Mrs. Larkins'
10   home and to Pamela Havird on September 17th, 2001, and
11   Pamela Havird wrote a letter to Werlin on September 19th,
12   2001, would you be willing to admit that Pamela Havird
13   responded to Mr. Werlin's September 17th letter?
14      A. I have no idea.
15      MR. SMITH: Vague, ambiguous, calls for
16   speculation, assumes facts not in evidence, improper
17   hypothetical.
18      THE WITNESS: I have no idea.
19   BY MS. LARKINS:
20      Q. Okay. If these two letters are discussing the
21   same subjects, would you admit that the one is the
22   response to the other?
23      MR. SMITH: You know, you keep asking her to
24   admit one is a response to the other to documents that
25   Ms. Schulman neither wrote nor received. If you want

---

Page 73

1    admission with respect to those documents, you're
2    probably better off asking the people who wrote or
3    received the documents.
4    BY MS. LARKINS:
5       Q. Okay. Well, let's go on. I said I would do
6    this more quickly. Let's try to do it more quickly.
7    Okay. I would like now to talk about -- let's see, we
8    did 53 -- Factual Finding 56. It says neither -- okay.
9    We are talking about a September 20th -- okay. Well,
10   this is --
11      MR. SMITH: Excuse me.
12   BY MS. LARKINS:
13      Q. Just tell me what to do. Do I need to do it
14   now?
15      VIDEOGRAPHER: We can do it now or you can ask a
16   few more questions.
17      MS. LARKINS: Okay. This is the end of Tape 1,
18   Disk 1. We are going off the record at 1:46 p.m.
19      (A recess was taken.)
20      VIDEOGRAPHER: Today is Friday, July 16th, 2004.
21   The time is now 1:55 p.m. We are beginning Tape 2, Disk
22   2 of the deposition of Elizabeth Schulman. We are going
23   on the record.
24   BY MS. LARKINS:
25      Q. Yes. Regarding Factual Findings 56 and 59 in

---

19 (Pages 70 to 73)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

**Page 74**

1  Exhibit 1, these state that neither Mrs. Larkins nor her
2  attorney responded to letters dated September 20th, 2001
3  and September 26th, 2001.  Do you see among these
4  Exhibits 9 through 15 that we recently labeled any
5  letters dated after September 20th, 2001?
6        MR. SMITH:  I am sorry.  Could you repeat your
7  question, please?
8        MS. LARKINS:  Are any of these exhibits dated
9  after -- are any of the letters from Pamela Havird to
10  Rick Werlin dated after September 20th, 2001?
11       MR. SMITH:  Ms. Larkins, to move things along,
12  we will stipulate that the dates on the letters are
13  whatever the dates on the letters are.  So you can tell
14  us whether they came before or after a certain date.
15       MS. LARKINS:  Okay.  Will you stipulate that
16  there are no letters among these letters that were placed
17  into -- will you stipulate there were no letters placed
18  into evidence in my administrative hearing from Pamela
19  Havird to Rick Werlin dated after September 20th, 2001?
20       MR. SMITH:  I will stipulate that Exhibits 9,
21  10, 11, 12, 13, 14 and 15 all bear dates that are on or
22  before September 19th, 2001.
23       MS. LARKINS:  Okay.
24       THE WITNESS:  I would also note that I think I
25  heard Mrs. Larkins misread 56 and 59, because she quoted

---

**Page 75**

1  dates and I don't remember seeing any dates.
2        MR. SMITH:  Don't worry about it.
3        THE WITNESS:  Okay.
4  BY MS. LARKINS:
5        Q.  Okay.  Do you recall who prepared these letters
6  to be exhibits in the administrative hearing?
7        MR. SMITH:  Which letters are you referring to?
8        MS. LARKINS:  Exhibits 9 through 15.
9        MR. SMITH:  And your question is who prepared
10  those letters?
11  BY MS. LARKINS:
12       Q.  Who made the copies and brought them to the
13  administrative hearing?
14       A.  No.
15       Q.  Okay.  Do you recall Maura Larkins asking you
16  during her administrative hearing to place Pamela
17  Havird's letters into evidence?
18       MR. SMITH:  Are you referring to specific
19  letters or any letters at all from Pamela Havird?
20       MS. LARKINS:  I am referring to these specific
21  letters.
22       MR. SMITH:  So is your question does
23  Ms. Schulman recall you asking her to put Exhibits 9
24  through 15 into evidence at the administrative hearing?
25       MS. LARKINS:  Yes.

---

**Page 76**

1        MR. SMITH:  Vague, ambiguous, calls for
2  speculation, not reasonably calculated to lead to the
3  discovery of admissible evidence.  You can answer, if you
4  can.
5        THE WITNESS:  I don't recall one way or the
6  other.
7        MS. LARKINS:  I have only got one copy of this,
8  but I'd like to place it into evidence.  I'd like this to
9  be labeled Exhibit 16.
10       THE REPORTER:  Do you want Rosie to make a quick
11  copy of it so you have something to work with?
12       MS. LARKINS:  That's all right.  I figured we
13  can make the copies afterwards.  I will make a note to
14  myself to make copies of Exhibit 16.
15       MR. SMITH:  So, for the record, Exhibit 16 is a
16  two-page document entitled "Index to Respondent's Hearing
17  Exhibits."  There are some handwritten notations on the
18  document.
19       (Exhibit 16 was marked for identification.)
20  BY MS. LARKINS:
21       Q.  Does this appear to be the index that you
22  prepared for my administrative hearing?
23       MR. SMITH:  Vague, ambiguous.
24       THE WITNESS:  It looks like the index that my
25  office prepared, yes.

---

**Page 77**

1  BY MS. LARKINS:
2        Q.  Okay.  Are any of these letters that are
3  Exhibits 9 through 15 listed there?
4        A.  Not that I see.
5        Q.  So, apparently, these exhibits were added.  One
6  of them, actually, is a Chula Vista School District
7  exhibit, that No. 62.  But the others were exhibits --
8  will you stipulate that the others are exhibits that you
9  added after the administrative hearing began?
10       MR. SMITH:  Wait a second.  Are you asking
11  Ms. Schulman for a stipulation?
12       MS. LARKINS:  Yeah.
13       MR. SMITH:  That's improper.  If you want to
14  stipulate with something, you and I can discuss
15  stipulations.
16       MS. LARKINS:  Oh, okay.  Well --
17       MR. SMITH:  Ms. Schulman is here to answer your
18  questions about the facts.  Ask her questions.  She will
19  answer the questions.  You and I can discuss
20  stipulations.
21       MS. LARKINS:  Okay.  Good.  I am happy to hear
22  she is going to answer my questions.
23       MR. SMITH:  Well, we have been here all day
24  ready and willing to answer questions.  We haven't had
25  very many questions that are approaching the universe of

---

20 (Pages 74 to 77)

Page 78

1  relevancy. Notwithstanding that, we are still here. So,
2  please, please ask a question.
3  BY MS. LARKINS:
4      Q.  Were Exhibits 9 through 15 added after the
5  hearing began?
6      MR. SMITH:  Vague, ambiguous.  Added to what?
7  BY MS. LARKINS:
8      Q.  Go ahead.
9      A.  I don't understand the question by "added."
10     Q.  Did you ask the judge in the -- in my
11 administrative hearing to place these letters into
12 evidence during my administrative hearing?
13     MR. SMITH:  Vague, ambiguous, calls for hearsay.
14     THE WITNESS:  Well, there's a record that's five
15 volumes long.  And, if the record shows that I asked for
16 these letters to be admitted into evidence, then that's
17 what the record shows.
18 BY MS. LARKINS:
19     Q.  Okay.  Why do you think they weren't included on
20 the index prepared by your office before the
21 administrative hearing?
22     MR. SMITH:  Vague, ambiguous, argumentative,
23 calls for speculation.
24     THE WITNESS:  I would have to look at the
25 District's exhibit list to see if they were included on

Page 79

1  that list.  I don't recall that they were or were not.
2  However, in the course of hearings, as the evidence
3  unfolds, it sometimes becomes necessary to make certain
4  strategy decisions and judgment calls as to what you
5  might want to put in that you didn't want to put in
6  before.
7  BY MS. LARKINS:
8      Q.  Did Maura Larkins beg you to place into evidence
9  these letters?
10     MR. SMITH:  Vague, ambiguous, argumentative,
11 calls for speculation.  I am sorry.
12     THE WITNESS:  Not -- not that I recall.
13 BY MS. LARKINS:
14     Q.  Did Maura Larkins bring other letters written by
15 Pamela Havird that are not -- that were not -- that are
16 not here and ask you to please place those into evidence,
17 also?
18     MR. SMITH:  Vague, ambiguous, calls for
19 speculation, argumentative.
20     THE WITNESS:  I don't recall.
21 BY MS. LARKINS:
22     Q.  Okay.  Did Maura Larkins bring multiple copies
23 of Richard Werlin's responses to grievances and ask you
24 to place them in evidence?
25     MR. SMITH:  Vague, ambiguous, calls for

Page 80

1  speculation.
2      THE WITNESS:  I don't recall.
3  BY MS. LARKINS:
4      Q.  Okay.  I'd like to look at Exhibit 1, the
5  Factual Finding 6.  We have already discussed the first
6  paragraph.  I'd like to look at the second paragraph.  It
7  says, "In the 2000-2001 school year, Mrs. Larkins had
8  several disagreements with fellow teachers that led
9  Mrs. Larkins to believe that her colleagues were
10 intentionally ignoring and slighting her.  Mrs. Larkins
11 believed Principal Donndelinger practiced favoritism and
12 failed to use consensus in the decision-making process at
13 Castle Park Elementary School."
14     This isn't -- that's kind of a mild one.  That
15 doesn't really express what was being said at the
16 administrative hearing.  Let's -- let's look at something
17 that gives us more of an idea of the atmosphere at that
18 hearing.
19     MR. SMITH:  So we are now turning away from Fact
20 No. 5, which you just -- half of which you just read into
21 the record?
22     MS. LARKINS:  Fact --
23     MR. SMITH:  Or Fact 6.  I apologize.
24     MS. LARKINS:  Yeah.  What I am trying to do is
25 to establish the portrayal of Maura Larkins that was

Page 81

1  created by the two witnesses for the District, Richard
2  Werlin and Gretchen Donndelinger.  And, as I recall, the
3  portrayal was of a person who was always causing trouble.
4  And I think -- well, maybe at trial we can find more of
5  that.
6      Q.  Did Maura Larkins ask you to place into evidence
7  one or more documents that showed that the only issues,
8  the issues -- that the issues that caused this hostile
9  feeling towards Maura Larkins had to do with policies and
10 procedures at the school?
11     MR. SMITH:  Okay.
12     MS. LARKINS:  I can -- I will do it over.
13     Q.  Let me ask to put this in evidence.  I mean to
14 mark it.  Would that be 17 now?
15     THE REPORTER:  Yes.
16     (Exhibit 17 was marked for identification.)
17     MR. SMITH:  For the record, Plaintiff has marked
18 as Exhibit 17 a one-page document entitled "Is Kingdoms a
19 Good Program?"
20 BY MS. LARKINS:
21     Q.  Did Maura Larkins ask you to put this document
22 into evidence in her administrative hearing?
23     A.  I don't recall.
24     MS. LARKINS:  I would like to take a break.
25     MR. SMITH:  Okay.

21 (Pages 78 to 81)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 82

1    MS. LARKINS: Just a --
2    VIDEOGRAPHER: We are going off the record. The
3  time is 2:09 p.m.
4    (A recess was taken.)
5    VIDEOGRAPHER: We are going on the record. The
6  time is 2:17 p.m.
7  BY MS. LARKINS:
8    Q. Okay. As I told you, I am trying to point out
9  some indications of how I was being made out to be some
10  kind of a trouble causer at the school. And I found
11  something that might be helpful on Page 4 of Exhibit 1.
12  It's Factual Finding 12. The February 12th --
13    MR. SMITH: Just a second. Give us a chance to
14  turn to it, please. Which factual finding are you
15  referring to?
16    MS. LARKINS: 12. Ready?
17    MR. SMITH: Give us a moment to read it.
18    MS. LARKINS: Oh, okay.
19    Q. Okay. In Factual Finding 12 the second sentence
20  says: "Mrs. Larkins was at the center of several
21  interpersonal conflicts over the past few months."
22    If Exhibit -- is it 17? Yeah. If Exhibit 17
23  had been shown to the panel at the hearing, would it not
24  have given an indication that the conflicts were not
25  personal but had to do with procedures and policies in

Page 83

1  the school?
2    MR. SMITH: Calls for speculation, vague,
3  ambiguous. You're asking, if this document had been
4  shown to the panel, what effect it would have had on the
5  panel?
6    MS. LARKINS: Let me rephrase. Let me rephrase.
7    Q. Did you make any effort to prove to the panel
8  that Maura Larkins -- that the problems that the other
9  teachers were having with Maura Larkins were based on
10  policies, her efforts to discuss policies and procedures?
11    MR. SMITH: Vague, ambiguous, overbroad. The
12  evidentiary record is contained within the reporter's
13  transcript and the exhibits presented at the
14  administrative hearing. And that record speaks for
15  itself with respect to what arguments were made.
16    THE WITNESS: There were five volumes there. I
17  think, if you read through those volumes, the answer to
18  your question will be there.
19    MS. LARKINS: I think so, too.
20    MR. SMITH: Good. We are agreed. Next
21  question.
22    MS. LARKINS: I think the answer is you didn't
23  make any effort.
24    MR. SMITH: What is your next question?
25    MS. LARKINS: Okay. We can set that aside.

Page 84

1    Q. Sticking with Factual Finding 12 on Page 4, the
2  second paragraph says, "Assistant Superintendent Werlin
3  clearly told Mrs. Larkins he was not passing judgment and
4  assured Mrs. Larkins that his primary interest was campus
5  safety and to return Mrs. Larkins to work as quickly as
6  possible."
7    "It was reasonable" -- continuing on to
8  Paragraph 3, "It was reasonable for Assistant
9  Superintendent Werlin to ask Mrs. Larkins to take time
10  off work and to obtain clearance from a physician or
11  mental health care provider before she returned to
12  campus."
13    As an employment -- as an attorney with an
14  emphasis on employment law, have you had occasion in the
15  past to deal with situations where an employee was asked
16  to take time off work to get a mental health clearance?
17    MR. SMITH: Objection. Vague, ambiguous, over-
18  broad.
19    THE WITNESS: That would call for the disclosure
20  of an attorney-client confidence. I can't answer that
21  question.
22  BY MS. LARKINS:
23    Q. Okay. I believe court cases and administrative
24  hearings are public records, as long as you don't -- as
25  long as you don't reveal a name. I don't --

Page 85

1    MR. SMITH: Could you repeat the question,
2  please?
3  BY MS. LARKINS:
4    Q. Have you had experience in a case where an
5  employee was asked for a mental health clearance?
6    MR. SMITH: Are you asking if, in general, she's
7  ever had a case with that?
8    MS. LARKINS: Yes.
9    MR. SMITH: Vague, ambiguous, not reasonably
10  calculated to lead to the discovery of admissible
11  evidence.
12    THE WITNESS: And I don't want to answer that
13  question, because I want to be real careful not to open
14  up the door for attorney-client confidentiality to be
15  revealed.
16    MS. LARKINS: Okay. I will withdraw the
17  question.
18    Q. When Mrs. Larkins -- when you found out that
19  Mrs. Larkins had been removed from her classroom on
20  February 12th, 2001 and told to go and get a mental
21  health clearance from a doctor or a fitness-for-duty
22  clearance from a doctor, what was your reaction as a
23  lawyer to how you would handle such a situation?
24    MR. SMITH: Vague, ambiguous, overbroad. I
25  don't understand the question.

22 (Pages 82 to 85)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 86

1    THE WITNESS: I wasn't representing you then.
2  Mrs. Havird represented you before I did. I am not too
3  sure when her representation started. I think it
4  probably was sometime in June.
5    MS. LARKINS: I said when I told you about it.
6  When I told you about having been taken out of my
7  classroom on February 12th, 2001 -- nobody was
8  representing me then -- and asked to go get a fitness-
9  for-duty evaluation, what would a good employment lawyer
10  respond when learning of that situation?
11    MR. SMITH: Vague, ambiguous, argumentative,
12  calls for speculation.
13    THE WITNESS: This was long after the fact that
14  you and I first ever met. There was nothing for me to
15  respond to.
16  BY MS. LARKINS:
17    Q. Okay. Did you make it clear at the
18  administrative hearing that it was illegal for the School
19  District to have insisted that I get a fitness-for-duty
20  evaluation?
21    MR. SMITH: Vague, ambiguous, argumentative,
22  assumes facts not in evidence.
23    THE WITNESS: There's five volumes there and
24  whatever was said is in those five volumes. And, as best
25  I recall, I think when you came back you just had a

---

Page 87

1  letter from a doctor, not a fitness for duty.
2  BY MS. LARKINS:
3    Q. To the best of your knowledge as an employment
4  lawyer, is it legal for a school district to place a
5  teacher on administrative leave and tell them that they
6  can't come back until they get a fitness-for-duty
7  evaluation?
8    MR. SMITH: Objection. Vague, ambiguous, calls
9  for a legal conclusion, calls for an improper opinion,
10  calls for speculation, incomplete hypothetical.
11    You can answer, if you can.
12    THE WITNESS: No. It's also overbroad and I
13  can't answer the question the way you have phrased it.
14  BY MS. LARKINS:
15    Q. Okay. Did you do any research regarding the
16  legality of the District's action in placing me on
17  administrative leave and telling me to -- I couldn't come
18  back to work until I had a physician's clearance?
19    MR. SMITH: Objection. Vague, ambiguous
20  overbroad.
21    THE WITNESS: I don't recall.
22  BY MS. LARKINS:
23    Q. Would it be your habit and custom to do
24  research?
25    MR. SMITH: Same objections.

---

Page 88

1    THE WITNESS: If it were relevant to the issues
2  at hand, it would be my habit and custom.
3  BY MS. LARKINS:
4    Q. Okay. Is it possible that my being taken out of
5  my classroom and placed on administrative leave and asked
6  to get a fitness-for-duty evaluation would be irrelevant
7  to my administrative hearing?
8    MR. SMITH: Objection. Vague, ambiguous,
9  argumentative, calls for speculation.
10    THE WITNESS: It is possible it could have been
11  irrelevant or only minorly important to the issues that
12  were being heard.
13  BY MS. LARKINS:
14    Q. So a good lawyer might pretty much ignore it?
15    MR. SMITH: Argumentative. Is this where we are
16  going? You're going to argue with Ms. Schulman?
17    MS. LARKINS: Let's see. Am I arguing? What
18  did I ask? I asked -- let me try again.
19    Q. When a lawyer is representing an employee who is
20  being dismissed, would he be using an adequate standard
21  of care if he or she failed to adequately address the
22  employee's being placed on administrative leave and being
23  asked to get a mental health clearance before coming back
24  to work?
25    MR. SMITH: Vague, ambiguous. That question was

---

Page 89

1  riddled with pronouns. I am not sure which "he" or "she"
2  refers to whom.
3    MS. LARKINS: Okay.
4    MR. SMITH: And you're ask also asking opinion
5  questions. If you're going to call Ms. Schulman and ask
6  her expert opinions, you know, pay her an expert witness
7  fee. We are here to answer factual questions. Ask
8  factual questions. We will answer them. We have been
9  here all day. We have been very patient with a long
10  series of speeches and irrelevant questions.
11    We are not going to sit through days of this.
12  This is not the way this deposition is going to go. If
13  necessary, we will seek a protective order, but we are
14  not going to waste days and days designed to argue with
15  Ms. Schulman or harass her and oppress her or embarrass
16  her.
17    So, I am encouraging you, once again, to please
18  ask factual questions. We will answer them.
19    MS. LARKINS: Mr. Smith, I believe Mrs. Schulman
20  had even more obligation to me than if I had hired her to
21  be an expert witness. I hired her to represent me. And,
22  in agreeing to represent me, she became obliged to use a
23  standard of care in her representation of me. And, if
24  she would ignore something this important, then I think
25  it's pretty clear that she wasn't using an adequate

---

23 (Pages 86 to 89)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 90

1  standard of care.
2       MR. SMITH: You may think that's clear. That's
3  fine. I will agree with you that there was a standard of
4  care owed. My argument is that the standard of care was
5  met. I think Ms. Schulman did a fabulous job for you in
6  a case that wasn't a very good case. But we are not here
7  to argue the merits. That's going to take place at a
8  later time on a motion hearing or before the judge and
9  before the jury. A deposition is not the place to make
10  that argument and Ms. Schulman is not the person to
11  direct that argument to.
12       MS. LARKINS: Okay. I am just going to point
13  out one thing. It's against the Education Code to do
14  this. In order for a school district to ask a teacher
15  for a fitness-for-duty clearance, they have to, in
16  writing, within 10 days give the reasons for doing so.
17  It was a violation of California law.
18       MR. SMITH: Okay. And you're paying for the
19  court reporter. If you want to spend the time to point
20  out things like this, that's fine. But it is not the way
21  a deposition is used. You're abusing the deposition
22  process. This isn't your opportunity to lecture and
23  debate Ms. Schulman. It's your opportunity to discover
24  evidence and to ask questions that are reasonably
25  calculated to lead to discoverable evidence.

Page 91

1       We have been sitting here all day listening to
2  speeches and statements and reading letters into the
3  record. Frankly, it's a waste of everyone's time.
4  Please ask a factual question.
5  BY MS. LARKINS:
6       Q. Well, that's interesting. I was trying to
7  discuss Ms. Schulman's performance as a lawyer and now
8  we have shifted to discussing my performance as a lawyer.
9  If you'd like to discuss that, I'd rather do it after the
10  deposition is over and you could tell me your opinions
11  about my lawyering skills then.
12       MR. SMITH: I am not here to express opinions
13  about your lawyering skills. I am here to make sure that
14  the discovery process, the deposition process, isn't
15  being used and abused to debate, oppress and harass my
16  client and to argue with her.
17       We are here to participate in the discovery
18  process in good faith. It appears that you're abusing
19  the discovery process and taking this as an opportunity
20  to make speeches and argue with my client. And if that's
21  the way you want to use the deposition time, you're going
22  to find that the deposition time is cut short.
23       MS. LARKINS: I don't doubt that it will be cut
24  short, but I don't think that will be the reason. I
25  think it's because you want to hide the truth in this

Page 92

1  case.
2       MR. SMITH: We have been here since 10:00
3  o'clock this morning ready and willing to answer
4  questions. So, if you want to ask factual questions,
5  we have answered every factual question that you have
6  asked. I haven't instructed the witness not to answer.
7  She hasn't refused to answer your questions.
8       So, this isn't -- you may think that the people
9  are trying to hide things from you and you may think
10  there is a big conspiracy. There simply isn't. But we
11  are not going to put up with a use of the deposition
12  process to harass and embarrass and oppress my client.
13  It's that simple.
14       MS. LARKINS: I hope this doesn't embarrass you,
15  but as I recall you did one time instruct your client not
16  to answer the question.
17       MR. SMITH: Yes, I did. When you asked for
18  attorney-client privileged information I did.
19  BY MS. LARKINS:
20       Q. Okay. What I am going to do now is I would like
21  to mark as Exhibit -- what are we on, Exhibit 18 -- as
22  Exhibit 18 the first day's -- the transcript of the first
23  day of the administrative hearing, which was January 6th,
24  2003. Now, what it this going to be? I am sorry. Is
25  this 19?

Page 93

1       MR. SMITH: 18.
2       (Exhibit 18 was marked for identification.)
3       MS. LARKINS: 18.
4       Q. Would you please turn to page -- well, 65.
5       MR. SMITH: For the record, Exhibit 18 purports
6  to be 237 pages. I've flipped through it really quickly.
7  I am making no representations whether all the pages are
8  there. You asked us to turn to Page 65?
9       MS. LARKINS: Yes, please.
10       Q. Okay. Let's see. I would like to bring your
11  attention to Line 15. And it appears that this is
12  questioning by Mr. Bresee, B-r-e-s-e-e, the lawyer for
13  Chula Vista Elementary School District, of Mr. Richard
14  Werlin.
15       And Mr. Bresee says, on Line 15: "And what
16  happened? You testified earlier that you walked 50 to
17  100 feet away from the office. What happened when you
18  reached that point?"
19       And Mr. Werlin answered: "I shared with
20  Mrs. Larkins that she was not to be on campus, that we
21  had clearly told her that she was expected to remain away
22  from the site until a meeting was scheduled with her
23  union representative, her principal and myself."
24       "She immediately exploded, got very loud and
25  said, 'You don't want me on that campus? You don't want

---

24 (Pages 90 to 93)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

**Page 94**

1　me on that campus?'  And she started to flail her arms
2　with jerky movements.  Her eyes got very glazed over.
3　She ran away from me.  And I said, 'Maura,' very quietly,
4　'please come back so we can have a conversation.'  She
5　runs back.  Then she, with jerky movement -- she had
6　pencils in her hand, and all that I can recall is her
7　movements were so abrupt that the pencils flew out of her
8　hand.  And when they flew, they landed at my feet."
9　　　　MR. SMITH:  Are you reading the transcript or
10　are you interpreting the transcript?
11　　　　MS. LARKINS:  Are you complaining about the
12　inflections in my voice?
13　　　　MR. SMITH:  Well, you have the inflections in
14　your voice that are going to show up on the video.  So,
15　be that as it may, but the transcript says, "And when
16　they flew they landed my feet."
17　　　　MS. LARKINS:  Oh, okay.
18　　　　MR. SMITH:  Now, are you -- are you having
19　recollection that he said "landed at my feet" or are you
20　maintaining that the transcript is transcribed
21　incorrectly?
22　　　　MS. LARKINS:  Let me just read it like it says
23　and I will accept that as the correct version.
24　　　　"And when they flew, they landed my feet.  And
25　she kept running, jerking behavior back and forth toward

---

**Page 95**

1　me and away from me, not wanting to listen, and then she
2　would come back when I would quietly ask her to please
3　come back so that we can have this conversation.  Then I
4　told her she would need to leave the campus."
5　　　　Would you agree, Mrs. Schulman, that, if true,
6　the teacher being described here is seriously emotionally
7　unstable?
8　　　　MR. SMITH:  Could you repeat that question?
9　BY MS. LARKINS:
10　　　　Q.  Is the teacher being described here by
11　Mr. Werlin someone with real emotional problems?
12　　　　MR. SMITH:  Aren't you the teacher being
13　described by Mr. Werlin in this passage?
14　　　　MS. LARKINS:  Yes, I am.
15　　　　MR. SMITH:  So is your question are you someone
16　with serious emotional problems?
17　　　　MS. LARKINS:  Well, this isn't true.  But I am
18　saying that, if it were true, wouldn't -- if this were
19　true, wouldn't it be describing a teacher with serious
20　emotional problems.
21　　　　MR. SMITH:  Are you asking Ms. Schulman, an
22　attorney, to make a diagnosis based on a paragraph pulled
23　out of a transcript numbering hundreds of pages, pulling
24　two paragraphs out and asking her to make a diagnosis
25　about whether a person described by Mr. Werlin is

---

**Page 96**

1　somebody with serious emotional problems?
2　　　　MS. LARKINS:  Let me rephrase.
3　　　　Q.  I know you have children.  And I guess they are
4　grown up now, but when they were in elementary school you
5　would have been worried if a teacher that would respond
6　like this was their teacher, wouldn't you?
7　　　　MR. SMITH:  Objection, relevance.  Let's keep
8　this professional and not start asking about peoples
9　family or children.  Okay?  If you have a question, ask a
10　question.
11　　　　Ms. Schulman is not here to give a diagnosis for
12　what emotional problems you may or may not have had at
13　the time or that are described by Mr. Werlin.
14　BY MS. LARKINS:
15　　　　Q.  If you had a client that behaved like this in
16　front of the person who was second in command of her
17　employment institution, would you want to argue that she
18　was wrongly dismissed?
19　　　　MR. SMITH:  Objection.  Argumentative, vague,
20　ambiguous, improper hypothetical, calls for speculation.
21　　　　THE WITNESS:  I can't answer the question as you
22　phrased it.
23　BY MS. LARKINS:
24　　　　Q.  Okay.  Let me try again.  When Mr. Werlin said
25　this in front of you during the administrative hearing,

---

**Page 97**

1　did you believe it to be true?
2　　　　MR. SMITH:  Objection.  Vague, ambiguous, not
3　reasonably calculated to lead to the discovery of
4　admissible evidence.  Did you believe that -- is your
5　question was he -- did she believe that he was
6　accurately --
7　　　　MS. LARKINS:  Telling the truth.
8　　　　MR. SMITH:  -- accurately reporting his
9　interpretation of events?
10　　　　MS. LARKINS:  Yes.  Well, no.  Accurately
11　reporting events.  Obviously, this is his interpretation
12　or at least it's the interpretation he wants to put on
13　record under oath.
14　　　　MR. SMITH:  Well, you know, different people
15　viewing the same circumstances have different
16　interpretations of a given set of facts.  So I want to
17　make sure I am clear on what the question is.
18　　　　Are you asking Ms. Schulman if she believed that
19　at the time Mr. Werlin gave the testimony that you read
20　into the record several minutes ago that Ms. Schulman
21　believed at that point in time that Mr. Werlin was lying
22　in a premeditated fashion?
23　　　　MS. LARKINS:  Yes.
24　　　　THE WITNESS:  Based upon my experience, both
25　life experience and attorney experience, different people

---

25 (Pages 94 to 97)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 98

1 who take part in the same events have different
2 interpretations of those events. It's very common.
3 BY MS. LARKINS:
4    Q. That doesn't respond to the question. He really
5 stated it very nicely.
6    A. Well, I am not answering his questions. I am
7 answering what I thought was your question.
8    Q. My question -- well, I'm going to repeat it the
9 way Mr. Smith said it, because I thought it was elegant.
10 Basically, did you believe Werlin was lying?
11    MR. SMITH: Relevance, calls for speculation.
12    MS. LARKINS: Okay.
13    THE WITNESS: I think that he had his
14 interpretation of what happened that day and you had your
15 interpretation of what happened that day.
16 BY MS. LARKINS:
17    Q. Do you think he genuinely believed this is what
18 happened?
19    MR. SMITH: Asked and answered.
20    MS. LARKINS: I don't think it has been asked
21 for.
22    THE WITNESS: You're asking me to speculate.
23 You're asking me to speculate as to what's in somebody
24 else's mind. I can't possibly do that.
25 ///

Page 99

1 BY MS. LARKINS:
2    Q. If someone is lying about your client, is it
3 your duty to prove it?
4    MR. SMITH: I am sorry. What?
5 BY MS. LARKINS:
6    Q. If someone is lying about your client,
7 Mrs. Schulman, in an administrative hearing, is it your
8 duty as a representative of your client to prove that
9 it's a lie?
10    MR. SMITH: Vague, ambiguous, argumentative,
11 calls for speculation, asks for expert opinion.
12    THE WITNESS: My obligation is to represent the
13 client as best I can based on my judgment and my
14 strategies of what is happening during the hearing.
15 BY MS. LARKINS:
16    Q. Did you feel reluctant to accuse an assistant
17 superintendent of lying?
18    MR. SMITH: Objection. Vague, ambiguous, not
19 reasonably calculated to lead to the discovery of
20 admissible evidence, assumes facts not in evidence.
21    THE WITNESS: It is not my practice to have a
22 witness up on the stand and say, "You're a liar."
23 BY MS. LARKINS:
24    Q. What is your practice when you know that someone
25 is up on the stand lying about your client?

Page 100

1    MR. SMITH: Overbroad.
2 BY MS. LARKINS:
3    Q. What is your obligation when someone is up on
4 the stand lying continually about your client?
5    MR. SMITH: Ms. Schulman's obligation is a
6 matter of law which is set forth. So, you don't need her
7 to testify about what her obligation is.
8 BY MS. LARKINS:
9    Q. Did you do all you could to prove that
10 Mr. Werlin was lying?
11    MR. SMITH: Objection. Vague, ambiguous,
12 overbroad, calls for speculation.
13    THE WITNESS: Argumentative.
14    MR. SMITH: Thank you.
15    THE WITNESS: I did all that I could reasonably
16 do to represent you.
17 BY MS. LARKINS:
18    Q. Did you try to prove Mr. Werlin was lying?
19    MR. SMITH: Same objections.
20    THE WITNESS: I think I have answered your
21 question.
22 BY MS. LARKINS:
23    Q. You know, you never answered my question. Did
24 you think Mr. Werlin was lying?
25    MR. SMITH: Relevance.

Page 101

1    THE WITNESS: I did answer that question.
2    MS. LARKINS: No, you didn't.
3    Q. Did you think Mr. Werlin was lying?
4    A. I think that two people taking part in the same
5 event or viewing the same event are going to see it
6 differently.
7    Q. It's a yes-or-no question.
8    MR. SMITH: Well, no, it's not necessarily a
9 yes-or-no question. Your question is vague and
10 ambiguous. And, you know, you get into any lawsuit,
11 you're going to hear people testify about things and they
12 are going to say things that are different. Does that
13 mean one of them is lying and one of them is not? Not
14 always the case.
15    So, whether Mr. Werlin was or was not lying,
16 we will never know. Whether Mr. Werlin -- whether
17 Ms. Schulman believed Mr. Werlin was lying is irrelevant.
18 It doesn't matter. An attorney puts on evidence, puts on
19 a case and the decision-maker comes down with a decision.
20    So, this line of questioning about whether
21 somebody believed or thought somebody was lying or not
22 makes no difference at all and is purely argumentative
23 and, again, seems sort of a pattern to engage in debate
24 with my client rather than use the deposition process
25 properly to discover admissible evidence.

26 (Pages 98 to 101)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 102

1  MS. LARKINS: I believe that was a yes-or-no
2  question, but let's go on.
3  Q. This event took place on March 27th?
4  MR. SMITH: What "event" are you referring to?
5  MS. LARKINS: The event described here by
6  Mr. Werlin, it took place on March 27th. It allegedly
7  took place on March 27th.
8  MR. SMITH: Where are you getting that from?
9  MS. LARKINS: On Page 64, Line 3.
10  MR. SMITH: So you're representing that the
11  question at Page 64, Line 3, relates to the answer
12  provided at Page 65, Lines 18 through Page 66, Line 12?
13  MS. LARKINS: Yes.
14  MR. SMITH: Okay. That's your representation.
15  MS. LARKINS: Yes.
16  Q. Okay. Did Maura Larkins ever return to work
17  after this event?
18  MR. SMITH: Vague, ambiguous, overbroad, calls
19  for speculation.
20  THE WITNESS: If I remember correctly, you
21  returned to work sometime in April for a short period of
22  time.
23  MS. LARKINS: Exactly.
24  Q. On April 4th I was asked to return to work
25  without any mental health evaluation, without any

---

Page 103

1  fitness-for-duty evaluation. Do you find that strange?
2  MR. SMITH: Wait. Wait. Wait. Wait. Is your
3  question, following your speech, did she find it strange
4  that you were allowed to return to work?
5  MS. LARKINS: Yes.
6  MR. SMITH: Irrelevant. This is not reasonably
7  calculated to lead to the discovery of admissible
8  evidence. Again, you're engaging in argument.
9  BY MS. LARKINS:
10  Q. Did you find it strange?
11  A. No.
12  Q. So, you figure it's perfectly normal to ask a
13  teacher who behaves like this to come back to work with
14  small children?
15  MR. SMITH: Objection. Argumentative, not
16  reasonably calculated to lead to the discovery of
17  admissible evidence.
18  BY MS. LARKINS:
19  Q. Do you feel that it's appropriate to ask a
20  teacher that behaves like this to show -- now, the
21  interesting thing is here I was on administrative leave
22  at this time. They had asked me on March 24th and 25th
23  to come back to work and then I came back. And I said
24  that the allegations that I was going to kill people
25  needed to be discussed. And, immediately thereafter,

---

Page 104

1  this event supposedly takes place.
2  So, I have been on leave since February 12th,
3  because the District fears that I might kill teachers.
4  And then this happens. And then I am asked to come back
5  to work about a week later.
6  Does that not seem strange?
7  MR. SMITH: Okay. That's -- you're just
8  arguing. This is -- this is your closing argument.
9  That's fine. Save it for the jury. Save it for the
10  judge. It's not the subject of a deposition.
11  BY MS. LARKINS:
12  Q. Why didn't you make this argument at the
13  administrative hearing?
14  MR. SMITH: Which argument?
15  MS. LARKINS: The argument I just made.
16  THE WITNESS: I would have to look at the
17  administrative hearing to see which arguments I made and
18  which arguments I did not make and what arguments were
19  relevant to the issues.
20  BY MS. LARKINS:
21  Q. Okay. Have you ever been morally outraged by an
22  administrative decision?
23  A. No.
24  MR. SMITH: Irrelevant.
25  ///

---

Page 105

1  BY MS. LARKINS:
2  Q. Did you feel that Maura Larkins had a hostile
3  environment at Castle Park Elementary School?
4  MR. SMITH: Objection. Irrelevant, vague and
5  ambiguous, not reasonably calculated to lead to the
6  discovery of admissible evidence.
7  THE WITNESS: What my personal views of any
8  client's case might be are not relevant to the issues of
9  the case.
10  BY MS. LARKINS:
11  Q. They could supply a motive for not adequately
12  representing the client.
13  MR. SMITH: Is that a question or is that an
14  argument?
15  BY MS. LARKINS:
16  Q. I'd like to know what your personal views were.
17  MR. SMITH: I beg your pardon?
18  MS. LARKINS: I would like to know what her
19  personal views were.
20  MR. SMITH: About?
21  MS. LARKINS: About whether or not I had a
22  hostile environment at my school.
23  MR. SMITH: You know, this is irrelevant. Are
24  you now arguing that she intentionally lost the
25  administrative hearing because of some animus towards

---

27 (Pages 102 to 105)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 106

1  you?
2      MS. LARKINS: I am asking what her personal
3  views were about whether or not the arguments she was
4  making were true.
5      MR. SMITH: Not reasonably calculated to lead to
6  the discovery of admissible evidence, vague,
7  argumentative.
8      THE WITNESS: My personal views are not relevant
9  to what I am doing.
10 BY MS. LARKINS:
11     Q. Okay. You haven't answered the question and I
12 will file a motion to compel you to answer the question.
13     A. As you wish.
14     MR. SMITH: Okay. Go ahead.
15 BY MS. LARKINS:
16     Q. Did you feel that Maura Larkins was victimized
17 by the situation at Castle Park?
18     MR. SMITH: Irrelevant, not reasonably
19 calculated to lead to the discovery of admissible
20 evidence, vague and ambiguous, calls for speculation,
21 argumentative.
22     THE WITNESS: If the question is my personal
23 view --
24     MS. LARKINS: Yes.
25     THE WITNESS: -- not relevant to my

---

Page 107

1  representation.
2  BY MS. LARKINS:
3      Q. Okay. There were some glaring omissions in the
4  documents that were produced by the District in this
5  case. The documents were Bates stamped. And just
6  sometimes when it would get just really interesting there
7  would be a page missing or two or three pages missing.
8      Why didn't you compel the District to produce
9  those documents?
10     MR. SMITH: Which documents are you referring
11 to?
12     MS. LARKINS: Well, these were documents that
13 were represented by Mr. Bresee to have been Bates stamped
14 by Dan Shinoff's office. The two that I was most
15 interested were Bates stamped Page 39 and Bates stamped
16 Page 55, but there were a number of others, a few of them
17 were 24, 27, 28, 39, 44. I don't think the exact numbers
18 are all that significant.
19     Q. Why didn't you compel them to produce those
20 documents?
21     MR. SMITH: Well, which documents is important.
22 If you're asking why didn't she try to compel certain
23 documents, you have got to tell us what documents you're
24 talking about so she can answer the question
25 intelligently.

---

Page 108

1  BY MS. LARKINS:
2      Q. Bates stamped Pages 39 and 55.
3      A. I don't remember, sitting here today, what those
4  pages are.
5      Q. Why didn't you demand a single one of them be
6  produced?
7      MR. SMITH: A single one of what?
8      MS. LARKINS: The missing pages.
9      MR. SMITH: Because there is missing -- because
10 there were skips in Bates stamp numbers, you're operating
11 on the assumption that there are pages missing and being
12 withheld that should have been produced; is that what
13 you're saying?
14     MS. LARKINS: Yes.
15     MR. SMITH: And you're wondering why -- well,
16 never mind. I am not going to ask any questions for you.
17 What is your question?
18     MS. LARKINS: I'd like to put something into
19 evidence. Let's see. Do I have more of these? Okay.
20 I'd like to place into evidence two pages. Actually, I
21 should probably put in the entire Exhibit 14 from my
22 administrative hearing. I guess I don't have other
23 copies.
24     THE REPORTER: If we take a quick break, I'll
25 make a copy.

---

Page 109

1      MS. LARKINS: Okay. Great.
2      VIDEOGRAPHER: We are going off the record. The
3  time is 2:59 p.m.
4      MS. LARKINS: Okay. Great.
5      VIDEOGRAPHER: We are going on the record. The
6  time is 3:08 p.m.
7  BY MS. LARKINS:
8      Q. Okay. I'd like to direct your attention to
9  Exhibit 1, Page 23, Legal Conclusion 8.
10     MR. SMITH: The one entitled, "Mrs. Larkins
11 demonstrated evident unfitness for service"?
12     MS. LARKINS: Exactly. "Mrs. Larkins
13 demonstrated evident unfitness for service."
14     Q. Okay. And do you want to take a minute to read
15 it? Let's see, 19. I don't know. Did we each get one?
16     MR. SMITH: Which one has the original sticker
17 on it?
18     THE REPORTER: You can feel it.
19     MS. LARKINS: This one.
20     Q. Okay. I am going to go ahead and read it. "A
21 preponderance of the evidence established cause to
22 terminate Maura Larkins from her employment with the
23 Chula Vista Elementary School District under Education
24 Code Section 44932-A5 based on her evident unfitness for
25 service. It was established by a preponderance of the

---

28 (Pages 106 to 109)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 110

1  evidence that Mrs. Larkins was insubordinate and did not
2  report for duty as a result of her blind quest for
3  personal justice, conduct that was based upon her
4  stubborn, unforgiving nature, a trait of character, was
5  not remediable."
6      MR. SMITH: Are going to read the next
7  paragraph?
8      MS. LARKINS: Oh. And then it says, "This
9  conclusion is based on legal conclusions." It just gives
10  all the legal conclusions and factual findings which it
11  is based on, which many of which happen to be absolutely
12  false and obviously so. But, apparently, that didn't
13  shock or appall Mrs. Schulman.
14      Q. Okay. Are you familiar with the Morrison
15  criteria?
16      A. Yes.
17      Q. Did the judge in the administrative hearing
18  discuss the Morrison criteria?
19      A. Yes.
20      Q. Okay. For the Morrison criteria, the Morrison
21  criteria -- tell me if you think I am stating this
22  correctly. The Morrison criteria say that in order for a
23  teacher to be declared unfit for service they have
24  to have -- the actions that they did have to show a trait
25  of character that's not remediable.

Page 111

1      Am I stating that correctly?
2      MR. SMITH: Objection. Calls for a legal
3  conclusion, best evidence, vague, ambiguous, overbroad.
4      THE WITNESS: The administrative law judge
5  actually provided us with what he was talking about for
6  the Morrison criteria. There were six, seven different
7  criteria. I would have to take a look at it to see if,
8  in fact, the way you're stating it is the way it was
9  stated in the Morrison criteria. There certainly is a
10  criteria about the likelihood of recurrence.
11  BY MS. LARKINS:
12      Q. Okay. I'd like to look at some of these factual
13  findings that this is based on. One of them is 50. I
14  believe we discussed that before. That was the one that
15  said that neither Maura Larkins nor her attorney made any
16  response to a letter. And we discovered that was false.
17      It was also based on 56, which was -- and 53,
18  which said the same thing and were also false. Let's
19  look at -- let's see -- 83. It's based on 83. I'd like
20  to look at 83, which is on Page 17.
21      MR. SMITH: Tell us when you get to the end of
22  the speech and we are starting the beginning of a
23  question.
24      MS. LARKINS: You're not going to look? Are you
25  going to look at it?

Page 112

1      MR. SMITH: I don't know. I wasn't sure whether
2  you were done with your speech or not. Are you done or
3  are we now --
4      MS. LARKINS: Yes. I'd like you to look at 83,
5  if you can find it.
6      MR. SMITH: Are we getting ready to lead into a
7  question?
8      MS. LARKINS: Do I have to answer your
9  questions, if they are rhetorical? Tell you what. You
10  let me ask the questions. Okay? And I'll try not to
11  ask too many rhetorical questions, though I know neither
12  one of us can resist throwing in a few of them.
13      MR. SMITH: Okay. So, you're preparing to ask a
14  question about Fact No. 83?
15      MS. LARKINS: Yes. Okay. Fact 83 says: "On
16  March 11th, 2002, Mrs. Larkins filed a lawsuit against
17  the District." So, Mrs. Larkins is found unfit for
18  service based on the fact that she filed a lawsuit.
19      Q. Did you protest during the administrative
20  hearing that filing a lawsuit is not grounds for -- that
21  filing a lawsuit is a constitutionally-protected right
22  and does not make a person unfit for service?
23      MR. SMITH: Could you repeat the question?
24  BY MS. LARKINS:
25      Q. Did you argue in the administrative hearing that

Page 113

1  filing a lawsuit is a constitutionally-protected right
2  and does not make an employee unfit for service?
3      MR. SMITH: Vague, ambiguous. The
4  administrative record speaks for itself and it contains
5  all the arguments that were made. So, if you want to
6  know whether an argument was or was not made, just refer
7  to the five-volume reporter's transcript and the exhibits
8  placed into evidence at the administrative hearing.
9  BY MS. LARKINS:
10      Q. Did you have an obligation to protect my
11  constitutional rights during this hearing?
12      MR. SMITH: Objection. Vague, ambiguous,
13  argumentative, calls for a legal conclusion, calls for an
14  expert opinion.
15      THE WITNESS: I don't understand your question.
16  BY MS. LARKINS:
17      Q. Did you have an obligation to protect my
18  constitutional rights during my administrative hearing?
19      MR. SMITH: Same objections.
20      THE WITNESS: I don't understand your question.
21      MR. SMITH: What constitutional right are you
22  referring to?
23      MS. LARKINS: The right to petition for redress
24  of grievances.
25      MR. SMITH: Aren't you in the process of

29 (Pages 110 to 113)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

---

Page 114

1  petitioning for redress of grievances with the District
2  right now?
3      MS. LARKINS: This is exactly the lawsuit we are
4  referring to right here.
5      MR. SMITH: Right. So you are currently
6  exercising your constitutional right to petition for
7  redress of grievances at this very moment; isn't that
8  correct?
9      MS. LARKINS: I was dismissed for doing so.
10 Anyway, am I not supposed to be asking the questions?
11     MR. SMITH: You know, I wish -- I wish you
12 would. I wish you would.
13     MS. LARKINS: Okay. I will ask it again and I
14 will try to ask it in a different way.
15     Q. Is Legal Conclusion No. 8 illegal?
16     A. Legal conclusion number what?
17     Q. Eight, this one we have been talking about.
18     A. Eight?
19     MR. SMITH: Okay. We have got --
20     MS. LARKINS: It's on Page 23.
21     MR. SMITH: Right now you had asked us to turn
22 to Factual Conclusion No. 83.
23     MS. LARKINS: Yeah. Okay.
24     MR. SMITH: So now you're asking us to turn back
25 to Legal Conclusion No. 8?

---

Page 116

1  56 and 59. And a lot of these are just things that have
2  nothing to do with anything, really, like -- let's see --
3  No. 4 says this: "In September, 1974, Mrs. Larkins began
4  employment with the Chula Vista Elementary School
5  District. Mrs. Larkins provided services at Montgomery
6  Elementary School, Rice Elementary School and Harborside
7  Elementary School from 1974 through 1995."
8      "In September 1997, following a two-year leave
9  of absence, Mrs. Larkins was assigned to teach bilingual
10 classes at Castle Park Elementary School."
11     Well, I think we can all agree that I wasn't
12 found unfit for service because of that.
13     MR. SMITH: You know, we are not going to all
14 agree about much, if anything, here today, I don't think.
15 But, regardless, this document was not drafted by
16 Ms. Schulman. It was drafted by the Commission on
17 Professional Competence.
18     What the Commission intended when drafting this
19 document and these legal conclusions and how they
20 balanced and weighed these legal conclusions and factual
21 findings and what weight, if any, they gave to any of
22 them is for the Commission to know, not for us. They
23 wrote it down. You can interpret it. I can interpret
24 it. We all can read it and come to our own conclusions
25 about it. But it is the Commission who wrote this

---

Page 115

1      MS. LARKINS: Yeah. We looked at 83, because
2  you can see right here that 83 is referred to. And here
3  in Legal Conclusion 8 it says, "This conclusion is based
4  on, among other things, Factual Finding 83."
5      MR. SMITH: Right. So now you want us to review
6  Legal Conclusion No. 8 and you want Ms. Schulman to
7  express an opinion with respect to whether that legal
8  conclusion is correct or not?
9      MS. LARKINS: Yeah. Is a person -- can a person
10 be found unfit for service because they file a lawsuit?
11     MR. SMITH: Objection. Vague, ambiguous.
12 You're pulling -- there is a list of one, two, three,
13 four, five, six, seven, eight, nine, ten, eleven,
14 twelve -- well, you know, 20 or more factual findings and
15 legal conclusions upon which Legal Conclusion No. 8 is
16 based. And you're pulling one out and asking for an
17 opinion with respect to whether the legal conclusion is
18 correct.
19     Ms. Schulman is not here to express legal
20 opinions or give expert opinions. She is here to answer
21 factual questions. This isn't a forum for argument. You
22 can make all those arguments later. This is not the time
23 to do it.
24     MS. LARKINS: As a matter of fact, I didn't just
25 pick out one of them. I have already discussed 50, 53,

---

Page 117

1  document. If you have got questions about the document,
2  talk to the Commission.
3      MS. LARKINS: You don't sound like someone who
4  wants to answer questions. You want to talk, don't you?
5      Q. Okay. Let me ask the question again. Is Legal
6  Conclusion No. 8 legal, given the fact that it finds
7  Mrs. Larkins unfit for service because she filed a
8  lawsuit?
9      MR. SMITH: Vague, ambiguous, overbroad, calls
10 for speculation, incomplete hypothetical, calls for an
11 expert opinion, calls for a legal conclusion. If you can
12 answer, go ahead.
13     THE WITNESS: It likely is a very good basis for
14 the finding.
15     MS. LARKINS: Thank you. Okay.
16     Q. Okay. I imagine your clients must have faired
17 all quite well, if you think filing a lawsuit is a good
18 reason for finding someone unfit for service. Okay. I
19 will try to do this real fast.
20     In Exhibit 19, I would like to bring your
21 attention to Page 54. And I think that's going to be --
22 they seem to be numbered. Well, tell you what. How
23 about I -- I will give you these Pages 54 and 55, so you
24 don't have to search for them and I'll try to search for
25 them.

---

30 (Pages 114 to 117)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 118

1     (Exhibit 19 was marked for identification.)
2     MR. SMITH:  Are you pulling pages out of Exhibit
3 19?
4     MS. LARKINS:  Yeah, but I am just --
5     MR. SMITH:  Are you going to mark them
6 separately or --
7     MS. LARKINS:  No.  No.  I am just trying to help
8 out.  I found these two.
9     MR. SMITH:  Well, just hang onto what you got.
10 We have got an Exhibit 19 here.
11     MS. LARKINS:  Okay.
12     MR. SMITH:  Let's look through Exhibit 19.  If
13 you want to direct her attention to a specific portion of
14 Exhibit 19, we can do that.  But let's not confuse
15 matters by pulling apart exhibits, unless you want to
16 mark a separate exhibit of some type.
17     Exhibit 19, for the record, is photocopies of
18 several pages of handwritten notes.  The copies bear a
19 page number up in the upper right-hand corner numbered
20 consecutively from 1 to 48.  The pages also bear Bates
21 stamps on the bottom portions of the pages.  These have
22 been all marked as an exhibit as a group, although we
23 make no representation whether the documents actually
24 belong together.
25     MS. LARKINS:  I will go ahead and represent that

Page 119

1 these documents were Exhibit 14 of the District's
2 exhibits in my administrative hearing.
3     Q.  Did you find Page 54?
4     MR. SMITH:  Is that -- I am sorry.  You're
5 asking us to turn to Page --
6     MS. LARKINS:  54.
7     MR. SMITH:  You're referring to the Bates stamp
8 or the page number up in the upper right?
9     MS. LARKINS:  The Bates stamp.
10     MR. SMITH:  Is there a page number up in the
11 upper right-hand corner?
12     MS. LARKINS:  Yeah.  Oh, it's -- yeah, 22 and
13 23.
14     MR. SMITH:  That's probably the easier way to
15 look at these.
16     MS. LARKINS:  Oh, you're so right.  So let's
17 look at 20 -- you know what?  Actually, these are going
18 in -- yeah, let's look at 22, first, because that's dated
19 March 26th and 23 is dated March 27th.
20     THE WITNESS:  Are you talking about the numbers
21 in the upper right-hand corner?
22     MR. SMITH:  Yeah.
23     THE WITNESS:  Well, let's see.  Mine goes 21,
24 23, 24, 25 --
25     MS. LARKINS:  I can give you 22.

Page 120

1     THE WITNESS:  -- 26.
2     MR. SMITH:  Let me see this.
3     MS. LARKINS:  I -- I'm sorry.
4     MR. SMITH:  You're right.  We are missing 22.
5 Okay.  We will put 22 in there.
6     MS. LARKINS:  22.
7     MR. SMITH:  Let me look through this again and
8 make sure we have got all the pages.
9     MS. LARKINS:  I am just going to ask a couple
10 more questions.
11     MR. SMITH:  Okay.
12     MS. LARKINS:  Okay.  You know what?  We are only
13 going to look at Page 54, which is also Page 23.
14     MR. SMITH:  Okay.
15     MS. LARKINS:  Okay.  I'd like you to look down
16 at the bottom there.  It says:  "The reason she was asked
17 to leave was that we thought she would kill two teachers.
18 Needed three people.  I said I thought she was
19 capable...."
20     Q.  Didn't you want to know what the next page said?
21     MR. SMITH:  Well, first of all, I am going to
22 object for the record to your reading of this document.
23 The last line on, at least my copy, is cut off.  I am not
24 sure what it says.  And some of this handwriting is hard
25 to read anyway.

Page 121

1     MS. LARKINS:  My point exactly.
2     MR. SMITH:  So, to the extent you know -- well,
3 never mind.  Go ahead.  Ask your question.
4     MS. LARKINS:  I totally agree with you,
5 Mr. Smith.  It's troubling that the bottom of this is
6 cut off.
7     Q.  "I said I thought she was capable" and then it's
8 cut off.  And then the next page isn't produced.  Why
9 didn't you ask for that next page to be produced?
10     A.  What next page?
11     Q.  It would be Bates Stamp 55.  Don't you think
12 this is really interesting stuff?
13     MR. SMITH:  Argumentative, vague, ambiguous, not
14 reasonably calculated to lead to discovery of admissible
15 evidence.
16     MS. LARKINS:  Okay.  I am finished for today.  I
17 mean I am not -- I know that the court reporter needs to
18 go to another deposition.
19     MR. SMITH:  Okay.  Well --
20     MS. LARKINS:  Let's discuss what's going to
21 happen next.  Will you come on Monday?
22     MR. SMITH:  No.
23     MS. LARKINS:  Will you make an appointment for
24 another, to continue this deposition?
25     MR. SMITH:  No.

31 (Pages 118 to 121)

Larkins v. Schulman
GIC 823858

Deposition of Elizabeth Schulman
July 16, 2004

Page 122

1      MS. LARKINS: Are you suspending the deposition?
2      MR. SMITH: You know, we have spent all day in
3  this deposition. And, rather than using it as an
4  opportunity to ask questions, you have used it as a forum
5  for making speeches, making arguments and trying to
6  harass and oppress my client. We are ending the
7  deposition right now because the court reporter has to
8  leave.
9      We have made ourselves available all day to
10  answer questions. You have asked few, if any, proper
11  questions or questions reasonably calculated to lead to
12  the discovery of admissible evidence. If you want us to
13  appear at another session of a deposition, you're going
14  to need an order to compel.
15      MS. LARKINS: Very good. Okay. I understand
16  that you are refusing to answer any more questions in
17  this deposition and I will need a motion to compel you to
18  answer any more questions.
19      MR. SMITH: That's right. And, as I understand
20  it, you already plan on filing a motion to compel anyway.
21  So we can just do it in one fell swoop.
22      With respect to the transcript of this
23  deposition that we have here, I would stipulate that we
24  agree to relieve the court reporter of her duties under
25  the code and have the original transcript prepared and

Page 123

1  sent to me. And I will present it to Ms. Schulman for
2  her review and any changes that she thinks are necessary
3  and provide changes, notice of changes, to you within 30
4  days of my receipt.
5      Is such a stipulation acceptable to you?
6      MS. LARKINS: That's fine.
7      MR. SMITH: If for whatever reason the original
8  is lost, a certified copy may be used in lieu thereof.
9      Is that acceptable, Ms. Larkins?
10      MS. LARKINS: Yes, that's acceptable.
11      VIDEOGRAPHER: This concludes today's
12  deposition. We are going off the record at 3:30 p.m.
13      (The deposition was concluded at 3:30 p.m.)
14          * * * * * *
15      I, Elizabeth Schulman, Esq., swear, under
16  penalty of perjury, that I have read the foregoing
17  deposition, and that it is true and correct, to the best
18  of my knowledge and belief.
19      Signed on this _____ day of _____, 2004
20  at _____. _____
         (City)          (State)
21
22      _____
            ELIZABETH SCHULMAN, ESQ.
23
24
25

Page 124

1  STATE OF CALIFORNIA)
                      ss
2  COUNTY OF SAN DIEGO)
3
4      I, Diane M. Holnback, a Certified Shorthand
5  Reporter, Certificate No. 11686, in and for the County of
6  San Diego, State of California, do hereby certify that
7  the witness in the foregoing deposition was by me first
8  duly sworn to testify to the truth, the whole truth, and
9  nothing but the truth in the foregoing cause; that the
10  deposition was then taken before me at the time and place
11  herein named; that said deposition was reported by me in
12  shorthand, and then transcribed through computer-aided
13  transcription under my direction, and that the foregoing
14  transcript contains a true record of the testimony of
15  said witness.
16      I do further certify that I am a disinterested
17  person and am in no way interested in the outcome of this
18  action, or connected with or related to any of the
19  parties in this action or to their respective counsel.
20      IN WITNESS WHEREOF, I have hereunto set my hand
21  on this 3rd day of August, 2004.
22
23      _____
       Diane M. Holnback, C.S.R.
24      Certificate No. 11686
25

32 (Pages 122 to 124)

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF SAN DIEGO

3

     ————————————————————————

4                                              )

  MAURA LARKINS,                                )

5                                              )

        Plaintiff,                          )

6                                              )

  vs.                                           )   Case No. GIC 781970

7                                              )

  CHULA VISTA ELEMENTARY SCHOOL                 )

8  DISTRICT, a California public entity,        )

  et al.,                                       )

9                                              )

        Defendants.                         )

10 ————————————————————————)

11

12

13              DEPOSITION OF MAURA LARKINS

14                 SAN DIEGO, CALIFORNIA

15                  OCTOBER 25, 2004

16

17

18

19

20 REPORTED BY JUDY M. REIERSEN, CSR NO. 7505

21

22

23

24

25

# C E R T I F I C A T E

*I, the undersigned, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following changes listed below):*

| PAGE No. | LINE No. | |
|---|---|---|

| PAGE No. | LINE No. | |
|---|---|---|
| 23 | 6 | should say "2130 and 2136 Broadway" |
| 33 | 20 | after "PERB." should say "The letters might have been ~~were also~~ m.e produced to Elizabeth Schulman." and "I received copies when they were sent to PERB." |
| 37 | 6 | "teacher" should be plural: "teachers" |
| 66 | 20 | should have quotation marks at beginning |
| 66 | 23 | should have quotation marks at beginning |
| 67 | 5 | "demur" should be "demurrer" |
| 67 | 6 | should have quotation marks at beginning |
| 67 | 7 | should have quotation marks at the end |
| 70 | 2 | should say "Oh, I'm so glad to learn that." |
| 75 | 10 | 2004 instead of 2003 |
| 76 | 16 | instead of period (.), there should be two dashes after "other" |
| 78 | 7 | instead of period (.), there should be two dashes after "Angell" |

*Maura Larkins*

**PLEASE TURN TO BACK OF TRANSCRIPT AND SIGN THE PENALTY OF PERJURY PAGE**

2

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA
2            COUNTY OF SAN DIEGO
3
4    _____
            )
     MAURA LARKINS,            )
5                               )
            Plaintiff,          )
6                               )
     vs.                        )  Case No. GIC 781970
7                               )
     CHULA VISTA ELEMENTARY SCHOOL    )
8    DISTRICT, a California public entity, )
     et al.,                    )
9                               )
            Defendants.         )
10   _____ )
11
12
13
14
15        DEPOSITION OF MAURA LARKINS,
16   taken by the Defendants Robin Donlan and Linda Watson,
17   commencing at 10:05 a.m. on Monday, October 25, 2004, at
18   401 West A Street, 15th Floor, San Diego, California, before
19   Judy M. Reiersen, Certified Shorthand Reporter, in and for
20   the State of California.
21
22
23
24
25

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

---

3

1    APPEARANCES:
2
3       For the Plaintiff:
4       MAURA LARKINS, IN PRO PER
        1935 Autocross Court
        El Cajon, CA 92019
5       (619) 444-0065
6
7       For the Defendants Robin Donlan and Linda Watson:
8       STUTZ, ARTIANO, SHINOFF & HOLTZ
        BY: KELLY R. ANGELL, ESQ.
        401 West A Street, 15th Floor
9       San Diego, CA 92101
        (619) 232-3122
10
11      For the Defendant Michael Carlson:
12      McCORMICK & MITCHELL
        BY: DEBORAH K. GARVIN, ESQ.
13      625 Broadway, Suite 1400
        San Diego, CA 92101
14      (619) 235-8444
15
        For the Defendants Chula Vista Elementary Education
16      Association, Virginia Boyd and Tim O'Neill:
17      ROTHNER, SEGALL & GREENSTONE
        BY: BERNHARD ROHRBACHER, ESQ.
18      510 South Marengo Avenue
        Pasadena, CA 91101-3115
19      (626) 796-7555
20
        Videotape Operator:
21
        Videographics
22      Alan Peak, Videographer
        1903 30th Street
23      San Diego, CA 92102
        (619) 239-2066
24
25

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

---

4

1            I N D E X
2
     WITNESS:  Maura Larkins
3
4    EXAMINATION                      PAGE
5
     By Ms. Angell                      6
6
7
8            E X H I B I T S
9    EXHIBIT                        MARKED
10   1    10/14/04 fax to Ms. Larkins from      76
          Ms. Angell, two pages
11
12   2    10/15/04 fax to Ms. Angell from       78
          Ms. Larkins, one page
13
14
15
16
17            * * *
18
19
20
21
22
23
24
25

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

---

5

1        THE VIDEOGRAPHER:  This is the deposition of
2    Maura Larkins being taken on behalf of Defendants in the
3    matter Maura Larkins versus Chula Vista Elementary School
4    District, et al., San Diego Superior Court Case
5    No. GIC 781970.
6        This deposition is being held in the offices of
7    Stutz, Artiano at 401 West A Street, Suite 1500, in
8    San Diego, California, on October 25, 2004 at 10:05 a.m.
9        My name is Alan Peak. I'm the legal video
10   specialist with Videographics, located at 1903 30th Street,
11   in San Diego, California.
12       The certified shorthand reporter is Judy Reiersen
13   with Peterson & Associates.
14       Will counsel please state their appearances for the
15   record?
16       MS. ANGELL:  Kelly Angell for Defendants Donlan and
17   Watson.
18       MS. GARVIN:  Deborah Garvin for Defendant
19   Michael Carlson.
20       THE WITNESS:  Maura Larkins, Plaintiff in pro per.
21       THE VIDEOGRAPHER:  And the witness may now be
22   sworn.
23   / / /
24   / / /
25   / / /

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

6

1          MAURA LARKINS,
2    having been first duly sworn, testified as follows:
3
4          MS. ANGELL: My microphone keeps flipping over like
5    this. Does it have an effect? Can you hear me all right?
6          THE VIDEOGRAPHER: If you put it on the other side
7    like that.
8          MS. ANGELL: Just kind of shove it here?
9          THE VIDEOGRAPHER: No, just there.
10          Thanks.
11          MS. ANGELL: There we go. I stuck it through a
12    button hole.
13          Well, there isn't a higher button hole.
14          THE VIDEOGRAPHER: That's fine. Thank you.
15          MS. ANGELL: Okay.
16
17          EXAMINATION
18    BY MS. ANGELL:
19      Q   Mrs. Larkins, have you had your deposition taken
20    before at any time?
21      A   No, I -- I haven't.
22      Q   Have you ever been involved in any litigation other
23    than the current lawsuit entitled Larkins v. Werlin, et al.?
24      A   Well, I've been involved in litigation related to
25    this case.

7

1      Q   Okay.
2      A   That arose out of it or --
3      Q   All right. So starting with the most recent case
4    other than Larkins v. Werlin, counting backwards, can you
5    tell me the name of the most recent case?
6      A   Larkins versus Schulman.
7      Q   And was your deposition taken in that matter?
8      A   It's going to be taken this Thursday.
9      Q   Have you taken any other depositions in that
10    matter?
11      A   I took the deposition of Elizabeth Schulman.
12      Q   Any depositions in that case other than
13    Ms. Schulman's?
14      A   No.
15      Q   And did you take Ms. Schulman's deposition
16    yourself?
17      A   Yes, I did, although I should mention that it was
18    not completed.
19      Q   Okay.
20          THE VIDEOGRAPHER: Excuse me, Counsel. Could I
21    pause for a moment, please?
22          MS. ANGELL: Of course.
23          THE VIDEOGRAPHER: Off the record.
24          (Pause.)
25          THE VIDEOGRAPHER: Back on the record.

8

1          MS. ANGELL: Thank you.
2    BY MS. ANGELL:
3      Q   And what is the nature of the case entitled Larkins
4    v. Schulman?
5      A   Elizabeth Schulman was the lawyer in my
6    administrative hearing regarding my dismissal from
7    Chula Vista Elementary School District.
8      Q   So is that an attorney malpractice case?
9      A   Yes.
10      Q   Are there any other causes of action other than
11    those related specifically to attorney malpractice, meaning
12    negligence?
13      A   I -- intentional infliction of emotional distress.
14      Q   So are there two causes of action there,
15    intentional infliction of emotional distress and negligence?
16      A   I believe so.
17      Q   Any other causes of action in that matter?
18      A   I haven't looked at it in a long time. I don't
19    think so. I think it's just those two.
20      Q   Do you have an attorney in that matter?
21      A   No.
22      Q   So you're representing yourself there?
23      A   Yes.
24      Q   And did you write the complaint in that matter?
25      A   Yes, I did.

9

1      Q   And was it verified?
2      A   Oh, yes.
3      Q   So you would be familiar with the content of the
4    complaint in that matter then?
5      A   Yes.
6      Q   Okay. And before the Larkins v. Schulman case,
7    what is the next most recent litigation that you've been
8    involved in?
9      A   Larkins versus Elton.
10      Q   And in what forum was that filed? Was that, say,
11    Superior Court or some other --
12      A   Yes.
13      Q   San Diego Superior Court?
14      A   Yes.
15      Q   And were any depositions taken in that matter?
16      A   No.
17      Q   You mentioned an administrative hearing concerning
18    a dismissal from employment; is that correct?
19      A   Yes.
20      Q   Was your deposition taken in that matter?
21      A   No.
22      Q   Were other people's depositions taken in that
23    matter?
24      A   Yes.
25      Q   Did you attend those depositions?

10

1   A  Yes.

2   Q  Are you familiar then with the process of how

3  depositions work?

4   A  Yes.

5   And, by the way, speaking of depositions taken in

6  my administrative hearing, I have some documents that I want

7  to produce to you.

8   I've already produced in this case the deposition

9  of Linda Watson, which was taken for that administrative

10  hearing, and I also have the deposition of JoEllen Hamilton,

11  Gretchen Donndelinger, Rick Denman, and Richard Werlin,

12  which I would like to produce to you.

13   Q  And are those items responsive to any particular

14  request for production that's contained in your notice of

15  deposition?

16   A  This case is -- has circumstantial evidence. I did

17  not see anyone obtain my arrest records. I was called into

18  the office of my school district and told that I was being

19  taken out of my classroom because two teachers were afraid I

20  was going to kill them, and this being a very bizarre event,

21  I wondered how this idea got started that I would kill

22  anybody.

23   Q  If we can hold on for just a minute. We don't have

24  the admonitions on yet, and it sounds like you want to start

25  testifying. So let's just get the admonitions on and then

11

1  you can go ahead and continue with whatever you wanted to

2  say.

3   A  Okay. Let's do that.

4   MS. GARVIN: I would just move to strike as

5  nonresponsive.

6   MS. ANGELL: Join.

7  BY MS. ANGELL:

8   Q  Just to briefly go over the ground rules, for lack

9  of a better term --

10   A  Uh-huh.

11   Q  -- for the way depositions work, as you know -- as

12  I believe that you know and as you can see, there's a court

13  reporter here who is taking down every word that's said by

14  you, by me, by anyone in the room.

15   Do you understand that?

16   A  Yes. I -- I see the court reporter here.

17   Q  Okay. So in order so that the court reporter can

18  get everything that is said down, we need to make audible

19  responses, which means "yes" or "no" instead of "uh-huh" or

20  nodding head, that kind of thing.

21   Do you understand?

22   A  I will try to remember that, but I'm afraid that

23  you're going to have to remind me sometimes.

24   Q  Okay. And I may as well, and we'll address that as

25  it comes, but for the most part, we'll try our best there.

12

1  Okay?

2   A  (Witness nods head.)

3   Q  Okay? Yes?

4   A  I -- I told you you'd have to remind me. Yes.

5   Q  Okay. Another thing that we need to do so that the

6  court reporter can get everything down is that we need to

7  each speak one at a time.

8   So for me, my job will be to make my best effort to

9  not interrupt you or ever talk over you or anybody else who

10  is talking during the deposition, and I would ask that you

11  do me the same courtesy.

12   Do you understand?

13   A  Yes, I do.

14   Q  Okay. During a deposition, what we don't want is

15  for you to guess. If you don't know something, the answer

16  would be that you don't know as opposed to guessing at what

17  occurred or how long something is; however, during a

18  deposition, we are entitled to your best estimate.

19   So for example of that, if I asked you to tell me

20  how long the table is in this room, you would be able to

21  give me an estimate because you've seen the table; however,

22  if I asked you how long the desk is in my office, you

23  wouldn't be able to give me an estimate of that because to

24  my knowledge you've never been in my office.

25   Do you understand the difference between a guess

13

1  and an estimate?

2   A  I think I do. I'm only a third grade teacher, but

3  I think I do.

4   Q  Okay. So based on my explanation, do you

5  understand the difference of what I mean as the difference

6  between a guess and an estimate?

7   A  Yeah. I think your definition is pretty standard.

8   Q  Okay. At the end of this deposition process, a

9  copy of what the court reporter is typing down is going to

10  be forwarded to you so that you can review it for purposes

11  of determining -- making sure that it's accurate, making any

12  corrections to it, if necessary, and that could be typos or,

13  if you need to, to correct portions of testimony.

14   However, I would like to point out that any changes

15  that are made to the substance of testimony after today can

16  be commented on by anybody at trial.

17   Do you understand?

18   A  (Witness nods head.)

19   Q  Is that a yes?

20   A  Yes. Yes.

21   Q  Okay. Thank you.

22   Why don't we go ahead and get it on the record now

23  instead of at the end as to length of time and how the

24  process of completing the review of the deposition

25  transcript is going to go.

14

1  A  That would be fine. Haven't we usually chosen a
2  month?
3  Q  The original of the deposition transcript will be
4  forwarded directly to you at an address that you will
5  provide to the court reporter during this deposition. Okay?
6  A  (Witness nods head.)
7  Q  Is that a yes?
8  A  I've already provided her with an address.
9  Q  Okay. Great.
10  And with that transcript, there will be -- at the
11  back of it there's a page where you would note any changes
12  that you need to make.
13  So what you would need to do is review the
14  transcript, if necessary, make any changes or corrections,
15  and sign and date the document, and then send a copy of all
16  changes to my attention.
17  We have a hearing on summary judgment scheduled I
18  think for December 17th, and it usually takes a week or
19  two weeks for these kinds of transcripts to get done, and in
20  order so that we can have the transcript available,
21  probably -- I don't know if you're going to want to use it
22  in an opposition or anything, but I'm thinking that a
23  shorter time frame than 30 days would probably be a good
24  idea.
25  A  I think that would be a good idea.

15

1  Q  Do you need to consult a calendar to check your
2  availability or do we want to say that -- I don't -- are you
3  employed in -- are you employed right now?
4  A  I do some work for myself, but I can determine my
5  own schedule.
6  Q  Okay. So do you think that a week from the date
7  that you're provided with the document would be enough time
8  for you to review it and make any changes or updates
9  necessary?
10  A  Certainly.
11  Q  Okay. So, then, we'll agree and stipulate that
12  from the time that you receive the transcript, you'll make
13  any changes or updates and notify counsel within seven
14  calendar days, and that if the -- and that includes signing
15  and dating the transcript, and that if it's not signed and
16  dated within that seven-day period, it will be deemed signed
17  and dated.
18  Do we all so stipulate?
19  A  So stipulated.
20  MS. GARVIN:  So stipulate.
21  BY MS. ANGELL:
22  Q  And also, that a fax copy of the signature on that
23  deposition transcript will be acceptable as evidence of your
24  signature and date on that transcript as well as that if the
25  original is lost or unavailable for any reason, that a

16

1  certified copy of the transcript will be sufficient for all
2  purposes.
3  So stipulated?
4  A  So stipulated.
5  MS. GARVIN:  So stipulated.
6  MS. ANGELL:  I see that counsel has arrived.
7  MR. ROHRBACHER:  I apologize for my delay. First
8  of all, I was under the impression it was at 10:00, and I
9  hit traffic. My apologies.
10  THE WITNESS:  Mr. Hersh told us that he gave you
11  the wrong information.
12  MR. ROHRBACHER:  He did?
13  THE WITNESS:  Yes.
14  MR. ROHRBACHER:  That's very nice of him.
15  I would like to sit on this side, if possible.
16  MS. ANGELL:  Can we go off for a second?
17  THE VIDEOGRAPHER:  Off the record at 10:18.
18  (Discussion off the record.)
19  THE VIDEOGRAPHER:  Back on the record at 10:19.
20  MS. ANGELL:  Thank you.
21  BY MS. ANGELL:
22  Q  Mrs. Larkins -- oh, I'm sorry. Is there any reason
23  why you're unable to give your best testimony today?
24  A  No, although I would like to say on the causes of
25  action in the Schulman, I believe it's two causes of action,

17

1  but I wouldn't be horribly surprised if it turned out to be
2  three.
3  Q  Okay.
4  A  I forget exactly how many causes of action I wrote.
5  Q  Okay. Before we had the admonitions, we were
6  discussing what other litigation that you've been involved
7  in with the most recent counting backwards.
8  The last case you told me about was one called
9  Larkins v. Elton. Do you know the Superior Court case
10  number in that matter?
11  A  No, I don't.
12  Q  And when was it filed?
13  A  Let's see. It was after -- it was after this case.
14  You know, I think it was January 2003.
15  Q  And is that case still viable, still alive?
16  A  No, that case was settled.
17  Q  When was it settled?
18  A  Oh, boy. It seems to me it was the summer of 2003.
19  Q  So within about six months of the time that you
20  filed it, it was settled, correct?
21  A  Yes.
22  Q  And who were all of the defendants listed, named in
23  that case?
24  A  Just Kathleen Elton.
25  Q  And what was the nature of the allegations of that

18

1  case?

2      A  That she had filed a false police report.

3      Q  And what was the cause of action?

4      A  It was a -- it was a statute. I think it was -- it

5  was a statute that makes it illegal to file a false police

6  report.

7      Q  And was Ms. Elton -- did she make an appearance in

8  that case?

9      A  No, she didn't.

10      Q  So she didn't respond to the case at all?

11      A  If you mean an appearance as filing something with

12  the court, she didn't.

13      Q  How did it come about that the case was settled?

14      A  It was settled as part of my -- the probate of my

15  father.

16      Q  What were the terms of the settlement of Larkins v.

17  Elton?

18      A  I promised not to file any lawsuit against

19  Joseph Hogan for conspiring with Kathleen Elton to file a

20  false police report, and in return, I received $75,000,

21  although that isn't exactly an even trade because I also

22  gave my brother Joseph Hogan in that case some property in

23  Guatamala.

24      Q  I didn't hear anything about Ms. Elton in the terms

25  of that settlement. So you --

19

1      A  Oh. I agreed -- I agreed not to sue her.

2      Q  Oh.

3      A  I think I did. It was -- she was -- she conspired

4  with Joseph Hogan to call the police and make a false police

5  report, which has resulted in this litigation in which you

6  are involved and the other defendants, and I think

7  Joseph Hogan was mostly worried about himself.

8          I -- I can -- I can get you a copy of that

9  settlement if you'd like to see it.

10      Q  Okay. Thank you.

11      A  Okay.

12      Q  And to clarify the record, is Joseph Hogan related

13  to you?

14      A  He's my brother.

15      Q  And is Kathleen Elton related to you?

16      A  She's his ex-wife.

17      Q  Did Ms. Elton ever live on any property owned by

18  you?

19      A  She lived on property which was owned by my father

20  and then was part of my father's estate.

21      Q  So your father passed away?

22      A  Yes.

23      Q  Approximately when?

24      A  August of 1998.

25      Q  And so did Mrs. Elton live on that property

20

1  subsequent to August of 1998?

2      A  Yeah. She also lived there prior to that time.

3      Q  Okay. Do you know the last approximate date at

4  which Ms. Elton lived at that property?

5      A  It was early in 2003.

6      Q  Do you currently own that property?

7      A  No, it was sold by the estate.

8      Q  Approximately when was it sold by the estate?

9      A  May of 2003 I'm going to guess.

10      Q  Before it was sold, did you have any ownership

11  interest in it as far as you know?

12      A  Only as an heir to the estate.

13      Q  During that time period when you had an ownership

14  interest as an heir to the estate, was any money owed on the

15  property for purposes of a mortgage?

16      A  No.

17      Q  Was any money owed on the property with regard to

18  keeping the property running, say, for insurance or

19  electricity or that kind of item?

20      A  Do you mean were electricity bills late or do you

21  mean were there electricity bills?

22      Q  Yes, both. I'm getting to the first question that

23  you mentioned.

24          Did you make any payments to any insurance company,

25  electric company, that kind of thing during the time period

21

1  that you had an ownership interest in that property?

2      A  Yes.

3      Q  And the payments were for operation -- related to

4  the operation of that property?

5      A  Yes.

6      Q  Did there ever come a time when you were handling

7  such payments when you were unable to make the payment that

8  was due? And by "unable," I mean financially unable.

9      A  No. There was -- there were some problems, though,

10  that my brother stopped -- at first my brother was in

11  complete charge of all of the bills. He was in charge of

12  all the money. He took in all the rent. He -- he kept

13  charge of all the cash in the estate, and he was supposed to

14  pay all the bills, and then at some point, he decided to

15  stop paying the bills, and Kathleen Elton called me up one

16  day and she said, "The water's been turned off," and it

17  was -- I remember it was before -- I think it was a

18  three-day weekend, and she was really worried.

19      Q  Excuse me one moment.

20          Was this before August of 2000?

21      A  Yes.

22      Q  But after your father had passed?

23      A  Yes.

24      Q  Okay. Sorry. Continue.

25      A  And so I ran -- I rushed down to the water company

22

1  and got there just before 5:00 to pay the bill. So I guess
2  that bill was late, but it -- it got turned -- the water got
3  turned back on pretty fast.
4      Q  So was that approximately when Ms. Elton called you
5  concerning the water bill? Was that when you started making
6  any of the payments that you made in relation to that
7  property?
8      A  Let's see. I had been paying -- I would have to
9  look up my records. I believe I was paying the phone bill
10  and the gas and electric bill. My brother was supposed to
11  be paying taxes. I know I paid insurance.
12      Q  Do you mean like homeowners insurance?
13      A  Actually, liability insurance. I had -- I got that
14  myself.
15      Q  And what was the time period that you paid the
16  phone bill, gas and electric and insurance, your best
17  estimate, on this property that we've been discussing?
18      A  Oh, yeah, and I also paid the fire insurance, too.
19         I remember the first bill I paid was about -- I
20  think it was about a month after my father died, and I went
21  to his place and I searched around for any bills that might
22  need paying, and I found that the fire insurance hadn't been
23  paid, and I was able to call up the agent and get that
24  retroactively reestablished.
25      Q  And did you continue making whatever payments you

23

1  had taken over up until the time that the property was sold
2  by the estate in about May of 2003?
3      A  Yes.
4      Q  What's the address of this property that we've been
5  discussing?
6      A  1930 and 1936 Broadway.
7      Q  In what city, state and zip code, please?
8      A  San Diego, 92102.
9      Q  What part of town is that?
10      A  Golden Hill.
11      Q  Returning to the terms of the settlement of the
12  Larkins v. Elton case, I understand your testimony to be
13  that the terms of the settlement were that you agreed to
14  dismiss with prejudice against Ms. Elton and that you agreed
15  not to sue Joseph Hogan concerning a police report filed by
16  Ms. Elton. Is that an accurate statement of what you've
17  said?
18      A  Yes.
19      Q  Thank you.
20         Were there any other terms of that settlement?
21      A  Well, there was the distribution of the money in
22  the estate.
23      Q  Right. But I'm asking you about the Larkins v.
24  Elton settlement, not your probate matter with your brother.
25      A  No, other than what I already mentioned.

24

1      Q  You've been mentioning a probate matter. Is there
2  a case name on that?
3      A  It would be William O. Hogan.
4      Q  Versus?
5      A  It's probate.
6      Q  Approximately when was that matter opened as far as
7  your involvement in it?
8      A  Well, do you mean when probate was opened?
9      Q  I mean when did you get involved with that matter.
10      A  Okay. When probate was opened, the will mentioning
11  me was filed with the court. That was -- I'm thinking -- it
12  was in 1999.
13      Q  Was your deposition taken in that matter?
14      A  No.
15      Q  Did Ms. Elton ever say to you that she -- words to
16  the effect that she had falsely filed the police report at
17  issue in that Larkins v. Elton litigation?
18      A  No.
19      Q  Did Joseph Hogan ever tell you words to the effect
20  that he had agreed with Ms. Elton to get her to file a
21  police report against you?
22      A  He has been pretty much all over the -- all over
23  the ballpark on his positions in this case.
24         I really think you should probably depose him if
25  you want to find out what his position is.

25

1      Q  My question was not what his position was.
2         My question was, did he ever tell you that he
3  agreed with Ms. Elton for her to file a police report
4  against you?
5      A  No.
6      Q  And as we're moving backwards in time, you've
7  already named the Larkins v. Schulman and Larkins v. Elton
8  cases. What was the next most recent litigation in which
9  you were involved?
10      A  This current litigation.
11      Q  Would that be Larkins v. Werlin, et al.?
12      A  Yes.
13      Q  And prior to Larkins v. Werlin, et al., what was
14  the next most recent litigation in which you were involved?
15      A  The only litigation I was involved in was when
16  there was a big thing with all the homeowners in my
17  development against the developer, but I wasn't very much
18  involved in that.
19      Q  Was your deposition taken?
20      A  No.
21      Q  Approximately what year was this?
22      A  Oh, heavens. 10 years ago.
23      Q  Were you a plaintiff in that case?
24      A  I don't know if they used my name.
25      Q  Did you receive settlement --

26

1   A  Yes.
2   Q  -- in that case?
3      What's the name of your development?
4   A  Well, it's Cottonwood. I think it might have a --
5   it might be Broadmoor.
6      There were several -- I think there was -- I wasn't
7   an original owner so I -- you know, I don't really know
8   exactly what signs they had out when it was first built.
9   Q  Was this case that you're telling me about now that
10  was about 10 years ago, was it some sort of a case brought
11  by a homeowners association against a builder or something
12  of that nature?
13  A  It had to do with the P -- I think it was PVC pipes
14  or something in the plumbing, and they replaced them with
15  copper.
16  Q  So was it a construction defect case?
17  A  Yes.
18  Q  You're talking about a house that was -- strike
19  that.
20     Do you currently live in a house?
21  A  Yes.
22  Q  And what is the address of the house that you
23  currently live?
24  A  1935 Autocross Court.
25  Q  Is this the same property that was subject of the

27

1   construction -- of the CD case that you were just
2   referencing?
3   A  Yes.
4   Q  And what's the city, state and zip on that
5   property?
6   A  El Cajon, California 92019.
7   Q  And is there a telephone number at that address
8   currently?
9   A  (619) 444-0065.
10  Q  And how long has that been the telephone number for
11  that property?
12  A  Maybe about five years.
13  Q  Are there any other telephone numbers affiliated
14  with that property?
15  A  No.
16  Q  Are there any other -- I'm not a telephony person
17  so I don't know the right way to say it, but are there any
18  other telephone numbers, like a fax number or other methods
19  of telephonic communication with that property?
20  A  There have been in the past. I don't even know
21  what it was.
22     We had a -- our computer was hooked up to a
23  telephone number, but I don't even remember what that
24  telephone number was.
25  Q  Were those other telephone numbers prior to the

28

1   last five years?
2   A  The computer one, I think we just disconnected that
3   about a year ago.
4   Q  And what was the telephone number for that?
5   A  I have no idea.
6   Q  Did you receive faxes and send faxes through that
7   computer line?
8   A  If I did, it would have only been a couple. Let's
9   see. You know, I don't think I did. I don't think I ever
10  did.
11  Q  Do you have any other telephone number?
12  A  I have a cell phone.
13  Q  I'm sorry. Let me strike the --
14  A  Okay.
15  Q  -- question.
16     Within the last five years, have you had any other
17  landline telephone number?
18  A  Yeah. That same outlet that has the 0065 now used
19  to be 1459.
20  Q  I'm sorry. Is that 444 --
21  A  Yes.
22  Q  -- 1459?
23  A  Yes.
24  Q  And when did you get rid of that phone number?
25  A  About five years ago.

29

1   Q  And have you had any other telephone or fax
2   numbers, landline numbers in your name within the last
3   five years?
4   A  Yeah -- well, in my husband's name, I believe, or
5   it might have been in my name.
6   Q  Is that the 1459 number that was in --
7   A  No, it's the 660 -- you've received many faxes from
8   the 444-660 -- what was it? 44 -- 6955.
9   Q  660-6955?
10  A  Yeah.
11  Q  Is that a 619 area code?
12  A  Yeah.
13  Q  And where is the physical location of that
14  telephone number?
15  A  Well, it was at 11406 Via Rancho San Diego.
16  Q  Can we have a city, state and zip, please?
17  A  Well, you want -- Number 18.
18  Q  Oh, thank you.
19  A  And it's El Cajon, 92019.
20  Q  That's El Cajon, California?
21  A  Yeah.
22  Q  And what was located besides the telephone at
23  11406 Via Rancho San Diego, meaning was it a residence or an
24  office, or can you describe the nature of that location?
25  A  It's a condo and it's been an office. It's been

30

```
 1  rented out.
 2     Q  Any other uses for that property?
 3     A  No.
 4     Q  Do you own that property at 11406 Via Rancho
 5  San Diego?
 6     A  Yes.
 7     Q  And when did you acquire the property?
 8     A  About 11 years ago.
 9     Q  So would that be since approximately 1993?
10     A  Something like that.
11     Q  Do you still own the property?
12     A  Yes.
13     Q  Anybody else's name on title besides yours?
14     A  My husband's.
15     Q  Do you own any other real property?
16     A  No.
17     Q  Whose name is on title of the 1935 Autocross Court
18  property?
19     A  My husband.
20     Q  Is your name on that title as well?
21     A  And mine in joint tenancy.
22     Q  Thanks.
23        For our mutual reference, I'll discuss the 11406
24  property as the condo.
25     A  Yeah.
```

31

```
 1     Q  And the 1935 Autocross Court property as your
 2  house.
 3     A  Yeah.
 4     Q  Okay.  Is there any amount outstanding on the
 5  mortgage at the condo property?
 6     A  Yes, somewhere around 60,000.
 7     Q  And from August of 2000 continuing until today, has
 8  there ever come a point in time when you were financially
 9  unable to make your mortgage payment on that condo property?
10     A  No.
11     Q  Is there any amount owed on the mortgage for the
12  house?
13     A  Yes, quite a bit.
14     Q  And --
15     A  About 2 -- 245 or something like that.
16     Q  And beginning with August 2000 and continuing until
17  today, has there ever been a point in time when you were
18  financially unable to make the payment on that property?
19     A  No.  We took out a big loan to -- to get by
20  financially.
21     Q  When?
22     A  Oh, gosh.  About -- was it two years ago or --
23  about two years ago, I think it was, or maybe it's
24  three years ago.
25     Q  And how much was that loan for?
```

32

```
 1     A  Let's see.  We had --
 2     Q  Approximately.
 3     A  Yeah, I'm trying to figure it out.
 4        I think it was 130,000 -- well, see, we took
 5  130,000, added to it.  See, it had been about 115 that was
 6  owed on it and so we added about 130,000 to it.
 7     Q  Was that some sort of home equity loan or something
 8  like that?
 9     A  Yes.  Well, actually, first we did a home equity
10  loan and then we refinanced.
11     Q  On the Autocross Court property?
12     A  Yeah.  Yeah.
13     Q  And what did you use -- have you used the $130,000
14  in total?
15     A  Yes.
16     Q  And what did you spend it on generally, you know?
17     A  Living expenses.
18     Q  And has any --
19     A  And this lawsuit.
20     Q  Has any of that money been paid back or is the
21  entire balance still outstanding?
22     A  Well, it's being paid back a little bit each month.
23     Q  Have you been able to, generally speaking, make
24  your payments?
25     A  Yes.
```

33

```
 1     Q  I'm sorry if I already asked this one:  Is there
 2  any other real property that you own?
 3     A  No.
 4     Q  Okay.  And prior to the homeowners construction
 5  defect litigation, have you been involved in any other type
 6  of litigation?
 7     A  No.
 8     Q  Have you ever filed for a restraining order against
 9  anyone?
10     A  No.
11     Q  To your knowledge, has anyone ever sought a
12  restraining order against you?
13     A  They've never filed one.  I know that
14  Michelle Scharmach wanted the district to file one.
15     Q  How do you know that?
16     A  Because I saw a letter she wrote.
17     Q  When did you see the letter she wrote?
18     A  When your colleagues, Parham & Rajcic, produced it.
19  Oh, no.  They didn't produce it to me.  They produced it to
20  PERB.
21     Q  How do you know this was a letter written by
22  Michelle Scharmach?
23     A  I forget exactly all the details.  I think she
24  mentioned something about being in the library, and I know
25  she was the librarian.
```

34

1    Q   Do you have a copy of this letter?

2    A   You do. I've produced it to you I'm quite sure.

3    Q   Do you know the date of this letter?

4    A   It was strangely not dated, but I'm quite certain

5    it was around early December 2001.

6    Q   And what makes you think that?

7    A   Because a group of letters were written by I think

8    it was about five employees at Castle Park School at about

9    that time.

10       I remember Linda Watson dated hers. She dated hers

11   November 30th. And they were -- also in depositions people

12   have discussed this, that -- at about this time. In fact,

13   Rick Werlin was talking about how Michelle -- he talked to

14   Michelle Scharmach about this time. And then PERB came up

15   with the documents in January of 2000 -- no, not -- was it?

16   Parham & Rajcic produced the documents to PERB in I think

17   February.

18   Q   Of what year?

19   A   Of 2002.

20   Q   And to your knowledge, was any application or

21   petition for a restraining order ever sought against you by

22   these people?

23   A   Do you mean filed? Oh --

24   Q   In any fashion.

25   A   No, I don't think they ever actually went to the

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

35

1    court.

2        Michelle Scharmach wanted the district to, and the

3    district has at times claimed that it feared that I would

4    kill people. People at the district have said that they

5    feared that I would come to school and shoot everybody, but

6    for some strange reason, no one ever managed to get down to

7    the police department or the courthouse and ask for a

8    restraining order, which one might expect in such a case.

9    Q   Concerning the statement you just made, people said

10   they feared I would come to District and shoot everybody,

11   who is "people"?

12   A   You know, I think it would be a good idea to ask

13   Maria Beers that question. She has -- she heard them say

14   it.

15       I -- I -- I really don't think that I should --

16   should name all the names of everybody who expressed that

17   fear. I don't think I can. As you yourself admonished in

18   the beginning, I should be careful not to just make wild

19   guesses.

20   Q   Again, the question was, you said that people said

21   they feared I would come to the district and shoot

22   everybody. Who were you referring to as "people"?

23   A   Teachers at Castle Park.

24   Q   Which teachers at Castle Park?

25   A   I'd prefer not to name names.

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

36

1        You know, what's really interesting to me is that

2    the district has never produced any evidence of having asked

3    these teachers about this.

4        I'm really surprised that there isn't some document

5    where the district, which claimed to fear that I was going

6    to kill people, that Richard Werlin, the assistant

7    superintendent for human resources, where he went to

8    Castle Park school and said, "Okay. Now, who's afraid that

9    Maura Larkins is going to shoot them or shoot somebody?

10   What makes them think that?"

11       It's obvious that the district has tried to create

12   an enormous smoke screen in this case by refusing to produce

13   any interviews, any documents showing what they were doing,

14   why they were doing it.

15       For example, I was taken out of my classroom on

16   February 12th, and no document was produced about that

17   personnel action until April 4th in which -- which was the

18   very day that the district asked me to come back to work,

19   and on that day, they gave me a document saying that I was

20   being told to stay away from Chula Vista schools. It's all

21   been pretty much a big farce.

22       MS. GARVIN:   Move to strike as nonresponsive.

23       MS. ANGELL:   Join.

24       Would you read the question back, please?

25       (Question read.)

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

37

1    BY MS. ANGELL:

2    Q   Would you please answer the question?

3    A   I cannot answer the question, Ms. Angell, but in

4    the three and a half years since I was taken out of my

5    classroom for fear that I would kill somebody. the district

6    really should have some documents that show which teacher

7    said they thought I was going to come to school and shoot

8    everybody.

9        MS. ANGELL:   Move to strike for everything after

10   "Ms. Angell" as being nonresponsive.

11       MR. ROHRBACHER:   Join.

12       MS. GARVIN:   Join.

13   BY MS. ANGELL:

14   Q   Why is it, Mrs. Larkins, that you can't say what

15   teachers at Castle Park said that they feared that you would

16   come to the district and shoot everybody?

17   A   You're trying to strike the truth. You can't hide

18   the truth in this case. It's going to come out.

19       The fact is you in particular have tried to make

20   sure that I couldn't have any contact with employees of

21   Chula Vista Elementary School District. You've tried to

22   create a wall so that I wouldn't know what was being said

23   there, that I would not be able to find anyone who would be

24   willing to tell the truth in this case.

25       I was not there. I should have been. I should

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

38

1   have been listening to these people making these
2   accusations.
3       Why is it three and a half years later the second
4   caller on February 12th has still not been identified by the
5   district?
6       Q   Are you finished?
7       A   Yes, but I'm getting thirsty. I think I'd like to
8   take a break.
9       MS. ANGELL: Before we do that, we'll move to
10  strike the response as nonresponsive.
11      MR. ROHRBACHER: Join.
12      MS. GARVIN: Join.
13      MS. ANGELL: And let's go off so the plaintiff can
14  take a break.
15      THE VIDEOGRAPHER: Off the record at 10:51.
16      (Recess.)
17      THE VIDEOGRAPHER: Back on the record at 11:01.
18  BY MS. ANGELL:
19      Q   Which telephone carrier provides service to your
20  (619) 444-0065 telephone number?
21      A   I think it's SBC.
22      Q   And is the bill in your name?
23      A   I think it's in -- oh. I think it's in my
24  husband's name.
25      Q   And what is your husband's name?

39

1       A   Robert W. Larkins.
2       Q   And is in fact SBC the carrier for that telephone
3   or are you guessing?
4       A   I'm -- I'm about 80 percent sure.
5       Q   Okay. And for the 660-6955 number, what telephone
6   carrier provides the service for that number?
7       A   Well, that number is no longer in service, but I
8   believe it was Cox.
9       Q   Cox Telecommunications?
10      A   (Witness nods head.)
11      Q   And whose name was that telephone bill in?
12      A   I believe that was in my name.
13      Q   And for how long has the 660-6955 number been out
14  of service?
15      A   A few -- let's see. About six months maybe.
16      Q   Has it been replaced by a different telephone or
17  fax line?
18      A   No.
19      Q   So there's currently no telephone or fax line at
20  the condo property?
21      A   No.
22      Q   Is my question --
23      A   There is no fax or phone line --
24      Q   Thank you.
25      A   -- at the condo property.

40

1       Q   Thank you.
2       And I notice that you have a cell phone sitting on
3   the table.
4       A   Uh-huh.
5       Q   Is that your cell phone?
6       A   Yes. It's Cingular, and the number is
7   (619) 312-5642.
8       Q   And in whose name is that telephone bill?
9       A   My name.
10      Q   And how long have you had that cell phone number?
11      A   About a year.
12      Q   Did you have a cell phone account before this one?
13      A   Before I got this one there was a while I didn't
14  have any, and before that, I -- I did with Sprint. I don't
15  even think I could tell you the number that that was. I
16  didn't use it very much.
17      Q   During the 2000-2001 school year, did you send
18  faxes, faxed correspondence from time to time to the school
19  district offices?
20      A   Yes.
21      Q   And from what telephone number did you send those
22  faxes, if you recall?
23      A   It would have been -- some of them I'm quite sure
24  were from the 660 number, and some of them were -- I think
25  were from the -- the 0065 number.

41

1       Q   Did you send faxes to the district office during
2   the '00-01 school year from any other number besides your
3   home and condo fax machines?
4       A   No.
5       Q   Does the fax machine -- do you still have the same
6   fax machine at your home number that you had since the
7   '00-01 school year?
8       A   No. No.
9       Q   It's a different fax machine now?
10      A   Uh-huh.
11      Q   And when did you change it?
12      A   A few months ago.
13      Q   So since it's now October 2004, would that be maybe
14  May of 2004 that you changed it?
15      A   I'm just guessing. I -- I can't give you a month
16  more accurate than -- you know, it was a few months ago.
17      Q   Does "a few" mean three or four?
18      A   Yeah.
19      Q   Okay. And was there --
20      A   Or five. "A few" could mean five, couldn't it?
21  Yeah, three or four or five.
22      Q   Okay. And was there any particular purpose or
23  reason that you changed out that fax machine at your home
24  number?
25      A   Yes, because I realized that I -- it would be a

42

1  good investment to get a machine that would make a copy of
2  the document that was being faxed.
3      Q  Okay.  And did the fax machine that you used
4  previous to the one that you have now, did it create a date
5  and time stamp on faxes that you sent?
6      A  Yes.
7      Q  And to the best of your knowledge, was the date and
8  time stamp accurate in reflecting the time that a fax was
9  sent or received?
10     A  It could have been an hour off during Daylight
11  Savings Time.
12     Q  Okay.  Did you ever notice from time to time that
13  it was off by an hour?
14     A  Yes, and then I thought it would be best to just
15  leave it because then I could always just say during that
16  entire period of Daylight Savings Time it was off by an hour
17  instead of trying to remember exactly when.
18     Q  Did you ever try to adjust the time to correct for
19  the --
20     A  Not during, only at -- not during a Daylight
21  Savings period, but like I tried to get it right the next
22  year.
23     Q  Okay.  And did you succeed in getting it right the
24  next year?
25     A  I'm really not sure.  We'll have to -- we could

43

1  compare faxes.
2      Q  What year was it that you noticed that the date and
3  time stamp was off on this fax machine?
4      A  Sometime during this litigation, which has gone on
5  for three and a half years.  I made notes, and I could go
6  look up my notes.
7      Q  Was it before you filed your first complaint in the
8  matter of Larkins v. Werlin, et al.?
9      A  It could have been, but I don't remember.
10     Q  Do you have any other telephone or fax numbers
11  besides the home fax phone and the cell phone currently?
12     A  No.
13     Q  And other than the several numbers that you've
14  already given us in this deposition, have you had any other
15  fax or telephone numbers within the last five years?
16     A  No.
17     Q  Returning to your statement made before we went on
18  break that people said they feared I would come to the
19  district and shoot everybody, who are the persons who said
20  they feared you would come to the district and shoot
21  everybody?
22     A  Okay.  I think you really want some names, and I'm
23  happy to give you names.
24        Okay.  This is what -- let me give you all the
25  information I have, and then if that doesn't satisfy you, I

44

1  guess you can ask me the question again afterwards.
2        Okay.  Maria Beers gave me some information about
3  what was going on at Castle Park.
4      Q  When did she give you this information?
5      A  Oh, I talked to her maybe every -- every two,
6  three months maybe since -- more frequently at the beginning
7  when I was first taken out of my classroom.
8      Q  And what date are you referring to?
9      A  February 12, 2001.
10     Q  So in response to my question of who said that they
11  feared that you would come to the district and shoot
12  everybody, can you --
13     A  I'm going to have to give you hearsay, what
14  Maria Beers told me.
15     Q  Okay.  What did Maria Beers tell you?
16     A  Okay.  She said that Robin Donlan was one of the
17  ones who expressed most concern, although the first person
18  who ever really expressed serious concern to her was
19  Linda Watson.
20        Right -- well, I should say, maybe a few weeks
21  after I was taken out of my classroom, Maria Beers told me
22  that Linda Watson came up to her and said, "Are you afraid
23  of Maura?"
24        And she said, "No."
25        She said, "Well, but she does things so differently

45

1  from us.  We're afraid of her."
2        And she said, you know, "Well, I'm not."
3        And she says -- Linda Watson said, "She's the kind
4  of person who becomes a mass murderer."
5      Q  Were you present for this conversation between
6  Ms. Beers and Ms. Watson?
7      A  No.  As I told you, this is -- this is hearsay, but
8  you wanted these names so I'm trying to give you some names.
9      Q  Did Maria tell you anything else that Linda
10  allegedly said during that conversation?
11     A  That's all I remember at the moment.
12     Q  Did Maria say anything else about what she said
13  during that conversation?
14     A  I think she said something about that it was -- it
15  was terrible, that -- that a good teacher, her career was
16  being destroyed and -- and that it was ridiculous that these
17  accusations were made.
18     Q  Did Maria tell you she said that to Linda during
19  that conversation?
20     A  I can't be sure -- I'm not absolutely sure.  I'd
21  have to check my notes, but I think so.  I think so.
22     Q  And what document would refresh your memory on this
23  issue of what Linda and Maria said to themselves during the
24  conversation that occurred within a few weeks of
25  February 12, 2001?

46

1    A   Well, some documents that I produced to you during
2    Linda Watson's deposition. You have them.
3    Q   Which documents are those?
4    A   They have -- it says "mass murderer" on them.
5    Q   And did you take those notes?
6    A   Yes.
7    Q   And what was the circumstance in which you were
8    taking those notes?
9    A   I took notes when I was talking to Maria Beers on
10   the phone.
11   Q   And when did Maria Beers -- when did this telephone
12   conversation occur with Maria Beers when she told you about
13   these spring 2001 questions by Linda Watson?
14   A   I -- I really -- I -- you know what? I think there
15   might have been a date on that document. So that would
16   be -- if there's a date on that document, that's the day she
17   called me and talked about Linda Watson saying that I was
18   the type of person who became a mass murderer, but all I'm
19   remembering, it was like, I'm going to say, a few weeks
20   after I was taken out of my classroom.
21   Q   So sometime during March of 2001, would that be
22   accurate?
23   A   You might be narrowing it down too much. It's
24   possible it was the end of February.
25   Q   Okay. So February or March 2001?

47

1    A   Yeah.
2    Q   Did Maria tell you about any other conversations
3    that she had with Linda Watson concerning you?
4    A   You mean ever? Did she ever tell me about any
5    more?
6    Q   Yes.
7    A   And you want it to be limited to after I was taken
8    out of my classroom?
9    Q   No.
10   A   Conversations she had with Linda before?
11   Q   At any time concerning you.
12   A   I think she might have talked to them about -- to
13   Linda and Richard Denman, would be the main people, about
14   that they should include the bilingual class, which was my
15   class, in teaming.
16       MS. GARVIN: I'm sorry in?
17       THE WITNESS: Teaming.
18       MS. GARVIN: Okay.
19   BY MS. ANGELL:
20   Q   Did Maria Beers tell you that she told Watson and
21   Denman that they should include your class in teaming?
22   A   You know, she either told me or she might have said
23   that during the administrative hearing.
24   Q   And what is the approximate best estimate time
25   frame of this comment to Watson and Denman regarding

48

1    inclusion of bilingual class in teaming?
2    A   I don't know. I don't think that Maria gave a
3    specific time frame for it.
4    Q   When Maria was telling you about the February,
5    March 2001 conversation between herself and Ms. Watson, did
6    she tell you that anything else was said other than the
7    comments you already told me?
8    A   I -- nothing else is coming to me right now.
9    Q   Is that a yes or a no or an I don't remember?
10   A   That's an I don't remember.
11   Q   Did Maria tell you about any other conversations
12   that she had with Linda Watson concerning you?
13   A   Not much.
14       Maria became frightened of -- of talking about what
15   was going on. She told me that she didn't want the people
16   there to be mad at her.
17   Q   Is that a no?
18   A   No. There wasn't much. There wasn't much else she
19   told me about -- let's see -- specifically about Linda.
20       If I think of it, though -- if I think of anything,
21   I'll mention it, but right now, I can't remember anything
22   specifically about Linda.
23       Oh, yeah. No, wait a minute. Your question was
24   anything that she talked to Linda about me?
25   Q   Yes. My -- let me restate my question so it's

49

1    clear and for the record.
2    A   Yeah.
3    Q   The question was, did Maria tell you about any
4    other conversations she had with Linda Watson
5    concerning you other than the two you've already recounted?
6    A   Yeah, that summer, that summer she said that --
7    Q   Which summer? I'm sorry.
8    A   2001, after I had been taken out of my classroom
9    the second time.
10       I was asked to come back to work without any
11   investigation. First they claim that I'm going to kill
12   people and then they don't even bother to investigate and
13   they ask me to come back to work, and then, surprise,
14   surprise, same allegations again, and I was taken out a
15   second time.
16       MS. ANGELL: Move to strike; nonresponsive.
17       Would you read the question back, please?
18       (Record read.)
19       MS. ANGELL: Thank you.
20   BY MS. ANGELL:
21   Q   So could you please tell me about any other
22   conversation that Maria told you she had with Linda Watson
23   other than the two you've already recounted?
24   A   About me? Conversations about me?
25   Q   Yes, conversations that Maria told you she had with

50

1  Linda Watson concerning you.

2      A  Not with any new information.  She might have just

3  said, "Oh, Maria -- Linda is still the same," something like

4  that other times I talked to her.

5      Q  So does that mean that she never told you about any

6  other conversations that she had with Linda?

7      A  No, it just means that there was no new

8  information, just the -- that she was -- it was clear to her

9  that Linda continued to fear that I would kill her or other

10  people or everybody.

11      Q  When you previously told me about this February or

12  March 2001 conversation between Maria Beers and

13  Linda Watson, you didn't say anything about Linda fearing

14  that you would kill her.  Did you forget to mention that

15  part?

16      A  Linda said that on February 10th when she called up

17  Rick Werlin within I guess about 15 minutes of

18  JoEllen Hamilton calling Rick Werlin.

19      And it's funny, but Mr. Werlin pretended during his

20  deposition and then during the administrative hearing to be

21  totally shocked that a teacher would call up and say that

22  they were afraid, and it turned out that he had invited --

23  JoEllen said that he had invited her to call him at home.

24      MS. ANGELL:  Move to strike; nonresponsive.

25      Can we have the question back, please?

51

1      (Question read.)

2  BY MS. ANGELL:

3      Q  Please answer the question.

4      A  No, as I said -- no, she didn't say that in that

5  conversation.

6      Q  Okay.

7      A  Linda said that on February 10th when she called up

8  Rick Werlin at his home.

9      Q  And how do you know that Linda Watson said that she

10  feared that you would come to the district -- I'm sorry.

11  Strike that.

12      What statement is.it that you attribute to

13  Linda Watson as having been made on February 10, 2001?

14      A  That she was afraid that I would kill her.

15      Q  And on what basis do you make that allegation?

16      A  Well, Rick Werlin told me.  He didn't tell me her

17  name at that time.  On February 12th I didn't know her name.

18  All I knew was that -- well, actually, I didn't know that

19  the teachers for sure said these things, but I sure know

20  that Rick Werlin told me they did.

21      Rick Werlin said that two teachers called him up

22  Saturday, February 10, 2001, and said that they feared for

23  their lives, and they -- that I had behaved in a way that

24  indicated that I was going to kill them, and then later on I

25  discovered that Linda Watson was the second caller.

52

1      Q  Did Mr. Werlin say that these two teachers said

2  anything other than that they feared for your (sic) lives

3  and that you behaved in a way that indicated you would kill

4  them?

5      A  Yes.

6      Q  What else did he say?

7      A  He said they thought that I was emotionally

8  unstable.

9      Q  These two teachers said this during the phone calls

10  that Mr. Werlin was referencing which occurred on

11  February 10, 2001, correct?

12      A  Yes, they did, according to Mr. Werlin, but

13  strangely enough, in the three and a half years since then,

14  the district has never seen fit to go and ask these

15  teachers, you know, "Did you say this?  Did Werlin make this

16  up?  Did this happen?"

17      No investigation by the district, and apparently

18  CVE didn't want any investigation either.

19      MR. ROHRBACHER:  Move to strike everything after

20  "but strangely enough."

21      MS. ANGELL:  Join.

22      MS. GARVIN:  Join.

23      MS. ANGELL:  Nonresponsive.

24      MR. ROHRBACHER:  That's what I meant.

25  / / /

53

1  BY MS. ANGELL:

2      Q  When did Mr. Werlin tell you that two teachers

3  called him up on Saturday, February 10, 2001?

4      A  On February 12, 2001.

5      Q  Was anyone else present when Werlin told you this?

6      A  Yes.

7      Q  Who was present?

8      A  Gina Boyd, who was presenting herself as someone

9  who was representing my interests, and

10  Gretchen Donndelinger, and Cynthia Miller, and

11  Richard Werlin.

12      Q  Is that five people total?

13      A  Gina Boyd never said anything during that entire

14  meeting.  She never objected to anything that Rick Werlin

15  did.  She turned to me and told me that he had to take me

16  out of my classroom, that he had no choice.

17      MS. ANGELL:  Move to strike; nonresponsive.

18      There's no question pending concerning what

19  Gina Boyd said to you.

20      MR. ROHRBACHER:  Join.

21  BY MS. ANGELL:

22      Q  And if you could look at me.  I know that you want

23  to make a documentary out of this, but I'm the one that's

24  asking you questions so --

25      A  Does the law require that I look at you?

54

1    Q   Well, it's not a show.

2    A   Does the law require that I look at you?

3    Q   It's not a show.  This is just a

4  question-and-answer period.

5    A   I believe that I will look wherever feels right to

6  me because you have tried to take away all my rights, but

7  that's one right I'm not going to let you take away.

8        I have the right to look at whomever and whatever I

9  want to look at, Ms. Angell.

10       MS. GARVIN:  Move to strike.  No question pending.

11       MS. ANGELL:  Join.

12       MR. ROHRBACHER:  Join.

13       THE WITNESS:  And this is a show.  This is a

14  circus.  This a three-ring circus that CVE and the

15  district have been carrying on for three and a half years.

16       I think you're quite wrong when you say this is not

17  a show.

18       MS. GARVIN:  Move to strike.  No question pending.

19       MS. ANGELL:  Join.

20       MR. ROHRBACHER:  Join.

21  BY MS. ANGELL:

22    Q   Subsequent to February 12, 2001, did Mr. Werlin

23  tell you the name of any teacher who called him on

24  February 10, 2001?

25    A   He didn't tell me, but Gina Boyd called me up and

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

56

1    A   Rick Werlin said this on February 12th.  He was

2  referring to the number of people who were saying --

3  accusing me of being apparently so emotionally unstable that

4  I was homicidal.

5    Q   And who are the three people he was talking about?

6    A   The two -- on that day, he didn't give any names.

7  He said two teachers and Gretchen Donndelinger.

8    Q   So in response to my question before your long

9  narrative, is the answer that Richard Werlin never told you

10  who the two teachers were or who anybody was who phoned him

11  on February 10, 2001?

12    A   He never directly told me.  He did say it, though,

13  in his deposition and in the administrative hearing.

14    Q   Were you present during the deposition --

15    A   Yes.

16    Q   -- of Mr. Werlin?

17    A   Yes.

18    Q   And with regard to that deposition, you mean the

19  deposition that was taken of Mr. Werlin in relation to your

20  dismissal hearing before the Commission on Professional

21  Competence?

22    A   Yes.  You won't allow any deposition of

23  Richard Werlin in this case.

24       MS. ANGELL:  Move to strike, nonresponsive,

25  everything after "Yes."

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

55

1  told me that -- she changed her story.

2        She called me up in March, I think it was March 22,

3  2001, and she said that the teacher who had called and said

4  she feared I would kill her was JoEllen Hamilton.

5        And I said to Gina, "And who was the other

6  teacher?"

7        And Gina said, "There was only one teacher."

8        And I was worried.  I thought -- I really seriously

9  thought Gina Boyd might be developing Alzheimer's, and I was

10  upset because she was my only witness.  I was depending on

11  her to tell the truth about what happened at that meeting.

12       And there's no way anybody could forget, you know,

13  if they had a brain that was working.  It was really

14  dramatic when he said that there were two teachers.

15       In fact, he also said that Gretchen Donndelinger,

16  the principal, supported their claims and agreed with them,

17  and he said to me, "It's three to one," and he cupped his

18  hands like this.  It was impossible to forget.

19       And I don't -- now I realize Gina didn't forget it.

20  She just said she did.

21       And he said, "It's three to one.  If it had been

22  two to two, I might have some choice, but it's three to

23  one."

24    Q   What are you talking about with this weighing of

25  your hands?  What conversation are you talking about?

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

57

1        MR. ROHRBACHER:  Join.

2  BY MS. ANGELL:

3    Q   And in that deposition, did Mr. Werlin say that one

4  person called him on February 10, 2001?

5    A   Yes.

6    Q   Did he deny that multiple persons had called him on

7  February 10, 2001 concerning you at that deposition?

8    A   My lawyer refused to ask that question.  I even

9  asked my lawyer to say specifically "Did Linda Watson call

10  you that night," and my lawyer refused to do it.  That's why

11  we have the case Larkins versus Schulman.

12       My answer was that the question was not asked.

13    Q   Thank you.

14       Do I understand it to be your testimony that

15  Gina Boyd told you that Werlin had only said that one person

16  had phoned him?

17    A   Yes.  She told me that Werlin was now saying that

18  it was one person, and I said, "But it was two people."

19       And she said, "Well, that's what he's going to

20  say."

21    Q   I'm sorry.  That wasn't my question.

22       My question was, when you talked with Gina Boyd, I

23  think you said sometime in March of 2001 --

24    A   Uh-huh.

25    Q   -- concerning the identity of the Saturday phone

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

58

1  caller, did Gina tell you, "No, during our February 12, 2000
2  (sic) meeting Mr. Werlin had only said that there had been
3  one phone call," or was Gina saying, "Well, he said there
4  were two, but now he's saying one"?
5      A  Well, in the first part of that conversation, she
6  was saying that it was -- she was claiming herself there
7  was -- Richard Werlin only mentioned one caller on
8  February -- when he talked to us on February 12th.
9      Q  Okay.
10      A  But then by the end of the conversation, when I --
11  I was appalled and I was saying, you know, "Don't you
12  remember? It was two people," and then by the end she said,
13  "Well, he's going to say it was one person."
14      So in other words, she was basically admitting it
15  was two, but she wanted me to know that his story was now
16  that it was one.
17      Q  Did she ever say, "Yes, there were two callers,
18  Werlin said that there were two callers during our
19  February 12, 2001 meeting"?
20      A  Yes.
21      Q  When did she say that?
22      A  She said that for -- in her -- you were present at
23  her deposition just on October 11th. She said there were --
24  she used the phrase "more than one."
25      She also said that in the first part of her

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

59

1  deposition back a few months ago, whenever it was.
2      She said that to me, and then even after that
3  March, I think it was March 22nd conversation, she said to
4  me, "I looked at my notes from the February 12th meeting,
5  and I said -- it says 'They feared for their lives.' So
6  you're right, it was more than one person."
7      Can I ask you, Mr. Rohrbacher, for some water?
8      MR. ROHRBACHER: Water?
9      THE WITNESS: Thank you.
10      MR. ROHRBACHER: Of course.
11      THE WITNESS: Thank you very much.
12  BY MS. ANGELL:
13      Q  At your hearing on your dismissal before the
14  Commission on Professional Competence, was there testimony
15  on the issue of whether -- as far as you can remember, of
16  whether or not there were two phone callers calling
17  Mr. Werlin at home that Saturday in February of '01?
18      A  Oh, that's a -- that's a really interesting
19  transcript.
20      I was sitting there right next to my lawyer
21  saying --
22      Q  Excuse me. Could you answer the question asked?
23  Was there, as far as you remember, testimony --
24      A  Please don't interrupt me when I'm talking.
25      Q  -- on that issue?

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

60

1      A  We agreed at the beginning that we weren't going to
2  interrupt each other.
3      Okay. Now I'm going to try to recall what my train
4  of thought was.
5      I was sitting next to my lawyer, and I gave her a
6  slip of paper that said, "Ask her if Linda Watson called."
7      And what happened was she asked "Did anyone else
8  call that night? Did you talk to anyone else on the phone?"
9      And he said, "Oh, let's see. I think I might have
10  called Gretchen Donndelinger."
11      And then she said, "Did anyone else call?"
12      And he goes, "Oh, I might have called the school
13  police."
14      And she goes, "Did anyone else call?"
15      And then he committed perjury, and he said, "No, no
16  one else called."
17      He was kind of -- he didn't want to commit perjury
18  at that moment, but he did.
19      Q  Are you finished?
20      A  Yes, I am.
21      Q  What's your basis for the allegation that
22  Richard Werlin committed perjury in his testimony before the
23  CPC?
24      A  Because he told me that two people called. I sat
25  right looking him in the eye and he said two people called.

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

61

1      Gina Boyd has testified twice under oath, and you
2  were present, that it was more than one person that called,
3  and then in his testimony he said only one teacher called.
4      Q  Has Richard Werlin been brought before any
5  tribunal, court, administrative panel, any type of
6  proceeding with reference to your allegations that he
7  committed perjury in front of the Commission on Professional
8  Competence in your dismissal proceeding?
9      A  That's an interesting question. As a matter of
10  fact, I informed the school board, I think it was December
11  of 2001, that Richard Werlin was committing various illegal
12  acts, and there was never any investigation. In fact, he
13  was allowed to investigate himself regarding all my
14  grievances.
15      He was the district's legal contact regarding this
16  case. This very case against him, he was the district's
17  legal contact. So obviously the district has made every
18  effort not to investigate him.
19      And it continues to be a strange situation because
20  apparently Rick Werlin hasn't worked in almost a year, but
21  he's still collecting pay.
22      It almost makes me wonder if he's collecting his
23  huge salary, which I believe is like 150,000, to keep him
24  quiet, and I have a hard time believing that he's so ill
25  because he was looking for another job just before he

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

62

1  suddenly disappeared from the scene.
2      I think the district knows that he committed crimes
3  and that's why they don't want him to be there at the
4  district office, but they're keeping him on the payroll and
5  going along with the story that he's ill just so he won't
6  have to testify in this case.
7      Q  Are you finished?
8      A  Yes.
9      MS. ANGELL:  Move to strike; nonresponsive.
10     Can we have the question back, please?
11     (Question read.)
12  BY MS. ANGELL:
13     Q  Would you please respond with a yes or no?
14     A  Could you read the answer, just the first word?
15     (Answer read.)
16     THE WITNESS:  Oh.  Let me answer that.  Not that I
17  know of.
18  BY MS. ANGELL:
19     Q  Thank you.
20     A  But he certainly should have been.
21     MS. ANGELL:  Move to strike everything after "Not
22  that I know of."  It's nonresponsive.
23     THE WITNESS:  I need to say something, sort of
24  as -- as my own legal representative here.
25     I informed you that I was not available today to do

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

63

1  a deposition, and I have personal matters that I need to
2  attend to.
3      It seems to me that your questions here today have
4  been what you yourself have called outside the scope of
5  discovery in this case, although I myself think that they're
6  well within the scope of discovery, but to all my questions
7  that I asked Gina Boyd and to most of my questions that I
8  asked Linda Watson in their depositions, you made
9  responses -- anytime that I asked questions about what
10  happened at Chula Vista Elementary School District, for
11  example, this was a question I asked -- I believe this was
12  Linda Watson.  It's on Page 138 of her deposition, "Do you
13  recall who some of those teachers were?"
14     Just the sort of questions -- just the exact
15  question that you asked me over and over again today.
16     No, strike that.
17     MS. ANGELL:  Are you attempting to make an
18  objection of some sort or something other than just making a
19  speech?
20     THE WITNESS:  I'm attempting to wrap up this
21  deposition.  I need to go.  I have things to do, and I would
22  like to read back your own objection to my questioning
23  Gina Boyd and Linda Watson about events at Chula Vista
24  Elementary School District.
25     MS. ANGELL:  If you're attempting to make an

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

64

1  objection to a question, Mrs. Larkins, if you can interpose
2  that objection as the question is read, and then we'll move
3  on with the deposition.
4      THE WITNESS:  Okay.
5      MS. ANGELL:  So shall I continue with the
6  questioning or do you want to continue with your speech?
7      THE WITNESS:  Oh, no.  I want to make an objection.
8      MS. ANGELL:  To what question?
9      THE WITNESS:  To all your questions about events at
10  Chula Vista Elementary School District, and this is my
11  objection:  You yourself have objected to this line of
12  questioning.  Now, would you agree to stipulate that these
13  events that we're talking about, meetings at Chula Vista
14  Elementary School District with Rick Werlin, phone
15  conversations with Maria Beers, phone conversations with
16  Gina Boyd, would you stipulate that these are within the
17  scope of discovery in this case?
18     MS. ANGELL:  Mrs. Larkins, I'm following up on your
19  allegation specifically that, quote, people said they feared
20  I would come to the district and shoot everybody, and in
21  your response to my question of who is the people who said
22  that, which goes to your allegation of -- contained in the
23  sixth amended complaint concerning information from a record
24  of arrest, I'm guessing that's how you relate it that people
25  would come to the district and shoot everybody, that's what

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

65

1  I'm following up on.  I'm following up on your testimony
2  that you've given in this deposition.
3      THE WITNESS:  Okay.
4      MS. ANGELL:  So I have no stipulation to make.  I'm
5  just following up on comments that you're making in this
6  deposition because you've previously let me know that you
7  plan on saying whatever you feel like during this deposition
8  and not necessarily being responsive to the question.
9      THE WITNESS:  Okay.  So what you're saying is you
10  continue to believe that events at Chula Vista School
11  District are outside the scope of discovery in this case?
12  Is that what you're saying?
13     MS. ANGELL:  I'm saying that I'm entitled to follow
14  up on your responses to my questions and that I believe that
15  my questions -- my initial lines of questioning relate to
16  information that is reasonably calculated to lead to the
17  discovery of admissible evidence in this matter and that
18  when I have to follow up on your allegation that so-and-so
19  said something to such-and-such person, you're opening that
20  door.
21     I'm not saying whether or not it's reasonably
22  calculated to lead to the discovery of admissible evidence
23  regarding your allegations, but when you say something in
24  deposition, I have to be able to explore that.
25     THE WITNESS:  Okay.  Okay.  I think you've made

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

66

1  your position very clear. You are going to try to keep all
2  discussion of events at Chula Vista Elementary School
3  District out of this trial, but you're just -- in case the
4  judge allows this in, you want to be prepared with
5  information?
6        MS. ANGELL: I'm -- this is not testimony. This
7  is, for the record, your attempt to act as counsel. This
8  is -- your statement of my state of mind is not relevant, is
9  not accurate, and I am not the deponent here.
10       THE WITNESS: Okay.
11       MS. ANGELL: So if you have a particular objection
12  to make to a particular question, please make it; otherwise,
13  we need to continue with the deposition.
14       THE WITNESS: Okay. I am going to object to this
15  line of questioning.
16       MS. ANGELL: Which line of questioning?
17       THE WITNESS: About events at Chula Vista
18  Elementary School District because you have objected to it,
19  and I am going to use your precise words.
20       I object to this line of questioning, the entire
21  line of questioning, because it relates to a cause of action
22  which has been dismissed with prejudice from this lawsuit.
23       These questions do not relate to any issue, any
24  issue reasonably calculated to lead to the discovery of
25  admissible evidence with regard to the causes of action that

67

1  exist in this lawsuit, and I request that you please limit
2  your questions to those which are calculated to lead to the
3  discovery of admissible evidence in this matter that's
4  before the judge, not matters that have been dismissed on
5  demur which was sustained without leave to amend.
6        This is an abuse of the discovery process. It's
7  harassing of this witness. It's a waste of public funds.
8        Now, Mrs. -- Ms. Angell, as I told you before, I
9  was not available to come today, and I need to leave by
10  noon, but I would be happy to reschedule the rest of this
11  deposition for another time, which is certainly more than
12  Defendants were willing to do on October 11th when ending
13  the deposition of Gina Boyd, unilaterally saying that they
14  were just going to go home and not schedule any further
15  meeting for the deposition.
16       MS. ANGELL: Are you finished?
17       THE WITNESS: Just -- you can go ahead and talk.
18       MS. ANGELL: Mrs. Larkins, when did you tell me
19  that you were unavailable for deposition today?
20       THE WITNESS: I wrote you -- I wrote you a fax as
21  soon as -- you served me with the court order telling me to
22  appear on October 28th, and that very night I sent you a fax
23  saying that I was not available, and then the next day you
24  went to the court and got it changed to the date that I had
25  told you I was not available.

68

1        MS. ANGELL: Do you have a copy of that fax,
2  Mrs. Larkins?
3        THE WITNESS: Yes, I do.
4        MS. ANGELL: Would you please produce it?
5        THE WITNESS: I'd be happy to. Let me make myself
6  a note.
7        MS. ANGELL: I mean now. Do you have a copy with
8  you?
9        THE WITNESS: Okay. Is it your thought that maybe
10  I have all my faxes to you with me here today?
11       MS. ANGELL: I didn't ask that question. I asked
12  if you had a copy of that particular fax.
13       THE WITNESS: Okay. You thought I might have just
14  brought that particular one today?
15       MS. ANGELL: Yes.
16       THE WITNESS: Why don't you look in your records.
17  I faxed it to you. You have it here in the office. I did
18  not bring it with me.
19       MS. ANGELL: So your answer is no, you did not
20  bring it?
21       THE WITNESS: No.
22       MS. ANGELL: Mrs. Larkins, are you aware that
23  you're under court order to appear for your deposition
24  testimony today?
25       THE WITNESS: Yes, I am.

69

1        MS. ANGELL: Mrs. Larkins, did you appear at court
2  on the day that the hearing was scheduled on the motion to
3  compel your testimony?
4        THE WITNESS: No, because you had already notified
5  me of the court's order.
6        I had no idea you were going to go and try to get
7  it changed. I didn't even oppose your motion.
8        MS. ANGELL: Mrs. Larkins, do you have any evidence
9  that --
10       THE WITNESS: Just a second. Let me write this
11  down because you want me to produce this to you. Let me
12  make a note.
13       MS. ANGELL: Do you have any evidence --
14       THE WITNESS: Excuse me. Would you please wait a
15  minute?
16       You asked me to produce something, and I want to
17  follow through because I told you that I would produce it.
18  Now let me write a note to make sure that I do.
19       Okay. You want me to produce the fax I sent
20  you --
21       MS. ANGELL: Let's go off the record for a minute.
22       THE WITNESS: -- saying I -- we haven't agreed to
23  do that, have we? Aren't we supposed to all agree?
24       MS. GARVIN: You don't have to agree. She can say
25  that -- the opposing attorney can say when you go on and off

70

1 the record.
2     THE WITNESS: Oh, I forgot to learn that.
3     THE COURT REPORTER: Excuse me.
4     MS. ANGELL: It will be about two minutes.
5     THE COURT REPORTER: Let me just make a statement
6 on the record, that as a duty as a court reporter, I cannot
7 go off record until all counsel agree to go off record.
8     MS. ANGELL: Well, she's not counsel. So do you
9 agree to go off the record?
10     MR. ROHRBACHER: Sure.
11     MS. GARVIN: Yes.
12     THE WITNESS: I do not agree. I am representing
13 myself and I think I have the same rights as counsel.
14     I would like to state for the record that
15 Ms. Angell has walked out of the room.
16     THE COURT REPORTER: Is that off the record now?
17     THE WITNESS: Oh, it -- oh, okay. Ever since she
18 said that --
19     THE COURT REPORTER: I'm not off record. Yeah, I
20 can't go off record until you say okay.
21     THE WITNESS: But you did write that, that she left
22 the room?..
23     THE COURT REPORTER: Yeah, I'm still on record,
24 just for the record, because she's counsel -- representing
25 herself. So --

71

1     THE WITNESS: Alan? No, I shouldn't -- you don't
2 have an extra VCR, do you? You just have one?
3     THE VIDEOGRAPHER: We're still on the record.
4     THE WITNESS: Okay.
5     I assume she went to look for the fax that I sent
6 her.
7     THE COURT REPORTER: Did you want to go off the
8 record now?
9     THE WITNESS: You know, this is kind of interesting
10 to me, the arrogance, the contempt, that she wouldn't have
11 waited to see what it was I wanted to say.
12     MS. GARVIN: Objection; no question pending. Move
13 to strike.
14     MR. ROHRBACHER: Join.
15     THE WITNESS: This reminds me of Bush's
16 seven minutes. I wonder how many minutes it will be. Maybe
17 it will be more like Nixon's 18 minutes.
18     MR. ROHRBACHER: Same objection.
19     MS. GARVIN: Join.
20     THE WITNESS: I have no idea if she's coming back
21 at all.
22     I want to tell you that I have another case,
23 Larkins versus Schulman. The trial is going to be
24 December 3rd. Discovery ends I believe 30 days before that.
25     I am late in providing them with documents and

72

1 responses, but the court has ordered me to provide them.
2     I have an appointment in East County at 1:00. I
3 cannot continue to stay here as long as Kelly Angell
4 apparently wants me to stay today, and if she doesn't come
5 back soon, I'm going to have to leave.
6     Perhaps one of you could go find out what's going
7 on with her? She didn't tell you where she was going, what
8 she was doing?
9     MS. GARVIN: Move to strike. No question pending.
10     MR. ROHRBACHER: Join.
11     THE WITNESS: I think this is perfectly typical of
12 the district's behavior, Kelly Angell being the lawyer for
13 the district. It's a feeling that they don't have to worry
14 about telling the truth, and the law is of no interest to
15 them except when it can be used to limit the revelation of
16 the truth.
17     MS. GARVIN: Move to strike. There's no question
18 pending.
19     MR. ROHRBACHER: Join.
20     THE WITNESS: I find it really unprofessional that
21 she would just get up and leave in the middle of a
22 deposition and not tell anybody where she's going or what
23 she is doing.
24     Let's see. It's five minutes now.
25     MR. ROHRBACHER: Move to strike. No question

73

1 pending.
2     MS. GARVIN: Join.
3     THE WITNESS: I feel I should do something to
4 entertain the camera.
5     Well, unfortunately, the camera can't see the
6 beautiful view of San Diego out these windows. This is a
7 really nice office.
8     MR. ROHRBACHER: Move to strike. No question
9 pending.
10     THE WITNESS: Please don't interrupt me when I'm
11 speaking.
12     MS. GARVIN: Join.
13     THE WITNESS: This is really a beautiful office
14 that the taxpayers are paying for here today.
15     MR. ROHRBACHER: Move to strike. No question
16 pending.
17     MS. GARVIN: Join.
18     THE WITNESS: I'm so glad you came back, Kelly. I
19 was afraid you weren't going to.
20     MR. ROHRBACHER: Move to strike. No question
21 pending.
22     MS. GARVIN: Join.
23     MS. ANGELL: Join.
24     MS. GARVIN: We have not been off the record. The
25 court reporter would not go off the record so we've been on

74

1  the record the whole time.
2  　　MS. ANGELL: I understand.
3  　　THE WITNESS: Move to strike. No question pending.
4  BY MS. ANGELL:
5  　　Q  Mrs. Larkins, on or about October 12, 2004, were
6  you fax served with a copy of the court's tentative ruling
7  on Ms. Donlan's motion to compel this deposition?
8  　　A  Was that a Thursday?
9  　　Q  I don't know.
10  　　A  Okay. Let's see. If the 5th -- in fact, I have a
11  calendar. I brought a calendar.
12  　　Wait a minute, Ms. Angell. I told you I have to
13  leave. Why are you asking the questions?
14  　　MR. ROHRBACHER: Just for the record -- can I make
15  a statement on the record?
16  　　MS. ANGELL: Please do so.
17  　　MR. ROHRBACHER: I just want to advise Ms. Larkins
18  so that she's on notice that if she abandons this
19  deposition, my client will seek sanctions against her for
20  disobeying a court order and my client will seek dismissal
21  of complaint against them for failure to participate in
22  discovery.
23  　　THE WITNESS: I would like to advise
24  Bernhard Rohrbacher that I don't have the transcript of
25  Gina Boyd's deposition which took place on October 11th, but

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

75

1  I have the DVD's right here.
2  　　Mr. Hersh ended the deposition unilaterally. He
3  refused to schedule any new meetings. So I'm sure that any
4  sanctions that the -- Judge Nevitt would give to me he would
5  certainly give to Mr. Hersh and the association defendants.
6  　　Would you like to reschedule this? I am willing --
7  unlike Mr. Hersh, I am willing to reschedule. I -- excuse
8  me. Excuse me. I'm not finished.
9  　　I have another case. I have a trial on December 3,
10  2003 (sic). One of the tactics of CTA's lawyers, CVE's
11  lawyers and the district lawyers is that they have been
12  trying to overwhelm me, a third grade teacher, with
13  discovery. That is not a way to bring about justice.
14  That's a way to prevent justice.
15  　　Why not let me go and prepare my discovery, which
16  is late, for Elizabeth Schulman? I have a court -- I have a
17  court order I have to obey from Judge Styn -- Styn.
18  　　I need to go and prepare this discovery, and
19  there's going to be a discovery cut-off early next week in
20  that other case. I need to go do that.
21  　　Now, you claimed that you were not able to have my
22  deposition on October 28th --
23  　　MS. ANGELL: Excuse me. Are you finished with your
24  response to his objection? Because this is not an
25  opportunity for you to go on narrative for 25 pages.

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

76

1  　　I will state my notice to you that if you leave
2  this deposition we will seek the court to -- we will seek
3  sanctions for your failure and refusal to participate in
4  this deposition and we will seek terminating sanctions in
5  this litigation on behalf of Ms. Donlan and Ms. Watson and
6  any school district defendant.
7  　　Are you aware of that? Do you understand that?
8  　　THE WITNESS: Ms. Angell, even if this case got
9  thrown out of court this afternoon and if the other case got
10  thrown out of court tomorrow, you cannot hide the truth.
11  　　MS. ANGELL: Could you please answer the question
12  as to whether you understand that we are going to seek
13  sanctions if you leave?
14  　　THE WITNESS: Please don't interrupt me. It was
15  you yourself who suggested today that we not interrupt each
16  other.
17  　　MS. ANGELL: However, during a deposition you need
18  to be responsive to the question that's posed.
19  　　Do you understand that if you leave today we will
20  seek sanctions for your failure to participate in discovery
21  and for your flagrant refusal to comply with the court
22  order?
23  　　THE WITNESS: Yes.
24  　　(Exhibit 1 was marked.)
25  　　MS. ANGELL: Okay. Mrs. Larkins, I'm going to hand

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

77

1  you what I --
2  　　THE WITNESS: I was not finished speaking.
3  　　MS. ANGELL: I'm sorry, but we need to move on.
4  　　THE WITNESS: Okay.
5  　　MS. ANGELL: This is what I'm marking as Exhibit 1.
6  　　THE WITNESS: Then I'm going to unilaterally end
7  this deposition.
8  　　MS. ANGELL: Are you aware --
9  　　THE WITNESS: No, I --
10  　　MS. ANGELL: -- that if you unilaterally end this
11  deposition, we will seek sanctions?
12  　　THE WITNESS: Well, no. Let's see. See, now,
13  that's what a third grade teacher says.
14  　　I am not unilaterally ending this deposition. I am
15  willing to continue this deposition. I am happy to continue
16  this deposition. I just can't continue it today.
17  　　I am -- I -- now, do you refuse to reschedule this
18  deposition?
19  　　MS. ANGELL: Yes. This is the court ordered date,
20  time and place of the deposition.
21  　　THE WITNESS: Okay.
22  　　MR. ROHRBACHER: I drove two and a half hours
23  through rush-hour traffic. I'm not rescheduling this
24  deposition.
25  　　/ / /

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

78

BY MS. ANGELL:

Q   Mrs. Larkins, I show you what's been marked as Exhibit 1. This is correspondence from myself to you dated October 14, 2004, the second page of which is a proof of fax transmission.

Have you seen this document before?

A   You're being unreasonable, Ms. Angell.

Q   Could you please answer the question? Have you seen the document before?

A   You have had protective order after protective order in this case.

Q   Mrs. Larkins, can you please answer the question? Have you seen this document before?

A   Okay. It looks like I'm going to just have to leave.

(Exhibit 2 was marked.)

BY MS. ANGELL:

Q   Next Exhibit, 2, facsimile from you dated October 15 --

A   I'm willing to reschedule.

Q   -- in which you state "I am looking forward to my opportunity to tell my story on October 25, 2004. Please remember that Defendants have had many opportunities to tell their stories.

"I expect you to allow me to speak without

79

interruption. I will not tolerate your cutting me off when I am speaking."

Did you write this letter? Mrs. Larkins, did you write this letter that's marked as Exhibit 2?

THE WITNESS: Are you the official videographer here? I mean, can you leave now? Because I -- I would like to stop paying you now because I'm going.

BY MS. ANGELL:

Q   Mrs. Larkins, did you write that letter and fax it to me, the document that's marked as Exhibit 2 dated October 15?

THE WITNESS: I tell you what, I will pay you as long as you stay. You stay as long as you want.

MS. ANGELL: Mrs. Larkins, I'll advise you that I'm going to contact the court and seek an ex parte hearing immediately, and I will be traveling to the court immediately if the court will hear me on this issue of compelling your deposition.

THE WITNESS: Okay.

MS. ANGELL: Do you understand that?

THE WITNESS: I want to say this on camera.

Actually, I think it would be kind of exciting if the court were to find me in contempt of court and throw me in jail.

Shinoff has been able to keep this story out of the

80

news. Even the letter I wrote about Shinoff that was printed in the East County Union Tribune, it got taken off the archives.

This story about the five teachers that got transferred out of Castle Park was covered in the Union again and again and again, and I gave them information about what that case was really about. They would never cover it.

If you could get Judge Nevitt to find me in contempt of court and throw me in jail, I bet then I'd get in the paper.

MS. ANGELL: Well, then, why don't we hold on right now while we try and call Judge Nevitt's court and see if he'll rule on this motion immediately seeing as how you're under court order to be here?

Let the record reflect that Plaintiff has exited the deposition room.

Danielle, will you let me know if she gets on the elevator, please?

THE RECEPTIONIST: Yes, she is, Kelly.

MS. ANGELL: Let me know when she's on the elevator, please, and if you all could remain for a few minutes.

THE VIDEOGRAPHER: Do you want to go off?

THE RECEPTIONIST: She's getting on the elevator.

MS. ANGELL: Has she left our floor?

81

THE RECEPTIONIST: She pushed the button.

MS. ANGELL: Let's stay on until she vacates and then we'll call the court.

Could I have that telephone, please?

Thank you.

THE VIDEOGRAPHER: You want to stay on for this?

MS. ANGELL: Let's go off for a minute, please.

THE VIDEOGRAPHER: Off the record at 12:02.

(Recess.)

THE VIDEOGRAPHER: Back on the record at 12:14.

MS. ANGELL: Thank you.

We're on the record for purposes of a declaration of the non-appearance of Mrs. Larkins at her deposition at this point in time.

I'd like to reflect for the record that while we were off, I, being Kelly Angell, informed Plaintiff Larkins that I was about to telephone the court and set an ex parte hearing.

I requested whether she would like to attend an ex parte hearing concerning whether her deposition can be taken off at this point, and she declined to attend and she declined to wait and speak with the court.

And I would also like to reflect that she has departed the building apparently. She left this room about 10 minutes ago.

82

1    Furthermore, I did not agree on behalf of my
2  clients, Robin Donlan and Linda Watson, for Mrs. Larkins to
3  leave the deposition. I did not agree to continue the
4  deposition to another date, and we'll hear from other
5  counsel who are present as to whether they agreed that the
6  deposition go off at this point in time and be rescheduled.
7    MR. ROHRBACHER: Bernhard Rohrbacher, counsel for
8  the association defendants.
9    I also did not agree to -- I also did not agree to
10  reschedule the deposition on account of the fact that I have
11  traveled considerable time and distance to attend here
12  today, had reserved the entire day, was under the
13  understanding that the deposition would proceed the entire
14  day, and I'm not in a position to expend more funds of my
15  client to reschedule this deposition unnecessarily.
16    MS. GARVIN: Deborah Garvin for defendant
17  Michael Larson (sic). I did not agree that the deposition
18  be suspended and rescheduled.
19    MS. ANGELL: Do you mean on behalf of
20  Michael Carlson?
21    MS. GARVIN: Who did I say?
22    MS. ANGELL: You said Larson.
23    MS. GARVIN: I'm -- Carlson.
24    MS. ANGELL: Okay. And at this point, can we
25  have -- at this point, can the court reporter make some sort

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

83

1  of certificate of non-appearance as of this particular time?
2    THE COURT REPORTER: Can we go back off the record?
3    MS. ANGELL: Let's go off the record.
4    THE VIDEOGRAPHER: Off record.
5    (Discussion off the record.)
6    THE VIDEOGRAPHER: Back on the record at 12:18.
7    MS. ANGELL: And we're -- since Plaintiff has left
8  the deposition without anybody's agreement, claiming that
9  she needs to go prepare for another -- do some discovery in
10  other litigation, that she's busy this afternoon, we're
11  going to take a lunch break.
12    We have a phone call into the court seeking an
13  ex parte appearance, and we will reconvene at approximately
14  1:00?
15    MR. ROHRBACHER: Sounds good to me.
16    MS. ANGELL: At approximately 1:00 by agreement of
17  counsel, and let's go off.
18    THE VIDEOGRAPHER: Off the record at 12:19.
19
20    -- Lunch Recess --
21
22    THE VIDEOGRAPHER: Back on the record at 1:17.
23    MS. ANGELL: You know what? I forgot to call
24  Ms. Garvin so I'm doing that right now.
25    THE VIDEOGRAPHER: Do you want to go off or are you

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

84

1  on?
2    MS. ANGELL: It will take just a sec to get her on.
3  She's expecting the call.
4    No, I'm calling for Deborah. She's expecting my
5  call. We're in depo.
6    MR. ROHRBACHER: That was a day well spent.
7    MS. ANGELL: We're on.
8    Deborah, this is Kelly. I've put you on
9  speakerphone. Can you hear us?
10    MS. GARVIN: Yes, I can.
11    MS. ANGELL: Okay. We're on the record after
12  taking a break to see if Mrs. Larkins would return, and I'm
13  just reflecting for the record that we've not had a return
14  phone call from the court seeking an ex parte hearing this
15  afternoon and also reflecting for the record that all
16  counsel who were present this morning are present now
17  including myself. Ms. Garvin is telephonically present and,
18  one more time, what's your name?
19    MR. ROHRBACHER: Rohrbacher.
20    MS. ANGELL: Mr. Rohrbacher is here as well.
21    So at this time, we'll close this session of the
22  deposition, not because any counsel has agreed to go off,
23  but because Plaintiff has left the deposition site.
24    We already had the stipulation concerning the
25  date for and turn-around time for reviewing and returning

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

85

1  the transcript so I think that that stipulation stands.
2    Are we good, Counsel?
3    MS. GARVIN: Yes.
4    MR. ROHRBACHER: Yes, we are.
5    THE VIDEOGRAPHER: This concludes today's
6  proceedings in the deposition of --
7    MS. ANGELL: Can you hear me?
8    MS. ANGELL: Yes. Do you have anything else to
9  say?
10    MS. GARVIN: No. That accurately reflects what
11  occurred.
12    MS. ANGELL: So stipulated.
13    MS. GARVIN: So stipulated.
14    THE VIDEOGRAPHER: This concludes today's
15  proceedings in the deposition of Maura Larkins. Off the
16  record at 1:19 p.m.
17    (Whereupon the deposition adjourned at 1:19 p.m.)
18
19
20    * * *
21
22
23
24
25

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

86

1        I declare under penalty of perjury under the laws
2    of the State of California that the foregoing is true and
3    correct; that I have read my deposition and have made the
4    necessary corrections, additions, or changes to my answers
5    that I deem necessary.
6        Executed on this_____day of _____,
7    2004.
8
9
10
11        _____
12        MAURA LARKINS
13
14
15
16
17
18
19
20
21
22
23
24
25

87

1    I, JUDY M. REIERSEN, Certified Shorthand Reporter for the
2    State of California, do hereby certify:
3
4    That the witness in the foregoing deposition was by me first
5    duly sworn to testify to the truth, the whole truth and
6    nothing but the truth in the foregoing cause; that the
7    deposition was taken by me in machine shorthand and later
8    transcribed into typewriting, under my direction, and that
9    the foregoing contains a true record of the testimony of the
10   witness.
11
12
13
14   Dated: This_____day of_____, 2004,
15   at San Diego, California.
16
17
18
19
20        _____
            JUDY M. REIERSEN
            CSR No. 7505
21
22
23
24
25

1           I declare under penalty of perjury under the laws

2    of the State of California that the foregoing is true and

3    correct; that I have read my deposition and have made the

4    necessary corrections, additions, or changes to my answers

5    that I deem necessary.

6           Executed on this ___18th___ day of _November_,

7    2004.

8

9

10

11                    _Maura Larkins_

12                    MAURA LARKINS

13

14

15

16

17

18

19

20

21

22

23

24

25

1　　　IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
2　　　　　IN AND FOR THE COUNTY OF SAN DIEGO
3
4

5　　　　　　　　　　　　　　　　　　　　　　　)
　　　MAURA LARKINS,　　　　　　　　　　　　　)
6　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Plaintiff,　　　　　　　)
7　　　　　　　　　　　　　　　　　　　　　　　)
　　　vs.　　　　　　　　　　　　　　　　　　　) Case No. GIC 781970
8　　　　　　　　　　　　　　　　　　　　　　　)
　　　RICHARD T. WERLIN, GRETCHEN　　　　　　)
9　　　DONNDELINGER, JO ELLEN HAMILTON,　　　)
　　　ALAN R. SMITH, LINDA M. WATSON,　　　　)
10　　MICHELLE LEON-SCHARMACH, LYNNE　　　　　)
　　　MARGARET SALLANS, LIBIA S. GIL,　　　　)
11　　Superintendent, as an Individual,　　)
　　　CHULA VISTA ELEMENTARY SCHOOL　　　　　)
12　　DISTRICT, a California public　　　　　)
　　　entity, and DOES 1 through 50,　　　　)
13　　inclusive,　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
14　　　　　　　　　　Defendants.　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
15
16
17
18　　　　　　　　　DEPOSITION OF MAURA LARKINS
19　　　　　　　　VOLUME II, PAGES 88 THROUGH 112
20　　　　　　　　　　SAN DIEGO, CALIFORNIA
21　　　　　　　　　　NOVEMBER 11, 2004
22
23
24　　REPORTED BY LAURA J. BOLLSCHWEILER, RPR, CSR NO. 10500
25
26
27
28

89

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN DIEGO

```
_____
                        )
MAURA LARKINS,          )
                        )
        Plaintiff,      )
                        )
vs.                     ) Case No. GIC 781970
                        )
RICHARD T. WERLIN, GRETCHEN   )
DONNDELINGER, JO ELLEN HAMILTON, )
ALAN R. SMITH, LINDA M. WATSON,  )
MICHELLE LEON-SCHARMACH, LYNNE   )
MARGARET SALLANS, LIBIA S. GIL,  )
Superintendent, as an Individual, )
CHULA VISTA ELEMENTARY SCHOOL    )
DISTRICT, a California public     )
entity, and DOES 1 through 50,    )
inclusive,              )
                        )
        Defendants.     )
_____ )
```

DEPOSITION OF MAURA LARKINS, VOLUME II,
Taken by Defendants, commencing at the hour of 9:44 a.m. on
Thursday, November 11, 2004, at 401 West A Street, Suite
1500, San Diego, California, before Laura J. Bollschweiler,
Certified Shorthand Reporter in and for the State of
California.

---

90

APPEARANCES:
For the Plaintiff:
    Maura Larkins
    In Propria Persona
    1935 Autocross Court
    El Cajon, California 92019
    (619) 444-0065
For the Defendants Robin Donlan and Linda M. Watson:
    STUTZ, ARTIANO, SHINOFF & HOLTZ
    BY: KELLY R. ANGELL
    401 West A Street, 15th Floor
    San Diego, California 92101
    (619) 232-3122
For the Defendant Michael Carlson:
    McCORMACK & MITCHELL
    BY: DEBORAH GARVIN
    625 Broadway, Suite 1400
    San Diego, California 92101
    (619) 235-8444
For the Defendants California Teachers Association, Tim
O'Neill and Gina Boyd:

    CALIFORNIA TEACHERS ASSOCIATION LEGAL
    DEPARTMENT
    BY: MICHAEL D. HERSH
    11745 East Telegraph Road
    P.O. Box 2153
    Santa Fe Springs, California 90670
    (562) 942-7979

The Videographer:

    VIDEOGRAPHICS
    BY: GREGG EISMAN
    1903 30th Street
    San Diego, California 92101
    (619) 239-2066

---

91

INDEX

WITNESS: MAURA LARKINS
EXAMINATION:                          PAGE
By Ms. Angell                         93

EXHIBITS

FOR DEFENDANTS:                       MARKED
3  Notice of Volume 2 of Deposition of Plaintiff,    94
   Maura Larkins, and Request for Production of
   Documents at Deposition

---

92

SAN DIEGO, CALIFORNIA; THURSDAY, NOVEMBER 11, 2004

        THE VIDEOGRAPHER:  This is the videotaped
deposition of Maura Larkins being taken in the matter of
Maura Larkins vs. Richard T. Werlin, etc., et al., San
Diego Superior Court, Case No. GIC 781970.

        This deposition is being held in the offices
of Stutz, Artiano, located 401 West A Street, Suite 1500,
San Diego, California.  Today is Thursday, November 11,
2004, and the time is now 9:48 a.m.

        My name is Gregg Eisman.  I am a legal video
specialist with Videographics, 1903 30th Street, San Diego,
California.  The certified shorthand reporter is Laura
Bollschweiler of Peterson & Associates, San Diego,
California.

        For the video record, would counsel please
state their appearances.

        MS. ANGELL:  Kelly Angell for Robin Donlan and
Linda Watson.

        MS. GARVIN:  Deborah Garvin for Michael
Carlson.

        MR. HERSH:  Michael Hersh on behalf of the
California Teachers Association, Chula Vista Educators, Tim
O'Neill, and Gina Boyd.

        MS. ANGELL:  Do they need another mike?  And
she hasn't stated her appearance yet.

        THE WITNESS:  And Maura Larkins, plaintiff in
pro per.

        THE VIDEOGRAPHER:  Will the reporter please

93

1  swear the witness.
2          MAURA LARKINS,
3  having been first duly sworn, testified as follows:
4          EXAMINATION
5  BY MS. ANGELL:
6      Q.  Mrs. Larkins, have you had your deposition
7  taken before today?
8      A.  Just the time you -- the first session of this
9  deposition and in the Schulman case.
10     Q.  Have you taken any depositions prior to today?
11     A.  Yes.
12     Q.  Do you feel that you're familiar with the
13 deposition process?
14     A.  Yes.
15     Q.  Is there any reason that you're unable to give
16 your best testimony today?
17     A.  No.
18     Q.  Mrs. Larkins, I'm going to hand you what I'm
19 marking as --
20         What's the last exhibit number in this
21 deposition?
22         THE REPORTER:  I didn't get it.
23         MS. ANGELL:  Do you know, Deborah?
24         MS. GARVIN:  I don't know.
25         MS. ANGELL:  Let's go off for one second.
26         THE VIDEOGRAPHER:  We're going off.  The time
27 is 9:50 a.m.
28         (Discussion off the record.)

94

1          MS. ANGELL:  Let's go back on, please.
2          THE VIDEOGRAPHER:  We're going on the record.
3  The time is 9:51 a.m.
4          MS. ANGELL:  Can I have the last statement
5  read back, please.
6          (Record read.)
7          (Exhibit 3 was marked for identification.)
8  BY MS. ANGELL:
9      Q.  So I have handed over here what I'm marking as
10 Exhibit 3 and distributed copies to counsel and the court
11 reporter.  Have you seen a copy of this document before?
12     A.  I probably saw it in passing.
13     Q.  So that's a "yes"?
14     A.  I'll say yes.
15     Q.  Did you bring any documents with you today in
16 response to this deposition notice and request for
17 production of documents?
18     A.  No.  I faxed you I think it was day before
19 yesterday a supplemental response to the request for
20 documents by Robin Donlan, and that's all I have at this
21 time to produce to you.
22     Q.  So are you stating that the fax that you sent
23 me within the last two days was in response to the request
24 for production of documents that's in Exhibit 3 as opposed
25 to being a supplemental response to Ms. Donlan's first
26 request for production of documents which you've been court
27 ordered to provide responses to?
28     A.  Well, I would say that it was a response to

95

1  Robin Donlan's request.
2      Q.  There have been request for production of
3  documents, Set One, by Ms. Donlan, which you've been court
4  ordered to respond to.  There's request for production of
5  documents, Set Two, by Ms. Donlan, for which your responses
6  are due approximately November 30, and then there's a
7  deposition notice which required you to bring documents.
8  The prior deposition notice required you to bring
9  documents.
10         So Set One are the requests that you've been
11 court ordered to provide responses to.  So is the fax that
12 you're talking to me about that you've sent within the last
13 two weeks a response to the notice of today's deposition or
14 is it some sort of tardy response to the request for
15 production of documents, Set One, from Ms. Donlan?
16     A.  It's a supplemental response to Set One from
17 Ms. Donlan.
18     Q.  So do you have any documents that you've
19 brought with you today in response to the request for
20 production of documents that is part of this deposition
21 notice?
22     A.  No.  All the documents that I have produced in
23 this case -- I have produced all the documents that I have
24 prepared in this case, and I've already produced them to
25 you.  So you have them here.  It would be very burdensome
26 for me to carry them all here.
27     Q.  What document is responsive to Request No. 1
28 on page two of Exhibit 3?

96

1      A.  The 18-page fax that I faxed you day before
2  yesterday.
3      Q.  Is the contents of that 18-page fax
4  essentially a copy of the Chula Vista Police Department --
5  or San Diego Police Department's records of your August 25,
6  2000, arrest?
7      A.  Yes.
8      Q.  Is there any other document that's responsive
9  to Request No. 1?
10     A.  Not that I have.
11     Q.  Concerning Request No. 2 on page three, have
12 you brought with you any documents responsive to that
13 request?
14     A.  I'd like to interrupt a moment because I am
15 concerned about the stipulation that we entered into on
16 October 25 regarding how long I would have to check over
17 the transcript once it's prepared.  And at that time, you
18 said to me that you were concerned about the proximity of
19 the December 17th hearing regarding summary judgment and
20 you felt that one week would be an appropriate amount of
21 time.  And I agreed to that, believing that you were
22 sincere when you were mentioning the December 17th date and
23 wanting to get depositions signed.
24     Q.  Excuse me, Mrs. Larkins.  I move to strike
25 that as nonresponsive to the question.  And if you have
26 procedural matters that you would like to discuss at a
27 later time off the record, if you want to make a different
28 stipulation for this deposition, that's fine.  But for now,

97

1 I'm entitled to ask my questions.
2 Could we please return to the question that I
3 posed concerning your documents that are responsive to
4 Request No. 2 on page three?
5 A. I am speaking now not as a witness, but as a
6 person who is representing herself. I am very concerned
7 that you used dishonest means to get me to agree to the
8 one-week time limit on how long I would have to review my
9 deposition. And then afterwards, you had your witnesses
10 one after another and you claimed that each one of them
11 needed three weeks to look over the transcript.
12 So obviously, you were being disingenuous when
13 you acted like you thought that it was important to have
14 these depositions prepared in a shortened time period, and
15 I'm very concerned about this matter. And if this matter
16 cannot be settled, then I don't see any point in going on
17 with this deposition because it's obviously simply an
18 attempt to abuse the discovery process and to harass me.
19 The idea of one week for me and three weeks for all of your
20 witnesses is wrong.
21 Q. Mrs. Larkins, what you're referring to is a
22 stipulation that you entered into freely. You're acting as
23 your own counsel. If you would like to discuss separately
24 from this deposition any adjustment to that, we can discuss
25 it later. But this is not your forum for making legal
26 arguments. You've brought litigation against my clients,
27 and this is my opportunity to conduct discovery, to ask you
28 what your evidence is. This is not your forum to make

98

1 legal arguments.
2 So regardless of whether you like the
3 agreement you already entered into or regardless of your
4 desire to change that agreement, today is the time for you
5 to respond to questions pursuant to court order. And if
6 you would like to walk out of this deposition again, that
7 would be great for me because it will be more evidence in
8 seeking sanctions against you.
9 A. Okay.
10 Q. All right? So let's return to the line of
11 questioning. We're not going to spend all morning arguing.
12 We've got your statement on the record. I have not moved
13 to strike it. So let's just proceed.
14 Concerning Exhibit No. 3 --
15 A. I would like to speak as the person who is
16 representing the witness. The stipulation to which you
17 have just referred --
18 Q. Mrs. Larkins, we're not going to spend 20
19 minutes discussing how long you've agreed to, to review and
20 make changes to your last volume of your deposition. If
21 you want to talk after or off the record today concerning
22 stipulations, procedural matters that are not relevant to
23 this deposition, we can do that. But for now, I'm entitled
24 to get your deposition testimony.
25 Now, are you refusing to answer my question
26 concerning the Request for Production No. 2 in Exhibit 3?
27 A. No, I'm not.
28 Q. All right. Please answer it. The question is

99

1 have you brought any documents that are responsive to
2 Request for Production No. 2 contained in Exhibit 3?
3 A. I believe that I will need to seek a
4 protective order if you refuse to discuss and change the
5 stipulation regarding my having only one week to review
6 this deposition transcript.
7 Q. You do whatever you want, Mrs. Larkins.
8 A. Okay.
9 Q. We're here today for you to give testimony
10 concerning the allegations that you have brought. Your
11 time to review a different deposition transcript has
12 absolutely nothing to do with the court order compelling
13 you to give testimony. You walked out on the last volume
14 of your deposition without cause, and that matter will be
15 taken up with the court. That's my opinion, that you
16 walked out without cause and in violation of court order.
17 We'll let that court decide that, and that's not at issue
18 here and I'm not here to argue about that with you.
19 What I am here to do today is conduct your
20 deposition, and I will conduct your deposition today. I
21 will not spend the day arguing with you. All right?
22 So either you're going to refuse to answer the
23 question or you're going to answer it. Do you need to hear
24 the question again?
25 A. No, I don't need to hear the question again.
26 I remember the question.
27 Q. Would you please provide a response to the
28 question posed?

100

1 A. Ms. Angell, you walked out of Michelle
2 Scharmach's deposition yesterday. You became very upset
3 and you ordered your client. You're not supposed to order
4 her to leave. You're supposed to, perhaps, counsel her to
5 leave or even instruct her to leave. But the way you
6 ordered her was evidence of what I think is a lack of
7 emotional control.
8 And it's ironic that here you stand here today
9 talking about how I walked out of my deposition when I had
10 told you before that deposition was ever scheduled that I
11 was not available on that day, which was October 25th. And
12 you sneaked over to the courthouse and got the judge to
13 change it to a date on which you knew I was not available.
14 I came on that date and I sat for two and a
15 half hours and then I told you I had to leave. And I
16 assure you that any sanctions you want to get against me, I
17 will ask the same sanctions for your walking out of the
18 deposition yesterday.
19 You also unilaterally ended Linda Watson's
20 deposition. The only reason I didn't follow up on that one
21 was that I had already had enough proof that she was a
22 completely unreliable witness and there was absolutely no
23 use asking her any further questions.
24 Mr. Hersh here --
25 Q. Mrs. Larkins, excuse me. We're not here for
26 you to give a 20-minute diatribe. Move to strike,
27 nonresponsive to the question posed.
28 MS. GARVIN: Joined.

101

1  MR. HERSH: Joined.
2  BY MS. ANGELL:
3  Q.  Mrs. Larkins --
4  A.  .Excuse me.
5  Q.  No. We're not here for you to give a
6  20-minute soliloquy every five minutes on what your
7  arguments are. We're here for you to give responses to
8  questions. If you have an objection to the question,
9  please so state.
10  A.  I was not --
11  Q.  I get to ask the question. You respond to it.
12  If you want to make an objection acting as your own
13  counsel, you're free to do so, and I will allow you to make
14  your objections. But we're not here to spend the morning
15  listening to you make arguments about stuff that I'm not
16  asking about. I get to ask the questions today, and these
17  counsel get to ask the questions today.
18      Therefore, the question posed is did you bring
19  any documents with you in response to Request for
20  Production No. 2 contained in Exhibit 3?
21  A.  I was not speaking as a witness when I made a
22  statement that you asked to have stricken.
23  Q.  Mrs. Larkins, you are the witness. You are
24  the plaintiff. You know, you may want to try to separate
25  it in your mind, but if the court's treating you as both,
26  you're both. It is my opinion that everything that you say
27  in this record, in this proceeding is evidence.
28  A.  I really think we need the court to help us

102

1  out here, because I think that's preposterous. I can also
2  speak as my own representative.
3  Q.  You are one person wearing both hats and I am
4  not here -- the purpose of this proceeding today is not to
5  have a legal argument with you about what you think the law
6  is. It's not relevant to the issue of whether you brought
7  documents with you in response to this request for
8  production.
9      So I'm going to ask you this question for the
10  final time, and if you refuse to answer it, you refuse to
11  answer it and I'll move on to the next question.
12      Mrs. Larkins, have you brought with you any
13  documents that are responsive to Request No. 2 in Exhibit 3
14  which seeks each document that supports your allegation
15  that Robin Donlan and Michael Carlson conspired to defame
16  you?
17  A.  Speaking as my own representative, you are
18  harassing the witness. You are -- yesterday, you asked a
19  lot of questions. And now today, you act like the person
20  who is representing the witness should not be allowed to
21  ask questions. Which is it? You keep changing the rules
22  depending on who's being deposed.
23      I really think we need a judge to straighten
24  out several matters in this case, including your
25  preposterous arguments about client-attorney privilege,
26  which you seem to think covers -- prevents your witnesses
27  from making any statements about anything which was ever
28  discussed by a lawyer in this case. And you said if the

103

1  lawyer instructed you to talk about this matter, then
2  everything you talked about to everybody is covered by
3  attorney-client privilege. That's preposterous.
4  Q.  Excuse me, Mrs. Larkins. We're not here to
5  listen to your arguments and your thoughts about other
6  witness testimony and your thoughts about the discovery
7  process.
8      So I'm taking your failure to respond to that
9  question when posed for the third time as a refusal to
10  answer the question. And I'll ask the court reporter to
11  mark the transcript and we'll move on to the next question.
12      Mrs. Larkins, have you brought a copy of any
13  document with you today that's responsive to Request No. 3
14  in Exhibit 2? And that requires a yes or no answer.
15  A.  I did not refuse to answer the last question.
16  Q.  Yes, you did. We've been sitting here for 15
17  minutes while you want to talk about other things instead
18  of answering the question. That's a refusal to answer.
19  Would you like to answer the prior question now?
20  A.  I would like to be recognized as both
21  plaintiff -- no, strike that.
22      I would like to be recognized as both witness
23  and the party representing the witness. And I would like
24  you to stop asking that my comments be stricken from the
25  record when I am speaking as the person representing myself
26  in this case. I would like you to address the problem of
27  your -- the one-week limit on my time to review the
28  transcript before it gets much longer. I think before it

104

1  gets too much longer, perhaps I need to go to the court and
2  talk about several problems that you have, including an
3  extremely hostile attitude.
4  Q.  Are you refusing to respond to my question
5  concerning whether you brought any document with you in
6  response to Request for Production No. 3 contained in
7  Exhibit 3?
8  A.  No.
9  Q.  Then please respond to the question.
10  A.  Please allow me to finish when I'm speaking.
11  Q.  My mistake. Would you please respond to the
12  question posed?
13  A.  Ms. Angell, your questions are ridiculous. I
14  told you I haven't brought any documents. Now if you're
15  going to go through all the way up through Question No. 46
16  and ask -- 47 and ask a separate question about each one, I
17  don't know. I think you're going to get laryngitis and
18  something. I don't even see it as in your own interest.
19  The answer to all the questions is no.
20  Q.  Okay. So the answer is -- let me rephrase the
21  question so that we can just knock it out in one and we
22  won't have to go through each.
23      I'll represent to you that the request for
24  production of documents contained in the notice of your
25  deposition for today contains a request -- contains 47
26  separate requests for production of documents.
27      Mrs. Larkins, have you brought with you today
28  any documents in response to any of those 47 requests for

105

1  documents?
2    A.  No.
3        I would like to make a statement as the person
4  who is representing the witness.
5    Q.  Mrs. Larkins, if you have an objection to the
6  question, please make the objection. But this is not to
7  forum for you to make legal arguments and go on and on
8  because we need to proceed with your deposition.
9    A.  Move to strike.
10   Q.  Unlike how you conduct depositions, I am
11  asking questions that are relevant to the subject matter
12  and I expect you to respond to them. You're under a court
13  order to proceed with your deposition and to respond. If
14  you do not proceed with the deposition and respond, I will
15  proceed with my request for sanctions against you. And
16  frankly, it's to my benefit if you misbehave again today
17  because it will simply demonstrate for the court your
18  behavior and your contempt for the court's order. The
19  court has ordered you to sit for deposition and participate
20  in it.
21   A.  Move to strike everything said by Kelly Angell
22  since I last spoke.
23   Q.  On what basis?
24   A.  On the basis that you're not asking questions.
25  You're just making a statement. You're just making a
26  diatribe.
27   Q.  Mrs. Larkins, you can play the game as much as
28  you want to, but we need to proceed with the deposition.

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

106

1        So the next question is --
2    A.  Move to strike. Excuse me. I'm not finished
3  speaking.
4        Move to strike Ms. Angel's last comment.
5    Q.  On what basis?
6    A.  On the basis that it is not a question.
7    Q.  Counsel gets to talk. If you ask a question,
8  I get to respond to your question. If you ask me for an
9  offer of proof, I get to make my offer of proof. If you --
10  you can make your motion to strike. That's not something
11  that you get to decide, and the court will decide it at a
12  later date if and when that's appropriate.
13       So let me get going with the questioning. Who
14  is Amber Bradley?
15   A.  Ms. Angell, I believe you just said "Counsel
16  gets to talk." Now, do you exclude me from your definition
17  of counsel?
18   Q.  Mrs. Larkins, who is Amber Bradley?
19   A.  This deposition is being conducted in an
20  extremely abusive and illegal manner because you are
21  refusing to allow me to act as my own counsel.
22   Q.  Mrs. Larkins, if you have objections to make
23  to any question posed, please state your objection and then
24  respond to the question, or if you choose, instruct
25  yourself not to answer. However, you are obstructing the
26  discovery process by more than -- well, about a half an
27  hour now of arguments back and forth in your attempt to
28  preclude me from conducting your deposition.

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

107

1        So I get to ask the question. If you, acting
2  as your own counsel, disapprove of the question in some
3  manner or would like to state your objection, please state
4  your objection. And unless you're going to instruct
5  yourself not to answer, please provide an answer. That's
6  how it goes: Question, objection if necessary, answer.
7  And that's how it goes until we're done.
8        So I've stated my question and I'll restate
9  the question. Who is Amber Bradley?
10   A.  I believe I need to suspend this deposition at
11  this time and talk to the court about whether or not I have
12  a right to act as my own counsel during my deposition.
13   Q.  Mrs. Larkins, I haven't said that you don't
14  have a right to act as counsel. I'm saying please state
15  your objection on the record and then let's proceed.
16   A.  And to ask the court to make some -- to
17  arbitrate or make some decision regarding the one-week
18  stipulation for my time to look over the transcript.
19       MS. ANGELL:  Let the record reflect that Mrs.
20  Larkins has stood, has gathered her things, and appears to
21  be walking out and there's no agreement that her deposition
22  go off calendar or be stopped at this time.
23       MR. HERSH:  That's correct.
24  BY MS. ANGELL:
25   Q.  Mrs. Larkins, please be advised that if you
26  leave again, I will seek sanctions against you for walking
27  out on your deposition and preventing discovery from
28  occurring.

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

108

1    A.  You know, I could have said things like that
2  yesterday too when you walked out.
3    Q.  We're talking about today, Mrs. Larkins. You
4  are the plaintiff. You are court ordered to be here.
5  Judge Nevitt has issued an order that you be here for your
6  deposition and this is the second time that you're in
7  defiance of his court order by walking out.
8        If you want to instruct yourself not to answer
9  certain questions, be my guest. Instruct yourself not to
10  answer those certain questions.
11       But just because you don't want to answer a
12  question on a particular topic, does not mean that I don't
13  get to ask any questions and conduct discovery and the
14  other two counsel who have come here for this deposition
15  today, including Mr. Hersh who's come here from -- I don't
16  remember how far away.
17       How far did you have to come?
18       MR. HERSH:  About 120 miles, I believe.
19  BY MS. ANGELL:
20   Q.  So if you don't want to answer a question
21  concerning who is Amber Bradley, fine. Instruct yourself
22  not to answer. Make your objections. Then I get to ask
23  the next question.
24   A.  I -- you're much calmer this time than you
25  were on October 25. At that time, I believe that you were
26  making threats of contempt of court. But I didn't want to
27  say either one of those things to Michelle Scharmach
28  yesterday to threaten her with either contempt of court or

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

109

1  sanctions because I knew that she was in a pretty weak
2  position because you simply ordered her to leave her own
3  deposition. And she hesitated to leave. She stayed in her
4  seat a while. And it was clear that she had misgivings
5  about obeying your order. But then she felt she had to
6  obey.
7       I believe that you have given very bad legal
8  advice to Michelle Scharmach as well as the district in
9  this case. And I think that you really don't believe that
10 you need to follow the rules, the laws, and the laws are
11 only for you to use against other people and you think they
12 don't apply to you. And I am leaving.
13      MS. ANGELL: Please be informed that we will
14 seek a court order for contempt and sanctions against you
15 for leaving.
16      (Ms. Larkins leaves the deposition room.)
17      MS. ANGELL: Let the record reflect that
18 Plaintiff has now left the room. By my watch, it is 10:15.
19 And Plaintiff, by the way, arrived about 15 minutes late
20 for her deposition. So there hasn't been, I don't think, a
21 single response to a question posed.
22      MS. GARVIN: Well, she did respond that she
23 did not bring any documents.
24      MS. ANGELL: Oh, yes. That's true. She did
25 respond that she didn't bring any documents.
26      Counsel, do you want to wait around and see if
27 she cools her jets and comes back, or shall we go off the
28 record, Plaintiff having walked out for a second time?

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

110

1       MS. GARVIN: We should go off the record.
2       MR. HERSH: Yes, I agree. Off the record.
3       THE VIDEOGRAPHER: We're going off the record.
4  The time is 10:14 a.m.
5  (Whereupon, the proceedings were adjourned at 10:14 a.m.)
6                  * * *

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

111

1       I, MAURA LARKINS, declare under penalty of perjury
2  under the laws of the State of California that the
3  foregoing is true and correct; that I have read my
4  deposition and have made the necessary corrections,
5  additions, or changes to my answers that I deem necessary.
6       Executed on this _____ day of _____, 2004

_____
MAURA LARKINS

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

112

1       I, LAURA J. BOLLSCHWEILER, Certified Shorthand
2  Reporter for the State of California do hereby certify:
3
4       That the witness in the foregoing deposition was by me
5  first duly sworn to testify to the truth, the whole truth
6  and nothing but the truth in the foregoing cause; that the
7  deposition was taken by me in machine shorthand and later
8  transcribed into typewriting, under my direction, and the
9  foregoing contains a true record of the testimony of the
10 witness.
11
12 Dated: This _____ day of _____, 2004,
13 at San Diego, California

_____
LAURA J. BOLLSCHWEILER, CSR, RPR
CERTIFICATE NO. 10500

PETERSON & ASSOCIATES COURT REPORTING & VIDEO SERVICES

# CERTIFICATE

   *I, the undersigned, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following changes listed below):*

| PAGE No. | LINE No. | |
|---|---|---|
| 96 | 23 | two dashes at end of line instead of period |
| 104 | 8 | After "No.", add "Mark--" |
| 106 | 1 | should be replaced with: "A. Move to strike--" |
| | 2 | should be replaced with: "Q. So the next question is--" |
| | 3 | should be replaced with"A.Excuse me. I'm not finished speaking." |
| 107 | 12 | two dashes at end of line instead of period |

*Maura Larkins*
*November 27, 2004*

**PLEASE TURN TO BACK OF TRANSCRIPT AND SIGN THE PENALTY OF PERJURY PAGE**

1     I, MAURA LARKINS, declare under penalty of perjury

2  under the laws of the State of California that the

3  –foregoing is true and correct; thàt I have read my

4  deposition and have made the necessary corrections,

5  additions, or changes to my answers that I deem necessary.

6     Executed on this *27th* day of *November*, 2004

7

8

9            *Maura Larkins*

10     MAURA LARKINS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**FILED**

**I. (a) PLAINTIFFS**

STUTZ, ARTIANO SHINOFF & HOLTZ, APC

**DEFENDANTS**

MAURA LARKINS and DOES 1-100

07 NOV 19 PM 2: 53

SOUTHERN DISTRICT OF CALIFORNIA

**(b)** County of Residence of First Listed Plaintiff   San Diego, California
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

'07 CV 2202 WQH  (WMC)
DEPUTY

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Stutz, Artiano, Shinoff & Holtz 2488 Historic Decatur Rd. suite 200 San Diego, CA 92106  619 232 3122

Attorneys (If Known)

Maura Larkins 1935 Autocross CT  El Cajon, CA 92019 619 444 0065

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                            and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☒ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☐ 1 Original Proceeding   ☒ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
United States Constitution, First Amendment   28 USC 1441 1442 1443 1446

Brief description of cause:
Defendant's right to freedom of speech is at issue in this malicious prosecution by public figure for defamation

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**   (See instructions):

JUDGE                               DOCKET NUMBER

DATE   11/19/2007

SIGNATURE OF ATTORNEY OF RECORD
*Maura Larkins (pro se defendant)*

**FOR OFFICE USE ONLY**

RECEIPT # 144656   AMOUNT $350   APPLYING IFP   JUDGE   MAG. JUDGE

Sn 11/19/07

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 144656    — SH
* * C O P Y * *
November 19, 2007**
**14:54:29**

**Civ Fil Non-Pris
07-02202**
Judge..: WILLIAM Q HAYES
Amount.:                    $350.00 CK
Check#.: PC 4949

**Total—> $350.00**

FROM: STUTZ ET AL V. LARKINS ET AL