|   |   |   |   |
|---|---|---|---|
| 1 | MAURA LARKINS |  FILED FEB 01 2008 CLERK, U.S. DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA BY ___ DEPUTY | NUNC PRO TUNC FEB 1 2008 |
| 2 | 1935 Autocross Court | | |
|   | El Cajon, CA 92019 | | |
| 3 | 619 444 0065 | | |
|   | Defendant pro se | | |

## UNITED STATES DISTRICT COURT
### Southern District of California

| | |
|---|---|
| STUTZ ARTIANO SHINOFF & HOLTZ, APC, | ) Case number: 07cv02202-WQH (WMc) |
| | ) |
| | ) Judge:   Hon. William Q. Hayes |
| Plaintiff, | ) (Hon. William McCurine, Jr.) |
| | ) Date:    February 19, 2008 |
| | ) Time:    ~~3:00 p.m.~~ 11:00 a.m. |
| v. | ) |
| | ) |
| MAURA LARKINS, | ) OPPOSITION TO MOTION FOR |
| | ) REMAND |
| and DOES 1 through 100, inclusive, | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) COMPLAINT FILED:   10/05/07 |
| | ) TRIAL DATE:        None set |

Defendant Maura Larkins offers the following opposition to plaintiff's motion for remand:

Defendant asked that this case be removed to federal court because the California Superior Court, at least in part due to its being overburdened with cases—like this one--that should have been settled out of court, was unable to reach a just outcome in lawsuits previously brought by the current defendant. Three of those cases are attached as Exhibits 1, 2, and 3. Defendant then took her case to the court of public opinion by creating a web site and describing the case and the actions of Stutz, Artiano, Shinoff & Holtz (SASH) lawyers (Exhibit 5).

SASH's main complaint seems to be that defendant accuses it of having suborned perjury, intimidated witnesses and parties, hidden or destroyed documents, and obstructed justice.

Defendant stands by this accusation, and believes that these actions defeated the state court's efforts to reach a just outcome.

The San Diego Superior Court judge who dismissed defendant's case against Richard Werlin, Michael Carlson, Robin Donlan, et al, did so very soon after receiving a declaration from the Sheriff of Santa Barbara which said that those individuals were innocent. The judge apparently believed that such a declaration would hold up in court. As it happened, the sheriff's representative admitted during his deposition that the declaration prepared by attorney Deborah Garvin was false (Exhibit 6).

Plaintiffs knew very well that their clients were guilty, yet they believed that their successful perpetration of multiple frauds on the court would prevent the truth from ever coming out.

Plaintiffs were clearly wrong about this. The truth came out on defendant's website.

SASH's ability to intimidate witnesses and to cause documents to disappear led to a disgraceful decision in the California Office of Administrative Hearings. The Professional Competence Commission dismissed defendant Larkins from her teaching position *because she filed grievances and a lawsuit.* This proved, according to the decision, that Larkins had an irremediable defect of charater: she was "unforgiving." The decision contradicted itself by saying that Larkins had not

been the victim of any wrongdoing, but this was just one of many inconsistencies in the decision. The judge said documents did not exist, when he had accepted them into evidence in his own handwriting. He apparently looked up the school district on a website, which is the only explanation defendant can think of for his bizarre statement that there were six members on the school board, five of them elected and one appointed. Judge Ahler must have clicked on the web page that shows the photo of the superintendent next to the photos of board members, with the caption "Board of Education." There was no testimony about the number of board members in evidence or even discussed in the hearing.

But the biggest venture into unjudicial behavior came when Judge Ahler jumped up in the middle of Maura Larkins' testimony, and ordered the two panelists to come into a small side room with him, and told them to disregard Larkins' statements. The court reporter and parties and lawyers sat waiting. When Alher realized that Larkins could hear what he was saying, since she was sitting in the witness stand just a few feet from the little room, he closed the door and remained there, talking, for about ten minutes (Exhibit 15).

SASH shows its disrespect for the justice system by putting forward this decision again and again to justify its continuing smear of Maura Larkins (Exhibits 9 through 16).

SASH's propensity toward discovery abuse, and its readiness to smear Larkins are illustrated by the following quotes from the November 9, 2007 deposition of SASH lawyer Ray Artiano (Exhibit 4), taken for the current case. The first question below deals with the still-missing documents collected by Daniel

3
Opposition to Motion for Remand

Shinoff at Castle Park Elementary in the fall of 2001. Some pages of this 87-page set of Bate-stamped documents were produced by attorney Mark Bresee of Parham & Rajcic, who worked with SASH, for the administrative hearing. SASH refused to produce a single document in response to the very specific request: "The Bate stamps begin with the number 1, not 01 or 001, and continue through 87."

Page 6 line 14 through Page 7 line 11

Q. Mr. Artiano, on page 2, line 15 of Exhibit 1, do you see the sentence, "The bate stamps begin with the number 1, not 01 or 001, and continue through 87"?

A. Yes, I do.

Q. Okay. Do you have a document that is bate stamped with a 5, not a 05 or a 005?

A. Not to my knowledge.

MR. SHINOFF [Acting as Ray Artiano's counsel]: Nor do I.

BY MS. LARKINS: Q. Well, that is very interesting. How about a document that is bate stamped 06 -- 6, not 06?

A. Not to my knowledge.

MR. SHINOFF: Nor do I.

BY MS. LARKINS: Q. Did you bring any of the documents that are specifically numbered here in paragraph 1 on page 2 of this exhibit?

A. Based on what we could make out from your request, we had the documents gathered, which Mr. Shinoff, my attorney, brought with him.

Q. Well, it would appear that either intentionally or unintentionally, you ignored this last sentence in this first document request...

Page 11 lines 1-14

4

Opposition to Motion for Remand

1  MR. SHINOFF: Well, I think you need to be clearer then in terms of what you

2  want.

3  MS. LARKINS: Mr. Shinoff, I faxed to Kelly Angell the documents

4

5  that you did produce (well, actually, you didn't produce them, but Parham Rajcic

6  produced them from my administrative hearing) so that she could easily determine

7  what were the missing documents. Your law firm has had years to produce these

8  documents; and, apparently, they must be very harmful to your case or you would

9  have produced them.

10

11 MR. SHINOFF: Well, you can entertain whatever fantasy you wish to engage in;

12 and I know that you are prone to fantasies, but I respectfully disagree with your

13 characterization...

14 Stutz law firm's attorney Ray Artiano walked out of his deposition, and its attorney

15 Daniel Shinoff never showed up for his deposition, without having filed an

16 objection in advance.

17

18      Defendant has voluminous evidence of subornation of perjury and other

19 crimes by SASH. Stutz, Artiano, Shinoff & Holtz and its agents Daniel Shinoff and

20 Kelly Angell Minnihan violated the penal code section 127 by committing

21

22 subornation of perjury in furtherance of the destruction documents, which

23 documents included the Feb. 12, 2001 notes of Gina Boyd, notes taken by Richard

24 Werlin on February 12, 2001, April 4, 2001 August 13, 2001, and the report of

25 Robin Donlan submitted on April 4, 2001.

26

27                    5
28          Opposition to Motion for Remand

Stutz suborned the perjury of Robin Donlan on November 4, 2004. Kelly Angell Minnehan, knowing that she was suborning perjury, intentionally caused Robin Colls Donlan to change her testimony from a true statement to a false statement during her deposition for San Diego Superior Court case number GIC781970. Kelly Angell Minnehan was working under the supervision of Daniel Shinoff, who had, with Jeffery Morris, set out a strategy of destruction of documents, dishonesty, and subornation of perjury for this case, and had, on December 17, 2003 and continually after that time, made clear to Angell Minnehan that he approved and would help cover-up any illegal actions she might take to win the case.

ROBIN DONLAN DEPOSITION   November 4, 2004 **(Exhibit 1)**

Page 99

> **Q. Do you know that I was dismissed by the school district?**
>
> **MS. ANGELL: You mean other than conversations that are attorney-client privileged, attorney work product and information related to Ms. Donlan in the course of this litigation?**
>
> **MS. LARKINS: Yes.**
>
> **THE WITNESS: We were told during a meeting, so--**

At this point, the deponent had answered a clear question, AFTER her lawyer's clarification that the question specifically ruled out information that was "attorney-client privileged, attorney work product and information related to Ms. Donlan in the course of this litigation." Ms. Donlan made it clear that there had

Why did ANGELL want this apparently innocuous information contradicted? The information is a matter of public record. Because ANGELL was desperate to avoid any testimony about discussions about the matter by teachers and Michael Carlson and Rick Werlin at that time, since those discussions involved covering up crimes by planning new crimes.

This isn't a private lawyer protecting a client. This is a public entity lawyer preventing a witness from telling the truth about harm done by the public entity. This is a representative of a public institution (Chula Vista Elementary School District) forcing a client to lie to cover up a committed by that institution. This is public, not private. This is subornation of perjury BY government, supported by tax dollars, and the public has a right to know about it. The lawyers provided to CVESD by the San Diego County Office of Education Joint Powers Authority must stop milking the public and committing misdemeanors and felonies that harm public education.

Defendants' conduct as alleged in this cause of action constitutes an unlawful act in violation of Penal Code section 127, which states, "Every person who willfully procures another person to commit **perjury** is guilty of subornation of **perjury**, and is punishable in the same manner as he would be if personally guilty of the perjury so procured."

The following quotes from Robin Donlan's deposition show exactly how she contradicted the sworn testimony of her principal. SASH knew very well that these people had violated Labor Code Section 432.7 (a misdemeanor) against

Larkins (Exhibit 8), but instead of an apology to Larkins they continued to bill the district for their efforts to subvert the justice system.

ROBIN COLLS DONLAN DEPOSITION

November 4, 2004

P123

18    MS. LARKINS: Okay. I would like to ask that
19    this document be labeled -- okay -- as Exhibit 5.
20    I want to make sure that you get one,
21    Ms. Garvin, because this relates so specifically to your
22    client.

P 124

3    (Exhibit 5 marked for identification.)
17    A. "Deposition of Gretchen Donndelinger."

P 125

22    A. "Did Robert -- Robin Colls ever share with you
23    any kind of information concerning a police report
24    allegedly, somehow, involving Maura Larkins?"

P 126

9    Q. Was there ever something about a police report
10    that you didn't want Gretchen Donndelinger to know?
11    A. Not to my recollection, no.
12    Q. Okay. So according to your recollection,
13    Gretchen Donndelinger's testimony about you here is

14    false?

15    A. As far as I recall.

9     Q. Was there ever something about a police report

10    that you didn't want Gretchen Donndelinger to know?

11    A. Not to my recollection, no.

12    Q. Okay. So according to your recollection,

13    Gretchen Donndelinger's testimony about you here is

14    false?

15    A. As far as I recall.

16    Q. Okay. Did your brother ever talk to you during

17    the year 2000 about my having been arrested?

18    MR. GARVIN: Vague and ambiguous.

19    THE WITNESS: No.

21-22   Q. Okay. Would you please read the question on Line 2 of Page 81.

**P 127 line 9-16**

Q. Okay. Now that you have read almost half a page of Gretchen Donndelinger's testimony about a conversation she claims to have had with you, are you getting any memories at all of this conversation?

A. No, none whatsoever.

Q. Okay. Do you have any explanation for why Gretchen Donndelinger would have said that you talked about a police report?

**Page 128 line 8 through page 129 line 5**

1    Q. So could you read the question that was asked of Gretchen Donndelinger that
2    is recorded here on Line 10 on Page 81.
3    A. "Was this in a face-to-face conversation with Robin Colls?"
4    Q. And what was Gretchen's answer?
5    A. "Yes."
6
7    Q. Okay. You don't remember any face-to-face conversation with Gretchen
8    Donndelinger about a police report that allegedly somehow involved me?
9    A. No, I don't.
10    Q. Okay. Do you have any experience of Gretchen Donndelinger having
11    hallucinations?
12    A. No. Personally, no.
13    Q. Okay. But you heard -- her testimony here is false; is that your testimony?
14
15    A. I don't have any recollection of that event.
16    Q. Could this conversation have had happened and you might have forgotten it?
17    A. I doubt that.
18    Q. So you're quite sure this conversation never took place?
19    A. I don't recall it.
20    Police report
21
22
23
24    P70
25    perjury
26    11    Q. When I was working at Castle Park and Gretchen

12   Donndelinger was working at Castle Park, did you ever

13   talk to her about a police report involving me or anyone

14   connected with me?

15       A. No.

16       Q. Did you ever tell her that you knew something

17   about me, but you -- she wouldn't want to know it?

18       A. No.

19       Q. Did you ever tell her that there was some sort

20   of non-school relationship between my family and your

21   family?

22       A. Not to my recollection, no.

p71

7        Q. Did you ever talk to Gretchen Donndelinger

8    without an attorney present about me at any other time

9    other than the times you were discussing the white board

10   incident and the notebook incident?

11       A. I don't recall any, no.

12       Q. Okay. If you had knowledge about a police

13   report about a teacher at your school, is that something

14   you'd be likely to remember?

15       A. Probably.

Opposition to Motion for Remand

Another individual who committed perjury was Linda Watson (Exhibit 7), contradicting herself again and again, and changing her testimony when Larkins asked if Watson would mind if her phone records were subpoenaed.

Defendant respectfully asks that her first amendment rights be protected by being allowed to fight this lawsuit in federal court.

Respectfully submitted,

Dated: February 1, 2008          *Maura Larkins*

Maura Larkins, pro se defendant