# EXHIBIT 1

1

MAURA LARKINS
1935 Autocross Court
El Cajon, CA 92019
619 444 0065

Plaintiff in pro per

FILED
CIVIL BUSINESS OFFICE 6
CENTRAL DIVISION

04 JAN -6 PM 3: 57

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN DIEGO

MAURA LARKINS,
     Plaintiff,

       vs.

ELIZABETH SCHULMAN,
and DOES 1 through 10, inclusive,
     Defendants.

) Case No. GIC 823858
) Judge:
) Department:
)
) COMPLAINT FOR DAMAGES:
) NEGLIGENCE
)
)
)
)
)
)

Plaintiff alleges:

## GENERAL ALLEGATIONS

1. Plaintiff MAURA LARKINS is an individual and is now, and at all times mentioned in this complaint was, a resident of San Diego County, California.

2. Defendant ELIZABETH SCHULMAN, hereinafter referred to as SCHULMAN, is an individual and is now, and at all times mentioned in this complaint was, a resident of San Diego County, California.

1

COMPLAINT FOR DAMAGES

3. Defendant, SCHULMAN, at all times mentioned in this complaint was licensed to practice law and practiced law in San Diego County, California.

4. The true names of defendants DOES 1 through 10, inclusive, are unknown to plaintiff at this time. Plaintiff sues those defendants by such fictitious names pursuant to section 474 of the Code of Civil Procedure. Plaintiff is informed and believes, and based on that information and belief alleges, that each of the defendants designates as a DOE is legally responsible for the events and happenings referred to in this complaint, and unlawfully caused the injuries and damages to plaintiff alleged in this complaint.

5. On or about June 11, 2002, Plaintiff retained and employed SCHULMAN to represent Plaintiff in an administrative hearing regarding Plaintiff's dismissal from employment with Chula Vista Elementary School District. SCHULMAN accepted such employment and agreed to represent Plaintiff.

6. The administrative hearing regarding Plaintiff's dismissal from employment took place on January 6, 2003 through January 10, 2003.

7. An attorney is expected to possess a knowledge of those plain and elementary principles of law that are commonly known by well-informed attorneys, and to discover those additional rules of law which, although not commonly known, may be readily found by standard research techniques [Smith v. Lewis (1975) 13 Cal. 3d 349, 358.

8. When an attorney accepts employment to give legal advice or to render other legal services, the attorney impliedly agrees to use such skill, prudence, and diligence as attorneys of ordinary skill and capacity commonly possess and exercise in

2

COMPLAINT FOR DAMAGES

the performance of the tasks they undertake [Kirsch v. Duryea (1978) 21 Cal. #d 303, 308.

9. The standard (of care for attorneys) is that of members of the legal profession in the same or similar locality under similar circumstances [Wright v. Williams (1975) 47 Cal. App. 3d 802, 809.

10. On or about February 11, 2002, the Commission on Professional Competence mailed a decision to dismiss Plaintiff.

11. In rendering legal services to Plaintiff pursuant to such representation, SCHULMAN failed to exercise reasonable care and skill as specified in the following causes of action.

## FIRST CAUSE OF ACTION

## NEGLIGENT ADVICE TO A CLIENT

12. Plaintiff realleges and incorporates as though fully stated herein, paragraphs 1 through 11 inclusive of the General Allegations.

13. On or about March 27, 2003, SCHULMAN negligently advised Plaintiff that Plaintiff had 90 days to file a Petition for Judicial Review of the decision of the Commission on Professional Competence **(Exhibit 1).**

14. Plaintiff relied on such advice and in consequence thereof Plaintiff filed her Petition for Writ of Mandate ninety days after the decision was mailed, instead of the required 60 days, and that Petition was dismissed on the basis of being late filed. Plaintiff so acted only on the advice of Defendant SCHULMAN and would not have so acted without such advice.

3

COMPLAINT FOR DAMAGES

15. As a direct and proximate result of the above-described negligence and carelessness of Defendant, Plaintiff was damaged in that Plaintiff's Petition for Writ of Mandate **(Exhibit 2),** which would have been given precedence in Superior Court over other cases, and regarding which the Superior Court would have made an independent judgment on the evidence, was summarily dismissed, and Plaintiff's dismissal from employment became final and Plaintiff suffered loss of her career and livelihood, including salary and future benefits, and severe emotional distress in an amount according to proof at trial.

16. Plaintiff is informed and believes, and on the basis of that information and belief alleges, that had SCHULMAN used proper skill and care in her representation of Plaintiff, Plaintiff would have prevailed in her Petition for Writ of Mandate since she was entitled to Judicial Review and the independent judgment of the Superior Court.

## SECOND CAUSE OF ACTION

## LACK OF DILIGENCE IN COMMUNICATION WITH CLIENT AND REPRESENTATION OF CLIENT RESULTING IN BREACH OF DEFENDANT'S GOOD FAITH AND FIDUCIARY DUTY

17. Plaintiff realleges and incorporates as though fully stated herein, paragraphs 1 through 11 inclusive of the General Allegations.

18. SCHULMAN was negligent in her representation of Plaintiff on January 6, 2003, and subsequently. Defendant failed to use reasonable skill and care in that SCHULMAN negligently and carelessly:

4

(a) Allowed at least one fake document to be placed in evidence by Mark Bresee, the District's lawyer, without pointing out the significance of the false statements in the false document, especially after Werlin admitted that the document represented by Parham and Rajcic's attorney to be the November 21, 2001 report by Richard Werlin was not actually the document Richard Werlin gave to Plaintiff on November 21, 2001. It is a felony to knowingly produce into evidence a fake document, and this matter should have been pursued. Professional courtesy should not be allowed to destroy a client's career.

(b) failed to demand that missing documents be produced, even though 1) there were glaring omissions in consecutively numbered documents, 2) notes by Cindy Miller, official note-taker, were missing, 3) SCHULMAN caused Plaintiff to believe that missing pages would be produced but she didn't bother to demand them, 4) failed to show documents to Plaintiff in a timely manner, possibly so Plaintiff wouldn't see was missing and insist that missing documents be produced.

(c) failed to put Jo Ellen Hamilton on the stand to contradict Richard Werlin's testimony that Ms. Hamilton feared for her life (**Exhibit 3**) and therefore Richard Werlin had to remove Plaintiff from her classroom. Ms. Hamilton had testified in her deposition (**Exhibit 4**) that she had had no fear for her life and had not been distraught,

and had only called Mr. Werlin to ask about a meeting;
SCHULMAN also failed to put Ms. Hamilton on the stand to
testify that Mr. Werlin had suggested that she call him, and that he
was not surprised as he claimed in his testimony.

(d) After having refused to look at documents which Plaintiff brought
to her office, telling Plaintiff to take them home, SCHULMAN also
refused to place into evidence multiple copies of documents
Plaintiff brought to the hearing.  SCHULMAN brought empty
boxes to the hearing to pretend she had lots of evidence.  By these
actions SCHULMAN caused the Commission to think Plaintiff was
lying when she testified that she had written letters to the board that
were not in evidence nor were they located in the many bankers'
boxes which Schulman had brought.

(e) didn't question Richard Werlin as to whether Linda Watson had
called him on same night as Jo Ellen Hamilton, allowing him to
evade stating whether or not Linda called.  The knowledge that Ms.
Watson had made an accusation which was deemed untrue and
unreliable by the District when it asked Plaintiff to come back to
work, would have put Linda's later allegations into question.  Even
though the District's lawyer as much as admitted that Ms. Watson
had called Richard Werlin, and Werlin very likely would have
admitted it if asked directly, SCHULMAN ignored the important
question of Linda Watson's credibility.

19.  Plaintiff is informed and believes, and on the basis of that information and belief alleges, that had defendant used proper skill and care in her representation of Plaintiff, Plaintiff would have prevailed in her administrative hearing since the above-mentioned evidence, if presented, would have made it clear that her dismissal was a violation of the Labor Code, the State and Federal Constitutions, and had been accompanied by gross misconduct on the part of the School District.

20.  As a direct and proximate result of the above-described negligence and carelessness of Defendant SCHULMAN, Plaintiff was damaged in that the Commission on Professional Competence upheld Plaintiff's dismissal from employment and Plaintiff suffered loss of her career and livelihood, including salary and future benefits, and severe emotional distress in an amount according to proof at trial.

WHEREFORE, plaintiff requests judgment from all defendants sued in above causes of action as follows:

1.  Plaintiff believes that since Plaintiff's civil tort action was filed before the School Board voted to terminate her, and since the District had caused significant damage to Plaintiff before she was terminated, that the amount of damages caused by SCHULMAN's negligence can only be calculated after Plaintiff's civil suit against the District and other individuals is decided.

2.  For actual damages for loss of career and livelihood, and future salary and benefits and for cost of representation at administrative hearing, and emotional damages according to proof:

3.  For general damages for loss of career and livelihood, and future salary and

benefits and for cost of representation at administrative hearing, and emotional

damages according to proof:

4.  Special damages for loss of career and livelihood, and future salary and benefits

and for cost of representation at administrative hearing, and emotional damages

according to proof:

5.  for pain and suffering according to proof;

6..  Cost of suit;

7.  Such further relief as the court deems proper.


January 6, 2004          *Maura Larkins*

MAURA LARKINS

VERIFICATION

I, MAURA LARKINS, am the plaintiff in the above-entitled action.  I have read the

foregoing complaint for negligence and know its contents.  The same is true of my

own knowledge, except as to those matters which are alleged on information and

belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct.


January 6, 2004          *Maura Larkins*

MAURA LARKINS

8

COMPLAINT FOR DAMAGES

8

# EXHIBIT 1

# Schulman & Schulman

Elizabeth Schulman
Melvyn J. Schulman

A.P.C.
Attorneys at Law
1551 Fourth Avenue
Suite 502
San Diego, California 92101-3153

Telephone: (619) 238-0303

March 27, 2003

Maura Larkins
1935 Autocross Court
El Cajon, California 92019

Re:    *Petition for Writ of Mandate*

Dear Ms. Larkins:

Thank you for your fax of 03/26/03. You have previously indicated you did not have funds to appeal the Commission's decision. I have a longstanding office policy of not providing self-help to clients to pursue matters *in pro per.*

There are C.E.B. books available at law libraries on *mandamus* and administrative *mandamus*, which set forth the proper forms, procedures, and timelines. You may also wish to refer to *C.C.P.* §1085, *et seq.* More specifically, you may wish to study *C.C.P.* § 1094.5 and 1094.6. *C.C.P.* §1094.6(b) requires a petition to be filed no later than the ninetieth day following the date on which the decision becomes final with respect to any commission decision. In an abundance of caution, I may have previously told you 60 days.

I am unable to handle this matter with my current workload. I *discourage* you from proceeding on your own. I wish you well.

Very truly yours,

Elizabeth S. Schulman

ES:eja

# EXHIBIT 2

MAURA LARKINS
1935 Autocross Court
El Cajon, CA 92019
619 660 6955

Plaintiff in pro per

OFFICE 18
CIV ... DIVISION

2003 MAY 12 P 3: 56

CL... RIOR COURT
... COUNTY, CA

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN DIEGO

| | |
|---|---|
| MAURA LARKINS,<br>      Petitioner,<br><br>      vs.<br><br>COMMISSION ON PROFESSIONAL<br>COMPETENCE,<br>      Respondent<br>_____<br><br>CHULA VISTA ELEMENTARY SCHOOL<br>DISTRICT, Real Party in Interest.<br>_____ | ) Case No.  GIC  **810661**<br>)<br>)<br>)<br>)<br>) PETITIONER'S MEMORANDUM<br>) OF POINTS AND AUTHORITIES<br>) IN SUPPORT OF PETITION FOR<br>) WRIT OF MANDATE<br>)<br>)<br>)<br>) |

Comes now Petitioner and offers the following Memorandum of Points and

Authorities in support of her Petition for Writ of Mandate.

TABLE OF CONTENTS

I.      SUMMARY AND OVERVIEW OF EVIDENCE

        A.      FEBRUARY 12, 2001--PETITIONER REMOVED FROM CLASSROOM

                BY ASSISTANT SUPERINTENDENT WERLIN DUE TO

                ALLEGATIONS THAT SHE WAS GOING TO KILL TWO TEACHERS.

1

B.     MARCH 24, 2001--PETITIONER WAS ASKED TO RETURN TO HER CLASSROOM WITHOUT ANY INVESTIGATION.

C.     MARCH 27, 2001--PETITIONER WAS TOLD NOT TO RETURN TO DISTRICT PROPERTY.

D.     APRIL 4, 2001--PETITIONER WAS ASKED TO RETURN TO HER CLASSROOM WITHOUT ANY INVESTIGATION.

E.     APRIL 20, 2001--PETITIONER WAS TOLD NOT TO RETURN TO DISTRICT PROPERTY.

F.     APRIL 21, 2001--A POLICE PRESENCE WAS ESTABLISHED AT CASTLE PARK ELEMENTARY SCHOOL WHICH CREATED AN IMPRESSION IN THE COMMUNITY THAT PETITIONER WAS DANGEROUS.

G.     JUNE 2001--AT THE REQUEST OF PETITIONER'S ATTORNEY, ASSISTANT SUPERINTENDENT WERLIN AGREED TO INVESTIGATE ALLEGATIONS AGAINST PETITIONER.

H.     JULY 2001--THE SUPERINTENDENT REFUSED TO REMOVE MR. WERLIN AS SUPERINTENDENT'S DESIGNEE FOR HANDLING PETITIONER'S GRIEVANCES;

I.     AUGUST 13, 2001--PETITIONER WAS TOLD SHE WOULD BE ON ADMINISTRATIVE LEAVE THE FOLLOWING YEAR.

J.     SEPTEMBER 2001--WERLIN BEGAN FAXING PETITIONER WHEN HER LAWYER WAS OUT OF TOWN, DEMANDING THAT SHE COME IN AND MEET WITH HIM; PETITIONER REFUSED.

2

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of Mandate

13

K.    SEPTEMBER 2001--PETITIONER AND HER ATTORNEY EACH WROTE TO THE DISTRICT REGARDING MR. WERLIN'S ACTIONS.

L.    SEPTEMBER 26, 2001--PETITIONER'S PAY WAS STOPPED; SHE REQUESTED A FULL EVIDENTIARY HEARING; THE DISTRICT REFUSED;

M.    OCTOBER 5, 2001--PETITIONER WAS TOLD TO REPORT BACK TO WORK; PETITIONER SAID SHE WOULD NOT RETURN UNTIL THERE HAD BEEN AN INVESTIGATION.

N.    NOVEMBER 13, 2001--PETITIONER FILED 3 GRIEVANCES.

O.    NOVEMBER 14, 2001--PETITIONER WAS THREATENED WITH DISMISSAL.

P.    NOVEMBER 21, 2001--MR. WERLIN GAVE PETITIONER THE ONE AND ONLY DISTRICT REPORT ABOUT HER CASE;

Q.    NOVEMBER AND DECEMBER, 2001--PETITIONER WROTE LETTERS ATTEMPTING TO SETTLE HER PENDING LAWSUIT

R.    DECEMBER 2001--PETITIONER'S GRIEVANCES WERE SUMMARILY DENIED BY MR. WERLIN.

S.    FEBRUARY 2002--PETITIONER FILED A PERB CHARGE AGAINST THE DISTRICT.

T.    MARCH 2002--PETITIONER FILED A LAWSUIT AGAINST THE DISTRICT.

U.    MAY 7, 2002--THE SCHOOL BOARD VOTED TO DISMISS PETITIONER.

3

II.    THE COMMISSION ABUSED ITS DISCRETION IN ITS DECISION TO

DISMISS PETITONER.

III.    THE COMMISSION'S FINDINGS ARE NOT SUPPORTED BY THE EVIDENCE.

IV.    THE COMMISSION'S DECISION IS NOT BASED ON THE FINDINGS.

V.    THE COMMISSION FAILED TO PROCEED IN THE MANNER REQUIRED BY

LAW.

      **A.**    THE COMMISSION MISCONSTRUED THE LAW.

            1.    **THE COMMISSION FOUND THAT IT IS REQUIRED TO**

                **BELIEVE THAT "THE EXISTENCE OF A FACT IS MORE**

                **PROBABLE THAN ITS NONEXISTENCE."**

            2.    THE COMMISSION MISCONSTRUED CALIFORNIA EDUCATION

                CODE SECTIONS 44932(a)(7), 44932(a)(5) AND 44939.

      **B.**    THE COMMISSION VIOLATED THE RULES OF EVIDENCE

      **C.**    THE COMMISSION VIOLATED PETIONER'S CONSTITUTIONAL

RIGHT TO PETITION FOR REDRESS OF GRIEVANCES BY RULING THAT

PETITIONER MAY BE DISMISSED FOR FILING GRIEVANCES AND A LAWSUIT.

TABLE OF AUTHORITIES

*Board of Education v. Matthews* (1957) 149 Cal.App.2d 265

*Board of Education v. Swan* (1953) 41 Cal.2d 546

*Gardner v. Commission of Professional Competence* (1985) 164 Cal.App.3d 1035

*Governing Board of the Oakdale Union School District V. Seaman* (1972) 28 Cal. App.3d 77

Hanley v. Murphy 40 Cal.2d 572 [255 P.2d 1]

4

1 5

*Hayman v. city of Los Angeles* 17 Cal.App.2d 679 [62 P.2d 1047]

*In re Micheal G.* (1998) 63 Cal.App.4th 700

*Woodland Joint Unified School District v. COMMISSION on Professional Competence*

(1992) 2 Cal.app.4th 1429

I.    **SUMMARY AND OVERVIEW OF THE EVIDENCE**

    **A. FEBRUARY 12, 2001--PETITIONER WAS REMOVED FROM HER**

        **CLASSROOM BY ASSISTANT SUPERINTENDENT WERLIN DUE TO**

        **ALLEGATIONS THAT SHE WAS GOING TO KILL TWO TEACHERS.**

    This case addresses the nightmare scenario which developed in CHULA VISTA ELEMENTARY SCHOOL DISTRICT when a false accusation was thrown into a human resources department which had a policy of keeping no written records of investigations and no written records of personnel actions connected to those investigations. In addition, the Superintendent was unable or unwilling to exercise any supervision over the actions of the Assistant Superintendent of Human Resources Richard Werlin.

    Petitioner Maura Larkins, was removed from her classroom and placed on administrative leave on February 12, 2001 due to wild rumors that she was going to kill two teachers. To this day, she has never been told what caused anyone to make such statements. To this day, neither those allegations nor the later allegation that she was going to come to school and shoot *everybody* have ever been retracted.

    And yet, at her termination hearing, not one teacher or administrator testified to ever having witnessed Petitioner saying or doing anything to cause anyone to fear for his or her life.

In fact, the District's only two witnesses, Assistant Superintendent of Human Resources Richard Werlin and Principal Gretchen Donndelinger, testified under oath that Mrs. Larkins was removed from her position because teacher Jo Ellen Hamilton called Mr. Werlin at home on February 10, 2001 and reported an incident which had occurred on February 6, 2001. Mrs. Hamilton's written account of the incident was accepted into evidence (Exhibit R-25). It describes a simple conversation.

It is simply not believable that Petitioner would be removed from her classroom because of the event described in Exhibit R-25. And it is even more preposterous that the COMMISSION found that such removal was reasonable for the reasons stated by the District (Factual Finding 12). The action only becomes reasonable if one believes the testimony of Petitioner Maura Larkins, which is in stark contrast to the testimony of the District's two witnesses.

The evidence indicates that the hazing Mrs. Larkins endured before her Jan 23, 2001 letter (Exhibit 9) got out of hand after she informed her principal about it.

On February 12, 2001, Mr. Werlin told Mrs. Larkins that two teachers and Principal Donndelinger had reported to him that Mrs. Larkins had the intent to kill teachers and the capability to do so. Petitioner was placed on administrative leave. On about March 7, 2001, Mr. Werlin illegally changed her administrative leave to sick leave.

**B.      MARCH 24, 2001--PETITIONER WAS ASKED TO RETURN TO HER CLASSROOM WITHOUT ANY INVESTIGATION.**

Mr. Werlin had no contact with Mrs. Larkins until March 24 and 25, 2001, when he called her at her home and asked her to return to work as soon as possible.

6

17

Mrs. Larkins was concerned because no investigation had been done by the district, and the accusations hadn't been retracted, and the teachers who had made the false accusation had gotten away with it completely. They had destroyed Mrs. Larkins' reputation, and damaged her students, and had spread rumors of guns and violence so that a growing number of teachers were frightened. Ominously, these teachers still had the full support of the administration.

Mrs. Larkins said that she would be happy to help her substitute, but that a meeting needed to be held to discuss how she would be protected from further false accusations. Mr. Werlin offered a twenty-minute meeting. Mrs. Larkins said that would not be sufficient. Mrs. Larkins went to school to help her substitute on March 26, 2001, and was welcomed by Principal Donndelinger.

### C.    MARCH 27, 2001--PETITIONER WAS TOLD NOT TO RETURN TO DISTRICT PROPERTY.

On March 27, 2001, Mrs. Larkins went to school again, to attend a meeting with Dr. Donndelinger and parents about her situation. Dr. Donndelinger admits that she did not tell Mrs. Larkins on March 26 that she shouldn't come to school. Dr. Donndelinger admits she welcomed Mrs. Larkins on March 27, 2001. But Dr. Donndelinger did not allow Mrs. Larkins to attend the meeting of which she herself was the topic! Mrs. Larkins told Dr. Donndelinger that the charges that she was going to kill people were very serious and needed to be discussed before she could come back.

Dr. Donndelinger called Mr. Werlin, who came and took Mrs. Larkins to a place outside the gate of the school where there were no witnesses. He said a few pleasantries,

_____7_____

1    then stood silent. Mrs. Larkins left because he seemed to want her to leave, although he

2    didn't say so. Petitioner's account of the event appears on page 340 of the hearing transcript.

3        After Mrs. Larkins left, Mr. Werlin spread the story to teachers that Mrs. Larkins had

4    come to school without permission. He claims that he told Petitioner, *during the very same*

5

6    *conversation in which he asked her to return to work*, not to set foot on campus. The story

7    he spread was that he had told Mrs. Larkins on March 27 that she had to leave, and that she

8    had gone berserk, exhibiting symptoms which might best be described as some sort of spastic

9    fit.

10        If Mr. Werlin's story were true, wouldn't Mr. Werlin require Mrs. Larkins to undergo a

11    psychological examination under the Ed.Code Section 44942, or at least be checked by a

12    medical doctor for motor or neurological disorders? But in order to require a fitness-for-duty

13    evaluation, Mr. Werlin would have had to put his March 27 story down in writing and give it

14    to Mrs. Larkins. He required nothing but a Kaiser return-to-work form.

15

16        Petitioner believes that the first obligation of the District is to protect the safety of

17    children and adults. Mr. Werlin never took any action to protect anyone from physical

18    danger. He never, not once, interviewed Mrs. Larkins after February 12, 2001. He never

19    required a fitness-for-duty evaluation. He never questioned Mrs. Larkins' accusers.

20

21        On March 27, 2001, Mr. Werlin apparently decided that Mrs. Larkins would never

22    come back. He testified at her termination hearing that she never did return to work after this

23    alleged incident. The District's lawyer had to prod him to get him to remember that just

24    eight days after this alarming incident, he had asked her to return to her classroom. One can

25    understand Mr. Werlin's confusion on the witness stand. He had just described Mrs.

26    Larkins' behavior as bordering on psychosis (Court Reporter's transcript page 65:25 to page

27

28                                              8

66:9), and then he was called upon to describe how, just eight days later, he had asked her to come back to work.

Mr. Werlin's testimony fell flat. He had no explanation for this.

Mrs. Larkins' testimony explains what happened. Mrs. Larkins sent Mr. Werlin a five-page fax on April 3, 2001. The next day Mr. Werlin asked her to return to work. The full five-page April 3 fax is not among the exhibits, however, in addition to Exhibit 17, which is the first page of the fax, we have Exhibit R-28, page 17, which is the second page of the fax. The other three pages of the fax consisted of the remaining pages of the restraining order against Kathleen Elton.

Kathleen Elton

On April 3, 2001, Mrs. Larkins had begun to suspect that the allegations about her might have originated with her ex-sister-in-law, Kathleen Elton. Ms. Elton was homeless and unemployed when Mrs. Larkins allowed her to stay in a building which had belonged to Mrs. Larkins' deceased father.

About the same time, Mrs. Larkins found that her own brother, who was co-administrator with Mrs. Larkins of their father's estate, had deceived her about the amount of money taken by him out of estate accounts. She told him not to take any more money out, and he became enraged.

Perhaps in an effort to prove the hypothesis that no good deed goes unpunished, Ms. Elton, who has experience as a stage actress, and her ex-husband, Mrs. Larkins' brother, told police that Mrs. Larkins was trespassing on her deceased father's property. Ms. Elton told police that Mrs. Larkins had a gun, and convinced them that Mrs. Larkins was a dangerous person. The police stormed the building and arrested Mrs. Larkins.

9

1    It is clear from the evidence regarding the District's dramatic reaction to Mrs.

2  Larkins' April 3, 2001 fax, Exhibit 17, that the District had utilized the police report about

3  Mrs. Larkins as a basis for its action against Mrs. Larkins on February 12, 2001. As it

4  happens, it is a misdemeanor to utilize a record of an arrest which did not lead to a conviction

5
6  to determine any aspect of an individual's employment (Labor Code section 432.7).

7    It is understandable that the District did not want the truth revealed about this. But it

8  could and should have made sure that the accusers understood that the false allegations

9  would not be allowed to continue. so that she could go back to work in peace.

10    Instead, Richard Werlin prepared the ground for Mrs. Larkins to be taken out again.

11  He started on the very day he asked her to return to work.

12
13 **APRIL 4, 2001--PETITIONER WAS ASKED TO RETURN TO HER CLASSROOM**

14 **WITHOUT ANY INVESTIGATION.**

15    Mr. Werlin seldom puts things in writing. He made no written record that Mrs.

16  Larkins was asked on April 4, 2001 to return to work, and that she did return to work after

17  spring break. He later told the clerk in the payroll office to record that Mrs. Larkins had

18
19  never come back to work at all in April 2001. However, there is a document which confirms

20  that Mrs. Larkins was asked back. It is Exhibit 19, Dr. Donndelinger's April 6, 2001 letter to

21  parents

22    Mr. Werlin's April 4, 2001 letter to Mrs. Larkins (Exhibit 18) is an example of an

23  instance where Mr. Werlin violated his own policy of not putting things in writing.

24  Unfortunately, the document is entirely deceptive. This April document states that Mrs.

25
26  Larkins is being placed on administrative leave in February! It deceptively orders her to stay

27  away from all district property, when the cabinet of CHULA VISTA ELEMENTARY

28                                                10

1  SCHOOL DISTRICT had already made the decision to ask her to return to work. Mrs.

2  Larkins understood Mr. Werlin's feelings of humiliation and frustration when he found that

3  the cabinet felt he had made a mistake on February 12, 2001. But Mrs. Larkins failed to

4  perceive the depth of his anger.

5
6  Mr. Werlin's April 4 letter is a clear attempt to create a hostile work environment for

7  Mrs. Larkins. In hindsight, Mrs. Larkins realizes that she was doomed from the moment she

8  received that letter. She went back to work expecting that allegations that she was going to

9  kill people would subside. They did not. Werlin had been working to create an atmosphere

10  of hysteria at Castle Park Elementary School.

11
12  Staff members were not encouraged to welcome her back to campus. Maria Beer's

13  notes (page 22 of Exhibit R 28—in evidence) show that show Dr. Donndelinger said, "We

14  are not answering questions now. You will have a chance to air your concerns at a mediated

15  meeting." Before Mrs. Larkins returned to work in April, no meetings were held with

16  teachers to tell them that the allegations that Mrs. Larkins had a gun or that Mrs. Larkins had

17  behaved as if she would kill teachers groundless. Teachers were not asked to retract their

18  accusations. There was no effort to prevent more false accusations, in fact, just the opposite

19  effort was made. On March 28, 2001, the administration told Jo Ellen Hamilton and Kathy

20  Bingham, "Maura Larkins' behavior is irrational. She is not permitted on campus or any

21  campus until further notice" (Exhibit 14 page 24).

22
23  Some teachers were nervous, perhaps out of guilt, perhaps because Mr. Werlin

24  whipped up fears with his story of March 27 spastic behavior which he has never retracted.

25  Petitioner now knows that there were allegations that Mrs. Larkins had a gun. Mr. Werlin

26  did not deny these allegations. The District, in the entire year that passed before voting for

27
28  _____11_____

2 2

dismissal, never asked or allowed Mrs. Larkins to hear the allegations against her or respond to them. Only one teacher ever presented his allegations (See Alan Smith's notes--Exhibit R 24).

When Mrs. Larkins went back to work on April 16, 2001, Linda Watson, in particular, had apparently decided to make up some stories which would retroactively justify her February 12, 2001 phone call. She was clearly afraid of being found out to have made a false accusation. According to page three of her own notes in evidence, she was worried about a lawsuit. And she managed to throw herself into a tizzy with worries that she would have to take a lie detector test. She did not get that idea from Mrs. Larkins.

**E. APRIL 20, 2001--PETITIONER WAS TOLD NOT TO RETURN TO DISTRICT PROPERTY.**

Petitioner wasn't allowed at a meeting in Dr. Donndelinger's office on April 20, 2001 of which she was the topic of discussion--even though she was sitting outside door waiting.

At that meeting Karen Snyder says that the staff is afraid she might have a gun (Exhibit 14, page 40). Mr. Werlin left the fear hanging in the air.

Mrs. Larkins was sent home without ever being allowed to speak, and within a couple of hours was told she was on administrative leave again.

**F. APRIL 21, 2001--A POLICE PRESENCE WAS ESTABLISHED AT CASTLE PARK ELEMENTARY SCHOOL WHICH CREATED AN IMPRESSION IN THE COMMUNITY THAT PETITIONER WAS DANGEROUS**

Exhibit 14 page 44 shows an intentional effort to create hostile environment by making a show of bringing police on campus when Mrs. Larkins wasn't even going to be there, as if they were afraid she'd come and do something terrible.

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of Mandate

1     MR. WERLIN used the police to instill physical fear in Mrs. Larkins.

2    **G. JUNE 2001--AT THE REQUEST OF PETITIONER'S ATTORNEY, ASSISTANT**

3    **SUPERINTENDENT WERLIN AGREED TO INVESTIGATE ALLEGATIONS**

4    **AGAINST PETITIONER.**

5

6     One of the most significant things in this case is that the district never heard Mrs.

7    Larkins story—never given a chance to hear and respond to allegations—although the fact

8    that she was asked back after each set of allegations indicates they didn't believe the

9    allegations themselves.  The distric encouraged teachers to come up with allegations by

10    frightening them, and making sure they knew they wouldn't have to face the person accused.

11    Mr. Werlin was allowed to investigate Mrs. Larkins' claims of his dishonesty and violations

12    of the contract.  The District failed to supervise the supervisor.  Mr. Werlin never put the

13

14    March 27 story on the record until after Mrs. Larkins filed suit.

15     Mr. Werlin failed to keep his promises to Mrs. Larkins' attorney that there would be

16    an investigation.  On page 761 of the Court Reporter's transcript Mr. Werlin states: "And we

17    agreed that we would continue at future meetings to attempt to get other teachers to come in

18    and to have dialogue so that there was no misunderstanding of what Ms. Larkins was being

19    accused of."  On page 768, Mr. Werlin: "I'm not sure about the specific time lines, but I did

20

21    make a commitment to her that I would attempt to get the teachers to both meet with Ms.

22    Larkins, and also, if necessary, to try to get some written statements from them."

23     Mr. Werlin agreed that Petitioner would respond after she had heard all the

24    allegations.  The only allegations she heard were Al Smith's (Exhibit R-24)  The District did

25    not take all steps necessary to return Mrs. Larkins to work.   Mr. Werlin never completed

26

27    investigation as he had agreed.

28

13

2 4

**H. JULY 2001--THE SUPERINTENDENT REFUSED THE REQUEST OF THE**

**EXECUTIVE DIRECTOR OF THE TEACHERS ASSOCIATION TO REMOVE**

**WERLIN AS SUPERINTENDENT'S DESIGNEE FOR HANDLING PETITIONER'S**

**GRIEVANCES; THE TEACHERS ASSOCIATION MADE NO FURTHER**

**DEMANDS ON THE DISTRICT.**

**I. AUGUST 13, 2001--PETITIONER WAS TOLD SHE WOULD BE ON**

**ADMINISTRATIVE LEAVE THE FOLLOWING YEAR, AND WOULD NOT BE**

**ALLOWED TO TEACH IN ANY CLASSROOM.**

Mr. Werlin did not offer Mrs. Larkins employment for the following year, and in fact told her in August she would not be allowed to teach at any school in the fall, but would be on administrative leave. In the hearing he denied this. On Page 770 of the Court Reporters Transcript he was asked, "Did you correspond with Ms. Havird to disabuse her of this particular view that is stated in the letter?" Mr. Werlin said :I don't recollect. (The District did not produce any evidence regarding any such letter from Mr. Werllin.)

**J. SEPTEMBER 2001--WERLIN BEGAN FAXING PETITIONER WHEN HER**

**LAWYER WAS OUT OF TOWN, DEMANDING THAT SHE COME IN AND**

**MEET WITH HIM; PETITIONER REFUSED.**

Mr. Werlin was not authorized by the contract to transfer Petitioner involuntarily. The purpose of any meeting with Mr. Werlin is suspect.

The Superintendent never made any attempt to supervise Mr. Werlin. She left Mrs. Larkins in his personal control, even after Mrs. Larkins had filed grievances and written letters ( Exhibit 41) about his hostile and dishonest and illegal behavior.

14

The only meetings Mrs. Larkins refused to attend were those with Mr. Werlin. It is shameful that both the Superintendent and the Board completely ignored Petitioner's serious accusations against Mr. Werlin. He did not offer to meet with her with others present until he had suspended her without pay.

**K. SEPTEMBER 2001--PETITIONER AND HER ATTORNEY EACH WROTE SEVERAL LETTERS TO THE DISTRICT REGARDING THE DANGER TO PETITIONER FROM MR. WERLIN.**

**L. SEPTEMBER 26, 2001--PETITIONER'S PAY WAS STOPPED; SHE REQUESTED A FULL EVIDENTIARY HEARING TO WHICH SHE WAS ENTITLED BY THE CONTRACT REGARDING HER SUSPENSION WITHOUT PAY; THE DISTRICT REFUSED.**

Only after he placed her on suspension without pay did Mr. Werlin offer to have other administrators present at a meeting with Mrs. Larkins. Mrs. Larkins asked to meet with the Superintendent. She was entitled to a full evidentiary hearing. The DISTRICT refused to give her the hearing, claiming falsely that she was not suspended without pay. (She was not allowed to set foot at any school on September 26, and she wasn't paid—she was clearly suspended without pay.)

The district never made any determination as to whether the charges against Mrs. Larkins were true. Two things are possible—the District took a completely innocent person out of her classroom twice, and destroyed her reputation, and never investigated or retracted the accusations. The other possibility is that the District took a potential mass murderer out of her classroom twice—but then asked her to come back again and again without ever investigating! Either way, they failed grievously in their obligation as holder of a public

_15_

1  trust, and they violated Mrs. Larkins rights, and are not justified in dismissing an employee

2  whom they admit is highly qualified and has no mental or physical problems.

3  **M. OCTOBER 5, 2001--PETITIONER WAS TOLD TO REPORT BACK TO WORK;**

4  **PETITIONER SAID SHE WOULD NOT RETURN UNTIL THERE HAD BEEN**

5
6  **AN INVESTIGATION.**

7      Mrs. Larkins attended every meeting the Superintendent asked her to attend.

8  The Superintendent never investigated Mrs. Larkins' allegations.

9      Maria Beers testified many people feared Mrs. Larkins would come and shoot them

10 all.

11 **N. NOVEMBER 13, 2001--PETITIONER FILED 3 GRIEVANCES**

12
13 **O. NOVEMBER 14, 2001--PETITIONER WAS THREATENED WITH DISMISSAL.**

14 **P. NOVEMBER 21, 2001--MR. WERLIN GAVE PETITIONER THE ONE AND**

15 **ONLY REPORT HE EVER PREPARED ABOUT HER SITUATION; IT**

16 **CONTAINED NOTHING MORE THAN GENERAL ALLEGATIONS, WITHOUT**

17 **ANY SPECIFIC DATES, WORDS OR ACTIONS ON WHICH THE ALLEGATIONS**

18 **AGAINST HER MIGHT HAVE BEEN BASED.**

19
20 **Q. NOVEMBER AND DECEMBER, 2001--PETITIONER WROTE LETTERS TO**

21 **ONE COLLEAGUE, ADMINISTRATORS, AND SCHOOL BOARD MEMBERS,**

22 **ATTEMPTING TO PREVENT A LAWSUIT BY ASKING THOSE INVOLVED**

23 **TO REVEAL THE TRUE REASONS FOR FALSE ALLEGATIONS AGAINST**

24 **HER, BY ASKING THE DISTRICT TO MITIGATE HER DAMAGES BY**

25 **PAYING HER, AND BY ASKING THE DISTRICT TO AMELIORATE THE**

26
27
28

_____16_____

EXCEEDINGLY HOSTILE WORK ENVIRONMENT TO WHICH SHE HAD

BEEN ASKED TO RETURN; SHE WAS IGNORED BY ALL.

R.  DECEMBER 2001--PETITIONER'S GRIEVANCES WERE SUMMARILY

DENIED BY MR. WERLIN.

S.  FEBRUARY 2002--PETITIONER FILED A PERB CHARGE AGAINST THE

DISTRICT.

T.  MARCH 2002--PETITIONER FILED A LAWSUIT AGAINST THE DISTRICT.

U.  MAY 7, 2002--THE SCHOOL BOARD VOTED TO DISMISS

PETITIONER—SEVEN MONTHS AFTER SHE REFUSED TO REPORT TO

WORK;  IT HAD NO REASON TO DISMISS HER SINCE SHE WASN'T

WORKING AND WASN'T BEING PAID; ITS MOTIVE WAS CLEARLY

RETALIATION

    The District was happy to keep everything quiet, as long as Mrs. Larkins stayed home

and wasn't paid.  But when Mrs. Larkins filed suit, the District figured that a good offense

was the best defense.

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of Mandate

## II. THE COMMISSION ABUSED ITS DISCRETION.

The proceedings were undermined by bad faith, fabrication by the COMMISSION, and failure to consider evidence, even denial that evidence existed when it was actually undisputed evidence that had been accepted into evidence.

THE COMMISSION DID NOT PROCEED IN THE MANNER REQUIRED BY LAW. The COMMISSION misconstrued the law, accepted evidence which should not have been accepted, and took it upon itself to violate Petitioner's constitutional rights on behalf of the school district.

Many of the decisions "factual findings" are actually allegations by the COMMISSION regarding which no evidence was presented.

Of the 16 Legal Conclusions, 1, 7, 8, 9, 11 and 16 are invalid because they are based on implied findings, and/or on findings which are not supported by evidence, and/or on misconstruction of the law,

Legal Conclusions 2, 3, 4, 5, 6, 10, 14, and 15 are valid in themselves but were misconstrued by the COMMISSION in reaching its decision.

The Commission's decision is so self-contradictory that one wonders if it didn't just decide it wanted to dismiss Mrs. Larkins from her employment because she filed a lawsuit, and then left it up to the judge to come up with 22 pages of allegations. The findings do not merely ignore undisputed evidence, they boldly state it doesn't exist.

## III. THE COMMISSION'S FINDINGS ARE NOT SUPPORTED BY THE EVIDENCE

The District and the COMMISSION have latched on to any excuse they can lay their hands on to justify District actions which were complete mistakes. The goal of the District

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of Mandate

and the COMMISSION seems to be to smear Mrs. Larkins with unfounded allegations, in order to create the illusion that the District's actions were justified.

In some instances the COMMISSION findings are obviously fabricated; in other instances, the fabrications are less obvious, but equally, or possibly more, significant.

With 103 Findings of Fact, the COMMISSION managed never once to mention the fact that this case is about someone whom many teachers feared would "come to school and kill them all." Somehow, the COMMISSION felt it could completely ignore this fact. Ironically, the teacher who was twice ordered to stay off school property, is being dismissed for NOT coming to work.

To make its finding of Legal Conclusion 11, the COMMISSION ignored the evidence which fulfills the requirements for a hostile work environment as set forth in Legal Conclusion 10: The COMMISSION failed to consider:

(1)     "The nature of the unwelcome acts." The actions taken against Mrs. Larkins by Mr. Werlin were extremely serious. He participated in and encouraged serious false allegations, which escalated and increased in number, and he removed her from her classroom twice based on false allegations. Mrs. Larkins could not safely return to work.

(2)     "The frequency of the offensive encounters." The hostile acts were remarkable in their frequency. After the first action taken against Petitioner on February 12, the second event occurred after only one week back at work. This is a very high level of frequency for being taken out of one's classroom on charges that the district now claims have nothing to do with this dismissal. They have everything to do with why Petitioner was afraid to go back to work.

19

(3)    "The total number of days over which all the offensive conduct occurred." To this day the District has never investigated or retracted the allegations that Petitioner was going to kill teachers. At this time the belief among many teachers in the District is that Mrs. Larkins might come to school and shoot them all. This work environment is too hostile for Mrs. Larkins to dare set foot in the district.

(4)    "The context in which any offensive conduct occurred." The context was a campaign by Mr. Werlin to destroy Mrs. Larkins' career. The evidence is overwhelming that he slandered her to teachers and the principal of Castle Park Elementary School, and solicited allegations against her, and promised her accusers that they would never have to face the accused.

The environment was hostile because Mrs. Larkins was refused protection of the contract, CVE wouldn't arbitrate although it admitted it was wrong for Mr. Werlin to handle, Werlin had total personal, arbitrary control over her, including the ability to make absolutely any allegation about her and act on it, with no oversight by Superintendent or CVE.

On page 865 of the Court Reporter's transcript, Petitioner's counsel explained that the "hostile environment" concept was not being used in this case as a "sword," a complaint used to establish liability of the employer, but as a defense against a charge filed by the employer.

**LEGAL CONCLUSION 7.** Mrs. Larkins Was Guilty of Insubordination (Persistent Violations of Distsrict Rules)

**"Mrs. Larkins Was Guilty of Insubordination."**

Factual Findings 50, 53, 56, 59 and 73 declare that documents accepted into evidence and recorded in Judge Ahler's own handwriting do not exist. (See Clerk's Record)

20

1    **Factual Finding 50** is contradicted by Exhibit 62, Pamela Havird's letter to Mr. Werlin

2    dated September 10, 2001.

3    **Factual Finding 53** is contradicted by Exhibit R 34.

4    **FACTUAL FINDING 56**:

5    The first part of the letter is a repeat of the information in the September 17 letter, to which

6    Pamela Havird had already responded one day earlier, in her September 19, 2001 letter

7    (Exhibit R34); the second part of the letter was answered by Mrs. Larkins on September 27,

8    2001 (Exhibit 33).

9    **FACTUAL FINDING 59**:

10   The COMMISSION outdid itself in making this finding.  In this finding the

11   COMMISSION denies the existence of not just one but *six* responses sent by MRS.

12   LARKINS to the district.  Five of these responses are in evidence (Exhibits 33, sent to two

13   people, Exhibit 41, pages 4 and 5, and Exhibit 36.)  Although the sixth response was not

14   taken into evidence, its existence is proven by other evidence, specifically, the

15   Superintendent's letter answering it **(Exhibit 39, page 5).**

16   **FACTUAL FINDING 73:  Neither Mrs. Larkins nor Attorney Havird provided**

17   **the DISTRICT with any writing suggesting that Mrs. Larkins' refusal to work was**

18   **supported by or justified under the DISTRICT/CVEA agreement.**

19   This finding is contradicted by Exhibit 41, the November 13, 2001 Level I Grievance

20   filed by Mrs. Larkins regarding Safety.   At this time, Mrs. Larkins was entitled to a full

21   evidentiary hearing regarding the September 26 change from administrative leave to unpaid

22   suspension.   this pay stoppage was a violation of the contract for several reasons, as Mrs.

23   Larkins points out in Exhibit 37.

21

**The following sentence in LEGAL CONCLUSION 11 (page 25 of the decision) is simply preposterous: "The conduct Mrs. Larkins complained about did not prevent her from meeting her teaching responsibilities."**

What hearing were these three triers of fact attending?

The hostile environment Mrs. Larkins complained about was the one where she was repeatedly placed on administrative leave any time someone made up a story. This was done twice, within two-and-a-half months. The tiniest bit of rational thought applied to the undisputed evidence allows no other possible conclusion than that Mrs. Larkins was thwarted in her ability to fulfill her responsibilities as a teacher when she was on administrative leave. Mrs. Larkins suffered extreme harassment. She was taken out of classroom due to false accusations, the most extreme of which was that she would come to school and kill everybody. The police were called to create an atmosphere of fear. The allegations have never been retracted to this day.

Petitioner was not persistent in the face of opposition. There was no opposition to Mrs. Larkins not reporting to work. The evidence shows that what Werlin writes for the record and what he says in person or on the phone are completely different, for example the shocking contradiction between his April 4 letter and his concurrent personnel action. They asked me on only one occasion, October 5, 2001 to report to an assignment.

**Neither the findings nor the evidence support LEGAL CONCLUSION 11: "To the extent that Mrs. Larkins experienced difficulty at Castle Park Elementary School, Principal Dr. Donndelinger and Assistant Superintendent   Mr. Werlin made reasonable and sincere efforts to accommodate Mrs. Larkins' situation."**

*22*

When Mr. Werlin and Dr. Donndelinger asked Mrs. Larkins to return to school in April, 2001, they did not even assure teachers that Mrs. Larkins didn't have a gun. They did not admit that the accusations against her were false. Teachers had expressed worries; they were "on eggshells," but the administration encouraged their hostility to Mrs. Larkins.

When Mrs. Larkins was asked to return in April of 2001, she didn't know she was returning to a hazardous duty, but it became clear within a week that Werlin would do whatever he had to to find an excuse to remove her again. By the fall of 2001, Mrs. Larkins was fully aware of how hazardous her work environment was.

## IV. THE COMMISSION'S DECISION IS NOT BASED ON ITS FINDINGS.

The COMMISSION's decision is not supported by its findings. The decision is supported by implied findings.

Legal Conclusions 8, 11, and 16 contain allegations by the COMMISSION which are not based on findings. Legal Conclusion 8 states that Mrs. Larkins has a "stubborn, unforgiving nature, a trait of character was not remediable." But there is no finding about whom or what Mrs. Larkins was supposed to forgive and did not forgive. Petitioner filed suit in order to get her job back, not because she failed to forgive anyone.

The findings supported by implied findings. The COMMISSION has not found that there were specific words or actions of Mrs. Larkins to support its conclusions about her character.

The COMMISSION's legal conclusions contradict each other.

According the COMMISSION, no harm was done to Mrs. Larkins. There was no hostile environment, no violation of the contract, no violation of the law against her. But the conclusion that Mrs. Larkins was "unforgiving" implies a finding that there was something to

23

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of Mandate.

3 4

1  forgive. The COMMISSION not only based its Legal Conclusion 8 on implied findings, but

2  those findings don't even support the conclusion—they contradict it. The finding of an

3  "unforgiving nature, a trait of character that was not remediable" is a virtual admission that

4  Mrs. Larkins suffered harm, that Mrs. Larkins did indeed have a hostile environment. This

5  contradicts the statement in the very same Legal Conclusion 8 (and in legal conclusions 7

6

7  and 9) that Mrs. Larkins was insubordinate.

8      Legal Conclusion 11: "A reasonable person in Mrs. Larkins' situation would have

9  continued working and would have reported to work when directed to do so by the

10  Superintendent of Schools." Mrs. Larkins had reported back to work in April of 2001,

11  which seemed reasonable at the time. Within a week Mr. Werlin made his true intentions

12  clear. He was determined to remove her from her classroom, using any flimsy excuse he

13

14  could come up with. What he came up with was Exhibit R-24, Al Smith's notes, and Exhibit

15  20, Linda Watson's notes. In the summer he told he she would not be allowed to teach in

16  any school in the district the following year. When he asked her back in the fall, without an

17  investigation or a single retraction, she knew that it would be downright foolish, much less

18  unreasonable, to expose herself once again to Mr. Werlin's extreme hostility, and absolute,

19

20  arbitrary power over every aspect of her employment.

21      To be banned from every school in the district but one is a mark of Cain which has

22  never been placed on any employee of any school district to Petitioner's knowledge. It is a

23  clear signal that MRS. LARKINS was considered a persona non grata in the district, that she

24  was suspected of being dangerous and disruptive. This was not a hostile environment? How

25  did the COMMISSION determine how a reasonable person would respond? It is such a

26

27

28

24

malicious act, that it is difficult to find anything to compare it with, but it is certainly

comparable to the forms of harassment which have been ruled illegal in countless cases.

**V. THE COMMISSION FAILED TO PROCEED IN THE MANNER REQUIRED BY LAW.**

    A.   **THE COMMISSION MISCONSTRUED THE LAW.**

    1.   **THE COMMISSION FOUND THAT IT IS REQUIRED TO BELIEVE THAT "THE EXISTENCE OF A FACT IS MORE PROBABLE THAN ITS NONEXISTENCE."**

The COMMISSION grievously misconstrued the "preponderance of the evidence" standard of proof.

The COMMISSION states in its decision (Legal Conclusion 1, page 21): "The standard of proof in this dismissal proceeding is a preponderance of the evidence. Petitioner agrees. However, the COMMISSION goes on to state:

**"The "preponderance of the evidence" standard requires a trier of fact to believe that the existence of a fact is more probable than its nonexistence. See, *In re Michael G.* (1988) 63 Cal.App.4th 700."**

This is not a typographical error. This sentence does indeed describe the standard of proof which the COMMISSION used in making this decision. The COMMISSION shockingly misconstrued the meaning of "preponderance of the evidence."

The Administrative Law Judge in this proceeding explained how the COMMISSION would fulfill its responsibility to weigh the evidence: *"... you know, who's right or wrong*

25

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of Mandate.

36

*and cunning and lying at the swimming pool, I don't think that's going to require more than a couple of minutes of discussion*" (page 794 of the Court Reporter's transcript,). This is how the COMMISSION reached its stunning conclusion that Petitioner did not have a hostile work environment and that the District had behaved reasonably.

Petitioner requests Judicial Notice of the *In re Michael G.* decision, from which the COMMISSION claims to have derived this definition of "preponderance of the evidence." Petitioner has been unable to discover a single line in *In re Michael G.* which discusses the meaning of "preponderance of the evidence." Only two mentions of "preponderance of evidence" were found by Petitioner. Under Roman numeral II, in the section titled "Standard of Proof," the court states, "...the Supreme Court of Alaska held the state court preponderance of evidence standard applied." Further on the court states, "Department points out that reasonable services must be proven by clear and convincing evidence... at the 18-month review stage, proof by only *a preponderance of the evidence* is required." The case is about choosing between different standards of proof, not about defining them.

The number of Findings of Fact in this case which fly in the face of undisputed evidence is mind-boggling. The three members of the COMMISSION have signed their names to a compendium of Findings and Legal Conclusions which is staggering in its self-contradictions and outright falsehoods.

All the conclusions in this decision are invalidated by the COMMISSION's reliance on the improper standard of proof described in Legal Conclusion 1.

2.    **THE COMMISSION MISCONSTRUED CALIFORNIA EDUCATION CODE SECTIONS 44932(a)(7), 44932(a)(5) and 44939.**

26

A. The COMMISSION misconstrued the meanings of "persistent" and "reasonable" in the context of "persistent violation of and refusal to obey the school laws of the state or reasonable regulations prescribed by the governing Board" in CALIFORNIA EDUCATION CODE SECTION 44932(a)(7).

B. The COMMISSION misconstrued the meaning of "evident unfitness for service" in CALIFORNIA EDUCATION CODE SECTION 44932(a)(5).

C. The COMMISSION misconstrued "willful refusal to perform regular assignments without reasonable cause, as prescribed by reasonable rules and regulations of the employing school district" in CALIFORNIA EDUCATION CODE SECTION 44939. The COMMISSION construed this section of the law by proceeding as if the word "reasonable" were nowhere to be found.

D. The COMMISSION failed to consider PETITIONER'S Affirmative Defenses, including hostile environment, and to properly construe the law regarding such defenses.

E. The COMMISSION improperly construed the MORRISON criteria.

F. The COMMISSION failed to consider rights of Petitioner according to the contract, the Constitution, and the laws of California.

## DISCUSSION

**PETITIONER'S REFUSAL ON OCTOBER 5, 2001 TO REPORT TO WORK WAS A SINGLE ACT, NOT "PERSISTENT" REFUSAL**

27

1    During the seven months after October 5, 2001, the district never asked Petitioner to

2    come back to work. There was no persistent refusal to a district order. The District asked

3    once, Petitioner refused once. The Superintendent never offered to have a conference with

4    Mrs. Larkins to discuss the reasons for her transfer, as required by the contract, and no

5    investigation was ever conducted.

6

7    The threshold which must be reached in order to dismiss a teacher for violation of

8    Board rules and regulations, or failure to perform regular assignments, was addressed in

9    *Governing Board of the Oakdale Union School District V. Seaman* (1972) 28 Cal.

10   App..3d 77. The COMMISSION cites *Seaman* in legal conclusion 5, but misconstrues the

11   case egregiously.

12

13   *Seaman* applies very pertinently to this case, but supports a decision contrary to the

14   one made by the COMMISSION. The Court in *Seaman* states, "... respondent argues,

15   merely, that each day of appellant's absence was a separate violation of the school board's

16   regulations, and hence that the violation in this case met the "persistent" requirement of

17   subdivision (g) of section 13403...**The argument is specious. This is not a case where it**

18   **is reasonable to say that Mrs. Seaman's absence, by its very duration, amounted to a**

19   **"persistent" [28 Cal.App.3d 83] violation of the governing board's rules. Nor can it**

20   **be fairly said from the evidence presented that the teacher was motivated by an**

21   **attitude of continuous insubordination.** Mrs. Seaman had been employed by the district

22   for eight years, and there is no evidence in the record to prove that she ever violated a

23   school law or regulation of the governing board prior to the incident in question."

24

25   The district and the COMMISSION make the same **specious** argument as the

26   respondent in *Seaman*.

27

28                                      28

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of
Mandate

39

**The COMMISSION misconstrues the case law by ignoring that a particular act rarely constitutes unfitness for service, and certainly does not do so in this case. Petitioner was ready and willing to come back to work as soon as it was safe.**

The case law has insisted that one "particular act" rarely constitutes "evident unfitness for service" and certainly not a "persistent violation of or refusal to obey prescribed rules and regulations

The particular act in this case was when Mrs. Larkins told the District immediately on October 5, 2001, which was the first and only occasion in which the District mentioned a specific school site, that I did not feel safe until an investigation had been done and obviously false allegations retracted. No student was forced to spend a single day without his regular teacher because of my decision. The district had willfully and continually refused to protect me from arbitrary actions due to slanders.

The COMMISSION also ignored the court's definition of "persistent violation" in Seaman by failing to give proper weight to the words "continuing, especially in the face of opposition…constantly repeated." The COMMISSION should have noted that there was no opposition to Petitioner's not reporting to work after October 5, 2001. There was never a letter or fax or phone call asking her to report to work other than October 5, 2001. You notice that not even the November 14, 2001 letter threatening dismissal (Exhibit 42) directs her to report to any assignment. It was made clear at the November 21, 2001 meetings with Mrs. Larkins and her attorney that the District wanted Mrs. Larkins to quit.

The District's efforts to connect this case to *Board of Education v. Matthews* (1957) 149 Cal.App.2d 265 are inappropriate.

29

1    *Matthews* is about a teacher who decided "it was too cold and nasty and foggy up

2    here" (in Richmond), so she had "gone south to get warm." The teacher who drove down

3    to Los Angeles where she stayed for ten days without any further communication, and

4    when the school called, "all (her) interests in Richmond came rushing into (her) brain and

5    (she) did feel ashamed (she) had been gone so long and it dawned then, (she) had been

6    gone longer than (she should have been." The following year there were similar problems.

7

8    The District in its Memorandum (Exhibit J-4), cites *Matthews* to justify all three of

9    its charges against Mrs. Larkins. In so doing, it underlines the fact that all three charges are

10   based on a single act, Mrs. Larkins' refusal on October 5, 2001 to return to work without an

11   investigation and retraction.

12

13   *Matthews* makes it clear that the school authorities do not *have the power to make* an

14   illegal rule. *Matthews* did not concern a hostile work environment. The two cases could

15   hardly be more different.

16   COMMISSION's LEGAL CONCLUSION 4, **"The refusal of a teacher to accept an**

17   **assignment...is, in essence, insubordination,"** fails to allow for laws allowing employees to

18   defend themselves.

19   The COMMISSION misconstrued *Board of Education v. Swan* (1953) 41 Cal.2d 546

20

21   by automatically applying the decision in Swan to this case without recognizing that refusal

22   to accept assignment is not automatically insubordination, but that an employee may defend

23   against a charge of insubordination by establishing that the conduct for which he or she is

24   being dismissed was justified. This COMMISSION incorrectly permits the district to disobey

25   the law and the contract.

26

27

28                              *30*

1    *Swan* concerned a principal who badmouthed the school board at a PTA meeting, and

2    who refused to be demoted to a teaching assignment. Mrs. Larkins was perfectly happy in

3    her teaching assignment for twenty-six years, then in 2001 was taken out of her classroom

4    and sent home twice, for months at a time, because of false allegations. Mrs. Larkins was

5    willing to go back to teaching as soon as it was safe, which required measures to stem the

6    rising tide of hysteria in the District, an end to the District's violations of the Collective

7

8    Bargaining Agreement, and an end to Assistant Superintendent Werlin's total, arbitrary, and

9    abusive control over every aspect of Mrs. Larkins' employment.

10    In *Swan*, the Court clearly states that not all employees are in the same category as

11    Ione Swan. The decision states, "The case of *Hanley v. Murphy*, 40 Cal.2d 572 [255 P.2d

12
      1], is clearly distinguishable. There the superior officer acted without regard for the
13
      prescribed civil service rules, and his alleged bad faith therefore became a material
14
15    consideration in determining the aggrieved employee's rights." Petitioner's contract clearly

16    required a conference, and reasonable necessity, and safety. It clearly allowed her to file

17    grievances, and forbade retaliation by the district when she did so. The law allows her to file

18    a lawsuit. The law specifically forbids retaliation when an employee files a PERB charge,
19
20    and when an employee reports illegal or criminal behavior to a public agency.

21    The Court in *Swan* refers to *Hayman v. City of Los Angeles*, 17 Cal.App.2d 679 [62

22    P.2d 1047] also rules that there are limits on the power of public employers: "Control over

23    public employees is not only a right but a duty, and in the discharge thereof a wide discretion

24    is allowed, *which will not be disturbed until the point of illegality is reached." In* the instant
25
26    case, the weight of the evidence shows that the point of illegality was reached early in 2001,

27    and the illegal actions of the District have been growing in number ever since.

28

31

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of
Mandate

42

## THE COMMISSION MISCONSTRUED PETITIONER'S RIGHTS

The Agreement provides teachers with rights regarding Employee Discipline, Safety, and Transfer which the District violated. Also, the California Ed Code and other laws provide for employee rights.

The COMMISSION's decision violates Petitioner's substantive rights conferred by another agency, and violates constitutional rights and rights under state law and the contract.

California law forbids retaliatory discharge when an employee files a PERB charge. A settlement offer may not be used in a court case. The COMMISSION misconstrued Article 5 of the Collective Bargaining Agreement.

The COMMISSION found in Factual Finding 2: "...Article 5.1 of the DISTRICT/CVEA agreement provided that the DISTRICT *retained all rights and authority to direct the work of its employees*." In making this finding, the COMMISSION ignored the section of Article 5.1 which states, "In addition, the DISTRICT retains the right to hire, classify, assign, promote, lay off, terminate and discipline employees, *except as otherwise provided in this Agreement or by law*." There is a very significant difference between this article and the COMMISSION's interpretation.

Again and again in this decision the COMMISSION demonstrated its belief that the DISTRICT is above the law and the contract. In her June 9 grievance Mrs. Larkins enumerated some laws which had been violated, including freedom of speech and association, due process, telephone eavesdropping, slander, defamation of character. The COMMISSION incorrectly construed the law to mean that the District is not bound by these laws, or, apparently, any laws at all.

32

43

The District and Commission violate Petitioner's right to defend herself, to attempt to settle with those who had wronged her, and to file claims. The District is limited by United States Constitution and the Constitution and laws of California and the contract.

**FACTUAL FINDING 81.** Mrs. Larkins sent letters to several persons identified as expressing concerns regarding Mrs. Larkins' conduct at Castle Park Elementary School. Threats of litigation were set forth in those letters.

Evidence shows Petitioner wrote to only one of her accusers, a person she liked, Michelle Leon-Scharmach. Petitioner testified she couldn't believe Mrs. Scharmach would be in on accusations, and was therefore attempting to settle with her before filing a lawsuit. As a settlement offer Petitioner asked only that Mrs. Scharmach tell her the truth about how the accusations came about.

**FACTUAL FINDING 74:**, which the COMMISSION relied on in part to find Petitioner unfit for service, the COMMISSION makes specific mention of the fact that Petitioner "specifically" named  Mr. Werlin and the Superintendent in her grievances. 75-dismissal threat made day after grievances received—contract says there may be no retaliation for grievances, Article 5 says DISTRICT does not retain rights which have been eliminated in any other part of the agreement, 7.4.1 says "No reprisals of any kind will be taken by the DISTRICT or representatives of the DISTRICT against any grievant." The DISTRICT violates the contract with this decision which dismisses Petitioner for filing grievances.

School Board members, School Superintendents, and Assistant Superintendents, just like Presidents of the United States, must respond in good faith to petitions for redress of grievances from employees and other citizens. Watchfulness in the citizen is the salvation of

33

the state, as it says on the walls of San Diego's Hall of Justice. The use of above-board legal

channels is a more honorable way of behaving than trying to prevail with false and secret

accusations.

**FACTUAL FINDING 83:** The COMMISSION cites as evidence of unfitness the

fact that I filed a lawsuit. Filing a lawsuit is a right protected by the constitution, in the right

to petition for redress of grievances. Petitioner's reputation was destroyed and she was

unable to work. It is a bizarre contradiction saying she is to be dismissed because she did not

report to work, and to say she is unfit for duty at the same time.

**FACTUAL FINDING 103:** The District offered numerous opportunities for Mrs.

Larkins to meet with Assistant Superintendent Mr. Werlin and with Superintendent Gil to

discuss her transfer from Castle Park Elementary School to a more suitable campus. Mrs.

Larkins refused to attend those conferences. In doing so, she waived any right to them. The

District and Superintendent substantially complied with Article 33.5

Undisputed evidence shows that Mrs. Larkins attended every meeting with the

Superintendent which she was offered. She was never offered a conference with

Superintendent Gil until after she wrote to Dr.Gil on September 27, 2001 suggesting that they

meet. Dr. Gil claimed she was not available in September. When Gil finally offered to meet

with Mrs. Larkins on October 5, 2001, Mrs. Larkins and her attorney attended the meeting.

At the meeting, Dr. Gil, in violation of the contract, refused to discuss the transfer.

This Factual finding is not only invalid, it is a ruling on a grievance (Exhibit 40)

which was not even accepted into evidence. Petitioner asks the reviewing court to

invalidate this finding.

34

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of Mandate.

4 5

On page 875 of the Court Reporter's Transcript Petitioner's right to sue is argued. The lawsuit was reason they dismissed she was dismissed, but as counsel argues on page 890, the law allows Mrs. Larkins to sue.

**The COMMISSION misconstrues the law regarding "unfitness for service."**

The COMMISSION has clearly based its conclusion that Petitioner has a "temperamental defect," a "fixed character trait," on the findings that Petitioner filed grievances, wrote letters, and filed a lawsuit.

The COMMISSION and District violate the contract by dismissing Petitioner because she filed grievances. The COMMISSION is amazing in its boldness to actually state that its decision is based on this. The original dismissal threat had been sent one day after Plaintiff filed three grievances, but the district has tried to claim that this was not the reason.

The "fixed character trait" is inferred from the fact that Mrs. Larkins did not return to work under the conditions in effect, which were extremely unusual conditions which very few teachers have been forced to face. It is one decision, one action. She was asked once, illegally, to report to an assignment. The contract clearly requires a conference with the Superintendent, not merely a directive. The Superintendent refused this with the excuse that Petitioner had filed a tort claim. There is nothing in the contract that says it may be disregarded in the event an employee files a tort claim. The tort claim law was created so that government entities would have time to remediate wrongs before becoming subject to a civil lawsuit. The District chose to do nothing to remediate the wrong.

35

1   It was patently unreasonable to ask that in September 2001 Mrs. Larkins

2   place herself in the private and personal charge of Mr. Werlin, an administrator who

3   had made serious, uncorroborated accusations against her, and had taken the actions

4   which the district claimed to want to reverse.  It was grievously unreasonable of the

5   district to put a teacher at such risk, and to make no effort to find out if the

6   supervisor's behavior was dishonest and abusive.  The district failed to supervise

7

8   the supervisor.

9   PETITIONER had reasonable cause to refuse to return to work, and to meet with Mr.

10   Werlin, due to the extreme hostility and danger of each.

11   **THE COMMISSION MISCONSTRUED THE MORRISON CRITERIA AND**

12   **IGNORED EVIDENCE REGARDING MORRISON CRITERIA**

13

14   The Morrison criteria ask the COMMISSION to look at the motives of the teacher that

15   caused her behavior.  Grievances were filed in effort to get district to obey the law.  To honor

16   rights, to honor the values of the American justice system, The flag is a clear symbol of what

17   she was trying to say, No reason to think acts would be repeated if charges retracted before

18   going back. Mrs. Mrs. Larkins taught for twenty-seven years in the district, and never had

19   any problem like this.  She was forced into this by the district.  It was the district's obvious

20

21   goal, and Mr. Werlin was the perfect person to carry it out, to make it impossible for MRS.

22   LARKINS to work in the district.

23   **LEGAL CONCLUSIONS 8, 11 AND 16 (related to unfitness for service)**

24   **The COMMISSION states: "Termination of Mrs. Larkins will not have an adverse**

25   **impact or chilling effect on  Mrs. Larkins' constitutional rights or the constitutional**

26

27   **rights of others."**

28

*36*

47

This will certainly have a chilling and adverse impact on other teachers because the COMMISSION dismissed MRS. LARKINS because she attempted to bring the district into compliance with the law. Petitioner's constitutional right to petition for redress of grievances is violated by the COMMISSION's decision.

This decision dismisses Petitioner from employment on the basis of "evident unfitness for service" because she petitioned for redress of grievances. The findings on which the conclusion regarding her "evident unfitness for service" was based include:

**Factual finding 74:** "...Mrs. Larkins filed additional grievances with the District, specifically naming Assistant Superintendent Werlin and Superintendent Gil in those grievances."

**Factual finding 82:** Mrs. Larkins filed several more grievances against the District in the months that followed.

**Factual finding 83:** On March 11, 2001, Mrs. Larkins filed a lawsuit against the District.

To protect constitutional rights and for the public good, government entities must not assure accusers, as did the District, that they will not have to face those they have accused.

Having courage doesn't mean a person lacks compassion.

Both evidence and testimony contradicts this. Concern for Michelle, Sandra Ornelas, Linda Watson, and, on January 26, 2001, for all who had harassed her.

**Where is the evidence about character?**

Evidence shows Petitioner gave a home to a homeless seventeen-year-old girl in 2001 (Exhibit 51). This is a person without compassion? There is no evidence that Petitioner is

37

unable or unwilling to recognize other people's feelings and needs. It is a baseless slander by the COMMISSION. Plaintiff hopes to be vindicated. That does not mean she is vindictive. The district gave no testimony about what these "interpersonal conflicts" were about. No dates, no names, no description of words or actions. on the basis of these factual findings:

Exhibit 14 page 30 in evidence--compassion for Sandra

Mrs. Larkins stated on page 312 of the Court Reporter's transcript: "I just didn't want to complain about these people to the Assistant Superintendent. It just seemed to be making too big a deal out of it, and that's why I told Dr. Donndelinger (the principal), you know, I didn't want to make that big a deal out of it. 'I just wanted to talk to you first.'"

Page 313 Mrs. Larkins: "...the Comer process is a—it's based on a philosophy whereby everyone is important, every voice is heard, every child, every teacher, every parent, and it was perfect for my situation because I literally was not being heard."

This case has almost no resemblance to Woodland. Mrs. Larkins is clearly different from Mr. Zuber. The only fixed character traits apparent in Mrs. Mrs. Larkins are courage, and faith in the justice system. Al Smith actually accuses Mrs. Larkins of saying, "We need to be positive."

Mrs. Larkins' motives were revealed in her Dec. 4, 2001 letter to Cheryl Cox (Exhibit 47),

"You have been entrusted with the responsibility not only to advance the academic and general wellbeing of the students of the district, but to protect the taxpayers' money from liability due to illegal actions by the district's administration. Actions against me by Mr. Werlin and Libby Gil will probably be very costly to the district. I trust you have fulfilled your obligation to the taxpayers,

*38*

voters and children of Chula Vista by examining my case since I gave notice of intent to sue the district exactly two months ago. I believe this requires reading my five grievances.

"For some reason the school board as a whole appears not to have decided to demand that Mr. Werlin and Dr. Gil obey the contract and the law (surely Mr. Werlin and Dr. Gil would obey such an order?), but I trust you are nevertheless dismayed that yesterday Mr. Werlin dug the district still deeper into the legal morass that he and Libby have created.

"I am concerned that our new director of Human Resources, Tom Cruz, is being tainted by the unfinished business and improper policies of Mr. Werlin. Dr. Cruz knows (or should know) that I am entitled to a hearing regarding my suspension without pay, and that I am entitled to full pay until after the hearing, and that a pay stoppage that is 26-days retroactive is illegal (ten days notice must be given!) Yet this is happening on his watch. I doubt that Mr. Werlin and Dr. Gil would respond positively to him if he were to ask them to obey the law.

"That is why it is incumbent upon you and the other board members to do so. It occurs to me that you, as a long-time principal in Chula Vista, must know these things, Mrs. Cox. I don't recall hearing about wholesale violations of the contract when you were a principal. Why haven't you done anything about this current situation? I'd like to suggest that it's time to clean up Chula Vista School District. The board of education needs to make it clear to the administration that the contract and the law must be obeyed at all times.

39

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of Mandate

50

"A new morality needs to be introduced into the district office and the schools. No more lies. No more slander. No more jostling for personal political power at the expense of children.

"Mr. Werlin's efforts, extreme as they have been, have failed to cover up the facts of my case. This failure has made it clear that truth and justice are the only means for solving this problem. You owe the taxpayers and children of Chula Vista an immediate and intensive investigation of my case."

MRS. LARKINS was doing a public service by making sure they had every opportunity to comply with the law before a lawsuit was filed. A lawsuit causes hurt feelings, as the COMMISSION notes

The COMMISSION ignored evidence that Mr. Werlin was very hostile to Mrs. Larkins, and that he was given complete authority by the DISTRICT to determine every condition of Petitioner's employment. The COMMISSION ignored evidence that Mrs. Larkins and any reasonable person would fear to go into a situation as serious and escalating as the one he created for Petitioner.

The evident unfitness for service is based on insubordination, which is not supported by the evidence nor by the proper construction of the law.

There is no evidence that Petitioner's quest for justice was blind, nor that is was based upon a stubborn, unforgiving nature.

The unsigned, undated letter allegedly written by Michelle Scharmach (Exhibit 7), contains hearsay about Petitioner. Mrs. Scharmach did not testify. It is most likely that this letter was prepared after Petitioner wrote to her saying, "I cannot fault you." Mrs. Scharmach's guilty conscience may have caused her to read it, "I cannot forgive you."

40

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of Mandate.

51

1  or any findingwhichwhich finds that Petitioner failed to forgive a single actionanything or

2  anybody.  One would presume an act must have taken place in order for it to be forgiven.

3  What acts should have been forgiven?  False allegations?  But the COMMISSION has not

4  found one singe allegation to be false, not even the allegation that Petitioner had behaved as

5  if she would kill people.

6

7  **B.  THE COMMISSION VIOLATED THE RULES OF EVIDENCE**

8          There was clear abuse of discretion by the COMMISSION in accepting and relying

9  on evidence which was hearsay, notes which were prepared long after events and presented

10 as contemporaneous notes, an unsigned and undated letter which was slipped into a back-

11 dated report.

12         The District produced documents in late December 2002 for a January 6,

13 2003 hearing. Pages were missing: Bate-stamped pages 39 and 55 in particular.

14 There was not time to compel complete production.  Petitioner asks that these be

15 produced and introduced into evidence.

16

17         Many, if not most, of the notes produced by Principal Donndelinger were

18 prepared long after the date to which they refer, most likely after the District was

19 sued. Dr. Donndelinger's notes dated March 26 include the words, "I later tried to

20 call her that evening at home." The words *that evening* indicate that these notes

21 were prepared a while later.  They should not have been admitted into evidence

22 without some claim of memory impairment and some explanation of why the

23 original notes were not produced for some dates.

24

25         The "library incident" was reported three months after the fact by Mrs.

26 Scharmach and Ms. Del Galdo.  Dr. Donndelinger's notes about it were prepared

27

28                                    41

long after the report, which occurred long after the alleged "incident." On these

notes, (Exhibit 14, pages 1 and 2). Dr. Donndelinger wrote at the top of the page,

"Around 9/21/00." In the middle of the page she wrote, "About one month later."

On the next page she wrote, "Lynne and Michelle told me before Christmas."

These are obviously notes written long after the incident, and should not have been

accepted into evidence.

Neither Mrs. Scharmach nor Ms. Del Galdo testified. Mr. Werlin's and Dr.

Donndelinger's testimony is hearsay.

Mrs. Scharmach's letter about the incident (Exhibit 7) is not acceptable because it is

hearsay, it is unsigned, undated and was added to Mr. Werlin's November 21, 2001 report

(Exhibit R-35), and produced *after Mrs. Larkins filed suit against the District.* Exhibit R-35

is the actual report given to Mrs. Larkins on November 21, 2001. Exhibit 44 is the same

report excet it has been revised so as to make a reference to the Scharmach letter, and has

been back dated to October 4, 2001 (see page 423 of Court Reporter's Transcript). Mrs.

Scharmach did not testify as to the date or the validity of the letter, nor did she sign it. Mrs.

Larkins testified that the real report was Exhibit R35 ( pages 420-423 of Court Reporter's

transcript). It is most likely that this letter was prepared after Petitioner wrote to her saying,

"I cannot fault you." Mrs. Scharmach's guilty conscience may have caused her to read it,

"I cannot forgive you."

FACTUAL FINDING 28—Invalid—relying on hearsay of hearsay. Mrs. Larkins

testified that Kathy Bingham said that Mrs. Larkins might have poisoned food. Mrs.

Larkins did not testify to having told a joke to Kathy Bingham. Kathy Bingham did not

testify. Maria Beers was not present at either time when Mrs. Bingham or Mrs. Larkins

42

1   spoke of poisoned food. The COMMISSION is relying on Maria Beers hearsay of some

2   unknown person's hearsay.

3       Mr. Werlin's and Dr. Donndelinger's testimony about events they did not witness,

4   and what others said that someone said, and even what someone said to them, is hearsay.

5   This hearsay should not be relied upon for findings.

6

7       No hearsay, or hearsay of hearsay, should be relied upon for findings.

8       Petitioner requests that Exhibit 40, a grievance regarding Transfer, pertaining to

9   Article 33 of the Collective Bargaining Agreement be entered as evidence. The Commission

10  chose to rule on this grievance, without the grievance itself being taken into evidence. Also,

11  Petitioner asks that the appropriate Article from Exhibit 6, the Collective Bargaining

12  Agreement, be entered into evidence in order to rule on this grievance.

13

14      The Commission, in Factual Finding 17, ruled on the facts in Grievances 1 and 2

15  regarding Employee Discipline (Exhibits 26 and 30). Petitioner asks that Exhibit be taken

16  into evidence. Petitioner asks that Article 38, Employee Discipline, be accepted into

17  evidence in order to decide the grievance.

18      The Commission also ruled on the Safety Grievance. Petitioner asks that the court

19

20  review the decisions on the grievances. Alternatively, Petitioner asks the court to invalidate

21  the findings.

22      Notice of Logdment is attached. Exhibit Books and Court Reporter's

23  Transcript and court record are attached as exhibits and incorporated by reference

24

25

26  5/12/03                    Maura Larkins

27                             Plaintiff in proper

28                 43

Petitioner's Memorandum of Points and Authorities in Support of Petition for Writ of
Mandate                                                                    5 4

MAURA LARKINS
1935 Autocross Court
El Cajon, CA 92019
619 660 6955

Plaintiff in pro per

CI... ... OFFICE 18
CENTRAL DIVISION

2003 MAY 12 P 3: 56

CLE... ...RIOR COURT
... ... COUNTY, CA

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN DIEGO

MAURA LARKINS,
  Petitioner,

    vs.

COMMISSION ON
PROFESSIONAL COMPETENCE
  Respondent

CHULA VISTA ELEMENTARY SCHOOL
DISTRICT, Real Party in Interest

) Case No.   GIC    **810661**
)
)
)
) **PETITION FOR WRIT OF**
) **MANDATE (CCP sections 1085,**
) **1094.5)**
)
)
)
)
)
)
)
)

    MAURA LARKINS hereby petitions for issuance of a writ of mandate under Code of

Civil Procedure sections 1085 and 1094.5 as follows:

    1. MAURA LARKINS is an individual residing in the County of San Diego,

California, and is the Respondent in an administrative proceeding regarding her dismissal as

a certificated permanent employee of CHULA VISTA ELEMENTARY SCHOOL

DISTRICT.

    2. Respondent COMMISSION ON PROFESSIONAL COMPETENCE, hereinafter

referred to as the "COMMISSION," is a transitory administrative body duly authorized and

organized under the laws of the State of California, in accordance with Education Code

1

Petition for Writ of Mandate

55

section 44944. The COMMISSION consists of an administrative law judge and two certificated school employees. The COMMISSION was constituted for the limited purpose of conducting a hearing regarding whether the DISTRICT had a legal right to dismiss Petitioner LARKINS from her position as a certificated permanent employee of CHULA VISTA ELEMENTARY SCHOOL DISTRICT.

3. Real party in interest CHULA VISTA ELEMENTARY SCHOOL DISTRICT, hereinafter referred to as the "DISTRICT," is a public school DISTRICT organized and operating pursuant to the Constitution and laws of the State of California, and is governed by a five-member Board of Education.

4. On June 5, 2002, a written accusation was served on Petitioner MAURA LARKINS charging that cause existed to dismiss her as a certificated permanent employee of the DISTRICT based on persistent violation of and refusal to obey the school laws of the state or reasonable regulations prescribed by the Governing Board, evident unfitness for service, and willful refusal to perform regular assignments without reasonable cause.

5. MAURA LARKINS requested a hearing pursuant to Education code section 44944 and Government Code sections 11500 *et seq.*

6. A hearing in the matter pursuant to Petitioner MAURA LARKINS's request was commenced on January 6, 2003 and continued through January 10, 2003.

7. On February 11, 2003, the COMMISSION mailed to the DISTRICT and to MAURA LARKINS its written decision that MAURA LARKINS should be dismissed. A copy of said decision is attached as Exhibit A.

2

Petition for Writ of Mandate

8. Respondent's decision is invalid under the Code of Civil Procedure section 1094.5 and Respondent committed a prejudicial abuse of discretion in that it has not proceeded in a manner required by law.

9. Respondent's decision is invalid under the Code of Civil Procedure section 1094.5 and Respondent committed a prejudicial abuse of discretion in that and its decision is not supported by the findings.

10. Respondent's decision is invalid under the Code of Civil Procedure section 1094.5 and Respondent committed a prejudicial abuse of discretion in that its findings are not supported by the evidence.

11. The COMMISSION had discretion to determine the relevant facts.

12. The hearing was required by law to be held for the determination of those facts.

13. Evidence was required to be taken at the hearing.

14. According to Education Code section 44945, the court, on review, must exercise its independent judgment on the evidence.

15. There is no other plain, speedy or adequate remedy in the ordinary course of law available to Petitioner.

16. This Petition seeks Administrative Mandamus in accordance with Code of Civil Procedure section 1094.5, and in light of the fundamental right involved, the independent judgment test applies. Alternatively, this petition seeks writ of Mandate pursuant to Code of Civil Procedure section 1085.

17. This Petition is based on and supported by the attached Memorandum of Points and Authorities.

Prayer for relief

WHEREFORE, Petitioner prays:

1. For a writ of mandate directing the COMMISSION to set aside its decision, and further ordering that MAURA LARKINS be reinstated in her position as a credentialed permanent employee of the district;

2. For attorney's fees and costs of the administrative hearing on this matter, and for the costs of this petition;

3. For other and further relief as the Court may deem proper.

May 12, 2003

Maura Larkins, Petitioner

VERIFICATION

I, MAURA LARKINS, am the petitioner in the above-entitled proceeding. I have read the foregoing petition and know the contents thereof. The same is true of my own knowledge except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

May 12, 2003

Maura Larkins, Petitioner

4

58

# EXHIBIT 3

1   BEFORE THE COMMISSION OF PROFESSIONAL COMPETENCE

2    CHULA VISTA ELEMENTARY SCHOOL DISTRICT

3   COUNTY OF SAN DIEGO, STATE OF CALIFORNIA

4

5         CERTIFIED COPY

6 _____ )

7 In the matter of the Accusations) Case No. L-2002050728
 against         )

8            )
     MAURA LARKINS  )

9            )
     Respondent.   )

10 _____ )

11

12

13

14     Reporter's Transcript

15     San Diego, California

16     January 6, 2003

17     (Volume 1)

18

19

20

21

22

23 Reported By:      815 Mission Avenue
            Suite 207

24 JEAN S. ALFAFARA   Oceanside, CA  92054
 C.S.R. #7418     (800) 524-2454

25         (760) 967-1797  60

1                    INDEX OF WITNESSES

2                                                        BY THE
     FOR DISTRICT    DIRECT    CROSS    REDIRECT    RECROSS    COURT
3

4    WERLIN, RICK       35      128        184        193

5    DONNDELINGER,      197
     GRETCHEN
6

7                    INDEX OF EXHIBITS

8                                        FOR              IN
     JOINT EXHIBIT                   IDENTIFICATION    EVIDENCE
9
       1 - Stipulation of jurisdictional facts              9
10

11                                       FOR              IN
     DISTRICT'S EXHIBITS              IDENTIFICATION    EVIDENCE
12
       6 - Collective bargaining agreement      105
13         between the School District and
           the Chula Vista Educators
14
       7 - Document to Dr. Donndelinger                     128
15         from Michele Leon-Scharmach

16     8 - 1/17/01 note to Maura Larkins                    206
           from Gretchen
17
       9 - 1/23/01 letter to Dr. Donndelinger               215
18         from Maura Larkins

19    11 - 1/26/01 letter to Dr. Donndelinger                59
           from Maura Larkins
20
      12 - 2/5/01 note to Maura Larkins                     215
21
      14 - 48 pages of handwritten notes          204
22
      15 - 3/6/01 letter to parents with                    234
23         a handwritten notation

24    16 - 3/29/01 letter to parents                        234

25                                                         61

1    model for instructional improvement.

2              According to this letter, it would appear that

3    it's to resolve issues. I don't know that to be the

4    fact.

5              THE COURT: Okay. Thank you.

6    BY MR. BRESEE:

7         Q   When you saw this letter, did you step back

8    and -- "this letter" being Exhibit 11 -- did you step

9    back and decide not to get involved at that point?

10        A   I felt like I didn't have any other option. I

11   was still concerned, but I did step back because

12   unless -- unless there is an agreement for

13   bi-participation, then it doesn't take place, so yes, I

14   did step back.

15        Q   Did you at some point after seeing this letter

16   in not getting involved become aware of this issue at

17   Castle Park again subsequently?

18        A   Yes, I did.

19        Q   Do you recall the when the next time you heard

20   about the issues at Castle Park was?

21        A   I don't have the exact date, but it was

22   sometime shortly after this that there was -- I received

23   a phone call from the teacher.

24        Q   Who was the teacher?

25        A   Jo Ellen Hamilton.

62

1    Q   And where and when was this phone call

2  received?

3    A   I received the phone call at my home on a

4  Saturday evening at approximately 8:15 in the evening.

5    Q   And what was communicated to you in this phone

6  call?

7    A   Well, Mrs. Hamilton first apologized for

8  reaching me on a Saturday night and alleging that she

9  was interrupting me, and I said no, it was not an

10  interruption, and she had had a great deal of concern

11  and trepidation in her voice.  She had a concern about a

12  fellow teacher, and she went into discussing a

13  conversation that she had had with Maura Larkins where

14  she was alleging that Maura invaded her space, got very

15  close to her, and it was very frightening the way Maura

16  looked at her and the tone of voice.  She shared with me

17  that she was very concerned about her life because she

18  was the mother of two small children, and it was very

19  concerning to her and wanted to make sure that I knew

20  about this.

21    Q   Did she say when this conversation had taken

22  place?

23    A   It had happened that week, but I don't recall

24  when it had happened that week.

25    Q   Did she say why she waited until Saturday night

63

50

1  to call you?

2      A    I don't recall the reason.

3      Q    Did you question why she had waited until

4  Saturday night to call you?

5      A    I did not at the time quite frankly because she

6  was so upset and unnerved by this alleged confrontation

7  with Maura Larkins that it was more important to play

8  the role of an active listener than doing a lot of

9  inquiry at that time.

10      Q    In your experience as a human resources

11  administrator for school districts, have you had

12  employees call you at home on weekends previously to

13  express concerns?

14      A    It's very rare.  Perhaps in almost 30 years,

15  for a teacher to call, it's a rarity, particularly on a

16  Saturday evening.  In the evening it's highly unusual.

17      Q    Do you know -- strike that.

18          Did you ask how she got your home phone number?

19      A    No, I did not.  My number -- we require that

20  all cabinet members are listed.

21      Q    Listed in the regular phone book?

22      A    In the directory, in the school district

23  directory.  I am also listed in the public directory.

24      Q    Had you given her specifically your phone

25  number?

64

KNIGHT COURT REPORTERS, INC.

1       A    I don't recall ever giving her specifically my

2    number, no.

3       Q    And on hearing this information, what, if

4    anything, did you say back to her?

5       A    Well, the first thing that I said to her was

6    that I appreciated her coming forward with this

7    information, that we would have to make sure that this

8.   was investigated and that we would give all parties an

9    opportunity to respond.  However, she was so frightened

10   and was not -- was not anxious to go back to school, was

11   very concerned for her safety and particularly because

12   she said she was the mother of two young children, and I

13   assured her that we would take every opportunity to

14   provide a safe environment for all of our employees.

15      Q    And after speaking with her, what, if anything,

16   did you do based on this phone call?

17      A    I immediately attempted to reach her principal.

18   I was unable to right away, but I did reach her that

19   weekend.

20      Q    And was that Dr. Donndelinger?

21      A    Yes.  Dr. Donndelinger.

22      Q    Did you subsequently meet with Maura Larkins --

23      A    Yes, I did.

24      Q    -- about this incident?

25      A    Yes, I did.

*65*

KNIGHT COURT REPORTERS, INC.

# EXHIBIT 4



BEFORE THE GOVERNING BOARD OF THE

CHULA VISTA ELEMENTARY SCHOOL DISTRICT

```
--------------------------------
IN THE MATTER OF THE ACCUSATION )
AGAINST                         )
          MAURA LARKINS,        ) Case No. L-2002050728
                                )
                  Respondent. )
--------------------------------
```

DEPOSITION OF JOELLEN HAMILTON

Taken on Tuesday, September 10, 2002
At 1:00 A.M.
At 84 East J Street
Chula Vista, California 91910

**CONDENSED TRANSCRIPT**

**Page 2**

```
 1       APPEARANCES
 2
 3    For the Plaintiff:
 4       MARK R. BRESEE
         BY: MARK R. BRESEE, ESQ.
 5       23195 La Cadena Dr., Suite 103
         Laguna Hills, California 92653
 6       (949) 587-0585
 7
 8    For the Respondent:
 9
         SCHULMAN & SCHULMAN A.P.C.
         BY: ELIZABETH SCHULMAN, ESQ.
10       1551 Fourth Ave., Suite 502
         San Diego, California 92101
11       (619) 238-0303
12
13    Also present:
14       Maura Larkins
15       Gina Boyd
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1       JOELLEN HAMILTON,
 2  called as a witness by the defendant, who, being by me first
 3  duly sworn, was thereupon examined as a witness in said cause.
 4
 5       EXAMINATION
 6
 7  BY MS. SCHULMAN:
 8    Q   Could you please state your full name for the record?
 9    A   JoEllen Hamilton.
10    Q   Have you ever had your deposition taken before today?
11    A   No.
12    Q   And how do you spell your name?
13    A   J-o-E-l-l-e-n H-a-m-i-l-t-o-n.
14    Q   Before we went on the record, I gave you a document
15  entitled "Deposition Preamble," which I asked you to read. We
16  marked this as Exhibit 1 to the previous deposition. Have you
17  taken the time to read it?
18    A   Yes.
19    Q   Do you understand the information contained therein?
20    A   Yes.
21    Q   And do you have any questions about the information
22  contained in that document?
23    A   Not so far.
24    Q   All right. Do you know of any reason why you
25  couldn't give your best testimony here today?
```

**Page 4**

```
 1    A   No.
 2        MS. SCHULMAN: And I note that we have another person
 3  who is present in the deposition. Ma'am, are you Gina Boyd?
 4        MS. BOYD: Yes, I am.
 5        MS. SCHULMAN: And you're president of the Teachers'
 6  Union for this district; is that correct?
 7        MS. BOYD: Yes.
 8        MS. SCHULMAN: And what is your purpose in being here
 9  today?
10        MS. BOYD: As an observer with one of my union
11  members.
12        MS. SCHULMAN: I would note and I have noted this
13  with Mr. Bresee, that I object to your presence here since
14  there is a teacher dismissal that is involved in this
15  proceeding, which I am defending on behalf of -- not one of
16  your current members, then, one of your former members. And it
17  seems to me, you are here in the capacity representing one
18  member against the other, which as I understand it is not
19  something that is permissible.
20        So, as far as I'm concerned, I really don't think
21  it's appropriate for you to be here and request that you leave.
22        MS. BOYD: I'm sorry. I will stay as an observer
23  with my union member.
24        MS. SCHULMAN: You understand you are not allowed to
25  participate, in any matter, with this procedure or interfere
```

**Page 5**

```
 1  with it?
 2        MS. BOYD: Absolutely.
 3        MR. BRESEE: I would like to put on the record that I
 4  think it's somewhat unusual to suggest that -- two things, one,
 5  that an individual shouldn't be present when there's no basis
 6  that the individual is going to interrupt the deposition in any
 7  way, shape, or form.
 8        And secondly, when you talked about one union member
 9  against the other. The respondent in this case, Maura Larkins,
10  has made accusations against other members and in this filing
11  a, lawsuit, naming the deponent as a defendant. So, to suggest
12  that this is being transformed into one union member over
13  another because of Ms. Boyd's presence when Ms. Larkins, long
14  ago. made this into a union member against others dispute, I
15  think, is misstating the history of this case. I just want
16  that on the record also.
17        And I think that she has every right to be here. The
18  deponent has every right to have a representative here.
19        MS. SCHULMAN: This case involves an action of
20  dismissal that was brought by the school district against
21  Ms. Larkins.
22        As I understand it, any civil action that might have
23  been brought against Ms. Hamilton has already been resolved by
24  the court. So, there is nothing current as to that.
25        It is my understanding that this union has in the
```

2 (Pages 2 to 5)

68

1  past represented Ms. Larkins, if not in this matter, then in
2  related matters. And I will say that in 26 years of practicing
3  law, I have never once had anybody other than a witness, the
4  parties' attorneys, and an attorney representing a deponent
5  from time to time, I have never had an observer. I have never
6  requested an observer be present in any deposition that I have
7  participated in, and I find this highly inappropriate.
8      But my choice is to either proceed or delay the
9  proceedings before the appropriate body that we have here. And
10  as far as the presence of Ms. Boyd, I don't know and I have no
11  personal quarrel with her. We voiced our objections. We elect
12  to go forward, but we may take some action, further action,
13  that will not delay these proceedings regarding this matter.
14      And I must say from a personal point of view, since I
15  was requested to change the depositions for this week at your
16  request, Mr. Bresee, to this location, which I agreed to do and
17  which I promised I am abiding by at this point in time, I feel
18  somewhat like I have been corralled here.. And all of a sudden,
19  over my protest, there is a union representative present, who I
20  believe would not be here if it were conducted in my office.
21  And at this juncture, I am seriously considering moving
22  tomorrow's depositions to my office.
23      MR. BRESEE: Well, that's fine. She will be there at
24  your office tomorrow if you choose to do that. Her presence
25  here has nothing to do with the fact that we asked, and you

Page 6

1  agreed, to move the depositions here. Just so that the
2  individuals being deposed would have less time away from the
3  work place than they otherwise might. But if you want to move
4  it back to your office, that's fine.
5      MS. SCHULMAN: I will mull that one over. I also
6  will note for the record that this witness's deposition was
7  noted for 2:00 o'clock at her request made through your office.
8  I agreed to do my best to move it up to 1:00 o'clock, which we
9  have done. It is now 1:15. So, I intend to get started with
10  this deposition.
11  BY MS. SCHULMAN:
12      Q   Ms. Hamilton, do you have any kind of college
13  degrees?
14      A   Yes.
15      Q   And where did you graduate from college?
16      A   San Diego State University.
17      Q   And when?
18      A   1988.
19      Q   And with what degree?
20      A   Degree in liberal studies, and then, also, I got my
21  teaching credential.
22      Q   And did your teaching credential involve teaching
23  students at a particular grade level?
24      A   Yes, student teaching.
25      Q   What grade level?

Page 7

1      A   I do my student teaching in kindergarten and in a
2  fourth grade classroom.
3      Q   And did part of your educational studies at San Diego
4  State University involve studies in early childhood education?
5      A   Yes.
6      Q   And approximately, how many credits did you earn in
7  education areas, undergraduate?
8      A   Well, the credential is 30 units, and I cannot recall
9  before that how many units I took in early childhood education.
10  I'd have to look at my transcripts.
11      Q   And did you graduate with any particular honors?
12      A   No.
13      Q   Do you have any degrees, beyond your bachelor's from
14  San Diego State?
15      A   No.
16      Q   Have you pursued any additional courses of study,
17  beyond your bachelor's degree?
18      A   Yes, I have.
19      Q   And what courses of studies have you pursued?
20      A   Classes that I took, probably six years ago to -- in
21  order to work on my CLAD certificate.
22      Q   And what is your CLAD certificate?
23      A   It's a Cross-Cultural Language Development
24  Certificate that the district encourages us to pursue.
25      Q   And did you complete that certificate?

Page 8

1      A   Not quite yet. I have to take another Spanish class.
2      Q   If I understand you correctly, did you take
3  everything that you needed six years ago except for that one
4  Spanish class, or have you been doing this over the course of
5  six years?
6      A   No. I just took four classes. I believe they were
7  back to back. It was so long ago. Four classes through
8  National. They have a special program there for the CLAD
9  certificate for the teachers. So, I took these four classes,
10  and then I took a Spanish class last year. But I believe I
11  still have to obtain one or two more units in Spanish before
12  I'm completely ready to apply for the certificate.
13      Q   And once you get that certificate, what will that
14  certificate make you eligible to do, if anything?
15      A   The only thing different, I believe, is to be able to
16  transfer to another school.
17      Q   Any particular type of school?
18      A   No.
19      Q   Why is that? You are --
20      A   It's also so that I can have the second language
21  students in my classroom, but as far as transferring to another
22  school, I have no desire at this time. But you never know when
23  I'll be ready for a change.
24      Q   So, at this time are you not able to transfer to
25  another school?

Page 9

69

3 (Pages 6 to 9)

1  questions, to call him. And it happened to be a Saturday
2  evening, and I called him to see if the meeting had gone
3  through. And I don't remember what else.
4    Q  So, you called him at home?
5    A  Yes, I did. He had told me if I had any questions or
6  concerns, that I could call him.
7    Q  At any time?
8    A  Uh-huh.
9    Q  That was a yes?
10   A  Yes. I believe that's what he said. I don't
11 remember the specific words.
12   Q  Okay. And did he give you his home telephone number?
13   A  No, he did not.
14   Q  Was that a number that was available to you, as an
15 employee of the district?
16   A  Yes, it is.
17   Q  And when he said, "You call me at any time," did you
18 take that to mean that it was okay to call him on a Saturday
19 evening and not on school time?
20   A  Yes, I did.
21   Q  Was there something that had happened over that
22 weekend that caused you to call him on a Saturday evening, as
23 opposed to waiting until regular school hours?
24   A  He was supposed to have a meeting with her on Friday
25 afternoon.

Page 46

1    Q  That was your understanding?
2    A  That was my understanding.
3    Q  He had told you that?
4    A  Yes. To the best of my recollection, he had told me
5  that he was going to have a meeting with her to talk about this
6  issue on Friday.
7    Q  The issue being, the letter?
8    A  The letter, the confrontation in the staff room.
9    Q  And you wanted to find out if that meeting had
10 occurred and what the results were?
11   A  If the meeting had occurred, what the results were,
12 did we have something set up for the following week.
13   Q  And what did he tell you the results of the meeting
14 were, if in fact, the meeting had occurred?
15   A  You know, I do not recall what he said.
16   Q  Did he tell you the meeting had occurred?
17   A  I do not even remember.
18   Q  So, you called at his invitation to contact him,
19 correct?
20   A  He said if I had any questions or concerns, to
21 contact him. And I thought well, if his number's in the
22 directory, then it would be okay to contact him.
23   Q  Did you ever tell him, Rick Werlin, in that telephone
24 conversation or at any other time that there was something that
25 Ms. Larkins had done, which made you fear for your life?

Page 47

1    A  No.
2    Q  Did you have any kind of communication either
3  directly or with Rick Werlin or with anybody else, wherein you
4  made a statement to the fact that you were fearful of your life
5  because of Ms. Larkins's contact?
6    A  No.
7    Q  Did Ms. Larkins ever threaten your life?
8    A  No.
9    Q  Other than this one conversation at home with the --
10 with Mr. Werlin, did you have any other conversations with
11 Mr. Werlin outside of regular school hours concerning
12 Ms. Larkins?
13   A  In and out, outside of regular school hours?
14   Q  Did you participate in any kind of meeting during the
15 school week concerning Ms. Larkins?
16   A  Yes, I believe we had a meeting. I don't remember
17 when or exactly what was discussed.
18   Q  And was it concerning Ms. Larkins?
19   A  Yes.
20   Q  And was it in 2001?
21   A  I believe so.
22   Q  And who was present at that meeting?
23   A  You know, I do not recall.
24   Q  Was Ms. Larkins present?
25   A  No. She was -- I do not believe she was at school,

Page 48

1  at that time.
2    Q  Was she on some sort of leave?
3    A  I do not know.
4    Q  Do you remember, generally, the gist of what was
5  discussed about Ms. Larkins?
6    A  I guess -- let me see. We were concerned about her
7  behavior at school, and I can only speak for myself. I was
8  concerned about her behavior at school.
9    Q  Was anything else discussed?
10   A  Not that I recall.
11   Q  How many people were at the meeting?
12   A  A hand full. I don't remember who was there.
13   Q  Was Mr. Werlin there?
14   A  Yes.
15   Q  Was Dr. Donndelinger there?
16   A  I believe she was, but I do not recall who else was
17 there.
18   Q  And where was the meeting held?
19   A  It would have been in Dr. Donndelinger's office.
20   Q  And was this during a time when Ms. Larkins was on
21 campus teaching or when she was on a leave of absence?
22   A  I don't believe she was on campus. I do not know why
23 she was not on campus.
24   Q  What, if anything, were the results of this meeting?
25   A  I'm trying to remember. Mr. Werlin, I believe, was

Page 49

7  0

13 (Pages 46 to 49)