# EXHIBIT 4

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

STUTZ, ARTIANO, SHINOFF &
HOLTZ, APC,

        Plaintiffs,

vs.

MAURA LARKINS, and DOES 1 through
100, inclusive,

        Defendants.

_____/

CASE NO.: 37-2007-00076218-CU-DF-CTL
_____/

VIDEOTAPED DEPOSITION OF RAY ARTIANO

Taken at San Diego, California

November 8, 2007

BONNIE G. BREEN,
CSR NO. 5582

1

1                    I N D E X

2     DEPOSITION OF RAY ARTIANO                    PAGE

3     November 8, 2007

4

5     EXAMINATION

6     By Ms. Larkins                    5

7

      EXHIBITS
8
      1    Deposition Notice                  6
9
      2    NCTimes.com Website Article dated      34
10         10-25-2007

11    3    Page from Website San Diego Education    40
           Report, Mauralarkins.com
12
      4    Subpoena to Testify Before Grand Jury    45
13

14    INSTRUCTIONS NOT TO ANSWER

15      PAGE      LINE

16        20        19
          26        13
17        27        18
          28        7
18        32        17
          34        10
19        43        11
          45        12
20        53        16

21
         NOTICE OF ADJOURNMENT OF DEPOSITION
22
         PAGE      LINE
23        54        9

24

25



2



1              DEPOSITION OF RAY ARTIANO

2          Pursuant to Notice to take deposition on the

3      8th day of November, 2007, commencing at the hour of

4      10:19 a.m., at 1620 Fifth Avenue, Suite 770, in the City

5      of San Diego, County of San Diego, State of California,

6      before me, Bonnie G. Breen, Certified Shorthand Reporter

7      in and for the State of California, personally appeared:

8                RAY ARTIANO,

9    who, called as a witness by the Defendants, being by me

10   first duly sworn, was thereafter examined as a witness in

11   said cause.

12                  APPEARANCES

13   FOR THE PLAINTIFFS:

14   STUTZ, ARTIANO, SHINOFF & HOLTZ
     BY: DANIEL SHINOFF
15   2488 Historic Decatur Road, Suite 200
     San Diego, California  92106-6113
16   (619) 232-3122

17   FOR THE DEFENDANT:

18   MAURAL LARKINS
     In Pro Per
19   1935 Autocross Court
     El Cajon, California  92019
20   (619) 444-0065

21

22   VIDEOTAPED By:

23   VIDEOTRACK/DEBORAH L. BURKE
     401 West A Street, Suite 135
24   San Diego, California 92101
     (619) 234-1990
25

3

1          THE VIDEOTAPE TECHNICIAN:  This is the

2    beginning of tape one of the deposition of Ray Artiano.

3    The case caption is Stutz, Artiano, Shinoff & Holtz, APC,

4    versus Larkins. My name is Deborah L. Burke. I'm a

5    certified legal video specialist and a Notary public for

6    the State of California, County of San Diego. I'm a

7    partner in Video Track, located at 401 West "A" Street,

8    Suite 135, San Diego, California. The court reporter

9    today is Bonnie Breen of San Diego Court Reporting.

10    Today's date is November 8th, 2007; and it is now 10:19

11    a.m. This video recording is being taken at San Diego

12    Court Reporting, located at 1620 Fifth Avenue, Suite 770,

13    San Diego, California.

14         Please be aware that the video and audio

15    recording will take place at all times throughout this

16    deposition, unless all parties agree to go off the

17    record; at which time, I will announce the time that we

18    are going off the record, and the recording devices will

19    then be stopped.

20         Would counsel please introduce yourselves.

21         MR. SHINOFF: My name is Daniel Shinoff; and

22    I'm appearing on behalf of the law firm as plaintiff in

23    this case.

24         MS. LARKINS: My name is Maura Larkins, and I'm

25    the defendant.

4

1        THE VIDEOTAPE TECHNICIAN:  Would the court

2    reporter please swear in the deponent.

3        (Whereupon, Ray Artiano, Plaintiff herein, was

4    duly sworn by the reporter.)

5        MR. SHINOFF:  Just before we proceed with the

6    deposition, I would like the record to reflect that the

7    deposition subpoena for the person most knowledgeable

8    from the law firm was scheduled for 10:00 a.m. and that

9    the deposition did not start until 10:19, as the

10    videographer indicated; and the deposing party did not

11    arrive until 10:15.  The depo was scheduled for ten.

12    EXAMINATION BY MS. LARKINS:

13        Q.  Ready?  Okay.  So I'm asking you the questions,

14    right?  Good morning.

15        A.  Good morning.

16        Q.  How are you feeling today?

17        A.  I'm feeling fine.

18      Q.  Can you think of any reason that you wouldn't

19   be able to give your best testimony today?

20      A.  No.

21      Q.  Okay.  Uhm.  My deposition subpoena asked for

22   documents.  Did you bring documents today?

23          MR. SHINOFF:  Yes.  We did.

24          MS. LARKINS:  Okay.  Instead of handing them

25   all in a bunch, where it will be hard, I'm sure you can


5


1   figure out what they are faster than I can.  Do you have

2   the bate stamped Document Number 5?

3          MR. SHINOFF:  We have many bate stamped

4   documents in our office, and we were attempting to figure

5   out precisely what it was that you were looking for, but

6   we do have a bate stamped Document Number 5 dated April

7   26, 2001 from yourself to Mr. Worland.

8          MS. LARKINS:  Okay.  You know, I'm a little

9   confused here.  Isn't Mr. Artiano supposed to be talking?

10          MR. SHINOFF:  No, not right now.  Not right

11   now, because you asked me about documents that are being

12    produced; and so, as counsel, I'm telling you what we

13    have produced.

14         MS. LARKINS:  Okay.

15         MR. SHINOFF:  We brought a series of documents

16    bate stamped 1 through 70 -- or through 84.

17         (EXH. 1 was marked for identification.)

18    BY MS. LARKINS:

19    Q.  Okay.  I'd like to have this marked as Exhibit

20    Number 1.  It is my notice of taking deposition and

21    request for production of documents.  And here is a copy

22    for you, Mr. Artiano.  Does this document look familiar

23    to you?

24    A.  Yes, it does.

25    Q.  Okay.  Would you look at the second page.  And


6


1    the first paragraph, can you read the bottom sentence,

2    the last sentence in the first paragraph.

3    A.  The deposition may also be recorded through

4    such means as to provide the instant display of the

5    testimony as also authorized by CCP Section 2025(d).

6        Q.  Excuse me.  I'm sorry.  I meant the paragraph

7    that is numbered one.

8        A.  Well, the document speaks for itself.  I'm not

9    here to read, ma'am.

10       Q.  Okay.  Well, I'm going to consider you a

11   hostile witness, and this is how I'm going to do it.  I

12   will ask you if it says a certain thing.  I'm going to

13   need my copy.

14           Mr. Artiano, on page 2, line 15 of Exhibit 1,

15   do you see the sentence, "The bate stamps begin with the

16   number 1, not 01 or 001, and continue through 87"?

17       A.  Yes, I do.

18       Q.  Okay.  Do you have a document that is bate

19   stamped with a 5, not a 05 or a 005?

20       A.  Not to my knowledge.

21           MR. SHINOFF:  Nor do I.

22   BY MS. LARKINS:

23       Q.  Well, that is very interesting.  How about a

24   document that is bate stamped 06 -- 6, not 06?

25       A.  Not to my knowledge.

7

1      MR. SHINOFF: Nor do I.

2    BY MS. LARKINS:

3      Q.   Did you bring any of the documents that are

4    specifically numbered here in paragraph 1 on page 2 of

5    this exhibit?

6      A.   Based on what we could make out from your

7    request, we had the documents gathered, which

8    Mr. Shinoff, my attorney, brought with him.

9      Q.   Well, it would appear that either intentionally

10   or unintentionally, you ignored this last sentence in

11   this first document request.  So I'm asking you, now that

12   I'm making it really clear to you that the documents I'm

13   talking about don't have any zeroes in front of the

14   single digits, did you bring any of those?

15     A.   I just answered that.

16     Q.   It's a yes or no answer.

17     A.   I just answered that.

18     Q.   Could you read back Mr. Artiano's last answer.

19        (Record read line 17 and then line 6 through

20   8.)

21   BY MS. LARKINS:

22      Q.  Okay.  Did you bring a document that is bate

23    stamped with a 9, not a 09?

24      A.  Not to my knowledge.

25      Q.  Did you bring a document that is bate stamped

8

1    09?

2        MR. SHINOFF:  Yes.

3    BY MS. LARKINS:

4      Q.  And what is that document, Mr. Artiano?

5      A.  That document is a letter dated -- actually, it

6    is undated; although, there is a Chula Vista Elementary

7    School Human Resources stamp that says June 4th, 2002.

8    It is addressed to a Dr. Gill from Maura Larkins.

9      Q.  And do you believe that the Maura Larkins who

10   wrote this letter is the person who is taking your

11   deposition right now?

12      A.  I assume so.

13      Q.  Well, why would you think that I would want a

14   copy of my own letter?

15    A.   I have no idea what's in your mind, ma'am.

16    Q.   I wanted a document that your law firm has been

17   refusing to produce for several years.  I'm very

18   disappointed that you are still not producing it.

19        MR. SHINOFF:  We'd be happy to produce whatever

20   we have.  The problem is that you have filed multiple

21   lawsuits.  And we have -- as you do, we have multiple

22   Beacon boxes of documents; and we used our best efforts

23   to try to determine exactly what you want, and this is

24   what we brought.

25        MS. LARKINS:  Is it not true, Mr. Shinoff, that

9

1   you actually used your best efforts not to produce the

2   documents I requested?

3        MR. SHINOFF:  That's not true.  And I'm not

4   going to argue with you.

5   BY MS. LARKINS:

6    Q.   Did you bring a bate stamped document 11 that

7   was not written by me?

8        MR. SHINOFF:  We brought a bate stamped

9    document 11.

10        MS. LARKINS:  Was it written by me?

11        MR. SHINOFF:  I don't know.  It has your

12    initials by it.

13        MS. LARKINS:  Does it have my name on it?

14        MR. SHINOFF:  It has your name on it, yes.

15        MS. LARKINS:  Does it say "from Maura Larkins"?

16        MR. SHINOFF:  It does.

17        MS. LARKINS:  But you are not sure if it

18    actually is from Maura Larkins?

19        MR. SHINOFF:  Only you could authenticate

20    whether that document is from you, but it appears to be

21    from you.

22        MS. LARKINS:  Why would you produce a document

23    in this case that appears to be from me if you didn't

24    think it was from me?

25        MR. SHINOFF:  Because you asked for bate stamp

10

1    11, we produced bate stamp 11.

2        MS. LARKINS:  You wouldn't by any chance be

3    trying to perpetrate a fraud on the court by producing a

4    false document that wasn't really from me, that appeared

5    to be from me?

6        MR. SHINOFF:  I would never perpetrate a fraud

7    upon the court.  I know that you use language like that

8    without any consideration of what you are saying, but

9    bate stamp 11 is responsive to your document request, and

10   bate stamp 11 is here.  So I would suggest that you move

11   forward with your documents and stop with the casting

12   personal aspersions.  Take the deposition, please.

13   BY MS. LARKINS:

14       Q.  Uhm.  Mr. Shinoff -- Mr. Artiano, did you do a

15   search for the documents I asked for?

16       A.  I had a paralegal do a search for the documents

17   which you asked for.

18       Q.  You had a paralegal do the search?

19       A.  Yes.

20        MS. LARKINS:  Okay.  May I look through the

21   documents?

22        MR. SHINOFF:  Certainly.

23        MS. LARKINS:  I believe that the documents that

24   you have here are completely separate, a completely

25    separate group of documents from the ones I wanted.


11


1        MR. SHINOFF:  Well, I think you need to be

2    clearer then in terms of what you want.

3        MS. LARKINS:  Mr. Shinoff, I faxed to Kelly

4    Angell the documents that you did produce.  Well,

5    actually, you didn't produce them, but Parham Rajcic

6    produced them from my administrative hearing so that she

7    could easily determine what were the missing documents.

8        Your law firm has had years to produce these

9    documents; and, apparently, they must be very harmful to

10    your case or you would have produced them.

11        MR. SHINOFF:  Well, you can entertain whatever

12    fantasy you wish to engage in; and I know that you are

13    prone to fantasies, but I respectfully disagree with your

14    characterization.

15        MS. LARKINS:  Mr. Shinoff, did you seek a

16    protective order from discovery in my case when I sued

17    Chula Vista Elementary School District?

18        MR. SHINOFF:  My deposition isn't being taken.

19    MS. LARKINS:  Oh, that is really confusing.

20    Uhm.  I have got to get more.  I've got to get you

21    talking more, Mr. Artiano.  I have got to remember that

22    it is not Mr. Shinoff's deposition being taken.

23    BY MS. LARKINS:

24        Q.  Did your law firm, Mr. Artiano, seek one or

25    more protective orders in -- when I -- in the case when

12

1    you were defending the Chula Vista Elementary School

2    District and other associated defendants?

3        A.  I have no idea.

4        Q.  Okay.  When did you first become aware of my

5    lawsuit against Chula Vista Elementary School District?

6        A.  Probably when we discovered the defamatory

7    material that you had on your website, right about that

8    time.

9        Q.  When I sued DOES for obstruction of justice,

10    and then I sought to name your firm as a DOE, your

11    secretary talked to me quite frequently about trying to

12   serve you. She would tell me that you weren't in. And I

13   remember one day in particular, she said you were in.

14   And then she called -- no, that you would be in at such

15   and such a time, and then half an hour before that, she

16   called and said that you had just left.

17        Do you have any memory of my trying to serve

18   you as a DOE as the representative of Stutz, Artiano?

19     A. No, ma'am.

20     Q. Do you normally have a pretty good memory?

21     A. I have an excellent memory.

22     Q. You have an excellent memory. Okay. I need to

23   find a document. I need to take a break. Is that okay

24   with everybody?

25        MR. SHINOFF: I want to stay on the record, but

13

1   you can look for your document.

2   BY MS. LARKINS:

3     Q. Uhm. Okay. Fine. Okay. What I'm looking for

4   is the motion that your law firm filed. What I'm looking

5   for is the motion that your law firm filed in that case

6    where I was -- I filed a complaint for obstruction of

7    justice against DOES; and your law firm got involved in

8    that.

9        A.  Ma'am, I'm here to have my deposition taken.

10   I'm not here to listen to you make speeches.  So please,

11   if you have questions that you would like to ask me, I

12   will be happy to answer them.

13       Q.  Okay.  Let me ask you this.  Well, I will tell

14   you what, just before we go on to the motion that Kelly

15   Angell filed on behalf of Chula Vista School District,

16   apparently collecting taxpayers' money for doing it, when

17   Chula Vista School District was not a party in the case.

18       A.  Ma'am, please ask me questions.  Don't give

19   speeches.

20       Q.  Well, gee, I would have thought that you really

21   didn't like to talk, to answer questions that much, since

22   you had Mr. Artiano doing most of your answers.

23           Okay.  I do want to get and note your law

24   firm's involvement in the obstruction of justice case.

25           Let's get -- let's just finish this up and find

14

1    out if you produced any of the documents that were

2    requested.  Okay.

3        MR. SHINOFF:  We produced the documents that

4    were requested.

5        MS. LARKINS:  So far, I haven't seen a single

6    document, but let's go on to Number 2.

7        MR. SHINOFF:  There is a disconnect, obviously,

8    between what you wrote down and what you wanted to have.

9    So I believe that we did a reasonable, good faith search

10    to determine what documents were responsive to your

11    request for production.

12        MS. LARKINS:  Did you read the last line in

13    this paragraph that is numbered one?

14        MR. SHINOFF:  The paralegal was charged with

15    the responsibility for looking for the documents.  So she

16    looked through multiple documents, and that's what she

17    found.

18        MS. LARKINS:  Well, perhaps it's the

19    paralegal's fault.  Perhaps she didn't read that

20    sentence.

21        MR. SHINOFF:  She's a very fine paralegal.

22          MS. LARKINS:  Well, this a very fine sentence.

23      It is very clear.

24          THE WITNESS:  Ma'am, I'm not going to waste my

25      time here with your engaging in these types of

15

1       discussions.  Just ask questions, please.

2          MS. LARKINS:  Well, Mr. Shinoff, did you hear

3      that?

4          MR. SHINOFF:  Yes, I did.  And there are

5      provisions in the Code of Civil Procedure that prevent

6      depositions that are vexatious, that are harassing, that

7      are argumentative.  You are held to the same standard as

8      a lawyer; and so you need to ask questions.  That is what

9      the Discovery Act in the State of California is all

10      about.

11          You desire to engage in speeches.  That's not

12      what the discovery process is about.  So I respectfully

13      disagree with your approach.  Mr. Artiano is here to

14      answer questions.

15          MS. LARKINS:  Okay.  Mr. Shinoff, you are

16    required to behave, as well as an in pro per; and that

17    means that you should not be engaging in speeches, which

18    you just did.

19        MR. SHINOFF:  Because I'm commenting on your

20    behavior, because I think it is violative of the Code of

21    Civil Procedure in the State of California.

22        MS. LARKINS:  Well, that's exactly what I think

23    of your behavior.  When you go on saying things like I

24    make statements without any consideration, which you said

25    today, or saying things like I know that you are prone to

16

1    fantasy, fantasies, I think that you are stepping outside

2    of a professional behavior, and I think that you need to

3    follow the suggestions that Mr. Artiano just made.

4        MR. SHINOFF:  Is that a question?

5        MS. LARKINS:  I'm not the deponent,

6    Mr. Shinoff.

7        MR. SHINOFF:  No.  You are the person who is

8    supposed to be posing the questions.

9      MS. LARKINS:  Thank you.  Okay.  I want to --

10     apparently, you completely avoided all of this by blaming

11     it on your paralegal.  And you avoided Number 1,

12     producing any of those documents.

13          Let's look at Number 2.  Okay.  Do you have

14     documents containing information regarding the dollar

15     amounts of payments from Chula Vista -- Chula Vista

16     Elementary School District?

17          MR. SHINOFF:  No.

18          MS. LARKINS:  Oh.  Didn't you just earlier say

19     that you produced all the documents?

20          MR. SHINOFF:  I said we produced the bate

21     stamped documents, yes.

22          MS. LARKINS:  But on Number 2, you didn't

23     produce any of those?

24          MR. SHINOFF:  That's correct.

25          MS. LARKINS:  May I ask why?


17


1      MR. SHINOFF:  Well, our objection is that they

2    are proprietary in nature.

3          MS. LARKINS:  Okay.  Did you produce documents

4     supporting your claim that my website has caused

5     financial losses to your firm?

6          MR. SHINOFF:  We don't have specific documents

7     other than your website itself, and we have documents

8     from your website.

9          MS. LARKINS:  I have no information on my

10     website about financial losses to you as a result of my

11     website.

12          MR. SHINOFF:  It is our belief that your

13     website has interfered with prospective economic

14     advantage.  It's our opinion that your website is

15     slanderous, per se.

16          MS. LARKINS:  If it were false, it would be

17     slanderous, per se.  I agree with you there.  The only

18     problem is is that it's all true.

19          Do you consider -- do you consider yourself a

20     lawyer for a public entity when you work for Chula Vista

21     Elementary School District?

22          MR. SHINOFF:  I think your deposition is of

23     Mr. Artiano.

24          MS. LARKINS:  Oh, that is right.  Boy.

25     BY MS. LARKINS:

18

1    Q.  Do you feel left out, Mr. Artiano?

2    A.  I just would like to get on with the deposition

3    if you intend to take my deposition.

4    Q.  Let's try.  Let's just hope that Mr. Shinoff

5    won't be talking quite so much.

6        Okay.  Mr. Artiano, in your complaint against

7    me, you stated or your firm stated that I had cost you

8    $100,000 or more.  Do you have -- can you explain to me

9    how you came to that figure?

10   A.  To which paragraph are you referring?

11   Q.  I think it's right at the end of your

12   complaint.

13   A.  Which paragraph specifically?

14   Q.  If you let me look at that, I will find it for

15   you.

16   A.  Well, this is my copy.

17   Q.  You don't remember putting in your complaint

18   that you had losses of $100,000 or more?

19      A.  Ma'am, I just asked you to tell me which

20    paragraph you are referring to.

21      Q.  Okay.

22      A.  I'm happy to answer it.

23      Q.  Mr. Artiano, I believe that the quality of your

24    memory is important.  Could you tell me, do you remember

25    that, in the complaint that your law firm filed, and you


19


1    are representing that law firm, that you said that you

2    had $100,000 or more of financial damages?

3         MR. SHINOFF:  I'm going to object to the nature

4    of the question as being argumentative.  You can answer

5    if you can.

6         THE WITNESS:  Yes.  In paragraph 35, it is

7    alleged that as a result of your defamatory statements

8    that we have suffered economic detriment and general

9    damages in an amount in excess of $100,000.

10   BY MS. LARKINS:

11      Q.  I notice that you did have to look through that

12    complaint to find that fact.  I myself remembered it

13    without looking at the complaint.

14        A.  I told you before.  I'm not here to listen to

15    you give speeches.  Just ask me questions.

16        Q.  Okay.  Let me just say, given what just

17    happened, Mr. Artiano, would you like to revise your

18    earlier statement that you have an excellent memory?

19            MR. SHINOFF:  I'm going to object that the

20    question is argumentative.  Don't respond to that.

21    BY MS. LARKINS:

22        Q.  Okay.  Is there any particular client that you

23    have lost as a result of my website that you know of?

24        A.  I don't know at this time if there is any

25    particular client that we have lost as a result of your


20


1    defamatory statements.

2        Q.  Mr. Artiano, they are only defamatory if they

3    are false.

4            MR. SHINOFF:  Again, I'm going to object that

5    the question is argumentative as phrased; and I would

6    respectfully request that you ask a question.

7    BY MS. LARKINS:

8        Q.  Okay.  You say that you don't know at this

9    time.  Why didn't you find out if you had lost a client

10   before you filed this suit saying that you had $100,000

11   of damages?

12       A.  You want me to answer that?

13       MR. SHINOFF:  Sure.  Go ahead.

14       THE WITNESS:  Because of the defamatory

15   statements, which you have made on your website, it has

16   come to my knowledge that there have been a number of

17   individuals who have googled the name of the website.

18   And that, in turn, has led them to your San Diego, I'm

19   not sure what, San Diego Education Report Website.

20       And I know that it has caused concern on the

21   part of at least one attorney.  I'm assuming that anyone

22   who googles us, as most clients and prospective clients

23   do, they'll come across your website and know nothing at

24   all about the author of the website and whether or not

25   the statements have any truth at all.

21

1    BY MS. LARKINS:

2        Q.  If they knew more about the author of the

3    website, what would they know, that you seem to imply

4    that there is something to be known that isn't on my

5    website, I mean?

6        A.  Well, what they would know is that the

7    statements, which you have made impugning the integrity

8    and character of the firm, are false.

9            In addition, I also know that, at least, at the

10   very least, one new attorney in our firm googled our

11   website prior to making a decision as to whether or not

12   he was going to join the firm, and then had to -- had to

13   check around after he saw the materials on your website

14   to determine who this person was and why these things

15   were being said so that he could determine whether or not

16   he should join our firm.

17           I assume that there are a number of prospective

18   candidates, as well as clients that we have, that do

19   exactly the same thing, come across the same information,

20   and it causes them concern.

21       Q.  Okay.  Well, it seems to me that you have done

22   a pretty good argument for saying that my website has not

23  harmed your firm.  The only evidence you have is that

24  someone read my website and then came to your firm.

25        MR. SHINOFF:  I'm going to object that the


                              22


1   question is -- the statement is argumentative.  If you

2   could ask your next question, please.

3   BY MS. LARKINS:

4       Q.  Okay.  Is it your wish that people not check

5   around before they join your firm?

6       A.  Is it my wish?

7       Q.  Uh-huh.  You seem to be complaining that this

8   prospective new attorney had to check around about you,

9   your firm, before he decided to join your firm.  Is it

10   your wish that prospective attorneys not check around?

11      A.  No.  I think that anyone proposing any type of

12   relationship with a firm, whether it is a candidate or a

13   prospective client, do their due diligence.  What

14   concerns me is that people have to deal with false

15   statements, which were made on your website.

16    Q.   Well, I'd like to point out to you,

17   Mr. Artiano --

18    A.   Don't point anything out to me, ma'am.  Just

19   ask questions.

20    Q.   Okay.  Has any court of law decided that these

21   statements were false, the statements on my website were

22   false?

23    A.   Has any court of law?

24    Q.   Uh-huh.

25    A.   This lawsuit was just filed.


23


1    Q.   Uhm.

2    A.   There will be -- there will be a determination

3   at the conclusion of this case that the statements on

4   your website were false.

5    Q.   Is that your hope?

6    A.   No.  I know that to be the case.

7    Q.   How do you know that?

8    A.   Because I know that the statements, which you

9   have made, are false.

10    Q.  Uhm.  Okay.  Let's get back.  Uhm.

11        Mr. Artiano, do you think that someone in your

12    law firm may have destroyed evidence in my lawsuit

13    against Chula Vista Elementary School District?

14    A.  I'm certain that no one in my law firm

15    destroyed any evidence.

16    Q.  Do you think that someone may have hidden some

17    evidence?

18    A.  I'm certain that no one has hidden evidence.

19    Q.  Do you think that someone may have misplaced

20    it?

21    A.  I have absolutely no idea as to whether or not

22    anyone misplaced documents.

23    Q.  Well, wouldn't that be your best explanation

24    for why you don't have Document 05 to produce to me

25    today?

24

1        MR. SHINOFF:  We did produce Document 05.

2    BY MS. LARKINS:

3      Q.   I mean Document 5 without the zero.  Isn't that

4   the best explanation for why you don't have Documents 5,

5   6 and 9 to produce to me today?

6      A.   No.  The best explanation is that your request

7   is extremely vague; and the paralegal did her best job in

8   trying to decipher what it was that you wanted.

9      Q.   Uhm.  Poor dear.  Uhm.  I -- maybe someone

10   should have helped her out.

11         Mr. Artiano, would you, yourself, give it a

12   try, to try to find these documents here, 5, 6, 9.  And

13   then these other ones, apparently, they have the same

14   numbers as the ones that you have produced, but they are

15   from a different set.

16         MR. SHINOFF:  Well, if you could be clearer in

17   terms of the documents that you are requesting, since

18   there are multiple lawsuits that you were involved in, we

19   would be happy to provide it in response to request for

20   production of documents.

21         MS. LARKINS:  Is that your answer, too?

22         MR. SHINOFF:  I'm responding to that question

23   as counsel for Mr. Artiano, because that is not an

24   appropriate question in a deposition.  The question is

25   whether we will produce documents responsive to a request

25

1    for production. We will of course produce documents

2    responsive to a request for production of documents.

3    BY MS. LARKINS:

4        Q. Okay. Mr. Artiano, are you in agreement that

5    you did not bring today documents that were bate stamped

6    with a simple 5 without a zero in front of it?

7        MR. SHINOFF: The document speaks for itself.

8    I'm going to object. I'm going to instruct the witness

9    not to respond.

10   BY MS. LARKINS:

11       Q. If my statements about your law firm are false,

12   then why are you so afraid of discovery?

13       MR. SHINOFF: Again, the objection is that the

14   question is argumentative; and it is vexatious in nature.

15   And I'm going to instruct him not to respond.

16   BY MS. LARKINS:

17       Q. Okay. Uhm. Mr. Artiano, when I asked you,

18   uhm, what should people who come to my website know about

19   me that they don't know from the website, you said that

20   the statements are false; that's what they should know.

21   But that is not something about me.  What should they

22   know about me that is not on the website?

23       A.  I don't know what they could possibly learn

24   about you through the website.

25       Q.  How many -- approximately how many pages of the

26

1   website have you read, Mr. Artiano?

2       A.  I have no idea.  I don't think that the website

3   is actually paginated.

4       Q.  No.  But just in your head, you could count,

5   like you would know if you had read one page or a hundred

6   pages.

7       A.  I know that I have looked at the pages that we

8   have produced today.

9       Q.  Okay.  Do you know that, on the website, I talk

10   about -- I tell the story of how I was arrested?

11       A.  (Witness shook head from side to side.)

12       Q.  You didn't know that?

13    A.  I have no idea whether or not you have been

14    arrested.  It wouldn't surprise me, but I have no idea.

15    Q.  What would you expect me to be arrested for,

16    Mr. Artiano?

17    A.  I have --

18      MR. SHINOFF:  I'm going to object that the

19    question calls for speculation.  I'm going to instruct

20    him not to answer.

21    BY MS. LARKINS:

22    Q.  Well, you said it wouldn't surprise you.  You

23    said it wouldn't surprise you that I had been arrested.

24    So I was just wondering what sort of arrest you were

25    expecting to have occurred?


27


1      MR. SHINOFF:  Go ahead.  You can answer that.

2      THE WITNESS:  I have no idea.

3    BY MS. LARKINS:

4    Q.  But you just kind of, perhaps you'd like the

5    idea of me being arrested, and maybe you just created a

6    fantasy about it?

7      MR. SHINOFF:  I'm going to object that the

8    question is argumentative.  Don't respond to that,

9    please.

10    BY MS. LARKINS:

11      Q.  Okay.  Uhm.  Did you know that, on my website,

12    I have a detailed explanation of my administrative

13    hearing?

14      A.  Do I know?

15      Q.  Yes.

16      A.  I seem to recall that there was some

17    information concerning an administrative hearing.

18      Q.  Okay.  Do you know that, on my website, there

19    is -- I have written a lot about the school I taught at?

20      A.  I don't really recall that.  What I was looking

21    at were statements concerning my law firm.

22      Q.  Uhm.

23      A.  Whatever else you may have written about was of

24    no concern to me.

25      Q.  Well, you seem to have expressed today a

28

1    concern that people know more about me than what is on my

2    website.

3        MR. SHINOFF: That's not a question.

4        MS. LARKINS: But we can talk about that in

5    another forum.

6        MR. SHINOFF: Is that a threat or is that a

7    question?

8        MS. LARKINS: You guys filed this lawsuit, not

9    me. We don't have to talk about everything in the

10    deposition. We can talk about it at trial, in motions,

11    in hearings, all kinds of other places. We don't have to

12    talk about it now.

13    BY MS. LARKINS:

14        Q. Okay. You said that you thought that people

15    should do due diligence when they -- let me see.

16        You seem to be upset that the prospective

17    lawyer had to check around after seeing my website. Am I

18    correct in that perception, that you were upset that he

19    had to check around?

20        A. As you have stated it, you are incorrect, yes.

21        Q. Could you explain to me exactly how you feel

22    about the lawyers, the prospective lawyers having to

23    check around?

24        A.  What I had said was that it's very unfortunate

25    that someone would have to investigate statements, which

29

1    you have made on your website, which are false,

2    concerning unethical behavior, comments impugning the

3    reputation and character of the law firm and individual

4    lawyers in the law firm.

5        Q.  Okay.  About how much of your law firm's work

6    is work for public entities?

7        A.  Uhm.  I'm not sure that it has ever been broken

8    down in percentages.  My best estimate would probably be

9    about 40 percent.

10       Q.  Okay.  How much of Mr. Shinoff's work is for

11    public entities?

12       A.  I don't know.

13       Q.  All right.  When Mr. Shinoff is working for a

14    public entity, do you believe that his actions become a

15    matter of public interest?

16       A.  If you are asking whether I think Mr. Shinoff

17    is a public figure, my answer is no.

18        Q.  Does Mr. Shinoff frequently speak to the press?

19        A.  You'd have to ask Mr. Shinoff that.  I

20    certainly know that he has spoken to the press, but you

21    can certainly ask.  You certainly have to ask him how

22    frequently.

23        Q.  Mr. Artiano, you seem to be very certain that

24    he's not a public figure; and, yet, you are not certain

25    whether he frequently speaks to the press.

30

1        A.  Is that a question, ma'am?

2        Q.  Well, I guess I'm just talking to myself here,

3    really.  I shouldn't be just mentioning that.  Uhm.

4    Okay.  I'm just trying to understand your position here.

5        Let me put it this way:  Does Mr. -- is

6    Mr. --

7        Do you read the newspaper?

8        A.  I read many newspapers.

9        Q.  Do you read the North County Times?

10    A.  That's not one of the newspapers that I read.

11    Q.  How about the San Diego Union?

12    A.  I read the San Diego Union.

13    Q.  Okay.  Has anybody ever talked to you about

14    articles about Mr. Shinoff and other lawyers in your firm

15    that have been running in the North County Times over the

16    last, well, years, many years?

17    A.  Probably not about the articles themselves;

18    although, there may have been discussions about cases,

19    which were prompted by articles.

20    Q.  Or articles that were prompted by cases?

21    A.  I'm sorry?

22    Q.  Or do you really mean articles that were

23    prompted by cases?

24    A.  No, discussions of cases or inquiries about

25    cases, which were prompted by individuals reading the

31

1    articles.

2    Q.  A case would be prompted by -- oh, you mean a

3    discussion was prompted by someone reading the article?

4    A.  Yes.

5    Q.  Okay.  Have you been following the Mira Costa

6  scandal?

7    A.  I have not.

8    Q.  You have not followed the Mira Costa scandal?

9    A.  No.

10    Q.  But you did see some articles about it in the

11  Union Tribune?

12    A.  I do recall, there were some articles about it,

13  yes.

14    Q.  Is the Union Tribune more careful of your ego

15  than the North County Times?

16    A.  I have no --

17    MR. SHINOFF:  I'm going to object that the

18  question is vague and argumentative.  Don't answer that

19  question.

20    THE WITNESS:  Not to mention that I have no

21  idea what that question meant.

22  BY MS. LARKINS:

23    Q.  Does the North -- okay.  By the way, who was

24  the attorney that checked around before he joined your

25  firm?

32

1    A.  B.C. Eziolu.

2    Q.  Could you spell that?

3    A.  I believe it is spelled E-z-i-o-l-u, but I

4    could be mistaken on that.

5    Q.  Okay.  Okay.  Now, do you know of anyone other

6    than this one individual, B.C. Eziolu, who had doubts

7    about your firm as a result of my website?

8    A.  I know that I had an inquiry from one lawyer

9    about the contents of your law firm.  His name is Bob

10   Gile, G-i-l-e.

11         I know there was at least one other client,

12   whom I had known and had a relationship with for quite

13   sometime, that asked me about the website, who was this

14   person, why was she writing these things.  And I

15   certainly assume again that any prospective client in

16   doing their due diligence will try to learn what they can

17   about the law firm.

18         For instance, when we respond to a request for

19   a proposal, and our firm is being considered along with

20    many other firms, the decision-makers, maybe an

21    individual or board members of a public entity will

22    likely do their due diligence.  And even if they have no

23    reason to believe that the statements on your website are

24    true, it may still cause concern on their part.

25        Q.  Do you believe that the public has a right to

33

1    know about public entity attorneys?

2        MR. SHINOFF:  I'm going to object that the

3    question is vague and ambiguous.  If you understand the

4    question, go ahead.

5        THE WITNESS:  I'm not really sure what you are

6    asking.

7    BY MS. LARKINS:

8        Q.  Let me rephrase it.  Should the tactics of

9    public entity attorneys be protected from public view?

10        MR. SHINOFF:  I'm going to object that the

11    question is vague and ambiguous in terms of the term

12    ambiguous -- in terms of the phrase tactics; and

13    protected from public view is also vague.  And I'm going

14    to instruct him not to answer.

15         THE WITNESS:  I have no idea what you are

16    asking.

17         (EXH. 2 was marked for identification.)

18    BY MS. LARKINS:

19      Q.  Okay.  I'd like to have a document marked as

20    Exhibit 2.  Thank you for taking a look at this document,

21    Mr. Artiano.  Does this newspaper article from the North

22    County Times from August 25th, 2006 look familiar to you?

23      A.  No.

24      Q.  Okay.  Uhm.  Do you want to -- do you still

25    want to refuse to read things into the record?  Would you


34


1    rather I do it in the form of a question?

2         MR. SHINOFF:  Please do it in the form of a

3    question.

4    BY MS. LARKINS:

5      Q.  Okay.  Uhm.  In this newspaper article, would

6    you look at paragraph five, and would you tell me if I

7    read this correctly.  It says:  An e-mail from the Mira

8    Costa public information office Friday stated that

9    Dr. Richart, or I guess her name is Richart or something

10   like that.  Let me start over.

11          "An e-mail from the Mira Costa public

12   information office Friday stated that Dr. Richart was

13   informed this morning by college attorney Daniel Shinoff

14   that the vice president of instructional services would

15   be on leave until further notice."

16          You agree that that's what it says?

17   A.   That's what it says, yes.

18   Q.   Thank you.  When Mr. Shinoff is telling the

19   president of a college what to do, would you say that he

20   becomes a public figure at that time?

21          MR. SHINOFF:  I'm going to object that the

22   question is vague and argumentative.

23          THE WITNESS:  Would I say that he becomes a

24   public figure?

25   BY MS. LARKINS:

35

1    Q.  Yes.

2    A.  No.

3    Q.  Oh, I should have mentioned that it is a public

4    college.  When Mr. Shinoff instructs the president of a

5    public college of an important personnel decision, is he

6    a public figure?

7    A.  No, ma'am.

8    Q.  I'd like you to look at paragraph 10.  It says:

9    "'On the advice of our attorneys, we really can't say

10   anything beyond the memo you got from the public

11   information office,' said Fernandez."

12        Is that true?  Does that say -- paragraph 10

13   say that?

14   A.  You have read it correctly.

15   Q.  Okay.  Uhm.  Does your firm believe that

16   information about how personnel decisions are made by

17   public entities should be kept from the press?

18        MR. SHINOFF:  I'm going to object that the

19   question is vague and ambiguous and overly broad.  If you

20   understand the question.

21        THE WITNESS:  I have no idea what you are

22   asking.

23   BY MS. LARKINS:

24      Q.  Does your law firm believe that the public

25      should be kept from knowing how personnel decisions are

36

1      made by public entities?

2          A.  I don't know if I can speak for the law firm as

3      a whole; but I can tell you this, that anything having to

4      do with the attorney-client relationship and the

5      decision-making process, which involves the

6      attorney-client relationship, is privileged information;

7      and no one other than the parties have a right to know

8      about that information.

9          Q.  Do you think that your firm uses

10     attorney-client privilege to hide information from the

11     public that the public has a right to know?

12         A.  I know they don't.

13         Q.  Are you aware that Mira Costa College paid

14     approximately $3 million for an investigation conducted

15     by Mr. Shinoff?

16         A.  I have no idea about amounts paid to afford an

17    investigation, nor do I have any knowledge that

18    Mr. Shinoff conducted an investigation.

19        Q.   That was in the Union Tribune.

20        MR. SHINOFF:  It is not a question.

21        THE WITNESS:  I know.  You to have ask

22    questions.

23        MS. LARKINS:  I know.  I'm not a lawyer.  So I

24    know I might not do this right.

25        THE WITNESS:  I'm not here to have my time


37


1    wasted.

2    BY MS. LARKINS:

3        Q.   Someone who is not a lawyer is a waste of time,

4    is that what you are saying?

5        MR. SHINOFF:  Don't respond to the

6    argumentative nature of that question.

7        MS. LARKINS:  Okay.  Actually, you weren't

8    responding to a question there.  Move to strike

9    Mr. Artiano's last statement.

10        I need to take a break, about 10 minutes.

11          MR. SHINOFF:  Okay.  Very good.

12          THE VIDEOTAPE TECHNICIAN:  Off the record at

13    11:18 a.m.

14          (Recess.)

15          THE VIDEOTAPE TECHNICIAN:  We are back on the

16    record at 11:27 a.m.

17    BY MS. LARKINS:

18      Q.  Mr. Artiano, what members of your firm made the

19    decision to sue me for defamation?

20      A.  It wasn't a matter of what members of the firm

21    made a decision.  I made a decision, certainly, that

22    unless you did the right thing by correcting the

23    mistake --

24          Actually, I shouldn't call it a mistake.

25      Q.  No, you shouldn't.


38


1      A.  -- of the intentional misstatements you placed

2    in your website, if you had removed that, that would have

3    obviated the need for a lawsuit.  And after I gave you

4    that opportunity to do that and you refused to do that, I

5    made the decision to go ahead and file suit.

6        Q.   Did you do any investigation to find out if the

7    statements on my website were true?

8        A.   I didn't have to do any investigation, because

9    I knew that the allegations in your -- that are posted on

10   your website are not true.

11       Q.   How closely do you follow Mr. Shinoff's actions

12   in his work?

13       A.   I don't follow his work.  I have known

14   Mr. Shinoff for approximately 30 years; and I know that

15   he is an extremely ethical, diligent, excellent attorney.

16       I can also speak for myself.  In one of your

17   websites, one of your website postings, it talks about

18   Stutz' partner, Ray Artiano, violating California law in

19   case after case; and I know that not to be true.

20       Moreover, I know that you didn't have any

21   involvement with me, knew nothing about any of the cases

22   that I handled, but yet you chose to make an

23   intentionally defamatory comment.

24       Q.   I noticed that you read from a document just

25   now.  Would you be willing to put that document into the

39

1    record as Exhibit 3.

2        A.  You want to make a copy of it?

3        Q.  Yes.

4        A.  That would be fine.

5            You'll make a copy of this?

6            THE REPORTER:  Yes.

7            (EXH. 3 was marked for identification.)

8    BY MS. LARKINS:

9        Q.  Could I take a peak at that just to make sure

10   he didn't take something out of context.

11           Did you start your quote in the middle of a

12   sentence, Mr. Artiano?

13       A.  I don't know that I started a quote anywhere.

14       Q.  When you -- when you read from the document,

15   Exhibit Number 3, did you start your quote in the middle

16   of a sentence?

17       A.  As I said, I don't know that I quoted anywhere.

18   What I said was that you have claimed that Sutz' partner,

19   Ray Artiano, violated California law in case after case.

20       Q.  Okay.

21      A.   You have also claimed that Daniel Shinoff,

22    Jeffrey Morris and Kelly Angell have violated California

23    law in case after case.

24      Q.   When you first became aware of this

25    accusation --


40


1       A.   Which accusation?  That I violated California

2    law in case after case?

3       Q.   This -- okay.  Let's just read this sentence

4    into the record, just so we know what we are talking

5    about.  Would you like to read it?

6       A.   Sure.  I will be happy to.

7       Q.   That first paragraph there.

8       A.   "Get out of jail free card?  The lawyers

9    provided by SDCOE Joint Powers Authority to Chula Vista

10    Elementary School District, Daniel Shinoff, Jeffrey

11    Morris, and Kelly Angell, as well as Stutz' partner, Ray

12    Artiano, violated California law in case after case."

13      Q.   Thank you.  Uhm.  When you first saw that

14    charge on my website, did it occur to you to do any

15    investigation at all into Daniel Shinoff or, well, you

16    say you have known Daniel Shinoff for 30 years, and you

17    wouldn't question him.

18         But how about Kelly Angell, did you do any

19    investigating into Kelly Angel's actions?

20    A.  Of course not.

21    Q.  May I ask why?

22    A.  Because there was no need for me to do that,

23    because I would know if anybody in my law firm had

24    violated California law --

25    Q.  How would you know that?


41


1    A.  -- in case after case.  We would be notified by

2    the state bar.  We would be notified by the courts.

3    Q.  Isn't it true that the state bar does not take

4    complaints from opposing clients or attorneys?

5    A.  No, it is not true.

6    Q.  Well, that's good news.  I was under the

7    impression that they did.  Uhm.  It seems to me that you

8    filed a lawsuit without making any effort at all to find

9    out if the allegations on my website are true and that

10   you have engaged in malicious prosecution.

11       A.  Is that a question, ma'am?

12       Q.  No.  No.  I flubbed up again.

13          Did Bob Gallagher ever discuss my case with

14   you?

15       A.  No, Bob Gallagher never discussed any of your

16   cases with me.

17       Q.  When I sent a complaint to your law firm in, it

18   was either December 2003 or early 2004, how was my

19   complaint handled?

20       A.  I have no idea.  If I saw a complaint that you

21   filed or that you sent, I have no recollection of that.

22       Q.  What would have happened if you saw a

23   complaint?

24       A.  It would depend on what the complaint said.

25       Q.  Well, what if it said that Daniel Shinoff was

42

1    violating the law?

2        A.  It would depend on how specific the complaint

3    was.

4        Q.  What if it says that he was obstructing justice

5    by trying to intimidate witnesses?

6        A.  Again, it would depend on what the complaint

7    said or what the letter said.

8        Q.  If someone complained to the firm that Daniel

9    Shinoff was violating the law and the firm protected him,

10   is not the firm also guilty of his wrongdoing?

11       MR. SHINOFF:  Don't answer that question.

12       THE WITNESS:  That question is nonsensical, as

13   well.

14   BY MS. LARKINS:

15       Q.  Okay.  Let me try again.  Let's not use Dan

16   Shinoff's name.  Let's keep this hypothetical.  If a

17   lawyer in your firm violates the law in case after case

18   and someone complains to the firm about that lawyer's

19   actions, aren't you aiding and abetting the wrongdoing by

20   failing to investigate, and by not just failing to

21   investigate, but by actively attacking the complainer?

22       MR. SHINOFF:  I'm going to object that the

23   question is vague and ambiguous.  It is an incomplete

24    hypothetical, and it calls for speculation.

25    BY MS. LARKINS:

43

1    Q.  Can you answer it?

2    A.  It is incapable of being answered.

3    Q.  Well, let me try again.  If one of your lawyers

4    in your firm obstructs justice and the firm is informed

5    about it and yet continues to support that lawyer by

6    shielding him from discovery, not producing documents,

7    not producing witnesses, filing malicious lawsuits

8    against the complainer, is not that firm guilty of the

9    same wrongdoing?

10    MR. SHINOFF:  I'm going to object that the

11    question is vague and ambiguous.  It is an incomplete

12    hypothetical and calls for speculation.

13    BY MS. LARKINS:

14    Q.  You still can't?

15    A.  Again, ma'am, you have to be much more specific

16    than that.

17    MS. LARKINS:  Okay.  Uhm.  I need to take a

18    break.

19         THE VIDEOTAPE TECHNICIAN:  Are we going off the

20    record?

21         MR. SHINOFF:  No.

22         THE WITNESS:  No.

23         MR. SHINOFF:  We just took a break.

24         MS. LARKINS:  Uhm, I need a -- well, I really

25    need this copied, but I suppose we could do it without


44


1    copying it.

2         (EXH. 4 was marked for identification.)

3    BY MS. LARKINS:

4         Q.  Okay.  Yes.  I have an exhibit I would like to

5    mark as exhibit -- I have an exhibit I would like to mark

6    as Exhibit 4.  I'm going to pass it to you here.

7         Exhibit 4, Mr. Artiano, does this document look

8    familiar to you?  Is it humorous to you, Mr. Artiano?

9         A.  I'm sorry?

10        Q.  Is this a matter of humor to you?  You have a

11    huge smile on your face or you did a second ago.

12        MR. SHINOFF:  Don't respond to that question.

13        MS. LARKINS:  Okay.

14        THE WITNESS:  The document is not familiar to

15    me.

16    BY MS. LARKINS:

17    Q.  When a complaint comes into your office, who

18    looks at it?  A complaint about one of your lawyers comes

19    into the Stutz office, who looks at it?

20        MR. SHINOFF:  I'm going to object that the

21    question is vague and ambiguous and overly broad.

22        THE WITNESS:  It would certainly depend upon

23    who brought the complaint.  In other words, you know, if

24    a judge was complaining about something serious, I'd

25    certainly expect to be involved.  Certainly if the state


45


1    bar brought a concern, I would expect to be involved.  In

2    all of our years of practice, that's never happened.

3        If an opposing attorney brought a complaint

4    against a lawyer, it would depend upon whether or not

5    that opposing attorney brought it directly to my

6    attention or it was brought to somebody else.  So --

7    BY MS. LARKINS:

8        Q.   Well, how about if it were addressed to the

9    firm itself?

10       A.   Just a blanket letter to the firm?

11       Q.   Yes, just to Stutz law firm.

12       A.   It would depend on where the mail was routed, I

13   suppose.

14       Q.   So it is all up to the person in the mail room?

15       A.   I would suspect that they would route it either

16   to the administrative manager --

17       Q.   Isn't that you?

18       A.   No.

19       Q.   Who is he?

20       A.   Who is she?  Right now, it is Rita Hee.

21       Q.   And how long has she --

22       A.   Or Rita.  Actually, her last name isn't Hee

23   anymore.  She's been our administrative manager probably

24   for two, two to three years.

25       Q.   And before that?

46

1    A.  Before that, a woman by the name of Diana

2    Clark, I believe.

3    Q.  And how long did she work for your firm?

4    A.  A few years.

5    Q.  Would that be three or more?

6    A.  Not necessarily.

7    Q.  What does that mean, a few?

8    A.  To the best of my recollection, about two.

9    Q.  About two.  And how about before that?

10    A.  We had the same administrative manager for

11    probably 20 years or so, and her name was Shari Randall.

12    Q.  How do you spell the Shari?

13    A.  S-h-a-r-i.

14    Q.  I'm glad I asked.  And Randall with two Ls?

15    A.  I believe so.

16    Q.  Okay.  You know, I think maybe I owe you an

17    apology, Mr. Artiano, for the big smile, because now that

18    I look at Exhibit Number 4, I see something funny.  Were

19    you smiling at the spelling of the name?

20    A.  Ma'am, I wasn't.  First of all, I wasn't

21    smiling.

22        Q.   You weren't smiling?

23        A.   And I have no idea what you are talking about.

24        Q.   Is that your testimony, that you weren't

25    smiling?


47


1        A.   Yes, ma'am.

2        Q.   Oh, that is great.  That's what the video

3    camera is for.  Did you think it was kind of humorous in

4    a way, the way that my name is spelled at the top of that

5    document?

6        A.   Frankly, I didn't notice the way your name was

7    spelled.

8        Q.   Oh, well, then we can't let you off the hook on

9    that, for the smiling.

10       A.   Is that a question?

11       Q.   No, that is a statement.

12           MR. SHINOFF:  I'm going to ask that you cease

13    with the personal comments, please.

14    BY MS. LARKINS:

15     Q.  Okay.  And do you also want me to stop saying

16     things without any consideration?

17         And, by the way, how did you know that I'm

18     prone to fantasies?

19         MR. SHINOFF:  I'm not going to respond to that

20     question.

21         MS. LARKINS:  Well, if you say something like

22     that again, I might ask you a similar question.

23         MR. SHINOFF:  Is that threat?

24         MS. LARKINS:  It is a promise.  If you make

25     disparaging personal comments such as I know that you are


48


1     prone to fantasies, I might ask you if that's what you

2     are talking about, when you ask me not to speak in a

3     certain way.

4         MR. SHINOFF:  Well, that is governed by the

5     Code of Civil Procedure.

6         MS. LARKINS:  Really?  Whether or not you can

7     sit there and say that I know you are prone to fantasies,

8    that is governed by the Code of Civil Procedure?

9        MR. SHINOFF:  The way you are asking questions

10   is governed by the Code of Civil Procedure.

11       MS. LARKINS:  But your comments are not?

12       MR. SHINOFF:  Please ask your next question.

13       MS. LARKINS:  Well, here I am, an in pro per

14   attorney, and you won't even give me answers.  I mean,

15   well, an in pro per defendant, not an in pro per

16   attorney.

17   BY MS. LARKINS:

18       Q.  Okay.  I'm sorry.  Can I look at Exhibit 1

19   again.  It is the deposition notice.  Okay.  On Number 4,

20   did you bring any documents related to your investigation

21   into whether the facts on my website might be true?

22       A.  There are no documents, because there is no

23   need to determine whether or not the statements on your

24   website were true, because I knew them to be false.

25       Q.  Oh, yeah, on this last one, I'm glad I came


49


1    back to this.  Did you bring any documents about your

2    policies with regard to complaints about unethical or

3    illegal behavior on the part of your attorneys?

4       A.   There are no written policies, nor have we ever

5    had any complaints about unethical or illegal behavior on

6    the part of any attorney in my firm other than from you.

7       Q.   That's very interesting that you would say

8    that.  Did Bob Gallagher leave your firm because your

9    firm was obstructing jus- -- was supporting Daniel

10    Shinoff's and Kelly Angell's obstruction of justice?

11       A.   No, that is not why Bob Gallagher left our

12    firm.

13       Q.   Why did he leave?

14       A.   You are not entitled to that information.  That

15    is protected by Mr. Gallagher's privacy rights.

16       Q.   Would you -- were you sorry to see him leave?

17       MR. SHINOFF:  I'm going to object that that is

18    irrelevant.

19       THE WITNESS:  Again, I'm not going to engage in

20    this line of questioning, because you seek to invade the

21    privacy rights of an employee of my firm, an ex-employee,

22    rather.

23    BY MS. LARKINS:

24       Q.   I'm not sure that you have a privacy right to

25    cover up obstruction of justice.


50


1       A.   If you continue making statements such as the

2    one -- such as the one that you just made, the deposition

3    will conclude rather quickly.

4       Q.   Well, that's too bad, because you are trying

5    to -- you are suing me for saying that your firm

6    obstructed justice; and yet, you claim that you have

7    never seen that Exhibit Number 4, which was part of a

8    complaint I sent to your law firm just about weeks before

9    Bob Gallagher left the firm.  I -- you are the plaintiff

10    here.  You are the one that wanted to talk about this in

11    court, about how you don't obstruct justice.

12       MR. SHINOFF:  You misunderstand the

13    allegations.

14       MS. LARKINS:  Okay.  Let's hear it.  I think

15    defamation is a heinous action; and I think people who do

16    it intentionally are heinous.  If I have said anything on

17    my website about your law firm or you as an individual,

18  Mr. Artiano, or you as an individual, Mr. Shinoff, I want

19  to apologize. I want to reimburse you for any losses

20  financially it has cost you. I want to take down the

21  website, put a big apology in its place. If all this is,

22  as Mr. Shinoff seems to be saying, a fantasy on my part,

23  please stay and explain it to me, how I'm wrong.

24        Your lawyer, Mr. Shinoff, and your other

25  lawyer, Kelly Angell, obstructed justice in an


51


1  unconscionable fashion in my case and in several other

2  cases. Intimidation seems to be a favorite tactic.

3        THE WITNESS: Please ask a question.

4  BY MS. LARKINS:

5     Q.  Okay. If your law firm is so great, why did

6  Bob Gallagher leave?

7     A.  I just explained to you that I would never talk

8  about an employee, who has departed the firm. I can tell

9  you this, however: It had absolutely nothing at all to

10  do with you.

11    Q.  Uhm. Do you always refer to Bob Gallagher as

12    an employee of the firm or do you sometimes refer to him

13    as a founder, a partner?

14        A.  He was a founder of the firm.  He was a

15    partner, actually, a shareholder.  In law firms, we

16    generally refer to partners, however.

17        Q.  He started the firm without you, correct?

18        A.  No.

19        Q.  You were there at the very beginning?

20        A.  Yes.

21        Q.  How many lawyers were in the firm when you

22    founded it?

23        A.  Three of us.

24        Q.  Okay.  But now you refer to him as an employee?

25        A.  An ex-employee, yes.  I am an employee of the

52

1    firm, as well.

2        Q.  Do you sort of -- are you uncomfortable talking

3    about Bob Gallagher?

4        A.  In California, everybody has a constitutional

5   right to privacy. And --

6     Q. Well, that's not what I'm talking about.

7   Really, it struck me when you referred to him as an

8   employee. It seemed like you were trying to diminish his

9   importance.

10     MR. SHINOFF: There is no question pending.

11     THE WITNESS: I know.

12   BY MS. LARKINS:

13     Q. How many lawyers do you know that have founded

14   a firm and then left it?

15     MR. SHINOFF: I'm going to object that the

16   question is irrelevant. Don't respond, please.

17     MS. LARKINS: You're instructing him not to

18   answer?

19     MR. SHINOFF: I am. I don't see how it's

20   calculated to lead to the discovery of relevant evidence.

21     MS. LARKINS: You know, we wouldn't even have

22   to continue with this case. If you just gave me just a

23   little flicker of a doubt about my allegations, I'd take

24   my site down right now. You are just acting so guilty.

25   You are acting like you are covering up.

53

1        THE WITNESS:  Are you going to continue to ask

2    questions or are you going to continue to make speeches?

3    If the latter, as I said before, we are going to end the

4    deposition.  I'm not here to listen to you make speeches.

5        MS. LARKINS:  I really am a person, who, when

6    I'm wrong, I admit it.

7        THE WITNESS:  Okay.  That's the end of this

8    deposition.

9        MR. SHINOFF:  We'll give you notice of our

10    motion for a protective order.  If we could have a copy

11    of the deposition transcript, please.

12        MS. LARKINS:  Are you going to attend your

13    deposition, Mr. Shinoff?

14        MR. SHINOFF:  No, because I'm concerned that

15    the deposition will go the same way.  And I think we need

16    guidance from the court so the court can provide guidance

17    for both parties in terms of the rules that govern the

18    deposition process.

19        MS. LARKINS:  Okay.

20        MR. SHINOFF:  I'm also going to ask that we be

21    permitted, just so that you know, that we be permitted to

22    have a camera that focuses on you, as well, because I

23    think that your behavior is also intended to intimidate,

24    vex, and annoy the witness, in particular, Mr. Artiano.

25          MS. LARKINS:  I certainly do want a camera


54


1    focused on me, because you are making false allegations,

2    and I want to be protected by the camera.  Would you

3    agree to have a camera on you, yourself, Mr. Shinoff?

4          MR. SHINOFF:  I have no problem having a camera

5    on me.  What's interesting to me --

6          THE VIDEOTAPE TECHNICIAN:  Excuse me.  Counsel,

7    I just need to find out technically how we are going off

8    the record, because everybody has to agree.  You are

9    going off to seek a protective order, go off with that

10    part of the statute?

11          MR. SHINOFF:  Yes, we are going to go off to

12    seek a protective order.

13          THE VIDEOTAPE TECHNICIAN:  So you want me to go

14    off the tape, and you want Bonnie to stop writing?

15          MR. SHINOFF:  No, I don't want the reporter to

16     stop.

17          It is curious to me that you would hold

18     yourself out as a person, who has a great honor for the

19     truth, yet you would deny that you were smirking and

20     smiling at Mr. Artiano throughout the course of your

21     questioning.

22          Are you saying that you weren't doing that,

23     because I believe you when you say that the truth is

24     something that is very important to you and that you find

25     defamation to be heinous?  So I take you at your word.


                            55


1          MS. LARKINS:  I may have smiled a few times.  I

2     really -- I don't know.  I would like to have the camera,

3     too.

4          MR. SHINOFF:  Okay.

5          MS. LARKINS:  So I know myself for sure how

6     true or false your allegations are.

7          MR. SHINOFF:  Okay.  I'm just telling you what

8     I observed.  Okay?  And I think that the camera would be

9    extremely beneficial.

10       MS. LARKINS:  I think so, too.  It will protect

11    me from any false allegations.

12       MR. SHINOFF:  Are you saying you didn't smile

13    and smirk at Mr. Artiano throughout the course of the

14    deposition?

15       MS. LARKINS:  I said that the camera will

16    protect me from any false allegations.

17       MR. SHINOFF:  Why is it that you won't answer

18    the question?

19       MS. LARKINS:  If you look at the deposition

20    transcript when it comes, you'll see that I said that I

21    may have smiled a few times.

22       MR. SHINOFF:  And how many is a few times?

23       MS. LARKINS:  I have no idea.  I wasn't paying

24    attention to my smiling.

25       MR. SHINOFF:  Thank you.


56


1       THE REPORTER:  We are going off the record now.

2          THE VIDEOTAPE TECHNICIAN:  Off the record at

3    12:00 p.m.

4          (Deposition adjourned at 12:00 p.m.)

5          I, the undersigned, say that I have read the

6    foregoing deposition and hereby declare under penalty of

7    perjury the foregoing is true and correct.

8          Executed this _____ day of _____, 2007,

9    at _____, _____.

10   (City)      (State)

11

12        _____

13          DECLARANT

14

15

16

17

18

19

20

21

22

23

24

25

57

1  STATE OF CALIFORNIA            )
                                  ) ss
2  COUNTY OF SAN DIEGO            )

3

4     I, Bonnie Breen, CSR No. 5582, a Certified Shorthand

5  Reporter in and for the County of San Diego, State of

6  California, do hereby certify:

7     That prior to being examined, the witness named in

8  the forgoing deposition was by me duly sworn to testify

9  to the truth, the whole truth, and nothing but the truth.

10    That said deposition was taken before me at the time

11 and place set forth and was taken down by me in shorthand

12 and thereafter reduced to computerized transcription

13 under my direction and supervision; and I hereby certify

14 the foregoing deposition is a full, true and correct

15 transcript of my shorthand notes so taken.

16    I further certify that I am neither counsel for nor

17 related to any party to said action nor in anywise

18 interested in the outcome thereof.

19      IN WITNESS WHEREOF, I have hereunto subscribed my

20   name this _____ day of _____, 2007 at San Diego,

21   California.

22

23   _____

     BONNIE G. BREEN, CSR NO. 5582
24

25

58