# EXHIBIT 6

**SAN DIEGO
EDUCATION REPORT**
mauralarkins.com

# Maura Larkins' Perjury Complaint Is a Public Interest Lawsuit

### Opposition to Defendants' Identical Demurrers filed Feb. 5, 2007

Link: perjury complaint
& documents proving
perjury

Who is Deborah
Garvin's lawyer?

Law Enforcement

Perjury in America

*"A police officer comes to the witness stand clothed with the authority of the State.*

*"His official status gives him credibility and creates a far greater potential for harm than exists when the average citizen testifies."*

Link: perjury
complaint &
**documents
proving
perjury**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO, EAST COUNTY DIVISION

| | | |
|---|---|---|
| MAURA LARKINS,<br>Plaintiff,<br><br>vs.<br><br>MICHAEL CARLSON,<br>DEBORAH K. GARVIN<br>and DOES 1 through 10, inclusive,<br>Defendants. | ) Case No.<br>) Judge:<br>) Dept:<br>) Date:<br>)<br>) OPPOSITION TO DEMURRER OF<br>) DEFENDANT DEBORAH K. GARVIN<br>)<br>)<br>)<br>) | GIE 034328<br>Eddie Sturgeon<br>14<br>February 16, 2007 |

*"The fact that plaintiff does NOT have a criminal history is precisely the reason that CARLSON's acquisition and distribution of information in the false police report was a criminal act."*

## A.    THIS CASE IS ABOUT CRYSTAL-CLEAR PERJURY

This case is about a felony committed to cover up a misdemeanor.
Defendants created a false document stating that MICHAEL CARLSON
committed ZERO illegal CLETS searches for plaintiff in the effort to prove
that he did not use an illegally obtained record of an arrest to destroy plaintiff's

career, reputation and livelihood.

Defendant GARVIN states (Demurrer, page 1, lines19-21), "Plaintiff's action is
much ado about an "and" and an "or"; a conjunctive v. disjunctive
typographical
error which had absolutely no bearing on a previous civil action between
plaintiff
and defendant Michael Carlson."

On the contrary, plaintiff's action is about a declaration (Exhibit 1),
every word of which was written for one purpose—to deceive. The
declaration's intent was to perpetrate a fraud on the Superior Court of
San Diego by creating a false document to be signed under penalty of
perjury by an official representative of the Sheriff of the County of
Santa Barbara.

Gabriel G. Hedrick supposedly prepared the identical motions filed by Garvin (and copied and filed by Carlson) in this case.

But Gabriel Hedrick left the firm of McCormick and Mitchell (where Garvin is a partner) at about the same time as these motions were filed. Gabe Hedrick went to Handal & Associates in San Diego. Hedrick's new law firm refused to state to plaintiff on March 5, 2007 whether or not Hedrick works for them, until she said that the Bar Association website indicates that he does. Handal & Associates then admitted the truth.

What's the story here? Perhaps Hedrick and his new firm are embarrassed by his role in this case.

Make a comment !
Maura Larkins' blog:
San Diego
Education Report Blog

Published by
Maura Larkins

Email:
sandiegoodreport@cox.net

The office of the Sheriff of Santa Barbara did not want Michael Carlson working in its information center after it discovered he had committed multiple crimes there.

Carlson was transferred to patrol duty.

But the sheriff committed perjury to cover up Carlson's crime from outsiders. Clearly, the sheriff is interested in protecting insiders, not the people on

## B. THIS CASE CONCERNS THE DIFFERENCE BETWEEN ZERO (CLETS SEARCHES) AND EIGHT (CLETS SEARCHES)

In his deposition, Sam Gross, without hesitation, testified that HIS OWN DECLARATION was FALSE.

Defendants have admitted their intent in identical demurrers filed in the present
action. They state (demurrer, p. 2; lines 24-25), "The declaration was intended
to show that Carlson did not access the CLETS system and therefore could not
have known of plaintiff's criminal history."  (CLETS is the acronym for the
CALIFORNIA LAW ENFORCEMENT TELECOMMUNICATIONS SYSTEM.)
Thus, GARVIN and CARLSON admit that they intended to make the court believe
something that the attached audits did not support in the least.  The declaration
in
question contained NO audits of searches for "maura" or "larkins" as it claimed,
only audits for "maura" and "larkins." The word "or" was necessary achieve the
admitted purpose of the declaration, and was not a "typographical error."
Although the word "or" was a critical part of the hoax perpetrated on the court
in
San Diego Superior Court, it was by no means the only deception in the
declaration.

Missing audits are further proof that GARVIN and CARLSON intended to deceive
the court. The audit documents included by defendants (labeled as "exhibit A"
within the Amended Declaration, which is attached as Exhibit 1) were carefully
designed to fool the judge and cover up EIGHT searches that had occurred.
Sheriff's representative Sam Gross admitted during his deposition on November
4, 2004, that the declaration he had signed was false.  Mr. Gross agreed to
conduct and report the results of the audits that had been written about, but
not
included, in his declaration. Weeks later, Mr. Gross sent a letter (Exhibit 2)
stating that there had actually been EIGHT (8) searches for "maura" or
"larkins"
of the CLETS database.

## C. CARLSON'S MOTION FOR TERMINATING SANCTIONS WAS DECIDED AFTER THE COURT WAS PRESENTED WITH THE FALSE DECLARATION OF THE SHERIFF OF SANTA BARBARA

Defendants' assertion that the perjured declaration of the Sheriff of Santa
Barbara's representative had no effect on the judge in San Diego Superior Court

case number GIC 781970 is preposterous.  The judge would not expect a false
declaration from the representative of the Sheriff of Santa Barbara County.
Contrary to GARVIN's claim, the declaration had a huge bearing on the previous

civil action between plaintiff and defendant Michael Carlson. As a result of the
perjured declaration, and other abuses of the justice system by defendants and
the eight law firms that worked together against plaintiff, plaintiff's case
against
Carlson was thrown out.

not the people on the outside, the people who pay for the sheriff's protection from crime.

The crime committed by defendants is particularly harmful to the public good because it involved two law enforcement officers.

In his dissent in Briscoe v. LaHUE, Justice Marshall stated:

"A police officer comes to the witness stand clothed with the authority of the State. His official status gives him credibility and creates a far greater potential for harm than exists when the average citizen testifies. The situation is aggravated when the official draws on special expertise. A policeman testifying about a fingerprint identification or a medical examiner testifying as to the cause of a death can have a critical impact on a defendant's trial. At the same time, the threat of a criminal perjury prosecution, which serves as an important constraint on the average witness' testimony, is virtually nonexistent in the police-witness context. Despite the apparent prevalence of police perjury, prosecutors exhibit extreme [460 U.S. 325, 366] reluctance in charging police officials with criminal conduct because of their need to maintain close working relationships with law enforcement agencies. The majority thus forecloses a civil sanction in precisely those situations where the need is most pressing."

Defendants are confident that they can, in this case, repeat their past success in deceiving the San Diego Superior Court. Defendants use the phrase "plaintiff's criminal history" (demurrer, p. 2; lines 24-25), despite the fact that plaintiff has no criminal history. Plaintiff never committed a crime nor was she ever charged with a crime. The fact that plaintiff does not have a criminal history is precisely the reason that CARLSON's acquisition and distribution of information in the false police report was a criminal act. (LABOR CODE §432.7(g) (1) (a misdemeanor) states: "No peace officer or employee of a law enforcement agency with access to criminal offender record information maintained by a local law enforcement criminal justice agency shall knowingly disclose, with intent to affect a person's employment, any information contained therein pertaining to an arrest or detention or proceeding that did not result in a conviction..." The wish to conceal CARLSON's criminal act is the reason that defendants suborned perjury.

## D.    LARKINS WOULD HAVE WON HER SUPERIOR COURT CASE IF IT HAD NOT BEEN THROWN OUT

To their shame, defendants continue to deny (identical demurrers, page 2 lines 15-16) that CARLSON knew anything of plaintiff before he was sued. The evidence proves not only that he knew about her, but had committed a crime against her long before she knew of his existence.

It should be noted that for a considerable time, CARLSON tried to make plaintiff believe that his innocent brother was in fact the guilty party. Gretchen Donndelinger, principal of Castle Park Elementary School (who was not at all supportive of plaintiff), revealed the truth about CARLSON in her deposition (Exhibit 3):

Q.    (page 80, lines 19-25)  Did Robin Colls [AKA Robin Donlan] ever share with you any kind of information concerning a police report allegedly, somehow, involving Maura Larkins?
A.    Actually, that did come up at some point when she [Robin Colls/Donlan] was talking, but she, herself, said, you know, you don't want to hear anything about that.  And I'm not going to tell you.  I know that there is something, but I have no clue what it is.  She didn't want me to know.
Q.    So she said there's something in the police report?
A.    It was a personal thing.
Q.     Involving something that was a non-school matter but that Robin Colls was aware of?
A.    Uh-huh.
Q.    Was that a yes?
A.    Yes, I do recall hearing something like that.  I have no details whatsoever.
Q.    Was this in a face-to-face conversation with Robin Colls?
A.    Yes.
Q.    And what year was that?
A.    That was the year, I think she told me about that this year, the year—
Q.    2002?
A.    Two—1999, 2000 school year.  It was the year before.
Q.    That this occurred?
A.    It occurred in the 1999, 2000 school year.
Q.    But you found out about it in which year.
A.    There was an incident that this is referring to in my belief.  They had a

problem with a staff member the year before and—that's what I understood this
to mean anyway.
Q.        Exhibit 19?  (Exhibit 4 in current action)
A.        (Page 82 lines 1-25:) Yes.  It happened in 1999, <u>September.  It was like the first week back from vacation.  That's when that happened, and, I believe, that's when Robin told me that there was an incident, there was a personal, a side incident, but she said you don't want to know about it.</u>  And I said
no, it's personal, doesn't have anything to do with school, I don't want to know.
Q.        <u>And she told you it involved some sort of police report or law enforcement
report?</u>
<u>A.        I think so, yes.</u>
Q.        Did you ask her how she knew that?
A.        Uh-uh.
Q.        No?
A.        That was it.  That's all she said.  She said I have this thing going on with her on the side.  Outside of school.  You don't want to know about it.
Q.        Was it an indication that she had it going on, that it was something personal?
A.        <u>It was a personal issue outside of school going on with Maura and her somehow, and I don't know if it was her or her family or—but that was it.</u>  That's
all she said.
Q.        Did Ms. Colls, rather, leave you with the impression that it was going on—
that somehow, Ms. Colls was actually involved in this personal incident?
A.        That she or her family, you know, she knows about it or it was—something
else going on outside of school,  (Page 83, lines 1-8:) something to do with Robin
and or her family and Maura.  I don't know even why I remember that.  Somehow
somebody told me, and I think it was Robin.
Q.        It had something to do with either Robin or a family member of Robin's?
A.        Yeah.  I think if it was actually Robin I probably would have wanted to know, just natural curiosity.  I don't think it was against her.  <u>I think it was a family member.</u>

<u>Thus, Carlson knew of plaintiff's existence long before she knew of his existence.</u>
Unbeknownst to plaintiff, Carlson and his sister, Robin Colls (AKA Robin Donlan),
had made plaintiff a matter of considerable discussion in the teacher's lounge and
the school district office in September of 2000.

## E.    CARLSON INCLUDED THE PERJURED DECLARATION OF SAM GROSS IN HIS MOTION FOR SUMMARY JUDGMENT

When the court read the declaration of the Sheriff of Santa Barbara, the court must have become convinced that plaintiff had no chance of winning.  This belief,
though incorrect, was certainly created by the false declaration of the representative of the Sheriff of Santa Barbara, the very declaration that is at the
heart of the current litigation.

Of course the judge assumed that the declaration of the Sheriff of Santa Barbara
was true.  By submitting the perjured  declaration, Defendant Deborah Garvin

01/29/08
Update:
Neither Sharon Jones
nor Randolph Ward
ever responded to
Larkins' public records
request.

02/07/07
SDCOE member
Sharon Jones is
currently helping her
constituent Larkins
with her public records
request regarding the
amount of payments
made to Dan Shinoff
and/or his law firm by
SDCOE-JPA in this
case and other cases.
(At least, we hope and
believe that Jones is
working on this
problem.  In the past,
SDCOE has simply
forwarded such
requests to Shinoff,

who routinely denies them.
We hope for a response from current SDCOE-JPA top administrator Randy Ward any day now.

fooled the Superior Court in case number GIC 781970.

**F. DEFENDANTS WITHDREW THEIR MOTION FOR SUMMARY JUDGMENT SO PLAINTIFF HAD NO OPPORTUNITY TO PROVE THAT IT CONTAINED A PERJURED DECLARATION**

It is shameful that defendants mention their Request for Summary Judgment, when they themselves withdrew this motion before Plaintiff could respond to it.

Without this document, and the Request for Summary Judgment in which it was

filed, the court would not have made the decision it did. Plaintiff was never allowed to file her Opposition to Request for Summary Judgment (Exhibit 5).

CARLSON and GARVIN did not retract their false declaration even after Sam Gross declared it to be false, because that would have destroyed their defense.

Their defense depended entirely on obstruction, intimidation, and dishonesty. Instead, GARVIN withdrew her Motion for Summary Judgment, specifically requesting that the court NOT make a decision, so that plaintiff would have no opportunity to submit proof that Sam Gross's declaration was false.

**G.  EIGHT LAW FIRMS** [including Stutz, Artiano, Shinoff & Holtz, the law firm that represented current Chula Vista mayor Cheryl Cox, and fellow CVESD board members Pamela Smith, Patrick Judd, Bertha Lopez, and Larry Cunningham, and was financed by Daniel Shinoff friend Diane Crosier,

director of the SDCOE-JPA ] **MADE SURE THAT JUSTICE DID NOT PREVAIL**

Plaintiff, a third-grade teacher, did not obtain justice because EIGHT LAW FIRMS
were determined to avoid a just outcome for her case.  Terminating Sanctions were granted against plaintiff simply because she could not keep up with the eight law firms working against her.

## H.  JUDGE NEVITT REVEALED THE REASON FOR THE TERMINATING SANCTIONS WAS PLAINTIFF'S FAILURE TO FILE A MOTION FOR A PROTECTIVE ORDER

Judge Nevitt states on page 2 of his decision granting Terminating Sanctions:

*"Although plaintiff does not make the argument, plaintiff's departure  from her deposition on November 11, 2004, may have been a suspension of the deposition arguably pursuant to CCP section 2025(n)* [see 11/11/04 rough transcript, p. 107;10-12 in plaintiff's Exh. 1, and p. 15:11-13 in defendant Donlans's and Watson's Exh. M]; *but plaintiff did not continue the procedure under section 2025(n) to seek a protective order. (Exhibit 6, page 2)*

Here is the passage to which the court refers:
**[Plaintiff]  "I believe I need to suspend this deposition at this time and talk to the court about whether or not I have a right to act as my own counsel during my deposition." (Exhibit 7)**

It is absurd to claim that plaintiff was unwilling to ask for a protective order against discovery abuse by defendants. Obviously, plaintiff would not intentionally fail to seek a protective order to which she is entitled. Plaintiff was
merely unable to keep up with eight large law firms working against her in two different cases. Eight law firms with multiple lawyers buried a third-grade teacher under motion after motion, all the while committing violations and abuses
of discovery law. Plaintiff was simply unable to keep up with the discovery abuse of eight law firms. Lawyers in different cases demanded to depose her on
the same day.

## I. AGAIN AND AGAIN, DEFENDANTS AND DEFENDANT WITNESSES WALKED OUT OF DEPOSITIONS

Ironically, just one day before plaintiff's momentous November 11, 2004 deposition, co-defendants' lawyer Kelly Angell walked out of the Scharmach deposition, and ordered Ms. S to leave (Exhibit 8, page 174 lines 15-19):

QUESTION:        Ms. S, did you feel that I was right not to
                bow to injustice when I was wrongfully removed
                from my classroom in Chula Vista Elementary;

MS. ANGELL:        Objection. Argumentative.
                Let's go, Mrs. S. We're done.

At that point, Kelly Angell walked out, and Mrs. Scharmach followed her. Angell's
law firm, Stutz, Artiano, Shinoff & Holtz, clearly believe that lawyers for a school
district have carte blanche to ignore the law. The behavior of Kelly Angell (AKA
Minnehan) was manipulative and deceitful when she got the court to order a deposition date for plaintiff when she knew plaintiff wouldn't be able to attend.

Angell started out by getting a court order for a deposition on October 28, 2004,
knowing that plaintiff was going to be deposed in another case the next day. Nevertheless, plaintiff wrote back and agreed to the date (Exhibit 9). The date

was agreed to, set in writing, so naturally plaintiff assumed Angell would not continue her ex parte quest for a deposition date. Shamefully, Angell did go to the judge, without plaintiff's knowledge, and asked for the agreed-upon deposition date to be changed to the ONE DAY, OCTOBER 25, 2004, when she knew plaintiff would be unavailable. Plaintiff came to her deposition for as long

as she could on that date.

Angell also got a protective order against all discovery based simply on the fact that discovery is just too troublesome for school districts. Plaintiff, on the other
hand, produced hundreds of documents, and answered hundreds of interrogatories. Kelly Angell wouldn't answer any interrogatories until eight months after plaintiff asked for CARLSON's address—after plaintiff had spent hundreds of dollars on a private detective and already knew the address—at which time Angell answered one interrogatory about Carlson's address.

Perjury was
rampant in this
case. It was
committed by
Richard Werlin, the
Assistant
Superintendent for

Defendant Chula Vista Educators President Gina Boyd's lawyer, Michael Hersh unilaterally declared that her deposition was finished. Boyd said that she gave her notes of meetings concerning plaintiff to her lawyer, who then helped Boyd explain that she might have accidentally thrown away (!) the notes (for a meeting that would prove she committed perjury), or they might have been lost

Superintendent for
Human Resources,
Gina Boyd, the
president of Chula
Vista Educators,
Robin Donlan,
Michael Carlson's
sister, and others.

(in the lawyer's office). Michael Hersh also prepared a declaration for Boyd to sign. The declaration attempted to explain what happened to the notes (Exhibit 15).

## J. WHY DID DEFENDANTS ABUSE DISCOVERY?

Defendant attorney **Kelly Angell obligingly explained,** on December 31, 2002, **why she would not answer plaintiff's interrogatories:**

**"I can't answer them.  I just can't.  I can't answer them and protect my client"**

(Exhibit 10).  This is clearly the reason for all the discovery avoidance by defendants.

## K.  CARLSON NEVER SUBMITTED TO A DEPOSITION OR ANY OTHER DISCOVERY

GARVIN asked the court to excuse CARLSON from discover without offering any reason why he should be exempted. CARLSON never submitted to a deposition. GARVIN simply refused to comply with discovery requests.

### L. DEFENDANTS CONTINUE TO TRY TO CONFUSE THE COURT IN THIS CASE

Defendants are trying to confuse the issue at hand by stating (identical demurrers, page 3 line 26-27), "[Sheriff's representative Sam] Gross revealed, however, "None of the names disclosed [in CLETS audits] was Maura and Larkins connected as a first and last name."" Defendants' statement is true, but only because there is no CLETS record for Maura Larkins. Why the cover-up of the two audits revealing the eight searches? Why did Sam Gross not reveal in his letter, as he had promised to do, whether or not CARLSON had conducted any or all of the eight searches? The point of the audits was NOT to see whose CLETS records came up in past searches, but to see WHO HAD CONDUCTED THOSE SEARCHES. When Sheriff's representative Sam Gross wrote the November 24, 2004 letter (Exhibit 2), he had the identification number/s of the person/s who conducted those eight searches, but did not reveal them. Why not?  Instead, Gross tried to confuse the issue by talking about the fact that Plaintiff's name does not show up in a CLETS search, and by saying he couldn't reveal the names of anyone whose history had come up.  It's long past time for the Sheriff of Santa Barbara to reveal whether CARLSON made any or all of those eight (8) searches for "maura" or "larkins."

## II.  THIS IS A PUBLIC INTEREST LAWSUIT

## A.  THE LITIGATION PRIVILEGE GOVERNED BY CIVIL CODE SECTION 47 SERIOUSLY UNDERMINES THE JUSTICE SYSTEM

Plaintiff's complaint concerns a public policy that runs counter to, and seriously

undermines, the basic purpose of our legal system. **Current public
policy allows individuals to sue for damages caused
by every crime in the book—except one.**

## That crime is perjury.

### B. ONE CENTURY'S JUDICIAL DISSENT IS ANOTHER CENTURY'S ACCEPTED LAW

Plaintiff asks that her complaint be considered in the light of dissenting
opinions
in Briscoe v. LaHUE (Exhibit 11). Law and case law as explicated in these
dissents require that defendant's demurrer be overruled.

The crime committed by defendants is particularly harmful to the public good
because it involved two law enforcement officers. In his dissent in Briscoe v.
LaHUE, Justice Marshall stated:

*A police officer comes to the witness stand clothed with the authority of
the State.*

*His official status gives him credibility and creates a far greater potential
for harm than exists when the average citizen testifies.*

*The situation is aggravated when the official draws on special expertise. A
policeman testifying about a fingerprint identification or a medical examiner
testifying as to the cause of a death can have a critical impact on a
defendant's trial.*

*At the same time, the threat of a criminal perjury prosecution, which serves
as an important constraint on the average witness' testimony, is virtually
nonexistent in the police-witness context.*

*Despite the apparent prevalence of police perjury, prosecutors exhibit
extreme [460 U.S. 325, 366] reluctance in charging police officials with
criminal conduct because of their need to maintain close working relationships
with law enforcement agencies.*

*The majority thus forecloses a civil sanction in precisely those situations
where the need is most pressing.*

### C. A WRONGFUL ACTION THAT CAUSES DAMAGE TO ANOTHER, WHETHER CIVIL

### OR CRIMINAL, MUST BE SUBJECT TO A CIVIL ACTION FOR DAMAGES; PERJURY SHOULD BE NO EXCEPTION

Any illegal action that results in harm is subject to a civil action for damages,
except perjury. Plaintiff is not asking that defendants be put in jail or convicted

in criminal court. Plaintiff asks only that Defendants remedy the wrongful harm

they have done.
The California Code of Civil Procedure 530 states, "A civil action is prosecuted

The California Code of Civil Procedure 350 states, "A civil action is prosecuted by one party against another for the declaration, enforcement or protection of a

right, or the redress or prevention of a wrong." This suit asks for the redress of

a wrong and prevention of further harm to plaintiff caused by the perjured court
record and its consequences.

In addition, CCP §32 states, "When the violation of a right admits of both a civil and criminal remedy, the right to prosecute the one is not merged in the other." The right to prosecute an offense in criminal court is separate from the right to file an action in civil court. Plaintiff has no authority over criminal court.
Plaintiff does, however, have a right to prosecute this matter in civil court.

If the truth had been told by defendants, plaintiff would have been reinstated in her job, her good standing in the community would have been returned to her,
her financial losses would have been mitigated, and the case would have been settled. It appears that GARVIN and CARLSON have no remorse, no sense of guilt, and no apparent intention of changing their ways.

By poisoning the case, destroying the fairness of the proceedings, defendants caused everyone who knows me, including people in northern California, to believe that the heinous and false accusations against me, initiated by Carlson, then spreading in a mass hysteria, were true.

## III. FEDERAL COURTS HAVE FOUND THAT PERJURED TESTIMONY CAN BE GROUNDS FOR RELIEF

Federal Courts have decided that a demonstration of perjured testimony can be grounds for relief under Rule 60(b)(3). See Harre v. A.H. Robins, 750 F.2d 1501, 1504-05 (11th Cir. 1985) (holding that perjury can constitute fraud under Rule 60(b) (3)). The Commission has noted that fraudulent conduct under
Rule 60(b)(3) must be proven by clear and convincing evidence. Secretary of Labor on behalf of Pena v. Eisenman Chem. Co., 11 FMSHRC 2166, 2167-68 (Nov. 1989) (denying miner's request for relief because it failed to provide "clear and convincing evidence" of fraud or misconduct where miner alleged that
operator defrauded him in the settlement of his discrimination suit); Wadding v.
Tunnelton Mining Co., 8 FMSHRC 1142, 1143 (Aug. 1986) (finding that miner failed pursuant to Rule 60(b)(3) to provide "clear and convincing evidence." In

Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 832 (7th Cir. 1985) the courts stated that an adverse party's fraud or subornation of perjury permits relatively free reopening of the judgment when the perjury goes to the heart of the issue.

## IV. PLAINTIFF'S ALLEGATIONS ARE CLEARLY SUPPORTED BY THE ATTACHED EXHIBITS AND PROVIDE CLEAR AND CONVINCING EVIDENCE

Defendants claim, "The exhibits to the complaint conflict with the facts alleged and do not support plaintiff's causes of action. In truth, there is absolutely NO conflict between the allegations and exhibits of plaintiff's complaint:
1. There WERE NO records about Maura Larkins in the CLETS database. However, there were eight searches for "maura" or "larkins" in the CLETS database in 2000 or 2001. When CARLSON was sued, he suborned his boss's perjury to cover up these searches. This is the basis of the present complaint.
2. There WERE police records at the San Diego Police Department about Maura Larkins. Defendants have included these records in their own filings. Plaintiff, on

page 4, lines 20-22 of the present complaint alleged that Carlson provided THESE SAN DIEGO POLICE RECORDS to his sister.

3. THE ABOVE TWO ALLEGATIONS ARE CLEARLY CONSISTENT WITH EACH OTHER.

4. Sam Gross himself admitted in his letter (Exhibit 2) that his interpretation of

audits of the CLETS system was incorrect.  Plaintiff's exhibits, which contain Sam

Gross's letter, are so devastatingly probative of plaintiff's allegations that plaintiff wonders if defendants are fully in tune with reality.  The declaration prepared by defendants sought, as defendants themselves admit (demurrer, p. 2;

lines 24-25), "The declaration was intended to show that Carlson did not access

the CLETS system and therefore could not have known of plaintiff's criminal history."  Defendants clearly intended to hide the fact that there were EIGHT searches for Maura  or Larkins. The declaration also intentionally avoided including the audits for those EIGHT searches, while claiming that they were included, in  order to create a false document for Sam Gross to sign.  Indeed, the

declaration seeks to cover up the truth by cravenly throwing in two red herrings,

the searches for "maura" AND "larkins,"  and the intentionally false claim that there were NO searches for "maura" OR "larkins."

## V.  PROPERLY INTERPRETED CASE LAW, COMMON LAW, AND STATUTORY FAIL TO SUPPORT THE PUBLIC POLICY OF CIVIL  IMMUNITY FOR ALL WHO COMMIT PERJURY

Defendants are understandably upset and frustrated that did not get clean away

with subornation of perjury, but their identical demurrers have not one speck of

merit to them.  Defendants' demurrers must be overruled because Plaintiff has pleaded her case correctly, and the current evidence proves the truth of plaintiff'
s allegations.

## CONCLUSION

It should trigger a warning in our justice system when a lawyer and a law enforcement officer both clearly believe that may commit perjury without consequence.

   Plaintiff respectfully asks the court to forward the proof provided in this complaint of subornation of perjury by attorney Deborah K. Garvin to the attorney discipline committee of the California State Bar. Plaintiff heard GARVIN complaining early in the previous case that GARVIN was tired of practicing law.  This case should provide the ticket to freedom that GARVIN has been waiting for.

Plaintiff requests that defendant's identical demurrers be overruled. Respectfully submitted,

February 1, 2007    _____

                    **MAURA LARKINS**