# EXHIBIT 14

San Diego Education Report
mauralarkins.com

# What happened at CVESD
Page 4

Page 4

<div style="float:right">Search</div>

MARCH 27, 2001

## MAURA LARKINS WAS TOLD NOT TO RETURN TO DISTRICT PROPERTY.

Home
Why This Website
SDCOE
CVESD
CTA
CVE
Stutz Artiano Shinoff
Silence Is Golden
Schools & Violence
Office Admin Hearings
Larkins OAH Hearing
Recommended Books
New Developments
SITE MAP

Larkins Hearing
| 1 Contents
| 2 Phone Calls
| 3 Handgun
| 4 Banned
| 5 Werlin's Letter
| 6 In Hiding
| 7 Children Hurt
| 8 No Investigation
| 9 No Job
| 10 Werlin Faxing
| 11 Hearing Denied
| 12 Retaliation
|

### "It is understandable that the District did not want the truth revealed about this.

"But it could and should have made sure that the accusers understood that the false allegations would not be allowed to continue, so that [Maura Larkins] could go back to work in peace.

"Instead, Richard Werlin prepared the ground for Mrs. Larkins to be taken out again. He started on the very day he asked her to return to work."

MARCH 27, 2001

### MAURA LARKINS WAS TOLD NOT TO RETURN TO DISTRICT PROPERTY.

On March 27, 2001, Mrs. Larkins went to school again, to attend a meeting with Dr. Donndelinger and parents about her situation. Dr. Donndelinger admits she welcomed Mrs. Larkins on March 27, 2001. But Dr. Donndelinger did not allow Mrs. Larkins to attend the meeting of which Larkins herself was the topic! Mrs. Larkins told Dr. Donndelinger that the charges that she was going to kill people were very serious and needed to be discussed before she could come back.

Dr. Donndelinger immediately called Mr. Werlin, who came and took Mrs. Larkins to a place outside the gate of the school where there were no witnesses. He said a few pleasantries, then stood silent. Mrs. Larkins left because he seemed to want her to leave, although he didn't say so. Larkins' account of the event appears on page 340 of the hearing transcript.

After Mrs. Larkins left, Mr. Werlin spread the story to teachers that Mrs. Larkins had come to school without permission. He claims that he told her, during the very same conversation in which he asked her to return to work, not to set foot on campus. The story was spread that he had told Mrs. Larkins on

Richard Werlin went to work for Richmond schools, and stayed true to form:
Link to San Diego Education Report Blog

13 Werlin Decides

Judge Broke Law

15 Fabrications

16 Unwanted Acts

17 Missing Docs

18 Discredited

19 Opposition

20 Forgiveness

21 Cunning

22 No Discussion

23 Seaman

24 Matthews

25 No Rights

26 No Defense

27 Coverup

28 Evidence

March 27 that she had to leave, and that she had responded by

running back and forth, jerking all the while, screaming, "I want
to work! I want to work!"

Eight days later Mr. Werlin tacitly confessed that his story was a malicious fabrication when he once again asked Mrs. Larkins to return to work. Either Mr. Werlin's story was a malicious fabrication, or else Mr. Werlin is a completely incompetent manager of human resources and dangerously unconcerned with student safety.

If Mr. Werlin's story were true, wouldn't Mr. Werlin require Mrs. Larkins to undergo a psychological examination under the

Ed Code Section 44942, or at least be checked by a medical doctor for motor or neurological disorders? But in order to require a fitness-for-duty evaluation, Mr. Werlin would have had to put his March 27 story down in writing.

Mrs. Larkins believes that the first obligation of the District is to
protect the safety of children and adults. Mr. Werlin never took

any action to protect anyone from physical danger. He never, not once, interviewed Mrs. Larkins after February 12, 2001. He never required a fitness-for-duty evaluation. He never questioned Mrs. Larkins' accusers.

On March 27, 2001, Mr. Werlin apparently decided that Mrs. Larkins would never come back. He invented a false story to justify this decision.

Mr. Werlin testified at Maura Larkins' termination hearing that she never did return to work after the alleged March 27, 2001 incident.

The District's lawyer had to prod Mr. Werlin on the witness stand to get him to remember that just eight days after this incident supposedly took place, he had asked Maura Larkins to

return to her classroom. One can understand Mr. Werlin's confusion on the witness stand. He had fabricated a description
of Mrs. Larkins' behavior as bordering on psychosis (Court Reporter's transcript page 65:25 to page 66:9), and then he was called upon to describe how, just eight days later, he had asked her to come back to work.

Mr. Werlin's testimony fell flat. He had no rational explanation

for this.

Mrs. Larkins' testimony explains what happened.

On April 3, 2001, Mrs. Larkins sent Mr. Werlin a five-page fax (links at right), consisting of a letter about Kathleen Elton, and

a copy of a four-page restraining order against Ms. Elton that had been filed three years earlier by a third party.

(Astonishingly, Kathleen Elton, a deeply troubled soul, had driven the decision-making process at CVESD's human resources department for the previous fifty days!)

April 3, 2001 Fax to Werlin

Kathleen Elton Restraining Order
Page 1
Page 2
Page 3
Page 4

Chula Vista Elementary school personnel clearly think that if a school lawyer tells them to do something, then it's okay to do it, even though they know full well that they are breaking the law.

School attorneys (and CTA attorneys) clearly have convinced employees they can get away with wrongdoing, but that they will be in trouble if they tell the truth.

A corrupt system that promotes lawlessness is in control of many San Diego County school districts.

## One day after receiving the April 3, 2001 fax, Mr. Werlin asked Maura Larkins to return to work.

By April 3, 2001, Mrs. Larkins had begun to believe that the allegations about her must have originated with her ex-sister-in-law, Kathleen Elton. Ms. Elton was homeless and unemployed when Mrs. Larkins allowed her to stay in a building
which had belonged to Mrs. Larkins' deceased father.

About the same time that Kathleen began staying in the building, Mrs. Larkins found that her own brother, who was co-administrator with Mrs. Larkins of their father's estate, had deceived her about the amount of money taken by him out of estate accounts. Mrs. Larkins told him not to take any more money out, and he became enraged.

Perhaps in an effort to prove the hypothesis that no good deed

goes unpunished, Ms. Elton, who has experience as a stage actress (and might be crazy, but is definitely not stupid), and her ex-husband, Mrs. Larkins' brother, told police that Mrs. Larkins was trespassing on her deceased father's property. Ms.
Elton told police that Mrs. Larkins had a gun, and convinced them that Mrs. Larkins was a dangerous person. The police stormed the building and arrested Mrs. Larkins.

It is clear from the evidence regarding the District's dramatic turnaround after receiving Mrs. Larkins' April 3, 2001 fax, that the District had utilized the police report about Mrs. Larkins as a
basis for its action against Mrs. Larkins on February 12, 2001. As it happens, it is a misdemeanor to utilize a record of an arrest which did not lead to a conviction to determine any aspect of an individual's employment (Labor Code section 432.7).

It is understandable that the District did not want the truth revealed about this. But it could and should have made sure that the accusers understood that the false allegations would not be allowed to continue, so that Maura Larkins could go back
to work in peace.

Instead, Richard Werlin prepared the ground for Mrs. Larkins to
be taken out again. He started on the very day he asked her to

return to work.